IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

WINDOW COVERING MANUFACTURERS ASSOCIATION,

Petitioner,

v.

UNITED STATES CONSUMER PRODUCT SAFETY COMMISSION,

Respondent.

On Petition For Review of a Final Rule of the
United States Consumer Product Safety Commission

**OPPOSED MOTION FOR A STAY PENDING REVIEW,
REMAND AND VACATUR, OR EXPEDITED CONSIDERATION**

Avi M. Kupfer
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600

Wajdi C. Mallat
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500
*Licensed only in Utah;
New York admission pending*.

Nicole A. Saharsky
Erika Z. Jones
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3000
nsaharsky@mayerbrown.com

*Counsel for Petitioner Window Covering Manufacturers Association*

# RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and D.C. Circuit Rule 26.1, the Window Covering Manufacturers Association states that it is a nonprofit corporation that represents the interests of window covering industry manufacturers, fabricators, and assemblers. It has no parent company, and no publicly-held company has a 10% or greater ownership interest in it.

/s/ *Nicole A. Saharsky*
Nicole A. Saharsky

# CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 18

This motion complies with Circuit Rule 18.  On December 1, 2022, petitioner requested that the Consumer Product Safety Commission stay the effective date of the final rule at issue pending judicial review and asked the CPSC to respond by December 15, 2022.  A159-64.  The CPSC has indicated that petitioner's request is pending before the Commissioners for a vote and a decision on the request is expected by December 21, 2022.  If the Commissioners grant the request to stay the effective date of the rule, petitioner will withdraw this motion.

In accordance with Circuit Rule 18(a)(2), on December 15, 2022, petitioner notified counsel for respondent by telephone that it planned to file this motion.

/s/ *Nicole A. Saharsky*
Nicole A. Saharsky

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................1

BACKGROUND .......................................................................................2

    A.    The Unique Requirements Of The CPSA .............................2

    B.    Voluntary Standards In The Window Covering Industry ...................4

    C.    The New Rule..................................................................................4

ARGUMENT ............................................................................................6

THE COURT SHOULD STAY THE RULE'S EFFECTIVE DATE
PENDING JUDICIAL REVIEW ...............................................................6

    A.    WCMA Has Established A Likelihood Of Success............................6

        1.    The CPSC did not meet the CPSA's prerequisites for
            overriding the voluntary standard ................................7

            a.    The CPSC did not find the necessary likelihood of
                injury to override the voluntary standard .......................7

            b.    The CPSC's cost-benefit analysis does not justify
                the Rule ......................................................................10

        2.    The CPSC has not justified the six-month effective date........13

        3.    The CPSC violated basic notice-and-comment
            requirements...............................................................................16

    B.    A Stay Is Necessary To Prevent Irreparable Harm To
        WCMA's Members ......................................................................18

    C.    The Public Interest And Balance Of Equities Support A Stay ..........20

    D.    Alternatively, The Court Should Remand The Rule Or Expedite
        The Litigation...............................................................................21

CONCLUSION........................................................................................23

ADDENDUM ........................................................................................A1

# TABLE OF AUTHORITIES

**Cases**          **Page(s)**

*Ass'n of Data Processing Serv. Orgs. v. Bd. of Governors of Fed. Reserve Sys.*,
745 F.2d 677 (D.C. Cir. 1984) ........................................................... 3

*Bennett v. Spear*,
520 U.S. 154 (1997) ........................................................................ 15

*BMW of N. Am., Inc. v. Gore*,
517 U.S. 559 (1996) ........................................................................ 10

*Consumers' Research v. CPSC*,
592 F. Supp. 3d 568 (E.D. Tex. 2022) .............................................. 18

*Daimler Trucks N. Am. LLC v. EPA*,
737 F.3d 95 (D.C. Cir. 2013) ........................................................... 16

*Finnbin, LLC v. CPSC*,
45 F.4th 127 (D.C. Cir. 2022) .......................................................... 10

*Giglio v. CPSC*,
575 F.2d 1 (1st Cir. 1978) ............................................................... 22

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ............................................................ 21

*In re NTE Conn., LLC*,
26 F.4th 980 (D.C. Cir. 2022) ...................................................... 6, 20

*Owner-Operator Indep. Drivers Ass'n v. FMCSA*,
494 F.3d 188 (D.C. Cir. 2007) ......................................................... 16

*Seila L. LLC v. CFPB*,
140 S. Ct. 2183 (2020) .................................................................... 18

*Whitman-Walker Clinic, Inc. v. HHS*,
485 F. Supp. 3d 1 (D.D.C. 2020) ...................................................... 20

*Wis. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) ......................................................... 20

**Cases (continued)**                                                      **Page(s)**

*Zen Magnets, LLC v. CPSC,*
   841 F.3d 1141 (10th Cir. 2016) ............................................................7, 9, 13

**Statutes, Regulations, and Rules**                                       **Page(s)**

Administrative Procedure Act,
   5 U.S.C. § 551 *et seq.*

      § 553(b)............................................................................................16

      § 553(c)............................................................................................16

      § 706(2)(A).........................................................................................7

Consumer Product Safety Act,
   15 U.S.C. § 2051 *et seq.*

      § 2051 ................................................................................................2

      § 2053(a)..........................................................................................18

      § 2056(b)(1).......................................................................................3

      § 2058(d)(2)......................................................................................16

      § 2058(f)(1)(A)...................................................................................9

      § 2058(f)(1)(B)..................................................................................11

      § 2058(f)(1)(C)..................................................................................11

      § 2058(f)(3)(A)....................................................................3, 7, 9, 13

      § 2058(f)(3)(D)(i)................................................................................3

      § 2058(f)(3)(E) .............................................................................3, 10

      § 2058(f)(3)(F)....................................................................................9

      § 2058(g)(1).......................................................................................13

      § 2060(b)...........................................................................................22

**Statutes, Regulations, and Rules (continued)**                     **Page(s)**

Consumer Product Safety Act,
   15 U.S.C. § 2051 *et seq*.

     § 2060(c) ................................................................3, 7

16 C.F.R. § 1260.2 ..............................................................15

16 C.F.R. § 1260.2(a) ........................................................5, 6

16 C.F.R. § 1260.2(b) ...............................................6, 14, 15

16 C.F.R. § 1260.2(c)(2) .......................................................5

16 C.F.R. § 1260.2(d) ...........................................................6

16 C.F.R. § 1260.4(b) ...........................................................9

16 C.F.R. § 1260.4(b)(8) .....................................................12

16 C.F.R. § 1260.4(e)(4) .................................................14, 15

16 C.F.R. § 1260.4(f)(1) ........................................................8

16 C.F.R. § 1260.4(f)(6) .......................................................14

16 C.F.R. § 1260.4(h) ...........................................................4

16 C.F.R. § 1260.4(i) ..........................................................10

Fed. R. App. P. 2 .................................................................22

D.C. Cir. R. 2 .....................................................................22

**Other Authorities**

87 Fed. Reg. 73,144 (Nov. 28, 2022)... 4, 5, 6, 7, 8, 9, 11, 12, 13, 14, 15, 16, 17, 18, 20, 21

87 Fed. Reg. 1,014 (Jan. 7, 2022) ......................................15

H. Rep. No. 92-1153 (1972) .................................................3

S. Rep. No. 92-749 (1972) ...................................................3

# INTRODUCTION

Since 1996, the window covering industry has complied with a voluntary standard that has made blinds, shades, and other window coverings very safe. Injuries almost never occur. The industry recently finalized a revision to that standard which will reduce that risk even further. That is how regulation in this industry is supposed to work. Congress made that clear in the Consumer Product Safety Act, when it expressed its strong preference for industry self-regulation and put the burden on the Consumer Product Safety Commission (CPSC) to justify overruling a voluntary standard.

Nonetheless, the CPSC recently adopted a new regulation for window coverings that will decimate the industry if not checked by this Court. The Rule focuses on custom window coverings, which is a multibillion-dollar industry in the United States.

The Rule has exceptionally broad reach. It bans practically all existing corded operating systems for custom window coverings—the majority of custom products. It will take years for manufacturers to design and produce new products that comply with the Rule. Yet the Rule becomes effective in six months. At that point, manufacturers will not have corded products to sell to their customers and will not be able to fulfill existing contracts. They will lose hundreds of millions of dollars in business; some will be forced to lay off employees; and some will go out of business.

The Window Covering Manufacturers Association (WCMA) has petitioned for review of the Rule. The Rule has many legal problems, including that the CPSC did not comply with the statutory prerequisites for overriding the voluntary standard and blew past the notice-and-comment process in an effort to beat the revision to the voluntary standard. The Rule undeniably will cause irreparable injury across the industry while the Court adjudicates the petition. The CPSC's own staff acknowledged that the Rule will be "very disruptive" for manufacturers and will cause "significant" financial harm to the industry, while any benefit of a six-month effective date will be "very small."

WCMA therefore respectfully requests that this Court stay the effective date of the Rule pending judicial review. In the alternative, WCMA suggests that the Court remand the Rule to the CPSC for it to consider key information it overlooked, or expedite this litigation so that the industry has the opportunity to challenge the Rule before it is too late. The CPSC opposes both a stay and remand, but it does not oppose expedited consideration of the petition for review.

## BACKGROUND

### A. The Unique Requirements Of The CPSA

The Consumer Product Safety Act, 15 U.S.C. § 2051 *et seq.* (CPSA), is unique among statutes governing administrative agencies because it requires the CPSC to justify its regulation in the face of a voluntary standard, instead of presuming that

the agency may regulate. Congress required the CPSC to "rely upon voluntary consumer product safety standards," rather than promulgate top-down rules, "whenever compliance with such voluntary standards would eliminate or adequately reduce the risk of injury addressed" and "substantial compliance" with the voluntary standard is likely. 15 U.S.C. § 2056(b)(1).

To override a voluntary standard, the CPSC must satisfy a heavy burden. Among other things, it must show that the mandatory rule is "reasonably necessary" to address an "unreasonable risk of injury associated with [the] product"; that compliance with the voluntary standard will not "eliminat[e] or adequate[ly] reduc[e]" that risk; and that the rule imposes the "least burdensome requirement" to adequately reduce that risk. 15 U.S.C. § 2058(f)(3)(A), (D)(i), (F). The CPSC also must conduct a rigorous cost-benefit analysis to justify the rule, *id.* § 2058(f)(3)(E), and must specifically justify the rule's effective date, *id.* § 2058(f)(3)(A). The rule must be supported by "substantial evidence on the record" on all of those points, *id.* § 2060(c), where "substantial evidence" is a "stricter standard of review" than "usual," H. Rep. No. 92-1153, at 26, 38 (1972); *see* S. Rep. No. 92-749, at 35 (1972); *see also Ass'n of Data Processing Serv. Orgs. v. Bd. of Governors of Fed. Reserve Sys.*, 745 F.2d 677, 685 (D.C. Cir. 1984).

## B. Voluntary Standards In The Window Covering Industry

WCMA's voluntary standard has been a model for the collaborative development of consumer product safety standards envisioned by the CPSA. In 1996, WCMA first adopted a voluntary industry standard for window coverings, and it has revised the standard six times since then. 87 Fed. Reg. at 73,154; A726. Since May 2021, WCMA has worked on its seventh revision, which the American National Standards Institute approved on December 13, 2022. A156-57. The CPSC acknowledges that the industry substantially complies with the voluntary standard. 16 C.F.R. § 1260.4(h).

Until it promulgated the Rule, the CPSC had worked cooperatively with WCMA on the voluntary standard. It participated in all previous proceedings to revise the standard and never voted against a revision. A726-27.

## C. The New Rule

Despite the success of the voluntary standard, this past year, the CPSC decided to push forward a mandatory rule for custom corded products. For the first time, the CPSC's staff voted against a revision to the voluntary standard. 87 Fed. Reg. at 73,155. Then the Commissioners rushed to promulgate the Rule before that revision was finalized. *Id.* at 73,165.

The Rule regulates custom window coverings, as opposed to stock products. In the United States, there are 229 million custom window coverings in homes, 87

Fed. Reg. at 73,149, and at least 80 million more in commercial buildings, A67. Homes and businesses often use custom window coverings, because their windows are too large for stock products, or because the desired color, fabric, or feature is not available in stock products. A4-5, A65-66, A125-26.

In most custom window coverings, the consumer pulls a cord attached to the headrail on the top of the window covering to raise and lower it (or move it from side to side). *See* 87 Fed. Reg. at 73,149 (63% of custom residential products use cords). Corded operating systems are popular with consumers because they are easy to use and much less expensive than non-corded alternatives. A6-9, A67-70, A126-28.

Corded operating systems come in three configurations: (1) the "cord lock" system, where the operating cords hang freely from the headrail; (2) the "single retractable cord lift" system, where a user pulls a cord or wand that is connected to a retractable cord housed in the headrail, and the retractable cord becomes exposed; and (3) the "continuous loop" system, where the user pulls a continuous cord that is anchored and under constant tension. 87 Fed. Reg. at 73,148; A6-9, A67-70. The Rule completely eliminates cord lock systems as an option. 16 C.F.R. § 1260.2(a); A1211-12. For single retractable systems, the Rule requires manufacturers to redesign existing products so that no more than 12 inches of cord is exposed when the products are in use. 16 C.F.R. § 1260.2(c)(2). And for continuous loop systems,

the Rule requires manufacturers to redesign existing products to add either a rigid shroud (to enclose the cord) or a restraining device (to prevent the creation of a large loop). *Id.* § 1260.2(a)-(b), (d); A1211-12.

Thus, the Rule either eliminates or requires massive changes to most custom window coverings used in the United States. No major manufacturer currently makes a corded custom window covering that complies with the Rule. *See* A9-11, A70-72.

## ARGUMENT

## THE COURT SHOULD STAY THE RULE'S EFFECTIVE DATE PENDING JUDICIAL REVIEW

At issue is the CPSC's rule establishing requirements for operating cords on custom window coverings, 87 Fed. Reg. 73,144 (Nov. 28, 2022) (the Rule). To justify a stay pending judicial review, WCMA must show that it likely will succeed on its challenge to the Rule; that its members will suffer irreparable harms absent a stay; and that the balance of equities favors a stay. *See In re NTE Conn., LLC*, 26 F.4th 980, 987 (D.C. Cir. 2022). Those requirements easily are met here.

### A.    WCMA Has Established A Likelihood Of Success

There are at least three fundamental legal problems with the Rule. First, the CPSC did not satisfy the statutory prerequisites for issuing the Rule in the face of the voluntary standard. Second, the CPSC did not justify the Rule's six-month effective date—a date with which the industry cannot comply. Third, the CPSC did

not comply with basic notice-and-comment requirements. Each independently justifies vacating the Rule as arbitrary, capricious, and not in accordance with law. 5 U.S.C. § 706(2)(A); *see* 15 U.S.C. § 2060(c).

### 1. The CPSC did not meet the CPSA's prerequisites for overriding the voluntary standard

#### a. The CPSC did not find the necessary likelihood of injury to override the voluntary standard

The CPSA requires the agency to justify regulation in the face of a voluntary standard. It prohibits the CPSC from regulating a product unless the agency shows that the rule is "reasonably necessary to eliminate or adequately reduce an unreasonable risk of injury associated with such product" that is not already addressed by the voluntary standard. 15 U.S.C. § 2058(f)(3)(A). In essence, the CPSC must find that "the severity of the injury that may result from the product, factored by the likelihood of the injury, offsets the harm the regulation imposes upon manufacturers and consumers." *Zen Magnets, LLC v. CPSC*, 841 F.3d 1141, 1147 (10th Cir. 2016). The CPSC did not do that here.

To begin with, the agency admits that the risk of injury is vanishingly small. To justify the Rule, the CPSC cited 36 incidents involving children related to custom products in 13 years. 87 Fed. Reg. at 73,152. That number is miniscule when compared to the hundreds of millions of custom window coverings in the United States. *See id.* at 73,149. The CPSC also noted 209 reported injuries since 2009

across *all* window coverings, stock and custom. 16 C.F.R. § 1260.4(f)(1). But in 2018, the voluntary standard prohibited operating cords in stock products (80% of the window coverings in residences, A592), which accounts for most incidents where the window covering type was known, 87 Fed. Reg. at 73,152.

For some of the operating systems subject to the Rule, there is no meaningful injury risk at all. For example, for single retractable cord systems, the CPSC stated that it is "not aware" of *any* incidents "associated with retractable cords." 87 Fed. Reg. at 73,178. That makes sense, because retractable cords are not accessible unless the window covering is in use, and even then, the accessible portion of the cord is under tension and at the very top of the window.

Further, many of the cited incidents would be prevented by the updates to the voluntary standard. Since 2009, WCMA has revised the voluntary standard four times to limit cord accessibility. A727, A739-40. The overall injury rate has decreased over 400% as a result. 87 Fed. Reg. at 73,152; A733-35. The CPSC has acknowledged that just two changes to the voluntary standard (in the 2018 and 2022 revisions) would have eliminated *half* of the 36 incidents. A672.

The CPSC did not evaluate the degree to which other recent changes to the voluntary standard would decrease the likelihood of injury even further. For example, the 2022 revision bans free-hanging operating cords, limits cord length in retractable lift systems, and requires the pre-installation of tension devices with

continuous loop systems.  A696.  The 2018 revision created defaults for cord length and requires durability testing for tension devices.  A1212-13, A1217.

Rather than assess how those measures reduce the risk of injury, the CPSC brushed them aside, saying they will not completely *eliminate* the risk of injury. *E.g.*, 87 Fed. Reg. at 73,157, 73,161, 73,165; A672.  But the CPSA requires the agency to determine the "degree . . . of the risk" under a voluntary standard and then justify the rule as "reasonably necessary" to address that risk.  15 U.S.C. § 2058(f)(1)(A), (3)(A).  If fact, the CPSC has to show that the Rule "imposes the least burdensome requirement" necessary to "prevent[] or adequately reduce[] th[at] risk."  *Id.* § 2058(f)(3)(F).  To meet those requirements, the CPSC cannot simply assume that there is some risk and then adopt a sweeping regulation based on that assumption.

The CPSC's risk analysis relies on hypotheticals, rather than an actual assessment of likelihood of injury under the voluntary standard.  To attempt to justify the Rule, the CPSC hypothesized scenarios in which products that comply with the voluntary standard theoretically could cause injuries.  16 C.F.R. § 1260.4(b).  But the "mere possibility" of risk is an insufficient justification; the CPSC must consider the "likelihood" of injury absent the mandatory rule.  *Zen Magnets*, 841 F.3d at 1147, 1151-52.  The CPSC provided no data establishing a likelihood of injury despite the voluntary standard.  To the contrary, the only data the CPSC provided (36 incidents

over 13 years, with the rate of incidents decreasing rapidly) shows that the voluntary standard works. *See* pp. 7-8, *supra*. If the CPSC could promulgate a mandatory rule based on hypothetical injuries, the statute's requirement of a risk analysis and its preference for voluntary standards would be meaningless.

### b. The CPSC's cost-benefit analysis does not justify the Rule

In addition to showing the need for a mandatory rule in general, the CPSC must justify the particular rule it adopts through a "rigorous cost-benefit analysis," *Finnbin, LLC v. CPSC*, 45 F.4th 127, 135 (D.C. Cir. 2022), where it establishes, using record evidence, that "the benefits expected from the rule bear a reasonable relationship to its costs," 15 U.S.C. § 2058(f)(3)(E).

Under its own cost-benefit analysis, the CPSC determined that the Rule's costs are 135-460% greater than its benefits. A609; *see* 16 C.F.R. § 1260.4(i). The CPSC ran 30 cost-benefit scenarios, and found that benefits outweigh costs in only one. A614-15; *see* 16 C.F.R. § 1260.4(i). That is not a "reasonable relationship" between costs and benefits. *Cf. BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 580 & n.32 (1996) (no "reasonable relationship" where one item is "out of all proportion" with another).

Besides, the CPSC vastly underestimated the Rule's costs and vastly overestimated its benefits. To determine costs, the CPSC multiplied the number of custom corded window coverings sold for residential use in 2020 by an estimated

increased cost per operating system, A601-09, then added an estimated cost of reduced sales and $14.7 million for "research, development, and retooling," A606, A610. That analysis has at least three problems. First, the estimated cost per operating system is obviously too low, because it is calculated as a percentage of average-sized stock products, A601-02; *see* A832-33 (99% of products considered were stock), rather than custom products, which generally are larger and use more expensive components and materials, A4-5, A65-66, A125-26.

Second, the analysis completely ignores the commercial side of the custom market. The CPSC based its cost assessment only on the residential market. A846; A603; *see* A604-10. The CPSC expressly acknowledged that. 87 Fed. Reg. at 73,149. Yet tens of millions of custom products are sold for commercial use every year. A66-67. The CPSC specifically stated that it wanted to regulate window coverings in "commercial . . . buildings" because consumers "visit such businesses." 87 Fed. Reg. at 73,173. Yet it did not even attempt to determine the "approximate number" of commercial products subject to the Rule and the "probable effect" of the Rule on the cost of those products, as the statute requires. 15 U.S.C. § 2058(f)(1)(B)-(C).

Third, the cost analysis severely underestimated some costs and ignored others. The CPSC asserted that the industry would have to spend $14.7 million to develop compliant products, 87 Fed. Reg. at 73,182, but it never explained how it

arrived at that figure. As the accompanying declarations show, that number is off by at least $32 million, just considering the costs for three manufacturers. A14, A75-76, A131. And, aside from the costs to develop compliant products, the industry will face other obvious costs, including hundreds of millions of dollars in lost revenue when the Rule takes effect; millions of dollars in spending to ramp up production of alternative, non-corded products; and the opportunity costs of diverting resources away from product launches. A21-23, A83-85, A136-38. The CPSC did not account for any of those.

Not only did the CPSC vastly underestimate the Rule's costs, but it vastly overestimated its benefits. The CPSC calculated the benefits by multiplying the number of incidents per year associated with custom corded products from 2009-2021 by cost per incident. 16 C.F.R. § 1260.4(b)(8); 87 Fed. Reg. at 73,182; *see* A593-98. But the CPSC plainly overestimated the number of incidents per year, because it assumed that custom products were responsible for 44-54% of all 209 reported incidents from 2009-2021, A594-95, even though only 36 of those incidents definitively involved custom products, and custom products are only 20% of products in use, 87 Fed. Reg. at 73,149, 73,152. The CPSC assumed the same inflated number for future incidents, 87 Fed. Reg. at 73,182; *see* A593-98, but that does not make sense, both because the incident rate has sharply declined over the last 13 years, and because (as the CPSC admits) the 2022 revision will make products

even safer, *see* pp. 8-9, *supra*. It was unreasonable for the CPSC to ignore these "known and significant . . . trend[s] in the data." *Zen Magnets*, 841 F.3d at 1149.

## 2. The CPSC has not justified the six-month effective date

Separately, the CPSC has not justified the six-month effective date. Although the CPSA presumes a six-month effective date, 15 U.S.C. § 2058(g)(1), the CPSC must justify its selected effective date as "reasonably necessary" to address the identified risks, *id.* § 2058(f)(3)(A). As the CPSC has acknowledged, the industry will not have compliant corded products available in six months; it will take manufacturers at least two years to develop those products. A564-65, A602. The industry will not be able to meet consumer needs with existing non-corded alternatives, because they often are unworkable and too expensive, and because there will be too few non-corded products on the market. A18-22, A79-83, A133-37.

Significantly, the CPSC staff did not recommend a six-month effective date. Instead, it twice recommended longer effective dates based on analysis of manufacturer capabilities and injury risk. A456-58, A475-76, A523-24 (two-year and one-year effective dates, depending on the product); A952-53 (two-year effective date). In an eleventh-hour move, the Commissioners overrode the staff's recommendation and chose a six-month effective date. A173, A309-10, A325-31. The Commissioners provided three justifications, none of which is supported by substantial evidence.

First, the CPSC asserted that the six-month effective date is needed to reduce the risks of injury. *See* 16 C.F.R. § 1260.4(f)(6). But as previously discussed, the risk from custom window coverings is exceedingly low and continues to decrease with revisions to the voluntary standard. The CPSC provided no analysis about why a six-month effective date would materially reduce the risk, as opposed to a one- or two-year effective date. The Rule is supposed to be "based on" the staff's analysis, 87 Fed. Reg. at 73,144, but that analysis contained no evidence to justify a six-month effective date. To the contrary, the CPSC staff repeatedly stated that any benefit from shortening the effective date to six months from one or two years would be "very small." A524, A619, A633.

Second, the CPSC asserted that manufacturers can comply with a six-month effective date because they already are complying with a similar rule in Canada. *See* 16 C.F.R. § 1260.4(e)(4); *see* 87 Fed. Reg. 73,173, 73,179. But the Canadian rule is materially different from the U.S. Rule. Although both impose significant restrictions on operating cords, the Canadian regulation limits cord accessibility when the product is *not* in use and the U.S. Rule limits cord accessibility when the product *is* in use. *Compare* A13, A32, *with* 16 C.F.R. § 1260.2(b), A1211. The Rule also requires rigid shrouds and/or restraining devices to pass flexibility and other tests that are not included in the Canadian regulation. *Compare* 16 C.F.R.

§ 1260.2(b), *with* A13, A73-75, A97-99, A108. Thus, the Canadian and U.S. regulations are not "substantively similar." 87 Fed. Reg. at 73,183.

Because of those and other differences, the products that U.S. manufacturers have designed to comply with the Canadian regulation do not comply with the U.S. Rule. A11-14, A72-75. The two largest U.S. manufacturers designed only two corded operating systems to comply with the Canadian regulation, and those operating systems do not comply with the Rule. *Id.* Instead, manufacturers must design entirely new products, which the CPSC's staff has acknowledged will take two to two and one-half years. *See* A564-65; *see also* A9-11, A70-72, A130-31.

Third, the CPSC asserted that a six-month effective date is reasonable because manufacturers have been "aware of the likelihood of a rule" since October 2021, when the staff issued briefing on the proposed Rule. 87 Fed. Reg. at 73,177; *see* 16 C.F.R. § 1260.4(e)(4). But only *final* agency action creates legal obligations. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997). Manufacturers are not required to begin compliance over a year before a final rule is adopted—especially where, as here, the Rule's requirements were a moving target up until the very last minute. *Compare* 16 C.F.R. § 1260.2, *with* 87 Fed. Reg. 1,014, 1,054-55 (Jan. 7, 2022); *see also* A456-58, A475-76, A523-24, A952-53.

### 3. The CPSC violated basic notice-and-comment requirements

The APA and the CPSA require notice-and-comment rulemaking for mandatory consumer product safety rules. *See* 5 U.S.C. § 553(b)-(c); 15 U.S.C. § 2058(d)(2). That process tests proposed regulations "via exposure to diverse public comment" and ensures "fairness to affected parties" by providing an opportunity to inform agency decisions. *Daimler Trucks N. Am. LLC v. EPA*, 737 F.3d 95, 100 (D.C. Cir. 2013).

Here, the agency ran roughshod over that fundamental requirement. The CPSC made changes to the Rule up until the last minute. When the Commissioners finally voted on the Rule, there were significant unanticipated differences between the proposed and final Rule. Two of the most significant involve the cost-benefit analysis and the 2022 voluntary standard.

First, the CPSC made substantial changes to its cost-benefit analysis without permitting any comment from the companies that would bear the brunt of the Rule's enormous costs. For example, the final Rule included estimates of the cost to develop compliant products, 87 Fed. Reg. at 73,182; A564-65, A602, A610, while the proposed Rule contained no such analysis. Manufacturers thus had "no way of knowing" how the CPSC would estimate costs up until the very end. *Owner-Operator Indep. Drivers Ass'n v. FMCSA*, 494 F.3d 188, 202 (D.C. Cir. 2007).

At the same time, the CPSC's estimate of benefits was constantly shifting. The agency first used one method to estimate the number of residential corded custom window coverings in the United States, A1165-66, then switched to a different method based on a CPSC study that was not made public, 87 Fed. Reg. at 73,149; A591-92.

In addition, the final Rule analyzed 15 new incident reports never discussed in the proposed Rule. 87 Fed. Reg. at 73,151-53. Rather than provide any notice or chance for comment, the CPSC simply pulled them out at the last minute and asserted that they support the Rule. And even now, despite WCMA's request, A166-70, the agency still has not provided those incident reports.

Second, and more fundamentally, the CPSC completely sandbagged the industry and the public with respect to the 2022 revision to the voluntary standard. WCMA had been working on that revision since May 2021. A723. The entire time the CPSC was considering the Rule, its staff was participating in WCMA proceedings to amend the voluntary standard. Yet the CPSC waited until the last minute—publication of the final Rule—to provide an analysis about the supposed inadequacy of the 2022 revision. 87 Fed. Reg. at 73,165-68; A657-73. The CPSC thus completely deprived WCMA of any opportunity to respond on that critical point. That failure to follow basic notice-and-comment procedures is inexcusable,

especially in the context of a statute that specifically requires the agency to justify regulation in the face of a voluntary standard.[1]

**B.    A Stay Is Necessary To Prevent Irreparable Harm To WCMA's Members**

Without a stay, WCMA's members will suffer irreparable harm.  The CPSC acknowledges this.  It admitted that the Rule will "be very disruptive for producers" and could "significant[ly] impact" small businesses in particular.  A524.

The financial harm from the Rule will be enormous.  Custom window coverings are a multi-billion-dollar industry.  87 Fed. Reg. at 73,149.  The Rule will make all of the industry's corded products—about 63% of custom products—non-compliant as of May 30, 2023.  *Id.*  The two largest manufacturers expect that they will have to spend $44 million to develop compliant products.  A14, A75-76.

To develop compliant products, manufacturers must completely redesign their products, revamp their production operations, and then perform the manufacturing, testing, and marketing necessary to bring new products to market.  A14-17, A75-79, A131-33, A143.  Compliant products will not be available for at least two years.  A14, A76, A131, A143.  The CPSC staff specifically acknowledged that it will take

---

[1]    The Rule also is void because the CPSC is unconstitutionally structured.  Under the CPSA, Commissioners may be removed by the President only for cause.  15 U.S.C. § 2053(a).  That violates the Constitution because the President generally must be able to remove executive officers at will.  *See Consumers' Research v. CPSC*, 592 F. Supp. 3d 568 (E.D. Tex. 2022), *appeal pending*, No. 22-40328 (5th Cir.); *see also Seila L. LLC v. CFPB*, 140 S. Ct. 2183, 2197-2200 (2020).

the industry two to two and one-half years to develop corded products that comply with the Rule.  A564-65, A602.

Thus, at the six-month mark, suppliers will not have corded products to sell consumers.  A21-23, A83-84, A137-38.  Consumers cannot simply switch to non-corded products, because those products are significantly more expensive and they cannot operate some types of custom window coverings.  A18-21, A79-82, A133-36, A150-53.  And suppliers with existing long-term contracts for custom commercial corded products will not be able to fulfill their obligations under those contracts.  A22-23, A84, A138-39.

Manufacturers are expending significant resources transforming their production operations to prepare for the effective date.  A21-22, A83, A137.  They must divert resources from high-priority product innovation initiatives that are significant revenue drivers in order to develop Rule-compliant corded products.  A22, A84, A137.  At the same time, they must manufacture additional *non-corded* products, so that they can try to blunt the expected revenue loss that will occur when they can no longer sell their corded products.  A21-22, A83, A137.

Manufacturers expect to lose hundreds of millions of dollars in revenue when the Rule takes effect.  A22-23, A83-84, A137-39.  They expect to have to lay off employees as soon as May 2023.  A23, A85, A138, A145, A153.  They also expect to suffer reputational harm because they will not be able to provide corded products

to the thousands of retailers and dealers, and hundreds of thousands of customers, who depend on them.  A23-24, A85.

Small businesses, in particular, will suffer acute financial harm when the Rule takes effect.  *See* A144-45, A153-54.  For some, the revenue decline threatens the very existence of their businesses.  *Id.*

These myriad injuries cannot be remedied at the end of the litigation if WCMA succeeds on the merits.  "[F]inancial injury can be irreparable where no adequate compensatory or other corrective relief will be available at a later date." *NTE Conn.*, 26 F.4th at 990 (alterations and quotation marks omitted).  That is true here; the affected companies' harm will be irreparable because they cannot recover money damages from the government due to sovereign immunity.  *See, e.g.*, *Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 57-59 (D.D.C. 2020) (citing cases).  Further, for small manufacturers, the Rule's expected monetary losses will threaten the very existence of their businesses.  *E.g.*, A44-45, A153-54*; see Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  Put simply, without a stay, any relief likely will be too little, too late.

## C.     The Public Interest And Balance Of Equities Support A Stay

Staying the Rule's effective date will not impair public safety.  Incidents involving custom window coverings almost never occur, and the 2022 revision to the voluntary standard will reduce them further.  87 Fed. Reg. at 73,152; A672.  And

even if Rule-compliant products would reduce the number of incidents further, those products will not be available for at least two years, A14, A76, A131, A143—when this litigation likely will be over.

The CPSC asserts that even if Rule-compliant products are not available, the Rule nonetheless will improve safety because the industry will stop selling corded products. *See* 87 Fed. Reg. at 73,194. But if no corded products are available, consumers will retain old products, which could be even less safe. *See* A163. So the CPSC has not shown any net benefit. Indeed, the CPSC staff has repeatedly stated that any benefit from shortening the effective date to six months from one or two years would be "very small." A524, A619, A633.

The CPSC has not claimed that a stay would cause it any harm. Besides, there is a "substantial public interest" in having government agencies "abide by the federal laws that govern their existence and operations," *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016), and WCMA is not following the rules here.

### D. Alternatively, The Court Should Remand The Rule Or Expedite The Litigation

If the Court does not stay the Rule, it should vacate and remand the Rule to the CPSC, or (at the very least) expedite this litigation.

Because of its preference for voluntary industry standards, the CPSA includes a special process for ensuring that the CPSC considers all material information provided by the industry. Specifically, if the challengers to a regulation seek to

"adduce additional data, views, or arguments" that are "material," and they had "reasonable grounds" for not providing that information to the agency earlier, the reviewing court may vacate the rule and remand to the agency at the outset of the litigation for the agency to consider that information. 15 U.S.C. § 2060(b); *Giglio v. CPSC*, 575 F.2d 1, 2 (1st Cir. 1978). That relief is appropriate here, because the CPSC made significant changes to the final Rule at the last minute—including its entire analysis of the 2022 revision to the voluntary standard and its reliance on still-undisclosed incidents—thereby depriving the industry of the opportunity to provide any data, views, or arguments on them. *See* pp. 16-18, *supra*.

If the Court does not stay or vacate and remand the Rule, it should expedite this litigation. Fed. R. App. P. 2; D.C. Cir. R. 2. WCMA respectfully suggests the following expedited schedule, which the CPSC does not oppose:

| | |
|---|---|
| Certified list of the record: | due January 10, 2023; |
| WCMA's principal brief: | due January 31, 2023; |
| CPSC's brief: | due March 2, 2023; |
| WCMA's reply brief: | due March 16, 2023; |
| Deferred appendix/final briefs: | due March 23, 2023. |

WCMA then respectfully requests that this Court hold argument at the earliest opportunity in the April-May 2023 timeframe.

## CONCLUSION

The Court should stay the Rule pending review. Alternatively, the Court should vacate and remand to the CPSC or expedite review.

Respectfully submitted,

/s/ *Nicole A. Saharsky*

Avi M. Kupfer
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600

Wajdi C. Mallat*
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500
*Licensed only in Utah;
New York admission pending.*

Nicole A. Saharsky
Erika Z. Jones
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3000
nsaharsky@mayerbrown.com

*Counsel for Petitioner Window Covering Manufacturers Association*

Dated: December 16, 2022

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5161 words excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 27(a)(2)(B).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirement of Rule 32(a)(6) because it was prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman 14-point type for text and footnotes.

/s/ *Nicole A. Saharsky*
Nicole A. Saharsky

## CERTIFICATE OF SERVICE

I hereby certify that on December 16, 2022, I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system which will serve all counsel of record.

/s/ *Nicole A. Saharsky*
Nicole A. Saharsky

**ADDENDUM**

# ADDENDUM TABLE OF CONTENTS

| Document | Page Number |
|---|---|
| Certificate as to Parties, Rulings, and Related Cases | A1 |
| Exhibit 1 – Declaration of Doug Barr, Hunter Douglas Inc. (Dec.13, 2022)<br><br>    Attachment A – Health Canada, *Corded Window Covering, Questions and Answers Regarding Test Method M22:* Corded Window Coverings *in support of the* Corded Widow Covering Regulations (Nov. 18, 2021) | A2 |
| Exhibit 2 – Declaration of Jason Grommon, Springs Window Fashions, LLC (Dec. 14, 2022)<br><br>    Attachment A – Prod. Safety Lab'y, Health Canada, *Reference Manual Book 5: Laboraty Policies and Procedures, Part B: Test Method Section, M22: Corded Window Coverings* (Nov. 18, 2021) | A63 |
| Exhibit 3 – Declaration of Derick Marsh, Rollease Acmeda, Inc. (Dec. 13, 2022) | A123 |
| Exhibit 4 – Declaration of William J. Taylor, Rowley Company (Dec.13, 2022) | A140 |
| Exhibit 5 – Declaration of Tracie Bresnahan, Custom Creations by Tracie Bresnahan (Dec. 9, 2022) | A146 |
| Exhibit 6 – Email from Ally Bonacasa, Am. Nat'l Standards Inst., to Michael Tierney, WCMA (Dec. 13, 2022) | A155 |
| Exhibit 7 – Letter from Ralph Vasami, Exec. Dir., WCMA, to Alberta Mills, Sec'y, CPSC (Dec. 1, 2022) | A158 |

| Document | Page Number |
|---|---|
| Exhibit 8 – Freedom of Information Act Request from WCMA to CPSC (Nov. 7, 2022) | A165 |
| Exhibit 9 – CPSC, *Minutes of Commission Meeting, Decisional Matter:  Final Rules to (1) Add Window Covering Cords to the Substantial Product Hazard List; and (2) Establish a Safety Standard for Operating Cords on Custom Window Coverings* (Nov. 2, 2022) | A171 |
| Exhibit 10 – CPSC, *Staff Briefing Package:  Draft Final Rules for Corded Window Coverings* (Sept. 28, 2022) (excerpt) | A339 |
| Exhibit 11 – WCMA, *Standard for Safety of Window Covering Products:  Re-Circulation ANSI Canvass Copy* (Sept. 2022) | A674 |
| Exhibit 12 – Letter from Ralph Vasami, Exec. Dir., WCMA, to Alberta Mills, Sec'y, CPSC (Mar. 23, 2022) | A717 |
| Exhibit 13 – Rowan McCarthy & Shannon Christie, D+R Int'l Ltd., *U.S. Consumer Product Safety Commission Window Covering Market Characterization:  Final Report* (Feb. 2021) | A826 |
| Exhibit 14 – CPSC, *Staff Briefing Package:  Draft Notices of Proposed Rulemakings for Corded Window Coverings* (Oct. 6, 2021) (excerpt) | A857 |
| Exhibit 15 – WCMA, *Standard for Safety of Window Covering Products* (Jan. 8, 2018) | A1202 |

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

1. ***Parties and Amici***

   **(i) Parties, Intervenors, and Amici who Appeared in the District Court**

   There were no district court proceedings in this case, which is a petition for review of final agency action.

   **(ii) Parties to this Case**

   Petitioner:  Window Covering Manufacturers Association

   Respondent:  United States Consumer Product Safety Commission.

   **(iii) Amici in this Case**

   None at present.

   **(iv) Circuit Rule 26.1 Disclosures**

   See disclosure form included above.

2. ***Rulings Under Review***

   Petitioner seeks review of the Consumer Product Safety Commission's final rule entitled "Safety Standard for Operating Cords on Custom Window Coverings," 87 Fed. Reg. 73,144 (Nov. 28, 2022).

3. ***Related Cases***

   This case has not previously been before this Court or any other court.

# EXHIBIT 1

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

WINDOW COVERING MANUFACTURERS ASSOCIATION,

Petitioner,

v.

UNITED STATES CONSUMER PRODUCT SAFETY COMMISSION,

Respondent.

## DECLARATION OF DOUG BARR

I, Doug Barr, hereby declare:

1.     Hunter Douglas Inc. is a global market leader in the manufacture of window coverings, such as blinds and shades.  Hunter Douglas is a member of the Window Covering Manufacturers Association.

2.     I am employed by Hunter Douglas as the president of its largest products division.  I have held this position since August 2022, and I have worked at Hunter Douglas for 24 years.  Before holding my current position, I performed similar duties for other Hunter Douglas product divisions.  I regularly consult with Hunter Douglas executive managers about supply, marketing, sales, and product development issues.

3.     This declaration has seven parts.  Part I provides background on Hunter

Douglas's business. Part II discusses the types of corded operating systems used in custom window coverings made by Hunter Douglas. Part III explains that Hunter Douglas does not manufacture products with corded operating systems that comply with the Consumer Product Safety Commission's (CPSC) new rule. Part IV explains that Hunter Douglas's Canadian products do not comply with the CPSC's rule. Part V describes the 2-2.5-year timeline for Hunter Douglas to develop products that comply with the CPSC's rule. Part VI explains why non-corded operating systems cannot be used for many custom products. Part VII discusses the substantial economic and reputational harm that Hunter Douglas will suffer because of the CPSC's rule.

## I.    Overview Of Hunter Douglas's Business

4.    Hunter Douglas is headquartered in Pearl River, New York. Hunter Douglas employs approximately 22,000 people worldwide, including 7,500 people in the United States.

5.    By revenue, Hunter Douglas is the largest manufacturer of window covering products in the United States. In 2021, its annual sales revenue in North America was approximately $2.395 billion, including $2.256 billion in the United States.

6.    Hunter Douglas sells mostly custom window coverings, but it also sells some stock window coverings. Stock products are mass produced, come in a limited

range of sizes, fabrics, and designs, and are made from relatively inexpensive materials. Stock products are used mainly in residences. In contrast, custom products are made to order from more durable components, come in an enormous range of sizes, fabrics and designs, and are generally bigger and more expensive than stock products. Custom products are needed in residences with larger windows and in most commercial establishments.

7. Approximately 90% ($2.16 billion) of Hunter Douglas's annual revenue is from selling custom window coverings to residential consumers. Hunter Douglas sells those window coverings through approximately 8,500 independent retailers and dealers. Retailers include home improvement stores, such as The Home Depot and Lowe's; stores that focus primarily on window-covering products, such as Budget Blinds; and companies that distribute window coverings through e-commerce, catalog, and "shop-at-home" channels, such as Blinds.com and Select Blinds. In contrast, dealers are smaller retail outlets and other businesses that typically have a small number of locations and employ 3-8 people. Most of the dealers' revenue comes from sales of window coverings made by manufacturers like Hunter Douglas.

8. Approximately 5% ($120 million) of Hunter Douglas's annual revenue is from contracting through dealers to sell custom window coverings in commercial, nonresidential settings, such as offices, restaurants, and university buildings.

9.      The vast majority of the remaining 5% ($120 million) of Hunter Douglas's annual revenue is from stock window coverings sold through retailers.

## II.      Hunter Douglas's Use Of Corded Operating Systems In Its Custom Window Coverings

10.      Approximately 42% of the custom window coverings currently sold by Hunter Douglas use a cord or bead chain that the consumer manipulates to raise and lower horizontal blinds and shades, or to slide vertical blinds and shades from side to side.

11.      Hunter Douglas makes products with three types of corded operating systems:  "continuous loop" operating systems, "single retractable cord lift" operating systems, and "cord lock" operating systems.  All of those products will have to change as a result of the CPSC's rule.

12.      Approximately 20% of all custom products sold by Hunter Douglas are operated by "continuous loop" operating systems under tension, an example of which is depicted in Figure 1 below.  The user operates that system by pulling a continuous cord or beaded chain loop that is kept taut with a tension device affixed to a wall.  More than 75% of the custom window coverings sold by Hunter Douglas for commercial use in the United States have continuous loop operating systems.

**Figure 1**



13.     Approximately 5% of all custom products sold by Hunter Douglas are operated by "single retractable cord lift" operating systems, an example of which is depicted in Figure 2 below.  In that system, a wand hangs from the headrail and is connected to a cord that is housed in the headrail.  The user raises or lowers the covering by pulling on the wand, which pulls the cord out from the headrail.  The cord fully retracts back into the headrail when the system is not in use.  Typically, 24-32 inches of cord are exposed when the user operates the window covering.

**Figure 2**



14.     Approximately 17% of the custom products sold by Hunter Douglas use "cord lock" operating systems, an example of which is depicted in Figure 3 below.  In a cord lock operating system, the operating cords hang freely from the headrail.  Although Hunter Douglas has been transitioning away from cord lock operating systems, they remain a popular choice with many consumers.

**Figure 3**



## III. Compliance With The CPSC's Rule

15. The CPSC's rule prohibits the manufacture of all three types of corded operating systems currently used in Hunter Douglas's custom window coverings. The rule completely eliminates the cord lock operating system as an option. It requires a continuous loop system under tension to be encased in a rigid shroud (a component made from inflexible material that limits cord accessibility) or a restraining device (a component installed on the window covering that prevents the creation of a large loop). And it sets a maximum of 12 inches of cord that may be exposed when a user operates a single retractable cord lift system.

16. Hunter Douglas has not previously developed a rigid cord shroud or

cord restraining device that complies with the requirements in the CPSC's rule. That is because consumers dislike those options. Compared to existing continuous loop systems under tension, rigid shrouds and restraining devices make products more expensive, more difficult to operate, and less visually appealing. They also make products less durable over time.

17.     Adding a rigid shroud or restraining device to a continuous loop system under tension will cost the consumer, on average, approximately $60 more per Hunter Douglas custom window covering. That is true for two reasons. First, when a window covering has a rigid shroud or restraining device, the consumer has to pull the cord additional times (increasing based on product size and weight) to move the window covering. For that reason, rigid shrouds and restraining devices must be made from relatively expensive components that can withstand additional engagement by the consumer and are durable long term. Second, window coverings with rigid shrouds or restraining devices have more components than existing continuous loop systems. The additional components add cost, and the process for making the window coverings is more labor intensive.

18.     Hunter Douglas has not developed a single retractable cord lift system that complies with the requirements in the CPSC's rule. In Hunter Douglas's existing single retractable cord lift systems, 24-32 inches of retractable cord are exposed when a user operates the product. Consumers dislike single retractable cord

lift systems with shorter retractable cords. That is because a shorter retractable cord significantly increases the number of times a consumer must pull the wand to move a window covering, and it makes the product less durable over time.

19. Hunter Douglas will need to significantly modify its single retractable cord lift system in order to comply with the CPSC's rule. It cannot simply shorten the cord in the existing system to 12 inches. That would increase fatigue on product components and would increase the risk of cord and component failure. Hunter Douglas does not sell window coverings that have a high risk of component failure. Its products generally carry a lifetime warranty for internal mechanisms, components, and brackets, and a 7-year warranty for operating cords. Consumers typically take advantage of the warranty when a Hunter Douglas product fails or breaks. In addition, Hunter Douglas has invested heavily in building window-covering brands that are known as safe, affordable, reliable, and user friendly. Hunter Douglas will not risk that reputation by selling products that have not undergone rigorous functionality and safety testing.

## IV. Compliance With The Canadian Rule

20. In April 2019, Health Canada promulgated regulations for window coverings used in residential settings. The regulations effectively prohibited the use of continuous loop operating systems under tension without rigid shrouds or restraining devices.

21.    Over the two-year period between when the Canadian regulations were promulgated and when the regulations went into effect, Hunter Douglas developed a rigid shroud to comply with the Canadian regulations.  That rigid shroud, however, does not comply with the CPSC's rule, because it allows too much of the cord or bead chain to be accessible when the user is operating the product.

22.    Hunter Douglas's Canadian-compliant rigid shroud is depicted in Figure 4 below.  To operate it, the user raises and holds up the shroud cover with one hand, while pulling on the exposed operating bead loop with the other hand to raise and lower the blind or shade.  When the shroud cover is in the raised position, up to 24 inches of the bead chain are available for use.

**Figure 4**



23. The rigid shroud complies with the Canadian regulations because the bead chain is not "reachable." The attached guidance from Health Canada explains that a product is tested for "reachable" cords or bead chains when it is "in a resting state (a static assessment)." Att. A at 7. Hunter Douglas's rigid shroud has no "reachable" beach chain because when the operating system is in a static position, the bead chain is covered by the shroud cover.

24. Hunter Douglas's Canadian rigid shroud does not comply with the CPSC's rule. The CPSC's rule, unlike the Canadian rule, focuses on whether the cord or bead chain is accessible when the product is in use, rather than when it is in a resting state. Under the CPSC's rule, when a rigid shroud is in use, no more than 8 inches of cord or bead chain may be accessible, or the system must pass tests for flexibility, cord accessibility with a probe, and hazardous loop formation. When Hunter Douglas's Canadian rigid shroud is in use, 24 inches of bead chain are accessible, and the shroud does not pass any of the three additional tests. The Canadian regulation does not require Hunter Douglas's rigid shroud to pass the three additional tests that are in the CPSC's rule. Thus, Hunter Douglas must create an entirely new rigid shroud for its products with continuous loop operating systems to comply with the CPSC's rule.

25. Hunter Douglas's existing single retractable cord lift system complies with the Canadian regulations but does not comply with the CPSC's rule. Again,

under the Canadian regulations, the cord cannot be "reachable" when the product is in a resting state. Hunter Douglas's single retractable cord lift system complies with that regulation because although 24-32 inches of retractable cord are exposed when the user operates the product, the retractable cord is not "reachable" when the window covering is in a resting state because it retracts into the headrail.

26. Hunter Douglas's single retractable cord lift system does not comply with the CPSC's rule. Again, the CPSC's rule focuses on cord exposure when the product is in use, as opposed to when it is in a resting state. Under the CPSC's rule, when a user operates a single retractable cord lift system, a maximum of 12 inches of retractable cord may be exposed. Hunter Douglas has not developed a single retractable cord lift system that complies with that requirement. In Hunter Douglas's existing single retractable cord lift system, 24-32 inches of cord are exposed when a user operates the product.

## V. Hunter Douglas's Timeline To Develop Products That Comply With The CPSC's Rule

27. Developing and implementing a single corded operating system that complies with the CPSC's rule will cost Hunter Douglas approximately $8.1-9.9 million. Hunter Douglas expects that it will cost up to an additional $6 million to implement the newly developed corded operating systems across all 20 of its product lines. Hunter Douglas expects that it will take approximately 2-2.5 years to implement the newly developed corded operating systems across its product lines.

28.     Creating a new operating system occurs in six steps.  The first step is to develop the concept for the operating system.  That process takes approximately 6-9 months and costs approximately $160,000.  An engineering team develops the initial concept for the operating system, which goes through numerous iterations.  That team constructs 3D prototypes using soft plastic to determine if the concept is functional and complies with applicable regulations.  The team refines the prototypes based on feedback from other Hunter Douglas groups and from dealers and retailers.

29.     The second step is tooling for the operating system, which, in total, takes approximately 9 months.  The tooling step has two phases.  In the first phase, Hunter Douglas uses soft tools to develop prototypes made from the materials that will likely be incorporated into the final product.  Prototypes undergo rigorous functionality testing, and the product engineering team makes design changes based on the results.  This is an iterative process that can require numerous design cycles and, depending on the design challenges involved, costs from $100,000-250,000.  The second phase is final production tooling.  The product team finalizes the components needed for the operating system, works with external toolmakers to produce those components, and identifies vendors for sourcing fabrics and other materials.  This phase can cost $300,000 to $1.3 million.  If supporting automation equipment is required to complete this phase, it can cost an additional $500,000-650,000.

30.     The third step is lifecycle and safety testing, which takes approximately 6 months.  This step costs approximately $11,000.  Internal testing includes testing using a robot that simulates 10 years of use; testing the product for its ability to withstand environmental factors, such as humidity, heat up to 135°F, cold, and ultraviolet rays; and testing for child safety.  A product fails these tests if any components fail or malfunction.  Products often fail their initial testing, which results in additional retooling and redesign work.

31.     The fourth step is preparing Hunter Douglas's production facilities for making the new product, which takes approximately 6-9 months.  This step costs approximately $75,000.  Computer programmers must modify Hunter Douglas's software for the assembly line to account for the assembly method required to produce the new product across dozens of fabric types and colors.  The plant floors are reassembled to reflect the software update.  Product assembly teams then learn how to develop the new product.

32.     The fifth step is building inventory of components to make the new product, which takes approximately 3 months and can occur at the same time as preparing the production facilities.  Each of Hunter Douglas's eight production facilities must be stocked with components before production begins.  Factors such as vendor location, delivery schedules, component scarcity, and the number of color options needed for a component can add time to the sourcing process.  Additional

lead time may be necessary to build inventory due to ongoing supply chain challenges.

33. The sixth step is creating promotional, sales, and training materials. That takes approximately 6 months and occurs at the same time as preparing factories and building inventory of component. This step costs approximately $7.48 million. It costs approximately $6 million to produce and deliver product samples to retailers and dealers—which are needed because most consumers will not purchase custom window coverings without first viewing and operating samples. It costs approximately $550,000 to develop product photography and videos for Hunter Douglas's website. It costs approximately $230,000 to create promotional and instructional materials for retailers, dealers, and installers. It costs approximately $100,000 to update the manual that retailers and dealers use to reference specifications and prices for Hunter Douglas products; retailers and dealers cannot sell new Hunter Douglas products until the manual is updated. It costs approximately $470,000 to train Hunter Douglas sales representatives to educate retailers and dealers on product messaging and to train customer service representatives to field consumer questions. It costs approximately $80,000 to update Hunter Douglas's order management system for dealers and retailers to order a new product. It costs approximately $50,000 to train independent service centers that do repair work.

## VI. Hunter Douglas's Use Of Non-Corded Operating Systems In Its Custom Window Coverings

34. There are two types of non-corded operating systems used in Hunter Douglas window coverings—motorized systems (Figure 5) and "cordless lift" systems (Figure 6).

**Figure 5**

**Figure 6**



35.   Those systems have design limitations that make them technically infeasible and impracticable for many custom window coverings.

36.   Motorized operating systems are often economically out of reach for most consumers because they generally include expensive components, such as motors with high torque capacity, electronic chipsets, and spring systems to assist in raising and lowering the product.  For example, motorization adds approximately $300 to the average cost to the consumer for a single Hunter Douglas custom window covering.

37.   In addition, motorized operating systems are impracticable for many

custom window coverings. The motor is installed in the headrail at the top of the window, and most window-covering motors are battery operated. If the headrail is out of reach, replacing motor batteries is difficult for the consumer. Even when the headrail is within reach, battery-operated motors often are still undesirable. The high-torque motors required for many custom window coverings drain batteries quickly, and most consumers do not want to frequently replace batteries in order to operate their window coverings. Window-covering motors can also be powered through electricity, but that can require extensive electrical rewiring that is cost prohibitive for most consumers.

38. For a cordless lift operating system, the user raises and lowers the product by pushing and pulling on the bottom rail with the assistance of counterbalanced springs in the headrail. Cordless lift systems cannot be used with larger, heavier window coverings, because significant spring force is necessary to assist a user in lifting a heavier product, and the additional force needed to make lifting easier also makes the product more difficult to lower. In addition, the large spring systems needed to lift heavier products cannot fit into many headrails. Thus, even though stock products often use cordless lift systems, many custom products cannot, because custom products are generally larger and heavier.

39. Cordless lift systems also have limitations based on user characteristics and window location. Window coverings with cordless lift systems can only be

raised as high as the consumer can reach, so cordless lift is not a feasible option for a shorter user or a higher window. In addition, many consumers do not have the strength needed to raise a heavy window covering, so those consumers cannot use cordless lift systems.

40. Even when a custom product is light enough, and the top of the window is low enough, for use with a cordless lift system, cordless lift systems are cost prohibitive for many consumers. The counterbalanced springs for a cordless lift system must be calibrated to each covering based on size and weight. That requires customizing the covering's components, which increases the cost to the consumer for a Hunter Douglas custom window covering by approximately $60-80 on average.

## VII. Irreparable Harms From The CPSC's Rule

41. The CPSC's rule will go into effect on May 30, 2023. The rule is imposing immediate and severe harms on Hunter Douglas's business. Hunter Douglas must try to ramp up its production of non-corded operating systems while also developing corded operating systems that comply with the CPSC's rule.

42. As of May 30, 2023, Hunter Douglas will not be able to make window coverings with *corded* operating systems that comply with the CPSC's rule. Because of that anticipated lack of products, Hunter Douglas currently is expending significant resources to make additional existing custom products with *non-corded* operating systems. To do so, Hunter Douglas must substantially increase component

inventory, rewrite production software, and reconfigure production lines. The process of ramping up production of existing custom products with non-corded operating systems will require significant expenditures, and will take approximately 6-9 months.

43. In addition, ramping up production of custom window coverings with non-corded operating systems is diverting resources from high-priority projects, such as future product launches and quality improvement initiatives. It is also slowing the development of operating systems that comply with the CPSC's rule. The resulting reduction in product innovation will harm Hunter Douglas's reputation among consumers. Hunter Douglas has spent decades building brand loyalty by continually improving the quality of its products and offering innovative designs.

44. The CPSC's rule is impacting Hunter Douglas's ability to fulfill existing commercial contracts. Hunter Douglas has long-term contracts with customers for corded window coverings that require product delivery after May 30, 2023. But when the CPSC's rule takes effect, Hunter Douglas may not be able to supply corded operating systems due under those contracts because it will not have products available that comply with the CPSC's rule. Some commercial customers have decided to terminate their existing contracts, or have requested discounts on more expensive, alternative non-corded products, because of the additional time it will take Hunter Douglas to design and supply compliant corded products. Those

issues could result in $10 million in lost revenue in 2023.

45. When the CPSC's rule takes effect, Hunter Douglas will need to immediately stop manufacturing most of its custom window coverings, which use corded operating systems. Hunter Douglas expects that its annual revenue will decline by approximately $125-250 million (5.5-11%) the first year the rule is in effect, and approximately $40-50 million (1.8-2.2%) the second year the rule is in effect. That is because, as discussed above (¶¶ 27-40), non-corded operating systems are not a viable alternative for many custom window coverings, and it will take approximately 2-2.5 years to develop compliant corded operating systems across Hunter Douglas's 20 product lines.

46. The anticipated revenue decline will impact Hunter Douglas's ability to retain employees. Hunter Douglas could be forced to lay off employees in 2023. Layoffs could impact product development personnel, which would make it more difficult for Hunter Douglas to develop custom products that comply with the CPSC's rule. Depending on the severity of the business decline, Hunter Douglas may be forced to close plants in 2023 in order to consolidate manufacturing. Hunter Douglas operates 8 plants. Each plant closure would result in layoffs of 100-500 employees.

47. Complying with the CPSC's rule is likely to harm Hunter Douglas's relationships with retailers and dealers because they will not have a full range of

compliant products available when the rule takes effect. Consumers will likely be dissatisfied with the limited range of available operating systems, and retailers and dealers will see a decline in business as a result. That will strain Hunter Douglas's relationships with retailers and dealers. These same issues harmed Hunter Douglas's relationships with Canadian retailers and dealers after the Canadian regulations went into effect.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of December 2022.

Doug Barr

# Attachment A
# to Declaration of Doug Barr

# Corded Window Coverings

Questions and Answers Regarding Test Method M22: *Corded Window Coverings* in support of the *Corded Window Covering Regulations*

## Preface

This document provides answers regarding stakeholder questions and comments received following the distribution, on January 27, 2020, of Health Canada's draft Test Method M22: *Corded Window Coverings* to approximately 30 stakeholders that would have an interest in Health Canada's test method.  The test method was created to support the department's capacity to verify compliance of the new *Corded Window Covering Regulations* (SOR/2019-97) once in force. In addition, Health Canada held a teleconference call on February 6, 2020, with interested stakeholders to provide an introduction to the draft version of the test method and seek stakeholders initial views. Written comments on the draft test method were requested by February 21, 2020 from the interested stakeholders contacted. The following table of contents presents a paraphrased summary of the questions and comments received from those stakeholders.  All original questions and comments received by Health Canada can be found in Appendix A of this document.

This document is not intended to substitute for, supersede or limit the requirements of the *Canada Consumer Product Safety Act* (CCPSA) and the *Corded Window Coverings Regulations*. In case of any discrepancy between the information in this document and the legislation and its regulations, the legislation or regulations will prevail. Health Canada also reserves the right to update the guidance that is provided in this document based on changes in the legislation, regulations, policy or other factors as they develop.

Regulated parties are responsible for ensuring that their products are compliant with the CCPSA and its Regulations. Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the CCPSA or its Regulations are mandatory methods that must be used by regulated parties. Test Method M22 for corded window coverings is not set out in the CCPSA or the *Corded Window Coverings Regulations*. As such, a regulated party may identify different test procedures and/or equipment than outlined in Test Method M22, and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.

# Contents

Preface ................................................................................................................................................ 1

POST-DISTRIBUTION REMARKS ................................................................................................................ 5

DEFINITIONS, TERMS AND INTERPRETATION ........................................................................................ 5

(1)    Based on the scope of the Regulations, what exactly is a corded window covering? .................. 5

(2)    What is a cord and what *isn't* a cord? ..................................................................................... 5

(3)    Are electrical power cords considered a "cord" by the Regulations? ........................................... 6

(4)    What is a reachable cord? ........................................................................................................... 7

(5)    Health Canada's test method says "reachable" is assessed in a stationary adjustment
position. Where do the Regulations say this is a static assessment?........................................... 8

(6)    Why does reachability apply to 'any person'?............................................................................. 8

(7)    How does Health Canada define 'useful life'?............................................................................. 8

(8)    Why do the Regulations define a "loop" but Test Method M22 refers to Completely
Bounded Openings?..................................................................................................................... 9

(9)    What is a contact point?.............................................................................................................. 9

(10)   How do the Regulations affect products already in the field? ..................................................... 10

(11)   Why is information that appears on a product not allowed to make reference to the
Regulations? ............................................................................................................................... 10

PROCEDURAL QUESTIONS ....................................................................................................................... 11

(12)   There is no reference in Health Canada's test method to unreachable cords. Can it be
clarified for what to do in this case? ........................................................................................... 11

(13)   Note that a corded window covering, including those with unreachable cords, is subject to
the requirements for small parts, lead content and required information in addition to the
requirements for a cord.What environmental conditions are required to conduct Test
Method M22?.............................................................................................................................. 11

(14)   The labelling requirements make reference to "equivalent" language.  Can you please
elaborate on what is meant by this so that manufacturers can eliminate the risk of
misinterpretation?...................................................................................................................... 11

(15)   How should the labelling requirements be presented? ............................................................... 12

(16)   If the Manufacturer and Importer are affiliated entities, do both business names need to be
on the product and packaging? ................................................................................................... 13

(17)   How do you determine if a label is permanently affixed? Similarly, how is "useful life" of
section 10 of the Regulations assessed? ..................................................................................... 13

(18)   With respect to the test for permanency of labels, what is the rationale for using a scalpel or
knife to raise the corner of a label? How many attempts can be made? ..................................... 13

(19) If a corded window covering is compliant to the Regulations, including if there are no reachable cords, do the warning labels still need to be present?................................................14

(20) Are components internal to the headrail excluded from testing for lead content? ...................14

(21) Are components internal to the headrail excluded from testing for small parts?......................14

(22) Are cords internal to the headrail excluded from testing for reachable cords? ..........................15

(23) When applying a force to a reachable cord, what pull directions are permitted and how does the analyst know when to discontinue testing?.................................................................................15

(24) Is it permitted to test a reachable cord to less than 35 N? ........................................................16

(25) If a reachable cord breaks with less than 35 N pull, is a free hanging broken cord subject to 22 cm rule? ........................................................................................................................................16

(26) Is there a need to test for 22 cm cord length if it was already determined to be a part of a 44 cm completely bounded opening? ..................................................................................................16

(27) How do you measure a CBO containing the inner cord? ............................................................17

(28) A 90 N force applied in any direction for the push/pull test for small parts seems excessive. What are suitable ways of performing the Push/Pull Test?........................................................17

(29) Is there a separate distinction for small parts that do not completely block the airway if swallowed? ...................................................................................................................................18

DESIGN, SPECIFICATION AND USE OF TEST EQUIPMENT ..........................................................................19

(30) Test Method M22 does not specify all hardware required or the types of corded window covering products that can be mounted into Health Canada's test frame. How are the products mounted for testing?....................................................................................................19

(31) Why are the wheels of the test frame not locked during testing?..............................................19

(32) Why is a test weight used instead of a load cell?.......................................................................19

(33) What are the critical dimensions of the reachability probes and how do you use them? .........20

(34) What is meant by 'light manipulation' and why does this provision exist in Test Method M22?........................................................................................................................................21

(35) What are cord attachment fixtures, and why are they not specified in Test Method M22?.......21

(36) Why is a cord grasping pulley used for testing completely bounded openings as opposed to a hook or hooks with Tygon tubing? ........................................................................................21

(37) In addition to the vertical orientation, are other orientations of the restraining bar permitted?...............................................................................................................................21

(38) What are the perimeter and cord length gauges and how are they used? ................................21

(39) Was the use of a headform considered for assessing completely bounded openings? ..............22

GENERAL QUESTIONS .................................................................................................................................23

A28

(40) What steps were taken to validate Health Canada's test method, reference documents and equipment? In developing the test method did Health Canada test any products that would comply with the Regulations? ................................................................. 23

(41) Does Health Canada accommodate requests to visit the Product Safety Laboratory? .............. 23

(42) Does Health Canada have recommended suppliers? ................................................................. 24

(43) What changes have been made to Test Method M22 following the distribution of the January 27, 2020 version? ........................................................................................... 24

Appendix A:  Original Questions ........................................................................................... 25

Appendix B:  General process flow for Health Canada Test Method M22 ................................................. 37

A29

## POST-DISTRIBUTION REMARKS

As a follow-up to the teleconference call on February 6, 2020, a request was received to share a copy of SOP 77: Initialization of the Corded Window Coverings Test Frame. A draft copy of SOP 77 was sent out on February 18th to interested stakeholders.

Once the method and SOP 77 are finalised copies may also be requested by emailing CPS-SPC@hc-sc.gc.ca.

## DEFINITIONS, TERMS AND INTERPRETATION

### (1)    Based on the scope of the Regulations, what exactly is a corded window covering?

The definition of "corded window covering" establishes the scope of products that are subject to the Regulations, which reflects the same type of products regulated by the *Corded Window Covering Products Regulations* (CWCPR).

For a product to be in scope of the Regulations it must be an indoor window covering and it must be equipped with at least one cord. Any "corded window covering", regardless of design type, that meets this definition is subject to the Regulations.

"*an indoor window covering*"

To be in scope of the Regulations a product must first be an indoor window covering – where *covering* means that it extends over the interior area of the window. In general, window decorations or valances, or other types of drapery that only serve a decorative purpose and do not extend over the area of the window (such as concealing window covering hardware in a decorative fashion), are out of scope of the Regulations.

"*that is equipped with at least one cord*"

The phrase "is equipped with" means that a "cord" (as defined in the Regulations and described in Question 2) is incorporated into the design of the finished product. In making this determination, consideration is given to whether the product is provided with a cord or if a cord is specified for the product in the installation instructions, even if the specified cord may be obtained separately. Consideration is also given to whether the cord is integral to the product both in terms of being part of the whole (not separate) *and* the cord is necessary for its operation.

In addition, while the *Corded Window Coverings Regulations* repeal and replace the CWCPR, the Regulations apply to the same scope of affected products. The CWCPR excluded curtain embraces from the scope of those Regulations. As such, curtains or drapery that have no cords other than an embrace remain out of scope of the Regulations.

### (2)    What is a cord and what *isn't* a cord?

Firstly, for a product to be subject to the requirements of the Regulations, including those pertaining to a "cord", it must meet the definition of a "corded window covering" as described in Question 1.

The definition of "cord" is intended to capture the common understanding of a "cord"; something that would be intuitively recognized as a "cord". With this in mind, the following concepts are included in the definition:

*"a band, rope, strap, string, chain, wire or any other component"*

The listing of specific examples directly in the definition seeks to make it clear, in the definition, that things with similar characteristics as these examples, rope-like things, are captured, and not just anything that is capable of folding in every direction. The inclusion of "any other component" indicates that the list is not exhaustive with respect to things that one would intuitively recognize as a "cord".

While there is no width specification associated with the definition of a "cord", the list of examples built into the definition clarifies that something like a wide sleeve of fabric is not intended to be captured by the definition.

*"capable of folding in every direction"*

"Folding" means to bend completely upon itself; it describes a degree of flexibility that a component must inherently possess. Something that cannot bend completely upon itself would not be within the scope of the definition of a "cord". Rigid rods (including wands) or other components that may have a limited bending radius, but cannot bend completely upon itself do not meet the definition of "cord" in the Regulations.

"In every direction" further narrows the scope of components that are intended to be captured by the definition of "cord". Capable of folding in every direction includes rope-like things, but omits things that cannot fold or bend in *all* directions. Materials (and examples such as gear chains, flexible steel measuring tapes or timing belts) that are rigid in certain directions, and cannot bend completely upon itself in *all* directions, do not meet the definition of "cord" in the Regulations.

A test method to evaluate the capability of materials to fold in every direction has not been specified. In Health Canada's testing of products, the qualification of a cord will be done by visual assessment.

Sections 4.4 through 4.7 of Health Canada's test method all relate to reachable cords, and correspond to sections 5 through 8 of the Regulations. All "cords" that are "reachable", as those terms are defined in the Regulations, are subject to testing. Health Canada's test method contains provisions for testing whether a cord is able to be touched by the child and/or adult reachability probe.

## (3)    Are electrical power cords considered a "cord" by the Regulations?

A motorized window covering that is equipped with an integrated AC power cord or an integrated cord connection for charging, that is part of the finished product, would render the product a "corded window covering". Similarly, an extension power cord that is specified for the product and may be obtained separately, that may also be part of the finished product, would be subject to the Regulations. A power cord such as these that can bend completely upon itself in every direction would be considered a "cord" in the Regulations and subject to the requirements for a "cord".

The assessment of whether or not the power cord is "reachable" would occur when the window covering has been installed (which is described in Question 4). The assessment would occur with the

cord plugged into an electrical outlet. If the power cord is "reachable", it would be subject to the requirements of sections 6 (as a cord with no free end) and section 7 (if a loop is formed). If the power cord is not "reachable", then it would only be subject to the cord requirements of section 4 of the Regulations.

In keeping with the policy described in Question 22 concerning reachable cords inside a headrail, reachable power cords that are inside a headrail or concealed, obscured or covered behind the headrail upon installation would not be tested under Health Canada's test method, but remains subject to the requirements of the Regulations.

## (4)    What is a reachable cord?

In the Regulations, "reachable" with respect to a cord, "refers to the part of the cord that any person can touch when the corded window covering has been installed, whether the window covering is fully opened, fully closed or in any position in between."

The assessment of whether a cord is "reachable" takes place when the window covering is in a resting state (a static assessment) and will permit normal manipulation of the product. The term "accessible" with respect to a cord is not used in the Regulations nor in Health Canada's test method.

For a cord to be reachable within the meaning of the Regulations, the cord must meet the following three conditions specified in the definition of "reachable":

> "*the part of the cord that any person can touch*"

The definition refers to "any person", meaning that both adults and children are included. To "touch" is to make any form of contact.  Grasping, for example, is a subset of touching, and is also captured by the intention of the Regulations.

> *"when the corded window covering has been installed"*

A corded window covering must be installed before assessing if any of its cords is reachable.

Section 14 of the Regulations requires that installation instructions that inform a consumer how to assemble the product if it is sold not fully assembled, how to install it, and how to operate it must accompany every corded window covering. By purposely including this requirement, it is made clear that the intent of the Regulations with respect to a properly installed product is that it be installed in accordance with the instructions provided. Health Canada's test method follows this requirement by including procedural steps for installing the product as per the manufacturer's instructions, as described in section 4.4 *Installation in accordance with the instructions provided*.

> "*whether the window covering is fully opened, fully closed or in any position in between.*"

The assessment of whether a cord is "reachable" takes place when the window covering is in a resting state (a static assessment), whether the window covering is fully opened, fully closed or in any position in between.

*All cords* that satisfy these conditions are subject to the requirements for a reachable cord that are specified in sections 5 through 8 of the Regulations. In practical terms, a cord will be deemed reachable if it is able to be contacted by either of the two reachability probes specified in Test Method M22.

## (5) Health Canada's test method says "reachable" is assessed in a stationary adjustment position. Where do the Regulations say this is a static assessment?

The language of the Regulations confirms that the assessment of "reachable" with respect to a cord is to be undertaken in the static condition.

The expression "*is fully opened, fully closed or in any position in between*" indicates that the window covering has been placed into these respective static positions for the "reachability" of any cord to then be assessed.

The definition of "reachable" must also be read within the context of the Regulations. The performance requirements for a "reachable" cord set out under sections 5 to 8 begin with a cord that is already determined to be "reachable", and then the specified pull force is gradually applied (in any direction) and the measurements are taken. The order of operations for the performance requirements of a "reachable" cord set out under sections 5 to 8 indicate that "reachable" is determined before the pull force from 0 to 35 N is gradually applied in any direction.

Cords that are deemed unreachable are subject to section 4 of the Regulations. Section 4 states that unreachable cords "must remain so … throughout the useful life of the corded window covering." Therefore, a cord that is not reachable when the product is at rest must remain unreachable when the product is at rest throughout its useful life.

If a cord inside a channel or retractable cord, or any other cord, cannot be touched by a reachability probe when the window covering is in its resting state it would be considered an unreachable cord. In other words, if a cord can *only* be touched while the product is being operated it would be considered an unreachable cord.

## (6) Why does reachability apply to 'any person'?

The definition of "reachable" with respect to a "cord" in the Regulations is explicit, stating "that any person can touch…" As such, both adults and children are included. In including "any person" rather than trying to specify the limits of a "child", the Regulations address any discrepancies in determining what may or may not be within reach of a child of any age. The Regulations are concerned with cords that are reachable.

Further discussion on the rationale for including "any person" can be found in the Regulatory Impact Analysis Statement accompanying the publication of the Regulations in *Canada Gazette*, Part II.

## (7) How does Health Canada define 'useful life'?

"Useful life" is not defined in the Regulations, but is taken to mean the product design life.

At this time, Health Canada has no plan to add cycling or durability testing in its test method to verify compliance with this aspect of the Regulations.

## (8)   Why do the Regulations define a "loop" but Test Method M22 refers to Completely Bounded Openings?

The Regulations define a "loop" as "a shape, the majority of which is formed by a reachable cord that creates a completely bounded opening."  A loop is a colloquial term that is familiar to both users and corded window covering stakeholders, while the term *completely bounded opening* (CBO) is a technical term that is commonly used in safety standards and at Health Canada's Product Safety Laboratory.

A CBO or a loop, must be totally enclosed by boundaries on all sides with a continuous (unbroken) perimeter.  The boundaries of the perimeter can be comprised solely of a single "cord", multiple "cords", or "cord" and non-"cord" material.  A CBO may also be layered. That is, a length of cord may overlap and/or be in contact with other cords or non-cord material in such a manner that produces a continuous perimeter, which is generally observable in a single two-dimensional plane.  The pathway to injury can *only* occur by passing the head *through* the opening, and that is what the assessment of a CBO is intended to capture.

According to the Regulations, the majority of the CBO (*i.e.*, more than half) must be made up of "cord" for it to be considered a "loop". If a rigid rod, or anything that does not meet the definition of a "cord" in the Regulations, comprises more than half of a completely bounded opening, then it is not a "loop" per the definition.

Given this, for simplicity, Health Canada's test method evaluates CBOs and whether or not they contain 22 cm of cord first as opposed to evaluating the presence of a "loop".  By doing so, Health Canada's test method takes into consideration both requirements of sections 6 and 7 of the Regulations and assesses them in conjunction with each other.

## (9)   What is a contact point?

Requirements for reachable cords between "two consecutive contact points" are included in section 6 of the Regulations. Section 6 applies to a length of cord that has no free end; it is an uninterrupted length of cord with junction points at both ends. A junction may include a connection, intersection, joint, link, etc.

A contact point is a location where a portion of the cord is in contact with another portion of the installed product. The points of contact (the junctions) at either end of the portion of the cord may include:
-   any non-"cord" component (e.g., a length of cord between slats, a length of cord between eyelets, a length of cord between a wand and the headrail, etc.);
-   an intersecting segment of "cord" that also has no free end.

Contact points are *not* locations where any portion of the cord that is being assessed is in contact with the reachability probe, test equipment or with a user.

In the case of ladder cords, each portion of cord is considered to have no free end because it connects to other portons of cord or components (i.e., contact points). Since there are no free ends for each segment, section 6 would apply to each portion individually.

Using a venetian blind as an example: after it has been installed, a contact point could be the location where the portion of the cord being assessed is in contact with the ladder component of the blind.

## (10)   How do the Regulations affect products already in the field?

Section 17 of the Regulations states the coming-into-force date is the second anniversary of the day on which they are published in the *Canada Gazette*, Part II.  As these Regulations were published in the *Canada Gazette*, Part II, on May 1, 2019, they are set to come will come into force on May 1, 2021.

Corded window coverings that do not meet the requirements of the Regulations after this date may not be manufactured, imported, advertised or sold in Canada.

Corded window coverings that have been sold, including corded window coverings that are already in people's homes, before May 1, 2021 are not subject to the Regulations, unless those products are resold after May 1, 2021. (Any consumer product that is regulated under the *Canada Consumer Product Safety Act* that is resold is subject to its regulatory requirements that are in force, whether it is new or used).

With the coming-into-force date in mind, manufacturers, importers, distributors and retailers should manage their inventories appropriately leading up to this date.

## (11)   Why is information that appears on a product not allowed to make reference to the Regulations?

Reference to the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations in any information that appears on a corded window covering, that accompanies one or that is in an advertisement for one is prohibited by section 9 of the Regulations. This is a common provision found in several Regulations made under the CCPSA.

An example of a prohibited statement includes the following: "This product meets the requirements of Health Canada's Corded Window Coverings Regulations".

Health Canada uses a post-market approach in regulating the safety of consumer products under the CCPSA. This means that there is no pre-approval, nor review of compliance, before Industry manufactures, imports, advertises or sells its consumer products. The example above implies that Health Canada has approved the product which would be false and misleading. The purpose of this requirement, therefore, is to reduce the likelihood of consumers having the impression that the government of Canada "certifies" products regulated under the CCPSA, which could give consumers a false sense of security. This is examined in section 4.1 *Examination of Packaging, Product and Instructions Provided* of Test Method M22.

Industry (i.e. manufacturers, importers, distributors and retailers) is responsible for making sure that its consumer products are safe, and compliant with the legislation.

# PROCEDURAL QUESTIONS

**(12)   There is no reference in Health Canada's test method to unreachable cords. Can it be clarified for what to do in this case?**

Cords of a corded window covering (within scope of the Regulations as described in Question 1) may be reachable or unreachable.  To make this determination, cords are subject to an assessment, which is conducted by using the reachability probes in Health Canada's test method.  This will assist in making the determination whether the cord is in fact unreachable (i.e., that it cannot be touched by one of the two probes). Unreachable cords are subject to the requirements of section 4 of the Regulations.

During the assessment, cords that are found to be unreachable would not be subject to further assessment. Health Canada's test method has been updated in procedural steps 4.5.3.4.2, 4.6.3.4.2 and 4.7.3.4.2 to clarify this, with the addition of the following instruction:

> *Otherwise, if no further reachable cords are observed, proceed to [the next section of the test method].*

**(13)   Note that a corded window covering, including those with unreachable cords, is subject to the requirements for small parts, lead content and required information in addition to the requirements for a cord.What environmental conditions are required to conduct Test Method M22?**

Environmental conditions are not specified for Health Canada's Test Method M22 as the Product Safety Laboratory (PSL) has controlled ambient conditions as required by the PSL's Quality Management System and documented in its Quality Manual.  For this reason it was deemed unnecessary to document the environmental conditions in the test method.  This approach of not specifying temperature and humidity requirements is consistent with other Health Canada Product Safety Laboratory mechanical test methods.  The requirement to have a temperature and humidity controlled environment is part of good laboratory practises which all labs should be following.

**(14)   The labelling requirements make reference to "equivalent" language.  Can you please elaborate on what is meant by this so that manufacturers can eliminate the risk of misinterpretation?**

Section 15 of the Regulations begins by stating "The following warning or its equivalent must appear…" Warnings that have the same content, but use different wording to convey the same meaning, are acceptable. Information that contradicts any of the required information of the Regulations or that is misleading or deceptive with respect to the required information of the Regulations is not permitted.

An equivalent warning that conveys the same meaning must include all essential elements of the warning statement that is prescribed by the Regulations. In this way, users understand the risk and are alerted to the safety precautions that should be taken. In other words, consideration must be given to the following aspects of the warning:

- What is the warning about, what is the hazard? A risk of strangulation.
- Who is at risk? Young children.
- Why is this a hazard? Cords can strangle.
- When or where does the risk present itself? If a cord that can wrap around a child's neck (greater than 22 cm in length) or a loop that can pass over a child's head (greater than 44 cm in circumference) becomes accessible.
- How can the risk be avoided, what can users do? Immediately remove the product if the hazard exists.

While the warnings may be expressed in different wording, Health Canada encourages Industry to use the exact wording as set out in the Regulations to eliminate the risk of misinterpretation.

## (15)   How should the labelling requirements be presented?

The information that must appear on a corded window covering, as well as any packaging that is displayed to the consumer, is specified in section 13 of the Regulations.  Additionally, section 15 of the Regulations requires a warning (or its equivalent) that must appear on a corded window covering, its packaging, any accompanying instructions and all advertisements for the product. The requirement with regard to advertising in section 15 of the Regulations applies to printed, written and visual advertising.

The requirements for the presentation of this information are specified in sections 10, 11 and 12 of the Regulations.

Section 10 describes the language requirements, as well as the requirements for visibility, legibility and durability of label information. The determination of whether or not the information is legible and clearly displayed includes evaluating the sharpness of the colour contrast between the required information and the background. For example, as a guide, Health Canada considers a colour contrast of black on white to be sharply contrasting. Health Canada records the text colour and background colour in section 4.1 *Examination of Packaging, Product and Instructions Provided* of Test Method M22.

Sections 11 and 12 of the Regulations provide the requirements for print type, format and size of type. Health Canada assesses these requirements in section 4.1 *Examination of packaging, product and instructions provided* of Test Method M22.

No pictogram or hang tags are required by the Regulations; only text is required.  A pictogram or supplementary information in addition to the required information is permitted. However, information that contradicts any of the required information of the Regulations or that is misleading or deceptive with respect to the required information of the Regulations is not permitted. Additionally, direct or indirect reference to the *Canada Consumer Product Safety Act* or the Regulations is not permitted in accordance with section 9 of the Regulations (see Question 11).

Labelling and packaging requirements apply to all corded window coverings regardless of their manner of distribution. As such, the packaging for a custom or stock product will be assessed in the same manner. If the product packaging as received by Health Canada's Product Safety Laboratory did not include the required labeling information, Health Canada may request packaging labels from the company.

## (16) If the Manufacturer and Importer are affiliated entities, do both business names need to be on the product and packaging?

Paragraph 13 (d) of the Regulations states "in the case of a corded window covering that is imported for commercial purposes, the name and principal place of business of the manufacturer and the importer" must appear on the product as well as its packaging.

The Regulations stipulate the name and principal place of business of both the manufacturer and importer must appear on every corded window covering and its packaging, without exception. The Regulations do not differentiate whether the manufacturer is a subsidiary of the importer or whether the importer is the subsidiary of the manufacturer. To the extent that the manufacturer and importer are both separate legal entities, their respective name and principal place of business must appear on every corded window covering, as well as on any packaging in which the corded window covering is displayed to the consumer.

The intent of paragraph 13 (d) is to provide traceability of the product in the event of non-compliance and to provide information to the users of the product. This particular requirement provides an avenue to determining the source of the product to help determine if there is more than one Importer for the same product in Canada as it is possible for a manufacturer to distribute the same product into Canada via multiple importers.

## (17) How do you determine if a label is permanently affixed? Similarly, how is "useful life" of section 10 of the Regulations assessed?

Paragraph 10 (c) of the Regulations states that required information must "remain legible and visible throughout the useful life of the corded window covering under normal conditions of transportation, storage, sale and use." With respect to labels, Health Canada assesses these conditions in sections 4.2 *Permanency of the Labels* and 4.3 *Indelibility of the Printing* of Test Method M22.

A label which has been affixed or glued onto the product will be considered permanently affixed if the label cannot be removed in one piece, after having performed the test procedure of section 4.2 *Permanency of the Labels* of Test Method M22.  Hang tags are not considered a permanent presentation of required labelling.

## (18) With respect to the test for permanency of labels, what is the rationale for using a scalpel or knife to raise the corner of a label? How many attempts can be made?

The purpose of using a knife or scalpel is to raise just enough of the label such that a clamp may be attached. Care is taken to not damage the label material or surface on which it is affixed.

There is no set limit of attempts to raise a portion of the label, but if the corner of the label is unable to be lifted without damaging the surface it is affixed to, testing of the label would be discontinued and the result is reported.

13

It is standard practice to report whether the surface containing the label was damaged during the attempt to remove it from the product. This approach is consistent with how label testing is performed on many other regulated consumer products.

## (19)  If a corded window covering is compliant to the Regulations, including if there are no reachable cords, do the warning labels still need to be present?

Any product that is within scope of the Regulations (see Question 1), including those with unreachable cords, must meet all of the requirements of the Regulations, including sections 10 through 15 concerning the required information for the product and its packaging.

It is common for Regulations and standards alike to include warnings for a hazard that a compliant product may not otherwise present. The hazard may present itself due to a manufacturing defect, unexpected product failure, product use or misuse, wear and tear, incorrect installation, or other unforeseen circumstances.  A warning is an appropriate defence against these factors that cannot be covered by performance requirements.

## (20)  Are components internal to the headrail excluded from testing for lead content?

Components that are entirely inside the headrail are excluded from the lead content requirement of section 3.

Section 3 of the Regulations states that "Every external component of a corded window covering must not contain more than 90 mg/kg of lead…"  In light of this, and in the context of the question at hand, the use of the term "external" in section 3 refers to components that are outside of the headrail, and includes outward facing surfaces.

## (21)  Are components internal to the headrail excluded from testing for small parts?

Section 2 of the Regulations concerning small parts states "Every part of a corded window covering that is accessible to a child and is small enough to be totally enclosed in a small parts cyclinder as illustrated in Schedule 1 must be affixed to the corded window covering so that the part does not become detached when it is subject to a force of 90 N applied in any direction".

Note that the phrase "accessible to a child" used in section 2 does not have the same meaning as "reachable" within the Regulations. "Reachable" is a defined term in the Regulations that applies specifically to a cord only.

"Accessible to a child" is a phrase used in other Regulations under the *Canada Consumer Product Safety Act* and is used in the context of a child gaining access to a hazard during reasonably foreseeable use of the product. In keeping with other Regulations, a corded window covering that has been installed would not, during reasonably foreseeable use, allow a child to gain access to the components that are

completely enclosed within the headrail, unless the corded window covering is defective, it breaks down, or a component becomes accessible for any other reason.

At this point in time, Health Canada's test method will assess small parts to which a child may gain access. That is, external components of a headrail, including parts that have outward-facing surfaces or protrude beyond the confines of the headrail, which is similar to the testing of lead content (see Question 3).

However, while internal components of a headrail may be accepted to be sufficiently inaccessible to children and as such would not be tested under Health Canada's test method, they still remain subject to the requirements of the Regulations. Should an internal component of the headrail become accessible to a child as a result of a defect, it breaks down or becomes accessible for any other reason, such a component will be considered for testing by Health Canada.

## (22)   Are cords internal to the headrail excluded from testing for reachable cords?

For the purposes of Health Canada's test method, the assessment of reachable cords will exclude the part of the cord that is inside the headrail (even if it can be touched when the product is installed). This is consistent with the approach given for the testing of small parts as described in Question 21 as it relates to components inside the headrail.

While the part of a cord that is inside a headrail would not be tested under Health Canada's test method, any cord that is "reachable" as defined in the Regulations remains subject to the requirements. Should the part of a cord that is inside a headrail become readily reachable as a result of a defect, it breaks down, or becomes reachable for any other reason, such a cord will be considered for testing by Health Canada.

## (23)   When applying a force to a reachable cord, what pull directions are permitted and how does the analyst know when to discontinue testing?

Health Canada's test method specifies that the analyst is required to test every reachable cord identified on the product. In all cases, the analyst may configure the test equipment in a manner that most effectively exposes the hazard potential of the product as per the Regulatory requirements.

The Regulations specify that a reachable cord is assessed when it is pulled in any direction by the gradual application of force attaining 35 N. Health Canada's test frame is designed to accommodate a broad range of pull directions.  Note, however, that due to the design of the test frame the pull direction is not fixed, which is also permissible by the Regulations.

Regarding the testing of completely bounded openings (CBO), the test pulley is positioned in a location that might produce a CBO that exceeds 44 cm in perimeter and/or a length of cord greater than 22 cm when the cord is pulled.  While the angle of pull is not measured, the initial and final coordinates of the test frame in relation to a fixed point of reference provides sufficient information to describe how the product was tested.  This contributes to the repeatability and reproducibility of the test results produced using this equipment.  The analyst may test each cord multiple times, and may adjust the test frame between pulls in pursuit of identifying a CBO greater than 44 cm and/or a length of cord greater

than 22 cm. Each time, the analyst records any changes in the test frame's coordinates. The analyst will stop testing when they have exhausted all possibilities that appear that could produce an opening greater than 44 cm and/or cord length greater than 22cm.

Regarding cords with one free end, these types of cords are most commonly observed to be in the category of 'operating cords,' which tend to have their greatest length of cord exposed when the force is applied in the downward direction. Test Method M22 was written to complement the most commonly observed manners of product behaviour and operation. Where there are deviations from typical performance, a deviation on the test method may be applied by Health Canada. Such a deviation would remain consistent with the wording of the Regulations. If an increasing number of cases are observed in which the greatest length of cord is revealed when the force is applied in a direction other than downward direction, Health Canada's test method may be updated to address the emergence of such cases.

## (24)   Is it permitted to test a reachable cord to less than 35 N?

The requirements of sections 5 through 8 of the Regulations state "…by the gradual application of force attaining 35 N." The word *attaining* means that the force is applied from 0 N (i.e., cords at rest) to 35 N. In strict terms, all reachable cords are subject to the length and loop restrictions for all forces between 0 and 35 N.

## (25)   If a reachable cord breaks with less than 35 N pull, is a free hanging broken cord subject to 22 cm rule?

If a reachable cord breaks during the gradual application of force attaining 35 N, the portion of the cord that is still attached to the product would be considered a cord with one free end, and as such, subject to the requirements for a reachable cord with one free end (that is, restricted to 22 cm in length).

As per the response for Question 24 concerning the gradual application of force attaining 35 N, if the length of a reachable cord – including the portion of cord that is still attached to the product in the event of breakage – is found at rest (i.e., 0 N) already exceeding 22 cm, it would be non-compliant to section 5 of the Regulations.

## (26)   Is there a need to test for 22 cm cord length if it was already determined to be a part of a 44 cm completely bounded opening?

Section 4.6 *Reachable Cords – Completely Bounded Openings* of Health Canada's test method assesses two main criteria: First, whether a completely bounded opening (CBO) is greater than 44 cm in perimeter; and secondly, whether that same CBO contains at least 22 cm of continuous cord. In effect, this is an assessment of the perimeter of a loop that also incorporates an assessment of the length of reachable cord between two consecutive contact points.

In the case of a CBO that is comprised entirely of an inner cord and a ladder, it will be apparent that the formation of the CBO is made entirely of "cord" material, qualifying it as a "loop" under the Regulations.

In this case, if the CBO has a perimeter greater than 44 cm, it would also be clear that there is more than 22 cm of "cord" making up the CBO.

In the case of a CBO where it is unclear if it is comprised of majority "cord" (*e.g.*, contains both "cord" and non-"cord" material such as fabric), the perimeter of the CBO and the length of cord within the CBO must be assessed using the specified gauges.

## (27)   How do you measure a CBO containing the inner cord?

Inner cords tend to fall under the scope of 4.6 *Reachable Cords – Completely Bounded Openings* of Test Method M22.  In this test, the analyst first assesses the size of the completely bounded opening (CBO) using the perimeter gauge with the 35 N load applied to the reachable cord. The perimeter gauge is placed along the boundaries of the CBO, which can be made up of both cord and non-cord material.  In the event that certain materials obscure the true shape of the opening (and thus, distort the true hazard potential of the opening), light manipulation (as described in Question 34) may be used to clear aside any constituent elements of the opening that do not contribute to its structure as it relates to a possible strangulation hazard.  For example, loose fitting ladders (non-structural) that pass over a taut cord (structural) may be lightly pressed aside to reveal the true structure and size of the CBO. This applies similarly to shades, which contain a structural cord passing through a non-structural shade.

If the CBO is found to have exceeded the size of the perimeter gauge, then only the cord portion of the CBO is evaluated for length using the cord length gauge while the 35 N load remains applied to the reachable cord.

In the case of cellular type shades, when the cord is pulled and exits the cell, it may or may not contact the shade as it exits, thereby completing the CBO. In a case where the inner cord does not contact the shade as it exits, the section of the CBO internal to the shade is not considered. The CBO would be made up of the inner cord, and the outer edge of the shade where the inner cord exits the opening. In effect, the CBO is considered as an approximately two-dimensional entity.

## (28)   A 90 N force applied in any direction for the push/pull test for small parts seems excessive. What are suitable ways of performing the Push/Pull Test?

A 90 N pull force for small part testing is consistent with other Regulations and international standards for consumer products that affect the same age group of children, and reflects the forces that a child is able to exert.  Note that the rationale for the pull forces in small part testing established by other Regulations and international standards considers that a child may use any reasonably foreseeable method of applying that force.

For the Push/Pull test, Health Canada's Test Method M22 specifies using "a suitable force gauge attachment." Due to the wide variety of components that are subject to testing, the description of tools was left general. This is consistent with push/pull testing practices across many other areas of consumer product mechanical testing. In the case of pull testing, a common configuration is to have a hook attachment threaded onto the force gauge. A forcep type clamp can then be used to grasp the component on one end, and pulled by the force gauge's hook attachment on its opposite end.

Example attachments used to apply pull forces are forceps and Pennington clamps, while chisel tips are often used for push forces. If the component is not able to be grasped or pushed on in a meaningful way, it will not undergo further testing. The use of bonding agents is not a standard practice for push/pull testing.

## (29) Is there a separate distinction for small parts that do not completely block the airway if swallowed?

There is no exemption in the Regulations for small parts with breathing holes. Every part of a corded window covering that is accessible to a child is subject to the requirements of section 2 of the Regulations, which would be assessed as per section 4.8 *90 N Push/Pull Test* of Health Canada's test method.

## DESIGN, SPECIFICATION AND USE OF TEST EQUIPMENT

**(30)    Test Method M22 does not specify all hardware required or the types of corded window covering products that can be mounted into Health Canada's test frame. How are the products mounted for testing?**

The test frame was designed to accommodate a wide range of products in a variety of sizes that are currently available for purchase in Canada. It is recognised that there may be instances where certain products cannot be mounted due to factors such as size, or possibly due to changes in design of these products over time. If it is warranted, the test frame may be updated to accommodate products that do not fit well within the current test frame.

The test equipment used by Health Canada in Test Method M22 is not specified in the Regulations. Testing laboratories are free to design their own test frames with completely different specifications so long as it allows testing to assess compliance with the Regulatory requirements.

Regarding the mounting brackets in particular, Figure 2c of SOP 77 depicts the mounting brackets used in Health Canada's Product Safety Laboratory.  Note that the design of the test frame and brackets is not critical to any measurements taken. Testing laboratories may mount the product on a test frame in a different manner so long as it allows testing to assess compliance with the Regulatory requirements.


**(31)    Why are the wheels of the test frame not locked during testing?**

Due to the mass of Health Canada's test frame and the internal friction of the wheels, there has not been a need to lock the wheels during testing. Even in cases where the force is applied parallel to the plane of the window covering and test track, the mass applied is not large enough to overcome the static friction of the wheels.

Note that the wheels of the test frame are not critical to the measurements outputted by the graduated members of the test frame. Stakeholders are free to design their own test frames with completely different specifications so long as it allows testing to assess compliance with the regulatory requirements.


**(32)    Why is a test weight used instead of a load cell?**

In short, the use of a test weight enables the analyst to produce a passive sustained load, which affords the analyst the chance to perform cord length and perimeter assessments as the load is stabilized under the influence of gravity. In accordance with sections 5 through 8 of the Regulations that require the gradual application of force attaining 35 N, Health Canada's test method applies the test weight gradually (and evenly) over 10 s ± 2 s.

The use of a force gauge for applying the 35 N load was considered but based on Health Canada's screening of product samples it was found that applying the full 35 N required substantial movement. This factor alone had three major implications on force gauge use.  The first is that for upwardly pulls, the analyst may be constrained by their vertical reach, risking the possibility that they will not be able to attain the full 35 N without reaching their vertical limit.  Secondly, the analyst may not be able to read

the force gauge when applying the load in various directions, risking the possibility that the rate of force application will not be controlled and the target force may be exceeded. Lastly, the analyst may not be able to sustain the load while simultaneously assessing the length of cord or perimeter of a completely bounded opening. The broader implication of these challenges is that the use of a force gauge poses significant challenges with repeatability and reproducibility, since the direction and/or pathway of the pull cannot be documented and conveyed in any meaningful way. It should be noted that stakeholders are free to design their own test frames with completely different specifications so long as it allows testing to assess compliance with the regulatory requirements.

### (33)    What are the critical dimensions of the reachability probes and how do you use them?

The critical dimensions of the reachability probes are specified in Figures A-2 and A-3 in the Appendix of Test Method M22. These dimensions are based on the anthropometric data sourced from *CHILDATA, The Handbook of Child Measurements and Capabilities*. Dimensions that were not specified were deemed non-critical.

Both probes were designed to incorporate dimensions and geometries of the middle finger, hand and forearm. The middle finger was selected because it is typically the longest finger of the hand. Dimensions used for the middle finger were the 95th percentile middle finger length and the 5th percentile middle finger diameter. The probe has the finger positioned on the outer edge within the 'hand' portion of the probe and has a radius tip at the finger end. This is both a more realistic position and shape for the finger. The reachability probes were specified to have an overall length that corresponds to a distance spanning from the tip of the finger to the crux of the elbow. The hand barrel has a diameter representing the 5th percentile forearm diameter. As it turns out, the 5th percentile forearm diameter near the crux of the elbow and the 5th percentile hand aperture diameter tend to be similar in size. Given the length of the reachability probe, and knowing that in the extreme case the forearm would need to clear the opening, we opted to err on the side of 'undertesting' by applying the forearm diameter right up front.

Test laboratories may produce probes with a different design than what is specified in Health Canada's test method as long as they assess whether any person can reach the cord. Since the definition for "reachable" in the Regulations refers to "the part of the cord that any person can touch", anthropometric dimensions of both adults and children should be considered in the design of reachability probes.

Regarding use of the probes, excessive handling such as stretching, folding, bending, or otherwise distorting the corded window covering in a forceful manner in order to reach a "cord" would not be considered normal manipulation. There is no provision in Test Method M22 for applying a force through the probes, but light manipulation is expected on account of the pliable nature of many window covering materials.

If any part of the probe(s), including the tip portion, is able to touch a cord, the cord is deemed reachable. The probes may be inserted and directed as needed to achieve this, noting that Health Canada's test method will insert the finger tip end first. If a cord can be touched by either reachability probe, then it is subject to continued testing under sections 4.5, 4.6 and 4.7 (as applicable).

## (34) What is meant by 'light manipulation' and why does this provision exist in Test Method M22?

Light manipulation includes normal manipulation of the product. Excessive handling such as stretching, folding, bending or otherwise distorting the corded window covering in a forceful manner in order to reach a "cord" would not be considered normal manipulation. This manner of testing is consistent with how finger probes are used in most other areas of consumer product testing, both in Health Canada's test methods and in recognized international standards.

It is recognised that some manipulation of the reachable cord is required in order to attach the cord grasping pulley. This is comparable to the manipulation required in placing the dual hook cord grasping fixture behind the cord to be assessed as set in the test procedure in Appendix D, step D2.3.1 of ANSI A100.1-2018.

## (35) What are cord attachment fixtures, and why are they not specified in Test Method M22?

Specifications for cord attachment fixtures were intentionally excluded to allow for flexibility in assessing the product. Once a cord is determined to be reachable, any fixture may be used so long as the total mass applied to the reachable cord does not contribute to a force exceeding 35 N. This is consistent with mechanical testing practices of various other consumer products.

## (36) Why is a cord grasping pulley used for testing completely bounded openings as opposed to a hook or hooks with Tygon tubing?

In developing Test Method M22, the use of Tygon tubing to simulate skin during testing was explored. Based on Health Canada's screening of product samples it was found that the presence of Tygon tubing on a hook to simulate skin produced inconsistent results that affected repeatability and reproducibility. By contrast, the cord-grasping pulley allows for much more reliable dispensation of reachable cord when pulled.

## (37) In addition to the vertical orientation, are other orientations of the restraining bar permitted?

The purpose of the restraining bar is to minimize distortion of the window covering while a force is being applied. There is no reason that would prevent an analyst from mounting the restraining bar in any other orientation (*e.g.*, horizontally). As with any product testing, Health Canada's test method and test equipment may be updated to address new technologies and designs as necessary.

## (38) What are the perimeter and cord length gauges and how are they used?

The cord length and perimeter gauges are strands of beaded chain that have been sized in accordance with the requirements of sections 5 through 8 of the Regulations, namely 22 cm in length and 44 cm in

perimeter, with consideration for tolerances that are achievable in Health Canada's Product Safety Laboratory.

For a reachable cord with one free end, the cord length gauge is superimposed over its length to determine whether the length of reachable cord is greater than 22 cm.

In the case of a completely bounded opening (CBO), the perimeter is evaluated by positioning the perimeter gauge around the opening. This involves placing the gauge around the pulley wheel of the cord grasping pulley with the 35 N load applied. To verify that the CBO contains a continuous length of cord greater than 22 cm (i.e., an assessment of the perimeter of a loop that also incorporates an assessment of the length of reachable cord between two consecutive contact points), the cord length gauge is positioned around the cord portion of the CBO.  Both perimeter and cord length gauges can be passed through the pulley (along the perimeter of the pulley wheel) in order to account for this length of cord for the CBO, loop, and cord length assessments.

For both reachable cords with one free end and CBOs, tools and clips may be used to position the gauges.

Note that the perimeter gauge verification template depicted in Figure A-17 of Health Canada's test method is used solely to verify that the perimeter of the perimeter gauge is within the tolerances specified in the test method. It is not used during an actual CBO assessment.

## (39)   Was the use of a headform considered for assessing completely bounded openings?

The use of a headform go-no-go type gauge was explored, but was removed from consideration for two reasons. First, the Regulations do not specify the use of force to pass a headform through an opening. Secondly, the regulatory provision of pulling on a reachable cord in any direction creates significant variability in the shape of openings produced during a pull, while the use of a headform (and associated forces) is generally only compatible for standard shapes of openings (*e.g.*, rectangular openings).  It was determined that using perimeter and cord length gauges would provide the greatest possible alignment with the wording and intent of the Regulations.

# GENERAL QUESTIONS

## (40) What steps were taken to validate Health Canada's test method, reference documents and equipment? In developing the test method did Health Canada test any products that would comply with the Regulations?

Health Canada's Product Safety Laboratory (PSL) is an ISO/IEC 17025 accredited lab. That means that the laboratory has a Quality Management System that supports both method development and compliance testing. The Quality Management System requires Health Canada's PSL to have detailed procedures in place for the development, validation, training and proficiency of analysts related to new test method development

Prior to the development process for Test Method M22, many different types of corded window coverings with various operating system designs were sampled from the market and sent to the lab for test method development purposes. As required by the PSL's Quality Management System, a validation of applicable sections of Health Canada's test method was conducted to demonstrate analyst proficiency with the use of specified test equipment within the tolerances specified in the method. Consideration was given to factors such as uncertainty from the specified instruments (*i.e.*, calibration and resolution) and analyst repeatability and reproducibility.

In developing Test Method M22, the objective was to design procedures that assess the requirements of the Regulations rather than assess compliance of products currently in the market. As such, no formal compliance assessments were made.

Health Canada operates in a post-market regime, therefore, there is no pre-market approval or certification process that Health Canada provides for any consumer products, including corded window coverings. The onus is on industry to ensure that the products they manufacture, import, advertise or sell meet the requirements of the applicable regulations.

## (41) Does Health Canada accommodate requests to visit the Product Safety Laboratory?

Unfortunately Health Canada cannot accommodate requests to visit the Product Safety Laboratory. The reasons for not allowing industry into Health Canada labs include maintaining fairness when dealing with all industry players as limited resources would not allow us to entertain all similar requests from industry. There are also privacy concerns regarding other products undergoing testing in the lab, along with health & safety and security concerns. Health Canada continues to consider the best ways to give stakeholders equal and useful information.

Health Canada remains open and willing to help stakeholders understand the requirements of the regulation and respond to questions. The most effective way for this to happen is for individual stakeholders to contact their regional inspector with questions:

- 1-866-662-0666
- hc.cps-spc.sc@canada.ca
- \* Telephone calls and emails to these contacts will be directed to the nearest regional office.

## (42)  Does Health Canada have recommended suppliers?

Health Canada does not provide supplier recommendations.

## (43)  What changes have been made to Test Method M22 following the distribution of the January 27, 2020 version?

Based on the feedback from stakeholders received by Health Canada, the following edits have been incorporated into the next revision of Test Method M22:

- Step 4.3.3.4 has been updated to read "Repeat from 4.3.3.1 all other regions of print and product labels that contain required information."
- The phrase "at the discretion of the analyst" has been removed throughout.
- Procedural steps 4.5.3.4.2, 4.6.3.4.2 and 4.7.3.4.2 were edited to clarify what to do when no reachable cords are observed, with the addition of the following instruction:
  - *Otherwise, if no further reachable cords are observed, proceed to [the next section of the test method].*
- A typographical error in Figure A-2 of the Appendix was corrected.  The previous figure showed a maximum handle diameter of 25.4 mm, while the intended specification was for 44.2 mm (that is, no greater than the aperture diameter dimension of the child reachability probe).
- Flowcharts and other pictorial representations will not be incorporated directly into Health Canada's test method. Health Canada's Product Safety Laboratory (PSL) test methods are not "industry guidance", they are only made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements.  A flowchart depicting the general process flow for Test Method M22 has been included as Appendix B. In an effort to respond to requests for pictorial representations, Health Canada further intends to provide images of various procedural steps related to questions that have been posed by stakeholders at a later date through a distribution to all stakeholders.

## Appendix A: Original Questions

| Question | Reference Response(s) |
|---|---|
| Can additional clarification be provided as to what Health Canada would consider to be a "cord" applicable to this regulation? The definition included in the regulation is very generic and it has been questioned in the past about ribbons or other flexible fabric materials that are attached to products such as curtains or other window products. For example, products like the below. For the first image, the ribbon is used to simple tie up the fabric at the desired height. The ribbon runs the length of the product on both the front & the back side of the product and is typically just attached at the top of the unit. The second example is a typical curtain panel which contains a fabric tie-back to hold the curtain open. The tie back material is a single, continuous section of fabric that is wrapped around the gathered fabric of the curtain. The US market does not consider these types of ribbons or fabric to be "cords" per their requirements, but I am curious if Health Canada would consider it the same way or would these be applicable to the new regulation? | (1) , (2) |
| The test method references SOP 77: Initialization of the Corded Window Covering Test Frame. Is it possible for test labs to have access to this SOP to help provide further clarification around this test frame? If yes, how do we go about getting access? Will labs need to request this information from a specific contact at Health Canada, will it be shared with the stakeholder group, or will it be publically available on a website somewhere? | See 'Post-distribution remarks' |
| The test method does not currently include a section specifically covering "unreachable cords". It's easy enough to assume that if the cord cannot be touched using either the child or adult reachability probe, then the cord would be considered "unreachable". However, per the regulation it specifies that if a cord is unreachable, then it must remain unreachable "throughout the useful life of the corded window covering". So I was curious if Health Canada planned to do any sort of durability or similar type of testing to assess the ability to remain unreachable over time. | (4) , (5) , (7) , (12) , (22) , (43) |
| I understand this test method does not address the analytical lead testing requirements, but I am curious to know what how Health Canada would apply this testing. For example, in the US, the first 12 inches below the headrail are considered "exempt" from testing as it is understood that the components in the headrail and directly below it are not intended or likely to be handled by a child. Would Health Canada have a similar approach or since nothing is specified, does Health Canada expect all components to be compliant? For example, the brass knurled portion of the cord lock system in the head-rail often has higher levels of lead content, so if that component is evaluated, it will likely be a failure. | (20) |
| Are there any temperature & humidity expectations for any of the testing within this method? In particular, I would think extremes of temperature and/or humidity could have an effect on the permanency of label testing within section 4.2. I would not expect the requirements to be very tight, but I would think it may be appropriate to specify a range of conditions to be used during this testing. | (13) |
| In section 4.3.3.4, I believe it would be better to simply state something like "Repeat 4.3.3.1 through 4.3.3.3 for all other regions of print and product labels that contain required information". | (43) |

| Question | Reference Response(s) |
|---|---|
| In section 4.4.3.4, it specifies to "fasten the mounting header into the brackets of the test frame's mounting rail." I have not seen SOP 77 yet, so maybe that provides further clarification, but from the Appendix images, I do not see how the header attaches to a mounting rail of the test frame. Is this simply hanging the product in front of the test frame or does the mount for the product actually connect to the test frame somehow? This is not clear to me based on the information included. | (30) |
| In section 4.5.2.6, it references a cord attachment fixture. Can more detail be provided to clarify what this fixture is and how it is used? I believe this same fixture is being referenced in 4.5.3.6 as well. | (35) |
| In sections 4.5.3.6 and 4.5.3.8 there is not much detail regarding how the testing is to be applied. Maybe this is clarified further in SOP 77, but if not, can more detail be provided to clarify this further? For example, in sections 4.6.3.10 – 4.6.3.13 it provides greater detail on how to connect to the window covering cord and position the test frame for testing the product. Perhaps it would be appropriate to include some of this language in section 4.5 if the testing & set-up is done in the same manner. | (23) , (30) , (31) (32) , (34) , (35) |
| During the testing, it specifies that the test weight is to be applied to try to enlarge the loop or to lengthen the section of cord. I don't know if this would really be needed, but I imagine a lesser weight could be used if it resulted in a larger length or opening size, correct? For example, I'm wondering if a loop or cord contained a breakaway device and when applying the full test weight, the breakaway released. If this type of situation existed, I imagine it would be acceptable to use the maximum weight that would not cause separation of the release device (obviously not to exceed the specified test weight). I don't know that anything needs to be added to the method, I was simply just thinking about different designs/constructions that I have seen to think about the different scenarios we may encounter. | (24) , (25) |
| The test frame specified in the Appendix is shown as having a platform sub-assembly with a cart base that has roller wheels. Again, perhaps the SOP 77 would help to clarify this point, but is it necessary to have this platform and section with roller wheels? I imagine this portion is simply there to allow easy side-to-side movement of the test frame, but it seems this test frame could simply be slid across the floor rather than having this large platform & rolling base. For example, the hazardous loop test stand specified in the ANSI/WCMA standard does not have wheels or a track, but the lab can simply slide it as need be. I'm just wondering if it is really necessary to have that large of a platform as that will take up a great deal of space in our labs. | See 'Post-distribution remarks' , (30) , (31) |
| Being that the cord length gauge and the CBO gauge are just bead chains that are flexible, I imagine it will be rather difficult to hold the bead chain directly aligned with the cord or loop of the window covering under test. Are there clips or other types of holding devices that the lab will plan to use to help hold the bead chain aligned with the cord or loop being tested? | (38) |

| Question | Reference Response(s) |
|---|---|
| I am writing to inquire about how I would obtain a Canadian SOP. For instance, if SOP 77 for Corded Window Coverings was referenced in a Canada Test Method, how would I get the SOP 77 to review? Would I write to you guys, like I do to request TMs? Or is there another procedure, or another group I would go through? Please advise. | See 'Post-distribution remarks' |
| Is a plugin electrical cord of a motorized window covering considered a cord as per the regulations? Many people believe that since there can be so many electrical cords in a room that are legal (eg TV, toaster, desk lamp, phone charger etc. etc.), that an electrical cord that is attached to Window Covering is not considered a corded as defined by SOR/2019-97. | (3) |
| Is there a test method for determining what is capable of being folded in every direction? Certain items like roller chains cannot be folded in every direction. Some very thick or heavy bands or straps also cannot be folded in every direction or require extreme force to do so. | (2) |
| Is there a certain width that a band or strap is no longer a band or strap? Roman shades today are sometimes lifted with a very narrow width band or strap that would clearly be included in the new regulations. New styles of operating systems use wide pieces or multiple wide pieces of fabric to lift the shade. At what dimension is a piece of fabric a band or strap as compared to today what some call a "lift sheet"? | (2) |
| Questions about the dimensions of the reachability probes as seen in the diagrams below. | (33) , (43) |

| Question | Reference Response(s) |
|---|---|
| Should a small handle be placed on the back of the probes so that your hand does not interfere with full insertion of the probe into the window covering or does the dimensions of the probe include holding the probe knowing that your hand may stop the probe being full inserted into the window covering? In the picture below, holding the ruler as if it was a probe would reduce insertion into a cellular shade by roughly 100mm. | (33) |
| When inserting the probes into a window covering how much force can be used in attempt to touch a cord. In the picture below the cellular shade fabric is being crushed and damaged in an attempt to "reach a cord". Should be the full length of the probe be stopped at the edge of the fabric or is a certain level of force to be applied. | (4) , (5) , (33) , (34) |
| Is light manipulation of the window covering allowed when attempting to contact a potentially reachable cord using the reachability probes? | (33) , (34) |
| In the picture below, a lever is pressed that releases a bead chain from a channel. Is the analyst allowed to press the lever to expose the bead chain when using the reachability probe or is the probe only to be used when the window covering is in its resting state? | (5) |

28

A53

| Question | Reference Response(s) |
|---|---|
| In the picture below a wand is pulled that exposes a reachable cord that may become longer than 22cm when pulled with 34 N force. Is the analyst allowed to pull the wand to expose the cord when using the reachability probe or is the probe only to be used when the window covering is in its resting state? | (5) |
| The test frame seems to be extremely limited in that only window covering that can be mount from the top onto a 2x4 seem to be able to be tested. Many window coverings and accessories are mounted on the sides and bottom of the window for which the test frame does not allow yet 4.4.3.2 requires accessories to be installed. The test frame also does not allow for any type of specialty window, (bay window, bow window, arched window, angled top window, atrium or sky light windows). | (30) |
| If our product is deemed unreachable as per SOR/2019-97 do we need to include strangulation hazard on the packaging / product? - (for example in the case of a motorised product probably wouldn't carry these instructions) | (12) , (15) , (19) |
| In the scope of the Test Method there is no reference made to a product that contains unreachable cords, can a note be added to the test method for what to do in this case? | (12) , (43) |
| The test method BS EN 16433 contains a flow chart, Annex A, that determines the test to be performed for the evaluation of blinds. It would be useful to include a similar flow chart for the test method discussed today | Appendix B |
| Can a black and white definition/image of what reachable and unreachable means within the test plan or reg itself? | (4) , (5) , (6) |
| Can imagery be created showing how to determine perimeter/length of a CBO when the full loop is not accessible? | (38) , Image to follow |
| With the draft testing method, has Health Canada tested a cordless horizontal blind that has passed this new standard? | (40) |
| 4.1.3.5 Examine the product packaging for the following warning statement or its equivalent which must be in both English and French, as well as legible and prominently and clearly displayed with characters in a colour that contrasts sharply with the background.  -  With the wording "or its equivalent" testing labs will not decide if different wording means the same, so I recommend this be taken out.  With the wording "in a colour that contrasts sharply with the background", leaves it up to interpretation and opinions which is not clear enough.  What one person feels are contrasting colours is not to another person.  Please provide a clear warning label that is designed for all manufacturers to use, so there is no interpretation and decisions for a lab to determine if it is ok.  Like the Z600, the warning label is designed and clear with font size, wording, and colours and pictogram for everyone to comply.  Everyone has the same warning label which is clear and concise. | (14) , (15) |
| 4.5.3.2  At the discretion of the analyst, adjust the product to a position that may produce a length of cord that exceeds 22 cm in length.  This needs to be clearer, without the discretion of the analyst.  Everyone will do this differently so there is not going to be a consistent testing results.  Please provide clearer instructions for the tester to follow, again diagrams would be beneficial for clear instructions and consistent process. | (23) , (43) , Image to follow |

| Question | Reference Response(s) |
|---|---|
| 4.6.1.1 the definition of the "Completely Bounded Openings" (CBO) is not clearly explained.... it didn't explain exactly how the cord is consider CBO. Please clarify CBO. For example, the child reachability probe can actually touch the lifting cord of a cordless mini blind, but the vertical distance is not greater than 22cm... it is actually less than 3cm (the lifting cords goes thru the ladder in a zigzag format)... thus we don't have to continue this test? | (8) , (9) , (26) , (27) , (38) |
| 4.6.3.2. At the discretion of the Analyst, adjust the product to a position that may produce a CBO that exceeds 44 cm in perimeter. Again this terminology is not clear for everyone to do the procedure the same way, it is left to interpretation and manipulation which can lead to errors. Please provide the analyst, a clear description on how to do this step. | (23) , (43) |
| 4.6.3.8 What is SOP 77? It would be helpful when referencing a standard that it is included in the document. | See 'Post-distribution remarks' |
| Please provide further details regarding the portion of the product to be tested (e.g. which product cords will be tested), particularly in accordance with sections 4.4-4.8 of the proposed test method; | (2) , (3) , (4) , (5) , (22) |
| The addition of further illustrations and photographs depicting testing procedures would assist in clarifying the proposed test method. Please confirm whether Health Canada is able to provide additional illustrations and photographs depicting testing procedures; | (43) , Image to follow |
| Please confirm whether Health Canada can provide further definition of the phrase "completely bounded opening" in the proposed testing procedure; | (8) |
| The addition of further details regarding the use of the depicted equipment set out in the appendix to the proposed testing procedure would assist in clarifying the proposed testing methods. Please confirm whether Health Canada is able to provide further details regarding the use of the depicted equipment; | See 'Post-distribution remarks', (30) |
| Please confirm whether a power cable for a motorized roller shade would be captured within the definition of the word "cord" under the Regulations; | (3) |
| With respect to the proposed testing method outlined at sections 4.5 – 4.7, please confirm whether Health Canada is able to provide further guidance regarding how the child reachability probe (figure A-2) and the adult reachability probe (figure A-3) are used; | (33) , (34) |
| Please confirm whether Health Canada can provide further definition of the phrase "accessible to a child" in section 2 of the Regulations regarding small parts.<br>      a. For example, are components contained within or on the head rail considered to be accessible? | (21) |

| Question | Reference Response(s) |
|---|---|
| Likewise, with respect to the proposed testing method outlined at section 4.8, please confirm whether Health Canada is able to provide further guidance regarding how the push/pull procedure should be completed.<br><br>    a. For example, if the hook and clamp cannot attach to the component of the product independently, would they need to be attached in another manner (e.g. glued on) in order to complete the testing? Consider the case of product components such as hem bar end caps, which do not have easily accessible grips for fingers to latch onto. | (28) |
| Please confirm whether a motorized roller shade would be captured within the definition of the word "corded window covering" under the Regulations such that the other provisions of the Regulations would apply to such a product; | (3) |
| The prescribed information required by the Regulations must be "indelibly printed on the corded window covering itself or on a label that is permanently affixed to it." (see Regulations s. 10(d)) With respect to the test regarding the permanency of labels set out at section 4.2.3.4, please confirm the rationale for using a scalpel or knife to attempt to raise the label. It is submitted that it would be more appropriate to employ a fingernail or fingernail probe to determine whether a label can be lifted from its surface.<br><br>    a. Similarly, the test requires the application of "a force of 85 N ± 5 N" (i.e. approximately 19 lbs) to attempt to initiate and sustain removal action of the label. If a producer does not have an adhesive with this amount of resistance, please provide Health Canada's views regarding whether it would be appropriate to have a label that breaks apart under force to discourage removal attempts.<br><br>    b. Alternatively, does Health Canada have any recommendations as to a label supplier that makes labels that can sustain this level of force?<br><br>    c. Likewise, If the test method envisions human finger testing, it is submitted that it would be more appropriate to conduct the testing with a child sized finger as opposed to an adult sized finger in order to achieve the purpose of the Regulations. Please comment. | (6) , (17) , (18) , (42) |
| Please confirm whether Health Canada can provide further information regarding the pass/fail criteria for the test outlined at section 4.2.3 regarding the permanency of labels. Would a partially torn label satisfy this test? Also see point above and please provide Health Canada's views regarding whether it would be appropriate to have a label that breaks apart under force to discourage removal attempts. | (17) , (18) |
| In the case of a corded window covering that is imported for commercial purposes, the prescribed information required by the Regulations includes "the name and principal place of business of the manufacturer and the importer." (see Regulations s. 13(d)). If the manufacturer and importer are the same entity or are affiliated entities (e.g. Corporation A is the manufacturer and Corporation B is the Importer and is a wholly-owned subsidiary of Corporation A), please confirm whether both entities must be identified on the corded window covering, as well as on any packaging in which the corded window covering is displayed to the consumer. | (16) |

| Question | Reference Response(s) |
|---|---|
| Please confirm whether Health Canada can provide further information regarding the rationale behind prohibiting reference to the CCPSA or the Regulations among information that appears on a corded window covering or accompanies it (see Regulations s. 9 as well as s. 4.1.3.9). | (11) |
| In the 12/17/19 meeting in Ottawa, HC verbally advised the industry that products would be tested in the "static" position. There needs to be language included in the regulation (since the Regulation supersedes all other supporting documents) that confirms that situation. | (5) |
| 2. Please better define "accessible" for cord accessibility. Does "reachable" include "accessible"? | (4) , (5) , (22) |
| 3. More clearly define "reachable cord" | (4) , (5) , (22) |
| Does the cord have to be graspable or just touched to count as accessible/reachable? | (4) , (5) , (22) |
| Should "reachable" be limited to when installed per manufacturer? | (4) , (5) , (22) |
| If you can make contact with the cords located within the framework of the product headrail, is it subjected to testing? (for instance, inside the channel of a Vertical Blind) | (22) |
| Define accessibility of the lift cord within the ladder shroud. | (4) , (5) , (9) |
| Definition of cord – "capable of folding in every direction"; Can we get clarity on whether a belt, gear chain, tape, timing belt or a half inch wide measuring tape etc. classify as cords since they cannot "fold in every direction"? | (2) |
| Additional clarity of cord "folding" and "every" direction – as specifically pertaining to a fiberglass rods with a limited bending radius. | (2) |
| How does the definition of a cord apply to materials that are rigid in certain directions? | (2) |
| Useful Life is used in the CWC regulations sections 4 and 10 but is not defined. There is no reference to the term in the guidance document. Discussion with HC representatives leaves this definition to the manufacturer Product warranties can be considered lifetime of product. Product life can vary vastly between stock and custom window coverings. | (5) , (7) , (17) |
| If reachable cord breaks with less than 35N pull, is free hanging broken cord subject to 22 cm rule? | (25) |
| How slow or fast to pull the loop on the 35N test? Applied over 10 seconds is listed in their testing document. | (32) |
| How do you measure a loop on the inner cord, where it exits the shade or from within the shade? | (27) , (38) |
| Unreachable cords "must remain so": does this only applies to a shade at rest ("static" condition) or must the unreachable status be maintained during the operation? | (5) |
| How do accessible cords co-exist with motorized window coverings? | (3) |
| Loop - "majority is formed by a reachable cord" - what if 51% is formed by a rigid rod? 60%? | (8) |
| Is the force probe a "point of contact" (pertains to section 6 in the Regulation)? | (9) |
| Is the test pulley considered a contact point with respect to cord length? (Is the amount of cord on perimeter of pulley part of the measured accessible/ reachable cord?) | (9) , (38) |

| Question | Reference Response(s) |
|---|---|
| What are the allowable orientations of the restraining bar? If pull is vertical or to the side. | (37) |
| What is the correct (or max amount) of pulleys? | (30) |
| Can pulleys be mounted in different orientations? | (30) |
| How to lock wheels on fix during test? | (31) |
| What is the angle of pull when testing? Horizontal? | (23) |
| How close to the product is the test pulley? | (23) |
| If a probe can touch a cord, should a tool be used to extract the cord from its containment – (a long wire with a hook, for instance) Is that reasonable in the real world? | (4) , (34) |
| Why is there a need for two probes? Adults are not the targeted consumer group we are attempting to protect. | (6) |
| Use of pulley as simulation of child's finger does not account for friction- which will impact current designs which relied on materials that attempted to simulate skin or scalp. | (36) |
| Is the 44 cm bead chain used in conjunction with the square mounting plate in order to determine an overall perimeter of the CBO? | (38) |
| Is there a need to test for 22 cm cord length if it was already determined to be a part of a 44 cm CBO? | (8) , (26) |
| When have you tested enough directions? | (23) |
| How are "contact points" defined in the context of a ladder cord? | (9) |
| With a side-pull of reachable inner cords:<br>  a. Is anything done during test to anchor the shade?<br>  b. Do you measure 'exposed' cord…what pull out the side of fabric panel? OR to interior contact points? | (27) , (37) , (38) |
| 4.6.3.9: "using light manipulation" what does that mean? | (34) |
| 4.5.3.1: "while the product is in any stationary adjustment position" shouldn't this be in the regulations, not just the test procedure? | (5) |
| How do you effectively measure a 44 cm loop when part of the loop is in the substrate of the product? Wouldn't a head probe be a more accurate representation of a hazardous loop size? What if the two 22 cm lengths are exactly parallel at 1 mm apart from each other, for instance? | (39) , (27) |
| How was 90N force determined to be an appropriate force for small part testing? | (28) |
| Push/Pull test- This is significant change in that the force required is excessive at 90 N and testing in any direction. All forces are applied "gradually" at discretion of analyst due to type of component. Impact is not a consideration. | (28) |
| How do you attach a force gauge to a component in order to dislodge the component with a 90N force? | (28) |
| 4.8.3.1: "tip for pushing or a hook and clamp for pulling" How will this be accomplished on assembled shade? Inside of end-caps not accessible; outside would require bonding grab point onto plastic | (28) |

| Question | Reference Response(s) |
|---|---|
| 4.5.3.8: "Gradually apply the test weight" dead weight? Not load cell? Direction applied? If all is shade fixture on Gimbal? Test rig defined does not have this capability. | (32) |
| Is there any stipulation of being able to push the cord away from the shroud or being able to pinch or pull the cord away? | (4) , (34) |
| Is there any potential for small parts with breathing holes to be acceptable  (i.e., Lego heads/ pieces) | (29) |
| What about product in the field that needs to be remade? How do we proceed? | (10) |
| There is no guidance on the color for the characters of warning message as well as the background color. | (15) |
| Are there no pictograms? | (15) |
| Are there no warning hang tags? (If the product is compliant to HC Regulations, there should be no risk, and so why have a warning tag?) See #55 | (15) , (19) |
| How many times does one attempt to raise a portion of the warning label with a fingernail, knife or scalpel? | (18) |
| Is there a defined amount of resistance that the label has to achieve, before it detaches to pass? | (17) , (18) |
| Is a partially torn label compliant? If yes - how do you measure that? | (17) |
| Is there a requirement to reference the Canadian Product Safety Act or Corded Window Covering Regulations on the product or package? | (11) |
| Specifically clarify the requirement to include warning information on print advertising, TV advertising, social media advertising, direct marketing, digital advertising, web sites, radio advertising, billboard advertising and point of sale advertising. | (15) |
| Why is there a need to put a Warning Label that addresses the 22CM cord / 44CM loop on a product that was produced in accordance with the regulation and proven to be a considered compliant product ? | (19) |
| Product packaging is required to provide the same manufacturer detail as labels on products.<br><br>    o The regulation states in Section 13 that "… information must appear on every corded window covering, as well as on any packaging in which the corded window covering is displayed to consumer". The guidance document does not distinguish in the same manner (reference Section 4.1.3.2).<br><br>    o Custom products are shipped in corrugate cartons which are designed to withstand travel across long distances and multi points of handling while protecting the contents from damage. The majority of custom-made products are professionally installed, and the shipping carton is not reviewed by the consumer. The cartons are then disposed of after installation. There is no practical reason to place manufacturing and order details on shipping cartons for custom made products. | (15) |

| Question | Reference Response(s) |
|---|---|
| Product packaging is also required to carry the same warnings as product itself.<br><br>   o This may be practical for stock products, for which packaging helps to market the product to consumers in store.<br><br>   o Custom products are reviewed and purchased in store or in the consumers home using merchandising (advertising) materials like sample books, sample window coverings, displays and then shipped to consumer in nondescript cartons following consumer decision to purchase. A warning on a brown corrugate carton after the purchase has already taken place serves no purpose. | (15) |
| Additionally, warning labels only provide written content- visual or graphical content further supports and enforces safety and warning message. The regulation is void of visual or graphic content. | (15) |
| Section 4.1.3.9 directs inspector to examine product packaging for reference to Canada Consumer Product Safety Act or the Corded Window Coverings Regulations. It does not state that this reference should not be posted/placed on the carton or advertising as directed in the regulation. This is confusing because it has an action to examine but does not provide clear statement what to do with finding. | (11) , See 4.1.4.1 of test method |
| Testing for "permanently affixed" labels provides guidance on how to attempt to remove the label.<br>o It is assumed this "product label" is either the warning label or the manufacturing label per section 4.2.3.1. Although it indicates that if the label is torn and section detaches. It does not indicate what is deemed failure.<br>o Example- Partial removal acceptable-complete removal would fail the test. This test is extreme and likely will require changes- especially for manufacturing labels as these rely on typical label adhesive and are most often located in the headrail where they are not exposed to handling by a consumer. | (17) , (18) |
| The document would be more instructive if it provided graphical illustrations to provide visual confirmation of conditions and set up. Examples include:<br>o Section 4.5.1.1 Reachable cords with one free end or reachable cord between two consecutive points<br>o Section 4.6.1.1 Completely bounded opening (CBO)<br>o Section 4.7.1.1 two reachable cords with one free end | See 'Post-distribution remarks', Image to follow |
| Product cord testing is often conducted "at the discretion of the Analyst" to determine where to test product- "open, closed, or any position between". Better guidance is to direct for worst case. | (5) , (23) , (43) |
| How has the guidance document and referenced equipment been used to validate testing method on products that would be deemed compliant or not compliant to the corded window covering regulation? | (40) |

| Question | Reference Response(s) |
|---|---|
| I do believe there could be an exclusions to avoid confusion.. Reachable cords could include cords inside of a headrail. In order to avoid testing labs unnecessary testing, we believe Health Canada should consider, headrails to be exempt from reachable cords. There was a discussion within the US safety standard development process on a 12 inch exclusion from the headrail down the cord. I do not have the confidence, as a tester, to agree giving a distance of 12 inches however, I do believe that a distance of 1-3 inches from the headrail such as the distance inner cord stoppers are placed could allow safety devices or retrofit devices to be attached to cords and not the headrail. It may be that you see there is still no need for an exemption of distance from the headrail to a device so long as the cord cannot be pulled out. Having an exclusion on the headrail certainly does not change the testing method and gives testing labs direction which I think they need. Having the exclusion on the headrail could either allow or disallow the lead content of the parts in the headrail. Since consumers access would be limited other areas on the window covering, a lead exemption something to consider. | (22) |
| Although we know that these methods are for corded window coverings, I think clarifying examples and showing illustrations of common window coverings In the appendix would be helpful. For example: A corded window covering means an indoor window covering that is equipped with at least one cord. The following is a list of possible but not limited to window coverings that include at least one cord.<br><br>Draperies             Top-Down Bottom Up<br>Curtains              Roll-Up Shades<br>Horizontal blinds     Pleated Shades<br>Shades               Transverse Rod<br>Roman shades        Sheer Shade<br>Roller Shades        Vertical Blinds<br>                        Bead Restraining | (1) , Image to follow |
| One example for this is need is those who sell draperies. Would this regulation test the cords on curtain tie backs if they are included in a stock package? This cord is not manufactured with a cord "on" the window covering but is sold with the window covering and expected to be attached at some point. Not all draperies require pull back cords or bands, they use mounted large decorative hooks for this. I ask because there was an incident in the USA on a child who died on this type of cord. | (1) |
| I suggest Health Canada open their testing lab to a restricted audience for a training workshop or a private meeting. This meeting/workshop could only allow testing labs and organizations that hold trademark seals that include an unbiased assessment process (*not just an approval sticker that relies solely on a testing lab*). This meeting/workshop could give even more clarity to how your government is approaching the testing methods and train labs and testers on what to look for on products to avoid embarrassing future recalls. | (41) |

## Appendix B: General process flow for Health Canada Test Method M22



**Examination and assessment of the product, packaging and labels**
*(see s. 4.1 to 4.5 of M22)*

1. Examine packaging and product for damage
2. Assess content of product labelling and warnings
3. Assess permanency and indelibility of print

**Product installation and assessment of cord reachability**
*(see s. 4.6 and initial steps of s. 4.7 to 4.9 of M22)*

4. Install product
5. Assess reachability of cords at different product positions
6. Pull on reachable cords in any direction with 35 N

**Assessment of cord length and CBO perimeter, as applicable**
*(see s. 4.7 to 4.9 of M22)*

7. Assess individual cords with one free end
8. Assess cord between two consecutive contact points
9. Assess perimeter and cord component of CBO
10. Assess two cords connected end to end

**Evaluation of potentially small parts**
*(see s. 4.10 of M22)*

11. Push/pull on potential small parts with 90 N
12. Evaluate potential small part using small parts cylinder

# EXHIBIT 2

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

WINDOW COVERING MANUFACTURERS ASSOCIATION,

Petitioner,

v.

UNITED STATES CONSUMER PRODUCT SAFETY COMMISSION,

Respondent.

## DECLARATION OF JASON GROMMON

I, Jason Grommon, hereby declare:

1.     Springs Window Fashions, LLC (Springs) is a global market leader in the manufacture of custom window coverings, such as blinds and shades. Springs is a member of the Window Covering Manufacturers Association.

2.     I am employed by Springs as Executive Vice President & President, Dealer Business Unit. I have held this position since February 2020, and I have worked at Springs for over 5 years. Before holding my current position, I was Executive Vice President of Springs & President of Commercial Business Unit. I regularly work with employees in all facets of the business regarding finance, supply chain, operations, marketing, engineering/product development, and sales, and consulted closely with the executives in those areas regarding the impacts of the

Consumer Product Safety Commission's (CPSC) rule across our business.

3.     This declaration has seven parts.  Part I provides background on Springs's business.  Part II discusses the types of corded operating systems used in custom window coverings made by Springs.  Part III explains that Springs does not manufacture products with corded operating systems that comply with the CPSC's rule.  Part IV explains that Springs's Canadian products do not comply with the CPSC's rule.  Part V describes the 2-2.5-year timeline for Springs to develop products that comply with the CPSC's rule.  Part VI explains why non-corded operating systems cannot be used for many custom products.  Part VII discusses the substantial economic and reputational harm that Springs will suffer because of the CPSC's rule.

## I.     Overview Of Springs's Business

4.     Springs is headquartered in Middleton, Wisconsin.  Springs employs approximately 9,000 people, including approximately 2,500 people in the United States.

5.     By revenue, Springs is the second largest manufacturer of window-covering products in the United States by revenue.  In 2021, its annual sales revenue exceeded $1.1 billion in the United States.

6.     More than 95% of Springs's window coverings business is custom window coverings; the rest is stock window coverings.  Stock products are used

mainly in residences and are mass-produced, pre-packaged products based on the average desired specifications of the end-consumer. Stock products are made in limited widths and lengths, and from less expensive materials. Custom products are handmade to order from more durable components, come in a wider range of fabrics and designs, are available in taller and wider sizes, and are more expensive. Custom products are based on each end-consumer's desired specifications regarding dimensions, fabrics, colors, control mechanisms, and mounting techniques. Most commercial buildings require custom products as do residences with non-standard-sized windows and larger windows.

7.     Approximately 67% of Springs's annual revenue is from selling custom window coverings to residential consumers. Springs sells those window coverings through over 7,500 independent retailers and dealers. Retailers include big-box home improvement stores, such as The Home Depot and Lowes, and online outlets. In contrast, dealers include local stores, chains, specialty boutiques, and thousands of other small and independent market participants that cater to consumers who require personalized decorators or designers. Most of the dealers' revenue comes from selling and installing window coverings made by manufacturers like Springs.

8.     Approximately 20% of Springs's annual revenue is from the sale of custom window coverings in commercial, nonresidential settings, such as office buildings, hotels, restaurants, healthcare, education facilities, and consumer-facing

businesses such as retail stores. Springs sells commercial window coverings through commercial dealers who also install the products. Based on its knowledge of the industry and the CPSC's data on annual window covering shipments, Springs estimates that approximately 20% of custom window coverings sold in the United States are for commercial, non-residential use, and that there are at least 80 million custom window coverings currently used in commercial, non-residential settings in the United States.

9.     Springs's remaining annual revenue, approximately 13%, is from non-custom-window-covering products.

## II.    Springs's Use Of Corded Operating Systems In Its Custom Window Coverings

10.     Approximately 55% of the custom window coverings currently sold by Springs use a cord or bead chain that the consumer pulls to raise and lower horizontal blinds and shades, to slide vertical blinds and shades from side to side, or to tilt or rotate blinds slats.

11.     Springs makes products with three types of corded operating systems: "continuous loop" operating systems, "single retractable cord lift" operating systems, and "cord lock" operating systems. All of those products will have to change as a result of the CPSC's rule.

12.     Approximately 18% of all custom products sold by Springs are operated by "continuous loop" operating systems under tension, as depicted on a

roller shade in Figure 1 below. The user operates that system by pulling a continuous cord or beaded chain loop that is kept taut with a tension device affixed to a wall. Approximately 45% of the custom window coverings sold by Springs for commercial use in the United States have continuous loop operating systems.

**Figure 1**



13.     Less than 0.5% of all custom products sold by Springs are operated by "single retractable cord lift" operating systems, as depicted on a roller shade in Figure 2 below.  In that system, a cord or wand hangs from the headrail and is connected to a second cord that is housed in the headrail.  The user raises or lowers the covering by pulling on the hanging cord or wand, which pulls the second cord out from the headrail.  The second cord retracts back into the headrail when the system is not in use.  Typically, 36 inches of the second cord are exposed when the user operates the window covering.

**Figure 2**



Single Rtractable Cord Lift

14.      Approximately 35% of the custom products sold by Springs use "cord lock" operating systems, as depicted on a horizontal blind in Figure 3 below.  In a cord lock operating system, the operating cords hang freely from the headrail and may be used to raise, lower, tilt, or rotate the window covering, depending on the type of covering.  Although Springs has been transitioning away from cord lock operating systems, they remain a popular choice with many consumers. Approximately 45% of the custom window coverings sold by Springs for commercial use in the United States have a cord lock operating system.

**Figure 3**



## III. Compliance With The CPSC's Rule

15.     The CPSC's rule prohibits the manufacture of all three types of corded operating systems currently used in Springs's custom window coverings. The rule completely eliminates the cord lock operating system as an option. It requires a continuous loop system under tension to be encased in a rigid shroud (a component made from inflexible material that limits cord accessibility) or a restraining device (a component installed on the window covering that prevents the creation of a large loop). And it sets a maximum of 12 inches of cord from the headrail that may be exposed when a user operates a single retractable cord lift system.

16.     Springs has not previously developed a rigid cord shroud or cord restraining device that complies with the requirements in the CPSC's rule. That is because consumers dislike those options. Compared to existing continuous loop

systems under tension, rigid shrouds and restraining devices make products more expensive, more difficult to operate, and less visually appealing. Because rigid shrouds and restraining devices are complex and have many components, they are more difficult to engineer for durability.

17. Adding a rigid shroud or restraining device to a continuous loop system under tension will increase the cost of a Springs product to the residential consumer by approximately 15-20%, and that increase could be significantly greater in commercial settings. That is true for two reasons. First, when a window covering has a rigid shroud or restraining device, the consumer has to pull the cord additional times (increasing based on product size and weight) to move the window covering. For that reason, rigid shrouds and restraining devices must be made from relatively expensive components that can withstand additional engagement by the consumer and are durable long term. Second, window coverings with rigid shrouds or restraining devices have more components than existing continuous loop systems. The additional components add cost, and the process for making the window coverings is more labor intensive.

18. Springs has not developed a single retractable cord lift system that complies with the requirements in the CPSC's rule. In Springs's existing single retractable cord lift system, a maximum of 36 inches of retractable cord are exposed when a user operates the product. Consumers dislike single retractable cord lift

systems with shorter retractable cords. That is because a shorter retractable cord significantly increases the number of times a consumer must pull the wand to move a window covering.

19. Springs will need to significantly modify its single retractable cord lift system in order to comply with the CPSC's rule. It cannot simply shorten the cord in the existing system to 12 inches. Doing so would increase stress on product components and would increase the risk of cord and component failure. Springs has invested heavily in building window covering brands that are known as safe, affordable, reliable, and user friendly. Springs will not risk that reputation or take on product-liability risk by selling products that have not undergone rigorous functionality and safety testing.

## IV. Compliance With The Canadian Rule

20. In April 2019, Health Canada promulgated regulations that apply only to window coverings used in residential settings. The regulations effectively prohibited the use of continuous loop operating systems under tension without rigid shrouds or restraining devices.

21. Over the two-year period between when the Canadian regulations were promulgated and when the regulations went into effect, Springs developed a rigid shroud so that several of its products that use continuous cord loops comply with the Canadian regulations. That rigid shroud, however, does not comply with the CPSC's

rule for two reasons: because the cord is accessible with a testing probe and because the rigid shroud is too flexible.

22. Springs's Canadian-compliant rigid shroud is depicted with a roller shade in Figure 4 below. To operate it, the user raises and lowers a knob that slides up and down the shroud. That causes the continuous cord loop to rotate, which, in turn, raises or lowers the blind.

**Figure 4**



23. The rigid shroud complies with the Canadian regulations because the cord is not "reachable." The attached guidance from Health Canada explains that a manufacturer must test a product for "reachable" cords or bead chains using a probe with a diameter of .343 inches. Att. A at 11, 13, 17, 22. The cord or bead chain is reachable if the manufacturer is able to touch the cord with the probe, and it is noncompliant if the reachable cord can be formed into a large loop. A section view

of Springs's rigid shroud is depicted in Figure 5 below. The continuous cord loop encased in Springs's rigid shroud is not "reachable" because Springs is unable to touch the cord with a .343-inch probe.

**Figure 5**



24.     Springs's Canadian rigid shroud does not comply with the CPSC's rule. Under the CPSC's rule, a cord is accessible, and thus noncompliant, if the manufacturer is able to touch the cord with a probe. A manufacturer must test for cord accessibility using a probe with a diameter of .25 inches. As depicted in Figure 5 above, Springs can touch the cord encased in its Canadian rigid shroud with a .25-inch probe.

25.     A separate reason that Springs's Canadian rigid shroud does not comply with the CPSC's rule is that it is too flexible. As depicted in Figure 6 below, under the CPSC's rule, a rigid shroud or restraining device must pass a "center load test"

that limits the amount that the shroud or device may deflect when the manufacturer applies force to it. Springs's Canadian rigid shroud does not pass the center load test, so it does not comply with the CPSC's rule. The rigid shroud complies with the Canadian regulations because those regulations do not require a rigid shroud to pass a center load test.

**Figure 6**



26.     Furthermore, Springs's Canadian rigid shroud is not compatible with most products that Springs sells in the United States because Springs designed it as a gap-filling measure for one of its product lines. Springs did not design the rigid shroud to be compatible with its commercial products because the Canadian regulations do not apply to commercial products.

27.     Springs does not sell other products with corded operating systems in Canada.

## V.     Spring's Timeline To Develop Products That Comply With The CPSC's Rule

28.     Developing and implementing a new, complex operating system for a single window-covering line to comply with the CPSC's rule will cost Springs approximately $2.66 million, if it uses only internal resources. Since most of

Springs's 36 product lines have corded components that will require some redesign, to quickly develop rule-compliant products, Springs will need to outsource many aspects of product development at significant additional expense. Springs expects that it will cost more than $30 million to implement rule-compliant corded operating systems across all of its product lines, including approximately $8.8 million to develop the necessary promotional, sales, and training materials to commercialize those new products.

29.     Springs expects that it will take approximately 2-2.5 years to implement the newly-developed corded operating systems across its product lines.

30.     Creating a new operating system occurs in six steps. The first step is to develop the concept for the operating system. That process takes approximately 12 months and costs approximately $660,000. An engineering team develops the initial concept for the operating system, which goes through numerous iterations, as well as intellectual property clearance. That team constructs 3D prototypes using soft plastic to determine if the concept is functional and complies with applicable regulations. The team refines the prototypes based on feedback from other Springs groups.

31.     The second step is tooling for the operating system, which takes approximately 9 months. This step costs approximately $1.45 million. The tooling step has two phases. In the first phase, Springs uses prototype tools to develop

prototypes made from the materials that will likely be incorporated into the final product.  Prototypes undergo rigorous functionality and lifecycle testing, and the product engineering team makes design changes based on the results.  This is an iterative process that can require numerous design cycles with input from other Springs groups.  The second phase is final production tooling.  The product team finalizes the components needed for the operating system, works with external toolmakers to produce those components, tests to make sure the components can be produced at scale, and identifies vendors for sourcing fabrics and other materials.

32.    The third step is lifecycle and safety testing, which takes approximately 3 months.  This step costs approximately $50,000, and it involves internal testing and testing by an independent lab.  Internal testing includes automated testing that simulates up to 10,000 uses; testing the product for its ability to withstand environmental factors, such as humidity, heat, cold, and ultraviolet rays; and testing for child safety.  A product fails these tests if any components fail or malfunction.  Product performance often differs between prototype tooling and final tooling, which results in additional fine tuning, retooling, and redesign work.  After internal testing is completed, the product is tested by an independent laboratory that verifies compliance with the window covering industry's voluntary standard and certification requirements.

33.    The fourth step is preparing Springs's production facilities for making

the new product, which takes approximately 6 months. This step costs approximately $500,000. Springs must fully document the floor layout, work instructions, and other aspects of the manufacturing process, and in many cases, it must redesign the factory floor to build a new product. Computer programmers must modify Springs's software to account for the assembly method required to produce the new product across thousands of fabric types and colors. Product assembly teams then learn how to develop the new product.

34. The fifth step is building inventory of components to make the new product, which takes approximately 4 months and can normally occur at the same time as preparing the production facilities. Each of Springs's production facilities must be stocked with components before production begins. Factors such as vendor location, delivery schedules, component scarcity, and the number of colors options needed for a component can add time to the sourcing process. Additional lead time may be necessary to build inventory due to ongoing supply chain challenges.

35. The sixth step is creating promotional, sales, and training materials. That takes approximately 12-15 months, most of which happens at the same time as other steps occur. This will cost approximately $8.8 million across Springs's product lines. It will cost $3 million to replace sample products for 12,500 dealers and retailers. It will cost approximately $4 million to update 100,000 sample books to remove non-compliant products. It costs approximately $700,000 to provide new

fabric samples—which are needed because most consumers will not purchase custom window coverings without first viewing and operating samples. It costs approximately $700,000 to develop product photography, videos, and other updates for Springs's website. It costs approximately $125,000 to create promotional and instructional materials for retailers, dealers, and installers. It costs approximately $100,000 to train Springs's sales representatives to educate retailers and dealers on product messaging and to train customer service representatives to field consumer questions. It costs approximately $200,000 to update Springs's order management system for dealers and retailers to order new products.

## VI.   Springs's Use Of Non-Corded Operating Systems In Its Custom Window Coverings

36.    There are two types of non-corded operating systems used in Springs window coverings—motorized systems (Figure 7) and "cordless lift" systems (Figure 8). Figures 7 and 8 depict those systems in cellular shades. Those systems have design limitations that make them technically infeasible and impracticable for many custom window coverings.

**Figure 7**



**Figure 8**



37. Motorized operating systems are cost prohibitive for most consumers because they generally include expensive components, such as motors with high torque capacity, electronic chipsets, and spring systems to assist in raising and

lowering the product. For example, a motorized operating system increases the cost of a Springs custom window covering by 100-500% depending on the type of window covering, size of the window, and required motor.

38. In addition, motorized operating systems are impracticable for many custom window coverings. The motor is installed in the headrail at the top of the window, and most residential window-covering motors are battery operated. A large, high-torque motor (which is required to lift heavier window coverings) may not fit into the headrail for the product. In addition, if the headrail is out of reach, replacing motor batteries is difficult for the end-user. Even when the headrail is within reach, battery-operated motors often are still undesirable. The high-torque motors required for many custom window coverings drain batteries quickly, and most consumers do not want to frequently replace batteries in order to operate their window coverings. Window-covering motors can also be powered through electricity, but that can require extensive electrical rewiring that is cost prohibitive for most end-users. For these reasons, only 3% of Springs's custom window covering units are motorized.

39. For a cordless lift operating system, the user raises and lowers the product by pushing and pulling on the bottom rail with the assistance of counterbalanced springs in the headrail. Cordless lift systems cannot be used with larger, heavier window coverings, because significant spring force is necessary to

assist a user in lifting a heavier product. In addition, the large spring systems needed to lift heavier products cannot fit into many headrails. Thus, even though stock products often use cordless lift systems, many custom products cannot, because custom products are generally larger and heavier.

40.    Cordless lift systems also have limitations based on user characteristics and window location. Window coverings with cordless lift systems can only be raised as high as the user can reach, so cordless lift is not a feasible option for a shorter user, or a high or tall window. This is particularly true in commercial settings where the average window is 10 feet tall and many can be taller than 20 feet. In addition, some consumers do not have the dexterity or strength needed to raise a large window covering, so those consumers cannot use cordless lift systems.

41.    Even when a custom product is light enough, and the top of the window is low enough, for use with a cordless lift system, cordless lift systems are cost prohibitive for many consumers. The counterbalanced springs for a cordless lift system must be calibrated to each covering based on size and weight. That requires customizing the covering's components, which increases the cost to the consumer for a Springs custom window covering by approximately $40 on average.

## VII.   Irreparable Harms From The CPSC's Rule

42.    The CPSC's rule will go into effect on May 30, 2023. The rule is imposing immediate and severe harms on Springs's business. Springs must try to

ramp up its production of non-corded operating systems while also developing corded operating systems that comply with the CPSC's rule.

43.　　As of May 30, 2023, Springs will not be able to make window coverings with *corded* operating systems that comply with the CPSC's rule. Because of the anticipated lack of products, Springs currently is expending significant resources to make additional existing custom products with *non-corded* operating systems. To do so, Springs must substantially increase component inventory and reconfigure production lines. The process of ramping up production of existing custom products with non-corded operating systems will cost approximately $2-4 million. It will take approximately 6-18 months depending on supply chain issues. Supply-chain issues are common in procuring components for motorized operating systems that are available only from international suppliers, such as electronic chipsets.

44.　　In addition, ramping up production of custom window coverings with non-corded operating systems is diverting resources from high-priority projects, such as future product launches and quality improvement initiatives. Springs expects to lose more than $22 million in additional revenue in the 18-month period after the rule takes effect because it will need to divert resources from those projects, and they will not launch as planned. The resulting reduction in product innovation will harm Springs's reputation among consumers. Springs has spent decades building brand loyalty by continually improving the quality of its products and

offering innovative designs. Ramping up production of non-corded operating systems is also slowing the development of corded operating systems that comply with the CPSC's rule.

45. The CPSC's rule is impacting Springs's ability to fulfill existing commercial contracts and enter into new commercial contracts. Springs has contracts with customers for corded window coverings that require product delivery after May 30, 2023. But when the CPSC's rule takes effect, Springs will not be able to supply corded operating systems due under those contracts because those systems do not comply with the CPSC's rule. In addition, the rule is preventing Springs from entering into new commercial contracts for corded products because it cannot provide pricing options or timelines for product delivery. Those issues could result in $30 million in lost revenue in 2023.

46. When the CPSC's rule takes effect, Springs will need to immediately stop manufacturing most of its custom window coverings, which use corded operating systems. Springs expects that its annual revenue will decline by approximately $250-300 million the first year the rule is in effect, including a loss of $130-160 million in Springs's commercial business; Springs expects that its annual revenue will decline by approximately $100 million the second year the rule is in effect. That is because, as discussed above (¶¶ 28-41), non-corded operating systems are not a viable alternative for many custom window coverings, and it will

take approximately 2-2.5 years to develop compliant corded operating systems across Springs's product lines.

47.  The anticipated revenue decline will impact Springs's ability to retain employees.  Springs could be forced to lay off employees in June 2023.  Layoffs could impact product development personnel, which would make it more difficult for Springs to develop custom products that comply with the CPSC's rule.

48.  Complying with the CPSC's rule is likely to harm Springs's relationships with retailers and dealers due to the disruption to their business caused by the effort needed from them, in a very short timeline, to revise product offerings and thousands of displays.  In addition, consumers will likely be dissatisfied with the limited range, and significant additional expense, of available operating systems when the rule takes effect, and retailers and dealers will see a decline in business as a result.  That will strain Springs's relationships with retailers and dealers.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of December 2022.

Jason Grommon

# Attachment A
# to Declaration of Jason Grommon

Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**

## 1    SCOPE

This method describes test procedures for corded window coverings (CWC) in order to verify if the product meets the mechanical requirements of the *Corded Window Covering Regulations* (SOR/2019-97).  Chemistry related requirements are not covered by this method.  The numerical values of performance measures are based upon regulatory requirements. The tolerances for these values have been chosen such that no test parameter applied to the product results in a more severe condition than that specified in the Regulations, with the understanding that uncertainty of measurement is always present. The product is evaluated by performing the following test sections in sequence:

| | |
|---|---|
| 4.1 | EXAMINATION OF PACKAGING, PRODUCT AND INSTRUCTIONS PROVIDED |
| 4.2 | PERMANENCY OF THE LABELS |
| 4.3 | INDELIBILITY OF THE PRINTING |
| 4.4 | INSTALLATION IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED |
| 4.5 | REACHABLE CORDS – LENGTH |
| 4.6 | REACHABLE CORDS – COMPLETELY BOUNDED OPENINGS |
| 4.7 | TWO REACHABLE CORDS |
| 4.8 | 90 N PUSH/PULL TEST |

## 2    APPLICABLE DOCUMENTS

2.1   *Corded Window Coverings Regulations* (SOR/2019-97)

2.2   Test Method M00.1: *Small Components*

2.3   SOP 77: *Initialization of the Corded Window Coverings Test Frame*

## 3    SAMPLING

The following test procedures should be conducted on the number of sample elements provided or received (typically one), unless otherwise requested by the client.

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations.  Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties.  In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.

Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**

## 4 TESTING PROCEDURE

### 4.1 EXAMINATION OF PACKAGING, PRODUCT AND INSTRUCTIONS PROVIDED

#### 4.1.1 Scope

4.1.1.1 This section describes the procedure for determining whether the relevant information is present and clearly identified on the packaging, product and instructions as required, and that the product is in an undamaged condition.[1]

#### 4.1.2 Apparatus

4.1.2.2 A graduated measuring magnifier or equivalent with a resolution of 0.1 mm or better

#### 4.1.3 Procedure

4.1.3.1 Examine the product packaging for damage. If damage exists, inspect contents for damage. If contents are damaged, discuss with the client whether to continue with testing.

4.1.3.2 Examine the product packaging for the following information, which must be in both English and French, as well as legible and prominently and clearly displayed with characters in a colour that contrasts sharply with the background;

   i. Its model name or model number;

   ii. Its date of manufacture, consisting of the year and either the month or week, listed in that order;

   iii. In the case of a corded window covering that is manufactured in Canada, the name and principal place of business of the manufacturer or the person for whom the corded window covering was manufactured; and,

   iv. In the case of a corded window covering that is imported for commercial purposes, the name and principal place of business of the manufacturer and the importer.

4.1.3.3 Using the *graduated measuring magnifier*, measure the height of the characters used to present the information required in 4.1.3.2. When lower case print is used, the height of

---

[1] Sections 9 - 15 of the Regulations

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations. Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties. In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.

Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**

the type is determined by measuring the height of the lower case "b" or "p", or similar full height letter. If all text appears to be the same height and font, measure only one lower case letter or one upper case letter (see Figure 1 below).



**Figure 1   Standard sans-serif type**

4.1.3.4   Describe the colour of the characters and the background colour used to present the information in 4.1.3.2.

4.1.3.5   Examine the product packaging for the following warning statement or its equivalent which must be in both English and French, as well as legible and prominently and clearly displayed with characters in a colour that contrasts sharply with the background.

*English:*

**WARNING**

STRANGULATION HAZARD — Young children can be strangled by cords. Immediately remove this product if a cord longer than 22 cm or a loop exceeding 44 cm around becomes accessible.

*French:*

**MISE EN GARDE**

RISQUE D'ÉTRANGLEMENT — Les enfants en bas âge peuvent s'étrangler avec des cordes. Enlevez immédiatement ce produit si une corde mesurant plus de 22 cm devient accessible ou si le contour d'une boucle de plus de 44 cm devient accessible.

4.1.3.6   Using the *graduated measuring magnifier*, measure the height of the characters used to present the information required in 4.1.3.5 .  When lower case print is used, the height of the type is determined by measuring the height of the lower case "b" or "p", or similar

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations.  Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties.  In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.

Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**

full height letter. If all text appears to be the same height and font, measure only one lower case letter or one upper case letter (see Figure 1).

4.1.3.7 Using the *graduated measuring magnifier*, measure the height of signal words "WARNING" and "MISE EN GARDE". Observe if any lower case or non-bolded letters are used in the signal words.

4.1.3.8 Describe the colour of the characters and the background colour used to present the information in 4.1.3.5.

4.1.3.9 Examine the product packaging for any direct or indirect reference to *the Canada Consumer Product Safety Act* or the *Corded Window Coverings Regulations*.

4.1.3.10 Examine the product for damage. If there is damage, assess the extent of the damage, and discuss with the client whether to continue with testing.

**Note**: If the Analyst observes that partial installation of the product is necessary for ease of access to the warnings and labels on the product, partial installation can take place at this point so long as the manufacturer's instructions are followed. Full installation takes place in 4.4.

4.1.3.11 Repeat 4.1.3.2 through 4.1.3.9 for information on the product.

4.1.3.12 Repeat 4.1.3.5 through 4.1.3.9 for information found in the instructions.

4.1.3.13 Examine the instructions provided for the following information in text, drawings or photographs, or any combination of them.[2] If no installation instructions are provided, consult with the client.

  i. How to assemble the corded window covering and a quantitative list of its parts, if it is sold not fully assembled;

  ii. How to install it; and,

  iii. How to operate it.

---

[2] Section 14 of the Regulations

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations. Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties. In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.

Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**

4.1.4   Results

4.1.4.1   Record the following as applicable to the product packaging, product and accompanying instructions:

  i.   Whether the product and / or product packaging were damaged and a description of the extent of damage;

  ii.   Whether the information listed in 4.1.3.2 was present in English and French, and any discrepancies observed (product and product packaging only);

  iii.   Whether the information in 4.1.3.5 was present in English and French, and any discrepancies observed;

  iv.   The smallest letter height used to present all information (excluding signal words) in 4.1.3.2 and 4.1.3.5;

  v.   The smallest letter height used in signal words "WARNING" and "MISE EN GARDE" in 4.1.3.5, and whether any non-bolded letters or lower case letters were observed;

  vi.   Whether there were any direct or indirect reference to the *Canada Consumer Product Safety Act* or *Corded Window Coverings Regulations* that were made;

  vii.   The colour of the characters and the background colour used to present the information in 4.1.3.2 and 4.1.3.5; and,

  viii.   A description of any missing required information identified in 4.1.3.13 (installation instructions only).

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations. Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties. In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.

Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**

4.2 **PERMANENCY OF THE LABELS**

4.2.1 Scope

4.2.1.1 This section describes the procedure for determining whether the labels, with required information, on the product are permanently affixed to it.[3]

4.2.2 Apparatus

4.2.2.1 A force gauge that measures up to at least 90 N, with a resolution of 1 N or better

4.2.2.2 A Pennington clamp or equivalent (see Figure A - 1 of the Appendix)

4.2.2.3 A knife or scalpel

4.2.3 Procedure

**Note**: If the Analyst observes that partial installation of the product is necessary for ease of access to labels on the product, partial installation can take place at this point so long as the manufacturer's instructions are followed.  Full installation takes place in 4.4.

4.2.3.1 Select a product label that contains any required information from 4.1.3.2 or 4.1.3.5.

4.2.3.2 Using a fingernail, knife or scalpel, attempt to raise a portion of one of the labels (a corner is preferred, if available) far enough so that the *Pennington clamp* can be attached.  Only labels containing required information should be tested.  Care should be taken not to damage the label material or surface on which it is affixed.

4.2.3.3 Attach the *Pennington clamp* to the raised portion of the label at a point that has not been damaged (*e.g.*, torn, frayed) by the raising action.

4.2.3.4 Attach the force gauge to the *Pennington clamp* and gradually apply a force of 85 N ± 5 N in an attempt to initiate and sustain removal action of the label.  If the attached portion of the label slips from the clamp, adjust the clamp, re-attach it to the force gauge, and resume the test.  If the label begins to tear, continue with the test until the torn portion detaches or until the entire label has been completely detached.

4.2.3.5 Repeat from 4.2.3.1 for the remaining product labels that contain required information.

---

[3] Paragraph 10(d) of the Regulations

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations.  Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties.  In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.

Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**

4.2.4   Results

    4.2.4.1   Record the following for each label tested:

       i.    The location of the label(s);

       ii.    If partial installation of the product was required and what was installed;

       iii.    If a portion of the label could not be raised a sufficient amount to provide an adequate undamaged area to attach the *Pennington clamp* (or equivalent);

       iv.    Whether the label detached completely from the product;

       v.    The maximum force applied to the label;

       vi.    Whether the label tore or was damaged during the attempt to remove it from the product; and,

       vii.    Whether the surface on which the label was affixed was damaged during the attempt to remove it from the product.

**4.3   INDELIBILITY OF THE PRINTING**

4.3.1   Scope

    4.3.1.1   This section describes the procedure for determining whether the required information printed on the product or on a label that is permanently affixed to it is indelible.[4]

4.3.2   Apparatus

    4.3.2.1   A non-abrasive, non-corrosive household window cleaner

    4.3.2.2   An all-purpose 100% cotton cloth

---

[4] Paragraph 10(d) of the Regulations

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations. Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties. In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.

Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**

4.3.3   Procedure

**Note**:  If the Analyst observes that partial installation of the product is necessary for ease of access to the information printed on the product or on the labels that are affixed to it, partial installation can take place at this point so long as the manufacturer's instructions are followed.  Full installation takes place in 4.4.

4.3.3.1   Select a region that contains any required information from 4.1.3.2 or 4.1.3.5 that is either:

i.   Printed on a label which is glued onto the product;

ii.   Printed on plastic or other material affixed to the product; or,

iii.   Stamped or printed on the product.

4.3.3.2   Dampen a 100% cotton cloth with a non-abrasive, non-corrosive household window cleaner.

4.3.3.3   Rub the label 10 times (10 back and forth, smooth continuous strokes, not too harshly or too lightly).  Look for any portion of the lettering that smudged or erased.

4.3.3.4   Repeat from 4.3.3.1  for all other regions of print and product labels that contain required information.

4.3.4   Results

4.3.4.1   Record the following for all printed information tested:

i.   The location of the print;

ii.   If partial installation of the product was required and what was installed; and,

iii.   Whether any portion of the lettering was smudged or erased.

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations.  Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties.  In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.

Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**

4.4 **INSTALLATION IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED**

4.4.1 Scope

    4.4.1.1 This section describes the procedure for determining whether the product can be assembled, installed and operated in accordance with the instructions provided.

4.4.2 Apparatus

    4.4.2.1 Test frame (see Figure A - 4 to Figure A - 14, and Table A - 1 of the Appendix)

    4.4.2.2 Mounting header (framing lumber advertised as 2"x4"x8')

    4.4.2.3 Assorted hand tools required for installation

4.4.3 Procedure

    4.4.3.1 Label the mounting header (*i.e.*, lumber) with the sample number.

    4.4.3.2 Install the product on the mounting header according to the manufacturer's installation instructions. Install any accessories provided, if applicable. If multiple mounting configurations are possible (*e.g.*, inside mount, outside mount), select a mounting configuration that enables the Analyst the necessary access to conduct all subsequent tests in this method (see 4.5 to 4.8).

    4.4.3.3 If the window covering cannot be mounted according to the instructions; if there are missing parts; or more generally, if any installation issues are encountered – discuss with the client whether to continue with testing.

    4.4.3.4 Fasten the mounting header into the brackets of the test frame's mounting rail.

4.4.4 Results

    4.4.4.1 Record the mounting configuration.

    4.4.4.2 Record the direction the product faces when it is installed.

    4.4.4.3 Record a description of the problems encountered during the installation process (if applicable), and the corresponding resolution to each problem.

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations. Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties. In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.

Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**

### 4.5 REACHABLE CORDS – LENGTH

4.5.1 Scope

4.5.1.1 This section describes the procedure for determining if reachable cords with one free end or reachable cords between two consecutive contact points – excluding those found in completely bounded openings – are greater than 22 cm in length.[5]  For the purpose of this procedure, the same cord may be re-tested under the same or different test conditions (*e.g.*, product positions, pull directions, number of pulls).

4.5.2 Apparatus

4.5.2.1 Test frame (see Figure A - 4 to Figure A - 14, and Table A - 1 of the Appendix)

4.5.2.2 Tape measure with a resolution of 1 mm or better

4.5.2.3 Child reachability probe (see Figure A - 2 of the Appendix)

4.5.2.4 Adult reachability probe (see Figure A - 3 of the Appendix)

4.5.2.5 Cord length gauge measuring 230 mm ± 2 mm (see Figure A - 16 and Table A - 1 of the Appendix)

4.5.2.6 A cord attachment fixture

4.5.2.7 Test weight with a net weight of 34 N ± 1 N (taking into account the weight of all fixtures used)

4.5.2.8 A stopwatch with an audible indicator and a resolution of 0.1 second or better

4.5.3 Procedure

4.5.3.1 Examine the product for a potentially reachable cord while the product is in any stationary adjustment position, such as fully opened, fully closed, or any position in between.

4.5.3.2 Adjust the product to a position that may produce a length of cord that exceeds 22 cm in length.

---

[5] Sections 5 and 6 of the Regulations

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations.  Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties.  In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.

Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**

**Note:** Any issues regarding the classification of a particular component as a cord (as defined in the Regulations) must be brought to the client for resolution.

4.5.3.3 If the product is not configured in its fully opened or fully closed position, use a *tape measure* to measure the vertical distance between two points of reference (*e.g.*, the lowest surface of the headrail to the lowest surface of the bottom rail).

4.5.3.4 Attempt to contact a potentially reachable cord that may exceed 22 cm using the *child reachability probe*. Repeat this step with the *adult reachability probe*.

    4.5.3.4.1 In all cases where contact is made, mark the location of contact and proceed to 4.5.3.5.

    4.5.3.4.2 If contact is not made, repeat from 4.5.3.1 for all other potentially reachable cords that may exceed 22 cm. Otherwise, if no further reachable cords are observed, proceed to 4.6.

4.5.3.5 If there is any observed length of reachable cord that could be greater than 22 cm in length without any application of force, superimpose the *cord length gauge* overtop of the longest observed portion of that cord to assess its length.

    4.5.3.5.1 If there is no such cord observed, or if the length of reachable cord is not greater than the length of the *cord length gauge*, proceed to 4.5.3.6.

    4.5.3.5.2 If the length of reachable cord is confirmed to be greater than the *cord length gauge*, repeat from 4.5.3.1 for all other potentially reachable cords that may exceed 22 cm. The same cord may also be re-tested.

4.5.3.6 Attach an appropriate *fixture* to the cord.

4.5.3.7 Set the *stopwatch* to make audible beeps every 5 seconds.

4.5.3.8 Gradually apply the *test weight* to the *fixture* over 10 s ± 2 s.

4.5.3.9 Superimpose the *cord length gauge* overtop of the longest observed portion of cord to assess the length of cord. When the cord assessment has been completed, remove *test weight* and the *fixture* from the cord.

4.5.3.10 Repeat from 4.5.3.1 for all other potentially reachable cords that may exceed 22 cm. The same cord may also be re-tested.

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations. Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties. In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.

Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**

4.5.4   Results

4.5.4.1   Record whether the *reachability probes* contacted a cord (as applicable), and a description of the location of contact.

4.5.4.2   Record the combined weight of the *test weight* and *fixtures* (if applicable).

4.5.4.3   Record the position of the product (*i.e.*, fully opened, fully closed, or a linear measurement along with a description of the two points of reference used).

4.5.4.4   Record if any damage was observed after any weight application.

4.5.4.5   Record if the length of any reachable cord exceeded the length of the *cord length gauge*.

4.6   **REACHABLE CORDS – COMPLETELY BOUNDED OPENINGS**

4.6.1   Scope

4.6.1.1   This section describes the procedure for determining if a completely bounded opening (CBO) forms a perimeter of 44 cm or more, and is comprised of at least 22 cm of reachable cord.[6]  For the purpose of this procedure, the same cord may be re-tested under the same or different test conditions (*e.g.*, product positions, pull directions, number of pulls).

4.6.2   Apparatus

4.6.2.1   Test frame (see Figure A - 4 to Figure A - 14, and Table A - 1 of the Appendix)

4.6.2.2   Tape measure with a resolution of 1 mm or better

4.6.2.3   Child reachability probe (see Figure A - 2 of the Appendix)

4.6.2.4   Adult reachability probe (see Figure A - 3 of the Appendix)

4.6.2.5   Cord grasping pulley (see Figure A - 15 and Table A - 1 of the Appendix)

4.6.2.6   Cord length gauge measuring 230 mm ± 2 mm (see Figure A - 16 and Table A - 1 of the Appendix)

---

[6] Section 7 of the Regulations

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations.  Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties.  In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify alternate test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.

Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**

4.6.2.7 Perimeter gauge measuring 443 mm ± 2 mm (see Figure A - 17 and Table A - 1 of the Appendix)

4.6.2.8 Test weight with a net weight of 34 N ± 1 N (taking into account the weight of all fixtures used)

4.6.2.9 A stopwatch with an audible indicator and a resolution of 0.1 second or better

4.6.3 Procedure

4.6.3.1 Examine the product for a potentially reachable cord that makes up part of a CBO while the product is in any stationary adjustment position, such as fully opened, fully closed, or any position in between.

4.6.3.2 Adjust the product to a position that may produce a CBO that exceeds 44 cm in perimeter.

**Note:** Any issues regarding the classification of a particular component as a cord (as defined in the Regulations) must be brought to the client for resolution.

4.6.3.3 If the product is not configured in its fully opened or fully closed position, use a *tape measure* to measure the vertical distance between two points of reference (*e.g.*, the lowest surface of the headrail to the lowest surface of the bottom rail).

4.6.3.4 Attempt to contact a potentially reachable cord using the *child reachability probe*. Repeat this step with the *adult reachability probe*.

4.6.3.4.1 In all cases where contact is made, mark the location of contact and proceed to 4.6.3.5.

4.6.3.4.2 If contact is not made, repeat from 4.6.3.1 for other potentially reachable cords. Otherwise, if no further reachable cords are observed, proceed to 4.7.

4.6.3.5 Use the *tape measure* to measure the vertical distance from a fixed point of reference (*e.g.*, the lowest surface of the headrail) to the point where reachability was observed.

4.6.3.6 Adjust the mounting rail component of the *test frame* such that the mounted product is at the desired testing height.

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations. Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties. In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.

Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**

4.6.3.7   If there is a CBO that contains a reachable cord, and the CBO could have a perimeter greater than 44 cm without any application of force, superimpose the *perimeter gauge* overtop of the opening to assess its perimeter.

    4.6.3.7.1   If there is no such CBO observed, or if the CBO perimeter is not greater than that of the *perimeter gauge*, proceed to 4.6.3.8**.**

    4.6.3.7.2   If the CBO has a perimeter that is greater than that of the *perimeter gauge*, replace the *perimeter gauge* with the *cord length gauge*.  Superimpose the *cord length gauge* overtop of the longest observed portion of cord to assess its length.  If the length of cord does not exceed that of the *cord length gauge*, proceed to 4.6.3.8; otherwise, repeat from 4.6.3.1 for all other potentially reachable cords that may create a CBO that exceeds 44 cm in perimeter.

4.6.3.8   Zero all three coordinates of the *test frame* in accordance with SOP 77.

4.6.3.9   Using light manipulation, install the *cord grasping pulley* into the CBO that contains the portion of cord that was confirmed to be reachable.

4.6.3.10  Tie a loop of string through the eyelet of the *cord grasping pulley*, ensuring that the resulting length of *tether* is long enough to pass through the front and rear pulleys of the *test frame*.  The *test weight* will be applied to the opposite end of this *tether* near the rear pulley of the *test frame*.

4.6.3.11  Adjust the coordinates of the *test frame* such that its front pulley is positioned at a location that might produce a CBO that exceeds 44 cm in perimeter when the cord is pulled.

4.6.3.12  Thread the *tether* of the *cord grasping pulley* through the front and rear pulleys of the *test frame* and apply a *fixture* (*e.g.,* s-hook) to the end of the *tether* nearest the rear pulley.

4.6.3.13  Position the restraining arm sub-assembly of the *test frame* such that the restraining bar component reduces any foreseeable movement (*e.g.,* twisting) of the product while the reachable cord is being pulled.

    **Note:**  An example of this testing arrangement is shown in Figure A - 6 of the Appendix.

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations.  Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory test methods that must be used by regulated parties.  In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.

Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**

4.6.3.14 Set the *stopwatch* to make audible beeps every 5 seconds.

4.6.3.15 Gradually apply the *test weight* to the tethered *fixture* over a period of 10 s ± 2 s.

4.6.3.16 Install the *perimeter gauge* through the *cord grasping pulley* and superimpose the *perimeter gauge* over the CBO to assess its size.

    4.6.3.16.1 If the CBO has a perimeter that is greater than that of the *perimeter gauge*, proceed to 4.6.3.17**.**

    4.6.3.16.2 If the CBO has a perimeter that is less than or equal to that of the *perimeter gauge*, discontinue testing of the reachable cord and repeat from 4.6.3.1 for other potentially reachable cords.  The same cord may also be re-tested.

4.6.3.17 Replace the *perimeter gauge* with the *cord length gauge*.  Superimpose the *cord length gauge* overtop of the longest observed portion of cord to assess its length.  When the cord assessment has been completed, remove *test weight* and the fixture from the cord.

4.6.3.18 Repeat from 4.6.3.1 for all other potentially reachable cords that may create a CBO that exceeds 44 cm in perimeter. The same cord may also be re-tested.

4.6.4   Results

    4.6.4.1 Record whether the *reachability probes* contacted a cord (as applicable), and a description of the location of contact.

    4.6.4.2 Record the combined weight of the *test weight* and *fixtures* (if applicable).

    4.6.4.3 Record the position of the product (*i.e.*, fully opened, fully closed, or a linear measurement along with a description of the two points of reference used).

    4.6.4.4 Record a description of the cord being tested, and a measurement of the vertical distance between a fixed point of reference and the point where reachability was observed.

    4.6.4.5 Record the initial and final coordinates of the *test frame*.

    4.6.4.6 Record if any damage was observed after any weight application.

    4.6.4.7 Record whether the perimeter of the CBO exceeded that of the *perimeter gauge*.

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations.  Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties.  In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.

Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**

4.6.4.8   If applicable, record if the length of any reachable cord exceeded the length of the *cord length gauge*.

## 4.7   TWO REACHABLE CORDS

4.7.1   Scope

4.7.1.1   This section describes the procedure for determining if two reachable cords with one free end can produce a resulting cord that is greater than 22 cm in length after each cord has been pulled and connected end to end.[7]   For the purpose of this procedure, the same cord may be re-tested under the same or different test conditions (*e.g.*, product positions, pull directions, number of pulls).

4.7.2   Apparatus

4.7.2.1   Test frame (see Figure A - 4 to Figure A - 14, and Table A - 1 of the Appendix)

4.7.2.2   Tape measure with a resolution of 1 mm or better

4.7.2.3   Child reachability probe (see Figure A - 2 of the Appendix)

4.7.2.4   Adult reachability probe (see Figure A - 3 of the Appendix)

4.7.2.5   Cord length gauge measuring 230 mm ± 2 mm (see Figure A - 16 and Table A - 1 of the Appendix)

4.7.2.6   Cord attachment fixtures

4.7.2.7   Test weight with a net weight of 34 N ± 1 N (taking into account the weight of all fixtures used)

4.7.2.1 A stopwatch with an audible indicator and a resolution of 0.1 second or better

4.7.2.2 Two cord clamping forceps or equivalent (see parts list in Table A - 1 of the Appendix)

---

[7] Section 8 of the Regulations

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations.  Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties.  In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.

Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**

4.7.3    Procedure

4.7.3.1    Examine the product for a potentially reachable cord while the product is in any stationary adjustment position, such as fully opened, fully closed, or any position in between.

4.7.3.2    Adjust the product to a position that may produce a length of cord that exceeds 22 cm in length when two cords are connected to one another, end to end.

**Note:** Any issues regarding the classification of a particular component as a cord (as defined in the Regulations) must be brought to the client for resolution.

4.7.3.3    If the product is not configured in its fully opened or fully closed position, use a *tape measure* to measure the vertical distance between two points of reference (*e.g.,* the lowest surface of the headrail to the lowest surface of the bottom rail).

4.7.3.4    For each cord with one free end, attempt to contact the potentially reachable cord using the *child reachability probe*. Repeat this step with the *adult reachability probe*.

4.7.3.4.1    In all cases where contact is made, mark the location of contact and proceed to 4.7.3.5.

4.7.3.4.2    If contact is not made, repeat from 4.7.3.1 for other pairs of potentially reachable cords that may exceed 22 cm. Otherwise, if no further reachable cords are observed, proceed to 4.8.

4.7.3.5    If there are two observed lengths of reachable cord that, if connected, could produce a cord greater than 22 cm in length without any application of force, connect the two reachable cords (*e.g.,* by tying the two ends in a knot) and superimpose the *cord length gauge* overtop of the longest observed portion of that cord to assess its length.

4.7.3.5.1    If there are no such cords observed, or if the length of resulting cord is not greater than the length of the *cord length gauge*, proceed to 4.7.3.6.

4.7.3.5.2    If the length of reachable cord is confirmed to be greater than the *cord length gauge*, repeat from 4.7.3.1 for other pairs of potentially reachable cords that may exceed 22 cm.

4.7.3.6    Set the *stopwatch* to make audible beeps every 5 seconds.

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations. Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties. In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.

Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**

4.7.3.7 Attach an appropriate *fixture* to the first of the two reachable cords.

4.7.3.8 Gradually apply the *test weight* to the cord attachment *fixture* over 10 s ± 2 s. With the test weight applied, attach the *cord clamping forceps* onto the cord to lock its extension in place and remove the *test weight* and attachment *fixture*.

4.7.3.9 Attach an appropriate *fixture* to the second of the two reachable cords.

**Note:** The same attachment fixture may be used for both reachable cords.

4.7.3.10 Following the same interval of audible beeps produced by the *stopwatch*, gradually apply the *test weight* to the cord attachment *fixture* of the second reachable cord over 10 s ± 2 s. With the *test weight* applied, attach the *cord clamping forceps* onto the cord to lock its extension in place and remove the *test weight* and attachment *fixture*.

4.7.3.11 Attempt to connect the ends of the two locked cords (*e.g.*, by tying the two ends in a knot) and superimpose the *cord length gauge* overtop of the longest observed portion of that cord to assess its length.

4.7.3.12 Repeat from 4.7.3.1 for all other combinations of cords that appear that, if connected, they could produce a cord length greater than 22 cm. The same cord may also be re-tested.

4.7.4    Results

4.7.4.1 Record whether the *reachability probes* contacted a cord (as applicable), and a description of the location of contact.

4.7.4.2 Record the combined weight of the *test weight* and *fixtures* applied to each cord (if applicable).

4.7.4.3 Record the position of the product (*i.e.*, fully opened, fully closed, or a linear measurement along with a description of the two points of reference used).

4.7.4.4 Record if any damage was observed after any weight application.

4.7.4.5 Record if the combined length of any 2 connected cords exceeded the length of the *cord length gauge*.

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations. Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties. In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.

Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**

4.8　**90 N PUSH/PULL TEST**

4.8.1　Scope

4.8.1.1　This section describes the procedure for determining whether accessible components affixed to the product become detached under a force of 90 N applied in any direction. Components that are able to be detached from the product shall be assessed to see if they fit in the small parts cylinder.[8]

4.8.2　Apparatus

4.8.2.1　As per Method M00.1: *Small Components*

4.8.2.2　Test frame (see Figure A - 4 to Figure A - 14, and Table A - 1 of the Appendix)

4.8.2.3　A selection of attachments, grasping and/or clamping tools.

4.8.2.4　A force gauge that measures up to at least 90 N with a resolution of 1 N or better.

4.8.2.5　A stopwatch with audible indicator and a resolution of 0.1 second or better.

4.8.3　Procedure

4.8.3.1　Using a suitable force gauge *attachment* (*e.g.*, a chiselled tip for pushing or a hook and clamp for pulling), gradually apply a push or pull force of 85 N ± 5 N to the potentially small part in a direction most likely to result in separation.

4.8.3.1.1　If a component detaches, proceed to Method M00.1: *Small Components* to determine if it can be completely enclosed in the small parts cylinder.

4.8.3.1.2　If a component partially detaches, consult with the client.

4.8.3.2　Repeat from 4.8.3.1 for all other potentially small parts that may become detached under loading.  Do not re-test components that have already been pushed / pulled, unless instructed by the client.

---

[8] Section 2 of the Regulations

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations.  Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties.  In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.

Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**

4.8.4 Results

4.8.4.1 Record any damage that may have resulted from the applied force.

4.8.4.2 Record the force required to fully detach any component(s), a description of the component, and the location of the component on the mounted product.

4.8.4.3 Record whether the component(s) were able to be completely enclosed in the *small parts cylinder* following the M00.1: *Small Components* test procedure.


## 5   QUALITY ASSURANCE/QUALITY CONTROL PROCEDURES

5.1   Ensure that all measuring instruments are functional, verified and are calibrated with traceability to national or international standards.


## 6   TEST REPORT

6.1   The test report shall contain the following information:

6.1.1   The name and effective date of the test methods used for testing.

6.1.2   A description of the product to include (where available) brand, style, country of origin, size, photos (where necessary), UPC, and other pertinent information.

6.1.3   The number of sample elements tested.

6.1.4   The test results listed under each of the 'Results' subheadings under section 4, as applicable to any particular issues identified during testing.

6.1.5   The Analyst's name and signature, as well as the names(s) and signature(s) of the reviewer(s).

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations.  Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties.  In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.

**APPENDIX – EQUIPMENT SPECIFICATIONS**

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations.  Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties.  In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.


Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**



**Figure A - 1** *Pennington clamp* used for assessing permanency of labels.



**Figure A - 2** Specification for the *child reachability probe*. All dimensions are in millimeters. The probe is dimensioned to facilitate verification.



**Figure A - 3** Specification for the *adult reachability probe*. All dimensions are in millimeters. The probe is dimensioned to facilitate verification.

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations. Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties. In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.

Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**



**Figure A - 4   Rendering of the *test frame* positioned in front of an example corded window covering.**

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations.  Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties.  In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.


Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**

| PARTS LIST | | |
|---|---|---|
| ITEM | QTY | DESCRIPTION |
| A1 | 1 | Pulley Slider Bracket Assembly |
| A2 | 1 | Pulley Arm Assembly |
| A3 | 1 | Restraining Arm Slider Bracket Assembly |
| A4 | 1 | Restraining Arm Assembly |
| A5 | 1 | Platform Assembly |
| A6 | 1 | Cart Base Assembly |

**Figure A - 5   Overview of the *test frame* assembly.**

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations.  Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties.  In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.



**Figure A - 6   Example pull on a reachable cord making up part of a CBO.  As can be seen, the *test weight* is attached to an s-hook *fixture*, which is suspended on a *tether*.  On the opposite end of the *tether* (towards the mounted product) is a *cord grasping pulley*, which has been installed into a CBO.  The *restraining arm* is preventing the product from being distorted (*e.g.*, twisted) during load application.  Note that the restraining arm sub-assembly, pulley arm sub-assembly, platform sub-assembly, and the vertical post portion of the cart base sub-assembly are all graduated and adjustable in the directions shown by the red arrows.  This testing configuration shows an outwardly pull.  For sideways pulls, an auxiliary secondary pulley (not shown) may be used in conjunction with the front pulley of the pulley arm sub-assembly.**

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations.  Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties.  In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.

Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**



| PARTS LIST | | |
|---|---|---|
| ITEM | QTY | DESCRIPTION |
| 1 | 1 | UniBearing Bearing Assembly Long Single Mount- 15 Series |
| 2 | 1 | Double Flange Linear Bearings |
| 3 | 2 | Joining Plates - 4 Hole Inside Gusset Corner Bracket |
| 4 | 2 | "L" Handle Kit - Dynamic Pivot |
| 5 | 1 | 6" T-Slotted Profile - 15 Series |
| 6 | 2 | 3" T-Slotted Profile - 10 Series |



**Figure A - 7   Exploded isometric perspective of the pulley arm support slider sub-assembly.**

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations.  Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties.  In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.

Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**

| PARTS LIST | | |
|---|---|---|
| ITEM | QTY | DESCRIPTION |
| 3 | 1 | 4 Hole Inside Gusset Corner Bracket |
| 5 | 1 | 6" T-Slotted Profile - 15 Series (modified to allow for mounting of pulley) |
| 7 | 1 | 2 Hole Inside Corner Bracket |
| 8 | 1 | 30" T-Slotted Profile - 15 Series |
| 9 | 1 | Hanging, Single-Groove, Rigid Eye Pulley |
| 10 | 1 | Hanging Pulley For Fibrous Rope |



**Figure A - 8   Side perspective of the pulley arm sub-assembly.**

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations.  Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties.  In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.

Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**



| PARTS LIST | | |
|---|---|---|
| ITEM | QTY | DESCRIPTION |
| 1 | 1 | UniBearing Bearing Assembly Long Single Mount- 15 Series |
| 2 | 1 | Double Flange Linear Bearings |
| 3 | 4 | 4 Hole Inside Gusset Corner Bracket |
| 4 | 2 | "L" Handle Kit - Dynamic Pivot |
| 11 | 2 | 6" T-Slotted Profile - 15 Series |
| 12 | 2 | 4.5" T-Slotted Profile - 10 Series |

**Figure A - 9   Exploded isometric perspective of the restraining arm slider bracket sub-assembly.**

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations.  Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory test methods that must be used by regulated parties.  In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.

Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**



| PARTS LIST | | |
| --- | --- | --- |
| ITEM | QTY | DESCRIPTION |
| 7 | 2 | 2 Hole Inside Corner Bracket |
| 8 | 1 | 30" T-Slotted Profile - 15 Series |
| 13 | 1 | Restraining Arm Support Block (see drawing) |
| 14 | 1 | Restraining Bar (see drawing) |
| 15 | 2 | 5/16"-24 Thread, Length 3.5" Hex Head Screw |

**Figure A - 10    Exploded side perspective of the restraining arm sub-assembly.**

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations.  Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties.  In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.



Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**



| PARTS LIST | | |
|---|---|---|
| ITEM | QTY | DESCRIPTION |
| 16 | 2 | 145" T-Slotted Profile - 15 Series |
| 17 | 2 | 25" T-Slotted Profile - 15 Series |
| 18 | 4 | 8 Hole Inside Gusset Corner Bracket |

**Figure A - 11    Isometric perspective of the platform sub-assembly.**

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations.  Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties.  In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.



Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**

| PARTS LIST | | |
|---|---|---|
| ITEM | QTY | DESCRIPTION |
| 3 | 6 | 4 Hole Inside Gusset Corner Bracket |
| 19 | 2 | 36" T-Slotted Profile - 15 Series |
| 20 | 2 | 18" T-Slotted Profile - 15 Series |
| 21 | 1 | 5 Hole Tee Joining Plate |
| 22 | 4 | Roller Wheel Bracket Assembly - 15 Series |
| 23 | 1 | 95.5" T-Slotted Profile - 15 Series |
| 24 | 5 | 15 Series - 0 deg Living Hinge |
| 25 | 2 | 19.5" T-Slotted Profile - 15 Series |
| 26 | 1 | 15 Series - 90 deg Living Hinge |
| 27 | 1 | 22.563" T-Slotted Profile - 15 Series |

**Figure A - 12    Isometric perspective of the cart base sub-assembly.**

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations.  Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties.  In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.

Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**



Tolerances:
x ± 0.5
x.x ± 0.05
x.xx ± 0.01

All dimensions are in Inches

**Figure A - 13    Front, side and top perspectives of the restraining arm support block.**



Tolerances:

x ± 0.2
x.x ± 0.1
x.xx ± 0.01
x.xxx ± 0.005
x.xxxx ± 0.005

All dimensions are in Inches

**Figure A - 14    Front and side perspectives of the restraining bar.**

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations. Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties. In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.

A118

Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**



Figure A - 15   Example of (a) the cord grasping pulley installed into the CBO where a reachable cord has been confirmed, and (b) the end location of the cord grasping pulley during a 35 N pull (which is limited by the position of the front pulley of the pulley arm).

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations. Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties. In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.

Health Canada

Product Safety Laboratory

Page

34 of 36

Effective

2020-06-19

Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**



**Figure A - 16    Cord length gauge mounted on its corresponding verification template.**



**Figure A - 17    Perimeter gauge positioned on its corresponding verification template.**

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations. Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties. In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.

Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**

Table A - 1  Parts List

| Sub Assembly | Item # | Quantity | Description |
|---|---|---|---|
| Pulley arm slider Bracket assembly (A1) | 1 | 1 | UniBearing Bearing Assembly Long Single Mount- 15 Series |
| | 2 | 1 | Double Flange Linear Bearings |
| | 3 | 2 | Joining Plates - 4 Hole Inside Gusset Corner Bracket |
| | 4 | 2 | "L" Handle Kit - Dynamic Pivot |
| | 5 | 1 | T-Slotted Profile - 15 Series, Length: 6" |
| | 6 | 2 | T-Slotted Profile - 10 Series, Length: 3" |
| Pulley Arm Assembly (A2) | 3 | 1 | Joining Plates - 4 Hole Inside Gusset Corner Bracket |
| | 5 | 1 | T-Slotted Profile - 15 Series, Length: 6" (with slit and hole cut to mount pulley) |
| | 7 | 1 | 2 Hole Inside Corner Bracket |
| | 8 | 1 | T-Slotted Profile - 15 Series, Length: 30" |
| | 9 | 1 | Hanging, Single-Groove, Rigid Eye Steel Pulley[9] |
| | 10 | 1 | Hanging Pulley with Bearing and Swivel Eye[9] |
| Restraining Arm Slider Bracket Assembly (A3) | 1 | 1 | UniBearing Bearing Assembly Long Single Mount - 15 Series |
| | 2 | 1 | 15 Series 3 Slot Mount - Double Flange Long Standard Linear Bearing with Break Holes |
| | 3 | 4 | Joining Plates - 4 Hole Inside Gusset Corner Bracket |
| | 4 | 2 | "L" Handle Kit - Dynamic Pivot |
| | 11 | 2 | T-Slotted Profile - 15 Series, Length: 6" |
| | 12 | 2 | T-Slotted Profile - 10 Series, Length 4.5" |
| Restraining Arm Assembly (A4) | 7 | 2 | 2 Hole Inside Corner Bracket |
| | 8 | 1 | T-Slotted Profile - 15 Series, Length: 30" |
| | 13 | 1 | Restraining Arm Support Block |
| | 14 | 1 | Restraining Bar (5' Length, 1" OD Solid Steel Rod with Holes for Bolts) |
| | 15 | 2 | 5/16"-24 Thread, Length 3.5" Hex Head Screw |
| Support Platform Track (A5) | 16 | 2 | T-Slotted Profile - 15 Series, Length: 145" |
| | 17 | 2 | T-Slotted Profile - 15 Series, Length: 25" |
| | 18 | 4 | 8 Hole Inside Gusset Corner Bracket |
| Cart Base (A6) | 3 | 6 | 4 Hole Inside Gusset Corner Bracket - 15 series |
| | 19 | 2 | T-Slotted Profile - 15 Series Length: 36" |
| | 20 | 2 | T-Slotted Profile - 15 Series Length: 18" |

[9] Modifications were made to this item by replacing the housed pulley wheel and axle with ones made in house to incorporate lower friction bearings for the pulley wheel's rotation.

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations.  Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties.  In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.

Reference Manual Book 5: Laboratory Policies and Procedures

Part B: Test Method Section

**M22: Corded Window Coverings**

| Sub Assembly | Item # | Quantity | Description |
|---|---|---|---|
| | 21 | 1 | 5 Hole Tee Flat Joining Plate 15 Series |
| | 22 | 4 | Roller Wheel Bracket Assembly - 15 series |
| | 23 | 1 | T-Slotted Profile - 15 Series, Length: 95.5" |
| | 24 | 5 | Living Hinge Assemblies - 15 Series – 0° |
| | 25 | 2 | T-Slotted Profile - 15 Series, length: 19.5" |
| | 26 | 1 | Living Hinge Assembly - 15 Series - 90° |
| | 27 | 1 | T-Slotted Profile - 15 Series, Length 22.563" |
| Coordinate system | 28 | 2 | Starrett Adhesive Measure Tape 4' English/Metric Left to Right |
| | 29 | 2 | Starrett Adhesive Measure Tape 12' English/Metric Left to Right |
| Cord Grasping Pulley | 30 | 1 | Easy-Open, Rigid Eye, for 1/8" Diameter Pulley |
| Example Clamping Forceps for Cords with One Free End | 31 | - | Straight Head and Plain Grip 3 1/2" Locking Tongs |
| | 32 | - | Straight Head and Plain Grip 5 1/2" Locking Tongs |
| | 33 | - | 10° Bent Head Plain Grip 3 1/2" Locking Tongs |
| | 34 | - | 45° Bent Head Plain Grip 5 1/2" Locking Tongs |
| Material for CBO and Cord Length Gauges | 35 | 1 | 50' Nickel Plated Steel Bead Chain |
| | 36 | 1 | Bead Loop Links Nickel Plated Steel (100 pack) |
| | 37 | 1 | Screw Mount Links Nickel Plated Steel (100 pack) |
| Example Pennington Clamp | 38 | - | Pennington Forceps 8", Stainless Steel |

Regulated parties are responsible for ensuring that their products are compliant with the *Canada Consumer Product Safety Act* (CCPSA) and its Regulations. Health Canada's Product Safety Laboratory (PSL) test methods are not mandatory test methods. It is the regulated parties' responsibility to ensure that their products are assessed according to the requirements of the CCPSA and its Regulations. PSL test methods are made available to assist industry in understanding how Health Canada assesses products for compliance with mandatory regulatory requirements. Only test methods or test parameters that are prescribed within the *Canada Consumer Product Safety Act* (CCPSA) or its Regulations are mandatory methods that must be used by regulated parties. In cases where a specific test method or test parameters are not set out in the CCPSA or its Regulations, a regulated party may identify different test procedures and/or equipment than outlined in this method and is responsible for ensuring those procedures and equipment are suitable for the specified requirements.

# EXHIBIT 3

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

WINDOW COVERING MANUFACTURERS ASSOCIATION,

Petitioner,

v.

UNITED STATES CONSUMER PRODUCT SAFETY COMMISSION,

Respondent.

## DECLARATION OF DERICK MARSH

I, Derick Marsh, hereby declare:

1.     Rollease Acmeda, Inc. (Rollease), designs and makes components for custom window coverings, and supplies them to manufacturers of finished custom window coverings.  Rollease is a member of the Window Covering Manufacturers Association.

2.     I am the Chief Executive Officer of Rollease.  I have held this position since 2005.

3.     This declaration has seven parts.  Part I provides background on Rollease's business.  Part II discusses the types of corded operating systems that Rollease sells.  Part III explains that Rollease does not make corded operating systems that comply with the Consumer Product Safety Commission's (CPSC) rule.

Part IV explains that Rollease does not sell meaningful quantities of corded operating systems in Canada. Part V describes the 2-2.5-year timeline for Rollease to develop products that comply with the CPSC's rule. Part VI explains why non-corded operating systems cannot be used for many custom products. Part VII discusses the substantial economic and reputational harm that Rollease will suffer because of the CPSC's rule.

## I. Overview Of Rollease's Business

4. Rollease is headquartered in Stamford, Connecticut and employs approximately 240 people, including 140 people in the United States.

5. Rollease's annual sales revenue is approximately $200 million, including $110 million in the United States.

6. Rollease sells the components for making custom window coverings to manufacturers that produce finished window coverings. Rollease designs and manufactures many of the components that it sells. Rollease's customers range from large manufacturers of custom window covering, such as Hunter Douglas and Springs Window Fashions, to smaller manufacturers of custom window coverings, some of which are single-person businesses.

7. There are two types of window coverings—stock and custom. Stock products are mass produced, come in a limited range of fabrics and designs, and are made from relatively inexpensive materials. Stock products are used mainly in

residences. In contrast, custom products are made to order from more durable components, come in a wide range of fabrics and designs, and are generally bigger and more expensive than stock products. Custom products are needed in residences with larger windows and in most commercial establishments.

8.      By sales volume, approximately 75% of window covering components sold by Rollease are for residential use, and approximately 25% are for commercial, non-residential use.

9.      To make components for custom window coverings, Rollease sources fabrics and hardware from suppliers around the world in order to design and engineer custom window covering components. For example, custom window coverings generally incorporate sturdy materials like aluminum and heavy-gauge steel because they are relatively large and heavy. Rollease works closely with aluminum and steel suppliers to produce headrails, cassettes, aluminum panels, tubes, bottom or hem bars, steel springs, and brackets.

## II.     Rollease's Corded Operating Systems For Custom Window Coverings

10.      Approximately 35% of Rollease's annual revenue comes from selling window covering operating systems with a cord or bead chain, which the user operates by pulling to raise and lower window coverings. Rollease's corded operating systems are a relatively small portion of those used by large custom window covering manufacturers, which have their own in-house engineering and

design teams.

11.    Rollease sells two types of corded operating systems: "continuous loop" operating systems and "single retractable cord lift" operating systems. All of those products will have to change as a result of the CPSC's rule.

12.    Approximately 35% of Rollease's annual revenue comes from selling components for "continuous loop" operating systems under tension, examples of which are depicted in Figure 1 and Figure 2 below. The user operates that system by pulling a continuous cord or beaded chain loop that is kept taut with a tension device affixed to a wall.

**Figure 1**                              **Figure 2**

13.    Approximately 2% of Rollease's annual revenue comes from selling components for "single retractable cord lift" operating systems, an example of which

is depicted in Figure 3 below.  In that system, a cord or wand hangs from the headrail and is connected to a spring that is housed in the headrail or tube.  The user raises or lowers the covering by pulling on the hanging wand, which pulls the cord out from the headrail or tube.  The cord retracts back into the headrail when the system is not in use.

**Figure 3**



### III.    Compliance With The CPSC's Rule

14.    The CPSC's rule prohibits the manufacture of both types of corded operating systems that Rollease currently makes.  The Rule requires a continuous loop system under tension to be encased in a rigid shroud (a component made from inflexible material that limits cord accessibility) or a restraining device (a component installed on the window covering that prevents the creation of a large loop).  And it sets a maximum of 12 inches of cord that may be exposed when a user operates a

single retractable cord lift system.

15.     Rollease has not previously sold a rigid cord shroud or cord restraining device that was designed to comply with the requirements in the CPSC's rule. That is because consumers dislike those options. Compared to existing continuous loop systems under tension, rigid shrouds and restraining devices make products more expensive, more difficult to operate, and less visually appealing. They also make the products less durable over time.

16.     Adding a rigid shroud or restraining device to a continuous loop system will cost the custom window covering manufacturer, on average, approximately $6 more per Rollease operating system, excluding the additional labor required for assembly. That is true for two reasons. First, when a window covering has a rigid shroud or restraining device, the consumer pulls the cord loop through a rigid cover to move the covering. The resulting friction creates heat and wear on the material (with increasing severity as product size and weight increases). For that reason, rigid shrouds and restraining devices must be made from relatively expensive components that can withstand additional engagement by the consumer and are durable long term. Second, window coverings with rigid shrouds or restraining devices have more components than existing continuous loop systems. The additional components add cost, and the process for making the window coverings is more labor intensive.

17.    Rollease has not developed a single retractable cord lift system that complies with the requirements in the CPSC's rule.  In Rollease's existing single retractable cord lift system, 22 inches of retractable cord are exposed when a user operates the product.  Consumers dislike single retractable cord lift systems with shorter retractable cords.  That is because a shorter retractable cord significantly increases the number of times a consumer must pull the wand to move a window covering, and it makes the product less durable over time.

18.    Rollease will need to significantly modify its single retractable cord lift system in order to comply with the CPSC's rule.  It cannot simply shorten the cord in the existing system to 12 inches.  That would increase stress on product components and would increase the risk of cord and component failure.  Rollease does not sell window covering components that have a high risk of failure.  Rollease typically offers a lifetime warranty on its products.  Customers typically take advantage of the warranty when a Rollease product fails or breaks because the cost of the finished product to the end consumer can exceed $1,000 per unit.

## IV.    Compliance With The Canadian Rule

19.    In April 2019, Health Canada promulgated regulations for window coverings used in residential settings.  The regulations effectively prohibited the use of continuous loop operating systems under tension without rigid shrouds or restraining devices.

20.    Rollease has not developed corded operating systems that comply with the Canadian regulations.  Rather, Rollease mostly stopped selling components in Canada.  Since the Canadian regulations were enacted, Rollease's annual revenue from sales of manual components into Canada declined from over $1 million to under $100,000.

## V.    Rollease's Timeline To Develop Products That Comply With The CPSC's Rule

21.    Because of the great variety in sizes, shapes, and weights of custom window coverings, no single operating system is appropriate for all categories of window coverings.  Creating a family of corded operating systems and other alternatives that comply with the CPSC's rule will cost Rollease approximately $3-5 million, before considering the multi-million-dollar investment in inventory, selling, training, marketing, and other support services that Rollease must make.  It takes approximately 2-2.5 years to develop a corded operating system that complies with the rule.

22.    Rollease began developing several rigid cord shrouds six months ago, so custom window covering manufacturers may be able to purchase those products in mid-2024.  However, it will take those manufacturers significant additional time to incorporate the rigid shrouds into their finished window covering products. Manufacturers must modify their production facilities and processes to accommodate the rigid shrouds, and they must create new promotional, sales, and

training materials, as well as point-of-sale materials and samples for their retailer and dealer customers.

23.    Creating a new operating system occurs in roughly five steps. The first step is to develop the concept for the operating system. That takes approximately 6 months and varies in cost, but ranges from approximately $200,000 to $1 million. Rollease's engineers create prototypes of user-friendly operating systems. Rollease discusses those prototypes with its customers and conducts internal testing on the prototypes.

24.    The second step is material and tooling for the operating system. That takes approximately 9 months, and costs several hundred-thousand dollars. Rollease creates 3D models of the operating system and shares those with multiple molders. The molders provide feedback on the design and submit bids. Rollease works with the selected molder to adjust the design based on the molder's production capabilities and appropriate materials.

25.    The third step is testing, which takes approximately 3 months, and costs approximately $100,000. Rollease tests the product for safety, functionality, and durability. That includes ultraviolet testing, impact testing, and lifecycle tests that raise and lower the product 10,000 or more times.

26.    The fourth step is inventory planning and purchasing, which takes approximately 4 months, and costs several million dollars depending on expected

demand. More time may be necessary to identify vendors who make complicated parts. In addition, supply-chain issues may substantially increase the amount of time it will take to produce a new operating system. For instance, if Rollease makes a rigid shroud from aluminum and plastic parts, it will likely need to source those parts from three countries, including China, which has experienced frequent and unpredictable large-scale factory shutdowns due to the coronavirus.

27. The fifth step is developing training and customer service materials. That takes approximately 4 months, and costs several hundred thousand dollars depending on complexity and number of customers. This step can occur simultaneously with inventory planning.

## VI. Rollease's Use Of Non-Corded Operating Systems In Its Custom Window Coverings

28. Rollease makes two types of non-corded operating systems for window coverings—motorized systems (Figure 4) and "cordless lift" systems (Figure 5). Those systems have design and cost limitations that make them technically infeasible and impracticable for many custom window coverings.

**Figure 4**



**Figure 5**



29.    Motorized operating systems are cost prohibitive for most consumers because they generally include expensive components, such as motors with high torque capacity, electronic chipsets, and various electronic control interfaces to assist in and manage raising and lowering the product.  On average, a motorized operating system is 10-20 times more expensive for a Rollease customer than a corded operating system.

30.     In addition, motorized operating systems are impracticable for certain custom window coverings.  The motor is installed in the headrail or tube at the top of the window, and most window-covering motors sold by Rollease are battery operated.  If the headrail is out of reach, replacing motor batteries is difficult for the consumer.  Even when the headrail is within reach, battery-operated motors often are still undesirable.  The high-torque motors required for many custom window coverings drain batteries quickly, and most consumers do not want to frequently replace or recharge batteries in order to operate their window coverings.  Window covering motors can also be powered through line-delivered electricity, but that can require extensive electrical rewiring and permits that are cost prohibitive for most consumers.

31.     For cordless lift operating systems, the user raises and lowers the product by pushing and pulling on the bottom rail with the assistance of counterbalanced springs in the headrail.  Cordless lift systems cannot be used with larger, heavier window coverings, because significant spring force is necessary to assist a user in lifting a heavier product, and the additional force needed to make lifting easier also makes the product more difficult to lower.  In addition, the large spring systems needed to lift heavier products cannot fit into some headrails or tubes.  Thus, even though stock products often use cordless lift systems, many custom products cannot, because custom products are generally larger and heavier.

32.    Cordless lift systems also have limitations based on user characteristics and window location.  Window coverings with cordless lift systems can only be raised as high as the consumer can reach, so cordless lift is not a feasible option for a shorter user or a higher window.  A user could add a pole to the bottom of the window covering to assist in lifting, but most users dislike that system and dislike the clutter of having poles near their windows.  In addition, many consumers do not have the strength needed to raise a heavy window covering, especially certain types of horizontal blinds that get heavier as the slats collapse.  Those consumers cannot use cordless lift systems.

33.    Even when a custom product is light enough, and the top of the window is low enough, for use with a cordless lift system, cordless lift systems are cost prohibitive for many consumers.  The counterbalanced springs for a cordless lift system must be calibrated to each covering based on size and weight.  That requires customizing the covering's components, which make a Rollease cordless lift system approximately 2-5 times more expensive than a corded operating system.

## VII.   Irreparable Harms From The CPSC's Rule

34.    The CPSC's rule will go into effect on May 30, 2023.  The rule is imposing immediate and severe harms on Rollease's business.  Rollease must try to ramp up its production of non-corded operating systems while also developing shrouds and other alternatives for its corded operating systems that comply with the

CPSC's rule.

35.     As of May 30, 2023, Rollease will not be able to make *corded* operating systems that comply with the CPSC's rule (except for one rudimentary rigid shroud with very limited utility because it is difficult to use and puts significant strain on the components of a continuous loop operating system). Because of that anticipated lack of solutions, Rollease currently is expending significant resources to make additional *non-corded* operating systems and develop a low-cost motor. To do so, Rollease must substantially increase component inventory, qualify new vendors, and redirect engineering time and effort. The process of ramping up production of existing non-corded operating systems will cost approximately $2-3 million, and will take approximately 4-8 months.

36.     In addition, ramping up production of custom window coverings with non-corded operating systems is diverting resources from high-priority projects, such as future product launches and quality improvement initiatives. It is also slowing the development of operating systems that comply with the CPSC's rule. The resulting reduction in product innovation will harm Rollease's reputation among window covering manufacturers. Rollease has spent decades building brand loyalty by continually improving the quality of its products and offering innovative designs.

37.     When the CPSC's rule takes effect, Rollease will need to immediately stop manufacturing the majority of its manual custom window covering components.

Rollease expects that its annual sales revenue will decline by approximately $40 million (20%) in the first year the rule is in effect, and approximately $20 million (10%) the second year the rule is in effect. That is because, as discussed above (¶¶ 21-33), non-corded operating systems are not a viable alternative for many custom window coverings, and it takes approximately 2-2.5 years to develop compliant corded operating systems.

38. The anticipated revenue decline will impact Rollease's ability to retain employees. Rollease could be forced to lay off employees beginning in April 2023. Over the first year that the rule is in effect, the expected revenue decline could force Rollease to lay off up to 30% of its workforce, including employees who work in manufacturing, warehousing, and customer service. Layoffs could impact product development personnel, which would make it more difficult for Rollease to develop custom products that comply with the CPSC's rule.

39. The CPSC's rule will impact Rollease's ability to fulfill existing commitments for its customers' commercial projects. Rollease has long-term commitments with customers for corded operating systems that require product delivery after May 30, 2023. But when the CPSC's rule takes effect, Rollease may not be able to supply corded operating systems due under those contracts because it does not have products available that comply with the CPSC's rule. Some commercial customers may decide to terminate their commitments because of the

additional time it will take Rollease to design and supply compliant products, or to supply available products that are within the customers' budgets. Those issues could result in an additional $3-5 million in lost revenue in 2023.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of December 2022.

_Derick Marsh_
Derick Marsh

# EXHIBIT 4

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

WINDOW COVERING MANUFACTURERS ASSOCIATION,

Petitioner,

v.

UNITED STATES CONSUMER PRODUCT SAFETY COMMISSION,

Respondent.

## DECLARATION OF WILLIAM J. TAYLOR

I, William J. Taylor, hereby declare:

1.  Rowley Company (Rowley) designs and makes components for custom window coverings, and supplies them to manufacturers of finished custom window coverings. Rowley is a member of the Window Covering Manufacturers Association.

2.  I am on Rowley's Board of Directors and was the Chief Executive Officer from 2007 until recently.

## I. Overview Of Rowley's Business

3.  Rowley is headquartered in Gastonia, North Carolina. The company employs approximately 120 people, almost all of whom are located in the United States.

4.     Rowley sells the components and hardware for making custom window coverings to manufacturers that produce finished window coverings. Rowley designs and manufactures many of the components that it sells. Rowley's customers range from small mom-and-pop manufacturers to large national manufacturers of finished window coverings, such as Hunter Douglas and Springs Window Fashions. However, most of the manufacturers Rowley works with are small businesses with 10 employees or fewer.

5.     Rowley sells its products exclusively to manufacturers of custom window coverings. It does not produce components for stock window coverings.

6.     Rowley's annual revenue is more than $40 million, nearly all of which is from sales within the United States. By sales volume, approximately 40% of window covering components Rowley sells are for commercial, non-residential use.

7.     Rowley makes components for corded operating systems as well as finished corded operating systems. Corded operating systems are used to raise and lower blinds and shades, or to slide vertical blinds, shades, and draperies from side to side. Approximately 10% of Rowley's annual revenue comes from selling components for window covering operating systems with free-hanging cords. Approximately 10% of Rowley's annual revenue comes from selling components for, and completed, continuous loop operating systems under tension and single retractable cord lift operating systems.

## II.    Compliance With The CPSC's Rule

8.    The CPSC's rule prohibits the manufacture of all of those corded operating systems.  The rule completely eliminates operating systems with free-hanging cords as an option.  It requires a continuous loop system under tension to be encased in a rigid shroud (a component made from inflexible material that limits cord accessibility) or a restraining device (a component installed on the window covering that prevents the creation of a large loop).  And it sets a maximum of 12 inches of cord that may be exposed when a user operates a single retractable cord lift system.

9.    Rowley has not previously developed a rigid cord shroud, cord restraining device, or single retractable cord lift system that complies with the requirements in the CPSC's rule.

10.    It will take approximately 2 years for Rowley to develop a new corded operating system that complies with the CPSC's rule.  The cost of that process will be significant for Rowley.

## III.    Rowley's Process For Creating A New Operating System

11.    Creating a new operating system occurs in five steps  The first step is prototyping and engineering, which takes approximately 3 months.

12.    The second step is tooling for the operating system, and product redesign based on the tooling.  This step takes approximately 3 months.

13.     The third step is producing samples, testing those samples, and doing additional redesign work based on the testing.  This step takes approximately 3 months.

14.     The fourth step is producing the operating system, which takes approximately 3 months.

15.     The fifth step is marketing the operating system to manufacturers of window coverings, which takes approximately 12 months because Rowley markets new products in cycles and marketing involves significant customer engagement.

16.     It will take manufacturers of finished window coverings significant additional time to incorporate Rowley's new operating system into their products. Manufacturers must modify their production facilities and processes to accommodate the operating system, and they must create new promotional, sales, and training materials, as well as point-of-sale materials and samples for their retail and dealer customers.

## II.     Irreparable Harms From The CPSC's Rule

17.     Rowley will suffer immediate and irreparable harms as a result of the CPSC's rule.  Because Rowley will not complete development of compliant operating systems for approximately 2 years, it expects that its annual sales revenue will decline by 20% during the first year that the CPSC's new rule is in effect.

18.     Rowley depends on steady sales revenue to pay its employees and

creditors and to invest in designing and manufacturing new products.

19.     A revenue decline of 20% will make it impossible for Rowley to continue paying the salaries of all of its approximately 120 employees.  Rowley could be forced to begin laying off employees beginning in May 2023.  Over the first year that the rule is in effect, the expected revenue decline could force Rowley to lay off up to 15% of its workforce, including employees who work in manufacturing, warehousing, and distribution.

20.     These layoffs will make it even more difficult for Rowley to develop operating systems that comply with the CPSC's new rule.  Many of the employees Rowley will be forced to let go would otherwise be involved in developing operating systems that comply with the CPSC's rule.

21.     Rowley will also be forced to divert its resources from planned product launches to the development of products that comply with the CPSC's new rule.

22.     The expected revenue decline of 20% could threaten the financial stability of Rowley's business.  That would create significant challenges for Rowley's equity structure, require an overhaul of its business model, and likely reduce working capital and cash flow.

Executed this  13th  day of December 2022.

William J. Taylor

# EXHIBIT 5

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

WINDOW COVERING MANUFACTURERS ASSOCIATION,

Petitioner,

v.

UNITED STATES CONSUMER PRODUCT SAFETY COMMISSION,

Respondent.

## DECLARATION OF TRACIE BRESNAHAN

I, Tracie Bresnahan, hereby declare:

1.     Custom Creations by Tracie Bresnahan (Custom Creations) is a full-service workroom that makes custom window coverings for interior designers and installs them in residences.  Custom Creations also makes other custom home furnishings, such as upholstery, bedding, and pillows.  Custom Creations is a member of the Window Covering Manufacturers Association.

2.     I am the owner of Custom Creations.  I started Custom Creations out of my home in 2003, and I have worked in the window covering industry since 1996.

## I.    Overview Of Custom Creations' Business

3.     Custom Creations is located in Cartersville, Georgia.  I have one full-time employee and one part-time employee.  Custom Creations also frequently

works with two subcontractors.

4.     Custom Creations' annual sales revenue ranges from $350,000 to $450,000.

5.     Custom Creations purchases the components for making custom products from companies that design, manufacture, and sell window covering components, such as Rollease Acmeda.  Custom Creations assembles those components into finished window coverings.

6.     Approximately 80% of Custom Creations' annual revenue comes from making custom window coverings for interior designers and installing them in residences.  All of the window coverings that Custom Creations sells are custom products; it does not sell stock window covering products.

7.     By sales volume, approximately 20-25% of the window coverings sold by Custom Creations have corded or bead-chained operating systems.  That includes free-hanging cords, continuous loop systems, and single retractable lift systems.

8.     Approximately 75-80% of the window coverings sold by Custom Creations have non-corded operating systems.  That includes cordless lift systems and motorized systems.

**II.     Custom Creations' Process For Making And Installing Custom Window Coverings**

9.     Making and installing custom window coverings occurs in four steps. The first step is working with an interior designer to determine the design and type

of window coverings and operating systems needed for a project. That involves assessing and engineering the project, taking into consideration the style preferences, design needs, and functionality constraints of the user.

10. The second step is creating a budget estimate based on the costs for window covering components and labor to assemble and install them. That estimate includes the time needed for product design, client approvals, sourcing and ordering components and fabrics for the workroom, and making and installing the window covering.

11. The third step is placing an order for the necessary components from Rollease Acmeda and other manufacturers of components for custom window coverings. Once Custom Creations places those orders, it takes approximately 2-6 weeks to receive from the manufacturers all of the components necessary to begin fabricating a window covering.

12. The fourth step is making and installing the window coverings. That process typically takes 8-12 weeks. That includes the time needed to assemble components and fabrics, and to install the window coverings in the user's residence.

## III. Compliance With The CPSC's Rule

13. The window coverings with corded operating systems that Custom Creations currently makes do not comply with the Consumer Product Safety Commission's (CPSC) rule.

14.     Custom Creations will not be able to offer its customers window coverings with corded operating systems until component manufacturers offer compliant products.

15.     Manufacturers of window covering components have informed Custom Creations that it could take at least two years before they will be able to offer corded operating systems that comply with the CPSC's new rule.  That is because the manufacturers must develop new products that comply with the rule and bring those products to market.

16.     Because manufacturers do not anticipate having compliant products available when the CPSC's rule takes effect on May 30, 2023, Custom Creations expects to lose at least about 20-25% of its revenue during the first year that the CPSC's rule is in effect.

## IV.    Limitations Of Non-Corded Operating Systems

17.     Custom Creations will not be able to make up for the lack of compliant corded window coverings by simply substituting non-corded operating systems, because non-corded operating systems are technically infeasible, impractical, or too expensive for many customers.

18.     There are two key types of non-corded operating systems:  cordless lift systems and motorized systems.

19.     In a cordless lift system, the user raises and lowers the window covering

with the assistance of coiled springs that sit inside a tube housed in the headrail. A tensioned clutch mechanism locks the covering in place when engaged, and the user releases the clutch by pulling on the covering.

20. Custom Creations' components suppliers do not offer cordless lift systems for heavier custom window coverings. Springs are needed to raise and lower the window covering, and at a certain size (which depends on window covering width and length and fabric weight), the springs currently on the market will not effectively raise and lower the shade.

21. Cordless lift systems also have limitations based on the characteristics of the user and the height of the window. Coverings with cordless lift systems can only be raised as high as the consumer can reach. If a window is taller than the consumer's reach, the covering cannot be fully raised with a cordless lift system. In addition, the weight of a covering increases as it is lifted, so there may be a point at which the covering is too heavy for the user to lift.

22. Cordless lift systems are cost prohibitive for many customers. They require additional operating system components that increase the cost of the window covering. A window covering with a cordless lift system sold by Custom Creations costs 15-35% more on average than an equivalent-sized window covering with a corded operating system.

23. Window coverings also can use motorized operating systems, but they

are expensive. A window covering with a motorized operating system sold by Custom Creations costs 300-400% more on average than an equivalent-sized window covering with a corded operating system. As a result, motorized operating systems are cost prohibitive for most Custom Creations clients.

24.     In addition, motorized operating systems can be impracticable for many window coverings. Window covering motors can be battery operated. When the headrail is installed out of reach for the consumer, replacing motor batteries can be difficult or dangerous. Even when a headrail is within reach, battery-operated motors are often still undesirable. The high-torque motors required for many custom window coverings can drain batteries quickly, depending on frequency of use and the size of the window covering. Most consumers do not want to have to frequently replace batteries in order to operate their window coverings. Some clients also have physical limitations that make it difficult or impossible to reach the headrail in order to change the batteries.

25.     Window covering motors also can be powered through direct electrical wiring. However, it can require extensive electrical work to install outlets near window covering headrails. That additional electrical work is cost prohibitive for many Custom Creations clients.

26.     Custom Creations' estimate of at least 20-25% lost revenue (¶ 16) accounts for the fact that Custom Creations will be able to offer some—but not all—

of its customers window coverings with non-corded operating systems.

## V.    Irreparable Harms From The CPSC's Rule

27.    Custom Creations will suffer irreparable financial harms while this litigation is pending.  Most significantly, the expected revenue decline of 20-25% within one year will threaten the financial stability of Custom Creations' business.  As a result of that revenue decline, Custom Creations may not be able to continue paying the salaries of some of its employees.  Custom Creations could be forced to begin laying off employees in 2023.

28.    The revenue decline also could make it difficult for Custom Creations to continue paying rent and utilities.  I could be forced to relocate the business back to my home, or to spend money, time, and energy investing in other products to try to offset lost revenue.

29.    In addition, over the next year, I will need to transition Custom Creations away from custom corded window coverings and increase our sales in other areas of interior design, such as upholstery and top treatments.  I have invested 19 years in becoming an expert in fabricating custom corded window coverings.  I have built a loyal customer base for window coverings during that time.  It will likely take that same amount of time for me to develop comparable expertise in, and customer loyalty based around, manufacturing those other types of products.

30.    Transitioning Custom Creations away from corded custom window

coverings and into other interior design products will require overhauling its website and social media, building new client relationships, identifying new manufacturers for sourcing product components, and developing new products.

31. The process of transitioning Custom Creations away from custom corded window coverings will take several years. Essentially, I will need to restart my business from scratch.

Executed this 9th day of December 2022.

Tracie Bresnahan

8

# EXHIBIT 6

**From:** Ally Bonacasa <abonacasa@ansi.org>
**Sent:** Tuesday, December 13, 2022 10:07 AM
**To:** Michael Tierney <mtierney@kellencompany.com>
**Cc:** Michael Tierney <mptierney@snet.net>
**Subject:** ANSI Notification of Final Action for: ANSI/WCMA A100.1-2022

Michael Tierney
Window Covering Manufacturers Association

RE: Notification on Final Action on: ANSI/WCMA A100.1-2022
Standard for Safety of Window Covering Products
(revision of ANSI/WCMA A100.1-2018)
Approval Date of Final Action: 12/13/2022
Standards Action Publication Date: 12/23/2022

The Board of Standards Review has approved the above action in connection with a candidate American National Standard:

Notice of this Final Action will be published in an upcoming issue of Standards Action. For actions other than withdrawals, applicable publication and maintenance requirements are contained in clause 4 of the ANSI Essential Requirements: Due process requirements for American National Standards.

If your organization has arranged for ANSI to publish this standard, please contact Harvey Rosenfeld in the Publishing Department at 212-642-4921.

If you believe that this American National Standard may be of interest to the Occupational Safety and Health Administration (OSHA) for possible regulatory adoption, please forward a copy of the published standard to OSHA at the address listed below:
For General Industry / Maritime / Agriculture:
Maureen Ruskin
Acting Director, Directorate of Standards & Guidance U.S. DOL/OSHA
200 Constitution Ave, NW, #N-3718
Washington, DC 20210

For Construction:
Scott C. Ketcham
Director, Directorate of Construction
USDOL/OSHA
200 Constitution Ave, NW, #N-3468
Washington, DC 20210

In addition, as you know, many standards are incorporated by reference (IBR) in the U.S. Code of Federal Regulations (CFR). To facilitate public access to these standards, ANSI has established an online 'IBR portal'. We request that your organization consider contributing its referenced standards to ANSI's IBR portal (https://ibr.ansi.org/). To discuss this option, please contact Michelle Maas-Deane at mdeane@ansi.org.

Notification of Right to Appeal to the ANSI Board of Standards Review
In accordance with ANSI Essential Requirements, those objecting to this final action who have completed the appeals process at the Standards Developer are hereby notified of their right to file a procedural appeal with the ANSI Board of Standards Review (BSR). If you have not completed the appeals process at the standards developer, you are normally not eligible to appeal to the BSR. If you are eligible and choose to appeal, the appeal statement and all supporting documentation must be filed in writing with the office of the undersigned within 15 working days after receipt of this official notification. The appeal must be based on procedural criteria, and include a statement as to why the BSR action

should be modified. The BSR will not render decisions on the relative merits of technical matters, but it shall consider whether due process was afforded technical concerns. The appeal must be accompanied by a $1,200 filing fee payable to ANSI.

If you require an extension of the appeals filing deadline, please direct your written request along with a justification therefore to the office of the undersigned before the 15 working day deadline or you shall forfeit your right to appeal. A complete copy of the Operating Procedures of the ANSI Board of Standards Review, including clause 7, which addresses the appeals process, is available in the public library on ANSI Online ([www.ansi.org](www.ansi.org)) or by contacting [psa@ansi.org](psa@ansi.org).

Please contact the PSA Department at [psa@ansi.org](psa@ansi.org) if you have any questions.

Thank you for your continued support of the American National Standards process.

Sincerely,
Anne Caldas
Secretary, ANSI Board of Standards Review (BSR)

# EXHIBIT 7

December 1, 2022

BY EMAIL AND U.S. MAIL

Alberta E. Mills
Secretary
U.S. Consumer Product Safety Commission
4330 East West Highway
Bethesda, MD 20814
AMills@cpsc.gov

Re:     Request to Postpone the Effective Date of *Safety Standard for Operating Cords on Custom Window Coverings*

Dear Ms. Mills:

The Window Covering Manufacturers Association (WCMA) has petitioned the D.C. Circuit for judicial review of the U.S. Consumer Product Safety Commission's (CPSC) rule establishing requirements for operating cords on custom window coverings, 87 Fed. Reg. 73,144 (Nov. 28, 2022) (the Rule). Pursuant to 5 U.S.C. § 705 and Federal Rule of Appellate Procedure 18(a)(1), WCMA requests that the CPSC stay the effective date of the Rule pending its judicial review in the D.C. Circuit. The requested relief is necessary because the Rule is legally infirm in several respects, and WCMA members will suffer irreparable harm if forced to comply with the Rule. Please respond to this request by December 15, 2022, so that WCMA may seek a stay from the D.C. Circuit if necessary.

## I.     WCMA Is Likely To Prevail On The Merits

*The Consumer Product Safety Act*

The Consumer Product Safety Act reflects Congress's strong preference for consumer product standards established by industry, rather than mandatory rules promulgated by the CPSC. The Act requires the CPSC to "rely upon voluntary consumer product safety standards," rather than promulgate top-down rules, "whenever compliance with such voluntary standards would . . . adequately reduce the risk of injury addressed" and "it is likely that there will be substantial compliance." 15 U.S.C. § 2056(b)(1). The Act also directs the CPSC to "assist . . . groups of manufacturers . . . in the development of product safety standards." *Id.* § 2054(a)(4).

The Act circumscribes the CPSC's authority to issue safety rules in the presence of voluntary standards. The CPSC "shall not promulgate a consumer product safety rule" unless certain conditions are met: The CPSC must find that "the rule (including its effective date) is reasonably necessary to . . . reduce an unreasonable risk of injury associated with such product"; compliance with a voluntary standard is not likely to adequately reduce the risk of injury; the rule's costs and benefits "bear a reasonable relationship" to each other; and the rule "imposes the least burdensome requirement which . . . adequately reduces the risk of injury for which the rule is being promulgated." 15 U.S.C. § 2058(f)(3).

The CPSC also must make findings regarding "the degree and nature of the risk of injury the rule is designed to eliminate or reduce"; "the approximate number of consumer products, or

1

types or classes thereof, subject to such rule"; "the need of the public for the consumer products subject to such rule, and the probable effect of such rule upon the utility, cost, or availability of such products to meet such need"; and "any means of achieving the objective of the order while minimizing adverse effects on competition or disruption or dislocation of manufacturing and other commercial practices consistent with the public health and safety." 15 U.S.C. § 2058(f)(1). A mandatory rule "shall not be affirmed unless" those findings "are supported by substantial evidence on the record." *Id.* § 2060(c).

*Voluntary Industry Standards for Window Coverings*

Since 1995, WCMA has worked closely with manufacturers, retailers, consumer advocacy groups, and the CPSC to develop effective safety standards that govern operating cords for window coverings. Over the past decade, WCMA has twice modified the voluntary standard for custom window coverings in response to new injury data, in 2012 and in 2018. Further, WCMA has completed a multiyear process that will again amend the voluntary standard to further reduce the safety risk associated with operating cords on custom coverings (the 2022 amendment). The CPSC has acknowledged that the industry substantially complies with WCMA's voluntary standard.

WCMA's voluntary standard has been a model for the collaborative development of consumer product safety standards envisioned by the Act. According to the CPSC, residences in the United States contain 145 million custom corded window coverings, and between 2009 and 2021, those coverings were implicated in only 36 reported incidents involving children. Most of the incidents involved older products that would not have complied with the current voluntary standard. In fact, the CPSC staff concluded that just one aspect of the 2022 amendment to the voluntary standard would have prevented nearly half of the 36 reported incidents.

Instead of "assist[ing] . . . manufacturers" and other industry groups as they continued improving the voluntary standard, 15 U.S.C. § 2054(a)(4), the CPSC withheld relevant incident reports, and then voted against the 2022 amendment to the voluntary standard. The CPSC did not oppose any of the previous updates to the voluntary standard.

*The Rule Is Arbitrary, Capricious, And Not In Accordance With Law*

The Rule is arbitrary, capricious, and not in accordance with law. 5 U.S.C. § 706(2)(A); *see* 15 U.S.C. § 2060(c). The CPSC did not come close to satisfying the statutory prerequisites for issuing the Rule in the face of the voluntary industry standard.

The CPSC must find that a safety rule's "effective date . . . is reasonably necessary to eliminate or reduce an unreasonable risk of injury." 15 U.S.C. § 2058(f)(3)(A). Yet the six-month effective date in the Rule is untethered to any analysis of injury risk as compared to a later effective date. In fact, CPSC staff concluded that a longer effective date "would reduce the benefits of the rule by only a very small amount." The CPSC's finding that manufacturers can comply with a six-month effective date is based on several erroneous assumptions. The CPSC found that manufacturers already comply with "similar requirements" in Canada, but the Canadian requirements are meaningfully different, and many products that comply with the Canadian regulations do not comply with the Rule. The CPSC also stated that manufacturers already comply with "similar requirements" for stock window coverings, but non-corded operating systems used with stock products are incompatible with many custom window coverings. It will take significant time to develop products that comply with the Rule. It cannot be done in six months. Further, the

CPSC suggested that manufacturers should have started to comply with the Rule before it was even finalized, but that is not how administrative law works. It would make a mockery of the requirement of notice and the opportunity for comment on proposals if the industry was expected to start investing in compliance with the *proposed* Rule. Besides, the Rule was a moving target up until the end because the CPSC considered many different proposals.

To promulgate a mandatory rule, the CPSC must find that doing so is "reasonably necessary to . . . reduce an unreasonable risk of injury," and that the rule imposes the "least burdensome requirement" on industry for reducing that risk. In essence, the CPSC may not issue a safety rule unless it presents substantial evidence that "the severity of the injury that may result from the product, factored by the likelihood of the injury, offsets the harm the regulation imposes upon manufacturers and consumers." *Zen Magnets, LLC v. CPSC*, 841 F.3d 1141, 1147 (10th Cir. 2016). The Rule did not do that. Instead of considering the likelihood of injury, the CPSC merely concluded that the 2018 standard and 2022 amendment do not "eliminate" risk or "ensure" safety. But the mere theoretical possibility of injury under a voluntary standard does not support the finding that a mandatory rule is necessary to reduce the actual risk of injury.

Further, the CPSC must find that the "risk of injury" is "unreasonable." 15 U.S.C. § 2058(f)(3)(A), (F). The CPSC acknowledged that modifications to the voluntary standard in 2012 and 2018 have reduced the likelihood of injury, and that the 2022 amendment will reduce it further. Yet the CPSC found that the risk of injury remains unreasonable. The CPSC's methodology for reaching that conclusion was seriously flawed. The CPSC assumed that the risk of injury has remained constant since 2009. But the risk of injury has significantly declined since then due to WCMA's improvements to the voluntary standard. In addition, many of the incidents the CPSC considered do not demonstrate *any* risk of future injury because they involved products that would not comply with the 2018 voluntary standard or the 2022 amendment.

The CPSC also is required to undertake a "rigorous cost-benefit analysis," *Finnbin, LLC v. CPSC*, 45 F.4th 127, 135 (D.C. Cir. 2022), to demonstrate that there is a "reasonable relationship" between a safety rule's benefits and costs, 15 U.S.C. § 2058(f)(3)(E). The CPSC has to make findings regarding the "approximate number of consumer products, or types or classes thereof, subject to such rule" and the "probable effect of such rule upon the utility, cost, or availability of such products." *Id.* § 2058(f)(1)(B)-(C). The CPSC did not fulfill those requirements because the Rule fails to account for effects on the multibillion-dollar nonresidential custom window covering market. The Rule governs operating cords for window coverings used in both residential settings and nonresidential settings, such as office buildings, restaurants, and universities. Yet the CPSC did not even attempt to determine the impacts on the nonresidential custom market. Likewise, the cost side of the Rule's cost-benefit analysis was based on an estimate of the size of the residential custom window covering market, without accounting for the nonresidential market. The formula also ignores other costs that the Rule will create, such as the cost of developing new products and the cost of additional labor needed to manufacture compliant coverings.

Finally, the Rule violates the notice-and-comment requirement of the Administrative Procedure Act, 5 U.S.C. § 553(b)-(c). There are numerous unanticipated differences between the draft Rule and the final Rule that have enormous financial implications. WCMA and its members had no opportunity to provide views on those aspects of the Rule. For example, the draft Rule contained no analysis of whether a mandatory rule is the "least burdensome requirement" to adequately reduce the risk of injury in light of the 2022 amendment. 15 U.S.C. § 2058(f)(3)(F). Yet the final Rule contained substantial analysis of the 2022 amendment. The CPSC also made

significant modifications to its cost-benefit analysis with no opportunity for comment, and based the Rule on technical studies and data that the CPSC did not make available to commenters during the rulemaking process.

## II. WCMA Members Will Suffer Irreparable Harm If The CPSC Does Not Postpone The Rule's Effective Date

The custom window covering industry in the United States generates billions of dollars in annual sales and employs tens of thousands of people. As a result of the Rule, people who work in the industry will lose their jobs, and some companies will go out of business.

Manufacturers have developed different operating systems for raising and lowering window coverings. Most operating systems for custom window coverings use cords, for several reasons. Available alternatives, such as cordless operating systems, are much more expensive for consumers and cannot be engineered to accommodate heavier products, which are common in the custom market. One common corded operating system is a continuous cord loop under tension. The Rule requires manufacturers to fully encase that operating system in a "cord shroud" or "cord restraining device." Manufacturers have not yet developed cord shrouds and cord restraining devices for their products that comply with the Rule. Indeed, CPSC staff acknowledged that it will take two or more years for manufacturers to develop, test, source, and produce a compliant cord shroud. Thus, the Rule will take effect at least eighteen months before manufacturers will be able to offer viable products that comply with the Rule's requirements for custom window covering operating systems. That will cause irreparable financial and reputational harm to WCMA members—the manufacturers, fabricators, and assemblers that make up the window covering industry.

### The Effective Date Will Cause Irreparable Financial Harm

It will take significant time for the industry to have Rule-compliant products ready. The gap of at least eighteen months between the Rule's effective date and the date when compliant products are expected to become available will result in irreparable financial harm for WCMA members. There will be a steep decline in sales of custom window coverings. Available operating systems that meet the requirements in the Rule are too expensive for most consumers and cannot raise and lower heavier custom window coverings. As a result, large manufacturers will lose hundreds of millions of dollars in revenue and will be forced to lay off many employees. Smaller fabricators, component manufacturers, sub-contractors, and dealers that primarily rely on sales of corded custom window coverings likely will go out of business. The CPSC itself acknowledged that "a temporary shift [by consumers] to stock products could have a significant impact [on] small businesses."

Manufacturers also will need to begin the costly and time-consuming process of modifying the operating systems of tens of millions of window coverings that the Rule renders obsolete. This process is particularly complicated for commercial products, which typically have more complex components. In addition, manufacturers will need to redirect engineering, product management, operations, procurement, marketing, and other resources from existing projects to focus exclusively on quickly developing new operating systems that comply with the Rule. They also will lose money under existing commercial contracts that require the completion of projects on set timelines, and will lose out on future commercial contracts until they have compliant products to sell.

The CPSC suggests that manufacturers can comply quickly because they already are designing and selling products that comply with the voluntary standard for *stock* window coverings. That is incorrect. Custom window coverings pose special challenges that do not apply to stock products. Custom coverings are generally larger and heavier than stock coverings, so operating systems that work for stock will not necessarily work for custom. Even for custom window coverings that theoretically are compatible with non-corded operating systems, it will take much longer than six months for manufacturers to design, source, and market those products.

The CPSC says that manufacturers have products that comply with the Canadian regulations, but those regulations are very different from the Rule. In particular, they impose different design and testing requirements than the Rule, so manufacturers cannot necessarily sell their Canadian products in the United States. And even if they could sell those products in the United States, the United States market is ten times larger than the Canadian market. It would take years to build out the production and sales capacity necessary to offer those products in the United States.

*The Effective Date Will Cause Irreparable Reputational Harm*

The period between the Rule's effective date and the time when compliant products are available also will cause irreparable reputational harm to WCMA members. Manufacturers have spent decades building brand loyalty among consumers based on reliable, affordable, user-friendly, and aesthetically desirable operating systems. In six months, window coverings with those operating systems will no longer be available, and the only alternatives will be prohibitively expensive or impracticable for many custom window coverings. Manufacturers' reputations among consumers will suffer from that abrupt disruption to the industry.

Likewise, members' reputations among commercial clients will suffer when contracted products are no longer available, major projects go over budget due to delays, and product prices increase. And there will be strain on the relationships with the retailers and dealers that sell members' products. Retailers and dealers will be unable to offer some of the most affordable and reliable window coverings to consumers and they will need to substantially revise their sales systems and product displays.

## III.    The Balance Of Equities And Public Interest Support Postponing The Rule's Effective Date

Postponing the Rule's effective date will not injure the CPSC or harm the public. The CPSC has presented no evidence that there is any real risk of harm if the Rule is stayed pending judicial review. In fact, the CPSC staff stated that several aspects of the 2018 standard and 2022 amendment would have prevented half of the 36 reported incidents since 2009, and concluded that a longer effective date "would reduce the benefits of the rule by only a very small amount."

Further, for most custom window coverings, Rule-compliant operating systems will not be available for at least two years. Until those products become available, consumers likely will wait to replace the blinds and shades that they currently use. Thus, even assuming that the Rule's requirements for corded systems reduce injury risk, this case likely will be resolved well before those benefits begin to accrue. The injury risk from consumers holding onto old products with free-hanging cords may very well outweigh any risks associated with new corded products that comply with the 2018 standard and 2022 amendment. And even for custom products that are

5

compatible with existing non-corded operating systems, many consumers will hold off on purchases until more affordable Rule-compliant corded options are available.

In the meantime, allowing the Rule to take effect will harm livelihoods and businesses. The CPSC essentially is demanding that an entire multibillion-dollar industry remake itself in six months. That is impossible. As a result, jobs will be lost and businesses will fold, and it will take even longer to develop Rule-compliant products.

\* \* \* \* \*

For these reasons, WCMA requests that the CPSC stay the Rule's effective date pending judicial review. Please respond to this request by December 15, 2022.

Regards,

Ralph Vasami
Executive Director

cc via email:

- Rana Balci-Sinha (RBalcisinha@cpsc.gov)
- Jennifer Colten (JColten@cpsc.gov)

# EXHIBIT 8

Request - 23-F-00053     Create Appeal   ✉ Inbox (0)   ✎ Compose Message   🔔 Sent Messages   Withdraw Request   ← Back

### Requester Details

To modify request details please update your requester profile or contact the our office for assistance.

**Ms. Kate Ehrenberger**
Paralegal
Miles Stockbridge PC
Miles and Stockbridge P.C.
100 Light Street
Baltimore, 21202
Phone 4103853645
kehrenberger@milesstockbridge.com

Requester Default Category: Attorney - 1 (Commercial/Corporation)

### Request Details

| | |
|---|---|
| Date Requested | 11/07/2022 |
| Status | In Process |

### General Information

Choose the Type of Request from the drop-down box (Default: **FOIA**)
**Consultation:** You represent another Federal Agency and you have records responsive to a Freedom of Information Act (FOIA) request that pertain to or are the property of the U.S. Consumer Product Safety Commission (CPSC). You are asking the CPSC to consult on the release of this information.
**FOIA - Freedom of Information Act (FOIA):** The Freedom of Information Act (FOIA) of 1967, 5 U.S.C. § 552, gives the public the right to request access to any federal agency record. The federal agency must provide access to the record unless the record is prohibited from disclosure under one of the nine FOIA Exemptions or one of the three FOIA exclusions in 5 U.S.C. § 552(c).
**PA - Privacy Act (PA):** The Privacy Act of 1974, U.S.C. § 552a, governs the collection, maintenance, use, and dissemination of information about individuals that is maintained in systems of records by a federal agency. A system of records is a group of records from which information can be retrieved by either a person's name or by some other unique identifier assigned to the individual, such as address.

 **\*\*Important Note:\*\***

You may contact our FOIA Public Liaison, by letter, telephone at 1-800-638-2772, or email to Deborah Acosta at: dacosta@cpsc.gov to discuss any aspect of your request. Additionally, you may contact the Office of the Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation service they offer. The contact information of OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, MD 20740-6001, e-mail at: ogis@nara.gov; telephone at 202-741-5770, toll free at 1-877-684-6448; or fax at 202-741-5769.

| | |
|---|---|
| Request Type | FOIA ▾ |

Choose the Type of Requester you are from the drop-down box (Default: **Private Individual**)
(Click on the Fees, Types of Requesters, and Payment Information link for details)

| | |
|---|---|
| Requester Category | Attorney - 1 (Commercial/Cc ▾ |

Choose your preferred Delivery mode for the requested material from the drop-down box (Default: **PAL**)

| | |
|---|---|
| Delivery Mode | PAL ▾ |

Choose your Payment mode from the drop-down box (Click on the Fees, Types of Requesters, and Payment Information link for details)

Payment Mode    [ Check ▾ ]

## Shipping Address

This information is automatically entered based on the information you provided when you registered your account.  However, if you wish to have the material postal mailed to a different address, please provide that information here.

Street2    [ 100 Light Street ]

Street1    [ Miles and Stockbridge P.C. ]

City    [ Baltimore ]

(If not within the United States, change the Country first to be able to manually enter your State)
(If Canadian, choose the Country first then choose the Province to get the Cities)

State    [ MD ▾ ]

State (Other)

Country    [ United States ▾ ]

Zip Code    [ 21202 ]

## Request Information

Enter a Description for your Request or Appeal; for example, "We are requesting records on Annie Oakley," or "We are appealing the withholding of material for FOIA #17-F-00000."

Description    [ With reference to the October 19, 2022 public Commission hearing with staff to brief the Commissioners on the Custom Window Coverings Rule ("Briefing Hearing"), WCMA is requesting full copies of the 15 In- ]

Enter the date range for us to search for records (unless specified in your Request Description)
(Example:  Years 2004 to 2009 or Fiscal Years 2013-2015 or May 15, 2009 to June 21, 2009)

**Note:**  Our default search is 5 years  from the date of receipt of the request

Date Range for Record Search: From(mm/dd/yyyy)    [ 12/01/2021 ]    To (mm/dd/yyyy)    [ 10/19/2022 ]

Description Document    📎 Add Attachment

## Fee Information

Enter the amount you are willing to pay for the costs incurred to process your request (Default: **$25.00**)

Willing Amount ($)    [ 25.00 ]

Check the box to request a Fee Waiver and enter the reason you are requesting a Fee Waiver.  You can upload correspondence with an explanation by clicking on the **Add Attachment** link.

If your reason for a Fee Waiver exceeds 255 characters, you may upload an attachment by clicking on the **Add Attachment** link.

A167

| | | |
|---|---|---|
| Fee Waiver Requested | ☑ 📎 Add Attachment -Attachment to 11-07-2022 FOIA request on fee waiver.pdf | |
| Fee Waiver Granted | TBD | |
| Fee Waiver Request Reason | Please see attachment | |

**Cost Details :**

| | |
|---|---|
| Total Cost | $0.00 |
| Cost Incurred | $0.00 |
| Amount Paid | $0.00 |
| Balance Amount | $0.00 |
| Payment Status | No Charges |

You may receive Fee Estimate correspondence from CPSC's National Injury Information Clearinghouse.  If so, respond back to the Information Clearinghouse.  If you ignore or decline the Clearinghouse's Fee Estimate, you are stating you do not want the material requested in your FOIA submission.

Check the box to express your willingness to pay the fees incurred to process your request.  You will be provided with an estimate of the processing costs before the FOI staff processes the request.

Willing to Pay All Fees ☐

**Billing Address**

This information is automatically entered based on the information you provided when you registered your account.  However, if you wish to have the cost of processing your request billed to a different address, please provide that information here.

| | | | |
|---|---|---|---|
| | | Street2 | 100 Light Street |
| Street1 | Miles and Stockbridge P.C. | | |
| City | Baltimore | State | MD |
| State (Other) | | Country | United States |
| Zip Code | 21202 | | |

**Expedite Information**

Check the box to request Expedited Processing (The request will be reviewed for Approval/Denial)

Expedite Requested ☐ 📎 Add Attachment

Enter the reason you are requesting Expedited Processing of your FOIA Request
(If your reason exceeds 255 characters, upload the reason as an attachment by clicking the **Add Attachment** link)

Expedite Reason

4330 East West Highway, Room 820 | Bethesda, MD 20814

A168

Telephone: 800-638-2772|  Fax: 301-504-0127  |  E-Mail: cpsc-foia@cpsc.gov

© 2014 AINS, Inc.

A169

The request is being made on behalf of the Window Covering Manufacturers Association, Inc. ("WCMA"). The WCMA is the sponsor of ANSI/WCMA A100.1—Standard for the Safety of Window Covering Products. As part of that process, WCMA reviews available incident information in order to determine the root cause of incidents, and thereby identify potential issues to cover in the standard. CPSC IDIs contain important information for that review. In the past, CPSC staff had provided WCMA with IDIs to review for this purpose, albeit often without attachments.

 The attachments are important to the review, because they often contain photographs or more details concerning the incident that are not contained in the cover page of the IDI or the narrative. Consequently, the WCMA initiated a FOIA request for the IDIs, including attachments, which was suggested by CPSC staff regarding IDIs previously provided by staff to WCMA.  This subsequent FOIA request also pertains to identified IDIs and all attachments.

Although the WMCA is a trade association, in this case the information requested by the FOIA request is being used for non-commercial purposes; that is to support and further the review and revision of a voluntary safety standard sponsored by the WMCA. That standard is of substantial interest to the staff of the CPSC.

# EXHIBIT 9



# UNITED STATES CONSUMER PRODUCT SAFETY COMMISSION

## MINUTES OF COMMISSION MEETING

### Decisional Matter: Final Rules to (1) Add Window Covering Cords to the Substantial Product Hazard List; and (2) Establish a Safety Standard for Operating Cords on Custom Window Coverings
#### (Briefing package dated September 28, 2022)

November 2, 2022

Chair Alex Hoehn-Saric convened the November 2, 2022 meeting of the U.S. Consumer Product Safety Commission in open session at 10:02 a.m. The meeting was held remotely. Commissioners Peter A. Feldman, Richard L. Trumka Jr., and Mary T. Boyle were in attendance. The Chair made welcoming remarks, and summarized the agenda items for the meeting.

Chair Hoehn-Saric introduced the two draft final rules before the Commission, which were:

1) draft final rule under section 15 (j) of the Consumer Product Safety Act (CPSA) to deem stock window coverings that do not comply with the operating and inner cord requirements, or the manufacturer label requirement, in ANSI/WCMA A100.1 – 2018, American National Standard for Safety of Corded Window Covering Products (ANSI/WCMA-2018), and custom window coverings that do not comply with the requirements for inner cords or the manufacturer label in ANSI/WCMA-2018, present a substantial product hazard; and

2) draft final rule under sections 7 and 9 of the CPSA, establishing a Safety Standard for Operating Cords on Custom Window Coverings.

The Chair then introduced staff that was present to address questions from the Commission: Jason Levine, Executive Director; Duane Boniface, Assistant Executive Director; Alex Moscoso, Associate Executive Director for Economic Analysis; Austin Schlick, General Counsel; Dr. Rana Balci-Sinha, Director Division of Human Factors; and Mary House, Attorney, Office of the General Counsel.

Before the questioning session, the Chair stated that it was not appropriate to discuss legal advice given to the Commission by the Office of the General Counsel outside of Executive Session.

Chair Hoehn-Saric then called for questions for staff regarding the first item, the draft final rule under section 15(j) of the CPSA. The Commissioners did not have any questions for staff regarding this draft final rule. Hearing no questions, Chair Hoehn-Saric temporarily excused staff and commenced consideration of the draft final rule under section 15(j) of the CPSA, as well as any amendments to the rule. The Chair advised that each

**U.S. Consumer Product Safety Commission**
4330 East–West Highway
Bethesda, MD 20814
cpsc.gov

**National Product Testing & Evaluation Center**
5 Research Place
Rockville, MD 20850

Page 2
Minutes of CPSC Decisional Meeting on November 2, 2022: Final Rules to (1) Add Window Covering Cords to the
Substantial Product Hazard List; and (2) Establish a Safety Standard for Operating Cords on Custom Window
Coverings

Commissioner would be recognized by order of seniority and would have three minutes to explain any proposed amendments.  The Commissioners did not have any amendments for this draft final rule.

Chair Hoehn-Saric then moved for approval of staff's draft final rule to deem hazardous window covering cords as a substantial product hazard under section 15(j) of the CPSA, and publication of the same in the *Federal Register*.  The Chair called for a second and Commissioner Feldman seconded the motion.  The Commission voted unanimously (4-0) to approve staff's draft final rule and to publish the same in the *Federal Register*.

Chair Hoehn-Saric then called for questions for staff regarding the second item, the draft final rule to establish a safety standard for operating cords on custom window coverings under sections 7 and 9 of the CPSA.  The Commissioners did not have any questions for staff regarding this draft final rule.  Hearing no questions, Chair Hoehn-Saric excused staff and commenced consideration of staff's draft final rule under sections 7 and 9 of the CPSA, as well as any amendments to this rule.   Again, the Chair advised that each Commissioner would be recognized by order of seniority and would have three minutes to explain any proposed amendments

The Chair recognized himself for an amendment and introduced a substitute amendment that would restore the 180-day effective date for the final rule, as originally stated in the proposed rule that was published for public comment.  The Chair called for a second and Commissioner Feldman seconded the motion.  The Commissioners expressed support for the amendment.  Hearing no further discussion or questions, the Chair called for a vote on the amendment.  The Commissioners voted unanimously (4-0) to adopt the amendment; the Commission-adopted amendment is attached.

The Chair called for any other amendments and hearing none, moved for a vote on staff's draft final rule to establish a safety standard for operating cords on custom window coverings, under sections 7 and 9 of the CPSA, as amended, and publication of the same in the *Federal Register*.  The Chair called for a second and Commissioner Feldman seconded the motion.  The Commission voted unanimously (4-0) to approve the final rule as amended, and to publish the same in the *Federal Register*.

Chair Hoehn-Saric stated that each Commissioner would have up to 10 minutes for closing remarks. The Chair provided his closing remarks and then recognized each Commissioner. Commissioners Feldman, Trumka and Boyle each gave closing remarks. In their closing remarks, the Commissioners recognized and thanked staff, as well as victims' families and advocacy groups, for collaborative efforts in the development of these two rules.

There being no other business, Chair Hoehn-Saric adjourned the meeting at 10:18 a.m.

For the Commission:

Alberta E. Mills

Attachments:  Substitute Amendment from Chair Hoehn-Saric (adopted by the Commission)
              Statement by Statement by Chair Hoehn-Saric
              Statement by Commissioner Feldman
              Statement by Commissioner Trumka
              Statement by Commissioner Boyle

**Amendment in the Nature of a Substitute**
**Chair Alex Hoehn-Saric**

**CONSUMER PRODUCT SAFETY COMMISSION**

**16 CFR Parts 1112 and 1260**

**[CPSC Docket No. CPSC–2013–0028]**

**Safety Standard for Operating Cords on Custom Window Coverings**

**AGENCY**:  Consumer Product Safety Commission.

**ACTION**:  Final rule.

**SUMMARY**:  The U.S. Consumer Product Safety Commission (Commission or CPSC) has

determined that custom window coverings with accessible operating cords longer than 8 inches

pose an unreasonable risk of strangulation to children 8 years old and younger.  To address this

risk of strangulation, the Commission is issuing a final rule under the Consumer Product Safety

Act (CPSA) to require that operating cords on custom window coverings meet the same

requirements as operating cords on stock window coverings, as set forth in the applicable

voluntary standard.  The final rule provides several methods to make window covering cords

inaccessible or non-hazardous.  Because this is a consumer product safety rule, operating cords

on custom window coverings must be tested and certified as meeting the requirements of the

final rule.  Custom window coverings that meet the definition of a "children's product" require

third party testing by a CPSC-accepted third party conformity assessment body.  Accordingly,

the final rule also amends the Commission's regulation that lists children's product rules

requiring third party testing.

**DATES**:  ~~For all custom window coverings less than 10 feet in vertical length, or that are not~~
~~designed to be raised and lowered, t~~The effective date of the rule is [INSERT DATE ~~ONE~~

1

A174

~~YEAR~~ 180 DAYS AFTER DATE OF PUBLICATION IN THE *FEDERAL REGISTER*], and the rule will apply to all such products manufactured after that date. ~~For all custom window coverings 10 feet or greater in vertical length and that are designed to be raised and lowered, the effective date of the rule is [INSERT DATE TWO~~ ONE ~~YEARS AFTER DATE OF PUBLICATION IN THE *FEDERAL REGISTER*], and the rule will apply to all such products manufactured after that date.~~

**FOR FURTHER INFORMATION CONTACT:** Jennifer Colten, Compliance Officer, Office of Compliance and Field Operations, Consumer Product Safety Commission, 4330 East West Highway; telephone: 301-504-8165; jcolten@cpsc.gov.

**SUPPLEMENTARY INFORMATION:**

## I.     Introduction

On January 7, 2022, the Commission published a notice of proposed rulemaking (NPR) to regulate operating cords on custom window coverings.  87 FR 1014 (Jan. 7, 2022).  The Commission received over 2000 comments on the proposed rule and, on March 16, 2022, held a public hearing to receive oral comments on the proposed rule.[1]  87 FR 8441 (Feb. 15, 2022).[2]  As described in this preamble, after consideration of the comments, the Commission is now finalizing the rule.[3]  The final rule is generally consistent with the NPR, but provides two methods to make operating cords inaccessible under the rule (using a rigid cord shroud or a

---

[1] Video available at: https://www.youtube.com/watch?v=ggbi6Tm5egA; Transcript available at: https://www.regulations.gov/document/CPSC-2013-0028-3663.
[2] On March 2, 2022, the Commission voted to deny a February 11, 2022 request by the Window Covering Manufacturers Association (WCMA), to extend the comment period for this rulemaking by 75 days.  The staff's package explaining WCMA's request is available at: https://www.cpsc.gov/s3fs-public/NPR-for-Operating-Cords-on-Custom-Window-Coverings-Notice-of-Extensin-of-Comment-Period.pdf?VersionId=AHlkvtMCFUiY21f3.fCcNflLlqcTCsfT.  A Record of Commission Action on the request is available at: https://www.cpsc.gov/s3fs-public/RCA-Safety-Standard-for-Custom-Window-Coverings-Notice-of-Extension-of-Comment-Period.pdf?VersionId=.YvybvKXK8VfmPx8GFqgcHH7t3E7ggS6.  Although the Commission denied the comment period extension, the Commission has received and considered all late-filed comments for this rulemaking.
[3] <mark>Insert vote summary.</mark>

retractable cord), and allows use of a loop cord and bean chain restraining device to prevent formation of hazardous loops. The final rule is based on information and analysis contained in CPSC staff's September 29, 2021, Staff Briefing Package: Notice of Proposed Rulemaking for Corded Window Coverings (Staff's NPR Briefing Package),[4] and on information in staff's September 28, 2022, Staff Briefing Package: Draft Final Rules for Corded Window Coverings (Staff's Final Rule Briefing Package).[5]

     *A.*     *Overview of the Final Rule*

The purpose of the final rule is to address the unreasonable risk of strangulation to children 8 years old and younger associated with hazardous operating cords on custom window coverings. The Commission issues this final rule pursuant to sections 7 and 9 of the CPSA, 15 U.S.C. 2056 and 2058, to create a new mandatory standard for operating cords on custom window coverings. The Commission finds that this rule is reasonably necessary to address an unreasonable risk of death and serious injury to children 8 years old and younger associated with corded custom window coverings, due to the ongoing fatal and nonfatal incidents, the high severity of the outcomes (death and disability to children), the availability of cost-effective technologies that address the hazard, and the inadequacies of parental supervision, warnings, education campaigns, external safety devices for this class of products, and the existing voluntary standard for custom products.

The final rule is designed to eliminate the ongoing tragedy of child deaths on corded custom window coverings. The Commission is aware of 209 fatal and near-miss strangulations on window covering cords that occurred among children 8 years old and younger from January

---

[4] Available at: *https://www.cpsc.gov/s3fs-public/NPRs-Add-Window-Covering-Cords-to-Substantial-Product-Hazard-List-Establish-Safety-Standard-for-Operating-Cords-on-Custom-Window-Coverings-updated-10-29-2021.pdf?VersionId=HIM05bK3WDLRZrlNGogQLknhFvhtx3PD.*
[5] Available at: ==Insert Link==.

2009 through December 2021.  The industry has been long aware of the strangulation hazard and how to address these deaths and injuries, by removing accessible cords from window coverings. Finally, in 2018, after more than 20 years of consideration, the voluntary standards committee revised the voluntary standard to eliminate the strangulation hazard on stock window coverings. After this change in the market, sales of stock products increased, even though the prices of stock products in some cases doubled.

The final rule will extend the requirements for stock products to custom window coverings.  Staff estimates that compliance with the final rule will result in a net increase of as little as $24 per household every approximately 10 years when consumers replace all custom window coverings in their home.  *See* Table 9, *infra*, and Tab F of Staff's Final Rule Briefing Package.  This price increase represents only about 5% of the total costs of replacing all custom window coverings.  *Id*.  The Commission expects that the custom window covering market will absorb this cost, just as seen in the stock window covering market.  This fact is also observed in the Canadian window covering market.  Canada implemented a rule earlier this year that eliminates hazardous cords on all window covering products, and the market has reacted with cost-effective substitutes and redesigned products.

The final rule is consistent with the proposed rule, by requiring operating cords on custom window coverings to meet identical requirements for operating cords on stock window coverings, as set forth in section 4.3.1 of ANSI/WCMA A100.1 – 2018, American National Standard for Safety of Corded Window Covering Products (ANSI/WCMA-2018).  Section 4.3.1 of ANSI/WCMA-2018 requires stock window coverings to have:

(1) no operating cords (cordless) (section 4.3.1.1);

(2) inaccessible operating cords (section 4.3.1.3); or

(3) operating cords equal to or shorter than 8 inches in any use position (section 4.3.1.2).

The proposed rule provided requirements for one method, a rigid cord shroud, for manufacturers to make operating cords inaccessible, to comply with section 4.3.1.3.

Based on review and consideration of the public comments, the Commission is providing requirements for an additional method to meet the "inaccessible" requirement under section 4.3.1.3 in the final rule, a retractable cord, as long as it meets the performance requirements in the rule. The final rule does not preclude manufacturers from developing new methods of meeting the "inaccessible" requirement in section 4.3.1 of ANSI/WCMA-2018. However, if manufacturers choose to use a rigid cord shroud or a retractable cord, these devices must meet the requirements in the final rule. The final rule also contains requirements for one method to make accessible continuous loops non-hazardous: loop cord and bead chain restraining devices. ANSI/WCMA-18 and the draft ANSI/WCMA-2022 allow these three methods to make cords non-hazardous, with different requirements from the final rule. Hundreds of commenters requested that we allow these options to remain for custom products. These methods are allowed in the final rule provided that they meet durability requirements.

This final rule addresses the unreasonable risk of injury associated with operating cords on custom window coverings. In a separate, concurrent rulemaking under section 15(j) of the CPSA, under CPSC Docket No. CPSC–2021–0038, the Commission is finalizing a rule to deem a "substantial product hazard" (SPH), as defined in section 15(a)(2) of the CPSA: (1) the presence of hazardous operating cords on stock window coverings; (2) the presence of hazardous inner cords on stock and custom window coverings; or (3) the absence of a required manufacturer label on stock and custom window coverings.[6]

---

[6] The preamble to the rule under section 15(j) explains that the voluntary standard adequately addresses operating cord hazards associated with stock window coverings, and inner cord hazards associated with both stock and custom window coverings. Note that unlike with custom window coverings, ANSI/WCMA-2018 does not include requirements for additional methods for stock products to meet section 4.3.1, and most stock products use manual

*B.      Background and Statutory Authority*

Window coverings are "consumer products" within the jurisdiction of the CPSC, and subject to regulation under the authority of the CPSA.  *See* 15 U.S.C. 2052(a)(5).  The final rule applies to all custom window coverings used in residences, in schools, or elsewhere, as long as consumers have access to the window covering and are subject to a strangulation hazard.  *Id.* Section 7(a) of the CPSA authorizes the Commission to promulgate this final rule which sets forth performance requirements that are reasonably necessary to prevent or reduce an unreasonable risk of injury or death associated with operating cords on custom window coverings.  15 U.S.C. 2056(a).

Incident data demonstrate that children can strangle on accessible window covering cords that are long enough to wrap around their neck.  Accordingly, the performance requirements in the final rule require that operating cords on custom products meet the requirements for stock window coverings in section 4.3.1 of ANSI/WCMA-2018, to prevent an unreasonable risk of injury, strangulation and death, to children 8 years old and younger, and provides several methods to make operating cords inaccessible or non-hazardous.  Options to eliminate cords or to make cords inaccessible must be integrated with the product as sold, so that the safety of custom window coverings does not rely on the installation of external safety devices (*i.e.*, cord tension device) by a consumer or an installer.

Section 7(b)(1) of the CPSA requires the Commission to rely on a voluntary standard, rather than promulgate a mandatory standard, when compliance with the voluntary standard would eliminate or adequately reduce the risk of injury associated with a product, and it is likely that products will be in substantial compliance with the voluntary standard.  15 U.S.C.

---

lifting to comply with the voluntary standard.  Regardless, the rule under section 15(j) of the CPSA does not preclude manufacturers from innovating compliance methods, as long as the products meet the operating cord requirements in section 4.3.1 of ANSI/WCMA-2018.

6

2056(b)(1).  As described in section II.F of this preamble, the Commission finds that custom window coverings substantially comply with the voluntary standard, ANSI/WCMA-2018. However, as reviewed in the NPR, section 4.3.2 of ANSI/WCMA-2018 that applies to custom window coverings, does not adequately address the risk of injury associated with operating cords on custom window coverings because it allows for the sale of custom window coverings equipped with hazardous operating cords.  87 FR at 1030-32.  A hazardous cord is one that is not compliant with section 4.3.1 of ANSI/WCMA-2018, which requires that products be cordless, use cords that are inaccessible to children, or use cords that are short (equal to or less than 8 inches) to prevent children from wrapping a cord around their neck.  The NPR explained that the requirements in the rule would address 100 percent of the known operating cord incidents associated with custom window coverings. *Id*. at 1031.

Section 9 of the CPSA specifies the procedure that the Commission must follow to issue a consumer product safety standard under section 7 of the CPSA.  The Commission may commence rulemaking by issuing either an advance notice of proposed rulemaking (ANPR) or an NPR.  The Commission issued an ANPR for corded window coverings, including stock and custom products, in January 2015 (80 FR 2327 (January 16, 2015)).  Subsequently, in January 2022, the Commission issued two NPRs.  The Commission issued an NPR under section 15(j) of the CPSA for the hazards addressed by ANSI/WCMA-2018, including operating and inner cords on stock window coverings, and inner cords on custom window coverings (87 FR 891 (Jan. 7, 2022)), and issued an NPR under sections 7 and 9 of the CPSA to address operating cords on custom window coverings (87 FR 1014 (Jan. 7, 2022)).

As required in section 9 of the CPSA, in the NPR for custom window coverings, the Commission requested comment on the risk of injury identified by the Commission, the regulatory alternatives being considered, and other possible alternatives for addressing the risk of

7

injury.  The Commission also requested comments on the preliminary findings included in the proposed rule.  *Id*. at 1053-54.  Section III of this preamble summarizes and responds to the comments received on the NPR.

C.    *Product Description*

    1.  <u>Overview of Window Covering Products</u>

The NPR describes the types of custom window coverings in use and the types of operating cords and systems for custom window coverings.  87 FR at 1015-18.  Window coverings include a wide range of products, including shades, blinds, curtains, and draperies.  A cord or loop used by consumers to manipulate a window covering is called an "operating cord" and may be in the form of a single cord, multiple cords, or continuous loops.  "Cordless" window coverings are products designed to function without an operating cord, but they may contain inner cords.  Figures 1 through 6 explain window covering terminology and show examples of different types of window coverings.



**Figure 1. Horizontal blind**

8





**Figure 4a. Close-Up View
Vertical blind**

**Figure 4. Vertical blind**



**Figure 5. Roman shade**



**Figure 6. Cordless horizontal blind**

Figure 1 shows a horizontal blind containing inner cords, operating cords, and tilt cords.

Figure 2 shows a roll-up shade containing lifting loops and operating cords. Figure 3 shows a

cellular shade with inner cords between two layers of fabric and operating cords. Figure 4 shows

a vertical blind with a looped operating cord to traverse the blind and a looped bead chain to tilt the vanes. Figure 4a, a close-up view of Figure 4, shows two continuous loop operating cords on the same blind; one cord tilts the slats to open and close the blind, and the other cord traverses the blind. Figure 5 shows a Roman shade with inner cords that run on the back side of the shade and operating cords. Figure 6 is a horizontal blind that is marketed as "cordless" because it has no operating cords, but it still contains inner cords. Window covering operating systems can vary slightly by window covering type, but all operating systems fit into one of two general categories: corded or cordless.

2. <u>Corded Window Coverings</u>

"Traditional" or "corded" shades and blinds generally have cords located inside the product (inner cord), to the side of the product (operating cord or outer cord), or both. The inner cords between the head rail and bottom rail lift the horizontal slats to adjust light coming through, as in the case of horizontal blinds, or lift fabric and similar materials, as in the case of Roman or pleated shades. The outer cord or operating cord allows the user to raise, lower, open and close, rotate, or tilt the window covering. Operating cord systems generally fall into one of three categories: (1) standard; (2) single cord; and (3) continuous loop. The operating cord in a standard operating system consists of two or more cords and often includes a cord locking device to allow the user to set the height of the window covering. In a single cord operating system, the user can manipulate the window covering with a pull cord. The operating cord in a continuous loop operating system uses a single piece of cord or a beaded metal or plastic chain that is secured to a wall and operates like a pulley. For example, pulling down the rear half of the loop will lower the shade, while pulling down the front half of the loop will raise the shade.

### 3. Cordless Window Products

Virtually every window covering type is available with a "cordless" operating system, which means it has been designed to function without an operating cord.[7]  Cordless window coverings may require inner cords, but these can be, and typically are, made inaccessible.  In lieu of an operating cord, cordless operating systems can be manual or motorized.  A manual operating system allows users to lift or lower the window covering with a handle or directly by hand.  A motorized operating system uses a motor and control system to manipulate the window covering, such as a remote control or wall switch.  Installation of cordless window coverings that are motorized is more complicated than manual systems because motorized systems require a power source.

### 4. Other Types of Safety Devices

The NPR reviewed safety devices some manufacturers use to isolate operating cords to make them safer, and assessed whether these methods address the strangulation risk.  87 FR at 1018-19.  Alternative safety devices include, among others: retractable cords, cord cleats, cord shrouds, cord condensers, and wands.  Tab I in Staff's NPR Briefing Package contains a more detailed description of these devices.  In the NPR, the Commission preliminarily found that these devices, as addressed in ANSI/WCMA-2018, are inadequate to address the risk of injury associated with operating cords on custom window products.  *Id.*  However, the Commission requested comment on several methods used to make operating cords inaccessible, including

---

[7] The availability of alternatives to corded window coverings may sometimes be constrained due to size and weight limitations. *See* Lee, 2014.  Through market research, staff found several examples of cordless blinds that are made with a maximum height of 84" and a maximum width of 144" (Tab G of Staff's NPR Briefing Package).

rigid cord shrouds, a method included in the NPR, as well as retractable cords and cord and bead chain restraining devices. 87 FR at 1054.

Based on the comments received, and as discussed in section II of this preamble, the final rule includes additional methods to address the strangulation risk, including retractable cords and loop cord and bead chain restraining devices. In the final rule the Commission strengthens durability and performance requirements for these additional methods, to address the public comments and to ensure that use of safety devices does not introduce new hazards, such as from broken parts. These additional compliance methods allow for products that have one-handed operation and do not limit consumer accessibility to window coverings, but still eliminate the strangulation hazard.

    5.   <u>"Stock" and "Custom" Window Coverings Defined in the NPR</u>

Like the NPR, this final rule relies on the definitions of window coverings and their features as set forth in the ANSI/WCMA-2018 standard, which requires "stock" and "custom" window coverings to meet different sets of operating cord requirements. 87 FR at 1019. The final rule uses the same definition of a "stock window covering" as the NPR, and has the same meaning as the definition of "Stock Blinds, Shades, and Shadings" in section 3, definition 5.02 of ANSI/WCMA-2018. A "stock widow covering" is a completely or substantially fabricated product prior to being distributed in commerce. Even when the seller, manufacturer, or distributor modifies a pre-assembled product, by adjusting to size, attaching the top rail or bottom rail, or tying cords to secure the bottom rail, the product is still considered "stock," as defined in ANSI/WCMA-2018. Moreover, under the ANSI standard, online sales of a window covering, or the size of the order, such as multifamily housing orders, do not make the product a non-stock product. ANSI/WCMA-2018 provides these examples to clarify that, as long as the

product is "substantially fabricated" prior to distribution in commerce, subsequent changes to the product do not change its categorization from "stock" to "custom."

The final rule also defines a "custom window covering" using the same definition of "Custom Blinds, Shades, and Shadings" found in section 3, definition 5.01 of ANSI/WCMA-2018, which is "any window covering that is not classified as a stock window covering."  The final rule also includes definitions of "operating cord," "cord shroud," "rigid cord shroud," and "retractable cord," as described in section IV.A of this preamble.

6.  <u>The Window Covering Industry</u>

The total U.S. window covering market size in 2021 was approximately $6.7 billion.[8] (Euromonitor 2022a).  CPSC staff estimates that firms classified as small by Small Business Administration (SBA) guidelines account for $3.9 billion annually, and that none of these firms account for more than three percent of total market share by revenue. (Euromonitor 2022b).  The NPR reviewed that, based on 2017 data, 1,898 firms were categorized as blinds and shades manufacturers and retailers (Census Bureau, 2020).  87 FR at 1019.  Of these, about 1,840 firms (302 manufacturers and 1,538 retailers) are small.  In 2020, three manufacturers accounted for almost 38 percent of dollar sales in the U.S. window coverings market (Euromonitor 2021a).  Only one of these manufacturers is a publicly held firm.  In 2020, the largest global manufacturer and distributor of window coverings reported worldwide net sales of $3.5 billion, with North American window covering sales reported as $1.7 billion.  The second largest firm is privately held, and annual reports are not publicly available.  Estimates of this firm's revenue indicate annual U.S. window covering revenue in 2020 of approximately $728 million (Euromonitor 2021a).  The third firm is also privately held, and estimates indicate U.S. window covering

---

[8] Stock window coverings most likely account for a minority of the total market size in terms of revenue due to significant average price differences between stock and custom products. (D+R International 2021).

revenues in 2020 of approximately $88 million (Euromonitor 2021a). The remainder of the total market size of $6.6 billion is attributed to firms that each account for less than 3 percent market share (Euromonitor 2021b). *Id*.

A recent study conducted for CPSC (D+R, 2021) estimated that in 2019, approximately 139 million residential window coverings were shipped in the United States. Most of these shipments, 59.2 percent, were blinds, while 25.4 percent were shades. When comparing unit sales data to revenue data, CPSC staff found that while custom products account for approximately 44 percent of unit sales, a disproportionate amount of revenue is attributable to custom window covering products. For example, Roman shades, which are sold almost always as custom window covering products, account for 1.9 percent of annual sales in 2019, but generated revenues equal to 2.3 percent of the total.

7. <u>Retail Prices</u>

As reviewed in the NPR, retail prices for window coverings vary, depending on the type of the product and retailer. 87 FR at 1019; Tab F of the Final Rule Briefing Package. According to a D+R International (2021) study, average prices for window coverings range from $54 to $94 for shades and from $25 to $250 for blinds.[9] Prices for vertical blinds are generally lower than the prices of horizontal blinds; prices for roller shades are slightly lower than the prices of Roman and cellular shades (D+R International, 2021).[10]

Consumers can purchase custom sized and custom designed window coverings from mass merchants, specialty retailers, e-commerce retailers, and in-home consultation firms. Custom coverings include uncommon window covering sizes, such as extremely small (*e.g.*, 9

---

[9] The range for shades is based on average prices for cellular shades, roller shades, Roman shades, and pleated shades. The range for blinds is based on average prices for vinyl blinds, metal blinds, faux-wood blinds, wood blinds, and vertical blinds.
[10] The D+R review of prices and product availability found that stock product prices are generally lower than custom products and that cordless lift systems resulted in an increase in price except in the case of vertical blinds.

inches wide x 13 inches high), extremely large (*e.g.*, 96 inches wide x 96 inches high), and other unusual sizes.  Retail prices for custom made window coverings can be as high as $5,000.[11] Retailers often suggest in-home measuring and evaluation to estimate the price for custom designed products, as non-standard sizes or window shapes or motorized lift systems can require professional installation.  Prices for customized window coverings are on average higher than similar stock products sold by mass retailers.

8.  <u>Window Coverings in Use</u>

CPSC staff calculated an estimate of the number, and statistical distribution, of custom window coverings in use using CPSC's Product Population Model (PPM).[12] Tab F of the Staff Final Rule Briefing Package.  The PPM is a statistical model that projects the number of products in use given estimates of annual product shipments/unit sales and information on product failure rates over time.  Using the annual unit shipment estimates from the D+R International (2021) report, along with estimates on the number of corded products sold/in use, estimates for the share of custom products sold/in use, and estimates of the expected product life for window coverings by type provided by WCMA, staff estimates approximately 145 million corded custom window coverings in use in the United States in 2020.  Table 1 shows the breakdown and calculation of estimated *corded custom* products in use, by type.

[11]  Based on firms' websites, retail prices for custom-made Roman shades can range from $300-$5,000.
[12] Lahr, M.L., Gordon, B.B., 1980. Product life model feasibility and development study. Contract CPSC-C-79-009, Task 6, Subtasks 6.01-6.06). Columbus, OH: Battelle Laboratories.

**Table 1. Estimates of the Number of Corded Custom Window Coverings in Use**

| | [1]<br>Number of Products in use (Millions) | [2]<br>% of Custom products in use (WCMA 2022a) | [3]<br>% of Corded Products (WCMA 2022b) | [4]<br>Expected Product Life (WCMA 2022b) | [5]<br>Number of Corded Custom Products in use (Millions) |
|---|---|---|---|---|---|
| Horizontal Blinds | 474.24 | | | | 76.02 |
| Vinyl/Metal | 251.35 | 20% | 91.9% | 6.7 | 46.20 |
| Wood/Faux Wood | 222.89 | 20% | 66.9% | 10.8 | 29.82 |
| Shades | 280.36 | | | | 22.67 |
| Cellular | 94.46 | 20% | 21.0% | 7.2 | 3.97 |
| Pleated | 40.66 | 20% | 31.0% | 7.5 | 2.52 |
| Roman | 23.29 | 20% | 41.2% | 8.75 | 1.92 |
| Roller | 84.27 | 20% | 57.3% | 7.2 | 9.66 |
| Soft Sheer | 37.69 | 20% | 61.1% | 7.2 | 4.61 |
| Vertical Blinds | 177.84 | 20% | 64.8% | 7.6 | 23.05 |
| Curtains/Drapery | 212.59 | 20% | 54.4% | 15 | 23.13 |
| Total | 1,145.03 | | | | 144.87 |

*D.    Hazards Associated with Window Covering Cords*

Window covering cords, including operating cords (meaning pull cords and continuous loop cords), inner cords, and lifting loops, can pose strangulation hazards to children when they are accessible and long enough to wrap around a child's neck. Figures 7, 8, and 9 below depict the strangulation hazard for different window covering cord types.

16

A189



**Figure 7. (a) Operating pull cords ending in one tassel (left); (b) operating cords tangled, creating a loop (middle); (c) operating cords wrapped around the neck (right)**



**Figure 8. (a) Inner cords creating a loop (left), (b) Inner cords on the back side of Roman shade (right)**



**Figure 9. (a) Continuous loop cord (left), (b) Lifting loop on roll-up shade (right)**

Children can strangle from mechanical compression of the neck when they place a window covering cord around their neck. Strangulation due to mechanical compression of the neck is a complex process resulting from multiple mechanisms and pathways that involve both obstruction of the airway passage and occlusion of blood vessels in the neck. Strangulation can

17

A190

lead to serious injuries with permanent debilitating outcomes or death. If sustained lateral pressure occurs at a level resulting in vascular occlusion, strangulation can occur when a child's head or neck becomes entangled in any position, even in situations where the body is fully or partially supported.

Strangulation is a form of asphyxia that can be partial (hypoxia), when there is an inadequate oxygen supply to the lungs, or total, when there is complete impairment of oxygen transport to tissues. A reduction in the delivery of oxygen to tissues can result in permanent, irreversible damage. Experimental studies show that as little as 2 kg (4.4 lbs.) of pressure on the neck may occlude the jugular vein (Brouardel, 1897); and 3kg to 5 kg (7-11 lbs.) may occlude the common carotid arteries (Brouardel, 1897 and Polson, 1973). Minimal compression of any of these vessels can lead to loss of consciousness within 15 seconds and death in 2 to 3 minutes, (Digeronimo and Mayes, 1994; Hoff, 1978; Iserson, 1984; Polson, 1973).

The vagus nerve is also located in the neck near the jugular vein and carotid artery. The vagus nerve is responsible for maintaining a constant heart rate. Compression of the vagus nerve can result in cardiac arrest due to mechanical stimulation of the carotid sinus-vagal reflex. In addition, the functioning of the carotid sinuses may be affected by compression of the blood vessels. Stimulation of the sinuses can result in a decrease in heart rate, myocardial contractility, cardiac output, and systemic arterial pressure in the absence of airway blockage.

Strangulation proceeding along one or more of these pathways can progress rapidly to anoxia, associated cardiac arrest, and death. As seen in the CPSC data (Wanna-Nakamura, 2014), and in the published literature, neurological damage may range from amnesia to a long-term vegetative state. Continued deterioration of the nervous system can lead to death (Howell and Gully, 1996; Medalia et al., 1991).

Because a preexisting loop acts as a noose when a child's neck is inserted, and death can

occur within minutes of a child losing footing, CPSC staff concluded that head insertion into a preexisting loop poses a higher risk of injury than when a child wraps a cord around his or her neck.  However, both scenarios have been demonstrated to be hazardous and have led to fatal outcomes, according to CPSC data.

Based on the data, the Commission also concludes that reliance on parental supervision and warning labels are inadequate to address the risk of injury associated with window covering cords.  As reviewed in the NPR, a user research study found that caregivers lacked awareness regarding the potential for window covering cord entanglement; lacked awareness of the speed and mechanism of the strangulation injury; identified difficulty using and installing safety devices for window coverings among the primary reasons for not using them; and were unable to recognize the purpose of the safety devices provided with window coverings (Levi et al., 2016).[13]  According to Godfrey *et al*. (1983), consumers are less likely to look for and read safety information about the products that they frequently use and are familiar with.  Consumers almost certainly have window coverings in their homes and may use them daily.  Therefore, even well-designed warning labels will have limited effectiveness in communicating the hazard on this type of product.

Based on the foregoing, the Commission finds that warning labels are unlikely to effectively reduce the strangulation risk from hazardous cords on window coverings, because consumers are not likely to read and follow warning labels on window covering products, and strangulation deaths among children occur quickly and silently, such that parental supervision is insufficient to address the incidents.  Indeed, staff observed that most of the window covering units involved in incidents had the permanent warning label required by the ANSI/WCMA standard affixed to the product.  Even well-designed warning labels will have limited

---

[13] https://cpsc.gov/s3fs-public/Window%20Coverings%20Safety%20Devices%20Contractor%20Reports.pdf.

effectiveness in communicating the hazard on this type of product, because consumers are less likely to heed warnings for familiar products that they commonly interact with without incident.

In contrast to requirements for custom window coverings in ANSI/WCMA-2018, stock window covering requirements in the ANSI/WCMA standard adequately address the strangulation hazard, by not allowing hazardous cords on these products; stock window covering requirements do not rely on consumer action to address the risk of strangulation. Stock window coverings that comply with the ANSI/WCMA standard inherently minimize strangulation risk as sold because no consumer or installer action is required to protect against strangulation of children. Accordingly, the Commission concludes that the risk of injury associated with custom window coverings must be addressed through performance requirements for these products, to ensure that custom window coverings are as safe as stock window coverings for children 8 years old and younger.

E.    *Risk of Injury*

The incident data demonstrate that regardless of whether a product is categorized as stock or custom, children are exposed to the same risk of strangulation from accessible window covering cords. For the NPR, the Commission presented window covering cord incidents occurring from 2009 through 2020.[14] 87 FR at 1022-27. Since extracting data for the NPR, CPSC has received reports of 15 additional incidents. Tab A of Staff's Final Rule Briefing Package details this new incident data. The following analysis is based on incidents received from 2009 through 2021, and distinguishes between stock and custom window coverings whenever feasible.

---

[14] CPSC staff searched three databases for identification of window covering cord incidents: the Consumer Product Safety Risk Management System (CPSRMS), the National Electronic Injury Surveillance System (NEISS), and the Multiple Cause of Deaths data file (further information can be found at https://wonder.cdc.gov/mcd-icd10.html). The first two sources are CPSC-maintained databases. The Multiple Cause of Deaths data file is available from the National Center for Health Statistics (NCHS).

1. <u>Incident Data from CPSC Databases</u>

Based on newspaper clippings, consumer complaints, death certificates purchased from states, medical examiners' reports, reports from hospital emergency department-treated injuries, and in-depth investigation reports, CPSC staff found a total of 209 reported fatal and near-miss strangulations on window covering cords that occurred among children 8 years old and younger from January 2009 through December 2021. These 209 incidents do not necessarily include all window covering cord-related strangulation incidents that occurred during that period, and recent data, particularly for 2021, may be incomplete. However, these 209 incidents do provide a minimum number for such incidents during that time frame.

Table 2a provides the breakdown of the incidents by year. Totals include new incidents received after the NPR data analysis, which are noted in parentheticals below. Because reporting is ongoing and the number of incidents may grow, and because these reports are anecdotal, inferences should not be drawn from the year-to-year variations in the reported data.

**Table 2a**
**Reported Fatal and Near-Miss Strangulation Incidents Involving Window Covering Cords**
**Among Children Eight Years and Younger 2009 – 2021**

| Incident Year | Number of Reported Incidents | | |
|---|---|---|---|
| | *Total* | *Fatal Strangulations* | *Near-Miss Strangulations* |
| 2009 | 48 | 14 | 34 |
| 2010 | 31 | 11 | 20 |
| 2011 | 10 | 6 | 4 |
| 2012 | 17 | 8 | 9 |
| 2013 | 9 | 2 | 7 |
| 2014 | 17 | 12 | 5 |
| 2015 | 9 | 7 | 2 |
| 2016 | 17 | 13 | 4 |
| 2017 | 10 (1) | 5 | 5 (1) |
| 2018 | 8 | 4 | 4 |
| 2019 | 11 | 4 | 7 |
| *2020\** | 13 (5) | 8 (5) | 5 |
| *2021\** | 9 (9) | 6 (6) | 3 (3) |
| **Total** | **209 (15)** | **100 (11)** | **109 (4)** |

**Source: CPSC epidemiological databases CPSRMS and NEISS. Data in ( ) indicate the number of new incidents received since the NPR data analysis.**
**Note: \* indicates data collection is ongoing.**

21

Among the 15 newly reported incidents, staff identified 11 fatalities (73 percent) and 4 non-hospitalized injuries (27 percent).  The non-hospitalized injuries resulted in lacerations and abrasions.

Table 2b expands on Table 2a to display the distribution of the annual incidents by severity of incidents and type of window coverings involved.  CPSC staff identified 50 of 209 incident window coverings (24 percent) to be stock products, and 36 of the 209 (17 percent) window coverings as custom products.  Where staff could identify a product type, custom products therefore made up 42% (36 out of 86) of the incident products.  CPSC staff could not identify the window covering type in the remaining 123 of the 209 incidents (59 percent); 65 of the 123 incidents (53 percent) involving an uncategorized window covering resulted in a fatality.

**Table 2b**
**Reported Fatal and Near-Miss Strangulation Incidents Involving Stock/Custom/Unknown Types of Window Covering Cords Among Children Eight Years and Younger 2009 -- 2021**

| Incident Year | Reported Incidents by Window Covering Type | | | |
| | *Stock (Fatal/Nonfatal)* | *Custom (Fatal/Nonfatal)* | *Unknown (Fatal/Nonfatal)* | *All* |
|---|---|---|---|---|
| 2009 | 20 (4/16) | 7 (2/5) | 21 (8/13) | 48 |
| 2010 | 10 (3/7) | 7 (2/5) | 14 (6/8) | 31 |
| 2011 | 2 (1/1) | 4 (3/1) | 4 (2/2) | 10 |
| 2012 | 1 (1/0) | 5 (1/4) | 11 (6/5) | 17 |
| 2013 | 2 (1/1) | 3 (1/2) | 4 (0/4) | 9 |
| 2014 | 3 (2/1) | 2 (1/1) | 12 (9/3) | 17 |
| 2015 | 4 (4/0) | 1 (1/0) | 4 (2/2) | 9 |
| 2016 | 5 (3/2) | 4 (3/1) | 8 (7/1) | 17 |
| 2017 | 2 (1/1) | 1 (0/1) | 7 (4/3) | 10 |
| 2018 | -- | 1 (0/1) | 7 (4/3) | 8 |
| *2019* | 1(0/1) | -- | 10 (4/6) | 11 |
| *2020\** | -- | 1 (1/0) | 12 (7/5) | 13 |
| *2021\** | -- | -- | 9 (6/3) | 9 |
| **Total** | **50 (20/30)** | **36 (15/21)** | **123 (65/58)** | **209** |

**Source: CPSC epidemiological databases CPSRMS and NEISS.**
**Note:  \* indicates data collection is ongoing.**

One hundred of the 209 incidents (48 percent) reported a fatality.  Among the nonfatal incidents, 16 involved hospitalizations (8 percent).  The long-term outcomes of these 16 injuries

varied from a scar around the neck, to quadriplegia, to permanent brain damage. One additional child was treated and transferred to another hospital; the final outcome of this patient is unknown. In addition, 79 incidents (38 percent) involved less-severe injuries, some requiring medical treatment, but not hospitalization. In the remaining 14 incidents (7 percent), a child became entangled in a window covering cord, but was able to disentangle from the cord and escape injury. For the incidents identified in the NPR for which gender information is available, 66 percent of the children were males, and 34 percent were females. One incident did not report the child's gender. For the 15 new incidents staff found a similar pattern regarding gender; 62 percent of the victims were male and 38 percent were females.

Table 2c provides a breakdown of the incidents by window covering type. Among the 11 newly reported deaths since the NPR analysis, staff definitively identified the cord type in 6 deaths. Three deaths (27 percent of all newly reported deaths) involved a pull cord, 2 deaths (18 percent) involved a continuous loop, and 1 death (9 percent) involved inner cord(s); staff had insufficient information to determine the cord type involved for the remaining 5 fatal incidents.

23

A196

**Table 2c: Distribution of Reported Incidents by Types of**
**Window Coverings and Associated Cords 2009 – 2021**
**(Numbers in Parentheses Indicate New Reports Received Since NPR)**

| Window Covering Type | Cord Type | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Pull Cord** | **Continuous Loop** | **Inner Cord** | **Lifting Loop** | **Tilt Cord** | **Unknown** | **TOTAL** |
| **Horizontal** | 68 (3) | 2 | 4 (1) | 0 | 5 | 10 | 89 (4) |
| **Vertical** | 0 | 12 (1) | 0 | 0 | 0 | 0 | 12 (1) |
| **Drapery** | 0 | 4 (1) | 0 | 0 | 0 | 0 | 4 (1) |
| **Roman** | 2 | 2 | 19 | 0 | 0 | 1 | 24 |
| **Other\*** | 2 | 5 | 0 | 0 | 0 | 0 | 7 |
| **Roll-Up** | 1 | 0 | 0 | 4 | 0 | 1 | 6 |
| **Roller** | 0 | 9 | 0 | 0 | 0 | 0 | 9 |
| **Unknown** | 1 | 1 | 0 | 0 | 0 | 56 (9) | 58 (9) |
| **Subtotal †** | 74 (3) | 35 (2) | -- | -- | 5 | 68 (9) | 182 (14) |
| **TOTAL** | **74 (3)** | **35 (2)** | **23 (1)** | **4** | **5** | **68 (9)** | **209 (15)** |

**Source: CPSC epidemiological databases CPSRMS and NEISS.**
**Other\*: This category includes cellular and pleated shades.**
**Subtotal† : This row shows the incidents that are relevant to the section 7&9 rule.**

2. Incident Data from National Estimates

 (a) *Estimates of Window Covering Cord-Related Strangulation Deaths Using National Center for Health Statistics Data*

  The NCHS compiles all death certificates filed in the United States into multiple-cause mortality data files. The mortality data files contain demographic information on the deceased, as well as codes to classify the underlying cause of death, and up to 20 contributing conditions. The NCHS compiles the data in accordance with the World Health Organization (WHO) instructions, which request member nations to classify causes of death by the current Manual of the International Statistical Classification of Diseases, Injuries, and Causes of Death. Death classifications use the tenth revision of the International Classification of Diseases (ICD), implemented in 1999. For the NPR, 2019 was the latest available year for NCHS data; since then, data for 2020 have become available.

  Using the ICD10 code value of W76 (*Other accidental hanging and strangulation*), the code most likely to capture strangulation fatalities among children under 5 (based on empirical

A197

evidence from death certificates maintained in CPSC databases), CPSC staff derived fatality

estimates for 2009 through 2020, presented in Figure 10 below.  An unknown proportion of

strangulation deaths is likely coded under ICD10=W75 (*Accidental suffocation and*

*strangulation in bed*) as well as ICD10=W83 (*Other specified threats to breathing*), which staff

cannot separate out from the non-strangulation deaths because of the unavailability of any

narrative description in these data.  Hence, CPSC's estimates of strangulation deaths are

minimums.

   A 2002 CPSC report by Marcy *et al.* [15] concluded that 35 percent of all strangulation

fatalities among children less than 5 years old were associated with window covering cords.

Assuming that the same proportion applied for the entire 12-year period 2009 – 2020, Figure 10

below presents the national estimates for all strangulation fatalities as well as strangulations

involving window covering cords among children under 5.



**Figure 10: Estimated Annual Minimum for Fatal Strangulations
Among Children Under Five Years of Age 2009 - 2020**

**Source:  Multiple Cause of Death data, NCHS, 2009 – 2020.**
**Note: The estimates for the window covering cord fatalities are based on the assumptions that 35% of all
strangulation fatalities are due to window covering cords and that this percentage remained unchanged over
2009-2020.**

---

[15] N. Marcy, G. Rutherford. "Strangulations Involving Children Under 5 Years Old." U.S. Consumer Product Safety
Commission, December 2002.

Based on the 2002 study, staff estimates the annual average number of deaths due to window coverings at 8.1.[16] We note that this estimate is consistent with CPSC's actual incident data over a 12 year period. For example, at the time of this final rule analysis, the incidents over the 12-year period 2009-2020 report an average of 7.8 annual deaths involving window covering cords among children under 8 years old.

### F.    ANSI/WCMA-2018 History and Description

The NPR detailed CPSC staff's decades-long efforts to work with the Window Covering Manufacturers Association beginning in 1995 on an American National Standards Institute voluntary standard to address the strangulation hazard to young children from accessible cords on window coverings. 87 FR at 1027-28. Importantly, after several versions of a voluntary standard failed to adequately address the strangulation risk, on January 8, 2018, ANSI published a revision to the window coverings standard, ANSI/WCMA A100.1 – 2018, that adequately addressed the operating and inner cord strangulation hazard for stock window coverings, and the inner cord hazard for custom products. WCMA updated the 2018 version the standard in May 2018, and the standard went into effect on December 15, 2018. That standard did not, however, adequately address the operating cord hazard for custom products.

ANSI/WCMA-2018 segments the window covering market between "stock" and "custom" window coverings, as defined in section 3 of the standard, definitions 5.02 and 5.01. Per section 4.3.1 of the standard, stock window coverings are required to have:

(1) no operating cords (4.3.1.1),

(2) inaccessible operating cords (4.3.1.3), or

(3) short operating cords (equal to or less than 8 inches) (4.3.1.2).

---

[16] We received a comment critical of CPSC's use of this 2002 study. At this point in time, we are unaware of other data sources that would provide information regarding a more current national trend in window covering cord-related strangulations and the commenter did not provide an alternate data source.

Although manufacturers of custom window coverings can opt to meet the operating cord requirements for stock window coverings (sections 4.3.2.1 through 4.3.2.3 for custom window coverings are identical to 4.3.1.1 through 4.3.1.3), ANSI/WCMA-2018 allows the sale of corded window coverings that do not meet this standard, such as on some custom order products (sections 4.3.2.4 through 4.3.2.6). Table 3 demonstrates the operating cord systems allowed on custom window coverings that are prohibited on stock window coverings in ANSI/WCMA-2018.

**Table 3 – ANSI/WCMA-2018 Operating and Inner Cord Requirements for Stock and Custom Window Coverings**

| Performance Requirements in ANSI/WCMA A100.1-2018 | Assessment of the Performance Requirement | Stock Products | Custom Products |
|---|---|---|---|
| 1. *No operating cords OR*<br>2. *Short cord with a length equal to or less than 8 inches in any state (free or under tension) OR*<br>3. *Inaccessible operating cords* | Adequate | Required to have one or more of these options | Allowed/ Not Required |
| 4. *Inner cords that meet Appendix C and D* | Adequate | Required | Required |
| 5. *Manufacturer Label that meets section 5.3* | Adequate | Required | Required |
| 6. *Single Retractable Cord Lift System (no limit on length of exposed cord when operating)*<br>7. *Continuous Loop Operating System*<br>8. *Accessible Operating Cords longer than 8 inches* | Inadequate | Prohibited | Allowed/ Not Prohibited |

Section 4.3.2 of ANSI/WCMA-2018 contains additional requirements for custom products, including:

(1) operating cords must have a default length of 40 percent of the blind height (previously unlimited) (4.4);

(2) a wand is the default option for tilting slats (instead of a cord) (4.4.1.1); and

(3) warning labels must depict more graphically the strangulation hazard associated with cords (5.1).

27

A200

Section II of this preamble assesses the adequacy of requirements for operating cords on stock and custom window coverings in ANSI/WCMA-2018 to address the hazards associated with corded window coverings. Based on staff's assessment, the Commission finds that ANSI/WCMA-2018 adequately addresses the risk of strangulation on operating cords for stock window coverings, by removing operating cords, ensuring that they are inaccessible to children, or by making them too short for a child to wrap around his or her neck. However, consistent with Table 3, the Commission finds ANSI/WCMA-2018 does not adequately address the risk of injury associated with operating cords on custom window coverings, because custom products can still be sold to consumers with hazardous operating cords.

*G.* Development of Draft Revised ANSI/WCMA Voluntary Standard

After the publication of the NPR on January 7, 2022, WCMA brought forth several proposals to revise requirements for custom window covering cords in ANSI/WCMA-2018, resulting in a final draft revision that went to ballot on July 15, 2022.[17] The ballot closed on August 15, 2022. CPSC staff voted negative on the ballot based on staff's analysis of the draft standard. Staff assessed as inadequate to address the risk of injury the requirements for tension devices used with continuous loop operating systems, the requirements for retractable cords, and tests for rigid cord shrouds and loop cord and bead chain restraining devices.[18] Although the draft ANSI/WCMA-2022 has not been adopted, and thus an assessment of this draft is not necessary for this rulemaking, CPSC nonetheless discusses the draft revised standard in section II.D of this preamble, based on Tab I of Staff's Final Rule Briefing Package. The draft ANSI/WCMA-2022 standard improves some requirements for operating cords on custom

---

[17] From December 2021 through May 2022, CPSC staff participated in meetings held by ANSI/WCMA to discuss updating the voluntary standard. Tab C of Staff's Final Rule Briefing Package contains a more detailed description of staff's participation. Meeting logs and staff's correspondence have been placed on the docket for this rulemaking.
[18] CPSC staff letter is available at https://www.regulations.gov/document/CPSC-2013-0028-3667

window coverings, but continues to allow accessible operating cords and loops that are long enough to wrap around a child's neck.

On September 23, 2022, WCMA issued a recirculation ballot due to negative votes cast for the original balloted revisions. In addition to CPSC staff, Consumer Federation of America, Independent Safety Consulting, LLC, and Parents for Window Blind Safety voted negative. As explained in Tab C of Staff's Final Rule Briefing Package, the reballoting does not resolve the concerns identified by CPSC staff.

### H.   *Commission Efforts to Address Hazardous Window Covering Cords*

#### 1.   Petition and Rulemaking

Since the mid-1990s, CPSC staff has been engaged with the voluntary standards body urging changes to the ANSI/WCMA standard to reduce the risk of injury associated with window covering cords. On October 8, 2014, the Commission granted a petition to initiate a rulemaking to develop a mandatory safety standard for window coverings.[19]   The petition sought to prohibit window covering cords when a feasible cordless alternative exists. When a feasible cordless alternative does not exist, the petition requested that all window covering cords be made inaccessible by using passive guarding devices. The Commission granted the petition and published an ANPR seeking information and comment on regulatory options for a mandatory rule to address the risk of strangulation to young children on window covering cords, and then subsequently published two NPRs, under different authorities, to address the risk of injury.

The Commission is now finalizing both rules. The rule under section 15(j) is being finalized as proposed. See CPSC Docket Number CPSC-2021-0038. This rule under sections 7

---

[19] The petition, CP 13-2, was submitted by Parents for Window Blind Safety, Consumer Federation of America, Consumers Union, Kids in Danger, Public Citizen, U.S. PIRG, Independent Safety Consulting, Safety Behavior Analysis, Inc., and Onder, Shelton, O'Leary & Peterson, LLC. Staff's October 1, 2014 Petition Briefing Package, and a copy of the petition at Tab A, is available on CPSC's website at: https://www.cpsc.gov/Global/ Newsroom/FOIA/CommissionBriefingPackages/2015/PetitionRequestingMandatoryStandardforCordedWindowCov erings.pdf on (cpsc.gov).

29

and 9 of the CPSA is being finalized consistent with the NPR, but provides that rigid cord shrouds, retractable cords, and loop cord and bead chain restraining devices are all methods that can be used to make window covering cords inaccessible or non-hazardous. All of these devices are sold integrated with a custom window covering, and contain additional requirements in the final rule to ensure that any cords remain inaccessible or if accessible, non-hazardous, and that the test methods ensure durability over the use of the product.

    2.    <u>Window Covering Recalls</u>

Since January 1, 2009, CPSC has conducted 42 consumer-level window covering recalls, including two recall reannouncements. Tab C of Staff's NPR Briefing Package provides the details of these 42 recalls, where strangulation was the primary hazard. Manufacturers recalled more than 28 million units,[20] including Roman shades and blinds, roll-up blinds, roller shades, cellular shades, horizontal blinds, and vertical blinds. The recalled products also included stock products, which can be purchased off the shelf by consumers, and custom products, which are made-to-order window coverings based on a consumer's specifications, such as material, size, and color.

**II.    Assessment of Operating Cord Requirements for Stock and Custom Window Coverings**

Consistent with the NPR, the final rule requires that operating cords on custom window coverings meet the same requirements as those for operating cords on stock window coverings, as provided in section 4.3.1 of ANSI/WCMA-2018. Additionally, based on the comments received, the final rule includes rigid cord shrouds and retractable cords as methods to make operating cords on custom window coverings inaccessible to children, and loop cord and bead

---

[20] This estimate does not include the recalled units of Recall No. 10-073. This was a December 15, 2009 industry-wide recall conducted by members of the Window Covering Safety Council (WCSC). An exact number of recalled products was not stated in the recall announcements.

chain restraining devices as a method to prevent the formation of hazardous loops. Below we provide an overview of the engineering and human factors analysis of the requirements for stock and custom window coverings in ANSI/WCMA-2018, assess the balloted draft revision (draft ANSI/WCMA-2022), and evaluate the available technologies to make window coverings safer for children. We also explain the changes made in the final rule in response to the comments received on the NPR.

*A. Engineering Assessment of Operating Cord Requirements in ANSI/WCMA-2018*

1. <u>Stock Window Coverings</u>

As stated in the NPR, the requirements for operating cords on stock window coverings in ANSI/WCMA-2018 are adequate to address the risk of strangulation associated with window coverings. 87 FR at 1030-31. Staff analyzed the incident data for window coverings, which indicated that the largest proportion of deaths, irrespective of window covering type, involved operating cords (most frequently tangled or knotted cords, followed by cord(s) wrapped around the child's neck). The voluntary standard recognizes that long and accessible cords can pose a strangulation hazard. ANSI/WCMA-2018 defines the "operating cord" as the portion of a cord that the user interacts with and manipulates to move the window covering in a certain direction (*e.g.*, lifting or lowering, traversing, rotating). If a child wraps a long operating cord around their neck, or inserts their neck into a cord loop created by the design of the window covering or by tangled cords, the child can strangle to death within minutes. ANSI/WCMA-2018 provides three ways that a stock window covering can comply with the standard to reduce or eliminate the risk of children strangulating on operating cords:

*a. No Operating Cords (section 4.3.1.1).* Having no operating cords eliminates the strangulation hazard associated with operating cords. Consumers use a mechanism, other than an operating cord, to accomplish the desired movement action (*i.e.*, lifting, lowering,

traversing).  For example, a spring mechanism on a horizontal blind allows the user to lift and lower the blind via the bottom rail of the window covering.

   *b.  Short Cord with a Length Equal to or Less Than 8 Inches in Any State (section 4.3.1.2).*  Based on the anthropometric dimensions of the youngest child involved in an incident, a static cord length of 8 inches or shorter is insufficient to strangle a child, because the neck circumference of a fifth percentile 6- to 9-month-old child is 8 inches (BSI, 1990, as cited in Norris and Wilson, 1995).  Because a child would need some extra length of cord to hold the cord out and wrap it around their neck, staff calculated that a cord must be longer than 8 inches to cause strangulation.  The requirements for stock products in ANSI/WCMA-2018 rely on this 8 inch operating cord limit, requiring that operating cords must be 8 inches or shorter, or must be made inaccessible, to address the strangulation risk.  The Canadian window covering regulation has a similar requirement, limiting accessible cord lengths to about 8.7 inches.

   *c.  Inaccessible Operating Cords Determined Per the Test Requirement in Appendix C of the ANSI/WCMA-2018 (section 4.3.1.3).*  If a window covering has an operating cord that is longer than 8 inches, ANSI/WCMA-2018 requires that the cord must be inaccessible to children.  Having inaccessible cords effectively eliminates the strangulation hazard associated with operating cords, because the child is unable to access a cord to cause strangulation.  Accordingly, this requirement is tested using a probe that is intended to simulate the finger size of a young child; the diameter of the probe is 0.25 inches, based on fifth percentile 2- to 3.5-year-old's index finger diameter (Snyder et al., 1977) at 0.33 inches and the off-the-shelf availability of a 0.25-inch diameter dowel pin.  If the probe cannot touch the operating cord, the cord is then deemed inaccessible, pursuant to ANSI/WCMA-2018.

   Figure 11 displays an example of a rigid cord shroud.  In Figure 11, the accessibility probe cannot touch the operating cord because it is surrounded by the cord shroud.  Therefore,

the window covering in Figure 11 meets section 4.3.1.3 of ANSI/WCMA-2018, because the operating cord is inaccessible.



**Figure 11. Rigid cord shroud**

The Commission concludes that ANSI/WCMA–2018 adequately addresses the strangulation hazard posed by accessible operating cords on stock window covering products, because the standard either eliminates accessible operating cords, or it limits the length of the cord so that it is too short for a child to strangle.

2. <u>Custom Window Coverings</u>

As stated in the NPR, requirements for operating cords on custom window products in section 4.3.2 of ANSI/WCMA-2018 do not adequately address the risk of strangulation to children 8 years old and younger, because ANSI/WCMA-2018 allows custom window coverings to be sold with hazardous operating cords if they are custom ordered. 87 FR at 1031-32. Of the 36 custom window covering incidents reviewed by staff, 31 (86%) incidents were related to operating cords (including pull cords and continuous loops). CPSC has determined that had the requirements in section 4.3.1 of the ANSI/WCMA standard for operating cords on stock products been in effect for custom window coverings, the requirements would have prevented 100 percent of the incidents involving operating cords on custom window coverings.

The 2018 version of the voluntary standard added two new requirements for custom window coverings to mitigate the strangulation hazard: (1) default maximum operating cord length of 40 percent of the blind height when the product is fully lowered, and (2) a default tilt wand option, instead of a cord, for tilting slats.  However, ANSI/WCMA-2018 still allows hazardous operating cords to be part of the window covering design for custom products, which can comply with ANSI/WCMA-2018 using any of the methods below, all of which pose strangulation risks:

(a) *Accessible Operating Cords longer than 8 inches (section 4.3.2.6)*.  By allowing operating cords on custom window coverings to exceed 8 inches in length, ANSI/WCMA-2018 creates a continuing unreasonable risk of injury to children 8 years old and younger.  Section 4.3.2.6 of ANSI/WCMA-2018 allows hazardous operating cords, meaning operating cords that are long enough for a child to wrap around their neck, or multiple cords that can become tangled and create a loop large enough for a child to insert their head.  Even though ANSI/WCMA-2018 attempts to reduce the strangulation risk by shortening the default length of the cord to 40 percent of the window covering's length (section 4.4) and specifying the tilt wand as the default option versus tilt cords (section 4.4.1.1), as explained in Tab I of Staff's NPR Briefing Package, and in section II.C of the NPR, the risk associated with operating cords remains.

(b) *Continuous Loop Operating System (section 4.3.2.5)*.  This operating system requires that the operating loop be kept taut with a tension device.  However, as observed in the incident data, a child can still insert their head into the continuous loop if it is not taut enough; in addition, tension devices may not be attached to the wall, which results in a free loop.  Including the data reviewed since the NPR, CPSC staff identified 25 fatal strangulations involving a continuous corded loop without a functional tension device (*e.g.*, no device on the loop, device

on the loop but not attached to a fixed surface, or broken device).[21]  Moreover, staff identified

various scenarios where a head probe could be inserted into the hazardous loop from an installed

continuous loop with an ANSI/WCMA-compliant tension device attached to the wall.  Staff also

identified mis-installation or failure modes that will leave a hazardous loop on a custom product

throughout its life cycle, starting from its installation.[22]  In all these circumstances, a continuous

loop operating system is not sufficient to prevent strangulation of a child.

We received more than 420 comments stating that continuous loops with properly

attached tension devices are safe and should not be eliminated by the rule.  These comments,

however, are inconsistent with incident data, and CPSC staff's assessment of tension devices.

Because of the risk of serious injury and death to children created by these devices, absent

adequate safety features, the rule will not allow these devices to be sold with custom window

coverings unless there is also an integrated, durable, safety feature that will adequately address

the hazard.  Specifically, the final rule will allow continuous loop systems if the product

integrates a loop cord or bead chain restraining device that meets revised requirements in the

final rule, including tests to ensure durability, such as a UV test, followed by a cyclic test, and a

deflection test, as set forth in section 1260.2(d) of the final rule and explained in more detail in

section II.E of this preamble.

(b) *Single Retractable Cord Lift System (section 4.3.2.4).*  This method of

complying with ANSI/WCMA-2018 allows an operating cord on a custom window

covering to be pulled out to any length to operate the window covering, provided that it then

retracts to a shorter length when the user releases the cord.  Retractable cord lift systems

with an extended cord greater than 8 inches, and a low retraction force so that a child can

---

[21] Tab I of Staff's NPR Briefing Package, section II.C of the NPR.
[22] Tab I of Staff's Final Rule Briefing Package.

access that length, allow a child to manipulate the cord and wrap the cord around their neck.

Accordingly, the retractable cord requirement, as written in ANSI/WCMA-2018 for operating cords on custom window coverings, is not adequate to address the risk of injury, because the maximum cord length and a minimum pull force required to operate the system are not specified in the standard.

CPSC requested comment in the NPR on whether additional requirements for retractable cords, such as a maximum exposed cord length and a minimum pull force for a single retractable cord lift system, could address the strangulation hazard. 87 FR at 1031-32. More than 140 commenters requested that retractable cords be allowed for use on custom window coverings. To address the comments, and to adequately address the risk of injury, the final rule allows for the use of single retractable cord systems provided they meet the additional requirements in the rule. Section 1260.2(c) requires that retractable cord systems complete retraction at 30 grams, have a non-cord retraction device, and have a stroke length equal to or less than 12 inches below the headrail. Retraction at 30 grams is the amount of force required to pull back the retractable cord fully into the headrail, to ensure that the cord remains inaccessible after use. A non-cord retraction device means that the product must use something other than a cord for the user to interact with to operate the window covering, such as a wand. A stroke length is the fixed amount of exposed cord available when a user pulls the retraction device down to lower or raise the window covering. In section II.E below, we assess that these additional requirements, including requirements for durability testing, will adequately address the strangulation hazard associated with accessible window covering cords.

3. <u>Window Covering Technologies</u>

The NPR reviewed safer window covering technologies to address the strangulation hazard in use on stock and custom window coverings, including cordless window coverings, window coverings with rigid cord shrouds, and cordless motorized window coverings. 87 FR at 1032.  Operating cords can be made inaccessible with passive guarding devices that allow the user to operate the window covering without the direct interaction of a hazardous cord.  These types of window coverings use rigid cord shrouds, integrated cord/chain tensioners, or crank mechanisms.  *Id.*

Cordless blinds can be raised and lowered by pushing up the bottom rail or pulling down the rail.  This same motion may also be used to adjust the position of the horizontal slats for light control.  Through market research, CPSC staff found several examples of cordless blinds that are made with a maximum height of 84 inches and a maximum width of 144 inches.

Rigid cord shrouds can be retrofitted over various types of window coverings to enclose pull cords and continuous-cord loops.  A rigid cord shroud allows the user to use the pull cords while eliminating access to the hazardous cords.  CPSC staff worked with WCMA and other members from March through December 2018, to develop draft requirements to test the stiffness of "rigid cord shrouds," by measuring the deflection and deformation.[23]

The NPR included requirements for rigid cord shrouds based on the deflection and deformation test previously developed by the ANSI/WCMA members.  The final rule retains the requirements for two tests, as proposed in the NPR: the "Center Load" test and the "Axial Torque" test, to ensure the stiffness and the integrity of the shroud so that the enclosed operating cord does not become accessible when the shroud is twisted.  The Center Load test verifies the

---

[23] The 2018 standard tests rigid cord shrouds for UV stability and impact.

stiffness of the cord shroud, by measuring the amount of deflection in the shroud when a 5-pound force is applied at the mid-point. This test ensures that the shroud is not flexible enough to wrap around a child's neck. The Axial Torque test verifies that the cord shroud's opening does not enlarge to create an accessible cord opening when the shroud is twisted. Tab H of Staff's NPR Briefing Package contains additional detail on the requirement. The final rule maintains these requirements in section 1260.2(b). However, the final rule contains one clarification that rigid cord shrouds must also meet the UV and durability testing for cord shrouds in section 6.3 of ANSI/WCMA-2018.

The NPR also discussed crank mechanisms and cordless motorized blinds as safer alternatives to replace corded continuous-loop systems. 87 FR at 1032. Cordless custom window coverings are allowed in the final rule pursuant to section 1260.2(a). Crank mechanisms are also allowed under section 1260.2(a) if the crank mechanism replaces the operating cord.

B.    *International Standards for Window Covering Operating Cords*

The NPR identified and assessed three international standards for operating cords on window coverings: (1) Australian, (2) Canadian, and (3) European. 87 FR at 1032-22. The NPR stated that ANSI/WCMA-2018 is more stringent than the Australia Regulation, 2010 F2010C00801, and the European regulations, EN 13120, EN 16433 and EN 16434. However, the NPR stated that ANSI/WCMA-2018 is not as stringent as the new Canadian regulation, SOR/2019-97. Canada's window covering regulation states that any window covering cord that can be reached must be too short for a 1-year old child to wrap around their neck (*i.e.*, not more than 22cm (8.66 inches) in length) or form a loop that a 1-year-old child can pull over their head (*i.e.*, not more than 44cm (17.32 inches) in circumference). *Id*. Canada's regulation also requires that all window coverings meet one of the following conditions:

- Section 4: The cord shall be unreachable/inaccessible.

- Section 5 and 6: Reachable/accessible cords shall be 22 cm (8.66 inches) or less when pulled with 35N (7.87 lbf).

- Section 7: Reachable/accessible looped cords shall be 44 cm (17.32 inches) or less in perimeter when pulled with 35N (7.87 lbf).

Both the Canadian standard and the ANSI/WCMA stock window covering requirements do not permit a long, accessible operating cord. The Canadian standard is more stringent, however, because the Canadian standard applies to both stock and custom products, while the ANSI/WCMA standard contains separate requirements for stock and custom products, which allow long, accessible operating cords on custom products. *Id.*

Although the Canadian standard is similar to the ANSI/WCMA's stock window covering requirement, there are some differences. The NPR explained how the standards differ in the definition of an "accessible cord," stating that the ANSI/WCMA-2018 standard has a more stringent definition. *Id.* Additionally, in Tab F of Staff's Final Rule Briefing Package, staff explains that the Canadian standard has a more stringent inner cord pull force requirement than ANSI/WCMA-2018; although staff assesses that the pull force in the ANSI/WCMA standard is adequate to address the risk of injury.

C. *Human Factors Assessment of Operating Cord Requirements in ANSI/WCMA-2018*

Operating cord requirements for stock window coverings in section 4.3.1 of ANSI/WCMA-2018 effectively eliminate the strangulation hazard associated with operating cords for stock window coverings. However, section 4.3.2 of ANSI/WCMA-2018 sets different requirements for operating cords on custom window coverings. Manufacturers can choose to meet the same requirements as stock products (cordless, inaccessible, or 8 inches or shorter) to comply, but the standard continues to allow operating cords that are accessible and that are

39

A212

longer than 8 inches, such as single retractable cord lift systems (with no stroke length limit), continuous loop operating systems, and standard operating systems. Thus, the ANSI standard allows free-hanging and accessible cords on custom window coverings that do not eliminate the strangulation hazard associated with operating cords.

    1.   <u>Default Requirements for Custom Operating Cords Allow Accessible Cords</u>

In the earlier versions of the ANSI/WCMA standard, the standard contained no specified length for operating cords. However, ANSI/WCMA-2018 added the following two requirements for custom window coverings, which are intended to reduce the hazard associated with free-hanging and accessible operating cords:

- Section 4.4 of ANSI/WCMA-2018 requires that the default cord length should be no more than 40 percent of the product height when the window covering is fully lowered. The exception is when a custom length is required to ensure user accessibility. Figure 12 shows the length of operating cords that are longer than 40 percent of product height and shorter cords that comply with this new requirement.

- Section 4.4.1 requires that a wand tilt be the default operating system, and cord tilt be an allowable customer option (Figure 12). The length requirement in section 4.4 still applies to tilt cords.



**Figure 12. Window blind with operating cords longer than 40 percent of the length of the product**

**and tilt cords to tilt the slats (left). Window blind with operating cords equal to 40 percent of the product length and wand tilt replacing tilt cords (right)**

CPSC has concerns with longer operating cords that would comply with the requirements in sections 4.4 and 4.4.1 because:

- The length of operating cords can still be hazardous when the window covering is fully lowered.  First, a child can wrap the cord around their neck; about 8 inches of cord is enough to encircle the child's neck.[24]  Additionally, multiple cords can tangle and create a loop into which a child can insert their head; a loop with a circumference of about 17 inches is sufficient for child's head to enter.[25]  Figure 13 shows these two scenarios.



**Figure 13. Demonstration of wrapped cords around (doll) child's neck (left), (doll) child's head is through the loop created by entangled multiple cords (right)**

- Operating cord(s) will get longer as the window covering is raised, making it easier for a child to access and manipulate the hazardous operating cord. For example, a 60-inch tall window blind with a 24-inch long (*i.e.*, 40 percent, consistent with section 4.4 of ANSI/WCMA-2018) operating cord can have an operating cord that is as long as 84 inches when the blind is fully raised.

- If the cord tilt option is chosen, the cord tilt can also be long enough for a child to wrap around their  neck or be tangled and create a loop in which a child's head can enter.

---

[24] Neck circumference of fifth percentile 6- to 9-month-old children is 8 inches (BSI, 1990 as cited in Norris and Wilson, 1995.)
[25] Head circumference of fifth percentile 6- to 9-month-old children is 16.5 inches (Snyder et al., 1977)

- Firms typically allow consumers to easily change the default options during the custom order process, thus, maintaining a firm's ability to continue to sell accessible operating cords that exceed 8 inches long, posing a strangulation hazard.

Incident data show that children have strangled on operating cords in various ways. As reported in the incident data in section I.E of the NPR, and Tab A of Staff's NPR Briefing Package, custom window coverings were involved in at least 35 incidents. Table 4 shows how children accessed window covering cords. In 14 incidents, the child climbed on an item, including a couch, chair, toy chest, or dog kennel, and accessed the cord. In four cases, a child was on a sleeping surface, including a bed (2), playpen, and a crib. In six incidents, a child was able to reach the cord from the floor.

**Table 4. Child's interaction scenario in incidents associated with custom products**

| Scenario | Number of Incidents |
|---|---|
| Climbed on an item to reach the cords | 14 |
| On floor | 6 |
| On bed, in playpen or crib | 4 |
| Unknown | 11 |
| *Total* | *35* |

The incident data demonstrate that accessible cords that are longer than 8 inches are hazardous. For example, the data show that even if operating cords are kept close to the window covering head rail, with some means, children climb and access the cords. Additionally, a significant number of operating pull cord incidents occurred in fully or partially raised window coverings, which reduces the benefit of having a default length of 40 percent of the window covering height in the fully lowered position of the window covering, because the cords will get longer as the product is raised.[26] Based on these data, the Commission concludes that the

---

[26] A total of 36 out of 46 pull cord incidents when position of the window covering was known have occurred with partially or fully raised window covering (1996 to 2016 incidents.)

requirements in sections 4.4 and 4.4.1 of the ANSI/WCMA-2018 standard are inadequate because they continue to allow accessible and long cords to be part of the window covering.

    2. <u>Warning Labels in ANSI/WCMA-2018, Alone, Are Inadequate to Address the Strangulation Hazard Associated with Operating Cords</u>

The ANSI/WCMA-2018 standard requires that corded custom window covering products have warning labels regarding the strangulation hazard to children, as summarized below:

- A warning label must be permanently attached to the bottom rail, including a pictogram depicting the hazard of a cord wrapped around a child's neck. The content explains the strangulation hazard and what consumers need to do to avoid the hazard (keeping cords out of children's reach, shortening cords to prevent reach, moving crib and furniture away.)

- A similar warning label must be placed on product merchandising materials which includes, but is not limited to, the sample book and the website (if the website is relied upon for promoting, merchandising, or selling on-line).

- A warning tag containing a pictogram and similar text as above must be placed on accessible cords, including operating cords, tension devices that are intended to keep continuous loops taut, and on inner cords of a roll up shade.

Formatting of warning labels in the ANSI standard is required to follow ANSI Z535 standards.[27]  This includes a signal word ("WARNING") in all uppercase letters, measuring not less than 5/16 in (8 mm) in height and preceded by an ANSI safety alert symbol (*i.e.,* an equilateral triangle surrounding an exclamation point) of at least the same size, the rest of the

---

[27] The ANSI Z535 Series provides the specifications and requirements to establish uniformity of safety color coding, environmental/facility safety signs and communicating safety symbols. It also enables the design, application, use and placement of product safety signs, labels, safety tags and barricade tape.

warning message text be in both uppercase and lowercase letters, with capital letters measuring not less than 1/8 in (3 mm). A Spanish version of the label is also required.

Among the 36 incidents involving custom products, at least 16 of the incident units had a visible, permanent warning label, as displayed in Table 5.[28] In some cases, parents reported that they were aware of the cord hazard, but never thought their child would interact with a cord; in a few cases, parents were aware of the operating cord hazard but not the inner cord hazard. In some cases involving bead chains, parents thought that the connector clip on the bead chain loop was supposed to break away. None of the incident units had a hang tag. One unit had the hang tags tucked into the head rail, which was discovered when the unit was removed.

**Table 5. Presence of permanent warning labels in incident units**

| Permanent Label Present | Number of Incidents |
|---|---|
| Yes | 18 |
| Mostly peeled off | 1 |
| No | 7 |
| Unknown | 10 |
| *Total* | *36* |

As stated above, warning labels are unlikely to effectively reduce the strangulation risk due to hazardous cords on window coverings, because consumers are not likely to read and follow warning labels on window covering products, and strangulation deaths among children occur quickly and silently, such that parental supervision is insufficient to address the incidents.

3. <u>Certain Safety Devices Are Inadequate to Address the Risk of Strangulation</u>

ANSI/WCMA-2018 requires that custom products with accessible operating cords include cord cleats with instructions for use and mounting. The standard also requires that custom products with a continuous-loop operating system contain a cord tension device. Figure 14 shows examples of cord cleats and tension devices.

---

[28] In two cases, staff examined exemplar units.



**Figure 14. Examples of cord cleat (left), cord tension device (right)**

*(a) Cord Cleats*

When a cord cleat is installed, the consumer must wrap the cord around the cleat every time the product is raised or lowered to mitigate the strangulation hazard, which means that the user's active involvement is necessary every time. Furthermore, cord cleats can be accessed by a child if they climb onto something, like a couch or chair. In one incident, although caregivers normally wrapped the cord around the cleat, on the day of the incident, cords were not wrapped, and the child accessed the cords after climbing on a couch.

*(b) Tension Devices*

ANSI/WCMA-2018 requires that a tension device be attached to the cord or bead chain loop by the manufacturer, and also requires that removal of the device demand a sequential (*i.e.*, multi-step) process or tools. The voluntary standard also requires window coverings to be designed so that they are prevented, at least partially, from operating, unless the tension device is properly installed. The standard also requires that the tension device be supplied with fasteners and instructions and meets the durability test requirements.

Reliance on safety devices that consumers must use or install separately from the window covering operating system is problematic for several reasons. First, this is not an ideal approach from the consumer's perspective because securing safety devices goes beyond the installation of the window covering itself, and increases the time and effort required to use the product. Second, safety devices usually require drilling holes on the wall or windowsill, which may not be

45

permissible for renters and may not be desirable by homeowners. Third, the requirement that window coverings be designed so that they are at least partially prevented from operating, unless the tension device is properly installed, has not proven to be effective. CPSC staff has determined that a head probe (simulating a child's head) can be inserted into a tensioned loop cord; and as described below, there are reported strangulation incidents involving this scenario and others where tensioners were present.

Among the 36 incidents involving custom products, 13 had continuous loop cords or bead chains. In one non-injury incident, the child was able to insert his head through the loop even though a professional installer had attached the tension device to a wall. In two incidents, a tension device was attached to the cord but not to the wall. In one incident, the tension device had broken prior to the incident and not been repaired. In five incidents with continuous loops or bead chains, a tension device was not installed or present. The reports on the remaining four incidents contain no mention of tension device.

(c) *Consumer Perception of Non-Integrated Safety Devices*

Some consumers may believe that because they do not expect to have young children living with them or visiting them, installation of external safety devices, such as tension devices and cord cleats, is unnecessary. But custom window coverings last approximately 10 years, and so they can be expected to remain in the home for a long time. Unforeseen visits by children can occur in that period, and when homes are sold, or new renters move in, the existing window coverings, if they are functional, usually remain installed and become hazardous to visitors and new occupants with young children.

Finally, CPSC issued a contract to investigate the effectiveness of safety devices in reducing the risk of a child's access to hazardous cords and loops on window coverings.[29] The

---

[29] https://cpsc.gov/s3fs-public/Window%20Coverings%20Safety%20Devices%20Contractor%20Reports.pdf

46

research objective was to provide CPSC with systematic and objective data on the factors that impact installation, use, and maintenance of window covering safety devices; assess how these factors impact the likelihood of correct installation, use, and maintenance; and identify how the factors relate to the goal of reducing children's access to hazardous cords and loops on window coverings. Major findings from the study point to:

(i) A general awareness about cord entanglement among caregivers does not translate to precautionary action, due partly to the insufficient information provided at the point of sale;

(ii) Lack of awareness of the speed and mechanism of the injury that may lead to caregivers' underestimating the importance of providing an adequate level of supervision;

(iii) Difficulty using and installing safety devices as primary reasons for not using them; and

(iv) Inability to recognize the purpose of the safety devices provided with window coverings.

In general, participants in the study preferred a cordless window covering or a passive mechanism, which does not require intentional action by the user. The researchers concluded that there could be benefits from enhancing the public's awareness and understanding of the unique nature of incidents (*e.g.*, speed, mechanism) and explaining a child's vulnerability in all rooms in the home, and that providing specific information at the point of sale could be partially helpful. However, these improvements would be incremental, and increasing the use of cordless window coverings would be needed to achieve significant benefits.

For the final rule, the Commission determines that safety devices that are external to the window covering product and require installation and/or consumer interaction to make the cord

47

less hazardous, are ineffective to adequately reduce the risk of injury from strangulation. However, the final rule does provide for use of passive safety devices, such as cord shrouds and loop cord and bead chain restraining devices, to adequately address the risk of injury, provided that the passive safety device is integrated with the product before sale, and does not require use or installation of an external safety device.

    4.   <u>Relying on Parental Supervision Is Inadequate</u>

For many years, CPSC has identified cords on window coverings as a hidden hazard. If young children are left unsupervised for even a few minutes in a room that is considered safe, such as a bedroom or family room, they can wrap a cord around their neck, insert their head into a cord loop, and be injured or die silently.

Even when supervision is present, the level of supervision varies, and distractions and other limitations to supervision exist. For example, CPSC has incident reports involving five near-fatal strangulations, in which the parent was either nearby, or in the same room. Among the 36 incidents involving custom products, incident location is known for 34 incidents. In 18 incidents, the child was in a room shared by the family members, such as a family room, living room, and sunroom. Eleven of 18 incidents were not witnessed, whereas five were witnessed by an adult, and two incidents occurred in the company of other children. Almost all the incidents (15/16) that occurred in a bedroom were unwitnessed (Table 6).

Behavioral research supports these incident reports. People cannot be perfectly attentive, particularly over long periods, regardless of their desire to do so (Wickens & Hollands, 2000). Caregivers are likely to be distracted, at least occasionally, because they must perform other tasks, are exposed to more salient stimuli, or are subject to other stressors, such as being responsible for supervising more than one child. In fact, research by Morrongiello and colleagues (2006) indicates that older toddlers and preschool children (2 through 5 years old) are

48

A221

regularly out of view of a supervising caregiver for about 20 percent of their awake time at home, and are completely unsupervised for about 4 percent of awake time in the home. The most common rooms in which children were left alone and unsupervised, according to the research, were the living or family room and the bedroom.

**Table 6. Location of incidents and whether the incidents were witnessed**

| Location | Fatal | Nonfatal |
|---|---|---|
| Bedroom | | |
|    Witnessed by children | 1 | |
|    Not witnessed | 9 | 6 |
| Family/Living/Dining room | | |
|    Witnessed by Adult | | 5 |
|    Witnessed by children | | 2 |
|    Not witnessed | 5 | 6 |
| Unknown | | 2 |
| *Grand Total* | *15* | *21* |

5. <u>Assessment of Operating Cord Requirements for Window Coverings</u>

CPSC staff evaluated the requirements that apply to operating cords on stock window coverings in section 4.3.1 of ANSI/WCMA-2018: no operating cords, short operating cords 8 inches or shorter, or inaccessible operating cords determined per the test requirement in Appendix C of ANSI/WCMA-2018. Having no operating cords effectively eliminates the strangulation hazard associated with operating cords because there is no cord to cause strangulation; therefore, this is an adequate requirement. Having a short cord that does not exceed 8 inches of length in any position of the window covering also effectively eliminates the strangulation hazard associated with operating cords; the neck circumference of fifth percentile 6- to 9-month-old children is 8 inches (BSI, 1990 as cited in Norris and Wilson, 1995), therefore, this is an adequate requirement. Ensuring that the operating cords are inaccessible is another adequate requirement. This requirement is tested in ANSI/WCMA-2018 using a probe that is intended to simulate the finger size of a young child. If the probe cannot touch the cords, the cord is then deemed inaccessible. Staff assessed that child anthropometry and strength-related

inputs to develop these requirements are adequate to address the strangulation risk associated with hazardous cords.

To effectively address the unreasonable risk of strangulation associated with operating cords on custom window coverings, the final rule contains the same requirements for operating cords on custom window coverings that are required in the voluntary standard for stock window coverings. Additionally, the final rule specifically approves two methods to make operating cords inaccessible (rigid cord shroud or retractable cord), and one method to prevent the formation of a hazardous loop on a continuous-loop system (loop cord or bead chain restraining device).

6. <u>Addressability of Incidents with the Final Rule</u>

Table 7 displays incident data for the custom and stock (and unknown) product categories, by cord type. If the custom window coverings involved in the incident data had complied with the requirements in the final rule for operating cords, meaning complying with the requirements for stock products in section 4.3.1 of ANSI/WCMA-2018, 91.1 percent (31/34) of the custom product incidents for which cord type is known would have been prevented. All of the remaining custom product incidents for which cord type is known would have been addressed by complying with the voluntary standard for inner cords, which will be codified as mandatory in the final rule under section 15(j) of the CPSA.

**Table 7. Stock/Custom/Unknown Window Coverings involved in Incidents and Cord Types (All reported data combined)**

| Stock/ Custom | Continuous loop | Inner cord | Lifting loop | Operating cord | Tilt cord | Unknown | Grand Total |
|---|---|---|---|---|---|---|---|
| **Custom** | 13 | 3 | 0 | 18 | 0 | 2 | 36 |
| **Stock** | 3 | 14 | 1 | 24 | 2 | 6 | 50 |
| **Unknown** | 19 | 6 | 3 | 32 | 3 | 60 | 123 |
| *Grand Total* | *35* | *23* | *4* | *74* | *5* | *68* | *209* |

50

A223

7.    Accessibility Concerns

Section 9(e) of the CPSA, 15 U.S.C. 2058(e), requires that the Commission consider the special needs of elderly and handicapped persons to determine the extent to which such persons may be adversely affected by such rule.  At least 383 commenters stated that having a short cord introduces accessibility issues for various consumers, including people in wheelchairs or people who are otherwise challenged to reach elevated access cords; and these commenters urge that these consumers still need a corded product.  Similarly, some commenters stated that the proposed rule is not compliant with the Americans with Disabilities Act (ADA).  In that regard, the Department of Justice has published accessibility standards called the 2010 ADA Standards for Accessible Design (2010 ADA Standards).  The 2010 ADA Standards set minimum requirements for newly designed and constructed or altered state and local government facilities, public accommodations, and commercial facilities to be readily accessible to and usable by individuals with disabilities.  Sections 308.2 and 308.3 of the 2010 ADA Standards specify forward and side reach distances. [30] For example, an unobstructed high forward reach and high side reach shall be 48 inches (Figures 15-18).



**Figure 15. Obstructed Forward Reach**      **Figure 16. Unobstructed High Forward Reach**

[30] Department of Justice (2010). 2010 ADA Standards for Accessible Design, accessed at: https://www.ada.gov/regs2010/2010ADAStandards/2010ADAStandards.pdf

51

A224



**Figure 17. Obstructed Side Reach**          **Figure 18. Obstructed High Side Reach**

*Note.* Figures 15-18 are from 2010 ADA Standards for Accessible Design, accessed at
https://www.ada.gov/regs2010/2010ADAStandards/2010ADAStandards.pdf

In Tab B of Staff's Final Rule Briefing Package, staff assesses that alternative solutions can safely replace the existing hazardous cords, such as rigid cord shrouds and loop cord and bead chain restraining devices, which can allow access at about the same height as corded products. Additionally, retractable cords can be made accessible with a rigid wand or handle to an easy-to-access height. Moreover, poles are available to reach the bottom of cordless products.

Under the ADA, operable parts of the window covering need to be operable with one hand and not require tight grasping, pinching, or twisting of the wrist; the force required to activate operable parts must be five pounds maximum. Traditional operating cords and continuous loop bead chains and cords require tight pinching and grasping to operate. However, window coverings that are compliant with the mandatory rule would likely have interfaces, such as rigid cord shrouds, which would meet the ADA requirement, by avoiding pinch grip, and instead using hand grip.

Also, rigid cord shrouds, loop cord and bead chain restraining devices, and retractable devices can be easier to operate from behind furniture, compared to continuous loops that are attached to a wall. Figure 19 illustrates a comparative assessment. If the continuous loop is not attached to a wall, then it is easier to access (by leaning to grab it) and operate, but it poses a

52

strangulation risk (left); if a tension device is attached to a wall, it is not easy for consumers to access (middle); on the other hand, a rigid cord shroud is not less accessible, and it is operable behind the furniture while also being safe (right.)



**Figure 19. Operability of a window covering behind an obstruction**

Lastly, if continuous loops with tension devices were allowed as an option in homes where accessing the cord is an issue, continuous loops might not be attached to the wall, particularly in locations where a continuous loop is difficult to access when the cord is kept taut via a tension device. Based on the incident data, staff concludes that it is reasonably foreseeable that not only a consumer, but also a professional installer, may follow an elderly or disabled consumer's request not to install the tension device and remove it from the cord loop in homes where accessibility is an issue. By contrast, products manufactured with a safer option would be both accessible to a disabled user and protective of child safety.

Finally, as explained in more detail in section II.E of this preamble, the Commission is approving in the final rule three methods that not only make window coverings safer, but also may be suitable for hard-to-reach locations and for persons with disabilities.

8. Information and Education

Since 1985, CPSC has been warning of the danger of child strangulation due to corded window coverings. Every October, CPSC participates jointly with Window Covering Safety Council (WCSC) in National Window Covering Safety Month to urge parents and caregivers to check their window coverings for exposed and dangling cords and to take precautions. Both CPSC and WCSC recommend cordless window coverings at homes where young children live or visit.

In addition to traditional communication methods, CPSC reaches out to consumers using social media, such as safety blogs and online chats, to create awareness of the hazards associated with corded window coverings. Given the long history of continuing injuries and deaths despite window covering safety campaigns, the campaigns have not adequately eliminated or reduced the hazard.

D. *Assessment of the Balloted Draft ANSI/WCMA-2022 Standard*

After the publication of the NPR on January 7, 2022, WCMA brought forth several proposals to revise the requirements for custom window covering cords in ANSI/WCMA-2018. On July 15, 2022, WCMA issued a ballot to revise ANSI/WCMA-2018 (draft ANSI/WCMA-2022) and the ballot closed on August 15, 2022. The draft balloted ANSI/WCMA-2022 standard includes safety improvements from the ANSI/WCMA-2018 standard. These include: elimination of free-hanging operating and tilt cords, elimination of cord loop lift systems, elimination of continuous cord loop systems for horizontal blinds, and adding deflection and deformation tests for rigid cord shrouds.

Section 9(b)(2) of the CPSA requires the Commission to rely on a voluntary standard if the voluntary standard is likely to reduce the risk of injury and products within the scope of the standard will likely substantially comply with the voluntary standard. For section 9(b)(2) of the

54

CPSA to apply, such voluntary standard must be "in existence," meaning approved by the voluntary standards organization. ANSI/WCMA has not yet approved the balloted draft voluntary standard. Accordingly, the Commission will not rely on the draft balloted ANSI/WCMA-2022 standard for the final rule. In addition Tab I of the Staff's Final Rule Briefing Package contains a detailed analysis of the draft standard, which finds inadequacies in the proposal that we summarize below.

   1. *Modified requirements for single-cord retraction devices*: Although draft ANSI/WCMA-2022 eliminates cords attached to the Operating Interface (*i.e.*, the part of the cord retractor that the operator pulls on) to prevent the creation of a hazardous loop, the draft revision allows a maximum stroke length of 36 inches. In Tab B of Staff's Final Rule Briefing Package, CPSC staff assesses this revision to be inadequate to eliminate the strangulation hazard, because a 36-inch extended cord could allow a child to wrap the cord around his/her neck.

   2. *Additional requirements for tension devices used with continuous loop operating systems*:

      a. The modification in section 6.3.1 of the balloted standard requires tension devices to be attached to the cord or bead chain loop by the manufacturer, and be designed, placed, and shipped such that, unless properly installed, or unless altered from the shipped condition with sequential process (requiring two or more independent steps to be performed in a specific order) or tools, it prevents the window covering from operating fully. This draft requirement does not ensure that tension devices will be effective for the life of the window covering. For example, if an installer cuts the zip tie that is sometimes used to connect tension devices to the headrail, then the tension device would have been altered from its shipping condition with a tool, and operation of the window covering without the tension device would be consistent with section 6.3.1. Therefore, this requirement still allows consumers or the installer to set up the window covering

in an unsafe manner while either in a fully operable state by removing the tension device from the loop, or in a partially operable state, by leaving the tension device on the loop, but not attaching it on the wall.

b.   The modification in section 6.3.2, states that the manufacturer shall attach the tension device to the cord or bead chain loop by means of a permanent assembly method.  This requirement is intended to ensure that if an installer or consumer attempts to remove the tension device, the device or component will break.  CPSC staff is aware of an incident involving a tension device that used one-way snap features, as permitted by the balloted draft standard.  The snap features broke off, exposing the continuous loop cord (Figure 20 below, from In-Depth Investigation (IDI)).  This incident shows that a permanent assembly method requirement does not ensure that the tension device will remain assembled.  CPSC staff assesses that this provision is inadequate to address the risk of injury, because even if the tension device breaks, the looped cord will not necessarily be damaged.  Therefore, for hard-to-reach locations, or for people who do not want holes in their walls, removing the tension device may be preferable, and the window covering will remain fully operable.



**Figure 20. Broken tension device in IDI**

c.   The modification in section 6.3.3 of the balloted draft standard, states: "the tension device in conjunction with the product shall maintain tension on the operating cords when properly installed.  If the tension device is installed in a location that does not maintain tension on the operating cords, the tension device will prevent the window covering from operating as designed for full operation of the product.  The window covering may not operate independently of the Cord or Bead Chain Loop."

The draft standard defines "Tension" as "The applicable, consistently applied force required to eliminate or prohibit the creation of a hazardous loop in any operating position."  Yet, in testing a tension device identified as compliant with the draft standard, CPSC staff determined that an amount of tension that allowed full operation of the window covering still allowed a head probe to be inserted into the loop (Figure 21 below).



**Figure 21. A head probe can pass through properly installed continuous loop under tension**



**Figure 22. Re-enactment of how a 5-year-old child was found by a consumer with his head caught in a continuous cord loop**

Accordingly, staff has concluded that a properly installed tension device that would be acceptable under the balloted standard still allows an accessible hazardous loop, which is also observed in one incident (Figure 23).

Additionally, while the draft ANSI/WCMA-2022 requires the tension device to prevent the window covering from operating, as designed, for full operation of the product, the window covering can be operated partially, as shown in Figure 23. An incident that occurred in 2005 had a window covering with a "universal cord tensioner" that limited the operability of the window covering unless the tension device was installed. The plastic universal cord tensioner piece was hanging freely from the cord and not attached to the wall (Figure 24), reflecting that diminished

58

A231

utility was not sufficient motivation for the landlord or residents to repair or replace the tensioner.



**Figure 23. Partially operable window covering when tension device is not attached to a fixed surface**



Universal cord tensioner

**Figure 24. Universal cord tensioner remained unattached to the wall for about 3 years**

3.  *Exempting curtains and draperies from the scope of the standard.* While the balloted

draft standard does not require safety measures to prevent cord injuries with draperies and

59

A232

curtains, CPSC staff has identified at least four fatalities involving draperies and curtains; all deaths were a result of continuous loops. There are multiple cordless options available for draperies, including wands and motorized controls, as well as simply pulling the draperies on the traverse rod by hand, with no cord or other control.

E.      *Changes in the Final Rule*

The Commission, therefore, is finalizing the rule generally as proposed, requiring custom window coverings to meet the requirements for stock window coverings in section 4.3.1 of ANSI/WCMA-2018, meaning that custom window coverings must be cordless, have short cords (8 inches or less, or inaccessible cords), or the cords must be made inaccessible. The final rule allows, as proposed, a rigid shroud that meets the requirements of the rule as a method of making standard operating systems (pull cords) and continuous cord loop operating system inaccessible.

Based on the comments, the Commission considered including in the final rule other methods of making operating cords inaccessible or preventing the formation of hazardous loop. As stated in the NPR, and discussed above, continuous cord loop operating systems with external tension devices that are attached on a wall or window sill can pose a strangulation hazard, because they require the consumer or installer to properly install them to eliminate the hazard, and because external tension devices can break, be removed, or not be installed. Accordingly, they are not acceptable under the final rule. However, passive devices that make an operating cord inaccessible—meaning those installed on the product itself by the manufacturer that cannot be easily defeated, uninstalled, or break, such as a rigid cord shroud for operating cords and a loop cord or bead chain restraining device on a continuous cord loop operating system— eliminate the strangulation hazard and the need to rely on a consumer or installer to make the product safe as installed. The final rule allows these solutions.

Below we explain the requirements associated with these provisions of the final rule. We also set out specific requirements for large window coverings, which are included within the scope of the final rule.

1. <u>Requirements for Rigid Cord Shrouds</u>

The requirements for rigid cord shrouds are being finalized, as proposed. However, the requirements are now contained in section 1260.2(b) of the regulation text, as opposed to sections 1260.2(b) and (c), so that the test method for rigid cord shrouds are contained in a single section of the rule. The final rule eliminates hazardous continuous cord loop operating systems; however, manufacturers can still use standard operating systems (operating pull cords or continuous cord loop operating systems) if the cord is not accessible when tested to the requirements of the rule. A rigid cord shroud that meets the rule makes the cords on a continuous cord loop operating system or standard operating system inaccessible.

ANSI/WCMA 2018 defines a "cord shroud" as a device or material added to limit the accessibility of a cord or formation of a hazardous loop. Per section 4.3.2.5.2 of the 2018 standard, one of the ways that accessible cords (continuous cord loops and standard operating systems) can meet the standard is to contain the cords in a rigid cord shroud that meets the requirements in sections 6.3.1 (Appendix C: Test Procedure for Accessible Cords) and 6.3.2 (durability, impact, and operational cycle tests). The final rule clarifies in section 1260.2(b) that rigid cord shrouds must meet the requirements in section 6.3. Additionally, as proposed, rigid cord shrouds must also meet the deflection and deformation tests described in 1260.2(b)(1) and (2). Rigid cord shrouds can be used to enclose continuous cord or bead chain loops. Tab C of Staff's Final Rule Briefing Package contains examples, including pictures of rigid cord shrouds and how they operate.

61

A234

Staff found two window coverings currently on the market that use rigid cord shrouds. Staff purchased and evaluated these products. Based on staff's examination and the available products on the market, rigid cord shrouds are used to operate window coverings up to at least 76.75 inches (stock) to 96-inches tall (retro-fit, meaning after-market). CPSC's engineering staff further concluded, as described in Tab C of Staff's Final Rule Briefing Package, that a rigid cord shroud can be designed to operate window coverings more than 96 inches tall, if the shroud is made from more rigid materials, such as metal, that meet the deflection requirements in the final rule.

Large rigid cord shrouds may require additional development and tooling for continuous cord loop operating systems with window shades more than 96 inches tall; however, existing shrouds should not require major redesigns because these products have already been developed and only require adjustments to the head and the length of the cord shroud to fit the window covering. Based on engineering staff's review of the rigid cord shrouds currently on the market, which includes shrouds on window coverings up to 96 inches, the Commission finds that extensive development is unnecessary for custom manufacturers to incorporate rigid cord shrouds for window coverings that currently use a continuous bead chain operating system. For these reasons, the Commission determines that a continuous cord loop operating system with a rigid cord shroud could be manufactured to operate window coverings of all sizes and meet the requirements of the final rule.

2. Requirements for Loop Cord and Bead Restraining Devices

The NPR discussed that, unlike tension devices, loop cord and bead chain restraining devices are designed and installed by the manufacturer onto the window covering, are integral to the window covering, and do not need to be attached on the wall to keep the loop taut. The NPR requested comment on the adequacy of loop cord and bead chain restraining devices to address

62

A235

the risk of strangulation on custom window coverings.  87 FR at 1031.  CPSC received hundreds of comments from businesses opposing elimination of continuous cord loop operating systems to meet the requirements of the rule.

ANSI/WCMA-2018 defines a "cord and bead chain restraining device" as a device that prevents the creation of a hazardous loop from an accessible continuous operating cord. According to section 6.5 of the ANSI/WCMA-2018, loop cord and bead chain restraining devices must be subjected to durability, UV stability, and impact testing, and must pass the hazardous loop testing procedure to confirm that a loop cord and bead chain restraining device prevents the creation of a hazardous loop from an accessible continuous cord loop.  Tab C of Staff's Final Rule Briefing Package provides staff's assessment that loop cord and bead chain restraining devices are technically feasible to incorporate into custom window coverings, and that they address the continuous cord loop strangulation hazard by preventing the formation of a hazardous loop.  However, staff advises that the test sequence identified in section 6.5 of ANSI/WCMA-2018 is not representative of real-world scenarios, and recommends exposing the device to UV light first, and then conducting the operational cyclic test.  Staff also recommends incorporating a deflection test that is similar to the one provided in the NPR for rigid cord shrouds to improve the safety of these products by preventing bending to an extent that a child could wrap it around their neck.

The Commission will allow loop cord and bead chain restraining devices (as defined in section 1260.1 of the final rule) as a permissible way to make accessible continuous cord loop operating systems non-hazardous.  However, the final rule modifies the requirements for cord and bead chain restraining devices from those in section 6.5 of ANSI/WCMA-2018, to adequately address the risk of strangulation associated with accessible operating cords on custom window coverings.  Specifically, the final rule:

- Adds a deflection requirement for loop cord and bead chain restraining devices that prevents bending of the device to an extent that a child could wrap it around their neck, similar to the deflection requirements for rigid cord shrouds as stated in section 1260.2(b) of the final rule.

- Tests one sample to section 6.5.2.2 of ANSI/WCMA-2018, UV Stability, followed by testing to section 6.5.2.1, Operational Cycle Test. This change in test order will simulate real world conditions of a loop cord and bead chain restraining device exposed to sunlight and operated over the life of the window covering.

3.    Requirements for Retractable Cords

In the NPR, the Commission tentatively determined that the retractable cord requirement, as written in ANSI/WCMA-2018 for operating cords on custom window coverings, is not adequate to address the risk of injury, because the maximum cord length and a minimum pull force required to operate the system are not specified in the standard. CPSC requested comments on whether additional requirements for retractable cords, such as a maximum exposed cord length and a minimum pull force for a single retractable cord lift system, can address the strangulation hazard. 87 FR at 1031.

The Commission received at least 149 comments stating that retractable cords are safe based on the lack of incidents, and that because retractable cords have not been involved in incidents, retractable cords should not be eliminated by a mandatory standard. A June 21, 2022 letter from consumer advocates to WCMA suggests that retractable cords be allowed in the voluntary standard with the following text: "All cords must be inaccessible. The maximum allowable cord length is 12 inches from the headrail."[31]

---

[31] Letter can be found at: https://www.regulations.gov/document/CPSC-2013-0028-3664

The 12-inch exemption is, in part, based on the required steps that a child would need to go through with a retractable cord for it to pose a hazard. Tab B of Staff's Final Rule Briefing Package. Consistent with WCMA's recommendation, CPSC staff considered that while the smallest neck circumference of youngest children at risk, 6- to 9-month-old children, is about 8 inches,[32] children who can climb to the top of the window covering will be older, and they need to be able to hold the cord and wrap it around their neck at the same time, which requires the breadth of their hands to be added to the neck circumference. Therefore, in staff's view, 12 inches is a safe length for the headrail area of a window covering, whereas the 8 inches of cord length that is used to define the allowed short cord could be anywhere on the window covering. For further discussion on this topic, see Tab B and Tab I of Staff's Final Rule Briefing Package.

Accordingly, the final rule allows retractable cords as long as the exposed cord is limited to a maximum of 12 inches from the bottom of the headrail in any state of operation, and the other requirements in section 1260.2(d) are met to ensure full retraction and durability.

4.    Consideration of Large Window Coverings

At least eight commenters, including WCMA and seven businesses, raised the concern that available technologies to address the strangulation hazard, such as manual cordless systems, are difficult to implement for very large products. Various commenters also stated that there is an increased presence of taller windows in homes, which will lead to a higher number of taller window coverings installed in homes. Regardless of the height, the hazard patterns associated with window covering cords are the same. Furthermore, the ANSI/WCMA-2018 voluntary standard does not contain a height limit for in-scope window coverings for either stock or custom

---

[32] BSI (1990) as cited in Norris, B., & Wilson, J. R. (1995). CHILDATA: The handbook of child measurements and capabilities –Data for design safety. London: Department of Trade and Industry.

products.  Staff has determined that it is feasible to implement, for example, rigid cord shrouds on window coverings that are larger than 96" tall.  Tab C of Staff's Final Rule Briefing Package.

Because the hazard patterns associated with larger window coverings are the same as hazard patterns seen in shorter window coverings, the potentially increased number of installations of taller window coverings in residences, and the feasibility of applying safer technologies on these products, the Commission will not exclude taller products from the scope of the rule, but is, instead, establishing a later, 21-year effective date, to provide a reasonable time for manufacturers to implement the technologies for products that are raised and lowered and that are 10 feet or greater in vertical length.

Tabs C and F of Staff's Final Rule Briefing Package discuss The basis for a lateronger effective date for very tall custom window coverings that raise or loweris as set forth in Tabs C and F of Staff's Final Rule Briefing Package.  The Commission, however, concludes that delaying implementation for two years and thereby creating a novel scheme bifurcated by the height of a window covering, as recommended by staff, is not justified.  Although larger-size window coverings may have some additional challenges in complying with the rule, the Commission does not agree with staff that the development and logistics phases for larger-size window coverings require 24 months after publication of the final rule, and concludes that the 180-day effective date period specified by statute can reasonably be applied.  First, manufacturers have been aware of CPSC's intention to issue a rule for one year already.  CPSC's draft rule for custom window coverings has been available on our website since October 2021, and the proposed rule with a 180-day effective date was published in January 2022.  Second, as stated in Staff's Final Rule Briefing Package and in this preamble, Canada's similar rule on window covering cords became effective earlier this year, and the rule applies fully to larger-sized window coverings.  Manufacturers have already had two years to design, develop, and test

solutions specifically for larger-sized custom window coverings, to come into compliance with Canada's rule. Third, stock window coverings of all sizes are subject to ANSI/WCMA-2018, which also has led to development of cordless solutions that may be transferable to the largest sizes of 10 feet or more in vertical length. Finally, for very tall windows curtains may provide a readily available substitute for styles of custom window coverings that raise or lower.

F. *Window Coverings Substantially Comply with the Voluntary Standard*

Section 9(f)(3)(D) of the CPSA requires that when a voluntary standard has been adopted and implemented relating a risk of injury, to proceed with a final rule, the Commission must find either that compliance with such voluntary standard is not likely to result in the elimination or adequate reduction of such risk of injury; or that it is unlikely that there will be substantial compliance with such voluntary standard. WCMA, the trade association for window coverings and the body that created the voluntary standard, stated in a comment on the ANPR (comment ID: CPSC_2013-0028-1555) that there has been substantial compliance with the voluntary standard ANSI/WCMA since its first publication, and Tab E of Staff's NPR Briefing Package contains a more detailed description of staff's assessment of substantial compliance with the voluntary standard. CPSC received no comment in opposition to the Commission's preliminary determination of substantial compliance in the NPR. Based on the forgoing, the Commission determines that a substantial majority of window coverings sold in the United States comply with ANSI/WCMA-2018. However, as explained throughout this preamble and in the final rule, ANSI/WCMA-2018 is inadequate to address the risk of injury associated with custom window coverings.

III. **Response to Comments on the NPR**

CPSC received 2,060 comments on the NPR for custom window coverings during the period, and staff received two late comments in July 2022, which CPSC also considered.

Additionally, CPSC held an oral hearing on the proposed rule on March 16, 2022, during which seven presenters also provided comments.  All comments, meeting logs, and correspondence regarding custom window coverings have been included on Regulations.gov under the CPSC docket number for this rule: CPSC-2013-0028.  Below we summarize and respond to significant issues raised by commenters.

A.    *General Support or Opposition*

*Comment 1*: At least 114 commenters expressed support for the proposed rule.  Some commenters stated that, given the hidden nature of the hazard and severity of the risk, a mandatory standard is necessary.  Victims' families expressed hope that this rule will prevent corded products, not only in private residences, but also in hotels, rental properties, military housing, public buildings, and in effect, any place where children could be injured or killed in a window covering cord incident, so that no family will bear the pain of losing a child on a window covering cord.

At least 1,842 commenters were against the proposed rule, most suggesting that a regulation will have a negative economic impact on the window covering industry.  At least 440 comments stated that the proposed rule is either overreaching or unnecessary because: commenters believe that the current requirements in the ANSI/WCMA-2018 standard are strong; the risk of injury is low; consumers without young children would be adversely impacted by removing corded products; consumers need more window covering options and choices; and businesses will be limited in meeting consumer needs.

*Response 1:* The Commission agrees that a mandatory rule is required to address the unreasonable risk of injury associated with corded custom window coverings.  Staff's NPR and Final Rule Briefing Packages demonstrate that requiring inherently safe custom window coverings is feasible, and that the rule will not affect the utility or availability of custom window

coverings, but could affect their cost. However, the net increase in cost for consumers is as little as approximately $24 every time a household replaces *all* of its custom window coverings approximately every 10 years. *See* Table 9, *infra*, and Tab F of Staff's Final Rule Briefing Package (showing that the estimated net cost increase to replace 12 window coverings ranges from $23.67 using less expensive products to $218.82 using more expensive custom window coverings). The Commission finds that this is a reasonable cost to ensure that children avoid death or serious injury on window covering cords.

The feasibility of safer window coverings, and the fact that consumers will pay more for safer window coverings, has already been shown in the stock window covering market. Stock window coverings that meet ANSI/WCMA-2018 requirements for stock products are manufactured to be safe, without regulatory intervention. Voluntary compliance with the ANSI/WCMA standard for stock products did not cause a decline in revenue, by either units or by total revenue, as most of the industry transitioned to cordless-only products, even though the price of some stock coverings nearly doubled. Moreover, Canada's mandatory rule on window coverings is similar to the final rule, and CPSC staff identified no evidence from the Canadian market of a significant reduction in consumer choice as a result of their rule. Rather, the Canadian market has reacted with cost-effective substitutes and redesigned products. The Commission expects a similar result in the U.S. market.

Data show that the strangulation hazard associated with window covering cords is silent, quick, and hidden to consumers. Also, the hazard overwhelmingly involves the death of a child, and in many other cases, a serious injury, such as coma, paralysis, or problems controlling movement; sensory disturbances, including pain; seizures; cognitive and memory deficits; long-term or permanent vegetative state, requiring tracheotomy and gastrointestinal tube feeding. As

commenters from victims' families report, the death of a child on a window covering cord results in severe pain and suffering that never goes away.

B.    *Voluntary Standard*

*Comment 2*: Most of the businesses, including manufacturers, dealers, designers, and sellers who are opposed to the rule, stated that the voluntary standard process has led to substantial improvements in window covering safety, and furthermore, that a mandatory rule is not necessary.  However, other commenters, including at least 70 victims' families, consumers, and consumer organizations, stated that a mandatory standard is necessary to address the hazard associated with custom window coverings, because the voluntary standard still allows products with hazardous cords to be sold.

*Response 2*: Staff has worked closely with the voluntary standards organization, WCMA, to develop and revise the ANSI/WCMA A100.1 standard over the past 26 years.  The Commission agrees that the 2018 version of the voluntary standard has significantly reduced the risk of strangulation from stock window coverings, and from inner cords on both stock and custom products.  However, the ANSI/WCMA-2018 standard does not eliminate or adequately reduce the risk of injury associated with custom window coverings.  Similarly, Tabs B, C, and I of Staff's Final Rule Briefing Package indicate that even though the draft ANSI/WCMA-2022 is an improvement on ANSI/WCMA-2018, if adopted, the revised standard could allow retractable cords with a hazardous length of cord when pulled, and continuous loops with tension devices that pose a strangulation hazard.

Based on staff's review of available technologies for use in manufacturing safer window coverings (Tab C of Staff's Final Rule Briefing Package), the Commission determines that custom window products can be made as safe as stock window coverings, by meeting the same cord requirements.  Stock product compliance with ANSI/WCMA-2018 did not cause a decline

in revenue, by either units or by total revenue, even though the price of some stock coverings nearly doubled. When Canada issued a similar rule to prevent window covering cord strangulations, the Canadian window covering market responded with cost-effective substitutes and redesigned products.

C.    *Data Issues*

1.    NEISS Versus CPSRMS

*Comment 3*: WCMA stated that the 34 injury reports for custom products from NEISS were combined with anecdotal reports received by CPSC and that the NPR Briefing Package did not explain how NEISS data injury reports were added to the other incident data, and how CPSC ensured that no double-counting occurred.

*Response 3*: The CPSC data counts are not duplicative. For example, for the data presented in the NPR where staff integrated the reports from NEISS with anecdotal reports in CPSRMS, staff compared the individual NEISS nonfatal injuries with the reports received through CPSRMS, by considering the injury date, victim age and sex, and the injury scenario description, and staff ensured that no double counting of incidents occurred for the nonfatal incidents.

2.    Low Risk

*Comment 4*: At least 185 commenters, including 158 businesses, suggested that the risk associated with corded window coverings is low and advancements have been made in the voluntary standard that further reduced the hazard. Some commenters compared the number of deaths associated with corded window coverings to other products.

*Response 4*: The strangulation hazard to young children from window covering cords is serious, with most incidents resulting in death. The strangulation hazard is a "hidden hazard," because many consumers do not understand or appreciate the hazard, and do not take appropriate

71

steps to prevent death and injury from window covering cords. Warning labels and education campaigns have failed to prevent deaths and injuries. Strangulation is quiet, and incidents have occurred with parents in the same room. Telling caregivers to watch children is insufficient to address the risk; for instance, parents leave their children in rooms considered safe, such as a bedroom, or caregivers may be giving attention to other children when a strangulation incident occurs.

As explained above, the ANSI/WCMA-2018 standard, does not adequately address the strangulation risk associated with custom window coverings. However, the ANSI/WCMA-2018 standard does effectively address the hazard for stock products, and its implementation for stock products did not cause a decline in revenue, by either units or by total revenue. Manufacturers can apply similar technologies used in stock window coverings, as well as additional mechanisms, such as retractable cords and loop cord and bead chain restraining devices, to make custom products safer without impacting utility or availability of products, and with a reasonable cost increase per household.

Many commenters cited the anecdotal data that staff presented in the NPR Briefing Package as an indicator of a downward trend in strangulation incidents and a reason why CPSC should not finalize the rule. However, as stated in the NPR, the Commission has no assurance that the data on window covering cord strangulations includes all incidents that may have occurred, either fatal or nonfatal. In the NPR, the Commission stated that the incident data represent a *minimum* number of incidents that are known to have occurred. 87 FR at 1022. Additionally, reporting of incidents to CPSRMS is ongoing. For example, since the data analysis was completed for the NPRs in 2021, the number of fatalities reported has risen to eight (from three, as initially reported) in 2020, and six (from zero, as initially reported) in 2021. We expect that these numbers will likely increase over the next year as CPSC receives more data.

72

A245

*D.      Economic Issues*

1.      <u>Alternative methods for the Regulatory Impact Analysis</u>

*Comment 5*: Institute for Policy Integrity and WCMA suggested that instead of, or in addition to, a comparison of costs versus benefits, CPSC could have performed a breakeven analysis, citing the Office of Management and Budget (OMB) guidance (Circular A-4) that this method can be appropriate when the benefits cannot be quantified.

*Response 5*: The Commission agrees that there are unquantifiable benefits for the final rule.  However, the benefits in this case can be estimated based on more than 10 years of incident data.  Given that CPSC has data for strangulation deaths and has assessed that the final rule would address the hazard patterns, staff was able to calculate benefits and costs associated with the final rule.  Furthermore, recognizing that there are possible variations in costs or benefits to consider, staff conducted a sensitivity analysis, including looking at a children's value of statistical life (VSL) of three times the VSL for adults, as discussed in the NPR, as well, and found that in some cases, this type of increased VSL for children could result in the rule having a quantified net benefit.  For the final rule, we also discussed the additional unquantifiable benefits, because not all benefits of the rule are represented in the benefits analysis.

Additionally, as one commenter pointed out, the CPSA requires only that the benefits of a CPSC rule "bear a reasonable relationship to its costs," 15 U.S.C. 2058(f)(3)(E), and, as explained in section 1260.4(i) of the regulatory text, the Commission finds such a reasonable relationship exists here.  In addition, CPSC is an independent regulatory agency, not an Executive Branch agency, and CPSC is not subject to the requirements in Executive Order (EO) 12866 or 13563 that require the agency to "justify" the costs, or to comply with OMB Circular A4.

2.      <u>Cost of Safer Products</u>

73

*Comment 6*: At least 579 commenters, including 331 businesses, stated that safer window coverings are too expensive for some consumers; regulations will increase the cost of window coverings; and motorized window coverings are cost-prohibitive for many consumers.

*Response 6*: Market data on stock window coverings do not support the commenters' hypothesis regarding the inability of consumers and businesses to adjust to meaningful safety requirements. Voluntary compliance with the ANSI/WCMA-2018 standard for stock products did not cause a decline in revenue, by either units or by total revenue, as most of the industry transitioned to cordless-only products, even though the price of some stock coverings nearly doubled. Multiple commenters representing manufacturers and retailers noted that sales of cordless stock products have *increased* in the past few years, thus, demonstrating consumer demand for cordless products that protect against the death or injury of children as an acceptable replacement for hazardous corded products, even at a higher price.[33]

In 2019, moreover, Canada published the new Corded Window Coverings Regulations to restrict the length of cords and the size of loops allowed on window coverings sold in Canada; the requirements apply to all products, both stock and custom. The evidence from the Canadian custom window coverings market is that the transition to cordless options in the custom market has been relatively inexpensive for consumers. Staff observed that many designs are priced the same for cordless wand options as for the previous corded design, while motorized options add less than $100 to the retail price for commonly ordered sizes.

Lastly, in Table 17 in Tab F of Staff's Final Rule Briefing Package, Table 9, *infra*, staff provides estimated net costs to replace 12 custom window coverings per household, about every 10 years, that are compliant with the rule, showing as little as $24 to replace less expensive vinyl or metal products and up to a net increase of about $219 to replace expensive soft sheer blinds.

---

[33] Based on Euromonitor annual revenue estimates and D&R (2021).

The Commission finds that the estimated net increase per household, representing a price increase of only about 5% of the total costs of replacing all custom window coverings every 10 years, is a reasonable cost increase to ensure that all children who live or visit the home going forward, are not exposed to the risk of strangulation on a window covering cord.

        3.   <u>Commercial Establishments</u>

*Comment 7*: At least 12 businesses raised issues about mandating safer window coverings in commercial and educational buildings and suggested an exemption. Three commenters stated that in an emergency situation, such as a lock down, school teachers should be able to close the window coverings quickly and that new systems may require teachers to climb up ladders to operate the window covering, which is impractical and time consuming. One manufacturer stated that based on the NPR, the standard appears to intend to address potential hazards of window coverings in residences, but the scope of the proposed rule covers all custom products. Given the broad interpretation of the definition of "consumer products" under the CPSA, the commenter expressed the belief that many of the strictly commercial products could be subject to the regulation, unless the Commission makes clarifying changes to its definition of "custom window covering."

*Response 7*: CPSC generally has jurisdiction over window coverings that are produced or distributed for the use of consumers, as long as the product is customarily produced or distributed for consumer use. 15 U.S.C. 2052(a)(5). Products that do not fall within the CPSA's definition of "consumer product" would not be subject to this rule. However, custom window coverings that are produced or distributed for consumer use in residences, schools, recreation, or otherwise, fall within the scope of CPSC's jurisdiction. CPSC staff is not aware of products that are sold solely for use by workers in a specialized context that are not also available for the use and enjoyment of consumers who visit such businesses. If consumers have access to custom

A248

window coverings, and are subject to the potential harm, the product is within CPSC's jurisdiction and the safety benefits of this final rule applies to these products.

4. <u>Competition from Overseas Manufacturers</u>

*Comment 8*: Several commenters claimed that U.S. manufacturers cannot compete with less costly imports, and that unless a firm imported products in bulk, the cost of making many products cordless is more than the cost of the entire imported product. Commenters stated that the rule would make it more difficult to compete with foreign products, especially those from China.

*Response 8*: This comment is not specifically relevant to custom window coverings, which are the subject of this rulemaking. Custom window coverings may, in fact, be less affected by lower-cost foreign supply than stock window coverings, which have had strong cord safety requirements since 2018. Regardless, imported products will be subject to the same requirements as products made in the United States. The economies of scale should be the same for manufacturers of any nation. We anticipate that the expanded demand for cordless mechanisms should lower the costs of those mechanisms in the medium term, due to economies of scale.

5. <u>Impact on Businesses</u>

*Comment 9*: At least 1,007 commenters (of which about 938 identified themselves as businesses) stated that the proposed rule would cause a significant impact on their businesses. Particularly, small custom window covering retailers commented that the rule would reduce sales and raise costs. Large suppliers commented that they intended to require licensed dealers to purchase new "sample books" costing thousands of dollars each. Large suppliers and

associations also provided data on estimated costs of retooling and costs of components at the wholesale level.

*Response 9*: As explained in the Staff's NPR Briefing Package, CPSC anticipates a significant impact on small businesses in the short term, as firms transition their product lines to comply with the final rule. However, the impact may be less than estimated, given the enforcement of Canada's window covering regulation beginning in May 2022. Companies that sell in both Canada and the United States have already redesigned their custom offerings to be compliant with the Canadian regulation, which is substantively similar to the final rule. These companies already have stock of compliant product designed and ready to sell through small dealers and interior designers.

Although the window covering manufacturing sector is highly fragmented, the custom part of the market is concentrated, with a few large suppliers accounting for approximately 40 percent of the industry revenue. The large suppliers are multinational companies with distribution in multiple countries. This means that those large suppliers already have compliant products available for the Canadian market, and any incremental costs of redesign for the U.S. market will largely fall on those relatively large companies, rather than on their small distributors and dealers. If suppliers in this industry choose to force small distributors to buy new sample books, as alleged by some suppliers, that decision is in no way a requirement of this rule, nor is it an inevitable consequence of this rule.

6.      Small Versus Large Businesses

*Comment 10*: One commenter suggested that a regulation will give larger window covering corporations an unfair advantage because hard window coverings (blinds composed of slats or vanes) can comply with the rule, but small manufacturers who make soft window coverings (composed of a continuous roll of material) cannot comply.

*Response 10*: Stock window coverings that comply with ANSI/WCMA-2018 are available in both soft and hard types, and implementation of safer window covering technologies has been proven for both types of window coverings. CPSC expects significant cost impacts on small manufacturers of custom products, as discussed in the Regulatory Flexibility Analysis, but these costs are not associated with certain window covering types. The cost impacts of a rule on operating cords for custom window coverings vary by product type, as detailed in Tab F and summarized in Tab G of Staff's Final Rule Briefing Package.

7.    <u>Stockpiling should not be prohibited</u>

*Comment 11*: One online retailer of blind and shade repair parts suggested that companies should be allowed to purchase whatever products they deem necessary or prefer. This same commenter also asserted that the NPR specifies no consequence for violating the rule and was unclear who will be enforcing the rule.

*Response 11*: The anti-stockpiling provision is being finalized as proposed, subject to a conforming change to make the implementation of this provision consistent with the 180-day effective date that was proposed and is being adopted. The final rule reflects a balance between the competing policy goals of addressing the hazard and also accounting for realistic supply-chain limits and considering the compliance costs for businesses, and particularly those costs for small entities. A less-specific base period, or a higher proportion above the base production amount, would allow more noncompliant units to be manufactured and sold, which could reduce the burden to industry. However, it would also reduce safety benefits to consumers and force suppliers of compliant units to compete against a larger stockpiled supply of noncompliant, likely cheaper, units for a longer period of time. Custom products are typically made to order; so it is unlikely that a firm would manufacture large quantities in advance of demand. Therefore, this anti-stockpiling provision should not adversely impact manufacturers' normal operations.

78

A251

However, firms will need to modify their window coverings to comply with the requirements, and the modifications may be costly. Accordingly, CPSC believes it is appropriate to prevent stockpiling of noncompliant custom window coverings.

If a manufacturer or importer violates any provision of a mandatory rule, including the anti-stockpiling provision, CPSC can enforce that provision using authority under section 19(a)(1) of the CPSA, which prohibits the sale, offer for sale, manufacture for sale, distribution in commerce, or importation into the United States, any consumer product that is regulated under the CPSA, that is not in conformity with an applicable consumer product safety rule. 15 U.S.C. 2068(a)(1). CPSC's authority allows for corrective actions, or recalls, refusal of admission and/or seizure of products at the ports, and civil penalties for failure to conform to required regulations.

### 8. Unquantified Benefits Are Larger Than Estimated

*Comment 12*: The Institute for Policy Integrity and A. Finkel, economist, suggested that the regulatory analysis in the NPR underestimated the benefits of the rule, by not discussing unquantified, but potentially very large, benefits of the rule. The unquantified benefits suggested include parental grief, reduced cost of litigation for manufacturers and retailers, and averted recall costs. Two commenters specifically cited the example of a Federal Motor Vehicle Safety Standard for rear visibility cameras in passenger cars, where the regulatory impact analysis discussed the large unquantified benefits of reducing parental grief and emotional trauma from causing the death of one's own child, or a relative, or neighbor. One commenter pointed to that standard as an example of an "experience good," where the standard caused people's preferences to change to favor a safety technology with which they were previously unfamiliar.

*Response 12*: Such potential unquantified benefits would be included in an increased value of statistical life, or VSL, for children. A discussion of this fact is included in the

79

sensitivity analysis in Tab F of Staff's Final Rule Briefing Package and section V of this preamble. CPSC's Injury Cost Model (ICM) takes pain and suffering into account, so a portion of parental grief benefits are accounted for and would be accounted for in an increased VSL for children. Moreover, at this time CPSC cannot accurately assign a value to the potential that people might experience a shift in preferences towards a safer product, although the evidence of continued growth of demand for cordless stock coverings does indicate this is a potential benefit for custom window coverings as well.

9. <u>Value of a Statistical Life</u>

*Comment 13*: Two commenters (Institute for Policy Integrity and A. Finkel) suggested that CPSC use different references and different theoretical justifications to derive a value of statistical life (VSL) for children.

*Response 13*: As evidenced by the many alternative sources and several methods suggested by the commenters, no consensus exists (either in the U.S. or internationally) on what value or method regulators should use in their regulatory analyses. The current range of values in the peer reviewed literature for a child's VSL ranges from less than 1 to more than 7 times the value of an adult VSL, as discussed in more detail in the regulatory analysis. CPSC staff provided a discussion of this range to the sensitivity analysis in Tab F, but did not change in its analysis the core estimate of children's VSL. As noted in the sensitivity analysis, increasing a child VSL to three times the base VSL, $31.5 million, would result in a calculated net benefit for the final rule of $14.3 million.

E. *Consumer Issues*

1. <u>Accessibility issues with disabled population, people with short stature and seniors</u>

*Comment 14*: At least 383 comments (331 businesses, 8 consumers, and 44 unknown) stated that having a short cord introduces accessibility issues for various consumers such as

80

people in wheelchairs or who otherwise are challenged to access cords higher up. Some commenters questioned whether the proposed rule is compliant with the Americans with Disabilities Act.

*Response 14*: The final rule provides several ADA-consistent options to address accessibility of safer window coverings. Sections 308.2 and 308.3 of the 2010 ADA Standards for Accessible Design specify forward and side reach distances that would be applicable to window coverings. Section II.C.7 of this preamble and Tab B of Staff's Final Rule Briefing Package explain the ADA standard and the window covering options in detail.

2. <u>Acknowledgement of Risks before Ordering</u>

*Comment 15*: At least 48 commenters (45 businesses) stated that they either currently ask or suggest that consumers acknowledge the strangulation risk associated with cords before ordering a custom corded window covering.

*Response 15*: Even accepting that consumers may acknowledge the strangulation risk associated with the corded window coverings that they are purchasing, and assuming these acknowledgements are informed rather than pro forma, the hazard with the corded window covering remains. Household members other than the consumer who signed the document, including guests and small children who cannot comprehend the danger, as well as future residents of the home and their guests, also can be unaware of the hazard.

3. <u>Climbing on ladders or other furniture is unsafe</u>

*Comment 16*: At least 56 commenters, including 42 businesses, stated that climbing on ladders or other furniture is unsafe for consumers, particularly older consumers. Due to the short cord requirement, these commenters assert that climbing would be required to operate hard-to-reach window coverings. Some commenters provided statistics on falls.

*Response 16*: Consumers ordering custom window coverings are unlikely to choose a custom design that requires them to climb on furniture to open their window coverings. Alternative solutions to climbing that can safely replace the existing hazardous cords include poles to operate cordless systems, rigid cord shrouds, loop cord and bead chain restraining devices, as well as retractable devices that would be within easy reach of users. Accordingly, the Commission finds that the final rule would not lead to the unsafe behavior envisioned by these commenters.

4.    Exclude Draperies

*Comment 17*: Several commenters, including two businesses, argued that draperies should be excluded from the rule. One stated that there are no "aesthetic" alternatives to cords for draperies. Another commented that there is no evidence that draperies are unsafe because the cords are on pulleys attached to the floor.

*Response 17*: Multiple cordless options for draperies are available, including wands and motorized controls, as well as pulling the draperies on the traverse rod by hand, with no cord or other control. Section I.E of this preamble details fatal incidents involving draperies. Corded draperies are common, and often do not have the cord on a loop or attached to the floor as the commenter claims. On the other hand, of the different types of window coverings analyzed in the final regulatory analysis, draperies had the lowest cost of compliance with the final rule, estimated to be near zero, because the cost of a control wand is approximately equal to the cost of the cord it replaces.

5.    Informing the Customer

*Comment 18*: About 593 businesses stated that they regularly educate their clients on safer operating cord options during the ordering process and that consumers make an informed choice by being aware of the hazards associated with the corded product. At least 120

82

commenters stated that people should be made aware of the dangers and then make their own choice when purchasing a custom window covering.

*Response 18*: CPSC encourages sellers to inform and educate consumers on the operating systems that contain hazardous cords. However, information and education are not always provided, and where provided they do not negate products being sold and installed with hazardous cords, and that custom window coverings will remain in consumers' homes for many years. If consumers do not appreciate the hidden nature of the hazard, they may choose to buy a hazardous window covering even when children are present in the home. Moreover, as explained above, custom window coverings have a long product life. When a home is sold or rented, a new resident, potentially residents with children, will likely live with the hazardous window covering, without having been warned of the associated hazards. Due to the ineffectiveness of warning labels on such products, even a permanent label may not get the attention of the user. 87 FR at 1034-35. Information and education remain important to address the existing cord hazard, but as the incident data reflect, education and warning labels do not adequately address the risk of injury.

6. Parental Responsibility

*Comment 19*: At least 24 commenters, including 17 businesses, suggested that parents are responsible for supervising their children around window coverings.

*Response 19:* As reviewed in the NPR and in Staff's NPR Briefing Package, ordinary parental supervision is unlikely to effectively eliminate or reduce the strangulation hazard, because even young children are left unsupervised for a few minutes or more in a room that is considered safe, such as a bedroom or family room. 87 FR at 1036-37. Moreover, incidents have occurred even when family members were in the same room as the strangled child. *Id*. Strangulation with cords requires only a few minutes to occur and happens silently. A more

83

A256

effective solution to the window covering cord hazard is to require that window coverings are inherently safe as sold and do not have hazardous operating or inner cords.

7. <u>Rental Leases and Real Estate Documents</u>

*Comment 20*: To inform renters as well as purchasers, one business suggested informing and disclosing the hazards associated with corded window coverings at the time of rental or sale of the property. Two businesses (Comfortex Window Fashions and Inviting Interior Style) suggested home inspections when dwellings change hands.

*Response 20*: CPSC agrees with the commenters' concerns regarding window coverings included in rental units where tenants with young children may not have the option of choosing safer window coverings. Moreover, the sale process of a residence is an opportunity to inform buyers about the dangers associated with corded window coverings or to remove and replace hazardous window coverings. Certain state and local authorities may have regulations in place with regard to window coverings in rental homes. However, CPSC does not have the authority to require such practices. CPSC regulates consumer products rather than the terms of property rental or sale contracts, which are generally in the purview of state and local governments. Mandatory visual inspections of installations of corded window coverings would not prevent deaths and injuries without an additional safety rule, because hazardous loops can still be accessible even when cord loops are correctly installed and with tension (*see* Tab I of Staff's Final Rule Briefing Package).

8. <u>Replacement of Old Window Coverings</u>

*Comment 21*: At least 12 commenters, including 10 businesses, stated that the rule would discourage people from replacing their decades-old, non-compliant blinds and shades containing dangerous cords with new compliant window coverings because they would not want to give up corded products.

*Response 21*: Market data on stock window coverings does not support the commenters' hypothesis. Voluntary compliance with ANSI/WCMA-2018 for stock products did not cause a decline in revenue, by either units or by total revenue, as most of the industry transitioned to cordless only products. Multiple commenters representing manufacturers and retailers noted that sales of cordless stock products have *increased* in the past few years, thus demonstrating consumer demand for cordless products as an acceptable replacement for corded products. Canada has transitioned to safe window coverings with a similar absence of disruption.

9.   Require professional installation

*Comment 22*: As an alternative to the rule, two commenters (one interior designer and one business owner) suggested that CPSC should require that custom window coverings be professionally installed, stating that this would help small businesses and improve consumer safety.

*Response 22*: CPSC does not have the authority to regulate professional services or home inspections. Implementing these practices would also be more costly than the final rule, without providing as many benefits. The typical cost for adding cordless options to a custom window covering ranges from less than $10 (and in some cases nothing) to about $100, except for some very large, motorized options. This price range is far below the cost of hiring a professional installer for corded custom window coverings. In general, commenters' alternatives would raise costs for installed custom window coverings, while addressing few of the known incidents and fatalities, as well as not addressing the known hazard of corded window coverings.

10.   Twisting wand takes time and effort and use is inconvenient; poles may not work for elderly

*Comment 23*: At least 38 commenters, including 36 businesses, stated that using a wand is time consuming and may be difficult for some consumers.

*Response 23*: The wands that CPSC staff evaluated for this rulemaking are easy to learn about and use. We anticipate that further innovation will make wands even more efficient and easy to use. Some traditional wands used to rotate horizontal slats have thin diameters, which can make such wands more difficult to use compared to rigid cord shrouds, which staff evaluated to have thicker diameters and are more comfortable to use. The final rule does not require the use of wands. The final rule allows the use of many other types of safe operating systems instead of a wand, such as cordless, retractable cords, cord shrouds, cord restraining devices, or motorized systems.

F.      *Warnings, Public Awareness, and Education*

*Comment 24*: At least 5 businesses contended that warning labels on the products should be relied on to address the strangulation hazard as they inform the consumer about the hazard. At least 2 other commenters stated that warning labels and educational efforts were tried, did not work, and are insufficient to address the strangulation risk.

*Response 24*: The NPR explains that consumers are less likely to look for and read safety information on products that they use frequently and are familiar with. 87 FR at 1035. Incident data for window covering cords confirms this research, as most of the incident units had a visible warning label on the product. Even well-designed warning labels will have limited effectiveness in communicating the hazard on this type of product. However, the Commission agrees that public awareness is a crucial component in making safe purchasing decisions and safely using window covering products at home. Public information campaigns are on-going. CPSC and the Window Covering Safety Council (WCSC) have joined forces to raise awareness of strangulation risks presented by window covering cords, and October has been designated "Window Covering Safety Month" by CPSC and the WCSC since 2003.

Currently, the Commission does not have information to quantify the effectiveness of public information campaigns on reducing the risk of injury associated with corded window coverings. However, information and education campaigns on corded window coverings that have been continuing for decades have not adequately reduced or eliminated serious injuries and deaths, as evidenced by the continuing number of fatalities. Accordingly, the Commission will not rely on education campaigns to address the unreasonable risk of injury associated with operating cords on custom window coverings.

G.  *Other Product-Related Hazards*

1.  Access to battery to recharge or replace

*Comment 25*: At least 15 businesses stated that, with respect to motorized solutions, replacing or swapping batteries located on the headrail is difficult for consumers as they need to climb on ladders. At least 4 commenters also stated that the new rule would increase the use of batteries, which is wasteful for the planet.

*Response 25*: Staff reports that they found examples of window coverings where the batteries are stored in the bottom rail, making it easier for consumers to recharge or replace batteries. Batteries are rechargeable to reduce waste, and some window coverings are hardwired or solar powered.

2.  Button batteries used in remote controls

*Comment 26*: At least 3 commenters (WCMA, Parents for Window Blind Safety, and Independent Safety Consulting) suggested that remote controls that contain button batteries should comply with either ASTM F963 or other applicable button battery standards, or simply that battery compartments should have a screw.

*Response 26*: On August 2, 2022, Congress passed H.R. 5313, or Reese's Law, and the President signed the bill into law on August 16, 2022. Reese's Law directs the Commission to

establish a mandatory standard to protect children and other consumers against hazards associated with the accidental ingestion of button cell or coin batteries used in consumer products. Accordingly, staff is preparing a notice of proposed rulemaking for Commission consideration to implement this law. The Commission anticipates that window covering remote controls that use button cell or coin batteries will fall within the scope of that proceeding.

3. Continuous loops with tension devices are safe

*Comment 27*: At least 429 commenters stated that continuous loops with properly attached tension devices are safe and should not be eliminated. Commenters said that windows that are high up, windows over a sink, and windows behind a couch need continuous loops. Other commenters stated that some consumers do not want tension devices attached to the wall.

*Response 27*: Incident data demonstrate that tension devices may come off the wall or may not be installed at all, and continuous loops may not be taut enough to prevent strangulation incidents. Through testing, staff found that children may be able to insert their head into a properly installed continuous loop system even with a tension device. Accordingly, the Commission concludes that window coverings operated with continuous loops with tension devices can still leave hazardous loops accessible to children and do not adequately address the risk of strangulation.

For the final rule, CPSC staff analyzed how a window covering that is behind a piece of furniture or sink would be operable with a continuous loop if the loop has a tension device to keep the loop taut. Tab B of Staff's Final Rule Briefing Package provides a visual comparison. Tab B explains that the continuous loop would likely remain unattached to the wall with a tension device so that the consumer can pull the loop towards him/her to operate. This means that the continuous loop remains accessible to children and hazardous. Given children's ability to climb and incident data demonstrating this hazard scenario, the Commission concludes that

88

continuous loops that are contained in a rigid shroud or restrained within a passive restraining device are much safer for children and potentially easier to operate for both access and ease of use by consumers.

    4.    <u>Consumer preference for corded products</u>

*Comment 28*: At least 2 businesses suggested that they have customers who prefer to use corded window shades because they find them easier to use. Some businesses stated that the ANSI/WCMA-2018 requirement to limit the free hanging cord length to 40% of the product length generated customer complaints, because some of their clients cannot reach the cord with ease. Some businesses stated that they sell custom blinds to nursing homes and retirement homes; the users demand that the cords be long enough to be reached, which usually means 40 inches or more.

*Response 28*: The final rule's effect on sales for some particular products is accounted for in the regulatory analysis in section V of this preamble, and Tab F of Staff's Final Rule Briefing Package. However, stock products currently on the market that comply with ANSI/WCMA-2018 are available in a variety of materials, sizes, and types to meet consumer needs. Also, custom product requirements in the final rule allow for a variety of solutions to ease the operation of window coverings, including poles for cordless systems, rigid cord shrouds and loop cord and bead chain restraining devices, motorized window shades, and retractable cords. All of these options provide easy reach for consumers. Based on the comments, the final rule for custom window coverings specifically permits corded window coverings that use a single cord retractor, rigid cord shroud, or a cord restraining device, to create more options for non-motorized safe window coverings, provide options for accessible custom window coverings, and allow for ease of use.

89

A262

5. <u>Cord cleats</u>

*Comment 29*: About 42 commenters stated that cord cleats are provided with corded window coverings and address the hazard.

*Response 29*: Cord cleats do not adequately address the strangulation hazard associated with window covering cords because such devices rely on consumers to wrap the excess cord around the cord cleat every time they raise or lower the window covering. Incident data demonstrate that consumers may not wrap the cords around the cleat every time they operate the window covering, which results in dangling operating cords with which children can strangle. In one incident, although caregivers normally wrapped the cord around the cleat, on the day of the incident, cords were not wrapped, and the child accessed the cords after climbing on a couch.[34] Further, cord cleats may be accessed by children. In one incident:

> [a] four year old boy moved a small plastic table over near the window, climbed upon the table and reached up and removed the shortened pull cord for the window covering from the "safety" cleat. He pulled the cord out and wrapped it around his neck. He then jumped off of the table. The cord broke and he fell to the floor. His parents were able to remove the cord from his neck. The boy recovered from his injuries.[35]

6. <u>Effective date</u>

*Comment 30*: At least 401 commenters stated that the proposed six-month-effective-date is very short to meet the proposed requirements; 94 commenters suggested at least one year effective date, three commenters suggested at least an 18 month to 2 years effective date, and seven commenters suggested at least 2 years to comply with the rule. Two commenters submitted the extent of the delays in obtaining equipment, transit time in both sea and air to get equipment and components from overseas suppliers, and delays in lead times for raw materials.

---

[34] *Id.*
[35] Lee, K. (2014). Mechanical Engineering Response to Window Coverings Petition. CPSC memorandum to Rana Balci-Sinha, Project Manager, Window Coverings Petition CP 13-2. U.S. Consumer Product Safety Commission, Rockville, MD. Accessed at https://www.cpsc.gov/s3fs-public/pdfs/blk_pdf_PetitionRequestingMandatoryStandardforCordedWindowCoverings.pdf

One manufacturer, Safe T Shade, stated that "a 180-day lead time is more than sufficient for a painless Industry implementation," and consumer organizations stated that a mandatory standard should be issued as soon as possible.

*Response 30*: Under section 9(g)(1) of the CPSA, the Commission must find good cause that a later effective date is in the public interest, to extend the effective date of the final rule beyond 180 days. ~~Table 1 in staff's engineering analysis presents an estimate of the engineering steps involved in designing and prototyping a rigid cord shroud, the time involved for each step, and cost to develop a rigid cord shroud. Staff assessed that the redesign of window coverings for unusually sized windows to be compliant with the final rule would create even more additional effort and time, above typical sized-window modifications, for manufacturers to address. Engineering staff estimates that, if a 2-2.5 -year period were taken to develop a production-ready rigid cord shroud, it would cost $787,000 to do so in that time. Tab C, Appendix, Staff's Final Rule Briefing Package.~~

Although most of the comments seeking a later effective date~~r~~ were not specific or substantiated, Table 1a in the Appendix to Tab C of Staff's Final Rule Briefing Package presents the~~commenters'~~ timelines and criteria for creating compliant custom window coverings, such as tooling, transit, and inventory, that a few commenters offered. ~~*Id.*~~ These commenters provided timelines of 9 to 20 months in obtaining and transporting equipment/materials from overseas suppliers, citing long lead times of 4 to 12 months to acquire necessary equipment and materials, and an additional 1 to 4 months upon delivery to assemble component inventory. Another commenter stated an additional delay related to continued COVID-19 disruptions.

~~Staff found these concerns to be credible because of the specific examples provided by commenters and because these comments comport to what staff has determined about the industry's supply chain. Tab F of Staff's Final Rule Briefing Package. Additionally, staff~~

91

~~assesses that supply disruption could result in temporary, but significant, shift in consumer behavior and impact on small businesses that sell custom window coverings. Supply chain disruptions and delayed deliveries could result in a shift in demand from custom products to stock products. Stock products have a lower profit margin than custom products and thus may have a significant cost impact to manufacturers and retailers even if the shift is temporary. Further, most custom window coverings sellers are small businesses, and therefore a temporary shift to stock products could have a significant impact to small businesses. Staff believes A~~a later effective date would allow manufacturers more time to redesign, distribute costs of compliance along the entire year, or discontinue product variants that cannot meet compliance. Staff therefore ~~assesses~~ <u>recommended</u> a 1-year effective date, which is greater than the 30-180 day effective <u>-</u>date <u>range</u> provided for in CPSA section 9(g)(1), 15 U.S.C. 2058(g)(1), for most custom window coverings.

~~Based on the currently available products on the market, and in consideration of comments received, staff economists also recommend extending the effective date to 2 years for window coverings that are raised and lowered and are at least 10 feet tall in vertical length, because these heavier products may require additional research to reliably lift with cordless designs or make the cords inaccessible or accessible loops non-hazardous. *Id.*~~

The Commission <u>has considered the information supplied by commenters and staff's analysis, but does not agree that the development and logistics phases for most custom window coverings to come into compliance requires a one-year effective date from the time of publication of the final rule, nor that a delay beyond the default statutory maximum of 180 days (15 U.S.C. 2058(g)(1)) is in the public interest. First, staff's economic analysis in Tab F does not conclude that a longer effective date creates a material reduction in the estimated costs of the rule, and commenters do not show that this would be the case.</u>

Second, methods of eliminating the window covering cord hazard have been developed for stock window coverings under ANSI/WCMA-2018, and those same methods can be used for, or at a minimum can be adapted to, custom window coverings.

Third, more than two years ago, Canada issued a rule on window covering cords for all window coverings, whether stock or custom, without exceptions.  The NPR analyzed the requirements of the Canadian rule and discussed the effective date of that rule.  Canada's rule has been enforced since May 2022.  Manufacturers of custom window coverings had two years to come into compliance with Canada's rule, and the solutions developed for Canada should be usable in the United States as well.  Indeed, a number of commenters arguing for a delayed effective date are known to sell in Canada, and yet they did not address how the Canadian rule impacts compliance with CPSC's final rule.  Nor has any party suggested that implementation of the Canadian requirements is causing major disruption in that country.

Fourth, manufacturers have been aware of CPSC's proposed rule for at least one year already, since October 2021 when Staff's NPR Briefing Package was posted on CPSC's website.  Moreover, the proposed rule, with a 180-day effective date, was published in the *Federal Register* in January 2022.  Thus, a 180-day effective date from publication of a final rule comes on top of a substantial period of time during which manufacturers were aware of the likelihood of a rule. finds good cause to delay the effective date, and will establish a 2-year effective date for custom window coverings 10 feet or greater in vertical length and that are raised and lowered, and a one-year effective date for all other custom window coverings to come into compliance with the final rule.

Accordingly, the Commission does not find good cause in the public interest to delay the effective date for the majority of custom window covering products.  A 180-day effective date—the maximum period stated in section 9(g)(1) of the CPSA (15 U.S.C 2058(g)(1))—allows

93

sufficient time for industry to meet any additional design, development, testing, and logistics concerns with technologies already in use (cordless, short cords, and inaccessible cords) and also specifically with regard to the additional methods to comply (rigid cord shrouds, loop cord and bead chain restraining devices, and retractable cords). The record, including staff's analysis, reflects that cordless options are available for nearly all window covering types and many stock product substitutes are available to consumers.

7. Free hanging cords

*Comment 31*: At least three commenters stated that free hanging cords (meaning a cord that is longer than 8 inches and not restrained) should be prohibited because they pose a higher strangulation risk to a child. At least one manufacturer stated that free hanging cords are a large portion of their business.

*Response 31*: Free-hanging window covering cords are associated with 18 of 36 custom product strangulations or near strangulations (74 free-hanging cord incidents of the overall total of 209 incidents). Removing free-hanging cords from custom window coverings will reduce deaths and injuries. The window covering industry appears to be moving away from free-hanging cords, as WCMA, in their latest draft balloted revision, draft ANSI/WCMA-2022, proposes to remove cord lock systems, and thus free hanging operating pull cords from all custom products, regardless of type, size, and weight of the window covering. As stated earlier, the final rule contains several alternatives to hazardous free-hanging cords, such as rigid cord shrouds, loop cord and bead chain restraining devices, and retractable cords, in addition to manual and motorized cordless lift systems that can replace hazardous cord lock systems.

8. Coverings for high windows or windows that are hard-to-reach are impossible to use with an 8-inch cord

*Comment 32*: At least 385 commenters stated that window coverings located at higher locations on a wall, windows behind the kitchen sink, or windows behind furniture, cannot be operated with an 8-inch cord.

*Response 32*: The rule allows for several safe alternatives for operating cords besides using an 8-inch cord. For custom products in hard-to-reach locations, under the final rule consumers have the option to choose from, among others that could be developed:

- Cordless blinds with an access wand
- Motorized window covering with a remote control
- Single cord retractor systems with a 12-inch stroke
- Rigid cord shroud
- Cord restraining device

### 9. Manual spring system is not durable

*Comment 33*: At least 8 businesses stated that manual spring systems are not durable and break easily.

*Response 33*: Manual cordless lift systems, popular in stock products, often use a series of constant force springs. If the springs break, the window covering fails safe, because cordless window coverings do not have accessible operating cords. Any spring has a limited fatigue life (number of cycles to failure). Manufacturers can control fatigue life of the lift system by selecting the proper spring size, strength, and number of springs for the lift system.

### 10. Off-the-shelf products

*Comment 34*: At least 3 commenters suggested that stock products are more dangerous than custom products because stock products are allowed to have longer lengths of accessible pull cords than custom window coverings, stock product customers are less likely to get safety

95

information, and stock products are likely to be installed by consumers who may be unfamiliar with the hazard.

*Response 34*: Stock window coverings that are compliant with the existing voluntary standard, ANSI/WCMA-2018, cannot have lengthy pull cords as the commenters suggest. All stock products must be cordless, have short cords (equal to or shorter than 8 inches), or have inaccessible cords. Although consumers may not be as knowledgeable as professional installers, most of the custom products involved in the identified strangulation incidents were installed by professionals and still lacked safety devices. Several public commenters state that installers may remove the tension device from a product if the customer does not want it mounted, which allows a free-hanging hazardous loop on the product. Educating consumers is paramount particularly to reduce the risk associated with corded window coverings already installed in consumers' homes. However, as discussed in Staff's Final Rule Briefing Package, education campaigns are insufficient to adequately address the hazard, and manufacturing inherently safe custom window coverings that comply with the requirements for stock products in ANSI/WCMA-2018 is required to address the risk of injury or death.

        11.    <u>Product options / Limited choices for consumers</u>

*Comment 35*: At least 321 commenters suggested that consumers may want to have different window covering cord options to serve their different needs and that reducing consumer options is not preferable.

*Response 35*: The final rule leaves room for operating system options. Manufacturers can develop new operating systems that do not have accessible cords or implement existing solutions such as cordless systems, shrouded or continuous loop systems, or shrouded pull cord systems. These technologies are available and are being used for both stock and custom window coverings.

Suppliers of custom window coverings to the Canadian market have already adjusted their products to comply with Canada's window treatment regulations, which are substantially similar to this final rule. Compliance to the Canadian rule has apparently resulted in changes to advertised product lines; such as those shades that could not meet the inner cord requirements (*e.g.*, light pleated shades, narrow metal blinds) appear to have been removed from the market, as well as some of the largest sizes of other categories. Manufacturers are offering cost-effective redesigns to other product types that are cordless. In addition, manufacturers are offering new designs to replace the discontinued options in Canada, such as shades with light blocking material on the bottom and sheer on the top as a replacement for "top down/bottom up" (TDBU) shades. CPSC has no evidence from the Canadian market of a significant reduction in consumer choice. Rather, the market has reacted with cost-effective substitutes and redesigns.

12.  Retractable cords work well and are safe

*Comment 36*: At least 149 commenters stated that retractable cords are safe and should not be eliminated as an option to make operating cords inaccessible.

*Response 36*: CPSC is not aware of incidents associated with retractable cords, and based on the comments received, the final rule provides a retractable cord lift system option for custom window coverings, provided that the system only exposes up to 12 inches of cord from the bottom of the headrail as a stroke length. The Commission adopts a 12-inch cord limit based on staff's analysis (Tab B) demonstrating that it is extremely unlikely for a strangulation to occur in this scenario for both younger and older children, as well as lack of incidents within 12 inches of the headrail.

13.  Technology unavailable to cover all products in all sizes and weights

*Comment 37*: At least eight commenters, including WCMA, stated that non-motorized cordless lift systems are not feasible for large window coverings. Commenters stated that

continuous loop cords with tie down devices are capable of lifting any size window covering.  At least 3 commenters stated that manual cordless lift systems have limitations such as size and weight of the window covering that could limit the application (*e.g.*, for faux wood blinds, a general estimate for the maximum dimensions for cordless is 96 inches wide by 48 inches high and 60 inches wide by 84 inches high.).  Commenters also stated that there is an increased presence of taller windows in homes.

*Response 37*: Because hazard patterns in taller window coverings are the same as hazard patterns for shorter window coverings, the potentially increased number of installations of taller window coverings in residences, and the feasibility of applying safer technologies on these products, the Commission will not exclude taller products from the scope of the rule.  However, staff's product development time estimates (Tab C) demonstrates that a longer implementation date (*i.e.*, 2 years) is reasonable for manufacturers to implement the technologies for products that are raised and lowered and are 10 feet or more in length.

The Commission also considered the comments provided by manufacturers about the limitations for larger products to accommodate the manual cordless systems.  Staff reviewed the incident data to determine the largest products that were involved in incidents: the longest product that was involved in a nonfatal incident had a reported length of 112 inches (width was 124 inches). A reported fatality involved a roller shade; based on other dimensions provided in the in-depth investigation (IDI), staff estimates the length as 119 inches (width was estimated as 54 inches).

Based on staff's market research, rigid cord shrouds are currently limited to operating window coverings up to 96 inches tall.  Staff reviewed the available technologies on the market and determined that it is feasible to implement rigid cord shrouds, cord or bead chain restraining devices, or retractable cords on larger window coverings (Tab C).  Accordingly, the final rule

allows for the use of these methods, as long as the products meet the durability performance requirements in the rule.

14.      Top-Down-Bottom-Up (TDBU) shades

*Comment 38*: About 33 commenters believe that TDBU shades would be eliminated if the proposed rule becomes final. They believe that TDBU shades are safe and should not be eliminated.

*Response 38*: The final rule does not eliminate TDBU window coverings. Under the final rule a TDBU shade can be manufactured as long as it does not contain hazardous operating cords as stated in the final rule (meaning accessible cords longer than 8 inches). Moreover, inner cords are subject to the final rule under section 15(j) of the CPSA, which incorporates by reference the ANSI/WCMA-2018, requiring that accessible inner cords cannot create a hazardous loop. If the inner cords fail to meet this ANSI/WCMA-2018 requirement, manufacturers can redesign the product to meet the standard. For example, some manufacturers were concerned that TDBU products could not meet the Canadian inner cord requirement (which are more stringent than ANSI/WCMA-2018 requirements). However, Canadian custom window treatment retailers have already adjusted their products to comply with Canada's requirements for inner cords. Manufacturers are offering cost-effective redesigns for TDBU products to replace the discontinued options, such as shades with light blocking material on the bottom and sheer on the top as a replacement for TDBU shades.

15.      Training Installers

*Comment 39*: At least 353 businesses stated that they train their installers so that window coverings and safety devices are properly mounted.

*Response 39*: Over the lifetime of product use, even properly installed external safety devices such as tension devices may break or come off the wall. Also, consumers who do the

installation by themselves may not have the knowledge or ability to properly install the device. Importantly, staff's testing found that a child can fit their head through a properly tensioned cord (Tab I); cord tension devices do not eliminate or adequately reduce the risk of strangulation. Safer options to reduce the risk of injury include passive safety devices that do not rely on consumer behavior to prevent the hazard.

### H. Stories of Loss

*Comment 40*: More than 40 commenters either were personally affected by a window covering cord injury or death or know someone who was affected by a child's death on a window covering cord.

*Response 40*: The Commission appreciates the courage of these families in sharing their difficult stories of a tragic loss. To each of these parents, family members, and loved ones, we are deeply sorry for your loss. The Commission has taken the information about the interactions and conditions involved in the incidents into consideration in developing its final rules for stock and custom window coverings, in an effort to prevent the tragedy of losing a child to a window covering cord.

### I. Comments of the Chief Counsel for Advocacy, SBA

*Comment 41*: The Office of Advocacy of the Small Business Administration (Advocacy) states that CPSC's Initial Regulatory Flexibility Act (IRFA) analysis relies on incomplete information and advises that the Commission publish an updated analysis for comment.

*Response 41*: The Final Regulatory Flexibility Analysis (FRFA) incorporates the changes suggested by Advocacy. Tab G of Staff's Final Rule Briefing Package provides an estimate for the potential firms that may meet the criteria for small businesses and is discussed in more detail in Tab G.

*Comment 42*: Advocacy stated that CPSC should consider alternatives for the final rule that reduce the burden to small businesses while still meeting the stated objectives of increased child safety. Advocacy expressed concerns about the costs to comply, time to comply, and whether an updated voluntary standard would adequately address the risk of injury.

*Response 42*: The Commission considered alternatives to reduce the potential burden of the final rule to small businesses. Alternatives the Commission considered are listed in the Regulatory Flexibility Act analysis in the NPR and this final rule, and included continued work on education efforts, narrowing the scope of the rule, and updating the voluntary standard. For the final rule, the Commission considered an exemption for very large window coverings in response to comments from Advocacy and the public, but ultimately determined that it is feasible to make larger window coverings safe in a timely way, and the hazard associated with larger window coverings is the same as that of smaller products. Section II.E.4 of this preamble details the Commission's consideration of larger-sized window coverings and the Commission's decision to set a one-year effective date, effectively providing a six-month delay, for window coverings that are 10 feet or greater in vertical length and that are raised and lowered.

After considering CPSC staff's analysis and information from commenters, Tthe Commission is providingsets a final rulean effective date period of 180 days from publication in the *Federal Register*1 year for mostall custom window coverings, as to allow firms more time to obtain complaint component parts and retool production lines as compared to the 180-day period proposed in the NPR. Section III.G.6 of this preamble explains the Commission's rationale, and that unless the Commission finds good cause in the public interest to delay an effective date, the statutory maximum effective date is 180 days from publication in the *Federal Register*. An effective date of 180 days should be sufficient to complete any additional design, development, testing, and logistics, and to adopt the additional methods of compliance provided in the final

rule (rigid cord shrouds, loop cord and bead chain restraining devices, and retractable cords). *See supra*, section III.G.6. This will also allow manufacturers, including small businesses in the U.S. and larger and foreign firms that supply U.S. retailers that are small businesses, more time to source necessary component parts. ~~CPSC notes that m~~Many of the firms supplying the U.S. market with custom window coverings, including some small businesses, also supply the same products to the Canadian market, where ~~all corded products are non-compliant~~a similar rule was enforced in May 2022. The industry has already had years to come into compliance with the Canadian rule. So too, CPSC's draft rule has been available for at least one full year already. As CPSC staff has advised, moreover, compliant stock substitutions are available for most window covering types. These stock solutions also provide a source of design and materials for bringing custom window coverings into compliance.

~~Additionally, the Commission is setting a later effective date for products 10 feet or greater in vertical length and that are raised and lowered, to allow manufacturers to spread research and development costs over a longer time period. *See* Response to Comment 30. This will also allow manufacturers more time to source necessary component parts. The Commission will also specifically allow two methods, in addition to rigid cord shrouds, to make operating cords on custom products inaccessible or non-hazardous to children: retractable cord systems and loop cord and bead loop restraining devices, as long as these devices meet the requirements of the rule.~~

The reasons for not relying entirely on any voluntary standard are discussed elsewhere in this preamble.

*Comment 43*: Advocacy stated that CPSC should consider exceptions in situations where corded window coverings are a necessity, such as under the Americans with Disabilities Act.

*Response 43*:  Section 9 of the CPSA requires the Commission to consider the effects of a rule on elderly and disabled persons.  Section II.C.7 of this preamble provides an analysis of the issues raised by commenters with regard to the ADA.

**IV.     Description of the Final Rule**

The need for this rule under sections 7 and 9 of the ~~the~~ CPSA arises from a difference in the existing voluntary standard's requirements for operating cords on stock window coverings and operating cords on custom window coverings.  Section 4.3.1 of ANSI/WCMA-2018 sets forth the performance requirements for operating cords on stock window coverings (*see* Table 8). The Commission has determined that these operating cord performance requirements are adequate and effective to reduce or eliminate the unreasonable risk of strangulation to children 8 years old or younger on window covering cords (see section II.A of this preamble). Accordingly, in the separate proceeding for stock window coverings, the Commission is incorporating by reference the "readily observable" safety characteristics for window covering cords, as addressed by ANSI/WCMA-2018, into a rule that deems the absence of these safety characteristics a substantial product hazard under section 15(a) of the CPSA.

Conversely, the Commission has determined that the requirements for operating cords on custom window coverings in section 4.3.2 of ANSI/WCMA-2018 are inadequate to address the risk of strangulation to children.  Accordingly, the Commission finalizes this rule to require that operating cords on custom window coverings comply with the same performance requirements established in section 4.3.1 of ANSI/WCMA-2018 for operating cords on stock window coverings, instead of the weaker requirements in section 4.3.2.  The final rule also contains two methods, integrated into a window covering as sold, to make operating cords inaccessible to children 8 years and younger: rigid cord shrouds and retractable cords, and one method to make accessible continuous loops non-hazardous: loop cord and bead chain restraining devices.

ANSI/WCMA-18 and the draft ANSI/WCMA-2022 allow these methods with somewhat different requirements from the final rule. Hundreds of commenters requested that we allow these options to remain for custom products. Staff assessed the methods and advised that they could be made safer to address the risk of injury. Accordingly, these methods are allowed in the final rule provided that the methods meet the durability requirements in the final rule.

**Table 8. Comparison of Custom Product Requirements in ANSI/WCMA-2018, NPR, and the Final Rule**

| Performance Requirements | Custom Products in ANSI/WCMA 2018 | Custom Products NPR | Custom Products Final Rule |
|---|---|---|---|
| (No operating cords (cordless) | Allowed | Allowed | Allowed |
| Short cord (8 inches or shorter) in any state | Allowed | Allowed | Allowed |
| Inaccessible operating cords | Allowed | Allowed | Allowed |
| Rigid cord shrouds (can be used with any operating system) | Allowed if Rigid Cord Shroud meets ANSI/WCMA-2018 test requirements | Allowed if Rigid Cord Shroud meets ANSI/WCMA-2018 test requirements plus proposed deflection and deformation tests | Allowed if Rigid Cord Shroud meets ANSI/WCMA-2018 test requirements plus deflection and deformation tests |
| Single retractable cord lift system | Allowed, no limit in cord length under tension | Asked for comments | Allowed provided that it meets complete retraction at 30 gram, non-cord retraction device, and stroke length limited to 12 inches below the headrail |
| Non-hazardous Cord Loops using Cord and Bead Chain Restraining Device | Allowed if device meets ANSI/WCMA-2018 tests | Asked for comments | Allowed if device meets ANSI/WCMA-2018 tests and test for UV followed by cyclic test and deflection test |
| Accessible Operating Cords longer than 8 inches | Allowed | Prohibited | Prohibited |
| Continuous Loops with Tension Devices | Allowed | Prohibited | Prohibited |
| Cord Loop Lift Systems | Allowed | Prohibited | Prohibited |

A.  *Description of Section 1260.1 – Scope and Definitions*

A277

Section 1260.1, scope and definitions, describes the scope of the final rule and provides relevant definitions for the final rule. Definitions for terms defined in ANSI/WCMA-2018 remain consistent with the voluntary standard. Section 1260.1(a) limits the scope of the proposed rule to operating cords on custom window coverings because the risks of injury associated with inner cords on custom window coverings, and with operating and inner cords on stock window coverings, are addressed in a separate rule under section 15(j) of the CPSA. Section 1260.1(a)~~(1) and (2) set forth the effective date of the rule, which is dependent on the size of the custom window covering. The rule~~ provides an effective date of ~~one year~~180 days after publication of the rule in the *Federal Register* ~~for most custom window coverings. However, for large custom window coverings that are 10 feet or larger in vertical length and that are raised and lowered, the rule provides an effective date of two~~ one years after publication in the *Federal Register*.

Section 1260.1(b) incorporates by reference several definitions in section 3 of ANSI/WCMA-2018. The final rule clarifies the definition of a "Rigid Cord Shroud" to include the inaccessibility requirement in Appendix C of ANSI/WCMA-2018, and includes two additional terms to accommodate specification of two additional methods to make custom window covering cords inaccessible to small children, "Retractable Cord," and "Loop Cord and Bead Chain Restraining Device." Below we set forth the terms and explain how these terms are defined in the ANSI standard.

- "Custom window covering," definition 5.01 of ANSI/WCMA-2018, is a window covering that is not a stock window covering.

- "Stock window covering" definition 5.02 of ANSI/WCMA-2018, is a product that is a completely or substantially fabricated product prior to being distributed in commerce and is a stock-keeping unit (SKU). For example, even when the seller,

105

A278

manufacturer, or distributor modifies a pre-assembled product by adjusting to size, attaching the top rail or bottom rail, or tying cords to secure the bottom rail, the product is still considered stock under the ANSI standard. Online sales of the product or the size of the order, such as multi-family housing, do not make the product a non-stock product. These examples are provided in ANSI/WCMA A100.1 – 2018 to clarify that as long as the product is "substantially fabricated" prior to distribution in commerce, subsequent changes to the product do not change its categorization.

- "Operating cord," definition 2.19 of ANSI/WCMA-2018, is a cord that the user manipulates to use the window covering, such as lifting, lowering, tilting, rotating, and traversing. An example operating cord is pictured in Figure 7 of this preamble.

- "Cord shroud," definition 2.09 of ANSI/WCMA-2018, is material that is added around a cord to prevent a child from accessing the cord and to prevent the cord from creating a loop. Defining a cord shroud in the rule is necessary because the rule includes a test for a "rigid cord shroud" in 1260.2(b), to meet the inaccessibility requirement in section 4.3.1.3 of ANSI/WCMA-2018.

- "Cord retraction device," definition 2.08 of ANSI/WCMA-2018, is a passive device which winds and gathers cords when tension is no longer applied by the user.

The definition of "rigid cord shroud" in 1260.1(c) is based on work by the voluntary standards task group in 2018. A "rigid cord shroud" is not currently defined in the standard but is a hard material that encases an operating cord to prevent a child from accessing an operating cord. For the final rule, the Commission is clarifying in the definition that "inflexible material"

106

A279

is material that makes the cord inaccessible as defined in Appendix C of ANSI/WCMA A100.1 – 2018.

The final rule includes two new definitions in section 1260.2(d) and (e), to define the two additional methods to make custom window covering cords inaccessible or non-hazardous to children 8 and under: retractable cords and loop cord and bead chain restraining device. These definitions are similar to the definitions in draft ANSI/WCMA-2022, with modifications. A "retractable cord" is defined as "a cord that extends when pulled by a user, and fully retracts when the user releases the cord, rendering the cord inaccessible as defined in Appendix C of ANSI/WCMA A100.1 – 2018." A "loop cord and bead chain restraining device" is defined as "[a] device, integrated to and installed on the window covering, that prevents the creation of hazardous loop from an accessible continuous operating cord."

The final rule also includes a new definition in section 1260.1(f) for "operating interface," because this term is used to describe requirements for retractable cord devices. An "operating interface" is defined as the part of the window covering that the user physically touches or grasp by hand or a tool to operate the window covering, for example a wand to tilt the slats of the product or the bottom rail to raise or lower the product. This definition is similar to the definition in draft ANSI/WCMA-2022, with modifications.

B.    *Explanation of 1260.2 – Requirements for Operating Cords on Custom Window Coverings*

Section 1260.2 sets forth the requirements for operating cords on custom window coverings. Section 1260.2(a) requires that each operating cord on a custom window covering comply with section 4.3.1 of ANSI/WCMA-2018 (operating cord not present (section 4.3.1.1)); operating cord is inaccessible (section 4.3.1.3); or operating cord is eight inches long or shorter in any position of the window covering (section 4.3.1.2), instead of the current requirements for

operating cords on custom products in section 4.3.2 of ANSI/WCMA-2018. Section 1260.2(a) includes a revision from the NPR, to allow compliance with section 4.3.2.5.2 of ANSI/WCMA-2018, which is the provision in the voluntary standard setting forth requirements for loop cord and bead chain restraining devices. This addition in the final rule responds to the comments requesting that the rule not eliminate the use of continuous loop cords for custom window coverings by allowing their continued use as long as the hazardous cords are encased in an integrated loop cord or bead chain restraining device that meets the requirements of the rule.

Section 1260.2(b) contains the requirements and test methods for rigid cord shrouds, when they are used to comply with section 1260.2(a). Sections 1260.2(b)(1) and (b)(2) contain the test methods to confirm whether a cord shroud is "rigid." The requirements for rigid cord shrouds are not currently in the ANSI/WCMA standard. CPSC staff developed these test methods based on work by an ANSI/WCMA task group in 2018, regarding confirmation that a cord shroud is rigid enough to ensure that the shroud cannot be wrapped around a child's neck or form a hazardous u-shape. The rigid cord shroud requirements include two tests, the "Center Load" test and the "Axial Torque" test. The Center Load test verifies the stiffness of the cord shroud, by measuring the amount of deflection in the shroud when both ends are mounted and a 5-pound force is applied at the mid-point. This test ensures the shroud is not flexible enough to wrap around a child's neck. The Axial Torque test verifies the cord shroud's opening does not enlarge to create an accessible cord opening when the shroud is twisted.

CPSC is not aware of incidents related to current products with rigid cord shrouds and concludes that shrouds that meet the modifications to the ANSI/WCMA standard will address the strangulation hazard posed by accessible cords. Section II.A of this preamble and Tabs G and H of Staff's NPR Briefing Package contain further explanation and the language related to rigid cord shrouds.

Section 1260.2(c) contains requirements for retractable cords, when they are used to comply with section 1260.2(a), to make an operating cord inaccessible. The requirements in this section were developed by CPSC staff to ensure that children cannot pull on retractable cords and gain sufficient length to wrap the cord around their neck. The requirements limit the stroke length for the cord to 12 inches from the headrail, and require the user interface to be a pole or wand, or other non-cord interface, to prevent the creation of a hazardous loop. The requirements also provide for UV and durability testing, as provided in ANSI/WCMA-2018.

Section 1260.2(d) provides requirements for loop cord and bead chain restraining devices, which are intended to prevent the formation of a hazardous loop. The final rule requires that these devices meet the requirements of section 6.5 of ANSI/WCMA-2018, in addition to UV and durability tests added by the final rule.

C.    *Explanation of 1260.3 – Prohibited Stockpiling*

The purpose of 1260.3 is to prohibit manufacturers and importers from stockpiling products that will be subject to a mandatory rule. The Commission's authority to issue an anti-stockpiling provision is in section 9(g)(2) of the CPSA. 15 U.S.C. 2058(g)(2). Section 1260.3(a) prohibits manufacturers and importers of custom window coverings from manufacturing or importing custom window coverings that do not comply with the requirements of the final rule in the~~any~~ 180-day~~12-month~~ period between the date of the final rule's publication in the *Federal Register* and the effective date of the rule ~~(which depends on the size and type of window covering)~~, at a rate that is greater than 120 percent of the rate at which they manufactured or imported custom window coverings during the base period for the manufacturer.

The base period is described in section 1260.3(b) as any period of 180~~365~~ consecutive days, chosen by the manufacturer or importer, in the 5-year period immediately preceding

promulgation of the final rule. "Promulgation" means the date the final rule is published in the *Federal Register*.

D.     *Explanation of 1260.4 – Findings*

The findings required by section 9 of the CPSA are discussed in the regulatory text.

E.     *Explanation of 1260.5 – Standards Incorporated by Reference*

Section 1260.5 contains the information required by the Office of the Federal Register (OFR) to incorporate by reference the requirements in section 4.3.1, and the relevant definitions in section 3, of ANSI/WCMA-2018. As set forth in section XII of this preamble, the Commission has met the OFR's procedural requirements to incorporate by reference the relevant parts of ANSI/WCMA-2018.

F.     *Explanation of 1260.6 – Severability*

Section 1260.6 contains a severability clause. This final rule includes multiple sections and requirements that aim to address the risk associated with strangulation of children 8 years old or younger on custom window coverings with hazardous operating cords, including the scope of the rule to include all custom window coverings, regardless of size, definitions included in the rule, performance requirements for custom window coverings, and performance requirements for methods to make cords inaccessible or non-hazardous. Because the rule includes these multiple requirements, the rule also includes a provision stating the Commission's intent that if certain requirements in the rule are stayed or determined to be invalid by a court, the remaining requirements in the rule should continue in effect. ~~For example, if a court determines that the requirements for window coverings greater than 10 foot in vertical length are invalid, the remaining requirements in the rule regarding requirements for all other custom window coverings still serve the purpose of addressing the strangulation hazard, and it is the Commission's intent that these remain in effect.~~

**V.    Final Regulatory Analysis**

Section 9(f)(2) of the CPSA, 15 U.S.C. 2058(f)(2), requires a consumer product safety rule published in the *Federal Register* to include a final regulatory analysis that contains:

(A) A description of the potential benefits and potential costs of the rule, including costs and benefits that cannot be quantified in monetary terms, and the identification of those likely to receive the benefits and bear the costs.

(B) A description of any alternatives to the final rule which were considered by the Commission, together with a summary description of their potential benefits and costs and a brief explanation of the reasons why these alternatives were not chosen.

(C) A summary of any significant issues raised by the comments submitted during the public comment period in response to the preliminary regulatory analysis, and a summary of the assessment by the Commission of such issues.

The information and analysis in this section is based on Tab F of Staff's Final Rule Briefing Package.

*A.    Potential Benefits and Costs of the Rule*

Based on estimates from the NEISS and CPSC's Injury Cost Model, CPSC staff estimates that 7.6 nonfatal, medically treated injuries and 6.8 fatalities occur annually among all corded window coverings associated with cord types that are within scope of this rule (Chowdhury 2022). Staff estimates the societal costs of these injuries to be about $72 million annually. Overall, staff found that fatalities account for an overwhelming majority of societal costs at $71.4 million annually, and that nonfatal injuries account for about $498,000 in societal costs annually.

Staff estimates the societal cost of deaths and injuries attributable to custom window covering products, that would not otherwise be addressed by the 15(j) rule's provisions for inner

cords on both stock and custom window coverings, to be $31.6 million annually (about 44 percent of the total), based on a CPSC staff review of incidents and values, using the ICM and a Value of Statistical Life (VSL) of $10.5 million.  Staff calculated the present value of the societal cost[36] of deaths and injuries for each blind type, based on each type's expected product life. Staff combined these societal unit costs with corded custom window covering sales in 2020, to generate a gross annual societal cost of $24.35 million.  Finally, staff adjusts this estimate for the expected effectiveness of the final rule to estimate a total annual benefit of $23 million.

The final rule would impose costs on manufacturers of custom window covering products.  Manufacturers would likely pass much of incremental per-unit manufacturing cost to consumers in the form of higher prices.  Based on component cost estimates, assembly/ manufacturing costs, consumer surplus loss, and proportions of domestic manufacturing, the incremental cost per corded custom window covering produced would range from nothing to ~~to~~ approximately $35 and is highly dependent on product type.  The final rule would not result in any cost increases for already cordless custom window coverings.  Accordingly, staff combined the value of the number *corded* custom window coverings that were shipped in 2020, estimated to be $15.85 million, with the per-unit cost increase to generate an aggregate cost estimate ranging between $54.4 million and $114 million.  An additional cost estimate for the research, development, implementation, time, and retooling required for some corded product amounts to approximately $14.7 million.  Including this value results in a total aggregate cost estimate range of $54.4 million to $129 million annually.

To provide an accessible framework to perceive how the additional cost of the final rule impacts consumers, staff converted costs and benefits of the draft proposed rule into a calculated

---

[36] Calculating the annual societal costs per window covering unit, staff divided that total societal cost by an estimate of 145 million corded custom window coverings in use for the year of 2020, which resulted in a per-unit societal cost of $0.22 per corded custom window covering in use.

net cost per household, based on the data point that the average detached, single-family household has 12 window coverings. Table 9 contains the estimated household net costs from replacing all window coverings in the home with products compliant with the final rule.

**Table 9: Household Net Costs from Final Rule**

| WC Types | Mean Unit Price | Household Cost to update WC (pre-rule) | Low-End Cost per Unit | Benefit per Unit | Net per Unit | Household Net Cost |
|---|---|---|---|---|---|---|
| | [1] | [2] = [1] × 12 households | [3] | [4] | [5] = [4] - [3] | [6] = [5] × 12 households |
| Vinyl/Metal | $37.36 | $448.32 | $3.03 | $1.06 | ($1.97) | ($23.67) |
| Wood/Faux Wood | $69.79 | $837.48 | $6.38 | $1.61 | ($4.77) | ($57.24) |
| Cellular Shade | $94.51 | $1,134.12 | $5.73 | $2.04 | ($3.69) | ($44.25) |
| Pleated Shade | $54.53 | $654.36 | $2.20 | $2.12 | ($0.08) | ($0.94) |
| Roman Shade | $69.36 | $832.32 | $5.63 | $2.43 | ($3.20) | ($38.38) |
| Roller Shade | $64.04 | $768.48 | $5.19 | $2.04 | ($3.15) | ($37.83) |
| Soft Sheer | $250.00 | $3,000.00 | $20.28 | $2.04 | ($18.24) | ($218.82) |

Table 9 shows the net price increase to replace 12 window coverings based on the type of custom window covering. For example, horizontal blinds composed of metal or vinyl have a low-end, per-unit cost estimate of $3.03 and a per-unit benefit estimate of $1.06 (assuming the base VSL). This translates into a net cost of the final rule of $1.97 (assuming the base VSL) for metal/vinyl horizontal blinds. Using the assumption of 12 window coverings per household, this equates to a net cost of the rule (above the benefits provided) of $23.67 per household every time a household updates their custom window coverings, about once every 10 years. For metal or vinyl horizontal blinds, $23.67 is slightly more than 5 percent of the total cost of $448.32 that a household would spend to update their window coverings.

The cost impact from the final rule may be less than estimated, however, due to the enforcement of Canada's regulations beginning in May 2022.[37] Companies that sell in both Canada and the United States have already redesigned their custom offerings to be compliant

---

[37] https://laws-lois.justice.gc.ca/eng/regulations/SOR-2019-97/FullText.html.

with the Canadian regulations, which are substantively similar to those being finalized here. Those companies may already have stock of compliant product designed and available to sell to the U.S. market through small dealers and interior designers.

Based on staff's estimated benefits and costs, which does not account for efficiencies resulting from prior safety innovation in stock window coverings or custom window coverings for Canada, net benefits (*i.e.*, benefits minus costs) for the market of custom window coverings (*i.e.*, excluding stock window covering products, and the benefits of the separate rule for inner cords on custom window coverings) amounts to approximately -$31.3 million to about -$106 million annually.

Staff also conducted a sensitivity analysis for a few variables, including the value of statistical life (VSL). In the NPR, the Commission invited comment on a potentially higher VSL for children, up to three times the base level ($3 \times \$10.5$ million for a total of $31.5 million). 87 FR at 1044-45. CPSC received comments in support of a child-focused VSL, with alternative methods suggested. Staff considered a higher VSL for children in the sensitivity analysis. With a VSL value of $31.5 million, benefits exceed costs by approximately $14.3 million annually. Staff also highlights the unquantified benefits of the final rule, including the emotional distress level of caregivers that will be reduced by the final rule. This benefit is not directly accounted for in the primary VSL estimate of $10.5 million. The value of the shock or perceived guilt related to a caregiver's inattentiveness could be significant, as it could result in large reductions to physical wellbeing or income loss.

To issue this final rule, the Commission must find that the costs of the rule bear a reasonable relationship to the benefits of the rule. A reasonable relationship between costs and benefits requires Commission to exercise judgement, and to balance whether the risks involved warrant the cost to address the risks. The Commission has conducted this balancing, and finds that the predicted benefits expected

114

from the rule bear a reasonable relationship to the anticipated costs of the rule because, among other reasons, the severity of the injury is usually death to a child, the cost per household is reasonable particularly in light of the long life of the products, and similar operating cord requirements have been successfully implemented, without substantial market disruption, for stock window coverings in the U.S. as well as for stock and custom window coverings in Canada. *See* section 1260.4(i) of the regulatory text.

B.   *Regulatory Alternatives to the Final Rule*

1.   <u>No Action Alternative</u>

Under this alternative the status quo would be maintained. No costs are associated with this alternative. However, this alternative does not adequately address the fatal and nonfatal injuries involving corded custom window coverings.

2.   <u>Rely Upon or Improve Voluntary Standard for Window Coverings</u>

Another alternative is to adopt the recently balloted draft voluntary standard (ANSI/WCMA-2022) as a mandatory standard in this final rule, without waiting for the standard to become effective. In July 2022, WCMA issued a ballot to revise the 2018 voluntary standard. The proposed revisions would prohibit standard operating systems (operating pull cords) and the use of continuous loop systems in custom horizontal blinds only. CPSC staff voted against the ballot on August 15, 2022, stating that hazardous cords remain an option for operating cords on all other custom products other than horizontal blinds, [38] leaving a maximum of 87 incidents (fatal and non-fatal) unaddressed covering the time period from 2009 through 2021.[39] Staff also assessed the balloted draft standard's requirements for retractable cords inadequate because they allow for a 36-inch retractable cord (2 feet longer than the final rule) and because the UV test method allows for testing only a section of a rigid cord shroud (instead of the complete sample).

---

[38] CPSC staff letter is available at https://www.regulations.gov/document/CPSC-2013-0028-3667.
[39] Includes custom/unknown product categories, and continuous loops/unknown cord types.

Based on the assessment in Tab I of Staff's Final Rule Briefing Package, the Commission finds that the draft balloted standard is inadequate to address the risk of strangulation to children.

Adopting the balloted draft standard would narrow the benefits as well as the costs. The estimated costs would range from approximately $32 million to $72.5 million, but benefits using the base VSL would be just $9.6 million, leaving an unaddressed potential benefit of $13.4 million representing continued serious injuries and deaths. This unaddressed potential benefit is 58.3 percent of the total $23 million potential benefits (in value of lives saved and injuries prevented) estimated under the final rule. Hazardous cords would remain an option on custom shades, custom vertical blinds, and curtains/drapes, meaning an estimated 7.4 million units of custom products sold annually going forward.

A related alternative might be for Commission staff to continue participating in, and encouraging safety improvements to, the voluntary standard for window coverings. This option would be similar to the "no action alternative," with the key difference being that the Commission could direct staff to pursue safety improvements in the voluntary standard, including applying relevant conditions on stock products to custom, in the same manner that staff has been pursuing unsuccessfully for many years, as a conditional alternative to a mandatory standard developed by the Commission. The Commission could reconsider a mandatory standard if efforts to improve the voluntary standard on custom products remain unsatisfactory.

This option is unlikely to address the unreasonable risk of injury associated with operating cords on custom window coverings. The protracted and incompletely successful history of the voluntary standard process on this issue demonstrates that continuing to wait for ANSI/WCMA to address the injuries in the voluntary standard will result in additional deaths and injuries to children, with little hope of progress if the Commission does not pursue

116

A289

rulemaking. Based on 26 years of experience with the voluntary standards process for this hazard, the Commission will not choose this option.

As a third alternative, the Commission could wait and see whether ANSI and/or WCMA approve a revised standard, and then either rely upon it as a voluntary standard, or proceed to a final rule with similar provisions as in this final rule. This alternative would either produce a similar cost-benefit ratio as for the final rule adopted here (with lower costs but also lower benefits), or delay the implementation of a rule, like the one here, that more fully addresses the strangulation hazard. This alternative would risk the lives of more children to strangulation on hazardous custom products, and the Commission does not adopt it.

Furthermore, this approach might not allow the full range of consumer protections afforded by this final rule. For example, if the Commission chose to address custom horizontal blinds by relying on a voluntary standard under section 15(j) of the CPSA, then additional methods to make cords inaccessible on horizontal blinds, such as rigid cord shrouds and loop cord and bead chain restraining devices, could not be subject to any requirement that is not "readily observable," and so might not be subject to durability requirements like those in the final rule.

Based on the forgoing, the Commission concludes that the voluntary standards process is unlikely to lead to an adequate, or more beneficial and less costly, outcome for all custom window covering product types in the short or long run.

3.   <u>Later Effective Date</u>

The NPR proposed an effective date that is 180 days after the final rule is published in the *Federal Register*. Under section 9(g)(1) of the CPSA, the Commission must find good cause that is in the public interest to extend the effective date of the final rule beyond 180 days. Many commenters stated that CPSC should set a longer effective date for the final rule, as detailed in

117

section III.G.6 of this preamble.  The Commission reviewed and considered the commenters' concerns and staff's assessment of them, but finds that good cause in the public interest does not exist to extend the effective date beyond the default statutory maximum of 180 days from publication in the *Federal Register*.  's engineering analysis provides an example of how a manufacturer could develop a method, a rigid cord shroud, to make an existing continuous loop system comply with the final rule.  Table 1 in staff's engineering analysis presents an estimate of the engineering steps involved in designing and prototyping a rigid cord shroud, the time involved for each step, and cost to develop a rigid cord shroud.  Engineering staff estimates that it would cost of $787,000 over a 2-2.5 -year period to develop a production ready rigid cord shroud, with higher costs for faster development.  Tabs C, Appendix, of Staff's Final Rule Briefing Package.  Staff has assessed that redesigning window coverings for unusually-sized windows to be compliant with the final rule would involve additional effort and time, above typical sized-window modifications.

Table 1a in the Appendix of Tab C of Staff's Final Rule Briefing Package presents commenters' timelines and criteria for creating compliant custom window coverings, such as tooling, transit, and inventory.  Commenters provided timelines of 9 to 20 months in obtaining and transporting equipment/materials from overseas suppliers.  Commenters specifically stated long lead times of 4 to 12 months to acquire the necessary equipment and materials, and that an additional 1 to 4 months is required upon delivery to assemble component inventory.  Another commenter stated an additional delay related to continued COVID-19 disruptions.

Staff found these concerns to be credible because of the specific examples provided by commenters and because these comments comport to what staff has determined about the industry's supply chain.  Additionally, staff assesses that supply disruption could result in temporary, but significant, shift in consumer behavior.  Supply chain disruptions and delayed

118

deliveries could result in a shift in demand from custom products to stock products. Stock products have a lower profit margin than custom products and thus may have a significant cost impact to manufacturers and retailers even if the shift is temporary. Further, most custom window coverings sellers are small businesses, and therefore a temporary shift to stock products could have a significant impact to small businesses. A later effective date would allow manufacturers more time to redesign, distribute costs of compliance along the entire year, or discontinue product variants that cannot meet compliance.

Based on the currently available products on the market, and in consideration of comments received, staff economists recommend extending the effective date to 2 years for window coverings that are raised and lowered and are at least 10 feet tall in vertical length, because these products are heavier and may require additional research to reliably lift with cordless designs or make the cords inaccessible or accessible loops non-hazardous. *Id.*

The Commission finds good cause to delay the effective date, and will establish a 2-year effective date for custom window coverings over 10 feet in vertical length and that are raised and lowered, and a one-year effective date for all other custom window coverings to come into compliance with the final rule. These later effective dates will mitigate some of the costs related to redesign/research and development for manufacturers, but it is unlikely that costs, or the outcome of development efforts, would be affected significantly.

4. Narrow Final Rule to Vertical Blinds, Curtains, and Drapes

The Commission could narrow the final rule to vertical blinds, curtains, and drapes on the grounds that cords are not important to the operation of these products. These products typically offer cordless options at no additional cost for most applications because a plastic rod can be used for operation. Narrowing the final rule to these three product types would lessen the cost impact and make it unlikely that any window covering product would need to be phased out or

119

A292

changed substantially as a result of the rule. Although some consumers may require motorization for these products if operating cords are not available, which would dramatically increase the cost, this is unlikely to be a scenario that applies to many consumers. Some consumers may also prefer decorative cords that exceed the length described in the final rule, which would result in lower utility for these particular consumers should those decorative cords be removed.

Under this alternative, the benefits and costs would be limited to vertical blinds, curtains, and drapes, which accounted for approximately 30 percent of 2020 window covering product shipments. However, the number of injuries and deaths associated with these products represents a small fraction of the total for operating cords on custom window coverings. This would equate to annual net benefits of approximately $7.8 million under the baseline VSL. The estimated net benefits of this option would be greater than the final rule due to the large costs to conform for the other product types, however a large fraction of the deaths and injuries would not be addressed.

5. <u>Continue and Improve Information and Education Campaign</u>

The Commission could seek to improve its current information and education campaign concerning the strangulation hazard associated with corded window covering products. This alternative could be implemented without regard for regulatory action such as this final rule. Based on the continuing number of fatalities associated with window covering cords, however, the effective injury reduction of campaigns, such as those the Commission has sponsored for years, is most likely very small. The Commission will not rely on this option because information and education campaigns appear to be no more than slightly effective at reducing or preventing injuries associated with window coverings.

6.     Adopt Canadian Window Covering Mandatory Standard

Under this alternative the Commission could adopt the Canadian Corded Window Coverings Regulations (SOR/2019-97), as it is generally similar to the final rule. Staff estimates that this option would add more costs without adding more benefits than the final rule, although staff notes that it would provide some unquantifiable benefits related to harmonization of product standards for firms operating in both countries. The additional costs under this scenario are associated with requirements in the Canadian regulation that are more burdensome than the final rule, such as the pull force and inner cord requirements for products.[40] Under this alternative, net benefits are less than the final rule as the additional costs are expected to be greater than the unquantifiable benefit of standard harmonization.

C.     *Summary of Significant Economic Issues Raised by the Comments*

Commenters raised issues regarding CPSC's cost-benefit method, the cost of safer window coverings to consumers, safer window coverings in commercial buildings, competition from foreign manufacturers, the impact of the rule on businesses (including small versus large businesses), the anti-stockpiling provision, unquantified benefits in the NPR, and CPSC's VSL for children. Section III.D of this preamble summarizes and responds to the economic issues raised by the commenters.

**VI     Final Regulatory Flexibility Act Analysis**

Whenever an agency publishes a final rule, the Regulatory Flexibility Act (5 USC 601 – 612) requires that the agency prepare a final regulatory flexibility analysis that describes the

---

[40] See Tabs G and I of the NPR Staff Briefing Package available at Available at: *https://www.cpsc.gov/s3fs-public/NPRs-Add-Window-Covering-Cords-to-Substantial-Product-Hazard-List-Establish-Safety-Standard-for-Operating-Cords-on-Custom-Window-Coverings-updated-10-29-2021.pdf?VersionId=HIM05bK3WDLRZrlNGogQLknhFvhtx3PD*

impact the rule would have on small businesses and other entities. In this section we summarize information and analysis in Tab G of Staff's Final Rule Briefing Package. A FRFA must contain

(1) a statement of the need for, and objectives of, the rule;

(2) a statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments;

(3) the response of the agency to any comments filed by the Chief Counsel for Advocacy of the SBA in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule as a result of the comments;

(4) a description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available;

(5) a description of the projected reporting, recordkeeping and other compliance requirements of the rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record; and

(6) a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

*A.     Reason for Agency Action*

The final rule is intended to address an unreasonable risk of strangulation to children 8 years and younger involving corded custom window covering products.  An average of 6.8 fatal injuries (excluding inner cords and lifting loops) involving all corded window covering products that have operating cords annually to children less than 8 years old (Tab A, Chowdhury, 2022). The societal costs of these fatal and nonfatal injuries amounts to approximately $72 million.  The final rule would only address the proportion of these injuries attributable to operating cords on custom products which, based on a CPSC review of 209 reported incidents, would be approximately $31.6 million annually. (Tab F, Bailey, 2022).

*B.     Objectives of and Legal Basis for the Rule*

The objective of the rule is to reduce or eliminate an unreasonable risk of serious injury or death to children 8 years old or younger by strangulation on corded custom window coverings, by promulgating a consumer product safety standard pursuant to the CPSA.

*C.     Comments of the Chief Counsel for Advocacy, SBA*

Advocacy submitted several points on the proposed rule.  Consistent with one of the comments by Advocacy, the Commission is reducing the burden of the final rule by allowing, in addition to rigid cord shrouds as a method to make cords inaccessible, a retractable cord or a loop cord or bead restraining device, as long as such devices meet the requirements in the final rule.  The Commission will also provide a longer effective date, one year for most custom products and two years for products 10 feet or greater in vertical length and that are raised and

**Formatted:** Keep with next

~~lowered, to reduce burdens on small businesses.~~ Advocacy's comments are summarized and responded to in section III.I of this preamble.

### D.    Significant Economic Issues Raised by the Public

Section III.D of this preamble summarizes and responds to the significant economic issues raised by the commenters.

### E.    Small Entities to Which the Rule Will Apply

The North American Industry Classification System (NAICS) defines product codes for U.S. firms.  Firms that manufacture window coverings may list their business under the NAICS product code for blinds and shades manufacturers (337920 Blind and Shade Manufacturing) or retailers (442291 Window Treatment Stores).[41]  Window coverings can be sold in a variety of retail channels and could be listed under a large number of NAICS codes.  These could include but are not limited to 442299 (All Other Home Furnishings Stores), 452210 (Department Stores), 452311 (Warehouse Clubs and Supercenters), 454110 (Electronic Shopping and Mail-Order Houses), and 454390 (Other Direct Selling Establishments).

Under SBA guidelines, a manufacturer of window coverings is categorized as small if the firm has less than 1,000 employees.  (NAICS code 337920)  Importers would be considered small if the firm has less than 100 employees.  CPSC staff estimates that there are approximately 83 importers that meet the SBA guidelines for a small business.  (Bailey 2021)  Most retailers of window coverings would be considered small if they have sales revenue less than $8.0 million. (NAICS codes 442291, 454390)  Department stores, warehouse clubs, and electronic shopping and mail order houses must have revenues less than $35 million, $32 million, and $41.5 million, respectively, to be considered small.  Based on 2017 Census Bureau Statistics of US Businesses

---

[41] The two product codes 337920 and 442291 encompass most products in the window coverings market.  However, some drapery and curtain manufacturers may be listed under 322230, stationary product manufacturing.

(SUSB) data, there were 1,898 blinds and shades manufacturers, (NAICS 337920), and retailers (NAICS 442291).[42]  Of these, 1,840 firms (302 manufacturers and 1,538 retailers) are small entities by SBA guidelines.

Nearly all of the 302 small manufacturers identified are far below the 1,000 employee SBA threshold; 238 of the manufacturers have fewer than 20 employees and 151 have fewer than 5 employees.  CPSC staff estimates that the annual revenue for the firms with fewer than 20 employees to be under $250,000.[43]  Most of the firms with fewer than 5 employees manufacture custom window coverings on a per order basis.  The annual revenue for these manufacturers is most likely below $100,000, based on SUSB payroll data from the U.S. Census Bureau.

F.    *Compliance Requirements of the Final Rule, Including Reporting and Recordkeeping Requirements*

To eliminate the strangulation hazard on cords, the final rule establishes a performance standard that requires custom window coverings to meet the same requirements in section 4.3.1 of the voluntary standard ANSI/WCMA-2018 that apply to stock window coverings.  To comply with the performance requirements, all accessible operating cords will need to be removed, made inaccessible, or shortened to less than 8 inches.  The final rule provides two methods to make cords inaccessible (rigid cord shrouds and retractable cord devices) and one method that would remove the hazard from an accessible cord (cord or bead restraining device). Products that use one of these methods to meet the requirements must also conduct additional testing on durability, as set forth in the rule.

---

[42] This estimate focuses strictly on firms where window coverings are a majority of the operation. The other NAICS codes provided (322230, 454390, 442299, 452210, 452311, 454110) may include firms participating in the window coverings market but most likely account for a very small share of the firm's operation. In addition, it is possible some retailers of window coverings are listed under NAICS code 541410 Interior Design Services.

[43] Based on Census Bureau SUSB data, a review of firm financial reports, and Dun & Bradstreet reports.

Under section 14 of the CPSA, as codified in 16 CFR part 1110, manufacturers and importers of general use custom window coverings must certify, based on a test of each product or upon a reasonable testing program, that their window coverings comply with the requirements of the final rule. Manufacturers and importers of custom window coverings that are also children's products, as defined in 16 CFR part 1200, must use a CPSC-accepted third party conformity assessment body to test products for compliance, and issue a certificate of compliance based on such third-party testing. Testing and certification requirements are detailed in section X of this preamble.

G. *Costs of the Final Rule That Would Be Incurred bBy Small Manufacturers*

Custom window covering manufacturers would most likely adopt cordless lift operation systems to comply with the final rule. As discussed in Tab F of Staff's Final Rule Briefing Package, the cost to modify window covering lift systems to comply with the proposed rule ranges from $2.99 to $9.77 per horizontal blind, $2.18 to $35 per shade, and no expected cost increase for vertical blinds and curtains/drapes. CPSC staff estimates of redesign costs—where solutions are not already developed based on the stock window covering market, the Canadian market, or otherwise—equate to approximately $772,500, assuming a 2-year period for purposes of that analysis. Only manufacturers with at least 75 employees are anticipated to perform this investment as this is a significant investment for smaller manufacturers with fewer employees and lower annual revenues. Likely these manufacturers will either purchase the necessary completed hardware or license a patented solution from a larger firm.

However, as noted, the actual impact may be less, due in part to the enforcement of Canada's regulations beginning in May 2022. Companies that sell in both Canada and the U.S. have already redesigned their custom offerings to be compliant with the Canadian regulations,

which are substantially similar to the final rule, so already have stock of compliant product designed and ready to sell through small dealers and interior designers.

Manufacturers would likely incur some additional costs to certify that their window coverings meet the requirements of the final rule as required by section 14 of the CPSA. The certification must be based on a test of each product or a reasonable testing program. WCMA has already developed a certification program for window covering products titled "Best for Kids," which includes third party testing of products for accessible cords. CPSC staff assesses this certification would meet the requirements as outlined in section 14 of the CPSA. Based on price quotes from testing laboratory services for consumer products, the cost of the certification testing will range from $290 to $540 per window covering model. Note that the requirement to certify compliance with all product safety rules, based on a reasonable testing program, is a requirement of the CPSA and not of the final rule.

Depending on the type of window covering, a reasonable testing program for general-use window coverings could entail a simple visual inspection of products by the manufacturer. Therefore, the cost of a reasonable testing program for compliance of general use window coverings with the final rule is likely much lower than the cost of conducting a third-party certification test of each product, as required for children's products.

*H.*     *Impact on Small Manufacturers*

To comply with the final rule, small manufacturers are expected to incur redesign and incremental component costs for some product lines which currently are not available in inaccessible cord variants. CPSC does not expect small manufacturers to suffer a disproportionate cost effect from the final rule as the cost calculations and research were completed on a per unit basis, and CPSC expects little if any direct redesign costs for small manufacturers. CPSC staff estimates that small manufacturers of window coverings are likely to

incur, at a minimum, a 2 percent impact to their custom window covering revenue from the final rule. This implies that if custom products account for all of a firm's revenue, then the minimum impact of the final rule is 2 percent of revenue.

Generally, staff considers an impact to be potentially significant if it exceeds 1 percent of a firm's revenue. As the smallest estimate of incremental compliance cost from Panchal (2016) is 2 percent of retail price, the final rule could have a significant impact on manufacturers of custom window coverings. This effect is dependent on the share of annual revenues attributable to custom products. For example, if a small firm only manufactures custom cellular shades, then staff expects a lowest possible compliance cost of 2 percent of retail price. For small importers, the cost effect as a percent of revenue is dependent on the firm's custom window covering imports as a percent of total revenue. Any small importer with at least 50 percent of their revenues related to custom window covering products affected by the final rule could be significantly impacted. This is due to the lowest expected compliance cost equating to 2 percent of retail price, which at a 50 percent custom product share would equate to a 1 percent minimum impact on annual revenues. CPSC expects the final rule to have a significant effect on a substantial number of small firms.

I.      *Federal Rules which may Duplicate, Overlap, or Conflict with the Proposed Rule*

CPSC staff has not identified any other Federal rules that duplicate, overlap, or conflict with the final rule.

J.      *Alternatives for Reducing the Adverse Impact on Small Entities*

A FRFA should contain "a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the

rule considered by the agency which affect the impact on small entities was rejected." 5 U.S.C. 604. The Commission considered several alternatives to the final rule that could reduce the impact on small entities. Alternatives considered are discussed in section V.B of this preamble.

**VII.    Environmental Considerations**

Generally, the Commission's regulations are considered to have little or no potential for affecting the human environment, and environmental assessments and impact statements are not usually required. *See* 16 CFR 1021.5(a). The final rule to establish a safety standard for operating cords on custom window coverings is not expected to have an adverse impact on the environment and is considered to fall within the "categorical exclusion" for the purposes of the National Environmental Policy Act. 16 CFR 1021.5(c).

**VIII.    Paperwork Reduction Act**

This final rule contains information collection requirements that are subject to public comment and review by the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (PRA; 44 U.S.C. 3501–3521). Under the PRA, an agency must publish the following information:

- a title for the collection of information;

- a summary of the collection of information;

- a brief description of the need for the information and the proposed use of the information;

- a description of the likely respondents and proposed frequency of response to the collection of information;

- an estimate of the burden that will result from the collection of information; and

- notice that comments may be submitted to OMB.

129

A302

44 U.S.C. 3507(a)(1)(D).  In accordance with this requirement, the Commission provides the following information:

*Title*: Amendment to Third Party Testing of Children's Products, approved previously under OMB Control No. 3041-0159.

*Summary, Need, and Use of Information*: The final consumer product safety standard prescribes the safety requirements for operating cords on custom window coverings, and requires that these cords meet the same requirements for operating cords on stock window coverings, as set forth in the voluntary standard, section 4.3.1 of ANSI/WCMA-2018.  These requirements are intended to reduce or eliminate an unreasonable risk of death or injury to children 8 years old and younger from strangulation.

Some custom window coverings are considered children's products.  A "children's product" is a consumer product that is "designed or intended primarily for children 12 years of age or younger." 15 U.S.C. 2052(a)(2).  The Commission's regulation at 16 CFR part 1200 further interprets the term.  Section 14 of the CPSA requires that children's products be tested by a third party conformity assessment body, and that the manufacturer of the product, including an importer, must issue a children's product certificate (CPC).  Based on such third party testing, a manufacturer or importer must attest to compliance with the applicable consumer product safety rule by issuing the CPC.  The requirement to test and certify children's products fall within the definition of "collection of information," as defined in 44 U.S.C. 3502(3).

The requirements for the CPCs are stated in section 14 of the CPSA, and in the Commission's regulation at 16 CFR parts 1107 and 1110.  Among other requirements, each certificate must identify the manufacturer or private labeler issuing the certificate and any third-party conformity assessment body on whose testing the certificate depends, the date and place of manufacture, the date and place where the product was tested, each party's name, full mailing

130

address, telephone number, and contact information for the individual responsible for maintaining records of test results. The certificates must be in English. The certificates must be furnished to each distributor or retailer of the product and to the CPSC, if requested.

The Commission already has an OMB control number, 3041-0159, for children's product testing and certification. The final rule amends this collection of information to add window coverings that are children's products.

*Respondents and Frequency*: Respondents include manufacturers and importers of custom window coverings that are children's products. Manufacturers and importers must comply with the information collection requirements when custom window coverings that are children's products are manufactured or imported.

*Estimated Burden*: CPSC has estimated the respondent burden in hours, and the estimated labor costs to the respondent.

*Estimate of Respondent Burden:* The hourly reporting burden imposed on firms that manufacture or import children's product custom window coverings includes the time and cost to maintain records related to third party testing, and to issue a CPC.

**Table 9: Estimated Annual Reporting Burden.**

| Burden Type | Total Annual Reponses | Length of Response | Annual Burden (hours) |
|---|---|---|---|
| Third-party recordkeeping, certification | 24,850 | 1.0 hours | 24,850 |

Three types of third-party testing of children's products are required: certification testing, material change testing, and periodic testing. Requirements state that manufacturers conduct sufficient testing to ensure that they have a high degree of assurance that their children's products comply with all applicable children's product safety rules before such products are introduced into commerce. If a manufacturer conducts periodic testing, they are required to keep records that describe how the samples of periodic testing are selected.

131

A304

CPSC estimates that 0.1 percent of all custom window coverings sold annually, 24,850 window coverings, are children's products and would be subject to third-party testing, for which 1.0 hours of recordkeeping and record maintenance will be required. Thus, the total hourly burden of the recordkeeping associated with certification is 24,850 hours (1.0 × 24,850).

*Labor Cost of Respondent Burden.* According to the U.S. Bureau of Labor Statistics (BLS), Employer Costs for Employee Compensation, the total compensation cost per hour worked for all private industry workers was $40.90 (March 2022, https://www.bls.gov/ncs/ect/). Based on this analysis, CPSC staff estimates that labor cost of respondent burden would impose a cost to industry of approximately $1,016,365 annually (24,850 hours × $40.90 per hour).

*Cost to the Federal Government.* The estimated annual cost of the information collection requirements to the federal government is approximately $4,254, which includes 60 staff hours to examine and evaluate the information as needed for Compliance activities. This is based on a GS-12, step 5 level salaried employee. The average hourly wage rate for a mid-level salaried GS-12 employee in the Washington, DC metropolitan area (effective as of January 2022) is $48.78 (GS-12, step 5). This represents 68.8 percent of total compensation (U.S. Bureau of Labor Statistics, "Employer Costs for Employee Compensation," March 2022, percentage of wages and salaries for all civilian management, professional, and related employees: https://www.bls.gov/ncs/ect/. Adding an additional 31.2 percent for benefits brings average annual compensation for a mid-level salaried GS-12 employee to $70.90 per hour. Assuming that approximately 60 hours will be required annually, this results in an annual cost of $4,254 ($70.90 per hour × 60 hours = $ 4,254.07).

CPSC did not receive any comments on the burden estimate provided in the NPR (87 FR at 1048-49). CPSC has submitted the information collection requirements of this final rule to OMB for review in accordance with PRA requirements. 44 U.S.C. 3507(d).

## IX.    Preemption

Executive Order (EO) 12988, *Civil Justice Reform* (Feb. 5, 1996), directs agencies to specify the preemptive effect of a rule in the regulation.  61 FR 4729 (Feb. 7, 1996).  The final regulation for operating cords on custom window coverings is issued under authority of the CPSA.  15 U.S.C. 2051-2089.  Section 26 of the CPSA provides that "whenever a consumer product safety standard under this Act is in effect and applies to a risk of injury associated with a consumer product, no State or political subdivision of a State shall have any authority either to establish or to continue in effect any provision of a safety standard or regulation which prescribes any requirements as to the performance, composition, contents, design, finish, construction, packaging or labeling of such product which are designed to deal with the same risk of injury associated with such consumer product, unless such requirements are identical to the requirements of the Federal Standard." 15 U.S.C. 2075(a).

The federal government, or a state or local government, may establish or continue in effect a non-identical requirement for its own use that is designed to protect against the same risk of injury as the CPSC standard if the federal, state, or local requirement provides a higher degree of protection than the CPSA requirement.  *Id.* 2075(b).  In addition, states or political subdivisions of a state may apply for an exemption from preemption regarding a consumer product safety standard, and the Commission may issue a rule granting the exemption if it finds that the state or local standard: (1) provides a significantly higher degree of protection from the risk of injury or illness than the CPSA standard, and (2) does not unduly burden interstate commerce. *Id.* 2075(c).

Thus, absent exemption, the final rule for operating cords on custom window coverings preempts non-identical state or local requirements for operating cords on custom window

A306

coverings designed to protect against the same risk of injury and prescribing requirements regarding the performance of operating cords on custom window coverings.

**X.    Testing, Certification, and Notice of Requirements**

Section 14(a) of the CPSA includes requirements for certifying that children's products and non-children's products comply with applicable mandatory standards.  15 U.S.C. 2063(a).  Section 14(a)(1) addresses required certifications for non-children's products, and sections 14(a)(2) and (a)(3) address certification requirements specific to children's products.

A "children's product" is a consumer product that is "designed or intended primarily for children 12 years of age or younger." *Id.* 2052(a)(2).  The following factors are relevant when determining whether a product is a children's product:

- manufacturer statements about the intended use of the product, including a label on the product if such statement is reasonable;
- whether the product is represented in its packaging, display, promotion, or advertising as appropriate for use by children 12 years of age or younger;
- whether the product is commonly recognized by consumers as being intended for use by a child 12 years of age or younger; and
- the Age Determination Guidelines issued by CPSC staff in September 2002, and any successor to such guidelines.

*Id.*  "For use" by children 12 years and younger generally means that children will interact physically with the product based on reasonably foreseeable use.  16 CFR § 1200.2(a)(2).  Children's products may be decorated or embellished with a childish theme, be sized for children, or be marketed to appeal primarily to children.  *Id.* § 1200.2(d)(1).

CPSC estimates that approximately 0.1 percent of custom window coverings are specifically designed for children, and based on the factors listed above, fall within the definition

134

of a "children's product." This final rule requires custom window coverings that are children's products to meet the third-party testing and certification requirements in section 14(a) of the CPSA. The Commission's requirements for certificates of compliance are codified at 16 CFR part 1110.

*Non-Children's Products.* Section 14(a)(1) of the CPSA requires every manufacturer (which includes importers[44]) of a non-children's product that is subject to a consumer product safety rule under the CPSA or a similar rule, ban, standard, or regulation under any other law enforced by the Commission to certify that the product complies with all applicable CSPSC-enforced requirements. 15 U.S.C. 2063(a)(1).

*Children's Products.* Section 14(a)(2) of the CPSA requires the manufacturer or private labeler of a children's product that is subject to a children's product safety rule to certify that, based on a third-party conformity assessment body's testing, the product complies with the applicable children's product safety rule. *Id.* 2063(a)(2). Section 14(a) also requires the Commission to publish a notice of requirements (NOR) for a third-party conformity assessment body (*i.e.*, testing laboratory) to obtain accreditation to assess conformity with a children's product safety rule. *Id.* 2063(a)(3)(A). Because some custom window coverings are children's products, the final rule is a children's product safety rule, as applied to those products. Accordingly, this final rule also includes a final NOR.

The Commission published a final rule, codified at 16 CFR part 1112, entitled *Requirements Pertaining to Third Party Conformity Assessment Bodies*, which established requirements and criteria concerning testing laboratories. 78 FR 15836 (Mar. 12, 2013). Part 1112 includes procedures for CPSC to accept a testing laboratory's accreditation and lists the

---

[44] The CPSA defines a "manufacturer" as "any person who manufactures or imports a consumer product." 15 U.S.C. 2052(a)(11).

children's product safety rules for which CPSC has published NORs. When CPSC issues a new NOR, it must amend part 1112 to include that NOR. Accordingly, as part of this final rule for operating cords on custom window coverings, the Commission also amends part 1112 to add the "Safety Standard for Operating Cords on Custom Window Coverings" to the list of children's product safety rules for which CPSC has issued an NOR.

Testing laboratories that apply for CPSC acceptance to test custom window coverings that are children's products for compliance with the new rule would have to meet the requirements in part 1112. When a laboratory meets the requirements of a CPSC-accepted third party conformity assessment body, the laboratory can apply to CPSC to include 16 CFR part 1260, *Safety Standard for Operating Cords on Custom Window Coverings*, in the laboratory's scope of accreditation of CPSC safety rules listed on the CPSC website at: www.cpsc.gov/labsearch.

## XI. Effective Date

The Administrative Procedure Act (APA) generally requires that the effective date of a rule be at least 30 days after publication of a final rule. 5 U.S.C. 553(d). Section 9(g)(1) of the CPSA states that a consumer product safety rule shall specify the date such rule is to take effect, and that the effective date must be at least 30 days after promulgation, but cannot exceed 180 days from the date a rule is promulgated, unless the Commission finds, for good cause shown, that a later effective date is in the public interest and publishes its reasons for such finding. The NPR proposed an effective date of 180 days after publication of the final rule in the *Federal Register.* The Commission received over 400 comments on the proposed effective date. Consumer organizations stated that a mandatory standard should be issued as soon as possible, and one supplier of cordless lifting systemsmanufacturer (Safe T Shade) stated that 180-day lead time is more than sufficient for industry implementation. Other commentersmanufacturers,

136

however, requested that the Commission lengthen the effective date to allow for product development, training, and marketing of new designs to meet the requirements of the final rule. Some estimated lengthy delays in obtaining equipment and materials, but failed to provide specific justifications.  Even the most detailed comments were unpersuasive.  For example, t~~T~~wo international firms~~industry commenters~~ with large Canadian operations (Hunter Douglas and~~.~~ Blinds T~~T~~o Go) failed to address the significance of the similar Canadian standard, while~~and~~ a~~nother~~ comment~~er that~~ identifie~~d~~s the filer~~itself~~ inconsistently~~variously~~ as Springs Window Furnishings, Springs Window Fashions, or Spring Window Fashions, creating doubt whether the drafters were familiar with the company's operations.~~)~~ ~~estimated lengthy delays in obtaining equipment, transit time in both sea and air to get equipment and components from overseas suppliers, and delays in lead times for raw materials.~~

The Commission considered staff's analysis of the effective date and information supplied by commenters, but does not agree that most custom window covering manufacturers require more than 180 days after publication of the final rule to come into compliance, and does not find good cause within the public interest to extend this effective date beyond 180 days. ~~Crediting the generally consistent industry comments on the effective date, the Commission finds there is good cause to extend the effective date for this rule, and will finalize the rule with two effective dates.  For most custom window coverings, the effective date of the rule is one year after publication of the final rule in the *Federal Register*, and the rule will apply to all such products manufactured after that date.  For custom window coverings 10 feet or greater in vertical length and that are designed to be raised and lowered, the effective date of the rule is two years after publication of the final rule in the *Federal Register*, and the rule will apply to all such products manufactured after that date.~~The basis for the Commission's decision to set the effective date~~delay in effective date, beyond~~ at the 180-day upper bound set forth in section

9(g)(1) of the CPSA, is provided in Tabs C and F of Staff's Final Rule Briefing Package, and in sections II.E.4 and III.G.6 of this preamble.

**XII.    Incorporation by Reference**

The Commission incorporates by reference certain provisions of ANSI/WCMA A100.1 – 2018, American National Standard for Safety of Corded Window Covering Products.  The Office of the Federal Register (OFR) has regulations concerning incorporation by reference.  1 CFR part 51.  The OFR revised these regulations to require that, for a final rule, agencies must discuss in the preamble the ways that the materials the agency incorporates by reference are reasonably available to interested persons, or how the agency worked to make the materials reasonably available.  In addition, the preamble of the final rule must summarize the material.  1 CFR 51.5(a).

In accordance with the OFR's requirements, sections I.B.2.(d), II, IV and Tables 3 and 7 of this preamble summarize the provisions of ANSI/WCMA A100.1 – 2018 that the Commission incorporates by reference.  ANSI/WCMA A100.1 – 2018 is copyrighted.  The public may view a read-only copy of ANSI/WCMA A100.1 – 2018 free of charge at: https://wcmanet.com/wp-content/uploads/2021/07/WCMA-A100-2018_v2_websitePDF.pdf.  Alternatively, interested parties may inspect a copy of the standard free of charge by contacting Alberta E. Mills, Office of the Secretary, U.S. Consumer Product Safety Commission, 4330 East West Highway, Bethesda, MD 20814; telephone: 301-504-7479; e-mail: cpsc-os@cpsc.gov.  To download or print the standard, interested persons may purchase a copy of ANSI/WCMA A100.1 – 2018 from WCMA, through its website (http://wcmanet.com), or contacting the Window Covering Manufacturers Association, Inc., 355 Lexington Avenue, New York, New York, 10017; telephone: 212.297.2122.

**XIII.  Commission Findings**

The CPSA requires the Commission to make certain findings when issuing a consumer product safety standard.  These findings are contained in the regulatory text.

**XIV.  Congressional Review Act**

The Congressional Review Act (CRA; 5 U.S.C. §§ 801-808) states that, before a rule may take effect, the agency issuing the rule must submit the rule, and certain related information, to each House of Congress and the Comptroller General.  5 U.S.C. § 801(a)(1).  The submission must indicate whether the rule is a "major rule."  The CRA states that the Office of Information and Regulatory Affairs ("OIRA") determines whether a rule qualifies as a "major rule."  Pursuant to the CRA, OIRA designated this rule as a "major rule," as defined in 5 U.S.C. § 804(2).  To comply with the CRA, CPSC will submit the required information to each House of Congress and the Comptroller General.


**List of Subjects**

**16 CFR Part 1112**

Administrative practice and procedure, Audit, Consumer protection, Reporting and recordkeeping requirements, Third-party conformity assessment body.

**16 CFR Part 1260**

Consumer protection, Imports, Incorporation by reference, Administrative practice and procedure, Window Coverings, Cords, Infants and children.

For the reasons discussed in the preamble, the Commission amends subchapter B of title 16 of the Code of Federal Regulations as follows:

**PART 1112—REQUIREMENTS PERTAINING TO THIRD PARTY CONFORMITY ASSESSMENT BODIES**

139

1. The authority citation for part 1112 continues to read as follows:

**Authority:** Pub. L. 110-314, section 3, 122 Stat. 3016, 3017 (2008); 15 U.S.C. 2063.

2. Amend § 1112.15 by adding paragraph (b)(53) to read as follows:

## § 1112.15  When can a third party conformity assessment body apply for CPSC acceptance for a particular CPSC rule or test method?

\*      \*      \*      \*      \*

(b) \* \* \*

(53) 16 CFR part 1260, Safety Standard for Operating Cords on Custom Window Coverings.

\*      \*      \*      \*      \*

3. Add part 1260 to read as follows:

## PART 1260 – SAFETY STANDARD FOR OPERATING CORDS ON CUSTOM WINDOW COVERINGS

Sec.

1260.1  Scope and definitions.
1260.2  Requirements.
1260.3  Prohibited stockpiling.
1260.4  Findings.
1260.5  Standards Incorporated by Reference.
1260.6  Severability.

Authority: 15 U.S.C. 2056, 15 U.S.C. 2058, and 5 U.S.C. 553.

## § 1260.1  Scope and definitions.

(a) This part establishes a consumer product safety standard for operating cords on custom window coverings.

(1) For all custom window coverings less than 10 feet in vertical length, or that are not designed to be raised and lowered, tThe effective date of the rule is [INSERT DATE ONE YEAR180 DAYS AFTER DATE OF PUBLICATION IN THE *FEDERAL REGISTER*].

140

A313

(2) ~~For all custom window coverings 10 feet or greater in vertical length and that are designed to be raised and lowered, the effective date of the rule is [INSERT DATE TWO~~ ONE ~~YEARS AFTER DATE OF PUBLICATION IN THE *FEDERAL REGISTER*].~~

(b) This consumer product safety standard relies on the following definitions in section 3 of ANSI/WCMA A100.1 – 2018 (incorporated by reference, see § 1260.5):

(1) *Custom window covering* (Custom blinds, shades, and shadings) has the same meaning as defined in section 3, definition 5.01, of ANSI/WCMA A100.1 – 2018, as any window covering that is not classified as a stock window covering.

(2) *Stock window covering* (Stock blinds, shades, and shadings) has the same meaning as defined in section 3, definition 5.02, of ANSI/WCMA A100.1 – 2018, as a window covering that is completely or substantially fabricated prior to being distributed in commerce and is a specific stock-keeping unit (SKU). Even when the seller, manufacturer, or distributor modifies a pre-assembled product by adjusting to size, attaching the top rail or bottom rail, or tying cords to secure the bottom rail, the product is still considered stock. Online sales of the product or the size of the order such as multi-family housing do not make the product a non-stock product. These examples are provided in ANSI/WCMA A100.1 – 2018 to clarify that as long as the product is "substantially fabricated" prior to distribution in commerce, subsequent changes to the product do not change its categorization.

(3) *Operating cord* has the same meaning as defined in section 3, definition 2.19, of ANSI/WCMA A100.1 – 2018, as the portion of the cord that the user manipulates directly during operation (including lifting, lowering, tilting, rotating, and traversing).

(4) *Cord shroud* has the same meaning as defined in section 3, definition 2.09, of ANSI/WCMA A100.1 – 2018, as a device or material added to limit the accessibility of a cord or formation of a hazardous loop.

A314

(5) *Cord retraction device* has the same meaning as defined in section 3, definition 2.08, of ANSI/WCMA A100.1 – 2018, as a passive device which winds and gathers cords when tension is no longer applied by the user.

(c) *Rigid Cord Shroud* is a cord shroud that is constructed of inflexible material, rendering the cord inaccessible as defined in Appendix C of ANSI/WCMA A100.1 – 2018, to prevent a child from accessing a window covering cord.

(d) *Retractable Cord* is a cord that extends when pulled by a user, and fully retracts when the user releases the cord, rendering the cord inaccessible as defined in Appendix C of ANSI/WCMA A100.1 – 2018.

(e) *Loop Cord and Bead Chain Restraining Device* is a device, integrated to and installed on the window covering, that prevents the creation of hazardous loop from an accessible continuous operating cord.

(f) *Operating Interface* is the part of the window covering that the user physically touches or grasps by hand or a tool to operate the window covering, for example a wand to tilt the slats of the product or the bottom rail to raise or lower the product.

§ 1260.2  **Requirements.**

(a) *Requirements for operating cords*.  Each custom window covering shall comply with section 4.3.1 or 4.3.2.5.2, instead of section 4.3.2, of ANSI/WCMA A100.1 – 2018 (incorporated by reference, see § 1260.5).

(b) *Requirements for rigid cord shrouds*.  If a custom window covering complies with paragraph (a) of this section by using a rigid cord shroud to make an operating cord inaccessible, the rigid cord shroud shall meet the requirements in section 6.3, of ANSI/WCMA A100.1 – 2018 and shall not have an accessible cord when tested for cord accessibility using the test methods defined in paragraphs (b)(1) and (2).

A315

(1) *Test methods for rigid cord shrouds*: *Center load test.*  (i) Support each end of the rigid cord shroud, but do not restrict the rotation along the axial direction.  Supports must be within 0.25 inches from the ends of the shroud as shown in Figure 1.



**Figure 1 to Paragraph (b)(1) – Rigid Cord Shroud Test Set-up.**

(ii) Apply a 5-pound force at the center of the rigid cord shroud for at least 5 seconds as shown in Figure 2.

(iii) Measure the maximum deflection of the shroud, while the 5-pound force is applied.

(iv) For rigid cord shrouds that are ≤ 19 inches, the deflection shall not exceed 1 inch.  For every additional 19 inches in shroud length, the shroud can deflect an additional inch.  See Figure 2.



**Figure 2 to Paragraph (b)(4) –  Rigid Cord Shroud Center Load Test and Deflection Measurement.**

(v) While continuing to apply the 5-pound force, determine if the cord(s) can be contacted by the cord shroud accessibility test probe shown in Figure 3.  If the cord shroud accessibility test probe can touch any cord, the cord(s) are considered accessible.



**Figure 3 to Paragraph (b)(5) – Cord Shroud Accessibility Test Probe**

(2) *Test methods for rigid cord shrouds: Axial torque test.* (i) Mount one end of the rigid cord shroud and restrict the rotation along the axial direction.

(ii) Apply a 4.4 in-lb. (0.5Nm) torque along the other end of the rigid cord shroud for 5 seconds.

(iii) While continuing to apply the torque, determine if the cord(s) can be contacted by the cord shroud accessibility test probe shown in figure 3. If the cord shroud accessibility test probe can touch any cord, the cord(s) are considered accessible.

(c) *Requirements for cord retraction devices.* If a custom window covering complies with paragraph (a) using a cord retraction device, the cord retraction device shall meet the requirements in paragraphs (c)(1) through (4).

(1) When a 30 grams mass is applied to the Operating Interface, the Cord Retraction Device shall maintain full retraction of the Retractable Cord such that the Retractable Cord is not accessible per Appendix C of ANSI/WCMA A100.1 – 2018.

(2) The maximum stroke length for a Cord Retraction Device is 12 inches measured from the bottom of the headrail.

(3) The Operating Interface for Cord Retraction Devices may not be a Cord of any length including a Short Static or Access Cord. It may be a ring and pole, a wand or any other design that cannot bend on itself, eliminating the potential of creating a hazardous loop.

144

A317

(4) The Cord Retraction Device shall have a service life of at least 5,000 cycles after exposed portions or components have been subjected to 500 hours of UV exposure per AATCC Test Method 16-2004, Option 3 of ANSI/WCMA A100.1 – 2018.

(d) *Requirements for Loop Cord and Bead Chain Restraining Devices.*  If a custom window covering complies with paragraph (a) using a Loop Cord and Bead Chain Restraining Device, the Loop Cord and Bead Chain Restraining Device shall meet the requirements in section 6.5, of ANSI/WCMA A100.1 – 2018 with an additional test as defined in paragraph (d)(l), and shall not form a hazardous loop when tested for a hazardous loop using the test methods defined in paragraphs (d)(2) and (3).

(1) *Test methods for Loop Cord and Bead Chain Restraining Device: UV Stability and Operational Cycle test.* One sample Loop Cord and Bead Chain Restraining Device shall be tested to section 6.5.2.2 of ANSI/WCMA A100.1 – 2018, UV Stability, followed by section 6.5.2.1 of ANSI/WCMA A100.1 – 2018, Operational Cycle Test.

(2) *Test methods for Loop Cord and Bead Chain Restraining Device: Center load test.* (i) Support each end of the Loop Cord and Bead Chain Restraining Device, but do not restrict the rotation along the axial direction.  Supports must be within 0.25 inches from the ends of the shroud as shown in figure 4.



**Figure 4.  Cord and Bead Chain Restraining Device Test Set-up**

(ii) Apply a 5-pound force at the center of the Cord and Bead Chain Restraining Device for at least 5 seconds as shown in figure Y.

(iii) Measure the maximum deflection of the Cord and Bead Chain Restraining Device, while the 5-pound force is applied.

(iv) For Cord and Bead Chain Restraining Device that are ≤ 19 inches, the deflection shall not exceed 1 inch. For every additional 19 inches in shroud length, the shroud can deflect an additional inch. See Figure 5.



**Figure 5. Loop Cord and Bead Chain Restraining Device
Center Load Test and Deflection Measurement**

(v) While continuing to apply the 5-pound force, determine if the cord(s) create an opening between the cord and the restraining device. If the Hazardous Loop Head Probe (ANSI/WCMA A1001-2018, figure D1) can pass through the opening, the opening is considered a hazardous loop.

(3) *Test methods for Cord and Bead Chain Restraining Devices: Axial torque test.* (i) Mount one end of the *Cord and Bead Chain Restraining Device* and restrict the rotation along the axial direction.

(ii) Apply a 4.4 in-lb. (0.5 Nm) torque along the other end of the Cord and Bead Chain Restraining Device for 5 seconds. While continuing to apply the torque, determine if the cord(s) if the cord(s) create an opening between the cord and the restraining device. If the Hazardous Loop Head Probe (ANSI/WCMA A1001-2018, figure D1) can pass through the opening, the opening is considered a hazardous loop.

**§ 1260.3 Prohibited stockpiling.**

(a) *Prohibited acts.* Manufacturers and importers of custom window coverings shall not manufacture or import custom window coverings that do not comply with the requirements of this part in any ~~180-day~~12 month period between [insert date of publication in the *Federal Register*] and the effective date of the rule~~, either [insert date one year after publication in the~~ *Federal Register*]~~, or [insert date two years after publication in the~~ *Federal Register*]~~, as applicable based on the size of the custom window covering,~~ at a rate that is greater than 120 percent of the rate at which they manufactured or imported custom window coverings during the *base period* for the manufacturer.

(b) *Base period.* The base period for custom window coverings is any period of ~~180~~365 consecutive dates, chosen by the manufacturer or importer, in the 5-year period immediately preceding the promulgation of the final rule.

**1260.4 Findings.**

*(a) General.* Section 9(f) of the Consumer Product Safety Act (15 U.S.C. 2058(f)) requires the Commission to make findings concerning the following topics and to include the findings in the rule.

Note 1 to paragraph (a): Because the findings are required to be published in the rule, they reflect the information that was available to the Consumer Product Safety Commission (Commission, CPSC) when the standard was issued on [insert final rule publication date].

(b) *Degree and nature of the risk of injury. (*1*)* Operating cords on custom window coverings present an unreasonable risk of strangulation, including death and serious injury, to children 8 years old and younger.  If children can access a window covering cord that is longer than 8 inches, children can wrap the cord around their neck, or insert their head into a loop formed by

147

A320

the cord and strangle.  Strangulation can lead to serious injuries with permanent debilitating outcomes or death.

(2) Strangulation deaths and injuries on window covering cords are a "hidden hazard" because consumers do not understand or appreciate the hazard, or how quickly and silently strangulation occurs.  Because young children may be left unsupervised for a few minutes or more in a room that is considered safe, such as a bedroom or family room, adult supervision is unlikely to eliminate or reduce the hazard.  Children can wrap the cord around their neck, insert their head into a cord loop and get injured or die silently in a few minutes in any room, with or without supervision.

(3) Safety devices such as cord cleats and tension devices are unlikely to be effective to eliminate or substantially reduce the hazard.  Cord cleats, for example, need to be attached on the wall and caregivers must wrap the cord around the cleat each and every time the window covering is raised or lowered.  As incident data show, children can still access and become entangled in cords by climbing on furniture.  Tension devices also need to be attached on the wall or windowsill, which may not occur (and may not be permitted in rental homes); even if properly installed, depending on how taut the cord loop is, it can still allow a child's head to enter the opening as observed in the incident data.

(4) A user research study found a lack of awareness on cord entanglement among caregivers; lack of awareness of the speed and mechanism of the injury; difficulty using and installing safety devices as primary reasons for not using them; and inability to recognize the purpose of the safety devices provided with window coverings.  Warning labels are not likely to be effective because consumers are less likely to look for and read safety information about the products that they use frequently and are familiar with.  Many of the children at risk of strangulation, those 8 years old and younger, cannot read or appreciate warning labels.  Most of the window covering

148

units involved in strangulation incidents had the permanent warning label on the product. Even well-designed warning labels will have limited effectiveness in communicating the hazard on this type of product.

(5) Every custom product sold with an accessible operating cord presents a hidden hazard to young children and can remain a hazard in the household for one to two decades or longer. Some consumers may believe that because they do not currently have young children living with them or visiting them, accessible operating cords on window coverings are not a safety hazard. However, window coverings last a long time, family circumstances change, and when homes are sold or new renters move in, the existing window coverings, if they are functional, usually remain installed and could be hazardous to new occupants with young children.

(6) Window coverings that comply with the operating cord requirements for stock window covering requirements in section 4.3.1 of ANSI/WCMA A100.1 – 2018 adequately address the strangulation hazard, by not allowing hazardous cords on the product by design, and therefore do not rely on consumer action. CPSC finds that all of the operating cord incidents it identified as involving custom window coverings likely would have been prevented if the requirements in section 4.3.1 of ANSI/WCMA A100.1 – 2018 were in effect and covered the incident products.

(7) CPSC databases contain incident data showing a total of 209 reported fatal and nonfatal strangulations on window coverings among children eight years and younger, from January 2009 through December 2021. Nearly 48 percent of the reported incidents were fatal (100 of 2019). Sixteen of the surviving victims required hospitalization, and six survived a hypoxic-ischemic episode or were pulseless and in full cardiac arrest when found, suffered severe neurological sequalae ranging from loss of memory to a long-term or permanent vegetative state requiring tracheotomy and gastrointestinal tube feeding. One victim remained hospitalized for 72 days, was released with 75 percent permanent brain damage, and is confined to a bed.

(8) Based on CPSC's Injury Cost Model, approximately 7.6 medically treated nonfatal injuries to children 8 years and younger occurred annually in the United States from 2009 through 2021.  Based on National Center for Health Statistics (NCHS) data and a separate study of child strangulations, a minimum of approximately 6.8 fatal strangulations related to window covering operating cords (excluding inner cords and lifting loops) occurred per year in the United States among children under eight years old from 2009 – 2020.

(c) *Number of Consumer Products Subject to the Rule*. Approximately 145 million corded custom window coverings were in use in the United States in 2020. About 25 million custom window coverings were shipped in the U.S. in 2020, and about 15.9 million of these were corded custom window coverings.

(d) *The Public Need for Custom Window Coverings and the Effects of the Rule on Their Utility, Cost, and Availability*.  (1) Consumers commonly use window coverings in their homes to control light coming in through windows, for privacy, and for decoration.  The window covering market is divided into stock and custom products.  The final rule addresses hazards associated with custom window coverings, which present the same risk of strangulation as stock window coverings, but custom window coverings allow consumers to choose from a wider variety of materials, colors, operating systems, or sizes, than stock products.

(2) The Commission does not expect the final rule to have a substantial effect on the utility or availability of custom window coverings, and the impact on cost depends on the product type. The Commission considered whether some consumers, such as the elderly and disabled, or those with windows in hard-to-reach locations, would experience a loss of utility from the removal of accessible operating cords from custom window coverings.  The final rule mitigates any potential loss in utility by including several methods to make operating cords safer while still providing ease of use, including rigid cord shrouds, retractable cords, and loop cord and bead restraining

150

devices, to assist consumers to raise and lower custom window coverings. Additionally, consumers can choose to use a remote-controlled operating system, or other tools, such as a pole, to operate the window covering.

(3) Retail prices of custom window coverings vary substantially. The least expensive units for an average size window retail for less than $40, while some more expensive units may retail for several thousand dollars. Custom window covering prices may increase to reflect the added cost of modifying or redesigning products to comply with the final rule. If the costs associated with redesigning or modifying a custom window covering to comply with the standard results in the manufacturer discontinuing that model, there would be some loss in availability of that type.

(4) Although prices of stock window coverings have increased since ANSI/WCMA A100.1 – 2018 went into effect in 2018, sales of stock products remain consistent. For custom products, which have higher prices on average, consumers very well may be willing to pay more for a safer window covering without affecting sales, similar to stock window coverings. The regulatory analysis in the final rule states that the estimated net cost increase per household to replace all custom window products in a home to be as low as $24 for less expensive products, representing only a 5% increase in cost. Such cost increase is nominal to prevent the hidden strangulation hazard to children on window coverings for the 10 years custom window coverings are likely to be used.

(e) *Other Means to Achieve the Objective of the Proposed Rule, While Minimizing Adverse Effects on Competition and Manufacturing*. (1) The Commission considered alternatives to achieving the rule's objective of reducing the unreasonable risks to children of injury and death associated with operating cords on custom window coverings. For example, the Commission considered relying on compliance with the voluntary standard and education campaigns rather than issuing a mandatory rule for operating cords on custom window coverings. This is the

151

approach CPSC has relied on to date, and it would have minimal costs; however, it is unlikely to further reduce the risk of injury from operating cords on custom window coverings.

(2) Similarly, the Commission considered narrowing the scope of the rule to address only the hazards associated with operating cords on custom vertical blinds, curtains, and drapes, because cords are not critical to the operation of these products. Narrowing the proposed rule to these three product types would lessen the cost impact and make it unlikely that any particular product type and/or size would be eliminated, and costs would be near $0 because using plastic rods for operation is very similar to cords in cost. However, only 3 of the 36 custom product incidents (all are fatalities) were associated with vertical blinds, and there were no curtain or drape incidents where the stock/custom classification could be determined. This option would not result in an effective reduction in injuries and deaths.

(3) Other alternatives the Commission considered include: adopting the Canadian standard for window covering cords, which would increase the costs to comply with the rule with no additional benefits, and adopting a draft revised version of the voluntary standard, which the Commission staff has determined is inadequate to address the risk of injury because the revised standard would still allow accessible cords to remain available for sale to consumers.

(4) The Commission also considered setting a later effective date. ~~Due to comments explaining the challenges in redesigning certain window coverings of unusual sizes and acquiring components to meet the requirements of the rule in a short timeframe, the Commission will set a later effective date than the proposed 180 days, and provide an effective date of 2 years after publication of the final rule for custom window coverings which operate up and down and are 10 feet or more in vertical length. These larger products are heavier and require additional design to reliably lift with cordless designs or to make the cords inaccessible or loops non-hazardous. A 2-year effective date for these larger products will reduce the burden for small~~

~~manufacturers by allowing a longer period of time for product development. For all other~~ ~~custom window coverings,~~ Based on the record before the Commission, including the severity of the strangulation hazard to children, the advanced state of compliance with similar requirements for stock window coverings in the United States and for stock and custom window coverings in Canada, and the long pendency of this proceeding, the final rule provides an effective date that is 180 days ~~year~~ after publication of the final rule, as proposed. ~~A later effective date allows~~ ~~manufacturers more time to redesign and spread the research and development costs for these~~ ~~products.~~

*(f) Unreasonable Risk*. (1) Based on CPSC's Injury Cost Model, about 185 medically treated nonfatal injuries are predicted to have occurred annually from 2009 through 2020, involving children eight years and younger. Based on a review of National Center for Health Statistics (NCHS data) and a separate study of child strangulations, a minimum of 8.1 fatal strangulations related to window covering cords occurred per year in the United States among children under five years old from 2009 – 2020. Based on reviews of CPSC databases, we found reports of a total of 209 reported fatal and nonfatal strangulations on window coverings among children eight years and younger, from January 2009 through December 2021. Nearly 48 percent were fatal incident reports (100 of 209), while the remaining were near-miss nonfatal incidents.

(2) The Commission estimates that the rule would result in aggregate benefits of about $31.6 million annually due to a reduction in deaths and injuries caused by custom window coverings. Of the potential modifications for which staff was able to estimate the potential cost, the lowest costs were about $2.18 per unit, although costs for some units are likely $0. Effective performance requirements for operating cords on window coverings are well known and already utilized for lower-priced stock window coverings. Technologies to address hazardous window covering cords are also known and utilized on stock products.

(3) The determination of whether a consumer product safety rule is reasonably necessary to reduce an unreasonable risk of injury involves balancing the degree and nature of the risk of injury addressed by the rule against the probable effect of the rule on the utility, cost, or availability of the product.  The Commission does not expect the final rule to have a substantial effect on the utility or availability of custom window coverings.  The rule may impact the cost of custom window coverings, but consumers already pay more for custom window coverings, and are likely willing to pay more for safer products.

(4) ANSI/WCMA-2018 eliminated the strangulation hazard on stock window coverings, which did not negatively impact sales of stock products; sales increased and cordless technologies became well-developed.  The final rule will extend the requirements for stock products to custom window coverings.  The Commission expects that the custom window covering market will absorb this cost, just as seen in the stock window covering market.  This fact is also observed in the Canadian window covering market after Canada implemented a rule that eliminates hazardous cords on all window covering products.  Staff identified no evidence from the Canadian market of a significant reduction in consumer choice as a result of their rule.  Rather, the Canadian market has reacted with cost-effective substitutes and redesigned products.

(5) Weighing the possibility of increased costs for custom window coverings with the continuing deaths and injuries to young children, the Commission concludes that custom window coverings with hazardous operating cords pose an unreasonable risk of injury and death and finds that the final rule is reasonably necessary to reduce that unreasonable risk of injury and death.

(6) The Commission also finds that an effective date of 180 days after publication is reasonably necessary to address the unreasonable risk of strangulation from operating cords on custom window coverings.  Section 9(g)(1) of the CPSA (15 U.S.C 2058(g)(1)) sets a presumptive maximum effective date of 180 days after publication of the rule.  To extend this

154

period, the Commission must find good cause that doing so is within the public interest.  When balancing the risk of severe harm and death to young children over the entire service life of noncompliant window coverings, against the possibility that some styles of custom window coverings may be less available during a transition period and stock products or other custom styles might need to be used instead, the Commission finds that the public interest is better served by protecting the safety of children and families.

(g) *Public Interest*. This final rule is intended to address an unreasonable risk of injury and death posed by hazardous operating cords on custom window coverings.  Adherence to the requirements of the final rule will significantly reduce or eliminate a hidden hazard, strangulation deaths and injuries to children 8 years old and younger, without major disruption to industry or consumers; thus, the Commission finds that promulgation of the rule is in the public interest.

(h) *Voluntary Standards*. The Commission is aware of one national voluntary standard, ANSI/WCMA A100.1 – 2018, as well as European, Australian, and Canadian standards.  Among these, the Commission considers the Canadian standard to be the most stringent because it applies to all window coverings.  ANSI/WCMA A100.1 – 2018 contains adequate performance requirements to address the risk of strangulation on inner cords for both stock and custom window coverings and contains adequate requirements to address the risk of injury on operating cords for stock products.  The Commission also finds that custom window coverings substantially comply with the voluntary standard.  However, the Commission finds that operating cord requirements for custom window coverings in ANSI/WCMA A100.1 – 2018 are inadequate to address the risk of injury, because the voluntary standard allows accessible and hazardous operating cords to be present on custom products.  Thus, the Commission finds that compliance with an existing voluntary standard is not likely to result in the elimination or adequate reduction of the risk of injury presented by custom window coverings.

(i) *Relationship of Benefits to Costs.* (1) The aggregate benefits of the rule are conservatively estimated to be about $23 million annually with the base VSL; and the lowest cost of the rule is estimated to be about $54.4 million annually. Recent studies suggest that the VSL for children could be higher than that for adults. In other words, consumers might be willing to pay more to reduce the risk of premature death of children than to reduce the risk of premature death of adults. A review of the literature conducted for the CPSC suggested that the VSL for children could exceed that of adults by a factor of 1.2 to 3, with a midpoint of around 2 (IEc, 2018). The Commission received positive comment on increasing the VSL for children by a factor of 3. Staff provided a sensitivity analysis for the final rule demonstrating how the ratio of costs and benefits change based on several variables, including a higher VSL for children. When staff increased the VSL by a factor of 3 for children (value of $31.5 million), the benefits of the rule exceed costs by approximately $14.3 million.

(2) Staff's benefits and costs analysis also highlights unquantified benefits regarding the emotional distress of caregivers that could also be reduced by the final rule. This benefit is not directly accounted for in the primary VSL estimate of $10.5 million. The value of the shock or perceived guilt related to a caregiver's inattentiveness could be significant, as it could result in large reductions to physical wellbeing or income loss.

(3) To determine how the final rule impacts consumers, staff converted costs and benefits of the rule into a calculated net cost per household, based on the data point that the average detached, single-family household has 12 window coverings. This analysis translates into a net cost of the final rule of $1.97 for metal or vinyl horizontal blinds. Using the assumption of 12 window coverings per household, this equates to a net cost of the rule (above the benefits provided) of $23.67 per household every time a household updates their custom window coverings, about once every 10 years. For metal or vinyl horizontal blinds, $23.67 is slightly

156

more than 5 percent of the total cost of $448.32 that a household would spend to update their window coverings.

(4) We note that economies of scale associated with the voluntary standard for stock product operating cords, and the Canadian standard, may have reduced costs associated with cordless components since Commission staff developed the bases for their cost estimates as early as 2016. Additionally, custom window coverings have a longer product life, which increases the benefit of improving safety beyond the levels Commission staff determined for both stock and customer window coverings.

(5) Based on this analysis, the Commission finds that the benefits expected from the rule bear a reasonable relationship to the anticipated costs of the rule.

*(j) Least Burdensome Requirement That Would Adequately Reduce the Risk of Injury.* (1) The Commission considered less-burdensome alternatives to the final rule, detailed in ~~section V.B of the preamble to the final rule and in~~ section 1260.4(e), but finds that none of these alternatives would adequately reduce the risk of injury.

(2) The Commission considered relying on voluntary recalls, compliance with the voluntary standard, and education campaigns, rather than issuing a mandatory standard. These alternatives would have minimal costs but would be unlikely to reduce the risk of injury from custom window coverings that contain hazardous cords.

(3) The Commission considered issuing a standard that applies only to ~~a~~ certain types of window covering~~s~~ such as vertical blinds. This would impose lower costs on manufacturers but is unlikely to adequately reduce the risk of injury because it would only address incidents associated with those types. Based on the custom product incident data, only 8.3 percent of the incidents involved vertical blinds and 22.2 percent involved faux wood/wood blinds. The Commission considered adopting the Canadian standard for window covering cords, which

would increase the costs to comply with the rule with no additional benefits and/or providing a longer effective date.  And the Commission considered adopting a 2022 draft revision of the voluntary standard but finds the requirements in the standard inadequate to address the risk of injury.

(4) On the basis of comments claiming challenges in redesigning certain window coverings of unusual sizes and acquiring components to meet the requirements of the rule in a short timeframe, the Commission will set a longer effective date than the proposed 180 days, and provide an effective date of 2 years after publication of the final rule for custom window coverings which operate up and down and are 10 feet or more in vertical length.  These larger products are heavier and require additional design to reliably lift with cordless designs or to make the cords inaccessible or loops non-hazardous.  A 2-year effective date for these larger products will reduce the burden for small manufacturers by allowing a longer period of time for product development.  For all other custom window coverings, the final rule provides an effective date that is 1 year after publication of the final rule.  A later effective date allows manufacturers more time to redesign and spread the research and development costs for these products.

**§ 1260.5  Standards incorporated by reference.**

(a) Certain material is incorporated by reference into this part with the approval of the Director of the Federal Register under 5 U.S.C. 552(a) and 1 CFR part 51. All approved material is available for inspection at the Office of the Secretary, U.S. Consumer Product Safety Commission, 4330 East West Highway, Bethesda, MD 20814, telephone (301) 504-7479, email: cpsc-os@cpsc.gov, and is available from the sources listed below. You may also inspect a copy at the National Archives and Records Administration (NARA).  For information on the

availability of this material at NARA, email fr.inspection@nara.gov, or go to:

www.archives.gov/federal-register/cfr/ibr-locations.html.

(b) Window Covering Manufacturers Association, Inc., 355 Lexington Avenue, New York,

New York, 10017, telephone: 212.297.2122, https://wcmanet.com.

(1) ANSI/WCMA A100.1 – 2018, American National Standard for Safety of Corded

Window Covering Products, approved January 8, 2018; IBR approved for §§ 1260.1 and 1260.2.

(i) *Read-only copy*. https://www.wcmanet.com/pdf/WCMA-A100.1-2018_view-only_v2.pdf.

(ii) *Purchase*. https://webstore.ansi.org/Standards/WCMA/ANSIWCMAA1002018.

(2) [Reserved]

## § 1260.6  Severability

The provisions of this part are separate and severable from one another.  If any provision is

stayed or determined to be invalid, it is the Commission's intention that the remaining provisions

shall continue in effect.

**Alberta E. Mills,**
*Secretary,*
*Consumer Product Safety Commission.*



**Statement of Chair Alexander Hoehn-Saric on Passage of Safety Improvements for Window Coverings**

**November 2, 2022**

Today, the Commission took long overdue action to prevent the deaths of babies and small children who strangle to death after getting caught in window cords by unanimously adopting two mandatory safety rules. For decades, manufacturers have known of these deaths and injuries but taken too few steps to address this hazard. The rules we adopted will force a change in the industry that will prevent these unnecessary tragedies and protect future generations.

The Commission's action is the culmination of years of work by advocates and Consumer Product Safety Commission (CPSC) staff who have dedicated tremendous amounts of time, energy, and passion to improving window covering safety for all Americans.

Linda Kaiser with Parents for Window Blind Safety has been a consistent voice for safety, keeping the pressure on the industry and on the CPSC to prevent future tragedy. Her organization, along with Consumer Federation of America, Consumer Reports, Kids in Danger, Public Citizen, U.S. PIRG, Independent Safety Consulting, Safety Behavior Analysis, Inc., and Onder, Shelton, O'Leary & Peterson, LLC filed a petition eight years ago calling for a mandatory safety standard for window coverings. Thank you for that filing and for keeping the focus on this issue for all of these years.

The first rule adopted by the Commission, developed under section 15(j) of the Consumer Product Safety Act, deems that the inner cords of all window coverings and the operating cords of stock coverings present a substantial product hazard if they do not meet the requirements of the existing voluntary standard for cords.

The second rule, developed under Sections 7 and 9 of the CPSA, establishes a safety standard for operating cords for all custom window coverings – a safety gap that is left by the voluntary standard.

It is impossible to know exactly which babies will be saved and which parents and caregivers will not have to suffer the loss of a child – but there is no doubt there are children who will grow to adulthood and families kept whole by these rules.

I thank the staff for their hard work in putting this together.  I thank my fellow Commissioners and their staffs for their support for this proposal.  I'm looking forward to continuing our safety work and laying the foundation for the next 50 years of safer products.



UNITED STATES
**CONSUMER PRODUCT SAFETY COMMISSION**
4330 EAST WEST HIGHWAY
BETHESDA, MD 20814
COMMISSIONER PETER A. FELDMAN

**STATEMENT OF COMMISSIONER PETER A. FELDMAN
ON MANDATORY SAFETY STANDARD FOR OPERATING CORDS
ON CUSTOM WINDOW COVERINGS**

**NOVEMBER 2, 2022**

Today the U.S. Consumer Product Safety Commission (CPSC) promulgated a final rule establishing a mandatory safety standard for operating cords on custom window coverings, which will improve safety by reducing children's risk of strangulation. Moreover, today's action completes the work beginning with the 2014 petition to develop a mandatory standard for all products, the Commission's 2015 Advance Notice of Proposed Rulemaking, and the 2018 ANSI/WCMA revisions addressing hazards from operating cords in stock window coverings.

Based on the record before the Commission, including the long pendency of this proceeding, the severity of the hazard to children, and the fact that firms already comply with similar requirements for stock window coverings in the United States and all window coverings in Canada, I voted to approve this final rule.

Although I am concerned about the cost/benefit analysis underpinning this rulemaking, according to our statute, the Commission must consider only whether a final rule's costs bear a reasonable relationship to its benefits. In my view, given the unique circumstances surrounding this proceeding, including earlier revisions to the voluntary standard for custom products and industry's adherence to a substantially similar Canadian standard, the Commission has met this burden.

As discussed in the final rule, the Commission may have overstated costs. Industry already complies with the Canadian requirements, a standard they also opposed. The benefits may be understated because of the methodology we employed and the bifurcated approach (stock versus custom) that industry requested. For these reasons, I believe the magnitude of the benefits are commensurate with the rule's costs. My conclusions here are limited to the record in this matter.

While I base my decision solely on the existing record, the historical context is important. In 2016, CPSC entered into an agreement to suspend Commission enforcement activity to protect consumers based on WCMA's commitment to expedite revision and implementation of the ANSI/WCMA voluntary standard. WCMA's initial agreement on custom products indicates that such requirements are reasonable. However, WCMA did not complete this work in good faith. WCMA's failure to act made the Commission's actions today appropriate and necessary.



UNITED STATES
**CONSUMER PRODUCT SAFETY COMMISSION**
4330 EAST WEST HIGHWAY
BETHESDA, MD 20814

## COMMISSIONERS ENACT WINDOW COVERINGS RULE TO SAVE LIVES

### NOVEMBER 2, 2022

Today, the Commission voted on a final rule to stop window coverings from strangling children to death.  All four Commissioners came together on a bipartisan amendment to put this rule in force more quickly to save more children's lives.  While industry asked for more time, they failed to demonstrate the need for it.   This is a problem that industry has known about since at least 1983 and refused to fix on its own.  We are not about to give them more time.  The additional months of profits industry seeks for selling dangerous products are not worth the cost of children's lives.  CPSC will continue to create and enforce vital safety regulations as quickly as possible.



UNITED STATES

## CONSUMER PRODUCT SAFETY COMMISSION

4330 EAST WEST
HIGHWAY BETHESDA, MD
20814

COMMISSIONER MARY T. BOYLE

# Commissioner Mary T. Boyle Statement on Today's Vote to Approve Window Covering Final Rules

## November 2, 2022

Today, in a pair of unanimous votes, the Commission approved two Final Rules on Window Coverings. These rules come after years of work by staff, and I want to thank them for their conscientious efforts in advancing this package to protect children. I also want to recognize the tireless efforts of consumer advocates, including families whose lives were altered forever by deaths and injuries caused by hazardous cords. In particular, I want to give special recognition to Linda Kaiser for her steadfast efforts to make today a reality. I vividly recall the everyday worries of being a parent with small children, and these rules will mean one less hidden hazard in schools, homes, and public places.

Window covering cords have, for decades, posed a strangulation risk to children—since 2009 there have been at least 209 fatal and near-miss strangulations on window coverings affecting children aged 8 years or younger. In 2018, the voluntary standards committee advanced an effective standard that applies to stock window coverings, and today we used our 15(j) authority to deem products that are noncompliant with this standard a substantial product hazard.

This standard, however, failed to cover the vast number of custom window coverings on the market—leaving open a gaping product safety hole and putting children at risk. With the vote today, we will be closing that hole, and ensuring that all window coverings are safe for consumers to have in their homes and around their children.

The Commission also adopted an amendment today to provide a 180-day effective date for the new safety standard for custom window coverings. This time frame corresponds to the maximum period allowed by statute, absent a finding of good cause that a later effective date is in the public interest. In assessing this issue, the Commission indicated that there had been ample notice of the proposed standard and that manufacturers of custom window coverings had two years to come into compliance with Canada's similar rule. Because the record did not support a

finding that an extension of the effective date was in the public interest, the Commission preserved the 180-day effective date set forth in the Notice of Proposed Rulemaking.

Window covering cords are too often overlooked in consumers' homes and have been a hidden hazard to children for decades—I am confident that the rule adopted today will protect consumers.

Once again, our use of CPSC regulatory authority is making a difference in the lives of children and families.

# EXHIBIT 10


United States
**Consumer Product Safety Commission**

This document has been electronically
approved and signed.

**TO:** The Commission
Alberta E. Mills, Secretary

**DATE:** September 28, 2022

**THROUGH:** Austin C. Schlick, General Counsel
J. DeWane Ray, Acting Executive Director

**FROM:** Daniel R. Vice, Assistant General Counsel, Regulatory Affairs
Mary A. House, Attorney, Regulatory Affairs

**SUBJECT:** Final Rules to (1) Add Window Covering Cords to the Substantial Product Hazard List, and (2) Establish a Safety Standard for Operating Cords on Custom Window Coverings

---

**THIS MATTER IS NOT SCHEDULED FOR A BALLOT VOTE.**

**A DECISIONAL MEETING FOR THIS MATTER IS SCHEDULED ON:**  October 19, 2022

Staff is forwarding a briefing package to the Commission, recommending that the Commission publish in the *Federal Register* the attached draft final rules:

(1) under section 15(j) of the Consumer Product Safety Act (CPSA), a rule to deem that stock window coverings that do not comply with the operating and inner cord requirements, or the manufacturer label requirement, in ANSI/WCMA A100.1 – 2018, American National Standard for Safety of Corded Window Covering Products (ANSI/WCMA-2018), and custom window coverings that do not comply with the requirements for inner cords or the manufacturer label in ANSI/WCMA-2018, present a substantial product hazard; and

(2) under sections 7 and 9 of the CPSA, a rule to establish a Safety Standard for Operating Cords on Custom Window Coverings.

If finalized, the draft rules provided in the package together would address the risk of strangulation deaths and injuries to children 8 years old and younger from stock and custom window covering cords.

U.S. Consumer Product
Safety Commission
4330 East–West Highway
Bethesda, MD 20814

National Product Testing
and Evaluation Center
5 Research Place
Rockville, MD 20850

Page 1 of 2

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Please indicate your vote on the following options:

I.  Approve publication of the attached notices in the *Federal Register*, as drafted.

_____          _____
(Signature)                                                    (Date)

II. Approve publication of the attached notices in the *Federal Register*, with the specified changes.

_____

_____

_____

_____          _____
(Signature)                                                    (Date)

III. Do not approve publication of the attached notices in the *Federal Register*.

_____          _____
(Signature)                                                    (Date)

IV. Take other action specified below.

_____

_____

_____

_____          _____
(Signature)                                                    (Date)

Attachments: Draft Final Rules: (1) Substantial Product Hazard List: Window Covering Cords; (2) Safety Standard for Operating Cords on Custom Window Coverings

**U.S. Consumer Product**
**Safety Commission**
4330 East–West Highway
Bethesda, MD 20814

**National Product Testing**
**and Evaluation Center**
5 Research Place
Rockville, MD 20850

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION
CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Billing Code 6355-01-P

**CONSUMER PRODUCT SAFETY COMMISSION**

**16 CFR Parts 1112 and 1260**

**[CPSC Docket No. CPSC–2013–0028]**

**Safety Standard for Operating Cords on Custom Window Coverings**

**AGENCY**:  Consumer Product Safety Commission.

**ACTION**:  Final rule.

**SUMMARY**:  The U.S. Consumer Product Safety Commission (Commission or CPSC) has determined that custom window coverings with accessible operating cords longer than 8 inches pose an unreasonable risk of strangulation to children 8 years old and younger.  To address this risk of strangulation, the Commission is issuing a final rule under the Consumer Product Safety Act (CPSA) to require that operating cords on custom window coverings meet the same requirements as operating cords on stock window coverings, as set forth in the applicable voluntary standard.  The final rule provides several methods to make window covering cords inaccessible or non-hazardous.  Because this is a consumer product safety rule, operating cords on custom window coverings must be tested and certified as meeting the requirements of the final rule.  Custom window coverings that meet the definition of a "children's product" require third party testing by a CPSC-accepted third party conformity assessment body.  Accordingly, the final rule also amends the Commission's regulation that lists children's product rules requiring third party testing.

**DATES**:  For all custom window coverings less than 10 feet in vertical length, or that are not designed to be raised and lowered, the effective date of the rule is [INSERT DATE ONE YEAR AFTER DATE OF PUBLICATION IN THE *FEDERAL REGISTER*], and the rule will apply to all such products manufactured after that date.  For all custom window coverings 10 feet or

1

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

A342

greater in vertical length and that are designed to be raised and lowered, the effective date of the rule is [INSERT DATE TWO YEARS AFTER DATE OF PUBLICATION IN THE *FEDERAL REGISTER*], and the rule will apply to all such products manufactured after that date.

**FOR FURTHER INFORMATION CONTACT:** Jennifer Colten, Compliance Officer, Office of Compliance and Field Operations, Consumer Product Safety Commission, 4330 East West Highway; telephone: 301-504-8165; jcolten@cpsc.gov.

**SUPPLEMENTARY INFORMATION:**

I.      **Introduction**

On January 7, 2022, the Commission published a notice of proposed rulemaking (NPR) to regulate operating cords on custom window coverings.  87 FR 1014 (Jan. 7, 2022).  The Commission received over 2000 comments on the proposed rule and, on March 16, 2022, held a public hearing to receive oral comments on the proposed rule.[1]  87 FR 8441 (Feb. 15, 2022).[2] As described in this preamble, after consideration of the comments, the Commission is now finalizing the rule.[3]  The final rule is generally consistent with the NPR, but provides two methods to make operating cords inaccessible under the rule (using a rigid cord shroud or a retractable cord), and allows use of a loop cord and bean chain restraining device to prevent formation of hazardous loops.  The final rule is based on information and analysis contained in CPSC staff's September 29, 2021, Staff Briefing Package: Notice of Proposed Rulemaking for

---

[1] Video available at: https://www.youtube.com/watch?v=ggbi6Tm5egA; Transcript available at: https://www.regulations.gov/document/CPSC-2013-0028-3663.

[2] On March 2, 2022, the Commission voted to deny a February 11, 2022 request by the Window Covering Manufacturers Association (WCMA), to extend the comment period for this rulemaking by 75 days.  The staff's package explaining WCMA's request is available at: https://www.cpsc.gov/s3fs-public/NPR-for-Operating-Cords-on-Custom-Window-Coverings-Notice-of-Extensin-of-Comment-Period.pdf?VersionId=AHlkvtMCFUiY21f3.fCcNfILlqcTCstT.  A Record of Commission Action on the request is available at: https://www.cpsc.gov/s3fs-public/RCA-Safety-Standard-for-Custom-Window-Coverings-Notice-of-Extension-of-Comment-Period.pdf?VersionId=.YvybvKXK8VfmPx8GFqgcHH7t3E7ggS6.  Although the Commission denied the comment period extension, the Commission has received and considered all late-filed comments for this rulemaking.

[3] Insert vote summary.

THIS DOCUMENT HAS NOT BEEN REVIEWED          CLEARED FOR PUBLIC RELEASE
    OR ACCEPTED BY THE COMMISSION                          UNDER CPSA 6(b)(1)

Corded Window Coverings (Staff's NPR Briefing Package),[4] and on information in staff's

September 28, 2022, Staff Briefing Package: Draft Final Rules for Corded Window Coverings

(Staff's Final Rule Briefing Package).[5]

    *A.*      *Overview of the Final Rule*

       The purpose of the final rule is to address the unreasonable risk of strangulation to

children 8 years old and younger associated with hazardous operating cords on custom window

coverings.  The Commission issues this final rule pursuant to sections 7 and 9 of the CPSA, 15

U.S.C. 2056 and 2058, to create a new mandatory standard for operating cords on custom

window coverings.  The Commission finds that this rule is reasonably necessary to address an

unreasonable risk of death and serious injury to children 8 years old and younger associated

with corded custom window coverings, due to the ongoing fatal and nonfatal incidents, the high

severity of the outcomes (death and disability to children), the availability of cost-effective

technologies that address the hazard, and the inadequacies of parental supervision, warnings,

education campaigns, external safety devices for this class of products, and the existing

voluntary standard for custom products.

       The final rule is designed to eliminate the ongoing tragedy of child deaths on corded

custom window coverings.  The Commission is aware of 209 fatal and near-miss strangulations

on window covering cords that occurred among children 8 years old and younger from January

2009 through December 2021.  The industry has been long aware of the strangulation hazard and

how to address these deaths and injuries, by removing accessible cords from window coverings.

Finally, in 2018, after more than 20 years of consideration, the voluntary standards committee

---

[4] Available at: *https://www.cpsc.gov/s3fs-public/NPRs-Add-Window-Covering-Cords-to-Substantial-Product-Hazard-List-Establish-Safety-Standard-for-Operating-Cords-on-Custom-Window-Coverings-updated-10-29-2021.pdf?VersionId=HIM05bK3WDLRZrlNGogQLknhFvhtx3PD.*
[5] Available at: Insert Link.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

*OS-45*

**DRAFT**

revised the voluntary standard to eliminate the strangulation hazard on stock window coverings. After this change in the market, sales of stock products increased, even though the prices of stock products in some cases doubled.

The final rule will extend the requirements for stock products to custom window coverings. Staff estimates that compliance with the final rule will result in a net increase of as little as $24 per household every approximately 10 years when consumers replace all custom window coverings in their home. *See* Table 9, *infra*, and Tab F of Staff's Final Rule Briefing Package. This price increase represents only about 5% of the total costs of replacing all custom window coverings. *Id*. The Commission expects that the custom window covering market will absorb this cost, just as seen in the stock window covering market. This fact is also observed in the Canadian window covering market. Canada implemented a rule earlier this year that eliminates hazardous cords on all window covering products, and the market has reacted with cost-effective substitutes and redesigned products.

The final rule is consistent with the proposed rule, by requiring operating cords on custom window coverings to meet identical requirements for operating cords on stock window coverings, as set forth in section 4.3.1 of ANSI/WCMA A100.1 – 2018, American National Standard for Safety of Corded Window Covering Products (ANSI/WCMA-2018). Section 4.3.1 of ANSI/WCMA-2018 requires stock window coverings to have:

(1) no operating cords (cordless) (section 4.3.1.1);

(2) inaccessible operating cords (section 4.3.1.3); or

(3) operating cords equal to or shorter than 8 inches in any use position (section 4.3.1.2). The proposed rule provided requirements for one method, a rigid cord shroud, for manufacturers to make operating cords inaccessible, to comply with section 4.3.1.3.

4

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

A345

Based on review and consideration of the public comments, the Commission is providing requirements for an additional method to meet the "inaccessible" requirement under section 4.3.1.3 in the final rule, a retractable cord, as long as it meets the performance requirements in the rule. The final rule does not preclude manufacturers from developing new methods of meeting the "inaccessible" requirement in section 4.3.1 of ANSI/WCMA-2018. However, if manufacturers choose to use a rigid cord shroud or a retractable cord, these devices must meet the requirements in the final rule. The final rule also contains requirements for one method to make accessible continuous loops non-hazardous: loop cord and bead chain restraining devices. ANSI/WCMA-18 and the draft ANSI/WCMA-2022 allow these three methods to make cords non-hazardous, with different requirements from the final rule. Hundreds of commenters requested that we allow these options to remain for custom products. These methods are allowed in the final rule provided that they meet durability requirements.

This final rule addresses the unreasonable risk of injury associated with operating cords on custom window coverings. In a separate, concurrent rulemaking under section 15(j) of the CPSA, under CPSC Docket No. CPSC–2021–0038, the Commission is finalizing a rule to deem a "substantial product hazard" (SPH), as defined in section 15(a)(2) of the CPSA: (1) the presence of hazardous operating cords on stock window coverings; (2) the presence of hazardous inner cords on stock and custom window coverings; or (3) the absence of a required manufacturer label on stock and custom window coverings.[6]

---

[6] The preamble to the rule under section 15(j) explains that the voluntary standard adequately addresses operating cord hazards associated with stock window coverings, and inner cord hazards associated with both stock and custom window coverings. Note that unlike with custom window coverings, ANSI/WCMA-2018 does not include requirements for additional methods for stock products to meet section 4.3.1, and most stock products use manual lifting to comply with the voluntary standard. Regardless, the rule under section 15(j) of the CPSA does not preclude manufacturers from innovating compliance methods, as long as the products meet the operating cord requirements in section 4.3.1 of ANSI/WCMA-2018.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

B.        *Background and Statutory Authority*

Window coverings are "consumer products" within the jurisdiction of the CPSC, and subject to regulation under the authority of the CPSA.  *See* 15 U.S.C. 2052(a)(5).  The final rule applies to all custom window coverings used in residences, in schools, or elsewhere, as long as consumers have access to the window covering and are subject to a strangulation hazard.  *Id*. Section 7(a) of the CPSA authorizes the Commission to promulgate this final rule which sets forth performance requirements that are reasonably necessary to prevent or reduce an unreasonable risk of injury or death associated with operating cords on custom window coverings.  15 U.S.C. 2056(a).

Incident data demonstrate that children can strangle on accessible window covering cords that are long enough to wrap around their neck.  Accordingly, the performance requirements in the final rule require that operating cords on custom products meet the requirements for stock window coverings in section 4.3.1 of ANSI/WCMA-2018, to prevent an unreasonable risk of injury, strangulation and death, to children 8 years old and younger, and provides several methods to make operating cords inaccessible or non-hazardous.  Options to eliminate cords or to make cords inaccessible must be integrated with the product as sold, so that the safety of custom window coverings does not rely on the installation of external safety devices (*i.e.*, cord tension device) by a consumer or an installer.

Section 7(b)(1) of the CPSA requires the Commission to rely on a voluntary standard, rather than promulgate a mandatory standard, when compliance with the voluntary standard would eliminate or adequately reduce the risk of injury associated with a product, and it is likely that products will be in substantial compliance with the voluntary standard.  15 U.S.C. 2056(b)(1).  As described in section II.F of this preamble, the Commission finds that custom window coverings substantially comply with the voluntary standard, ANSI/WCMA-2018.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION                                   CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

However, as reviewed in the NPR, section 4.3.2 of ANSI/WCMA-2018 that applies to custom window coverings, does not adequately address the risk of injury associated with operating cords on custom window coverings because it allows for the sale of custom window coverings equipped with hazardous operating cords.  87 FR at 1030-32.  A hazardous cord is one that is not compliant with section 4.3.1 of ANSI/WCMA-2018, which requires that products be cordless, use cords that are inaccessible to children, or use cords that are short (equal to or less than 8 inches) to prevent children from wrapping a cord around their neck.  The NPR explained that the requirements in the rule would address 100 percent of the known operating cord incidents associated with custom window coverings. *Id*. at 1031.

Section 9 of the CPSA specifies the procedure that the Commission must follow to issue a consumer product safety standard under section 7 of the CPSA.  The Commission may commence rulemaking by issuing either an advance notice of proposed rulemaking (ANPR) or an NPR.  The Commission issued an ANPR for corded window coverings, including stock and custom products, in January 2015 (80 FR 2327 (January 16, 2015)).  Subsequently, in January 2022, the Commission issued two NPRs.  The Commission issued an NPR under section 15(j) of the CPSA for the hazards addressed by ANSI/WCMA-2018, including operating and inner cords on stock window coverings, and inner cords on custom window coverings (87 FR 891 (Jan. 7, 2022)), and issued an NPR under sections 7 and 9 of the CPSA to address operating cords on custom window coverings (87 FR 1014 (Jan. 7, 2022)).

As required in section 9 of the CPSA, in the NPR for custom window coverings, the Commission requested comment on the risk of injury identified by the Commission, the regulatory alternatives being considered, and other possible alternatives for addressing the risk of injury.  The Commission also requested comments on the preliminary findings included in the

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

proposed rule. *Id*. at 1053-54. Section III of this preamble summarizes and responds to the comments received on the NPR.

    C.     *Product Description*

    1.  Overview of Window Covering Products

    The NPR describes the types of custom window coverings in use and the types of operating cords and systems for custom window coverings. 87 FR at 1015-18. Window coverings include a wide range of products, including shades, blinds, curtains, and draperies. A cord or loop used by consumers to manipulate a window covering is called an "operating cord" and may be in the form of a single cord, multiple cords, or continuous loops. "Cordless" window coverings are products designed to function without an operating cord, but they may contain inner cords. Figures 1 through 6 explain window covering terminology and show examples of different types of window coverings.



**Figure 1. Horizontal blind**





THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



**Figure 4. Vertical blind**



**Figure 4a. Close-Up View
Vertical blind**



**Figure 5. Roman shade**



**Figure 6. Cordless horizontal blind**

Figure 1 shows a horizontal blind containing inner cords, operating cords, and tilt cords. Figure 2 shows a roll-up shade containing lifting loops and operating cords. Figure 3 shows a cellular shade with inner cords between two layers of fabric and operating cords. Figure 4 shows

9

THIS DOCUMENT HAS NOT BEEN REVIEWED                    CLEARED FOR PUBLIC RELEASE
OR ACCEPTED BY THE COMMISSION                                UNDER CPSA 6(b)(1)

a vertical blind with a looped operating cord to traverse the blind and a looped bead chain to tilt the vanes.  Figure 4a, a close-up view of Figure 4, shows two continuous loop operating cords on the same blind; one cord tilts the slats to open and close the blind, and the other cord traverses the blind.  Figure 5 shows a Roman shade with inner cords that run on the back side of the shade and operating cords.  Figure 6 is a horizontal blind that is marketed as "cordless" because it has no operating cords, but it still contains inner cords.  Window covering operating systems can vary slightly by window covering type, but all operating systems fit into one of two general categories: corded or cordless.

2.  <u>Corded Window Coverings</u>

"Traditional" or "corded" shades and blinds generally have cords located inside the product (inner cord), to the side of the product (operating cord or outer cord), or both.  The inner cords between the head rail and bottom rail lift the horizontal slats to adjust light coming through, as in the case of horizontal blinds, or lift fabric and similar materials, as in the case of Roman or pleated shades.  The outer cord or operating cord allows the user to raise, lower, open and close, rotate, or tilt the window covering.  Operating cord systems generally fall into one of three categories: (1) standard; (2) single cord; and (3) continuous loop.  The operating cord in a standard operating system consists of two or more cords and often includes a cord locking device to allow the user to set the height of the window covering.  In a single cord operating system, the user can manipulate the window covering with a pull cord.  The operating cord in a continuous loop operating system uses a single piece of cord or a beaded metal or plastic chain that is secured to a wall and operates like a pulley.  For example, pulling down the rear half of the loop will lower the shade, while pulling down the front half of the loop will raise the shade.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

### 3. Cordless Window Products

Virtually every window covering type is available with a "cordless" operating system, which means it has been designed to function without an operating cord.[7] Cordless window coverings may require inner cords, but these can be, and typically are, made inaccessible. In lieu of an operating cord, cordless operating systems can be manual or motorized. A manual operating system allows users to lift or lower the window covering with a handle or directly by hand. A motorized operating system uses a motor and control system to manipulate the window covering, such as a remote control or wall switch. Installation of cordless window coverings that are motorized is more complicated than manual systems because motorized systems require a power source.

### 4. Other Types of Safety Devices

The NPR reviewed safety devices some manufacturers use to isolate operating cords to make them safer, and assessed whether these methods address the strangulation risk. 87 FR at 1018-19. Alternative safety devices include, among others: retractable cords, cord cleats, cord shrouds, cord condensers, and wands. Tab I in Staff's NPR Briefing Package contains a more detailed description of these devices. In the NPR, the Commission preliminarily found that these devices, as addressed in ANSI/WCMA-2018, are inadequate to address the risk of injury associated with operating cords on custom window products. *Id.* However, the Commission requested comment on several methods used to make operating cords inaccessible, including

---

[7] The availability of alternatives to corded window coverings may sometimes be constrained due to size and weight limitations. *See* Lee, 2014. Through market research, staff found several examples of cordless blinds that are made with a maximum height of 84" and a maximum width of 144" (Tab G of Staff's NPR Briefing Package).

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

rigid cord shrouds, a method included in the NPR, as well as retractable cords and cord and bead chain restraining devices. 87 FR at 1054.

Based on the comments received, and as discussed in section II of this preamble, the final rule includes additional methods to address the strangulation risk, including retractable cords and loop cord and bead chain restraining devices. In the final rule the Commission strengthens durability and performance requirements for these additional methods, to address the public comments and to ensure that use of safety devices does not introduce new hazards, such as from broken parts. These additional compliance methods allow for products that have one-handed operation and do not limit consumer accessibility to window coverings, but still eliminate the strangulation hazard.

5. "Stock" and "Custom" Window Coverings Defined in the NPR

Like the NPR, this final rule relies on the definitions of window coverings and their features as set forth in the ANSI/WCMA-2018 standard, which requires "stock" and "custom" window coverings to meet different sets of operating cord requirements. 87 FR at 1019. The final rule uses the same definition of a "stock window covering" as the NPR, and has the same meaning as the definition of "Stock Blinds, Shades, and Shadings" in section 3, definition 5.02 of ANSI/WCMA-2018. A "stock widow covering" is a completely or substantially fabricated product prior to being distributed in commerce. Even when the seller, manufacturer, or distributor modifies a pre-assembled product, by adjusting to size, attaching the top rail or bottom rail, or tying cords to secure the bottom rail, the product is still considered "stock," as defined in ANSI/WCMA-2018. Moreover, under the ANSI standard, online sales of a window covering, or the size of the order, such as multifamily housing orders, do not make the product a non-stock product. ANSI/WCMA-2018 provides these examples to clarify that, as long as the

12

product is "substantially fabricated" prior to distribution in commerce, subsequent changes to the product do not change its categorization from "stock" to "custom."

The final rule also defines a "custom window covering" using the same definition of "Custom Blinds, Shades, and Shadings" found in section 3, definition 5.01 of ANSI/WCMA-2018, which is "any window covering that is not classified as a stock window covering." The final rule also includes definitions of "operating cord," "cord shroud," "rigid cord shroud," and "retractable cord," as described in section IV.A of this preamble.

6. <u>The Window Covering Industry</u>

The total U.S. window covering market size in 2021 was approximately $6.7 billion.[8] (Euromonitor 2022a). CPSC staff estimates that firms classified as small by Small Business Administration (SBA) guidelines account for $3.9 billion annually, and that none of these firms account for more than three percent of total market share by revenue. (Euromonitor 2022b). The NPR reviewed that, based on 2017 data, 1,898 firms were categorized as blinds and shades manufacturers and retailers (Census Bureau, 2020). 87 FR at 1019. Of these, about 1,840 firms (302 manufacturers and 1,538 retailers) are small. In 2020, three manufacturers accounted for almost 38 percent of dollar sales in the U.S. window coverings market (Euromonitor 2021a). Only one of these manufacturers is a publicly held firm. In 2020, the largest global manufacturer and distributor of window coverings reported worldwide net sales of $3.5 billion, with North American window covering sales reported as $1.7 billion. The second largest firm is privately held, and annual reports are not publicly available. Estimates of this firm's revenue indicate annual U.S. window covering revenue in 2020 of approximately $728 million (Euromonitor 2021a). The third firm is also privately held, and estimates indicate U.S. window covering

---

[8] Stock window coverings most likely account for a minority of the total market size in terms of revenue due to significant average price differences between stock and custom products. (D+R International 2021).

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

revenues in 2020 of approximately $88 million (Euromonitor 2021a). The remainder of the total market size of $6.6 billion is attributed to firms that each account for less than 3 percent market share (Euromonitor 2021b). *Id.*

A recent study conducted for CPSC (D+R, 2021) estimated that in 2019, approximately 139 million residential window coverings were shipped in the United States. Most of these shipments, 59.2 percent, were blinds, while 25.4 percent were shades. When comparing unit sales data to revenue data, CPSC staff found that while custom products account for approximately 44 percent of unit sales, a disproportionate amount of revenue is attributable to custom window covering products. For example, Roman shades, which are sold almost always as custom window covering products, account for 1.9 percent of annual sales in 2019, but generated revenues equal to 2.3 percent of the total.

     7.  <u>Retail Prices</u>

As reviewed in the NPR, retail prices for window coverings vary, depending on the type of the product and retailer. 87 FR at 1019; Tab F of the Final Rule Briefing Package. According to a D+R International (2021) study, average prices for window coverings range from $54 to $94 for shades and from $25 to $250 for blinds.[9] Prices for vertical blinds are generally lower than the prices of horizontal blinds; prices for roller shades are slightly lower than the prices of Roman and cellular shades (D+R International, 2021).[10]

Consumers can purchase custom sized and custom designed window coverings from mass merchants, specialty retailers, e-commerce retailers, and in-home consultation firms. Custom coverings include uncommon window covering sizes, such as extremely small (*e.g.*, 9

---

[9] The range for shades is based on average prices for cellular shades, roller shades, Roman shades, and pleated shades. The range for blinds is based on average prices for vinyl blinds, metal blinds, faux-wood blinds, wood blinds, and vertical blinds.

[10] The D+R review of prices and product availability found that stock product prices are generally lower than custom products and that cordless lift systems resulted in an increase in price except in the case of vertical blinds.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

inches wide x 13 inches high), extremely large (*e.g.*, 96 inches wide x 96 inches high), and other unusual sizes. Retail prices for custom made window coverings can be as high as $5,000.[11] Retailers often suggest in-home measuring and evaluation to estimate the price for custom designed products, as non-standard sizes or window shapes or motorized lift systems can require professional installation. Prices for customized window coverings are on average higher than similar stock products sold by mass retailers.

8. <u>Window Coverings in Use</u>

CPSC staff calculated an estimate of the number, and statistical distribution, of custom window coverings in use using CPSC's Product Population Model (PPM).[12] Tab F of the Staff Final Rule Briefing Package. The PPM is a statistical model that projects the number of products in use given estimates of annual product shipments/unit sales and information on product failure rates over time. Using the annual unit shipment estimates from the D+R International (2021) report, along with estimates on the number of corded products sold/in use, estimates for the share of custom products sold/in use, and estimates of the expected product life for window coverings by type provided by WCMA, staff estimates approximately 145 million corded custom window coverings in use in the United States in 2020. Table 1 shows the breakdown and calculation of estimated *corded custom* products in use, by type.

---

[11] Based on firms' websites, retail prices for custom-made Roman shades can range from $300-$5,000.
[12] Lahr, M.L., Gordon, B.B., 1980. Product life model feasibility and development study. Contract CPSC-C-79-009, Task 6, Subtasks 6.01-6.06). Columbus, OH: Battelle Laboratories.

THIS DOCUMENT HAS NOT BEEN REVIEWED                    CLEARED FOR PUBLIC RELEASE
    OR ACCEPTED BY THE COMMISSION                              UNDER CPSA 6(b)(1)

**Table 1. Estimates of the Number of Corded Custom Window Coverings in Use**

| | [1]<br>Number of Products in use (Millions) | [2]<br>% of Custom products in use (WCMA 2022a) | [3]<br>% of Corded Products (WCMA 2022b) | [4]<br>Expected Product Life (WCMA 2022b) | [5]<br>Number of Corded Custom Products in use (Millions) |
|---|---|---|---|---|---|
| Horizontal Blinds | 474.24 | | | | 76.02 |
| Vinyl/Metal | 251.35 | 20% | 91.9% | 6.7 | 46.20 |
| Wood/Faux Wood | 222.89 | 20% | 66.9% | 10.8 | 29.82 |
| Shades | 280.36 | | | | 22.67 |
| Cellular | 94.46 | 20% | 21.0% | 7.2 | 3.97 |
| Pleated | 40.66 | 20% | 31.0% | 7.5 | 2.52 |
| Roman | 23.29 | 20% | 41.2% | 8.75 | 1.92 |
| Roller | 84.27 | 20% | 57.3% | 7.2 | 9.66 |
| Soft Sheer | 37.69 | 20% | 61.1% | 7.2 | 4.61 |
| Vertical Blinds | 177.84 | 20% | 64.8% | 7.6 | 23.05 |
| Curtains/Drapery | 212.59 | 20% | 54.4% | 15 | 23.13 |
| Total | 1,145.03 | | | | 144.87 |

D.      *Hazards Associated with Window Covering Cords*

Window covering cords, including operating cords (meaning pull cords and continuous loop cords), inner cords, and lifting loops, can pose strangulation hazards to children when they are accessible and long enough to wrap around a child's neck. Figures 7, 8, and 9 below depict the strangulation hazard for different window covering cord types.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



**Figure 7. (a) Operating pull cords ending in one tassel (left); (b) operating cords tangled, creating a loop (middle); (c) operating cords wrapped around the neck (right)**



**Figure 8. (a) Inner cords creating a loop (left), (b) Inner cords on the back side of Roman shade (right)**



**Figure 9. (a) Continuous loop cord (left), (b) Lifting loop on roll-up shade (right)**

Children can strangle from mechanical compression of the neck when they place a window covering cord around their neck. Strangulation due to mechanical compression of the neck is a complex process resulting from multiple mechanisms and pathways that involve both obstruction of the airway passage and occlusion of blood vessels in the neck. Strangulation can

17

lead to serious injuries with permanent debilitating outcomes or death. If sustained lateral pressure occurs at a level resulting in vascular occlusion, strangulation can occur when a child's head or neck becomes entangled in any position, even in situations where the body is fully or partially supported.

Strangulation is a form of asphyxia that can be partial (hypoxia), when there is an inadequate oxygen supply to the lungs, or total, when there is complete impairment of oxygen transport to tissues. A reduction in the delivery of oxygen to tissues can result in permanent, irreversible damage. Experimental studies show that as little as 2 kg (4.4 lbs.) of pressure on the neck may occlude the jugular vein (Brouardel, 1897); and 3kg to 5 kg (7-11 lbs.) may occlude the common carotid arteries (Brouardel, 1897 and Polson, 1973). Minimal compression of any of these vessels can lead to loss of consciousness within 15 seconds and death in 2 to 3 minutes, (Digeronimo and Mayes, 1994; Hoff, 1978; Iserson, 1984; Polson, 1973).

The vagus nerve is also located in the neck near the jugular vein and carotid artery. The vagus nerve is responsible for maintaining a constant heart rate. Compression of the vagus nerve can result in cardiac arrest due to mechanical stimulation of the carotid sinus-vagal reflex. In addition, the functioning of the carotid sinuses may be affected by compression of the blood vessels. Stimulation of the sinuses can result in a decrease in heart rate, myocardial contractility, cardiac output, and systemic arterial pressure in the absence of airway blockage.

Strangulation proceeding along one or more of these pathways can progress rapidly to anoxia, associated cardiac arrest, and death. As seen in the CPSC data (Wanna-Nakamura, 2014), and in the published literature, neurological damage may range from amnesia to a long-term vegetative state. Continued deterioration of the nervous system can lead to death (Howell and Gully, 1996; Medalia et al., 1991).

Because a preexisting loop acts as a noose when a child's neck is inserted, and death can

18

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

occur within minutes of a child losing footing, CPSC staff concluded that head insertion into a preexisting loop poses a higher risk of injury than when a child wraps a cord around his or her neck. However, both scenarios have been demonstrated to be hazardous and have led to fatal outcomes, according to CPSC data.

Based on the data, the Commission also concludes that reliance on parental supervision and warning labels are inadequate to address the risk of injury associated with window covering cords. As reviewed in the NPR, a user research study found that caregivers lacked awareness regarding the potential for window covering cord entanglement; lacked awareness of the speed and mechanism of the strangulation injury; identified difficulty using and installing safety devices for window coverings among the primary reasons for not using them; and were unable to recognize the purpose of the safety devices provided with window coverings (Levi et al., 2016).[13] According to Godfrey *et al*. (1983), consumers are less likely to look for and read safety information about the products that they frequently use and are familiar with. Consumers almost certainly have window coverings in their homes and may use them daily. Therefore, even well-designed warning labels will have limited effectiveness in communicating the hazard on this type of product.

Based on the foregoing, the Commission finds that warning labels are unlikely to effectively reduce the strangulation risk from hazardous cords on window coverings, because consumers are not likely to read and follow warning labels on window covering products, and strangulation deaths among children occur quickly and silently, such that parental supervision is insufficient to address the incidents. Indeed, staff observed that most of the window covering units involved in incidents had the permanent warning label required by the ANSI/WCMA standard affixed to the product. Even well-designed warning labels will have limited

---

[13] https://cpsc.gov/s3fs-public/Window%20Coverings%20Safety%20Devices%20Contractor%20Reports.pdf.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

effectiveness in communicating the hazard on this type of product, because consumers are less likely to heed warnings for familiar products that they commonly interact with without incident.

In contrast to requirements for custom window coverings in ANSI/WCMA-2018, stock window covering requirements in the ANSI/WCMA standard adequately address the strangulation hazard, by not allowing hazardous cords on these products; stock window covering requirements do not rely on consumer action to address the risk of strangulation. Stock window coverings that comply with the ANSI/WCMA standard inherently minimize strangulation risk as sold because no consumer or installer action is required to protect against strangulation of children. Accordingly, the Commission concludes that the risk of injury associated with custom window coverings must be addressed through performance requirements for these products, to ensure that custom window coverings are as safe as stock window coverings for children 8 years old and younger.

E.      *Risk of Injury*

The incident data demonstrate that regardless of whether a product is categorized as stock or custom, children are exposed to the same risk of strangulation from accessible window covering cords. For the NPR, the Commission presented window covering cord incidents occurring from 2009 through 2020.[14] 87 FR at 1022-27. Since extracting data for the NPR, CPSC has received reports of 15 additional incidents. Tab A of Staff's Final Rule Briefing Package details this new incident data. The following analysis is based on incidents received from 2009 through 2021, and distinguishes between stock and custom window coverings whenever feasible.

---

[14] CPSC staff searched three databases for identification of window covering cord incidents: the Consumer Product Safety Risk Management System (CPSRMS), the National Electronic Injury Surveillance System (NEISS), and the Multiple Cause of Deaths data file (further information can be found at https://wonder.cdc.gov/mcd-icd10.html). The first two sources are CPSC-maintained databases. The Multiple Cause of Deaths data file is available from the National Center for Health Statistics (NCHS).

THIS DOCUMENT HAS NOT BEEN REVIEWED          CLEARED FOR PUBLIC RELEASE
OR ACCEPTED BY THE COMMISSION                      UNDER CPSA 6(b)(1)

1. <u>Incident Data from CPSC Databases</u>

Based on newspaper clippings, consumer complaints, death certificates purchased from states, medical examiners' reports, reports from hospital emergency department-treated injuries, and in-depth investigation reports, CPSC staff found a total of 209 reported fatal and near-miss strangulations on window covering cords that occurred among children 8 years old and younger from January 2009 through December 2021. These 209 incidents do not necessarily include all window covering cord-related strangulation incidents that occurred during that period, and recent data, particularly for 2021, may be incomplete. However, these 209 incidents do provide a minimum number for such incidents during that time frame.

Table 2a provides the breakdown of the incidents by year. Totals include new incidents received after the NPR data analysis, which are noted in parentheticals below. Because reporting is ongoing and the number of incidents may grow, and because these reports are anecdotal, inferences should not be drawn from the year-to-year variations in the reported data.

**Table 2a**
**Reported Fatal and Near-Miss Strangulation Incidents Involving Window Covering Cords**
**Among Children Eight Years and Younger 2009 – 2021**

| Incident Year | Number of Reported Incidents | | |
|---|---|---|---|
| | *Total* | *Fatal Strangulations* | *Near-Miss Strangulations* |
| 2009 | 48 | 14 | 34 |
| 2010 | 31 | 11 | 20 |
| 2011 | 10 | 6 | 4 |
| 2012 | 17 | 8 | 9 |
| 2013 | 9 | 2 | 7 |
| 2014 | 17 | 12 | 5 |
| 2015 | 9 | 7 | 2 |
| 2016 | 17 | 13 | 4 |
| 2017 | 10 (1) | 5 | 5 (1) |
| 2018 | 8 | 4 | 4 |
| 2019 | 11 | 4 | 7 |
| *2020*\* | 13 (5) | 8 (5) | 5 |
| *2021*\* | 9 (9) | 6 (6) | 3 (3) |
| **Total** | **209 (15)** | **100 (11)** | **109 (4)** |

**Source: CPSC epidemiological databases CPSRMS and NEISS. Data in ( ) indicate the number of new incidents received since the NPR data analysis.**
**Note:  \* indicates data collection is ongoing.**

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Among the 15 newly reported incidents, staff identified 11 fatalities (73 percent) and 4 non-hospitalized injuries (27 percent). The non-hospitalized injuries resulted in lacerations and abrasions.

Table 2b expands on Table 2a to display the distribution of the annual incidents by severity of incidents and type of window coverings involved. CPSC staff identified 50 of 209 incident window coverings (24 percent) to be stock products, and 36 of the 209 (17 percent) window coverings as custom products. Where staff could identify a product type, custom products therefore made up 42% (36 out of 86) of the incident products. CPSC staff could not identify the window covering type in the remaining 123 of the 209 incidents (59 percent); 65 of the 123 incidents (53 percent) involving an uncategorized window covering resulted in a fatality.

**Table 2b**
**Reported Fatal and Near-Miss Strangulation Incidents Involving Stock/Custom/Unknown Types of Window Covering Cords Among Children Eight Years and Younger 2009 -- 2021**

| Incident Year | Reported Incidents by Window Covering Type | | | |
| | *Stock (Fatal/Nonfatal)* | *Custom (Fatal/Nonfatal)* | *Unknown (Fatal/Nonfatal)* | *All* |
|---|---|---|---|---|
| 2009 | 20 (4/16) | 7 (2/5) | 21 (8/13) | 48 |
| 2010 | 10 (3/7) | 7 (2/5) | 14 (6/8) | 31 |
| 2011 | 2 (1/1) | 4 (3/1) | 4 (2/2) | 10 |
| 2012 | 1 (1/0) | 5 (1/4) | 11 (6/5) | 17 |
| 2013 | 2 (1/1) | 3 (1/2) | 4 (0/4) | 9 |
| 2014 | 3 (2/1) | 2 (1/1) | 12 (9/3) | 17 |
| 2015 | 4 (4/0) | 1 (1/0) | 4 (2/2) | 9 |
| 2016 | 5 (3/2) | 4 (3/1) | 8 (7/1) | 17 |
| 2017 | 2 (1/1) | 1 (0/1) | 7 (4/3) | 10 |
| 2018 | -- | 1 (0/1) | 7 (4/3) | 8 |
| *2019* | 1(0/1) | -- | 10 (4/6) | 11 |
| *2020\** | -- | 1 (1/0) | 12 (7/5) | 13 |
| *2021\** | -- | -- | 9 (6/3) | 9 |
| **Total** | **50 (20/30)** | **36 (15/21)** | **123 (65/58)** | **209** |

**Source: CPSC epidemiological databases CPSRMS and NEISS.**
**Note: * indicates data collection is ongoing.**

One hundred of the 209 incidents (48 percent) reported a fatality. Among the nonfatal incidents, 16 involved hospitalizations (8 percent). The long-term outcomes of these 16 injuries

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

varied from a scar around the neck, to quadriplegia, to permanent brain damage. One additional child was treated and transferred to another hospital; the final outcome of this patient is unknown. In addition, 79 incidents (38 percent) involved less-severe injuries, some requiring medical treatment, but not hospitalization. In the remaining 14 incidents (7 percent), a child became entangled in a window covering cord, but was able to disentangle from the cord and escape injury. For the incidents identified in the NPR for which gender information is available, 66 percent of the children were males, and 34 percent were females. One incident did not report the child's gender. For the 15 new incidents staff found a similar pattern regarding gender; 62 percent of the victims were male and 38 percent were females.

Table 2c provides a breakdown of the incidents by window covering type. Among the 11 newly reported deaths since the NPR analysis, staff definitively identified the cord type in 6 deaths. Three deaths (27 percent of all newly reported deaths) involved a pull cord, 2 deaths (18 percent) involved a continuous loop, and 1 death (9 percent) involved inner cord(s); staff had insufficient information to determine the cord type involved for the remaining 5 fatal incidents.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**Table 2c: Distribution of Reported Incidents by Types of**
**Window Coverings and Associated Cords 2009 – 2021**
**(Numbers in Parentheses Indicate New Reports Received Since NPR)**

| Window Covering Type | Pull Cord | Continuous Loop | Inner Cord | Lifting Loop | Tilt Cord | Unknown | TOTAL |
|---|---|---|---|---|---|---|---|
| | | | Cord Type | | | | |
| Horizontal | 68 (3) | 2 | 4 (1) | 0 | 5 | 10 | 89 (4) |
| Vertical | 0 | 12 (1) | 0 | 0 | 0 | 0 | 12 (1) |
| Drapery | 0 | 4 (1) | 0 | 0 | 0 | 0 | 4 (1) |
| Roman | 2 | 2 | 19 | 0 | 0 | 1 | 24 |
| Other* | 2 | 5 | 0 | 0 | 0 | 0 | 7 |
| Roll-Up | 1 | 0 | 0 | 4 | 0 | 1 | 6 |
| Roller | 0 | 9 | 0 | 0 | 0 | 0 | 9 |
| Unknown | 1 | 1 | 0 | 0 | 0 | 56 (9) | 58 (9) |
| Subtotal † | 74 (3) | 35 (2) | -- | -- | 5 | 68 (9) | 182 (14) |
| TOTAL | **74 (3)** | **35 (2)** | **23 (1)** | **4** | **5** | **68 (9)** | **209 (15)** |

Source: CPSC epidemiological databases CPSRMS and NEISS.
Other*: This category includes cellular and pleated shades.
Subtotal† : This row shows the incidents that are relevant to the section 7&9 rule.

2. <u>Incident Data from National Estimates</u>

*(a) Estimates of Window Covering Cord-Related Strangulation Deaths Using National Center for Health Statistics Data*

The NCHS compiles all death certificates filed in the United States into multiple-cause mortality data files. The mortality data files contain demographic information on the deceased, as well as codes to classify the underlying cause of death, and up to 20 contributing conditions. The NCHS compiles the data in accordance with the World Health Organization (WHO) instructions, which request member nations to classify causes of death by the current Manual of the International Statistical Classification of Diseases, Injuries, and Causes of Death. Death classifications use the tenth revision of the International Classification of Diseases (ICD), implemented in 1999. For the NPR, 2019 was the latest available year for NCHS data; since then, data for 2020 have become available.

Using the ICD10 code value of W76 (*Other accidental hanging and strangulation*), the code most likely to capture strangulation fatalities among children under 5 (based on empirical

24

evidence from death certificates maintained in CPSC databases), CPSC staff derived fatality estimates for 2009 through 2020, presented in Figure 10 below. An unknown proportion of strangulation deaths is likely coded under ICD10=W75 (*Accidental suffocation and strangulation in bed*) as well as ICD10=W83 (*Other specified threats to breathing*), which staff cannot separate out from the non-strangulation deaths because of the unavailability of any narrative description in these data. Hence, CPSC's estimates of strangulation deaths are minimums.

A 2002 CPSC report by Marcy *et al.* [15] concluded that 35 percent of all strangulation fatalities among children less than 5 years old were associated with window covering cords. Assuming that the same proportion applied for the entire 12-year period 2009 – 2020, Figure 10 below presents the national estimates for all strangulation fatalities as well as strangulations involving window covering cords among children under 5.

**Figure 10: Estimated Annual Minimum for Fatal Strangulations
Among Children Under Five Years of Age 2009 - 2020**



**Source: Multiple Cause of Death data, NCHS, 2009 – 2020.**
**Note: The estimates for the window covering cord fatalities are based on the assumptions that 35% of all strangulation fatalities are due to window covering cords and that this percentage remained unchanged over 2009-2020.**

---

[15] N. Marcy, G. Rutherford. "Strangulations Involving Children Under 5 Years Old." U.S. Consumer Product Safety Commission, December 2002.

25

Based on the 2002 study, staff estimates the annual average number of deaths due to window coverings at 8.1.[16]  We note that this estimate is consistent with CPSC's actual incident data over a 12 year period.  For example, at the time of this final rule analysis, the incidents over the 12-year period 2009-2020 report an average of 7.8 annual deaths involving window covering cords among children under 8 years old.

F.     *ANSI/WCMA-2018 History and Description*

The NPR detailed CPSC staff's decades-long efforts to work with the Window Covering Manufacturers Association beginning in 1995 on an American National Standards Institute voluntary standard to address the strangulation hazard to young children from accessible cords on window coverings.  87 FR at 1027-28.  Importantly, after several versions of a voluntary standard failed to adequately address the strangulation risk, on January 8, 2018, ANSI published a revision to the window coverings standard, ANSI/WCMA A100.1 – 2018, that adequately addressed the operating and inner cord strangulation hazard for stock window coverings, and the inner cord hazard for custom products.  WCMA updated the 2018 version the standard in May 2018, and the standard went into effect on December 15, 2018.  That standard did not, however, adequately address the operating cord hazard for custom products.

ANSI/WCMA-2018 segments the window covering market between "stock" and "custom" window coverings, as defined in section 3 of the standard, definitions 5.02 and 5.01.  Per section 4.3.1 of the standard, stock window coverings are required to have:

(1) no operating cords (4.3.1.1),

(2) inaccessible operating cords (4.3.1.3), or

(3) short operating cords (equal to or less than 8 inches) (4.3.1.2).

---

[16] We received a comment critical of CPSC's use of this 2002 study. At this point in time, we are unaware of other data sources that would provide information regarding a more current national trend in window covering cord-related strangulations and the commenter did not provide an alternate data source.

THIS DOCUMENT HAS NOT BEEN REVIEWED        CLEARED FOR PUBLIC RELEASE
OR ACCEPTED BY THE COMMISSION        UNDER CPSA 6(b)(1)

Although manufacturers of custom window coverings can opt to meet the operating cord requirements for stock window coverings (sections 4.3.2.1 through 4.3.2.3 for custom window coverings are identical to 4.3.1.1 through 4.3.1.3), ANSI/WCMA-2018 allows the sale of corded window coverings that do not meet this standard, such as on some custom order products (sections 4.3.2.4 through 4.3.2.6). Table 3 demonstrates the operating cord systems allowed on custom window coverings that are prohibited on stock window coverings in ANSI/WCMA-2018.

**Table 3 – ANSI/WCMA-2018 Operating and Inner Cord Requirements for Stock and Custom Window Coverings**

| Performance Requirements in ANSI/WCMA A100.1-2018 | Assessment of the Performance Requirement | Stock Products | Custom Products |
|---|---|---|---|
| 1. *No operating cords OR* <br> 2. *Short cord with a length equal to or less than 8 inches in any state (free or under tension) OR* <br> 3. *Inaccessible operating cords* | Adequate | Required to have one or more of these options | Allowed/ Not Required |
| 4. *Inner cords that meet Appendix C and D* | Adequate | Required | Required |
| 5. *Manufacturer Label that meets section 5.3* | Adequate | Required | Required |
| 6. *Single Retractable Cord Lift System (no limit on length of exposed cord when operating)* <br> 7. *Continuous Loop Operating System* <br> 8. *Accessible Operating Cords longer than 8 inches* | Inadequate | Prohibited | Allowed/ Not Prohibited |

Section 4.3.2 of ANSI/WCMA-2018 contains additional requirements for custom products, including:

(1) operating cords must have a default length of 40 percent of the blind height (previously unlimited) (4.4);

(2) a wand is the default option for tilting slats (instead of a cord) (4.4.1.1); and

(3) warning labels must depict more graphically the strangulation hazard associated with cords (5.1).

27

Section II of this preamble assesses the adequacy of requirements for operating cords on stock and custom window coverings in ANSI/WCMA-2018 to address the hazards associated with corded window coverings. Based on staff's assessment, the Commission finds that ANSI/WCMA-2018 adequately addresses the risk of strangulation on operating cords for stock window coverings, by removing operating cords, ensuring that they are inaccessible to children, or by making them too short for a child to wrap around his or her neck. However, consistent with Table 3, the Commission finds ANSI/WCMA-2018 does not adequately address the risk of injury associated with operating cords on custom window coverings, because custom products can still be sold to consumers with hazardous operating cords.

    *G.*     Development of Draft Revised ANSI/WCMA Voluntary Standard

After the publication of the NPR on January 7, 2022, WCMA brought forth several proposals to revise requirements for custom window covering cords in ANSI/WCMA-2018, resulting in a final draft revision that went to ballot on July 15, 2022.[17] The ballot closed on August 15, 2022. CPSC staff voted negative on the ballot based on staff's analysis of the draft standard. Staff assessed as inadequate to address the risk of injury the requirements for tension devices used with continuous loop operating systems, the requirements for retractable cords, and tests for rigid cord shrouds and loop cord and bead chain restraining devices.[18] Although the draft ANSI/WCMA-2022 has not been adopted, and thus an assessment of this draft is not necessary for this rulemaking, CPSC nonetheless discusses the draft revised standard in section II.D of this preamble, based on Tab I of Staff's Final Rule Briefing Package. The draft ANSI/WCMA-2022 standard improves some requirements for operating cords on custom

---

[17] From December 2021 through May 2022, CPSC staff participated in meetings held by ANSI/WCMA to discuss updating the voluntary standard. Tab C of Staff's Final Rule Briefing Package contains a more detailed description of staff's participation. Meeting logs and staff's correspondence have been placed on the docket for this rulemaking.
[18] CPSC staff letter is available at https://www.regulations.gov/document/CPSC-2013-0028-3667

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

window coverings, but continues to allow accessible operating cords and loops that are long enough to wrap around a child's neck.

On September 23, 2022, WCMA issued a recirculation ballot due to negative votes cast for the original balloted revisions. In addition to CPSC staff, Consumer Federation of America, Independent Safety Consulting, LLC, and Parents for Window Blind Safety voted negative. As explained in Tab C of Staff's Final Rule Briefing Package, the reballoting does not resolve the concerns identified by CPSC staff.

### H. *Commission Efforts to Address Hazardous Window Covering Cords*

#### 1. Petition and Rulemaking

Since the mid-1990s, CPSC staff has been engaged with the voluntary standards body urging changes to the ANSI/WCMA standard to reduce the risk of injury associated with window covering cords. On October 8, 2014, the Commission granted a petition to initiate a rulemaking to develop a mandatory safety standard for window coverings.[19] The petition sought to prohibit window covering cords when a feasible cordless alternative exists. When a feasible cordless alternative does not exist, the petition requested that all window covering cords be made inaccessible by using passive guarding devices. The Commission granted the petition and published an ANPR seeking information and comment on regulatory options for a mandatory rule to address the risk of strangulation to young children on window covering cords, and then subsequently published two NPRs, under different authorities, to address the risk of injury.

The Commission is now finalizing both rules. The rule under section 15(j) is being finalized as proposed. See CPSC Docket Number CPSC-2021-0038. This rule under sections 7

---

[19] The petition, CP 13-2, was submitted by Parents for Window Blind Safety, Consumer Federation of America, Consumers Union, Kids in Danger, Public Citizen, U.S. PIRG, Independent Safety Consulting, Safety Behavior Analysis, Inc., and Onder, Shelton, O'Leary & Peterson, LLC. Staff's October 1, 2014 Petition Briefing Package, and a copy of the petition at Tab A, is available on CPSC's website at: https://www.cpsc.gov/Global/Newsroom/FOIA/CommissionBriefingPackages/2015/PetitionRequestingMandatoryStandardforCordedWindowCoverings.pdf on (cpsc.gov).

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

and 9 of the CPSA is being finalized consistent with the NPR, but provides that rigid cord shrouds, retractable cords, and loop cord and bead chain restraining devices are all methods that can be used to make window covering cords inaccessible or non-hazardous. All of these devices are sold integrated with a custom window covering, and contain additional requirements in the final rule to ensure that any cords remain inaccessible or if accessible, non-hazardous, and that the test methods ensure durability over the use of the product.

    2.    <u>Window Covering Recalls</u>

Since January 1, 2009, CPSC has conducted 42 consumer-level window covering recalls, including two recall reannouncements. Tab C of Staff's NPR Briefing Package provides the details of these 42 recalls, where strangulation was the primary hazard. Manufacturers recalled more than 28 million units,[20] including Roman shades and blinds, roll-up blinds, roller shades, cellular shades, horizontal blinds, and vertical blinds. The recalled products also included stock products, which can be purchased off the shelf by consumers, and custom products, which are made-to-order window coverings based on a consumer's specifications, such as material, size, and color.

**II.    Assessment of Operating Cord Requirements for Stock and Custom Window Coverings**

Consistent with the NPR, the final rule requires that operating cords on custom window coverings meet the same requirements as those for operating cords on stock window coverings, as provided in section 4.3.1 of ANSI/WCMA-2018. Additionally, based on the comments received, the final rule includes rigid cord shrouds and retractable cords as methods to make operating cords on custom window coverings inaccessible to children, and loop cord and bead

---

[20] This estimate does not include the recalled units of Recall No. 10-073. This was a December 15, 2009 industry-wide recall conducted by members of the Window Covering Safety Council (WCSC). An exact number of recalled products was not stated in the recall announcements.

THIS DOCUMENT HAS NOT BEEN REVIEWED              CLEARED FOR PUBLIC RELEASE
OR ACCEPTED BY THE COMMISSION                  UNDER CPSA 6(b)(1)

chain restraining devices as a method to prevent the formation of hazardous loops. Below we provide an overview of the engineering and human factors analysis of the requirements for stock and custom window coverings in ANSI/WCMA-2018, assess the balloted draft revision (draft ANSI/WCMA-2022), and evaluate the available technologies to make window coverings safer for children. We also explain the changes made in the final rule in response to the comments received on the NPR.

*A. Engineering Assessment of Operating Cord Requirements in ANSI/WCMA-2018*

1. <u>Stock Window Coverings</u>

As stated in the NPR, the requirements for operating cords on stock window coverings in ANSI/WCMA-2018 are adequate to address the risk of strangulation associated with window coverings. 87 FR at 1030-31. Staff analyzed the incident data for window coverings, which indicated that the largest proportion of deaths, irrespective of window covering type, involved operating cords (most frequently tangled or knotted cords, followed by cord(s) wrapped around the child's neck). The voluntary standard recognizes that long and accessible cords can pose a strangulation hazard. ANSI/WCMA-2018 defines the "operating cord" as the portion of a cord that the user interacts with and manipulates to move the window covering in a certain direction (*e.g.*, lifting or lowering, traversing, rotating). If a child wraps a long operating cord around their neck, or inserts their neck into a cord loop created by the design of the window covering or by tangled cords, the child can strangle to death within minutes. ANSI/WCMA-2018 provides three ways that a stock window covering can comply with the standard to reduce or eliminate the risk of children strangulating on operating cords:

*a. No Operating Cords (section 4.3.1.1).* Having no operating cords eliminates the strangulation hazard associated with operating cords. Consumers use a mechanism, other than an operating cord, to accomplish the desired movement action (*i.e.*, lifting, lowering,

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

traversing). For example, a spring mechanism on a horizontal blind allows the user to lift and lower the blind via the bottom rail of the window covering.

   *b. Short Cord with a Length Equal to or Less Than 8 Inches in Any State (section 4.3.1.2).* Based on the anthropometric dimensions of the youngest child involved in an incident, a static cord length of 8 inches or shorter is insufficient to strangle a child, because the neck circumference of a fifth percentile 6- to 9-month-old child is 8 inches (BSI, 1990, as cited in Norris and Wilson, 1995). Because a child would need some extra length of cord to hold the cord out and wrap it around their neck, staff calculated that a cord must be longer than 8 inches to cause strangulation. The requirements for stock products in ANSI/WCMA-2018 rely on this 8 inch operating cord limit, requiring that operating cords must be 8 inches or shorter, or must be made inaccessible, to address the strangulation risk. The Canadian window covering regulation has a similar requirement, limiting accessible cord lengths to about 8.7 inches.

   *c. Inaccessible Operating Cords Determined Per the Test Requirement in Appendix C of the ANSI/WCMA-2018 (section 4.3.1.3).* If a window covering has an operating cord that is longer than 8 inches, ANSI/WCMA-2018 requires that the cord must be inaccessible to children. Having inaccessible cords effectively eliminates the strangulation hazard associated with operating cords, because the child is unable to access a cord to cause strangulation. Accordingly, this requirement is tested using a probe that is intended to simulate the finger size of a young child; the diameter of the probe is 0.25 inches, based on fifth percentile 2- to 3.5-year-old's index finger diameter (Snyder et al., 1977) at 0.33 inches and the off-the-shelf availability of a 0.25-inch diameter dowel pin. If the probe cannot touch the operating cord, the cord is then deemed inaccessible, pursuant to ANSI/WCMA-2018.

   Figure 11 displays an example of a rigid cord shroud. In Figure 11, the accessibility probe cannot touch the operating cord because it is surrounded by the cord shroud. Therefore,

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

the window covering in Figure 11 meets section 4.3.1.3 of ANSI/WCMA-2018, because the operating cord is inaccessible.



**Figure 11. Rigid cord shroud**

The Commission concludes that ANSI/WCMA–2018 adequately addresses the strangulation hazard posed by accessible operating cords on stock window covering products, because the standard either eliminates accessible operating cords, or it limits the length of the cord so that it is too short for a child to strangle.

2.  <u>Custom Window Coverings</u>

As stated in the NPR, requirements for operating cords on custom window products in section 4.3.2 of ANSI/WCMA-2018 do not adequately address the risk of strangulation to children 8 years old and younger, because ANSI/WCMA-2018 allows custom window coverings to be sold with hazardous operating cords if they are custom ordered.  87 FR at 1031-32.  Of the 36 custom window covering incidents reviewed by staff, 31 (86%) incidents were related to operating cords (including pull cords and continuous loops).  CPSC has determined that had the requirements in section 4.3.1 of the ANSI/WCMA standard for operating cords on stock products been in effect for custom window coverings, the requirements would have prevented 100 percent of the incidents involving operating cords on custom window coverings.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

The 2018 version of the voluntary standard added two new requirements for custom window coverings to mitigate the strangulation hazard: (1) default maximum operating cord length of 40 percent of the blind height when the product is fully lowered, and (2) a default tilt wand option, instead of a cord, for tilting slats. However, ANSI/WCMA-2018 still allows hazardous operating cords to be part of the window covering design for custom products, which can comply with ANSI/WCMA-2018 using any of the methods below, all of which pose strangulation risks:

(a) *Accessible Operating Cords longer than 8 inches (section 4.3.2.6).* By allowing operating cords on custom window coverings to exceed 8 inches in length, ANSI/WCMA-2018 creates a continuing unreasonable risk of injury to children 8 years old and younger. Section 4.3.2.6 of ANSI/WCMA-2018 allows hazardous operating cords, meaning operating cords that are long enough for a child to wrap around their neck, or multiple cords that can become tangled and create a loop large enough for a child to insert their head. Even though ANSI/WCMA-2018 attempts to reduce the strangulation risk by shortening the default length of the cord to 40 percent of the window covering's length (section 4.4) and specifying the tilt wand as the default option versus tilt cords (section 4.4.1.1), as explained in Tab I of Staff's NPR Briefing Package, and in section II.C of the NPR, the risk associated with operating cords remains.

(b) *Continuous Loop Operating System (section 4.3.2.5).* This operating system requires that the operating loop be kept taut with a tension device. However, as observed in the incident data, a child can still insert their head into the continuous loop if it is not taut enough; in addition, tension devices may not be attached to the wall, which results in a free loop. Including the data reviewed since the NPR, CPSC staff identified 25 fatal strangulations involving a continuous corded loop without a functional tension device (*e.g.*, no device on the loop, device

34

on the loop but not attached to a fixed surface, or broken device).[21]  Moreover, staff identified

various scenarios where a head probe could be inserted into the hazardous loop from an installed

continuous loop with an ANSI/WCMA-compliant tension device attached to the wall.  Staff also

identified mis-installation or failure modes that will leave a hazardous loop on a custom product

throughout its life cycle, starting from its installation.[22]  In all these circumstances, a continuous

loop operating system is not sufficient to prevent strangulation of a child.

We received more than 420 comments stating that continuous loops with properly

attached tension devices are safe and should not be eliminated by the rule.  These comments,

however, are inconsistent with incident data, and CPSC staff's assessment of tension devices.

Because of the risk of serious injury and death to children created by these devices, absent

adequate safety features, the rule will not allow these devices to be sold with custom window

coverings unless there is also an integrated, durable, safety feature that will adequately address

the hazard.  Specifically, the final rule will allow continuous loop systems if the product

integrates a loop cord or bead chain restraining device that meets revised requirements in the

final rule, including tests to ensure durability, such as a UV test, followed by a cyclic test, and a

deflection test, as set forth in section 1260.2(d) of the final rule and explained in more detail in

section II.E of this preamble.

(b) *Single Retractable Cord Lift System (section 4.3.2.4).*  This method of

complying with ANSI/WCMA-2018 allows an operating cord on a custom window

covering to be pulled out to any length to operate the window covering, provided that it then

retracts to a shorter length when the user releases the cord.  Retractable cord lift systems

with an extended cord greater than 8 inches, and a low retraction force so that a child can

---

[21] Tab I of Staff's NPR Briefing Package, section II.C of the NPR.
[22] Tab I of Staff's Final Rule Briefing Package.

THIS DOCUMENT HAS NOT BEEN REVIEWED                    CLEARED FOR PUBLIC RELEASE
   OR ACCEPTED BY THE COMMISSION                              UNDER CPSA 6(b)(1)

access that length, allow a child to manipulate the cord and wrap the cord around their neck.

Accordingly, the retractable cord requirement, as written in ANSI/WCMA-2018 for operating cords on custom window coverings, is not adequate to address the risk of injury, because the maximum cord length and a minimum pull force required to operate the system are not specified in the standard.

CPSC requested comment in the NPR on whether additional requirements for retractable cords, such as a maximum exposed cord length and a minimum pull force for a single retractable cord lift system, could address the strangulation hazard. 87 FR at 1031-32. More than 140 commenters requested that retractable cords be allowed for use on custom window coverings. To address the comments, and to adequately address the risk of injury, the final rule allows for the use of single retractable cord systems provided they meet the additional requirements in the rule. Section 1260.2(c) requires that retractable cord systems complete retraction at 30 grams, have a non-cord retraction device, and have a stroke length equal to or less than 12 inches below the headrail. Retraction at 30 grams is the amount of force required to pull back the retractable cord fully into the headrail, to ensure that the cord remains inaccessible after use. A non-cord retraction device means that the product must use something other than a cord for the user to interact with to operate the window covering, such as a wand. A stroke length is the fixed amount of exposed cord available when a user pulls the retraction device down to lower or raise the window covering. In section II.E below, we assess that these additional requirements, including requirements for durability testing, will adequately address the strangulation hazard associated with accessible window covering cords.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

3. <u>Window Covering Technologies</u>

The NPR reviewed safer window covering technologies to address the strangulation hazard in use on stock and custom window coverings, including cordless window coverings, window coverings with rigid cord shrouds, and cordless motorized window coverings. 87 FR at 1032. Operating cords can be made inaccessible with passive guarding devices that allow the user to operate the window covering without the direct interaction of a hazardous cord. These types of window coverings use rigid cord shrouds, integrated cord/chain tensioners, or crank mechanisms. *Id*.

Cordless blinds can be raised and lowered by pushing up the bottom rail or pulling down the rail. This same motion may also be used to adjust the position of the horizontal slats for light control. Through market research, CPSC staff found several examples of cordless blinds that are made with a maximum height of 84 inches and a maximum width of 144 inches.

Rigid cord shrouds can be retrofitted over various types of window coverings to enclose pull cords and continuous-cord loops. A rigid cord shroud allows the user to use the pull cords while eliminating access to the hazardous cords. CPSC staff worked with WCMA and other members from March through December 2018, to develop draft requirements to test the stiffness of "rigid cord shrouds," by measuring the deflection and deformation.[23]

The NPR included requirements for rigid cord shrouds based on the deflection and deformation test previously developed by the ANSI/WCMA members. The final rule retains the requirements for two tests, as proposed in the NPR: the "Center Load" test and the "Axial Torque" test, to ensure the stiffness and the integrity of the shroud so that the enclosed operating cord does not become accessible when the shroud is twisted. The Center Load test verifies the

---

[23] The 2018 standard tests rigid cord shrouds for UV stability and impact.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

stiffness of the cord shroud, by measuring the amount of deflection in the shroud when a 5-pound force is applied at the mid-point. This test ensures that the shroud is not flexible enough to wrap around a child's neck. The Axial Torque test verifies that the cord shroud's opening does not enlarge to create an accessible cord opening when the shroud is twisted. Tab H of Staff's NPR Briefing Package contains additional detail on the requirement. The final rule maintains these requirements in section 1260.2(b). However, the final rule contains one clarification that rigid cord shrouds must also meet the UV and durability testing for cord shrouds in section 6.3 of ANSI/WCMA-2018.

The NPR also discussed crank mechanisms and cordless motorized blinds as safer alternatives to replace corded continuous-loop systems. 87 FR at 1032. Cordless custom window coverings are allowed in the final rule pursuant to section 1260.2(a). Crank mechanisms are also allowed under section 1260.2(a) if the crank mechanism replaces the operating cord.

> B.    *International Standards for Window Covering Operating Cords*

The NPR identified and assessed three international standards for operating cords on window coverings: (1) Australian, (2) Canadian, and (3) European. 87 FR at 1032-22. The NPR stated that ANSI/WCMA-2018 is more stringent than the Australia Regulation, 2010 F2010C00801, and the European regulations, EN 13120, EN 16433 and EN 16434. However, the NPR stated that ANSI/WCMA-2018 is not as stringent as the new Canadian regulation, SOR/2019-97. Canada's window covering regulation states that any window covering cord that can be reached must be too short for a 1-year old child to wrap around their neck (*i.e.*, not more than 22cm (8.66 inches) in length) or form a loop that a 1-year-old child can pull over their head (*i.e.*, not more than 44cm (17.32 inches) in circumference). *Id*. Canada's regulation also requires that all window coverings meet one of the following conditions:

- Section 4: The cord shall be unreachable/inaccessible.

THIS DOCUMENT HAS NOT BEEN REVIEWED                    CLEARED FOR PUBLIC RELEASE
OR ACCEPTED BY THE COMMISSION                               UNDER CPSA 6(b)(1)

- Section 5 and 6: Reachable/accessible cords shall be 22 cm (8.66 inches) or less when pulled with 35N (7.87 lbf).

- Section 7: Reachable/accessible looped cords shall be 44 cm (17.32 inches) or less in perimeter when pulled with 35N (7.87 lbf).

Both the Canadian standard and the ANSI/WCMA stock window covering requirements do not permit a long, accessible operating cord. The Canadian standard is more stringent, however, because the Canadian standard applies to both stock and custom products, while the ANSI/WCMA standard contains separate requirements for stock and custom products, which allow long, accessible operating cords on custom products. *Id.*

Although the Canadian standard is similar to the ANSI/WCMA's stock window covering requirement, there are some differences. The NPR explained how the standards differ in the definition of an "accessible cord," stating that the ANSI/WCMA-2018 standard has a more stringent definition. *Id.* Additionally, in Tab F of Staff's Final Rule Briefing Package, staff explains that the Canadian standard has a more stringent inner cord pull force requirement than ANSI/WCMA-2018; although staff assesses that the pull force in the ANSI/WCMA standard is adequate to address the risk of injury.

C. *Human Factors Assessment of Operating Cord Requirements in ANSI/WCMA-2018*

Operating cord requirements for stock window coverings in section 4.3.1 of ANSI/WCMA-2018 effectively eliminate the strangulation hazard associated with operating cords for stock window coverings. However, section 4.3.2 of ANSI/WCMA-2018 sets different requirements for operating cords on custom window coverings. Manufacturers can choose to meet the same requirements as stock products (cordless, inaccessible, or 8 inches or shorter) to comply, but the standard continues to allow operating cords that are accessible and that are

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

longer than 8 inches, such as single retractable cord lift systems (with no stroke length limit), continuous loop operating systems, and standard operating systems. Thus, the ANSI standard allows free-hanging and accessible cords on custom window coverings that do not eliminate the strangulation hazard associated with operating cords.

1. <u>Default Requirements for Custom Operating Cords Allow Accessible Cords</u>

In the earlier versions of the ANSI/WCMA standard, the standard contained no specified length for operating cords. However, ANSI/WCMA-2018 added the following two requirements for custom window coverings, which are intended to reduce the hazard associated with free-hanging and accessible operating cords:

- Section 4.4 of ANSI/WCMA-2018 requires that the default cord length should be no more than 40 percent of the product height when the window covering is fully lowered. The exception is when a custom length is required to ensure user accessibility. Figure 12 shows the length of operating cords that are longer than 40 percent of product height and shorter cords that comply with this new requirement.

- Section 4.4.1 requires that a wand tilt be the default operating system, and cord tilt be an allowable customer option (Figure 12). The length requirement in section 4.4 still applies to tilt cords.



**Figure 12. Window blind with operating cords longer than 40 percent of the length of the product**

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**and tilt cords to tilt the slats (left). Window blind with operating cords equal to 40 percent of the product length and wand tilt replacing tilt cords (right)**

CPSC has concerns with longer operating cords that would comply with the requirements in sections 4.4 and 4.4.1 because:

- The length of operating cords can still be hazardous when the window covering is fully lowered.  First, a child can wrap the cord around their neck; about 8 inches of cord is enough to encircle the child's neck.[24]  Additionally, multiple cords can tangle and create a loop into which a child can insert their head; a loop with a circumference of about 17 inches is sufficient for child's head to enter.[25]  Figure 13 shows these two scenarios.



**Figure 13. Demonstration of wrapped cords around (doll) child's neck (left),
(doll) child's head is through the loop created by entangled multiple cords (right)**

- Operating cord(s) will get longer as the window covering is raised, making it easier for a child to access and manipulate the hazardous operating cord. For example, a 60-inch tall window blind with a 24-inch long (*i.e.*, 40 percent, consistent with section 4.4 of ANSI/WCMA-2018) operating cord can have an operating cord that is as long as 84 inches when the blind is fully raised.

- If the cord tilt option is chosen, the cord tilt can also be long enough for a child to wrap around their  neck or be tangled and create a loop in which a child's head can enter.

---

[24] Neck circumference of fifth percentile 6- to 9-month-old children is 8 inches (BSI, 1990 as cited in Norris and Wilson, 1995.)

[25] Head circumference of fifth percentile 6- to 9-month-old children is 16.5 inches (Snyder et al., 1977)

41

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

- Firms typically allow consumers to easily change the default options during the custom order process, thus, maintaining a firm's ability to continue to sell accessible operating cords that exceed 8 inches long, posing a strangulation hazard.

Incident data show that children have strangled on operating cords in various ways. As reported in the incident data in section I.E of the NPR, and Tab A of Staff's NPR Briefing Package, custom window coverings were involved in at least 35 incidents. Table 4 shows how children accessed window covering cords. In 14 incidents, the child climbed on an item, including a couch, chair, toy chest, or dog kennel, and accessed the cord. In four cases, a child was on a sleeping surface, including a bed (2), playpen, and a crib. In six incidents, a child was able to reach the cord from the floor.

**Table 4. Child's interaction scenario in incidents associated with custom products**

| Scenario | Number of Incidents |
|---|---|
| Climbed on an item to reach the cords | 14 |
| On floor | 6 |
| On bed, in playpen or crib | 4 |
| Unknown | 11 |
| *Total* | *35* |

The incident data demonstrate that accessible cords that are longer than 8 inches are hazardous. For example, the data show that even if operating cords are kept close to the window covering head rail, with some means, children climb and access the cords. Additionally, a significant number of operating pull cord incidents occurred in fully or partially raised window coverings, which reduces the benefit of having a default length of 40 percent of the window covering height in the fully lowered position of the window covering, because the cords will get longer as the product is raised.[26] Based on these data, the Commission concludes that the

---

[26] A total of 36 out of 46 pull cord incidents when position of the window covering was known have occurred with partially or fully raised window covering (1996 to 2016 incidents.)

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

requirements in sections 4.4 and 4.4.1 of the ANSI/WCMA-2018 standard are inadequate because they continue to allow accessible and long cords to be part of the window covering.

> 2. <u>Warning Labels in ANSI/WCMA-2018, Alone, Are Inadequate to Address the Strangulation Hazard Associated with Operating Cords</u>

The ANSI/WCMA-2018 standard requires that corded custom window covering products have warning labels regarding the strangulation hazard to children, as summarized below:

- A warning label must be permanently attached to the bottom rail, including a pictogram depicting the hazard of a cord wrapped around a child's neck. The content explains the strangulation hazard and what consumers need to do to avoid the hazard (keeping cords out of children's reach, shortening cords to prevent reach, moving crib and furniture away.)

- A similar warning label must be placed on product merchandising materials which includes, but is not limited to, the sample book and the website (if the website is relied upon for promoting, merchandising, or selling on-line).

- A warning tag containing a pictogram and similar text as above must be placed on accessible cords, including operating cords, tension devices that are intended to keep continuous loops taut, and on inner cords of a roll up shade.

Formatting of warning labels in the ANSI standard is required to follow ANSI Z535 standards.[27] This includes a signal word ("WARNING") in all uppercase letters, measuring not less than 5/16 in (8 mm) in height and preceded by an ANSI safety alert symbol (*i.e.,* an equilateral triangle surrounding an exclamation point) of at least the same size, the rest of the

---

[27] The ANSI Z535 Series provides the specifications and requirements to establish uniformity of safety color coding, environmental/facility safety signs and communicating safety symbols. It also enables the design, application, use and placement of product safety signs, labels, safety tags and barricade tape.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

warning message text be in both uppercase and lowercase letters, with capital letters measuring not less than 1/8 in (3 mm). A Spanish version of the label is also required.

Among the 36 incidents involving custom products, at least 16 of the incident units had a visible, permanent warning label, as displayed in Table 5.[28] In some cases, parents reported that they were aware of the cord hazard, but never thought their child would interact with a cord; in a few cases, parents were aware of the operating cord hazard but not the inner cord hazard. In some cases involving bead chains, parents thought that the connector clip on the bead chain loop was supposed to break away. None of the incident units had a hang tag. One unit had the hang tags tucked into the head rail, which was discovered when the unit was removed.

**Table 5. Presence of permanent warning labels in incident units**

| Permanent Label Present | Number of Incidents |
|---|---|
| Yes | 18 |
| Mostly peeled off | 1 |
| No | 7 |
| Unknown | 10 |
| *Total* | *36* |

As stated above, warning labels are unlikely to effectively reduce the strangulation risk due to hazardous cords on window coverings, because consumers are not likely to read and follow warning labels on window covering products, and strangulation deaths among children occur quickly and silently, such that parental supervision is insufficient to address the incidents.

3. <u>Certain Safety Devices Are Inadequate to Address the Risk of Strangulation</u>

ANSI/WCMA-2018 requires that custom products with accessible operating cords include cord cleats with instructions for use and mounting. The standard also requires that custom products with a continuous-loop operating system contain a cord tension device. Figure 14 shows examples of cord cleats and tension devices.

---

[28] In two cases, staff examined exemplar units.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

 

**Figure 14. Examples of cord cleat (left), cord tension device (right)**

*(a) Cord Cleats*

When a cord cleat is installed, the consumer must wrap the cord around the cleat every time the product is raised or lowered to mitigate the strangulation hazard, which means that the user's active involvement is necessary every time.  Furthermore, cord cleats can be accessed by a child if they climb onto something, like a couch or chair.  In one incident, although caregivers normally wrapped the cord around the cleat, on the day of the incident, cords were not wrapped, and the child accessed the cords after climbing on a couch.

*(b) Tension Devices*

ANSI/WCMA-2018 requires that a tension device be attached to the cord or bead chain loop by the manufacturer, and also requires that removal of the device demand a sequential (*i.e.*, multi-step) process or tools.  The voluntary standard also requires window coverings to be designed so that they are prevented, at least partially, from operating, unless the tension device is properly installed.  The standard also requires that the tension device be supplied with fasteners and instructions and meets the durability test requirements.

Reliance on safety devices that consumers must use or install separately from the window covering operating system is problematic for several reasons.  First, this is not an ideal approach from the consumer's perspective because securing safety devices goes beyond the installation of the window covering itself, and increases the time and effort required to use the product.  Second, safety devices usually require drilling holes on the wall or windowsill, which may not be

45

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

permissible for renters and may not be desirable by homeowners. Third, the requirement that window coverings be designed so that they are at least partially prevented from operating, unless the tension device is properly installed, has not proven to be effective. CPSC staff has determined that a head probe (simulating a child's head) can be inserted into a tensioned loop cord; and as described below, there are reported strangulation incidents involving this scenario and others where tensioners were present.

Among the 36 incidents involving custom products, 13 had continuous loop cords or bead chains. In one non-injury incident, the child was able to insert his head through the loop even though a professional installer had attached the tension device to a wall. In two incidents, a tension device was attached to the cord but not to the wall. In one incident, the tension device had broken prior to the incident and not been repaired. In five incidents with continuous loops or bead chains, a tension device was not installed or present. The reports on the remaining four incidents contain no mention of tension device.

*(c) Consumer Perception of Non-Integrated Safety Devices*

Some consumers may believe that because they do not expect to have young children living with them or visiting them, installation of external safety devices, such as tension devices and cord cleats, is unnecessary. But custom window coverings last approximately 10 years, and so they can be expected to remain in the home for a long time. Unforeseen visits by children can occur in that period, and when homes are sold, or new renters move in, the existing window coverings, if they are functional, usually remain installed and become hazardous to visitors and new occupants with young children.

Finally, CPSC issued a contract to investigate the effectiveness of safety devices in reducing the risk of a child's access to hazardous cords and loops on window coverings.[29] The

---

[29] https://cpsc.gov/s3fs-public/Window%20Coverings%20Safety%20Devices%20Contractor%20Reports.pdf

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

research objective was to provide CPSC with systematic and objective data on the factors that impact installation, use, and maintenance of window covering safety devices; assess how these factors impact the likelihood of correct installation, use, and maintenance; and identify how the factors relate to the goal of reducing children's access to hazardous cords and loops on window coverings.  Major findings from the study point to:

    (i)    A general awareness about cord entanglement among caregivers does not translate to precautionary action, due partly to the insufficient information provided at the point of sale;

    (ii)   Lack of awareness of the speed and mechanism of the injury that may lead to caregivers' underestimating the importance of providing an adequate level of supervision;

    (iii)  Difficulty using and installing safety devices as primary reasons for not using them; and

    (iv)  Inability to recognize the purpose of the safety devices provided with window coverings.

In general, participants in the study preferred a cordless window covering or a passive mechanism, which does not require intentional action by the user.  The researchers concluded that there could be benefits from enhancing the public's awareness and understanding of the unique nature of incidents (*e.g.*, speed, mechanism) and explaining a child's vulnerability in all rooms in the home, and that providing specific information at the point of sale could be partially helpful.  However, these improvements would be incremental, and increasing the use of cordless window coverings would be needed to achieve significant benefits.

      For the final rule, the Commission determines that safety devices that are external to the window covering product and require installation and/or consumer interaction to make the cord

47

less hazardous, are ineffective to adequately reduce the risk of injury from strangulation.

However, the final rule does provide for use of passive safety devices, such as cord shrouds and

loop cord and bead chain restraining devices, to adequately address the risk of injury, provided

that the passive safety device is integrated with the product before sale, and does not require use

or installation of an external safety device.

4. Relying on Parental Supervision Is Inadequate

For many years, CPSC has identified cords on window coverings as a hidden hazard. If

young children are left unsupervised for even a few minutes in a room that is considered safe,

such as a bedroom or family room, they can wrap a cord around their neck, insert their head into

a cord loop, and be injured or die silently.

Even when supervision is present, the level of supervision varies, and distractions and

other limitations to supervision exist. For example, CPSC has incident reports involving five

near-fatal strangulations, in which the parent was either nearby, or in the same room. Among the

36 incidents involving custom products, incident location is known for 34 incidents. In 18

incidents, the child was in a room shared by the family members, such as a family room, living

room, and sunroom. Eleven of 18 incidents were not witnessed, whereas five were witnessed by

an adult, and two incidents occurred in the company of other children. Almost all the incidents

(15/16) that occurred in a bedroom were unwitnessed (Table 6).

Behavioral research supports these incident reports. People cannot be perfectly attentive,

particularly over long periods, regardless of their desire to do so (Wickens & Hollands, 2000).

Caregivers are likely to be distracted, at least occasionally, because they must perform other

tasks, are exposed to more salient stimuli, or are subject to other stressors, such as being

responsible for supervising more than one child. In fact, research by Morrongiello and

colleagues (2006) indicates that older toddlers and preschool children (2 through 5 years old) are

THIS DOCUMENT HAS NOT BEEN REVIEWED          CLEARED FOR PUBLIC RELEASE
OR ACCEPTED BY THE COMMISSION                UNDER CPSA 6(b)(1)

regularly out of view of a supervising caregiver for about 20 percent of their awake time at home, and are completely unsupervised for about 4 percent of awake time in the home. The most common rooms in which children were left alone and unsupervised, according to the research, were the living or family room and the bedroom.

**Table 6. Location of incidents and whether the incidents were witnessed**

| Location | Fatal | Nonfatal |
|---|---|---|
| Bedroom | | |
|    Witnessed by children | 1 | |
|    Not witnessed | 9 | 6 |
| Family/Living/Dining room | | |
|    Witnessed by Adult | | 5 |
|    Witnessed by children | | 2 |
|    Not witnessed | 5 | 6 |
| Unknown | | 2 |
| *Grand Total* | *15* | *21* |

### 5.   Assessment of Operating Cord Requirements for Window Coverings

CPSC staff evaluated the requirements that apply to operating cords on stock window coverings in section 4.3.1 of ANSI/WCMA-2018: no operating cords, short operating cords 8 inches or shorter, or inaccessible operating cords determined per the test requirement in Appendix C of ANSI/WCMA-2018. Having no operating cords effectively eliminates the strangulation hazard associated with operating cords because there is no cord to cause strangulation; therefore, this is an adequate requirement. Having a short cord that does not exceed 8 inches of length in any position of the window covering also effectively eliminates the strangulation hazard associated with operating cords; the neck circumference of fifth percentile 6- to 9-month-old children is 8 inches (BSI, 1990 as cited in Norris and Wilson, 1995), therefore, this is an adequate requirement. Ensuring that the operating cords are inaccessible is another adequate requirement. This requirement is tested in ANSI/WCMA-2018 using a probe that is intended to simulate the finger size of a young child. If the probe cannot touch the cords, the cord is then deemed inaccessible. Staff assessed that child anthropometry and strength-related

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

inputs to develop these requirements are adequate to address the strangulation risk associated with hazardous cords.

To effectively address the unreasonable risk of strangulation associated with operating cords on custom window coverings, the final rule contains the same requirements for operating cords on custom window coverings that are required in the voluntary standard for stock window coverings. Additionally, the final rule specifically approves two methods to make operating cords inaccessible (rigid cord shroud or retractable cord), and one method to prevent the formation of a hazardous loop on a continuous-loop system (loop cord or bead chain restraining device).

6. <u>Addressability of Incidents with the Final Rule</u>

Table 7 displays incident data for the custom and stock (and unknown) product categories, by cord type. If the custom window coverings involved in the incident data had complied with the requirements in the final rule for operating cords, meaning complying with the requirements for stock products in section 4.3.1 of ANSI/WCMA-2018, 91.1 percent (31/34) of the custom product incidents for which cord type is known would have been prevented. All of the remaining custom product incidents for which cord type is known would have been addressed by complying with the voluntary standard for inner cords, which will be codified as mandatory in the final rule under section 15(j) of the CPSA.

**Table 7. Stock/Custom/Unknown Window Coverings
involved in Incidents and Cord Types (All reported data combined)**

| Stock/Custom | Continuous loop | Inner cord | Lifting loop | Operating cord | Tilt cord | Unknown | Grand Total |
|---|---|---|---|---|---|---|---|
| **Custom** | 13 | 3 | 0 | 18 | 0 | 2 | 36 |
| **Stock** | 3 | 14 | 1 | 24 | 2 | 6 | 50 |
| **Unknown** | 19 | 6 | 3 | 32 | 3 | 60 | 123 |
| ***Grand Total*** | *35* | *23* | *4* | *74* | *5* | *68* | *209* |

50

7.    Accessibility Concerns

Section 9(e) of the CPSA, 15 U.S.C. 2058(e), requires that the Commission consider the special needs of elderly and handicapped persons to determine the extent to which such persons may be adversely affected by such rule.  At least 383 commenters stated that having a short cord introduces accessibility issues for various consumers, including people in wheelchairs or people who are otherwise challenged to reach elevated access cords; and these commenters urge that these consumers still need a corded product.  Similarly, some commenters stated that the proposed rule is not compliant with the Americans with Disabilities Act (ADA).  In that regard, the Department of Justice has published accessibility standards called the 2010 ADA Standards for Accessible Design (2010 ADA Standards).  The 2010 ADA Standards set minimum requirements for newly designed and constructed or altered state and local government facilities, public accommodations, and commercial facilities to be readily accessible to and usable by individuals with disabilities.  Sections 308.2 and 308.3 of the 2010 ADA Standards specify forward and side reach distances. [30] For example, an unobstructed high forward reach and high side reach shall be 48 inches (Figures 15-18).



**Figure 15. Obstructed Forward Reach**          **Figure 16. Unobstructed High Forward Reach**

---

[30] Department of Justice (2010). 2010 ADA Standards for Accessible Design, accessed at: https://www.ada.gov/regs2010/2010ADAStandards/2010ADAStandards.pdf

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION          CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



Figure 17. Obstructed Side Reach          Figure 18. Obstructed High Side Reach

***Note***. **Figures 15-18 are from 2010 ADA Standards for Accessible Design, accessed at**
**https://www.ada.gov/regs2010/2010ADAStandards/2010ADAStandards.pdf**

In Tab B of Staff's Final Rule Briefing Package, staff assesses that alternative solutions can safely replace the existing hazardous cords, such as rigid cord shrouds and loop cord and bead chain restraining devices, which can allow access at about the same height as corded products. Additionally, retractable cords can be made accessible with a rigid wand or handle to an easy-to-access height. Moreover, poles are available to reach the bottom of cordless products.

Under the ADA, operable parts of the window covering need to be operable with one hand and not require tight grasping, pinching, or twisting of the wrist; the force required to activate operable parts must be five pounds maximum. Traditional operating cords and continuous loop bead chains and cords require tight pinching and grasping to operate. However, window coverings that are compliant with the mandatory rule would likely have interfaces, such as rigid cord shrouds, which would meet the ADA requirement, by avoiding pinch grip, and instead using hand grip.

Also, rigid cord shrouds, loop cord and bead chain restraining devices, and retractable devices can be easier to operate from behind furniture, compared to continuous loops that are attached to a wall. Figure 19 illustrates a comparative assessment. If the continuous loop is not attached to a wall, then it is easier to access (by leaning to grab it) and operate, but it poses a

THIS DOCUMENT HAS NOT BEEN REVIEWED          CLEARED FOR PUBLIC RELEASE
OR ACCEPTED BY THE COMMISSION                UNDER CPSA 6(b)(1)

strangulation risk (left); if a tension device is attached to a wall, it is not easy for consumers to access (middle); on the other hand, a rigid cord shroud is not less accessible, and it is operable behind the furniture while also being safe (right.)



✓ ACCESSIBLE
✗ HAZARDOUS looped cord/bead chain, not taut

✗ Looped cord/bead chain, taut with tension device INACCESSIBLE
✓ NOT HAZARDOUS (AS LONG AS IT IS TENSIONED)

✓ ACCESSIBLE
✓ Rigid cord shroud, NO HAZARDOUS LOOP

**Figure 19. Operability of a window covering behind an obstruction**

Lastly, if continuous loops with tension devices were allowed as an option in homes where accessing the cord is an issue, continuous loops might not be attached to the wall, particularly in locations where a continuous loop is difficult to access when the cord is kept taut via a tension device. Based on the incident data, staff concludes that it is reasonably foreseeable that not only a consumer, but also a professional installer, may follow an elderly or disabled consumer's request not to install the tension device and remove it from the cord loop in homes where accessibility is an issue. By contrast, products manufactured with a safer option would be both accessible to a disabled user and protective of child safety.

Finally, as explained in more detail in section II.E of this preamble, the Commission is approving in the final rule three methods that not only make window coverings safer, but also may be suitable for hard-to-reach locations and for persons with disabilities.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

8.   Information and Education

Since 1985, CPSC has been warning of the danger of child strangulation due to corded window coverings.  Every October, CPSC participates jointly with Window Covering Safety Council (WCSC) in National Window Covering Safety Month to urge parents and caregivers to check their window coverings for exposed and dangling cords and to take precautions.  Both CPSC and WCSC recommend cordless window coverings at homes where young children live or visit.

In addition to traditional communication methods, CPSC reaches out to consumers using social media, such as safety blogs and online chats, to create awareness of the hazards associated with corded window coverings.  Given the long history of continuing injuries and deaths despite window covering safety campaigns, the campaigns have not adequately eliminated or reduced the hazard.

   *D.    Assessment of the Balloted Draft ANSI/WCMA-2022 Standard*

After the publication of the NPR on January 7, 2022, WCMA brought forth several proposals to revise the requirements for custom window covering cords in ANSI/WCMA-2018. On July 15, 2022, WCMA issued a ballot to revise ANSI/WCMA-2018 (draft ANSI/WCMA-2022) and the ballot closed on August 15, 2022.  The draft balloted ANSI/WCMA-2022 standard includes safety improvements from the ANSI/WCMA-2018 standard.  These include: elimination of free-hanging operating and tilt cords, elimination of cord loop lift systems, elimination of continuous cord loop systems for horizontal blinds, and adding deflection and deformation tests for rigid cord shrouds.

Section 9(b)(2) of the CPSA requires the Commission to rely on a voluntary standard if the voluntary standard is likely to reduce the risk of injury and products within the scope of the standard will likely substantially comply with the voluntary standard.  For section 9(b)(2) of the

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

CPSA to apply, such voluntary standard must be "in existence," meaning approved by the voluntary standards organization. ANSI/WCMA has not yet approved the balloted draft voluntary standard. Accordingly, the Commission will not rely on the draft balloted ANSI/WCMA-2022 standard for the final rule. In addition Tab I of the Staff's Final Rule Briefing Package contains a detailed analysis of the draft standard, which finds inadequacies in the proposal that we summarize below.

1. *Modified requirements for single-cord retraction devices*: Although draft ANSI/WCMA-2022 eliminates cords attached to the Operating Interface (*i.e.*, the part of the cord retractor that the operator pulls on) to prevent the creation of a hazardous loop, the draft revision allows a maximum stroke length of 36 inches. In Tab B of Staff's Final Rule Briefing Package, CPSC staff assesses this revision to be inadequate to eliminate the strangulation hazard, because a 36-inch extended cord could allow a child to wrap the cord around his/her neck.

2. *Additional requirements for tension devices used with continuous loop operating systems*:

a. The modification in section 6.3.1 of the balloted standard requires tension devices to be attached to the cord or bead chain loop by the manufacturer, and be designed, placed, and shipped such that, unless properly installed, or unless altered from the shipped condition with sequential process (requiring two or more independent steps to be performed in a specific order) or tools, it prevents the window covering from operating fully. This draft requirement does not ensure that tension devices will be effective for the life of the window covering. For example, if an installer cuts the zip tie that is sometimes used to connect tension devices to the headrail, then the tension device would have been altered from its shipping condition with a tool, and operation of the window covering without the tension device would be consistent with section 6.3.1. Therefore, this requirement still allows consumers or the installer to set up the window covering

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

in an unsafe manner while either in a fully operable state by removing the tension device from the loop, or in a partially operable state, by leaving the tension device on the loop, but not attaching it on the wall.

b. The modification in section 6.3.2, states that the manufacturer shall attach the tension device to the cord or bead chain loop by means of a permanent assembly method. This requirement is intended to ensure that if an installer or consumer attempts to remove the tension device, the device or component will break. CPSC staff is aware of an incident involving a tension device that used one-way snap features, as permitted by the balloted draft standard. The snap features broke off, exposing the continuous loop cord (Figure 20 below, from In-Depth Investigation (IDI)). This incident shows that a permanent assembly method requirement does not ensure that the tension device will remain assembled. CPSC staff assesses that this provision is inadequate to address the risk of injury, because even if the tension device breaks, the looped cord will not necessarily be damaged. Therefore, for hard-to-reach locations, or for people who do not want holes in their walls, removing the tension device may be preferable, and the window covering will remain fully operable.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



**Figure 20. Broken tension device in IDI**

c.   The modification in section 6.3.3 of the balloted draft standard, states: "the tension device in conjunction with the product shall maintain tension on the operating cords when properly installed.  If the tension device is installed in a location that does not maintain tension on the operating cords, the tension device will prevent the window covering from operating as designed for full operation of the product.  The window covering may not operate independently of the Cord or Bead Chain Loop."

The draft standard defines "Tension" as "The applicable, consistently applied force required to eliminate or prohibit the creation of a hazardous loop in any operating position."  Yet, in testing a tension device identified as compliant with the draft standard, CPSC staff determined that an amount of tension that allowed full operation of the window covering still allowed a head probe to be inserted into the loop (Figure 21 below).

THIS DOCUMENT HAS NOT BEEN REVIEWED                           CLEARED FOR PUBLIC RELEASE
OR ACCEPTED BY THE COMMISSION                                 UNDER CPSA 6(b)(1)





**Figure 21. A head probe can pass through properly installed continuous loop under tension**



**Figure 22. Re-enactment of how a 5-year-old child was found by a consumer with his head caught in a continuous cord loop**

Accordingly, staff has concluded that a properly installed tension device that would be acceptable under the balloted standard still allows an accessible hazardous loop, which is also observed in one incident (Figure 23).

Additionally, while the draft ANSI/WCMA-2022 requires the tension device to prevent the window covering from operating, as designed, for full operation of the product, the window covering can be operated partially, as shown in Figure 23. An incident that occurred in 2005 had a window covering with a "universal cord tensioner" that limited the operability of the window covering unless the tension device was installed. The plastic universal cord tensioner piece was hanging freely from the cord and not attached to the wall (Figure 24), reflecting that diminished

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

utility was not sufficient motivation for the landlord or residents to repair or replace the tensioner.



**Figure 23. Partially operable window covering when tension device is not attached to a fixed surface**



**Figure 24. Universal cord tensioner remained unattached to the wall for about 3 years**

*3. Exempting curtains and draperies from the scope of the standard.* While the balloted

draft standard does not require safety measures to prevent cord injuries with draperies and

59

curtains, CPSC staff has identified at least four fatalities involving draperies and curtains; all deaths were a result of continuous loops. There are multiple cordless options available for draperies, including wands and motorized controls, as well as simply pulling the draperies on the traverse rod by hand, with no cord or other control.

E.      *Changes in the Final Rule*

The Commission, therefore, is finalizing the rule generally as proposed, requiring custom window coverings to meet the requirements for stock window coverings in section 4.3.1 of ANSI/WCMA-2018, meaning that custom window coverings must be cordless, have short cords (8 inches or less, or inaccessible cords), or the cords must be made inaccessible. The final rule allows, as proposed, a rigid shroud that meets the requirements of the rule as a method of making standard operating systems (pull cords) and continuous cord loop operating system inaccessible.

Based on the comments, the Commission considered including in the final rule other methods of making operating cords inaccessible or preventing the formation of hazardous loop. As stated in the NPR, and discussed above, continuous cord loop operating systems with external tension devices that are attached on a wall or window sill can pose a strangulation hazard, because they require the consumer or installer to properly install them to eliminate the hazard, and because external tension devices can break, be removed, or not be installed. Accordingly, they are not acceptable under the final rule. However, passive devices that make an operating cord inaccessible—meaning those installed on the product itself by the manufacturer that cannot be easily defeated, uninstalled, or break, such as a rigid cord shroud for operating cords and a loop cord or bead chain restraining device on a continuous cord loop operating system— eliminate the strangulation hazard and the need to rely on a consumer or installer to make the product safe as installed. The final rule allows these solutions.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Below we explain the requirements associated with these provisions of the final rule. We also set out specific requirements for large window coverings, which are included within the scope of the final rule.

1. Requirements for Rigid Cord Shrouds

The requirements for rigid cord shrouds are being finalized, as proposed. However, the requirements are now contained in section 1260.2(b) of the regulation text, as opposed to sections 1260.2(b) and (c), so that the test method for rigid cord shrouds are contained in a single section of the rule. The final rule eliminates hazardous continuous cord loop operating systems; however, manufacturers can still use standard operating systems (operating pull cords or continuous cord loop operating systems) if the cord is not accessible when tested to the requirements of the rule. A rigid cord shroud that meets the rule makes the cords on a continuous cord loop operating system or standard operating system inaccessible.

ANSI/WCMA 2018 defines a "cord shroud" as a device or material added to limit the accessibility of a cord or formation of a hazardous loop. Per section 4.3.2.5.2 of the 2018 standard, one of the ways that accessible cords (continuous cord loops and standard operating systems) can meet the standard is to contain the cords in a rigid cord shroud that meets the requirements in sections 6.3.1 (Appendix C: Test Procedure for Accessible Cords) and 6.3.2 (durability, impact, and operational cycle tests). The final rule clarifies in section 1260.2(b) that rigid cord shrouds must meet the requirements in section 6.3. Additionally, as proposed, rigid cord shrouds must also meet the deflection and deformation tests described in 1260.2(b)(1) and (2). Rigid cord shrouds can be used to enclose continuous cord or bead chain loops. Tab C of Staff's Final Rule Briefing Package contains examples, including pictures of rigid cord shrouds and how they operate.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Staff found two window coverings currently on the market that use rigid cord shrouds. Staff purchased and evaluated these products. Based on staff's examination and the available products on the market, rigid cord shrouds are used to operate window coverings up to at least 76.75 inches (stock) to 96-inches tall (retro-fit, meaning after-market). CPSC's engineering staff further concluded, as described in Tab C of Staff's Final Rule Briefing Package, that a rigid cord shroud can be designed to operate window coverings more than 96 inches tall, if the shroud is made from more rigid materials, such as metal, that meet the deflection requirements in the final rule.

Large rigid cord shrouds may require additional development and tooling for continuous cord loop operating systems with window shades more than 96 inches tall; however, existing shrouds should not require major redesigns because these products have already been developed and only require adjustments to the head and the length of the cord shroud to fit the window covering. Based on engineering staff's review of the rigid cord shrouds currently on the market, which includes shrouds on window coverings up to 96 inches, the Commission finds that extensive development is unnecessary for custom manufacturers to incorporate rigid cord shrouds for window coverings that currently use a continuous bead chain operating system. For these reasons, the Commission determines that a continuous cord loop operating system with a rigid cord shroud could be manufactured to operate window coverings of all sizes and meet the requirements of the final rule.

2. <u>Requirements for Loop Cord and Bead Restraining Devices</u>

The NPR discussed that, unlike tension devices, loop cord and bead chain restraining devices are designed and installed by the manufacturer onto the window covering, are integral to the window covering, and do not need to be attached on the wall to keep the loop taut. The NPR requested comment on the adequacy of loop cord and bead chain restraining devices to address

62

the risk of strangulation on custom window coverings. 87 FR at 1031. CPSC received hundreds of comments from businesses opposing elimination of continuous cord loop operating systems to meet the requirements of the rule.

ANSI/WCMA-2018 defines a "cord and bead chain restraining device" as a device that prevents the creation of a hazardous loop from an accessible continuous operating cord. According to section 6.5 of the ANSI/WCMA-2018, loop cord and bead chain restraining devices must be subjected to durability, UV stability, and impact testing, and must pass the hazardous loop testing procedure to confirm that a loop cord and bead chain restraining device prevents the creation of a hazardous loop from an accessible continuous cord loop. Tab C of Staff's Final Rule Briefing Package provides staff's assessment that loop cord and bead chain restraining devices are technically feasible to incorporate into custom window coverings, and that they address the continuous cord loop strangulation hazard by preventing the formation of a hazardous loop. However, staff advises that the test sequence identified in section 6.5 of ANSI/WCMA-2018 is not representative of real-world scenarios, and recommends exposing the device to UV light first, and then conducting the operational cyclic test. Staff also recommends incorporating a deflection test that is similar to the one provided in the NPR for rigid cord shrouds to improve the safety of these products by preventing bending to an extent that a child could wrap it around their neck.

The Commission will allow loop cord and bead chain restraining devices (as defined in section 1260.1 of the final rule) as a permissible way to make accessible continuous cord loop operating systems non-hazardous. However, the final rule modifies the requirements for cord and bead chain restraining devices from those in section 6.5 of ANSI/WCMA-2018, to adequately address the risk of strangulation associated with accessible operating cords on custom window coverings. Specifically, the final rule:

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

- Adds a deflection requirement for loop cord and bead chain restraining devices that prevents bending of the device to an extent that a child could wrap it around their neck, similar to the deflection requirements for rigid cord shrouds as stated in section 1260.2(b) of the final rule.

- Tests one sample to section 6.5.2.2 of ANSI/WCMA-2018, UV Stability, followed by testing to section 6.5.2.1, Operational Cycle Test. This change in test order will simulate real world conditions of a loop cord and bead chain restraining device exposed to sunlight and operated over the life of the window covering.

3.    Requirements for Retractable Cords

In the NPR, the Commission tentatively determined that the retractable cord requirement, as written in ANSI/WCMA-2018 for operating cords on custom window coverings, is not adequate to address the risk of injury, because the maximum cord length and a minimum pull force required to operate the system are not specified in the standard. CPSC requested comments on whether additional requirements for retractable cords, such as a maximum exposed cord length and a minimum pull force for a single retractable cord lift system, can address the strangulation hazard. 87 FR at 1031.

The Commission received at least 149 comments stating that retractable cords are safe based on the lack of incidents, and that because retractable cords have not been involved in incidents, retractable cords should not be eliminated by a mandatory standard. A June 21, 2022 letter from consumer advocates to WCMA suggests that retractable cords be allowed in the voluntary standard with the following text: "All cords must be inaccessible. The maximum allowable cord length is 12 inches from the headrail."[31]

---

[31] Letter can be found at: https://www.regulations.gov/document/CPSC-2013-0028-3664

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

The 12-inch exemption is, in part, based on the required steps that a child would need to go through with a retractable cord for it to pose a hazard. Tab B of Staff's Final Rule Briefing Package. Consistent with WCMA's recommendation, CPSC staff considered that while the smallest neck circumference of youngest children at risk, 6- to 9-month-old children, is about 8 inches,[32] children who can climb to the top of the window covering will be older, and they need to be able to hold the cord and wrap it around their neck at the same time, which requires the breadth of their hands to be added to the neck circumference. Therefore, in staff's view, 12 inches is a safe length for the headrail area of a window covering, whereas the 8 inches of cord length that is used to define the allowed short cord could be anywhere on the window covering. For further discussion on this topic, see Tab B and Tab I of Staff's Final Rule Briefing Package.

Accordingly, the final rule allows retractable cords as long as the exposed cord is limited to a maximum of 12 inches from the bottom of the headrail in any state of operation, and the other requirements in section 1260.2(d) are met to ensure full retraction and durability.

4.    Consideration of Large Window Coverings

At least eight commenters, including WCMA and seven businesses, raised the concern that available technologies to address the strangulation hazard, such as manual cordless systems, are difficult to implement for very large products. Various commenters also stated that there is an increased presence of taller windows in homes, which will lead to a higher number of taller window coverings installed in homes. Regardless of the height, the hazard patterns associated with window covering cords are the same. Furthermore, the ANSI/WCMA-2018 voluntary standard does not contain a height limit for in-scope window coverings for either stock or custom

---

[32] BSI (1990) as cited in Norris, B., & Wilson, J. R. (1995). CHILDATA: The handbook of child measurements and capabilities –Data for design safety. London: Department of Trade and Industry.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

products. Staff has determined that it is feasible to implement, for example, rigid cord shrouds on window coverings that are larger than 96" tall. Tab C of Staff's Final Rule Briefing Package.

Because the hazard patterns associated with larger window coverings are the same as hazard patterns seen in shorter window coverings, the potentially increased number of installations of taller window coverings in residences, and the feasibility of applying safer technologies on these products, the Commission will not exclude taller products from the scope of the rule, but is, instead, establishing a later, 2-year effective date, to provide a reasonable time for manufacturers to implement the technologies for products that are raised and lowered and that are 10 feet or greater in vertical length.

The basis for this effective date is as set forth in Tabs C and F of Staff's Final Rule Briefing Package. Based on comments and product development cycles for other consumer products, staff estimated that engineering design, development, and testing phases for the large products would take approximately 12 months, followed by a manufacturing and logistics phase, which would take another 12 months to complete. See Appendix to Tab C, Staff's Final Rule Briefing Package.

### F.    *Window Coverings Substantially Comply with the Voluntary Standard*

Section 9(f)(3)(D) of the CPSA requires that when a voluntary standard has been adopted and implemented relating a risk of injury, to proceed with a final rule, the Commission must find either that compliance with such voluntary standard is not likely to result in the elimination or adequate reduction of such risk of injury; or that it is unlikely that there will be substantial compliance with such voluntary standard. WCMA, the trade association for window coverings and the body that created the voluntary standard, stated in a comment on the ANPR (comment ID: CPSC_2013-0028-1555) that there has been substantial compliance with the voluntary standard ANSI/WCMA since its first publication, and Tab E of Staff's NPR Briefing Package

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

contains a more detailed description of staff's assessment of substantial compliance with the voluntary standard. CPSC received no comment in opposition to the Commission's preliminary determination of substantial compliance in the NPR. Based on the forgoing, the Commission determines that a substantial majority of window coverings sold in the United States comply with ANSI/WCMA-2018. However, as explained throughout this preamble and in the final rule, ANSI/WCMA-2018 is inadequate to address the risk of injury associated with custom window coverings.

### III. Response to Comments on the NPR

CPSC received 2,060 comments on the NPR for custom window coverings during the period, and staff received two late comments in July 2022, which CPSC also considered. Additionally, CPSC held an oral hearing on the proposed rule on March 16, 2022, during which seven presenters also provided comments. All comments, meeting logs, and correspondence regarding custom window coverings have been included on Regulations.gov under the CPSC docket number for this rule: CPSC-2013-0028. Below we summarize and respond to significant issues raised by commenters.

#### A. *General Support or Opposition*

*Comment 1*: At least 114 commenters expressed support for the proposed rule. Some commenters stated that, given the hidden nature of the hazard and severity of the risk, a mandatory standard is necessary. Victims' families expressed hope that this rule will prevent corded products, not only in private residences, but also in hotels, rental properties, military housing, public buildings, and in effect, any place where children could be injured or killed in a window covering cord incident, so that no family will bear the pain of losing a child on a window covering cord.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

At least 1,842 commenters were against the proposed rule, most suggesting that a regulation will have a negative economic impact on the window covering industry. At least 440 comments stated that the proposed rule is either overreaching or unnecessary because: commenters believe that the current requirements in the ANSI/WCMA-2018 standard are strong; the risk of injury is low; consumers without young children would be adversely impacted by removing corded products; consumers need more window covering options and choices; and businesses will be limited in meeting consumer needs.

*Response 1:* The Commission agrees that a mandatory rule is required to address the unreasonable risk of injury associated with corded custom window coverings. Staff's NPR and Final Rule Briefing Packages demonstrate that requiring inherently safe custom window coverings is feasible, and that the rule will not affect the utility or availability of custom window coverings, but could affect their cost. However, the net increase in cost for consumers is as little as approximately $24 every time a household replaces *all* of its custom window coverings approximately every 10 years. *See* Table 9, *infra*, and Tab F of Staff's Final Rule Briefing Package (showing that the estimated net cost increase to replace 12 window coverings ranges from $23.67 using less expensive products to $218.82 using more expensive custom window coverings). The Commission finds that this is a reasonable cost to ensure that children avoid death or serious injury on window covering cords.

The feasibility of safer window coverings, and the fact that consumers will pay more for safer window coverings, has already been shown in the stock window covering market. Stock window coverings that meet ANSI/WCMA-2018 requirements for stock products aremanufactured to be safe, without regulatory intervention. Voluntary compliance with the ANSI/WCMA standard for stock products did not cause a decline in revenue, by either units or by total revenue, as most of the industry transitioned to cordless-only products, even though the

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

price of some stock coverings nearly doubled. Moreover, Canada's mandatory rule on window coverings is similar to the final rule, and CPSC staff identified no evidence from the Canadian market of a significant reduction in consumer choice as a result of their rule. Rather, the Canadian market has reacted with cost-effective substitutes and redesigned products. The Commission expects a similar result in the U.S. market.

Data show that the strangulation hazard associated with window covering cords is silent, quick, and hidden to consumers. Also, the hazard overwhelmingly involves the death of a child, and in many other cases, a serious injury, such as coma, paralysis, or problems controlling movement; sensory disturbances, including pain; seizures; cognitive and memory deficits; long-term or permanent vegetative state, requiring tracheotomy and gastrointestinal tube feeding. As commenters from victims' families report, the death of a child on a window covering cord results in severe pain and suffering that never goes away.

B.    *Voluntary Standard*

*Comment 2*: Most of the businesses, including manufacturers, dealers, designers, and sellers who are opposed to the rule, stated that the voluntary standard process has led to substantial improvements in window covering safety, and furthermore, that a mandatory rule is not necessary. However, other commenters, including at least 70 victims' families, consumers, and consumer organizations, stated that a mandatory standard is necessary to address the hazard associated with custom window coverings, because the voluntary standard still allows products with hazardous cords to be sold.

*Response 2*: Staff has worked closely with the voluntary standards organization, WCMA, to develop and revise the ANSI/WCMA A100.1 standard over the past 26 years. The Commission agrees that the 2018 version of the voluntary standard has significantly reduced the risk of strangulation from stock window coverings, and from inner cords on both stock and

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

custom products.  However, the ANSI/WCMA-2018 standard does not eliminate or adequately reduce the risk of injury associated with custom window coverings.  Similarly, Tabs B, C, and I of Staff's Final Rule Briefing Package indicate that even though the draft ANSI/WCMA-2022 is an improvement on ANSI/WCMA-2018, if adopted, the revised standard could allow retractable cords with a hazardous length of cord when pulled, and continuous loops with tension devices that pose a strangulation hazard.

Based on staff's review of available technologies for use in manufacturing safer window coverings (Tab C of Staff's Final Rule Briefing Package), the Commission determines that custom window products can be made as safe as stock window coverings, by meeting the same cord requirements.  Stock product compliance with ANSI/WCMA-2018 did not cause a decline in revenue, by either units or by total revenue, even though the price of some stock coverings nearly doubled.  When Canada issued a similar rule to prevent window covering cord strangulations, the Canadian window covering market responded with cost-effective substitutes and redesigned products.

C.    *Data Issues*

1.    NEISS Versus CPSRMS

*Comment 3*: WCMA stated that the 34 injury reports for custom products from NEISS were combined with anecdotal reports received by CPSC and that the NPR Briefing Package did not explain how NEISS data injury reports were added to the other incident data, and how CPSC ensured that no double-counting occurred.

*Response 3*: The CPSC data counts are not duplicative.  For example, for the data presented in the NPR where staff integrated the reports from NEISS with anecdotal reports in CPSRMS, staff compared the individual NEISS nonfatal injuries with the reports received through CPSRMS, by considering the injury date, victim age and sex, and the injury scenario

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

description, and staff ensured that no double counting of incidents occurred for the nonfatal incidents.

2.   Low Risk

*Comment 4*: At least 185 commenters, including 158 businesses, suggested that the risk associated with corded window coverings is low and advancements have been made in the voluntary standard that further reduced the hazard.  Some commenters compared the number of deaths associated with corded window coverings to other products.

*Response 4*: The strangulation hazard to young children from window covering cords is serious, with most incidents resulting in death.  The strangulation hazard is a "hidden hazard," because many consumers do not understand or appreciate the hazard, and do not take appropriate steps to prevent death and injury from window covering cords.  Warning labels and education campaigns have failed to prevent deaths and injuries.  Strangulation is quiet, and incidents have occurred with parents in the same room.  Telling caregivers to watch children is insufficient to address the risk; for instance, parents leave their children in rooms considered safe, such as a bedroom, or caregivers may be giving attention to other children when a strangulation incident occurs.

As explained above, the ANSI/WCMA-2018 standard, does not adequately address the strangulation risk associated with custom window coverings.  However, the ANSI/WCMA-2018 standard does effectively address the hazard for stock products, and its implementation for stock products did not cause a decline in revenue, by either units or by total revenue.  Manufacturers can apply similar technologies used in stock window coverings, as well as additional mechanisms, such as retractable cords and loop cord and bead chain restraining devices, to make custom products safer without impacting utility or availability of products, and with a reasonable cost increase per household.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Many commenters cited the anecdotal data that staff presented in the NPR Briefing Package as an indicator of a downward trend in strangulation incidents and a reason why CPSC should not finalize the rule. However, as stated in the NPR, the Commission has no assurance that the data on window covering cord strangulations includes all incidents that may have occurred, either fatal or nonfatal. In the NPR, the Commission stated that the incident data represent a *minimum* number of incidents that are known to have occurred. 87 FR at 1022. Additionally, reporting of incidents to CPSRMS is ongoing. For example, since the data analysis was completed for the NPRs in 2021, the number of fatalities reported has risen to eight (from three, as initially reported) in 2020, and six (from zero, as initially reported) in 2021. We expect that these numbers will likely increase over the next year as CPSC receives more data.

D.    *Economic Issues*

1.    Alternative methods for the Regulatory Impact Analysis

*Comment 5*: Institute for Policy Integrity and WCMA suggested that instead of, or in addition to, a comparison of costs versus benefits, CPSC could have performed a breakeven analysis, citing the Office of Management and Budget (OMB) guidance (Circular A-4) that this method can be appropriate when the benefits cannot be quantified.

*Response 5*: The Commission agrees that there are unquantifiable benefits for the final rule. However, the benefits in this case can be estimated based on more than 10 years of incident data. Given that CPSC has data for strangulation deaths and has assessed that the final rule would address the hazard patterns, staff was able to calculate benefits and costs associated with the final rule. Furthermore, recognizing that there are possible variations in costs or benefits to consider, staff conducted a sensitivity analysis, including looking at a children's value of statistical life (VSL) of three times the VSL for adults, as discussed in the NPR, as well, and found that in some cases, this type of increased VSL for children could result in the rule having a

THIS DOCUMENT HAS NOT BEEN REVIEWED                    CLEARED FOR PUBLIC RELEASE
OR ACCEPTED BY THE COMMISSION                              UNDER CPSA 6(b)(1)

quantified net benefit. For the final rule, we also discussed the additional unquantifiable benefits, because not all benefits of the rule are represented in the benefits analysis.

Additionally, as one commenter pointed out, the CPSA requires only that the benefits of a CPSC rule "bear a reasonable relationship to its costs," 15 U.S.C. 2058(f)(3)(E), and, as explained in section 1260.4(i) of the regulatory text, the Commission finds such a reasonable relationship exists here. In addition, CPSC is an independent regulatory agency, not an Executive Branch agency, and CPSC is not subject to the requirements in Executive Order (EO) 12866 or 13563 that require the agency to "justify" the costs, or to comply with OMB Circular A4.

## 2.    Cost of Safer Products

*Comment 6*: At least 579 commenters, including 331 businesses, stated that safer window coverings are too expensive for some consumers; regulations will increase the cost of window coverings; and motorized window coverings are cost-prohibitive for many consumers.

*Response 6*: Market data on stock window coverings do not support the commenters' hypothesis regarding the inability of consumers and businesses to adjust to meaningful safety requirements. Voluntary compliance with the ANSI/WCMA-2018 standard for stock products did not cause a decline in revenue, by either units or by total revenue, as most of the industry transitioned to cordless-only products, even though the price of some stock coverings nearly doubled. Multiple commenters representing manufacturers and retailers noted that sales of cordless stock products have *increased* in the past few years, thus, demonstrating consumer demand for cordless products that protect against the death or injury of children as an acceptable replacement for hazardous corded products, even at a higher price.[33]

---

[33] Based on Euromonitor annual revenue estimates and D&R (2021).

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

In 2019, moreover, Canada published the new Corded Window Coverings Regulations to restrict the length of cords and the size of loops allowed on window coverings sold in Canada; the requirements apply to all products, both stock and custom. The evidence from the Canadian custom window coverings market is that the transition to cordless options in the custom market has been relatively inexpensive for consumers. Staff observed that many designs are priced the same for cordless wand options as for the previous corded design, while motorized options add less than $100 to the retail price for commonly ordered sizes.

Lastly, in Table 17 in Tab F of Staff's Final Rule Briefing Package, Table 9, *infra*, staff provides estimated net costs to replace 12 custom window coverings per household, about every 10 years, that are compliant with the rule, showing as little as $24 to replace less expensive vinyl or metal products and up to a net increase of about $219 to replace enpensive soft sheer blinds. The Commission finds that the estimated net increase per household, representing a price increase of only about 5% of the total costs of replacing all custom window coverings every 10 years, is a reasonable cost increase to ensure that all children who live or visit the home going forward, are not exposed to the risk of strangulation on a window covering cord.

3. Commercial Establishments

*Comment 7*: At least 12 businesses raised issues about mandating safer window coverings in commercial and educational buildings and suggested an exemption. Three commenters stated that in an emergency situation, such as a lock down, school teachers should be able to close the window coverings quickly and that new systems may require teachers to climb up ladders to operate the window covering, which is impractical and time consuming. One manufacturer stated that based on the NPR, the standard appears to intend to address potential hazards of window coverings in residences, but the scope of the proposed rule covers all custom products. Given the broad interpretation of the definition of "consumer products" under the CPSA, the

74

commenter expressed the belief that many of the strictly commercial products could be subject to the regulation, unless the Commission makes clarifying changes to its definition of "custom window covering."

*Response 7*: CPSC generally has jurisdiction over window coverings that are produced or distributed for the use of consumers, as long as the product is customarily produced or distributed for consumer use. 15 U.S.C. 2052(a)(5). Products that do not fall within the CPSA's definition of "consumer product" would not be subject to this rule. However, custom window coverings that are produced or distributed for consumer use in residences, schools, recreation, or otherwise, fall within the scope of CPSC's jurisdiction. CPSC staff is not aware of products that are sold solely for use by workers in a specialized context that are not also available for the use and enjoyment of consumers who visit such businesses. If consumers have access to custom window coverings, and are subject to the potential harm, the product is within CPSC's jurisdiction and the safety benefits of this final rule applies to these products.

### 4. Competition from Overseas Manufacturers

*Comment 8*: Several commenters claimed that U.S. manufacturers cannot compete with less costly imports, and that unless a firm imported products in bulk, the cost of making many products cordless is more than the cost of the entire imported product. Commenters stated that the rule would make it more difficult to compete with foreign products, especially those from China.

*Response 8*: This comment is not specifically relevant to custom window coverings, which are the subject of this rulemaking. Custom window coverings may, in fact, be less affected by lower-cost foreign supply than stock window coverings, which have had strong cord safety requirements since 2018. Regardless, imported products will be subject to the same requirements as products made in the United States. The economies of scale should be the same

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

for manufacturers of any nation.  We anticipate that the expanded demand for cordless mechanisms should lower the costs of those mechanisms in the medium term, due to economies of scale.

### 5. Impact on Businesses

*Comment 9*: At least 1,007 commenters (of which about 938 identified themselves as businesses) stated that the proposed rule would cause a significant impact on their businesses. Particularly, small custom window covering retailers commented that the rule would reduce sales and raise costs.  Large suppliers commented that they intended to require licensed dealers to purchase new "sample books" costing thousands of dollars each.  Large suppliers and associations also provided data on estimated costs of retooling and costs of components at the wholesale level.

*Response 9*: As explained in the Staff's NPR Briefing Package, CPSC anticipates a significant impact on small businesses in the short term, as firms transition their product lines to comply with the final rule.  However, the impact may be less than estimated, given the enforcement of Canada's window covering regulation beginning in May 2022.  Companies that sell in both Canada and the United States have already redesigned their custom offerings to be compliant with the Canadian regulation, which is substantively similar to the final rule.  These companies already have stock of compliant product designed and ready to sell through small dealers and interior designers.

Although the window covering manufacturing sector is highly fragmented, the custom part of the market is concentrated, with a few large suppliers accounting for approximately 40 percent of the industry revenue.  The large suppliers are multinational companies with distribution in multiple countries.  This means that those large suppliers already have compliant products available for the Canadian market, and any incremental costs of redesign for the U.S.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

market will largely fall on those relatively large companies, rather than on their small distributors and dealers.  If suppliers in this industry choose to force small distributors to buy new sample books, as alleged by some suppliers, that decision is in no way a requirement of this rule, nor is it an inevitable consequence of this rule.

6.     Small Versus Large Businesses

*Comment 10*: One commenter suggested that a regulation will give larger window covering corporations an unfair advantage because hard window coverings (blinds composed of slats or vanes) can comply with the rule, but small manufacturers who make soft window coverings (composed of a continuous roll of material) cannot comply.

*Response 10*: Stock window coverings that comply with ANSI/WCMA-2018 are available in both soft and hard types, and implementation of safer window covering technologies has been proven for both types of window coverings.  CPSC expects significant cost impacts on small manufacturers of custom products, as discussed in the Regulatory Flexibility Analysis, but these costs are not associated with certain window covering types.  The cost impacts of a rule on operating cords for custom window coverings vary by product type, as detailed in Tab F and summarized in Tab G of Staff's Final Rule Briefing Package.

7.     Stockpiling should not be prohibited

*Comment 11*: One online retailer of blind and shade repair parts suggested that companies should be allowed to purchase whatever products they deem necessary or prefer.  This same commenter also asserted that the NPR specifies no consequence for violating the rule and was unclear who will be enforcing the rule.

*Response 11*: The anti-stockpiling provision is being finalized as proposed.  The final rule reflects a balance between the competing policy goals of addressing the hazard and also accounting for realistic supply-chain limits and considering the compliance costs for businesses,

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

and particularly those costs for small entities. A less-specific base period, or a higher proportion above the base production amount, would allow more noncompliant units to be manufactured and sold, which could reduce the burden to industry. However, it would also reduce safety benefits to consumers and force suppliers of compliant units to compete against a larger stockpiled supply of noncompliant, likely cheaper, units for a longer period of time. Custom products are typically made to order; so it is unlikely that a firm would manufacture large quantities in advance of demand. Therefore, this anti-stockpiling provision should not adversely impact manufacturers' normal operations. However, firms will need to modify their window coverings to comply with the requirements, and the modifications may be costly. Accordingly, CPSC believes it is appropriate to prevent stockpiling of noncompliant custom window coverings.

If a manufacturer or importer violates any provision of a mandatory rule, including the anti-stockpiling provision, CPSC can enforce that provision using authority under section 19(a)(1) of the CPSA, which prohibits the sale, offer for sale, manufacture for sale, distribution in commerce, or importation into the United States, any consumer product that is regulated under the CPSA, that is not in conformity with an applicable consumer product safety rule. 15 U.S.C. 2068(a)(1). CPSC's authority allows for corrective actions, or recalls, refusal of admission and/or seizure of products at the ports, and civil penalties for failure to conform to required regulations.

8.   <u>Unquantified Benefits Are Larger Than Estimated</u>

*Comment 12*: The Institute for Policy Integrity and A. Finkel, economist, suggested that the regulatory analysis in the NPR underestimated the benefits of the rule, by not discussing unquantified, but potentially very large, benefits of the rule. The unquantified benefits suggested include parental grief, reduced cost of litigation for manufacturers and retailers, and averted

78

recall costs.  Two commenters specifically cited the example of a Federal Motor Vehicle Safety Standard for rear visibility cameras in passenger cars, where the regulatory impact analysis discussed the large unquantified benefits of reducing parental grief and emotional trauma from causing the death of one's own child, or a relative, or neighbor.  One commenter pointed to that standard as an example of an "experience good," where the standard caused people's preferences to change to favor a safety technology with which they were previously unfamiliar.

*Response 12*: Such potential unquantified benefits would be included in an increased value of statistical life, or VSL, for children.  A discussion of this fact is included in the sensitivity analysis in Tab F of Staff's Final Rule Briefing Package and section V of this preamble.  CPSC's Injury Cost Model (ICM) takes pain and suffering into account, so a portion of parental grief benefits are accounted for and would be accounted for in an increased VSL for children.  Moreover, at this time CPSC cannot accurately assign a value to the potential that people might experience a shift in preferences towards a safer product, although the evidence of continued growth of demand for cordless stock coverings does indicate this is a potential benefit for custom window coverings as well.

9.    Value of a Statistical Life

*Comment 13*: Two commenters (Institute for Policy Integrity and A. Finkel) suggested that CPSC use different references and different theoretical justifications to derive a value of statistical life (VSL) for children.

*Response 13*: As evidenced by the many alternative sources and several methods suggested by the commenters, no consensus exists (either in the U.S. or internationally) on what value or method regulators should use in their regulatory analyses.  The current range of values in the peer reviewed literature for a child's VSL ranges from less than 1 to more than 7 times the value of an adult VSL, as discussed in more detail in the regulatory analysis.  CPSC staff

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

provided a discussion of this range to the sensitivity analysis in Tab F, but did not change in its analysis the core estimate of children's VSL. As noted in the sensitivity analysis, increasing a child VSL to three times the base VSL, $31.5 million, would result in a calculated net benefit for the final rule of $14.3 million.

    E.    *Consumer Issues*

        1.    <u>Accessibility issues with disabled population, people with short stature and seniors</u>

*Comment 14*: At least 383 comments (331 businesses, 8 consumers, and 44 unknown) stated that having a short cord introduces accessibility issues for various consumers such as people in wheelchairs or who otherwise are challenged to access cords higher up. Some commenters questioned whether the proposed rule is compliant with the Americans with Disabilities Act.

*Response 14*: The final rule provides several ADA-consistent options to address accessibility of safer window coverings. Sections 308.2 and 308.3 of the 2010 ADA Standards for Accessible Design specify forward and side reach distances that would be applicable to window coverings. Section II.C.7 of this preamble and Tab B of Staff's Final Rule Briefing Package explain the ADA standard and the window covering options in detail.

        2.    <u>Acknowledgement of Risks before Ordering</u>

*Comment 15*: At least 48 commenters (45 businesses) stated that they either currently ask or suggest that consumers acknowledge the strangulation risk associated with cords before ordering a custom corded window covering.

*Response 15*: Even accepting that consumers may acknowledge the strangulation risk associated with the corded window coverings that they are purchasing, and assuming these acknowledgements are informed rather than pro forma, the hazard with the corded window covering remains. Household members other than the consumer who signed the document,

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

including guests and small children who cannot comprehend the danger, as well as future residents of the home and their guests, also can be unaware of the hazard.

3.    Climbing on ladders or other furniture is unsafe

*Comment 16*: At least 56 commenters, including 42 businesses, stated that climbing on ladders or other furniture is unsafe for consumers, particularly older consumers.  Due to the short cord requirement, these commenters assert that climbing would be required to operate hard-to-reach window coverings.  Some commenters provided statistics on falls.

*Response 16*: Consumers ordering custom window coverings are unlikely to choose a custom design that requires them to climb on furniture to open their window coverings.  Alternative solutions to climbing that can safely replace the existing hazardous cords include poles to operate cordless systems, rigid cord shrouds, loop cord and bead chain restraining devices, as well as retractable devices that would be within easy reach of users.  Accordingly, the Commission finds that the final rule would not lead to the unsafe behavior envisioned by these commenters.

4.    Exclude Draperies

*Comment 17*: Several commenters, including two businesses, argued that draperies should be excluded from the rule.  One stated that there are no "aesthetic" alternatives to cords for draperies.  Another commented that there is no evidence that draperies are unsafe because the cords are on pulleys attached to the floor.

*Response 17*: Multiple cordless options for draperies are available, including wands and motorized controls, as well as pulling the draperies on the traverse rod by hand, with no cord or other control.  Section I.E of this preamble details fatal incidents involving draperies.  Corded draperies are common, and often do not have the cord on a loop or attached to the floor as the commenter claims.  On the other hand, of the different types of window coverings analyzed in

81

the final regulatory analysis, draperies had the lowest cost of compliance with the final rule, estimated to be near zero, because the cost of a control wand is approximately equal to the cost of the cord it replaces.

5. <u>Informing the Customer</u>

*Comment 18*: About 593 businesses stated that they regularly educate their clients on safer operating cord options during the ordering process and that consumers make an informed choice by being aware of the hazards associated with the corded product. At least 120 commenters stated that people should be made aware of the dangers and then make their own choice when purchasing a custom window covering.

*Response 18*: CPSC encourages sellers to inform and educate consumers on the operating systems that contain hazardous cords. However, information and education are not always provided, and where provided they do not negate products being sold and installed with hazardous cords, and that custom window coverings will remain in consumers' homes for many years. If consumers do not appreciate the hidden nature of the hazard, they may choose to buy a hazardous window covering even when children are present in the home. Moreover, as explained above, custom window coverings have a long product life. When a home is sold or rented, a new resident, potentially residents with children, will likely live with the hazardous window covering, without having been warned of the associated hazards. Due to the ineffectiveness of warning labels on such products, even a permanent label may not get the attention of the user. 87 FR at 1034-35. Information and education remain important to address the existing cord hazard, but as the incident data reflect, education and warning labels do not adequately address the risk of injury.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

6. <u>Parental Responsibility</u>

*Comment 19*: At least 24 commenters, including 17 businesses, suggested that parents are responsible for supervising their children around window coverings.

*Response 19:* As reviewed in the NPR and in Staff's NPR Briefing Package, ordinary parental supervision is unlikely to effectively eliminate or reduce the strangulation hazard, because even young children are left unsupervised for a few minutes or more in a room that is considered safe, such as a bedroom or family room. 87 FR at 1036-37. Moreover, incidents have occurred even when family members were in the same room as the strangled child. *Id*. Strangulation with cords requires only a few minutes to occur and happens silently. A more effective solution to the window covering cord hazard is to require that window coverings are inherently safe as sold and do not have hazardous operating or inner cords.

7. <u>Rental Leases and Real Estate Documents</u>

*Comment 20*: To inform renters as well as purchasers, one business suggested informing and disclosing the hazards associated with corded window coverings at the time of rental or sale of the property. Two businesses (Comfortex Window Fashions and Inviting Interior Style) suggested home inspections when dwellings change hands.

*Response 20*: CPSC agrees with the commenters' concerns regarding window coverings included in rental units where tenants with young children may not have the option of choosing safer window coverings. Moreover, the sale process of a residence is an opportunity to inform buyers about the dangers associated with corded window coverings or to remove and replace hazardous window coverings. Certain state and local authorities may have regulations in place with regard to window coverings in rental homes. However, CPSC does not have the authority to require such practices. CPSC regulates consumer products rather than the terms of property rental or sale contracts, which are generally in the purview of state and local governments.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Mandatory visual inspections of installations of corded window coverings would not prevent deaths and injuries without an additional safety rule, because hazardous loops can still be accessible even when cord loops are correctly installed and with tension (*see* Tab I of Staff's Final Rule Briefing Package).

### 8. Replacement of Old Window Coverings

*Comment 21*: At least 12 commenters, including 10 businesses, stated that the rule would discourage people from replacing their decades-old, non-compliant blinds and shades containing dangerous cords with new compliant window coverings because they would not want to give up corded products.

*Response 21*: Market data on stock window coverings does not support the commenters' hypothesis. Voluntary compliance with ANSI/WCMA-2018 for stock products did not cause a decline in revenue, by either units or by total revenue, as most of the industry transitioned to cordless only products. Multiple commenters representing manufacturers and retailers noted that sales of cordless stock products have *increased* in the past few years, thus demonstrating consumer demand for cordless products as an acceptable replacement for corded products. Canada has transitioned to safe window coverings with a similar absence of disruption.

### 9. Require professional installation

*Comment 22*: As an alternative to the rule, two commenters (one interior designer and one business owner) suggested that CPSC should require that custom window coverings be professionally installed, stating that this would help small businesses and improve consumer safety.

*Response* 22: CPSC does not have the authority to regulate professional services or home inspections. Implementing these practices would also be more costly than the final rule, without providing as many benefits. The typical cost for adding cordless options to a custom window

84

covering ranges from less than $10 (and in some cases nothing) to about $100, except for some very large, motorized options. This price range is far below the cost of hiring a professional installer for corded custom window coverings. In general, commenters' alternatives would raise costs for installed custom window coverings, while addressing few of the known incidents and fatalities, as well as not addressing the known hazard of corded window coverings.

10. <u>Twisting wand takes time and effort and use is inconvenient; poles may not work for elderly</u>

*Comment 23*: At least 38 commenters, including 36 businesses, stated that using a wand is time consuming and may be difficult for some consumers.

*Response 23*: The wands that CPSC staff evaluated for this rulemaking are easy to learn about and use. We anticipate that further innovation will make wands even more efficient and easy to use. Some traditional wands used to rotate horizontal slats have thin diameters, which can make such wands more difficult to use compared to rigid cord shrouds, which staff evaluated to have thicker diameters and are more comfortable to use. The final rule does not require the use of wands. The final rule allows the use of many other types of safe operating systems instead of a wand, such as cordless, retractable cords, cord shrouds, cord restraining devices, or motorized systems.

F.      *Warnings, Public Awareness, and Education*

*Comment 24*: At least 5 businesses contended that warning labels on the products should be relied on to address the strangulation hazard as they inform the consumer about the hazard. At least 2 other commenters stated that warning labels and educational efforts were tried, did not work, and are insufficient to address the strangulation risk.

*Response 24*: The NPR explains that consumers are less likely to look for and read safety information on products that they use frequently and are familiar with. 87 FR at 1035. Incident data for window covering cords confirms this research, as most of the incident units had a visible

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

warning label on the product. Even well-designed warning labels will have limited effectiveness in communicating the hazard on this type of product. However, the Commission agrees that public awareness is a crucial component in making safe purchasing decisions and safely using window covering products at home. Public information campaigns are on-going. CPSC and the Window Covering Safety Council (WCSC) have joined forces to raise awareness of strangulation risks presented by window covering cords, and October has been designated "Window Covering Safety Month" by CPSC and the WCSC since 2003.

Currently, the Commission does not have information to quantify the effectiveness of public information campaigns on reducing the risk of injury associated with corded window coverings. However, information and education campaigns on corded window coverings that have been continuing for decades have not adequately reduced or eliminated serious injuries and deaths, as evidenced by the continuing number of fatalities. Accordingly, the Commission will not rely on education campaigns to address the unreasonable risk of injury associated with operating cords on custom window coverings.

G.   *Other Product-Related Hazards*

  1.   <u>Access to battery to recharge or replace</u>

*Comment 25*: At least 15 businesses stated that, with respect to motorized solutions, replacing or swapping batteries located on the headrail is difficult for consumers as they need to climb on ladders. At least 4 commenters also stated that the new rule would increase the use of batteries, which is wasteful for the planet.

*Response 25*: Staff reports that they found examples of window coverings where the batteries are stored in the bottom rail, making it easier for consumers to recharge or replace batteries. Batteries are rechargeable to reduce waste, and some window coverings are hardwired or solar powered.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

2. <u>Button batteries used in remote controls</u>

*Comment 26*: At least 3 commenters (WCMA, Parents for Window Blind Safety, and Independent Safety Consulting) suggested that remote controls that contain button batteries should comply with either ASTM F963 or other applicable button battery standards, or simply that battery compartments should have a screw.

*Response 26*: On August 2, 2022, Congress passed H.R. 5313, or Reese's Law, and the President signed the bill into law on August 16, 2022. Reese's Law directs the Commission to establish a mandatory standard to protect children and other consumers against hazards associated with the accidental ingestion of button cell or coin batteries used in consumer products. Accordingly, staff is preparing a notice of proposed rulemaking for Commission consideration to implement this law. The Commission anticipates that window covering remote controls that use button cell or coin batteries will fall within the scope of that proceeding.

3. <u>Continuous loops with tension devices are safe</u>

*Comment 27*: At least 429 commenters stated that continuous loops with properly attached tension devices are safe and should not be eliminated. Commenters said that windows that are high up, windows over a sink, and windows behind a couch need continuous loops. Other commenters stated that some consumers do not want tension devices attached to the wall.

*Response 27*: Incident data demonstrate that tension devices may come off the wall or may not be installed at all, and continuous loops may not be taut enough to prevent strangulation incidents. Through testing, staff found that children may be able to insert their head into a properly installed continuous loop system even with a tension device. Accordingly, the Commission concludes that window coverings operated with continuous loops with tension devices can still leave hazardous loops accessible to children and do not adequately address the risk of strangulation.

87

For the final rule, CPSC staff analyzed how a window covering that is behind a piece of furniture or sink would be operable with a continuous loop if the loop has a tension device to keep the loop taut. Tab B of Staff's Final Rule Briefing Package provides a visual comparison. Tab B explains that the continuous loop would likely remain unattached to the wall with a tension device so that the consumer can pull the loop towards him/her to operate. This means that the continuous loop remains accessible to children and hazardous. Given children's ability to climb and incident data demonstrating this hazard scenario, the Commission concludes that continuous loops that are contained in a rigid shroud or restrained within a passive restraining device are much safer for children and potentially easier to operate for both access and ease of use by consumers.

4.    Consumer preference for corded products

*Comment 28*: At least 2 businesses suggested that they have customers who prefer to use corded window shades because they find them easier to use. Some businesses stated that the ANSI/WCMA-2018 requirement to limit the free hanging cord length to 40% of the product length generated customer complaints, because some of their clients cannot reach the cord with ease. Some businesses stated that they sell custom blinds to nursing homes and retirement homes; the users demand that the cords be long enough to be reached, which usually means 40 inches or more.

*Response 28*: The final rule's effect on sales for some particular products is accounted for in the regulatory analysis in section V of this preamble, and Tab F of Staff's Final Rule Briefing Package. However, stock products currently on the market that comply with ANSI/WCMA-2018 are available in a variety of materials, sizes, and types to meet consumer needs. Also, custom product requirements in the final rule allow for a variety of solutions to ease the operation of window coverings, including poles for cordless systems, rigid cord shrouds and loop

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

cord and bead chain restraining devices, motorized window shades, and retractable cords. All of these options provide easy reach for consumers. Based on the comments, the final rule for custom window coverings specifically permits corded window coverings that use a single cord retractor, rigid cord shroud, or a cord restraining device, to create more options for non-motorized safe window coverings, provide options for accessible custom window coverings, and allow for ease of use.

5. Cord cleats

*Comment 29*: About 42 commenters stated that cord cleats are provided with corded window coverings and address the hazard.

*Response 29*: Cord cleats do not adequately address the strangulation hazard associated with window covering cords because such devices rely on consumers to wrap the excess cord around the cord cleat every time they raise or lower the window covering. Incident data demonstrate that consumers may not wrap the cords around the cleat every time they operate the window covering, which results in dangling operating cords with which children can strangle. In one incident, although caregivers normally wrapped the cord around the cleat, on the day of the incident, cords were not wrapped, and the child accessed the cords after climbing on a couch.[34] Further, cord cleats may be accessed by children. In one incident:

> [a] four year old boy moved a small plastic table over near the window, climbed upon the table and reached up and removed the shortened pull cord for the window covering from the "safety" cleat. He pulled the cord out and wrapped it around his neck. He then jumped off of the table. The cord broke and he fell to the floor. His parents were able to remove the cord from his neck. The boy recovered from his injuries.[35]

---

[34] *Id.*
[35] Lee, K. (2014). Mechanical Engineering Response to Window Coverings Petition. CPSC memorandum to Rana Balci-Sinha, Project Manager, Window Coverings Petition CP 13-2. U.S. Consumer Product Safety Commission, Rockville, MD. Accessed at https://www.cpsc.gov/s3fs-public/pdfs/blk_pdf_PetitionRequestingMandatoryStandardforCordedWindowCoverings.pdf

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

6. <u>Effective date</u>

*Comment 30*: At least 401 commenters stated that the proposed six-month-effective-date is very short to meet the proposed requirements; 94 commenters suggested at least one year effective date, three commenters suggested at least an 18 month to 2 years effective date, and seven commenters suggested at least 2 years to comply with the rule. Two commenters submitted the extent of the delays in obtaining equipment, transit time in both sea and air to get equipment and components from overseas suppliers, and delays in lead times for raw materials. One manufacturer, Safe T Shade, stated that "a 180-day lead time is more than sufficient for a painless Industry implementation," and consumer organizations stated that a mandatory standard should be issued as soon as possible.

*Response 30*: Under section 9(g)(1) of the CPSA, the Commission must find good cause to extend the effective date of the final rule beyond 180 days. Table 1 in staff's engineering analysis presents an estimate of the engineering steps involved in designing and prototyping a rigid cord shroud, the time involved for each step, and cost to develop a rigid cord shroud. Staff assessed that the redesign of window coverings for unusually sized-windows to be compliant with the final rule would create even more additional effort and time, above typical sized-window modifications, for manufacturers to address. Engineering staff estimates that, if a 2-2.5 - year period were taken to develop a production-ready rigid cord shroud, it would cost $787,000 to do so in that time. Tab C, Appendix, Staff's Final Rule Briefing Package.

Table 1a presents commenters' timelines and criteria for creating compliant custom window coverings, such as tooling, transit, and inventory. *Id*. These commenters provided timelines of 9 to 20 months in obtaining and transporting equipment/materials from overseas suppliers, citing long lead times of 4 to 12 months to acquire necessary equipment and materials,

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

and an additional 1 to 4 months upon delivery to assemble component inventory. Another commenter stated an additional delay related to continued COVID-19 disruptions.

Staff found these concerns to be credible because of the specific examples provided by commenters and because these comments comport to what staff has determined about the industry's supply chain. Tab F of Staff's Final Rule Briefing Package. Additionally, staff assesses that supply disruption could result in temporary, but significant, shift in consumer behavior. Supply chain disruptions and delayed deliveries could result in a shift in demand from custom products to stock products. Stock products have a lower profit margin than custom products and thus may have a significant cost impact to manufacturers and retailers even if the shift is temporary. Further, most custom window coverings sellers are small businesses, and therefore a temporary shift to stock products could have a significant impact to small businesses. A later effective date would allow manufacturers more time to redesign, distribute costs of compliance along the entire year, or discontinue product variants that cannot meet compliance. Staff therefore assesses that a 1-year effective date, which is greater than the 30-180 day effective date provided for in CPSA section 9(g)(1), 15 U.S.C. 2058(g)(1), would serve the public interest for most custom window coverings.

Based on the currently available products on the market, and in consideration of comments received, staff economists also recommend extending the effective date to 2 years for window coverings that are raised and lowered and are at least 10-feet tall in vertical length, because these heavier products may require additional research to reliably lift with cordless designs or make the cords inaccessible or accessible loops non-hazardous. *Id.*

The Commission finds good cause to delay the effective date, and will establish a 2-year effective date for custom window coverings 10 feet or greater in vertical length and that are

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

raised and lowered, and a one-year effective date for all other custom window coverings to come into compliance with the final rule.

       7.   <u>Free hanging cords</u>

*Comment 31*: At least three commenters stated that free hanging cords (meaning a cord that is longer than 8 inches and not restrained) should be prohibited because they pose a higher strangulation risk to a child. At least one manufacturer stated that free hanging cords are a large portion of their business.

*Response 31*: Free-hanging window covering cords are associated with 18 of 36 custom product strangulations or near strangulations (74 free-hanging cord incidents of the overall total of 209 incidents). Removing free-hanging cords from custom window coverings will reduce deaths and injuries. The window covering industry appears to be moving away from free-hanging cords, as WCMA, in their latest draft balloted revision, draft ANSI/WCMA-2022, proposes to remove cord lock systems, and thus free hanging operating pull cords from all custom products, regardless of type, size, and weight of the window covering. As stated earlier, the final rule contains several alternatives to hazardous free-hanging cords, such as rigid cord shrouds, loop cord and bead chain restraining devices, and retractable cords, in addition to manual and motorized cordless lift systems that can replace hazardous cord lock systems.

       8.   <u>Coverings for high windows or windows that are hard-to-reach are impossible to use with an 8-inch cord</u>

*Comment 32*: At least 385 commenters stated that window coverings located at higher locations on a wall, windows behind the kitchen sink, or windows behind furniture, cannot be operated with an 8-inch cord.

*Response 32*: The rule allows for several safe alternatives for operating cords besides using an 8-inch cord. For custom products in hard-to-reach locations, under the final rule consumers have the option to choose from, among others that could be developed:

THIS DOCUMENT HAS NOT BEEN REVIEWED            CLEARED FOR PUBLIC RELEASE
OR ACCEPTED BY THE COMMISSION                UNDER CPSA 6(b)(1)

A433

- Cordless blinds with an access wand

- Motorized window covering with a remote control

- Single cord retractor systems with a 12-inch stroke

- Rigid cord shroud

- Cord restraining device

9.   Manual spring system is not durable

*Comment 33*: At least 8 businesses stated that manual spring systems are not durable and break easily.

*Response 33*: Manual cordless lift systems, popular in stock products, often use a series of constant force springs.  If the springs break, the window covering fails safe, because cordless window coverings do not have accessible operating cords.  Any spring has a limited fatigue life (number of cycles to failure).  Manufacturers can control fatigue life of the lift system by selecting the proper spring size, strength, and number of springs for the lift system.

10.   Off-the-shelf products

*Comment 34*: At least 3 commenters suggested that stock products are more dangerous than custom products because stock products are allowed to have longer lengths of accessible pull cords than custom window coverings, stock product customers are less likely to get safety information, and stock products are likely to be installed by consumers who may be unfamiliar with the hazard.

*Response 34*: Stock window coverings that are compliant with the existing voluntary standard, ANSI/WCMA-2018, cannot have lengthy pull cords as the commenters suggest.  All stock products must be cordless, have short cords (equal to or shorter than 8 inches), or have inaccessible cords.  Although consumers may not be as knowledgeable as professional installers, most of the custom products involved in the identified strangulation incidents were installed by

93

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

A434

professionals and still lacked safety devices. Several public commenters state that installers may remove the tension device from a product if the customer does not want it mounted, which allows a free-hanging hazardous loop on the product. Educating consumers is paramount particularly to reduce the risk associated with corded window coverings already installed in consumers' homes. However, as discussed in Staff's Final Rule Briefing Package, education campaigns are insufficient to adequately address the hazard, and manufacturing inherently safe custom window coverings that comply with the requirements for stock products in ANSI/WCMA-2018 is required to address the risk of injury or death.

11.     Product options / Limited choices for consumers

*Comment 35*: At least 321 commenters suggested that consumers may want to have different window covering cord options to serve their different needs and that reducing consumer options is not preferable.

*Response 35*:   The final rule leaves room for operating system options. Manufacturers can develop new operating systems that do not have accessible cords or implement existing solutions such as cordless systems, shrouded or continuous loop systems, or shrouded pull cord systems. These technologies are available and are being used for both stock and custom window coverings.

Suppliers of custom window coverings to the Canadian market have already adjusted their products to comply with Canada's window treatment regulations, which are substantially similar to this final rule. Compliance to the Canadian rule has apparently resulted in changes to advertised product lines; such as those shades that could not meet the inner cord requirements (*e.g.*, light pleated shades, narrow metal blinds) appear to have been removed from the market, as well as some of the largest sizes of other categories. Manufacturers are offering cost-effective redesigns to other product types that are cordless. In addition, manufacturers are offering new

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

designs to replace the discontinued options in Canada, such as shades with light blocking material on the bottom and sheer on the top as a replacement for "top down/bottom up" (TDBU) shades. CPSC has no evidence from the Canadian market of a significant reduction in consumer choice. Rather, the market has reacted with cost-effective substitutes and redesigns.

## 12. Retractable cords work well and are safe

*Comment 36*: At least 149 commenters stated that retractable cords are safe and should not be eliminated as an option to make operating cords inaccessible.

*Response 36*: CPSC is not aware of incidents associated with retractable cords, and based on the comments received, the final rule provides a retractable cord lift system option for custom window coverings, provided that the system only exposes up to 12 inches of cord from the bottom of the headrail as a stroke length. The Commission adopts a 12-inch cord limit based on staff's analysis (Tab B) demonstrating that it is extremely unlikely for a strangulation to occur in this scenario for both younger and older children, as well as lack of incidents within 12 inches of the headrail.

## 13. Technology unavailable to cover all products in all sizes and weights

*Comment 37*: At least eight commenters, including WCMA, stated that non-motorized cordless lift systems are not feasible for large window coverings. Commenters stated that continuous loop cords with tie down devices are capable of lifting any size window covering. At least 3 commenters stated that manual cordless lift systems have limitations such as size and weight of the window covering that could limit the application (*e.g.*, for faux wood blinds, a general estimate for the maximum dimensions for cordless is 96 inches wide by 48 inches high and 60 inches wide by 84 inches high.). Commenters also stated that there is an increased presence of taller windows in homes.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

*Response 37*: Because hazard patterns in taller window coverings are the same as hazard patterns for shorter window coverings, the potentially increased number of installations of taller window coverings in residences, and the feasibility of applying safer technologies on these products, the Commission will not exclude taller products from the scope of the rule. However, staff's product development time estimates (Tab C) demonstrates that a longer implementation date (*i.e.*, 2 years) is reasonable for manufacturers to implement the technologies for products that are raised and lowered and are 10 feet or more in length.

The Commission also considered the comments provided by manufacturers about the limitations for larger products to accommodate the manual cordless systems. Staff reviewed the incident data to determine the largest products that were involved in incidents: the longest product that was involved in a nonfatal incident had a reported length of 112 inches (width was 124 inches). A reported fatality involved a roller shade; based on other dimensions provided in the in-depth investigation (IDI), staff estimates the length as 119 inches (width was estimated as 54 inches).

Based on staff's market research, rigid cord shrouds are currently limited to operating window coverings up to 96 inches tall. Staff reviewed the available technologies on the market and determined that it is feasible to implement rigid cord shrouds, cord or bead chain restraining devices, or retractable cords on larger window coverings (Tab C). Accordingly, the final rule allows for the use of these methods, as long as the products meet the durability performance requirements in the rule.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

14.    Top-Down-Bottom-Up (TDBU) shades

*Comment 38*: About 33 commenters believe that TDBU shades would be eliminated if the proposed rule becomes final.  They believe that TDBU shades are safe and should not be eliminated.

*Response 38*: The final rule does not eliminate TDBU window coverings.  Under the final rule a TDBU shade can be manufactured as long as it does not contain hazardous operating cords as stated in the final rule (meaning accessible cords longer than 8 inches).  Moreover, inner cords are subject to the final rule under section 15(j) of the CPSA, which incorporates by reference the ANSI/WCMA-2018, requiring that accessible inner cords cannot create a hazardous loop.  If the inner cords fail to meet this ANSI/WCMA-2018 requirement, manufacturers can redesign the product to meet the standard.  For example, some manufacturers were concerned that TDBU products could not meet the Canadian inner cord requirement (which are more stringent than ANSI/WCMA-2018 requirements).  However, Canadian custom window treatment retailers have already adjusted their products to comply with Canada's requirements for inner cords. Manufacturers are offering cost-effective redesigns for TDBU products to replace the discontinued options, such as shades with light blocking material on the bottom and sheer on the top as a replacement for TDBU shades.

15.    Training Installers

*Comment 39*: At least 353 businesses stated that they train their installers so that window coverings and safety devices are properly mounted.

*Response 39*: Over the lifetime of product use, even properly installed external safety devices such as tension devices may break or come off the wall.  Also, consumers who do the installation by themselves may not have the knowledge or ability to properly install the device. Importantly, staff's testing found that a child can fit their head through a properly tensioned cord

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

(Tab I); cord tension devices do not eliminate or adequately reduce the risk of strangulation. Safer options to reduce the risk of injury include passive safety devices that do not rely on consumer behavior to prevent the hazard.

*H.      Stories of Loss*

*Comment 40*: More than 40 commenters either were personally affected by a window covering cord injury or death or know someone who was affected by a child's death on a window covering cord.

*Response 40*: The Commission appreciates the courage of these families in sharing their difficult stories of a tragic loss.  To each of these parents, family members, and loved ones, we are deeply sorry for your loss.  The Commission has taken the information about the interactions and conditions involved in the incidents into consideration in developing its final rules for stock and custom window coverings, in an effort to prevent the tragedy of losing a child to a window covering cord.

*I.      Comments of the Chief Counsel for Advocacy, SBA*

*Comment 41*: The Office of Advocacy of the Small Business Administraton (Advocacy) states that CPSC's Initial Regulatory Flexibility Act (IRFA) analysis relies on incomplete information and advises that the Commission publish an updated analysis for comment.

*Response 41*: The Final Regulatory Flexibility Analysis (FRFA) incorporates the changes suggested by Advocacy.  Tab G of Staff's Final Rule Briefing Package provides an estimate for the potential firms that may meet the criteria for small businesses and is discussed in more detail in Tab G.

*Comment 42*: Advocacy stated that CPSC should consider alternatives for the final rule that reduce the burden to small businesses while still meeting the stated objectives of increased

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

child safety.  Advocacy expressed concerns about the costs to comply, time to comply, and whether an updated voluntary standard would adequately address the risk of injury.

*Response 42*: The Commission considered alternatives to reduce the potential burden of the final rule to small businesses.  Alternatives the Commission considered are listed in the Regulatory Flexibility Act analysis in the NPR and this final rule, and included continued work on education efforts, narrowing the scope of the rule, and updating the voluntary standard.  For the final rule, the Commission considered an exemption for very large window coverings in response to comments from Advocacy and the public, but ultimately determined that it is feasible to make larger window coverings safe, and the hazard associated with larger window coverings is the same as that of smaller products.

The Commission is providing an effective date period of 1 year for most custom window coverings, to allow firms more time to obtain complaint component parts and retool production lines as compared to the 180-day period proposed in the NPR.  CPSC notes that many of the firms supplying the U.S. market with custom window coverings also supply the same products to the Canadian market where all corded products are non-compliant.  Additionally, the Commission is setting a later effective date for products 10 feet or greater in vertical length and that are raised and lowered, to allow manufacturers to spread research and development costs over a longer time period.  *See* Response to Comment 30.  This will also allow manufacturers more time to source necessary component parts.  The Commission will also specficially allow two methods, in addition to rigid cord shrouds, to make operating cords on custom products inaccessible or non-hazardous to children: retractable cord systems and loop cord and bead loop restraining devices, as long as these devices meet the requirements of the rule.

The reasons for not relying entirely on any voluntary standard are discussed elsewhere in this preamble.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

*Comment 43*: Advocacy stated that CPSC should consider exceptions in situations where corded window coverings are a necessity, such as under the Americans with Disabilities Act.

*Response 43*: Section 9 of the CPSA requires the Commission to consider the effects of a rule on elderly and disabled persons. Section II.C.7 of this preamble provides an analysis of the issues raised by commenters with regard to the ADA.

## IV. Description of the Final Rule

The need for this rule under sections 7 and 9 of the the CPSA arises from a difference in the existing voluntary standard's requirements for operating cords on stock window coverings and operating cords on custom window coverings. Section 4.3.1 of ANSI/WCMA-2018 sets forth the performance requirements for operating cords on stock window coverings (*see* Table 8). The Commission has determined that these operating cord performance requirements are adequate and effective to reduce or eliminate the unreasonable risk of strangulation to children 8 years old or younger on window covering cords (see section II.A of this preamble). Accordingly, in the separate proceeding for stock window coverings, the Commission is incorporating by reference the "readily observable" safety characteristics for window covering cords, as addressed by ANSI/WCMA-2018, into a rule that deems the absence of these safety characteristics a substantial product hazard under section 15(a) of the CPSA.

Conversely, the Commission has determined that the requirements for operating cords on custom window coverings in section 4.3.2 of ANSI/WCMA-2018 are inadequate to address the risk of strangulation to children. Accordingly, the Commission finalizes this rule to require that operating cords on custom window coverings comply with the same performance requirements established in section 4.3.1 of ANSI/WCMA-2018 for operating cords on stock window coverings, instead of the weaker requirements in section 4.3.2. The final rule also contains two methods, integrated into a window covering as sold, to make operating cords inaccessible to

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

children 8 years and younger: rigid cord shrouds and retractable cords, and one method to make accessible continuous loops non-hazardous: loop cord and bead chain restraining devices. ANSI/WCMA-18 and the draft ANSI/WCMA-2022 allow these methods with somewhat different requirements from the final rule. Hundreds of commenters requested that we allow these options to remain for custom products. Staff assessed the methods and advised that they could be made safer to address the risk of injury. Accordingly, these methods are allowed in the final rule provided that the methods meet the durability requirements in the final rule.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**Table 8. Comparison of Custom Product Requirements in
ANSI/WCMA-2018, NPR, and the Final Rule**

| Performance Requirements | Custom Products in ANSI/WCMA 2018 | Custom Products NPR | Custom Products Final Rule |
|---|---|---|---|
| (No operating cords (cordless) | Allowed | Allowed | Allowed |
| Short cord (8 inches or shorter) in any state | Allowed | Allowed | Allowed |
| Inaccessible operating cords | Allowed | Allowed | Allowed |
| Rigid cord shrouds (can be used with any operating system) | Allowed if Rigid Cord Shroud meets ANSI/WCMA-2018 test requirements | Allowed if Rigid Cord Shroud meets ANSI/WCMA-2018 test requirements plus proposed deflection and deformation tests | Allowed if Rigid Cord Shroud meets ANSI/WCMA-2018 test requirements plus deflection and deformation tests |
| Single retractable cord lift system | Allowed, no limit in cord length under tension | Asked for comments | Allowed provided that it meets complete retraction at 30 gram, non-cord retraction device, and stroke length limited to 12 inches below the headrail |
| Non-hazardous Cord Loops using Cord and Bead Chain Restraining Device | Allowed if device meets ANSI/WCMA-2018 tests | Asked for comments | Allowed if device meets ANSI/WCMA-2018 tests and test for UV followed by cyclic test and deflection test |
| Accessible Operating Cords longer than 8 inches | Allowed | Prohibited | Prohibited |
| Continuous Loops with Tension Devices | Allowed | Prohibited | Prohibited |
| Cord Loop Lift Systems | Allowed | Prohibited | Prohibited |

A.    *Description of Section 1260.1 – Scope and Definitions*

Section 1260.1, scope and definitions, describes the scope of the final rule and provides

relevant definitions for the final rule.  Definitions for terms defined in ANSI/WCMA-2018

remain consistent with the voluntary standard.  Section 1260.1(a) limits the scope of the

proposed rule to operating cords on custom window coverings because the risks of injury

associated with inner cords on custom window coverings, and with operating and inner cords on

stock window coverings, are addressed in a separate rule under section 15(j) of the CPSA.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Section 1260.1(a)(1) and (2) set forth the effective date of the rule, which is dependent on the size of the custom window covering. The rule provides an effective date of one year after publication of the rule in the *Federal Register* for most custom window coverings. However, for large custom window coverings that are 10 feet or larger in vertical length and that are raised and lowered, the rule provides an effective date of two years after publication in the *Federal Register*.

Section 1260.1(b) incorporates by reference several definitions in section 3 of ANSI/WCMA-2018. The final rule clarifies the definition of a "Rigid Cord Shroud" to include the inaccessibility requirement in Appendix C of ANSI/WCMA-2018, and includes two additional terms to accommodate specification of two additional methods to make custom window covering cords inaccessible to small children, "Retractable Cord," and "Loop Cord and Bead Chain Restraining Device." Below we set forth the terms and explain how these terms are defined in the ANSI standard.

- "Custom window covering," definition 5.01 of ANSI/WCMA-2018, is a window covering that is not a stock window covering.

- "Stock window covering" definition 5.02 of ANSI/WCMA-2018, is a product that is a completely or substantially fabricated product prior to being distributed in commerce and is a stock-keeping unit (SKU). For example, even when the seller, manufacturer, or distributor modifies a pre-assembled product by adjusting to size, attaching the top rail or bottom rail, or tying cords to secure the bottom rail, the product is still considered stock under the ANSI standard. Online sales of the product or the size of the order, such as multi-family housing, do not make the product a non-stock product. These examples are provided in ANSI/WCMA A100.1 – 2018 to clarify that as long as the product is "substantially fabricated"

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

prior to distribution in commerce, subsequent changes to the product do not change its categorization.

- "Operating cord," definition 2.19 of ANSI/WCMA-2018, is a cord that the user manipulates to use the window covering, such as lifting, lowering, tilting, rotating, and traversing. An example operating cord is pictured in Figure 7 of this preamble.

- "Cord shroud," definition 2.09 of ANSI/WCMA-2018, is material that is added around a cord to prevent a child from accessing the cord and to prevent the cord from creating a loop. Defining a cord shroud in the rule is necessary because the rule includes a test for a "rigid cord shroud" in 1260.2(b), to meet the inaccessibility requirement in section 4.3.1.3 of ANSI/WCMA-2018.

- "Cord retraction device," definition 2.08 of ANSI/WCMA-2018, is a passive device which winds and gathers cords when tension is no longer applied by the user.

The definition of "rigid cord shroud" in 1260.1(c) is based on work by the voluntary standards task group in 2018. A "rigid cord shroud" is not currently defined in the standard but is a hard material that encases an operating cord to prevent a child from accessing an operating cord. For the final rule, the Commission is clarifying in the definition that "inflexible material" is material that makes the cord inaccessible as defined in Appendix C of ANSI/WCMA A100.1 – 2018.

The final rule includes two new definitions in section 1260.2(d) and (e), to define the two additional methods to make custom window covering cords inaccessible or non-hazardous to children 8 and under: retractable cords and loop cord and bead chain restraining device. These definitions are similar to the definitions in draft ANSI/WCMA-2022, with modifications. A

104

"retractable cord" is defined as "a cord that extends when pulled by a user, and fully retracts when the user releases the cord, rendering the cord inaccessible as defined in Appendix C of ANSI/WCMA A100.1 – 2018." A "loop cord and bead chain restraining device" is defined as "[a] device, integrated to and installed on the window covering, that prevents the creation of hazardous loop from an accessible continuous operating cord."

The final rule also includes a new definition in section 1260.1(f) for "operating interface," because this term is used to describe requirements for retractable cord devices. An "operating interface" is defined as the part of the window covering that the user physically touches or grasp by hand or a tool to operate the window covering, for example a wand to tilt the slats of the product or the bottom rail to raise or lower the product. This definition is similar to the definition in draft ANSI/WCMA-2022, with modifications.

> B.    *Explanation of 1260.2 – Requirements for Operating Cords on Custom Window Coverings*

Section 1260.2 sets forth the requirements for operating cords on custom window coverings. Section 1260.2(a) requires that each operating cord on a custom window covering comply with section 4.3.1 of ANSI/WCMA-2018 (operating cord not present (section 4.3.1.1)); operating cord is inaccessible (section 4.3.1.3); or operating cord is eight inches long or shorter in any position of the window covering (section 4.3.1.2), instead of the current requirements for operating cords on custom products in section 4.3.2 of ANSI/WCMA-2018. Section 1260.2(a) includes a revision from the NPR, to allow compliance with section 4.3.2.5.2 of ANSI/WCMA-2018, which is the provision in the voluntary standard setting forth requirements for loop cord and bead chain restraining devices. This addition in the final rule responds to the comments requesting that the rule not eliminate the use of continuous loop cords for custom window

105

coverings by allowing their continued use as long as the hazardous cords are encased in an integrated loop cord or bead chain restraining device that meets the requirements of the rule.

Section 1260.2(b) contains the requirements and test methods for rigid cord shrouds, when they are used to comply with section 1260.2(a). Sections 1260.2(b)(1) and (b)(2) contain the test methods to confirm whether a cord shroud is "rigid." The requirements for rigid cord shrouds are not currently in the ANSI/WCMA standard. CPSC staff developed these test methods based on work by an ANSI/WCMA task group in 2018, regarding confirmation that a cord shroud is rigid enough to ensure that the shroud cannot be wrapped around a child's neck or form a hazardous u-shape. The rigid cord shroud requirements include two tests, the "Center Load" test and the "Axial Torque" test. The Center Load test verifies the stiffness of the cord shroud, by measuring the amount of deflection in the shroud when both ends are mounted and a 5-pound force is applied at the mid-point. This test ensures the shroud is not flexible enough to wrap around a child's neck. The Axial Torque test verifies the cord shroud's opening does not enlarge to create an accessible cord opening when the shroud is twisted.

CPSC is not aware of incidents related to current products with rigid cord shrouds and concludes that shrouds that meet the modifications to the ANSI/WCMA standard will address the strangulation hazard posed by accessible cords. Section II.A of this preamble and Tabs G and H of Staff's NPR Briefing Package contain further explanation and the language related to rigid cord shrouds.

Section 1260.2(c) contains requirements for retractable cords, when they are used to comply with section 1260.2(a), to make an operating cord inaccessible. The requirements in this section were developed by CPSC staff to ensure that children cannot pull on retractable cords and gain sufficient length to wrap the cord around their neck. The requirements limit the stroke length for the cord to 12 inches from the headrail, and require the user interface to be a pole or

106

wand, or other non-cord interface, to prevent the creation of a hazardous loop. The requirements also provide for UV and durability testing, as provided in ANSI/WCMA-2018.

Section 1260.2(d) provides requirements for loop cord and bead chain restraining devices, which are intended to prevent the formation of a hazardous loop. The final rule requires that these devices meet the requirements of section 6.5 of ANSI/WCMA-2018, in addition to UV and durability tests added by the final rule.

C.     *Explanation of 1260.3 – Prohibited Stockpiling*

The purpose of 1260.3 is to prohibit manufacturers and importers from stockpiling products that will be subject to a mandatory rule. The Commission's authority to issue an anti-stockpiling provision is in section 9(g)(2) of the CPSA. 15 U.S.C. 2058(g)(2). Section 1260.3(a) prohibits manufacturers and importers of custom window coverings from manufacturing or importing custom window coverings that do not comply with the requirements of the final rule in any 12-month period between the date of the final rule's publication in the *Federal Register* and the effective date of the rule (which depends on the size and type of window covering), at a rate that is greater than 120 percent of the rate at which they manufactured or imported custom window coverings during the base period for the manufacturer.

The base period is described in section 1260.3(b) as any period of 365 consecutive days, chosen by the manufacturer or importer, in the 5-year period immediately preceding promulgation of the final rule. "Promulgation" means the date the final rule is published in the *Federal Register*.

D.     *Explanation of 1260.4 – Findings*

The findings required by section 9 of the CPSA are discussed in the regulatory text.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

E.    *Explanation of 1260.5 – Standards Incorporated by Reference*

Section 1260.5 contains the information required by the Office of the Federal Register

(OFR) to incorporate by reference the requirements in section 4.3.1, and the relevant definitions

in section 3, of ANSI/WCMA-2018.  As set forth in section XII of this preamble, the

Commission has met the OFR's procedural requirements to incorporate by reference the relevant

parts of ANSI/WCMA-2018.

F.    *Explanation of 1260.6 – Severability*

Section 1260.6 contains a severability clause.  This final rule includes multiple sections

and requirements that aim to address the risk associated with strangulation of children 8 years

old or younger on custom window coverings with hazardous operating cords, including the scope

of the rule to include all custom window coverings, regardless of size, definitions included in the

rule, performance requirements for custom window coverings, and performance requirements for

methods to make cords inaccessible or non-hazardous.  Because the rule includes these multiple

requirements, the rule also includes a provision stating the Commission's intent that if certain

requirements in the rule are stayed or determined to be invalid by a court, the remaining

requirements in the rule should continue in effect.  For example, if a court determines that the

requirements for window coverings greater than 10 foot in vertical length are invalid, the

remaining requirements in the rule regarding requirements for all other custom window

coverings still serve the purpose of addressing the strangulation hazard, and it is the

Commission's intent that these remain in effect.

**V.    Final Regulatory Analysis**

Section 9(f)(2) of the CPSA, 15 U.S.C. 2058(f)(2), requires a consumer product safety

rule published in the *Federal Register* to include a final regulatory analysis that contains:

(A) A description of the potential benefits and potential costs of the rule, including

THIS DOCUMENT HAS NOT BEEN REVIEWED                    CLEARED FOR PUBLIC RELEASE
OR ACCEPTED BY THE COMMISSION                              UNDER CPSA 6(b)(1)

costs and benefits that cannot be quantified in monetary terms, and the identification

of those likely to receive the benefits and bear the costs.

(B) A description of any alternatives to the final rule which were considered by the

Commission, together with a summary description of their potential benefits and costs

and a brief explanation of the reasons why these alternatives were not chosen.

(C) A summary of any significant issues raised by the comments submitted during

the public comment period in response to the preliminary regulatory analysis, and a

summary of the assessment by the Commission of such issues.

The information and analysis in this section is based on Tab F of Staff's Final Rule Briefing

Package.

A. *Potential Benefits and Costs of the Rule*

Based on estimates from the NEISS and CPSC's Injury Cost Model, CPSC staff

estimates that 7.6 nonfatal, medically treated injuries and 6.8 fatalities occur annually among all

corded window coverings associated with cord types that are within scope of this rule

(Chowdhury 2022). Staff estimates the societal costs of these injuries to be about $72 million

annually. Overall, staff found that fatalities account for an overwhelming majority of societal

costs at $71.4 million annually, and that nonfatal injuries account for about $498,000 in societal

costs annually.

Staff estimates the societal cost of deaths and injuries attributable to custom window

covering products, that would not otherwise be addressed by the 15(j) rule's provisions for inner

cords on both stock and custom window coverings, to be $31.6 million annually (about 44

percent of the total), based on a CPSC staff review of incidents and values, using the ICM and a

Value of Statistical Life (VSL) of $10.5 million. Staff calculated the present value of the societal

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

cost[36] of deaths and injuries for each blind type, based on each type's expected product life. Staff combined these societal unit costs with corded custom window covering sales in 2020, to generate a gross annual societal cost of $24.35 million. Finally, staff adjusts this estimate for the expected effectiveness of the final rule to estimate a total annual benefit of $23 million.

The final rule would impose costs on manufacturers of custom window covering products. Manufacturers would likely pass much of incremental per-unit manufacturing cost to consumers in the form of higher prices. Based on component cost estimates, assembly/ manufacturing costs, consumer surplus loss, and proportions of domestic manufacturing, the incremental cost per corded custom window covering produced would range from nothing to to approximately $35 and is highly dependent on product type. The final rule would not result in any cost increases for already cordless custom window coverings. Accordingly, staff combined the value of the number *corded* custom window coverings that were shipped in 2020, estimated to be $15.85 million, with the per-unit cost increase to generate an aggregate cost estimate ranging between $54.4 million and $114 million. An additional cost estimate for the research, development, implementation, time, and retooling required for some corded product amounts to approximately $14.7 million. Including this value results in a total aggregate cost estimate range of $54.4 million to $129 million annually.

To provide an accessible framework to perceive how the additional cost of the final rule impacts consumers, staff converted costs and benefits of the draft proposed rule into a calculated net cost per household, based on the data point that the average detached, single-family household has 12 window coverings. Table 9 contains the estimated household net costs from replacing all window coverings in the home with products compliant with the final rule.

---

[36] Calculating the annual societal costs per window covering unit, staff divided that total societal cost by an estimate of 145 million corded custom window coverings in use for the year of 2020, which resulted in a per-unit societal cost of $0.22 per corded custom window covering in use.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**Table 9: Household Net Costs from Final Rule**

| WC Types | Mean Unit Price [1] | Household Cost to update WC (pre-rule) [2] = [1] × 12 households | Low-End Cost per Unit [3] | Benefit per Unit [4] | Net per Unit [5] = [4] - [3] | Household Net Cost [6] = [5] × 12 households |
|---|---|---|---|---|---|---|
| Vinyl/Metal | $37.36 | $448.32 | $3.03 | $1.06 | ($1.97) | ($23.67) |
| Wood/Faux Wood | $69.79 | $837.48 | $6.38 | $1.61 | ($4.77) | ($57.24) |
| Cellular Shade | $94.51 | $1,134.12 | $5.73 | $2.04 | ($3.69) | ($44.25) |
| Pleated Shade | $54.53 | $654.36 | $2.20 | $2.12 | ($0.08) | ($0.94) |
| Roman Shade | $69.36 | $832.32 | $5.63 | $2.43 | ($3.20) | ($38.38) |
| Roller Shade | $64.04 | $768.48 | $5.19 | $2.04 | ($3.15) | ($37.83) |
| Soft Sheer | $250.00 | $3,000.00 | $20.28 | $2.04 | ($18.24) | ($218.82) |

Table 9 shows the net price increase to replace 12 window coverings based on the type of custom window covering. For example, horizontal blinds composed of metal or vinyl have a low-end, per-unit cost estimate of $3.03 and a per-unit benefit estimate of $1.06 (assuming the base VSL). This translates into a net cost of the final rule of $1.97 (assuming the base VSL) for metal/vinyl horizontal blinds. Using the assumption of 12 window coverings per household, this equates to a net cost of the rule (above the benefits provided) of $23.67 per household every time a household updates their custom window coverings, about once every 10 years. For metal or vinyl horizontal blinds, $23.67 is slightly more than 5 percent of the total cost of $448.32 that a household would spend to update their window coverings.

The cost impact from the final rule may be less than estimated, however, due to the enforcement of Canada's regulations beginning in May 2022.[37] Companies that sell in both Canada and the United States have already redesigned their custom offerings to be compliant with the Canadian regulations, which are substantively similar to those being finalized here. Those companies may already have stock of compliant product designed and available to sell to the U.S. market through small dealers and interior designers.

---

[37] https://laws-lois.justice.gc.ca/eng/regulations/SOR-2019-97/FullText.html.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Based on staff's estimated benefits and costs, which does not account for efficiencies resulting from prior safety innovation in stock window coverings or custom window coverings for Canada, net benefits (*i.e.*, benefits minus costs) for the market of custom window coverings (*i.e.*, excluding stock window covering products, and the benefits of the separate rule for inner cords on custom window coverings) amounts to approximately -$31.3 million to about -$106 million annually.

Staff also conducted a sensitivity analysis for a few variables, including the value of statistical life (VSL). In the NPR, the Commission invited comment on a potentially higher VSL for children, up to three times the base level (3 × $10.5 million for a total of $31.5 million). 87 FR at 1044-45. CPSC received comments in support of a child-focused VSL, with alternative methods suggested. Staff considered a higher VSL for children in the sensitivity analysis. With a VSL value of $31.5 million, benefits exceed costs by approximately $14.3 million annually. Staff also highlights the unquantified benefits of the final rule, including the emotional distress level of caregivers that will be reduced by the final rule. This benefit is not directly accounted for in the primary VSL estimate of $10.5 million. The value of the shock or perceived guilt related to a caregiver's inattentiveness could be significant, as it could result in large reductions to physical wellbeing or income loss.

To issue this final rule, the Commission must find that the costs of the rule bear a reasonable relationship to the benefits of the rule. A reasonable relationship between costs and benefits requires the Commission to exercise judgement, and to balance whether the risks involved warrant the cost to address the risks. The Commission has conducted this balancing, and finds that the predicted benefits expected from the rule bear a reasonable relationship to the anticipated costs of the rule because, among other reasons, the severity of the injury is usually death to a child, the cost per household is reasonable particularly in light of the long life of the products, and similar operating cord requirements have been

112

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

successfully implemented, without substantial market disruption, for stock window coverings in the U.S. as well as for stock and custom window coverings in Canada. *See* section 1260.4(i) of the regulatory text.

B.    *Regulatory Alternatives to the Final Rule*

1.    <u>No Action Alternative</u>

Under this alternative the status quo would be maintained. No costs are associated with this alternative. However, this alternative does not adequately address the fatal and nonfatal injuries involving corded custom window coverings.

2.    <u>Rely Upon or Improve Voluntary Standard for Window Coverings</u>

Another alternative is to adopt the recently balloted draft voluntary standard (ANSI/WCMA-2022) as a mandatory standard in this final rule, without waiting for the standard to become effective. In July 2022, WCMA issued a ballot to revise the 2018 voluntary standard. The proposed revisions would prohibit standard operating systems (operating pull cords) and the use of continuous loop systems in custom horizontal blinds only. CPSC staff voted against the ballot on August 15, 2022, stating that hazardous cords remain an option for operating cords on all other custom products other than horizontal blinds,[38] leaving a maximum of 87 incidents (fatal and non-fatal) unaddressed covering the time period from 2009 through 2021.[39] Staff also assessed the balloted draft standard's requirements for retractable cords inadequate because they allow for a 36-inch retractable cord (2 feet longer than the final rule) and because the UV test method allows for testing only a section of a rigid cord shroud (instead of the complete sample).

---

[38] CPSC staff letter is available at https://www.regulations.gov/document/CPSC-2013-0028-3667.
[39] Includes custom/unknown product categories, and continuous loops/unknown cord types.

THIS DOCUMENT HAS NOT BEEN REVIEWED                    CLEARED FOR PUBLIC RELEASE
OR ACCEPTED BY THE COMMISSION                              UNDER CPSA 6(b)(1)

Based on the assessment in Tab I of Staff's Final Rule Briefing Package, the Commission finds that the draft balloted standard is inadequate to address the risk of strangulation to children.

Adopting the balloted draft standard would narrow the benefits as well as the costs. The estimated costs would range from approximately $32 million to $72.5 million, but benefits using the base VSL would be just $9.6 million, leaving an unaddressed potential benefit of $13.4 million representing continued serious injuries and deaths. This unaddressed potential benefit is 58.3 percent of the total $23 million potential benefits (in value of lives saved and injuries prevented) estimated under the final rule. Hazardous cords would remain an option on custom shades, custom vertical blinds, and curtains/drapes, meaning an estimated 7.4 million units of custom products sold annually going forward.

A related alternative might be for Commission staff to continue participating in, and encouraging safety improvements to, the voluntary standard for window coverings. This option would be similar to the "no action alternative," with the key difference being that the Commission could direct staff to pursue safety improvements in the voluntary standard, including applying relevant conditions on stock products to custom, in the same manner that staff has been pursuing unsuccessfully for many years, as a conditional alternative to a mandatory standard developed by the Commission. The Commission could reconsider a mandatory standard if efforts to improve the voluntary standard on custom products remain unsatisfactory.

This option is unlikely to address the unreasonable risk of injury associated with operating cords on custom window coverings. The protracted and incompletely successful history of the voluntary standard process on this issue demonstrates that continuing to wait for ANSI/WCMA to address the injuries in the voluntary standard will result in additional deaths and injuries to children, with little hope of progress if the Commission does not pursue

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

rulemaking. Based on 26 years of experience with the voluntary standards process for this hazard, the Commission will not choose this option.

As a third alternative, the Commission could wait and see whether ANSI and/or WCMA approve a revised standard, and then either rely upon it as a voluntary standard, or proceed to a final rule with similar provisions as in this final rule. This alternative would either produce a similar cost-benefit ratio as for the final rule adopted here (with lower costs but also lower benefits), or delay the implementation of a rule, like the one here, that more fully addresses the strangulation hazard. This alternative would risk the lives of more children to strangulation on hazardous custom products, and the Commission does not adopt it.

Furthermore, this approach might not allow the full range of consumer protections afforded by this final rule. For example, if the Commission chose to address custom horizontal blinds by relying on a voluntary standard under section 15(j) of the CPSA, then additional methods to make cords inaccessible on horizontal blinds, such as rigid cord shrouds and loop cord and bead chain restraining devices, could not be subject to any requirement that is not "readily observable," and so might not be subject to durability requirements like those in the final rule.

Based on the forgoing, the Commission concludes that the voluntary standards process is unlikely to lead to an adequate, or more beneficial and less costly, outcome for all custom window covering product types in the short or long run.

3.    Later Effective Date

The NPR proposed an effective date that is 180 days after the final rule is published in the *Federal Register*. Under section 9(g)(1) of the CPSA, the Commission must find good cause to extend the effective date of the final rule beyond 180 days. Staff's engineering analysis provides an example of how a manufacturer could develop a method, a rigid cord shroud, to

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

make an existing continuous loop system comply with the final rule. Table 1 in staff's engineering analysis presents an estimate of the engineering steps involved in designing and prototyping a rigid cord shroud, the time involved for each step, and cost to develop a rigid cord shroud. Engineering staff estimates that it would cost of $787,000 over a 2-2.5 -year period to develop a production ready rigid cord shroud, with higher costs for faster development. Tabs C, Appendix, of Staff's Final Rule Briefing Package. Staff has assessed that redesigning window coverings for unusually-sized windows to be compliant with the final rule would involve additional effort and time, above typical sized-window modifications.

Table 1a in the Appendix of Tab C of Staff's Final Rule Briefing Package presents commenters' timelines and criteria for creating compliant custom window coverings, such as tooling, transit, and inventory. Commenters provided timelines of 9 to 20 months in obtaining and transporting equipment/materials from overseas suppliers. Commenters specifically stated long lead times of 4 to 12 months to acquire the necessary equipment and materials, and that an additional 1 to 4 months is required upon delivery to assemble component inventory. Another commenter stated an additional delay related to continued COVID-19 disruptions.

Staff found these concerns to be credible because of the specific examples provided by commenters and because these comments comport to what staff has determined about the industry's supply chain. Additionally, staff assesses that supply disruption could result in temporary, but significant, shift in consumer behavior. Supply chain disruptions and delayed deliveries could result in a shift in demand from custom products to stock products. Stock products have a lower profit margin than custom products and thus may have a significant cost impact to manufacturers and retailers even if the shift is temporary. Further, most custom window coverings sellers are small businesses, and therefore a temporary shift to stock products could have a significant impact to small businesses. A later effective date would allow

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

manufacturers more time to redesign, distribute costs of compliance along the entire year, or discontinue product variants that cannot meet compliance.

Based on the currently available products on the market, and in consideration of comments received, staff economists recommend extending the effective date to 2 years for window coverings that are raised and lowered and are at least 10-feet tall in vertical length, because these products are heavier and may require additional research to reliably lift with cordless designs or make the cords inaccessible or accessible loops non-hazardous. *Id*.

The Commission finds good cause to delay the effective date, and will establish a 2-year effective date for custom window coverings over 10 feet in vertical length and that are raised and lowered, and a one-year effective date for all other custom window coverings to come into compliance with the final rule. These later effective dates will mitigate some of the costs related to redesign/research and development for manufacturers, but it is unlikely that costs, or the outcome of development efforts, would be affected significantly.

4.      Narrow Final Rule to Vertical Blinds, Curtains, and Drapes

The Commission could narrow the final rule to vertical blinds, curtains, and drapes on the grounds that cords are not important to the operation of these products. These products typically offer cordless options at no additional cost for most applications because a plastic rod can be used for operation. Narrowing the final rule to these three product types would lessen the cost impact and make it unlikely that any window covering product would need to be phased out or changed substantially as a result of the rule. Although some consumers may require motorization for these products if operating cords are not available, which would dramatically increase the cost, this is unlikely to be a scenario that applies to many consumers. Some consumers may also prefer decorative cords that exceed the length described in the final rule,

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

which would result in lower utility for these particular consumers should those decorative cords be removed.

Under this alternative, the benefits and costs would be limited to vertical blinds, curtains, and drapes, which accounted for approximately 30 percent of 2020 window covering product shipments. However, the number of injuries and deaths associated with these products represents a small fraction of the total for operating cords on custom window coverings. This would equate to annual net benefits of approximately $7.8 million under the baseline VSL. The estimated net benefits of this option would be greater than the final rule due to the large costs to conform for the other product types, however a large fraction of the deaths and injuries would not be addressed.

5.      Continue and Improve Information and Education Campaign

The Commission could seek to improve its current information and education campaign concerning the strangulation hazard associated with corded window covering products. This alternative could be implemented without regard for regulatory action such as this final rule. Based on the continuing number of fatalities associated with window covering cords, however, the effective injury reduction of campaigns, such as those the Commission has sponsored for years, is most likely very small. The Commission will not rely on this option because information and education campaigns appear to be no more than slightly effective at reducing or preventing injuries associated with window coverings.

6.      Adopt Canadian Window Covering Mandatory Standard

Under this alternative the Commission could adopt the Canadian Corded Window Coverings Regulations (SOR/2019-97), as it is generally similar to the final rule. Staff estimates that this option would add more costs without adding more benefits than the final rule, although staff notes that it would provide some unquantifiable benefits related to harmonization of product

THIS DOCUMENT HAS NOT BEEN REVIEWED          CLEARED FOR PUBLIC RELEASE
OR ACCEPTED BY THE COMMISSION                UNDER CPSA 6(b)(1)

standards for firms operating in both countries.  The additional costs under this scenario are associated with requirements in the Canadian regulation that are more burdensome than the final rule, such as the pull force and inner cord requirements for products.[40]  Under this alternative, net benefits are less than the final rule as the additional costs are expected to be greater than the unquantifiable benefit of standard harmonization.

 C. *Summary of Significant Economic Issues Raised by the Comments*

 Commenters raised issues regarding CPSC's cost-benefit method, the cost of safer window coverings to consumers, safer window coverings in commercial buildings, competition from foreign manufacturers, the impact of the rule on businesses (including small versus large businesses), the anti-stockpiling provision, unquantified benefits in the NPR, and CPSC's VSL for children.  Section III.D of this preamble summarizes and responds to the economic issues raised by the commenters.

**VI** **Final Regulatory Flexibility Act Analysis**

 Whenever an agency publishes a final rule, the Regulatory Flexibility Act (5 USC 601 – 612) requires that the agency prepare a final regulatory flexibility analysis that describes the impact the rule would have on small businesses and other entities.  In this section we summarize information and analysis in Tab G of Staff's Final Rule Briefing Package.  A FRFA must contain

 (1) a statement of the need for, and objectives of, the rule;

 (2) a statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of

---

[40] See Tabs G and I of the NPR Staff Briefing Package available at Available at: *https://www.cpsc.gov/s3fs-public/NPRs-Add-Window-Covering-Cords-to-Substantial-Product-Hazard-List-Establish-Safety-Standard-for-Operating-Cords-on-Custom-Window-Coverings-updated-10-29-2021.pdf?VersionId=HIM05bK3WDLRZrlNGogQLknhFvhtx3PD*

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

such issues, and a statement of any changes made in the proposed rule as a result of such comments;

(3)  the response of the agency to any comments filed by the Chief Counsel for Advocacy of the SBA in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule as a result of the comments;

(4)  a description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available;

(5)  a description of the projected reporting, recordkeeping and other compliance requirements of the rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record; and

(6)  a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

*A.*    *Reason for Agency Action*

The final rule is intended to address an unreasonable risk of strangulation to children 8 years and younger involving corded custom window covering products.  An average of 6.8 fatal injuries (excluding inner cords and lifting loops) involving all corded window covering products that have operating cords annually to children less than 8 years old (Tab A, Chowdhury, 2022). The societal costs of these fatal and nonfatal injuries amounts to approximately $72 million.  The final rule would only address the proportion of these injuries attributable to operating cords on

THIS DOCUMENT HAS NOT BEEN REVIEWED          CLEARED FOR PUBLIC RELEASE
OR ACCEPTED BY THE COMMISSION                UNDER CPSA 6(b)(1)

custom products which, based on a CPSC review of 209 reported incidents, would be approximately $31.6 million annually. (Tab F, Bailey, 2022).

B.       *Objectives of and Legal Basis for the Rule*

The objective of the rule is to reduce or eliminate an unreasonable risk of serious injury or death to children 8 years old or younger by strangulation on corded custom window coverings, by promulgating a consumer product safety standard pursuant to the CPSA.

C.       *Comments of the Chief Counsel for Advocacy, SBA*

Advocacy submitted several points on the proposed rule. Consistent with one of the comments by Advocacy, the Commission is reducing the burden of the final rule by allowing, in addition to rigid cord shrouds as a method to make cords inaccessible, a retractable cord or a loop cord or bead restraining device, as long as such devices meet the requirements in the final rule. The Commission will also provide a longer effective date, one year for most custom products and two years for products 10 feet or greater in vertical length and that are raised and lowered, to reduce burdens on small businesses. Advocacy's comments are summarized and responded to in section III.I of this preamble.

D.       *Significant Economic Issues Raised by the Public*

Section III.D of this preamble summarizes and responds to the significant economic issues raised by the commenters.

E.       *Small Entities to Which the Rule Will Apply*

The North American Industry Classification System (NAICS) defines product codes for U.S. firms. Firms that manufacture window coverings may list their business under the NAICS product code for blinds and shades manufacturers (337920 Blind and Shade Manufacturing) or

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION          CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

retailers (442291 Window Treatment Stores).[41]  Window coverings can be sold in a variety of

retail channels and could be listed under a large number of NAICS codes.  These could include

but are not limited to 442299 (All Other Home Furnishings Stores), 452210 (Department Stores),

452311 (Warehouse Clubs and Supercenters), 454110 (Electronic Shopping and Mail-Order

Houses), and 454390 (Other Direct Selling Establishments).

Under SBA guidelines, a manufacturer of window coverings is categorized as small if the

firm has less than 1,000 employees.  (NAICS code 337920)  Importers would be considered

small if the firm has less than 100 employees.  CPSC staff estimates that there are approximately

83 importers that meet the SBA guidelines for a small business.  (Bailey 2021)  Most retailers of

window coverings would be considered small if they have sales revenue less than $8.0 million.

(NAICS codes 442291, 454390)  Department stores, warehouse clubs, and electronic shopping

and mail order houses must have revenues less than $35 million, $32 million, and $41.5 million,

respectively, to be considered small.  Based on 2017 Census Bureau Statistics of US Businesses

(SUSB) data, there were 1,898 blinds and shades manufacturers, (NAICS 337920), and retailers

(NAICS 442291).[42]  Of these, 1,840 firms (302 manufacturers and 1,538 retailers) are small

entities by SBA guidelines.

Nearly all of the 302 small manufacturers identified are far below the 1,000 employee

SBA threshold; 238 of the manufacturers have fewer than 20 employees and 151 have fewer than

5 employees.  CPSC staff estimates that the annual revenue for the firms with fewer than 20

employees to be under $250,000.[43]  Most of the firms with fewer than 5 employees manufacture

---

[41] The two product codes 337920 and 442291 encompass most products in the window coverings market.  However, some drapery and curtain manufacturers may be listed under 322230, stationary product manufacturing.
[42] This estimate focuses strictly on firms where window coverings are a majority of the operation. The other NAICS codes provided (322230, 454390, 442299, 452210, 452311, 454110) may include firms participating in the window coverings market but most likely account for a very small share of the firm's operation. In addition, it is possible some retailers of window coverings are listed under NAICS code 541410 Interior Design Services.
[43] Based on Census Bureau SUSB data, a review of firm financial reports, and Dun & Bradstreet reports.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

custom window coverings on a per order basis. The annual revenue for these manufacturers is most likely below $100,000, based on SUSB payroll data from the U.S. Census Bureau.

    F.    *Compliance Requirements of the Final Rule, Including Reporting and Recordkeeping Requirements*

    To eliminate the strangulation hazard on cords, the final rule establishes a performance standard that requires custom window coverings to meet the same requirements in section 4.3.1 of the voluntary standard ANSI/WCMA-2018 that apply to stock window coverings. To comply with the performance requirements, all accessible operating cords will need to be removed, made inaccessible, or shortened to less than 8 inches. The final rule provides two methods to make cords inaccessible (rigid cord shrouds and retractable cord devices) and one method that would remove the hazard from an accessible cord (cord or bead restraining device). Products that use one of these methods to meet the requirements must also conduct additional testing on durability, as set forth in the rule.

    Under section 14 of the CPSA, as codified in 16 CFR part 1110, manufacturers and importers of general use custom window coverings must certify, based on a test of each product or upon a reasonable testing program, that their window coverings comply with the requirements of the final rule. Manufacturers and importers of custom window coverings that are also children's products, as defined in 16 CFR part 1200, must use a CPSC-accepted third party conformity assessment body to test products for compliance, and issue a certificate of compliance based on such third-party testing. Testing and certification requirements are detailed in section X of this preamble.

    G.    *Costs of the Final Rule That Would Be Incurred By Small Manufacturers*

    Custom window covering manufacturers would most likely adopt cordless lift operation systems to comply with the final rule. As discussed in Tab F of Staff's Final Rule Briefing

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Package, the cost to modify window covering lift systems to comply with the proposed rule ranges from $2.99 to $9.77 per horizontal blind, $2.18 to $35 per shade, and no expected cost increase for vertical blinds and curtains/drapes. CPSC staff estimates of redesign costs—where solutions are not already developed based on the stock window covering market, the Canadian market, or otherwise—equate to approximately $772,500, assuming a 2-year period for purposes of that analysis. Only manufacturers with at least 75 employees are anticipated to perform this investment as this is a significant investment for smaller manufacturers with fewer employees and lower annual revenues. Likely these manufacturers will either purchase the necessary completed hardware or license a patented solution from a larger firm.

However, as noted, the actual impact may be less, due in part to the enforcement of Canada's regulations beginning in May 2022. Companies that sell in both Canada and the U.S. have already redesigned their custom offerings to be compliant with the Canadian regulations, which are substantially similar to the final rule, so already have stock of compliant product designed and ready to sell through small dealers and interior designers.

Manufacturers would likely incur some additional costs to certify that their window coverings meet the requirements of the final rule as required by section 14 of the CPSA. The certification must be based on a test of each product or a reasonable testing program. WCMA has already developed a certification program for window covering products titled "Best for Kids," which includes third party testing of products for accessible cords. CPSC staff assesses this certification would meet the requirements as outlined in section 14 of the CPSA. Based on price quotes from testing laboratory services for consumer products, the cost of the certification testing will range from $290 to $540 per window covering model. Note that the requirement to certify compliance with all product safety rules, based on a reasonable testing program, is a requirement of the CPSA and not of the final rule.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Depending on the type of window covering, a reasonable testing program for general-use window coverings could entail a simple visual inspection of products by the manufacturer. Therefore, the cost of a reasonable testing program for compliance of general use window coverings with the final rule is likely much lower than the cost of conducting a third-party certification test of each product, as required for children's products.

*H.*     *Impact on Small Manufacturers*

To comply with the final rule, small manufacturers are expected to incur redesign and incremental component costs for some product lines which currently are not available in inaccessible cord variants. CPSC does not expect small manufacturers to suffer a disproportionate cost effect from the final rule as the cost calculations and research were completed on a per unit basis, and CPSC expects little if any direct redesign costs for small manufacturers. CPSC staff estimates that small manufacturers of window coverings are likely to incur, at a minimum, a 2 percent impact to their custom window covering revenue from the final rule. This implies that if custom products account for all of a firm's revenue, then the minimum impact of the final rule is 2 percent of revenue.

Generally, staff considers an impact to be potentially significant if it exceeds 1 percent of a firm's revenue. As the smallest estimate of incremental compliance cost from Panchal (2016) is 2 percent of retail price, the final rule could have a significant impact on manufacturers of custom window coverings. This effect is dependent on the share of annual revenues attributable to custom products. For example, if a small firm only manufactures custom cellular shades, then staff expects a lowest possible compliance cost of 2 percent of retail price. For small importers, the cost effect as a percent of revenue is dependent on the firm's custom window covering imports as a percent of total revenue. Any small importer with at least 50 percent of their revenues related to custom window covering products affected by the final rule could be

125

significantly impacted.  This is due to the lowest expected compliance cost equating to 2 percent of retail price, which at a 50 percent custom product share would equate to a 1 percent minimum impact on annual revenues.  CPSC expects the final rule to have a significant effect on a substantial number of small firms.

I. *Federal Rules which may Duplicate, Overlap, or Conflict with the Proposed Rule*

CPSC staff has not identified any other Federal rules that duplicate, overlap, or conflict with the final rule.

J. *Alternatives for Reducing the Adverse Impact on Small Entities*

A FRFA should contain "a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected."  5 U.S.C. 604.  The Commission considered several alternatives to the final rule that could reduce the impact on small entities.  Alternatives considered are discussed in section V.B of this preamble.

**VII.  Environmental Considerations**

Generally, the Commission's regulations are considered to have little or no potential for affecting the human environment, and environmental assessments and impact statements are not usually required.  *See* 16 CFR 1021.5(a).  The final rule to establish a safety standard for operating cords on custom window coverings is not expected to have an adverse impact on the environment and is considered to fall within the "categorical exclusion" for the purposes of the National Environmental Policy Act.  16 CFR 1021.5(c).

126

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

## VIII. Paperwork Reduction Act

This final rule contains information collection requirements that are subject to public comment and review by the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (PRA; 44 U.S.C. 3501–3521). Under the PRA, an agency must publish the following information:

- a title for the collection of information;

- a summary of the collection of information;

- a brief description of the need for the information and the proposed use of the information;

- a description of the likely respondents and proposed frequency of response to the collection of information;

- an estimate of the burden that will result from the collection of information; and

- notice that comments may be submitted to OMB.

44 U.S.C. 3507(a)(1)(D). In accordance with this requirement, the Commission provides the following information:

*Title*: Amendment to Third Party Testing of Children's Products, approved previously under OMB Control No. 3041-0159.

*Summary, Need, and Use of Information*: The final consumer product safety standard prescribes the safety requirements for operating cords on custom window coverings, and requires that these cords meet the same requirements for operating cords on stock window coverings, as set forth in the voluntary standard, section 4.3.1 of ANSI/WCMA-2018. These requirements are intended to reduce or eliminate an unreasonable risk of death or injury to children 8 years old and younger from strangulation.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Some custom window coverings are considered children's products. A "children's product" is a consumer product that is "designed or intended primarily for children 12 years of age or younger." 15 U.S.C. 2052(a)(2). The Commission's regulation at 16 CFR part 1200 further interprets the term. Section 14 of the CPSA requires that children's products be tested by a third party conformity assessment body, and that the manufacturer of the product, including an importer, must issue a children's product certificate (CPC). Based on such third party testing, a manufacturer or importer must attest to compliance with the applicable consumer product safety rule by issuing the CPC. The requirement to test and certify children's products fall within the definition of "collection of information," as defined in 44 U.S.C. 3502(3).

The requirements for the CPCs are stated in section 14 of the CPSA, and in the Commission's regulation at 16 CFR parts 1107 and 1110. Among other requirements, each certificate must identify the manufacturer or private labeler issuing the certificate and any third-party conformity assessment body on whose testing the certificate depends, the date and place of manufacture, the date and place where the product was tested, each party's name, full mailing address, telephone number, and contact information for the individual responsible for maintaining records of test results. The certificates must be in English. The certificates must be furnished to each distributor or retailer of the product and to the CPSC, if requested.

The Commission already has an OMB control number, 3041-0159, for children's product testing and certification. The final rule amends this collection of information to add window coverings that are children's products.

*Respondents and Frequency*: Respondents include manufacturers and importers of custom window coverings that are children's products. Manufacturers and importers must comply with the information collection requirements when custom window coverings that are children's products are manufactured or imported.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

*Estimated Burden*: CPSC has estimated the respondent burden in hours, and the estimated labor costs to the respondent.

*Estimate of Respondent Burden:* The hourly reporting burden imposed on firms that manufacture or import children's product custom window coverings includes the time and cost to maintain records related to third party testing, and to issue a CPC.

**Table 9: Estimated Annual Reporting Burden.**

| Burden Type | Total Annual Reponses | Length of Response | Annual Burden (hours) |
|---|---|---|---|
| Third-party recordkeeping, certification | 24,850 | 1.0 hours | 24,850 |

Three types of third-party testing of children's products are required: certification testing, material change testing, and periodic testing. Requirements state that manufacturers conduct sufficient testing to ensure that they have a high degree of assurance that their children's products comply with all applicable children's product safety rules before such products are introduced into commerce. If a manufacturer conducts periodic testing, they are required to keep records that describe how the samples of periodic testing are selected.

CPSC estimates that 0.1 percent of all custom window coverings sold annually, 24,850 window coverings, are children's products and would be subject to third-party testing, for which 1.0 hours of recordkeeping and record maintenance will be required. Thus, the total hourly burden of the recordkeeping associated with certification is 24,850 hours (1.0 × 24,850).

*Labor Cost of Respondent Burden.* According to the U.S. Bureau of Labor Statistics (BLS), Employer Costs for Employee Compensation, the total compensation cost per hour worked for all private industry workers was $40.90 (March 2022, https://www.bls.gov/ncs/ect/). Based on this analysis, CPSC staff estimates that labor cost of respondent burden would impose a cost to industry of approximately $1,016,365 annually (24,850 hours × $40.90 per hour).

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**DRAFT**

*Cost to the Federal Government.* The estimated annual cost of the information collection requirements to the federal government is approximately $4,254, which includes 60 staff hours to examine and evaluate the information as needed for Compliance activities.  This is based on a GS-12, step 5 level salaried employee.  The average hourly wage rate for a mid-level salaried GS-12 employee in the Washington, DC metropolitan area (effective as of January 2022) is $48.78 (GS-12, step 5).  This represents 68.8 percent of total compensation (U.S. Bureau of Labor Statistics, "Employer Costs for Employee Compensation," March 2022, percentage of wages and salaries for all civilian management, professional, and related employees: https://www.bls.gov/ncs/ect/. Adding an additional 31.2 percent for benefits brings average annual compensation for a mid-level salaried GS-12 employee to $70.90 per hour. Assuming that approximately 60 hours will be required annually, this results in an annual cost of $4,254 ($70.90 per hour × 60 hours = $ 4,254.07).

CPSC did not receive any comments on the burden estimate provided in the NPR (87 FR at 1048-49).  CPSC has submitted the information collection requirements of this final rule to OMB for review in accordance with PRA requirements. 44 U.S.C. 3507(d).

## IX.    Preemption

Executive Order (EO) 12988, *Civil Justice Reform* (Feb. 5, 1996), directs agencies to specify the preemptive effect of a rule in the regulation.  61 FR 4729 (Feb. 7, 1996).  The final regulation for operating cords on custom window coverings is issued under authority of the CPSA.  15 U.S.C. 2051-2089.  Section 26 of the CPSA provides that "whenever a consumer product safety standard under this Act is in effect and applies to a risk of injury associated with a consumer product, no State or political subdivision of a State shall have any authority either to establish or to continue in effect any provision of a safety standard or regulation which prescribes any requirements as to the performance, composition, contents, design, finish,

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

construction, packaging or labeling of such product which are designed to deal with the same risk of injury associated with such consumer product, unless such requirements are identical to the requirements of the Federal Standard." 15 U.S.C. 2075(a).

The federal government, or a state or local government, may establish or continue in effect a non-identical requirement for its own use that is designed to protect against the same risk of injury as the CPSC standard if the federal, state, or local requirement provides a higher degree of protection than the CPSA requirement. *Id.* 2075(b). In addition, states or political subdivisions of a state may apply for an exemption from preemption regarding a consumer product safety standard, and the Commission may issue a rule granting the exemption if it finds that the state or local standard: (1) provides a significantly higher degree of protection from the risk of injury or illness than the CPSA standard, and (2) does not unduly burden interstate commerce. *Id.* 2075(c).

Thus, absent exemption, the final rule for operating cords on custom window coverings preempts non-identical state or local requirements for operating cords on custom window coverings designed to protect against the same risk of injury and prescribing requirements regarding the performance of operating cords on custom window coverings.

## X.    Testing, Certification, and Notice of Requirements

Section 14(a) of the CPSA includes requirements for certifying that children's products and non-children's products comply with applicable mandatory standards. 15 U.S.C. 2063(a). Section 14(a)(1) addresses required certifications for non-children's products, and sections 14(a)(2) and (a)(3) address certification requirements specific to children's products.

A "children's product" is a consumer product that is "designed or intended primarily for children 12 years of age or younger." *Id.* 2052(a)(2). The following factors are relevant when determining whether a product is a children's product:

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

- manufacturer statements about the intended use of the product, including a label on the product if such statement is reasonable;

- whether the product is represented in its packaging, display, promotion, or advertising as appropriate for use by children 12 years of age or younger;

- whether the product is commonly recognized by consumers as being intended for use by a child 12 years of age or younger; and

- the Age Determination Guidelines issued by CPSC staff in September 2002, and any successor to such guidelines.

*Id.* "For use" by children 12 years and younger generally means that children will interact physically with the product based on reasonably foreseeable use. 16 CFR § 1200.2(a)(2). Children's products may be decorated or embellished with a childish theme, be sized for children, or be marketed to appeal primarily to children. *Id*. § 1200.2(d)(1).

CPSC estimates that approximately 0.1 percent of custom window coverings are specifically designed for children, and based on the factors listed above, fall within the definition of a "children's product." This final rule requires custom window coverings that are children's products to meet the third-party testing and certification requirements in section 14(a) of the CPSA. The Commission's requirements for certificates of compliance are codified at 16 CFR part 1110.

*Non-Children's Products.* Section 14(a)(1) of the CPSA requires every manufacturer (which includes importers[44]) of a non-children's product that is subject to a consumer product safety rule under the CPSA or a similar rule, ban, standard, or regulation under any other law

---

[44] The CPSA defines a "manufacturer" as "any person who manufactures or imports a consumer product." 15 U.S.C. 2052(a)(11).

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

enforced by the Commission to certify that the product complies with all applicable CSPSC-enforced requirements. 15 U.S.C. 2063(a)(1).

*Children's Products.* Section 14(a)(2) of the CPSA requires the manufacturer or private labeler of a children's product that is subject to a children's product safety rule to certify that, based on a third-party conformity assessment body's testing, the product complies with the applicable children's product safety rule. *Id.* 2063(a)(2). Section 14(a) also requires the Commission to publish a notice of requirements (NOR) for a third-party conformity assessment body (*i.e.*, testing laboratory) to obtain accreditation to assess conformity with a children's product safety rule. *Id.* 2063(a)(3)(A). Because some custom window coverings are children's products, the final rule is a children's product safety rule, as applied to those products. Accordingly, this final rule also includes a final NOR.

The Commission published a final rule, codified at 16 CFR part 1112, entitled *Requirements Pertaining to Third Party Conformity Assessment Bodies*, which established requirements and criteria concerning testing laboratories. 78 FR 15836 (Mar. 12, 2013). Part 1112 includes procedures for CPSC to accept a testing laboratory's accreditation and lists the children's product safety rules for which CPSC has published NORs. When CPSC issues a new NOR, it must amend part 1112 to include that NOR. Accordingly, as part of this final rule for operating cords on custom window coverings, the Commission also amends part 1112 to add the "Safety Standard for Operating Cords on Custom Window Coverings" to the list of children's product safety rules for which CPSC has issued an NOR.

Testing laboratories that apply for CPSC acceptance to test custom window coverings that are children's products for compliance with the new rule would have to meet the requirements in part 1112. When a laboratory meets the requirements of a CPSC-accepted third party conformity assessment body, the laboratory can apply to CPSC to include 16 CFR part

133

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

1260, *Safety Standard for Operating Cords on Custom Window Coverings*, in the laboratory's

scope of accreditation of CPSC safety rules listed on the CPSC website at:

www.cpsc.gov/labsearch.

## XI.     Effective Date

The Administrative Procedure Act (APA) generally requires that the effective date of a

rule be at least 30 days after publication of a final rule.  5 U.S.C. 553(d).  Section 9(g)(1) of the

CPSA states that a consumer product safety rule shall specify the date such rule is to take effect,

and that the effective date must be at least 30 days after promulgation, but cannot exceed 180

days from the date a rule is promulgated, unless the Commission finds, for good cause shown,

that a later effective date is in the public interest and publishes its reasons for such finding.  The

NPR proposed an effective date of 180 days after publication of the final rule in the *Federal*

*Register.*  The Commission received over 400 comments on the proposed effective date.

Consumer organizations stated that a mandatory standard should be issued as soon as possible,

and one manufacturer (Safe T Shade) stated that 180-day lead time is more than sufficient for

industry implementation.  Other manufacturers, however, requested that the Commission

lengthen the effective date to allow for product development, training, and marketing of new

designs to meet the requirements of the final rule.  Two industry commenters (Hunter Douglas,

Blinds to Go, and a commenter that identifies itself variously as Springs Window Furnishings,

Springs Window Fashions, or Spring Window Fashions) estimated lengthy delays in obtaining

equipment, transit time in both sea and air to get equipment and components from overseas

suppliers, and delays in lead times for raw materials.

Crediting the generally consistent industry comments on the effective date, the

Commission finds there is good cause to extend the effective date for this rule, and will finalize

the rule with two effective dates.  For most custom window coverings, the effective date of the

134

rule is one year after publication of the final rule in the *Federal Register*, and the rule will apply

to all such products manufactured after that date.  For custom window coverings 10 feet or

greater in vertical length and that are designed to be raised and lowered, the effective date of the

rule is two years after publication of the final rule in the *Federal Register*, and the rule will apply

to all such products manufactured after that date. The basis for the Commission's delay in

effective date, beyond the 180-day upper bound set forth in section 9(g)(1) of the CPSA, is

provided in Tabs C and F of Staff's Final Rule Briefing Package, and in sections II.E.4 and

III.G.6 of this preamble.

## XII.    Incorporation by Reference

The Commission incorporates by reference certain provisions of ANSI/WCMA A100.1 –

2018, American National Standard for Safety of Corded Window Covering Products.  The Office

of the Federal Register (OFR) has regulations concerning incorporation by reference.  1 CFR

part 51.  The OFR revised these regulations to require that, for a final rule, agencies must discuss

in the preamble the ways that the materials the agency incorporates by reference are reasonably

available to interested persons, or how the agency worked to make the materials reasonably

available.  In addition, the preamble of the final rule must summarize the material.  1 CFR

51.5(a).

In accordance with the OFR's requirements, sections I.B.2.(d), II, IV and Tables 3 and 7

of this preamble summarize the provisions of ANSI/WCMA A100.1 – 2018 that the Commission

incorporates by reference.  ANSI/WCMA A100.1 – 2018 is copyrighted.  The public may view a

read-only copy of ANSI/WCMA A100.1 – 2018 free of charge at: https://wcmanet.com/wp-

content/uploads/2021/07/WCMA-A100-2018_v2_websitePDF.pdf.  Alternatively, interested

parties may inspect a copy of the standard free of charge by contacting Alberta E. Mills, Office

of the Secretary, U.S. Consumer Product Safety Commission, 4330 East West Highway,

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Bethesda, MD 20814; telephone: 301-504-7479; e-mail: cpsc-os@cpsc.gov.  To download or print the standard, interested persons may purchase a copy of ANSI/WCMA A100.1 – 2018 from WCMA, through its website (http://wcmanet.com), or contacting the Window Covering Manufacturers Association, Inc., 355 Lexington Avenue, New York, New York, 10017; telephone: 212.297.2122.

## XIII.   Commission Findings

The CPSA requires the Commission to make certain findings when issuing a consumer product safety standard.  These findings are contained in the regulatory text.

## XIV.   Congressional Review Act

The Congressional Review Act (CRA; 5 U.S.C. §§ 801-808) states that, before a rule may take effect, the agency issuing the rule must submit the rule, and certain related information, to each House of Congress and the Comptroller General.  5 U.S.C. § 801(a)(1).  The submission must indicate whether the rule is a "major rule."  The CRA states that the Office of Information and Regulatory Affairs ("OIRA") determines whether a rule qualifies as a "major rule."  Pursuant to the CRA, OIRA designated this rule as a "major rule," as defined in 5 U.S.C. § 804(2).   To comply with the CRA, CPSC will submit the required information to each House of Congress and the Comptroller General.


**List of Subjects**

**16 CFR Part 1112**

Administrative practice and procedure, Audit, Consumer protection, Reporting and recordkeeping requirements, Third-party conformity assessment body.

**16 CFR Part 1260**

136

Consumer protection, Imports, Incorporation by reference, Administrative practice and procedure, Window Coverings, Cords, Infants and children.

For the reasons discussed in the preamble, the Commission amends subchapter B of title 16 of the Code of Federal Regulations as follows:

## PART 1112—REQUIREMENTS PERTAINING TO THIRD PARTY CONFORMITY ASSESSMENT BODIES

1. The authority citation for part 1112 continues to read as follows:

   **Authority:** Pub. L. 110-314, section 3, 122 Stat. 3016, 3017 (2008); 15 U.S.C. 2063.

2. Amend § 1112.15 by adding paragraph (b)(53) to read as follows:

## § 1112.15 When can a third party conformity assessment body apply for CPSC acceptance for a particular CPSC rule or test method?

*       *       *       *       *

(b) * * *

(53) 16 CFR part 1260, Safety Standard for Operating Cords on Custom Window Coverings.

*       *       *       *       *

3. Add part 1260 to read as follows:

## PART 1260 – SAFETY STANDARD FOR OPERATING CORDS ON CUSTOM WINDOW COVERINGS

Sec.

1260.1  Scope and definitions.
1260.2  Requirements.
1260.3  Prohibited stockpiling.
1260.4  Findings.
1260.5  Standards Incorporated by Reference.
1260.6  Severability.

Authority: 15 U.S.C. 2056, 15 U.S.C. 2058, and 5 U.S.C. 553.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**§ 1260.1  Scope and definitions.**

(a) This part establishes a consumer product safety standard for operating cords on custom window coverings.

(1) For all custom window coverings less than 10 feet in vertical length, or that are not designed to be raised and lowered, the effective date of the rule is [INSERT DATE ONE YEAR AFTER DATE OF PUBLICATION IN THE *FEDERAL REGISTER*].

(2) For all custom window coverings 10 feet or greater in vertical length and that are designed to be raised and lowered, the effective date of the rule is [INSERT DATE TWO YEARS AFTER DATE OF PUBLICATION IN THE *FEDERAL REGISTER*].

(b) This consumer product safety standard relies on the following definitions in section 3 of ANSI/WCMA A100.1 – 2018 (incorporated by reference, see § 1260.5):

(1) *Custom window covering* (Custom blinds, shades, and shadings) has the same meaning as defined in section 3, definition 5.01, of ANSI/WCMA A100.1 – 2018, as any window covering that is not classified as a stock window covering.

(2) *Stock window covering* (Stock blinds, shades, and shadings) has the same meaning as defined in section 3, definition 5.02, of ANSI/WCMA A100.1 – 2018, as a window covering that is completely or substantially fabricated prior to being distributed in commerce and is a specific stock-keeping unit (SKU).  Even when the seller, manufacturer, or distributor modifies a pre-assembled product by adjusting to size, attaching the top rail or bottom rail, or tying cords to secure the bottom rail, the product is still considered stock.  Online sales of the product or the size of the order such as multi-family housing do not make the product a non-stock product.  These examples are provided in ANSI/WCMA A100.1 – 2018 to clarify that as long as the product is "substantially fabricated" prior to distribution in commerce, subsequent changes to the product do not change its categorization.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

(3) *Operating cord* has the same meaning as defined in section 3, definition 2.19, of ANSI/WCMA A100.1 – 2018, as the portion of the cord that the user manipulates directly during operation (including lifting, lowering, tilting, rotating, and traversing).

(4) *Cord shroud* has the same meaning as defined in section 3, definition 2.09, of ANSI/WCMA A100.1 – 2018, as a device or material added to limit the accessibility of a cord or formation of a hazardous loop.

(5) *Cord retraction device* has the same meaning as defined in section 3, definition 2.08, of ANSI/WCMA A100.1 – 2018, as a passive device which winds and gathers cords when tension is no longer applied by the user.

(c) *Rigid Cord Shroud* is a cord shroud that is constructed of inflexible material, rendering the cord inaccessible as defined in Appendix C of ANSI/WCMA A100.1 – 2018, to prevent a child from accessing a window covering cord.

(d) *Retractable Cord* is a cord that extends when pulled by a user, and fully retracts when the user releases the cord, rendering the cord inaccessible as defined in Appendix C of ANSI/WCMA A100.1 – 2018.

(e) *Loop Cord and Bead Chain Restraining Device* is a device, integrated to and installed on the window covering, that prevents the creation of hazardous loop from an accessible continuous operating cord.

(f) *Operating Interface* is the part of the window covering that the user physically touches or grasps by hand or a tool to operate the window covering, for example a wand to tilt the slats of the product or the bottom rail to raise or lower the product.

139

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**§ 1260.2  Requirements.**

(a) *Requirements for operating cords*.  Each custom window covering shall comply with section 4.3.1 or 4.3.2.5.2, instead of section 4.3.2, of ANSI/WCMA A100.1 – 2018 (incorporated by reference, see § 1260.5).

(b) *Requirements for rigid cord shrouds*.  If a custom window covering complies with paragraph (a) of this section by using a rigid cord shroud to make an operating cord inaccessible, the rigid cord shroud shall meet the requirements in section 6.3, of ANSI/WCMA A100.1 – 2018 and shall not have an accessible cord when tested for cord accessibility using the test methods defined in paragraphs (b)(1) and (2).

(1) *Test methods for rigid cord shrouds*: *Center load test*.  (i) Support each end of the rigid cord shroud, but do not restrict the rotation along the axial direction.  Supports must be within 0.25 inches from the ends of the shroud as shown in Figure 1.



**Figure 1 to Paragraph (b)(1) – Rigid Cord Shroud Test Set-up.**

(ii) Apply a 5-pound force at the center of the rigid cord shroud for at least 5 seconds as shown in Figure 2.

(iii) Measure the maximum deflection of the shroud, while the 5-pound force is applied.

(iv) For rigid cord shrouds that are ≤ 19 inches, the deflection shall not exceed 1 inch.  For every additional 19 inches in shroud length, the shroud can deflect an additional inch.  See Figure 2.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



**Figure 2 to Paragraph (b)(4) – Rigid Cord Shroud Center Load Test and Deflection Measurement.**

(v) While continuing to apply the 5-pound force, determine if the cord(s) can be contacted by the cord shroud accessibility test probe shown in Figure 3.  If the cord shroud accessibility test probe can touch any cord, the cord(s) are considered accessible.



**Figure 3 to Paragraph (b)(5) – Cord Shroud Accessibility Test Probe**

(2) *Test methods for rigid cord shrouds: Axial torque test.*  (i) Mount one end of the rigid cord shroud and restrict the rotation along the axial direction.

(ii) Apply a 4.4 in-lb. (0.5Nm) torque along the other end of the rigid cord shroud for 5 seconds.

(iii) While continuing to apply the torque, determine if the cord(s) can be contacted by the cord shroud accessibility test probe shown in figure 3.  If the cord shroud accessibility test probe can touch any cord, the cord(s) are considered accessible.

141

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

(c) *Requirements for cord retraction devices.* If a custom window covering complies with paragraph (a) using a cord retraction device, the cord retraction device shall meet the requirements in paragraphs (c)(1) through (4).

(1) When a 30 grams mass is applied to the Operating Interface, the Cord Retraction Device shall maintain full retraction of the Retractable Cord such that the Retractable Cord is not accessible per Appendix C of ANSI/WCMA A100.1 – 2018.

(2) The maximum stroke length for a Cord Retraction Device is 12 inches measured from the bottom of the headrail.

(3) The Operating Interface for Cord Retraction Devices may not be a Cord of any length including a Short Static or Access Cord. It may be a ring and pole, a wand or any other design that cannot bend on itself, eliminating the potential of creating a hazardous loop.

(4) The Cord Retraction Device shall have a service life of at least 5,000 cycles after exposed portions or components have been subjected to 500 hours of UV exposure per AATCC Test Method 16-2004, Option 3 of ANSI/WCMA A100.1 – 2018.

(d) *Requirements for Loop Cord and Bead Chain Restraining Devices.* If a custom window covering complies with paragraph (a) using a Loop Cord and Bead Chain Restraining Device, the Loop Cord and Bead Chain Restraining Device shall meet the requirements in section 6.5, of ANSI/WCMA A100.1 – 2018 with an additional test as defined in paragraph (d)(l), and shall not form a hazardous loop when tested for a hazardous loop using the test methods defined in paragraphs (d)(2) and (3).

(1) *Test methods for Loop Cord and Bead Chain Restraining Device: UV Stability and Operational Cycle test.* One sample Loop Cord and Bead Chain Restraining Device shall be tested to section 6.5.2.2 of ANSI/WCMA A100.1 – 2018, UV Stability, followed by section 6.5.2.1 of ANSI/WCMA A100.1 – 2018, Operational Cycle Test.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

(2) *Test methods for Loop Cord and Bead Chain Restraining Device: Center load test.* (i) Support each end of the Loop Cord and Bead Chain Restraining Device, but do not restrict the rotation along the axial direction. Supports must be within 0.25 inches from the ends of the shroud as shown in figure 4.



**Figure 4. Cord and Bead Chain Restraining Device Test Set-up**

(ii) Apply a 5-pound force at the center of the Cord and Bead Chain Restraining Device for at least 5 seconds as shown in figure Y.

(iii) Measure the maximum deflection of the Cord and Bead Chain Restraining Device, while the 5-pound force is applied.

(iv) For Cord and Bead Chain Restraining Device that are ≤ 19 inches, the deflection shall not exceed 1 inch. For every additional 19 inches in shroud length, the shroud can deflect an additional inch. See Figure 5.



**Figure 5. Loop Cord and Bead Chain Restraining Device
Center Load Test and Deflection Measurement**

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

(v) While continuing to apply the 5-pound force, determine if the cord(s) create an opening between the cord and the restraining device. If the Hazardous Loop Head Probe (ANSI/WCMA A1001-2018, figure D1) can pass through the opening, the opening is considered a hazardous loop.

(3) *Test methods for Cord and Bead Chain Restraining Devices: Axial torque test.* (i) Mount one end of the *Cord and Bead Chain Restraining Device* and restrict the rotation along the axial direction.

(ii) Apply a 4.4 in-lb. (0.5 Nm) torque along the other end of the Cord and Bead Chain Restraining Device for 5 seconds. While continuing to apply the torque, determine if the cord(s) if the cord(s) create an opening between the cord and the restraining device. If the Hazardous Loop Head Probe (ANSI/WCMA A1001-2018, figure D1) can pass through the opening, the opening is considered a hazardous loop.

## § 1260.3 Prohibited stockpiling.

(a) *Prohibited acts.* Manufacturers and importers of custom window coverings shall not manufacture or import custom window coverings that do not comply with the requirements of this part in any 12-month period between [insert date of publication in the *Federal Register*] and the effective date of the rule, either [insert date one year after publication in the *Federal Register*], or [insert date two years after publication in the *Federal Register*], as applicable based on the size of the custom window covering, at a rate that is greater than 120 percent of the rate at which they manufactured or imported custom window coverings during the *base period* for the manufacturer.

(b) *Base period.* The base period for custom window coverings is any period of 365 consecutive dates, chosen by the manufacturer or importer, in the 5-year period immediately preceding the promulgation of the final rule.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**1260.4 Findings.**

*(a) General.* Section 9(f) of the Consumer Product Safety Act (15 U.S.C. 2058(f)) requires the Commission to make findings concerning the following topics and to include the findings in the rule.

Note 1 to paragraph (a): Because the findings are required to be published in the rule, they reflect the information that was available to the Consumer Product Safety Commission (Commission, CPSC) when the standard was issued on [insert final rule publication date].

(b) *Degree and nature of the risk of injury. (*1) Operating cords on custom window coverings present an unreasonable risk of strangulation, including death and serious injury, to children 8 years old and younger.  If children can access a window covering cord that is longer than 8 inches, children can wrap the cord around their neck, or insert their head into a loop formed by the cord and strangle.  Strangulation can lead to serious injuries with permanent debilitating outcomes or death.

(2) Strangulation deaths and injuries on window covering cords are a "hidden hazard" because consumers do not understand or appreciate the hazard, or how quickly and silently strangulation occurs.  Because young children may be left unsupervised for a few minutes or more in a room that is considered safe, such as a bedroom or family room, adult supervision is unlikely to eliminate or reduce the hazard.  Children can wrap the cord around their neck, insert their head into a cord loop and get injured or die silently in a few minutes in any room, with or without supervision.

(3) Safety devices such as cord cleats and tension devices are unlikely to be effective to eliminate or substantially reduce the hazard.  Cord cleats, for example, need to be attached on the wall and caregivers must wrap the cord around the cleat each and every time the window covering is raised or lowered.  As incident data show, children can still access and become

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

entangled in cords by climbing on furniture. Tension devices also need to be attached on the wall or windowsill, which may not occur (and may not be permitted in rental homes); even if properly installed, depending on how taut the cord loop is, it can still allow a child's head to enter the opening as observed in the incident data.

(4) A user research study found a lack of awareness on cord entanglement among caregivers; lack of awareness of the speed and mechanism of the injury; difficulty using and installing safety devices as primary reasons for not using them; and inability to recognize the purpose of the safety devices provided with window coverings. Warning labels are not likely to be effective because consumers are less likely to look for and read safety information about the products that they use frequently and are familiar with. Many of the children at risk of strangulation, those 8 years old and younger, cannot read or appreciate warning labels. Most of the window covering units involved in strangulation incidents had the permanent warning label on the product. Even well-designed warning labels will have limited effectiveness in communicating the hazard on this type of product.

(5) Every custom product sold with an accessible operating cord presents a hidden hazard to young children and can remain a hazard in the household for one to two decades or longer. Some consumers may believe that because they do not currently have young children living with them or visiting them, accessible operating cords on window coverings are not a safety hazard. However, window coverings last a long time, family circumstances change, and when homes are sold or new renters move in, the existing window coverings, if they are functional, usually remain installed and could be hazardous to new occupants with young children.

(6) Window coverings that comply with the operating cord requirements for stock window covering requirements in section 4.3.1 of ANSI/WCMA A100.1 – 2018 adequately address the strangulation hazard, by not allowing hazardous cords on the product by design, and therefore do

146

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

not rely on consumer action. CPSC finds that all of the operating cord incidents it identified as involving custom window coverings likely would have been prevented if the requirements in section 4.3.1 of ANSI/WCMA A100.1 – 2018 were in effect and covered the incident products.

(7) CPSC databases contain incident data showing a total of 209 reported fatal and nonfatal strangulations on window coverings among children eight years and younger, from January 2009 through December 2021. Nearly 48 percent of the reported incidents were fatal (100 of 2019). Sixteen of the surviving victims required hospitalization, and six survived a hypoxic-ischemic episode or were pulseless and in full cardiac arrest when found, suffered severe neurological sequalae ranging from loss of memory to a long-term or permanent vegetative state requiring tracheotomy and gastrointestinal tube feeding. One victim remained hospitalized for 72 days, was released with 75 percent permanent brain damage, and is confined to a bed.

(8) Based on CPSC's Injury Cost Model, approximately 7.6 medically treated nonfatal injuries to children 8 years and younger occurred annually in the United States from 2009 through 2021. Based on National Center for Health Statistics (NCHS) data and a separate study of child strangulations, a minimum of approximately 6.8 fatal strangulations related to window covering operating cords (excluding inner cords and lifting loops) occurred per year in the United States among children under eight years old from 2009 – 2020.

(c) *Number of Consumer Products Subject to the Rule*. Approximately 145 million corded custom window coverings were in use in the United States in 2020. About 25 million custom window coverings were shipped in the U.S. in 2020, and about 15.9 million of these were corded custom window coverings.

(d) *The Public Need for Custom Window Coverings and the Effects of the Rule on Their Utility, Cost, and Availability*. (1) Consumers commonly use window coverings in their homes to control light coming in through windows, for privacy, and for decoration. The window

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

covering market is divided into stock and custom products. The final rule addresses hazards associated with custom window coverings, which present the same risk of strangulation as stock window coverings, but custom window coverings allow consumers to choose from a wider variety of materials, colors, operating systems, or sizes, than stock products.

(2) The Commission does not expect the final rule to have a substantial effect on the utility or availability of custom window coverings, and the impact on cost depends on the product type. The Commission considered whether some consumers, such as the elderly and disabled, or those with windows in hard-to-reach locations, would experience a loss of utility from the removal of accessible operating cords from custom window coverings. The final rule mitigates any potential loss in utility by including several methods to make operating cords safer while still providing ease of use, including rigid cord shrouds, retractable cords, and loop cord and bead restraining devices, to assist consumers to raise and lower custom window coverings. Additionally, consumers can choose to use a remote-controlled operating system, or other tools, such as a pole, to operate the window covering.

(3) Retail prices of custom window coverings vary substantially. The least expensive units for an average size window retail for less than $40, while some more expensive units may retail for several thousand dollars. Custom window covering prices may increase to reflect the added cost of modifying or redesigning products to comply with the final rule. If the costs associated with redesigning or modifying a custom window covering to comply with the standard results in the manufacturer discontinuing that model, there would be some loss in availability of that type.

(4) Although prices of stock window coverings have increased since ANSI/WCMA A100.1 – 2018 went into effect in 2018, sales of stock products remain consistent. For custom products, which have higher prices on average, consumers very well may be willing to pay more for a safer window covering without affecting sales, similar to stock window coverings. The regulatory

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

analysis in the final rule states that the estimated net cost increase per household to replace all custom window products in a home to be as low as $24 for less expensive products, representing only a 5% increase in cost. Such cost increase is nominal to prevent the hidden strangulation hazard to children on window coverings for the 10 years custom window coverings are likely to be used.

(e) *Other Means to Achieve the Objective of the Proposed Rule, While Minimizing Adverse Effects on Competition and Manufacturing*. (1) The Commission considered alternatives to achieving the rule's objective of reducing the unreasonable risks to children of injury and death associated with operating cords on custom window coverings. For example, the Commission considered relying on compliance with the voluntary standard and education campaigns rather than issuing a mandatory rule for operating cords on custom window coverings. This is the approach CPSC has relied on to date, and it would have minimal costs; however, it is unlikely to further reduce the risk of injury from operating cords on custom window coverings.

(2) Similarly, the Commission considered narrowing the scope of the rule to address only the hazards associated with operating cords on custom vertical blinds, curtains, and drapes, because cords are not critical to the operation of these products. Narrowing the proposed rule to these three product types would lessen the cost impact and make it unlikely that any particular product type and/or size would be eliminated, and costs would be near $0 because using plastic rods for operation is very similar to cords in cost. However, only 3 of the 36 custom product incidents (all are fatalities) were associated with vertical blinds, and there were no curtain or drape incidents where the stock/custom classification could be determined. This option would not result in an effective reduction in injuries and deaths.

(3) Other alternatives the Commission considered include: adopting the Canadian standard for window covering cords, which would increase the costs to comply with the rule with no

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

additional benefits, and adopting a draft revised version of the voluntary standard, which the Commission staff has determined is inadequate to address the risk of injury because the revised standard would still allow accessible cords to remain available for sale to consumers.

(4) The Commission also considered setting a later effective date. Due to comments explaining the challenges in redesigning certain window coverings of unusual sizes and acquiring components to meet the requirements of the rule in a short timeframe, the Commission will set a later effective date than the proposed 180 days, and provide an effective date of 2 years after publication of the final rule for custom window coverings which operate up and down and are 10 feet or more in vertical length. These larger products are heavier and require additional design to reliably lift with cordless designs or to make the cords inaccessible or loops non-hazardous. A 2-year effective date for these larger products will reduce the burden for small manufacturers by allowing a longer period of time for product development. For all other custom window coverings, the final rule provides an effective date that is 1 year after publication of the final rule. A later effective date allows manufacturers more time to redesign and spread the research and development costs for these products.

*(f) Unreasonable Risk.* (1) Based on CPSC's Injury Cost Model, about 185 medically treated nonfatal injuries are predicted to have occurred annually from 2009 through 2020, involving children eight years and younger. Based on a review of National Center for Health Statistics (NCHS data) and a separate study of child strangulations, a minimum of 8.1 fatal strangulations related to window covering cords occurred per year in the United States among children under five years old from 2009 – 2020. Based on reviews of CPSC databases, we found reports of a total of 209 reported fatal and nonfatal strangulations on window coverings among children eight years and younger, from January 2009 through December 2021. Nearly 48 percent were fatal incident reports (100 of 209), while the remaining were near-miss nonfatal incidents.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

(2) The Commission estimates that the rule would result in aggregate benefits of about $31.6 million annually due to a reduction in deaths and injuries caused by custom window coverings. Of the potential modifications for which staff was able to estimate the potential cost, the lowest costs were about $2.18 per unit, although costs for some units are likely $0. Effective performance requirements for operating cords on window coverings are well known and already utilized for lower-priced stock window coverings. Technologies to address hazardous window covering cords are also known and utilized on stock products.

(3) The determination of whether a consumer product safety rule is reasonably necessary to reduce an unreasonable risk of injury involves balancing the degree and nature of the risk of injury addressed by the rule against the probable effect of the rule on the utility, cost, or availability of the product. The Commission does not expect the final rule to have a substantial effect on the utility or availability of custom window coverings. The rule may impact the cost of custom window coverings, but consumers already pay more for custom window coverings, and are likely willing to pay more for safer products.

(4) ANSI/WCMA-2018 eliminated the strangulation hazard on stock window coverings, which did not negatively impact sales of stock products; sales increased and cordless technologies became well-developed. The final rule will extend the requirements for stock products to custom window coverings. The Commission expects that the custom window covering market will absorb this cost, just as seen in the stock window covering market. This fact is also observed in the Canadian window covering market after Canada implemented a rule that eliminates hazardous cords on all window covering products. Staff identified no evidence from the Canadian market of a significant reduction in consumer choice as a result of their rule. Rather, the Canadian market has reacted with cost-effective substitutes and redesigned products.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

(5) Weighing the possibility of increased costs for custom window coverings with the continuing deaths and injuries to young children, the Commission concludes that custom window coverings with hazardous operating cords pose an unreasonable risk of injury and death and finds that the final rule is reasonably necessary to reduce that unreasonable risk of injury and death.

(g) *Public Interest*. This final rule is intended to address an unreasonable risk of injury and death posed by hazardous operating cords on custom window coverings. Adherence to the requirements of the final rule will significantly reduce or eliminate a hidden hazard, strangulation deaths and injuries to children 8 years old and younger, without major disruption to industry or consumers; thus, the Commission finds that promulgation of the rule is in the public interest.

(h) *Voluntary Standards*. The Commission is aware of one national voluntary standard, ANSI/WCMA A100.1 – 2018, as well as European, Australian, and Canadian standards. Among these, the Commission considers the Canadian standard to be the most stringent because it applies to all window coverings. ANSI/WCMA A100.1 – 2018 contains adequate performance requirements to address the risk of strangulation on inner cords for both stock and custom window coverings and contains adequate requirements to address the risk of injury on operating cords for stock products. The Commission also finds that custom window coverings substantially comply with the voluntary standard. However, the Commission finds that operating cord requirements for custom window coverings in ANSI/WCMA A100.1 – 2018 are inadequate to address the risk of injury, because the voluntary standard allows accessible and hazardous operating cords to be present on custom products. Thus, the Commission finds that compliance with an existing voluntary standard is not likely to result in the elimination or adequate reduction of the risk of injury presented by custom window coverings.

(i) *Relationship of Benefits to Costs*. (1) The aggregate benefits of the rule are conservatively estimated to be about $23 million annually with the base VSL; and the lowest cost of the rule is

152

estimated to be about $54.4 million annually. Recent studies suggest that the VSL for children could be higher than that for adults. In other words, consumers might be willing to pay more to reduce the risk of premature death of children than to reduce the risk of premature death of adults. A review of the literature conducted for the CPSC suggested that the VSL for children could exceed that of adults by a factor of 1.2 to 3, with a midpoint of around 2 (IEc, 2018). The Commission received positive comment on increasing the VSL for children by a factor of 3. Staff provided a sensitivity analysis for the final rule demonstrating how the ratio of costs and benefits change based on several variables, including a higher VSL for children. When staff increased the VSL by a factor of 3 for children (value of $31.5 million), the benefits of the rule exceed costs by approximately $14.3 million.

(2) Staff's benefits and costs analysis also highlights unquantified benefits regarding the emotional distress of caregivers that could also be reduced by the final rule. This benefit is not directly accounted for in the primary VSL estimate of $10.5 million. The value of the shock or perceived guilt related to a caregiver's inattentiveness could be significant, as it could result in large reductions to physical wellbeing or income loss.

(3) To determine how the final rule impacts consumers, staff converted costs and benefits of the rule into a calculated net cost per household, based on the data point that the average detached, single-family household has 12 window coverings. This analysis translates into a net cost of the final rule of $1.97 for metal or vinyl horizontal blinds. Using the assumption of 12 window coverings per household, this equates to a net cost of the rule (above the benefits provided) of $23.67 per household every time a household updates their custom window coverings, about once every 10 years. For metal or vinyl horizontal blinds, $23.67 is slightly more than 5 percent of the total cost of $448.32 that a household would spend to update their window coverings.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

(4) We note that economies of scale associated with the voluntary standard for stock product operating cords, and the Canadian standard, may have reduced costs associated with cordless components since Commission staff developed the bases for their cost estimates as early as 2016. Additionally, custom window coverings have a longer product life, which increases the benefit of improving safety beyond the levels Commission staff determined for both stock and customer window coverings.

(5) Based on this analysis, the Commission finds that the benefits expected from the rule bear a reasonable relationship to the anticipated costs of the rule.

*(j) Least Burdensome Requirement That Would Adequately Reduce the Risk of Injury.* (1) The Commission considered less-burdensome alternatives to the final rule, detailed in section V.B of the preamble to the final rule and in section 1260.4(e), but finds that none of these alternatives would adequately reduce the risk of injury.

(2) The Commission considered relying on voluntary recalls, compliance with the voluntary standard, and education campaigns, rather than issuing a mandatory standard. These alternatives would have minimal costs but would be unlikely to reduce the risk of injury from custom window coverings that contain hazardous cords.

(3) The Commission considered issuing a standard that applies only to a certain types of window covering such as vertical blinds. This would impose lower costs on manufacturers but is unlikely to adequately reduce the risk of injury because it would only address incidents associated with those types. Based on the custom product incident data, only 8.3 percent of the incidents involved vertical blinds and 22.2 percent involved faux wood/wood blinds. The Commission considered adopting the Canadian standard for window covering cords, which would increase the costs to comply with the rule with no additional benefits and/or providing a longer effective date. And the Commission considered adopting a 2022 draft revision of the

154

voluntary standard but finds the requirements in the standard inadequate to address the risk of injury.

(4) On the basis of comments claiming challenges in redesigning certain window coverings of unusual sizes and acquiring components to meet the requirements of the rule in a short timeframe, the Commission will set a longer effective date than the proposed 180 days, and provide an effective date of 2 years after publication of the final rule for custom window coverings which operate up and down and are 10 feet or more in vertical length. These larger products are heavier and require additional design to reliably lift with cordless designs or to make the cords inaccessible or loops non-hazardous. A 2-year effective date for these larger products will reduce the burden for small manufacturers by allowing a longer period of time for product development. For all other custom window coverings, the final rule provides an effective date that is 1 year after publication of the final rule. A later effective date allows manufacturers more time to redesign and spread the research and development costs for these products.

### § 1260.5  Standards incorporated by reference.

(a) Certain material is incorporated by reference into this part with the approval of the Director of the Federal Register under 5 U.S.C. 552(a) and 1 CFR part 51. All approved material is available for inspection at the Office of the Secretary, U.S. Consumer Product Safety Commission, 4330 East West Highway, Bethesda, MD 20814, telephone (301) 504-7479, email: cpsc-os@cpsc.gov, and is available from the sources listed below. You may also inspect a copy at the National Archives and Records Administration (NARA). For information on the

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

availability of this material at NARA, email fr.inspection@nara.gov, or go to:

www.archives.gov/federal-register/cfr/ibr-locations.html.

(b) Window Covering Manufacturers Association, Inc., 355 Lexington Avenue, New York,

New York, 10017, telephone: 212.297.2122, https://wcmanet.com.

(1) ANSI/WCMA A100.1 – 2018, American National Standard for Safety of Corded

Window Covering Products, approved January 8, 2018; IBR approved for §§ 1260.1 and 1260.2.

(i) *Read-only copy*. https://www.wcmanet.com/pdf/WCMA-A100.1-2018_view-only_v2.pdf.

(ii) *Purchase*. https://webstore.ansi.org/Standards/WCMA/ANSIWCMAA1002018.

(2) [Reserved]

## § 1260.6 Severability

The provisions of this part are separate and severable from one another. If any provision is

stayed or determined to be invalid, it is the Commission's intention that the remaining provisions

shall continue in effect.

**Alberta E. Mills,**
*Secretary,*
*Consumer Product Safety Commission.*

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



United States
**Consumer Product Safety Commission**

# Staff Briefing Package

## Draft Final Rules for Corded Window Coverings

September 28, 2022

For additional information, contact:

Rana Balci-Sinha, PhD
Window Coverings Project Manager
Division of Human Factors
Directorate for Engineering Sciences
Office of Hazard Identification and Reduction
Email: rbalcisinha@cpsc.gov

U.S. Consumer Product Safety Commission
5 Research Place
Rockville, MD 20850

*This report was prepared by the CPSC staff.
It has not been reviewed or approved by,
and may not necessarily reflect the views of,
the Commission.*



THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

# Table of Contents

Briefing Memorandum ................................................................................................ 1

I.   Introduction ........................................................................................................ 2

II.  Discussion .......................................................................................................... 6

    A.   Overview of NPRs ......................................................................................... 6

    B.   ANSI/WCMA Standard and its Adequacy ...................................................... 7

    C.   Updated Incident Data Analysis ..................................................................13

    D.   Operating Cords and Inner Cords on Stock Window Coverings and Inner Cords on Custom Window Coverings under Section 15(j) of the CPSA ......................................14

    E.   Custom Window Coverings under Sections 7 and 9 of the CPSA ...............16

III. Conclusion ........................................................................................................25

Tab A: Draft Final Rules for Corded Window Coverings: Update on Fatal and Near-Miss Strangulation Incidents Associated with Window Covering Cords .......................27

Tab B: Draft Final Rules for Corded Window Coverings: Human Factors Assessment ..............34

Tab C: Draft Final Rule for Operating Cords on Custom Window Coverings: Mechanical Engineering Assessment of Balloted 2022 Revision to the Voluntary Standard ANSI/WCMA A100.1 – 2018 and Final Rule Recommendations ..............................................48

Appendix: Development Process  and Cost Estimate for Rigid Cord Shroud ...........................63

Tab D: Recommended Regulatory Text for Draft Final Rules ....................................................70

Tab E: Draft Final Rule for Window Covering Cords Under Section 15(j) of the CPSA:  Window Coverings Small Business Considerations ........................................................78

Tab F: Final Regulatory Analysis Report by the Directorate for Economic Analysis .................83

Tab G: Final Regulatory Flexibility Analysis Memorandum by the Directorate for Economic Analysis ..........................................................................................................125

Tab H: Draft Final Rules for Corded Window Coverings: Summary of Comments on the Proposed Rules and Staff's Recommended Responses for the Final Rules .....................137

Tab I: Draft Final Rule for Operating Cords on Custom Window Coverings: Assessment of Draft ANSI/WCMA 2022 Balloted Standard .............................................................158

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

# Briefing Memorandum

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



United States
**Consumer Product Safety Commission**
cpsc.gov | info@cpsc.gov | 800.638.2772

# Briefing Memorandum

**TO:** The Commission            **DATE:** September 28, 2022
Alberta E. Mills, Secretary

**THROUGH:** Austin C. Schlick, General Counsel
Jason K. Levine, Executive Director
DeWane Ray, Deputy Executive Director for Operations

**FROM:** Duane E. Boniface, Assistant Executive Director,
Office of Hazard Identification and Reduction

Rana Balci-Sinha Ph.D., Project Manager,
Division of Human Factors,
Directorate for Engineering Sciences

**SUBJECT:** Staff's Draft Final Rules for Corded Window Coverings

---

## I.  Introduction

On January 7, 2022, the U.S. Consumer Product Safety Commission (CPSC, Commission) published two notices of proposed rulemaking (NPR) to address strangulation hazards associated with corded window coverings:

(1) Under section 15(j) of the Consumer Product Safety Act (CPSA; 15 U.S.C. § 2064(j)) (87 *Fed. Reg.* 891), the Commission proposed to deem that stock window coverings that do not comply with the readily observable characteristics of operating and inner cord requirements in ANSI/WCMA A100.1 – 2018, American National Standard for Safety of Corded Window Covering Products (ANSI/WCMA-2018), and custom window coverings that do not comply with the readily observable requirements for inner cords in ANSI/WCMA-2018, present a substantial product hazard (SPH), as defined in section 15(a)(2) of the Consumer Product Safety Act (CPSA); and

(2) Under sections 7 and 9 of the CPSA (15 U.S.C. §§ 2051-2089), the Commission proposed to establish a safety standard for operating cords on custom window coverings. 87 *Fed. Reg.* 1,014.

Staff recommends that the draft final rule under section 15(j) of the CPSA be finalized, as proposed.  The Commission received five comments, all in support of the rule.  Accordingly, the draft final rule amends 16 CFR part 1120 to deem as an SPH: (a) The presence of hazardous operating cords on stock window coverings, (b) the presence of hazardous inner cords on stock and custom window coverings, or (c) the absence of a required manufacturer label.

The purpose of the second draft final rule under sections 7 and 9 of the CPSA is to create a new consumer product safety rule to address the risk of strangulation to children 8 years old and younger associated with hazardous operating cords on custom window coverings. Due to the ongoing fatal and nonfatal incidents associated with window covering cords, high severity of the outcomes (death and disability to children), proven technical feasibility of cordless products, implementation of stronger operating cord requirements for stock window coverings already on

the market, and ineffectiveness of warnings and safety devices for this class of products, the Commission proposed to regulate operating cords on custom window coverings. The Commission received more than 2,000 comments on the proposed rule.  Since staff submitted its NPR staff briefing package (SBP) on October 7, 2021, staff has reviewed and considered those public comments, and also participated with industry and consumer groups in the ANSI/WCMA voluntary standards process, to revise ANSI/WCMA-2018 to improve the safety of custom window coverings.[1]

Based on review and consideration of the comments, staff's participation in the ANSI/WCMA process, including consideration of the recently balloted draft revision to the voluntary standard, ANSI/WCMA A100.1-2022 (draft ANSI/WCMA-2022), staff recommends finalizing the safety standard for operating cords on custom window coverings to require operating cords on custom window coverings to meet requirements identical to those for operating cords on stock window coverings, as set forth in section 4.3.1 of ANSI/WCMA-2018. The ANSI/WCMA 2018 standard requires stock window coverings to have:

  (1) no operating cords (cordless) (section 4.3.1.1);
  (2) operating cords equal to or shorter than 8 inches in any use position (section
      4.3.1.2); or
  (3) inaccessible operating cords (section 4.3.1.3).

The NPR for custom window coverings proposed to allow rigid cord shrouds to meet the inaccessibility requirement in section 4.3.1.3, and it set forth proposed durability testing requirements for rigid cord shrouds.  After considering comments on the elimination of continuous loop operating cords in the NPR, as well as discussions during the ANSI/WCMA process for the draft final rule, staff recommends adding another method, to meet the inaccessibility requirement for operating cords: retractable cords (provided the length of exposed cord is less than or equal to 12 inches).  Staff also recommends allowing the use of loop cord and bead chain restraining devices that prevent formation of accessible hazardous loops. Finally, based on comments received, staff recommends extending the timeline to comply with the rule to 1 year, and allowing 2 years for window coverings that are raised and lowered and 10-feet or more in vertical length.  Table 1 summarizes staff's recommended requirements in the draft final rule.

Staff's Briefing Package provides an updated analysis of incidents reported to CPSC since the data were extracted for the NPR; summarizes the ongoing attempt to update ANSI/WCMA-2018; assesses balloted changes to a draft revision of the voluntary standard; summarizes and responds to public comments on the proposed rules; updates the economic implications of the draft final rules; and provides staff's recommendations for the final rules.

---

[1] Meeting logs and correspondence documenting staff's participation in the ANSI/WCMA process have been made part of the rulemaking record on Regulations.gov (CPSC Docket No. CPSC-2013-0028).

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**Table 1. Recommended Requirements in the Draft Final Rule**

| Section | ANSI/WCMA-2018 | Example | Requirements in Custom Products Draft Final Rule |
|---|---|---|---|
| 4.3.1.1 and 4.3.2.1 | No operating cords (usually marketed as "cordless") | ² | Allowed |
| 4.3.1.2 and 4.3.2.2 | Operating cords =< 8 inches in any use position | Cord is 8" or shorter | Allowed |
| 4.3.1.3 and 4.3.2.3 | Inaccessible operating cords | | Allowed |
| 4.3.2.4 | - Using Single Retractable Cord Lift System | ³ | Allowed, if it meets complete retraction at 30 grams, has non-cord retraction device, and has stroke length =< 12 inches below the headrail |
| 4.3.2.5.3 | - Using rigid cord shrouds (can be used with Standard Operating System and Continuous Loop System) | | Allowed, if rigid cord shroud meets ANSI/WCMA 2018 test requirements + NPR-proposed Deflection Test |

---

² https://cdn.selectblinds.com/images/Img_ProductColors/PID-1017_CID-10104_Solar-Shades_Onyx-3%25_R.webp.
³ https://cdn2.hunterdouglas.com/static/video/ultraglide-video-thumb_3.jpg.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

| Section | ANSI/WCMA-2018 | Example | Requirements in Custom Products Draft Final Rule |
|---|---|---|---|
| 4.3.2.5.2 | Cord or bead chain restraining device<br>- Using Continuous Loop System | <br>4 | Allowed, if device meets ANSI/WCMA 2018 tests + an additional test for a sample to go through UV followed by cyclic test + meets the Proposed Deflection Test |
| 4.3.2.5.1 | Continuous Loop Systems with Tension Devices | <br>5 | Not Allowed |
| 4.3.2.6 | Standard Operating System (one or more separate operating cords, aka pull cords) | <br>6 | Not Allowed |
| 4.3.2.7 | Cord Loop Lift Systems (traditionally used in roll-up shades) | | Not Allowed |

| Effective Date | Requirements in Custom Products Draft Final Rule |
|---|---|
| All corded custom window coverings except those 10 feet or greater in vertical length and are raised and lowered | One year |
| Corded custom window coverings 10 feet or greater in vertical length and are raised and lowered | 2 years |

---

[4] Vestal, W. D. (2014). U.S. Patent No. 8,763,671. Washington, DC: U.S. Patent and Trademark Office.
[5] https://www.kirsch.com/images/System_Cellular_Clutch_Control.jpg.
[6] https://health.choc.org/window-covering-cords-still-can-be-fatal-to-young-ones/.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

# II. Discussion

### A. Overview of NPRs

Both NPRs used the definitions of "stock" and "custom" window coverings and their features as set forth in the ANSI/WCMA-2018 standard, which requires "stock" and "custom" window coverings to meet different sets of requirements. For the NPRs, the definition of a "stock window covering" relied on the definition of "Stock Blinds, Shades, and Shadings" in section 3, definition 5.02 of ANSI/WCMA-2018, describing them as completely or substantially fabricated product prior to being distributed in commerce and as a specific stock-keeping unit (SKU). Even when the seller, manufacturer, or distributor modifies a pre-assembled product, by adjusting to size, attaching the top rail or bottom rail, or tying cords to secure the bottom rail, the product is still considered "stock" as defined in the voluntary standard. Moreover, under the voluntary standard, online sales of a window covering, or the size of the order, such as multifamily housing orders, do not make the product a non-stock product. ANSI/WCMA-2018 provides these examples to clarify that, as long as the product is "substantially fabricated," subsequent changes to the product do not change its categorization from "stock" to "custom." The NPRs defined a "custom window covering" the same as the definition of "Custom Blinds, Shades, and Shadings" in section 3, definition 5.01 of the ANSI/WCMA-2018 standard, which is any window covering that is not classified as a stock window covering.

In the NPR, staff estimated that, on average, a minimum of 9 fatal strangulations related to window covering cords occurred per year in the United States among children under 5 years old from 2009 through 2019.[7] Staff also estimated that, based on CPSC's Injury Cost Model, approximately 185 medically treated, nonfatal injuries have occurred annually from 2009 through 2020, involving children 8 years and younger.[8] Based on reviews of CPSC databases, staff found that a total of 194 reported fatal and nonfatal strangulations on window coverings have occurred among children 8 years and younger, from January 2009 through December 2020. Nearly 46 percent were fatal incident reports (89 of 194), while the remaining were near-miss, nonfatal incidents. Some of the reported nonfatal incidents involved severe injuries with long-term consequences, such as quadriplegia or permanent brain damage. Where known, stock window coverings accounted for 59 percent of all incidents and 58 percent of the fatal incidents. Similarly, where known, custom window coverings accounted for 41 percent of all incidents and 42 percent of the fatal incidents. However, for 56 percent of the 194 incidents, staff was unable to distinguish whether the incidents involved a stock or custom product. Although the ANSI/WCMA-2018 standard divides the window covering market into stock and custom products, incident scenarios are not based on WCMA's product distinction. Fatal and nonfatal injuries associated with window covering cords are not separately recorded between stock and custom products because the difference is often unknown to the consumer and both types of products share the same hazard patterns.

---

[7] Chowdhury, R. (2021.) Fatal and Near-Miss Strangulations Associated with Window Covering Cords. CPSC Memorandum, Draft Notices of Proposed Rulemaking for Corded Window Coverings. U.S. Consumer Product Safety Commission, Bethesda, MD. Available at https://www.cpsc.gov/s3fs-public/NPRs-Add-Window-Covering-Cords-to-Substantial-Product-Hazard-List-Establish-Safety-Standard-for-Operating-Cords-on-Custom-Window-Coverings-updated-10-29-2021.pdf?VersionId=HIM05bK3WDLRZrlNGogQLknhFvhtx3PD.

[8] Bailey, M. (2021.) Preliminary Regulatory Analysis of the Draft Proposed Rule for Custom Window Coverings. CPSC Memorandum, Draft Notices of Proposed Rulemaking for Corded Window Coverings. U.S. Consumer Product Safety Commission, Bethesda, MD. Available at https://www.cpsc.gov/s3fs-public/NPRs-Add-Window-Covering-Cords-to-Substantial-Product-Hazard-List-Establish-Safety-Standard-for-Operating-Cords-on-Custom-Window-Coverings-updated-10-29-2021.pdf?VersionId=HIM05bK3WDLRZrlNGogQLknhFvhtx3PD.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Hazardous operating cords can be in the form of a single cord, multiple cords, or continuous loops. The incident data indicate two primary ways a child can strangle on a window covering cord: (1) a child can wrap a long cord around their neck, or (2) they can insert their head through a loop.

A review of the 194 incidents in the NPR revealed that nearly 44 percent involved horizontal blinds; whereas 25 percent of the incidents did not report the window covering type. Roman shades (12 percent), followed by vertical blinds (6 percent), ranked next. Among the fatal incidents, horizontal blinds accounted for 48 percent of deaths, and unknown type of window coverings accounted for 15 percent of the deaths. Vertical blinds (11 percent) and Roman shades (8 percent) ranked next. Based on the reported incident scenarios, horizontal blind incidents predominantly involved pull cords. Vertical blind incidents predominantly involved continuous loop cord/beaded-chains, while Roman shade incidents mostly involved the inner cord. Irrespective of product classification (stock or custom), and product type (*e.g.*, horizontal blind, cellular shade), among the 89 fatal incidents reported from 2009 through 2020, derived from CPSC databases, CPSC staff found that the largest proportion (39 of the 89) of the deaths involved pull cord(s), most frequently with tangled or knotted cord(s), followed by one or more long cords wrapped around the child's neck. Children getting caught in continuous looped cords or beaded-chains without a functional tension device, or where the tension device was not attached to the wall, also figured as a major fatal hazard, accounting for 23 of the 89 fatal strangulations.

From January 1, 2009, to December 31, 2020, CPSC oversaw 42 consumer-level window covering product recalls. More than 28 million units were recalled and included Roman shades, roll-up blinds, roller shades, cellular shades, horizontal blinds, and vertical blinds. The recalled products included stock products, as well as custom products. Recalled products were associated with 14 deaths and 31 near-strangulations. No new recalls occurred since the NPR was issued.

### B. ANSI/WCMA Standard and its Adequacy (Tab C and Tab I)

Per the ANSI/WCMA-2018 standard, stock and custom window coverings have different sets of requirements and options for operating cords and inner cords. For the NPR, staff assessed the adequacy of these requirements, listed in Table 2. Staff determined that any of the options permitted for operating cords on stock window coverings (options 1, 2, and 3) are adequate to address the strangulation hazard. Similarly, the inner cord requirements listed for both stock and custom products (option 4) are also adequate. However, staff assessed that the options permitted by ANSI/WCMA-2018 for custom products (options 5, 6, and 7) still allow hazardous cords or loops to be formed, and therefore, these options are inadequate to address the strangulation hazard.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**Table 2. Requirements for Stock and Custom Products in ANSI/WCMA-2018 and staff's assessment of the performance requirements**

| Performance Requirements in ANSI/WCMA A100.1-2018 | Assessment of the Performance Requirement | Stock Products | Custom Products |
|---|---|---|---|
| 1. *No operating cords OR* | Adequate | Required to have one or more of these options | Allowed/ Not required |
| 2. *Short cord with a length equal to or less than 8 inches in any state (free or under tension) OR* | | | |
| 3. *Inaccessible operating cords* | | | |
| 4. *Inner cords that meet Appendix C and D* | Adequate | Required | Required |
| 5. *Manufacturer Label that meets section 5.3* | Adequate | Required | Required |
| 6. *Single Retractable Cord Lift System (no limit on length of exposed cord when operating)* | Inadequate | Prohibited | Allowed/ Not Prohibited |
| 7. *Continuous Loop Operating System* | | | |
| 8. *Accessible Operating Cords longer than 8 inches* | | | |

After the publication of the NPR on January 7, 2022, WCMA brought forth several proposals to revise requirements for custom window covering cords in ANSI/WCMA-2018. On July 15, 2022, WCMA issued a ballot to revise ANSI/WCMA-2018 (draft ANSI/WCMA-2022) and the ballot closed on August 15, 2022. Revisions in the draft ANSI/WCMA-2022 include the changes listed below. (See Tab I for a detailed analysis.)

1. Elimination of accessible, free-hanging operating and tilt cords. Staff find this revision adequate to address a strangulation hazard as it eliminates accessible free hanging operating cords and tilt cords for custom products.
2. Modified requirements for single-cord retraction devices:
   a. Elimination of cords attached to the Operating Interface (the part of the cord retractor that the operator pulls on) to prevent the creation of a hazardous loop. Section 6.3.1 of the draft ANSI/WCMA-2022 eliminates cords as the Operating Interface, and requires such interface to be a rigid device, such as a wand or ring that cannot bend on itself. Staff assesses that the elimination of cords for consumers to pull on when using single-cord retraction devices protects safety, because this revision eliminates a corded component that could lead to a potential strangulation.
   b. A maximum stroke length of 36 inches.[9] Section 6.1.2 of the draft ANSI/WCMA-2022 sets the maximum stroke length for a cord retraction device at 36 inches. Staff finds this revision inadequate to eliminate the strangulation hazard because a 36-inch extended cord could allow a child to wrap the cord around his/her neck. Staff recommends no more than a 12-inch stroke length to adequately address the strangulation hazard associated with corded window coverings. Staff determined

---

[9] When the user pulls the retraction device down, with each stroke, a fixed amount of cord ("stroke length") is exposed to lower or raise the window covering. After each stroke, exposed cord retracts completely into the headrail; the user continues to pull on the retraction device until the desired height is reached.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

that a child is unlikely to pull on the retraction device and simultaneously wrap the exposed 12-inch cord (which extends under tension from the headrail) around their neck. See Tab B for a comparison between 36-inch stroke length and staff-recommended 12-inch stroke length.

c. Section 6.1.1 of the draft ANSI/WCMA-2022 requires that when a 30 grams mass is applied to the operating interface, the cord retraction device shall maintain full retraction of the retractable cord such that the retractable cord is not accessible per the accessibility test in Appendix C of the standard. Staff assesses that this revision is effective in protecting safety if the maximum stroke length is limited to 12 inches, as recommended in b, because this ensures a minimum pull force to access the exposed cord.

3. Additional requirements for tension devices used with continuous loop operating systems. Requirements include:

a. Elimination of continuous cord loop systems for horizontal blinds. Section 4.4.2.5.1 of the draft ANSI/WCMA-2022 eliminates continuous cord loops on horizontal blinds. This revision will eliminate corded operating systems and require horizontal blinds to use safer options, such as cordless systems, rigid cord shrouds, or retractable lift systems. Staff assesses that this revision improves safety of horizontal blinds.

b. Modification in section 6.3.1, which states that the tension device shall be attached to the cord or bead chain loop by the manufacturer. It shall be designed, placed, and shipped such that, unless properly installed or altered from the shipped condition with Sequential Process or tools, it prevents the window covering from operating. This draft requirement does not ensure that tension devices will be effective for the life of the window covering. For example, if an installer cuts the zip tie that is sometimes used to connect tension devices to the headrail, then the tension device would have been altered from its shipping condition with a tool and operation of the window covering without the tension device would be consistent with section 6.3.1. Therefore, the requirement still allows consumers or the installer to use the window covering in an unsafe manner while either in a fully operable state, by removing the tension device from the loop, or in a partially operable state by leaving the tension device on the loop but not attaching it on the wall.

c. Modification in section 6.3.2, which states that the manufacturer shall attach the tension device to the cord or bead chain loop by means of a permanent assembly method. This requirement ensures that if an installer or consumer attempts to remove the tension device, the device or component will break. Staff is aware of an incident involving a tension device that used one way snap features as permitted by the standard. The snap features broke off, exposing the continuous loop cord (Figure 1, from In-Depth Investigation (IDI)). This incident shows that a permanent assembly method requirement does not ensure that the tension device will remain assembled. Staff finds this provision inadequate, because even if the tension device breaks, the looped cord will not necessarily be damaged. Therefore, for hard-to-reach locations, or for people who do not want holes on their walls, removing the tension device may be preferable, and the window covering will remain fully operable.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



**Figure 1. Broken tension device in IDI.**

d. Modification in section 6.3.3, which states: "the tension device in conjunction with the product shall maintain tension on the operating cords when properly installed. If the tension device is installed in a location that does not maintain tension on the operating cords, the tension device will prevent the window covering from operating as designed for full operation of the product. The window covering may not operate independently of the Cord or Bead Chain Loop." The draft standard defines "Tension" as "The applicable, consistently applied force required to eliminate or prohibit the creation of a hazardous loop in any operating position." This requirement is intended to ensure that the location of the tension device on the wall or window jamb is such that the cord moves freely and allows full operation of the window covering while not allowing a hazardous loop. Staff finds this requirement inadequate because staff confirmed that an amount of tension that allowed full operation of the window covering still allowed a head probe to be inserted into the loop (Figure 2).

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

A509



**Figure 2. A head probe can pass through properly installed continuous loop under tension.**



**Figure 3. Re-enactment of how a 5-year-old child was found by a consumer with his head caught in a continuous cord loop.**

Accordingly, a properly installed tension device still allows an accessible hazardous loop, which is also observed in one incident (Figure 3). The draft ANSI/WCMA-2022 requires the tension device to prevent the window covering from operating as designed for full operation of the product. Staff concludes that this requirement is inadequate because the window covering can be operated partially, as shown in Figure 4. Staff notes that an incident that occurred in 2005 had a window covering with a "universal cord tensioner" that limited the operability of the window covering unless the tension device is installed. In this incident, the victim's mother stated that they did not change the previous owner's window treatments. The incident product had a continuous loop cord with an attached, plastic universal cord tensioner. However, the plastic universal cord tensioner piece was hanging freely from the cord and not attached to the wall (Figure 5). The victim's mother also guessed that the window coverings were around 3 years old.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



**Figure 4. Partially operable window covering when tension device is not attached to a fixed surface.**



Universal cord tensioner

**Figure 5. Universal cord tensioner remained unattached to the wall for about 3 years.**

4. Elimination of cord loop lift systems. Cord loop lift systems are commonly used in roll-up blinds and present a strangulation hazard if the loop comes off the blind. The draft ANSI/WCMA-2022 eliminates section 4.3.2.7 of the ANSI/WCMA-2018 standard, which

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

allowed cord loop lift systems. This type of operating system uses accessible cords that pose a strangulation hazard and are associated with incidents. Their elimination addresses that hazard.

5. Additional requirements for remote control battery compartments to align with ANSI/UL 4200A. Section 4.3 of the draft ANSI/WCMA-2022 requires remote control devices to meet the requirements of ANSI/UL 4200A – Standard for Safety for Products Incorporating Button or Coin Cell Batteries of Lithium Technologies. This revision in the standard will minimize ingestion of button cell batteries. Staff notes that Reese's Law was signed into law on August 16, 2022, and it addresses products containing button and coin cell batteries.

6. Additional requirements for rigid cord shrouds to test for deflection and deformation. Section 6.5.2.4 of the draft ANSI/WCMA-2022 require rigid cord shrouds to meet the "Deflection and Deformation" test, which evaluates accessibility of the shrouded cords when the product is bent or twisted. Staff assesses that this revision is adequate for safety because the added requirement prevents the cords from coming out of the shroud due to bending or twisting of the shroud.

7. Exempting curtains and draperies from the scope of the standard. Staff finds this revision inadequate because staff is aware of at least four fatalities involving draperies and curtains; all deaths were a result of continuous loops. There are multiple cordless options for draperies, including wands and motorized controls, as well as simply pulling the draperies on the traverse rod by hand, with no cord or other control.

8. New warning labels for (a) continuous loop tension labels, and (b) retractable cords. Overall, staff supports improved warnings. Warning labels have attention-getting features that should improve their noticeability; however, even well-designed warning labels will have limited effectiveness in communicating the hazard on a product that is familiar to consumers and used frequently.

At this time, staff is not certain when or if the revised standard will be approved by WCMA or ANSI and published. Section 9(b)(2) of the CPSA requires the Commission to end rulemaking, and rely on a voluntary standard, if the voluntary standard is likely to reduce the risk of injury and products within the scope of the standard will likely substantially comply with the voluntary standard. For section 9(b)(2) of the CPSA to apply, such voluntary standard must be "in existence," meaning approved by the voluntary standards organization. ANSI/WCMA has not yet approved the balloted draft voluntary standard. Moreover, staff found that the balloted revisions to the voluntary standard are inadequate to address the risk of injury. For this reason, staff recommends that comments on the NPR, as well as staff's analysis of the current standard, ANSI/WCMA-2018, and discussions and correspondence with stakeholders through the voluntary standards process (that have been placed on the rulemaking record), be the basis for requirements in the draft final rule.

### C. Updated Incident Data Analysis (Tab A and Tab B)

Since staff assessed data for the NPR, CPSC has received 15 additional incident reports (including four reports from NEISS hospital emergency departments) involving strangulations or near-miss strangulations among children up to 8 years of age. Nine of the 15 incidents occurred in 2021, five of them in 2020, and the remaining one occurred in 2017. Among the 15 newly reported incidents, 11 involved a fatality. Staff definitively identified the cord type in six of the 11 deaths. Three deaths involved a pull cord (operating or tilt cord) on a horizontal blind; two

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

deaths involved a continuous loop on a vertical blind and on a drapery; and one death involved inner cord(s) on a horizontal blind; staff has insufficient information to determine the cord type involved for the remaining five fatal scenarios. The absence of incident data for 2022 does not suggest an absence of incidents in 2022. Rather, given the reporting delays and the timing of the data extraction for this package, it made more sense to end the timeframe of the available data with 2021.

For the 15 new incidents, staff has insufficient information to categorize 14 of the incidents as either stock or custom products; however, staff could identify one unit as a custom product.

The age of children involved in the 15 additional incidents ranged from 16 months to 8 years. The two continuous loop deaths involved 2-year-old children. Although the incidents were unwitnessed, it is likely that both children climbed on another object that was close by to reach the cords. In one incident, the child likely climbed on a table, and in the other, likely climbed on a toy box.

The inner cord incident involved an 8-year-old child with Down syndrome. The child was strangled in the inner cords that became accessible due to broken slats. The window covering was above the victim's bed.

One of the operating pull cord fatalities involved a 4-year-old who was found with the loop, formed by a knot in the cord, around her neck. In the second fatality, an 18-month-old child was found with operating cords wrapped tightly around her neck. In the third fatality, a 2-year-old child was found with tilt cords around his neck; police stated that they noticed a small foot print on the table where he climbed on the couch to get to the horizontal window blind. Based on ESHF staff's review of the facts involved in these 15 additional incidents, staff concludes that these incidents follow patterns similar to the previously assessed incidents for the NPR SBP. Staff did not identify any new hazard patterns from this data. Health Sciences staff reviewed the incidents and concluded that the hazard pattern and injuries are consistent with previously reported incidents analyzed for the NPR by staff of the Division of Pharmacology and Physiology (Wanna-Nakamura, 2021).[10]

### D. Operating Cords and Inner Cords on Stock Window Coverings and Inner Cords on Custom Window Coverings Under Section 15(j) of the CPSA

As explained below, staff recommends finalizing a rule under section 15(j) of the CPSA, as proposed.

#### 1. Public Comments on the Section 15(j) NPR

CPSC received three comments on the section 15(j) rule during the comment period, and two comments before the comment period began. All comments supported the 15(j) rule and have been placed on the docket for this rule. Commenters included WCMA (two comments), Consumer Federation of America, Consumer Reports, and Parents for Window Blind Safety.

#### 2. Small Business Considerations on the Section 15(j) Draft Final Rule (Tab E)

---

[10] Wanna-Nakamura, S. (2021.) Health Sciences Assessment of Fatal and Nonfatal Incidents Associated with Window Coverings NPR. CPSC Memorandum, Draft Notices of Proposed Rulemaking for Corded Window Coverings. U.S. Consumer Product Safety Commission, Bethesda, MD. Available at https://www.cpsc.gov/s3fs-public/NPRs-Add-Window-Covering-Cords-to-Substantial-Product-Hazard-List-Establish-Safety-Standard-for-Operating-Cords-on-Custom-Window-Coverings-updated-10-29-2021.pdf?VersionId=HIM05bK3WDLRZrINGogQLknhFvhtx3PD

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

The draft final rule would apply to operating cords on all stock window covering products, and inner cords on both "stock" and "custom" window coverings, as defined in the draft final rule, consistent with the definitions in ANSI/WCMA-2018. The total window covering market size in 2021 was approximately $6.7 billion. CPSC staff estimates that firms classified as small by U.S. Small Business Administration (SBA) guidelines account for $3.9 billion annually, and none of these firms account for more than 3 percent of total market share by revenue.

The draft final rule, which would designate window covering products that do not conform to ANSI/WCMA-2018 provisions concerning stock products and custom product inner cord accessibility as an SPH, will not likely have a significant impact on a substantial number of small businesses or other small entities. Data collected by CPSC staff, in person at manufacturers, retailers, and importers, indicate that the level of conformance with the sections of the ANSI/WCMA-2018 standard concerning stock products is high and most likely greater than 90 percent. Samples tested by CPSC staff also indicate a high level of conformance in custom products related to inner cord accessibility.

Firms already conforming to the standard would experience no impact by the proposed rule. CPSC staff notes that at least one small manufacturer that currently does not conform to the accessible cord provision, will experience a significant cost impact by the rule. Staff does not believe that a substantial number of small manufacturers will experience this cost impact. Retailers and importers are not expected to be impacted significantly by the rule, as potential costs to conform (no accessible cords and labeling) will be borne by manufacturers. Should a window covering retailer and/or importer bear a cost related to conformance, staff expects the cost to account for only a small portion of total revenues, because these firms typically sell/import other home furnishing products in addition to window coverings.

### 3. Staff's Recommendation for the Section 15(j) Draft Final Rule

The draft final rule would deem the presence of one or more of the readily observable characteristics demonstrating hazardous operating cords on stock window coverings, hazardous inner cords on stock and custom window coverings, and the absence of a required manufacturer label, all of which are adequately addressed in the ANSI/WCMA-2018 standard, to be a "substantial product hazard," as authorized under section 15(j) of the CPSA.

The Consumer Product Safety Improvement Act (CPSIA) expanded section 15 of the CPSA, by creating a new subsection (j) that allows the Commission to specify by rule for a consumer product, or class of consumer products, characteristics whose existence or absence the Commission deems present a substantial product hazard, as defined in section 15(a)(2) of the CPSA. To deem the presence or absence of characteristics an SPH:

- the characteristics must be "readily observable";
- the characteristics must be addressed by a voluntary standard;
- the voluntary standard must be effective at reducing the risk of injury; and
- there must be substantial compliance with the voluntary standard.

The ANSI/WCMA-2018 standard significantly improved the safety of stock window coverings by practically eliminating hazardous operating cords. The standard also improved the safety of stock and custom products by adequately reducing the inner cord strangulation hazard. The readily observable operating cord and inner cord characteristics of stock window coverings and inner cord characteristics of custom window coverings are embodied in ANSI/WCMA-2018, approved on January 8, 2018. The NPR SBP and the 15J NPR explained in detail the readily observable characteristics of stock and custom window coverings, and how these

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

characteristics were addressed in the voluntary standard. *See* NPR SBP at Tab D and 15J NPR, 87 FR at 901-09.

Staff's market study demonstrated a high level of product compliance with the voluntary standard.[11] Accordingly, CPSC staff concluded that all the criteria required for including stock window coverings that contain the readily observable hazardous operating and inner cords, which have been adequately addressed by ANSI/WCMA, have been met, and therefore, should be included on the SPH list under section 15(j) of the CPSA. In addition, CPSC staff concluded that the criteria required to include hazardous inner cords on custom window coverings on the 15(j) list of SPHs have been met, because hazardous inner cords are readily observable and have been adequately addressed in the ANSI/WCMA standard.

Based on the assessment performed and conclusions reached for the NPR and stakeholders' agreement with the proposed rule (and lack of comments disagreeing with staff's assessment of effectiveness and compliance), staff does not recommend any changes to the final rule under section 15(j).

### 4. Effective Date

The NPR proposed that any stock or custom window coverings that do not conform to the specified sections of ANSI/WCMA–2018, be deemed an SPH, effective 30 days after publication of a final rule in the *Federal Register.* At that time, all stock and custom window coverings that are subject to, but do not comply with, ANSI/WCMA 2018 regarding the identified readily observable characteristics, will be deemed to be an SPH. CPSC did not receive any comments suggesting a different date. Therefore, staff recommends that the final rule become effective 30 days after the publication.

### E. Custom Window Coverings under Sections 7 and 9 of the CPSA

#### 1. Public Comments on the Sections 7 and 9 NPR for Corded Custom Window Coverings

CPSC received 2,060 comments on the NPR for custom window coverings during the comment period. Additionally, CPSC held an oral hearing on the proposed rule on March 16, 2022, at which time, seven presenters also provided comments. In addition, CPSC received two late comments in July 2022. All comments, meeting logs, and correspondence regarding custom window coverings have been included on Regulations.gov under the CPSC docket number for this rule: CPSC-2013-0028.

More than 900 businesses stated that the proposed rule would cause a significant impact on their businesses. Small custom window coverings retailers commented that the rule would reduce sales and raise costs. Several other commenters requested that commercial buildings where children are not expected to be present should be excluded from the rule's scope.

---

[11] Balci-Sinha, R, (2021.) History of ANSI/WCMA Standard, CPSC Involvement, and Compliance with the Standard (Tab E). CPSC Memorandum to Window Coverings Rulemaking File, Notice of Proposed Rulemaking, U.S. Consumer Product Safety Commission, Rockville, MD. Available: https://www.cpsc.gov/s3fs-public/NPRs-Add-Window-Covering-Cords-to-Substantial-Product-Hazard-List-Establish-Safety-Standard-for-Operating-Cords-on-Custom-Window-Coverings-updated-10-29-2021.pdf?VersionId=HIM05bK3WDLRZrlNGogQLknhFvhtx3PD

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

More than 140 commenters requested that retractable cords be allowed on custom window coverings, while more than 420 commenters stated that continuous loops with properly attached tension devices are safe and should not be eliminated.

More than 380 commenters stated that windows located at higher locations, windows behind the kitchen sink, or behind a piece of furniture, cannot be operated with an 8-inch cord; more than 50 commenters stated that, due to the short cord requirement, climbing will be required to operate hard-to-reach window coverings, and climbing on ladders or other furniture is unsafe for consumers, particularly older consumers. At least eight commenters stated that non-motorized cordless lift systems are not feasible for large window coverings.  Commenters stated that continuous loop cords with tie-down devices are capable of lifting any size window covering. At least three commenters stated that manual cordless lift systems have limitations, such as size and weight of the window covering, which could limit the application (*e.g.*, for faux wood blinds, a general estimate for the maximum dimensions for cordless is 96 inches wide by 48 inches high and 60 inches wide by 84 inches high.) More than 320 commenters suggested that consumers may want to have different options to serve their different needs, and it is not preferable to reduce the options that are available to consumers.

More than 400 commenters stated that the proposed 6-month-effective date is very short to meet the proposed requirements; more than 90 commenters suggested at least a 1-year effective date.

More than 100 commenters expressed support for the custom product rulemaking effort, some stating that, given the hidden nature of the hazard and severity of the risk, a mandatory standard is necessary. About 42 comments were from families and friends of victims, as well as legal representatives of victims all supportive of the NPR. About 68 comments were from consumers, 31 of which were supportive of the NPR.

In Tab H, staff summarizes the comments and provides responses to the issues raised. Based in part on staff's consideration of comments, staff recommends allowing additional methods to meet the requirements of the rule, including certain retractable cords and loop cord and bead chain restraining devices. In addition, staff recommends an effective date that is 1 year after publication, due to challenges in redesigning certain window coverings of unusual sizes and acquiring components in a short timeframe. A later effective date would allow manufacturers more time to redesign and spread the research and development costs. Furthermore, staff recommends an effective date of 2 years after publication for custom window coverings, which operate up and down and are 10 feet or more in length, because these products are heavier and require additional design to reliably lift with cordless designs or to make the cords inaccessible or loops non-hazardous.  A 2-year effective date for these larger products will reduce the burden for small manufacturers by allowing a longer period of time for product development.

## 2.  Economic Analysis on the Sections 7 and 9 NPR

### 1. *Final Regulatory Analysis (Tab F)*

Based on estimates from the NEISS and the ICM, CPSC staff estimates that 7.6 nonfatal, medically treated injuries and 6.8 fatalities occur annually among all corded window coverings associated with cord types that are within scope of this rule (Chowdhury 2022).  Staff in the Directorate for Economic Analysis (EC) estimates the societal costs of these injuries to be about $72 million annually. Overall, staff found that fatalities account for an overwhelming majority of

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

societal costs at $71.4 million annually, and that nonfatal injuries account for about $498,000 in societal costs annually.

Staff estimates the societal cost of deaths and injuries attributable to custom window covering products, that would not be addressed by the 15(j) rule's provisions for inner cords, to be $31.6 million annually (about 44 percent of the total), based on a CPSC staff review of incidents and values, using the ICM and a Value of Statistical Life (VSL) of $10.5 million. Staff also conducted a sensitivity analysis, described below and in Tab F, which considered alternatives for certain values, including a child VSL of up to $31.5 million.

Staff calculated the present value of the societal cost[12] of deaths and injuries for each blind type, based on each type's expected product life. The present value of societal cost per unit for metal and vinyl horizontal blinds, wood and faux wood horizontal blinds amounts to $1.06 and $1.61, respectively. For cellular, pleated, Roman, roller, and soft sheer shades, the per-unit present value equates to $2.04, $2.12, $2.43, $2.04, and $2.04, respectively. Staff combines these societal unit costs with corded custom window covering sales in 2020, to generate a gross annual societal cost of $24.35 million. Finally, staff adjusts this estimate for the expected effectiveness of the draft final rule to estimate a total benefit of $23 million.

The draft final rule would impose costs on manufacturers of custom window covering products. Manufacturers would likely pass much of incremental per-unit manufacturing cost to consumers in the form of higher prices. Based on component cost estimates, assembly/manufacturing costs, consumer surplus loss, and proportions of domestic manufacturing, the incremental cost per corded custom window covering produced would range from $2.20 to $35.79 and is highly dependent on product type. The final rule would not result in any cost increases for already cordless custom window coverings. Staff combines the 2020 *corded custom* shipment estimate of 15.85 million with the per-unit cost increase to generate an aggregate cost estimate ranging between $54.4 million and $114 million. An additional cost estimate for the research, development, implementation, time, and retooling required for some corded product amounts to approximately $14.7 million after discounting future expenses by 3 percent. Including this value results in a total aggregate cost estimate range of $54.4 million to $129 million.

Staff notes that the cost impact from the draft final rule may be less than estimated, due to the enforcement of Canada's regulations beginning in May 2022.[13] Companies that sell in both Canada and the United States have already redesigned their custom offerings to be compliant with the Canadian regulations, which are substantively similar to those being finalized here. Those companies may already have stock of compliant product designed and available to sell to the U.S. market through small dealers and interior designers.

Based on staff's estimated benefits and costs, net benefits, (*i.e.*, benefits minus costs) for the market of custom window coverings (*i.e.*, excluding stock window covering products) amounted to between -$31.3 million to about $106 million. Staff also conducted a sensitivity analysis for a few variables, including the value of statistical life (VSL). Potentially higher VSL for children, up to three times the base level (3 × $10.5 million for a total of $31.5 million), were discussed in the NPR. CPSC requested comments on this child-focused VSL. CPSC received comments in support of a child-focused VSL with alternative methods suggested. Staff considered a higher

---

[12] Calculating the annual societal costs per window covering unit, staff divided that total societal cost by an estimate of 145 million *corded custom* window coverings in use for the year of 2020, which resulted in a per-unit societal cost of $0.22 per *corded custom* window covering in use.

[13] https://laws-lois.justice.gc.ca/eng/regulations/SOR-2019-97/FullText.html.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

VSL for children in the sensitivity analysis in Tab F. With a VSL value of $31.5 million, the rule achieves net benefit, with benefits exceeding costs by approximately $14.3 million. Staff also highlights that the emotional distress level of caregivers could also be reduced by the draft final rule. This benefit is not directly accounted for in the primary VSL estimate of $10.5 million.[14] The value of the shock or perceived guilt related to a caregiver's inattentiveness could be significant, as it could result in large reductions to physical wellbeing or income loss.

To provide an accessible framework to perceive how the additional cost of the draft final rule impacts consumers, staff converted costs and benefits of the draft proposed rule into a calculated net cost per household, based on the data point that the average detached, single-family household has 12 window coverings. For example, horizontal blinds composed of metal or vinyl have a low-end, per-unit cost estimate of $3.03 and a per-unit benefit estimate of $1.06 (assuming the base VSL). This translates into a net cost of the draft final rule of $1.97 (assuming the base VSL) for metal/vinyl horizontal blinds. Using the assumption of 12 window coverings per household, this equates to a net cost of the rule (above the benefits provided) of $23.67 per household every time a household updates their custom window coverings, about once every 10 years. For metal/vinyl horizontal blinds, $23.67 is slightly more than 5 percent of the total cost of $448.32 that a household would spend to update their window coverings.

Staff's analysis discusses several alternatives to the draft final rule, including (1) No Action Alternative, (2) Rely upon or Improve the Voluntary Standard for Window Coverings, (3) Later Effective Date, (4) Limit the Scope of the Final Rule to Vertical Blinds, Curtains, and Drapes, (5) Continue and Improve Information and Education Campaign, and (6) Adopt Canadian Standard. The costs of these alternatives would be lower, so would the expected benefits or in the case of Canadian standard, the costs would be higher without increased benefits. The only alternative staff recommends is a longer effective date for the rule. A later effective date would allow manufacturers more time to redesign and spread the research and development costs or allow extra time to eliminate product variants that cannot be switched to cordless/inaccessible/non-hazardous operation. Staff does not recommend any of the other alternatives, as discussed in the NPR and in Tab F of the final rule SBP, because none of these alternatives adequately address the risk of injury.

### 2. Final Regulatory Flexibility Analysis (Tab G)

Whenever an agency publishes a final rule, the Regulatory Flexibility Act (5 USC 601–612) requires that the agency prepare a final regulatory flexibility analysis (FRFA) that describes the impact the rule would have on small businesses and other entities.

The Office of Advocacy of the SBA (SBAA) submitted several comments on the proposed rule. SBAA stated that CPSC should consider alternatives for the final rule that reduce the burden to small businesses while still meeting the stated objectives of increased child safety. SBAA expressed concerns about the costs to comply, time to comply, and whether an updated voluntary standard would adequately address the risk of injury. One of the comments by SBAA contributed to CPSC staff recommending a change to the draft final rule. To reduce the burden of the final rule, in addition to rigid cord shrouds as a method to make cords inaccessible, CPSC

---

[14] Some of this potential benefit could be indirectly captured in estimates of pain and suffering related to consumer product injuries. Staff notes that this potential benefit is most likely bounded by the estimate of an increased multiplier (3X) for children's VSL, discussed in section 3.6. The benefit should not be treated as "in addition" to an increased VSL for children and is most likely already accounted for in the estimate. This is because the source of the children's VSL estimate is surveys where respondents reviewed and valued risk/harm reductions to children, and where, presumably, respondents accounted for emotional and physical effects related to the risks/harms.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

staff also recommends allowing a retractable cord or a loop cord and bead chain restraining device, as long as such devices meet the requirements in the draft final rule.  Staff also recommends a longer effective date, 2 years, for products 10 feet or greater in length. In addition, CPSC staff recommends an effective date of 1 year for all other custom window coverings, to allow firms more time to obtain compliant component parts and retool production lines. CPSC staff notes that many of the firms supplying the U.S. market with custom window coverings also supply the same products to the Canadian market, where all window coverings are required to meet a new Canadian standard that is substantially similar to those in the draft final rule, by restricting the length of cords and the size of loops.

SBAA also stated that CPSC should consider exceptions for situations where corded window coverings are a necessity, such as under the Americans with Disabilities Act (ADA). CPSC staff determined that many cordless or shrouded products that would meet the draft final rule meet the requirements of the ADA because they are operable with one hand and do not require pinching, tight grasping, or twisting of the wrist.  Staff concludes that the custom window covering requirements in the draft final rule do not limit accessibility, allow for products that have one-handed operation, and eliminate the strangulation hazard.

Custom window covering manufacturers would most likely adopt cordless lift operation systems to comply with the draft final rule, although less costly options are available. As discussed in the preliminary regulatory analysis of the proposed rule, the cost to modify window covering lift systems to comply with the draft rule ranges from $2.99 to $9.77 per horizontal blind, $2.18 to $35 per shade, and there would be no expected cost increase for vertical blinds and curtains/drapes. CPSC staff's estimates of redesign costs equate to approximately $772,500 over a 2-year period, after discounting future expenses at a rate of 3 percent. Only manufacturers with at least 75 employees are anticipated to perform this investment, as this is a significant investment for smaller manufacturers with fewer employees and lower annual revenues.  Likely these manufacturers will either purchase the necessary completed hardware, or they will license a patented solution from a larger firm.  CPSC staff expects component costs to be significant, as inaccessible cord operation is on the order of $2 to $35, as described above, and as shown in Tab F, which contains the final regulatory analysis. However, the impact may be less than originally estimated, due to the enforcement of Canada's regulations beginning in May 2022.  Companies that sell in both Canada and the United States have already redesigned their custom offerings to be compliant with the Canadian regulations that are substantively similar to those in the draft final rule. Companies may already have stock of compliant product designed and ready to sell to the U.S. market through small dealers and interior designers.

### 3. Impact on Small Businesses (Tab G)

To comply with the draft final rule, small manufacturers are expected to incur redesign and incremental component costs, described above, for some product lines that currently are not available in inaccessible cord variants. Staff does not expect small manufacturers to suffer a disproportionate cost effect from the draft final rule, as the cost calculations and research were completed on a per-unit basis, and staff expects little, if any, redesign costs. Staff expects small manufacturers of custom window coverings to incur, at a minimum, a 2 percent impact to their custom window covering revenue from the draft final rule. This implies that if custom products account for all of a firm's revenue, then the minimum impact of the draft final rule is 2 percent of revenue.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Generally, staff considers an impact to be potentially significant if it exceeds 1 percent of a firm's revenue. As the smallest estimate of incremental compliance cost is 2 percent of retail price,[15] staff concludes that the draft final rule could have a significant impact on manufacturers of custom window coverings. This effect depends on the share of annual revenues attributable to custom products. For example, if a small firm only manufactures custom cellular shades, then staff expects a lowest possible compliance cost of 2 percent of retail price.[16] Staff notes that small importers are expected to bear similar costs as small manufacturers, but staff is unclear whether the impact will be significant. The cost effect as a percent of revenue depends on the firm's custom window covering imports as a percent of total revenue. Any small importer with revenues of at least 50 percent related to custom window covering products affected by the draft final rule could be significantly impacted. This is due to the lowest possible compliance cost equating to 2 percent of retail price, which at a 50 percent custom product share, would equate to a 1 percent minimum impact on annual revenues. Based on this analysis, CPSC staff expects the draft final rule to have a significant impact on a substantial number of small firms.

### 3. Staff's Recommendation for the Sections 7 and 9 NPR for Operating Cords on Custom Window Coverings

#### a. Recommended Changes

The draft final rule addresses the unreasonable risk of injury and death associated with the hazardous cords on custom window coverings. The draft final rule seeks to address this hazard by regulating custom window coverings that contain accessible and hazardous cords. Staff recommends several revisions to the proposed rule, based on the comments received from the public, consideration of discussions and correspondence associated with the ANSI/WCMA voluntary standards activity, staff analysis of the products on the market, and the assessment of foreseeable incident scenarios.

The draft final rule requires custom window coverings to meet the same requirements as stock products in section 4.3.1 of the ANSI/WCMA-2018 standard, meaning products must be cordless, use operating cords that are 8 inches or shorter, or make operating cords inaccessible. The draft final rule contains requirements for two methods to meet the inaccessibility option: rigid cord shrouds and retractable cords. The draft final rule also allows for corded products that use a loop cord and bead chain restraining device that meets the requirements of the rule, to address the strangulation hazard (Table 3).

#### b. Impact of Recommended Changes

Staff assesses that the recommended changes in the draft final rule for custom window coverings will help improve consumers' ability to reach and operate window coverings with ease, even for hard-to-reach locations, or for consumers who are short in stature or in wheelchairs, while also keeping custom window coverings safe for children.

The recommendations provide flexibility for manufacturers to continue using currently implemented systems, such as continuous loops, provided that the cords are inaccessible (rigid

---

[15] Panchal Jitesh H., 2016. Manufacturing Cost Analysis: Cordless vs. Corded Window Covering Products. West Lafayette, IN. Purdue University.

[16] Staff presumes that some markup in the retail price of these products occurs, which would translate to a higher cost as a percentage of a manufacturers annual revenues. The lowest possible compliance cost in this estimate has an implicit assumption that a manufacturer can capture the full retail price of the product. This is an unlikely scenario, but helpful for illustrative purposes, as only a manufacturer with a large focus on vertical blinds and curtains/drapes could possibly be below the CPSC 1 percent significant impact criteria.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

cord shroud) or loops are accessible, but not hazardous (loop cord and bead chain restraining device). The recommended changes also respond to the comments about not limiting choices for consumers because consumers can keep using the same operating systems with combined safety measures, such as rigid cord shrouds, loop cord and bead chain restraining devices, or retractable cords, in addition to cordless systems.

**Table 3. Comparison of Custom Product Requirements in ANSI/WCMA-2018, NPR, and the Draft Final Rule**

| Performance Requirements | 15(j) Draft Final Rule for Stock Products | Custom Products in ANSI/WCMA 2018 | Custom Products NPR | Custom Products Draft Final Rule |
|---|---|---|---|---|
| (1) No operating cords (cordless) | Allowed | Allowed | Allowed | Allowed |
| (2) Short cord (8 inches or shorter) in any state | Allowed | Allowed | Allowed | Allowed |
| (3) Inaccessible operating cords | Allowed | Allowed | Allowed | Allowed |
| Using rigid cord shrouds (can be used with any operating system) | Allowed if Rigid Cord Shroud meets ANSI/WCMA 2018 accessibility test requirements | Allowed if Rigid Cord Shroud meets ANSI/WCMA 2018 test requirements | Allowed if Rigid Cord Shroud meets ANSI/WCMA 2018 test requirements plus NPR-proposed deflection and deformation tests | Same as NPR |
| Using Single Retractable Cord Lift System | Not Allowed | Allowed, no limit in cord length under tension | Asked for comments | Allowed provided that it meets complete retraction at 30 gram, non-cord retraction device. Stroke length limited to 12 inches below the headrail |
| (4) Non-hazardous Cord Loops using Cord and Bead Chain Restraining Device | Not Allowed | Allowed if device meets ANSI/WCMA tests | Asked for comments | Allowed if device meets ANSI/WCMA 2018 tests and an additional test for a sample to go through UV followed by cyclic test and deflection Test |
| (5) Accessible Operating Cords longer than 8 inches | Not Allowed | Allowed | Not Allowed | Not Allowed |
| (6) Continuous Loops with Tension Devices | Not Allowed | Allowed | Not Allowed | Not Allowed |
| (7) Cord Loop Lift Systems | Not Allowed | Allowed | Not Allowed | Not Allowed |

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

### c. Stakeholder Review and Opportunity to Comment

The staff NPR briefing package was posted online on October 14, 2021, and published in the *Federal Register* on January 7, 2022, after approval by the Commission. The Commission provided a comment period of 75 days for written comments and also provided an opportunity for oral comments. CPSC received 2,060 comments on the NPR for custom window coverings. Additionally, on March 16, 2022, CPSC held an oral hearing on the proposed rule, at which time, seven presenters also provided comments. In addition, we received two late comments in July 2022. All comments, meeting logs, and correspondence regarding custom window coverings have been included on Regulations.gov under the CPSC docket for this rule: Docket No. CPSC-2013-0028. WCMA and other commenters had ample opportunity to assess the proposed rule, and, before, during, and after the comment period, the WCMA Steering Committee, including manufacturers, retailers, test labs, consumer groups, and CPSC staff, met multiple times and worked on revising the 2018 voluntary standard to address additional strangulation scenarios. This effort eventually led to a draft standard that was balloted. CPSC staff evaluated the draft ANSI/WCMA-2022 and provided an assessment of the changes in a letter to WCMA and in this briefing package.[17]

### d. Assessment

Staff recognizes the efforts made by WCMA to continue revising the voluntary standard to address strangulation hazards; however, staff opposes the draft ANSI/WCMA-2022 that allows continuous loops with tension devices as a compliance method, because it relies on tension devices to keep continuous loops taut. Staff identified various scenarios where a head probe could be inserted into the hazardous loop from an installed continuous loop with an ANSI/WCMA-compliant tension device attached to the wall. Staff also identified mis-installation or failure modes that will leave a hazardous loop on custom products throughout its life cycle, starting from its installation. Staff concludes that a window covering should be inherently safe because a custom window covering product (1) has a long lifecycle, which may allow different residents in the same home, likely exposed to the same window covering, (2) presents a potentially hazardous outcome, even if the tension device is installed; because of its installation location, types of fasteners and installation surface, installer ability, and varying degrees of risk perception of consumers on taking safe actions.

### 4. Testing Certification and Notice of Requirements

Under section 14 of the CPSA, as codified in 16 CFR part 1110, manufacturers and importers of general use custom window coverings will be required to certify, based on a test of each product or upon a reasonable testing program, that their window coverings comply with the requirements of the draft final rule. Each certificate of compliance must identify the manufacturer or importer issuing the certificate and any manufacturer, firm, or third party conformity assessment body on whose testing the certificate depends. The certificate must be legible and in English and also include the date and place of manufacture, the date and place where the product was tested, including the full mailing address and telephone number for each party, and the contact information for the person responsible for maintaining records of the test results. The certificates may be in electronic format and must be provided to each distributor or retailer of the product. Upon request, the certificates must also be provided to the CPSC and Customs and Border Protection (CBP).

---

[17] CPSC staff letter is available at https://www.regulations.gov/document/CPSC-2013-0028-3667

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION  CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Additionally, as applied to children's custom window coverings, the rule would be a children's product safety rule that requires third party testing by a CPSC-accepted laboratory, and certification of compliance to the standard. As discussed in the NPR, CPSC is aware that some window coverings are specifically designed for children and may fall within the definition of "children's product."[18] Section 14(a)(2) of the CPSA states that, before importing for consumption or warehousing or distributing in commerce any children's product that is subject to a children's product safety rule, the manufacturer (including the importer) must submit sufficient samples of the children's product, or samples that are identical in all material respects to the product, to a CPSC-recognized third party conformity assessment body accredited under section 14(a)(3) of the CPSA ("recognized third party test laboratory"). The recognized third party test laboratory must test the children's product for compliance with such children's product safety rule. Based on the testing, the manufacturer or importer must issue a certificate that certifies that the children's product complies with the children's product safety rule. The Commission's requirements for testing and labeling children's products are codified at 16 CFR part 1107. Additionally, 16 CFR part 1109 sets forth requirements for using the testing of component parts to meet the testing and certification requirements for both children's and non-children's products.

Section 14(a)(3)(A) of the CPSA states that the third party testing requirement applies to any children's product manufactured more than 90 days after the Commission has established and published an NOR for the accreditation of third party conformity assessment bodies to assess conformity with a children's product safety rule. The Commission published a final rule regarding Requirements Pertaining to Third Party Conformity Assessment Bodies, codified in 16 CFR part 1112. 78 Fed. Reg. 15,836 (Mar. 12, 2013). Part 1112 establishes the requirements for accreditation of third party testing laboratories to test for compliance with a children's product safety rule. The final rule also codifies all of the NORs that CPSC has published, to date, for children's product safety rules. All new children's product safety rules require an amendment to part 1112 to create an NOR. For custom window coverings that are children's products, staff recommends that the Commission finalize, as proposed, an amendment to part 1112 to include custom window coverings that are children's products in the list of children's product safety rules for which CPSC has issued NORs.

### 5. Effective Date

The NPR proposed an effective date of 180 days after the final rule's publication in the Federal Register. During the comment period, many commenters representing manufacturers and retailers stated their concerns about meeting the proposed 180-days effective date due to long lead times for receiving equipment or material, manufacturing compliant window coverings, and delivering the product to consumers. Commenters provided timelines of 9 to 20 months in obtaining and transporting equipment/materials from overseas suppliers. Two commenters, both large manufacturers, specifically stated long lead times of 4 to 12 months related to acquiring necessary equipment and materials. One of the commenters asserted an additional 1 to 4 months would be required upon delivery to assemble component inventory. Another commenter stated an additional delay related to continued COVID-19 disruptions. Additionally, staff has assessed that the redesigning of window coverings for unusually sized-windows to be compliant

---

[18] Draft Notices of Proposed Rulemaking for Corded Window Coverings is available at https://www.cpsc.gov/s3fs-public/NPRs-Add-Window-Covering-Cords-to-Substantial-Product-Hazard-List-Establish-Safety-Standard-for-Operating-Cords-on-Custom-Window-Coverings-updated-10-29-2021.pdf?VersionId=HIM05bK3WDLRZrlNGogQLknhFvhtx3PD.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

with the final rule would create even more additional effort and time, above typical sized-window modifications, for manufacturers to address.

Staff found these concerns to be credible because of the specific examples provided by commenters and because these comments comport to what staff has determined about the industry's supply chain. Additionally, staff assesses that supply disruption could result in temporary, but significant, shift in consumer behavior. Supply chain disruptions and delayed deliveries could result in a shift in demand from custom products to stock products. Stock products have a lower profit margin than custom products and thus may have a significant cost impact to manufacturers and retailers even if the shift is temporary. Further, most custom window coverings sellers are small businesses, and therefore a temporary shift to stock products could have a significant impact to small businesses. A later effective date would allow manufacturers more time to redesign, distribute costs of compliance along the entire year, or discontinue product variants that cannot meet compliance.

As these examples show, a 180-days effective date has the potential to be very disruptive for producers and consumers. An extended effective date would mitigate costs related to redesign/research and development for manufacturers. Further, postponing the effective date by several months would reduce the benefits of the rule by only a very small amount as most noncompliant window coverings will take years to cycle out of use. Given the totality of these comments and assessments, staff accordingly assesses that there is good cause to extend the effective date beyond 180 days. Staff recommends the effective date in the final rule be extended to one year after publication for most custom window coverings and two-years for window coverings that are 10 feet or greater in vertical length and are raised and lowered.

# III. Conclusion

Based on the assessment performed and conclusions reached for the NPR and stakeholders' and commenters' agreement with the proposed rule, staff recommends finalizing the rule proposed under Section 15(j) of the CPSA. This rule will deem that stock window coverings that do not comply with the requirements in the ANSI/WCMA-2018 standard for operating cords and inner cords, custom window coverings that do not comply with the requirements for inner cords, and stock and custom products that lack the required manufacturer label, present a substantial product hazard. Staff recommends that the final rule become effective 30 days after publication.

Staff concludes that the ANSI/WCMA-2018, as well as the balloted draft ANSI/WCMA-2022, do not adequately address the risk of strangulation associated with operating cords on custom window coverings. CPSC staff recommends that the Commission publish a final rule for operating cords on custom window coverings that sets performance requirements to ensure that custom window coverings: (1) do not have cords, (2) have short, static cords that do not pose a strangulation hazard, (3) have cords that are inaccessible through the use of rigid cord shrouds or retractable cords, or (4) have continuous loops used with loop cord and bead chain restraining devices, which make accessible loops non-hazardous.

Additionally, CPSC staff recommends that the final rule contains an effective date of 1 year after publication of the final rule for manufacturers to comply with the operating cord requirements for custom window coverings, except those that are 10 feet or greater in length and are raised and lowered, for which staff recommends allowing 2 years to comply with the rule. Staff also

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

recommends including an anti-stockpiling provision and publishing an NOR for children's products.

Inherently safe window coverings that do not pose a strangulation hazard to children have the chance to impact people's lives significantly and positively for decades to come. Parents and families will not have to face emotional distress, shock, or perceived guilt of losing a child by strangulation on a window covering cord. Consumers will have easy-to-use, clean-looking window coverings and they will not have to worry about the safety of their children and grandchildren.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

A525

# Tab A: Draft Final Rules for Corded Window Coverings: Update on Fatal and Near-Miss Strangulation Incidents Associated with Window Covering Cords

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



United States
**Consumer Product Safety Commission**
cpsc.gov | info@cpsc.gov | 800.638.2772

# Memorandum

**TO:**     Rana Balci-Sinha                           **DATE:** September 28, 2022
                  Project Manager, Window Covering Cords Petition
                  Director, Division of Human Factors, Directorate for
                  Engineering Sciences

**THROUGH:**  Stephen Hanway
                  Associate Executive Director
                  Directorate for Epidemiology

**FROM:**    Risana Chowdhury
                  Director, Division of Hazard Analysis
                  Directorate for Epidemiology

**SUBJECT:**  Draft Final Rules for Corded Window Coverings: Update on Fatal and Near-Miss
                  Strangulation Incidents Associated with Window Covering Cords

## I.   Introduction

On October 6, 2021, CPSC staff submitted for Commission consideration a staff briefing package (SBP) in support of two draft notices of proposed rulemaking (NPRs) to address hazardous cords on Window Coverings Cords (WC) for stock and custom products. The Commission published these NPRs on January 7, 2022. Staff presented data in the NPRs SBP[1] covering 2009–2019 or 2009–2020, depending on the availability of data. In this memorandum staff presents updated data and analysis based on data received by CPSC since the submission of the NPRs SBP. Most of the incidents occurred in 2020 or 2021, while one incident occurred in 2017.

## II.   Methodology

As was done for the NPRs SBP, CPSC staff searched three databases for identification of window covering cord incidents: the Consumer Product Safety Risk Management System (CPSRMS), the National Electronic Injury Surveillance System (NEISS), and the Multiple Cause of Deaths data file. The first two sources are CPSC-maintained databases. The Multiple Cause of Deaths data file is available from the National Center for Health Statistics (NCHS).

---

[1] *See* Tab A: Fatal and Near-Miss Strangulations Associated with Window Covering Cords, available at: https://www.cpsc.gov/s3fs-public/NPRs-Add-Window-Covering-Cords-to-Substantial-Product-Hazard-List-Establish-Safety-Standard-for-Operating-Cords-on-Custom-Window-Coverings-updated-10-29-2021.pdf?VersionId=HIM05bK3WDLRZrlNGogQLknhFvhtx3PD.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION                            CLEARED FOR PUBLIC RELEASE
                                                    UNDER CPSA 6(b)(1)

# III.  Results

### A.  Incidents from CPSC Databases

In the NPRs SBP, staff presented analysis based on 194 reported fatal and near-miss strangulations on window covering cords that occurred among children up to 8 years old from January 2009 through December 2020. For the emergency department-treated injury data (NEISS), the low number of injury reports yielded aggregated estimated injuries that fell below the NEISS reportable threshold.[2] Hence, staff combined NEISS reports with other incident reports in the CPSRMS database, which included newspaper clippings, consumer complaints, death certificates purchased from states, medical examiners' reports, as well as in-depth investigation reports. When combining data from different sources, staff routinely checks the various data fields like incident dates, age and sex of victim, city and state of injury, and the accompanying narratives in the reports to ensure that no double-counting has occurred. Since then, staff has received 15 additional incident reports (including 4 reports from NEISS hospital emergency departments) involving strangulations or near-miss strangulations among children up to 8 years of age. Nine of the 15 incidents occurred in 2021, five of them in 2020, and the remaining incident occurred in 2017. Table 1a shows the distribution of the 209 incidents (194 from the NPRs SBP and 15 since the NPRs SBP) by year of occurrence; the newly reported cases, since the NPRs SBP, are shown in parentheses.

**Table 1a: Reported Fatal and Near-Miss Strangulation Incidents Involving Window Covering Cords Among Children Eight Years and Younger 2009 – 2021**
**(Numbers in Parentheses Indicate New Reports Received Since NPR)**

| Year | Total Strangulation Incidents | Fatal Strangulations | Near-Miss Strangulations |
|------|------|------|------|
| 2009 | 48 | 14 | 34 |
| 2010 | 31 | 11 | 20 |
| 2011 | 10 | 6 | 4 |
| 2012 | 17 | 8 | 9 |
| 2013 | 9 | 2 | 7 |
| 2014 | 17 | 12 | 5 |
| 2015 | 9 | 7 | 2 |
| 2016 | 17 | 13 | 4 |
| 2017 | 10 (1) | 5 | 5 (1) |
| 2018 | 8 | 4 | 4 |
| 2019 | 11 | 4 | 7 |
| 2020* | 13 (5) | 8 (5) | 5 |
| 2021* | 9 (9) | 6 (6) | 3 (3) |
| **Total** | **209 (15)** | **100 (11)** | **109 (4)** |

Source: CPSC epidemiological databases CPSRMS and NEISS.
Note:    * indicates data collection is ongoing.

---

[2] According to the NEISS publication criteria, an estimate must be 1,200 or greater, the sample size must be 20 or greater, and the coefficient of variation must be 33% or smaller.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Table 1b expands on Table 1a to display the distribution of the annual incidents by severity of incidents and type of window coverings involved. In the combined data (from the NPR and this update), staff identified 50 of the 209 incident window coverings (24 percent) to be stock products and 36 of the 209 (17 percent) to be custom products; staff could not identify the window covering type in the remaining 123 of the 209 (59 percent) incidents.

**Table 1b: Reported Fatal and Near-Miss Strangulation Incidents Involving Stock/Custom/Unknown Types of Window Covering Cords Among Children Eight Years and Younger 2009 -- 2021**

| Incident Year | Reported Incidents by Window Covering Type | | | |
|---|---|---|---|---|
| | *Stock (Fatal/Nonfatal)* | *Custom (Fatal/Nonfatal)* | *Unknown (Fatal/Nonfatal)* | *All* |
| 2009 | 20 (4/16) | 7 (2/5) | 21 (8/13) | 48 |
| 2010 | 10 (3/7) | 7 (2/5) | 14 (6/8) | 31 |
| 2011 | 2 (1/1) | 4 (3/1) | 4 (2/2) | 10 |
| 2012 | 1 (1/0) | 5 (1/4) | 11 (6/5) | 17 |
| 2013 | 2 (1/1) | 3 (1/2) | 4 (0/4) | 9 |
| 2014 | 3 (2/1) | 2 (1/1) | 12 (9/3) | 17 |
| 2015 | 4 (4/0) | 1 (1/0) | 4 (2/2) | 9 |
| 2016 | 5 (3/2) | 4 (3/1) | 8 (7/1) | 17 |
| 2017 | 2 (1/1) | 1 (0/1) | 7 (4/3) | 10 |
| 2018 | -- | 1 (0/1) | 7 (4/3) | 8 |
| *2019* | 1(0/1) | -- | 10 (4/6) | 11 |
| *2020** | -- | 1 (1/0) | 12 (7/5) | 13 |
| *2021** | -- | -- | 9 (6/3) | 9 |
| **Total** | **50 (20/30)** | **36 (15/21)** | **123 (65/58)** | **209** |

Source: CPSC epidemiological databases CPSRMS and NEISS.
Note: * indicates data collection is ongoing.

In the NPRs SBP, staff reported that males comprised 66 percent of the victims involved in window covering cord incidents, while females comprised 34 percent of the victims. Staff observes similar gender distribution in the new data, with 62 percent of the victims being male and 38 percent being females.

In the NPRs SBP, staff reported that:

- 89 of the 194 incidents (46 percent) was a fatality.

- 16 incidents involved hospitalizations (8 percent), where the long-term outcomes of the injuries varied from a scar around the neck, to quadriplegia, to permanent brain damage.

- 75 incidents (39 percent) involved less-severe injuries, some of which required medical treatment but not hospitalization, and

- 14 incidents (7 percent) did not involve any injuries. In these incidents, a child became entangled in a window covering cord but was able to disentangle him or herself from the cord and escape injury.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Among the 15 newly reported incidents, staff identified 11 fatalities (73 percent) and 4 non-hospitalized injuries (27 percent). The non-hospitalized injuries resulted in lacerations and abrasions.

### 1. Distribution of Reported Incidents by Window Covering and Associated Cord Types

In the NPRs SBP, staff identified that 50 of 194 incident window coverings (26 percent) had been sold as stock products and 35 of the 194 (18 percent) as custom products; no such information was available for window coverings involved in the remaining 109 of the 194 (56 percent) incidents. Among the 15 newly reported incidents, only one incident involving a custom product contained enough information for staff to discern the stock-versus-custom designation. The remaining incidents did not have sufficient information to be classified as stock or custom. Table 2 below presents the distribution of all 209 incidents (194 incidents from the NPRs SBP data review and 15 newly reported incidents since the NPRs SBP) by types of window coverings (*e.g.,* horizontal blinds, vertical blinds, etc.) across the types of cords associated with each (*e.g.,* pull cords, continuous loops, etc.), irrespective of the custom-versus-stock sale status of the product.

**Table 2: Distribution of Reported Incidents by Types of Window Coverings and Associated Cords**
**2009 – 2021**
**(Numbers in Parentheses Indicate New Reports Received Since NPR)**

| *Window Covering Type* | Pull Cord | Continuous Loop | *Cord Type* Inner Cord | Lifting Loop | Tilt Cord | Unknown | TOTAL |
|---|---|---|---|---|---|---|---|
| **Horizontal** | 68 (3) | 2 | 4 (1) | 0 | 5 | 10 | 89 (4) |
| **Vertical** | 0 | 12 (1) | 0 | 0 | 0 | 0 | 12 (1) |
| **Drapery** | 0 | 4 (1) | 0 | 0 | 0 | 0 | 4 (1) |
| **Roman** | 2 | 2 | 19 | 0 | 0 | 1 | 24 |
| **Other\*** | 2 | 5 | 0 | 0 | 0 | 0 | 7 |
| **Roll-Up** | 1 | 0 | 0 | 4 | 0 | 1 | 6 |
| **Roller** | 0 | 9 | 0 | 0 | 0 | 0 | 9 |
| **Unknown** | 1 | 1 | 0 | 0 | 0 | 56 (9) | 58 (9) |
| **Subtotal †** | 74 (3) | 35 (2) | -- | -- | 5 | 68 (9) | 182 (14) |
| **TOTAL** | 74 (3) | 35 (2) | 23 (1) | 4 | 5 | 68 (9) | 209 (15) |

Source: CPSC epidemiological databases CPSRMS and NEISS.
Other\*: This category includes cellular and pleated shades.
Subtotal† : This row shows the incidents that are relevant to the Section 7&9 rule. The 27 incidents (23 inner cords and 4 lifting loops)  would be addressed by Section 15(j) of the CPSA. The lifting loop hazard for custom classification products would be addressed by the Section 7&9 draft final rule but no incidents involving custom products with lifting loops could be identified in this analysis.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

## 2. Most Common Cord Types and Associated Hazards Resulting in Fatalities

In the analysis completed for the NPRs SBP, staff definitively identified that:

- 39 fatalities (44 percent) involved a child getting entangled in pull cords, the most common cord type involved in the 89 reported deaths. A majority of these deaths involved loops created by knotted/tangled cords or one or more long cords getting wrapped around a child's neck.

- 23 fatalities (26 percent) involved continuous loop cords or beaded chains which were not mounted with a tension device or that broke loose from a tension device at the time of the incident.

- 7 fatalities (8 percent) involved inner cords on horizontal blinds and/or Roman shades. Children got caught in the loop created by the pulled-out portion of the inner cord or they inserted their heads into the opening between the inner cord and the shade material.

Among the 11 newly reported deaths since the NPRs SBP, staff definitively identified the cord type in 6 deaths. Three (27 percent) deaths involved a pull cord, two deaths (18 percent) involved a continuous loop, and one death (9 percent) involved inner cord(s); staff has insufficient information to determine the cord type involved for the remaining five fatal scenarios.

### B. National Estimates of Window Covering Cord-Related Strangulation Deaths Using NCHS Data

The NCHS compiles all death certificates filed in the United States into multiple cause mortality data files. NCHS compiles the data in accordance with the World Health Organization's instructions to classify causes of death by the current (tenth revision) Manual of the International Statistical Classification of Diseases, Injuries, and Causes of Death. For the NPRs SBP, 2019 was the latest available year for NCHS data; since then, data for 2020 have become available.

Using the ICD10 code value of W76(*Other accidental hanging and strangulation*), the code most likely to capture strangulation fatalities among children under 5 (based on empirical evidence from death certificates maintained in CPSC databases), staff derived fatality estimates for 2009 through 2020 which are presented in Figure 1 below. An unknown proportion of strangulation deaths is likely coded under ICD10=W75 (A*ccidental suffocation and strangulation in bed*) as well as ICD10=W83 (*Other specified threats to breathing*), which staff cannot separate out from the non-strangulation deaths because of the unavailability of any narrative description in these data. Hence, staff's estimates of strangulation deaths are minimums.

A 2002 CPSC report by Marcy *et al* [3] concluded that 35 percent of all strangulation fatalities among children less than 5 years old were associated with window covering cords. Assuming that the same proportion applied for the entire 12-year period 2009 – 2020, Figure 1 below presents the national estimates for all strangulation fatalities as well as strangulations involving window covering cords among children under 5.

CPSC received a comment critical of CPSC's use of this 2002 study. At this point in time, staff is unaware of other data sources that would provide information regarding a more current national trend in window covering cord-related strangulations. Based on the 2002 study, the annual

---

[3] N. Marcy, G. Rutherford. "Strangulations Involving Children Under 5 Years Old." U.S. Consumer Product Safety Commission, December 2002.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

average number of deaths would be estimated at 8.1 (or 9, if rounded up to the nearest integer). This estimate is consistent with CPSC's actual incident data over a 12 year period. For example, at the time of this analysis, the incidents over the 12-year period 2009-2020 report an average of 7.8 (or 8, if rounded up to the nearest integer) annual deaths involving window covering cords among children under 8. As stated before, the incident data represent a minimum because they are anecdotal in nature (not nationally representative) and data collection is ongoing. Nevertheless, the limitations of each data source notwithstanding, the average estimated and the average reported death numbers appear to be in the same range.

**Figure 1: Estimated Fatalities Associated with Strangulations Among Children Under 5 Years 2009 – 2020**

**Source:  Multiple Cause of Death data, NCHS, 2009 – 2020.**
**Note: The estimates for the window covering cord fatalities are based on the assumptions that 35% of all strangulation fatalities are due to window covering cords and that this percentage remained unchanged over 2009-2020.**

# IV.  Conclusion

In this memorandum, staff presents updated data and analysis based on reports received by CPSC since the submission of the NPRs SBP to Commission in October, 2021. Without the availability of nationally representative data on injuries or fatalities, staff relied on the analyses of the anecdotal incident reports received by CPSC. Staff identified 15 new incidents, most of which occurred in 2021. Nearly three-quarters of the new incidents reported a fatality. Based on the information available, staff identified one of the 15 incident products as a custom window covering. Analyses of this data by cord type and covering type reveal no new hazard patterns compared to what was presented in the NPRs SBP.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

# Tab B: Draft Final Rules for Corded Window Coverings: Human Factors Assessment

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

A533

United States
**Consumer Product Safety Commission**
cpsc.gov | info@cpsc.gov | 800.638.2772

# Memorandum

**TO:**      The Window Coverings Rulemaking File          **DATE:** September 28, 2022

**THROUGH:** Mark Kumagai, Associate Executive Director,
             Directorate for Engineering Sciences

**FROM:**    Rana Balci-Sinha, Director,
             Division of Human Factors,
             Directorate for Engineering Sciences

**SUBJECT:** Draft Final Rules for Corded Window Coverings: Human Factors Assessment

# I.  Background

In the October 6, 2021 Staff Briefing Package (SBP)[1] in support of the Notice of Proposed Rulemaking (NPR) to establish a Safety Standard for Operating Cords on Custom Window Coverings, staff from the Division of Human Factors, Engineering Sciences (ESHF) evaluated the requirements for operating cords on custom window coverings in the ANSI/WCMA-2018. Staff concluded that operating cord requirements for custom products in the ANSI/WCMA-2018are inadequate to effectively address the strangulation hazard to children 8 years old and younger associated with custom window covering cords. When compliant with the voluntary standard, operating cords for custom window coverings can still be long enough to fit around a child's neck or can create a loop large enough to allow a child to insert their head. Staff identified that at least 86 percent of custom window covering incidents (30 of 35) can still occur if the product complies with the voluntary standard. Staff also concluded that safety devices, such as cord cleats and tension devices, are unlikely to be effective because, for example, to prevent the strangulation hazard, caregivers must use cord cleats properly every time they interact with the operating cord and must first install tension devices properly on the wall or window sill and then check the tension devices regularly to ensure that the cord loop remains taut.

Staff recommended for the custom window covering NPR that the requirements for stock products in section 4.3.1 of ANSI/WCMA-2018 (cordless, inaccessible cords, or short cords equal to or less than 8 inches) also be applied to custom products to address the strangulation hazard.  Staff assessed that stock window covering requirements in ANSI/WCMA-2018 adequately address the strangulation hazard by not allowing hazardous cords on the product by design, and therefore does not rely on consumer action to mitigate the hazard. Based on staff's assessment, the Commission published the custom window covering NPR on January 7, 2022 (87 FR 1014), proposing that operating cords on custom window coverings meet the requirements in section 4.3.1 of ANSI/WCMA A100.1 – 2018.  The NPR also proposed to allow

---

[1] *See* Tab I: Human Factors Considerations for the Proposed Rule on Custom Window Coverings, available at: [. https://www.cpsc.gov/s3fs-public/NPRs-Add-Window-Covering-Cords-to-Substantial-Product-Hazard-List-Establish-Safety-Standard-for-Operating-Cords-on-Custom-Window-Coverings-updated-10-29-2021.pdf?VersionId=HIM05bK3WDLRZrlNGogQLknhFvhtx3PD

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

a rigid cord shroud, subject to appropriate durability testing, to meet the inaccessible cord option in section 4.3.1.3 of the ANSI/WCMA standard.

In this memorandum, staff analyzes the new incidents reported to CPSC after staff submitted the NPR SBP to the Commission, evaluates and responds to the public comments associated with human factors issues, and provides updated recommendations for the draft final rule to establish a safety standard for operating cords on custom window coverings.

In addition to the proposed rule on operating cords on custom window coverings, on January 7, 2022, CPSC published a second notice of proposed rulemaking to establish a rule under section 15(j) of the Consumer Product Safety Act (CPSA) (15J NPR). (87 FR 891). The 15J NPR proposed to deem that one or more of the following readily observable characteristics of window coverings, which are adequately addressed in ANSI/WCMA-2018, present a substantial product hazard (SPH) under the CPSA: the presence of hazardous operating cords on stock window coverings, the presence of hazardous inner cords on stock and custom window coverings, or the absence of a manufacturer label on stock and custom window coverings. CPSC received five comments in support of the rule. As discussed below, staff recommends finalizing the 15J NPR as proposed.

## II. Discussion

### A. Incident Data

Since submitting the SBP in support of the window covering NPRs, staff received an additional 15 incident reports involving strangulations or near-miss strangulations among children up to 8 years of age. Nine of the 15 incidents occurred in 2021, five incidents occurred in 2020, and the remaining incident occurred in 2017. Among the 15 newly reported incidents, 11 involved a fatality. Staff definitively identified the cord type in 6 of the 11 deaths. Three deaths involved a pull cord (operating or tilt cord) on a horizontal blind, two deaths involved a continuous loop on a vertical blind and on a drapery, and one death involved inner cord(s) on a horizontal blind; staff has insufficient information to determine the cord type involved for the remaining five fatal scenarios.

For the 15 new incidents, staff has insufficient information to categorize 14 of the 15 incidents as either stock or custom products, however staff could identify one unit as a custom product.

The age of children involved in the 15 additional incidents ranged from 16 months to 8 years. The two continuous loop deaths involved 2-year-old children. Although the incidents were unwitnessed, it is likely that both children climbed on another object that was close by to reach the cords. In one incident, the child likely climbed on a table and in the other, likely climbed on a toy box in the bedroom (incident involved a custom product).

The inner cord incident involved an 8-year-old child with Down syndrome. The child was strangled in the inner cords which became accessible due to broken slats. The window covering was above the victim's bed.

One of the operating pull cord fatalities involved a four-year-old who was found with the loop, formed by a knot in the cord, around her neck. In the second fatality, an 18-month-old child was found with operating cords wrapped tightly around her neck. In the third fatality, a 2-year-old child was found with tilt cords around his neck; police stated that they noticed a small foot print on the table where he climbed on the couch to get to the horizontal window blind. Based on

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

ESHF staff's review of the facts involved in these 15 additional incidents, staff concludes that these incidents follow patterns similar to the previously assessed incidents for the NPR SBP. Staff did not identify any new hazard patterns from these data.

**B. Addressability of Incidents with Draft Final Rules**

*1. Addressability: Draft Final Rule Under Section 15J of the CPSA to Deem Hazardous Operating and Inner Cords on Stock Window Coverings and Hazardous Inner Cords on Custom Window Coverings an SPH*

As stated above, the rule under section 15(j) would deem hazardous operating cords on stock products, and hazardous inner cords on both stock and custom products, to be a Commission-determined SPH.  The 15(j) rule requires stock products to comply with operating cord requirements in section 4.3.1 of ANSI/WCMA-2018, and stock and custom products to comply with the inner cord requirements in section 4.5 of the ANSI/WCMA standard.  Additionally, both stock and custom products must comply with the manufacturer labeling requirement in section 5.3 of ANSI/WCMA-2018. This label is required to be permanently placed on all finished window coverings, and contain: name, city, and state of the manufacturer / importer / fabricator; month and year of manufacture; and designation of window covering as "Custom" or "Stock"

Staff is not aware of any of the 15 new incidents involving products manufactured after ANSI/WCMA-2018 became effective.  Among the 15 new incidents, 14 incidents did not have sufficient information to categorize whether the incident product was stock or custom. If all products had been compliant with ANSI/WCMA-2018, staff could have identified the type of each incident product based on the required manufacturer label. Moreover, for all of the incidents involving stock products, staff assesses that all of the incidents would have been addressed by compliance with the section 15(j) rule. Incidents involved a continuous loop in one incident, an inner cord in one incident, and an operating pull cord in three incidents. Per ANSI/WCMA-2018, stock products are only allowed to have (1) no cords, (2) a short static cord that is 8 inches or shorter, or (3) inaccessible cords. Therefore all 3 operating pull cord incidents as well as one continuous loop incident would have been addressed if the incident units complied with section 4.3.1 of ANSI/WCMA-2018. The inner cord incident would also have been addressed because the requirements in the voluntary standard associated with inner cords in section 4.5 adequately address the strangulation hazard for both stock and custom products for a properly functioning, intact window covering.[2] The nine unknown cord type incidents would also have been addressed if the products were stock, because no hazardous cord is left to address for stock products in ANSI/WCMA A100.1 – 2018.

*2. Addressability: Draft Final Rule for Operating Cords on Custom Window Coverings*

For the NPR SBP, staff categorized the incidents by product type, as shown in Table 1, and assessed whether the existing voluntary standard, ANSI/WCMA-2018, adequately addressed the hazard patterns in the data.  Staff concluded that for the 35 incidents known to involve custom, 30 incidents would not be addressed if the product involved were compliant with the 2018 version of the ANSI/WCMA standard.

For the draft final rule, staff performed a similar assessment for the 15 new incidents (Table 2). Staff could only categorize one of the 15 incidents as a custom product. Staff concludes that this

---

[2] Note that inner cords can still present a hazard on window coverings if slats are broken, or fabric is torn to expose inner cords in a hazardous manner.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

incident would have been addressed by the draft final rule but not with the custom window covering requirements in ANSI/WCMA-2018, because the continuous loop in the incident unit is not adequately addressed in section 4.3.2 of the standard for custom products. Among the remaining 14 incidents, one inner cord incident would have been addressed by ANSI/WCMA-2018, under the section 15(j) rulemaking; one incident involving an accessible continuous loop with a drapery would have been addressed by the draft final rule, which requires continuous loops be made inaccessible using a rigid cord shroud or loop cord and bead chain restraining device; the three operating cord incidents would also have been addressed by the draft final rule because it prohibits hazardous pull cords, meaning those longer than 8 inches. Even though the cord types are unknown in the remaining nine incidents, those incidents would also have been addressed by the draft final rule, because draft final rule eliminates the possibility of accessible and hazardous cords and loops on all types of window coverings that are unbroken and intact.

Staff then combined all reported incidents to determine an aggregate addressability estimate (Table 3). Based on staff's review of the incident data for custom window coverings, staff concludes that all 31 incidents associated with operating cords and continuous loops (out of 36 total incidents involving custom products, with the others including 3 that involved inner cords and 2 unknown) would have been prevented if the custom window coverings complied with the requirements for stock window coverings in the ANSI/WCMA standard, as required in the draft final rule. The three inner cord related incidents would have been prevented if the incident units complied with ANSI/WCMA-2018 and also remained intact and unbroken. Requirements for inner cords would be codified by the draft final rule to amend 16 CFR part 1120 to add window covering cords to the substantial product hazard list, CPSC Docket No. CPSC–2021–0038. This draft final rule under section 15(j) of the CPSA addresses inner cord hazards for both stock and custom window coverings by requiring products to meet the inner cord requirements in sections 4.5, 6.3, 6.7, and Appendices C of ANSI/WCMA-2018.

If the custom window coverings involved in the aggregated incident data had complied with the requirements in the draft final rule under sections 7 and 9, meaning complying with the requirements for stock products in section 4.3.1 of ANSI/WCMA A100.1 – 2018, 86.1 percent (31/36) of the custom product incidents would have been prevented. Additionally, 8.3 percent (3/36) of the custom window covering inner cord incidents would have been addressed by complying with the voluntary standard, which, if the Commission adopts staff's recommendation, will be codified as mandatory in the final rule under section 15(j) of the CPSA. Given that all accessible and hazardous custom window covering cords are effectively addressed with the requirements in the draft final rule, the remaining 5.6 percent of the incidents (which represented 2/36 incidents for which the involved cord type was unknown) would also be addressed because there are no remaining cord types left unaddressed by finalizing the consumer product safety rule under sections 7 and 9 of the CPSA and the SPH-based rule under section 15(j) of the CPSA.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**Table 1. Stock/Custom/Unknown Window Coverings involved in Incidents and Cord Types (from NPR)**

| Stock/Custom | Continuous loop | Inner cord | Lifting loop | Operating cord | Tilt cord | Unknown | Grand Total |
|---|---|---|---|---|---|---|---|
| **Custom** | 12 | 3 | | 18 | | 2 | 35 |
| **Stock** | 3 | 14 | 1 | 24 | 2 | 6 | 50 |
| **Unknown** | 18 | 5 | 3 | 29 | 3 | 51 | 109 |
| *Grand Total* | *33* | *22* | *4* | *71* | *5* | *59* | *194* |

**Table 2. Stock/Custom/Unknown Window Coverings involved in Incidents and Cord Types (new data)**

| Stock/Custom | Continuous loop | Inner cord | Lifting loop | Operating cord | Tilt cord | Unknown | Grand Total |
|---|---|---|---|---|---|---|---|
| **Custom** | 1 | | | | | | 1 |
| **Stock** | | | | | | | 0 |
| **Unknown** | 1 | 1 | | 3 | | 9 | 14 |
| *Grand Total* | *2* | *1* | *0* | *3* | *0* | *9* | *15* |

**Table 3. Stock/Custom/Unknown Window Coverings involved in Incidents and Cord Types (All reported data combined)**

| Stock/Custom | Continuous loop | Inner cord | Lifting loop | Operating cord | Tilt cord | Unknown | Grand Total |
|---|---|---|---|---|---|---|---|
| **Custom** | 13 | 3 | 0 | 18 | 0 | 2 | 36 |
| **Stock** | 3 | 14 | 1 | 24 | 2 | 6 | 50 |
| **Unknown** | 19 | 6 | 3 | 32 | 3 | 60 | 123 |
| *Grand Total* | *35* | *23* | *4* | *74* | *5* | *68* | *209* |

# III.  Public Comments and Staff's Recommended Changes to the Draft Final Rule

CPSC received 2,060 comments on the NPR for operating cords on custom window coverings. The main comment areas associated with human factors issues include comments asserting the following:

- if the rule is finalized, falls, in particular elderly falls, are likely to increase because users would need to climb up to operate a cordless window covering or a window covering with an 8-inch long cord;

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

- existing warning labels on products are sufficient;
- top-down-bottom-up shades are safe;
- the existing voluntary standard is sufficient;
- continuous loop tension devices are safe;
- cord cleats are safe;
- parental responsibility and watching children are the solution, and
- retractable cords are safe.

Tab H contains ESHF staff's response to public comments; however, below we discuss EXHR staff's general response on the main comment topics.

### A. Large Window Coverings

At least eight commenters, including WCMA and seven businesses, raised the concern that available technologies to address the strangulation hazard, such as manual cordless systems, are difficult to implement for very large products. Staff reviewed the incident data to determine the largest products that were involved in incidents: the longest product that was involved in a nonfatal incident had a reported length of 112 inches and a width of 124 inches. A reported fatality involved a roller shade; based on other dimensions provided in the associated IDI, staff estimates the length as 119 inches and the width as 54 inches. Staff from the Division of Mechanical and Combustion Engineering (ESMC) assessed the available technologies (Tab C) and determined that rigid cord shrouds do not appear to be applied to operating window coverings over 96" tall but that it is feasible to implement these technologies on larger window coverings.

Various commenters stated that there is an increased presence of taller windows in homes, which will lead to a higher number of taller window coverings installed in homes. Staff notes that regardless of the height, the hazard patterns associated with window coverings are the same. Further, the ANSI/WCMA-2018 does not contain a height limit for in-scope window coverings for either stock or custom. Because the hazard patterns associated with larger window coverings are the same as hazard patterns seen in shorter window coverings, the potentially increased number of installations of taller window coverings in residences, and the feasibility of applying safer technologies on these products, staff does not recommend excluding taller products from the scope of the rule. However, staff recommends that a longer implementation date (*i.e.*, 2 years) is reasonable for manufacturers to implement the technologies for products that are raised and lowered and are at least 10 feet long.  Please see Tab C for a more detailed discussion on this issue.

### B. Retractable Cords

In the NPR, staff determined that the retractable cord requirement, as written in ANSI/WCMA-2018 for operating cords on custom window coverings is not adequate to address the risk of injury, because the maximum cord length and a minimum pull force required to operate the system are not specified in the standard. Staff requested comments on whether additional requirements for retractable cords, such as a maximum exposed cord length and a minimum pull force for a single retractable cord lift system, can address the strangulation hazard.

The Commission received at least 149 comments stating that retractable cords are safe based on the lack of incidents, and that because retractable cords have not been involved in incidents, retractable cords should not be eliminated. The June 21, 2022 letter from consumer advocates

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

to WCMA suggest that retractable cords be allowed with the following text: "All cords must be inaccessible. The maximum allowable cord length is 12 inches from the headrail."[3]

Staff is not aware of any incidents involving retractable cords. Based on staff's review of incidents and confirming that no incident involved a retractable window covering, discussion with industry and consumer advocates during the ANSI/WCMA revision process, public comments associated with providing options for easy access for operability, assessment of available retractable technologies on the market and evaluating their safety and feasibility, staff recommends that for the final rule, the Commission include retractable cords as a compliance path, as long as the exposed cord is limited to a maximum of 12 inches in any state of operation from the bottom of the headrail and the other requirements are met (e.g., full retraction with 30-gram mass to the operating interface, which is not a cord and cannot bend on itself and tested to last 5,000 cycles after UV exposure, see Tab D for the exact language.)

Staff recommends the 12-inch requirement for the exposed cord because this allowance is consistent with a requirement for inner cords, which are exempt if they are within 12 inches of the headrail in the inner cord accessibility test. The 12-inch exemption is in part based on the required steps that a child would need to go through with a retractable cord for it to pose a hazard:

1. Child needs to climb to get close to the headrail.
2. Child holds and pulls the retraction device to expose 12 inches of cord from the bottom of the headrail.
3. Child attempts to wrap the cord around his neck using 12 inches of cord while maintaining tension on the cord.

To arrive at the 12-inch length, staff considered that while the smallest neck circumference of youngest children at risk, 6-9-month-old children, is about 8 inches,[4] children who can climb to the top of the window covering will be older, and they need to be able to hold the cord and wrap it around the neck at the same time, which requires the breadth of their hands to be added to the neck circumference. Therefore, 12 inches is a safe length for the headrail area of a window covering, whereas the 8 inches of cord length that is used to define the allowed short cord could be anywhere on the window covering. For further discussion on this topic, see Tab I. Based on staff's review of the incident data, staff concludes that it is very unlikely for a child to perform all of these steps that would pose a hazard with a retractable cord that met the 12-inch requirement.  See Tab I for a fuller discussion of this hazard scenario.

On July 15, 2022, WCMA balloted a revised version of the voluntary standard, ANSI/WCMA A100.1-2022 (draft ANSI/WCMA-2022). The draft ANSI/WCMA-2022 allows a 36-inch-long retractable cord ("stroke length") to be exposed under tension.[5] Staff assesses that, depending on the height of the window covering, installation location, and the operating interface, a child may be able to wrap a cord around his/her neck if it is 3-feet long. Staff provides an example in Figures 1-4 demonstrating an average 4-year-old's interaction with the retraction device. As an example, consider that a 5.5 ft long window covering is installed 2 feet from the floor in a room

---

[3] Letter can be found at https://www.regulations.gov/document/CPSC-2013-0028-3664
[4] BSI (1990) as cited in Norris, B., & Wilson, J. R. (1995). CHILDATA: The handbook of child measurements and capabilities –Data for design safety. London: Department of Trade and Industry.)
[5] When the user pulls the retraction device down, with each stroke, a fixed amount of cord ("stroke length") is exposed to lower or raise the window covering. After each stroke, or pull on the retractor device, exposed cord retracts completely into the headrail and the user continues to stroke until reaching the desired window covering height.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

with 9 ft ceiling and the top of the window is 7.5 ft from the floor (Figure 1). The retraction device length is 40 percent of the length of the window covering, which comes out to be 2.2 ft. (Figure 1). The average height of a 4-year-old is 3.6 ft, and that child may climb on a surface to get closer to the retraction device (Figure 1). In this example, the child can easily reach the retraction device and pull on the retraction device because the overhead reach of an average 4-year-old is 4.13 ft (Figure 2). A 36-inch long cord would be exposed per the draft balloted standard, leaving 13.2 inches of cord that is within reach and eye view of the child to manipulate (Figure 3.) The neck circumference of a 3.5-4.5 year old child is 10.8 inches (Figure 3). Thus, Figure 3 demonstrates that a child can access a sufficient length of cord to wrap around their neck and strangle. If only 12 inches of cord were exposed using the requirement in staff's recommended change in the draft final rule, this would limit a child's ability to manipulate a cord to wrap around his/her neck (Figure 4). Staff notes the risk from a 36 inch stroke length allowance illustrated in Figure 3 is higher for older children because an 8-year-old child of average height would have over 20 inches of exposed cord to manipulate while their neck circumference is less than half of that length (10.7 inches), which will provide ample exposed length of cord to wrap around his/her neck.[6] Staff also notes that a retractable device may appeal to children due to its interactive nature and pull and release function (e.g., play value), and encourage children to play with it; therefore, the length of the cord that can be pulled should not be hazardous.[7]

---

[6] The average height of an 8-year old is 4.4 ft (Steenbekkers, 1993). The exposed length of pulled cord when the child climbs to 2 ft tall surface would be 22.8 inches based on his combined height plus climbed height (4.4 ft + 2 ft = 6.4 ft) and the exposed cord length (4.5 ft from floor) that the child can view and manipulate. The neck circumference of an average 8-year-old is 10.7 inches. (Snyder, 1977)

[7] Final Interpretive Rule on Children's Product (16 CFR 1200) defines "play value" as features primarily attractive to children 12 years of age or younger that promote interactive exploration and imagination for fanciful purposes (whimsical activities lacking utility for accomplishing mundane tasks; actions performed for entertainment and amusement).

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



* Steenbekkers, P. A. (1993) Child Development, Design Implications and Accident Prevention. Delft University Press ISBN 90-6275-895-9.

**Figure 1. Example set up showing a 5.5-ft tall window covering installed in a room and an average 4-year-old who climbed on a surface.**



* Steenbekkers, P. A. (1993) Child Development, Design Implications and Accident Prevention. Delft University Press ISBN 90-6275-895-9.

**Figure 2. Overhead reach of a 4-year-old.**

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)





* Snyder RG, Schneider LW, Owings CL, Reynolds HM, Golomb DH & Schork MA (1977), Anthropometry of infants, children & youths to age 18 tor product safety design. Report no. UM-HSRI-77-17, Consumer Product Safety Commission, Washington DC, USA.

**Figure 3. A 13.2 inch long exposed cord that is within reach of a child and can be wrapped around neck using 3-ft stroke length.**

**Figure 4. Exposed cord that is not within reach of a child using 1-ft stroke length.**

Based on engineering and HF staff's analysis, staff concludes that a 12-inch long exposed cord measured from the bottom of the headrail is a safe length, that also ensures usability of the cord.

### C. *Accessibility Issues*

At least 383 commenters stated that having a short cord introduces accessibility issues for various consumers, including people in wheelchairs or who are otherwise challenged to access cords that are high-up on the window covering.

- Some commenters stated that the proposed rule is not compliant with the Americans with Disabilities Act (ADA).

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

o The Department of Justice published revised regulations for Titles II and III of the Americans with Disabilities Act of 1990 in the *Federal Register* on September 15, 2010. These regulations adopted revised, enforceable accessibility standards called the 2010 ADA Standards for Accessible Design (2010 ADA Standards). The 2010 ADA Standards set minimum requirements for newly designed and constructed or altered state and local government facilities, public accommodations, and commercial facilities to be readily accessible to and usable by individuals with disabilities.

o The portions of the 2010 ADA Standards that are applicable to window coverings are as follows:

• Sections 308.2 and 308.3 of the 2010 ADA Standards specify forward and side reach distances. [8] For example, an unobstructed high forward reach and high side reach shall be 48 inches (Figures 5-8).



**Figure 5. Obstructed Forward Reach.**     **Figure 6. Unobstructed High Forward Reach.**



**Figure 7. Obstructed Side Reach.**          **Figure 8. Obstructed High Side Reach.**

*Note.* **Figures 5-8 are from 2010 ADA Standards for Accessible Design, accessed at https://www.ada.gov/regs2010/2010ADAStandards/2010ADAStandards.pdf**

• Staff assesses that alternative solutions can safely replace the existing hazardous cords such as rigid cord shrouds and loop cord and bead chain

---

[8] Department of Justice (2010). 2010 ADA Standards for Accessible Design, accessed at https://www.ada.gov/regs2010/2010ADAStandards/2010ADAStandards.pdf

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

restraining devices, which can allow access to a height that is about at the same height as corded products. In addition, retractable cords can be made accessible with a rigid wand or handle to an easy-to-access height. Poles are currently being offered to reach the bottom of cordless products.

- Operable parts need to be operable with one hand and shall not require tight grasping, pinching, or twisting of the wrist. The force required to activate operable parts shall be 5 pounds maximum. Staff questions whether the traditional operating pull cords as well as continuous loop bead chains and cords would be compliant with this requirement as they require tight pinching and grasping to operate. Further, in many cases, the pull force of a corded system can exceed 5 pounds. Staff also determined that window coverings that are compliant with the mandatory rule would likely have interfaces that the consumer needs to grasp with hand such as rigid cord shrouds, which would meet the ADA requirement by avoiding pinch grip and instead use hand grip.

- Staff assesses that rigid cord shrouds or loop cord and bead chain restraining devices or retractable devices can be easier to operate from behind furniture compared to continuous loops that are attached to a wall. Figure 9 contains a comparative assessment. If the continuous loop is not attached to a wall, then it is easier to operate (once leaned to grab it) but it poses a strangulation risk (left); if a tension device is attached to a wall, it is not easy for consumers to access (middle); on the other hand, a rigid cord shroud is not less accessible and is operable behind the furniture while also being safe (right.)



**Figure 9. Operability of a window covering behind an obstruction.**

Staff concludes that if continuous loops with tension devices remain as an option, in homes where accessing the cord is an issue, continuous loops may not be attached to the wall, particularly in locations where a continuous loop may be difficult to access when the cord is kept taut via a tension device. Staff assesses, based on the incident data, that it is reasonably foreseeable that not only a consumer, but also a professional installer, may follow a consumer's request to not install the tension device and remove it from the cord loop in homes where accessibility is an issue, rather than manufacturing the product with a safer option that will still

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

be accessible to a disabled user. CPSC received numerous comments regarding wheelchair users who need longer cords. Some businesses stated that they provide extra-long cords for wheelchair users so that they can operate the window covering. Staff again notes that tight grasping or pinching of cords is not an acceptable operation per ADA standards.

# IV. Conclusion

ESHF staff assessed the new incidents and evaluated the effectiveness of the draft final rule for custom window coverings, and the balloted draft voluntary standard, to address the custom window covering incidents.  ESHF staff also reviewed issues raised by commenters on the custom window covering NPR. Staff did not identify new hazard patterns in the data, assessed that if the incident window coverings complied with the draft final 15J rule, or the draft final rule for operating cords on custom window coverings under sections 7 and 9, as applicable, all of those incidents would have been addressed, while compliance with the balloted draft ANSI/WCMA 2022 standard would allow the risks associated with continuous loops used with tension devices to remain. Staff also concluded that having rigid cord shrouds or loop cord and bead chain restraining devices may allow an easier reach for certain locations compared to a continuous loop that is used with an external tension device.

As a modification to the NPR, staff recommends for the final rule, allowing (1) retractable cords that meet the recommended exposed cord requirements, (2) loop cord and bead chain restraining devices that meet the ANSI/WCMA 2018 test requirements in addition to meeting recommended test requirements (see Tab C, ESMC memo) to adequately address the strangulation risk and facilitate ease of use.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

A546

# Tab C: Draft Final Rule for Operating Cords on Custom Window Coverings: Mechanical Engineering Assessment of Balloted 2022 Revision to the Voluntary Standard ANSI/WCMA A100.1 – 2018 and Final Rule Recommendations

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

A547

OS-248



United States
**Consumer Product Safety Commission**
cpsc.gov | info@cpsc.gov | 800.638.2772

# Memorandum

**TO:**       Rana Balci-Sinha, Project Manager,        **DATE:** September 28, 2022
              Division of Human Factors,
              Directorate for Engineering Sciences

**THROUGH:**  Caroleene Paul, Director,
              Division of Mechanical and Combustion Engineering
              Directorate for Engineering Sciences

**FROM:**     Kevin Lee, Mechanical Engineer,
              Division of Mechanical and Combustion Engineering,
              Directorate for Engineering Sciences

**SUBJECT:**  Draft Final Rule for Operating Cords on Custom Window Coverings: Mechanical Engineering
              Assessment of Balloted 2022 Revision to the Voluntary Standard ANSI/WCMA A100.1 –
              2018 and Final Rule Recommendations

## I.  Introduction

On January 7, 2022, the Commission published a proposed rule to establish a Safety Standard for Custom Window Covering Cords.  87 FR 1014.  In Tab G of the October 6, 2021, Staff Briefing Package: Draft Notices of Proposed Rulemaking for Corded Window Coverings (NPR SBP) supporting the rule, ESMC staff concluded that the voluntary standard for window coverings, ANSI/WCMA-2018, does not adequately address the risk of strangulation associated with operating cords on custom window covering products.  Specifically, ANSI/WCMA-2018 allows custom window covering products to have one or more operating cords that are longer than the 8-inch maximum length proposed in the NPR and to have continuous loop operating systems that, to address the strangulation hazard, rely on a consumer or installer to properly attach and maintain a tension device to the wall, and which may allow passage of a head probe in certain functional installations.

This memorandum provides staff's summary of the recent voluntary standards activities, an assessment of the July 15, 2022 balloted draft ANSI/WCMA A100.1 -2022 voluntary standard (draft ANSI/WCMA-2022), and recommendations for the draft final rule.

## II.  Discussion

### A.  Incident Data

Based on the memorandum from staff of Directorate for Epidemiology (Tab A), staff received 15 additional incident reports since the NPR SBP involving strangulations or near-strangulations on window covering cords among children up to 8 years of age.  ESHF staff reviewed the incident data and did not identify any new hazard patterns, concluding that the 15 new incidents followed hazard patterns previously identified in in the incident data for the NPR (Tab B).

49

THIS DOCUMENT HAS NOT BEEN REVIEWED                    CLEARED FOR PUBLIC RELEASE
OR ACCEPTED BY THE COMMISSION                            UNDER CPSA 6(b)(1)

A548

### B. Voluntary Standards Activity

After the publication of the NPR on January 7, 2022, WCMA brought forth several proposals to revise requirements for custom window covering cords in ANSI/WCMA-2018, resulting in a final draft revision that went to ballot on July 15, 2022. The ballot closed on August 15, 2022. Staff voted negative because of the inadequate requirements pertaining to tension devices used with continuous loop operating systems and insufficient requirements to address the strangulation hazard associated with retractable cords and tests for rigid cord shrouds and loop cord and bead chain restraining devices.[1] Below is a summary of voluntary standards activity since staff's submission of the NPR SBP:

- 12/2/2021 – WCMA held the first meeting after officially reopening the ANSI/WCMA-2018 using the ANSI procedures. With a stated goal of making custom window coverings safer, WCMA's stated focus areas for discussion included the following:
  - eliminating the standard cord lock system, tilt cords, and cord connectors to remove these free-hanging cords
  - adding the rigid cord shroud requirement to make operating cords inaccessible
  - reviewing retractable cords and continuous loops with tension devices.

- 1/19/2022 – WCMA presented their first revision of the ANSI/WCMA A100.1 – 2018 standard, which:
  - Eliminated free-hanging cords (cord lock system, tilt cords, and cord connectors)
  - Added testing to evaluate the internal cord accessibility of rigid cord shrouds
  - Proposed more stringent requirements for tension devices, such as requiring the tension device to maintain tension on the operating cords when properly installed and added a tension device warning stating the loss of tension in the continuous cord loop can create a strangulation hazard.

- 1/21/2022 – ANSI/WCMA meeting. Stakeholders discussed the proposed changes and inquired about additional requirements for cord retraction devices to make them safer, such as adding a pull force requirement or limiting exposed cord length under tension.

- 2/25/2022 – WCMA sent a draft copy of the second revision which:
  - Added a warning label for the single retractable cord lift systems
  - Proposed an additional requirement for manufacturers to attach the tension devices to the continuous cord loop by a permanent assembly method or the use of a tamper resistant fastener.

- 3/1/2022 – CPSC staff submitted a letter to WCMA providing comments regarding the draft revisions.[2] The letter stated staff concerns about the proposed custom window covering requirements for:
  - Continuous Cord Loop Operating Systems, which would still be allowed on custom window coverings

---

[1] CPSC staff letter is available at https://www.regulations.gov/document/CPSC-2013-0028-3667
[2] CPSC staff letter is available at https://www.regulations.gov/document/CPSC-2013-0028-3652

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

- o Single Retractable Cord Lift systems, which would still allow an operating cord to be pulled to any length

- 3/2/2022 – ANSI/WCMA meeting. Discussed retractable cords and tension devices. CSPC staff and consumer groups advocated eliminating external tension devices due to the risk associated with continuous cord loops when the tension device is not attached, or attached improperly, comes off the wall, breaks, or is removed from the cord.

- 3/21/2022 – Consumer Federation of America, Independent Safety Consulting and Parents for Window Blind Safety sent a letter to WCMA,[3] stating that they:
  - o support the elimination of standard operating systems and multi-cord lift systems, because it mirrors the stock window covering requirements in the 2018 WCMA standard,
  - o do not support tension devices as they are ineffective in addressing strangulation hazards because:
    - consumers can manually slide the tension device away from the headrail to continue using the window covering with an exposed hazardous continuous cord loop present,
    - consumers or installers can remove the tension device, exposing a hazardous continuous cord loop,
    - repeated use over time can result in the detachment of a tension device
    - CPSC's data contains incidents involving tension devices that were not installed or improperly installed,
    - the technical committee has not provided any evidence proving that tension devices eliminate the continuous cord loop strangulation hazard,
  - o support cord retraction devices with a maximum allowable cord length of 12 inches from the headrail.

- 4/5/2022 – WCMA sent a response to the above letter stating that the points raised in the letter would be discussed at the next meeting.[4]

- 4/27/2022 – WCMA sent a revised copy of the draft standard to steering committee members. The main change was to exclude the use of continuous cord loop operating systems with tension devices on horizontal blinds. Continuous cord loop operating systems remain an option on all other custom window covering types.

- 5/3/2022 – ANSI/WCMA meeting. Discussed the exposed length of a tensioned cord and pull forces for a retractable cord system.

- 7/15/2022 – WCMA issued a ballot, described below, to revise the ANSI/WCMA-2018.

- 8/15/2022 – ballot closed

---

[3] Letter can be found at https://www.regulations.gov/document/CPSC-2013-0028-3664
[4] Letter can be found at https://www.regulations.gov/document/CPSC-2013-0028-3662

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

### C. Assessment of the Balloted Draft ANSI/WCMA A100.1-2022 Standard

#### 1. Description and Assessment of Draft ANSI/WCMA A100.1 – 2022

Staff reviewed the balloted draft ANSI/WCMA A100.1 – 2022 standard and determined that requirements for stock window coverings remain unchanged.  A detailed assessment of the balloted draft is in Tab I.  To summarize, staff (1) finds the requirement to eliminate accessible free hanging operating and tilt cords adequate, (2) finds the requirements for single cord retraction devices adequate but recommends a maximum of 12 inches of stroke length, (3) assesses that the continuous cord loop operating systems used with tension devices are inadequate due to remaining hazardous scenarios, (4) finds the elimination of continuous cord loop operating systems for horizontal blinds adequate, (5) finds the elimination of cord loop lift systems adequate, (6) finds the requirement to test remote control battery compartments adequate, (7) finds the bending and axial torque testing of rigid cord shrouds adequate, (8) assesses that exempting curtains and draperies is inadequate due to incidents associated with those products and availability of safer technologies, and (9) finds the warning label for the retractable cords requirement adequate.

#### 2. Status of Balloted Draft ANSI/WCMA A100.1-2022

On July 15, 2022, ANSI/WCMA opened a ballot to revise the standard under the ANSI process. The ballot closed on August 15, 2022.  On August 15, 2022, CPSC staff voted negative on the ballot, and sent a letter explaining staff's negative vote.[5]  CPSC staff's negative vote explained concerns with the use of tension devices to prevent strangulations in continuous cord or bead chain loops and allowing a 36-inch stroke length for retractable cord lift systems.  Staff recommended adding deflection tests for loop cord and bead chain restraining devices and reordering the durability testing to conduct UV exposure testing prior to operational cycle testing.

On September 23, 2022, WCMA rejected CPSC staff's negative vote and concerns of reliance of tension devices to prevent strangulations and allowing a 36-inch hazardous cord length for retractable devices.[6]  WCMA indicated that a voluntary standard is not required by law to prevent all hazards:

> The CPSC's "oppose" vote appears to be based on the view that a voluntary standard must prevent all hazards. That is not the law.

CPSC staff interprets this statement to mean that WCMA does not believe it is necessary or required for the standard to prevent all deaths and injuries due to strangulation in custom window coverings.  This voluntary standard is not required by law to prevent all hazards; however, staff assesses that the proposed revision leaves children exposed to an unreasonable risk for which solutions are readily available.

WCMA also stated that staff's position is flawed:

> Rather CPSC's position is flawed in two key respects: (1) CPSC relies on conjecture and speculation about what could happen, without any evidence or data to support such concerns are reasonably likely to happen (or, indeed, that they have ever happened at all) and (2) CPSC tests its theoretical concerns in the context of completely eliminating,

---

[5] CPSC staff letter is available at https://www.regulations.gov/document/CPSC-2013-0028-3667
[6] https://www.regulations.gov/docket/CPSC-2013-0028/document?sortBy=postedDate

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

*rather than adequately reducing, known or reasonably foreseeable risks of injury. CPSC further puts forth the flawed argument that only window covering designs that do not rely on the consumer or third-party installer can adequately address the hazard. Again, however, CPSC makes this assertion without providing any meaningful analysis or data on why the improvements made in the draft standard over the previous standard do not go far enough to adequately reduce the identified risk of hazard.*

Staff disagrees with WCMA's assertion that staff's assessment is "flawed" and based on "conjecture and speculation". Staff assessment of the balloted requirement is provided in Tab I: Draft Final Rule for Operating Cords on Custom Window Coverings: Assessment of Draft ANSI/WCMA 2022 Balloted Standard.

In addition to CPSC staff, Consumer Federation of America, Independent Safety Consulting, LLC, and Parents for Window Blind Safety voted negative because the revised standard allowed the use of tension devices for continuous loop cords and a 36-inch stroke length for retractable cords. Negative votes also recommended safety requirements for remote control devices to contain button batteries and that requirements for warning label to be on the merchant's websites before adding the product to the cart.

On September 23, 2022, WCMA issued a recirculation ballot due to the negative votes cast for the original ballot. In response to CPSC staff's objection regarding the order of testing, WCMA's revised draft standard now reverts to the 2018 ANSI/WCMA standard's order for testing to require the UV test before the operational cycle test. In response to the recommendations to clarify the types of button batteries that are subject to the standard, WCMA's revised draft standard now requires that the applicable battery powered remote control devices meet the requirements of 15 USC 2056e and any subsequent standard developed by CPSC.

At this time, staff is not certain when or if the revised standard will be approved by WCMA and/or ANSI and published. Section 9(b)(2) of the CPSA requires the Commission to end rulemaking, and rely on a voluntary standard, if the voluntary standard is likely to result in the elimination or adequate reduction of the risk of injury and products within the scope of the standard likely substantially comply with the voluntary standard. Staff finds that neither the existing nor the balloted draft ANSI/WCMA standard eliminate or adequately reduce the risk of injury for operating cords on custom products because hazardous loops and hazardous lengths of cords remain accessible. In addition to the lack of adequate reduction of risk, for section 9(b)(2) of the CPSA to apply, such voluntary standard must be "in existence," meaning approved by the voluntary standards organization. ANSI/WCMA has not yet approved the balloted draft voluntary standard. Moreover, staff found that not all revisions to the voluntary standard are adequate to address the risk of injury. Because of the inadequate reduction of risk and the lack of "existence" of ANSI/WCMA A100.1-2022, staff advises that the Commission should not rely on the balloted draft voluntary standard and recommends that staff's analysis of the current standard, ANSI/WCMA-2018, discussions and correspondence with stakeholders through the voluntary standards process (placed on the rulemaking record), as well as comments on the NPR, be the basis for requirements in the draft final rule.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

# III. Evaluation ANSI/WCMA A100.1 – 2018, Recommended Requirements for the Draft Final Rule, and Technical Feasibility

As in the NPR, staff recommends that to adequately address the strangulation hazard for custom window coverings, the Commission should finalize the rule under sections 7 and 9 of the CPSA by:

- Applying the requirements for stock window coverings in section 4.3.1 of ANSI/WCMA A100.1 – 2018 to custom window coverings requires cordless, short cords (8 inches or less, or inaccessible cords); and
- allowing a rigid shroud that meets the requirements of the rule as a permissible method of making standard operating systems (pull cords) and continuous cord loop operating system inaccessible.

For the final rule, staff recommends two additional methods to meet the objectives of the rule. First, staff recommends allowing a second method of making operating cords inaccessible in the draft final rule, using a Single Retractable Cord Lift System, provided the retractable cord meets the requirements in the draft final rule to adequately address the strangulation hazard. Second, staff recommends that loop cord and bead chain restraining devices be an option to make continuous cord loop operating systems non-hazardous, provided such devices meet the requirements in the draft final rule. Tab D, Regulatory Language for Draft Final Rule, contains the exact language for the retractable cord and loop cord and bead chain restraining device requirements.

CPSC recommends these two modifications based on the comments, discussions with stakeholders during the ANSI meetings, feedback from consumer groups, and consideration of the Canadian window covering regulation that became effective in May 2022. CPSC received hundreds of comments from businesses opposing elimination of continuous cord loop operating systems to meet the requirements of the rule. These comments are summarized and addressed in Tab H. During conversations with industry and consumer advocates during the ANSI process, staff discussed performance requirements and tests for rigid cord shrouds and cord retraction devices. Meeting logs from the ANSI discussions have been placed on the docket for this rulemaking. Staff notes that consumer advocates also sent a letter.[7] Finally, enforcement of Canada's regulations began in May 2022. Companies that sell in both Canada and the U.S. have already redesigned their custom offerings to be compliant with the Canadian regulations, which are substantively similar to those being recommended here, so already have stock of compliant product designed and ready to sell through small dealers and interior designers.

## A. Requirements on Rigid Cord Shrouds

For the final rule, staff recommends finalizing the requirements for rigid cord shrouds as proposed in section 1260.2(b) and (c) of the NPR. Tab D, Regulatory Language for Draft Final Rule, contains the exact language for the requirements.

---

[7] https://www.regulations.gov/document/CPSC-2013-0028-3664

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

### 1. Rationale

In the NPR, staff recommended applying stock window covering requirements to custom window coverings.  Section 4.3.1 in the voluntary standard requires that window coverings be cordless, have short cords (8 inches or less), or have inaccessible operating cords, to eliminate the strangulation hazard.  CPSC received hundreds of comments from businesses opposing elimination of continuous cord loop operating systems to meet the requirements of the rule. Neither the NPR nor section 4.3.1 eliminates non-hazardous continuous cord loop operating systems; manufacturers can still use standard operating systems (operating pull cords or continuous cord loop operating systems) if the cord is not accessible when tested to the requirements of the rule.  The NPR allowed for a rigid cord shroud to make the cords on a continuous cord loop operating system or standard operating system inaccessible.

### 2.  Feasibility of Rigid Cord Shrouds

The ANSI/WCMA-2018 standard defines a Cord Shroud as a device or material added to limit the accessibility of a cord or formation of a hazardous loop. Per section 4.3.2.5.2 of the 2018 standard, one of the ways that accessible cords (continuous cord loops and standard operating systems) can meet the standard is to contain the cords in a rigid cord shroud that meets the requirements in sections 6.3.1 (Appendix C: Test Procedure for Accessible Cords) and 6.3.2 (durability, impact, and operational cycle tests). Rigid cord shrouds must also meet the staff-recommended deflection and deformation tests described in 1260.2(b). In the NPR, staff determined that the use of rigid cord shrouds that meet the inaccessibility requirement is acceptable. Rigid Cord Shrouds (Figures 1 and 2) can be used to enclose continuous cord or bead chain loops.  Rigid cord shrouds are incorporated into a window covering (Figure 1) or sold as retrofits to existing corded window coverings (Figure 2).





**Figure 1.  Rigid Cord Shroud on Stock Product.**

**Figure 2.  Rigid Cord Shroud Retrofit Kit for Custom or pre-2018 standard stock product.**

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Figures 3 and 4 demonstrate how to operate the currently available cord shrouds. For the stock product shown in Figure 1, the user slides the operating handle up the rigid shroud, as shown in Figure 3.



**Figure 3. To raise/lower the window covering, the user slides the operating handle up/down.**

To raise the window covering using the retrofit rigid cord shroud shown in Figure 2, the user slides the operating handle up the rigid cord shroud as shown in Figure 4, step 1. Then while squeezing the top edge of the handle (Figure 4 step 2), the user pulls the handle down (Figure 4 step 3). The user performs the same steps to lower the window covering, except the bottom edge of the handle is pressed.





Step 1. Slide handle up

Step 2. Squeeze top edge of handle

Step 3. Pull handle down

**Figure 4. To raise the window covering, the user first slides the handle to the top of the Rigid Cord Shroud. Then, while squeezing the top edge of the handle, the user pulls down, raising the shade. The user performs the same steps to lower the window covering, except the bottom edge of the handle is pressed.**

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Staff found two window coverings currently on the market that use rigid cord shrouds. Staff purchased and evaluated these products. Based on staff's examination and the available products on the market, a rigid cord shroud can operate window coverings up to 76.75 inches (stock) to 96-inches tall (retro-fit). After examining the current rigid cord shroud product line, engineering staff concludes that a rigid cord shroud can be designed to operate window coverings over 96 inches tall, if the shroud is made from more rigid materials such as metal, that meet the deflection requirements in the draft final rule.

Engineering staff evaluated two rigid cord shrouds that were similarly configured. Figure 5 shows the components that make up the rigid cord shroud retrofit kit described above. The product consists of five parts: (1) the head that attaches to the window covering, (2) the cord shroud that encapsulates (3) the bead chain, (4) the handle that operates the bead chain, and (5) the bottom pulley that keeps the cord loop taught. Figure 5 shows that the length of the rigid cord shroud is dependent on the shroud (part #2) and bead chain (part #3) length. Long shrouds over 8 feet may need to be made with a stiffer material other than plastic, such as aluminum to prevent excessive bending. The clutch and pulley components in the head (part #1) are sized to the desired lift capacity. Heavier shades usually require a larger clutch and pulley to provide a gear ratio that would make raising the shade easier. The size of the clutch and pulley will be similar to products that use a continuous cord loop lift system without a rigid shroud. The handle (part #4) consists of a mechanism inside the handle that engages the bead to either side of the loop, allowing the operator to raise or lower the shade. The handle would be the same for any length shroud because the handle is not dependent on the window covering's size or weight. The bottom pulley (part #5) keeps the bead chain taught and would be the same for any length shroud because the size of the pulley is dependent upon the size of the bead chain, which does not change with the height of the window covering.



(1) Head - consist of the clutch and pulley that engages with the roller of the window covering. The clutch and pulley are sized to shade weight and desired pull force needed to lift the shade.

(2) Shroud - consist of a hollow tube to enclose (3) the bead chain. The shroud and bead chain are sized to the desired length.

(4) Handle – allows user to raise and lower the window covering - same part for all lengths

(5) Bottom pulley – same part for all lengths

**Figure 5. Components of a Rigid Cord Shroud.**

Large rigid cord shrouds may require additional development and tooling for continuous cord loop operating systems with window shades over 96 inches tall; however, existing shrouds should not require major redesigns because these products have already been developed and only require adjustments to the head and the length of the cord shroud to fit the window covering. Based on engineering staff's review of the rigid cord shrouds currently on the market,

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

which includes shrouds on window coverings up to 96 inches, staff concludes that extensive development is unnecessary for custom manufacturers to incorporate rigid cord shrouds for window coverings that currently use a continuous bead chain operating system.  Staff estimates that the development cost for rigid cord shrouds for 10 feet or larger window coverings would range from $550K to $1M over a 2-2.5-year period while it would be more if this period were shortened (See Appendix).

Based on staff's examination of rigid cord shrouds on the market and review of the comments, staff concludes that a continuous cord loop operating system with a rigid cord shroud could be manufactured to operate window coverings of all sizes and meet the requirements of the draft final rule.  Rigid cord shrouds are available for window covering under 10 feet; therefore, these products do not require extensive research and development.  If manufacturers have not started product development of shrouds for window coverings over 10 feet long, they may need additional development time (2 years) to produce these larger shrouds that meet the requirements in the draft final rule.

### B.  Requirements for Loop Cord and Bead Chain Restraining Devices

The ANSI/WCMA-2018 defines a Cord and Bead Chain Restraining Device as a device that prevents the creation of a hazardous loop from an accessible continuous operating cord.  For the draft final rule, staff recommends that loop cord and bead chain restraining devices (as defined in section 1260.1(e) of the draft final rule) be a permissible way to make accessible continuous cord loop operating systems non-hazardous. Staff recommends modifying the performance requirements for loop cord and bead chain restraining devices, as set forth in section 6.5 of ANSI/WCMA-2018, to adequately address the risk of strangulation associated with accessible operating cords on custom window coverings. Specifically, staff recommends the following modifications to address the risk of injury:

- Add a deflection requirement for loop cord and bead chain restraining devices that prevents bending of the device to an extent that a child could wrap it around their neck that meet similar deflection requirements for rigid cord shrouds as stated in section 1260.2(d) of the draft final rule.
- Test one sample to section 6.5.2.2, Ultraviolet (UV) Stability, followed by section 6.5.2.1, Operational Cycle Test. This change will simulate real world conditions of a loop cord and bead chain restraining device exposed to sunlight and operated over the life of the window covering.

According to section 6.5 of ANSI/WCMA-2018, loop cord and bead chain restraining devices must meet durability, UV stability, and impact testing and must pass the hazardous loop testing procedure to confirm that a loop cord and bead chain restraining device prevents the creation of a hazardous loop from an accessible continuous cord loop. Staff recommends inclusion of these loop cord and bead chain restraining devices in the draft final rule as these would address the continuous cord loop strangulation hazard and are technically feasible. However, staff does not find the test sequence identified in section 6.5 representative of real-world scenarios and recommends adding a test to expose the loop cord and bead chain restraining device to UV light first, and then conduct the operational cyclic test. The test is similar to the test that rigid cord shrouds go through as described in section 6.6 of the ANSI/WCMA 2018 standard. Staff also recommends incorporating a deflection test that is similar to the one recommended in the NPR for rigid cord shrouds to improve the safety of these products. With these modifications to the draft final rule, continuous cord loop operating systems on custom window coverings have two methods to meet the final rule: (a) a loop cord and bead chain restraining device or (b) a

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

rigid cord shroud. TAB D, Regulatory Language for Draft Final Rule, contains the exact language for the requirements.

### 1. Rationale

In the NPR SBP, staff assessed that loop cord and bead chain restraining devices are designed and installed by the manufacturer onto the window covering, are integral to the window covering, and do not need to be attached on the wall to keep the loop taut. These loop cord and bead chain restraining devices are required to meet durability, UV stability, and impact testing and must pass the hazardous loop testing procedure to confirm that the loop cord and bead chain restraining device prevents the creation of a hazardous loop from an accessible continuous cord loop. The NPR requested comment on the adequacy of loop cord and bead chain restraining devices to address the risk of strangulation on custom window coverings. CPSC received hundreds of comments from businesses opposing elimination of continuous cord loop operating systems to meet the requirements of the rule. In response to comments, staff evaluated additional methods to make continuous cord loop operating systems non-hazardous. Additionally, CPSC staff, industry, and consumer advocates discussed loop cord and bead chain restraining devices in the WCMA Steering Committee meetings. On June 21, 2022; consumer groups sent a letter to WCMA recommending that loop cord and bead chain restraining devices used with continuous cord loop operating systems be deemed an acceptable method in the voluntary standard for custom window coverings to address the strangulation hazard.[8]

Staff recommends that the draft final rule allow loop cord and bead chain restraining devices defined in 1260.1(e) that meet staff-proposed test methods described in 1260.2(d).

### 2. Feasibility of Loop Cord and Bead Chain Restraining Devices

Staff is not aware of cord or bead chain restraining devices that are currently on the US market but has become aware of a version marketed internationally in the past. A CPSC contractor evaluated a similar device for the "Technical Feasibility and Cost Improvement Analysis of Safer Window Covering Technologies" report.[9]

Staff considers development of a loop cord and bead chain restraining device to have the same level of complexity as developing a rigid cord shroud, because the components are similar and previous products on the market confirm feasibility. Therefore, staff concludes that a continuous cord loop operating system with a loop cord and bead chain restraining device can be manufactured to operate window coverings of all sizes and meet the requirements of the draft final rule.

### C. Modifications to Requirements for Single Retractable Cord Lift Systems

For the draft final rule, staff recommends allowing single retractable cord lift systems as an additional method to eliminate hazardous operating cords. However, staff does not recommend the retractable cord requirements in the ANSI/WCMA A100.1 – 2018 standard, because the

---

[8] Meeting log can be found at https://www.regulations.gov/document/CPSC-2013-0028-3654.
Consumer groups' letter can be found at https://www.regulations.gov/document/CPSC-2013-0028-3664

[9] See "Tethered Loop Cord" on page 12 of the report. Report can be accessed at https://www.cpsc.gov/s3fs-public/012517_CPSC_S_15_0072_Phase5_Final_Report.pdf.

THIS DOCUMENT HAS NOT BEEN REVIEWED OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE UNDER CPSA 6(b)(1)

standard does not contain a maximum stroke length, allowing a child to pull a long enough cord to wrap around their neck.

To address the strangulation hazard, staff recommends the following modifications to the retractable cord requirements in the voluntary standard:

- Limit the stroke length for cord retraction devices to 12 inches measured from the bottom of the headrail.
- Require the mechanism to maintain full retraction when a 30-gram weight is attached to the Operating Interface (the part of the cord retractor that the operator pulls on) to ensure the device fully retracts the cord.
- Eliminate cords attached to the Operating Interface (the part of the cord retractor that the operator pulls on) to prevent the creation of a hazardous loop.

Tab D, Regulatory Language for Draft Final Rule, has the exact language for the proposed requirements.

### 1. Rationale

In the NPR SBP, staff determined that the retractable cord requirement, as written in ANSI/WCMA-2018, is not adequate to address the risk of injury because the maximum cord length and a minimum pull force required to operate the system is not specified in the standard. The NPR requested comments on whether additional requirements for retractable cords, such as a maximum exposed cord length and a minimum pull force for a single retractable cord lift system, can address the strangulation hazard. The Commission received at least 149 comments stating that retractable cords are safe and should not be eliminated. Moreover, the June 21, 2022 letter from consumer advocates to WCMA suggested that retractable cords be allowed with the following text: "All cords must be inaccessible. The maximum allowable cord length is 12 inches from the headrail."[10]

After further consideration, discussion with stakeholders through the ANSI/WCMA process, and review of comments, for the draft final rule, staff recommends that retractable cords be a permissible method of making an operating cord inaccessible if the stroke length is limited to 12 inches from the bottom of the headrail. Staff concludes that it is extremely unlikely for a child to be able to climb to get to the exposed cord that is within 12 inches of the headrail while pulling the retraction device from the bottom and wrapping the tensioned cord around his/her neck (Tab B and Tab I). Staff determined that limiting the stroke length to 12 inches is reasonable and will maintain the system's usability. Also, a 12-inch maximum stroke length is consistent with the rationale in the ANSI/WCMA 2018 standard (Appendix C) regarding inner cords:

> "Inner cords on the window covering product that are within 12 inches of the bottom of the headrail are considered not accessible."

### 2. Feasibility of Single Retractable Cord Lift System

CPSC staff determined that single retractable cord lift systems can be limited to a 12-inch stroke length while maintaining consumer usability. To raise a window covering with a single retractable cord lift system, the user pulls the cord retraction device downward, as shown in Figure 6. This drives the spool mechanism in the headrail to raise the shade. The distance the shade is raised is usually equal to the stroke length. For example, if the user pulls the retractor

---

[10] https://www.regulations.gov/document/CPSC-2013-0028-3664

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

12 inches, the shade will raise 12 inches. Next, the user releases their pull on the device, allowing it to retract back up to the headrail. Then the user can repeat the pull process until the shade is fully raised.



**Figure 6. Single Retractable Cord Lift System.**

To lower a window covering, the user pulls the operating interface laterally to activate the switch allowing the shade to lower (Figure 7).



**Figure 7. Activating the switch to lower the shade.**

61

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Currently, one manufacturer offers a cord retractor operating system that uses a 24-inch stroke length. Reducing the stroke length of this type of cord retractor to 12-inches would require the user to perform twice as many strokes to lift the shade. For example, if a shade covers a 5-foot window, the user will pull a 12-inch stroke retractor five times to raise the shade from a fully lowered position to a fully raised position.

## IV. Conclusion

As stated in the NPR, staff concludes that continuous cord loop operating systems with external tension devices that are attached on a wall or window sill pose a strangulation hazard because they require the consumer or installer to properly install them to eliminate the hazard, and because external tension devices can break, be removed, or not be installed. However, passive devices that make an operating cord inaccessible, meaning those installed on the product itself by the manufacturer that cannot be easily defeated, uninstalled, or break, such as a rigid cord shroud for operating cords and a loop cord or bead chain restraining device on a continuous cord loop operating system, eliminate the strangulation hazard and the need to rely on a consumer or installer to make the product safe as installed. Therefore, staff recommends for the draft final rule that the requirements for custom window coverings that use a continuous cord loop operating system be required to incorporate a loop cord and bead chain restraining device or rigid cord shroud, and to meet the recommended tests for rigidity and durability specified in Tab D, as a means of making hazardous operating cords durable and inaccessible to children.

Additionally, staff recommends allowing a retractable cord, as modified in the draft final rule (see Tab D), to be an additional way to remove hazardous accessible operating cords on a custom window covering. As stated in the NPR SBP, page 48, "Staff advises that retractable cord lift systems with an extended cord greater than 8 inches, and a low-retraction force to sustain that length, could allow a child to manipulate the cord and wrap the cord around his/her neck." After a review of comments and further consideration, staff concludes that limiting the maximum stroke length for a Cord Retraction Device to 12-inches measured from the bottom of the headrail would address the strangulation hazard and is technically feasible. Accordingly, the draft final rule includes modified requirements for a retractable cord as an additional method of meeting the mandatory standard.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

# Appendix: Development Process and Cost Estimate for Rigid Cord Shroud

## A. Development Process

Figure 1 shows a top-level generic product design process. For this analysis, staff considered most manufacturers were in Phase III, Engineering Design, Development and Testing Phase (EDDTP) (shown in the box of figure A1) for development of a rigid cord shroud for their continuous cord loop operating systems.



**Figure 1. Product Design Process. Ref: D'Entremont, K. (2021). *Engineering ethics and design for product safety*. The McGraw-Hill Companies, Inc.**

Engineering Sciences (ES) Staff used this process to estimate the time and cost to market for design, development, and production of a rigid cord shroud used with a continuous cord loop operating system. The analysis assumed the product development is performed in-house by the window covering manufacturer. If the manufacturer outsources the product design, then the same process would be used by the supplier except the manufacturer's role would be to ensure the supplier meets product specifications and quality requirements.

## B. Idea and Concept Selection Phase

The ANSI/WCMA standard establishes Rigid Cord Shrouds as a method to make continuous loop operating systems safe without the use of tension devices. A comment made by a manufacturer of continuous cord loop clutch mechanisms (https://www.regulations.gov/comment/CPSC-2013-0028-3505) stated that they are in development of rigid shrouds that cover operating cords, in whole or in part, and had previously produced a shroud but have since withdrawn it from the market. The commenter did not estimate cost or time required to develop rigid cord shrouds.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

A562

Also, at ANSI/WCMA meetings during the past several years, participants have discussed use of shrouds on continuous cord loop operating systems. In 2018, WCMA established a task group to develop performance requirements for a "rigid cord shroud" that is designed to make operating cords inaccessible on window coverings. The requirement would clarify "rigid" by confirming that a cord shroud is rigid enough to ensure that the shroud cannot be wrapped around a child's neck or won't form a u-shape as a result of attaching the free end of the shroud to the wall (similar hazards to a single cord). CPSC staff is not aware of incidents related to current products with rigid cord shrouds and concludes that shrouds that meet the draft final rule will address the strangulation hazard posed by accessible cords. The task group, including CPSC staff, worked from March through December 2018 to develop draft language, but at the time of the NPR, WCMA had not balloted the requirements.[11] Since the NPR, WCMA has balloted these requirements, but this ballot has not passed nor has the new standard been published. Staff is also aware of rigid cord shrouds available to retrofit window coverings that use a continuous bead chain loop and stock products that incorporate a rigid shroud into their continuous cord loop shade. Because of the current availability of stock and retrofit the rigid cord shrouds on the market, staff considers this option as the most likely path of compliance to the draft final rule. Staff determined that Phase I (idea) and Phase II (concept selection) have been completed or nearly completed by many custom window covering manufacturers and suppliers.

### C. Engineering Design Development & Testing Phase (EDDTP) of a Rigid Cord Shroud

CPSC staff considered a rigid cord shroud to be a relatively low technology product consisting of low cost injected molded plastic. Shrouds may need to use metal components such as aluminum or steel extrusions, stampings, or machining for longer shrouds. Available rigid cord shrouds are attached to the roller at the headrail as shown in Figure 2. The clutch mechanism is driven by a continuous cord loop over a pulley. Staff found clutches with pulley diameters from 1.5 inches to 3.5 inches (Figure 3) depending on the lift capacity of the clutch. A clutch system with a 3.5-inch pulley could lift a 53-pound shade and smaller clutch systems with a pulley 1.5 inches lifted a 6-pound shade.

---

[11] Task group meeting logs can be found at:
https://cpsc.gov/Newsroom/FOIA/ReportList?month=all&year=2018&nfr_type=All&title=%22wcma+rigid+cord+shroud+task+group+meeting%22

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)





Roller

Rigid Cord
Shroud

Pulley diameters range
from 1.5 – 3.5 inches

**Figure 2. Rigid Cord Shroud
Attached to the Shade Roller.**

**Figure 3. Clutch Component.**

In addition, cut-to-size rigid shroud extension could be fitted between the clutch component and existing rigid cord shroud. Staff is aware of products such as clutch adaptors that are on the market that accommodate various roller tube sizes. Staff concludes that a rigid cord shroud with different size pulley heads (interface between shroud and clutch mechanism), could be fitted onto all continuous cord loop operating systems that use a clutch. Therefore, a manufacturer could develop one basic Rigid Cord Design with a few pulley head sizes to accommodate different shade weights. Manufacturers could use this process to make all product lines that currently use continuous cord loop operating systems with inaccessible operating cords.

### D. Product Development Estimated Cost and Time Requirements

Based on comments and product development cycles for other consumer products, staff estimates 12 months to complete Phase III (Engineering Design, Development &Testing) and an additional 12 month to complete Phase IV (Manufacturing & Logistics) and V (Use) to develop a rigid cord shroud. CPSC also received several comments from manufacturers about difficulties due to supply chain disruptions and production delays with their Asian manufacturers. Therefore, staff estimates an additional 6-months if supply chain issues continue. Staff estimated the development of a rigid cord shroud would require a design team consisting of a one lead design engineer, one manufacturing engineer, one engineering technician, a machinist for prototyping, and an engineer to design the injection mold and other tooling to fabricate the rigid cord shroud. Staff estimated a 2 - 2.5-year development time with associated labor costs as shown in Table 1 below.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**Table 1.  Rigid Cord Shroud Development Cost Estimate.**

| Rigid Cord Shroud Development Resource | Phase III (12 month) | Phase IV, V (12 – 18 month[1]) | Total cost |
|---|---|---|---|
| **Lead design Engineer** Mechanical Engineers (bls.gov)  mean annual wage $97,000/year | 12 months $97K | 6 months $49K | 18 months $146K |
| **Manufacturing Engineering Technician** Industrial Engineering Technologists and Technicians : Occupational Outlook Handbook: : U.S. Bureau of Labor Statistics (bls.gov) mean annual wage $60,220/year | 4 months $20.07K | 12 months $60.22K | 16 months $80.29 K |
| **Test Engineering Technician**  Mechanical Engineering Technologists and Technicians : Occupational Outlook Handbook: : U.S. Bureau of Labor Statistics (bls.gov) mean annual wage $60,460/year | 4 months $20.15K | 2 months $10.10K | 6 months $30.23K |
| **Prototyping and fabrication (machinist)** Machinists and Tool and Die Makers: Occupational Outlook Handbook: U.S. Bureau of Labor Statistics (bls.gov) mean annual wage $47,940/year | 3 months $11.98K | 1 month $4.00K | 4 months $15.98K |
| **Mold Designer** Mechanical Engineers (bls.gov) mean annual wage $97,000/year | 2 months 16.17K | 10 months 80.83K | 12 months $97K |
| **Cost of mold[2]** | | $80K | $80K |
| Total direct cost | $165.38K | $284.13K | $449.50K |
| Overhead cost = 75% | $124.03K | $213.09K | $337.128K |
| Total Cost | $289.41K | $497.22K | $786.63K |
| [1] If Supply Chain issues persists, staff estimates an additional 6 months for production. [2] 2.5 x $31,261; estimated cost for molds by Panchal, Manufacturing Cost Analysis Cordless vs. Corded Window Covering Products, 2016, (https://www.cpsc.gov/s3fs-public/ManufacturingCostAnalysis.pdf) | | | |

Staff estimates a cost of $787K over a 2-2.5 -year period to develop a production ready Rigid Cord Shroud.

Staff notes that several commenters provided specific timelines for the manufacturing phase that applies to Phase IV shown in Table 1. Custom product manufacturers commented that overseas third-party suppliers will need sufficient time to develop new tooling such as injection molds and to implement manufacturing line changes to assemble new parts. Transit of new parts from Asia to the U.S for final assembly into new window coverings requires added time to build inventory to maintain supplies for consumers.  Manufacturers estimated a 9 – 20 months product development and production cycle (see Table 1a below).  Manufacturing delays due to impacts such as supply chain issues, work hours redirected to training operators on new assembly processes and other unforeseen problems are also likely to occur.  CPSC staff considers a 12 month effective date to be reasonable time frame for manufacturers to come into compliance with the draft final rule for custom window coverings under 10 ft long.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**Table 1a. Comments of Estimated Time to Produce New Product**

| Activity | Comment 2013-0028-3452 | Comment 2013-0028-3587 |
|---|---|---|
| Acquire and implement new tooling | 22-25 weeks | 4-12 months |
| Air freight logistics time for tooling | 8 weeks | |
| Ocean transit | | 3-4 months |
| Manufacturing (build component inventory) | 6-16 weeks | 2-4 months |
| Total time | 36-57 weeks, 9 – 14.5 months | 9-20 months |

### E. Comparison of Staff's cost estimate to comments:

Most commenters did not describe in detail their product design process. However, using the generally accepted product development phases and average labor costs, staff was able to estimate the times and costs of 2 major manufacturers.

A comment made by a major custom manufacturer of custom window coverings (https://www.regulations.gov/comment/CPSC-2013-0028-3352) estimated that a new product has a 32–40-month new product development cycle.

A comment made by another major custom window covering manufacturer (https://www.regulations.gov/comment/CPSC-2013-0028-3587) estimated $1M-3M cost to redesign a single product line and another $1M for capital equipment, totaling $2M-$4M. The manufacturer multiplied this cost for every product line. The manufacturer added an additional $1M-$2M to accelerate product development to within 2 years. Including other expenses such as marketing and IT, the total development cost equaled $77.06M-125.89M over 16 product lines or 4.8M – $7.86M per product redesign.

During its rulemaking to prohibit hazardous window covering cords, Health Canada's analysis (Canada Gazette, Part 2, Volume 153, Number 9: Corded Window Coverings Regulations ) estimated a 6- month product development cycle. Health Canada's cost analysis assumes one full time engineer for 6-months at $35.67/hour totaling $37,196 (2017 Canadian). Tooling cost by an overseas manufacturer was estimated to require 2,000 hours at $49.35/hour totaling $98,700 (2017 Canadian). Total product development cost would be $135,896 (2017 Canadian) or $104,639 (2017 USD)[12] per manufacturer. Adjusting for inflation, the 2022 cost is $121.140.[13] Health Canada then multiplied these costs over 107 Canadian manufacturers to estimate a total cost of $3.98 million (2017 Canadian) for research and development and $11.1 million (2017 Canadian) for tooling.

---

[12] Canadian dollar to USD Exchange Rate in 2017 = 0.77
[13] Inflation calculation using  CPI Inflation Calculator (bls.gov)

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

One comment from a manufacturer of rigid cord shrouds (https://www.regulations.gov/comment/CPSC-2013-0028-3356) stated that Health Canada's estimate for research and development and tooling should be zero. The commenter stated:

- *Research & Development cost of $3.98 million is unnecessary and should default to $0. Every Manufacturer either already has a cordless alternative or has been working on one and has already incurred this cost regardless of a new Regulation.*
- *Tooling cost estimate of $11.1 million is unnecessary and should default to $0. Every Manufacturer must build new tools about every 5 to 7 years as a normal course of their business regardless of current or new design.*

Staff's estimate of $787K to develop a rigid cord shroud was close to the industry commenters' low end estimate of $1M to redesign a single product line. Staff determined that a rigid cord design with different head sizes to accommodate various clutch pullies will cover all product lines that currently use continuous cord loop operating systems, rather than developing different shrouds for each product line as indicated by one commenter (https://www.regulations.gov/comment/CPSC-2013-0028-3587). Table 2 is a comparison of staff's development cost and time estimates compared to estimates received from commenters on the NPR and Health Canada's analysis.

**Table 2. Product development time and cost estimates.**

| Development of Rigid Cord Shroud | Major Custom Window Covering Manufacturer https://www.regulations.gov/comment/CPSC-2013-0028-3352 | Major Custom Window Covering Manufacturer https://www.regulations.gov/comment/CPSC-2013-0028-3587 | Rigid Cord Shroud Manufacturer https://www.regulations.gov/comment/CPSC-2013-0028-3356 | Health Canada Regulation Canada Gazette, Part 2, Volume 153, Number 9: Corded Window Coverings Regulations | CPSC Staff |
|---|---|---|---|---|---|
| Product Development time | 32-40 months | 27-48 months | 0 months | 6 months | 24-30 months |
| Development Cost | No estimate | $4.8M-$7.86M per product line | $0 | $121,140 (2022 USD) | $787,000 |

Comments on development cost and time ranged from no cost to $7.86M per product line and a development time from 0 months to 48 months. If a 30% accuracy range is applied to staff-estimated development cost of $787,000, the cost would range from $550K to $1M. The development time remains the same, 2-2.5 years.

## F. Conclusion

Staff concludes that the development cost of rigid cord shrouds for continuous loop operating systems would range from $550,000 to $1M over a 2-2.5-year time. Staff assumes manufacturers have developed concepts but have not started product development or tooling for products. Staff also assumes the development cost and time for a new rigid cord shroud would be the same whether the development is done in-house or outsourced. However, if a

THIS DOCUMENT HAS NOT BEEN REVIEWED OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE UNDER CPSA 6(b)(1)

manufacturer is further along in the development phase and has existing fabrication and production capability in place, development time and cost would be reduced.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

# Tab D: Recommended Regulatory Text for Draft Final Rules

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

A569

**AMENDMENT TO PART 1120—SUBSTANTIAL PRODUCT HAZARD LIST**

To address the risk of injury associated with operating cords on stock window coverings, and inner cords on stock and custom window coverings, staff recommends finalizing, as proposed, the addition of three paragraphs to 16 C.F.R. part 1120 to: define "stock window covering" and "custom window covering," describe the readily observable characteristics of stock and custom window coverings in ANSI/WCMA A100.1 – 2018, and incorporate by reference relevant portions of ANSI/WCMA A100.1 – 2018, as follows:

**1120.2 Definitions.**

(f) *Stock window covering* (also known as a *stock blind, shade, or shading*) has the same meaning as defined in section 3, definition 5.02 of ANSI/WCMA A100.1 – 2018, as a product that is a completely or substantially fabricated product prior to being distributed in commerce and is a stock-keeping unit (SKU). Even when the seller, manufacturer, or distributor modify a pre-assembled product by adjusting to size, attaching the top rail or bottom rail, or tying cords to secure the bottom rail, the product is still considered stock. Online sales of the product, or the size of the order, such as multi-family housing, does not make the product a non-stock product. These examples are provided in the standard to clarify that as long as the product is "substantially fabricated" prior to distribution in commerce, subsequent changes to the product do not change its categorization.

(g) *Custom window covering* (also known as a *custom blind, shade, or shading*) has the same meaning as defined in section 3, definition 5.01 of ANSI/WCMA A100.1 – 2018, as any window covering that is not classified as a stock window covering.

**1120.3 Products deemed to be substantial product hazards.**

(e) *Stock window coverings* that fail to comply with one or more of the following requirements of ANSI/WCMA A100.1 – 2018:

(1)Operating cord requirements in sections 4.3.1.1 (cordless operating system), 4.3.1.2 (short static or access cord), or 4.3.1.3 (inaccessible operating cord); and

(2)Inner cord requirements in section 4.5.

(f) *Custom window coverings* that fail to comply with inner cord requirements in section 4.5 of ANSI/WCMA A100.1 – 2018.

(g) *Stock* and *custom window coverings* that fail to comply with the requirement for an on-product manufacturer label in section 5.3 of ANSI/WCMA A100.1 – 2018.

**1120.4 Standards incorporated by reference.**

(d) Window Covering Manufacturers Association, Inc. 355 Lexington Avenue, New York, New York, 10017. telephone: 212.297.2122. http://wcmanet.com

(1) ANSI/WCMA A100.1 – 2018. *American National Standard For Safety Of Corded Window Covering Products,* IBR approved for §1120.3 (e), (f), and (g).

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

To address the risk of injury associated with operating cords on custom window coverings, staff recommends finalizing the proposal that the requirements for operating cords on stock products in the ANSI/WCMA-2018 standard be extended to custom window coverings. Additionally, staff recommends finalizing the rigid cord shroud requirement, as a means to meet the inaccessibility option in ANSI/WCMA-2018 section 4.3.1.3, with minor clarifications. For the final rule, staff also recommends allowing a retractable cord as an option to meet the inaccessibility option, as long as the requirements as set forth below, are met. Staff also recommends adding a final option for a non-hazardous cord in the final rule, and that is to allow a *Cord and Bead Chain Restraining Device* that meets the requirements set forth below. Accordingly, for the final rule, staff recommends adding a new part to title 16, chapter II of the Code of Federal Regulations, as follows:

**PART 1260-SAFETY STANDARD FOR CUSTOM WINDOW COVERING PRODUCTS**

Sec.

1260.1  Scope and definitions.

1260.2  Requirements for custom window covering products.

1260.3  Prohibited stockpiling

1260.4  Findings.

1260.5 Incorporation by Reference

**Authority**:  **15 U.S.C. 2051(b), 2056, 2058, 2063(c), 2076(e)**

**§ 1260.1  Scope and definitions.**

(a)  This part establishes a consumer product safety standard for operating cords on custom window coverings.

(b)  This consumer product safety standard relies on the following definitions in section 3 of ANSI/WCMA A100.1 – 2018 (incorporated by reference, see § 1260.5):

(1) *Custom window covering* (Custom blinds, shades, and shadings) has the same meaning as defined in section 3, definition 5.01, of ANSI/WCMA A100.1 – 2018.

(2) *Stock window covering* (Stock blinds, shades, and shadings) has the same meaning as defined in section 3, definition 5.02, of ANSI/WCMA A100.1 – 2018.

(3) *Operating cord* has the same meaning as defined in section 3, definition 2.19, of ANSI/WCMA A100.1 – 2018.

(4) *Cord shroud* has the same meaning as defined in section 3, definition 2.09, of ANSI/WCMA A100.1 – 2018.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

(5) *Cord retraction device* has the same meaning as defined in section 3, definition 2.08, of ANSI/WCMA A100.1 – 2018.

*(c) Rigid Cord Shroud* is a cord shroud that is constructed of inflexible material, rendering the cord inaccessible as defined in Appendix C, of ANSI/WCMA A100.1 – 2018, to prevent children from accessing a window covering cord.

*(d) Retractable Cord* is a cord that extends when pulled by a user, and fully retracts when the user releases the cord, rendering the cord inaccessible as defined in Appendix C, of ANSI/WCMA A100.1 – 2018.

*(e) Loop Cord and Bead Chain Restraining Device*. A device, integrated to and installed on the window covering, that prevents the creation of hazardous loop from an accessible continuous operating cord.

(f) *Operating Interface*. The part of the window covering that the user physically touches or grasps by hand or a tool to operate the window covering, for example a wand to tilt the slats of the product or the bottom rail  to raise or lower the product.

## § 1260.2  Requirements for operating cords on custom window coverings.

(a) *Requirements for operating cords.*  Each custom window covering shall comply with section 4.3.1 or 4.3.2.5.2, instead of section 4.3.2, of ANSI/WCMA A100.1 – 2018, American National Standard For Safety of Corded Window Covering Products (approved on January 8, 2018) (incorporated by reference, see § 1260.5).

 (b) *Requirements for rigid cord shrouds.*  If a custom window covering complies with paragraph (a) using a rigid cord shroud, the rigid cord shroud shall meet the requirements in section 6.3, of ANSI/WCMA A100.1 – 2018 and shall not have an accessible cord when tested for cord accessibility using the test methods defined in paragraphs (b)(1) and (2).

(1) *Test methods for rigid cord shrouds*: *Center load test.*

(i) Support each end of the rigid cord shroud, but do not restrict the rotation along the axial direction.  Supports must be within 0.25 inches from the ends of the shroud as shown in figure 1.



**Figure 1. Rigid Cord Shroud Test Set-up.**

(ii)  Apply a 5-pound force at the center of the rigid cord shroud for at least 5 seconds as shown in figure 2.

(iii) Measure the maximum deflection of the shroud, while the 5-pound force is applied.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

(iv) For rigid cord shrouds that are ≤ 19 inches, the deflection shall not exceed 1 inch. For every additional 19 inches in shroud length, the shroud can deflect an additional inch. See Figure 2.



**Figure 2. Rigid Cord Shroud Center Load Test and Deflection Measurement.**

(v)  While continuing to apply the 5-pound force, determine if the cord(s) can be contacted by the cord shroud accessibility test probe shown in Figure 3. If the cord shroud accessibility test probe can touch any cord, the cord(s) are considered accessible.



**Figure 3. Cord Shroud Accessibility Test Probe.**

(2) *Test methods for rigid cord shrouds: Axial torque test.*

(i) Mount one end of the rigid cord shroud and restrict the rotation along the axial direction.

(ii)  Apply a 4.4 in-lb. (0.5Nm) torque along the other end of the rigid cord shroud for 5 seconds.

(iii)While continuing to apply the torque, determine if the cord(s) can be contacted by the cord shroud accessibility test probe shown in figure 3.  If the cord shroud accessibility test probe can touch any cord, the cord(s) are considered accessible.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

(c) *Requirements for cord retraction devices.* If a custom window covering complies with paragraph (a) using a cord retraction device, the retraction device shall meet the requirements in paragraphs (c)(1) through (4).

(1) When a 30 grams mass is applied to the Operating Interface, the Cord Retraction Device shall maintain full retraction of the Retractable Cord such that the Retractable Cord is not accessible per Appendix C of ANSI/WCMA A100.1 – 2018.

(2) The maximum stroke length for a Cord Retraction Device is 12 inches measured from the bottom of the headrail.

(3) The Operating Interface for Cord Retraction Devices may not be a Cord of any length including a Short Static or Access Cord. It may be a ring and pole, a wand or any other design that cannot bend on itself, eliminating the potential of creating a hazardous loop.

(4) The Cord Retraction Device shall have a service life of at least 5,000 cycles after exposed portions or components have been subjected to 500 hours of UV exposure per AATCC Test Method 16-2004, Option 3 of ANSI/WCMA A100.1 – 2018.

(d) *Requirements for Loop Cord and Bead Chain Restraining Devices.* If a custom window covering complies with paragraph (a) using a Loop Cord and Bead Chain Restraining Device, the Loop Cord and Bead Chain Restraining Device shall meet the requirements in section 6.5, of ANSI/WCMA A100.1 – 2018 with an additional test as defined in paragraph (e)(l), and shall not form a hazardous loop when tested for a hazardous loop using the test methods defined in paragraphs (d)(2) and (3).

(1) *Test methods for Loop Cord and Bead Chain Restraining Device: UV Stability and Operational Cycle test.* One sample Loop Cord and Bead Chain Restraining Device shall be tested to section 6.5.2.2 of ANSI/WCMA A100.1 – 2018, UV Stability, followed by section 6.5.2.1 of ANSI/WCMA A100.1 – 2018, Operational Cycle Test.

(2) *Test methods for Loop Cord and Bead Chain Restraining Device: Center load test.*

(i) Support each end of the Loop Cord and Bead Chain Restraining Device, but do not restrict the rotation along the axial direction. Supports must be within 0.25 inches from the ends of the shroud as shown in Figure 4.



Cord and Bead Chain Restraining Device

0.25 in.

**Figure 4. Cord and Bead Chain Restraining Device Test Set-up.**

(ii) Apply a 5-pound force at the center of the Cord and Bead Chain Restraining Device for at least 5 seconds as shown in figure Y.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

(iii) Measure the maximum deflection of the Cord and Bead Chain Restraining Device, while the 5-pound force is applied.

(iv) For Cord and Bead Chain Restraining Device that are ≤ 19 inches, the deflection shall not exceed 1 inch. For every additional 19 inches in shroud length, the shroud can deflect an additional inch. See Figure 5.



**Figure 5. Loop Cord and Bead Chain Restraining Device Center Load Test and Deflection Measurement**

(v) While continuing to apply the 5-pound force, determine if the cord(s) create an opening between the cord and the restraining device. If the Hazardous Loop Head Probe (ANSI/WCMA A1001-2018, figure D1) can pass through the opening, the opening is considered a hazardous loop.

*(3) Test methods for Cord and Bead Chain Restraining Devices: Axial torque test.*

(i) Mount one end of the *Cord and Bead Chain Restraining Device* and restrict the rotation along the axial direction.

(ii) Apply a 4.4 in-lb. (0.5 Nm) torque along the other end of the Cord and Bead Chain Restraining Device for 5 seconds. While continuing to apply the torque, determine if the cord(s) if the cord(s) create an opening between the cord and the restraining device. If the Hazardous Loop Head Probe (ANSI/WCMA A1001-2018, figure D1) can pass through the opening, the opening is considered a hazardous loop.

**1260.3 Prohibited stockpiling.**

(a) *Prohibited acts.* Manufacturers and importers of custom window coverings shall not manufacture or import custom window coverings that do not comply with the requirements of this part in any 12-month period between [date of promulgation of the rule] and [effective date of the rule] at a rate that is greater than 120 percent of the rate at which they manufactured or imported custom window coverings during the *base period* for the manufacturer.

(b) *Base period.* The base period for custom window coverings is any period of 365 consecutive dates, chosen by the manufacturer or importer, in the 5-year period immediately preceding the promulgation of the final rule.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**1260.4 Findings.**

[Findings and Incorporation by Reference are part of the draft final rule.]

**1260.5 Incorporation By Reference.**

[Incorporation by Reference is part of the draft final rule.]

**1260.6 Severability.**

[Severability is part of the draft final rule.]

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

A576

# Tab E: Draft Final Rule for Window Covering Cords Under Section 15(j) of the CPSA:  Window Coverings Small Business Considerations

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



United States
**Consumer Product Safety Commission**
cpsc.gov | info@cpsc.gov | 800.638.2772

# Memorandum

**TO:**      Rana Balci-Sinha, Project Manager,       **DATE:** September 28, 2022
             Division of Human Factors,
             Directorate for Engineering Sciences

**THROUGH:** Alexander P. Moscoso, Associate Executive Director,
             Directorate for Economic Analysis

**FROM:**    Mark Bailey, Directorate for Economic Analysis

**SUBJECT:** Draft Final Rule for Window Covering Cords Under Section 15(j) of the CPSA:  Window
             Coverings Small Business Considerations

## I.   Introduction

This memorandum addresses small business considerations related to a draft final rule under section 15(j) of the Consumer Product Safety Act (CPSA). The Commission did not receive any comments opposed to the rule, or on the small business considerations of the proposed rule. Accordingly, staff recommends finalizing the rule as proposed, and that the Consumer Product Safety Commission (CPSC or Commission) determine that window covering products, as defined in the final rule, that do not conform to one or more readily observable characteristics set forth in the ANSI/WCMA A100.1 – 2018, American National Standard for Safety of Corded Window Covering Products (ANSI/WCMA A100.1 – 2018) voluntary standard present a substantial product hazard (SPH).

## II.   Background

Section 223 of the Consumer Product Safety Improvement Act of 2008 (CPSIA) amended section 15 of the CPSA with the addition of section 15(j), 15 U.S.C. § 2064(j). The amendment states that the Commission may specify, by rule, characteristics of products that present an SPH if: (a) the characteristics are readily observable; (b) the characteristics have been addressed by a voluntary standard; (c) such voluntary standard is effective in reducing the risk of injury; and (c) products substantially comply with the requirements in the voluntary standard. On January 7, 2022, the Commission published a proposed rule to deem as an SPH, "stock" window covering products that do not conform to one or more readily observable characteristics in WCMA A100 1.2018 and "custom" window covering products that do not conform to the inner cord provisions in WCMA A100 1.2018 section 6.  87 FR 891.

In the NPR, the Commission found that ANSI/WCMA-2018 adequately addresses the risk of injury associated with hazardous cords on "stock" window coverings and inner cords on both "stock" and "custom" window coverings. ANSI/WCMA-2018 has been in effect since December 2018. Staff noted in the NPR staff briefing package (SBP) that many manufacturers began offering cordless stock products before the standard went into full effect.

CPSC received three comments on the section 15(j) rule during the comment period, and two comments before the comment period began, with all of the commenters supporting the rule.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Based on staff's assessment of the ANSI/WCMA-2018 standard and all comments in support of the rule, staff recommends finalizing the rule as proposed. If the Commission votes to promulgate the draft final rule under section 15(j) of the CPSA, the rule would make failure to comply with of one or more of the following readily observable characteristics required in WCMA A100 1.2018 a reason for deeming stock window coverings an SPH.

- *Stock window coverings* that fail to comply with one or more of the following requirements of ANSI/WCMA A100.1 – 2018:

  - Operating cord requirements in sections 4.3.1.1 (cordless operating system), 4.3.1.2 (short static or access cord), or 4.3.1.3 (inaccessible operating cord); and

  - Inner cord requirements in section 4.5.

- *Custom window coverings* that fail to comply with inner cord requirements in section 4.5 of ANSI/WCMA A100.1 – 2018.

- *Stock* and *custom window coverings* that fail to comply with the requirement for an on-product manufacturer label in section 5.3 of ANSI/WCMA A100.1 – 2018.

Window coverings that fall within the scope of ANSI/WCMA-2018 and the draft final rule that do not conform to the provisions above would present an SPH and be subject to appropriate enforcement action, such as a product recall, fines, or seizure and forfeiture upon importation.

# III.  Market Information

The draft final rule would apply to operating cords on all stock window covering products, and inner cords on both stock and custom window coverings, as defined in the draft final rule, consistent with the definitions in ANSI/WCMA-2018.  Window coverings include the following product categories: blinds, shades, and curtains and draperies.  The shades category includes: cellular shades, pleated shades, roller shades, and Roman shades. The blinds category includes horizontal blinds and vertical blinds of varying material types. The total window covering market size in 2021 was approximately $6.7 billion.[1] (Euromonitor 2022a)  CPSC staff estimates that firms classified as small by Small Business Administration (SBA) guidelines account for $3.9 billion annually, and that none of these firms account for more than three percent of total market share by revenue. (Euromonitor 2022b)

# IV.  Industry Information

The North American Industry Classification System (NAICS) defines product codes for U.S. firms.  Firms that manufacture window coverings may list their business under the NAICS product code for blinds and shades manufacturers (337920 Blind and Shade Manufacturing) or retailers (442291 Window Treatment Stores).[2] Importers of window coverings are generally

---

[1] Stock window coverings most likely account for a minority of the total market size in terms of revenue due to significant average price differences between stock and custom products. (D+R International 2021)

[2] The two product codes 337920 and 442291 encompass most products in the window coverings market.  However, some drapery and curtain manufacturers may be listed under 322230, stationary product manufacturing. Retailers that sell window coverings could also be listed under a few other products codes, but it is unlikely that window coverings revenues account for a significant share of the total revenues.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

listed in Home Furnishing Merchant Wholesalers (423220) which includes other home furnishing items and is non-specific to window coverings.

Under SBA guidelines, a manufacturer of window coverings is categorized as small if the firm has fewer than 1000 employees, retailers are considered small if they have sales revenue less than $8.0 million, and importers if the firm has fewer than 100 employees. Based on 2017 data, 1,898 firms were categorized as blinds and shades manufacturers and retailers (Census Bureau, 2020). Of these, about 1,840 firms (302 manufacturers and 1,538 retailers) are small. As the NAICS code for importers is non-specific to window coverings, CPSC staff reviewed Customs and Border Patrol data, firm financial reports, and Dun & Bradstreet reports to obtain an estimate. CPSC staff estimates that there are approximately 83 importers that meet the SBA guidelines for a small business. (Bailey 2021) Nearly all of the 302 small manufacturers identified are far below the 1000 employee SBA threshold as a majority are firms with under 5 employees. The window coverings produced by these firms would likely meet the voluntary standard definition of a custom product, because many are hand crafters and produce products to a specific customer order.

# V.   Small Business Impacts

The draft final rule designating window covering products that do not conform to ANSI/WCMA-2018 provisions concerning stock products and custom product inner cord accessibility as an SPH will not likely have a significant impact on a substantial number of small businesses or other small entities. Data collected in person at manufacturers, retailers, and importers by CPSC staff indicates that the level of conformance with the sections of the WCMA standard concerning stock products is high and most likely greater than 90 percent.[3] Samples tested by CPSC staff also indicate a high level of conformance in custom products related to inner cord accessibility.[4]

Firms already conforming to the standard would experience no impact on their manufacturing costs by the draft final rule. CPSC staff does note though that at least one small manufacturer that does not currently conform to the accessible cord provision will experience a significant cost impact by the rule. (Bailey 2021) Based on the level of compliance, staff concludes it unlikely that a substantial number of small manufacturers will experience this cost impact. Staff does not expect retailers and importers to be significantly impacted by the rule as potential costs to conform (no accessible cords, and labeling) will be borne by manufacturers. Should a window covering retailer and/or importer bear a cost related to conformance, staff expects the cost to only account for a small portion of total revenues as these firms typically sell/import other home furnishing products in addition to window coverings.

# VI.  Summary

The draft final rule would make failure to comply with one or more readily observable characteristics required in ANSI/WCMA-2018 as specified in the regulatory text a reason for

---

[3] CPSC staff conducted in person unannounced visits to window covering retailers, manufacturers, and importers in major metropolitan areas and only found one instance of non-compliance, in which a stock product was available with accessible cords. Two other non-compliance cases were found concerning warning/manufacturer labels but were related to a custom product and out of scope.

[4] Staff tested custom product samples using test parameters defined in WCMA A100 1.2018 which involved the use of a cord accessibility probe.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

A580

deeming stock and custom window coverings an SPH. There are a large number of small businesses in the market and nearly all of these firms comply with the sections of the voluntary standard concerning these observable characteristics. CPSC received only comments in support of this action. The commission could certify the rule as proposed.

# References Cited

Bailey, Mark, 2021. *Preliminary Regulatory Analysis of the Draft Proposed Rule for Custom Window Coverings* U.S. Consumer Product Safety Commission, 2021.

Census Bureau, 2020. Statistics of US Businesses (SUSB) 2017. Suitland, MD. Census Bureau.

D+R International Ltd, 2021. Window Covering Market Characterization: Final Report. Silver Spring, MD. D+R International.

Euromonitor International, 2022a. Window Covering Market Share by Company 2016-2021. Chicago, IL. Euromonitor International.

Euromonitor International, 2022b. Window Covering Market Size USD 2016-2021. Chicago, IL. Euromonitor International.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

# Tab F: Final Regulatory Analysis Report by the Directorate for Economic Analysis

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



United States
# Consumer Product Safety Commission

# Final Regulatory Analysis

## Draft Final Rule for Custom Window Coverings

September 28, 2022

FOR ADDITIONAL INFORMATION, CONTACT:

MARK BAILEY
ECONOMIST
DIRECTORATE FOR ECONOMIC ANALYSIS
OFFICE OF HAZARD IDENTIFICATION AND REDUCTION
EMAIL: mbailey@cpsc.gov

U.S. CONSUMER PRODUCT SAFETY COMMISSION
4330 EAST WEST HIGHWAY

BETHESDA MD. 20814



THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

United States
**Consumer Product Safety Commission**
cpsc.gov | info@cpsc.gov | 800.638.2772

Table of Contents ................................................................................84

Executive Summary ............................................................................86

I.   Introduction ................................................................................88

    A.   Draft Final Rule ..................................................................88

II.  Market Information ......................................................................89

    A.   The Product ........................................................................89

    B.   Corded Window Covering Products ..................................89

    C.   Cordless Window Products ................................................90

    D.   Other Types of Safety Devices ........................................90

    E.   Retail Prices ......................................................................90

    F.   Annual Shipments ............................................................91

    G.   Window Coverings In Use ................................................92

III. Final Regulatory Analysis ..........................................................93

    A.   Annual Injury Costs ..........................................................94

    1. Fatal and Nonfatal Injuries involving Window Covering Cords ................................94

    2. Annual Injury Costs, per Window Covering in Use ..........97

    B.   The Expected Costs of the Rule ......................................99

    C.   Comparison of Costs and Benefits of the Draft Final Rule ................................109

    D.   Characterization of Uncertainty in Benefit and Cost Estimates ........................112

    E.   Sensitivity Analysis ........................................................113

    F.   Additional Discussion ......................................................116

    G.   Unquantified Benefits ......................................................116

    H.   Summary of Changes to Preliminary Regulatory Analysis in response to comments received ................................117

    I.   Summary and Conclusion ..............................................117

IV. Regulatory Alternatives ............................................................118

    A.   No Action Alternative ......................................................118

    B.   Improve Voluntary Standard for Window Coverings ........118

    C.   Later Effective Date ........................................................119

    D.   Narrow Final Rule to Vertical Blinds, Curtains, and Drapes ................................120

    E.   Continue and Improve Information and Education Campaign ..........................120

References ........................................................................................122

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

A584

# Executive Summary

Window coverings are separated into the following product categories: blinds, shades, and curtains/draperies.  The shades category includes cellular shades, pleated shades, roller shades, and Roman shades, while the blinds category includes horizontal blinds and vertical blinds of varying material types.  Curtains/draperies are a piece of material (normally a fabric) hung at the top of a window to form a covering or screen.  These products are further classified by a "stock" and "custom" designation as defined in the voluntary standard for window coverings, American National Standards Institute/Window Coverings Manufacturers Association ANSI/WCMA A100.1-2018.  Generally, stock products are less expensive than custom for similar materials and construction.  Operating systems for window coverings are classified into two categories: corded and cordless. Corded window covering operating systems generally have cords to raise and lower the product, or move the product from side to side, as well as to open and close slats to allow for light control.  Corded window coverings can be made safer by incorporating a passive mechanism to make hazardous cords inaccessible or less hazardous to children, such as using a rigid cord shroud, a retractable cord, or a loop cord and bead chain restraining device.

Over the last  5 years, three large manufacturers have accounted for over 40 percent of sales in the U.S. window coverings market. Only one of these manufacturers is a publicly-held firm and has accounted for nearly 30 percent of all U.S. window covering sales in terms of revenue in 2021. The other two large manufacturers account for a much smaller share of revenue, but a slim majority of all revenues in the window covering market is from firms that account for less than three percent market share individually. Approximately 15.85 million *corded custom* window coverings were shipped in 2020.

The draft final rule would address the risk of strangulation to children aged 8 and under by eliminating hazardous accessible cords from custom window covering products. ANSI/WCMA published a voluntary standard which has been in effect since late 2018.  CPSC staff assesses that compliance with this voluntary standard eliminates accessible cords from stock window covering products and is adequate to address the strangulation risk in those products. However, staff also assesses that the ANSI/WCMA standard does not eliminate the risk of strangulation from custom window covering products because the standard still allows for the use of hazardous accessible cords in custom products. This draft final rule requires custom window coverings to meet the same requirements as stock products in section 4.3.1 of the ANSI/WCMA standard, meaning products must be cordless, use operating cords that are 8 inches or shorter, or make operating cords inaccessible.  The draft final rule contains requirements for two methods to meet the inaccessibility option: rigid cord shrouds and retractable cords. The draft final rule also allows for corded products that use a loop cord or bead chain restraining device that meets the requirements of the rule to address the strangulation hazard.

Based on estimates from the National Electronic Injury Surveillance System (NEISS) and the Injury Cost Model (ICM), CPSC staff estimates that 7.6 nonfatal medically treated injuries and 6.8 fatalities occur annually among all corded window coverings after excluding incidents

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

involving inner cords and lifting loops.[1] (Chowdhury 2022). Staff in the Directorate for Economic Analysis (EC) estimate the societal costs of these injuries to be about $72 million annually using the adult-focused $10.5 million VSL. Overall, staff found that fatalities account for an overwhelming majority of societal costs at $71.4 million annually, and that nonfatal injuries account for about $498,000 in societal costs annually.

Staff assesses that the voluntary standard adequately addresses the risk of injury from stock window coverings, and addresses stock window coverings in a separate draft final rule under section 15(j) of the Consumer Product Safety Act (CPSA). The draft final rule addressing custom window coverings, under sections 7 and 9 of the CPSA, would only address the proportion of corded window covering injuries attributable to the operating cords of custom products. Staff estimates the societal cost of deaths and injuries attributable to custom products to be $31.6 million annually, (about 44 percent of the total) based on a CPSC staff review of incidents. Staff divided that societal cost by the estimated 145 million *corded custom* window coverings in use for the year of 2020 which resulted in a per-unit societal cost of $0.22.

Staff calculated the present value of the societal cost of deaths and injuries for each blind type based on each type's expected product life. The present value of societal cost per unit for Metal and Vinyl horizontal blinds, and Wood and Faux Wood horizontal blinds amounts to $1.06 and $1.61 respectively. For cellular, pleated, roman, roller, and soft sheer shades, the per unit present value equates to $2.04, $2.12, $2.43, $2.04, and $2.04 respectively. Staff combines these societal unit costs with *corded custom* window covering shipments in 2020 to generate a gross annual societal cost of $24.35 million. Finally, staff adjusts this estimate for the expected effectiveness of the draft final rule to estimate a total benefit of approximately $23 million from the draft final rule.

The draft final rule would impose costs on manufacturers of custom window covering products. Manufacturers would likely pass much of incremental per unit manufacturing cost to consumers in the form of higher prices. Based on component cost estimates, assembly/manufacturing costs, consumer surplus loss, and proportions of domestic manufacturing, the incremental cost per corded custom window covering produced would range from $2.20 to $35.79 and is highly dependent on product type. Data show that approximately 53 percent of custom products shipped in 2021 were corded (WCMA 2022b). The draft final rule would not result in any cost increases for cordless custom window coverings. Staff combines the 2020 *corded custom* shipment estimate of 15.85 million units with the per unit cost increase to generate an aggregate cost estimate ranging between $54.4 million and $114 million. An additional cost estimate for the research, development, implementation, time, and retooling required for some corded product amounts to approximately $14.7 million after discounting future expenses by 3 percent. Including this value results in a total aggregate cost estimate range of $54.4 million to $129 million.

Based on staff's estimated benefit and costs, net benefits, (*i.e.*, benefits minus costs) for the market of custom window coverings (*i.e.*, excluding stock window covering products) amounted between -$106 million to about -$31.3 million. Staff also conducted a sensitivity analysis for a few variables, with net benefits varying from the main analysis with the highest value equating to approximately positive benefit of $14.3 million. Specifically, staff's adjustment to a child-focused VSL of $31.5 million increased the net benefits range to -$45.3 million to $14.3 million.

---

[1] Incidents involving inner cords and lifting loops are addressed by the rule concerning stock and custom product inner cords/lifting loops. These incidents would be addressed by the draft final rule for Window Covering Cords Under Section 15(j) of the CPSA.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Staff's analysis also discusses several alternatives to the draft final rule, including:

- No Action Alternative
- Rely upon or Improve the Voluntary Standard for Window Coverings
- Later Effective Date
- Limit the Scope of the Final Rule to Vertical Blinds, Curtains, and Drapes
- Continue and Improve Information and Education Campaign
- Adopt Canadian Mandatory Standard

The costs related to four alternatives would be lower than the expected costs of the draft final rule, but the benefits would also be lower. Staff recommends a longer effective date for the rule as it reduces some costs related to research and development for larger window coverings with an inconsequential expected reduction in benefits. Staff does not recommend any of the other alternatives, as discussed later in this Tab, because none of those alternatives adequately address the risk of injury or provide additional benefits.

# I. Introduction

Parents for Window Blind Safety, Consumer Federation of America, Consumers Union, Kids in Danger, Public Citizen, U.S. Public Interest Research Group (PIRG), Independent Safety Consulting, Safety Behavior Analysis, Inc., and Onder, Shelton, O'Leary & Peterson, LLC petitioned the CPSC to promulgate a mandatory standard that prohibits the use of cords in window coverings where a feasible cordless alternative exists, and, for those instances where a feasible cordless alternative does not exist, require that the cords be less than 8 inches long, or require that cords be made inaccessible through the use of passive guarding devices. On July 15, 2013, the Commission published a *Federal Register* notice (78 *Fed. Reg.* 42,026) requesting public comments on the petition.

The CPSC initiated a regulatory proceeding by publishing an Advance Notice of Proposed Rulemaking (ANPR) on January 16, 2015 (80 *Fed. Reg.* 566). In 2017, the Window Covering Manufacturers Association (WCMA) updated its voluntary standard that was officially adopted in 2018 (ANSI/WCMA-2018). The 2018 version of the ANSI/WCMA voluntary standard segments window covering products into two main categories: stock and custom. The voluntary standard requires stock window covering products to be without cords, without accessible cords, or with a short, static cord (*i.e.*, maximum eight inches in length). The voluntary standard requires custom products to meet one of the three requirements: (1) No operating cords; (2) Short cord with a length equal to or less than 8 inches in any state (free or under tension), (3) Inaccessible operating cords determined per the test requirement in Appendix C of the standard **or** have operating systems that result in free-hanging and accessible cords; these systems include single retractable cord lift system, continuous loop operating system, and standard operating system. The voluntary standard allows for several types of accessible hazardous cords or loops in custom window coverings (Tab C).

## A. Draft Final Rule

The draft final rule addresses the strangulation hazard involving corded custom window covering products by applying the requirements for stock products in section 4.3.1 of ANSI/WCMA-2018 to custom window coverings – with an allowance for rigid cord shrouds, retractable cords, and cord and bead restraining devices, that meet the requirements in the rule. Staff concludes that the requirements for stock products are effective at preventing

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

strangulations and would be 94.4 percent effective when applied to custom window coverings. (Balci-Sinha 2022)

# II.  Market Information

### A.  The Product

Window coverings include the following product categories: blinds, shades, and curtains and draperies.  The shades category includes cellular shades, pleated shades, roller shades, and Roman shades, while the blinds category includes horizontal blinds and vertical blinds of varying material types. Window covering products are further classified by a "stock" or "custom" designation, as defined in ANSI/WCMA-2018.  The standard defines a "stock" window covering product as a specific stock keeping unit, which is completely or substantially fabricated in advance of being distributed in commerce (as that term is defined in 15 U.S.C. Sect.2052(a)(7)) and in advance of any specific consumer request for that product. A stock window covering can either be sold "as is" or modified or adjusted by the seller, manufacturer, or distributor before or after being distributed in commerce. Even after modification, the product would still be considered a stock blind or shade. Custom products are all products which do not meet the definition of a stock product.

Materials used to make shades and blinds include fabric, wood or faux wood, polymers, such as vinyl, and woven materials, such as bamboo. Window covering operating systems can vary slightly by window covering type, but all operating systems fit into one of two general categories: corded or cordless. Window covering products are mounted either inside or outside the window frame, and can be customized to fit non-standard sized windows, or for operation when the window frame is inaccessible, using tools or mobility devices (ladders, stools, lifts etc.). Some window covering types, curtains/drapes, shades, and horizontal blinds, can also be customized to fit unusual window shapes like circles, ovals, trapezoids, diamonds etc., but operation may be limited.

### B.  Corded Window Covering Products

"Traditional" or "corded" shades and blinds generally have cords located inside the product (inner cord), to the side of the product (operating cord or outer cord), or both.  The inner cords between the headrail and bottom rail lift the horizontal slats to adjust light coming through, as in the case of horizontal blinds, or fabric and similar materials, as in the case for Roman or pleated shades.  The inner cords may be exposed from the front, rear, or bottom of the window covering, or can be rendered inaccessible depending upon how the product is constructed. Horizontal blinds and pleated shades generally have two inner cords, one on each side of the blind, but products manufactured for wider windows may require more than two inner cords to be operational.

The outer cord or operating cord allows the user to raise, lower, open and close, rotate, or tilt the window covering.  Operating cord systems generally fall into one of three categories: (1) standard; (2) single cord; and (3) continuous loop.  The operating cord in a standard operating system consists of two or more cords and often includes a cord locking device to allow the user to set the height of the window covering.  In a single cord operating system, the user is able to manipulate the window covering with a pull cord. The operating cord in a continuous loop operating system uses a single piece of cord or a beaded metal or plastic chain which is secured to a wall and operates like a pulley.  For example, pulling the rear loop will raise the shade while pulling the front half of the loop will lower the shade.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

While operating systems can vary, some products are more commonly coupled with specific systems. Cellular and pleated shades can have any of the three systems while roller and Roman shades mostly use a standard or continuous loop. Horizontal blinds are generally coupled with a standard operating system while vertical blinds operate by continuous loop. Some curtains and drapes operate by continuous loop in conjunction with a traverse rod and are also within the scope of the rule. However, many curtains and drapes are stationary and do not have operating systems; these products are not within the scope of the rule.

### C. Cordless Window Products

Virtually every window covering type is available with a "cordless" operating system, which means it has been designed to function without an operating cord.[2] Staff note that while cordless options are currently available for nearly all window covering *types,* these options are not available for all *sizes.* Cordless window coverings may require inner cords, but these cords are made inaccessible or do not allow hazardous loop to be created through a variety of approaches, as required in the voluntary standard for both stock and custom window coverings. In lieu of an operating cord, cordless operating systems can be manual or motorized. A manual operating system allows users to lift or lower the window covering with a handle or directly by hand. For this regulatory analysis, "cordless" or cordless products will refer to systems where a cord is inaccessible either through the absence of a cord or use of safety device that would meet the requirements of the rule.

A motorized operating system uses a motor and control system to manipulate the window covering, such as a remote control or wall switch. Installation of cordless window coverings that are motorized is more complicated than manual systems as these require a power source. The power sources for motorized systems in order of installation complexity are: battery powered, electrical outlet, solar powered, and what is commonly called "hardwired."

### D. Other Types of Safety Devices

Rather than eliminating the operating cord entirely, some manufacturers offer other devices to render the operating cord inaccessible. These alternatives include, among others: retractable cord devices, cord shrouds, cord and bead chain restraining devices, and wands. All of these devices are available for purchase by consumers, but offerings vary by manufacturer. A retractable cord device uses a spring-loaded spool to adjust the length of the pull cord. A cord shroud encloses the pull cord or continuous cord loops for various types of blinds and shades with a rigid material, usually plastic. Wands are simple pieces of plastic that the consumer rotates or pulls to operate the window covering in place of a cord.

### E. Retail Prices

Retail prices for window coverings vary, depending on the type of the product and retailer. Stock window covering products can be purchased at a variety of retailers, such as big box stores, home furnishing stores, and e-commerce retailers, such as Amazon and Wayfair. The type of material and brand affect the price. According to a D+R International (2021) study, average prices for window coverings range from $54 to $94 for shades and from $25 to $250 for blinds.[3]

---

[2]The availability of alternatives to corded window coverings may sometimes be constrained due to size and weight limitations but still feasible with additional research. *See* Tab C Lee 2022.

[3] The range for shades is based on average prices for cellular shades, roller shades, Roman shades, and pleated shades. The range for blinds is based on average prices for vinyl blinds, metal blinds, faux-wood blinds, wood blinds, and vertical blinds.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Prices for vertical blinds are generally lower than the prices of horizontal blinds; prices for roller shades are slightly lower than the prices of Roman and cellular shades (D+R International, 2021).[4]

Consumers can purchase custom sized and custom designed window coverings from mass merchants, specialty retailers, e-commerce retailers, and in-home consultation firms. Custom coverings include uncommon window covering sizes, such as extremely small (e.g., 9 inches wide x 13 inches high), extremely large (e.g., 96 inches wide x 96 inches high), and other unusual sizes. Retail prices for custom made window coverings can be as high as $5,000.[5] Retailers often suggest in-home measuring and evaluation to estimate the price for custom designed products, as non-standard sizes or window shapes or motorized lift systems can require professional installation. Prices for customized window coverings are on average higher than similar stock products sold by mass retailers.

### F. Annual Shipments

Staff obtained annual shipment estimates by product type for the years 2015 to 2025 from D+R International as part of a CPSC-funded contract for a window covering market characterization report.[6] D+R International based these estimates on manufacturer-submitted data from a 2007 to 2015 time frame. Table 1 provides staff's annual shipment estimates by product type from 2015 to 2020.

---

[4] The D+R review of prices and product availability found that stock product prices are generally lower than custom products and that cordless lift systems resulted in an increase in price except in the case of vertical blinds.
[5] Based on firms' websites, retail prices for custom-made Roman shades can range from $300-$5,000.
[6] See Figure 7 of D+R International 2021.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**Table 1. Annual Window Covering Shipments by Type (Millions)**

|  | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|
| Metal/Vinyl Horizontal Blinds | 36.77 | 34.39 | 31.91 | 33.53 | 39.24 | 34.02 |
| Wood or Faux Wood Horizontal Blinds | 17.62 | 22.72 | 23.45 | 23.02 | 21.28 | 16.34 |
| Cellular Shades | 10.02 | 13.84 | 13.55 | 13.26 | 13.07 | 10.67 |
| Pleated Shades | 6.61 | 4.52 | 3.44 | 3.95 | 5.48 | 7.02 |
| Roman Shades | 2.19 | 2.82 | 2.92 | 2.86 | 2.64 | 2.03 |
| Roller Shades | 11.48 | 13.12 | 10.62 | 9.70 | 10.89 | 10.60 |
| Soft Sheer | 8.32 | 6.90 | 4.77 | 3.31 | 3.23 | 4.24 |
| Vertical Blinds | 18.99 | 25.16 | 25.83 | 24.50 | 21.73 | 16.59 |
| Sheer Drapery | 1.73 | 2.60 | 3.22 | 3.96 | 4.70 | 4.95 |
| Curtains/Drapery | 5.52 | 7.94 | 10.67 | 13.46 | 15.81 | 17.06 |
| Interior Shutters | 1.04 | 1.00 | 0.65 | 0.60 | 0.78 | 0.67 |
| Total | 120.29 | 135.02 | 131.01 | 132.15 | 138.84 | 124.17 |
| Source: D+R International (2021) | | | | | | |

## G. Window Coverings In Use

CPSC staff calculated an estimate of the number, and statistical distribution, of custom window coverings in use using CPSC's Product Population Model (PPM).[7] The PPM is a statistical model that projects the number of products in use given estimates of annual product shipments/unit sales and information on product failure rates over time. For this analysis, staff estimated the population of each type of window covering in 2020. Staff assumed the failure rate for each type of window coverings would follow a gamma distribution (with a shape parameter of 3) which is a commonly used distribution for modeling product failure rates.[8] Using the annual unit shipment estimates from the D+R International (2021) report (See Table 1), along with estimates on the number of corded products sold/in use, estimates for the share of custom products sold/in use, and estimates of the expected product life for window coverings by type provided by WCMA; staff estimates approximately 145 million corded custom window coverings in use in the United States in 2020. This includes about 76 million horizontal blinds, and approximately 23 million each for shades/vertical blinds/curtains/drapes. Horizontal blinds,

---

[7] Lahr, M.L., Gordon, B.B., 1980. Product life model feasibility and development study. Contract CPSC-C-79-009, Task 6, Subtasks 6.01-6.06). Columbus, OH: Battelle Laboratories.
[8] See Zamula, Rodgers, Bailey (2016), Smith (2016), and Bailey (2018) for other examples.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

shades, vertical blinds, and curtains/drapes account for 52.4 percent, 15.9 percent, 15.9 percent, and 15.9 percent of the window covering population, respectively.

Table 2 shows the breakdown and calculation of estimated *corded custom* products in use, by type. The estimate is created by multiplying the total number of window coverings in use (created with the PPM) by the share of custom product sales and the share of corded product sales. For example, the estimate for the number of Vinyl/Metal horizontal blinds in use in 2020 is 46.2 million. (251.35 million products in use × 20% of products that are custom × 91.9% of products that are corded).[9]

**Table 2. Estimates of the Number of Corded Custom Window Coverings in Use**

| | [1]<br>Number of Products in use (Millions) | [2]<br>% of Custom products in use (WCMA 2022a) | [3]<br>% of Corded Products (WCMA 2022b) | [4]<br>Expected Product Life (WCMA 2022b) | [5]<br>Number of Corded Custom Products in use (Millions) |
|---|---|---|---|---|---|
| Horizontal Blinds | 474.24 | | | | 76.02 |
| Vinyl/Metal | 251.35 | 20% | 91.9% | 6.7 | 46.20 |
| Wood/Faux Wood | 222.89 | 20% | 66.9% | 10.8 | 29.82 |
| Shades | 280.36 | | | | 22.67 |
| Cellular | 94.46 | 20% | 21.0% | 7.2 | 3.97 |
| Pleated | 40.66 | 20% | 31.0% | 7.5 | 2.52 |
| Roman | 23.29 | 20% | 41.2% | 8.75 | 1.92 |
| Roller | 84.27 | 20% | 57.3% | 7.2 | 9.66 |
| Soft Sheer | 37.69 | 20% | 61.1% | 7.2 | 4.61 |
| | | | | | |
| Vertical Blinds | 177.84 | 20% | 64.8% | 7.6 | 23.05 |
| | | | | | |
| Curtains/Drapery | 212.59 | 20% | 54.4% | 15 | 23.13 |
| Total | 1,145.03 | | | | 144.87 |

# III. Final Regulatory Analysis

Pursuant to section 9(c) of the Consumer Product Safety Act, publication of a final rule must include a final regulatory analysis containing the following:

---

[9] These estimates have an underlying assumption that the share of shipments/sales will equal the population in use. Staff note that changes in consumer preferences over time and differences in the product life between custom and stock products could result in significant deviations in this estimate.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

(1) a description of the potential benefits and costs of the final rule, including any benefits or costs that cannot be quantified in monetary terms, and an identification of those likely to receive the benefits and bear the costs;

(2) a description of any reasonable alternatives to the final rule, together with a summary description of their potential costs and benefits and why such alternatives should not be published as a proposed rule and

(3) a summary of significant issues raised by the comments submitted during the public comment period in response to the preliminary regulatory analysis, and a summary of the assessment by the commission of such issues.

This analysis discusses the benefits (sections III.A, III.C, and III.F) and costs (sections III.B, III.C) of the draft final rule from a societal perspective, considering all significant costs and health outcomes (Gold et al., 1996; Haddix, Teutsch, and Corso, 2003; Neumann et al., 2016). Staff measures benefits of the draft final rule as the reduction in societal costs from deaths and injuries involving corded window coverings. Some potential benefits could not be quantified and are instead discussed qualitatively in section III.F. The costs of the rule are defined as the added costs associated with bringing custom corded window coverings into compliance with the draft final rule. The primary outcome measure is expected net benefits (i.e., benefits minus costs) of the draft final rule. The analysis calculates the benefits and costs of the rule on a per product in use basis (Jenkins and Rodgers, 2020), and applies these estimates to annual sales data to determine the expected benefits and costs that would be associated with one year's production and sale of a custom window covering.

## A. Annual Injury Costs

Staff developed annual estimates of societal cost of injuries and deaths involving corded window coverings. These injury costs represent the pool of potential benefits of the final rule. Staff then distributed the societal costs over the major window covering categories (e.g., horizontal blinds, shades, vertical blinds, and curtains/draperies) and classification (stock/custom) to calculate annual societal costs, per window covering, during the 2009 through 2021 time period. Staff then adjusted these estimates to account for safety improvements associated with 2018 revisions to the voluntary standard and CPSC enforcement actions that have taken place in recent years.

### 1. Fatal and Nonfatal Injuries involving Window Covering Cords

According to the Directorate for Epidemiology (EPI), there were 100 reported fatalities from 2009 to 2021, which translates to an average of 7.7 deaths. Excluding incidents involving inner cords/lifting loops, there were 88 fatalities over the same time period, which corresponds to an average of 6.8 deaths per year (Chowdhury, 2022). Many of these fatal incidents occurred before the introduction of the 2018 voluntary standard, however staff finds that the ANSI/WCMA 2018 standard does not eliminate or adequately reduce the risk of injury for custom products as described above because hazardous loops and hazardous lengths of cords remain accessible (Tab C). Staff notes that the average annual fatalities addressed by the draft final rule was 4.8 for the time frame 2018 to 2021, however, the data for these years is not complete, and staff cannot yet draw any trend conclusions from this fact. For example, since staff completed the NPR staff briefing package (SBP) in October 2021, the number of fatalities reported has actually risen to eight (from three, as initially reported) in 2020, and six (from zero, as initially reported) in 2021. Staff expects that these numbers will likely increase over the next year, as CPSC receives more data.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

EPI also provided estimates of injuries reported through the National Electronic Injury Surveillance System (NEISS), a national probability sample of U.S. hospital emergency departments. This NEISS estimate of nonfatal injuries treated in hospital emergency departments did not meet the reporting requirements established by CPSC.[10] Further detail on this can be found in Tab A of this package.

EPI's estimated death and injury estimates are based on 209 flagged incidents that fall within the scope of the strangulation hazard from corded window coverings. Staff performed an incident review of the 209 incidents, which includes fatalities and nonfatal injuries, from 2009 to 2021. Of the 209 incidents, 23 involved inner cords and 4 involved lifting loops which would not be addressed by this rule.[11] Eliminating these incidents reduces the total to 182.[12] Staff identified window covering type and stock/custom classification based on the investigations completed for CPSC, the submitted NEISS narratives, and the information submitted through CPSC's Consumer Product Safety Risk Management System (CPSRMS). Based on this work, Table 3 shows the share of incidents by window covering type and stock/custom classification.

**Table 3. Percentage Share of Injury Incidents from 2009 to 2021 by Blind Type and Classification**

| Product type | Fatalities | | | Nonfatal | | | Total |
|---|---|---|---|---|---|---|---|
| | Stock | Custom | Unknown | Stock | Custom | Unknown | |
| Horizontal Blinds | 7.7% | 3.3% | 13.2% | 9.3% | 6.6% | 6.6% | 46.7% |
| Shades | 1.1% | 2.2% | 2.7% | 0.5% | 3.3% | 2.7% | 12.6% |
| Vertical Blinds | 0.5% | 1.6% | 3.8% | 0.0% | 0.0% | 0.5% | 6.6% |
| Unknown Type | 0.0% | 0.0% | 9.9% | 0.0% | 1.1% | 20.9% | 31.9% |
| Drapes | 0.0% | 0.0% | 2.2% | 0.0% | 0.0% | 0.0% | 2.2% |
| Total | 9.3% | 7.1% | 31.9% | 9.9% | 11.0% | 30.8% | 100.0% |

Horizontal blinds account for the largest share of incidents. Window coverings that could not be identified, "Unknown Type", compose the second largest share of incidents. For both the fatal and nonfatal incidents, the largest share of incidents occurred on products where the classification (stock/custom) could not be determined. For the incidents where the classification could be identified, stock products accounted for a larger share of incidents than custom products.

---

[10] Due to this, the benefit estimates, and estimates of injuries treated outside of emergency departments described later in this report, are based on only reported incidents.

[11] The four lifting loop incidents involved shade product types, but the classification for only 1 (stock) could be determined.

[12] These 27 incidents would be addressed by the other rule in this package under section 15(j) of the CPSA which addresses the inner cord hazard for both classifications and lifting loop hazard for the stock classification. The lifting loop hazard for custom classification products would be addressed by the draft final rule but as no incidents involving custom products with lifting loops could be identified they are excluded from the calculations in this analysis.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

For many incidents, staff could not determine both the windows covering type and stock/custom classification. Staff distributed these "unknown" incidents among the other categories based on of the proportion of incidents for each window covering type and classification with the "unknowns" set aside. This approach assumes that incidents with unidentifiable window covering type and/or classification closely resemble the breakdown of incidents in incidents with known types and classifications.[13]

Table 4 displays the "adjusted" percentage share of incidents after the removal and reassignment of the unknown product type and/or classification.  The adjusted share of custom product fatalities and nonfatal injuries is about 44 percent and 54 percent, respectively.[14]

**Table 4. Adjusted Percentage Share of Injury Incidents by Blind Type and Classification**

| | Fatalities | | Nonfatal | |
|---|---|---|---|---|
| **Product Type** | **Stock** | **Custom** | **Stock** | **Custom** |
| Horizontal Blinds | 43.59% | 18.68% | 41.37% | 30.26% |
| Shades | 5.02% | 10.04% | 3.43% | 21.63% |
| Vertical Blinds | 4.02% | 12.06% | 1.65% | 1.65% |
| Curtains/Drapes | 3.30% | 3.30% | 0.00% | 0.00% |
| Sub Total | 55.93% | 44.07% | 46.45% | 53.55% |
| Total | 100.00% | | 100.00% | |

The NEISS estimates of injuries capture those treated in hospital emergency departments (EDs). However, many product-related injuries are treated in other medical settings like physicians' offices, clinics, and ambulatory surgery centers.  Some injuries also result in direct hospital admission, bypassing the ED entirely. To estimate the number of nonfatal corded window covering injuries treated outside of hospital EDs, staff used the CPSC's Injury Cost Model (ICM) (Lawrence et al., 2018).[15] The ICM uses empirical relationships between the characteristics of injuries (diagnosis and body part) and victims (age and sex) initially treated in hospital EDs, and the characteristics of those initially treated in other settings, to project the number of medically treated injuries treated outside of hospital EDs (Lawrence et al., 2018). The ICM uses the Medical Expenditure Panel Survey (MEPS) data, in combination with a classification tree analysis technique, to project the number and characteristics of injuries treated outside of hospitals. To project the number of direct hospital admissions which bypass

---

[13] Staff split incidents 50/50 between stock and custom if for a product type there were no incidents with an identifiable classification.

[14] If staff had limited the incident analysis to the time frame of 2018 to 2021, therefore eliminating incidents before the 2018 voluntary standards, the custom fatality and nonfatal injury share would change to 52.5 percent and 50 percent, respectively. Staff notes that many of the incidents between 2018 and 2021 the product type and/or classification could not be identified and CPSC assumed a 50 percent split between stock and custom.

[15] Additional detail related to these calculations can be found in the ICM documentation section 5 which is available at: The Consumer Product Safety Commission's Revised Injury Cost Model, February 2018 (cpsc.gov).

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

hospital EDs, the ICM uses data from the Nationwide Inpatient Sample of the Healthcare Cost and Utilization Project (HCUP-NIS), also analyzed using a classification tree analysis technique.

Based on the reported NEISS incidents of window covering injuries initially treated in hospital EDs from 2009 through 2021, the ICM projects a total of 99 injuries with a majority (61) of these injuries treated in treatment settings like a doctor's office.[16] This equates to estimated annual total of about 7.6 medically treated nonfatal injuries involving corded window coverings. Staff note that for injuries of these types to younger age groups the estimate of medically treated injuries in non-ED settings will typically account for 60 to 75 percent of the total nonfatal injury estimate.

## 2. Annual Injury Costs, per Window Covering in Use

Staff monetized nonfatal and medically treated injury costs using the ICM. The ICM is fully integrated with NEISS, and in addition to providing estimates of the costs of injuries reported through NEISS, also estimates the costs of injuries initially treated outside of hospital emergency departments. The injury cost components calculated by the ICM include medical costs, work losses, and the intangible costs associated with lost quality of life or pain and suffering.

Medical costs include three categories of expenditures: (1) medical and hospital costs associated with treating the injured victim during the initial recovery period and in the long run, including the costs associated with corrective surgery, the treatment of chronic injuries, and rehabilitation services; (2) ancillary costs, such as costs for prescriptions, medical equipment, and ambulance transport; and (3) costs of health insurance claims processing. Staff derived cost estimates for these expenditure categories from a number of national and state databases, including the MEPS, the Nationwide Inpatient Sample of the HCUP-NIS, the Nationwide Emergency Department Sample (NEDS), the National Nursing Home Survey (NNHS), MarketScan® claims data, and a variety of other federal, state, and private databases.

Work loss estimates can include: (1) the forgone earnings of the victim, including lost wage work and household work, (2) the forgone earnings of parents and visitors, including lost wage work and household work, (3) imputed long term work losses of the victim that would be associated with permanent impairment, and (4) employer productivity losses, such as the costs incurred when employers spend time juggling schedules or training replacement workers. Estimates are based on information from the, the Nationwide Inpatient Sample of the HCUP-NIS, NEDS, Detailed Claims Information (a workers' compensation database), the National Health Interview Survey, U.S. Bureau of Labor Statistics, and other sources.

The intangible, or non-economic, costs of injury reflect the physical and emotional trauma of injury as well as the mental anguish of victims and caregivers. Intangible costs are difficult to quantify because they do not represent products or resources traded in the marketplace. Nevertheless, they typically represent the largest component of injury cost and need to be accounted for in any benefit-cost analysis involving health outcomes (Rice et al., 1989). The ICM develops a monetary estimate of these intangible costs from jury awards for pain and suffering. While these awards can vary widely on a case-by-case basis, studies have shown them to be systematically related to a number of factors, including economic losses, the type

---

[16] For this analysis, staff assigned a weight of 1 to each of the 35 reported NEISS incidents, which is a subset of the total 209 observed incidents. The subset only includes incidents from the NEISS data set that have enough standardized information (e.g., location of the injury, and diagnosis) to comport with the ICM's data needs and potentially develop an estimate.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

and severity of injury, and the age of the victim (Viscusi, 1988; Rodgers, 1993). Estimates for the ICM were derived from regression analysis of jury awards in nonfatal product liability cases involving consumer products compiled by Jury Verdicts Research, Inc. (Lawrence et al., 2018).

Based on estimates from the ICM, the injury costs of the approximately 7.6 nonfatal medically treated injuries involving corded window coverings amounted to about $498,000 annually, or an average of about $65,000 per injury. These injury costs ranged from about $9,900 per injury treated outside of a hospital ED, to about $14,200 per injury treated and released from the ED, to about $483,000 per hospitalized injury.

EPI estimated 6.8 deaths involving window coverings occurred annually during 2009-2021 (Chowdhury, 2022). Staff assigns a cost of $10.5 million for each death, based on current estimates of the value of a statistical life (VSL) in 2021 dollars. The costs associated with these deaths amount to $71.4 million annually (6.8 deaths × $10.5 million).[17, 18] When combined with the injury costs of nonfatal injuries, the aggregate societal costs from corded window coverings incidents amounted to about $72 million annually ($71.4 from deaths + $0.5 million from nonfatal injuries). The impact of using a child-focused VSL is described in the Sensitivity Analysis in Section III.I of this Tab.

To narrow the societal cost estimate to only include incidents from *custom* corded window coverings, staff multiplied societal costs from deaths and nonfatal injuries from *all* corded window coverings (excluding inner cord and lifting loop incidents) by the adjusted percentage share of incidents for *custom* products in Table 4. This calculation results in an annual *custom* product societal cost estimate of $31.3 million for fatalities and $0.27 million for nonfatal as illustrated in Table 5.

**Table 5: Calculations of Societal Cost Custom Corded Window Coverings (2009-2021)**

| Product Type | [1] Adjusted Percentage Share of Injury Incidents | | [3] All Corded WC Death Cost | [4] All Corded WC Nonfatal Injury Cost | [5] = [1] × [3] Custom Corded WC Death Cost | [6] = [2] × [4] Custom Corded WC Nonfatal Injury Cost |
|---|---|---|---|---|---|---|
| | **Fatalities** | **Nonfatal** | | | | |
| Horizontal blinds | 18.68% | 30.26% | | | $13,278,462 | $150,610 |
| Shades | 10.04% | 21.63% | $71,076,923 | $497,651 | $7,134,615 | $107,648 |
| Vertical Blinds | 12.06% | 1.65% | | | $8,571,635 | $8,235 |
| Curtains/Drapes | 3.30% | 0.00% | | | $2,342,308 | $0 |
| Total | | | | | $31,327,019 | $266,493 |

To calculate societal costs per custom window covering in use, staff divided the total societal cost for each window covering type (sum of columns [5] and [6] of each type in Table 5) by the

---

[17] Staff repeated these calculations using only the incidents from the 2018 to 2021 (after the publication of the 2018 voluntary standards) which resulted in a societal cost total of $50.4 million (4.8 deaths × $10.5 million) and nonfatal of $0.4 million, however the fatality data for the most recent years are incomplete and expected to increase as more data are received.
[18] The number of deaths is rounded up to 6.8 from 6.77. Performing the calculation with 6.77 deaths results in a total value of $71.08 million.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

estimated number of *custom* window coverings in use (column [5] of Table 2). For example, staff divides the total societal cost of drapes of $2.3 million ($2.3 million in deaths + $0 in nonfatal injury) by the estimated 23.1 million drapes in use to calculate societal cost of $0.10 per unit. Societal costs per custom window covering in use, range from $0.10 per curtain or drape to $0.37 per vertical blind.

Staff estimates the present value of these annual per unit societal cost estimates over the expected product life of the window coverings using a 3 percent discount rate. Staff obtained expected product life for each window covering type from WCMA. (WCMA 2022b). Table 6 below displays these results by product type along with the expected product life.

**Table 6.  Estimates of Societal Costs per Product by Window Covering Type**

|  | [1] | [2] | [3] | [4] | [5] |
|---|---|---|---|---|---|
|  | Annual Injury Cost (Millions) | Number of Corded Custom Products in use (Millions) | Annual Injury Cost per unit | Expected Product Life | PV of Injury Costs per unit* |
| Horizontal Blinds | $13.4 | 76.0 | $0.18 |  |  |
| Vinyl/Metal |  |  | $0.18 | 6.7 | $1.06 |
| Wood/Faux Wood |  |  | $0.18 | 10.8 | $1.61 |
| Shades | $7.2 | 22.7 | $0.32 |  |  |
| Cellular |  |  | $0.32 | 7.2 | $2.04 |
| Pleated |  |  | $0.32 | 7.5 | $2.12 |
| Roman |  |  | $0.32 | 8.75 | $2.43 |
| Roller |  |  | $0.32 | 7.2 | $2.04 |
| Soft Sheer |  |  | $0.32 | 7.2 | $2.04 |
|  |  |  |  |  |  |
| Vertical Blinds | $8.6 | 23.0 | $0.37 | 7.6 | $2.50 |
|  |  |  |  |  |  |
| Curtains/Drapery | $2.3 | 23.1 | $0.10 | 15 | $1.21 |
| * Calculated using a 3% discount rate. |  |  |  |  |  |

## B. The Expected Costs of the Rule

Staff's cost analysis relied primarily on two window covering reports prepared for the CPSC. Jitesh H. Panchal, Ph.D., an academic engineering expert, prepared one of the reports.  Dr. Panchal designed a study to estimate the incremental manufacturing costs of implementing cordless designs for window covering products (Panchal, 2016). Industrial Economics (IEc) prepared the second report, a comprehensive cost analysis that evaluated the possible costs of a rule that would eliminate window covering designs with accessible cords (IEc, 2016b).

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Because of the many window covering types and designs, and including stock and custom products, the comprehensive cost analysis conducted by IEc (2016b) developed both lower and upper bound cost estimates of eliminating accessible cords from window coverings. The study based its lower bound largely on the Panchal (2016) study and the upper bound on information from the WCMA's (2016a) May 2015 presentation at CPSC testing laboratories and reported in the IEc study (2016b).

### 1. Low-End Cost Estimates

Panchal (2016) used a product archeology[19] approach, supplemented by models that calculate manufacturing and assembly costs, to estimate the incremental cost of implementing cordless technology for entry-level stock window coverings – the type of window coverings that are available for purchase off-the-shelf from home improvement stores. Hence, Panchal's estimates are suited for estimating costs for basic and inexpensive cordless products at the low end of pricing for window coverings. Panchal's estimates do not account for product development and design innovations, testing, licensing of technology, manufacturing restrictions due to existing patents, and training of personnel. These components would further add to the costs of implementing cordless technologies (Panchal, 2016). Additionally, Panchal notes that higher incremental costs could result from the use of higher-quality cordless systems than those analyzed in his report and from customized solutions for window coverings above average size and weight. Thus, staff assigns the estimates in the Panchal (2016) report as the low-end estimate of compliance with the draft final rule.

Panchal specifically analyzes three low-price stock products: horizontal blinds, cellular shades, and Roman shades. For each product, Panchal provides incremental costs for two window covering sizes. Panchal also provided separate cost estimates for window coverings produced in (1) a low-cost manufacturing environment, and (2) a high-cost manufacturing environment. The low-cost environment reflects costs for window coverings produced abroad and imported into the U.S., and the high-cost environment reflects costs for window coverings produced domestically. Finally, to make the per-unit cost estimates applicable to the large array of window coverings in the marketplace, Panchal estimated increased manufacturing costs as a percent of retail price for each product.

Table 7 shows the cost findings from Panchal's study. Note that the percentage range for each window covering type, size, and manufacturing environment reflects the range for production volume. Thus, the lower percentage estimate in each range reflects costs when there is a high production volume (about one million units annually); the higher percentage reflects costs when there is a smaller production volume (about 100,000 units annually).

---

[19] Product Archeology is a methodology used to calculate the differences in manufacturing cost for functionally similar products through direct observation and comparison of the physical products.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**Table 7. Low-End Estimates of Increased Manufacturing Costs for Selected Window Covering Types, as a Percentage of Retail Prices**

| Window   Covering Type | Increased Manufacturing Costs, as a Percent of Retail Price | |
|---|---|---|
| | Low-Cost Environment | High-Cost Environment |
| | | |
| Horizontal Blinds | | |
| 27" x 64" | 6 – 11% | 11 – 20% |
| 72" x 64" | 5 – 9% | 9 – 16% |
| Cellular Shades | | |
| 23" x 72" | 3 – 5% | 5 – 9% |
| 72" x 72" | 2 – 4% | 4 – 7% |
| Roman Shades | | |
| 27" x 64" | 4 – 8% | 8 – 15% |
| 72" x 64" | 3 – 6% | 7 – 13% |
| Source: Panchal (2016). Notes: a.) The low-cost environment assumes manufacturing occurs outside of the United States. b.) The high-cost environment assumes manufacturing occurs in the United States. | | |

Table 8 presents the share of window covering production that is manufactured in either foreign or domestic production (IEc, 2016b). These data allow staff to consider the proportions of window coverings produced in a high-cost environment (U.S. domestic production) or a low-cost environment (foreign production imported into the United States).

**Table 8. Manufacturing Location**

| Window Covering Type | Percent Produced Outside the U.S. (Low-Cost Environment) | Percent Produced Domestically (High-Cost Environment) |
|---|---|---|
| Vinyl Blinds | 97% | 3% |
| Metal blinds | 79% | 21% |
| Faux wood blinds | 85% | 15% |
| Wood blinds | 75% | 25% |
| Pleated shades[a] | 75% | 25% |
| Cellular shades | 18% | 82% |
| Roman shades | 48% | 52% |
| Source: IEc (2016b) a.) Although Panchal (2016) does not analyze pleated shades, we apply the incremental cost estimate for cellular shades to this product. | | |

101

Staff applied Panchal's cost estimates as a percentage of retail price to the retail prices from the D+R International study described in section II.B.4 to estimate the low-end estimates for compliance with the draft final rule. (IEc, 2016b)[20]  Table 9 shows the calculation of low-end per unit cost estimates for each window covering type.

**Table 9. Average Incremental Costs Associated with the Draft Final Rule (2020 dollars)**

| Window Covering Type | [1] Mean Unit Price | Low-End Estimates (Based on Panchal, 2016) | |
| --- | --- | --- | --- |
| | | [2] Average Cost Increase as a % of Retail Price | [3] Average Unit Cost Increase |
| Vinyl/Metal Blinds | $37.36 | 8% | $2.99 |
| Wood/Faux Wood Blinds | $69.79 | 9% | $6.28 |
| Cellular Shades | $94.51 | 4% | $5.67 |
| Pleated Shades | $54.53 | 6% | $2.18 |
| Roman Shades | $69.36 | 8% | $5.55 |
| Roller Shades | $64.04 | 8% | $5.12 |

1. Although Panchal (2016) does not evaluate pleated shades explicitly, we apply the estimate for the incremental increase in price for cellular shades to this product category.
2. Panchal (2016) only evaluated motorized cordless roller shades; we apply the estimate for incremental increase in price for roman shades to this category as it is more appropriate.

### 2. High-End Cost Estimates

To capture costs possibly omitted in Panchal (2016), the IEc study (2016b) also reported high-end estimates. In May 2015, WCMA delivered a presentation to CPSC staff. WCMA representatives noted that the cost of implementing cordless technology is within a range of 20 to 40 percent of the overall cost for custom products and 40 to 60 percent for stock products.[21]

Staff combined WCMA's estimates with information from Supplier Relations US, LLC (2010) reports, that the producer price represents 46.4 percent of the total retail price for window coverings,[22] to determine high-end per unit incremental costs. Staff used the producer share of price to convert WCMA's stated increase in cost from cordless technology into its quantified impact on price. For example, cordless technology will increase cost for custom products by 20 to 40 percent, which would then increase prices by 9.3 percent to 18.6 percent (0.464 × 0.20 to 0.464 × .40), or an average of 13.9 percent. The IEc study applied this methodology for all

---

[20] The derivations of mean unit price and average cost increase as percentage of retail price fully detailed in Industrial Economics Inc. (IEc), 2016b. "Memorandum to CPSC: Final Cordless Window Coverings Comprehensive Cost Analysis".

[21] Presumably, the higher percentage of costs as a proportion of the overall product costs for the stock products is because the base cost of stock products is substantially lower than for the custom products.

[22] The remainder of the retail price is comprised of margins for wholesalers (9.6 percent), freight (7.1 percent), and retailers (36.9 percent).

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

window covering types to estimate the average cost increase as a percentage of retail price. (IEc 2016b) Table 10 shows the application of this cost increase to mean unit price to calculate the high-end average per unit cost increase from the draft final rule.

**Table 10. Average Incremental Costs Associated with the Draft Final Rule (2020 dollars)**

| Window Covering Type | [1] Mean Unit Price | High-End Estimates (Based on WCMA, 2015a) | |
|---|---|---|---|
| | | [2] Average Cost Increase as a % of Retail Price | [3] Average Unit Cost Increase |
| Vinyl/Metal Blinds | $37.36 | 23% | $8.59 |
| Wood/Faux Wood Blinds | $69.79 | 14% | $9.77 |
| Cellular Shades | $94.51 | 14% | $13.23 |
| Pleated Shades | $54.53 | 14% | $7.63 |
| Roman Shades | $69.36 | 14% | $9.71 |
| Roller Shades | $64.04 | 14% | $8.97 |

As cordless designs are currently available for all window covering product types, but not available for all window covering sizes, firms are expected to incur some research and development and retooling costs for these larger/unusual sizes. The most likely path of compliance for these larger sizes is through the use of a rigid cord shroud. (Tab C Lee 2022) CPSC staff developed an estimate of approximately $787,000 over a 2-year period for a firm to implement a rigid cord shroud solution.[23] The estimate amounts to approximately $289,000 in costs the first year and an additional $498,000 the second year.[24] After discounting the second year value, the total cost per firm is equal to approximately $772,500.

However, the impact may be somewhat less than originally estimated, due to the enforcement of Canada's regulations beginning in May 2022. Staff reviewed product offerings in the U.S. and Canada and found significant overlap in the manufacturers and retailers operating in the two countries. Companies that sell in both Canada and the U.S. have already redesigned their custom offerings to be compliant with the Canadian regulations, which are substantively similar to those being finalized here. Therefore, those companies likely already have compliant product designed that would be ready to sell through small dealers and interior designers. This potential reduction in impact is limited, though, because it would only affect the research and development and retooling costs. The per unit cost of compliance in the U.S. is unaffected by the adoption and enforcement of the Canadian standard.

Staff expect only the firms with more than 75 employees will make this investment. Smaller firms with fewer than 75 employees will either license a solution from a larger firm or purchase rigid cord shrouds from a firm with a patented product.

### 3. Annual Shipment

---

[23] More detail on the individual components of this estimate can be found in appendix A of Tab B of this package.
[24] These costs are one-time charges and will not accrue beyond the time to develop and implement.

THIS DOCUMENT HAS NOT BEEN REVIEWED OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE UNDER CPSA 6(b)(1)

To calculate aggregate annual cost, staff must estimate the number of units that will be affected by the draft final rule. WCMA (2015b) provided an estimate of about 100 million window covering units sold in the United States annually. D+R International (2021) estimated annual sales of about 131 million units from 2015 to 2020. For purposes of this analysis, staff uses annual sales of 124.9 million units of window coverings in 2020, which is consistent with estimates of the current population of window coverings in use and their expected product life.

Based on statements from WCMA, CPSC staff assumed that 20 percent of window covering shipments were custom products in 2020. Staff also applied the WCMA data submitted during the comment period on the percent of corded products to calculate the number of shipments of *corded custom* products. Table 11 illustrates the calculation of estimated shipments for each window covering product using these assumptions.

**Table 11. Estimated Window Covering Shipments, Total and Corded Annually, by Window Covering Type**

| Window Covering Type | Estimated Annual Sales 2020 (Units Shipped) | Percent Share of Shipments Custom | Custom Shipments | Percent Share of Corded Shipment (2021) | Estimated Corded Custom Shipments |
|---|---|---|---|---|---|
| | | | | | |
| Metal/Vinyl Horizontal Blinds | 34,017,312 | 20% | 6,803,462 | 91.9% | 6,252,382 |
| Wood or Faux Wood Horizontal Blinds | 16,342,311 | 20% | 3,268,462 | 66.9% | 2,186,601 |
| Cellular Shades | 10,669,117 | 20% | 2,133,823 | 21.0% | 448,103 |
| Pleated Shades | 7,016,809 | 20% | 1,403,362 | 31.0% | 435,042 |
| Roman Shades | 2,025,071 | 20% | 405,014 | 41.2% | 166,866 |
| Roller Shades | 10,599,143 | 20% | 2,119,829 | 57.3% | 1,214,662 |
| Soft Sheer | 4,946,911 | 20% | 989,382 | 61.1% | 604,513 |
| Vertical Blinds | 16,587,800 | 20% | 3,317,560 | 64.8% | 2,149,779 |
| Sheer Drapery | 4,946,911 | 20% | 989,382 | 54.4% | 538,224 |
| Curtains/Drapery | 17,055,616 | 20% | 3,411,123 | 54.4% | 1,855,651 |
| Interior Shutters | 674,335 | 20% | 134,867 | 54.4% | 0 |
| Total | 124,881,335 | | 24,976,267 | | 15,851,822 |
| Source: D&R International (2021), WCMA (2022a) WCMA (2022b) | | | | | |

### 4. Impact of Higher Prices on Sales and Lost Consumer Surplus

The increasing retail prices of custom window coverings, as costs are passed on to consumers, may result in a reduction in window covering sales. Consequently, consumers may experience a loss in consumer surplus. Figure 1 illustrates these impacts. The downward sloping curve in Figure 1 represents the demand for custom window coverings; p0 and q0 represent,

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

respectively, the pre-regulatory price and quantity demanded for custom window coverings. After the regulation becomes effective, custom window covering prices rise to p1, and the quantity of custom window coverings purchased declines to q1. The change in price from $p_0$ to $p_1$ represents the direct costs[25] of the rule per custom window covering. The area given by the rectangle **a** represents the aggregate direct costs of the rule over the time period being considered (e.g., one year); it is equal to the product of the increase in window covering price $(p_1 - p_0)$ and the quantity demanded during the period (i.e., $q_1$).



**Figure 1. Demand for Window Coverings.**

The triangle **b** represents an additional loss in consumer surplus. Triangle b specifically represent the loss to consumers which the final rule pushes out of the market due to the higher price, $p_2$.[26][27]

---

[25] Rectangle **a** is a transfer in wealth from consumers to producers due to the increase in price from the draft final rule. This transfer is then used towards the costs of compliance with the rule, and therefore labeled as a direct cost.
[26] In general, consumer surplus represents the difference between the market clearing price and the maximum amount consumers would have been willing to pay for the product. Ideally, we would like to measure the costs of lost producer surplus (*i.e.*, a measure of revenue accruing to firms that produce and sell products over and above the price that they would have been willing to supply the products), as well as lost consumer surplus. However, to do so would require information on the supply and demand functions for window coverings, which is not available. As an alternative, we assume that the cost of the regulation is borne by consumers in the form of higher prices, and we estimate the change in consumer surplus resulting from increased prices. Additionally, although information needed to derive a well-specified demand curve is not currently available, we employ an assumption about the slope of the demand curve, based on an estimate of price elasticity of demand for home goods provided in Taylor and Houthakker (2010). (Note also that while we have referred to the area of the triangle **b** in Figure 1 as the loss in consumer surplus for consumers not willing to pay the higher price p1, technically, the entire area **a** + **b** represents the lost consumer surplus relative to the original pre-regulatory price of p0.)
[27] Alternatively, the increasing retail prices of custom window coverings could result in consumers substituting stock window coverings which already conform to the safety standard, possibly reducing the loss in consumer surplus.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Given information on the pre-regulatory price ($p_0$) and quantity demanded ($q_0$), the expected impact of the rule on product prices, and information on the elasticity of demand for window coverings (*i.e.*, the percentage change in quantity demanded given a percentage change in price), staff can estimate the expected reduction in sales ($q_0 - q_1$) and the lost consumer surplus represented by b in the above graph.

For this analysis, staff used an elasticity estimate of −0.3367 for home goods from Taylor and Houthakker (2010), to calculate loss of consumer surplus.[28] An elasticity of −0.3367 suggests that a 1 percent increase in the price of window coverings results in a reduction in the quantity demanded of about one-third of a percent.[29]

Consider, for example, the *low-end* cost estimates for metal/vinyl horizontal blinds. From Table 9, the pre-regulatory baseline price for metal/vinyl horizontal blinds is $37.36 and sales amounted to about 6.25 million annually. Given these parameters, and combining the *low-end* direct cost estimate of $2.99, shown in Table 9, staff estimates a sales decline of 2.69 percent [0.08 × −0.3367], which is a reduction of about 168,000 metal/vinyl horizontal blinds (0.0269 × 6.25 million) annually.  Additionally, the lost consumer surplus (represented by the area of triangle *b* in the graph above), amounts to about $251,000 (*i.e.*, 0.5 × ($p_1 - p_0$) × ($q_0 - q_1$)) = 0.5 × $2.99 × 168,000).

Table 12 shows the expected reduction in annual sales and the expected lost consumer surplus for all the product types and sub totals. Reduced sales could range from 4,500 window coverings under the low-end cost estimates (column a), to about 587,000 under the high-end cost estimates (column e), representing a sales reduction of about 2.69 percent to 7.74 percent. The annual loss in consumer surplus ranges from about $6,400 under the low-end cost estimates (column c), to about $2.08 million, under the high-end cost estimates (column g).[30]

---

[28] "Home goods" are defined to include products such as "floor coverings; picture frames; mirrors; art products; portable lamps; window coverings and hardware; telephone equipment; writing equipment; and hand, power, and garden tools."
[29] The elasticity of demand value from Taylor and Houthakker (2010) would apply to the purchases of residential consumers and exclude commercial users.
[30] Vertical blinds and curtains/drapes are not included in these estimates due to the underlying assumption that costs will be borne completely by consumers. Staff expects no price increases for these product types.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**Table 12. Aggregate Expected Post-Regulatory Annual Window Covering Sales, Sales Reduction, and Lost Consumer Surplus, by Cost Level and Aggregated Window Covering Type**

| Window Covering Type[1] | Low-End Cost Estimate | | | | High-End Cost Estimate | | | |
|---|---|---|---|---|---|---|---|---|
| | (a) Expected Sales Reduction | (b) Expected Post-Regulatory Sales | (c) Aggregate Lost Consumer Surplus | (d) Per Unit Lost Consumer Surplus | (e) Expected Sales Reduction | (f) Expected Post-Regulatory Sales | (g) Aggregate Lost Consumer Surplus | (h) Per Unit Lost Consumer Surplus |
| Horizontal Blinds | -234,675 | 8,204,308 | -$459,772.77 | -$0.06 | -587,263 | 7,851,720 | -$2,583,814.66 | -$0.33 |
| Vinyl/Metal | -168,414 | 6,083,968 | -$251,678.12 | -$0.04 | -484,191 | 5,768,191 | -$2,080,276.99 | -$0.36 |
| Wood/Faux Wood | -66,261 | 2,120,341 | -$208,094.65 | -$0.10 | -103,072 | 2,083,529 | -$503,537.67 | -$0.24 |
| Shades | -68,408 | 2,800,778 | -$291,169.11 | -$0.10 | -135,248 | 2,733,938 | -$1,011,550.22 | -$0.37 |
| Cellular | -9,053 | 439,050 | -$25,666.77 | -$0.06 | -21,123 | 426,980 | -$139,741.28 | -$0.33 |
| Pleated | -5,859 | 429,183 | -$6,389.99 | -$0.01 | -20,507 | 414,535 | -$78,277.33 | -$0.19 |
| Roman | -4,495 | 162,371 | -$12,470.09 | -$0.08 | -7,866 | 159,000 | -$38,189.65 | -$0.24 |
| Roller | -32,718 | 1,181,944 | -$83,810.76 | -$0.07 | -57,257 | 1,157,405 | -$256,670.47 | -$0.22 |
| Soft Sheer | -16,283 | 588,229 | -$162,831.51 | -$0.28 | -28,496 | 576,017 | -$498,671.49 | -$0.87 |
| Total | -303,082 | 11,005,086 | -$750,941.89 | -$0.07 | -722,510 | 10,585,658 | -$6,179,179.54 | -$0.58 |

Vertical blinds and curtains/drapes are excluded from the calculation as no change to prices paid by the consumer is expected.

Table 13 presents the total costs per window covering, including the direct manufacturing costs, and lost consumer surplus. The direct manufacturing cost estimates, per window covering, are from Table 9 and 10. The lost consumer surplus, per window covering, is calculated as the aggregate lost consumer surplus (from Table 12, columns c and g) divided by the post-regulatory estimate of sales (Table 12, columns b and f). Total per-unit costs range from roughly $3.03 to $10.01 per horizontal blind, to $2.20 to $35.87 per shade.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**Table 13. Total Costs of the Final Rule, per Window Covering, by Cost Level and Window Covering Type**

| | Low-End Cost Estimates, per window covering | | | High-End Cost Estimates, per window covering | | |
|---|---|---|---|---|---|---|
| | (a) Direct Costs | (b) Lost Consumer Surplus | (c) Total (a) + (b) | (d) Direct Costs | (e) Lost Consumer Surplus | (f) Total (d) + (e) |
| Product Type | | | | | | |
| Horizontal Blinds | | | | | | |
| Vinyl/Metal | $2.99 | $0.04 | $3.03 | $8.59 | $0.36 | $8.95 |
| Wood/Faux Wood | $6.28 | $0.10 | $6.38 | $9.77 | $0.24 | $10.01 |
| Shades | | | | | | |
| Cellular | $5.67 | $0.06 | $5.73 | $13.23 | $0.33 | $13.56 |
| Pleated | $2.18 | $0.01 | $2.20 | $7.63 | $0.19 | $7.82 |
| Roman | $5.55 | $0.08 | $5.63 | $9.71 | $0.24 | $9.95 |
| Roller | $5.12 | $0.07 | $5.19 | $8.97 | $0.22 | $9.19 |
| Soft Sheer | $20.00 | $0.28 | $20.28 | $35.00 | $0.87 | $35.87 |

Staff estimates the aggregate costs of the rule in 2020 in columns (c) and (f) of Table 14. The total cost of the draft final rule in 2020 is $54.40 million for the low-end estimate and $114.41 million for the high-end estimate. Horizontal blinds account for about 59 percent of the total, under the low-end annual cost estimates, and about 63 percent of the costs under the high-end estimates.

**Table 14. Annual Post-Regulatory Sales, Per-Unit Cost Estimates, and Aggregate Annual Costs of the Final Rule, by Cost Level and Window Covering Type**

| Window Covering Type | Low-End Cost Estimates | | | High-End Cost Estimates | | |
|---|---|---|---|---|---|---|
| | (a) Annual Post-Regulatory WC Sales | (b) Per Unit Costs (Direct Costs + Lost Consumer Surplus) | (c) Aggregate Costs (a) × (b) | (d) Annual Post-Regulatory WC Sales | (e) Per Unit Costs (Direct Costs + Lost Consumer Surplus) | (f) Aggregate Costs (d) × (e) |
| Horizontal Blinds | 8,204,308 | $3.90 | $31,961,607 | 7,851,720 | $9.23 | $72,506,059 |
| Vinyl/Metal | 6,083,968 | $3.03 | $18,435,441 | 5,768,191 | $8.95 | $51,645,191 |
| Wood/Faux Wood | 2,120,341 | $6.38 | $13,526,166 | 2,083,529 | $10.01 | $20,860,868 |
| Shades | 2,800,778 | $8.01 | $22,437,869 | 2,733,938 | $15.33 | $41,907,123 |
| Cellular | 439,050 | $5.73 | $2,515,346 | 426,980 | $13.56 | $5,789,287 |
| Pleated | 429,183 | $2.20 | $942,524 | 414,535 | $7.82 | $3,242,921 |
| Roman | 162,371 | $5.63 | $913,435 | 159,000 | $9.95 | $1,582,144 |
| Roller | 1,181,944 | $5.19 | $6,139,145 | 1,157,405 | $9.19 | $10,633,502 |
| Soft Sheer | 588,229 | $20.28 | $11,927,420 | 576,017 | $35.87 | $20,659,269 |
| Total | 11,005,086 | $4.94 | $54,399,476 | 10,585,658 | $10.81 | $114,413,182 |

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

A607

## C. Comparison of Costs and Benefits of the Draft Final Rule

This section compares the costs and benefits of the draft final rule over the expected product life of 2020 sales of corded custom window coverings. First, staff use estimated annual sales for each type of custom corded window coverings in 2020 from section III.E to determine the number of window covering products that will be affected by the draft final rule. Second, staff compared the costs and benefit estimates from the previous sections.

### 1. Unit Costs for Custom Window Coverings, by Type, and Aggregate Costs and Benefits for One Year of Product Sales

Table 15 presents cost and benefit information. Column 1 contains the estimates of affected corded products post-regulation, which accounts for the reduced demand due to price increase. Staff uses this quantity to calculate aggregate costs because firms will adjust the quantity they produce to the decrease in demand caused by the price increase from compliance with the rule. Column 2 contains estimates of the affected corded products pre-regulation, which does not account for the reduced demand. Staff uses this quantity to calculate aggregate benefits because window coverings that are no longer purchased due to the price increase still generate benefits because they are removed as potential strangulation hazards; for example, by consumers substituting the purchase with lower price compliant stock window coverings. Column 3 presents the low-end per unit cost estimates and Column 4 multiplies those cost estimates with column 1 to calculate low-end aggregate costs. Column 5 presents the high-end per unit cost estimates and Column 6 multiplies those cost estimates with column 1 to calculate high-end aggregate costs. Column 7 presents the per unit benefit estimates and Column 8 multiplies those cost estimates with column 2 to calculate aggregate benefits.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**Table 15. Preliminary Description of the Potential Benefits and Costs of the Draft Proposed Rule, by Detailed Distribution of Window Covering Types**

| | Annual Unit Sales of Corded Custom | | | Low-End Costs | | High-End Costs | | Benefit Estimate | |
|---|---|---|---|---|---|---|---|---|---|
| | [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] |
| | Affected Window Coverings Post Regulation (Low End Cost) (millions) | Affected Window Coverings Post Regulation (High End Cost) (millions) | Affected Window Coverings Pre Regulation (millions) | Cost per Window Covering | Aggregate Costs (millions $) | Cost per Window Covering | Aggregate Costs (millions $) | PV of Injury Costs per unit* | Aggregate Benefits (millions $) |
| Horizontal Blinds | | | | | | | | | |
| Vinyl/Metal | 6.08 | 5.77 | 6.25 | $3.03 | $18.44 | $8.95 | $51.65 | $1.06 | $6.61 |
| Wood/Faux Wood | 2.12 | 2.08 | 2.19 | $6.38 | $13.53 | $10.01 | $20.86 | $1.61 | $3.52 |
| Shades | | | | | | | | | |
| Cellular | 0.44 | 0.43 | 0.45 | $5.73 | $2.52 | $13.56 | $5.79 | $2.04 | $0.91 |
| Pleated | 0.43 | 0.41 | 0.44 | $2.20 | $0.94 | $7.82 | $3.24 | $2.12 | $0.92 |
| Roman | 0.16 | 0.16 | 0.17 | $5.63 | $0.91 | $9.95 | $1.58 | $2.43 | $0.40 |
| Roller** | 1.18 | 1.16 | 1.21 | $5.19 | $6.14 | $9.19 | $10.63 | $2.04 | $2.48 |
| Soft Sheer** | 0.59 | 0.58 | 0.60 | $20.28 | $11.93 | $35.87 | $20.66 | $2.04 | $1.23 |
| | | | | | | | | | |
| Vertical Blinds | 2.15 | 2.15 | 2.15 | $0.00 | $0.00 | $0.00 | $0.00 | $2.50 | $5.37 |
| | | | | | | | | | |
| Curtains/Drapery | 2.39 | 2.39 | 2.39 | $0.00 | $0.00 | $0.00 | $0.00 | $1.21 | $2.89 |
| - | | | - | - | - | - | - | - | - |

\* The per unit present value of injury costs associated with corded window coverings equals the implied benefits associated with removal of accessible cords.
\*\* The cost increase as a percent of retail price for roman shades is applied to these product types.

No costs are associated with cordless vertical blinds or curtains/drapery based on the assumption that wands can generally be substituted for cords in these types (Panchal, 2016).

Table 16 summarizes aggregate costs and benefits by window covering type (e.g., horizontal blinds, shades, vertical blinds, and curtains/drapery) after the adjustment to benefits by the estimate of the draft final rule's effectiveness of 94.4 percent (Balci-Sinha 2022). Blinds account for the majority of costs and approximately 42 percent of benefits. In aggregate, the estimated costs ranged from $54 million to $129 million, while the estimated benefits amounted to about $23 million. Aggregate net benefit estimate is between −$31 million and −$106 million annually.[31]

---

[31] Performing this same analysis but limiting the time period of review to only 2018 to 2021 results in a minimum benefit estimate of $18.5 million which further decreases the net benefit estimate.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**Table 16.  Estimates of Aggregate Costs, and Benefits Adjusted for Effectiveness of Standard, by Category of Window Covering**

| | [1] | [2] | [3] | [4] |
|---|---|---|---|---|
| | Affected Window Covering (millions) | Aggregate Costs (low-end) millions $ | Aggregate Costs (high end) (millions) | Aggregate Benefits (millions $) |
| Horizontal Blinds | 8.44 | $31.96 | $72.51 | $9.57 |
| Shades | 2.87 | $22.44 | $41.91 | $5.62 |
| Vertical Blinds | 2.15 | $0.00 | $0.00 | $5.07 |
| Curtains/Drapery | 2.39 | $0.00 | $0.00 | $2.73 |
| Total* | 15.85 | $54.40 | $129.09 | $22.99 |

*The estimate of research, development, and retooling of $14.7 million is included in the high-end cost estimate total.

Given the ubiquity of window coverings, cost and benefit estimates in the aggregate may not be an intuitive framework to perceive how the additional cost of the draft final rule impacts consumers. In this regard, staff used the data point that the average detached single-family household has 12 window coverings to convert costs and benefits into an additional cost per household. (D+R International 2013) For example, horizontal blinds composed of metal or vinyl have low-end per unit cost estimate of $3.03 and a per unit benefit estimate of $1.06. This translates into a net cost of the draft final rule of $1.97 for metal/vinyl horizontal blinds. Using the assumption of 12 window coverings per household, this equates to a net cost (above the benefits provided) of $23.67 per household of the rule every time they update their window coverings. For metal/vinyl horizontal blinds, $23.67 is a slightly over 5 percent of the $448.32 of the total cost a household would spend to update their window coverings. Table 17 shows this calculation for all window covering types.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

A610

**Table 17: Household Net Costs from Draft Final Rule**

| WC Types | Mean Unit Price | Household Cost to update WC (pre-rule) | Low-End Cost per Unit | Benefit per Unit | Net per Unit | Household Net Cost |
|---|---|---|---|---|---|---|
| | [1] | [2] = [1] × 12 households | [3] | [4] | [5] = [4] - [3] | [6] = [5] × 12 households |
| Vinyl/Metal | $37.36 | $448.32 | $3.03 | $1.06 | ($1.97) | ($23.67) |
| Wood/Faux Wood | $69.79 | $837.48 | $6.38 | $1.61 | ($4.77) | ($57.24) |
| Cellular Shade | $94.51 | $1,134.12 | $5.73 | $2.04 | ($3.69) | ($44.25) |
| Pleated Shade | $54.53 | $654.36 | $2.20 | $2.12 | ($0.08) | ($0.94) |
| Roman Shade | $69.36 | $832.32 | $5.63 | $2.43 | ($3.20) | ($38.38) |
| Roller Shade | $64.04 | $768.48 | $5.19 | $2.04 | ($3.15) | ($37.83) |
| Soft Sheer | $250.00 | $3,000.00 | $20.28 | $2.04 | ($18.24) | ($218.82) |

### D. Characterization of Uncertainty in Benefit and Cost Estimates

In a complex cost benefit analysis using estimated parameters, inputs from several models, assumptions based on expert judgment, and public/private data there are likely to be many sources of uncertainty. This section examines several sources of uncertainty in the analysis that could impact the findings. These include the VSL applicable to analyzing risks to children, the incremental cost of cordless products, the number of corded custom window coverings in use, and a longer average product life than used for horizontal vinyl/metal custom blinds. Particularly of note is that for a child-focused VSL value of $31.5 million, net benefits are slightly positive.

### 1. Value of Reducing Fatal Risks

The analysis valued the benefit of preventing a fatal incident at $10.5 million per incident. The VSL is not a value of a life, but an estimate of the amount people would be willing to pay for a small reduction in risk of death. This exercise is surveyed and summed over many people. For example, if 10,000 people were willing to pay $900 each to reduce their risk of death by 0.0001, then those people would combined be willing to spend $9 million to reduce the risk of one additional death.

Staff's literature review found research suggesting that people might be willing to spend more for a small reduction in the risk to children than they are for the same reduction in their own risk.[32] A review of the literature conducted for the CPSC suggested that the VSL for children could exceed that of adults by a factor of 1.2 to 3, with a midpoint of around 2 (IEc, 2018). If for example we substituted the high end of this range, which suggests that the VSL for children could be 3 times the VSL for adults ($31.5 million), the estimated benefits of the draft final rule

---

[32] There are two primary methods to estimate a person's willingness to pay (WTP) for reductions in fatal risks, revealed or stated preference. Revealed preference research is not informative for estimating how an individual values risk to children as the primary sources of information in a revealed preference estimate are typically wage risk models i.e. market decision type models. Stated preference research is better able to estimate how an individual values risks to children as the primary sources of information rely on survey research techniques and contingent valuation experiments with hypothetical scenarios.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

would be higher at almost $69 million.[33] The sensitivity analysis later in this report provides the results of an increased VSL for children.

### 2. Incremental Cost of Cordless Technology

As already indicated, some uncertainty exists regarding the incremental cost of the cordless technologies. Therefore, staff used a range of costs in the analysis, including cost estimates from Panchal (2016) and IEc (2016b). We note that especially the low estimate from Panchal (2016) were probably more applicable to stock products than to custom products, which are the window coverings to which the rule would apply. The reason that these may be underestimates for a rule involving custom products include the fact that he mostly analyzed stock products and that for the low estimates he assumed a high volume production in China, which is less applicable for custom than for stock products. Therefore, the low value from Panchal (2016) is probably the lowest potential cost.

Importantly, cordless custom window coverings are already widely available and the incremental retail price differences between custom window coverings that are alike in every respect except that one is cordless are observable. The observed increment in retail prices between the two typically ranges from $10 to $80 and is highly dependent on product type and size. Staff considered retail markups and incremental costs and determined that the cost estimates presented in this analysis are reasonable. Additionally, one commenter to the NPR submitted an alternative incremental cost estimate of $7.78 per custom product. This estimate is reasonable and closely resembles the limited analysis on custom products performed in Panchal's report. From this the staff concludes that the actual per unit costs are probably within the ranges of the estimated costs used in this analysis, but there is some chance that the cost estimates underestimate the actual cost.

### 3. Estimate of Corded Custom Window Coverings in Use

The estimate of corded custom window coverings in use that staff used in the base analysis is given in Table 2. As noted, staff based this estimate on estimates of the total number of window coverings created with CPSC's PPM using as inputs, shipment estimates from D+R International and estimates of the expected product life for window coverings from WCMA. Estimates were not based on exposure surveys and thus the actual number of corded custom products could be either higher or lower than the estimate used in the base analysis. Staff has no basis for stating whether we have over or underestimated the number. If the share of custom cordless products has grown by a greater amount than estimated, then there could be fewer corded products in use, meaning that we have underestimated the risk associated with corded products. On the other hand, if we have overestimated the number of corded products in use, then there could be more corded products in use which means we have overestimated the risk and therefore overestimated the per unit benefits of the draft final rule.

### E. *Sensitivity Analysis*

---

[33] The source of the factor of 3 WTP estimate is Hammitt and Haninger (2017) in which respondents provided separate estimates of WTP for themselves, a child in their household, and another adult in the household. The survey was related to nonfatal risks, but the concept and study is very similar to evaluating fatal risks. The authors noted that respondents valued the risk to another adult at a factor of 2.5 greater than themselves. Another study indicating a WTP factor of 3 for children is Hammitt and Herrera (2017) which specifically looked at fatal risks. CPSC staff note that this survey was administered to French adults and not the U.S. population.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

The primary focus of this report described staff's benefit-cost methodology and the results from the analysis. This section presents an analysis that will describe the sensitivity of the results to variations in key parameters of the primary analysis. A sensitivity analysis accounts for the uncertainty in the values of some input variables. The variables staff examined include: discount rate, time period analyzed, VSL, percent of corded products in use, expected product life, low/high estimates of expected product life, increase/decrease of the number of injuries (fatal and nonfatal) by 50 percent, an alternative incremental cost estimate provided by a commenter to the NPR, an imputed price elasticity of demand provided by WCMA in a comment to the NPR, and an increase/decrease of the average annual shipments of corded custom products by 20 percent.

Relative to the primary analysis, the table below presents the results for a 7 percent discount rate, limited time period analyzed to 2018-2021, alternative VSL that varies by 300 percent and 50 percent, an increase/decrease of corded custom window coverings in use by 20 percent, high and low estimates of the expected product life, the number of injuries varying by 50 percent, a flat alternative incremental cost estimate of $7.78, an imputed price elasticity of demand by product type, and a 20 percent increase/decrease of the average annual sales of custom corded products. The range of estimates for each input variable is presented for a low-cost and high-cost environments as described earlier in this report.

Table 18 below presents the results of the sensitivity analysis. Only benefits/costs associated with custom window coverings are shown. The methodology to estimate benefits/costs is the same as used in the reference case with only the input variables adjusted.

Increasing the discount rate as well had a minor impact on net benefits as shown in table 18 row b. Limiting the time period of injuries analyzed to the 2018 to 2021 resulted in a significant reduction in benefits (from $23 million to $18.5 million shown in row c) as the average annual value of addressable incidents noticeably drops. Staff notes that that the data used in this calculation for the recent years is not complete, as data on the number of deaths is lagged by about 2 to 3 years. In addition to the lagged data for many of the incidents in this time frame, the window covering type and classification could not be identified and therefore were arbitrarily split between stock and custom products.  Increases and decreases in the VSL estimate resulted in significant changes to the benefit estimates which is shown in rows d and e. Particularly of note is that for a VSL value of $31.5 million net benefits turn slightly positive.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**Table 18. Sensitivity Analysis**

| Input Values | | | |
|---|---|---|---|
| *Row* | *Input Values for Sensitivity Analysis* | *Expected Benefits (millions of 2020 dollars)* | *Range of Expected Costs (millions of 2020 dollars)* |
| a. | Reference Case Analysis | $23.0 | $54.4 to $129.1 |
| Discount Rate | | | |
| b. | 7 percent | $19.4 | $54.4 to $129.1 |
| Average Number of Injuries Calculation, Time Period | | | |
| c. | 2018 to 2021 | $18.5 | $54.4 to $129.1 |
| Value of Statistical Life (VSL) | | | |
| d. | VSL= $31.5 million | $68.7 | $54.4 to $129.1 |
| e. | VSL= $5.25 million | $11.6 | $54.4 to $129.1 |
| Percentage of Corded Custom Window Coverings In Use | | | |
| f. | Increase of 20% | $19.7 | $54.4 to $129.1 |
| g. | Decrease of 20% | $28.8 | $54.4 to $129.1 |
| Expected Product life | | | |
| h. | High Estimate | $28.3 | $54.4 to $129.1 |
| i. | Low Estimate | $17.6 | $54.4 to $129.1 |
| Estimate of Injuries (Fatal and Nonfatal) | | | |
| j. | Increase of 50% | $34.7 | $54.4 to $129.1 |
| k. | Decrease of 50% | $11.4 | $54.4 to $129.1 |
| Alternative Cost Estimate | | | |
| l. | Flat per unit cost $7.78 | $23.0 | $83.2 |
| Price Elasticity of Demand | | | |
| m. | Imputed WCMA Value | $23.0 | $52.5 to $112 |
| Annual Sales of Custom Corded Products | | | |
| n. | 20% Higher | $27.6 | $65.2 to $151.5 |
| o. | 20% Lower | $18.4 | $43.5 to $105.9 |

Adjustments of 20 percent to the estimate of corded custom products in use (rows f and g) resulted in large changes to benefit estimates with a decrease resulting in a non-proportional increase in benefits to $28.8 but net benefits are still largely negative. Applying the high and low estimates of expected product life are shown in rows h and i with net benefits still negative despite the adjustments.  Increasing the estimate of injuries by a large amount (50 percent) had a large impact on potential benefits but the range of net benefits still remained negative as shown in rows j and k.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

The alternative incremental cost estimate, and imputed price elasticity adjustments results shown in rows l and m are slightly mixed, with the alternative cost estimate within staff's estimated range and the imputed elasticity slightly lowering total cost.  The alternative incremental cost estimate is in the range of the low and high end cost estimates but still results in negative net benefits with the base VSL. The imputed price elasticity results in slightly lower costs but CPSC staff believe this is related to the method used to create the values.[34] Changes in the annual sales of custom corded products produce a proportional change as it effects the point estimate in the same manner.

### F.  Additional Discussion

EC staff note that cordless window covering options exist for nearly every window covering type. In 2018, WCMA published a voluntary safety standard requiring that all stock window coverings be cordless, have a short cord, or have inaccessible cords.  According to WCMA, stock window coverings account for about 80 percent of all window coverings sold.  These products are generally less expensive than custom window coverings, whether they are corded or cordless. Additionally, cordless options exist for most types of custom window coverings and some consumers do opt for cordless custom window coverings (D+R International 2021).

However, there could be some inefficiencies in the market that result in less than the optimal amount of safety being provided by the market. The first type of inefficiency or market failure related to window coverings is the potential existence of externalities. Externalities exist when one party's actions impose uncompensated benefits or costs on another party.  In the case of rental housing, for example, the choice of window covering may be made by a landlord.  The purchase decision reflects the risk preferences of the landlord, but the costs of that decision (in terms of risk) would be borne by tenants and their children. A landlord may choose a custom window covering with a hazardous cord because of personal preference, rather than consumer safety, which would not be in the best interests of his or her tenants.

The second type of market failure is related to information asymmetry. Some consumers might have inadequate information concerning the hazard and either underestimate, or be generally unaware of, the risks posed by corded window coverings even though corded window coverings include warnings of the strangulation risk. The final rule may also provide benefits to consumers who might underestimate the extent to which the risk posed by corded window coverings could apply to their own household. For example, they might not believe that their children would play with window covering cords and disregard the warnings. These consumers could undervalue the risk reduction offered by cordless window coverings.[35] In addition, staff note that the draft final rule is intended to protect young children who are unlikely to read warnings or to understand the risks of their actions.

### G.  Unquantified Benefits

The monetized benefits in this analysis only reflect the subset of benefits attributable to a reduction in fatal and nonfatal injuries associated with custom window coverings. There may

---

[34] WCMA provided estimates of the expected changes in sales as a result of the rule. These values were obtained through a survey of members which may not accurately reflect what could occur in the market. Of particular note is pleated shades which an imputed price elasticity of demand from the provided values shows an increase in quantity demanded despite cost increases. This can occur with some consumer products, but it is uncommon.

[35] Conversely, households that do not have young children and seldom receive visits from young children do not face the risk of having a child strangled by a window cord. These households would not benefit from choosing cordless window coverings solely for reducing the risk of strangulation while they occupy the home.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

also be unquantifiable benefits related to operation or aesthetics of cordless products or reductions in emotional distress for parents.

Some consumers may derive additional utility from the more streamlined look of cordless products. Also, note that cordless products may more reliably operate during lift or tilt operation which can be a source of frustration with corded products. However, because cordless alternatives exist for virtually all types of custom window coverings, the value of these unquantified benefits is assumed to be less than the price differential between the corded and cordless options.

The emotional distress level of caregivers could also be reduced by the draft final rule. This benefit is not directly accounted for in the primary VSL estimate of $10.5 million, or the pain and suffering estimates of CPSC's ICM.[36] The value of the shock or perceived guilt related to a caregiver's inattentiveness could be significant as it could result in large reductions to physical well-being or income loss. More information and formal study would be required to include such values in the primary analysis of the draft final rule.

### H. Summary of Changes to Preliminary Regulatory Analysis in response to comments received

Substantive comments were submitted by the public in response to the NPR. Many of these comments included data related to cost, benefit, and market conditions. Staff updated the final regulatory analysis in this report to include much of this data and address criticisms of the analysis. Of particular note is data related to the estimates of custom products in use, expected changes in annual sales as a result of the rule, and an alternative cost estimate.

Staff created a new estimate of custom products in use using CPSC's PPM which is discussed in more detail earlier in this report. As part of the sensitivity analysis staff also included a per unit cost estimate which was very similar to a limited cost analysis on custom products conducted in Panchal 2016. This estimate was within the low to high range of the cost estimates included in this report. Also included in the sensitivity analysis is an imputed price elasticity of demand calculated from data provided by a commenter. Staff also expanded the number of variables included in the sensitivity analysis to better demonstrate the effect of the primary inputs on the analysis. [37]

### I. Summary and Conclusion

This analysis estimates the monetized costs from the draft final rule for most shade and horizontal blinds to be greater than the monetized benefits. However, for curtains/ draperies and for vertical blinds, the analysis estimates monetized benefits to be greater than the monetized costs. In the aggregate, across all product types, the monetized benefits are less than the monetized costs. Staff estimated aggregate benefits for one year's worth of sales amounted to approximately $23 million or approximately $1.45 per corded custom unit sold. The estimated aggregate costs using the low-end/high-end cost environment amounts to $54 million and

---

[36] Some of this potential benefit could be indirectly captured in estimates of pain and suffering related to consumer product injuries. Staff notes that this potential benefit is most likely bounded by the estimate of an increased multiplier (3X) for children's VSL discussed in section 3.6. The benefit should not be treated as "in addition" to an increased VSL for children and is most likely already accounted for in that estimate. This is because the source of the children's VSL estimate is based on surveys where respondents reviewed and valued risk/harm reductions to children where presumably respondents accounted for emotional and physical effects related to the risks/harms.
[37] Comment responses can be found in Tab H of this package.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

$129.1 million, respectively. These values equate to a per unit sold cost of $3.41 for the low-end environment and $7.20 for the high-end environment.

Inherent in all estimates is some level of uncertainty.  Particularly of note is that for a VSL value of $31.5 million net benefits turn slightly positive. There is uncertainty concerning the distribution of deaths and injuries by the stock and custom categories.  Specifically, a voluntary standard becoming effective in the middle of the time period where CPSC collected data on incidents makes it difficult to determine precisely how many of the deaths actually involve custom products during this time frame. This is due to the standard having different sets of requirements for custom as opposed to stock products. To address this and other uncertainties, staff conducted a sensitivity analysis which is discussed in the section above.

# IV.  Regulatory Alternatives

### A.  No Action Alternative

Under this alternative the status quo would be maintained. This option might be selected if the risk associated with custom corded products was considered reasonable, considering that warning materials describing the risk associated with corded window covering products are distributed to consumers upon purchase. Additionally, cordless products are widely available for nearly all window covering types for consumers that can afford them. There are no costs associated with this alternative.  However, this alternative does nothing to address the fatal and nonfatal injuries involving corded custom window coverings. Corded custom products would still be available to consumers but admittedly at a higher price than cordless stock products.

### B.  Rely Upon or Improve Voluntary Standard for Window Coverings

Another alternative is to adopt the draft balloted standard (ANSI/WCMA A100.1-2022) as a mandatory standard in this final rule, without waiting for the standard to become effective.  In July 2022, WCMA issued a ballot to revise the 2018 voluntary standard.  The proposed revisions would prohibit standard operating systems (operating pull cords) and the use of continuous loop systems in custom horizontal blinds only. Staff voted against the ballot on August 15, 2022, stating that hazardous cords remain an option for operating cords on all other custom products other than horizontal blinds, [38] leaving a maximum of 87 incidents (fatal and non-fatal) unaddressed covering the time period from 2009 through 2021.[39] The balloted draft standard's requirements for retractable cords are also inadequate because they allow for a 36-inch retractable cord (2 feet longer than the draft final rule) and because the UV test method allows for testing only a section of a rigid cord shroud (instead of the complete sample).  Staff concludes that the balloted draft standard is inadequate to address the risk of injury based on this information, and also assesses that adopting the balloted draft standard would narrow the benefits as well as the costs. The estimated costs would range from approximately $32 million to $72.5 million, but benefits would be just $9.6 million, leaving an unaddressed potential benefit of $13.4 million.  This unaddressed potential benefit is 58.3 percent of the total $23 million potential benefits estimated in this report under the proposed final rule.  Hazardous cords would remain an option on custom shades, custom vertical blinds, and curtains/drapes, meaning an estimated 7.4 million units of custom products sold annually going forward.

---

[38] CPSC staff letter is available at https://www.regulations.gov/document/CPSC-2013-0028-3667.
[39] Includes custom/unknown product categories, and continuous loops/unknown cord types.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

A related alternative might be for Commission staff to continue participating in, and encouraging safety improvements to, the voluntary standard for window coverings, ANSI/WCMA-2018. This option would be similar to the "no action alternative," with the key difference being that the Commission could direct staff to pursue safety improvements in the voluntary standard, including applying relevant conditions on stock products to custom, in the same manner that staff has been pursuing unsuccessfully for many years, as a conditional alternative to a mandatory standard developed by the Commission. The Commission could reconsider a mandatory standard if efforts to improve the voluntary standard on custom products remain unsatisfactory. As discussed in this briefing package, operating cords on custom window coverings are not adequately addressed in ANSI/WCMA 2018. Staff also notes that the history of WCMA's efforts, as well as the incremental nature of the balloted draft standard in 2022, demonstrate that continuing to wait for WCMA to address the injuries in the voluntary standard will result in additional deaths and injuries to children, with little hope of progress if the Commission does not pursue rulemaking. Accordingly, staff does not recommend this option.

As a third alternative, the Commission could wait and see whether ANSI and/or WCMA approve the balloted draft standard, and then modify in a rulemaking the requirements for custom shades, custom vertical blinds, and curtains/drapes to have the same requirements as the draft final rule. This alternative would lead to a similar cost-benefit ratio as discussed in this report (with lower costs but also lower benefits), and would delay the implementation of a rule. Delaying the final rule risks the lives of more children to strangulation on hazardous custom products.

Furthermore, if the Commission chose to remove costs by addressing custom horizontal blinds under Section 15(j) of the CPSA, the additional methods to make cords inaccessible on horizontal blinds, such as rigid cord shrouds and loop cord and bead chain restraining devices, could not be subject to any requirement that is not "readily observable," and so could not be subject to the durability requirements in the draft final rule. Shifting horizontal blinds to a section 15(j) rule would save burden, but may introduce cord hazards if the methods of making cords inaccessible are not subject to adequate testing.

Consequently, staff concludes that the voluntary standards process is unlikely to lead to an adequate, or more beneficial and less costly, custom cordless requirement for all product types in the short or long run.

### C. Later Effective Date

The NPR proposed an effective date of 180 days after the final rule's publication in the *Federal Register*. During the comment period, many commenters representing manufacturers and retailers stated their concerns about meeting the proposed 180-days effective date due to long lead times for receiving equipment or input material, manufacturing compliant window coverings, and delivering the product to consumers. Commenters provided timelines of 9 to 20 months in obtaining and transporting equipment/materials from overseas suppliers. Two commenters, both large manufacturers, specifically stated long lead times of 4 to 12 months related to acquiring necessary equipment and materials. One of the commenters asserted an additional 1 to 4 months would be required upon delivery to assemble component inventory. Another commenter stated an additional delay related to continued COVID-19 disruptions. Additionally, staff has assessed that the redesigning of window coverings for unusually sized-windows to be compliant with the final rule would create even more additional effort and time, above typical sized-window modifications, for manufacturers to address. (Tab C Appendix)

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Staff found these concerns to be credible because of the specific examples provided by commenters and because these comments comport to what staff has determined about the industry's supply chain. Additionally, Staff assesses that supply disruption could result in temporary, but significant, shift in consumer behavior. Supply chain disruptions and delayed deliveries could result in a shift in demand from custom products to stock products. Stock products have a lower profit margin than custom products and thus may have a significant cost impact to manufacturers and retailers even if the shift is temporary. Further, most custom window coverings sellers are small businesses, and therefore a temporary shift to stock products could have a significant impact to small businesses. A later effective date would allow manufacturers more time to redesign, distribute costs of compliance along the entire year, or discontinue product variants that cannot meet compliance.

As these examples show, a 180-days effective date has the potential to be very disruptive for producers and consumers. An extended effective date would mitigate costs related to redesign/research and development for manufacturers. Further, postponing the effective date by several months would reduce the benefits of the rule by only a very small amount as most noncompliant window coverings will take years to cycle out of use. Given the totality of these comments and assessments, staff accordingly assesses that there is good cause to extend the effective date beyond 180 days. Staff recommends the effective date in the final rule be extended to one year after publication for most custom window coverings and two-years for large/unusual sized window coverings.

### D. Narrow Final Rule to Vertical Blinds, Curtains, and Drapes

The Commission could narrow the draft final rule to vertical blinds, curtains, and drapes on the grounds that cords are not critical to the operation of these products. These products typically offer cordless options at no additional cost for most applications because a plastic rod can be used for operation. Narrowing the final rule to these three product types would lessen the cost impact and make it unlikely that any particular product type and/or size would be eliminated. Note though that some consumers may require motorization which would dramatically increase the cost, but few consumers are expected to require motorization for these products. Consumers may also prefer decorative cords that exceed the length described in the final rule which would result in lower utility for these consumers should those decorative cords be removed.

Under this alternative, the benefits and costs would be limited to vertical blinds, curtains, and drapes which accounted for approximately 30 percent of 2020 window covering product shipments. However, the number of injuries and deaths associated with these products represents a small fraction of the total. This would equate to annual net benefits of approximately $7.8 million. The net benefits of this option would be greater than the final rule due to the large costs to conform for the other product types, however a large fraction of the deaths and injuries would not be addressed.

### E. Continue and Improve Information and Education Campaign

The Commission could work to improve the current information and education campaign concerning the strangulation hazard associated with corded window covering products. This alternative could be implemented on its own without regard for regulatory action. Staff does not have information to quantify the effectiveness of public information campaigns, that have been in effect since 2003, on reducing the risk of injury associated with corded window coverings.

120

Staff notes that based on the continuing number of fatalities, the effective injury reduction of the campaign is most likely very small. As a result, staff does not recommend this alternative because staff finds the current campaign to be ineffective at communicating the hazard to consumers and by extension ineffective at reducing or preventing injuries associated with window coverings.

### F. Adopt Canadian Window Covering Mandatory Standard

Under this alternative the Commission could adopt the Canadian Corded Window Coverings Regulations (SOR/2019-97), as it is similar to the draft final rule. Staff estimates that this option would add more costs without adding more benefits than the draft final rule, although staff notes that it would provide some unquantifiable benefits related to harmonization of product standards for firms operating in both countries.  The additional costs under this scenario are associated with requirements in the Canadian regulation that are more burdensome than the draft final rule, such as the pull force and inner cord requirements for products.  In addition to higher costs, these differences could lead to permanent reductions in consumer choice if some custom product variations and sizes cannot meet these inner cord requirements.  Under this alternative, net benefits are less than the draft final rule as the additional costs are expected to be greater than the unquantifiable benefit of standard harmonization.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

# References

Asch, Peter, 1988. *Consumer safety regulation*. Oxford University Press: New York.

Bailey, Mark, 2018. *Table Saw Population Estimates for 2017*. Bethesda, MD: U.S. Consumer Product Safety Commission (November 13, 2018).

Balci-Sinha, Rana, 2022. "Draft Final Rules for Corded Window Coverings: Human Factors Assessment ". Bethesda, MD: U.S. Consumer Product Safety Commission.

Chowdhury, Risana, 2022. "Draft Final Rules for Corded Window Coverings: Update on Fatal and Near-Miss Strangulation Incidents Associated with Window Covering Cords". Bethesda, MD: U.S. Consumer Product Safety Commission.

Census Bureau, 2020. Statistics of US Businesses (SUSB) 2017. Suitland, MD. Census Bureau.

Corded Window Coverings Regulations (2019), SOR/2019-97, available at: https://canadagazette.gc.ca/rp-pr/p2/2019/2019-05-01/pdf/g2-15309.pdf

D&R International Ltd, 2013. Residential Windows and Window Coverings: A Detailed View of the Installed Base and Consumer Behavior. Silver Spring, MD. D&R International.

D+R International Ltd, 2021. Window Covering Market Characterization: Final Report. Silver Spring, MD. D+R International.

Euromonitor International, 2022a. Window Covering Market Share by Company 2016-2021. Chicago, IL. Euromonitor International.

Euromonitor International, 2022b. Window Covering Market Size USD 2016-2021. Chicago, IL. Euromonitor International.

Gold, Marthe R., Siegel, Joanna E., Russell, Louise B., Weinstein, Milton C., 1996. *Cost-effectiveness in health and medicine*. New York: Oxford University Press.

Haddix, Anne C., Teutsch, Steven M., Corso, Phaedra S., 2003. *Prevention effectiveness: A guide to decision and economic evaluation* (2nd ed.). New York: Oxford University Press.

Hammitt, J.K. and K. Haninger. 2017. Valuing Nonfatal Health Risk as a Function of Illness Severity and Duration: Benefit Transfer using QALYs. Journal of Environmental Economics and Management, 82: 17-38.

Hammitt, J.K. and D. Herrera. 2017. Peeling Back the Onion: Using Latent Class Analysis to Uncover Heterogeneous Responses to Stated Preference Surveys. Journal of Environmental Economics and Management.

Industrial Economics Inc. (IEc), 2016a. "Memorandum to CPSC: Window Coverings Market Research Report. Cambridge, MA. Industrial Economics Inc.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

A621

Industrial Economics Inc. (IEc), 2016b. "Memorandum to CPSC: Final Cordless Window Coverings Comprehensive Cost Analysis". Cambridge, MA. Industrial Economics Inc.

Jenkins, Jill L., Rodgers, Gregory B., 2020. Combining measures of risk exposure with injury incidence estimates to estimate nursery product injury rates, *Journal of Safety Research,* 72, 43-46.

Lahr, M.L., Gordon, B.B., 1980. *Product life model feasibility and development study.* Contract CPSC-C-79-009*, Task 6, Subtasks 6.01-6.06).* Columbus, OH: Battelle Laboratories.

Motiv, 2016. Technical Feasibility and Cost Improvement Analysis of Safer Window Covering Technologies: Phase 5 Final Report. Boston, MA. Motiv.

Laciak, Arthur, 2020. Importation Patterns for USA: For Blinds. Bethesda, MD: U.S. Consumer Product Safety Commission.

Lee, Kevin, 2022. "Draft Final Rule for Operating Cords on Custom Window Coverings: Mechanical Engineering Assessment of Balloted 2022 Revision to the Voluntary Standard ANSI/WCMA A100.1 – 2018 and Final Rule Recommendations". Bethesda, MD: U.S. Consumer Product Safety Commission.

Lawrence, BA, Miller, TR, Waejrer, GM, Spicer, RS, Cohen, MA, Zamula, WW, 2018. The Consumer Product Safety Commission's Revised Injury Cost Model. Maryland: Pacific Institute for Research and Evaluation (PIRE). (February, 2018). Available at: https://www.cpsc.gov/s3fs-public/ICM-2018-Documentation.pdf?YWuW4Jn0eb2hExeA0z68B64cv6LlUYoE

Neumann, Peter J., Sanders, Gillian D., Russell, Louise B., Siegel, Joanna E., Ganiats, Theodore G., 2016. *Cost-effectiveness in health and medicine*: *Second Edition.* New York: Oxford University Press.

OMB, 1993. Executive Order 12866 of September 10, 1993: regulatory planning and review, *Federal Register* 58(90), 51735-51744. Available at: http://www.archives.gov/federal-register/executive-orders/pdf/12866.pdf

Panchal Jitesh H., 2016. Manufacturing Cost Analysis: Cordless vs. Corded Window Covering Products. West Lafayette, IN. Purdue University.

Rice, Dorothy P., MacKenzie, Ellen J., and Associates, 1989. *Cost of injury in the United States: A report to Congress.* San Francisco, CA: Institute for Health & Aging, University of California and Injury Prevention Center, The Johns Hopkins University.

Rodgers, Gregory B., 1993. Estimating jury compensation for pain and suffering in product liability cases involving nonfatal personal injury. *Journal of Forensic Economics 6*(3), 251-262.

Smith, Charles, 2016. *Draft Proposed Rule Establishing a Safety Standard for Portable Generators : Preliminary Regulatory Analysis*. Bethesda, MD: U.S. Consumer Product Safety Commission (October 5, 2016).

Taylor, Lester D., Houthakker*, H.S., 2010.* Consumer demand in the United States: Prices, income, and consumption behavior (3rd ed.). New York: Springer.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Viscusi, W. Kip, 1988. The determinants of the disposition of product liability cases: Systematic compensation or capricious awards? *International Review of Law and Economics,* 8, 203-220.

Viscusi, W. Kip, Harrington, Joseph E., Vernon, John M., 2005. *Economics of regulation and antitrust, 4th Edition.* Cambridge, MA: MIT press.

Window Covering Manufacturers Association. 2015a. "Memorandum to Window Covering Manufacturers Association, Re: Review and Critique of CPSC Economic Analysis in ANPR and Briefing Package." Submitted with public comment on 80 *FR* 2327, submitted June 1, 2015, Docket No. CPSC-2013-0028.

Window Covering Manufacturers Association. 2015b. Public comment on 80 *FR* 2327 submitted June 1, 2015. Docket No.CPSC-2013-0028.

Window Covering Manufacturers Association. 2022a. CPSC Public Hearing: Safety Standard for Operating Cords on Custom Window Coverings. Statements made by Ralph Vasami WCMA Executive Director. March 16, 2022. Docket No. CPSC-2013-0028. Transcript located at: https://www.regulations.gov/document/CPSC-2013-0028-3663

Window Covering Manufacturers Association. 2022b. Public comment submitted to CPSC on March 23, 2022. Docket No. CPSC-2013-0028.

Zamula, William, Rodgers, Gregory, Bailey, Mark, 2016. *Preliminary regulatory analysis of the draft proposed rule for table saws.* Bethesda, MD: U.S. Consumer Product Safety commission (December 2016).

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

# Tab G: Final Regulatory Flexibility Analysis Memorandum by the Directorate for Economic Analysis

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



United States
**Consumer Product Safety Commission**
cpsc.gov | info@cpsc.gov | 800.638.2772

# Memorandum

**TO:** Rana Balci-Sinha, Project Manager,
Division of Human Factors,
Directorate for Engineering Sciences

**DATE:** September 28, 2022

**THROUGH:** Alexander P. Moscoso, Associate Executive Director,
Directorate for Economic Analysis

Jose E. Tejeda, Senior Staff Coordinator,
Directorate for Economic Analysis

**FROM:** Mark Bailey, Economist,
Directorate for Economic Analysis

**SUBJECT:** Final Regulatory Flexibility Analysis of a Rule that Would Establish a Standard for Custom Window Coverings

# I. Introduction

The Commission is considering a draft final rule that would establish a mandatory safety standard for operating cords on custom window coverings. The draft final rule would require that custom window coverings be cordless, have no accessible cords, or have short, static cords no longer than eight inches in length as set forth in section 4.3.1. of ANSI/WCMA A100.1-2018.

Whenever an agency publishes a final rule, the Regulatory Flexibility Act (5 USC 601 – 612) requires that the agency prepare a final regulatory flexibility analysis (FRFA) that describes the impact the rule would have on small businesses and other entities. The FRFA must contain

1. a statement of the need for, and objectives of, the rule;
2. a statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments;
3. the response of the agency to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA) in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule as a result of the comments;
4. a description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available;
5. a description of the projected reporting, recordkeeping and other compliance requirements of the rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record;
6. a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes,

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected;

## II.   Reason for Agency Action

The draft final rule is intended to address the strangulation hazard involving corded custom window covering products.  The Directorate for Epidemiology, Division of Hazard Analysis (EPHA), reports an average of 6.8 fatal injuries involving all corded window covering products annually to children less than 8 years old (Tab A, Chowdhury, 2022).  The societal costs of these fatal injuries amounted to about $71.4 million annually (Tab F Bailey, 2022). Based on the estimate of about 7.6 nonfatal window covering injuries annually from CPSC's Injury Cost Model (ICM) the Directorate for Economic Analysis estimates the societal costs of nonfatal window covering injuries are approximately $498,000. (Tab F, Bailey, 2022).  Combining these estimates amounts to annual societal costs associated with corded window coverings of approximately $72 million. The draft final rule would only address the proportion of these injuries attributable to custom products which, based on a CPSC review of 209 reported incidents, would be approximately $31.6 million annually. (Tab F, Bailey, 2022)

The draft final rule would adopt for custom products the same requirements in section 4.3.1 of ANSI/WCMA-2018 that currently apply to stock products.  Staff assesses that these requirements are effective at preventing strangulations for stock products and would be equally effective when applied to custom window coverings Tab B (Balci-Sinha 2022).

## III.   Objectives of and Legal Basis for the Rule

The objective of the rule is to reduce the risk of serious injury or death related to corded custom window coverings to children under age 8. The draft final rule would be issued under the authority of Sections 7 and 9 of the Consumer Product Safety Act (CPSA).

## IV.   Comments of the Chief Council for Advocacy, SBA

The Office of Advocacy of the SBA (SBAA) submitted several comments on the proposed rule. One of the comments by SBAA resulted in CPSC staff recommending a change to the draft final rule. To reduce the burden of the final rule, in addition to rigid cord shrouds as a method to make cords inaccessible, staff also recommends allowing a retractable cord or a loop cord or bead restraining device, as long as such devices meet the requirements in the draft final rule. Staff also recommends a longer effective date, two years, for products 10 feet or greater in length to reduce burden on small businesses. This section discusses SBAA's specific comments along with CPSC staff responses below.

Comment: SBAA states that CPSC's Initial Regulatory Flexibility Act (IRFA) analysis relies on incomplete information and advises that the Commission publish an updated analysis for comment. Of note is an incorrectly cited Census Bureau data set used in the analysis.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Response: CPSC staff has updated the Final Regulatory Flexibility Analysis (FRFA) to reflect the requested minor change related to firms affected and corrected the citation SBAA pointed out. Staff provides an estimate for the potential firms that may meet the criteria for small businesses and is discussed in more detail later in this memorandum.

Comment: SBAA also stated that CPSC should consider alternatives for the final rule that reduce the burden to small businesses while still meeting the stated objectives of increased child safety. SBAA expressed concerns about the costs to comply, time to comply, and whether an updated voluntary standard would adequately address the risk of injury.

Response: CPSC staff has considered alternatives to reduce the potential burden of the rule to small businesses. Alternatives considered were included in the IRFA and included continued work on education efforts, narrowing the scope of the rule, and updating the voluntary standard. An additional size exemption alternative was considered in response to comments from SBA and the public, but ultimately not recommended. Staff found that it is feasible to make larger window coverings safe, and the hazard associated with larger window coverings is the same as that of smaller products. However, CPSC staff included a longer effective date for products 10 feet or greater in length to allow manufacturers to spread research and development costs over a longer time period. This will also allow manufacturers more time to source necessary component parts. CPSC staff also recommends allowing two additional methods to make operating cords on custom products inaccessible or non-hazardous to children: retractable cord systems and cord and bead loop restraining devices, as long as these devices meet the requirements of the rule.

In addition, CPSC staff recommends an effective date of one year for all other custom window coverings to allow firms more time to obtain complaint component parts and retool production lines. CPSC staff note that many of the firms supplying the US market with custom window coverings also supply the same products to the Canadian market where all corded products are non-compliant.

Also, ANSI/WCMA-2018 is the latest effective standard and, as of the date of this memorandum, WCMA has not approved any revisions to the standard. On July 15, 2022, WCMA balloted a revision to the standard, but staff is unclear whether the balloted revisions will become an approved revised standard. CPSC submitted a negative vote on the ballot.[1] CPSC staff does not recommend adopting the current or draft voluntary standard because it does not adequately address the risk of injury associated with custom window coverings.

Comment: Lastly, SBAA stated that CPSC should consider exceptions in situations where corded window coverings are a necessity, such as under the Americans with Disabilities Act (ADA).

Response: Sections 308.2 and 308.3 of 2010 ADA Standards for Accessible Design specify forward and side reach distances.[2] For example, the ADA requires that an unobstructed high forward reach shall be 48 inches; if there is obstruction, high reach shall be 48 inches or 44 inches where the reach depth is 20 inches maximum or 25 inches maximum, respectively. Unobstructed high side reach shall be 48 inches; if there is obstruction, the high side reach shall be maximum 48 inches and 46 inches if the reach depth is 10 inches maximum and if the reach depth is over 10 inches but less than or equal to 24 inches, respectively. Staff is aware of

---

[1] CPSC staff letter is available at https://www.regulations.gov/document/CPSC-2013-0028-3667
[2] Department of Justice (2010). 2010 ADA Standards for Accessible Design, accessed at https://www.ada.gov/regs2010/2010ADAStandards/2010ADAStandards.pdf

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

alternative solutions for window coverings that can safely replace the existing hazardous cords, such as cordless, rigid cord shrouds, cord and bead chain restraining devices, retractable wands, and assistive poles, which can allow access to a height that is about at the same height as corded products. For example, retractable cords can be made accessible with a rigid wand or handle to an easy-to-access height.  Poles are currently being offered to reach the bottom of cordless products.

Staff notes that per the ADA, operable parts need to be operable with one hand and shall not require tight grasping, pinching, or twisting of the wrist. The force required to activate operable parts shall be 5 pounds maximum. Staff questions whether the traditional operating pull cords as well as continuous loop bead chains and cords are compliant with this requirement as they require tight pinching and grasping to operate. Further, in many cases, the pull force of a corded system can exceed 5 pounds.

# V.  Significant Economic Issues Raised by the Public

These are discussed in Tab H of this package.

# VI.  Small Entities to Which the Rule Will Apply

The North American Industry Classification System (NAICS) defines product codes for U.S. firms.  Firms that manufacture window coverings may list their business under the NAICS product code for blinds and shades manufacturers (337920 Blind and Shade Manufacturing) or retailers (442291 Window Treatment Stores, ).[3] Window coverings can be sold in a variety of retail channels and could be listed under a large number of NAICS codes. These could include but are not limited to 442299 (All Other Home Furnishings Stores), 452210 (Department Stores), 452311 (Warehouse Clubs and Supercenters), 454110 (Electronic Shopping and Mail-Order Houses), and 454390 (Other Direct Selling Establishments).

Under U.S. Small Business Administration (SBA) guidelines, a manufacturer of window coverings is categorized as small if the firm has less than 1,000 employees. (NAICS code 337920) Importers would be considered small if the firm has less than 100 employees. As the NAICS code for importers is non-specific to window coverings CPSC staff reviewed Customs and Border Patrol data, firm financial reports, and Dun & Bradstreet reports to obtain a more precise estimate of importers.  Based on this research, CPSC staff estimates that there are approximately 83 importers that meet the SBA guidelines for a small business. (Bailey 2021) Most retailers of window coverings would be considered small if they have sales revenue less than $8.0 million. (NAICS codes 442291, 454390) Department stores, warehouse clubs, and electronic shopping and mail order houses must have revenues less than $35 million, $32 million, and $41.5 million respectively to be considered small.  Based on 2017 Census Bureau Statistics of US Businesses (SUSB) data, there were 1,898 blinds and shades manufacturers,

---

[3] The two product codes 337920 and 442291 encompass most products in the window coverings market.  However, some drapery and curtain manufacturers may be listed under 322230, stationary product manufacturing.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

(NAICS 337920), and retailers (NAICS 442291).[4] Of these, 1,840 firms (302 manufacturers and 1,538 retailers) are small entities by SBA guidelines.

Nearly all of the 302 small manufacturers identified are far below the 1,000 employee SBA threshold; 238 of the manufacturers have fewer than 20 employees and 151 have fewer than 5 employees. CPSC staff estimates that the annual revenue for the firms with fewer than 20 employees to be under $250,000.[5] Most of the firms with fewer than 5 employees manufacture custom window coverings on a per order basis. The annual revenue for these manufacturers is most likely below $100,000, based on SUSB payroll data from the U.S. Census Bureau.

# VII. Compliance Requirements of the Draft Final Rule, Including Reporting and Recordkeeping Requirements

To eliminate the strangulation hazard on cords, the draft final rule would establish a performance standard that would require custom window coverings to meet the same requirements in section 4.3.1 of the voluntary standard ANSI/WCMA A100.1 – 2018 that apply to stock window coverings.[6] To comply with the performance requirements, all accessible operating cords would need to be removed, made inaccessible, or shortened to less than 8 inches. The draft final rule provides two methods to make cords inaccessible (rigid cord shrouds and retractable cord devices) and one method that would remove the hazard from an accessible cord (cord or bead restraint device). Products that use one of these methods to meet the requirements must also conduct additional testing on durability, as set forth in the rule.

Under section 14 of the CPSA, as codified in 16 CFR part 1110, manufacturers and importers of general use custom window coverings will be required to certify, based on a test of each product or upon a reasonable testing program, that their window coverings comply with the requirements of the draft final rule. Each certificate of compliance must identify the manufacturer or importer issuing the certificate and any manufacturer, firm, or third-party conformity assessment body on whose testing the certificate depends. The certificate must be legible and in English and also include the date and place of manufacture, the date and place where the product was tested, including the full mailing address and telephone number for each party, and the contact information for the person responsible for maintaining records of the test results. Certificates must accompany the product or the product shipment but may be in electronic format. Certificates must be provided to each distributor or retailer of the product. Upon request, the certificates must also be provided to the CPSC and Customs and Border Protection (CBP).[7] Manufacturers and importers of custom window coverings that are also children's products, as defined in 16 CFR part 1200, must use a CPSC-accepted third party conformity

---

[4] This estimate focuses strictly on firms where window coverings are a majority of the operation. The other NAICS codes provided (322230, 454390, 442299, 452210, 452311, 454110) may include firms participating in the window coverings market but most likely account for a very small share of the firm's operation. In addition, it is possible some retailers of window coverings are listed under NAICS code 541410 Interior Design Services.

[5] Based on Census Bureau SUSB data, a review of firm financial reports, and Dun & Bradstreet reports.

[6] See section 4.3.1 of the voluntary standard for a description of the operating systems that would be allowed as the draft proposed rule would adapt the stock product requirements for custom products. In addition, staff note that retractable cord systems would be considered compliant with the requirements.

[7] The regulations governing the content, form, and availability of the certificates of compliance are codified at 16 CFR part 1110.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

assessment body to test products for compliance, and issue a certificate of compliance based on such third-party testing.

# VIII. Costs of Draft Final Rule That Would Be Incurred By Small Manufacturers

Custom window covering manufacturers would most likely adopt cordless lift operation systems to comply with the draft final rule. As discussed in the preliminary regulatory analysis of the proposed rule (Tab F Bailey, 2022), the cost to modify window covering lift systems to comply with the proposed rule ranges from $2.99 to $9.77 per horizontal blind, $2.18 to $35 per shade, and no expected cost increase for vertical blinds and curtains/drapes. CPSC staff estimates of redesign costs equate to approximately $772,500 over a 2-year period. (Tab F Bailey 2022) Only manufacturers with at least 75 employees are anticipated to perform this investment as this is a significant investment for smaller manufacturers with fewer employees and lower annual revenues. Likely these manufacturers will either purchase the necessary completed hardware or license a patented solution from a larger firm. CPSC staff expects component costs to be significant as inaccessible cord operation is on the order of a few dollars per window covering up to a high-end estimate of as much as about $35 per window covering for one type of window covering as shown in Tab F containing the final regulatory analysis. However, the impact may be less than originally estimated, due to the enforcement of Canada's regulations beginning in May 2022. Companies that sell in both Canada and the U.S. have already redesigned their custom offerings to be compliant with the Canadian regulations, which are substantially similar to the proposed final rule, so already have stock of compliant product designed and ready to sell through small dealers and interior designers.

Estimates of the costs to modify three types of window coverings in Panchal (2016) indicate that at a minimum the costs to modify will range from 2 to 11 percent of retail prices.[8] Panchal (2016) used a product archeology approach, supplemented by standard models for calculating only manufacturing and assembly costs, to estimate the incremental cost of implementing standard manual cordless technology for entry-level stock window coverings – the type of window coverings that are available for purchase off-the-shelf from home improvement stores. Hence his estimates are most applicable to the more basic and inexpensive cordless products at the low end of the window coverings market. Panchal's analysis does not account for any costs associated with product development and design innovations, testing, licensing of technology, manufacturing restrictions due to existing patents, and training of personnel, which would add further costs to implementing cordless technologies (Panchal, 2016).

Manufacturers would likely incur some additional costs to certify that their window coverings meet the requirements of the draft final rule as required by Section 14 of the CPSA. The certification must be based on a test of each product or a reasonable testing program. The Window Covering Manufacturers Association (WCMA) developed a certification program for window covering products titled "Best for Kids" which includes third party testing of products for accessible cords. CPSC staff assesses this certification would meet the requirements as outlined in Section 14 of the CPSA. Based on quotes from testing laboratory services for consumer products, the cost of the certification testing will range from $290 to $540 per window

---

[8] See Table 3 Summary of incremental manufacturing costs for sample entry-level products in different product categories in Panchal 2016 for additional detail on these values.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

covering model.[9] Note that the requirement to certify compliance with all product safety rules, based on a reasonable testing program, is a requirement of the CPSA and not of the draft final rule.

CPSC staff note that a reasonable testing program for general-use window coverings could entail a simple visual inspection of products by the manufacturer and would still likely meet the requirements. Therefore, the cost of a reasonable testing program for compliance of general use window coverings with the draft final rule is likely much lower than the cost of conducting a third-party certification test of each product, as required for children's products.

# IX. Impact on Small Manufacturers

In order to comply with the draft final rule, small manufacturers are expected to incur redesign and incremental component costs described above for some product lines which currently are not available in inaccessible cord variants. Staff does not expect small manufacturers to suffer a disproportionate cost effect from the draft final rule as the cost calculations and research were completed on a per unit basis and little if any redesign costs are expected. Staff expects small manufacturers of window coverings to incur, at a minimum, a 2 percent impact to their custom window covering revenue from the draft final rule. This implies that if custom products account for all of a firm's revenue then the minimum impact of the draft final rule is 2 percent of revenue.

Generally, staff considers an impact to be potentially significant if it exceeds 1 percent of a firm's revenue. As the smallest estimate of incremental compliance cost from Panchal (2016) is 2 percent of retail price, staff concludes that the draft final rule could have a significant impact on manufacturers of custom window coverings. This effect is dependent on the share of annual revenues attributable to custom products. For example, if a small firm only manufactures custom cellular shades then staff expects a lowest possible compliance cost of 2 percent of retail price.[10]   Staff notes that small importers are expected to bear similar costs as small manufacturers, but staff is unclear whether the impact will be significant. The cost effect as a percent of revenue is dependent on the firm's custom window covering imports as a percent of total revenue. Any small importer with at least 50 percent of their revenues related to custom window covering products affected by the draft proposed rule could be significantly impacted. This is due to the lowest possible compliance cost equating to 2 percent of retail price which at a 50 percent custom product share would equate to a 1 percent minimum impact on annual revenues. CPSC staff expects the draft final rule to have a significant effect on a substantial number of small firms.

---

[9] Based on quotes from firms to conduct certification tests to the current WCMA voluntary standard on window covering products currently available at retailers.

[10] There is presumably some retail markup in the retail price of these products which would translate to a higher cost as a percentage of a manufacturers annual revenues. The lowest possible compliance cost in this estimate has an implicit assumption that a manufacturer can capture the full retail price of the product. This is an unlikely scenario but helpful for illustrative purposes as only a manufacturer with a large focus on vertical blinds and curtains/drapes could possibly be below the CPSC 1 percent significant effect criteria.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

# X. Federal Rules which may Duplicate, Overlap, or Conflict with the Proposed Rule

CPSC staff has not identified any other Federal rules that duplicate, overlap, or conflict with the draft final rule.

# XI. Alternatives for Reducing the Adverse Impact on Small Entities

Under the Regulatory Flexibility Act, a Final Regulatory Flexibility Analysis should contain "a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected." CPSC staff examined several alternatives to the draft final rule which could reduce the impact on small entities. Staff discusses the alternatives below.

### A. No Action Alternative

Under this alternative the status quo would be maintained. This option might be selected if the risk associated with custom corded products was considered reasonable, considering that warning materials describing the risk associated with corded window covering products are distributed to consumers upon purchase. Additionally, cordless products are widely available for nearly all window covering types for consumers that can afford them. There are no costs associated with this alternative. However, this alternative does nothing to address the fatal and nonfatal injuries involving corded custom window coverings. Corded custom products would still be available to consumers but admittedly at a higher price than cordless stock products.

### B. Improve Voluntary Standard for Window Coverings

Another alternative would be for Commission staff to continue participating and encouraging safety improvements to the voluntary standard for window coverings, ANSI/WCMA A100.1. This option would be similar to the "no action alternative," with the key difference being that the Commission could direct staff to pursue safety improvements in the voluntary standard, including applying relevant conditions on stock products to custom, in the same manner that staff has been pursuing this unsuccessfully for many years, as a conditional alternative to a mandatory standard. The Commission could then reconsider a mandatory standard if efforts to improve the voluntary standard on custom products remain unsatisfactory.

Staff has supported some aspects of recent changes in the voluntary standard, but overall has found them inadequate and has voted against them due to inadequacies with requirements for cordless stock products, more descriptive warning labels, and materials describing the strangulation hazard. Additionally, voluntary standards committees have in the past rejected initiatives to require no accessible cords on custom products. And the most recent, July 15, 2022 balloted revisions to the standard would still allow hazardous operating cords on custom products. Consequently, it does not appear that the voluntary standards process is likely to lead to a custom cordless requirement for any product type in the short or long run.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

### C.  Later Effective Date

The NPR proposed an effective date of 180 days after the final rule's publication in the *Federal Register*. During the comment period, many commenters representing manufacturers and retailers stated their concerns about meeting the proposed 180-days effective date due to long lead times for receiving equipment or input material, manufacturing compliant window coverings, and delivering the product to consumers. Commenters provided timelines of 9 to 20 months in obtaining and transporting equipment/materials from overseas suppliers. Two commenters, both large manufacturers, specifically stated long lead times of 4 to 12 months related to acquiring necessary equipment and materials. One of the commenters asserted an additional 1 to 4 months would be required upon delivery to assemble component inventory. Another commenter stated an additional delay related to continued COVID-19 disruptions.  Additionally, staff has assessed that the redesigning of window coverings for unusually sized-windows to be compliant with the final rule would create even more additional effort and time, above typical sized-window modifications, for manufacturers to address. (Tab C Appendix)

Staff found these concerns to be credible because of the specific examples provided by commenters and because these comments comport to what staff has determined about the industry's supply chain. Additionally, Staff assesses that supply disruption could result in temporary, but significant, shift in consumer behavior. Supply chain disruptions and delayed deliveries could result in a shift in demand from custom products to stock products. Stock products have a lower profit margin than custom products and thus may have a significant cost impact to manufacturers and retailers even if the shift is temporary. Further, most custom window coverings sellers are small businesses, and therefore a temporary shift to stock products could have a significant impact to small businesses. A later effective date would allow manufacturers more time to redesign, distribute costs of compliance along the entire year, or discontinue product variants that cannot meet compliance.

As these examples show, a 180-days effective date has the potential to be very disruptive for producers and consumers. An extended effective date would mitigate costs related to redesign/research and development for manufacturers. Further, postponing the effective date by several months would reduce the benefits of the rule by only a very small amount as most noncompliant window coverings will take years to cycle out of use. Given the totality of these comments and assessments, staff accordingly assesses that there is good cause to extend the effective date beyond 180 days. Staff recommends the effective date in the final rule be extended to one year after publication for most custom window coverings and two-years for large/unusual sized window coverings.

### D.  Narrow Proposed Rule to Vertical Blinds, Curtains, and Drapes

The Commission could narrow the draft final rule to vertical blinds, curtains, and drapes on the grounds that cords are not critical to the operation of these products. These products typically offer cordless options at no additional cost as for most applications because a plastic rod can be used for operation. Narrowing the proposed rule to these three product types would lessen the cost impact and make it unlikely that any particular product type and/or size would be eliminated. Note though that some consumers may require motorization which would dramatically increase the cost, but few consumers are expected to require motorization for

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

these products. Consumers may also prefer decorative cords that exceed the length described in the proposed rule which would result in lower utility for these consumers should those decorative cords be removed.

Under this alternative, the benefits and costs would be limited to vertical blinds, curtains, and drapes which accounted for approximately 30 percent of 2020 window covering product sales. However, the number of injuries and deaths associated with these products represents a small fraction of the total. This would equate to annual net benefits of approximately $7.8 million. The net benefits of this option would be greater than the proposed rule due to the large costs to conform for the other product types, however a large fraction of the deaths and injuries would not be addressed.

### E. Continue and Improve Information and Education Campaign

The Commission could work to improve the current information and education campaign concerning the strangulation hazard associated with corded window covering products. This alternative could be implemented on its own without regard for regulatory action. CPSC staff assess that continuing current information and education campaigns would not reduce injuries associated with window coverings below current rates.

### F. Adopt Canadian Window Covering Mandatory Standard

Under this alternative the Commission could adopt Canadian Corded Window Coverings Regulations (SOR/2019-97), which is similar to the draft final rule. This option is not appropriate for consideration under the Regulatory Flexibility Act as staff estimates this alternative would not reduce costs for small businesses. The alternative increases costs with no additional benefits than the draft final rule. See section IV.F Tab F of this briefing package for additional detail.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

# References

Bailey, Mark, 2021. Preliminary Regulatory Analysis of the Draft Proposed Rule for Custom Window Coverings. Bethesda, MD: U.S. Consumer Product Safety Commission.

Bailey, Mark, 2022. Final Regulatory Analysis of the Draft Proposed Rule for Custom Window Coverings. Bethesda, MD: U.S. Consumer Product Safety Commission.

Chowdhury, Risana, 2022. "Memorandum to Window Covering Cords Project Manager: Draft Final Rules for Corded Window Coverings: Update on Fatal and Near-Miss Strangulation Incidents Associated with Window Covering Cords". Bethesda, MD: U.S. Consumer Product Safety Commission.

Census Bureau, 2020. Statistics of US Businesses (SUSB) 2017. Suitland, MD. Census Bureau.

Euromonitor International, 2022a. Window Covering Market Share by Company 2016-2021. Chicago, IL. Euromonitor International.

Euromonitor International, 2022b. Window Covering Market Size USD 2016-2021. Chicago, IL. Euromonitor International.

Industrial Economics Inc. (IEc), 2016. "Memorandum to CPSC: Final Cordless Window Coverings Comprehensive Cost Analysis. Cambridge, MA. Industrial Economics Inc.

Laciak, Arthur, 2020. Importation Patterns for USA: For Blinds. Bethesda, MD: U.S. Consumer Product Safety Commission.

Panchal Jitesh H., 2016. Manufacturing Cost Analysis: Cordless vs. Corded Window Covering Products. West Lafayette, IN. Purdue University.

Window Covering Manufacturers Association. 2015a. "Memorandum to Window Covering Manufacturers Association, Re: Review and Critique of CPSC Economic Analysis in ANPR and Briefing Package." Submitted with public comment on 80 *FR* 2327, submitted June 1, 2015, Docket No. CPSC-2013-0028.

Window Covering Manufacturers Association. 2015b. Public comment on 80 *FR* 2327 submitted June 1, 2015. Docket No.CPSC-2013-0028.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

# Tab H: Draft Final Rules for Corded Window Coverings: Summary of Comments on the Proposed Rules and Staff's Recommended Responses for the Final Rules

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

A636

United States
**Consumer Product Safety Commission**
cpsc.gov | info@cpsc.gov | 800.638.2772

# Memorandum

**TO:** Commission
Alberta E. Mills, Secretary

**DATE:** September 28, 2022

**THROUGH:** Duane Boniface, Assistant Executive Director,
Office of Hazard Analysis and Reduction (EXHR)

**FROM:** Window Coverings EXHR Team

**SUBJECT:** Draft Final Rules for Corded Window Coverings: Summary of Comments on the Proposed Rules and Staff's Recommended Responses for the Final Rules

# I.   Background

On January 7, 2022, the Commission published two notices of proposed rulemaking in the *Federal Register*: (1) Safety Standard for Operating Cords on Custom Window Coverings (87 *Fed. Reg.* 1,014) (Custom NPR); and (2) Substantial Product Hazard List: Window Covering Cords (87 *Fed. Reg.* 891) (15J NPR) and requested comment on the proposals. Taken together, the proposed rules are intended to address the risk of strangulation deaths and injuries to children 8 years old and younger on stock and custom window covering cords, comprised of operating cords and inner cords, on each product type.  The Commission is now finalizing the two rules and in preparation for a final rule, CPSC staff reviewed the comments received on the each of the NPRs.  Below we summarize the comments and provide staff's responses.

CPSC received 2,060 comments on the Custom NPR during the comment period and 4 comments on the 15J NPR.  All four commenters on the 15J NPR (three consumer organizations and one trade association) supported the proposed rule.  For the Custom NPR, about 1,620 comments were from businesses, including sellers, dealers, retailers, manufacturers, component suppliers, and designers.  Nineteen of these 1,620 business commenters were supportive of the Custom NPR whereas 1,517 indicated opposition; 84 commenters did not indicate clearly whether they support the Custom NPR.[1]  About 42 comments were from families and friends of victims as well as legal representatives of victims who were all supportive of the Custom NPR. About 68 comments were from consumers, 31 of which were supportive of the Custom NPR and 35 opposed the Custom NPR. Three commenters were trade associations, all of which opposed the Custom NPR. This memorandum summarizes the comments received on the NPRs and provides technical staff's responses to the issues raised.

On March 16, 2022, CPSC held an oral hearing on the custom NPR, at which time, seven presenters provided comments. In addition, two late comments were received in July 2022.

---

[1] Staff determined that nine comments were duplicative: 8 were from businesses, and one from a victim's.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

## II.   Comments and Responses on the 15J NPR

CPSC received three comments on the section 15(j) rule during the comment period, and two comments before the comment period began.  All comments supported the 15(j) rule and have been placed on the docket for this rule.  Commenters include WCMA (two comments), Consumer Federation of America, Consumer Reports, and Parents for Window Blind Safety.  All of these organizations strongly supported the proposed rule and did not recommend any changes.  Based on staff's assessment of the ANSI/WCMA-2018 standard and all comments in support of the rule,  staff recommends finalizing the 15J NPR as proposed.

## III.   Comments and Responses on the Custom NPR

### A.  General Support or Opposition

At least 114 commenters expressed support for the Custom NPR rulemaking effort, some stating that given the hidden nature of the hazard and severity of the risk, a mandatory standard is necessary.  At least 1,842 commenters were against the Custom NPR, most suggesting that a regulation will have a negative economic impact on the window covering industry.  At least 440 comments stated that the proposed rule is either overreaching or unnecessary because commenters believe that the current requirements in the standard are strong, risk is low and customers without young children would be adversely impacted, customers need more options and choices, and businesses will have limitations to meet their needs.

*Response*

Staff is generally in agreement with those supporting the rulemaking.  CPSC staff agrees that a rule is required because the ANSI/WCMA A100.1 – 2018 standard is not likely to eliminate or adequately reduce the risk of injury. Furthermore, the draft final rule to require inherently safe custom window coverings is feasible, and the rule will not affect the utility or availability of custom window coverings, but could affect cost.  However, the average increase to consumers is only approximately $24 every time a household replaces *all* of its custom window coverings.  Consumers will likely bear this cost to ensure that their children, or children who are guests, are not strangled on window covering cords.  The feasibility of safer window coverings, and the fact that consumers will pay more for safer  window coverings, has already been shown in the stock window covering market.  Most stock window coverings are already manufactured to be safe, without regulatory intervention.  Voluntary compliance with the ANSI standard for stock products did not cause a decline in revenue, by either units or by total revenue, as most of the industry transitioned to cordless only product, even though the price of some stock coverings nearly doubled. A similar observation is made for the Canadian market.  Staff has no evidence from the Canadian market of a significant reduction in consumer choice.  Rather, the market has reacted with cost-effective substitutes and redesigned products.

Data show that the hazard is silent, quick, and hidden to consumers. Also, the hazard overwhelmingly involves the death of a child, and in many other cases a serious injury, such as coma; paralysis or problems controlling movement; sensory disturbances including pain; seizures; cognitive and memory deficits; long-term or permanent vegetative state requiring tracheotomy and gastrointestinal tube feeding.  As commenters from victims' families report, the death of a child on a window covering cord results in severe pain and trauma that never goes away. Victims' families hope that this rule will prevent corded products not only in private

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

residences, but also hotels, rental properties, military housing, public buildings, and effectively any place where children could be injured or killed, so that no family, parent, or grandparent should bear the pain of losing a child on a window covering cord.

### B. Voluntary Standard

Most of the businesses, including manufacturers, dealers, designers, and sellers, who are opposed to the rule stated that the voluntary standard process has led to substantial improvements in window covering safety and that a mandatory rule is not necessary. However, other commenters including at least 70 victims' families, consumers, and consumer organizations stated that a mandatory standard is necessary to address the hazard associated with custom window coverings, because the voluntary standard still allows products with hazardous cords to be sold.

*Response*

Staff has worked closely with the voluntary standards organization, WCMA, to develop and revise the ANSI/WCMA A100.1 standard over the past 26 years. Staff agrees that the 2018 version of the voluntary standard has significantly reduced the risk of strangulation from stock window coverings, and from inner cords on both stock and custom products. However, CPSC staff assesses that a mandatory rule is needed because ANSI/WCMA-2018 is not likely to eliminate or adequately reduce the risk of injury associated with custom window coverings. Staff also assesses that the draft ANSI/WCMA-2022 still allows continuous loops with tension devices that pose a strangulation hazard and therefore is inadequate. Both corded custom and stock window coverings have identical hazard patterns. Since 2018, stock products are made cordless with manual or motorized lifts or made with inaccessible cords. These same technologies can also apply to most sizes of custom window coverings, and additional technologies to make cords inaccessible or safer for children are feasible. Based on staff's review of available technologies for use in manufacturing safer window coverings, staff concludes that custom products could be made equally safe as stock window coverings and meet the same cord requirements. Staff assesses that compliance with the ANSI standard for stock products did not cause a decline in revenue, by either units or by total revenue, even though the price of some stock coverings nearly doubled; similarly, Canadian market responded with cost-effective substitutes and redesigned products to the Canadian regulations.

### C. Data Issues

#### 1. NEISS vs CPSRMS

One commenter (WCMA) stated that the 34 injury reports from NEISS were combined with the anecdotal reports received by CPSC and that the briefing package did not explain how NEISS data injury reports were added to the other incident data, and how CPSC ensured that no double-counting occurred.

*Response*

Staff routinely ensures that CPSC data counts are not duplicative. For example, for the data presented in the NPR where staff combined the reports from NEISS with anecdotal reports in CPSRMS, staff compared the individual NEISS nonfatal injuries with the reports received through CPSRMS by taking into consideration the injury date, victim age and sex, and the injury scenario description, and ensured that no double counting of incidents have occurred for the nonfatal incidents. All fatal injury reports that are reported through NEISS are also reported through CPSRMS. As such, staff did not need to combine these reports to the incident data.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

## 2. Low Risk

At least 185 commenters, including 158 businesses, suggested that the risk associated with corded window coverings is low, advancements have been made in the voluntary standard that reduced the hazard further, and some commenters compared the number of deaths associated with corded window coverings to other products.

*Response*

Commission staff is well-aware that children die from interacting with other household products; however, that does not diminish the seriousness of the hidden and fatal strangulation hazard from window covering cords, nor the necessity of setting a performance standard to reduce the risk. The strangulation hazard to young children from window covering cords is serious, with most incidents resulting in death. The strangulation hazard is a "hidden hazard," because many consumers do not understand or appreciate the hazard, and do not take appropriate steps to prevent death and injury from window covering cords. Staff assesses that neither the ANSI/WCMA-2018 nor the draft ANSI/WCMA-2022 standard adequately addresses the strangulation risk associated with custom window coverings. Staff also assesses that compliance with the ANSI standard for stock products did not cause a decline in revenue, by either units or by total revenue. Staff concludes that manufacturers can apply similar technologies used in stock window coverings as well as additional mechanisms such as retractable cords and loop cord and bead chain restraining devices to custom products to make them safer without impacting utility, availability or cost.

Many commenters cited the anecdotal data that staff presented in Custom NPR briefing package as an indicator of a downward trend in strangulation incidents and a reason why CPSC should not finalize the rule. However, staff does not have an assurance that the data on window covering cord strangulations is inclusive of all such incidents that may have occurred, either fatal or nonfatal. As such, CPSC has no evidence of any trend--increasing, decreasing, or stationary. In the Custom (Section 7 and 9) NPR package, staff stated that the anecdotal data are not necessarily a representation of reality. The anecdotal data represent a *minimum* number of incidents, which are known to have occurred. Additionally, reporting of incidents to CPSRMS is ongoing. For example, since the data analysis was completed for the NPRs in 2021, the number of fatalities reported has risen to eight (from three, as initially reported) in 2020, and six (from zero, as initially reported) in 2021. Staff expects that these numbers will likely increase over the next year, as CPSC receives more data.

## D. Economic Issues

### 1. Alternative methods for the Regulatory Impact Analysis

Two commenters (Institute for Policy Integrity and WCMA) suggested that instead of or in addition to a comparison of costs versus benefits, CPSC could have performed a breakeven analysis, citing the OMB guidance (Circular A-4) that this method can be appropriate when the benefits cannot be quantified.

*Response*

Staff agrees that there are unquantifiable benefits for the draft final rule. However, the benefits in this case can be estimated based on more than 10 years of anecdotal incident data. The Injury Cost Model utilized by CPSC staff accounts for some unquantified benefits, so it would not be accurate to say that the benefits of the rule are completely unknown. Given that staff has data for strangulation deaths and has assessed that the draft final rule would address the

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

hazard patterns, staff was able to calculate benefits and costs associated with the draft final rule. Furthermore, recognizing that there are possible variations in costs or benefits to consider, staff conducted a sensitivity analysis including looking at a children's VSL of 3 times the VSL for adults, as discussed in the NPR as well, and found that in some cases this type of increased VSL for children could result in the draft rule having a net benefit. Additionally, for the draft final rule, staff discusses additional unquantifiable benefits, because not all benefits of the rule are represented in the benefits analysis.

In addition, as one commenter pointed out, the CPSA requires only that the benefits of a CPSC rule "bear a reasonable relationship to its costs." CPSC is an independent regulatory agency, not an Executive Branch agency, and CPSC is not subject to the requirements in EO 12866 or 13563 that require the agency to "justify" the costs, or to comply with OMB Circular A4.

## 2. Cost of Safer Products

At least 579 commenters, including 331 businesses, stated that safer window coverings are too expensive for some consumers, regulations will increase the cost of window coverings, and motorized window coverings cost much more and are cost-prohibitive for many consumers.

*Response*

Market data on stock window coverings do not support the commenters' hypothesis regarding the cost of cordless window coverings. Voluntary compliance with the ANSI standard for stock products did not cause a decline in revenue, by either units or by total revenue, as most of the industry transitioned to cordless only product, even though the price of some stock coverings nearly doubled. Multiple commenters representing manufacturers and retailers noted that sales of cordless stock products have *increased* in the past few years, thus demonstrating consumer demand for cordless products as an acceptable replacement for corded products, even at a higher price.[2]

In 2019, Canada published the new Corded Window Coverings Regulations to restrict the length of cords and the size of loops allowed on window coverings sold in Canada, the requirements apply to all products, both stock and custom. The evidence from the Canadian custom window coverings market is that the transition to cordless options in the custom market has been relatively inexpensive for consumers. Staff observed that many designs are priced the same for cordless wand options as for the previous corded design, while motorized options add under $100 to the retail price for commonly ordered sizes.

## 3. Commercial Establishments

At least 12 businesses raised issues about mandating safer window coverings in commercial buildings and suggested an exemption. Three commenters stated that in an emergency situation such as a lock down, school teachers should be able to close the window coverings quickly and that new systems may require teachers to climb up ladders to operate the window covering, which is impractical and time consuming. One manufacturer stated that based on the NPR, the proposed standard appears to intend to address potential hazards of window coverings in residences, but the scope of the proposed rule covers all custom products. Given the broad interpretation of the definition of "consumer products" under the Consumer Product Safety Act, the commenter believes that many of the strictly commercial products could be

---

[2] Based on Euromonitor annual revenue estimates and D&R (2021)

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

subject to the regulation, unless the Commission makes clarifying changes to its definition of "custom window covering."

*Response*

CPSC has jurisdiction over window coverings that are produced or distributed for the use of consumers, as long as the product is customarily produced or distributed for use by consumers. 15 U.S.C. 2052(a)(5). Custom window coverings that are produced or distributed for use in residences, schools, recreation, or otherwise, fall within the scope of CPSC's jurisdiction. Staff is unclear what a "commercial" window covering is and how such a product would be exempted. For example, CPSC staff is not aware of products that are solely sold for use by workers in a specialized context that are not also present for the use and enjoyment of consumers that visit such business. If consumers have access to custom window coverings and are subject to the potential harm, the product is within CPSC's jurisdiction.

Additionally, exempting window coverings in businesses from the requirements of the draft final rule would not address the strangulation hazard, as there is still a hazard to children in office buildings, retail locations, and other buildings, such as commercially-managed residential apartment buildings. The final rule allows multiple ways to make custom window coverings safer, such as cordless products, short cords, cord shrouds, retractable cords, and loop cord and bead restraining devices. Also, staff recommends a longer implementation date for larger-sized custom window coverings. The draft final rule applies to all custom window covering products, meaning those products used in residential and other settings where consumers have access to window covering cords and any associated hazards.

## 4. Competition from Overseas Manufacturers

Several commenters claimed that U.S. manufacturers cannot compete against cheap imports, and that "the cost of the mechanism to make many products cordless is more than the cost of the entire product imported from overseas unless you purchase container loads of the mechanism at a time. The new rules make it more difficult to compete especially with China."

*Response*

Imported products will be subject to the same requirements as products made in the U.S. The economies of scale should be the same for manufacturers of any nation. We anticipate that the expanded demand for cordless mechanisms should lower the costs of those mechanisms in the medium term, due to economies of scale.

Overall, this comment does not seem specifically relevant to custom-made products. This regulation covers *custom* products, which are made to a unique customer's specifications, ordered from a U.S. brick and mortar retailer, online store, or through an interior designer. This regulation does not require U.S. manufacturers or retailers to source the parts or materials from any particular country. While it is theoretically possible for a U.S. consumer to order custom blinds from Chinese websites in small lots, we have no evidence that customers ordering custom window coverings directly from China is common, or a measurable portion of the market. While U.S. consumers can easily order custom blinds from Canadian online retailers that already have compliant window coverings in stock, this does not appear to be the "cheap imports" to which the commenters refer, and the Canadian online retailers are in several cases subsidiaries or affiliates of U.S.-based companies.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

### 5.  Impact on Businesses

At least 1,007 commenters (at least 938 identified themselves as businesses) stated that the proposed rule would cause a significant impact on their businesses. Particularly, small custom window coverings retailers, commented that the rule would reduce sales and raise costs.  Large suppliers commented that they intended to require licensed dealers to purchase new "sample books" costing thousands of dollars each.  Large suppliers and associations also provided extensive data on estimated costs of retooling and costs of components at the wholesale level.

*Response*

As explained in the Staff Briefing Package (SBP) to the NPR, CPSC does anticipate a significant impact on small businesses in the short term, as firms transition product lines to being compliant with the standard.  However, the impact may be less than originally estimated, due to the enforcement of Canada's regulations beginning in May 2022.  Companies that sell in both Canada and the U.S. have already redesigned their custom offerings to be compliant with the Canadian regulations that are substantively similar to those in this draft final rule, so already have stock of compliant product designed and ready to sell through small dealers and interior designers.

While the window covering manufacturing sector as a whole is highly fragmented, the custom part of the market is concentrated, with a few large suppliers accounting for approximately 40 percent of the industry revenue.  The large suppliers are multinational companies with distribution in multiple countries.  This means that those large suppliers already have compliant products available for the Canadian market, and that any incremental costs of redesign for the U.S. market will largely fall on those relatively large companies, rather than their small distributors and dealers.  If suppliers in this industry choose to force small distributors to buy new sample books, that decision is in no way a requirement of this rule, or an inevitable consequence of this rule.

### 6.  Small versus Large Businesses

One commenter suggested that a regulation will give larger corporations an unfair disadvantage as the hard window coverings can comply with it but small manufacturers who make soft window coverings cannot.

*Response*

Stock window coverings that comply with ANSI/WCMA-2018 are available in both soft and hard types, and implementation of safer window covering technologies has been proven for both types of window coverings. As stated in the Initial Regulatory Flexibility Analysis for custom window coverings, section VI of the NPR preamble and Tab J of the NPR SBP, CPSC expects significant cost impacts on small manufacturers of custom products, but these costs are not limited to small manufacturers of certain window covering types. The cost impacts of a rule on operating cords for custom window coverings vary by product type, as detailed in Tab F and summarized in Tab G. CPSC expects that small manufacturers of all custom window covering product types will have significant cost impacts (i.e., those that exceed 1 percent of annual revenue) associated with the mandatory rule.

### 7.  Stockpiling should not be prohibited

One online retailer of blind and shade repair parts suggested that companies should be allowed to purchase whatever products they deem necessary or prefer. This same commenter also

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

stated that the rule states no consequence for violating the rule and was unclear on who will be enforcing it.

*Response*

The stockpiling provision in the draft final rule reflects a balance between the competing policy goals of addressing the hazard but also accounting for realistic supply chain limits and considering the compliance costs for businesses and particularly those for small entities. A less specific base period, or a higher proportion above the base production amount, would allow more non-compliant units to be manufactured and sold, which could reduce the burden to industry. However, it would reduce safety benefits to consumers and also force suppliers of compliant units to compete against a larger stockpiled supply of non-compliant, likely cheaper, units for a longer period of time. A more stringent provision would increase the burden to industry, and might not have a corresponding benefit, because the reduced hazard might not be proportional to the reduced sales of non-compliant units. Considering the balance of competing policy goals, staff does not recommend changing the stockpiling provision.

If a manufacturer or importer violates any provision of a mandatory rule, including the stockpiling provision, CPSC can enforce that provision using authority under section 19(a)(1) of the CPSA, which prohibits the sale, offer for sale, manufacture for sale, distribution in commerce, or importation into the United States, any consumer product that is regulated under the CPSA, that is not in conformity with an applicable consumer product safety rule. 15 U.S.C. 2068(a)(1). CPSC's authority allows for corrective actions, or recalls, refusal of admission and/or seizure of products at the ports, and civil penalties for failure to conform to required regulations.

## 8. Unquantified Benefits are Larger Than Estimated

Multiple commenters (Institute for Policy Integrity and A. Finkel, economist) suggested that the RIA underestimated the benefits of the rule, by not discussing unquantified, but potentially very large, benefits of the rule. The unquantified benefits suggested included parental grief, reduced cost of litigation for manufacturers and retailers, and averted recall costs. Two commenters specifically cited the example of a Federal Motor Vehicle Safety Standard for rear visibility cameras in passenger cars, where the regulatory impact analysis for that rule discussed the large unquantified benefits of reducing parental grief and emotional trauma from causing the death of one's own child or a relative or neighbor. One commenter pointed out that particular standard as an example of an "experience good", where the standard caused people's preferences to change to favor a safety technology with which they were previously unfamiliar.

*Response*

These potential unquantified benefits would be included in an increased value of statistical life, or VSL, for children. A discussion of this is included in the sensitivity analysis portion of Tab F. We note that the Injury Cost Model already takes pain and suffering into account, so a portion of parental grief benefits are accounted for and would be accounted for in an increased VSL for children. Moreover, we cannot accurately assign a value to the potential that people might experience a shift in preferences towards a safer product, although the evidence of continued growth of demand for cordless stock coverings does indicate this is a potential for custom window coverings as well.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

### 9. Value of a Statistical Life

Two commenters (Institute for Policy Integrity and A. Finkel) suggested that CPSC use different references and different theoretical justifications to derive a value of statistical life (VSL) for children.

*Response*

As the commenters noted, CPSC has many possible references and several alternative methods for deriving a value of statistical life specifically for children. However, as evidenced by the many alternative sources and several methods suggested by the commenters, no consensus exists (either in the U.S. or internationally) on what value or method should be used by regulators. Therefore, staff provided a range of possible values in the RIA, as part of the discussion of the uncertainty of the magnitude of benefits. The current range of values in the peer reviewed literature for a child's VSL ranges from less than 1 to more than 7 times the value of an adult VSL, as discussed in more detail in the RIA. CPSC staff added a discussion of this range to the sensitivity analysis but have not changed the core estimate of children's VSL. As noted in the discussion, increasing a child VSL to three times the base VSL, $31.5 million, would result in a calculated net benefit for the draft proposed rule of $14.3 million.

### E. Consumer Issues

#### 1. Accessibility issues with disabled population, people with short stature and seniors

At least 383 comments (331 businesses, 8 consumers, and 44 unknown) stated that having a short cord introduces accessibility issues for various consumers such as people in wheelchairs or otherwise challenged to access cords higher up. Some commenters questioned whether the proposed rule is compliant with Americans with Disabilities Act (ADA).

*Response*

People with accessibility concerns have other product choices beyond short cords to address the strangulation hazard. Specifically, the draft final rule provides several options, consistent with the ADA, to address accessibility of window coverings. Sections 308.2 and 308.3 of 2010 ADA Standards for Accessible Design specify forward and side reach distances that would be applicable to window coverings.[3] For example, an unobstructed high forward reach shall be 48 inches; if there is obstruction, high reach shall be 48 inches or 44 inches where the reach depth is 20 inches maximum or 25 inches maximum, respectively. Unobstructed high side reach shall be 48 inches; if there is obstruction, the high side reach shall be maximum 48 inches and 46 inches if the reach depth is 10 inches maximum and if the reach depth is over 10 inches but less than or equal to 24 inches, respectively. Based on these requirements in the ADA, several alternative window covering solutions can safely replace existing hazardous cords, such as rigid cord shrouds and loop cord and bead chain restraining devices, which can allow access to a height that is about at the same height as corded products. In addition, retractable cords can be made accessible with a rigid wand or handle to an easy-to-access height. Poles are currently being offered to reach the bottom of cordless products.

Staff also notes that existing corded window covering designs may not be ADA compliant. The ADA states that operable parts need to be operable with one hand and shall not require tight

---

[3] Department of Justice (2010). 2010 ADA Standards for Accessible Design, accessed at https://www.ada.gov/regs2010/2010ADAStandards/2010ADAStandards.pdf

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

grasping, pinching, or twisting of the wrist. The force required to activate operable parts shall be 5 pounds maximum. Staff questions whether traditional operating pull cords and continuous loop bead chains and cords are compliant with this ADA requirement, as such cords require tight pinching and grasping to operate. Further, in many cases, the pull force of a corded system can exceed the maximum 5 pound requirement. Staff determined that many cordless or shrouded products that would meet the draft final rule are operable with one hand and do not require pinching, tight grasping, or twisting of the wrist. Staff concludes that the custom window covering requirements in the draft final rule do not limit accessibility, allow for products that have one-handed operation, and eliminate the strangulation hazard.

## 2. Acknowledgement of Risks before Ordering

At least 48 commenters (45 businesses) stated that they either currently ask or suggest that consumers acknowledge the strangulation risk associated with cords before ordering a custom corded window covering.

*Response*

Even though consumers may acknowledge the risk associated with the corded window coverings that they are purchasing, the hazard with the corded window covering remains on the product. Household members other than the consumer who signed the document; as well as future residents of the household, may still be unaware of the hazard and may allow a child to be exposed to the hazardous cord.

## 3. Climbing on ladders or other furniture is unsafe

At least 56 commenters, including 42 businesses, stated that climbing on ladders or other furniture is unsafe for consumers, particularly older consumers. Due to the short cord requirement, climbing will be required to operate hard-to-reach window coverings. Some commenters provided statistics on falls.

*Response*

Staff agrees that climbing should not be a regular practice to operate a window covering. Alternative solutions to climbing that can safely replace the existing hazardous cords include: poles to operate cordless systems, rigid cord shrouds, loop cord and bead chain restraining devices, as well as retractable devices that would be within easy reach of users. Accordingly, there is no reason why the draft final rule would lead to the unsafe behavior envisioned by these commenters.

## 4. Exclude Draperies

Several commenters, including two businesses, noted that draperies should be excluded from the rule. One stated that there are no "aesthetic" alternatives to cords for draperies. Another commented that there is no evidence that draperies are unsafe, given that the cords are on pulleys attached to the floor.

*Response*

Multiple cordless options for draperies are available, including wands and motorized controls, as well as simply pulling the draperies on the traverse rod by hand, with no cord or other control. The SBP and draft final rule detail fatal incidents involving draperies in the data. Corded draperies are common, and often do not have the cord on a loop or attached to the floor as the commenter claims. Of the different types of window coverings analyzed in the RIA, draperies

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

had the lowest costs of compliance, assumed to be near zero because the cost of a control wand is approximately equal to the cost of the cord it replaces.  The benefits of including draperies in scope exceed the near-zero costs of compliance for draperies.

### 5.  Informing the Customer

About 593 businesses stated that they regularly educate their clients on the safer options during the ordering process and that consumers make an informed choice by being aware of the hazards associated with the corded product. At least 120 commenters stated that people should be made aware of the dangers and then make their own choices.

*Response*

Staff encourages sellers to inform and educate consumers on the operating systems that contain hazardous cords. However, information and education does not negate the fact that the window covering that may be purchased and installed can still be hazardous. If consumers do not appreciate the hazard, they may choose to buy a hazardous window covering even when children are present in the home. Moreover, custom window coverings have a long product life. When a home is sold or rented, a new resident, potentially residents with children, will likely live with the hazardous window covering, unaware of the associated hazards. These consumers would not be properly informed about the hazard as they are not the original purchasers of the product; due to the ineffectiveness of warning labels on such product, even a permanent label may not get the attention of the user (see the ESHF memorandum in the NPR staff briefing for warning label assessment.)  Information and education remain important to address the existing cord hazard, but as the incident data reflect, education and warning labels do not adequately address the risk of injury.

### 6.  Parental Responsibility

At least 24 commenters including 17 businesses suggested that parents are responsible for supervising their children around window coverings.

*Response*

Strangulation with cords requires only a few minutes to occur and happens silently. Parental supervision is unlikely to effectively eliminate or reduce the hazard, because even young children are left unsupervised for a few minutes or more in a room that is considered safe, such as a bedroom or family room.[4] A more effective solution to the window covering cord hazard is to ensure that window coverings do not have hazardous cords.

### 7.  Rental Leases and Real Estate Documents

One business suggested informing and disclosing the hazards associated with corded window coverings to inform renters as well as purchasers. Two businesses (Comfortex Window Fashions and Inviting Interior Style) suggested home inspections when dwellings change hands.

---

[4] Balci-Sinha, R. (2021) Human Factors Considerations for the Proposed Rule on Custom Window Coverings. CPSC memorandum to the Window Coverings Rulemaking File, U.S. Consumer Product Safety Commission, Rockville, MD. Accessed at https://www.cpsc.gov/s3fs-public/NPRs-Add-Window-Covering-Cords-to-Substantial-Product-Hazard-List-Establish-Safety-Standard-for-Operating-Cords-on-Custom-Window-Coverings-updated-10-29-2021.pdf?VersionId=HIM05bK3WDLRZrlNGogQLknhFvhtx3PD

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

*Response*

CPSC staff agrees with the commenters' concerns regarding window coverings included in rental units where tenants with young children may not have the option of choosing safer window coverings. Staff also agrees that the sale process of a residence is an obvious opportunity to inform the buyers about the dangers associated with corded window coverings or to remove and replace the hazardous window coverings. Certain state and local authorities may have regulations in place with regard to window coverings in rental homes. However, CPSC regulates consumer products, wherever consumers may use such products (homes, schools, in recreation, or otherwise), rather than the terms of commercial contracts. Mandatory inspections of installations of corded window coverings would not prevent deaths and injuries without an additional safety rule, because hazardous loops can still be accessible even when cord loops are correctly installed and with tension (see Tab I).

## 8. Replacement of Old Window Coverings

At least 12 commenters, including 10 businesses, stated that the rule would discourage people from replacing their decades old blinds and shades containing non-compliant dangerous cords with new window coverings because they would not want to give up their corded products.

*Response*

Market data on stock window coverings does not support the commenters' hypothesis. Voluntary compliance with the ANSI standard for stock products did not cause a decline in revenue, by either units or by total revenue, as most of the industry transitioned to cordless only product. Multiple commenters representing manufacturers and retailers noted that sales of cordless stock products have *increased* in the past few years, thus demonstrating consumer demand for cordless products as an acceptable replacement for corded products.

In addition, the expected product life provided by one industry commenter for custom products is at most 10 years.  (The RIA had a range of expected life with the lower end of the range around 7 years, based on expected product life of stock products, particularly inexpensive vinyl blinds.)   Customers cannot realistically keep corded blinds and shades for much longer than the expected product life. Staff notes that the total expected additional net cost for a household living in a single family detached home would equate to about $24 for custom vinyl blinds, although less expensive options are available.

## 9. Require Professional Installers to Install

As an alternative to the rule, several commenters (one interior designer and one business owner) suggested that CPSC should require that custom window coverings be professionally installed.  This would help small businesses and improve consumer safety. Others suggested that inspection of custom window treatments should be a mandatory part of home inspections.

*Response*

Although staff agrees that these practices may improve safety, these alternatives of regulating professional services are outside of CPSC's authority.  Also, staff believes that these alternatives would be more costly than the rule, without providing as many benefits; so, it would be less cost effective than finalizing the rule.  The typical cost for adding cordless options to a custom window covering ranges from under $10 to about $100, except for some very large, motorized options, far less than the cost of hiring a professional installer for corded custom window coverings.  In general, commenters' alternatives would raise costs for custom window

149

covering installation, while addressing few of the known incidents and fatalities, as well as not addressing the known hazard of corded window coverings. Therefore, the costs would likely greatly exceed the potential benefits. Most importantly, mandatory inspections of installations of corded window coverings would not prevent deaths and injuries without an additional safety rule, because hazardous loops can still be accessible even when cord loops are correctly installed and with tension (see Tab I).

### 10. Twisting Wand Takes Time and Effort and Use is Inconvenient; Poles may not Work for Elderly

At least 38 commenters, including 36 businesses, stated that using a wand is time consuming and may be difficult for some consumers.

*Response*

The wands that staff evaluated are easy to learn and use and staff anticipates that further innovation will make wands even more efficient and easy to use. Staff notes that some traditional wands used to rotate horizontal slats have thinner diameters, which can make such wands more difficult to use compared to rigid cord shrouds that staff evaluated which have thicker diameters and are more comfortable to use. Also, the draft final rule does not require the use of wands. Many other types of safe operating systems can be used instead of a wand, such as cordless, retractable cords, or motorized systems.

### F. Warnings, Public Awareness, and Education

At least 5 businesses mentioned that warning labels on the products should be relied on to address the strangulation hazard as they inform the consumer about the hazard while at least 2 other commenters stated that warning labels and educational efforts were tried, did not work, and are insufficient to address the strangulation risk.

*Response*

CPSC's Human Factors staff state that research demonstrates that consumers are less likely to look for and read safety information on products that they use frequently and are familiar with.[5] This research is demonstrated in the data. Most of the incident units had the permanent warning label on the product. Even well-designed warning labels will have limited effectiveness in communicating the hazard on this type of product. However, CPSC staff agrees that public awareness is a crucial component in making safe purchasing decisions and safely using window covering products at home. Public information campaigns are on-going. CPSC and the Window Covering Safety Council (WCSC) have joined forces to raise awareness of strangulation risks presented by window covering cords. October has been designated "Window Covering Safety Month" by CPSC and the Window Covering Safety Council (WCSC) since 2003. Currently, staff does not have information to quantify the effectiveness of public information campaigns on reducing the risk of injury associated with corded window coverings. However, staff notes that information and education campaigns on corded window coverings that have been continuing for decades have had limited effectiveness in the reduction of injuries and deaths, as evidenced by the continuing number of fatalities. Accordingly, staff does not recommend relying solely on education campaigns to address the risk of injury.

### G. Other Product-Related Hazards

---

[5] *Ibid.*

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

1.  **Access to battery to recharge or replace**

At least 15 businesses stated that replacing or swapping batteries located on the headrail is difficult for consumers as they need to climb on ladders. At least 4 commenters also stated that the new rule would increase the use of batteries, which is wasteful for the planet.

*Response*

Staff found examples of window coverings where the batteries are stored in the bottom rail. This would make it easier for consumers to recharge or replace batteries. Batteries are rechargeable. In addition, some window coverings are hardwired or solar powered.

2.  **Button batteries used in remote controls**

At least 3 comments (WCMA, Parents for Window Blind Safety, Independent Safety Consulting) suggested that remote controls that contain button batteries either comply with ASTM F963, other applicable button battery standards, or simply stated that battery compartments should have a screw.

*Response*

On August 2, 2022, Congress passed H.R. 5313, or Reese's Law, and the President signed the bill into law on August 16, 2022. Reese's Law directs the Commission to establish a mandatory standard to protect children and other consumers against hazards associated with the accidental ingestion of button cell or coin batteries used in consumer products. Accordingly, staff is preparing implementation of this law, and anticipate that window covering remote controls that use button batteries will fall within the scope of the rule. The 2022 draft balloted revision of the ANSI/WCMA standard also has a requirement for battery compartments to meet ANSI/UL 4200A, which staff supports.

3.  **Continuous loops with tension devices are safe**

At least 429 commenters stated that continuous loops with properly attached tension devices are safe and should not be eliminated. Commenters said that windows that are high up, windows over a sink, and windows behind a couch need continuous loops.

*Response*

Incident data demonstrate that tension devices may come off the wall, may not be installed at all, or that continuous loops may not be taut enough to prevent incidents. Because of these reasons, staff finds that window coverings operated with continuous loops with tension devices can leave hazardous loops accessible and do not adequately address the risk. Instead, staff finds that inherently safe window coverings that do not rely on the consumer or a third party installer to install and maintain a safety device are the most effective solution to address the strangulation hazard. Staff received various comments stating that some consumers do not want the tension devices attached (e.g., comment CPSC-2013-0028-2047 states: "approximately 90% of my clients do NOT want the cord safety device installed because it is unattractive.")

Staff analyzed how a window covering that is behind a piece of furniture or sink would be operable with a continuous loop if it is attached to a wall to keep the loop taut. See ESHF memo (Tab B) for a visual comparison. Staff assesses that the continuous loop would likely remain unattached to the wall with a tension device so that the consumer can pull the loop towards him/her to operate. This means that the continuous loop remains accessible to children and

151

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

hazardous. Given children's ability to climb and incident data demonstrating this hazard scenario, staff concludes that continuous loops that are contained in a rigid shroud or restrained within a passive restraining device are much safer for children and much easier to operate for both access and ease of use by consumers.

### 4. Consumer preference for corded products

At least 2 businesses suggested that they have customers who prefer to use corded window shades because they find them easier to use. Some stated that the most recent safety change to limit the free hanging cord length to 40% of the product length generated complaints because some of their clients can't reach the cord with ease. Some businesses stated that they sell custom blinds to nursing homes and retirement homes; the users demand that the cords be long enough to be reached, which usually means 40" or more.

*Response*

Staff acknowledges that some decrease in sales may occur and lead to a lost consumer surplus. This cost is accounted for in the RIA . Staff notes also that stock products currently on the market that comply with ANSI/WCMA 100.1-2018 are available in a variety of materials, sizes, and types to meet consumer needs. Proposed custom product requirements allow a variety of solutions to ease the operation of window coverings, including poles for cordless systems, rigid cord shrouds and loop cord and bead chain restraining devices, motorized window shades, and retractable cords. All of these options provide easy reach for consumers. Based on the comments, staff recommends that the draft final rule for custom window coverings permit corded window coverings as long as they use a single cord retractor, rigid cord shroud, or a cord restraining device, to create more options for non-motorized safe window coverings, provide options for accessible custom window coverings, and allow for ease of use.

### 5. Cord cleats

About 42 commenters stated that cord cleats are provided with the corded window covering and address the hazard.

*Response*

Cord cleats do not adequately address the strangulation hazard associated with window covering cords because such devices rely on consumers to wrap the excess cord around the cord cleat every time they raise or lower the window covering. Incident data demonstrate that consumers may not be wrapping the cords around the cleat every time they operate the window covering, which results in dangling operating cords with which children can strangle. In one incident, although caregivers normally wrapped the cord around the cleat, on the day of the incident, cords were not wrapped, and the child accessed the cords after climbing on a couch.[6] Further, cord cleats can be accessed by a child if he/she climbs up. In one incident "A four year old boy moved a small plastic table over near the window, climbed upon the table and reached up and removed the shortened pull cord for the window covering from the "safety" cleat. He pulled the cord out and wrapped it around his neck. He then jumped off of the table. The cord

---

[6] Ibid.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

broke and he fell to the floor. His parents were able to remove the cord from his neck. The boy recovered from his injuries."[7]

## 6. Effective date

At least 401 commenters stated that the proposed six-month-effective-date is very short to meet the proposed requirements; 94 commenters suggested at least one year effective date, three commenters suggested at least an 18 month to 2 years effective date, and seven commenters suggested at least 2 years to comply with the rule. Two commenters submitted the extent of the delays in obtaining equipment, transit time in both sea and air to get equipment and components from overseas suppliers, and delays in lead times for raw materials. Consumer organizations stated that a mandatory standard should be issued as soon as possible; one manufacturer (Safe-T-Shade, LLC) stated that 180-day lead time is more than sufficient for industry implementation.

*Response*

Based on the Directorate for Economic Analysis memorandum (Tab F, Bailey 2022,) a duration of one year provides adequate time for window covering manufacturers to come into compliance with the draft final rule for custom window coverings under 10 ft long. Staff assesses that a one-year timeframe is sufficient to accommodate delays in lead times for raw materials, logistics, equipment, and building inventory For larger windows covering over 10-feet long, manufacturers may require additional time to develop non-motorized lift systems such as rigid shrouds on continuous loop systems. Staff estimates a 2-year development cycle for larger window coverings and therefore recommends a 2-year effective date for custom window coverings that are at least 10 feet tall.

## 7. Free hanging cords

At least three commenters stated that free hanging cords should be removed because they pose a higher risk to a child. At least one manufacturer stated that free hanging cords are a large portion of their business.

*Response*

Free-hanging window covering cords are associated with 18 of 36 custom product strangulations or near strangulations (74 free-hanging cord incidents of the overall total of 209 incidents) , and staff recommends removing them from custom window coverings. The window covering industry is moving away from free-hanging cords, as WCMA, in their latest draft balloted revision to ANSI/WCMA-2018, intends to remove cord lock systems and thus free hanging operating pull cords from all custom products, regardless of type, size, and weight of the window covering. Staff agrees with this proposal, which aligns with the recommended language in the NPR. As stated earlier, the draft final rule contains several alternatives to hazardous free-hanging cords, such as rigid cord shrouds, loop cord and bead chain restraining devices, and retractable cords, in addition to manual and motorized cordless lift systems that can replace cord lock systems.

---

[7] Lee, K. (2014). Mechanical Engineering Response to Window Coverings Petition. CPSC memorandum to Rana Balci-Sinha, Project Manager, Window Coverings Petition CP 13-2. U.S. Consumer Product Safety Commission, Rockville, MD. Accessed at https://www.cpsc.gov/s3fs-public/pdfs/blk_pdf_PetitionRequestingMandatoryStandardforCordedWindowCoverings.pdf

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

### 8. High windows or windows that are hard-to-reach are impossible to use with an 8-inch cord

At least 385 commenters stated that windows located at higher locations, windows behind the kitchen sink, or behind furniture cannot be operated with an 8-inch cord.

*Response*

Staff agrees that an eight-inch cord hanging from the headrail is unlikely to be useful for hard-to-reach locations. In response to this and other comments and staff considerations, an option was added to allow the use of single cord retractor systems with a 12-inch stroke. Staff notes that several safer alternatives besides eight-inch operating cords, replacing existing hazardous cords exist. Consumers can use:

- Cordless blinds with an access wand
- Motorized window covering with a remote control
- Single cord retractor systems with a 12-inch stroke
- Rigid cord shrouds
- Cord restraining devices

Manual spring system is not durable

At least 8 businesses stated that manual spring systems are not durable and break easily.

*Response*

Cordless window coverings often use a series of constant force springs. Any spring has a limited fatigue life (number of cycles to failure). Manufacturers can control fatigue life of the lift system by selecting the proper spring size, strength, and number of springs for the lift system. Also, if the springs break, the window covering fails safe, meaning cords do not become accessible to consumers, because cordless window coverings do not have accessible operating cords.

### 9. Off-the-shelf products

At least 3 commenters suggested that stock products are more dangerous than custom products because stock products are allowed to have longer lengths of accessible pull cords than custom window coverings, stock product customers are less likely to get safety information, and stock products are likely to be installed by consumers who may be unfamiliar with the hazard.

*Response*

Stock window coverings that are compliant with the existing voluntary standard cannot have lengthy pull cords as the commenter suggests. All stock products must be cordless, have short cords (equal to or shorter than 8 inches), or have inaccessible cords. Although staff agrees that consumers may not be as knowledgeable as professional installers, staff notes that the majority of the custom products involved in the incidents were installed by professionals and still lacked safety devices. Educating consumers is paramount particularly to reduce the risk associated with the corded window coverings already installed in consumers' homes. However, as discussed in this staff briefing package, education campaigns are insufficient to address the hazard, and manufacturing inherently safe custom window coverings that comply with the ANSI/WCMA standard's stock products requirements is needed. Staff also observed in several

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

public comments that installers may remove the tension device from the product if the customer does not want it mounted, which would allow a hazardous loop on the product.

### 10. Product options / Limited choices for consumers

At least 321 commenters suggested that consumers may want to have different options to serve their different needs and reducing the options that are available to consumers is not preferable.

*Response*

The draft final rule does not eliminate operating system options but rather applies performance requirements that eliminate hazardous cords. Manufacturers can develop new operating systems that do not have accessible cords or implement existing solutions such as cordless systems, shrouded or continuous loop systems, or shrouded pull cord systems. These technologies are available and are being used for both stock and custom window coverings.

For example, suppliers of custom window coverings to the Canadian market have already adjusted their products to comply with Canada's window treatment regulations which are substantially similar to this draft final rule. This has apparently resulted in changes to advertised product lines; such as those shades that could not meet the inner cord requirements (e.g., light pleated shades, narrow metal blinds) appear to have been removed from the market, as well as some of the largest sizes of other categories. Manufacturers are offering cost-effective redesigns to other types that are cordless. In addition, manufacturers are offering new designs to replace the discontinued options in Canada, such as shades with light blocking material on the bottom and sheer on the top as a replacement for "top down/bottom up" shades. Staff has no evidence from the Canadian market of a significant reduction in consumer choice. Rather, the market has reacted with cost-effective substitutes and redesigns.

### 11. Retractable cords work well and are safe

At least 149 commenters stated that retractable cords are safe and should not be eliminated.

*Response*

In the Custom Window Coverings NPR, the Commission sought comment on whether retractable cords should be included in the final rule. Staff is not aware of incidents associated with retractable cords, and based on the comments received, staff now recommends that custom window coverings be permitted to use a single retractable cord lift system that exposes up to 12 inches of cord from the bottom of the headrail as a stroke length. Staff recommends the 12 inch cord limit based on staff's analysis demonstrating that it is extremely unlikely for a strangulation to occur in this scenario for both younger and older children due to their abilities and physical dimensions, as well as lack of incidents within 12 inches of the headrail.

### 12. Technology unavailable to cover all products in all sizes and weights

At least eight commenters, including WCMA, stated that non-motorized cordless lift systems are not feasible for large window coverings. Commenters stated that continuous loop cords with tie down devices are capable of lifting any size window covering. At least 3 commenters stated that manual cordless lift systems have limitations such as size and weight of the window covering that could limit the application (*e.g.*, for faux wood blinds, a general estimate for the maximum dimensions for cordless is 96 inches wide by 48 inches high and 60 inches wide by 84 inches high.)

*Response*

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Staff considered the comments provided by manufacturers about the limitations for larger products to accommodate the manual cordless systems.

Staff also reviewed the incident data to determine the largest products that were involved in incidents: the longest product that was involved in a nonfatal incident had a reported length of 112 inches (width was 124 inches). A reported fatality involved a roller shade; based on other dimensions provided in the IDI, staff estimates the length as 119 inches (width was estimated as 54 inches).

Based on staff's market research, rigid cord shrouds are currently limited to operating window coverings up to 96" tall. Staff reviewed the available technologies on the market and determined that it is feasible to implement rigid cord shrouds, cord or bead chain restraining devices or retractable cords on larger window coverings (Tab C.)

Staff received comments stating that there is an increased presence of taller windows in homes. Because hazard patterns in taller window coverings are the same as hazard patterns for shorter window coverings, and the potentially increased number of installations of taller window coverings in residences, and the feasibility of applying safer technologies on these products, staff does not recommend excluding taller products from the scope of the rule. However, staff's product development time estimates (Tab C) demonstrates that a longer implementation date (*i.e.*, 2 years) is reasonable for manufacturers to implement the technologies for products that are raised and lowered and are 10 feet or more in length.

### 13. Top-Down-Bottom-Up (TDBU) shades

About 33 commenters believe that TDBU shades would be eliminated if the proposed rule becomes final. They believe that TDBU shades are safe and should not be eliminated.

*Response*

Staff did not recommend eliminating TDBU shades. A TDBU shade can be manufactured as long as it does not contain hazardous operating cords and hazardous inner cords. The inner cord requirements differ between the ANSI/WCMA-2018 and the Canadian rule; however, even if the TDBU shades fail to meet the draft final rule, Canadian custom window treatment retailers have already adjusted their products to comply with Canada's window treatment regulations. Manufacturers are offering cost-effective redesigns to replace the discontinued options, such as shades with light blocking material on the bottom and sheer on the top as a replacement for "top down/bottom up" shades. There is no evidence from the Canadian market of a significant reduction in consumer product choice. Rather, the market has reacted with cost-effective substitutes and redesigns. Since the same large companies sell window coverings to the Canadian and U.S. markets, we anticipate that these innovative replacements will be available in the U.S. at competitive prices.

### 14. Training Installers

At least 353 businesses stated that they train their installers so that window coverings and safety devices are properly mounted.

*Response*

Staff encourages sellers to train installers so that safety devices, in particular, are installed in a proper manner. However, over the lifetime of the product use, external safety devices such as tension devices may break or come off the wall. In addition, consumers who do the installation

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

by themselves may not have the knowledge or ability to properly install the device. The type of wall and fasteners can make a big difference in the proper installation of tension devices and that is not within the control of manufacturers.  Custom window coverings that use a tension device are inadequate to address the strangulation risk.  Staff testing found that a child can still fit their head through a properly tensioned cord (Tab I), so this option does not eliminate or adequately reduce the risk of strangulation.  Moreover, consumers may not install tension devices, or alternatively they may break or be uninstalled.  Safer options to reduce the risk of injury include passive safety devices that do not rely on consumer behavior to prevent the hazard.

## H.  Stories of Loss

Over 40 commenters either were personally affected by window covering cord injury or death or knew someone who was affected by a child's death on a window covering cord.

### Response

Staff appreciates the courage of these families in sharing their difficult stories of a tragic loss. To each of these parents, family members, and loved ones, we thank you for sharing these stories and we are deeply sorry for your loss. The Commission has taken the information about the interactions and conditions involved in the incidents into consideration in developing the final rules for stock and custom window coverings, so that no family must endure the same tragedy of losing a child to a window covering cord.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

# Tab I: Draft Final Rule for Operating Cords on Custom Window Coverings: Assessment of Draft ANSI/WCMA 2022 Balloted Standard

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



OS-358

United States
**Consumer Product Safety Commission**
cpsc.gov | info@cpsc.gov | 800.638.2772

# Memorandum

**TO:**        The Window Coverings Rulemaking File            DATE: September 28, 2022

**THROUGH:** Joel Recht, Deputy Assistant Executive Director for Hazard Identification and Reduction

**FROM:**    Engineering Sciences Staff

Office of Hazard Identification and Reduction

**SUBJECT:** Draft Final Rule for Operating Cords on Custom Window Coverings: Assessment of Draft ANSI/WCMA 2022 Balloted Standard

# I.  Background

On July 15, 2022, WCMA issued a ballot to revise the ANSI/WCMA A100.1 – 2018 standard (draft ANSI/WCMA-2022). Staff reviewed the draft ANSI/WCMA-2022 and, in this memorandum, assesses the proposed changes to the standard and evaluates its adequacy to address the strangulation hazard associated with corded custom window coverings.

# II.  Discussion

### A.  Assessment of the draft balloted standard

Staff reviewed the draft ANSI/WCMA-2022 and determined that the standard contains no revisions to requirements for stock window coverings.  All revisions in the draft ANSI/WCMA-2022 are to requirements for custom window coverings. Staff's assessment of these revisions includes the following:

#### 1.  Elimination of accessible free hanging operating cords and tilt cords

Staff Assessment:

Staff assesses that the revision to eliminate accessible free hanging operating cords and tilt cords for custom products is an adequate requirement.  This revision should result in safer custom window coverings. According to Appendix C of the draft ANSI/WCMA-2022, tilt cords on a custom window covering product that are within 12 inches (31 cm) of the bottom of the headrail are considered not accessible. Staff concurs with this accessibility allowance for tilt cords, which is the same as the allowance for inner cords. Staff is not aware of reported incidents involving operating or inner cords that are within 12 inches of the headrail. Based on the climbing ability and neck circumference of children, discussed below, twelve inches of cord is unlikely to allow a child who is at a climbing age to hold the cord and wrap it around their neck.

Staff Briefing Package: Draft Final Rule for Corded Window Coverings | September 28, 2022 | cpsc.gov

159

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

A658

Children generally are able to walk up the stairs with support when they are 1 year old (Bayley, 1969); and older 1-year-olds are capable of climbing on and off furniture without assistance (Therrell, Brown, Sutterby, & Thornton, 2002). Frost and colleagues (2001) report that gross motor play and the use of climbers are dominant, starting at about 1-½ years of age; and as these children approach age 2, they engage extensively in gross-motor play and begin to learn to use large playground apparatuses independently. Two-year-old children especially enjoy climbing, and can climb steps, short ladders, and jungle gyms (Therrell, Brown, Sutterby, & Thornton, 2002; Hughes, 1991).

A 2-year-old would need to climb about 4.2 ft to get to the headrail in a room with common dimensions such as 9-feet tall ceiling and the top of the window placed at 1.5 feet below the ceiling. The 97th percentile height of a 2-year-old child is 3.3 ft (Steenbekkers, 1993). Staff concludes this is a very unlikely scenario based on both the abilities of children at this age and the common placement of windows (Figure 1).



**Figure 1. Two-year-old's climbing to access the "inaccessible" cord area.**

After climbing, children would need to be able to hold the cord and wrap it around their neck. Although older children may be able to climb taller heights, a 12-inch length cord is not sufficient to strangle a child in the above scenario because the neck circumference of a 5th percentile 8-year-old is 9.6 inches (Snyder 1977) and the hand breath at the palm is 2.4 inches, which is exactly 12 inches with no distance to spare between the window covering cord and the child.

### 2. Modified requirements for single cord retraction devices

a.  Elimination of cords attached to the Operating Interface (the part of the cord retractor that the operator pulls on) to prevent the creation of a hazardous loop.  Section 6.3.1 of the draft balloted standard eliminates cords as the Operating Interface, and requires such interface to be a rigid device, such as a wand or ring that cannot bend on itself.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Staff Assessment:

Staff supports the elimination of cords for consumers to pull on when using single cord retraction devices because this revision eliminates a corded component that could lead to a potential strangulation.

b.  A maximum stroke length of 36 inches.  Section 6.1.2 of the draft balloted standard sets the maximum stroke length for a cord retraction device at 36 inches.

Staff Assessment:

Staff finds this revision inadequate because a 36-inch extended cord could allow a child to wrap the cord around his/her neck. Staff recommends no more than a 12-inch stroke length to adequately address the strangulation hazard associated with corded window coverings.  See Tab B (ESHF memorandum) for a comparison between 36-inch stroke length and staff-recommended 12-inch stroke length. At 12 inches, younger children with smaller neck circumferences are unlikely to be able to climb to get to the bottom of the head rail and wrap the cord around their necks; older children who can climb to that height would not have sufficient length of cord to hold and wrap the cord around their necks as explained above.

c.  Section 6.1.1 of the draft ANSI/WCMA-2022 requires that when a 30 grams mass is applied to the Operating Interface, the Cord Retraction Device shall maintain full retraction of the Retractable Cord such that the Retractable Cord is not accessible per the accessibility test in Appendix C of the standard.

Staff Assessment:

Staff supports this revision because this ensures a minimum pull force to access the exposed cord.  Staff supports this revision if the maximum stroke length is limited to 12 inches as recommended in b.  Staff assessed that a child is unlikely to simultaneously pull on the retraction device and wrap the exposed 12 inch cord around his neck.

### 3.  Additional requirements for tension devices used with continuous loop operating systems

Based on the incident data, staff determined that if tension devices are not installed, are installed improperly, damaged or are removed from the cord, a hazardous loop is present. Staff's incident review for the NPR found that a total of 12 strangulations or near strangulations occurred in a custom product containing continuous loops between 2009 and 2020, in addition to 21 incidents involving stock (3) and unknown stock/custom (18).  Since the NPR, staff is aware of two additional fatal incidents involving a continuous loop operating system, one of which is identified as a likely custom product; a tension device was not observed in either incident. Staff communicated their concerns and objections to tension devices numerous times to the ANSI/WCMA committee.[1] Below staff analyzes the effectiveness of each requirement for a tension device in the draft ANSI/WCMA-2022.

a.  6.3.1 The Tension Device shall be attached to the Cord or Bead Chain Loop by the manufacturer. It shall be designed, placed and shipped such that, unless properly installed

---

[1] Staff's letters can be found at https://cpsc.gov/Regulations-Laws--Standards/Voluntary-Standards/Window-Blind-Cords

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

or altered from the shipped condition with Sequential Process or tools, it prevents the window covering from operating.

Staff Assessment:

This draft requirement would require a consumer or installer to use a tool or perform at least two independent steps to remove the tension device and make the window covering operable. For example, a zip tie may need to be cut to remove the connection between the tension device and the headrail. The requirement attempts to ensure a linkage between the tension device and the safe operation of the window covering, by causing the consumer or installer to properly install the tension device to use the window covering. However, the requirement still allows consumers or the installer to use the window covering in an unsafe manner, by removing the tension device from the loop, which would leave the hazardous loop accessible to children for the remaining life of the product.

b. 6.3.2 The manufacturer shall attach the Tension Device to the Cord or Bead Chain Loop by means of a Permanent Assembly Method. This Cord or Bead Chain Loop and Tension Device assembly must meet the durability requirements in section 6.3.5.

Staff Assessment:

This requirement ensures that if an installer or consumer attempts to remove the tension device, the device or component will break. Staff is aware of an incident involving a tension device that used one way snap features as permitted by the standard. The snap features broke off, exposing the continuous loop cord. This incident shows that a permanent assembly method requirement does not ensure that the tension device will remain assembled. Staff finds this provision inadequate, because even if the tension device breaks, the looped cord will not necessarily be damaged. Therefore, for hard-to-reach locations or for people who do not want holes on their walls, removing the tension device may be preferable and the window covering will remain fully operable. One business owner in their comments stated that even in recent window covering installations they frequently witnessed cord tensioners that were not installed, that have been removed by the homeowner after installation, or were broken.

c. 6.3.3 The Tension Device in conjunction with the product shall maintain Tension on the operating cords when properly installed. If the Tension Device is installed in a location that does not maintain Tension on the operating cords, the Tension Device will prevent the window covering from operating as designed for full operation of the product. The window covering may not operate independently of the Cord or Bead Chain Loop.

Staff Assessment:

The draft ANSI/WCMA-2022 defines "Tension" as "The applicable, consistently applied force required to eliminate or prohibit the creation of a Hazardous Loop in any operating position." This requirement is intended to ensure that the location of the tension device on the wall or window jamb is such that the cord moves freely and allows full operation of the window covering while not allowing a hazardous loop. Staff finds this requirement inadequate because staff confirmed that an amount of tension that allowed full operation of the window covering still allowed a head probe to be inserted into the loop (Figure 2). Accordingly, a properly installed tension device still allows an accessible hazardous loop.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



**Figure 2. Head probe goes through the loop that has Tension.**

The draft ANSI/WCMA-2022 requires the Tension Device to prevent the window covering from operating as designed for full operation of the product.  Staff concludes that this requirement is inadequate because the window covering can be operated partially as shown in Figure 3.



**Figure 3. Partially operable window covering when tension device is not attached to a fixed surface.**

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

d. 6.3.4 The Tension Device shall be supplied with fasteners and instructions to attach to wood substrates. The Tension Device shall also be supplied with information about attaching to drywall and metal substrates. The fasteners shall have a minimum fastener manufacturer-rated or tested release force of 20 pounds (89 Newton).

Staff Assessment:

Staff finds this requirement inadequate because it relies on the installer or the consumer to properly, securely and permanently attach to the wall a critical safety component for continuous loop operating systems. The draft ANSI/WCMA-2022 relies on a third party (consumer or installer) to install this critical safety component. Staff concludes that the requirement does not adequately address installation issues that could lead to a strangulation incident for the following reasons:

1. Consumers or installers may not recognize the safety importance of a properly installed tension device or may not have the skills or training to perform the task. Relying on the consumer or installer to properly install the tension device, a critical safety component, into an unknown substrate (wood, drywall, metal or other material) is not a reasonable expectation. The standard shifts the manufacturer's responsibility to produce a safe product to the consumer or installer to properly attach the tension device. Staff considers the balloted requirement inadequate and unenforceable.

2. Installing the tension device into a wood stud or wood trim is not always an available option for all homes. The draft ANSI/WCMA-2022 requires wood fasteners to be included in the packaging, however fasteners to attach the tension device to metal or drywall are not required and is left to the installer or consumer to find/supply. Therefore, the required instructions and hardware to attach the tension device into wood will not apply for all installations.

3. Figure 4 shows a typical tension device installed to the window jamb (Figure 4a) and to the wall (Figure 4b). If the window jamb or wall is drywall, the screw may not be in a wood stud location and can only be fastened into drywall. The structural integrity of a screw fastened into drywall is less secure than a screw fastened into wood. Even if the screw is fastened into drywall using a drywall anchor, the screw and drywall anchor can loosen and pull out over time due to forces transmitted to the screws while raising and lowering the window covering.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

 

**Figure 4. Typical installation of a tension device: 4(a) inside mount to jamb (Secure-child-safe-cords-cord-tensioner-pirouette-Skyline-Window-Coverings.jpg (900×601) (skylinewindowcoverings.com), 4(b) outside mount to wall (Universal Cord Tension Device for Roman Shades 6 Colors DIY - Etsy).**

4.  The requirement does not specify a product or test standard to ensure the fastener meets the 20 lb. release force.  Staff is not aware of a standard test that provides a "minimum fastener manufactured-rated or tested release force."  Because the standard does not require supplying fasteners for drywall or metal, the 20 lbs. manufacturer-rated release force is not required for fastening into drywall or metal.

e.  6.3.5 The tension device, in conjunction with the product, shall be designed for durability to meet the following test requirements:

6.3.5.1 Operational Cycle Tests:

Changes to ANSI/WCMA standard: The 2022 standard uses the same test method as the 2018 standard.

6.3.5.2 UV Stability:

Changes to ANSI/WCMA standard:  The 2022 standard uses the same test method as the 2018 standard except the tension device is removed from the Loop Cord or Bead Chain to allow placement into the UV chamber.

6.3.5.4 Loop Cord and Bead Chain Durability Testing:

Changes to ANSI/WCMA standard:  In the 2022 standard, the tension device now needs to be reassembled onto the Loop Cord or Bead Chain before testing can start.  The 2022 standard uses the same cyclic test method as the 2018 standard.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Staff Assessment:

These tests include operational cycle, UV stability, impact, and durability tests. The test specifies that each sample is mounted on drywall, wood, and metal. Staff does not support these tests because the attachment hardware to drywall and metal is not required for tension devices (see paragraph d, 2 above). These tests cannot control how a consumer or installer fastens the tension device to the window jamb or wall. Therefore, these requirements do not adequately assess the integrity of the attachment method to drywall or metal substrate.

**4. Elimination of continuous cord loop systems for horizontal blinds**

Staff Assessment:

Section 4.4.2.5.1 of the draft ANSI/WCMA-2022 eliminates continuous cord loops on horizontal blinds. Staff supports this revision because it will require horizontal blinds to use safer options, such as cordless systems, rigid cord shrouds, or retractable lift systems. However, sheer horizontal shades are not included in the definition of a "horizontal blind," they are considered "horizontal shades," and at least two incident units were horizontal shades (Figures 5 and 6). The incident units have horizontal slats but do not meet the definition of a horizontal blind, as written in the standard, because they are not suspended from a headrail by ladders (Figures 7 and 8). Instead, these products have horizontal vanes held together by sheer fabric.



**Figure 5. Incident unit in IDI 140203CCC2348.**



**Figure 6. Close-up view of a horizontal shade https://www.vistashades.com/horizontal-shades/.**

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)





**Figure 7. Horizontal blinds (Figure H1, ANSI/WCMA A100.1 – 2018).**

**Figure 8. Close-up view of a horizontal blind https://www.inprocorp.com/products/commercial-window-treatments/horizontal-blinds/horizontal-blinds/.**

## 5. Elimination of Cord Loop Lift systems

Staff Assessment:

The draft ANSI/WCMA-2022 eliminates the section 4.3.2.7 of ANSI/WCMA-2018 which allowed cord loop lift system is now removed. Staff supports this revision because this type of operating system uses accessible cords that pose a strangulation hazard and are associated with incidents. Cord Loop Lift System are commonly used for roll-up shades. (Figure 9).

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

A666



**Figure 9. Roll up shade.**

6. **Additional requirements for remote control battery compartments to align with ANSI/UL 4200A.**

<u>Staff Assessment:</u>

Section 4.3 of the draft ANSI/WCMA-2022 requires remote control devices to meet the requirements of ANSI/UL 4200A – *Standard for Safety for Products Incorporating Button or Coin Cell Batteries of Lithium Technologies*. Staff supports this revision in the standard to minimize ingestion of button cell batteries. Staff notes that Reese's Law was enacted on August 16, 2022 and requires CPSC to establish product safety standards with respect to batteries that pose an ingestion hazard (e.g., button cell or coin batteries). Specifically, consumer products with these batteries must include (1) a warning label instructing consumers to keep the batteries out of the reach of children, and (2) a battery compartment that prevents access to the batteries by children who are six years of age or younger. Additionally, such batteries, if sold separately or included separately with a product, must comply with federal child-resistant packaging regulations.

7. **Additional requirements for Rigid Cord Shrouds to test for deflection and deformation**

<u>Staff Assessment:</u>

Section 6.5.2.4 of the draft ANSI/WCMA-2022s requires rigid cord shrouds to meet the "Deflection and Deformation" test, which evaluates accessibility of the shrouded cords when the product is bent or twisted. Staff supports this revision because the added requirement prevents the cords form coming out of the shroud due to bending or twisting of the shroud.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

### 8. Exempting curtains and draperies from the scope of the standard

Staff Assessment:

Staff finds this exemption inadequate because staff is aware of at least four fatalities involving draperies and curtains; all deaths were a result of continuous loops. There are multiple cordless options for draperies, including wands and motorized controls, as well as simply pulling the draperies on the traverse rod by hand, with no cord or other control. The Directorate for Economic Analysis memorandum states that of the different types of window coverings analyzed in the Regulatory Impact Analysis, draperies had the lowest cost of compliance, assumed to be near zero because the cost of a wand is approximately equal to the cost of the cord it replaces.

### 9. New warning labels for (a) continuous loop tension devices and (b) retractable cords

Staff Assessment:

Overall staff supports improved warnings. The draft ANSI/WCMA-2022 has two new permanent warning labels regarding the strangulation risk: one to warn the consumer about damaged, loose, or missing tension devices; and the second to warn about a retractable cord that fails to fully retract. Both warning labels include the attention-getting pictogram of a strangling child and follow ANSI Z535.4 formatting guidelines. In addition, window coverings that contain a continuous loop and a tension device must include a warning tag which has a list of six bullet items for the consumer to follow. The window covering with a retractable cord lift system must include another warning tag containing four bullet items. Both tags have formatting that follow ANSI Z535 guidelines and include the same pictogram as permanent warning labels. Although the warning labels and warning tags have attention-getting features that should improve their noticeability, even well-designed warning labels will have limited effectiveness in communicating the hazard on a product that is familiar to consumers and used frequently. See Tab I of the staff briefing package for the NPR for a detailed analysis of the limitations of relying on warning labels.

### B. Addressability of Incidents with the Draft ANSI/WCMA 2022

Staff assesses below whether the reported custom product incidents would be addressed by the draft ANSI/WCMA-2022 based on the type of the cord involved in each incident.

### 1. Continuous Loop Incidents

Staff assesses that the following use scenarios involving continuous loops that come with tension devices are not addressed in the balloted standard (Table 1). Window covering arrives with tension device attached to the cord loop.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**Table 1. Unaddressed Scenarios in the Incident Data Involving Tension Devices (green indicates fully functional window covering, yellow indicates possibility of hazardous loop and partially operable window covering, orange indicates hazardous loop)**

| TENSION DEVICE ATTACHMENT TO WALL | TENSION DEVICE LOCATION | OPERABILITY OF THE WINDOW COVERING | HAZARDOUS LOOP |
|---|---|---|---|
| 1. Consumer or installer attaches the tension device to a wall/ window sill | a) Installation is in a proper location to maintain Tension | Loop cord freely moves and fully operates the window covering | A hazardous loop can form depending on the amount of Tension (IDI 141003CAA1005 involves a product with tension device attached and full operable shade but child was able to insert his head through the loop.) |
| | b) Installation is in a location that does not maintain Tension | Window covering is not fully operational but is partially operable | A hazardous loop can form |
| 2. Consumer or installer decides not to attach the tension device to the wall: | a) If tension device is left on the cord loop | Tension device prevents full operation of window covering but is partially operable | A hazardous loop is present (e.g., IDI 050804CCC1029 involves a tension device that would prevent the full operation, but the tension device was still not attached to the wall.) |
| | b) If consumer or professional installer decides to remove the tension device | Tension device or a component breaks. Once tension device is not on the loop, window covering is fully functional | A hazardous loop is present (IDI 140203CCC2348 involves a tension device that broke off from the loop) |

Out of the 36 custom product incidents in the aggregated incident data, 13 incidents involved strangulation on a continuous loop. Staff's review of these incidents demonstrates that they are likely to remain unaddressed, even if the products complied with WCMA's draft ANSI/WCMA-2022. Consumers can remove the tension device, or it can be damaged. A consumer's preference, knowledge of, and concern with the strangulation hazard, the location where the product will be installed, and consumer satisfaction with a partially operable window covering, could each result in a consumer choosing an unsafe option.

1. In one of the incidents (110516CCC3728), the tension device was attached only to the cord and not to the wall or window jamb. The draft ANSI/WCMA-2022 would require that if a tension device is used, full operation of the window covering be prevented if the tension

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

device is not properly installed. Reviewing the facts of CPSC's in-depth investigation (IDI), staff learned that the incident product was installed by the landlord in a rented home, and that the family living there did not know what the tension devices were used for or that they needed to be secured to a wall or window jamb. Scenario 2(a) in Table 1 would result in a partially operable window covering and a hazardous loop. Staff cannot determine whether the consumer in this case would have preferred to attach the tension device to the wall to make the window covering fully operable, or whether they would have preferred the tension device to be completely removed (given that they never attached the tension device to the wall). Staff assesses that some consumers do not attach the tension device because they do not want holes in their walls.

2. In another continuous loop incident (140924CAA1966), staff observed the same situation where the tension device was on the cord but not installed, although there were no images of the tension device. Scenario 2(a) in Table 1 would result in a partially operable window covering and a hazardous loop.

3. In four incidents (140924CAA1969, 090915CCC3962, 140924CAA2904, 160517CBB2597) a tension device on the cord was missing or was not installed; scenario 2(b) is likely applicable, and it would create a hazardous loop.

4. In one incident (140203CCC2348), the tension device was broken prior to the incident; staff determined that the tension device would have met the requirement for Permanent Assembly Method in section 6.3.2 of the draft ANSI/WCMA-2022. The definition for Permanent Assembly Method is:

> *3.04. Permanent Assembly Method - Any assembly method that cannot be disassembled without breaking a component, including without limitations one way snap features, sonic welding, crush pins or other compliant method.*

The IDI indicated that the tension device was assembled using one way snap features as required by the draft ANSI/WCMA-2022 (see Figure 10 from IDI 140203CCC2348). Despite compliance, the broken tension device left an accessible hazardous loop, resulting in a near-strangulation. IDI 140203CCC2348 indicated that the consumer ordered four custom made horizontal blinds from a home improvement store. The consumer installed the blinds and the tension devices. Over the following 2 years, the covers to all four tension devices broke off, exposing the cord loop as shown in Figure 11.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



**Figure 10. Photograph from IDI 140203CCC2348 indicates the tension device was constructed with one way snaps and would have met the requirement for Permanent Assembly as required in the balloted standard.**



**Figure 11. Photograph from IDI 140203CCC2348 shows the incident blind with the broken tension device and exposed cord loop.**

The consumer said that she saw her son standing on a chair with the looped cord around his neck. The consumer grabbed her son from the chair. He was uninjured. This IDI shows

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

that a tension device that meets the draft ANSI/WCMA-2022 can fail in an unsafe manner, exposing an accessible cord loop, which is the most hazardous cord condition.

5. In five incidents (090901CCC3939, 100920CBB1174, 160531CBB1714, 161213CBB3244, 211006CCC1032,) the tension device was not mentioned in the incident report and staff did not observe a tension device in photographs of the incident product. Continuous loop products without a tension device result in fully functioning window coverings and a hazardous loop as defined in scenario 2(b).

6. Finally, one incident (141003CAA1005) had a tension device attached on the cord and on the wall or jamb, but the cord was not taut enough to prevent the victim from inserting his head into the loop. The draft ANSI/WCMA-2022 requires that if the tension device is installed in a location that does not maintain tension on the operating cords, the tension device will prevent the window covering from operating as designed for full operation of the product. Scenarios 1(a) or 1(b) are likely, meaning a hazardous loop can form.

Staff notes that one of the incidents mentioned in (3) above and the incident in (4) above involved horizontal shadings (Figures 6 and 7). These products are not considered horizontal blinds by definition, therefore, according to the draft ANSI/WCMA-2022, they can still contain a tension device instead of the other options that are deemed safe by staff (no cords, short static cords, inaccessible cords, retractable cords.) Therefore, staff's addressability assessment remains the same.

### 2. Operating Pull Cord or Tilt Cord Incidents

Eighteen custom window covering incidents involved pull or tilt cords.  Fifteen of the 18 operating pull cord incidents reportedly occurred on horizontal blinds and would be addressed with the draft ANSI/WCMA-2022 because horizontal blinds under the balloted standard must include one of the other options (cordless, short cords, inaccessible cords, retractable cords) that are deemed safe by staff, not a continuous loop with a tension device.

The remaining three operating pull cord custom window covering incidents of the 18 involved a horizontal shade, a cellular shade, and a Roman shade. If those units were designed to use a continuous loop with a tension device, the hazard would remain. If one of the safer options (cordless, short cords, inaccessible cords, retractable cords) are chosen, the strangulation hazard would be addressed.

### 3. Inner Cord Incidents

All three inner cord incidents would be addressed by complying with the voluntary standard, which will be codified in the draft final rule under section 15(j) of the CPSA.

Overall, staff assesses that 15 of 36 incidents (41.7%) would be prevented by compliance with the draft ANSI/WCMA-2022, 3 of 36 incidents (8.3%) would be prevented by compliance with ANSI/WCMA-2018, which corresponds to a total of 50.0% (3 incident units with pull cords may switch to continuous loops and therefore not counted in this assessment), compared to the 94.4% that are addressed in the draft final rule for the known types of cords, as discussed in Tab B of this briefing package.

## III. Conclusion

ES staff assessed the draft ANSI/WCMA-2022 and evaluated the effectiveness of the draft ANSI/WCMA-2022 to address the custom product incidents. Although there are several

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

improvements in this revision, primarily the elimination of operating pull cords and tilt cords, the draft ANSI/WCMA-2022 still allows continuous loops with tension devices that pose a strangulation hazard.

# References

American National Standard for Product Safety Signs and Labels, ANSI Z535.4-2011 (R2017). Rosslyn, VA: National Electrical Manufacturers Association

Bayley, N. (1969). Bayley Scales of Infant Development. New York, NY, USA: The Psychological Corporation

Frost, J. L., Wortham, S., & Reifel, S. (2001). Play and Child Development. Upper Saddle River, NJ: Prentice-Hall.

Hughes, F.P. (1991). *Children, Play, and Development*. Boston: Allyn & Bacon.

Steenbekkers, P. A. (1993) Child Development, Design Implications and Accident Prevention. Delft University Press ISBN 90-6275-895-9.

Therrell, J.A., Brown, P., Sutterby, J.A., Thirnton, C.D., (2002). Age Determination Guidelines: Relating Children's Ages to Toy Characteristics and Play Behavior. T. P. Smith (Ed.), Bethesda, MD: U.S. Consumer Product Safety Commission.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

# EXHIBIT 11

STANDARD

FOR SAFETY OF

WINDOW COVERING PRODUCTS

SPONSOR



WINDOW COVERING MANUFACTURERS ASSOCIATION, INC.

Re-Circulation
ANSI Canvass Copy
September 2022

Published by
Window Covering Manufacturers Association, Inc.
355 Lexington Avenue, New York, New York, 10017

Copyright © 2018 by the Window Covering Manufacturers Association, Inc.
Not to be reproduced without
specific authorization from WCMA

Printed in the USA

This Standard was developed by the Window Covering Manufacturers Association, Inc

# FOREWORD

WCMA standards, of which the document contained herein is one, are developed through a consensus standards development process approved by the American National Standards Institute. This process brings together volunteers representing varied viewpoints and interests to achieve consensus around window covering products and safety issues. While the WCMA administers the process and establishes rules to promote fairness in the development of consensus, it does not independently test, evaluate, or verify the accuracy of any information or the soundness of any judgments contained in any such standards.

The WCMA disclaims liability for any personal injury, property, or other damages of any nature whatsoever, whether special, indirect, consequential or compensatory, directly or indirectly resulting from the publication, use of, or reliance on this document. The WCMA also makes no guaranty or warranty as to the accuracy or completeness of any information published herein.

In issuing and making this document available, the WCMA is not undertaking to render professional or other services for or on behalf of any person or entity. Nor is the WCMA undertaking to perform any duty owed by any person or entity to someone else. Anyone using this document should rely on his or her own independent judgment or, as appropriate, seek the advice of a competent professional in determining the exercise of reasonable care in any given circumstances.

The WCMA has no power, nor does it undertake, to police or enforce compliance with the contents of this document. Nor does the WCMA list, certify, test or inspect products, designs, or installations for compliance with this document. Any certification or other statement of compliance with the requirements of this document shall not be attributable to the WCMA and is solely the responsibility of the certifier or maker of such statement.

# TABLE OF CONTENTS

1 SCOPE ....................................................................................................................... 5

2 GENERAL ................................................................................................................. 6

3 DEFINITIONS ........................................................................................................... 7

4 PRODUCT REQUIREMENTS ................................................................................ 10

5 LABELING AND OPERATIONAL TAG REQUIREMENTS .................................. 11

6 TESTS AND PARAMETERS .................................................................................. 16

APPENDIX A:  REFERENCE DOCUMENTS ............................................................ 21

APPENDIX B:  RATIONALE AND BACKGROUND INFORMATION ..................... 22

APPENDIX C:  TEST PROCEDURE FOR ACCESSIBLE CORDS ............................ 24

APPENDIX D:  HAZARDOUS LOOP TEST PROCEDURE ....................................... 27

APPENDIX E:  TESTING SUMMARY, PRODUCT ILLUSTRATIONS .................... 36

APPENDIX G:  DEFLECTION ................................................................................... 41

*THIS PAGE INTENTIONALLY LEFT BLANK.*

**1 SCOPE**

1.1 **Background:** The members of the Window Covering Manufacturers Association, Inc. (WCMA), recognizing that unfortunate accidents, including strangulation, have occurred among young children using certain products made or imported by members of the industry, have prepared this Standard in cooperation with the U.S. Consumer Product Safety Commission (CPSC).

This Standard is not intended to inhibit, but rather to encourage, the development of devices and methods that shall further improve the safety of products manufactured by industry members. Manufacturers and other users of this Standard are requested to submit suggestions for improvements to WCMA.

Members of WCMA, in recognition of continuing improvements to be made, shall sponsor appropriate revisions to this Standard on a regular basis.

1.2 This Standard applies to all interior window covering products. The items covered include the products listed in 1.3.

1.3 Types of window covering products documented in this standard include, but are not limited to, cellular shades, horizontal blinds, pleated shades, roll up style shades, roller shades, sheer shades, Roman style shades, traverse rods (including products that are used with traverse rods), panel tracks, and vertical blinds. These products can be manufactured and distributed as either stock or custom products. (See Section 3 for definitions of these terms.)

**2 GENERAL**

2.1 **Objective:** The objective of this Standard is to provide requirements for products documented in this standard in 1.2 and 1.3 that reduce the possibility of injury, including strangulation, to young children from the bead chain, cord, or any type of flexible Loop.

2.2 **Values:** Required values given in this Standard are given in U.S. units. The SI (metric) equivalents are approximate.

2.3 **Tolerances:** Where only plus or minus values are given, they are permitted to be exceeded or reduced as appropriate at the option of the manufacturers. Linear dimensions expressed without specific tolerances or not marked maximum or minimum shall be plus or minus 1/32 in (1 mm).

2.4 **Reference Documents:** All documents referenced are included in Appendix A: Reference Documents.

2.5 **Products:** Product types are described and / or illustrated in Appendix H: Product Illustrations.

## 3 DEFINITIONS

| Genus | ID | Term | Definition |
|---|---|---|---|
| 1. Window Covering products | 1.01 | Cellular Shades | Multiple layers of material formed into tubes or cells, whose operation consists of raising and lowering. |
| | 1.02 | Horizontal Blinds | Rigid horizontal slats, suspended from a headrail by Ladders, and whose operation may include tilting, raising and lowering. |
| | 1.03 | Pleated Shades | Single or multiple layers of material with permanent pleats in a horizontal orientation, whose operation consists of raising and lowering. |
| | 1.04 | Roll Up Style Shade | A flexible sheet with no cords, whose operation consists of rolling up the sheet from the bottom or top, as the case may be. This would be secured by clips or other fastening means |
| | 1.05 | Roller Shade | Flexible sheets of material attached to a roller and a means of supporting the roller, whose operation consists of furling or unfurling the material from the roller. |
| | 1.06 | Roman Style Shades | Flexible fabric with rings, clips, or attachment devices, aligned in columns and spaced, through which cords or Wide Bands run from the headrail to the lowest ring or bottom rail, so that the fabric folds or gathers during operation as the cord or Wide Band is pulled towards the headrail. |
| | 1.07 | Traverse Rod | A rod or track upon which drapes or panels are attached that slide open and closed |
| | 1.08 | Vertical Blinds | Rigid or flexible sheet vertical slats suspended from a headrail, and whose operation may include traversing and rotating. |
| 2. Cord-related components | 2.01 | Accessible Cords | Cord that can be contacted by the test probe following the test procedures in Appendix C: Test Procedure for Accessible Cords. |
| | 2.02 | Band | A thin strip of material which is wider than it is thick and is utilized in the function or operation of a window covering product. If a band is not classified as a Wide Band, then for testing purposes, the band is considered equivalent to a cord. |
| | 2.03 | Bead Chain | A cord with series of small spheres made of plastic or metal |
| | 2.04 | Cord | A long slender flexible material. |
| | 2.05 | Cord Retraction Device | A passive device which winds and gathers cords when tension is no longer applied by the user. |
| | 2.06 | Cord Shroud | A device or material added to limit the accessibility of a cord or formation of a Hazardous Loop. |

| | 2.07 | Guide Cord | A fixed or static Cord intended to restrict and/or guide window covering product components. |
|---|---|---|---|
| | 2.08 | Hazardous Loop | A Loop that allows the head probe to pass through it when tested per Appendix D: Hazardous Loop Test Procedure. |
| | 2.09 | Inaccessible Operating Cord | Operating Cords that are inaccessible as determined per the test requirements in Appendix C: Test Procedure for Accessible Cords. |
| | 2.10 | Inner Cord | The portion of a Cord which transfers force from the user interface to components during operation. |
| | 2.11 | Ladder | A system that is typically constructed of Cord but can also be made of fabric with decorative facings that are used in horizontal blinds that support and determine spacing between slats. |
| | 2.12 | Loop | A bounded opening formed by any configuration of Cords and/or window covering material. |
| | 2.13 | Loop Cord and Bead Chain Restraining Device | A device that prevents the creation of a Hazardous Loop from an Accessible Continuous Operating Cord. |
| | 2.14 | Operating Cord | The portion of a Cord which the user manipulates directly during operation. Operation includes, but is not limited to, lifting, lowering, tilting, rotating, and traversing. |
| | 2.15 | Operating Interface | The part of a blind or shade that the user physically grasps or touches with their hand or tool to operate the product, for example a wand or bottom rail. |
| | 2.16 | Short Static or Access Cord | An Operating Cord or Band that is fixed in length in any state (free or under tension), to be a length equal to or less than 8 inches, typically attached to a bottom rail to enable access to operate the shade. |
| | 2.17 | Retractable Cord | A Cord that extends when pulled by a user through an Operating Interface, and fully retracts when Tension is no longer applied by the user, rendering the cord not accessible as defined in Appendix C. |
| | 2.18 | Rigid Cord Shroud | A Cord Shroud that is constructed of inflexible material and does not have an Accessible Cord as defined in Appendix C, including Appendix C3.1. |
| | 2.19 | Tension | The applicable, consistently applied force required to eliminate or prohibit the creation of a Hazardous Loop in any operating position |
| | 2.20 | Cord(s) Under Tension | An Inner or Operating cord to which Tension is applied during all conditions of operation. |
| | 2.21 | Tension Device | A device that is used to maintain Tension on the Cord or Bead Chain Loop. |
| | 2.22 | Wide Band | A Band that meets the specifications outlined in 6.6. |
| 3. Non-Cord | 3.01 | Active Device | A device that is activated and operated by the direct interaction of the user. |

| | | product component | | |
|---|---|---|---|---|
| | 3.02 | Bottom Rail | Component at the bottom of a window covering that acts as an attachment point for the ends of Inner Cords or provides weight to insure proper operation. |
| | 3.03 | Headrail | Component at the top of a window covering that supports the product while mounted and allows Operating and Inner Cords to be routed through it. |
| | 3.04 | Permanent Assembly Method | Any assembly method that cannot be disassembled without breaking a component, including without limitations one way snap features, sonic welding, crush pins or other compliant method. |
| | 3.05 | Wand | A rigid or semi-rigid material that cannot be folded upon itself, used for manual operation. |
| 4. Method of operating a window covering product | 4.01 | Cycle | A single complete instance of operation, which may include raise, lower, traverse, and rotate. |
| | 4.02 | Operating Systems, Continuous Loop | A single Cord or Bead Chain formed in a continuous Loop to perform operation. |
| | 4.03 | Operating Systems, Cordless | An operating system that does not require an Operating Cord, or whose Operating Cord is inaccessible, as defined in 2.13. A cordless product may still have Accessible Inner Cords. |
| | 4.04 | Operating Systems, Motorized | A Cordless Operating system that includes a motor and control system. |
| | 4.05 | Operating Systems, Single cord | A single Operating Cord to perform operation. |
| | 4.06 | Permanent (marking) | A marking or label that cannot be removed, or which tears, or that damages the surface to which it is attached during an attempt to manually remove it without the aid of tools or solvents. |
| | 4.07 | Sequential Process | An operation that requires two or more independent steps to be performed in a specific order. |
| 5. Method of distributing window covering product | 5.01 | Custom Blinds, Shades, and Shadings | Any window covering that is not classified as a stock window covering. |
| | 5.02 | Stock Blinds, Shades, and Shadings: | A specific stock keeping unit or SKU, which is completely or substantially fabricated (as defined below) in advance of being distributed in commerce (as that term is defined in 15 U.S.C. Sect. 2052(a)(7) and in advance of any specific consumer request for that product. The SKU can either be sold "as is" or modified |

| | | | or adjusted by the seller, manufacturer, or distributor before or after being distributed in commerce and it would still be considered a Stock Blind, Shade and Shading. |
| --- | --- | --- | --- |
| | | | "Substantially fabricated" would include products pre-assembled in advance of a consumer order or purchase. Pre-assembled products that are modified or adjusted by the seller, manufacturer or distributor before or after being distributed in commerce will still be considered as "substantially fabricated" if they require, but is not limited to, any of the following: adjustments to size, attachment of the top rail and/or bottom rail, and/or tying of Cords to secure the Bottom Rail to finish the assembly of the product. |
| | | | Stock Blinds, Shades, and Shadings shall not be considered Custom Blinds, Shades, and Shadings solely because of the method of distribution (e.g., Internet sales) or the size of the purchasing order (e.g., for multi-family housing developments). |

## 4 PRODUCT REQUIREMENTS

4.1 **Allowable Lead Content:** Exterior components of the window covering which are 12 in (31 cm) or more below the bottom of the headrail shall be produced with no more than 0.01% lead by weight (100 ppm) and follow the methodology and exemptions described in the Consumer Product Safety Improvement Act of 2008, Public Law 110-314, 122 Stat. 3016, and regulations promulgated thereunder.

4.2 **Small Parts:** Any safety component or device that is intended to separate from the product shall meet the requirements of Federal Standard: 16 CFR Part 1501 (see Appendix A: Reference Documents).

4.3 **Remote Control Battery Accessibility:** Applicable battery powered remote control devices shall meet the requirements of 15 USC 2056e and any subsequent standard developed by the CPSC to ensure that the button cell or coin battery compartments are secured in a manner that would eliminate or adequately reduce the risk of injury from button or coin cell battery ingestion by children that are 6 years of age or younger during reasonably foreseeable use or misuse and the warning label requirements in 15 USC 2056e.

4.4 **Operating Systems**

4.4.1 **Stock Blinds, Shades, and Shadings:** Where more than one method is utilized, at least one shall meet the applicable requirement in Section 6.

4.4.1.1 **Cordless Operating System:** (includes Motorized Operating Systems)

4.4.1.1.1 The product shall have no Operating Cords.

4.4.1.2 **Short Static or Access Cords**

4.4.1.2.1 The product shall have a Short Static or Access Cord.

### 4.4.1.3 **Inaccessible Operating Cords**

4.4.1.3.1 The Operating Cords shall be inaccessible as determined per the test requirements in Appendix C: Test Procedure for Accessible Cords.

4.4.2 **Custom Blinds, Shades, and Shadings:** Where more than one method is utilized, at least one shall meet the applicable requirement in Section 6.

### 4.4.2.1 **Cordless Operating System:** (includes Motorized Operating Systems)

4.4.2.1.1 The product shall have no Operating Cords.

### 4.4.2.2 **Short Static or Access Cords**

4.4.2.2.1 The product shall have a Short Static or Access Cord.

### 4.4.2.3 **Inaccessible Operating Cords**

4.4.2.3.1 The Operating Cords shall be inaccessible as determined per the test requirements in Appendix C: Test Procedure for Accessible Cords.

### 4.4.2.4 **Single Retractable Cord Lift System**

4.4.2.4.1 The product shall contain a permanently attached Cord Retraction Device that meets the requirements in 6.1. All window covering products with a Retractable Cord require warning labels and warning tags as described in 5.1 and 5.2.

### 4.4.2.5 **Continuous Loop Operating System:** Where more than one method is utilized, at least one shall meet the applicable requirement in 6.

4.4.2.5.1 The product shall contain a Tension Device for Cord or Bead Chain Loops that meets the requirements in 6.3 and shall exclude use on Horizontal Blinds. All window covering products with a Tension Device for Cord or Bead Chain Loops require warning labels and warning tags as described in 5.1 and 5.2.

4.4.2.5.2 The product shall contain a Loop Cord and Bead Chain Restraining Device that meets the requirements of 6.4

4.4.2.5.3 The product shall contain a Rigid Cord Shroud that meets the requirements of 6.2

4.5 **Inner Cords:** All products with Inner Cords must meet the requirements in Appendix C and Appendix D

4.5.1 If the product has Shrouded Inner Cords they must meet requirements in section 6.2.

## 5 LABELING AND OPERATIONAL TAG REQUIREMENTS

5.1 **Labeling:** Manufacturers shall provide warning labels on all window coverings described in 4.4.2.4, 4.4.2.5.1. All warning labels and warning tags shall comply with the requirements below and shall adhere to ANSI Z535 standards (see Appendix A: Reference Documents), and shall be provided in both English and Spanish. If a single long label containing both languages is used instead of two separate labels, only one set of pictograms is required.

5.1.1 **Custom Continuous Loop Operating System with Tension Device & Single Retractable Cord Lift System Warning Bottom Rail Label(s):** The signal word ("Warning" in English and "Advertencia" in Spanish) shall be in all uppercase letters measuring not less than 5/16 in (8 mm) in height and preceded by an ANSI safety alert symbol (an equilateral triangle surrounding an exclamation point) of at least the same size. The rest of the warning message text shall be in both uppercase and lowercase letters (sentence capitalization), with capital letters measuring not less than 1/8 in (3 mm) (English) or 3/32 in (2 mm) (Spanish). The warning label shall include a pictogram that represents the hazard of a Cord wrapping around a young child's neck as depicted in the example below. The label shall be a permanent marking affixed to all products with Continuous Loop Operating Systems or Single Retractable Cord Lift Systems. The label shall be placed on the bottom rail of the window covering, and printed in a color that contrasts the bottom rail color. For products without bottom rails, the label shall be placed in an alternative location on the product, to be determined by the manufacturer or importer, that is visible to the user. The generic warning label(s) shall read as follows:

**Warning Label for Continuous Loop Operating System with Tension Device**

  **Window Blind Cord Strangulation Risk**
A damaged, loose, or missing tension device poses a strangulation risk to children. Remove from use and repair or replace if tension device is damaged, loose, or missing

**Warning Label for Single Retractable Cord Lift System**

  **Window Blind Cord Strangulation Risk**
A retractable window blind cord that fails to fully retract poses a strangulation risk to children. Remove from use and repair or replace if cord fails to fully retract

5.1.2 **Custom Continuous Loop Operating System with Tension Device & Single Retractable Cord Lift System Warning Bottom Rail Label for Narrow Product:** A warning label of reduced size may be used only on product less than 18 in (457 mm) wide or where space limitations prevent the use of label(s) described in 5.1.1 The signal word ("Warning" in English and "Advertencia" in Spanish) shall be in all uppercase letters measuring not less than 5/32 in (4 mm) and preceded by an ANSI safety alert symbol (an equilateral triangle surrounding an exclamation point) of at least the same size. The rest of the warning message text shall be in both uppercase and lowercase letters (sentence capitalization), with capital letters measuring not less than 1/16 in (2 mm). The warning label shall include a pictogram that represents the hazard of a Cord wrapping around a young child's neck as depicted in the example above. The label shall be a permanent marking affixed to all products with Continuous Loop Operating Systems or Single Retractable Cord Lift Systems. The label shall be placed on the bottom rail of the window covering, and printed in a color that contrasts the bottom rail

color. For products without bottom rails, the label shall be placed in an alternative location on the product, to be determined by the manufacturer or importer, that is visible to the user.  The generic warning label(s) shall read as shown in 5.1.1.

5.1.3 **Labels for Merchandising for Continuous Loop Operating System with Tension Device & Single Retractable Cord Lift System Products:** A warning label is to be placed on product merchandising materials which includes, but is not limited to, the sample book and the website (if the website is relied upon for promoting, merchandising, or selling on-line). The warning label shall include pictograms that represent the hazard of a Cord wrapping around a young child's neck as depicted in the example below.  The warning label shall be placed conspicuously on the merchandising materials. For the United States, the languages shall be English and Spanish.



5.1.3.1 The signal word ("Warning" in English, and "Advertencia" in Spanish) shall be in all uppercase letters measuring not less than 5/16 in (8 mm) and preceded by an ANSI safety alert symbol (an equilateral triangle surrounding an exclamation point) of at least the same size. The rest of the warning message text shall be in both uppercase and lowercase letters (sentence capitalization), with capital letters measuring not less than 1/8 in (3 mm). The generic warning label(s) shall read as shown in 5.1.3.

5.2 **Operational Warning Tags:** The manufacturer shall provide an operational warning tag on the product. This tag shall include, at a minimum, all information presented in the following operational warning tags based on the characteristics of the product or the safety devices included on the product. The "Warning" word shall be typeset no less than 5/16 in (8 mm) in capital letters and preceded by the ANSI safety alert symbol (an equilateral triangle surrounding an exclamation point).  The rest of the message is in upper and lower case with the capital letters not less than 1/8 in (3 mm).  The warning tag shall include a pictogram that represents the hazard of a Cord wrapping around a young child's neck as depicted in the example below. The warning tag(s) shall be used on all window covering products that have a Continuous Loop Operating System or Single Retractable Cord Lift System.

### 5.2.1 **Tension Device Warning Tag (attach to Cord or Tension Device)**



**⚠ WARNING**

**Products with a Damaged, Loose, or Missing, Tension Device Pose a Strangulation Risk to Children**

This Window Blind is equipped with a Tension Device
• Remove from use and repair or replace if tension device is damaged, loose, or missing
• Tension device must be securely attached to wall or floor
• Children can climb on furniture to reach cords
o Fasteners provided with tension device may not be appropriate for all mounting surfaces
o Use appropriate anchors for mounting surface conditions
• Tag to be removed only by end-user

### 5.2.2 **Single Retractable Cord Lift System Warning Tag (attach to Cord or Wand)**



**⚠ WARNING**

**Malfunctioning Retractable Cord Poses a Strangulation Risk to Children**

This Window Blind is equipped with a retractable cord
• Remove from use and repair or replace if cord fails to fully retract.
• Children can climb on furniture to reach cords
• Move crib and furniture away
• Tag to be removed only by end-user

5.3 **Manufacturer Label:** There shall be a permanent label(s) or marking on all finished window covering products identifying:

5.3.1 The readily distinguishable name, city, and state of the manufacturer or importer of record or fabricator

5.3.2 The month and year of manufacture.

5.3.3 The designation of the window coverings as "Custom" or "Stock", per the definitions in 3, using a "C" or the word "Custom" or an "S" or the word "Stock", respectively.

5.3.4 Custom products must also include customer order information (e.g., customer name or customer order number) to match the product with a specific order.

5.3.5 This label is to be located within or on the headrail or on the roller tube so it can be easily referenced by the user or inspecting agency.

# 6 TESTS AND PARAMETERS

6.1 **Cord Retraction Devices**: Permanent or internally design Cord Retraction Devices shall adhere to the following:

6.1.1 When a 30 grams mass is applied to the Operating Interface, the Cord Retraction Device shall maintain full retraction of the Retractable Cord such that the Retractable Cord is not accessible per Appendix C.

6.1.2 The maximum stroke length for a Cord Retraction Device is 36 inches.

6.1.3 The Operating Interface for Cord Retraction Devices may not be a Cord of any length including a Short Static or Access Cord. It may be a ring and pole, a wand or any other design that cannot bend on itself, eliminating the potential of creating a hazardous loop.

6.1.4 The Cord Retraction Device shall have a service life of 5,000 cycles after exposed portions or components have been subjected to 500 hours of UV exposure per AATCC Test Method 16-2004, Option 3.

6.2 **Cord Shroud:** Cord Shrouds are designed to limit accessibility of Inner Cords or Operating Cords and shall adhere to the following:

6.2.1 Evaluated as an assembly or individual cords as determined by Appendix C: Test Procedure for Accessible Cords and tested in accordance with Appendix D: Hazardous Loop Test Procedure.

6.2.2 The components of the Cord Shroud assembly shall be exposed to 500 hours of UV per AATCC Test Method 16-2004, Option 3 and then tested for durability.

6.2.2.1 Rigid Design- Evaluate for durability, impact, and operation per 6.5.

6.2.2.2 Non-Rigid Design – for Inner Cords only- evaluate all connection points which must not separate and expose Inner Cords at less than 5 lbs pull force.

6.3 **Tension Devices:** Tension Devices for Cord or Bead Chain Loops shall adhere to the following:

6.3.1 The Tension Device shall be attached to the Cord or Bead Chain Loop by the manufacturer. It shall be designed, placed and shipped such that, unless properly installed or altered from the shipped condition with Sequential Process or tools, it prevents the window covering from operating.

6.3.2 The manufacturer shall attach the Tension Device to the Cord or Bead Chain Loop by means of a Permanent Assembly Method. This Cord or Bead Chain Loop and Tension Device assembly must meet the durability requirements in section 6.3.5.

6.3.3 The Tension Device in conjunction with the product shall maintain Tension on the operating cords when properly installed. If the Tension Device is installed in a location that does not maintain Tension on the operating cords, the Tension Device will prevent the window covering from operating as designed for full operation of the product. The window covering may not operate independently of the Cord or Bead Chain Loop.

6.3.4 The Tension Device shall be supplied with fasteners and instructions to attach to wood substrates. The Tension Device shall also be supplied with information about attaching to drywall and metal substrates. The fasteners shall have a minimum fastener manufacturer-rated or tested release force of 20 lb (89 N).

6.3.5 The Tension Device, in conjunction with the product, shall be designed for durability to meet the following test requirements:

6.3.5.1 **Operational Cycle Test:** Cycle test Tension Device in conjunction with the product as supplied by the manufacturer and mounted with the supplied anchors/fasteners to an appropriate vertical or horizontal surface as recommended by the manufacturer for 3,000 cycles with a delay interval of a standard 2 min. between each cycle. Standard speed of 1.0 - 1.5 ft/sec (31- 46 cm/sec), unless otherwise specified by the manufacturer.

6.3.5.2 **UV Stability:** Subject five separate Tension Devices (assemblies) and five separate sets of mounting components to 500 hours UV per AATCC Test Method 16-2004, Option 3 and the table below:

| Sample Number | Testing Required |
|---|---|
| 1 | 6.3.5.2; 6.3.5.3 |
| 2 | 6.3.5.2; 6.3.5.4 |
| 3 | 6.3.5.2; 6.3.5.4 (substrate 1) |
| 4 | 6.3.5.2; 6.3.5.4. (substrate 2) |
| 5 | 6.3.5.2; 6.3.5.4. (substrate 3) |

6.3.5.3 **Impact Test:** Impact test according to ASTMD5420, with Gardner tester IG-1120 using striker # IG-1243 using 15 in-lb (1.7 joule) on the Tension Device and separately on attachment components (if any). A drawing should be provided with the part(s) indicating the location and direction for impact but at a minimum of horizontal and perpendicular to the mounting surface.

6.3.5.3.1 Place one of the UV-exposed Tension Device (assemblies) into test fixture and provide impact as stated above, both parallel and perpendicular to the mounting direction. Deformation of the parts is acceptable, but any cracking or dislodged parts are considered a failure.

6.3.5.3.2 Place one of the UV-exposed mounting components into test fixture and provide impact as stated above on the portion of the product that mounts to the wall (or other mounting surface). Deformation of the parts is acceptable, but any cracking or dislodged parts are considered a failure.

6.3.5.4 **Loop Cord and Bead Chain Durability Testing:** The Cord or Bead Chain Loop and tension device shall be tested to ensure proper functionality is maintained on the assembly.

According to the manufacturer's provided instructions and hardware, mount one each of the UV-exposed Tension Devices & mounting components / Loop assemblies to the following vertical surfaces: drywall, wood, and metal.

6.3.5.4.1 Subject the Cord or Bead Chain Loop to a force of 5 lb (22.2 N) for 5 seconds both parallel and perpendicular to the mounting surface by pulling on the Loop Cord.

6.3.5.4.2 Repeat the testing within 6.3.5.4.1 for a total of ten tests in each direction (parallel and perpendicular), for each sample & substrate material

(drywall, wood, and metal). Each tension device & mounting hardware shall maintain integrity without cracking or breaking.

6.4 **Loop Cord and Bead Chain Restraining Device:** Loop Cord and Bead Chain Restraining Devices shall adhere to the following:

6.4.1 The Loop Cord and Bead Chain Restraining Device shall be designed and installed on the window covering product by the manufacturer to prevent the operating Cord Loop length from creating a Hazardous Loop

6.4.2 The components of the Loop Cord and Bead Chain Restraining Device shall be tested for durability and safety using the following:

6.4.2.1 **Operational Cycle Test:** Test the Loop Cord and Bead Chain Restraining Device in conjunction with the product as supplied by the manufacturer and mounted as recommended by the manufacturer to an appropriate surface for 3,000 cycles with a delay interval of a standard 2 min. between each cycle. Standard speed of 1.0 - 1.5 ft/sec (31- 46 cm/sec), unless otherwise specified by the manufacturer.

6.4.2.2 **UV Stability:** Subject three of the Loop Cord and Bead Chain Restraining Devices (and mounting components (if any) to 500 hours UV per AATCC Test Method 16-2004, Option 3 and the table below:

| Sample Number | Testing Required |
|---|---|
| 1 | 6.4.2.2; 6.4.2.3; 6.4.2.4 |
| 2 | 6.4.2.2; 6.4.2.4 |
| 3 | 6.4.2.2; 6.4.2.5 |

6.4.2.3 **Impact Test:** Impact test according to ASTM D5420, with Gardner tester IG-1120 using striker # IG-1243 using 15 in-lb (1.7 joule) on the Loop Cord and Bead Chain Restraining Device and attachment components (if any). A drawing should be provided with the part(s) indicating the location for impact but at a minimum of horizontal and perpendicular to the window covering product.

6.4.2.3.1 Place another of the UV-exposed Loop Cord and Bead Chain Restraining Device (assemblies) into test fixture and provide impact as stated above on the portion of the product which contains the Loop Cord or Bead Chain. Deformation of the parts is acceptable, but any cracking or dislodged parts are considered a failure.

6.4.2.3.2 Place mounting parts (if any) into test fixture and provide impact as stated in 6.6.2.4 on the portion of the device that mounts to the body of the window covering product or to the wall (or other mounting surface). Deformation of the parts is acceptable, but any cracking or dislodged parts are considered a failure.

6.4.2.4 **Loop Cord and Bead Chain Restraining Device Durability Testing:** The Cord or Bead Chain Loop shall be tested to ensure proper functionality is maintained on the Loop Cord or Bead Chain assembly.

6.4.2.4.1 Mount the window covering with the attached UV-exposed Loop Cord and Bead Chain Restraining Device to a rigid surface according to manufacturer's testing instructions.

6.4.2.4.2 Locate the approximate midpoint of the accessible combined Loop. Using the test fixture as shown in Appendix D: Hazardous Loop Test Procedure, subject the Cord or Bead Chain Loop to a force of 5 lb (22.2 N) for 5 seconds both parallel and perpendicular to the window covering.

6.4.2.4.3 Determine if the Loop Cord and Bead Chain Restraining Device assembly can maintain integrity of the assembly according to design intent.

### 6.4.2.5 Hazardous Loop Testing Procedure for Loop Cord and Bead Chain Restraining Devices

6.4.2.5.1 Place the Hazardous Loop Test Stand Assembly (Figure D2) at the location of the Cord or Bead Chain restraining device and Operating Cord of the window covering and adjust the vertical height so that the Restraining Arm Assembly (Figure D2 #17,15,16) aligns with the approximate midpoint of the accessible combined Loop to be tested. Place the Restraining Arm (Figure D2 Item #16) against the Cord or Bead Chain restraining device.

6.4.2.5.2 Ensure the scale measuring distance traveled on the Force Gauge Arm Subassembly is set to zero (Figure D2 Item 1). Zero the Force Gauge and then loop the Accessible Cord or Bead Chain onto both hooks of the Force Gauge Arm Subassembly (Figure D5 Item #1.1).

6.4.2.5.3 Set the Force Gauge to "Continuous Readout" and over a time period of 5 seconds +/- 1 second, gently pull the Horizontal Arm (Figure D5 Item #1.8) of the Force Gauge Arm Subassembly away from the window covering to create an open Loop until the Force Gauge indicates a tension force of 5 lb (+/- 0.25 lb) (22.2 N +/- 1.1 N) or the Scale (Figure D5 Item #1.4) indicates a pulled distance of 25 in (+/- 0.25 in) (63.5 cm +/- 0.6 cm), whichever comes first. Lock the Horizontal Arm in place using the Brake Assembly (Figure D-5 Item #1.10).

6.4.2.5.4 Using the head probe in Figure D1 determine whether the head probe can pass through the opening created between the Hooks and the Restraining Arm with an insertion force of 10lb (44.5 N) or less, perpendicular to the plane of the opening.

6.4.2.5.4.1 If the head probe cannot pass through the Loop under the conditions above, the opening is not a Hazardous Loop.

6.4.2.5.4.2 If the head probe can pass through the Loop under the conditions above, the Loop is considered a Hazardous Loop.

6.5 **Rigid Cord Shroud:** A Rigid Cord Shroud device shall adhere to the following:

6.5.1 The Rigid Cord Shroud Device shall be designed and installed on the window covering product by the manufacturer to limit Operating Cord accessibility

6.5.2 The components of the Rigid Cord Shroud Device shall be tested for durability and safety using the following:

6.5.2.1 **UV Stability:** Subject three of the Rigid Cord Shroud Devices (and mounting components, if any) to 500 hours UV per AATCC Test Method 16-2004, Option 3 and the table below:

| Sample Number | Testing Required |
|---|---|
| | |

| 1 | 6.6.2.1; 6.6.2.2 |
| 2 | 6.6.2.1; 6.6.2.3 |

**6.5.2.2 Operational Cycle Test:** Test the Rigid Cord Shroud Device in conjunction with the product as supplied by the manufacturer and mounted as recommended by the manufacturer to an appropriate surface for 3,000 cycles with a delay interval of a standard 2 min. between each cycle. Standard speed of 1.0 - 1.5 ft/sec (31- 46 cm/sec), unless otherwise specified by the manufacturer.

**6.5.2.3 Impact Test:** Impact test according to ASTM D5420, with Gardner tester IG-1120 using striker # IG-1243 using 15 in-lb (1.7 joule) on the Rigid Cord Shroud device and attachment components (if any). A drawing should be provided with the part(s) indicating the location for impact but at a minimum one horizontal and one perpendicular to the window covering product.

6.5.2.3.1 Place the UV-exposed Rigid Cord Shroud Device (assemblies) into test fixture and provide impact as stated above on the portion of the product which contains the Operating Cord at a point that provides or translates function of the Operating Cord. Deformation of the parts is acceptable, but any cracking or dislodged parts are considered a failure.

6.5.2.3.2 Place mounting parts (if any) into test fixture and provide impact as stated in 6.5.2.3 on the portion of the device that mounts to the body of the window covering product. Deformation of the parts is acceptable, but any cracking or dislodged parts are considered a failure.

**6.5.2.4 Deflection and Deformation Test Procedure:** Test for deflection and deformation in accordance with the procedures set forth in Appendix G.

**6.6 Wide Lift Bands:** Wide Lift Bands shall be treated as Cords unless they meet the requirements for a Wide Lift Band, and when used, shall adhere to the following requirements:

6.6.1 Bands shall be a minimum width of 3.5 in.

6.6.2 Bands should be constructed of a material that has a wide lift band safety factor of 16.0 (in-kg) or greater

6.6.2.1 Wide Lift Band safety factor shall be calculated by the following parameters.

6.6.2.1.1 Width (inches) of material measured when flat (measured in inches).

6.6.2.1.2 Stiffness of band tested in accordance with ASTM D4032, with pneumatic actuator, digital gage with 25 kgf capacity (measured in kg).

6.6.2.1.3 Wide Lift Band safety factor is the simple product of the numerical values achieved in 6.6.2.1.1 and 6.6.2.1.2.

## APPENDIX A: REFERENCE DOCUMENTS

**Reference Documents**

**American Association of Textile Chemists and Colorists (AATCC)**

AATCC TEST Method 16-2004 Option 3- Colorfastness to Light

Available from American Association of Textile Chemists and Colorists, AATCC, P. O. Box 12215, One Davis Drive, Research Triangle Park, North Carolina, 27709-2215, fax +1 919 549 8933, www.aatcc.org

**American National Standards Institute (ANSI)**

ANSI Z535.1-2006 (r2011) - Safety Color Code
ANSI Z535.2-2006 (r2011) - Environmental and Facility Safety Signs
ANSI Z535.3-2006 (r2011) - Criteria for Safety Symbols
ANSI Z535.4-2006 (r2011) - Product Safety Signs and Labels
ANSI Z535.5-2006 (r2011) - Accident Prevention Tags (for temporary hazards)
ANSI/UL 4200A (2020) - Products Incorporating Button or Coin Cell Batteries of Lithium Technologies

Available from American National Standards Institute, 25 West 43rd Street 4th Floor, New York, NY 10036, +1 212 642 4900, www.ansi.org

**ASTM International**

ASTM D4032-08 Standard Test Method for Stiffness of Fabric by the Circular Bend Procedure
ASTM D5420-10 Standard Test Method for Impact Resistance of Flat, Rigid Plastic Specimen by Means of a Striker Impacted by a Falling Weight (Gardner Impact)
ASTM F963-17 - Standard Consumer Safety Specification for Toy Safety
Available from ASTM International, 100 Barr Harbor Drive, PO Box c700, West Conshohocken, PA 19428-2959, +1 610 832 9500, www.astm.org

**Code of Federal Regulations (CFR)**

16 CFR Part 1501 - Method for Identifying Toys and Other Articles Intended for Use by Children Under 3 Years which Present Choking, Aspiration, or Ingestion Hazards Because of Small Parts

Available from U.S. Consumer Product Safety Commission, Washington, DC 20207, +1 800 638 2772, www.cpsc.gov

**European Standards**

EN 71-3:1994/ A1:2000/AC:2002 of the European Committee for Standardization entitled Safety of Toys – Part 3

## APPENDIX B: RATIONALE AND BACKGROUND INFORMATION

Appendix B describes the rationale and / or background information for select provisions of the standard.

**B1** Wand Tilt and Cord Tilt

B1.1 Wand Tilt- Wands require fine hand manipulations to operate (twisting motion).

B1.2 Cord Tilt on Custom Blinds would be an acceptable option if the cords remain Inaccessible during all phases of operation as defined in Appendix C: Test Procedure for Accessible Cords.

**B2** The 36 inch maximum stroke length for Cord Retraction Devices is based on a combination of anthropometric data of the useable arm pull and the actual systems in market currently.

**B3** Section 6.6 Wide Lift Bands

B3.1 The WCMA engaged an independent laboratory to verify that "wide" lift bands reduce risk of strangulation when used in place of an Inner Cord. Test results showed a relationship between width and stiffness of the material and influence on pressures to occlude an airway during simulation. Based on data and discussion of the testing, a safety factor of 16.0 was determined to be acceptable. The wide lift band safety factor (in-kg) is calculated by multiplying the width of the wide lift band (measured in inches) by the stiffness of the wide lift band (measured in kgf). Stiffness values of the wide lift band were measured using test method ASTM 4032-2008, pneumatic actuator, digital gage with a 25kgf (115 N) capacity.

**B4** Figure C1, Cord Accessibility Probe

B4.1 The 6 in (152 mm) end depth is based on anthropometric data and historical information.

B4.2 The 5/8 in (16 mm) diameter is based on a child inserting his/her index finger into the opening and curl his/her finger to grasp the Cord. The distance from the tip of index finger to the middle joint is approximately same as the inside grip diameter (5th percentile 2.5-3.5 year olds[1]), which is added to the index finger diameter (5th percentile 2-3.5 year olds[2]).

B4.3 The 1in (25 mm) depth is the rounded number for the tip of index finger to the middle joint explained above.

B4.4 The 1 13/16 in (46 mm) diameter is based on the opening needed to grasp the Cord if a child inserts his/her hand in a straight position up to the thumb crotch. Hand circumference at the palm (mean 2-2.5 year old child[3]) is added to the opening needed to grasp the Cord with index finger (inside grip diameter of a 5th percentile 2.5-3.5 year old).

B4.5 The 2.5 in (64 mm) depth is the thumb crotch – middle finger length for 5th percentile 2-3.5 year old[2].

B4.5.1 [1] Owings, C.L., Norcutt, R.H., Snyder, R.G., Golomb, D.H. & Lloyd, K.Y. (1977). Gripping Strength Measurements of Children for Product Safety Design. Prepared for the U.S. Consumer Product Safety Commission, Washington, D.C.

B4.5.2 [2]Snyder, R.G., Schneider, L.W., Owings, C.L., Reynolds, H.M., Golomb, D.H., & Schork, M.A. (1977). *Anthropometry of Infants, Children and Youths to Age 18 for Product Safety Design* (Report No. UM-HSRI-77-17). Prepared for the U.S. Consumer Product Safety Commission, Washington, D.C.

B4.5.3 [3]BSI (1990) as cited in Norris, B., & Wilson, J. R. (1995). CHILDATA: The handbook of child measurements and capabilities –Data for design safety. London: Department of Trade and Industry.

**B5** Figure C2, Cord Shroud Accessibility Probe

B5.1 The ¼ in (6 mm) diameter is based on: 0.33 in (8 mm) is the 5th percentile 2-year-old's index finger diameter in Snyder's study[2].

**B6** Section D2.4, Head Probe

B6.1 Tension force of 5 lb (22.2 N) is based on Section 4.14.1 Cords, Straps, and Elastics in ASTM F963.

B6.2 Insertion force of 10 lb (44.5) is based on Section 8.22 Test for Loops and Cords in ASTM F963.

B6.3 16.6 in (42.2 cm) is representative of the 5th percentile 7-9 month old, measurements provided by http://ovrt.nist.gov/projects/anthrokids and shape provided by Intertek CT scan images

## APPENDIX C: TEST PROCEDURE FOR ACCESSIBLE CORDS

Appendix C describes test requirements for determining the accessibility of Cords on the front, rear, bottom, or sides of properly installed window covering product.

The Inner Cords on a window covering product that are within 12 in (31 cm) of the bottom of the headrail are considered not accessible.

The tilt Cords on a Custom window covering product that are within 12 in (31 cm) of the bottom of the headrail are considered not accessible.

Test method is determined by the window covering construction type as described in C2.1

### C1 Shade Mounting and Preparation

C1.1 Hang the window covering on a mounting rail using brackets according to manufacturer's installation instructions. The shade is to be tested in the fully lowered position

C1.1.1 Allow enough room around the mounted window covering to perform the Accessible Cord test.

### C2 Inner Cord Test with Cord Accessibility Probe

C2.1 Determine if the window covering is to be tested to the "Open" or "Closed" construction test procedure.

Open Construction window covering products have one of the following:

- Inner Cords that are exposed from the front, rear, bottom or sides of the window covering which are typical of Roman, horizontal, and pleated window coverings.
- Cords that are enclosed between layers of the window covering without segmented sections allowing access to any portion of the interior from any opening.

Closed Construction has Inner Cords that are enclosed within segmented layers of the product which is typical of Cellular Shade. Access is limited to only that section of the Cord in an individual segment.

**C2.1.1 "Open" construction:** Determine if any opening in the window covering, more than 12 in (31 cm) below the bottom of the headrail, allows touching of the Inner Cords with the Inner Cord accessibility probe (Figure C1).

C2.1.1.1 If the Inner Cord accessibility probe can touch any Cords before reaching the 2 in (51 mm) diameter section the Cords are considered accessible and must be tested to Appendix D: Hazardous Loop Test Procedure.

C2.1.1.2 If the 2 in (51 mm) diameter section of the Inner Cord accessibility probe can be inserted into any opening then the Cords are considered accessible and must be tested to Appendix D: Hazardous Loop Test Procedure.

**C2.1.2 "Closed" construction:** Determine if any opening in the window covering, more than 12 in (31 cm) below the bottom of the headrail, allows touching of the Inner Cords with the Inner Cord accessibility probe (Figure C1).

C2.1.2.1 If the Inner Cord accessibility probe can touch any Cords before reaching the 4 in (102 mm) diameter section the Cords are considered accessible and must be tested to the Appendix D: Hazardous Loop Test Procedure.

C2.1.2.2  If the 4 in (102 mm) diameter section of the Inner Cord accessibility probe can be inserted into any opening then the Cords are considered accessible and must be tested to Appendix D: Hazardous Loop Test Procedure.



**Figure C1 – CORD ACCESSIBILITY PROBE**
Note: See Appendix G: Rationale and Background Information,

**C3 Operating Cords**

C3.1 Any Operating Cord or Retractable Cord, when it is in the static position, which can be contacted by the Cord accessibility probe (Figure C1) is considered an Accessible Cord.

**C4 Cord Shroud Accessibility Test with Cord Shroud Accessibility Probe**

C4.1 Cord Shrouds with openings smaller than 1/4" diameter, are to be tested with the Cord, per Appendix D. Cord Shrouds with openings larger than 1/4" diameter, are to be tested independently of the Cord, per Appendix D.



**Figure C2 – CORD SHROUD ACCESSIBILITY PROBE**

Note: See Appendix G: Rationale and Background Information,

# APPENDIX D:  HAZARDOUS LOOP TEST PROCEDURE

Appendix D describes test requirements for the Accessible Inner Cords of all window covering types and the potentially Hazardous Loop or opening that may be created between an Inner Cord and the window covering material by manipulation of the Inner Cord and / or window covering material.  If a Hazardous Loop is formed following the Appendix D: Hazardous Loop Test Procedure, the product is non-compliant.

## D1 Window Covering Mounting and Preparation

D1.1 Hang the window covering on a mounting rail using brackets according to manufacturer's installation instructions.

D1.1.1 It is recommended that enough room is allowed all around the mounted window covering for the test fixture and Cord-pull allowance.

D1.1.2 It is recommended that allowances are made for various heights of either window covering or test fixture and tests at multiple vertical positions on the window covering, either by raising or lowering the entire window covering, or by adjusting the level of the test fixture.

D1.1.3 All Inner Cords which are accessible from the front, sides, bottom, or rear of the window covering and are 12 in (31 cm) or more below the bottom of the headrail, are subject to these tests.

D1.1.3.1 If the openings between the Accessible Inner Cord and the window covering material are similar in design, the tests shall be conducted on a minimum of one Inner Cord near the side edge of the window covering and one Inner Cord towards the horizontal center of the window covering for each configuration tested.

D1.1.3.2 If the openings between the Accessible Inner Cord and the window covering material are similar in design, the tests shall be conducted on a minimum of the bottom most row of openings and the middle row of openings.

D1.1.4 At each position on the window covering product where Cords are tested, all combinations of Cords and combined Loops shall be tested separately.

D1.1.5 Test procedure D2 shall be performed with the window covering in the fully lowered position.

D1.1.5.1 If the sample contains a top-down, bottom-up operation feature, Procedure D2 shall be performed with the bottom rail fully lowered and the middle rail up against the headrail (window covering fully covering the window).

D1.1.6 Loops that are formed by excessive or intricate manipulations, including damaging the product or using tools, of the Accessible Cord shall be exempt from testing.

## D2 Creation of a Hazardous Loop

D2.1 Orient the Hazardous Loop test stand assembly, shown in Figure D2 through Figure D6, such that the hooks (Figure D5 Item #9.5) on the force gauge arm subassembly (Figure D5) will be able to pull the Accessible Inner Cord to form or

enlarge a Loop (see Figure D7). The direction of pull will be perpendicular to surface of the window covering product, and away from the surface.

D2.1.1 If the Inner Cord is only accessible from the side of the window covering, then the fixture shall be oriented such that it will apply the pull force perpendicular to that side surface of the window covering (or parallel to the front of the window covering). If the Inner Cord is accessible from the back or front of the window covering, then the fixture shall be oriented such that the pull force is applied perpendicular to that surface of the window covering. Likewise, if the Inner Cord is only accessible from the bottom of the window covering, the pull force should be applied in a vertical direction, perpendicular to the bottom surface. The restraining arm (Figure D2 Item #16) shall be placed against the window covering.

D2.1.2 If the same Inner Cord section is accessible from two or more directions, testing shall be conducted by pulling the Inner Cord in the direction that would result in the largest Loop opening.  It may be necessary to conduct the evaluation more than once to determine the direction that would result in the largest Loop opening on certain window covering designs.

D2.2 Place the Hazardous Loop test stand assembly at the surface of the window covering and adjust the vertical height so that the restraining arm aligns with the opening to be tested.

D2.2.1 If testing a Roman Style Blind, the restraining arm shall be placed in between the Inner Cord and the window covering material at the opening to be tested.

D2.2.2 When testing all other styles of window coverings, the restraining arm shall be placed against both the window covering material and the Inner Cord, just slightly above the opening to be tested.

D2.3 Ensure the scale measuring distance traveled on the force gauge arm subassembly is set to zero (Figure D2 Item 1). Zero the force gauge and place the force gauge in continuous read-out mode.  Loop the Accessible Cord onto both hooks of the force gauge arm subassembly (Figure D5 Item #1.1).

D2.3.1 While looping the Cord onto both hooks, the force exerted on the Cord or the force registered on the force gauge may exceed 5 lb (22.2 N) to obtain the required set-up configuration.

D2.3.2 The coating on the hooks (Figure D5 Item #1.6) is Tygon tubing with a durometer 69A that is intended to simulate human skin.  In the event that the tubing becomes worn or damaged, replace it with new tubing.

D2.4 Over a time period of 5 seconds +/- 1 second, gently pull the horizontal arm (Figure D5 Item #1.8) of the force gauge arm subassembly away from the window covering to create an open Loop until the force gauge indicates a tension force of 5 lb +/- 0.25 lb (22.2 N +/- 1.1 N) or the scale (Figure D5 Item #1.4) indicates a pulled distance of 25 in+/- 0.25in (63.5 cm +/- 0.6 cm), whichever comes first.  Lock the horizontal arm in place using the brake assembly (Figure D-5 Item #1.10).

D2.5 Using the head probe (Figure D1) determine whether the head probe can pass through the opening created between the hooks and the restraining arm with an insertion force of 10 lb (44.5 N) or less, perpendicular to the plane of the opening

D2.5.1 If the head probe cannot pass through the Loop under the conditions above, the opening is not a Hazardous Loop.

D2.5.2 If the head probe can pass through the Loop under the conditions above, the Loop is considered a Hazardous Loop.



### HAZARDOUS LOOP HEAD PROBE

| ITEM NO. | ITEM NAME | DESCRIPTION (MCMASTER CARR PART NUMBERS PROVIDED FOR REFERENCE. EQUIVALENTS ARE ACCEPTABLE.) | QTY. |
|---|---|---|---|
| 1 | HEAD PROBE | 7-9 MONTH OLD 5% : 4.33in (110mm) HEAD BREADTH, 5.83in (148mm) HEAD LENGTH, 16.6in (422mm) +/- 0.3in (8mm) HEAD CIRCUMFERENCE, 5.9in (150mm) OVERALL HEIGHT | 1 |
| 2 | THREADED INSERT | MCMASTER CARR #99362A600 10-32 THREADED INSERT DRILL 0.264in (6.7mm) 3/8in (9.5mm) LONG | 1 |
| 3 | FORCE GAUGE | MCMASTER CARR #17435T33 10LB SCALE WITH MAXIMUM HOLD | 1 |

**Figure D1 – HAZARDOUS LOOP HEAD PROBE**



HAZARDOUS LOOP TEST STAND

**Figure D2 – HAZARDOUS LOOP TEST STAND ASSEMBLY**

# HAZARDOUS LOOP TEST STAND ASSEMBLY
## BILL OF MATERIALS

**80/20 COMPONENTS CAN BE ORDERED AS KIT# WCMA060410**
BERTELKAMP AUTOMATION, INC
6321 BAUM DRIVE
KNOXVILLE TN 37919
800-251-9134
INFO@BERTELKAMP.COM



| ITEM NO. | ITEM NAME | DESCRIPTION (MCMASTER CARR, 80/20 PART NUMBERS PROVIDED FOR REFERENCE. EQUIVALENTS ARE ACCEPTABLE.) | QTY. |
|---|---|---|---|
| 1 | FORCE GAUGE ARM SUBASSEMBLY | 80/20, MCMASTER CARR, MARK-10 COMPONENTS - SEE SEPARATE ASSEMBLY DRAWING FOR COMPONENTS | 1 |
| 2 | STAND BASE | 80/20 1530 36in (914mm) LONG - TAP BOTH ENDS 5/16in-18 | 1 |
| 3 | UPRIGHT | 80/20 1515 96in (2438mm) LONG | 1 |
| 4 | SLIDE MOUNT | 80/20 1530 10in (254mm) LONG | 1 |
| 5 | HORIZONTAL ARM | 80/20 1515 30in (762mm) LONG - TAP ONE END 5/16in-18 | 1 |
| 6 | JOINING PLATE 4312 | 80/20 4312 7 HOLE JOINING PLATE | 1 |
| 7 | VERTICAL ADJUSTMENT SLIDE | 80/20 6526 LINEAR SLIDE WITH BRAKE | 1 |
| 8 | CORNER BRACE | 80/20 4301 4 HOLE CORNER BRACE | 1 |
| 9 | BRAKE ASSEMBLY | 80/20 6800 LINEAR SLIDE BRAKE ASSEMBLY | 1 |
| 10 | MACHINE SCREW | 80/20 3122 SOCKET HEAD CAP SCREW 5/16in-18 1in LONG | 4 |
| 11 | 3320 T NUT ASSEMBLY | 80/20 3320 TNUT ASSEMBLY 5/16in-18 X 11/16in FLANGED BUTTON HEAD WITH 3/16in HEX DRIVER AND ECONOMY T NUT | 21 |
| 12 | 3439 T NUT ASSEMBLY | 80/20 3439 TNUT ASSEMBLY 5/16in-18 X 3/4in BUTTON HEAD WITH 3/16in HEX DRIVER AND ECONOMY T NUT | 2 |
| 13 | 1515 ENDCAP | 80/20 2030YEL 1515 YELLOW ENDCAP WITH CENTER PUSHIN | 1 |
| 14 | 3340 BUTTON HEAD SCREW | 80/20 3340 5/16in-18 X 1/2in FLANGED BUTTON HEAD WITH 3/16in HEX DRIVER | 3 |
| 15 | STAND BASE LEGS | 80/20 # CM04-042910 OR MCMASTER CARR # 8982K174 1-1/2in (38mm) X 1-1/2in (38mm) X 3/16in (4.8mm) X CUT TO 18in (457mm) LONG 6061 ALUMINUM WITH 11/32in (8.7mm) DIA HOLES | 2 |
| 16 | FABRIC SUPPORT ARM | 80/20 # CM45-0604410 OR MCMASTER-CARR #8975K533 ALUMINUM 6061 3/16in (4.8mm) X 2in (51mm) CUT TO 18in (457mm) LONG WITH 1 HOLE 11/32in (8.7mm) DIA, 2 HOLES TAPPED 5/16in-18 | 1 |
| 17 | CUSTOM EXTENSION PLATE | 80/20 # CM03-042910 OR MCMASTER CARR #8975K425 4in (102mm) X 1/4in (6mm) X 12in (305mm) LONG ALUMINUM 6061 PLATE WITH 6 X 11/32in (8.7mm) DIA HOLES | 2 |

**Figure D3 – HAZARDOUS LOOP TEST STAND BILL OF MATERIALS**

# HAZARDOUS LOOP TEST STAND CUSTOM COMPONENTS



| ITEM NO. | ITEM NAME | DESCRIPTION (MCMASTER-CARR PART NUMBERS PROVIDED FOR REFERENCE. EQUIVALENTS ARE ACCEPTABLE.) | QTY. |
|---|---|---|---|
| 15 | STAND BASE LEGS | 80/20 # CM04-042910 OR MCMASTER CARR # 8982K174 1-1/2in (38mm) X 1-1/2in (38mm) X 3/16in (4.8mm) X CUT TO 18in (457mm) LONG 6061 ALUMINUM WITH 11/32in (8.7mm) DIA HOLES | 2 |

| ITEM NO. | ITEM NAME | DESCRIPTION | QTY. |
|---|---|---|---|
| 16 | FABRIC SUPPORT ARM | 80/20 # CM45-060410 OR MCMASTER-CARR #8975K533 ALUMINUM 6061 3/16in (4.8mm) X 2in (51mm) CUT TO 18in (457mm) LONG WITH 1 HOLE 11/32in (8.7mm) DIA, 2 HOLES TAPPED 5/16in-18 | 1 |

| ITEM NO. | ITEM NAME | DESCRIPTION | QTY. |
|---|---|---|---|
| 17 | CUSTOM EXTENSION PLATE | 80/20 # CM03-042910 OR MCMASTER CARR #8975K425 4in (102mm) X 1/4in (6mm) X 12in (305mm) LONG ALUMINUM 6061 PLATE WITH 6 X 11/32in (8.7mm) DIA HOLES | 2 |

**Figure D4 - HAZARDOUS LOOP TEST STAND CUSTOM COMPONENTS**



**FORCE GAUGE ARM SUBASSEMBLY**

| ITEM NO. | FORCE GAUGE ARM SUBASSEMBLY ITEM NAME | DESCRIPTION (MCMASTER CARR, 80/20, MARK-10 PART NUMBERS PROVIDED FOR REFERENCE. EQUIVALENTS ARE ACCEPTABLE.) | QTY. |
|---|---|---|---|
| 1.1 | FORCE GAUGE MG10 | MARK-10 # MG10 0-10LB FORCE GAUGE WITH #6-32 MOUNTING HOLES | 1 |
| 1.2 | GAUGE MOUNTING SCREW | MCMASTER CARR #90272A148 #6-32 X 1/2in LONG ZINC PLATED PAN PHILLIPS HEAD | 4 |
| 1.3 | THREADED INSERT | MCMASTER CARR #99362A600 10-32 THREADED INSERT DRILL 0.264in (6.7mm) 3/8in (9.5mm) LONG | 1 |
| 1.4 | SCALE | MCMASTER CARR #19325A43 ADHESIVE BACKED SCALE LEFT TO RIGHT | 1 |
| 1.5 | HOOK | MCMASTER CARR # 29905T46 HOOK 304SS, 0.157in (4.0mm) WIRE | 2 |
| 1.6 | TUBING | MCMASTER CARR # 9449K43 TYGON TUBING, 5/16in (7.9mm) OD X 3/16in (4.8mm) ID, 69A DUROMETER, CUT TO 2in (51mm) LONG | 2 |
| 1.7 | 3320 T NUT ASSEMBLY | 80/20 3320 TNUT ASSEMBLY 5/16in-18 X 11/16in FLANGED BUTTON HEAD WITH 3/16in HEX DRIVER AND ECONOMY T NUT | 2 |
| 1.8 | HORIZONTAL ARM | 80/20 1515 30in (762mm) LONG - TAP ONE END 5/16in-18 | 1 |
| 1.9 | FORCE GAUGE SLIDE ASSEMBLY | 80/20 6873 LINEAR SLIDE ASSEMBLY WITH BRAKE | 1 |
| 1.10 | BRAKE ASSEMBLY | 80/20 6800 LINEAR SLIDE BRAKE ASSEMBLY | 1 |
| 1.11 | 1515 ENDCAP | 80/20 2030YEL 1515 YELLOW ENDCAP WITH CENTER PUSHIN | 1 |
| 1.12 | MOUNTING BLOCK | 80/20 # CM44-060410 OR MCMASTER CARR #8733K81 NYLON BAR WITH ADDED HOLES FOR HOOKS AND THREADED INSERT | 1 |
| 1.13 | FORCE GAUGE MOUNTING PLATE | 80/20 # CM43-060410 OR MCMASTER CARR #8975K686 2-1/2in (64mm) X 1/4in (6.4mm) X 6in (152mm) LONG ALUMINUM 6061 PLATE WITH 4 HOLES 3/16in (4.8mm) DIA AND 2 HOLES 11/32in (8.7mm) DIA | 1 |

**Figure D5 – HAZARDOUS LOOP TEST STAND FORCE GAUGE ARM SUBASSEMBLY BILL OF MATERIALS**

# FORCE GAUGE ARM SUBASSEMBLY CUSTOM COMPONENTS



| ITEM NO. | ITEM NAME | DESCRIPTION (MCMASTER CARR NUMBERS ARE PROVIDED FOR REFERENCE. EQUIVALENTS ARE ACCEPTABLE.) | QTY. |
|---|---|---|---|
| 1.12 | MOUNTING BLOCK | 80/20 # CM44-060410 OR MCMASTER CARR #8733K81 NYLON BAR WITH ADDED HOLES FOR HOOKS AND THREADED INSERT | 1 |

| ITEM NO. | ITEM NAME | DESCRIPTION | QTY. |
|---|---|---|---|
| 1.13 | FORCE GAUGE MOUNTING PLATE | 80/20 # CM43-060410 OR MCMASTER CARR #8975K686 2-1/2in (64mm) X 1/4in (6.4mm) X 6in (152mm) LONG ALUMINUM 6061 PLATE WITH 4 HOLES 3/16in (4.8mm) DIA AND 2 HOLES 11/32in (8.7mm) DIA | 1 |

**Figure D6 – HAZARDOUS LOOP TEST STAND FORCE GAUGE ARM SUBASSEMBLY CUSTOM COMPONENTS**



**CREATION OF A HAZARDOUS LOOP**

HEAD RAIL ATTACHED TO MOUNTING RAIL (NOT PICTURED) ACCORDING TO MANUFACTURER'S INSTRUCTIONS

ATTEMPT TO INSERT HEAD PROBE INTO LOOP CREATED WITH HAZARDOUS LOOP TEST STAND

**Figure D7 – HAZARDOUS LOOP TEST STAND AND A ROMAN STYLE SHADE**

**APPENDIX E:  TESTING SUMMARY, PRODUCT ILLUSTRATIONS**

**Not Part of ANSI/WCMA A100.1**

**Component Testing and Window Covering Product Testing Summary**

| Section | Component Testing | Window Covering Product Testing |
|---|---|---|
| 4.1 | Lead testing<br>• Components such as finish on bottom rail, textiles, louvers, slats | |
| 4.2 | Small component testing for choking hazard<br>• Safety component or device that is intended to separate | |
| 4.3 | Remote Control Battery Accessibility<br>• ANSI/UL 4200A | |
| 5 | | All window covering products Appropriate warning labels, tags, and instructions |
| 6.1 | | Any fully assembled window covering products that rely on cord Retraction Devices<br>• Retraction test, 6.1.1<br>• Cycle test, 6.1.4 |
| 6.2 | | Any fully assembled window covering products that rely on Cord Shroud devices<br>• Accessibility test- Appendix C<br>• Creation of Hazardous Loop- Appendix D, if required<br>Non-rigid Cord Shroud<br>• Force for attachment points, 6.2.2.2 |
| 6.3 | Cord Tensioner<br>• UV stability test, 6.3.5.2<br>• Impact test, 6.3.5.3<br>• Durability, 6.3.5.4 | Any fully assembled window covering products that rely on Tension Devices<br>• Evaluate for shipped condition, 6.3.1<br>• Test for partial inoperability, 6.3.3<br>• Operational test, 6.3.5.1 |

| | | |
|---|---|---|
| 6.4 | Looped Cord and Bead Chain Restraining Device <br> • UV Stability, 6.4.2.3 <br> • Impact, 6.4.2.4 <br> • Durability, 6.4.2.2 | Any fully assembled window covering products that rely on Loop Cord or Bead Chain restraining devices <br> • Operational test, 6.4.1 <br> • Hazardous Loop testing, 6.4.2 |
| 6.5 | Rigid Cord Shroud Device <br> • UV Stability, 6.5.2.2 <br> • Impact, 6.5.2.3 | Any fully assembled window covering products that rely on Rigid Cord Shroud devices <br> • Operational test, 6.5.2.1 |
| 6.6 | Wide lift band materials <br> • Band width, 6.6.1 <br> • Materials stiffness, 6.6.2 | |
| Appendix C | | Test Procedure for Accessible Cords <br> • Operating Cords <br> • Inner Cords |
| Appendix D | | Hazardous Loop Test Procedure <br> Inner cord test D3 |

**APPENDIX F: ILLUSTRATIONS OF COMMON WINDOW COVERINGS, OPERATING SYSTEMS, AND OPTIONS** (Images may not represent all styles of window coverings and these are for illustration purposes only).



| FIGURE F1 Horizontal Blinds | FIGURE F2 Cellular Shade |
| FIGURE F3 Pleated Shade | Figure F4 Vertical Blind |
| FIGURE F5 Roller Shade | FIGURE F6 Traverse Rod |



FIGURE F7 Roman Style Shade

FIGURE F8 Panel Track

Figure F9 Sheer Shade

Figure F10 Motorized Roller Shade

Figure F11- BUTD Shade

Figure F12 Bead Chain Restraining Device

A713



| | |
|---|---|
| Figure F13- Single Retractable Cord Lift System | Figure F14- Rigid Shroud |
| Figure F15- Loop Cord and Bead Chain Tension Device | Figure F16 – Cordless Roll Up Shade |

## APPENDIX G:  DEFLECTION

### 1.    Center Load Test:

The Rigid Cord Shroud is supported at both ends (pin support, does not restrict rotation or movement in axial direction). A force of 5 lbs is applied at the mid-point of the device for 5 seconds.   Measure the deflection at the end of the testing period, while maintaining the force on the device.  If the deflection exceeds (a) 1 inch for a device 19 inches or shorter, or (a) an additional inch for every 19 inch length thereafter, then the device is not a Rigid Cord Shroud.  By way of example, the deflection cannot exceed 2 inches for a device longer than 19 inches and up to 38 inches, or 3 inches for a device longer than 38 inches but shorter than 57 inches.  In addition, while maintaining the force on the device, using the accessibility probe pursuant to the procedures in Appendix C, determine if the Cord is accessible.  If it is accessible, then the device is not a Rigid Cord Shroud and is considered a Cord and Bead Chain Restraining Device.



### 2.    Axial Torque Test

(a)    Support the Rigid Cord Shroud fixedly at one end (rigid support, restricts rotation, no movement in axial direction). Apply a torque of 4.4 in-lb (0.5 Nm) at the opposite end of the device for 5 seconds.  Test for an Accessible Cord both during and after application of the torque.  If there is an Accessible Cord anywhere on the device, either during or after the deformation stage of the testing, then the device is not a Rigid Cord Shroud, and is considered a Cord and Bead Chain Restraining Device.

*THIS PAGE INTENTIONALLY LEFT BLANK.*

# EXHIBIT 12



**WINDOW COVERING
MANUFACTURERS
ASSOCIATION**

March 23, 2022

VIA Email and Regulations.gov

Ms. Alberta Mills
Secretary
Division of the Secretariat
Office of the General Counsel
U.S. Consumer Product Safety Commission
4330 East West Highway
Bethesda, MD 20814

Re: Comments on CPSC-2021-0038 – Substantial Product Hazard List: Window Covering Cords,
Notice of Proposed Rulemaking

Dear Ms. Mills,

The Window Covering Manufacturers Association (WCMA) appreciates the opportunity to
comment on CPSC-2021-0038 – Substantial Product Hazard List: Window Covering Cords.

WCMA represents the interests of the window covering industry manufacturers, fabricators, and
assemblers. Industry products include blinds, shades, shutters, curtains, curtain rods, drapes,
drapery hardware, and other window coverings. Our members are a leading resource for
policymakers developing industry standards, rating systems, and test procedures. WCMA is also
the American National Standards Institute (ANSI)-accredited standard development organization
for window coverings.

WCMA is aligned with the Consumer Product Safety Commission Commissioners, staff, and safety
advocates in addressing the risk to young children from strangulation hazards associated with
certain window covering cords. WCMA has a long record of working with the CPSC and safety
advocates to eliminate hazards and drive innovation.

WCMA supports CPSC's proposed rule under section 15(j) of the Consumer Product Safety Act. We
hope that the rule is finalized expeditiously.

As CPSC considers finalizing the Proposed Rulemaking under 15(j), WCMA encourages the Commission to consider WCMA's comments on CPSC-2013-0028 - Safety Standard for Operating Cords on Custom Window Coverings. Those comments are attached to this letter and submitted for the record. CPSC's analysis of incident data, the window covering industry (including estimates of products in use), and the relative impacts of injuries and benefits of CPSC's actions is the same for both CPSC's proposed standard for custom window coverings as it is for the rulemaking under 15(j). As such, WCMA's comments addressing CPSC's data, methodology, assumptions, and estimates are relevant to the rulemaking under 15(j). Before finalizing this rulemaking, we request that CPSC rectify the issues raised by WCMA in these comments.

Attached are WCMA's comments for the record.

Should you have any questions or need for additional information, please do not hesitate to contact me.

Regards,

Ralph Vasami
Executive Director

cc:

The Honorable Alexander Hoehn-Saric, Chairman (Without Attachment)
The Honorable Dana Baiocco, Commissioner (Without Attachment)
The Honorable Peter A. Feldman, Commissioner (Without Attachment)
The Honorable Richard Trumka Jr., Commissioner (Without Attachment)
Ms. Rana Balci-Sinha, Director (Without Attachment)
Mr. Austin Schlick, General Counsel (Without Attachment)

Attachments:

Attachment 1 – WCMA Comments on Safety Standard for Operating Cords on Custom Window Coverings

Attachment 2 – WCMA Comments on Safety Standard for Operating Cords on Custom Window Coverings – Attachments 1-6

355 Lexington Avenue, 17th Floor
New York, NY 10017-6603
Phone: (212) 297-2122
Fax: (212) 370-9047

# <u>Attachment 1:</u>

# WCMA Comments on Safety Standard for Operating Cords on Custom Window Coverings

# CPSC Docket No. CPSC-2013-0028

March 23, 2022



**WINDOW COVERING
MANUFACTURERS
ASSOCIATION**

March 23, 2022

VIA Email and Regulations.gov

Ms. Alberta Mills
Secretary
Division of the Secretariat
Office of the General Counsel
U.S. Consumer Product Safety Commission
4330 East West Highway
Bethesda, MD 20814

Re: Comments on CPSC-2013-0028 – Safety Standard: Operating Cords on Custom Window Coverings, Notice of Proposed Rulemaking

Dear Ms. Mills,

The Window Covering Manufacturers Association (WCMA) appreciates the opportunity to comment on CPSC-2013-0028 – Safety Standard: Operating Cords on Custom Window Coverings, Notice of Proposed Rulemaking. Attached are WCMA's comments.

Should you have any questions or need for additional information, please do not hesitate to contact me.

Regards,

Ralph Vasami
Executive Director

cc:

The Honorable Alexander Hoehn-Saric, Chairman
The Honorable Dana Baiocco, Commissioner
The Honorable Peter A. Feldman, Commissioner
The Honorable Richard Trumka Jr., Commissioner
Ms. Rana Balci-Sinha, Director

## I.  Introduction

The Window Covering Manufacturers Association (WCMA) provides the U.S. Consumer Product Safety Commission (CPSC or Commission) with the following comments on the Commission's proposed Safety Standard for Operating Cords on Custom Window Coverings (Proposed Standard).[1]

WCMA is the national voice for the window covering industry, representing the interests of the industry's manufacturers, fabricators, and assemblers.  WCMA members have significant expertise in the manufacture and distribution of all manner of window coverings, including blinds, shades, shutters, curtains, curtain rods, drapes, drapery hardware, and other window treatments.  WCMA is also the American National Standards Institute (ANSI)-accredited standard development organization for window coverings.  For this reason, WCMA and its membership have served as a leading resource for policymakers.

WCMA has a long record of working with the CPSC and safety advocates to eliminate hazards and drive innovation related to window covering products.[2]  Since the standard was first enacted, WCMA and its members have been leaders in developing innovative solutions to address risks, encouraged by the voluntary standard's performance approach.  The result has been an evolving standard that has prioritized addressing scenarios that pose the highest risk first.

Most recently, in 2018, WCMA worked with CPSC, safety advocates, and other stakeholders to publish the 2018 American National Standards Institute (ANSI)/WCMA Standard for Safety of Window Covering Products (ANSI/WCMA-2018).  ANSI/WCMA-2018 eliminated corded stock window covering products from the market by requiring that these products be cordless, have only inaccessible cords, or have a short helper cord.  ANSI/WCMA-2018 also imposed new requirements on custom products, which are the subject of this rulemaking, by creating a default cordless product, allowing free hanging cords (with length limitations) and/or tilt cords only where the customer explicitly requested them for their custom products, and introducing a new graphic warning label designed to increase its impact with the consumer.  By focusing on the elimination of corded stock window coverings, ANSI/WCMA-2018 addressed the largest category of window coverings and potential hazards—stock window covering products make up approximately 80 percent of the market.[3]

---

[1] CPSC, Safety Standard for Operating Cords on Custom Window Coverings, Notice of Proposed Rulemaking, 87 Fed. Reg. 1,014 (Jan. 7, 2022).

[2] As the CPSC notes, dating back to 1995, CPSC staff and WCMA have worked together to address the strangulation hazard to young children from accessible cords on window coverings. 87 Fed. Reg. 1,027.

[3] The decision to focus on the elimination of accessible cords from stock products was purposeful in reducing the risk.  Stock products represent 80 percent of the market.  Consumers often purchase stock products with little to no interaction from window covering professionals to provide warnings regarding the potential dangers of cords.  In contrast, consumers purchasing custom products are often better informed on the product selection and the

WCMA continues to be proactive on the voluntary standards process. On May 23, 2021—five months before CPSC staff released its Staff Briefing Package in support of the Proposed Standard—WCMA re-opened the voluntary standard on custom products, a fact that was well-known to CPSC staff.[4] Since then, WCMA has convened multiple meetings of the Technical Committee and Steering Committee (in which CPSC staff is a member and fully participates) with the goal of further reducing potential hazards associated with custom window coverings.

The custom product market, which represents approximately 20 percent of the market,[5] is highly variable and requires flexibility to meet the needs of consumers to serve a variety of size, weight, and location constraints. The custom market is made up of over 20 different product categories that will require multiple and unique engineering solutions to achieve possible compliance.[6] This differs from the stock segment, which is predominantly comprised of horizontal blinds, available within limited size ranges, to which a single solution could be applied to transition to cordless. Although there are cordless options for all custom product categories, there are some applications that currently have no known technical solution due to size, weight, and location of the window. For example, products that are installed with no direct access for consumers to touch and operate, products that use heavy materials like wood and room darkening and other insulating fabric, and products that are designed to cover large expanses of glass, are all ill-suited for cordless operation. Custom products with compliant cords are also needed for segments of the population that are unable to effectively operate a cordless product due to physical restrictions or who are unable to afford a motorized product.[7]

As discussed in these comments, WCMA members strongly believe that the CPSC's Proposed Standard is fatally arbitrary and in derogation of The Consumer Product Safety Act ("CPSA"), unnecessary and over-reaching, is not supported by CPSC's own data, and is not technically feasible.

---

warnings associated with corded products. In addition, based on WCMA's incident assessment at the time of ANSI/WCMA-2018, stock products were involved with 75-80 percent of all identifiable incidents.

[4] ANSI requires that voluntary standards be reopened every five (5) years. WCMA reopened the ANSI/WCMA Standard within three (3) years of the previous standard.

[5] In the past, WCMA submitted data from a comprehensive, confidential U.S. retail window covering market study conducted in 2016 that showed the breakdown of unit sales of window covering products by category. That study is the basis for WCMA's contention that 80 percent of window blinds are stock product, and 20 percent are custom product.

[6] The following is a non-exhaustive list of the various types of custom window coverings, each of which will require its own engineering solution to comply with the Proposed Standard: (1) horizontal blinds made of aluminum; (2) horizontal blinds made of wood; (3) horizontal blinds made of composite material; (4) horizontal blinds made of plastic; (5) vertical blinds; (6) cellular shades; (7) pleated shades; (8) roller shades; (9) woven wood shades; (10) banded shades; (11) vertical panels; (12) horizontal shadings; (13) vertical shadings; (14) multi-functional shadings; (15) cellular roller shades; (16) roman style roller shadings; (17) roman style tiered shadings; (18) insulating shadings; (19) balloon shades; (20) traditional roman shades; and (21) specialty shapes in multiple applications and product styles.

[7] These limitations are discussed in more detail in Section III.E.2.

WCMA encourages the Commission to terminate this rulemaking. Instead, CPSC should collaborate with WCMA and safety advocates on updating the ANSI/WCMA-2018 standard for custom products. Indeed, CPSC staff are already actively engaged in such collaboration on updating the 2018 standard by virtue of its comments to proposed revisions and its participation in all Steering Committee meetings. Updating the voluntary standard is the fastest and most direct way to allow industry, consumer advocates, and CPSC to achieve our common goal of addressing and further reducing the risk to young children of strangulation from window covering cords.

Should the CPSC decide to move forward with finalizing the Proposed Standard, the Commission will need to remedy the numerous flaws in its determination, analysis of relevant incidents, and the costs and benefits of compliance, including development of an accurate assessment of the significant costs to the economy and small businesses associated with widespread elimination of products within 180 days of the final rule, with no marginal benefit to child safety.

## II.    Summary of Comments

The Proposed Standard is fatally arbitrary and in derogation of the CPSA; is unnecessary and over-reaching; is not supported by CPSC's own data; and is not technically feasible. The following is a summary of WCMA's feedback on the Proposed Standard.

- CPSC should terminate this rulemaking and instead collaborate with WCMA and safety advocates on updates the ANSI/WCMA-2018 standard for custom products.

- The proposed 180-day effective date is not supported by the record, would eliminate the availability of product before the industry can develop new products, and would delay consumer transition to available safer products. If CPSC moves forward with the finalizing a mandatory standard, CPSC should revert to the 2-year effective date proposed by CPSC staff.

- CPSC's assessment of window covering incidents relies on flawed methodology that ignores the clear downward trend in incidents associated with custom window coverings. CPSC fails to provide any valid or credible assessment of the relative risk associated with corded custom window coverings under ANSI/WCMA-2018.

- By relying on the available incident data, CPSC failed to assess the effectiveness of ANSI/WCMA-2018 in reducing the risk of injury (which only went into effect in December 2018). Based on the available incident data, it is clear that the updates found in ANSI/WCMA-2018 and prior standards have adequately reduced the risk of injury.

- CPSC's Proposed Standard fails to recognize the limitations associated with cordless technology; will eliminate the availability of products; and ignores accessibility concerns that are addressed by corded products.

- CPSC's Preliminary Regulatory Analysis does not justify the Proposed Standard as it relies on data sets that are incomplete, estimates that are not methodologically sound, and extreme assumptions that do not support real world application. These flaws in the foundation of the cost benefit analysis produce distorted results that even by CPSC's own flawed methodology do not demonstrate that alleged potential benefits offset the significant actual costs to society.

- CPSC's statutorily required findings are not based on "substantial evidence." CPSC's justification and reasoning for the Proposed Standard is flawed at every step, from the estimated number of incidents to the assumptions on corded custom windows coverings in use, to the availability of technology to comply with the Proposed Standard. These flaws render the data and justifications underpinning CPSC's findings and determinations essentially meaningless.

- CPSC failed to consider the impact of proposed testing, certification, and notice requirements.

## III. Comments

### A. Updating the ANSI/WCMA-2018 Voluntary Standard is the Most Effective and Efficient Way to Reduce the Potential Risk From Custom Products

On May 23, 2021, WCMA re-opened the ANSI/WCMA Standard for Safety of Window Covering Products (ANSI/WCMA A100.1-2018) to further address corded custom window covering products. WCMA had determined that revising ANSI/WCMA-2018 was appropriate to further reduce the risk. Window covering technology had sufficiently advanced since 2018 for the standard to add provisions for custom products that would eliminate all free hanging cords and require improved safety mechanisms used in cords under tension.[8]

In order to move the voluntary standard revision process forward promptly, WCMA convened an initial WCMA Technical Committee meeting on November 12, 2021, and a subsequent stakeholder Steering Committee meeting on December 2, 2021 to begin the process of updating the standard. The Steering Committee is comprised of CPSC staff, industry representatives, retailers, test lab representatives, and consumer advocates.[9] The Steering Committee members universally agreed with the goal of eliminating free hanging cords (all standard cord lock systems, cord joiners, and cord tilting systems) from custom window covering

---

[8] After several requests from WCMA to CPSC, in September 2020 CPSC staff shared with WCMA the most recent incident data. That data was redacted and incomplete. Despite numerous attempts and requests under the Freedom of Information Act, and for reasons that remain unclear, CPSC has refused to share the incident data in its entirety. Factual data is particularly important to WCMA's review, because using it to make fact and science-based determinations of the causes of incidents is the best way to improve window covering products through the standards making process.

[9] Participation in the Steering Committee is not limited and there are no caps on the number of representatives from any type of stakeholder group.

products. With the anticipated revisions, it is WCMA's intention to address the major hazard scenarios identified by the In-Depth Investigations (IDIs) prepared by CPSC and shared with WCMA.[10]

As the CPSC recognizes, the voluntary consensus standards development process is more efficient and effective than the government promulgating a regulation.[11] The WCMA voluntary standard process is open to all interested parties and receives input from manufacturers, CPSC, safety advocates, and other relevant stakeholders. WCMA believes that diverse membership is essential to creating a consensus standard and supports the standard being developed in a fair and transparent manner. The ongoing voluntary standard process will not only save government resources, but, more importantly, create a standard effective at even further reducing the hazard. Should CPSC promulgate a regulation, it is much more difficult and requires a lengthy process to revise the regulation should it be determined a future revision is necessary to accommodate advancements in technology. A voluntary standard will be both effective and provide the flexibility to readily adapt to updated technology.

The window covering industry has worked with CPSC and safety advocates in support of a voluntary standard since 1995. Since the first standard was published in 1996, WCMA has updated the voluntary standard six times based in part by requests from CPSC. These updates were made possible due to the evaluation of new data relating to the root causes of identified hazards and continued advancements in technology.

*1996 ANSI/WCMA Standard* – Established requirements for operating cords, safety warnings and tags, and product testing; eliminated loop-ended pull cords on horizontal blinds, cellular and pleated shades; provided requirements for products subject to the standard that reduce the possibility of injury, including strangulation, to young children from the bead chain, cord, or any type of flexible loop device used to operate the product.

*2002 ANSI/WCMA Standard* – Mitigated looped pull-cords on all types of horizontal blinds and shades and new requirements for lead testing of components and accessible inner cords adding inner cord-stop mechanisms on corded horizontal blinds and shades.

---

[10] CPSC identifies three types of cords as the most hazardous scenarios based on fatal incident data: pull cords (44%), continuous loops (26%), and inner cords (8%). Each of these hazards was either eliminated by ANSI/WCMA-2018 (or by prior standard revisions) or will be addressed by the new version of the voluntary standard under development. CPSC, "Staff Briefing Package: Draft Notices of Proposed Rulemaking for Corded Window Coverings" ("Staff Briefing Package") Tab A: Fatal and Near-Miss Strangulations Associated with Window Covering Cords, (October 6, 2021), p. 48.

[11] "Voluntary standards are also useful and valuable for saving government resources to create effective requirements. If the government had to create every safety requirement on its own, the government would need to hire many more experts and spend a lot more money to achieve the same level of effectiveness that we currently enjoy with voluntary standards." CPSC, Voluntary Standards Development FAQ for Consumers, available at https://www.cpsc.gov/About-CPSC/Consumer-Ombudsman/Voluntary-Standards-Development-FAQ-for-Consumers (last accessed Feb. 25, 2022).

*2007 ANSI/WCMA Standard* – Required that a tension device be attached to products with continuous cord loops and required a design that would render a product partially inoperable if the tension device was not installed properly; expanded test and parameters for cord release device and cord shear device; enhanced the operational warning hangtags; and provided definitions for free standing loop, inner cords, and multiple cords.

*2009 ANSI/WCMA Standard* – Added requirements for Roman style shades limiting the pleat height, created minimum distance of the cord position to the edge of product to minimize accessibility; established a weighted and ridged requirements for bottom rail to eliminate free standing cord loops; added an operational hang tag for Roman style shades; revised definitions for accessible cords and accessible inner cords.

*2010 ANSI/WCMA Standard* – Eliminated the prescriptive approach of the previous standard and created a performance based standard with specific tests and requirements to determine accessibility of inner cords, rear cords, lift cords and their ability to create a hazardous cord loop; added a roll-up style shade warning tag to inform consumer of inner cord risk; revised requirements for instructions for length adjustable products; revised requirements for cord shroud devices to limit accessibility of inner or operating cords; revised requirements for tension devices.

*2012 ANSI/WCMA Standard* – Addressed all interior corded window coverings products; added and expanded testing requirements for cord accessibility, hazardous loop formation, and durability of safety devices; improved safety instructions and introduced warning requirements for multiple point of purchase areas.

*2018 ANSI/WCMA Standard* – Eliminated corded stock window covering products from the market by requiring that these products be cordless, have only inaccessible cords, or have a short helper cord; imposed new requirements on custom products by creating a default cordless product, allowing free hanging cords (with length limitations) and/or tilt cords only where the customer explicitly requested them for their custom products; at the request of consumer advocates, introduced an extremely graphic warning label to increase its effectiveness; tab and customer education requirements.

Over time, the voluntary standard has become ubiquitous within the industry. In fact, CPSC recognizes that it "has several bases to determine preliminarily that window coverings substantially comply with the requirements for operating cords in ANSI/WCMA-2018."[12] This is confirmed by D+R International's 2021 report, which found that all manufacturers interviewed for the report were aware of the voluntary standard and implemented compliance in all stages of the product development process from product design to fabrication.[13] In short, the window

---

[12] 87 Fed. Reg. 1039.

[13] D+R International Ltd, Window Covering Market Characterization: Final Report (February 2021).

covering industry has worked with CPSC to improve the safety of window coverings and should not be considered the type of recalcitrant industry where a mandatory standard is warranted.

WCMA encourages CPSC to recognize that the voluntary standard process will address the risk associated with corded custom window coverings more effectively and efficiently than the government promulgating a mandatory standard and to terminate the rulemaking to advance the Proposed Standard.

### B. The 180-Day Effective Date Would Delay Consumer Transition To Safer Products and Lacks Justification

While WCMA believes that the Proposed Standard on custom window coverings is flawed, unnecessary, and would impose an enormous cost on manufacturers, retailers and consumers, the Commission's arbitrary decision to accelerate the effective date to 180 days will create even more unneeded issues and costs for those stakeholders.

The Commission rejected CPSC staff's recommendation of a two-year effective date for its Proposed Standard and instead arbitrarily included a 180-day effective date. Not only is 180 days not supported by the economic analysis prepared for the Proposed Standard, the 180 days is not feasible to allow for industry to respond to the elimination of product categories resulting from the new regulation and would delay consumer transition to available safer products. WCMA strongly encourages the Commission to include a minimum two-year effective date, as originally recommended by CPSC Staff.

As CPSC recognizes, the Proposed Standard would eliminate product options for custom window coverings with no viable replacements at this time.[14] The industry has yet to develop the technology to support custom window coverings that could both comply with the Proposed Standard and replace the existing array of custom products. Size, weight, and location requirements for custom products prevent the use of many of the cordless lift systems offered for stock products, despite CPSC claims to the contrary.[15] Once technology is developed, it needs to be incorporated into supply chains, affecting planning and decision making of manufacturers, distributors, and retailers. From concept to marketing, the timeline to commercially introduce a new product can take up to 48 months. The resources and costs associated with this transition is compounded because the custom category is made up of over 20 totally different product designs that will require multiple and unique engineering solutions to achieve possible compliance.

If industry is not afforded sufficient time to develop and implement new technology there will be a period where the Proposed Standard is in place, product categories are eliminated, and no viable alternative products are available to be sold in the market. This dynamic creates an

---

[14] "[E]limination of some product sizes is possible because conversion to cordless operation may not be feasible for some large or unusual sizes." 87 Fed. Reg. 1,045.

[15] The size, weight, and location limitations associated with cordless products are discussed in more detail in Section III.E.1.

incentive for consumers to hold onto older, non-compliant corded window coverings instead of replacing them with window coverings that meet ANSI/WCMA-2018 (or the newer revised voluntary standard on which the industry is currently working). This dynamic will be perpetuated if industry cannot create viable alternatives to meet consumer demand.

The costs associated with the transition to alternative products will be significant and is greatly underestimated by CPSC,[16] as noted in Section III.F.2 of these comments. The costs associated with a 180-day effective date are even greater. The elimination of the product categories resulting from the Proposed Standard will severely impact the industry—product lines will be eliminated, contracted for and purchased product will go to waste, and retailers will not be able to meet consumer requests. This will impose a significant impact on small businesses, which make up the majority of the industry.[17] CPSC estimates that small manufacturers can expect a "potentially significant" impact due to redesign costs and incremental component costs.[18]

The Commission's acceleration of the effective date to 180 days is not supported by the record. The CPSC's own economic analysis in support of the Proposed Standard does not contemplate a 180-day effective date but instead considers the impact of a two-year effective date.[19] In support of a two-year effective date, CPSC staff recognized "that there are some issues in redesigning certain window coverings of unusual sizes to accommodate a cordless option."[20] Because "elimination of some product sizes is possible because conversion to cordless operation may not be feasible for some large or unusual sizes," CPSC should consider an effective date "longer than two years to mitigate the impact."[21] CPSC staff states in its report that it is unlikely

---

[16] For example, in considering alternatives to the Proposed Standard, CPSC suggests that the cost of transitioning operating cords to an operating wand is $0 "because using plastic rods for operation is very similar to cords in cost." 87 Fed. Reg. 1,046. Regardless of whether the costs of the products are the same, the CPSC completely ignores the costs associated with the re-engineering of product lines, sourcing of new materials, and updating of retailer displays, among other costs. Furthermore, WCMA members report that the cost of shipping a product that uses a plastic rod is higher than a product that uses a tilt cord because the package needs to accommodate the rigidity and length of the plastic rod.

[17] CPSC estimates that based on 1,898 firms that were categorized as blinds and shades manufacturers and retailers, 1,840 firms are small. 87 Fed. Reg. 1,046.

[18] CPSC estimates that the Proposed Standard would impose an impact on small businesses of two percent of revenue. WCMA estimates the impact to be significantly higher because CPSC fails to consider many aspects of the supply chain and elimination of product lines. See Section III.F.2 of these comments for more detail. Nonetheless, the CPSC itself considers any impact greater than 1 percent to be "potentially significant." 87 Fed. Reg. 1,048.

[19] CPSC Staff Briefing Package, Tab K: Preliminary Regulatory Analysis of the Draft Proposed Rule for Custom Window Coverings, (October 6, 2021), p. 189.

[20] Staff Briefing Package, p. 30; see also p. 34.

[21] Staff Briefing Package, p. 30-31; WCMA notes that the challenges associated with cordless technology are not limited to "large" or "unusual" sizes. Cordless technology also is limited for heavy products, even at smaller sizes, and in many locations. See Section III.E.1 of these comments for a more fulsome discussion of the limitations associated with cordless technology.

that any manufacturer would leave the market as a result of the Proposed Standard.[22]  These considerations were based on a two-year effective date, not the arbitrary 180-day effective date in the Proposed Standard.

Because the CPSC has not considered the impacts of the 180-day effective date, the CPSC has not made the requisite findings "that the rule (including its effective date) is reasonably necessary to eliminate or reduce an unreasonable risk of injury associated with such product."[23] Nor has the CPSC afforded WCMA or other stakeholders the ability to provide meaningful comment on this critical aspect of the rulemaking.  Rather, the 180 days was adopted with little to no discussion or analysis—and without any input from industry stakeholders—by CPSC Commissioners at the time they voted to approve the Notice of Proposed Rulemaking.

WCMA urges CPSC to terminate the Proposed Standard and instead continue to collaborate with WCMA and safety advocates on updating ANSI/WCMA-2018.  Alternatively, CPSC should go back to the 2-year effective period as originally recommended by CPSC staff.

### C.    CPSC's Assessment of Window Covering Incidents and Risk is Flawed and Does Not Establish an Unreasonable Risk

Because of the efforts of all stakeholders including CPSC, industry and safety advocates, fatalities related to window covering products used in the United States are extremely rare.[24] The industry's collective product development and consumer awareness efforts are producing positive results.  Yet the CPSC's flawed risk analysis continues to ignore positive trends in a reduced number of incidents over time.

#### 1.    CPSC's Methodology in Calculating the Number of Incidents is Flawed

WCMA retained RIAS Inc., to review the CPSC's identification and assessments of incidents associated with corded custom window coverings.[25]  The RIAS analysis found several problems with CPSC's methodology in calculating the rate of incidents, which reveal that the Proposed Standard is based on a flawed factual foundation.

*Estimates Using National Center for Health Statistics (NCHS) Data* – Using NCHS data for 2009-2019,  CPSC concluded that there are on average nine (9) fatalities per year, which CPSC suggests is a minimum estimate due to the exclusion of two incident codes.[26]  RIAS' review of the

---

[22] 87 Fed. Reg. 1045.

[23] 15 U.S.C. § 2058(f)(3)(A).

[24] CPSC estimates there to be 1,014 million window coverings in use.  87 Fed. Reg. 1,020.  WCMA believes the number of window coverings is significantly higher and has concerns regarding CPSC's methodology in developing this estimate.  See Section III.F.1.

[25] RIAS Inc. Assessment of CPSC's Notice of Proposed Rulemaking: "Safety Standard: Operating Cords on Custom Window Coverings," (March 22, 2022) Attachment 1.

[26] 87 Fed. Reg. 1,027.

excluded codes suggests that they would include minimal if any incidents during the time period that CPSC reviewed and that CPSC has no basis for suggesting its estimate is a minimum.

CPSC estimated the proportion of these incidents attributable to window covering cords by applying a fixed percentage derived from a 2002 study on the percent of strangulation fatalities due to window coverings. There have been six updates to the ANSI/WCMA standard since 2002 (with a seventh in development).[27] CPSC has offered no explanation in support of its continued use of this study nor for its assumption that the percentage of strangulations would remain constant.

The CPSC's estimate is applied to an average annual death figure calculated over the entire period from 2009 to 2019. Using a single annual average estimate over eleven (11) years ignores the downward trend in incidents that occurred from 2009 to 2020 and treats each year equally, despite the fact that CPSC's review of more recent years is more relevant to the question respecting the current hazard. In this respect, the CPSC's "approach" is analogous to trying to draw trends on traffic fatalities by including incidents occurring when seat belts were not required to be worn with data for (more recent) years when the wearing of seat belts is required, and air bags are standard in cars. It is truly mixing "apples and oranges."

In 2015, when responding to the Advanced Notice of Proposed Rulemaking (ANPR), WCMA also had retained an expert to review CPSC's assessment of window covering incidents.[28] That expert identified almost identical errors in the CPSC's methodology and conclusions. WCMA provided these conclusions in its comments on the ANPR. Not only did CPSC staff not respond to or even acknowledge comments challenging CPSC's methodology and conclusions related to incident data, but they have repeated these errors. WCMA is disappointed to have to once again find the same errors in CPSC's methodology and conclusions.

Nonetheless, even with this flawed methodology, CPSC's own estimates demonstrate a marked downward trend in incidents. In 2015, relying on NCHS data from 1999 to 2010, CPSC estimated eleven (11) fatal strangulations related to window covering cords occurred per year.[29] CPSC now estimates nine (9) fatal strangulations per year, a decrease of over 18 percent. CPSC fails to acknowledge or explain this decrease in fatalities, despite this trend being clearly visible. As demonstrated by RIAS and depicted in Figure 1, based on the NCHS data from 2002 to 2019 as collected by CPSC, there is a clear downward trend in the number of incidents attributable to window covering cords.

---

[27] There have been six updates to the ANSI/WCMA standard with the original being published in 1996 and subsequent updates in 2002, 2007, 2009, 2010, 2012, and 2018.

[28] Heiden & Associates, "Review and Critique of CPSC Hazard Analysis in ANPR and Briefing Package." (June 1, 2015). Attachment 2.

[29] 80 Fed Reg. 2,327 (Jan. 16, 2015), https://www.federalregister.gov/documents/2015/01/16/2015-00566/corded-window-coverings-request-for-comments-and-information

**Figure 1: NCHS and CPSMRS Fatality Data, 1999-2020**[30]



*Estimates Using National Electronic Injury Surveillance System (NEISS) Data* - CPSC reviewed data for the aggregated estimated injuries from 2009 through 2020 to children eight (8) years of age and younger who were entangled on window covering cords according to emergency department-treated injury data (NEISS), but "the total numbers were below the NEISS reportable threshold."[31] However, CPSC states that it combined the 34 injury reports from NEISS "with the anecdotal reports received by CPSC in the incident analysis."[32] Nowhere in the Staff Briefing or the preamble in support of the Proposed Standard does CPSC explain how the 34 NEISS data injury reports were added to the other incident data, and how CPSC ensured that no double-counting occurred. For any regulatory analysis to be credible, all data and assumptions should be made available so that the common standard of reproducibility can be tested. CPSC's analysis does not meet this basic threshold, which calls into question the validity of CPSC's findings.

Notably, in the related rulemaking for stock products and inner cords on custom products, CPSC concludes, based on the same NEISS data, that "the number of pediatric strangulations have declined" and that there is a "slightly declining trend for both fatal and non-fatal pediatric injuries."[33] The NEISS data does not make a distinction between custom and stock products.[34] Therefore, any observation in the declining trend in pediatric injuries is relevant to custom products in addition to stock and custom product inner cords.

---

[30] RIAS Inc. "Assessment of CPSC's Risk and Preliminary Regulatory Analysis," p. 3. Fig. 1.

[31] 87 Fed. Reg. 1,027.

[32] Staff Briefing Package, p. 53.

[33] Staff Briefing Package, Tab F: Draft Proposed Rule Under Section 15(J) of The CPSC: Operating and Inner Cords on Stock Window Coverings and Inner Cords of Custom Window Coverings Small Business Considerations, p. 97 n. 27.

[34] "National estimates of deaths and injuries involving window covering strangulations among children under 5 years of age are associated with all types of window coverings, because the available information does not allow the CPSC to distinguish product subtypes." 87 Fed. Reg. 1,022.

11

*Estimates Using CPSC's Incident Data* – Using incident data from its own databases, CPSC concluded that from January 2009 to December 2020 there were 194 total incidents, with 89 incidents resulting in fatalities with corded window coverings.[35]

First, RIAS notes that CPSC has not explained the spike in incident data presented by CPSC for 2009 and 2010 that is the result of the anomalous number of nonfatal incidents reported in those years, which are 5.2 and 3.1 times greater respectively than the average number of nonfatal incidents over the 1996 to 2020 period. CPSC has never offered an explanation for this drastically inconsistent data associated with nonfatal incidents. A legitimate concern is that the "combining" of NEISS injury data into the CPSC incident data noted above may be the cause of this anomaly.

Based on WCMA's engagement on these issues, it is likely that the spike can be attributed to Roman shade incidents.[36] During this time period, Roman shades became very popular and there was a dramatic increase in the number of imported Roman shades that were sold as stock product in large big box and mass merchant retailers. They were designed with light weight fabric, extremely long distances between horizontal batons, light weight bottom rails, and exposed rear and inner cords that could form hazardous loops. Recognizing the need to act swiftly to address the potential hazard, WCMA initiated a revision of the Voluntary Standard relying on ANSI's provisional standard process—a process that had never been used for any other ANSI-supported standard. As a result, and with CPSC's and consumer advocate's agreement, a new performance requirement was added to the voluntary standard to eliminate the potential for hazards that occurred with the problematic Roman shades. WCMA reacted swiftly and decisively to address this hazard pattern and to ensure that it could not be repeated. As such, CPSC's inclusion of this anomalous data cannot support a new mandatory standard for a hazard pattern that has already been addressed.

This anomalous incident data for the years 2009 and 2010 skews the examination of trends in incidents by making the 1996 to 2020 trends for nonfatal and total incidents appear less downward trending, and the 2009 to 2020 trends of nonfatal and total incidents more strongly downward trending over time than they would be otherwise. However, even after adjusting for the problematic nonfatal incident datapoints, incidents still show a strong downward trend over the 2009 to 2020 period for CPSC's analysis, as shown in Figure 2.

---

[35] 87 Fed. Reg. 1,052.

[36] Because CPSC has not fully shared the incident data with WCMA, WCMA is limited in its review of incidents and assessing their root cause. Nonetheless, WCMA member manufacturers were keenly aware of the 2009-2010 Roman shades incident spike, which not only resulted in the referenced standard revision but also extensive "recall to repair" efforts for roman shades products.

**Figure 2: Trends in Incidents, 2009-2020 (adjusted to address anomalous data in 2009 and 2010)[37]**



Second, RIAS concludes that there is a downward trend in incidents over the 2009 to 2020 time period for custom products. In their breakdown of incidents into stock and custom products, CPSC could only identify the window covering type in 109 out of the 194 incidents (56%) presented in their findings, only 35 of which pertained to custom products (18% of incidents). For those products identified as custom products, as depicted in Figure 3, the data clearly show that incidents trend strongly downward over the 2009 to 2020 time period.

**Figure 3: Trends in Known Incidents for Custom Product[38]**



Recognizing that CPSC was limited in their ability to distinguish between stock and custom products for nearly half of the 194 incidents, even if all products in the unknown category are assumed to be custom product, the incidents on custom products still trend strongly downwards over the 2009 to 2020 period as depicted by Figure 4.

[37] RIAS Inc. "Assessment of CPSC's Risk and Preliminary Regulatory Analysis," p. 6. Fig. 3.

[38] RIAS Inc. "Assessment of CPSC's Risk and Preliminary Regulatory Analysis," p. 7. Fig. 5.

13

**Figure 4: Trend in Incidents, Custom + Unknown** [39]



CPSC cautions against drawing inferences based on the year-to-year increase or decrease in the reported data.[40] Yet, CPSC offers no other alternative metric or methodology by which to assess the risk associated with these hazards. Furthermore, CPSC itself relies on the existence of these incidents and the breakdown of incidents by product categories to support its own analysis. If the data is anecdotal and cannot support inferences in any increase or decrease, the data also cannot support inferences based on the percentage of incidents attributed to different product types.

Moreover, it is reasonable to expect that the observed downward trend in fatal incidents for custom products will continue. ANSI/WCMA-2018 compliant custom products are now widely available and will continue to replace older products in homes. As future updates to the ANSI/WCMA are implemented, this trend will continue. Separate from the voluntary standard, each year the industry offers new product innovations, further expanding the cordless or cord inaccessible product offerings to consumers.

        2.        CPSC Has Failed to Perform a Risk Analysis and Has Not Established an "Unreasonable Risk"

The CPSC's authority to promulgate consumer product safety standards is limited to when there is an "unreasonable risk of injury" associated with a product.[41] CPSC risk analysis falls well short of meeting this threshold of proof. Instead, the CPSC uses the existence of incidents to justify its elimination of a perceived hazard, namely the presence of an operating cord. However, the existence of a hazard does not mean there is an unreasonable risk.

---

[39] RIAS Inc. "Assessment of CPSC's Risk and Preliminary Regulatory Analysis," p. 8. Fig. 6.

[40] Staff Briefing Package, p. 40.

[41] 15 U.S.C. § 2056(a).

A proper risk assessment would analyze the underlying causal factors for the trends in incidents, such as changes in exposure to potential hazards (*e.g.*, changes in population of children under five (5) years of age over time, changes in number of window coverings in households over time, and the impacts of continuous improvements in window covering safety under the WCMA/ANSI voluntary standard and the introduction of a greater number of cordless and motorized products by manufacturers) to establish a credible historical baseline that would then be used to provide evidence-based projections of future risk scenarios (expected changes in future incidents with and without CPSC's proposed mandatory standard in place). Normally, such projections should include probabilities and likelihood of occurrence using statistical techniques to analyze uncertainty.[42]

Additionally, CPSC has not acknowledged that incident reporting has changed tremendously since 2009 (the first year of CPSC's data set in support of the Proposed Standard) providing CPSC with greater ability to identify incidents that they previously might not have been aware of. And that despite greater access to incident data, incidents associated with window coverings have consistently declined. It was not until 2011 that saferproducts.gov was established so that consumers can submit reports of harm or risks of harm via the internet, and to search for safety information on products. Prior to saferproducts.gov, CPSC was receiving incident reports from consumers via the CPSC hotline, which was originally introduced in 1975.[43] NEISS was also updated in 2018 to better collect incident data from participating hospitals, allowing for CPSC to obtain better and more incident data. Improvements in internet search functions also provide CPSC greater access to anecdotal data. Even with these advancements in technology, the incidents related to window coverings have continuously declined.

CPSC has failed to perform any sort of analysis, sophisticated or otherwise, of the underlying factors that influence exposure to potential hazards associated with corded window coverings, including changes in population of children under five years of age, changes in the number of window coverings in households over time (WCMA believes CPSC's estimate of more than one billion to be an inaccurate and low estimate), the actual rate of replacement of non-compliant window coverings in households over time, and so on.[44] Instead, CPSC relies on the existence of incidents to support its elimination of cords from custom window coverings. Such lack of analysis cannot be said to be reasoned decision making and surely cannot support a determination that corded custom window coverings pose an "unreasonable" risk under the ANSI/WCMA-2018 Standard.

---

[42] See Memorandum For the Heads of Executive Departments and Agencies, Updated Principles of Risk Analysis, Sep. 19, 2007.

[43] CPSC, "CPSC Establishes A Call Diverter System For Reporting Substantial Product Hazards By Manufacturers, Distributors And Retailers" (January 6, 1975), available at https://www.cpsc.gov/Newsroom/News-Releases/1975/CPSC-Establishes-A-Call-Diverter-System-For-Reporting-Substantial-Product-Hazards-By-Manufacturers-Distributors-And-Retailers.

[44] For example, CPSC estimates there to be 1,014 million window coverings in use. 87 Fed. Reg. 1,020. WCMA believes these numbers to be significantly higher and has concerns regarding CPSC's methodology in developing these estimates. See Section III.F.1.

**D.      ANSI/WCMA-2018 Reduces the Risk of Injury Associated With Corded Custom Window Coverings**

In providing the CPSC its authority to promulgate consumer product safety standards, Congress recognized that reliance on voluntary standards is the preferred approach to advancing consumer product safety.  Where a voluntary standard is in place and effective at reducing the risk, the Commission "shall rely upon [the] voluntary consumer product safety standard[] rather than promulgate a consumer product safety standard."[45]   This inquiry requires the CPSC to undertake a two-part analysis of the voluntary standard:

(1) whether compliance with the voluntary standard "would eliminate or adequately reduce the risk of injury addressed[;]" and

(2) whether it is "likely that there will be substantial compliance with such voluntary standard[]."[46]

In 2018, working alongside CPSC Staff and safety advocates, WCMA and its members updated ANSI/WCMA-2018, which required that the vast majority of window covering products sold in the United States to be cordless or have inaccessible or short cords.  ANSI/WCMA-2018 has been in effect for a little more than three years.  CPSC has determined that custom window coverings substantially comply with ANSI/WCMA-2018.[47]   Nonetheless, CPSC alleges that the requirements for custom products in ANSI/WCMA-2018 do not adequately address the risk of strangulation to children because the standard "allows" operating cords if window coverings are custom orders.[48] CPSC's proposal is arbitrary and capricious and not in accordance with law.  The Commission should follow its own statute, defer to the voluntary standard, and terminate this rulemaking.[49]

1.      CPSC Failed to Evaluate the Effectiveness of ANSI/WCMA-2018

CPSC's assessment of the risk associated with corded custom window coverings is predicated on its review of data related to window coverings from 2009 to 2020 across three different databases.[50]   Based on CPSC's databases, CPSC identified 194 fatal and non-fatal incidents, 89 of those incidents were fatal, and 35 were identified as involving custom window

---

[45] 15 U.S.C. § 2056(b)(1).

[46] 15 U.S.C. § 2056(b)(1); 15 U.S.C. § 2058(f)(3)(D).

[47] 87 Fed. Reg. 1053.

[48] 87 Fed. Reg. 1,031.

[49] "The Commission shall rely upon voluntary consumer product safety standards rather than promulgate a consumer product safety standard . . . whenever compliance with such voluntary standards would eliminate or adequately reduce the risk of injury addressed and it is likely that there will be substantial compliance with such voluntary standards." 15 U.S.C. § 2056(b)(1).

[50] 87 Fed. Reg. 1,022, 1022 fn. 12; Section III.C.2 of these comments provides a critique of the incident data CPSC has relied upon for its hazard analysis and determination of unreasonable risk.

16

coverings. Of the 35 incidents involving custom window coverings, CPSC reports that 18 involved pull cords, 12 involved continuous loops, and three (3) involved inner cords (the remaining two (2) involved unknown types of cords).[51]

The incident data presented do not identify the age of the custom window coverings involved in the incidents. Moreover, ANSI/WCMA-2018 only went into effect on December 15, 2018; as such, at most there only would be one year's worth of data where products possibly could have been compliant to be reflected in the incident data. CPSC staff can draw no conclusions about which version of the ANSI/WCMA standard the window coverings complied and, similarly, cannot draw any conclusions whatsoever about the effectiveness of ANSI/WCMA-2018 in reducing the risk of incidents and injuries.

In its assessment of pull cord incidents, CPSC states that "the effects, if any, of the 2018 voluntary standard on these products have yet to be reflected in the data."[52] Given this admission, there is no way to determine, for example, the extent to which the default cord length requirement (ANSI/WCMA 2018, section 4.4) or default wand tilt requirement (section 4.4.1.1) have reduced or eliminated the risk of strangulation from custom products.

Interestingly, in the context of CPSC's related rulemaking for stock products and inner cords for custom products, CPSC notes that according to NEISS data, "the number of pediatric strangulations has declined as more cordless stock products become available."[53] CPSC attributes this to changes in ANSI/WCMA-2018 for stock products.[54] It is unclear how CPSC can draw this inference for stock products given the limitations in the data set and the fact that the NEISS data does not make a distinction between custom and stock products.[55] Nonetheless, CPSC makes no attempt to undertake a similar analysis for custom products or, at the least, acknowledge the same trend exists as to custom products. Nor does CPSC's assessment take into account the increasing numbers of cordless and motorized operating systems in the custom segment. It is beyond argument that this trend contributes to reducing risk.

Instead, the CPSC appears to focus solely on the <u>elimination</u> of risk. Because ANSI/WCMA-2018 allows for cords longer than 8" in limited applications, according to CPSC, the standard does not eliminate the risk.[56] While WCMA will continue to work diligently, "elimination" is not the standard by which Congress prescribed CPSC's authority to reject

---

[51] 87 Fed. Reg. 1,024, Table 2.

[52] 87 Fed. Reg. 1,025.

[53] Staff Briefing Package, p. 97.

[54] Staff Briefing Package, p. 97 ("Staff notes that many manufacturers began offering cordless stock products before the standard went into full effect.").

[55] 87 Fed. Reg. 1,022 ("National estimates of deaths and injuries involving window covering strangulations among children under 5 years of age are associated with all types of window coverings, because the available information does not allow the CPSC to distinguish product subtypes."); *see also id*. at 1,027 (noting that trend analysis of the NEISS data is unfeasible).

[56] 87 Fed. Reg. 1,031.

voluntary standards as it is an impossible standard to meet. As required by the statute, CPSC should undertake an evaluation of ANSI/WCMA-2018 to determine whether it <u>adequately reduces</u> the risk.[57] Absent any meaningful evidence to the contrary, CPSC cannot conclude to the contrary and cannot meet the requirements of the CPSA.

2.     ANSI/WCMA-2018 Adequately Reduces the Risk

For custom window covering products, the 2018 update to the ANSI/WCMA window covering safety standard required a redesign of custom products to further minimize the potential risk to children. These changes, combined with the fact that custom products make up a relatively small portion of the window covering industry, and CPSC's own incident data, demonstrate that ANSI/WCMA-2018 adequately reduces the risk of injury associated with corded custom window coverings.

*Accessible Operating Cords* – For custom products, ANSI/WCMA-2018 created a default cord length limitation for operating cords and a default to a tilt wand that eliminates tilt cords. These defaults can only be overridden by an explicit decision by the consumer and only after the consumer is exposed to appropriate safety information. The reports from the industry suggest that there is minimal pushback on these product defaults. In addition, an ever-growing segment of the custom product market is selecting cordless products as the product of choice.[58]

As noted above, CPSC staff attributes a decline in pediatric strangulations to the availability of more cordless stock products, but because the data makes no distinction between custom and stock, this decline can also be attributed to the limitations of cords in custom products.[59]

*Continuous Loop Operating System* – ANSI/WCMA-2012 added new requirements for the durability and effectiveness of tension devices, including cycle testing, UV stability and impact testing (these requirements remained in place in ANSI/WCMA-2018). Prior to this standard, tension devices were inconsistently designed and manufactured, with material that sometimes did not withstand the long-term effects of UV rays, impacts from other objects or extended friction from running the cord or chain through the device.

When properly installed, there has been no recorded incident related to cords tensioned with compliant tension devices. This is confirmed by the CPSC, which notes that incidents involving continuous loop cords involved situations where tension devices were not present or were broken, but not in situations where the window covering was compliant with ANSI/WCMA-

---

[57] 15 U.S.C. § 2056(b)(1).

[58] RIAS Inc. "Assessment of CPSC's Risk and Preliminary Regulatory Analysis," p. 16.

[59] 87 Fed. Reg. 1,022 ("National estimates of deaths and injuries involving window covering strangulations among children under 5 years of age are associated with all types of window coverings, because the available information does not allow the CPSC to distinguish product subtypes."); *see also id.* at 1,027 (noting that trend analysis of the NEISS data is unfeasible).

2018.[60]  As a result, these incidents cannot be considered as incidents where cords were under tension in a manner that would comply with ANSI/WCMA-2012 or ANSI/WMCA-2018.  WCMA is committed to improving the use of tension devices and other safety mechanisms to reduce the potential that these mechanisms will fail or be purposefully defeated—either by accident or on purpose—and is committed to working with the Steering Committee on an acceptable solution to enhance the existing requirements for cords under tension.

*Single Retractable Cord Lift System* – Retractable lift systems were developed to provide the consumer with a safe and easy method for operating their product.  Millions of dollars and man hours were invested in these systems that were introduced in 1999 and have performed for over 22 years without any known incident. The ANSI/WCMA-2018 requirements provide for cord retraction devices that retract cords when tension is no longer applied, meaning there is no or minimally exposed cord when the window covering is not being actively operated.  During operation when the cord is exposed beyond a minimal length, there is tension on the cord and forming a hazardous loop or wrapping the cord around a child's neck is not possible without substantial manipulation.  The CPSC has publicly acknowledged that single retractable cord lift systems have never been involved in any safety incidents.[61]  The updated voluntary standard will further enhance this cord under tension operating system by requiring a semi-rigid wand to control the unit versus a cord.  This is demonstrated in the video that is linked in the footnote below and the following image.[62]

---

[60] Staff Briefing Package, p. 10 ("Children getting caught in continuous looped cords or beaded-chains without a functional tension device also figured as a major fatal hazard, accounting for 23 of the 89 fatal strangulations.") emphasis added.  In subsequent discussions CPSC has suggested that there could be one (1) incident that involved an installed tension device.  Because CPSC only provided a narrative description of the incident and withheld the images from WCMA, WCMA cannot make a determination on the information provided.  However, based on WCMA's expertise on this technology, it is suspected that if the tension device was installed, it was not installed properly and allowed for the formation of a hazardous loop.

[61] CPSC Staff made this comment during the Steering Committee meeting on March 2, 2022.

[62] Video of window covering using a retractable wand system, https://drive.google.com/file/d/1Gzj2ARAAQeP34WRUkC-dbZumchMTWcZQ/view.

**Figure 5: Image of a retractable cord using a semi-rigid wand.**



CPSC identifies three types of cords as the most hazardous scenarios based on fatal incident data: pull cords (44%), continuous loops (26%), and inner cords (8%).[63] Each of these hazards was either eliminated by ANSI/WCMA-2018 or will be addressed by the new version of the voluntary standard under development. ANSI/WCMA-2018 eliminated pull cords and continuous loops for stock products and prior versions of the standard addressed potential inner cord hazards for stock and custom products. In the newest version of the standard, which is currently under development, WCMA is committed to eliminating pull cords for custom products and reducing the potential for misuse and failure of tension devices for continuous loops on custom products. As such, CPSC has no justification for moving forward with its Proposed Standard.

*Information and Education* – Because of the lengthy product life of window coverings, and custom window coverings in particular, corded window coverings will remain in homes and will not be impacted by CPSC's mandatory standard. Consumer education and awareness initiatives are required to make consumers with older products aware of the potential hazard. WCMA was dismayed that CPSC has made no effort to assess the effectiveness of public education campaigns and instead concluded that because incidents still occur these campaigns must not work.[64] ANSI/WCMA-2018 included a change in warning tags to more graphically depict the strangulation

---

[63] Staff Briefing Package, p. 48.

[64] 87 Fed. Reg. 1,038 ("Staff has not assessed the effectiveness of these public education campaigns").

hazard. It is typical for a consumer when purchasing custom products to interact with a salesperson, installation specialist or online information and warnings, which provides window covering safety information, specifically regarding the fact that consumers should not use corded products in homes with young children. These changes were included with the support of consumer advocates and CPSC staff—despite their recent statements that such efforts are ineffective.

In addition, through the Window Covering Safety Council ("WCSC"), which is a coalition of major U.S. manufacturers, importers, and retailers of window coverings, WCMA and its members are dedicated to educating consumers about window covering cord safety. The WCSC website (www.windowcoverings.org) is a great resource of information for consumers and industry. WCSC assists and supports its members in the industry's ongoing efforts to encourage the use of cordless products in homes with young children, redesign corded products, and to support the national ANSI/WCMA standard for corded window coverings. WCSC sponsors, at times with CPSC, National Window Covering Safety Month each October to specifically concentrate the public's attention on safety issues. Additionally, WCSC provides free retrofit kits and educational materials on how consumers can successfully retrofit their window coverings in order to make older window coverings safer.[65] To date WCSC has shipped hundreds of thousands of free retrofit kits. WCSC would welcome the CPSC's meaningful participation and collaboration in these efforts to amplify these messages, reach more households, and prevent incidents.[66]

WCSC's safety efforts have led to tremendous results. In March 2022, WCSC conducted an online survey among 1,000 U.S. adults, ages 18 and older and found that 90% of adults with children in the home are aware of the strangulation hazard certain window cords may pose to infants and young children.[67] WCSC will continue to educate the public so that as many consumers as possible are aware of the safety hazard of window covering cords.

E.    CPSC's Proposed Standard Is Not Technically Feasible

The Proposed Standard would require that all custom window coverings be cordless. The CPSC goes to great lengths to describe the cordless window covering technologies that are available to replace corded custom window coverings. In fact, CPSC claims that "[v]irtually every window covering type is available with a 'cordless' operating system.[68] CPSC is correct in the observation that (due to industry's continuous product development efforts) cordless operating

---

[65] A more fulsome summary of WCSC's efforts can be found in Attachment 3.

[66] Over the years, WCSC has routinely invited CPSC participation despite CPSC's haphazard response and participation. CPSC often has declined to participate and, when it does participate, often delays and limits the initiatives. CPSC's less-than-robust participation in, and enthusiasm for, WCSC's efforts is puzzling, especially when the intent of these efforts is to address and reduce child safety risks.

[67] WCSC, National Survey Finds 90% of Adults with Children in the Home are Aware of Window Covering Cord Safety Hazards, March 18, 2022, https://windowcoverings.org/national-survey-finds-90-of-adults-with-children-in-the-home-are-%e2%80%8eaware-of-window-covering-cord-safety-hazards/.

[68] 87 Fed. Reg. 1,018.

systems are available for every "type" of window covering product, ranging from wood blinds to sheer shades. But that blanket statement conveniently ignores that, within these product types, there are specific product varieties that—due to size, weight, product location, or other limitations—are not presently available with, or suitable to, cordless or motorized operating systems. For example, for faux wood blinds, a general estimate for the maximum dimensions for cordless is 96 inches wide by 48 inches high and 60 inches wide by 84 inches high. This leaves many larger sizes unavailable in cordless options.

CPSC is forced to admit this fact (albeit hidden in a footnote) that the Proposed Standard would limit the availability of products.[69] Given that the focus of CPSC's Proposed Standard is the "custom" segment (where, by definition, products are made to suit a consumer's unique needs and wants), the significance of CPSC's incorrect blanket statement is even more pronounced.

1. CPSC's Proposed Standard Ignores the Limits of Cordless Technology

The following provides an overview of the limitations associated with what CPSC considers available cordless products.

*Cordless Motorized Blinds* – CPSC suggests that cordless motorized blinds are an alternative to the cord lift system.[70] However, CPSC fails to recognize that these products have limitations in their use. Cordless motorized products have limited application for larger window openings (both height and width) due to the weight limitations of the motor – bigger window coverings are heavier and require larger motors. Larger motors require larger headrails, which typically elicit consumer complaints. Minimizing headrail size is a constant focus of industry design efforts. Having a family of motors to cover light, medium, and heavy shades is very expensive to develop and inventory, resulting in increased cost for the consumer. The larger sizes particularly need special companion headrails and roller tubes, requiring greater product complexity and manufacturing costs and leading to greater consumer costs. In addition, motors need power supply. Some smaller motors can be powered off batteries; however, changing batteries[71] or recharging them is not convenient for window coverings placed in hard-to-reach locations. A direct power source also can be used to power a motor but, depending on the location of the window and the availability of the power source, long cords and/or the use of an electrician might be required—both costly and possibly impracticable solutions for consumers. CPSC recognizes that product costs could "exceed $1,000 for just one unusual size and/or shaped window."[72] While ignoring "impracticable solutions for consumers" with respect to motorized products on the one hand, CPSC then identifies similar types of concerns in their justification for

---

[69] 87 Fed. Reg. 1,018 n.2. ("[t]he availability of alternatives to corded window coverings may sometimes be constrained due to size and weight limitations").

[70] 87 Fed. Reg. 1,032.

[71] WCMA supports the adoption of requirements that prevent access to batteries.

[72] Staff Briefing Package, p. 187. Despite recognizing these extreme costs, CPSC fails to incorporate these costs into its cost benefit analysis.

why it is not practical for customer installation of tension and other safety devices.[73] This sort of selective "pick and choose" approach is improper, illogical, and simply underscores CPSC's determination to make the "means fit the ends."

*Cordless Blinds* – CPSC suggests that cordless blinds operated by pushing the bottom rail up or pulling the rail down offer an alternative to corded custom products with heights up to 84 inches and widths of 144 inches.[74] In fact, CPSC suggests, without any support, "custom window covering manufacturers would most likely adopt cordless lift operation systems to comply with the proposed rule." This suggestion fails to recognize that custom window covering products often are much longer and wider than stock products and are substantially heavier. For example, horizontal blinds, which get heavier as they are lifted, can weigh in excess of 20 pounds. Current cordless systems cannot handle those dimensions or weights.[75] Furthermore, this cordless option only works if the window is accessible, and the consumer can reach the desired location of the rails.

As noted above, although cordless (including motorized cordless) may be available for all product types, not all sizes can be accommodated with cordless technology. Various manufacturers have different limitations of product availability for cordless technology. Figure 6 provides a visual representation of the representative availability of product types (cordless, motorized, retractable, and continuous cord loops with tension devices) for different size configurations. Regardless of the manufacturer, the size and weight of the window covering significantly limits the cordless product options. The width, height, and corresponding weight of a product will limit the cordless operating system applicability, and many product styles would not be available with cordless technology. Those product options would be eliminated if the CPSC's Proposed Rule were finalized.

---

[73] 87 Fed. Reg. 1,035 ("CPSC has concerns with using safety devices to reduce the risk of strangulation for several reasons. Securing safety devices goes beyond the installation of the window covering itself, which increases the 'cost of compliance' that is the time and effort to use the product. Also, safety devices, such as tension devices, usually require drilling holes on the wall or windowsill that may not be permissible for renters and may not be desirable by homeowners.")

[74] 87 Fed. Reg. 1,032; WCMA members report that the availability of products with heights greater than 74 inches is generally extremely limited and often limited to trade shows and displays.

[75] The weight of these products may also limit operation by consumers who may not have the physical capabilities to generate the needed lift force to easily operate these products. These concerns are discussed more in Section III.E.2.

23

**Figure 6 – General Availability of Cordless Technology on Product Sizes for Cellular Window Coverings**



**Cordless Operating Systems Max Width & Height vs CCL w/Tension Device**

*An example of a roller shade, but the same pattern occurs on other products as the components themselves have the limitations.*

*Crank Mechanisms* – Crank mechanisms have high gear ratios requiring several turns per inch of window covering travel to be able to lift heavy window coverings. This results in poor usability and very low consumer acceptance. One WCMA member evaluated a sample of a competitive crank system on an average size faux wood blind (42 inches wide by 72 inches high) and it required over 150 revolutions to fully raise and/or lower the blind. Not only is this time consuming (several minutes per blind), but also it requires significant dexterity and endurance to raise or lower a single blind. This option is not suitable for consumers with multiple windows or consumers that have physical limitations. In addition, the gears and crank attachment area require substantially more space than most operating systems and are therefore visually unacceptable and allow too much exterior light to leak in, which reduces the product's energy efficiency, light control, and privacy functionality, which is unacceptable to consumer seeking a window covering to provide these utilities.

*Rigid Cord Shrouds* – In theory a rigid shroud can cover any cord, and several have been available for years. However, actual use or sale of this product type has been extremely limited due to unacceptable aesthetics, designs that are awkward to use (typically requiring a high number of pulls on a cord or chain due to limited stroke length). The inventory levels and therefore dollar investment for this product run prohibitively high as this product often costs a manufacturer four (4) to six (6) times more than a clutch and tensioned cord or chain. Multiple pre-cut lengths fitted with multiple clutches and operating systems, usually in multiple colors, are required to accommodate the broad range of fabric colors and styles and window sizes and heights. Rigid shrouds also do not universally accommodate headrail systems as they can vary in dimension from two (2) to seven (7) inches and larger, and include round, square and rectangular

24

shapes, with attachment points in the front or bottom of the headrail. Similar to crank mechanisms, rigid shrouds often increase light gap, which reduces the product's energy efficiency, light control, and privacy functionality.

Recently there have been suggestions that if the window covering industry can comply with Health Canada's Corded Window Coverings Regulations (CWCR) (which prohibits cords), then the window covering industry can comply with the Proposed Standard. The assertion that the window covering industry can comply with CWCR is wrong.

In a March 3, 2022 letter to Canadian Minister of Health, The Honorable Jean-Yves Duclos, PC, MP, WCMA details the significant issues with the Canadian standard and its potential economic impacts on the window covering industry.[76] The CWCR went into effect in May 2021 and will be enforced in May 2022. WCMA has repeatedly informed Health Canada and other policy makers that 88 percent of the window blinds manufactured and sold in Canada will not comply. Home Depot, Bouclair Canada, Kent Building Supplies and other retailers have repeatedly informed Health Canada officials that they will not be able to source compliant product from any Canadian or global supplier based on the current CWCR and as of now there are no viable solutions to replace proven safe products on their shelves.[77]

As a result, manufacturers have started abandoning the Canadian market, closing facilities, or laying off their workforce as product lines are abandoned. Further, it is estimated that under the current CWCR, total losses (direct, indirect, and induced impacts) across the Canadian economy will amount to $800 million in lost economic output, a $357 million reduction in value-added, and a loss of over 3,900 jobs and $214 million in wages for Canadian workers. All of this will occur while Canada is still recovering from the pandemic.[78]

2. CPSC's Proposed Standard Fails to Address Accessibility

The Proposed Standard also fails to adequately recognize accessibility concerns with eliminating cords from custom window coverings.[79] According to CPSC, there are "various tools" on the market to make operation of window coverings easier and accessible.[80] However, these types of tools, primarily extension poles and grips, cannot be used in all settings. Furthermore, WCMA notes, that despite assertions to the contrary, the American Disabilities Act ("ADA") does not apply to residential situations.[81] Consumers expect a high level of comfort and convenience in their homes that may not be achieved with a one-size fits all approach considered "ADA-

---

[76] WCMA, Letter to Canadian Minister of Health, The Honorable Jean-Yves Duclos, PC, MP, "Health Canada's Failed Leadership on Corded Window Blinds Will Cost Thousands of Jobs" March 3, 2022.

[77] WCMA Letter to Canadian Minister of Health, The Honourable Patricia Hajdu, PC, MP, August 3, 2021.

[78] WCMA, Letter to Canadian Minister of Health, The Honorable Jean-Yves Duclos, PC, MP, March 3, 2022.

[79] CPSC is required to consider "the special needs of elderly and handicapped persons." 15 U.S.C. § 2058(e).

[80] 87 Fed. Reg. 1,037-38.

[81] 42 U.S.C. § 12182 (prohibition of discrimination by public accommodations; Id. at § 12181 (definition of public accommodation).

25

compliant." If these products are no longer available, consumers are likely to hold onto existing products that do not adhere to updated safety standards. Therefore, suggestions that cords are not "ADA" compliant has no relevance in this rulemaking.

In December 2021, the CPSC Division of Hazard Analysis and Directorate for Epidemiology released a report titled "Consumer Product-Related Injuries and Deaths Among Adults 65 Years of Age and Older." In the report, CPSC found that from 2016-2020, adults 65 and older sustained an estimated 14.6 million emergency department treated injuries associated with, but not necessarily caused by consumer products. Nearly two-thirds of these injuries—7.3 million—were due to falls, by far the most common hazard.[82] The blanket elimination of cords—and especially continuous loop cords under tension operating systems—from custom window coverings eliminates a tool for the elderly and those with accessibility challenges to access window coverings in a safe manner. This will increase an already considerable risk profile for significant population segments, without resulting in any significant decrease in the already minimal safety risk associated with these operating systems.

If finalized, the Proposed Standard would eliminate product options for custom window coverings with no viable replacements. CPSC staff reluctantly acknowledges this in its report but fails to acknowledge that if consumers have no alternative, they are far more likely to hold on to older and less safe window covering products for extended periods of time. Obviously, such a result would not contribute to risk reduction.

## F.    CPSC's Preliminary Regulatory Analysis Does Not Justify the Proposed Standard

As the CPSC is aware, its authority to promulgate a mandatory standard is limited. Not only did Congress limit this authority to situations where there is an "underlined unreasonable risk of injury," but also in exercising this authority, Congress prescribed specific findings and analyses that the Commission is required to perform in order to establish that the mandatory rule is justified. These requirements include a regulatory analysis of the potential benefits and costs,[83] findings on the degree and nature of the risk,[84] the public need for the consumer products,[85] and ways to minimize disruption to the economy,[86] among others. CPSC cannot finalize a mandatory standard unless, based on the foregoing analysis, the severity of the injury and the likelihood of the injury offset the harms imposed on manufacturers and consumers.[87]

---

[82] CPSC, "Consumer Product-Related Injuries and Deaths Among Adults 65 Years of Age and Older" December 2021, pg. 4.

[83] § 2058(c); § 2058(f)(2).

[84] § 2058(f)(1)(A)

[85] § 2058(f)(1)(C)

[86] § 2058(f)(1)(D)

[87] See, generally 15 U.S.C. § 2058(f)(3).

CPSC's evaluation of the costs and benefits is flawed and incomplete, does not support the findings required by Congress, and does not comport with recognized principles for developing a regulatory impact analysis.[88] In its assessment of both the costs and the benefits, CPSC relies on data sets that are incomplete, estimates that are not methodologically sound, and extreme assumptions that do not support real world application. These types of flaws in the foundation of the cost benefit analysis produce distorted results that even by CPSC's own flawed methodology do not demonstrate that the potential benefits offset the significant actual costs to society.

In order to provide a more comprehensive and accurate portrayal of the true costs and benefits of the Proposed Standard, WCMA retained RIAS to provide feedback on CPSC's preliminary regulatory analysis.[89]

1.      CPSC's Industry and Product Profiles Are Inaccurate

Based on their expert review, RIAS concludes that CPSC's estimates of the industry and product profiles use outdated data, small sample sizes, and flawed assumptions that make CPSC's estimates of market size and product use inaccurate. These estimates serve as a critical foundation for CPSC it its cost benefit analysis. By relying on flawed data as the foundation, the cost benefit analysis is subsequently flawed by the distorted data. The following summarize the RIAS expert conclusions.

*Inaccurate Industry Profile* – The CPSC relied on Census data, a 2021 D+R International study on window covering market characterization, and other market research reports to estimate the total number of firms in window coverings related sectors, and the number of firms that are small businesses. According to CPSC, there are 1,898 firms categorized as blinds and shades manufacturers and retailers and about 1,840 of these firms (302 manufacturers and 1,538 retailers) are small businesses.[90] CPSC estimated total market size to be $6.6 billion, based on data from a Euromonitor (2021) study for CPSC.[91] CPSC relied on a D+R (2021) study that estimated 139 million residential window coverings were shipped in the United States in 2019, with custom products accounting for approximately 44 percent of unit sales.

By limiting its review to manufacturers and retailers, the CPSC's analysis fails to include significant portions of the window covering industry, including home furnishings merchant wholesalers, other home furnishings stores, and interior design services. In addition, CPSC's analysis does not capture independent wholesaler, retailer, and designer sales of customized window treatments created from fabric and hardware inputs—generally referred to as "custom product workrooms." CPSC's analysis also excludes larger retailers like big box stores that provide shop-at-home services and design consultants to offer custom products. WCMA

---

[88] See, White House Office of Management and Budget Circular A-4 (Sept. 17, 2003).

[89] RIAS Inc. "Assessment of CPSC's Risk and Preliminary Regulatory Analysis," Attachment 1.

[90] 87 Fed. Reg. 1,019.

[91] CPSC did not make this data available to the public. WCMA purchased this data set directly from Euromonitor.

identified these gaps in CPSC's analysis of the industry in response to the 2015 ANPRM, yet CPSC has made no attempt to correct for them. Most critically, the CPSC estimate of the number of potentially affected small businesses is too low, because it excludes large numbers of small firms in these additional sectors that depend on window treatment sales for a share of revenues and profits. For example, for the industry sectors of home furnishings merchant wholesalers, other home furnishings stores, and interior design services, there are nearly 25,000 businesses that have fewer than 100 employees.

*Stock versus Custom Products* – CPSC's analysis of custom window coverings in use suggests that out of an estimated total 1,014 million window coverings in use in U.S. households, 511.7 million are custom window coverings. WCMA believes the total figure of 1,014 million window coverings is an underestimate, and the 511.7 million custom window coverings is an overestimate. According to these estimates, custom window coverings represent over 50 percent of the total U.S. window coverings market. The source of these figures is the D+R (2021) report prepared for CPSC, which acknowledged that their assumptions could contribute to inaccurate estimates.[92] CPSC chose to employ these estimates from D+R, despite these limitations, and despite past evidence that WCMA has provided. WCMA previously submitted data to CPSC from a comprehensive, confidential U.S. retail window covering market study conducted in 2016 that showed the breakdown of unit sales of window covering products by category. Based on the custom product market shares in that study, RIAS calculated that if the total number of window coverings in use is 1,014 million, the number of custom window coverings would be 272 million, not 512 million as CPSC asserts.

*Corded Custom Window Coverings in Use* – The CPSC estimates there to be 1,014 million window coverings in residential use in 2019, based on estimates of U.S. residential housing units and the number of window coverings in use per house.[93] CPSC derives its estimates of the number of custom window coverings in use by type based on 2019 sales data. CPSC then applies a percentage of 65 percent to estimate the percentage of custom corded products to produce CPSC's estimate of 332.6 million corded custom window coverings in use.

Although the CPSC's estimate of residential housing units is likely an accurate estimate, the remaining steps in estimating the number of corded window coverings in use is at best confusing, and at worst, yields unreliable results.

To estimate the number of window coverings per housing unit, D+R used the assumptions from a 2013 United States Department of Energy (US DOE) market characterization study (that D+R prepared). In their 2021 Report, D+R claims that the average number of windows across all housing units in the United States is approximately 12 windows.[94] Upon further review of the underlying reports, 12 is not the average, but the 75th percentile, which would result in a much

---

[92] McCarthy, Rowan and Shannon Christie. Window Covering Market Characterization: Final Report. Prepared for Consumer Product Safety Commission by D+R International Ltd. February 2021.

[93] 87 Fed. Reg. 1,019.

[94] D+R International Ltd, Window Covering Market Characterization: Final Report (February 2021).

28

A749

higher overall estimate of the total installed base of windows. CPSC's estimate of the 1,014 million window coverings in use cannot be reproduced based on the D+R 2021 Report.

Further, there is no indication given in the Staff Briefing Package or either of the D+R studies how the number of windows per household may be changing over time, and no way to determine if the 2013 estimates for all window coverings are relevant to custom corded window coverings in 2022.

As the CPSC recognizes, relying on a single year point estimate of sales data "may distort product in use estimates."[95] It is not clear whether CPSC's sales data is based on the number of units sold or on sales revenues by product category. Because custom products are generally at a higher price point than stock products, and there is often significant variation in price points among types of custom products, relying on revenue would distort the percentages and would be inapplicable to the number of products in use. The source of the data also is not clear. We assume that the source of these custom product share estimates come from the D+R (2021) study, which conceded that their assumptions could contribute to inaccurate estimates for market size. However, CPSC did not acknowledge or account for these issues either in the Staff Briefing Package, nor in the Preliminary Regulatory Analysis in support of the Proposed Standard. The RIAS Report details the key areas of concern for these assumptions.

More fundamentally, CPSC assumes 2019 <u>sales</u> data is equal to 2019 <u>use</u> data. That assumption fails to recognize the useful life of products. It also fails to capture shifts in sales and use data associated with the implementation of ANSI/WCMA-2018 in December 2018.

Finally, CPSC estimated the number of corded custom products by applying an estimate of 65 percent. CPSC provides no context, explanation, or analysis in support of its estimate that 65 percent of custom products are corded other than that it is from "interviews conducted with retailers and manufacturers" in which "some gave conflicting accounts."[96] Instead, CPSC is forced to acknowledge that "the actual number of corded custom products could be either higher or lower than the estimate used in the base analysis and we have no basis for stating if we think we have over or underestimated the number."[97] Therefore, by CPSC's own admission, it has no basis for knowing the accuracy of the estimates of corded custom window coverings in use that it subsequently utilized in its estimates of both the costs and benefits of the rule.

By contrast, RIAS solicited feedback from WCMA members on the market share of custom product for 2018 and 2021 broken down by corded and cordless products. In 2018, the share of custom products that were corded was 64.6 percent, but that number had fallen substantially to

---

[95] Staff Briefing Package, p. 165 n.64.

[96] Staff Briefing Package, p. 29, 183. CPSC does not provide the date or subjects of these interviews, so it is impossible to know whether these statements were made before or after ANSI/WCMA-2018 went into effect nor whether the interviews represent a meaningful sample of industry.

[97] Staff Briefing Package, p. 183.

53.2 percent by 2021. The estimates by product type are shown in Figure 7. The use of static estimates by CPSC ignores these real trends that are taking place in the industry.

**Figure 7: Changing Shares of Custom Product that is Corded and Cordless, by Product Type (2018 and 2021)[98]**

|  | 2018 | | 2021 | |
|---|---|---|---|---|
|  | Corded | Cordless | Corded | Cordless |
| Metal or vinyl horizontal blinds | 95.1% | 4.9% | 91.9% | 8.1% |
| Vertical blinds | 70.9% | 29.1% | 64.8% | 35.2% |
| Wood or faux wood horizontal blinds | 84.2% | 15.8% | 66.9% | 33.1% |
| Cellular shades | 30.7% | 69.3% | 21.0% | 79.0% |
| Pleated shades | 54.1% | 45.9% | 31.0% | 69.0% |
| Roller shades | 68.4% | 31.6% | 57.3% | 42.7% |
| Soft sheer blinds | 69.7% | 30.3% | 61.1% | 38.9% |
| Roman Shades | 47.6% | 52.4% | 41.2% | 58.8% |

Source: WCMA member responses to February 2022 questionnaire on CPSC's NPR

This data demonstrates an important continuation of the shift to more cordless and motorized products and, correspondingly that there has been a decrease in the share of custom product that is corded between 2018 and 2021, across all categories of product. WCMA members indicate that this observed trend will continue. These trends should have been considered in CPSC's analysis.

In the past, WCMA has submitted data from a comprehensive, confidential U.S. retail window covering market study conducted in 2016 that showed the breakdown of unit sales of window covering products by category. Based on the custom product market shares from that study and the 53.2 percent share of the custom product market that is corded in 2021 (based on WCMA member shipments in 2021), RIAS calculated the following revised estimates of corded custom window coverings in use.

---

[98] RIAS Inc. "Assessment of CPSC's Risk and Preliminary Regulatory Analysis," p. 16 Table 1.

**Figure 8: Estimated Custom Product in Use, by Product Category[99]**

| | CPSC estimates of custom product in use | CPSC estimates of corded custom product in use (based on 65% assumption) | Revised estimates of custom product in use based on corrected market shares | Revised estimates of corded custom product in use (based on 53.2% share in 2021) |
|---|---|---|---|---|
| Horizontal Blinds, All Types | 110.7 | 72 | 58.9 | 31.4 |
| Shades, All Types | 212.6 | 138.2 | 113.2 | 60.2 |
| Vertical Blinds | 9.8 | 6.4 | 5.2 | 2.8 |
| Curtains & Drapes | 178.6 | 116.1 | 178.6 | 95.0 |
| Total | 511.7 | 332.6 | 272.4 | 189.4 |

Source: RIAS Inc calculations

RIAS concludes that CPSC's estimate of the number of corded custom window coverings in use by category suffers from the following shortcomings:

- The estimates are not based on direct measures, but rather on numerous data sources and studies from different years, each with underlying assumptions that, taken together, could have major influence on the end results. This is a critical weakness in the analysis because the number of corded custom window coverings in use is a fundamental piece used in CPSC's estimates of annual injury costs.

- The CPSC's estimates of the number of custom window coverings in use cannot be reproduced from the data presented in the notice in support of the Proposed Standard, the Staff Briefing Package, nor any of the other studies that have been available as part of the public record, so RIAS cannot reproduce CPSC's estimates with the data provided. However, using data from sound alternative sources, RIAS' estimates of number of custom window coverings in use differs substantially from CPSC estimates.

- CPSC has not presented any historical trends or future projections of the number of custom window coverings in use in either the notice in Support of the Proposed Standard or the Staff Briefing Package, despite availability of information derived in the D+R (2021) study. CPSC has not shown how these critical estimates in their analysis are expected change over time in the absence of any intervention by way of a mandatory standard for corded custom window coverings.

  2. CPSC Significantly Understates the Costs of the Proposed Standard

CPSC concludes that the aggregate costs to society to implement the Proposed Standard would range from $156.5 million to $309 million.[100] RIAS concludes that this is an incomplete and inaccurate assessment of the costs, based on out of date and irrelevant estimates, a failure

---

[99] RIAS Inc. "Assessment of CPSC's Risk and Preliminary Regulatory Analysis," p. 17 Table 2.

[100] 87 Fed. Reg. 1,044.

to consider costs outside of the per-product (component) manufacturing costs, and unsupported assumptions. The result is that the CPSC Preliminary Regulatory Analysis grossly understates the costs that would be incurred by the Proposed Standard.

CPSC's cost-benefit analysis uses estimated per-product increases in component manufacturing cost across product type as the primary measure of the cost associated with adopting a mandatory standard. This presents only a partial picture of the costs for the window covering industry to implement the Proposed Standard and ignores the significant costs that would be imposed at every level within the supply chain:

*Manufacturing* – In addition to increased cost of component parts, cordless window coverings require up to 50 percent more assembly labor per blind or shade. This will require plant reconfiguration and additional square footage to support the same production volume. This will require capital approvals and lengthy plant construction activities.

*Supply Chain* – Increases in cordless operating system components will require additional tooling and/or sources of supply across a significant number of components and sub-systems.

*Marketing* – Sample books need to be updated to reflect the new product offerings. This complex development/supply chain exercise requires an 18 to 24-month development cycle. Website information and materials must also be updated after the new product offerings have been finalized.

*Retailer Systems* – Retailer ordering system integrations are completed at the conclusion of new product development and the timing will vary by retailer, but generally take a few months.

CPSC's evaluation also improperly assumes costs are limited to the transition of available cordless technologies, and even these are based on a two-year effective date, not the 180 days in the Proposed Standard. However, cordless technologies do not yet exist to cover the wide array of custom product offerings. This is reluctantly admitted by CPSC in its analysis: "the [Proposed Standard] could potentially result in the elimination of some sizes, and/or types of window coverings from the market."[101]

The industry will need to develop new technologies to meet consumer demand. Developing operating system solutions to cover gaps created within product offerings will be required, and such new product developments can take up to 48 months to implement on average. Once a new design successfully passes engineering trials, it requires an additional five to six months of on-site production qualification trials. Therefore, if the Proposed Standard goes into effect 180 days after it is approved, there would be a time where cordless products would not be available to consumers because the industry won't have adequate time to develop these new technologies (if they can be developed at all)—a cost that is not considered by the Proposed Standard.

---

[101] Staff Briefing Package, p. 187.

The time and resources required to develop new products is compounded for the custom product market, which is made up of over 20 totally different product categories that will require multiple and unique engineering solutions to achieve possible compliance.[102] Manufacturers with multiple products lines affected will need to stagger and prioritize product development using existing resources (which will delay the availability of product), or expand their product development staff and resources (which will impose greater costs).

The use of manufacturing cost also ignores the impact of an increase in product prices on demand, with the higher prices encouraging consumers to postpone replacement of current products. The resulting reduction in sales would slow down the replacement of older corded window coverings, causing them to remain in use for a longer period of time, thereby reducing the estimated benefits of a mandatory standard for several years after adoption.

In February 2022, RIAS solicited input from WCMA members on the impact the Proposed Standard would have on product costs and expected change in sales. Figure 9 summarizes the cost implications of the proposed mandatory standard for custom window coverings, and the resulting impact on retail prices and total sales.

Figure 9: Estimated Impact of the Proposed Rule on Costs, Price and Sales, by Product Type[103]

| | Average change in cost of parts | Average change in final product cost | Average change in final retail price | Expected change in total sales |
|---|---|---|---|---|
| Metal or vinyl horizontal blinds | 60% | 59% | 38% | -70% |
| Vertical blinds | -16% | 1% | 1% | -2% |
| Wood/faux wood horizontal blinds | 31% | 32% | 41% | -21% |
| Cellular shades | 38% | 40% | 34% | -5% |
| Pleated shades | 17% | 17% | 24% | 18% |
| Roller shades | 33% | 27% | 25% | -1% |
| Soft sheer blinds | 18% | 21% | 18% | -17% |
| Roman Shades | 24% | 23% | 15% | -3% |

[102] The following is a non-exhaustive list of the various types of custom window coverings, each of which will require its own engineering solution to comply with the Proposed Standard: (1) horizontal blinds made of aluminum; (2) horizontal blinds made of wood; (3) horizontal blinds made of composite material; (4) horizontal blinds made of plastic; (5) vertical blinds; (6) cellular shades; (7) pleated shades; (8) roller shades; (9) woven wood shades; (10) banded shades; (11) vertical panels; (12) horizontal shadings; (13) vertical shadings; (14) multi-functional shadings; (15) cellular roller shades; (16) roman style roller shadings; (17) roman style tiered shadings; (18) insulating shadings (sonnette type); (19) balloon shades; (20) traditional roman shades; and (21) specialty shapes in multiple applications and product styles.

[103] RIAS Inc. "Assessment of CPSC's Risk and Preliminary Regulatory Analysis," p. 22. Table 4.

33

CPSC's preliminary regulatory analysis fails to acknowledge, much less address, the complex and dynamic impact that the Proposed Standard would have on the window covering industry and relative market shares for products. For example, WCMA members estimate that for corded custom metal and vinyl blinds, the expected increase in parts and production cost and the resulting increase in price is expected to result in an overall 70 percent reduction of sales. For companies that sell corded custom vertical blinds, sales are expected to migrate to cordless, except where no cordless option is available (e.g., for product over 144" in width). For corded custom wood and faux wood blinds, companies estimate a 21 percent loss in sales, with customers migrating to cordless window coverings, but that due to price and the lack of a retractable cord option in the market, many customers will transition to shades. CPSC does not attempt to consider any of the likely resulting shifts among product types and categories, and instead offers a relatively simplistic and naïve view of the industry.

Overall, results from WCMA members indicate that more than 3.2 million units or 5.6 percent of custom product will be lost from the U.S. marketplace (this assumes zero lost sales in the custom curtains/draperies market).[104]

The preliminary regulatory analysis also does not acknowledge the extent to which initial and continuing costs would be incurred by wholesalers, retailers, and interior design centers to change their distribution, sales, marketing, and service operations to support drastically revised product lines. It is also possible that as consumers transition to more specialized technology, including motorized cordless, there could be higher service and repair costs to maintain the operability of cordless window coverings.

Finally, while the preliminary regulatory analysis focuses on residential use, commercial window coverings could be affected since CPSC considers many products used in commercial locations to be "consumer" products. The vast majority of commercial products are custom. If CPSC's Proposed Standard were applied to commercial products CPSC's estimate of the potential cost impacts of the Proposed Standard would grossly underestimate the true impact because CPSC's cost impacts do not include commercial products.

The elimination of custom products with no viable replacements will have a severe financial impact on manufacturers and retailers including lost revenue and unused product. In addition, consumers will be deprived of the utility of these products—window coverings provide value to consumers in a number of ways, including privacy concerns, light control, temperature regulation, improved energy efficiency, and aesthetics. According to the U.S. Department of

---

[104] These estimates were calculated by RIAS Inc. based on the expected change in sales in custom products by category provided to RIAS Inc by WCMA members in February 2022 as summarized in Figure 9, multiplied by the number of units sold by category from WCMA members, then scaled to the total custom units by category in 2021 from the D+R (2021) report.

Energy, "[a]bout 30% of a home's heating energy is lost through windows" as depicted in Figure 10.[105]

**Figure 10: Most household heat loss is through the windows and roof. Source, U.S. Department of Energy.**



In cooling seasons, about 76 percent of sunlight that falls on standard double-pane windows enters to become heat.  Window coverings can help with this energy loss and lowering energy bills." [106]  The energy savings potential from window coverings is significant.[107]  Custom products in particular offer consumers unique solutions to address these needs that often are not available with stock products, needs like window coverings to prevent energy loss.  Limitations associated with cordless products will have a direct impact on the availability of window coverings for large glass windows and windows out of reach from consumers—the same windows that have the highest energy losses.  In addition, as discussed above certain "alternatives"—such as crank mechanisms and rigid cord shrouds—decrease the energy efficiencies of window covering products.  CPSC staff's erroneous assumption that cordless window coverings are available for all custom products results in their incomplete assessment of the true costs of the Proposed Standard.

Setting aside the incomplete costs, CPSC admits that there is tremendous uncertainty associated with the cost estimates it did produce.[108]  CPSC's estimates primarily were drawn from studies published in 2016 (which rely on data collected in 2015 and earlier).  These studies do not reflect new technology developed in the interim; nor do they reflect the changes in the technology required by ANSI/WCMA-2018.  Moreover, CPSC acknowledges that its cost estimates

---

[105] The U.S. Department of Energy recognizes the importance of window coverings in saving energy.  U.S. Department of Energy, Energy Efficient Window Coverings, available at https://www.energy.gov/energysaver/energy-efficient-window-coverings.

[106] The U.S. Department of Energy recognizes the importance of window coverings in saving energy.  U.S. Department of Energy, Energy Efficient Window Coverings, available at https://www.energy.gov/energysaver/energy-efficient-window-coverings.

[107] See, U.S. Department of Energy, Energy Savings from Window Attachments, October 2013, Appendix C.

[108] 87 Fed. Reg. 1,044.

are probably "more applicable to stock products than to custom products."[109] CPSC appears to dismiss this concern by pointing to price differences between available corded and cordless custom products. However, this comparison does not reflect the costs associated with developing cordless custom products that are not yet available. And as noted above, there is significant uncertainty associated with CPSC's estimate of the cordless custom products in use, injecting further uncertainty into these estimates.[110]

3. CPSC Significantly Overstates the Benefits of the Proposed Standard

CPSC's estimate of the benefits that could be expected from the Proposed Standard is predicated on a flawed estimate of fatal and nonfatal incidents that CPSC attributes to corded custom window coverings and fails to recognize the likely substantial future reduction in incidents that will occur absent finalizing the Proposed Standard. As a result, RIAS concludes that the benefits that CPSC attributes to the Proposed Standard are grossly overstated.

CPSC's estimate of annual injury costs is predicated in part on its fatal incident estimate of nine (9) deaths per year based on NCHS data, which CPSC estimates to result in $82.8 million annually. Based on the estimate of 185 nonfatal window covering injuries annually from CPSC's Injury Cost Model (ICM), CPSC staff estimates that the societal costs of nonfatal window covering injuries are approximately $9.3 million annually. Nowhere does the CPSC provide details on how the 185 nonfatal window covering injuries annually were estimated using the ICM, so it is impossible to reproduce CPSC's numbers to verify if the calculations are reasonable – either as to their amount or with respect to the methodology applied by CPSC.

CPSC calculated a total annual benefit of approximately $49.5 million. RIAS concludes that there are several reasons why this estimate substantially overstates the benefits that could be reasonably anticipated from a mandatory standard:

CPSC uses average annual numbers of fatal and non-fatal injury incidents calculated across the 2010 to 2020 period as the baseline for assessing the value of the Proposed Standard. As shown in RIAS' assessment of CPSC's incident data earlier in these comments,[111] the rates of fatality and injury incidents for custom window covering products have been declining over time, even when all incidents where the type of product is unknown are assumed to be custom products.

In addition to assuming that no reductions in the rates of fatalities and injuries have taken place over the past 13 years, CPSC's injury cost estimates also assume that no further reductions

---

[109] Staff Briefing Package, p. 182.

[110] CPSC's estimate of corded custom window coverings in use "was based on estimates of the total number of window coverings and interviews with manufacturers and retailers in which some gave conflicting accounts. They were not based on exposure surveys and thus the actual number of corded custom products could be either higher or lower than the estimate used in the base analysis and we have no basis for stating if we think we have over or underestimated the number." Staff Briefing Package, p. 183.

[111] A full accounting of the flaws associated with CPSC's incident analysis are discussed in Section III.C.1.

would take place in the future in the absence of a mandatory standard. This assumption is completely erroneous. As RIAS has shown, the number of fatal and non-fatal incidents has continued to decrease over time as the ANSI/WCMA safety standard has been updated and as older products that did not comply with newer versions of the safety standard were replaced with compliant product. This downward trend in incidents will continue as newer stock and custom window coverings that are compliant with ANSI/WCMA-2018 displace older non-compliant product. Work on the next update to the ANSI/WCMA safety standard is underway, which when implemented, should result in a further reduction in incidents related to corded custom products.

CPSC assumes that all fatalities and injuries will be eliminated if a mandatory standard were adopted. However, this conclusion is illogical. The imposition of a mandatory standard will not remove legacy products from use. Furthermore, there is no compelling evidence presented by CPSC that the Proposed Standard is the only feasible option. And since the current data on incidents does not distinguish the age of window covering products, there is no reasonable way that CPSC can justify a mandatory standard as the sole means to improve safety. It also ignores the "natural evolution" of increased numbers of cordless and motorized products sold each year. This stems from industry innovation and is not solely tied to regulatory mandates.

Furthermore, the present value of injury costs is derived by the CPSC staff from a number of underlying estimates all of which have weaknesses. For example, CPSC's annual injury cost per custom window covering in use is based on the estimated injury cost for each category of window covering, divided by the estimated number of corded window coverings in use for each category. Both the injury costs and the number of corded window coverings are decreasing over time – yet CPSC ignores these trends in the calculation of annual injury costs avoided if the Proposed Standard were to be implemented. [112]

As shown above, the number of corded custom products in use estimates cannot be independently verified based on the data presented in the notice of the Proposed Standard, the Staff Briefing Package, or any other studies that are part of the public record for the Proposed Standard. Further, future projections of the number of corded custom products in use in the absence of any intervention (*i.e.*, a mandatory standard) have not been incorporated in the analysis, so the estimates are likely overstated.

The annual injury cost per custom window covering in use is based on the estimated injury cost for each category of window covering divided by the estimated number of corded window coverings in use for each category. As discussed above, both the injury costs and the number of corded window coverings are decreasing over time—yet CPSC ignores these trends in the calculation of annual injury costs avoided if the mandatory rule were to be implemented.

---

[112] RIAS Inc. "Assessment of CPSC's Risk and Preliminary Regulatory Analysis," p. 20.

4.   The Justification for CPSC's Proposed Standard Limits Its Applicability to Residential Use

The entirety of CPSC's justification for the Proposed Standard is limited to the use of corded window coverings in residential applications: the incidents from CSPC's database are all in residential settings and CPSC's estimates of the total number of corded custom window coverings in use is derived from an estimate of U.S. residential housing units.[113] If finalized, any application of this standard outside the definition of consumer product and the justification provided would not be supported.

5.   CPSC Has Not Provided the Public with Access to Information that it Relied on to Develop the Proposed Standard

As noted throughout these comments, CPSC has not been forthcoming with the data, assumptions, and analysis CPSC claims support its Proposed Standard.  For example, WCMA still does not have access to much of the supporting data related to the incidents that CPSC identified.  CPSC also has not provided access to a D+R Report from 2020, which appears to form the basis of many of CPSC's conclusions regarding the number of custom corded products in use.[114] Reports and data aside, CPSC has not released the bulk of the assumptions and analysis that form the basis of its estimates in the preliminary regulatory analysis, making assessment (or reproduction) of the analysis impossible.

Once the Proposed Standard was published, WCMA requested the underlying data and reports upon which CPSC staff relied for their briefing package.  CPSC denied WCMA access to one report and two data sets on claims that the information was proprietary and/or privileged. CPSC did not inform WCMA that it would not provide access to this information for six weeks, until February 24, 2022.[115]  WCMA eventually was able to access the two data sets by purchasing the data sets at a cost of $1,195.  WCMA obtained this data on March 16, 2022, one week before the comment period closed.

Without access to the underlying data, assumptions, and analysis, stakeholders like WCMA cannot provide meaningful comment and participation in the rulemaking process.  The information withheld by CPSC relates to the composition of the industry and the breakdown of stock and custom products.  This data is critical in that it underpins CPSC's assumptions regarding the number of custom products sold and in use and the potential benefits and costs of the Proposed Standard.  Contrary to the Commission's assertion, CPSC has not provided WCMA with

---

[113] See, e.g., 87 Fed. Reg. 1,019 (CPSC's description of the window coverings in use derives solely from U.S. residential housing units.).

[114] If in fact the reference to the 2020 D+R Report is a typo, RIAS has not been able to reproduce CPSC's estimates, suggesting that CPSC has failed to provide stakeholders with access to critical information supporting this rulemaking.

[115] A full summary of WCMA's efforts to obtain this information was provided to the Commission on February 28, 2022.  Attachment 6.

A759

access to the data that was needed to provide thorough comments on the Proposed Standard.[116] CPSC's lack of transparency and failure to provide the underlying data in a timely manner is a violation of the Administrative Procedures Act.[117]

### G. CPSC Has Failed to Make the Requisite Findings in Support of a Mandatory Standard

CPSC's authority to promulgate a mandatory safety standard is limited to situations where CPSC has first made appropriate findings in support of the standard and then determined that the standard is justified based on a balancing of costs and benefits.[118] These findings must be based on "substantial evidence."[119] As detailed throughout these comments, CPSC's justification and reasoning for the Proposed Standard is flawed at every step, from the estimated number of incidents, to the assumptions on corded custom windows coverings in use, to the availability of technology to comply with the Proposed Standard. These flaws render the data and justifications underpinning CPSC's findings and determinations meaningless.[120]

*Degree and Nature of the Risk* – CPSC's finding is limited to identifying that operating cords on custom window coverings present a strangulation risk. But CPSC makes no attempt to discern the degree of this risk, which would need to consider the rate of incidents across time and the number of incidents as compared to the products in use, among other factors, as required by the statute.[121]

*Number of Consumer Products Subject to Proposed Rule* – CPSC estimates 512 million custom window coverings are in use. As noted above, based on RIAS' expert analysis, WCMA believes CPSC's methodology in producing this estimate is flawed. Instead, based on more recent WCMA member data, WCMA estimates there to be 272 million custom products in use. CPSC

---

[116] See, Statement of Chair Alex Hoehn-Saric Regarding Votes to Deny Extensions of Two Public Comment Periods, March 1, 2022, https://www.cpsc.gov/s3fs-public/Statement-of-Chair-Alex-Hoehn-Saric-Rulemaking-Extension-Statement.pdf?VersionId=B4LBcL5.YOtCTb1GbMLRwRkGKuderpDz.

[117] *Chamber of Commerce of U.S. v. S.E.C.*, 443 F.3d 890, 899 (D.C. Cir. 2006) (Among the information that must be revealed for public evaluation are the "technical studies and data" upon which the agency relies.); *Conn. Light & Power Co*., 673 F.2d at 530–31 (Enforcing the APA's notice and comment requirements ensures that an agency does not "fail to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary" so that "a genuine interchange" occurs rather than "allow[ing] an agency to play hunt the peanut with technical information, hiding or disguising the information that it employs.").

[118] 15 U.S.C. §§ 2058(f)(1), (3).

[119] 15 U.S.C. §2060(c).

[120] The following is not meant to be an exhaustive list of flaws associated with each finding, but instead identifies the most egregious and fundamental errors.

[121] See 15 U.S.C. § 2058(e) ("A consumer product safety rule shall express in the rule itself the risk of injury which the standard is designed to eliminate or reduce."); id. § 2058(f)(1); *Zen Magnets v. CPSC*, 841 F.3d 1141, 1147 (10th Cir. 2016) ("The regulation may issue if the severity of the injury that may result from the product, <u>factored by the likelihood of the injury</u>, offsets the harm the regulation imposes upon manufacturers and consumers.") (emphasis added).

then applies the flawed premise that 65 percent of custom products are corded to conclude that 39 million corded custom products are sold each year. As CPSC itself acknowledges, it has no way of knowing the accuracy of the 65 percent value. CPSC also fails to explain its methodology for a calculation that uses estimates of product in use and to be sold.

*Public Need for Custom Window Coverings and the Effects of the Proposed Rule on Their Utility, Cost, and Availability* – CPSC's description of the public need focuses on aesthetics and fails to capture public utility associated with privacy, temperature control, and energy efficiency. Moreover, although CPSC acknowledges there could be impacts to product availability and impacts to consumers with accessibility issues, it minimizes these impacts suggesting that consumers are likely willing to pay more and there could be alternative solutions available.

*Other Means to Achieve the Objective of the Proposed Rule, While Minimizing Adverse Effects on Competition and Manufacturing* – CPSC reviews the alternatives it considered but claims that the alternatives would not reduce the risk from injury. One alternative considered was a "later effective date," to extend the effective date beyond two years. However, the Commission without any justification proposed a 180-day effective date, rendering this alternative meaningless. Furthermore, for the remainder of the alternatives, CPSC's reasoning focuses solely on the product and whether the alternative would allow for corded products. CPSC made no attempt to assess the risk associated with these alternatives.

*Unreasonable Risk* – CPSC's discussion of unreasonable risk is predicated on its flawed estimates of related incidents and potential benefits. Although CPSC acknowledges that this inquiry involves a balancing of the risk of the injury against the probable effect of the rule, CPSC's analysis is conclusory at best. Without any support, CPSC concludes that "consumers already pay more for custom window coverings and are likely to pay more for safer products." CPSC has not performed any willingness-to-pay studies associated with increased cost of corded custom window coverings. Moreover, CPSC's balancing inquiry is mismatched when it compares "the possibility of increased costs for custom window coverings with the continuing deaths and injuries to young children." There are understated costs associated with the Proposed Standard that include not just product manufacturing, development, and introduction and support costs, but lost utility for the public. On the other side, CPSC has not acknowledged the downward trend in incidents, the impact of the voluntary standard, and the true risk of these incidents associated with products compliant with the voluntary standard, making the claim that incidents will "continue" speculative.

*Public Interest* – CPSC's statement of public interest makes no mention of the public utility that would be lost by the Proposed Standard, including the availability of custom product types, nor does it recognize that the incidents it relies on are on products that pre-date the most recent voluntary standard.

*Voluntary Standard* – As noted above, CPSC failed to make any meaningful attempt in assessing the effectiveness of ANSI/WCMA-2018 and instead relies on incident data that pre-dates the standard and the potential presence of cords to support its determination.

*Relationship of Benefits and Costs* – CPSC compares the aggregate benefits of the rule, $49.5 million, to the lowest costs of the Proposed Standard, $156.5 million. As CPSC notes, the lower cost estimates are more applicable for stock products. Instead, the upper bound estimate, which WCMA explains understates the costs, is $309 million. CPSC's discussion focuses on minimizing the likely impact of the rule and suggesting that consumers are willing to pay more. But importantly, CPSC provides absolutely no justification for why the benefits bear a reasonable relationship to the costs or any analysis to support its conclusion that consumers are willing to pay more.

*Least Burdensome Requirement that Would Adequately Reduce the Risk of Injury* – CPSC reviews the alternatives considered as justification for the Proposed Rule. As noted above, CPSC's alternatives analysis failed to meaningfully assess the alternatives and their impact on safety.

## H.    CPSC Failed to Consider the Impact of Proposed Testing, Certification, and Notice Requirements

By finalizing a mandatory safety standard, custom window coverings would become subject to Section 14(a) of the CPSA certification requirements. The CPSC suggests that in some instances, custom window coverings could be considered "children's products," subject to the certification and testing specific to children's products.[122] WCMA believes that most, if not all, custom window coverings are, and should be, considered non-children's products. This is consistent with the CPSC's definition of "furnishing and fixtures," which excludes general home furnishings from the definition of "children's products," unless the product is explicitly for children:

> General home furnishings and fixtures (including, but not limited to: . . . window curtains . . . ) that often are found in children's rooms or schools would not be considered children's products unless they are decorated or embellished with a childish theme and invite use by a child 12 years of age or younger, are sized for a child, or are marketed to appeal primarily to children.[123]

CPSC itself acknowledges that the percentage of custom window coverings considered "children's products" is low.[124]

Nonetheless, CPSC has failed to adequately consider the costs of compliance with Section 14(a) certification requirements.[125] If the Commission issues a mandatory safety standard, manufacturers or importers of non-children's custom window coverings must test products to

---

[122] 87 Fed. Reg. 1,049.

[123] 16 C.F.R. § 1200.2(d)(1).

[124] 87 Fed. Reg. 1,049.

[125] In the final rule for clothing storage units, CPSC acknowledged and considered the impact of testing and certification requirements. 87 Fed. Reg. 6,246, 6,301-02 (Feb. 3, 2022).

the rule and issue a General Certificate of Conformity (GCC) demonstrating compliance.[126] Manufacturers of custom window coverings that are children's products must have products third party tested by a CPSC-accepted laboratory and issue a Children's Product Certificate (CPC) demonstrating compliance with the rule.[127]  CPSC has failed to account for these costs in its assessments of the costs of the proposed standard.[128]

## IV.    Conclusion

WCMA appreciates the opportunity to comment on CPSC's Proposed Standard and to continue this important dialogue with CPSC.  Should you have any questions on these comments or need for additional information, please contact Ralph Vasami, Executive Director of WCMA.

---

[126] 15 U.S.C. § 2063(a)(1); see, generally, 16 C.F.R. Part 1110.

[127] 15 U.S.C. 2063(a)(2); see, generally, 16 C.F.R. Part 1110.

[128] In its assessment of the burden pursuant to the Paperwork Reduction Act, CPSC acknowledges minimal impact – 1 hour of recordkeeping and record maintenance – associated with compliance with the children's products certification and testing requirements.  87 Fed. Reg. 1,049.  Not only does this estimate fail to acknowledge the burden for non-children's products, but CPSC's assertion that any amount of testing and certification could be accomplished with 1 hour of work is risible.

A763

# Attachment 2:

## WCMA Comments on Safety Standard for Operating Cords on Custom Window Coverings

## CPSC Docket No. CPSC-2013-0028

## Attachments 1-6

March 23, 2022

# WCMA Attachments 1-6

March 23, 2022

# Attachment 1:

# Assessment of CPSC's Notice of Proposed Rulemaking "Safety Standard: Operating Cords on Custom Window Coverings"

RIAS Inc.

March 23, 2022

## Assessment of CPSC's Notice of Proposed Rulemaking "Safety Standard: Operating Cords on Custom Window Coverings"

RIAS Inc. at the request of the Window Covering Manufacturers Association (WCMA), prepared this assessment of the Consumer Product Safety Commission's (CPSC) analysis of the risk of injury and preliminary regulatory analysis contained in the Notice of Proposed Rulemaking, "*Safety Standard for Operating Cords on Custom Window Coverings*", published in the Federal Register on January 7, 2022 (Docket CPSC-2013-0028-1567).

## I.   Assessment of the Risk of Injury Analysis

The risk analysis prepared by the CPSC in support of their proposed rulemaking involves incident data related to window coverings from 2009 through 2020. CPSC's incident search focused on fatal and non-fatal strangulation incidents involving window covering cords and children under 8 years of age, and under 5 years of age. CPSC references three databases: (1) the Multiple Cause of Deaths data file from the National Center for Health Statistics (NCHS); ; (2) the Consumer Product Safety Risk Management System (CPSRMS); and (3) the National Electronic Injury Surveillance System (NEISS) maintained by the CPSC.

The CPSC attempted to distinguish between stock and custom window coverings but could only do so for 56% of incidents.

**Summary of Major Deficiencies in CPSC's Risk of Injury Analysis**

- **CPSC's number of fatalities attributed to corded window coverings is not a minimum estimate as claimed.** It is likely that the number of fatalities attributed to window coverings estimated by CPSC from the NCHS strangulations data does not represent a lower bound or minimum estimate, but is more likely a reasonable approximation of the total fatalities.

- **CPSC ignores clear downward trends in fatal incidents** CPSC states that "*a minimum of 9 strangulation fatalities (35 percent of the unrounded average annual death estimate of 23.27) occur annually on window covering cords among children under 5 years of age*", but this estimate does not take into account the clear downward trend occurring in fatalities.

- **For most of the incident data, product type is "unknown":** More is unknown than is known in the incident data, which undermines CPSC's justification for the need to implement a mandatory standard. In their breakdown of incidents into stock and custom products, CPSC could only identify the window covering type in 109 out of the 194 incidents (56%) presented in their findings, only 35 of which pertained to custom products (18% of incidents).

- **CPSC ignores downward trends in known incidents for custom products.** Incident data trends in incident data that CPSC has identified as pertaining to custom product clearly show a strong downward trend over the 2009 to 2020 period. It is notable that even given the limitations of the incident data, if all incidents for products in the unknown category are included with incidents identified with custom products, the trend in incidents is still strongly downwards over the 2009 to 2020 period.

A more detailed assessment of CPSC's Risk of Injury Analysis is provided below.

## CPSC Analysis of NCHS Data

CPSC indicates that the NCHS fatality data in their analysis were extracted by searching for incidents with a single ICD-10 cause of death code (W76, "other accidental hanging and strangulation"). However, these data do not provide information on the products involved in the incidents. CPSC staff estimated the proportion of these incidents attributable to window covering cords by applying a fixed percentage from a 2002 study:

> "*A CPSC report by Marcy et al., which reviewed CPSC databases in strangulation fatalities among children less than 5 years old were associated with window covering cords.[1] Assuming that this 35 percent proportion applies to the entire period 2009 through 2019, CPSC staff estimates that, on average, a minimum of 9 strangulation fatalities (35 percent of the unrounded average annual death estimate of 23.27) occur annually on window covering cords among children under 5 years of age.*"

The CPSC staff's 35% estimate of strangulation incidents being associated with window covering cords is a fundamental assumption underlying the CPSC's risk assessment, and it is based on a 20-year-old study. Since 2002, there have been six updates to the ANSI/WCMA safety standard, so it is reasonable to question whether this 35% estimate continues to be valid.

---

[1] Marcy, N., Rutherford, G. (2002) Strangulations Involving Children Under 5 Years Old. U.S. Consumer Product Safety Commission, December 2002.

Also, CPSC staff asserts that this average annual number of incidents for the period 2009 to 2019 represents a minimum estimate because it does not include cord-related strangulations recorded under two other ICD-10 codes: W75 ("accidental suffocation and strangulation in bed") and W83 ("other specified threats to breathing"). The impact of this omission is minimal, however:

- Our review of CPSC's database indicates that there are no records of any fatality incidents occurring between 2000 and 2020 with an ICD-10 code of W75.

- Only eleven incidents occurring over the 2000-2020 period (i.e., fewer than one incident per year) were coded as W83, and even applying CPSC's flawed approach, only 35% (3.85) would be from window coverings.

As shown in Figure 1 below, the NCHS fatality data for ICD code W76, children under 5 years of age, shows a clear downward trend for over 20 years. When combined with the 2002 Marcy et al estimate that 35% of strangulations may be due to window coverings, the annual results track the CPSRMS fatality data very closely. In fact, the trendlines for the two sets of estimates (CPSRMS fatal incidents and the 35% of NCHS strangulations) over the 1999 to 2020 period are almost identical.

**Figure 1: NCHS and CPSMRS Fatality Data, 1999-2020**



Source: Data from CPSC's 2015 ANPR and 2022 NPR

What we observe from the above is:

- It is likely that the number of fatalities attributed to window coverings estimated by CPSC from the NCHS strangulations data does not represent a lower bound or

minimum estimate, but is more likely a reasonable approximation of the total fatalities.

- The 35% estimate from the 2002 study appears reasonable, however the manner in which CPSC applied this estimate to arrive at their finding that "*a minimum of 9 strangulation fatalities (35 percent of the unrounded average annual death estimate of 23.27) occur annually on window covering cords among children under 5 years of age*" is not reasonable, because it does not take into account the clear downward trend occurring in fatalities. This same issue was pointed out by Heiden Associates seven years ago in their assessment of the 2015 ANPR for the WCMA. By applying the 35% factor to average annual death calculated across the 2009-2020 period, the result artificially suppresses any trend in annual incidents specifically involving window covering cords. We assume that this was unintentional when CPSC made the calculation in 2015. Making the same error again seven years later after it had been pointed out by a third-party expert in risk assessment is either a serious oversight by CPSC, or a deliberate misrepresentation of the data.

- The number of fatalities shows a clear downward trend, but this has been seemingly ignored by CPSC.

**CPSC's Incident Data Analysis**
Based on their analysis of CPSRMS data, CPSC found that a total of 194 strangulation and near-strangulation incidents, involving children 8 years old and younger, were reported from 2009 through 2020.

**NEISS injury data "combined" with CPSC incident data:** CPSC used the emergency department-treated injury data (NEISS) for the aggregated estimated injuries from 2009 through 2020 to children 8 years of age and younger who were entangled on window covering cords, but CPSC staff reported that "the total numbers were below the NEISS reportable threshold."[2] However, CPSC did combine 34 injury reports from NEISS "with the anecdotal reports received by CPSC in the incident analysis."[3]

Nowhere in the NPR does CPSC explain how the 34 injury reports from NEISS data were added to the other incident data, and how CPSC ensured that no double-counting occurred. The CPSC

---

[2] Staff Briefing Package, p.52.
[3] Ibid, p.53.

Staff Briefing Package contains information on CPSC Data Sources and a brief overview of the CPSC's Data Selection Criteria, but falls well short of explaining how the 34 injury reports from the NEISS data were included in the analysis. For any regulatory analysis to be credible, all data and assumptions should be made available so that the common standard of reproducibility can be tested. CPSC's analysis does not meet this basic threshold, which calls into question the validity of CPSC's findings.

**Unexplained anomalous injury data for 2009 and 2010:** There is an unexplained spike in incident data presented by CPSC for 2009 and 2010. Figure 2 below shows the number of fatal incidents and total incidents reported by CPSC for 1996 to 2020.

**Figure 2: Trends in Incidents, All Window Coverings**



Source: Data from CPSC's 2015 ANPR and 2022 NPR

The spike in total incidents circled in Figure 2 is the due to the anomalous number of nonfatal incidents reported by CPSC for 2009 and 2010, which are 5.2 and 3.1 times greater respectively than the average number of nonfatal incidents over the 1996-2020 period. These anomalous data nonfatal incidents show up in CPSC's stock and unknown categories of products.

CPSC has never offered an explanation for this drastically inconsistent data. WCMA members point to an influx of roman shades in the U.S. market during this period that resulted in an increase in near miss strangulation incidents due to rear cords. WCMA took proactive actions to address these risks: a recall and repair order was issued, and the rear cord, inner cord and hazardous loop test requirements were added to the 2012 ANSI/WCMA safety standard to eliminate this hazard.

**Downward trends in incidents are apparent:** This anomalous incident data for the years 2009 and 2010 skews the examination of trends in incidents, by making the 1996-2020 trends for nonfatal and total incidents appear less downward trending, and the 2009-2020 trends of nonfatal and total incidents more strongly downward trending over time than they would be otherwise. However, even after adjusting for the problematic nonfatal incident datapoints, incidents still show a strong downward trend over the 2009-2020 period for CPSC's analysis.

**Figure 3: Trends in Incidents, 2009-2020 (adjusted to address anomalous data in 2009 and 2010)**



Source: Author's calculations, data from CPSC's 2022 NPR

**CPSC Analysis of Incidents by Product Type**

**Downward trend in incidents for custom and stock products.** Figure 4 shows data presented by CPSC (Table 1b, page 1023) by product type.

**Figure 4: Trends in All Incidents for by Product Type**



Source: CPSC data from Table 1b, p. 1023, with trendlines added.

The data show significant downward trends in incidents from 2009 to 2020 for both custom and stock products, and even for the "unknown" category. However, as noted above, nonfatal incidents for stock and known products in 2009 and 2010 appear to be unreliable, and skews the downward trend in total incidents for stock and unknown product types. Despite this, incidents show downward trends for both custom and stock products.

It is important to note that while custom products were only specifically identified under the ANSI/WCMA safety standard in 2018, custom products have been subject to the continuous improvements in safety requirements resulting from revisions to this standard for all product types (e.g., tension devices, anchoring warning labels, testing requirements, etc.), and continue to be subject to specific custom product requirements under the 2018 standard (e.g., 40% operating cord length, default to tilt wand, etc.).

It is reasonable to expect that the observed downward trend in fatal incidents for custom products will continue as 2018 ANSI/WCMA safety standard-compliant custom product further penetrates the U.S. market over time, and when additional custom product safety enhancements are implemented under future updates to the ANSI/WCMA safety standard.

**Trends in Known Incidents for Custom Products are Strongly Downward.** Figure 5 shows the trends in incident data that CPSC has identified as pertaining to custom product. The data clearly show that incidents trend strongly downward over the 2009 to 2020 period.

**Figure 5: Trends in Known Incidents for Custom Product**



**For most of the incident data, product type is "unknown":**  More is unknown than is known in the incident data, which undermines CPSC's justification for the need to implement a mandatory standard. In their breakdown of incidents into stock and custom products, CPSC could only identify the window covering type in 109 out of the 194 incidents (56%) presented in their findings, only 35 of which pertained to custom products (18% of incidents).

It is notable that even given the limitations of the incident data, if all products in the unknown category *are assumed to be custom product*, the trend in incidents would still be strongly downwards over the 2009 to 2020 period, as shown in Figure 6 below.

**Figure 6: Trend in Incidents, Custom + Unknown**



Source: CPSC data from Table 1b, p. 1023, with ordinary least squares trendlines added.

**Age of custom products in the incident data unknown:** Of the 35 incidents involving custom window coverings, CPSC reports in Table 2 (p. 1024) that 18 involved pull cords, 12 involved continuous loops, and 3 involved inner cords (remaining 2 involved unknown types of cords). Of the 18 pull cord incidents, 16 involved custom horizontal blinds. The 12 continuous loop incidents were fairly evenly distributed across custom window covering types, and the 3 inner cord incidents involved custom roman shades.

Critically, the incident data presented do not identify the age of the custom window coverings involved in the incidents, and therefore staff can draw no reasonable conclusions about which version of the ANSI/WCMA standard the window coverings complied with. In their assessment of pull cord incidents, CPSC states that "the effects, if any, of the 2018 voluntary standard on these products have yet to be reflected in the data." There is no way to determine from the data, for example, the extent to which the default cord length requirement (ANSI/WCMA 2018, section 4.4) or default wand tilt requirement (section 4.4.1.1) have reduced or eliminated the risk of strangulation from pull cords or continuous loop cords for custom products.
Further, incidents cited by CPSC with continuous loop cords involved situations where tension devices were not installed or were broken. Without knowing the age of the products involved, it is impossible to determine with any certainty the effectiveness of improvements to the ANSI/WCMA 2012 standard regarding tension devices and anchoring performance aimed at reducing or eliminating these specific kinds of risks. The three incidents involving inner cords have been addressed by Appendix C and Appendix D of the WCMA/ANSI standard.

## II.    Assessment of CPSC's Preliminary Regulatory Analysis

CPSC's proposed rulemaking includes a preliminary description of the potential benefits and potential costs. The CPSC's estimates annual costs ranging from $156.5 million to $309 million, which significantly exceed the estimated annual benefits of $49.5 million. A limited sensitivity analysis conducted by CPSC suggests that even when assumptions underlying their analysis are adjusted, costs still exceed benefits by a wide margin in every case.

**Summary of Major Deficiencies in CPSC's Preliminary Regulatory Analysis**

1. **Benefits are overstated.** The CPSC preliminary regulatory analysis estimates a *maximum* benefit from the anticipated mandatory standard of approximately $49.5 million. This estimate overstates the benefits for the following reasons:

   - CPSC uses average annual numbers of fatal and non-fatal injury incidents

calculated across the 2010-2020 period as the baseline for assessing the value of the proposed mandatory standard. However, as demonstrated in the previous section of this report, the rates of fatality and injury incidents for custom window covering products have been declining over time. CPSC has not taken this into account in their benefits estimates.

- Further, CPSC assumes that no further reductions would take place in the future in the absence of a mandatory standard.  This assumption is completely erroneous considering the evidence that fatal and non-fatal incidents have been decreasing over time as the ANSI/WCMA safety standard has been updated and as older products are replaced with compliant product.  This downward trend in incidents will continue as newer stock and custom window coverings that are compliant with the 2018 safety standard displace older non-compliant product, and as subsequent updates to the ANSI/WCMA safety standard are implemented in the future.

- All fatalities and injuries are assumed to be eliminated if a mandatory standard were adopted. However, there is no compelling evidence presented by CPSC that this is the only feasible option. And since the current data on incidents of strangulations does not distinguish the age of window covering products, there is no reasonable way that CPSC can justify a mandatory standard as the sole means to improve safety.

2. **Costs are understated.** The CPSC preliminary regulatory analysis also understates the costs that would be incurred to comply with a mandatory standard:

- The CPSC cost-benefit analysis uses estimated per-product component increases in manufacturing cost across product type as the sole measures of the cost associated with adopting a mandatory standard.  The preliminary regulatory analysis does not acknowledge  the initial and continuing costs that would be incurred by manufacturers, wholesalers, retailers, and interior design centers to change their distribution, sales, marketing, and service operations to support drastically revised product lines.

- The sole use of manufacturing (component) cost also ignores the impact of an increase in product prices on demand, with the higher prices encouraging consumers to postpone replacement of current products. The resulting reduction in sales would slow down the replacement of older corded window coverings, causing them to remain in use for a longer period of time, thereby reducing the estimated benefits of a mandatory standard for several years after adoption.

- Consumers could incur higher service and repair costs to maintain the operability of cordless window coverings, or alternatively, need to replace these products more frequently.

3. **Societal costs exceed benefits.** Even with overstated per-product benefit and understated per-product cost estimates, the CPSC preliminary regulatory analysis acknowledges that the estimated per-product benefit is substantially below the entire range of per-product cost estimates presented. In other words, even using questionable baseline data and unreasonably optimistic assumptions about the impact of adopting a mandatory standard, the proposed requirements would fail a cost-benefit test by a wide margin.

4. **CPSC's analysis ignores the disproportionate impact of its proposed mandatory standard on small businesses.** In addition to the problems noted with the cost-benefit analysis, there are deficiencies in the CPSC's preliminary regulatory analysis that drastically understate the potential impact of a mandatory standard on affected industry sectors, and particularly on small business in these sectors. The CPSC preliminary regulatory analysis does not provide a complete profile of the industry, omitting sectors with thousands of small firms that would face higher costs and lower demand for their products. Adopting a mandatory standard would be likely have a disproportionate impact on these small firms.

5. **CPSC's analysis does not meet accepted standards for a proper Cost-Benefit Analysis.** CPSC does not project future risks "with" and "without" the proposed mandatory standard, taking into account trends in incidents and in custom window coverings, and how those trends are likely to evolve over time as the voluntary standard continues to be updated. A proper cost-benefit analysis would present these scenarios, estimate the costs and benefits of each, and test for uncertainty in their estimates using statistical techniques such as Monte-Carlo analysis. The CPSC's analysis falls well short of this standard for proper cost-benefit analysis, and is therefore not sufficient to accurately inform decision-making.

A more detailed assessment of CPSC's regulatory impact analysis is provided below.

**Assessment of CPSC's Preliminary Regulatory Analysis**

**Inaccurate industry profile:** The CPSC used Census data, the D+R (2021) study, and other market research reports to estimate the total number of firms in window coverings related sectors, and the number of firms that are small businesses. According to the CPSC analysis:

- The industry includes businesses listed under the NAICS product code for blinds and shades manufacturers (337920 Blind and Shade Manufacturing) or retailers (442291 Window Treatment Stores).[4]

- Based on 2017 data, 1,898 firms were categorized as blinds and shades manufacturers and retailers (Census Bureau, 2020). Of these, about 1,840 firms (302 manufacturers and 1,538 retailers) are small.

- Total market size is estimated to be $6.6 billion, based on data from a Euromonitor (2021) study for CPSC, which was not made available for review as part of the public record. CPSC relied on a D+R (2021) that estimated approximately 139 million residential window coverings were shipped in the United States in 2019, and custom products accounted for approximately 44 percent of unit sales.[5]

Based on available Census and industry data, the CPSC preliminary regulatory analysis provides an incomplete and inaccurate profile of the window coverings industry:

- The U.S. window coverings industry includes not just manufacturers and window treatment stores, but also home furnishings merchant wholesalers (NAICS 42322), other home furnishings stores (NAICS 442299), and 54141 (interior design services).[6] The Census data do not include estimated shares of these sectors' total revenues that are derived from the sale of window treatments. As noted by Heiden Associates (2015), window treatments often represent the highest margin component of home projects sold

---

[4] The CPSC economic analysis indicates that "The two product codes 337920 and 442291 encompass most products in the window coverings market. However, some drapery and curtain manufacturers may be listed under 322230, stationary product manufacturing." As noted by Heiden Associates (2015), this assertion by CPSC is not entirely correct. The 337920 sector includes domestic production of blinds, shades, and curtain/drapery hardware, but not the value of draperies and curtains. Some draperies, curtains, and other window treatments are made outside of the manufacturing sector by retailers, interior design services, and contract workrooms.

[5] McCarthy, Rowan and Shannon Christie. Window Covering Market Characterization: Final Report. Prepared for Consumer Product Safety Commission per contract #61320620P0025 by D+R International Ltd. February 2021.

[6] In fact, the D+R (2021) study indicates that only 11 percent of window coverings are sold through window treatment stores.

through these channels.[7]

- In addition, the Census data are not able to capture adequately wholesaler, retailer, and independent designer sales of customized window treatments created from fabric and hardware inputs by employees or contractors (often referred to as "workrooms"). Their analysis also excludes larger retailers including big box stores, that provide shop-at-home services and design consultants to offer custom products.

- Most critically, the CPSC estimate of the number of potentially affected small businesses is too low, because it excludes large numbers of small firms in the three additional sectors (NAICS 42322, 442299, and 54141) that depend on window treatment sales for a share of revenues and profits. There are nearly 25,000 businesses in these three sectors that have fewer than 100 employees.

**Questionable accuracy of estimated corded custom window coverings in use.** The CPSC's preliminary regulatory analysis also provides estimates of the number of corded custom window coverings in use in U.S. homes. Most of these estimates are based on results from the D+R (2021) study:

- The D+R study combined the estimated number of housing units from Census data with the estimated average window coverings per housing unit based on a household survey conducted as part of the study, estimates of the proportion of window coverings in use by type, estimates of the expected product life of window coverings, and estimates of the proportion of corded custom window coverings sold by type, to arrive at an estimate of 1,014 million window coverings in use in the U.S. during the year 2019.

- CPSC staff then estimated custom product shares of the 1,014 million window coverings using the 2019 share of custom product sales to total for each aggregate category from D+R 2021, and then applied an estimate of 65 percent of custom window covering products in use having operating and/or accessible cords, to achieve their estimates of the affected custom window coverings by type: 72 million corded custom horizontal blinds, 138.2 million corded custom shades, 6.4 million corded custom vertical blinds, and 116.1 million custom curtains & drapes—for an estimated total of 332.7 million of custom corded products.

---

[7] Heiden, Edward J, and Steve McGonegal. "Review and Critique of CPSC Economic Analysis in ANPR and Briefing Package". Prepared by Heiden Associates for the Window Covering Manufacturers Association, June 1, 2015. p.8

The D+R (2021) estimate of U.S. residential housing units was based on housing growth indicators and characteristics including (1) the number of homes in the U.S., (2) housing construction data (3) growth rates, (4) the type of homes. Just estimating the number of U.S. residential housing units involves four different factors. In this instance, each of the factors used to construct their estimate of residential housing units is based on reliable sources of data, so the total number of housing units is likely an accurate estimate.

However, the remaining steps in estimating the number of corded window coverings in use is, at best, confusing, and, at worst, yields unreliable estimates.

- To estimate the number of window coverings per housing unit, D+R used the assumptions from a 2013 United States Department of Energy (US DOE) market characterization study also prepared by D+R. The study was based on a survey of 2,100 households in 13 cities across the United States to collect a representative sample of data on household characteristics including number of windows, the location of windows, size of windows (small, medium, large, as judged by occupants), the types of window coverings installed, and how those coverings were operated to try and understand energy use implications.

- D+R (2021) states that "the average number of windows across all housing units in the United States is approximately 12 windows. This average window count broken down by unit type can be seen in Table 3."[8]

Table 3. Average Number of Windows by Housing Unit Type[11]

| Housing Unit Type | Average Number of Windows |
|---|---|
| Single-Family Detached | 14 |
| Single-Family Attached (Townhome) | 9 |
| Apartment Building 2-4 Units | 7 |
| Apartment Building 5+ Units | 4 |
| Manufactured/Mobile | 10 |

- However, Table 3 in D+R (2021) study is not the average number of windows by housing type. As shown in Figure 2 (p.15) of the D+R 2013 study, the average number of windows shown in Table 3 are closer to the 75th percentile estimates from the 2013 study, not the

---

[8] D+R International (2021), p. 11.

average.[9] The 75th percentile would result in a much higher overall estimate of the total installed base of window coverings than the 1,014 million estimate.

Figure 2: Number of Windows per Household by Residence Type

- In the Staff Briefing Package, it states "the D+R (2020) study estimated an average of about 8.17 window coverings per housing unit. The product of the number of housing units and the average number of window coverings per housing unit suggests about 1,014 million window coverings may have been in use in the U.S. (124.1 million housing units × 8.17 window coverings per housing unit) during the year 2019."[10] We note that there is no reference provided in the Staff Briefing Package for a D+R (2020) study. Also, on page eleven of the D+R (2021) report, it clearly states that the "average number of windows across all housing units in the United States is approximately 12 windows."

- The estimate of 1,014 window coverings in use cannot be reproduced from the data shown in the D+R (2021) study. We also note that neither the Staff Briefing Package nor the D+R studies discuss how the number of windows per household may be changing over time. And there is no way to determine if the 2013 estimates for all window coverings are relevant to custom corded window coverings in 2022.

---

9 Bickel, Stephen, Emily Phan-Gruber and Shannon Christie. Residential Windows and Window Coverings: A Detailed View of the Installed Base and User Behavior. Prepared U.S. Department of Energy by D&R International, Ltd. September 2013. p.15.
10 Staff Briefing Package, page 165.

The number of window coverings by type in use is then estimated by applying the 2019 share of custom product sales to the 1,014 million window coverings estimate, resulting in estimates of 110.7 million custom horizontal blinds, 212.6 million custom shades, 9.8 million custom vertical blinds, and 178.6 million custom curtains or drapery, for a total of 511.7 million custom blinds in use in 2019.

- In Figure 1 (p. 166) of the Staff Briefing Package, it is unclear whether the calculation of custom product share of sales (Horizontal Blinds, all types - 32.52% custom, Shades, all types - 70.66% custom, Vertical Blinds - 5.82%, and Curtains & Drapes - 100%) is based on the number of units sold or on sales revenues by product category. We assume that the source of these custom product share estimates come from the D+R (2021) study, and D+R discussed how their assumptions could contribute to inaccurate estimates for market size. However, these issues were not covered in either the Staff Briefing Package, nor the Preliminary Regulatory Analysis in the NPR.

It is worth noting some of the key areas of concern covered in the D+R (2021) study that were excluded from the Staff Briefing Package and the Preliminary Regulatory Analysis:

- "It is assumed that 65 percent of metal/vinyl blinds imports are for residential consumers. This residential unit estimate is also assumed to account for 90-95 percent of the market for this category. However, the imports are higher by a factor of nine in some cases compared to some of the historical empirical sales data for this window covering category. Because of this disparity, 25 percent of the residential imports were assumed to be sold in the same year they were imported for the projection model."

- "The average useful life estimates could also be lower than actual life times. This increases the number of failures and therefore sales for each category. This is especially true for the metal/vinyl blinds category which makes up the largest share of the installed base and of new product sales. The average useful life for this category is assumed to be 4.25 years in the DOE report. This causes a higher volume of failures for this category compared to all others."

- "The shares of sales for the various window covering categories are based upon the sales from some of the major manufacturers in the United States window covering market. However, these manufacturers focus on specific categories and in some cases do not have particular categories in their offerings. This introduces greater uncertainty specifically in the shares of sales in the curtains/drapery and sheer drapery categories that are not present in the data available from manufacturers. This also produces some uncertainty in the

representative breakdown of stock versus custom shipments for categories that are only sold as custom products by these manufacturers for instance. This bias can be seen in the representation of some categories being 100% custom shipments."[11]

- CPSC did not test the impact of these uncertainties on their estimates in the very limited sensitivity analysis presented in its preliminary regulatory analysis.

- No data or assessment is presented in the NPR or in the Staff Briefing Package on the trends in the estimated custom products in use by product category, despite the existence of projections over time developed in the D+R (2021) study.

The number of corded custom window covering products in use by category are estimated by applying an estimated 65 percent of custom window covering products in use having operating and/or accessible cords. This results in an estimated total of 332.6 million corded custom window coverings in use for the year 2019, of which approximately 72 million are corded custom horizontal blinds, 138.2 million corded custom shades, 6.4 million corded custom vertical blinds, and 116.1 million corded custom curtains or drapery.[12]

- As the CPSC acknowledges, these estimates of corded product in use are based on "an implicit assumption that the share of annual sales will equate to a similar share of product in use. Changes in consumer preferences over time, and differences in the expected product life between custom and stock products, could result in significant deviations in this estimate."

- CPSC assumes that 65% of custom products are corded, and applies this percentage across all custom categories. According to CPSC, the 65% estimate comes from "D+R's review and interviews with retailers" and notes that there is uncertainty surrounding the estimate.[13] WCMA members provided RIAS Inc. with data on custom product market shares by type based on actual shipments in 2018 and 2021. In 2018, the share of custom products that were corded was 64.6%, but that number had fallen substantially to 53.2% by 2021. The use of static estimates by CPSC ignores these real trends that are taking place in the industry.

---

[11] For example, D+R (2021) estimates that 100% custom share of the market for Curtains/Draperies (p.23), Pleated Shades (p.25), Soft Sheer Blinds 26) and Roman Shades (p.26).

[12] Staff Briefing Package, p. 166

[13] Ibid, p.178.

**Table 1: Changing Shares of Custom Product that is Corded and Cordless, by Product Type (2018 and 2021)**

|  | 2018 | | 2021 | |
| --- | --- | --- | --- | --- |
|  | Corded | Cordless | Corded | Cordless |
| Metal or vinyl horizontal blinds | 95.1% | 4.9% | 91.9% | 8.1% |
| Vertical blinds | 70.9% | 29.1% | 64.8% | 35.2% |
| Wood or faux wood horizontal blinds | 84.2% | 15.8% | 66.9% | 33.1% |
| Cellular shades | 30.7% | 69.3% | 21.0% | 79.0% |
| Pleated shades | 54.1% | 45.9% | 31.0% | 69.0% |
| Roller shades | 68.4% | 31.6% | 57.3% | 42.7% |
| Soft sheer blinds | 69.7% | 30.3% | 61.1% | 38.9% |
| Roman Shades | 47.6% | 52.4% | 41.2% | 58.8% |

Source: WCMA member responses to February 2022 questionnaire on CPSC's NPR

- This data shows that, based on experience to date, there has been a decrease in the share of custom window covering products that are corded between 2018 and 2021, across all categories of product. WCMA members indicate that this observed trend will continue. These trends should have been considered in CPSC's analysis.

- Also, as shown in Table 3 below, WCMA members recently provided RIAS Inc. with estimates of expected product life for custom window products. While similar to the product life estimates used by CPSC for all products, the life span estimates specific to custom window coverings are higher for metal/vinyl horizontals, lower for wood/faux horizontals, and lower for Roman shades than the numbers used by CPSC in their analysis.

In the past, WCMA has submitted data from a comprehensive, confidential U.S. retail window covering market study conducted in 2016 that showed the breakdown of unit sales of window covering products by category. Based on the custom product market shares from that study and the 53.2% share of the custom product market that is corded in 2021 (based on WCMA member shipments in 2021), we calculate the following revised estimates of corded custom window coverings in use:

**Table 2: Estimated Custom Product in Use, by Product Category**

|  | CPSC estimates of custom product in use | CPSC estimates of corded custom product in use (based on 65% assumption) | Revised estimates of custom product in use based on corrected market shares | Revised estimates of corded custom product in use (based on 53.2% share in 2021) |
|---|---|---|---|---|
| Horizontal Blinds, All Types | 110.7 | 72 | 58.9 | 31.4 |
| Shades, All Types | 212.6 | 138.2 | 113.2 | 60.2 |
| Vertical Blinds | 9.8 | 6.4 | 5.2 | 2.8 |
| Curtains & Drapes | 178.6 | 116.1 | 178.6 | 95.0 |
| Total | 511.7 | 332.6 | 272.4 | 189.4 |

Source: RIAS Inc calculations

Our revised estimates of corded custom product in use results in much lower numbers than CPSC's estimates across all categories.

Overall, the CPSC's estimated number of corded custom window coverings in use by category suffers from the following shortcomings:

- The estimates are not based on direct measures, but rather on numerous data sources and studies from different years, each with underlying assumptions that, taken together, could have major influence on the end results. This is a critical weakness in the analysis because the number of corded custom window coverings in use is a fundamental data point used in CPSC's estimates of annual injury costs.

- The CPSC's estimates of the number of custom window coverings in use cannot be reproduced from the data presented in the NPR, the Staff Briefing Package, nor any of the other studies that have been available as part of the public record. While we therefore cannot reproduce CPSC's estimates with the data provided, using data from reliable alternative sources, our estimates of the number of corded custom window coverings in use differs substantially from CPSC estimates.

- No historical trends or future projections of the number of custom window coverings in use were presented in the NPR or the Staff Briefing Package, despite the availability of information derived in the D+R (2021) study. CPSC has not shown how these critical estimates in their analysis are expected to change over time in the absence of any intervention by way of a mandatory standard for corded custom window coverings.

**Benefits of the proposed rule are overstated.** CPSC's preliminary regulatory analysis estimated 9 fatal injuries involving corded window coverings per year, with an estimated societal cost of these fatal injuries to be $82.8 million annually. Based on the estimate of 185 nonfatal window covering injuries annually from CPSC's Injury Cost Model (ICM), CPSC staff estimates that the societal costs of nonfatal window covering injuries are approximately $9.3 million annually. Overall, staff estimates the societal costs of fatal and nonfatal injuries to be about $92.1 million annually.

- Nowhere does the CPSC provide details on how the 185 nonfatal window covering injuries annually were estimated using the ICM, so it is impossible to reproduce CPSC's numbers to verify if the calculations are correct.

- Again, CPSC uses a single, point-in-time estimate of nonfatal injuries which ignores the downward trend in fatalities and nonfatal injuries observed in the incident data.

To calculate the annual injury cost per custom window covering in use, CPSC staff divided the injury cost for each product category by the estimated number of products in use for each category. The estimates of annual injury costs, per custom window covering in use, were $0.92 for cellular, pleated, and roller shades; $1.57 for Roman shades; $3.61 for wood and faux wood horizontal blinds; $1.34 for metal/vinyl horizontal blinds; $7.56 for vertical blinds; and, $0.14 for curtains/drapes. Combining these estimates with one year of corded custom window covering sales (2019) amounts to a gross annual benefit of $52.3 million. Adjusting this estimate for the expected effectiveness of the proposed rule, as not all incidents associated with custom window coverings involved operating cords, resulted in a total annual benefit of approximately $49.5 million.

There are several reasons why this estimate substantially overstates the benefits that could be reasonably anticipated from a mandatory standard:

- CPSC uses average annual numbers of fatal and non-fatal injury incidents calculated across the 2010-2020 period as the baseline for assessing the value of the proposed mandatory standard. As shown in our assessment of CPSC's incident data earlier in this assessment, the rates of fatality and injury incidents for custom window covering products have been declining over time, even when all incidents where the type of product is unknown are assumed to be custom products.

- In addition to assuming that no reductions in the rates of fatalities and injuries have taken place over the past 13 years, CPSC's injury cost estimates also assume that no further reductions would take place in the future in the absence of a mandatory standard. This

assumption is completely erroneous. As we have shown, the number of fatal and non-fatal incidents has continued to decrease over time as the ANSI/WCMA safety standard has been updated and as older products that did not comply with newer versions of the safety standard were replaced with compliant product. This downward trend in incidents will continue as newer stock and custom window coverings that are compliant with the 2018 safety standard displace older non-compliant product. Work on the next update to the ANSI/WCMA safety standard is underway, which when implemented will further reduce incidents related to corded custom product.

- CPSC assumes all fatalities and injuries would be eliminated if a mandatory standard were adopted. However, there is no compelling evidence presented by CPSC that this is the only feasible option. Since the current data on incidents of strangulations does not distinguish the age of window covering products, there is no reasonable way that CPSC can justify a mandatory standard as the sole means to improve safety.

- The present value of injury costs is derived by the CPSC staff from a number of underlying estimates, all of which have weaknesses:

    o As shown above, CPSC's number of corded custom products in use estimates cannot be independently verified based on the data presented in the NPR, the Staff Briefing Package nor any other studies that are part of the public record for the NPR. Furthermore, future projections of the number of corded custom products in use in the absence of any intervention (i.e., a mandatory standard) have not been incorporated in the CPSC's analysis. Therefore, the estimates are likely overstated.

    o CPSC's annual injury cost per custom window covering in use is based on the estimated injury cost for each category of window covering, divided by the estimated number of corded window coverings in use for each category. As discussed above, both the injury costs and the number of corded window coverings are decreasing over time – yet CPSC ignores these trends in the calculation of annual injury costs avoided if the mandatory rule were to be implemented.

    o CPSC's expected product life estimates are also used to calculate present value injury costs. WCMA members provided RIAS Inc with feedback on the expected product life estimates developed by D+R. Results are compared to the D+R product life estimates below:

**Table 3: Comparison of Product Life Estimates**

|  | Estimates of Product Life used by CPSC Staff | Range of WCMA Member Estimates for Custom Products | | |
|---|---|---|---|---|
|  |  | Low | Mid | High |
| Metal or vinyl horizontal blinds | 4.25 | 5.5 | 6.7 | 8.1 |
| Vertical blinds | 7 | 4.8 | 7.6 | 10.6 |
| Wood/faux wood horizontal blinds | 13 | 8 | 10.8 | 13.8 |
| Cellular shades | 7 | 4.4 | 7.2 | 10.2 |
| Pleated shades | 7 | 4.5 | 7.5 | 9.75 |
| Roller shades | 7 | 4.4 | 7.2 | 9.6 |
| Soft sheer blinds | 7 | 5 | 7.2 | 9.45 |
| Roman Shades | 13 | 6.25 | 8.75 | 11.25 |

Source: WCMA member responses to February 2022 questionnaire on CPSC's NPR

The product life estimates used in the CPSC analysis relate to all window coverings. WCMA member input specific to custom window coverings are higher for metal/vinyl horizontals, lower for wood/faux horizontals, and lower for Roman shades. In CPSC's approach, these higher estimates of product life would have the perverse effect of increasing the present value estimates of injury cost per product, even though as we have shown, the trend in custom corded window products is towards replacement of corded products with cordless.

**Costs of the proposed rule are understated.** The CPSC preliminary regulatory analysis also understates the costs that would be incurred to comply with a mandatory standard:

- The CPSC cost-benefit analysis uses estimated per-product increases in manufacturing (component) costs across product type as the sole measures of the cost associated with adopting a mandatory standard. This presents only a partial picture of the costs to implement the proposed rule. The proposed mandatory standard would require significant, costly changes across the supply chain:

  o **Manufacturing:** In addition to increased cost of component parts, cordless window coverings require 50%+ more assembly labor per blind/shade. This will require significantly more square footage at a facility to support the same production volume. Plant configuration changes of this magnitude require capital approvals and lengthy plant construction activities.

  o **Supply Chain:** Increases in cordless operating system components will require additional tooling and/or sources of supply across a significant number of components and sub-systems.

- o **New Product Development:** Developing operating system solutions to cover gaps created within product offerings will be required, and such changes take 18 to 30 months to implement on average. Once a new design successfully passes engineering trials, it requires and additional five to six months of on-site production qualification trials.

- o **Marketing:** Sample books must be updated to reflect the new product offerings, product warnings, etc. This complex development/supply chain exercise requires an 18 to 24-month development cycle. Website information and materials must also be updated after the new product offerings have been finalized.

- o **Retailer Systems:** Retailer ordering system integrations are finished at the completion of new product development and the timing will vary by retailer, but generally take several months.

- The CPSC's focus on manufacturing component costs ignores increased component costs due to current global supply challenges and demand for raw materials for such components. It also ignores the impact of an increase in product prices on demand, with higher prices encouraging consumers to postpone replacement of current products. The resulting reduction in sales would slow the replacement rate of older corded window coverings, causing them to remain in use for a longer period of time, thereby reducing the estimated benefits of a mandatory standard for several years after adoption. Table 4 shows how increased prices will result in reduced sales by product type.

- In February 2022, RIAS solicited input from WCMA members on the impact the Proposed Standard would have on product costs and expected change in sales. Table 4 below summarizes the cost implications of the proposed mandatory standard for custom window coverings, and the resulting impact on retail prices and total sales:

**Table 4: Estimated Impact of the Proposed Rule on Costs, Price and Sales, by Product Type**

|  | Average change in cost of parts | Average change in final product cost | Average change in final retail price | Expected change in total sales |
|---|---|---|---|---|
| Metal or vinyl horizontal blinds | 60% | 59% | 38% | -70% |
| Vertical blinds | -16% | 1% | 1% | -2% |
| Wood/faux wood horizontal blinds | 31% | 32% | 41% | -21% |
| Cellular shades | 38% | 40% | 34% | -5% |
| Pleated shades | 17% | 17% | 24% | 18% |
| Roller shades | 33% | 27% | 25% | -1% |
| Soft sheer blinds | 18% | 21% | 18% | -17% |

| Roman Shades | 24% | 23% | 15% | -3% |
|---|---|---|---|---|

Source: WCMA member responses to February 2022 questionnaire on CPSC's NPR

For corded custom metal/vinyl blinds, the expected increase in parts and production cost, and the resulting increases in price, will lead to an overall 70% reduction of sales. Some companies expect that these lost sales will move to stock/made to measure and to shades. Companies involved in selling corded custom vertical blinds expect sales to migrate to cordless, except where no cordless option was available (e.g., for product over 144" in width).

For corded custom wood/faux wood blinds, companies estimate a 21% loss in sales, with customers migrating to cordless blinds, but due to price and lack of a retractable cord option for many custom blinds, many customers are expected to transition to shades. Sales across corded custom shades will transition to cordless or retractable cord option. Losses in sales of shades due to increased prices could be offset somewhat from demand shifting from the custom blind market where retractable cord options are lacking.

Overall, results from WCMA members indicate that more than 3.2 million units or 5.6% of custom product will be lost from the US marketplace (this assumes zero lost sales in the custom curtains/draperies market).

- The CPSC's preliminary regulatory analysis also does not acknowledge the initial and continuing costs that would be incurred by wholesalers, retailers, and interior design centers to change their distribution, sales, marketing, and service operations to support drastically revised product lines.

- It is also possible that consumers could incur higher service and repair costs to maintain the operability of cordless window coverings, or alternatively, need to replace these products more frequently.

- Finally, while CPSC's preliminary regulatory analysis focuses on residential use, commercial window coverings could also be affected since CPSC considers many products used in commercial locations to be "consumer" products. The vast majority of commercial products are custom. If CPSC's cost impacts doesn't include commercial products, it could greatly understate the potential impacts of the proposed mandatory standard.

**Societal costs exceed benefits of the proposed rule.** Even with overstated per-product benefit and understated per-product cost estimates, the CPSC preliminary regulatory analysis acknowledges that the estimated per-product benefit is substantially below the entire range of per-product cost estimates presented. In other words, even using questionable baseline data and unreasonably optimistic assumptions about the impact of adopting a mandatory standard, the proposed requirements would fail a cost-benefit test by a wide margin.

**Significant impacts on small business.** In addition to the problems noted with the cost-benefit analysis, there are some deficiencies in CPSC's preliminary regulatory analysis that drastically understate the potential impact of a mandatory standard on affected industry sectors, and particularly on small firms in these sectors. The CPSC preliminary regulatory analysis does not provide a complete profile of the industry, omitting sectors with thousands of small firms that would face higher costs and lower demand for their products. Despite this gap in the analysis, CPSC does find that the proposed mandatory rule will have a significant effect on a substantial number of small firms.[14]

**Rudimentary sensitivity analysis.** The "Characterization of Uncertainty in Benefit and Cost Estimates" presented in the CPSC's Staff Briefing Package is too simplistic given the number of assumptions and depth of uncertainty throughout the preliminary regulatory analysis. A proper sensitivity analysis would identify each key assumption and systematically assess the sensitivity of the cost and benefit estimates using appropriate statistical techniques. Normally, deterministic results (what CPSC refers to in the Staff Briefing Package as the "reference case") are presented based on the most likely values for underlying assumptions, then statistical techniques are used to test the possible ranges of values for all assumptions in the analysis to determine the overall robustness of results. It is not clear why CPSC did not undertake this type of standard analysis.

The most critical shortcoming in the sensitivity analysis is the failure to consider the downward trends in fatal and nonfatal incidents as part of a properly defined baseline for the analysis, and how this would affect the estimates of costs and benefits of the proposed mandatory rule.

## III.  Overall Assessment of CPSC's Analysis

In conclusion, RIAS Inc's assessment of the CPSC's analysis of the risk of injury and preliminary regulatory analysis contained in the Notice of Proposed Rulemaking, "Safety Standard for Operating Cords on Custom Window Coverings" found:

---

[14] Federal Register / Vol. 87, No. 5, p. 1048

- **Accepted standards for proper risk analysis have not been met.** A proper risk assessment would analyze the underlying causal factors for the trends in incidents, such as changes in exposure to potential hazards, including changes in population of children under 5 years of age over time, changes in number of window coverings in households over time, and the impacts of continuous improvements in window covering safety under the WCMA/ANSI safety standard, to establish a credible historical baseline. This baseline would then be used to provide evidence-based projections of future risk scenarios (expected changes in future incidents with and without the proposed regulation in place). Normally such projections would include probabilities/likelihood of occurrence using statistical techniques to analyze uncertainty. It is unclear why CPSC has not undertaken this kind of analysis, as it is common practice for regulatory agencies.[15]

- **CPSC's analysis does not meet accepted standards for a proper cost-benefit analysis.** CPSC does not establish a baseline for the analysis of costs and benefits, "with" and "without" their proposed mandatory standard, nor does it take into account trends in incidents and how those trends are likely to evolve over time as the voluntary standard continues to be updated. A proper cost-benefit analysis would present these scenarios, estimate the costs and benefits of each, and test for uncertainty in these estimates using appropriate statistical techniques. CPSC's analysis falls well short of this standard for proper cost-benefit analysis[16], and is therefore it is not sufficient to accurately inform decision-making.

- **Requirements under Section 9(f) of the Consumer Product Safety Act have not been met.** The assessment above has shown fundamental weaknesses in CPSC's analysis of risks, costs and benefits for the purposes of justifying implementation of a mandatory standard. As a result, CPSC's analysis has not met the requirements established under Section 9(f) of the Consumer Product Safety Act.

---

[15] Principles for proper risk analysis are set out in Updated Principles for Risk Analysis, Office of Information and Regulatory Affairs, U.S. Office of Management and Budget (OMB), which notes: "Due to the inherent uncertainties associated with estimates of risk, presentation of a single estimate may be misleading and provide a false sense of precision. Expert panels agree that when a quantitative characterization of risk is provided, a range of plausible risk estimates should be provided. When something more than a superficial analysis can be conducted, quantitative uncertainty analysis, sensitivity analysis, and a discussion of model uncertainty can greatly inform risk management decisions."

[16] As required under Circular A-4, Office of Information and Regulatory Affairs, U.S. Office of Management and Budget (OMB)

# <u>Attachment 2:</u>

# Review and Critique of CPSC Hazard Analysis in ANPR and Briefing Package

Heiden & Associates

June 1, 2015

**June 1, 2015**

**To:    Window Covering Manufacturers Association**

**From: Edward J. Heiden, Ph.D.**
**Steve McGonegal**

**Re:    Review and Critique of CPSC Hazard Analysis in ANPR and Briefing Package**

In a January 6, 2015 Advance Notice of Proposed Rulemaking (ANPR), the Consumer Product Safety Commission (CPSC) indicated that it is considering adopting a mandatory standard that would prohibit the use of cords in window coverings, where feasible, and require cords to be covered when used in products for which they cannot be feasibly eliminated. The ANPR resulted from the Commission's October 8, 2014, decision to grant petition CP 13-2, in which Parents for Window Blind Safety and seven other petitioners requested that CPSC issue this type of mandatory standard. Petitioners and the Commission acknowledge that the current voluntary standard (ANSI/WCMA A100.1-2014) is the most stringent standard for window covering safety worldwide, but argue that it is still not adequate to eliminate all potential strangulation hazards from closed cord loops.

CPSC staff prepared a comprehensive briefing package to support the Commission votes to grant the petition and to publish an ANPR. Per your request, we have reviewed the ANPR and the accompanying staff briefing package. Based on this review, we conducted research and analysis of several issues relating to the incident/hazard and economic analysis sections of the staff briefing package described above. This report summarizes our findings on the incident and hazard issues.[1]

**Summary of Major Problems Identified in Petitioners' and CPSC Incident Analysis**

- The CPSC staff analysis of incident rates and trends specifically excludes fatality incident data presented in the report for 2011 and 2012, the last two years of the period used for most of the staff analysis. The staff analysis also excludes all reports received relating to incidents in 2013.

- To assess the impact of including data from recent years in the hazard analysis, Heiden Associates developed a fatal and non-fatal incident database based on a comprehensive review of the reports in the DTHS, INDP, IPII, and NEISS databases. The new fatality analysis shows that:

---

[1] The results and discussion in the memo will be combined with a revised version of the previous economic analysis and presented in a single report on Monday, June 1st.

- o The fatality incident reports received thus far incidents in 2011, 2012, and 2013 are adequate to estimate the total number of such incidents that occurred during these years.

- o Incorporating these estimates shows that the annual number of fatalities was lower in the most recent decade (2004-2013) than the estimate of 11 fatalities per year in the 1996-2010 time period presented in the CSPC staff analysis.

- o Including the fatality incident data for the period from 1996-2003 and excluding data for 2011-2013 makes the average higher than if only the more recent data were used.

- It is even less clear why the CPSC staff analysis declined to present injury estimates for the 2011-2013 period or to investigate whether there was any trend in the annual numbers of non-fatal incidents using data from the one statistically representative source it maintains. Our new analysis shows that the data are adequate to develop a valid average annual estimate of ED-treated strangulation injuries for the most recent 10-year period:

  - o There were an average of 53 such injuries treated annually between 2004 and 2013. This estimate is about 60 percent of the 90 per year that the CPSC staff analysis estimates for the period from 1996 through 2010.

  - o As with the fatality estimates, including the non-fatal injury data for the period from 1996-2003 and excluding data for 2013 makes the average higher than if only the more recent data were used.

It is not clear why data from more than a decade ago is more relevant than data for the past few years for evaluating trends in fatality or injury incidents. A CPSC decision to proceed with proposing a mandatory standard should be based on the most recent and relevant data available. Moreover, the engineering analysis appears to misclassify incidents involving hazard patterns that were addressed by successive versions of the voluntary standard.

In addition, the CPSC engineering analysis appears to misclassify incidents involving closed cord loops on horizontal blinds as not being addressed by the ANSI/WCMA voluntary standard.

**Incident and Hazard Assessments in the Briefing Package**

The briefing package includes three studies that support the Commission's assessment of the hazards associated with corded window coverings and the extent to which the current ANSI/WCMA standard is able to mitigate these hazards:

- Tab A is a copy of the petition requesting that CPSC establish a mandatory standard. Exhibit I of the petition is an analysis of window covering cord strangulation incidents

prepared by Shelley Deppa of Safety Behavior Analysis, Inc (SBAI). The SBAI analysis concluded that the current ANSI/WCMA voluntary standard (A100.1, last revised in 2012) would not have prevented 102 of 292 window covering cord strangulation incidents that occurred from 1996 through 2012. We previously reviewed and critiqued the SBAI analysis for WCMA in 2013.

- Tab B is an August 2014 analysis of fatal and nonfatal strangulations prepared by the CPSC Directorate for Epidemiology. The CPSC analysis included a search for 1996-2012 incidents in additional CPSC and National Center for Health Statistics (NCHS) databases. This study includes fatalities, injuries, and non-injury incidents involving children age eight or younger, a wider age range than used in the SBAI analysis of strangulation incidents.

- Tab E is an August 2014 assessment by the CPSC Directorate of Engineering Sciences that attempts to determine the extent to which the hazard patterns identified in 285 fatal and non-fatal strangulation incidents are addressed by the current voluntary standard.[2] The engineering staff analysis concludes the 2014 ANSI/WCMA voluntary standard fails to address the hazard pattern in the majority (57 percent) of the cord-related incidents investigated by CPSC.

Heiden Associates reviewed each of these analyses and developed a complete database of fatality and non-fatality incidents from the four major CPSC hazard monitoring databases to assess the validity of the conclusions presented in each of these components of the staff briefing package. In the remainder of this report, we provide a critique of each of the CPSC hazard assessment reports, then present a new analysis highlighting more recent data and trends on cord-related strangulation incidents than is available in the staff briefing package.

**Petitioners' Incident Analysis (SBAI report provided in Tab A)**

It is important to note at the outset that petitioners do not make any statement about trends in the numbers of fatality and non-fatality incidents over time. Rather, they characterize the fact that fatal and non-fatal strangulation incidents have continued to occur ("the toll of injuries and deaths continued to rise") as evidence that a mandatory standard is required, irrespective of whether the numbers of these incidents have fallen or remain unchanged over time.

The incident data in the petition is provided in the form of hazard analysis by Safety Behaviors Analysis, Inc. (SBAI). Exhibit I of the SBAI analysis consists of several listings of incidents that petitioners argue would not have been prevented by corded window coverings that complied with the applicable voluntary standard. Petitioners cite the SBAI analysis as the basis for requesting a mandatory standard (Briefing Package, p. 44):

---

[2] The 285 incidents, which are drawn from the Epidemiology analysis in Tab B, include 249 for which in-depth investigations were conducted. Most of these incidents are also included in the set analyzed in the 2013 SBAI study.

*Examination of available injury and death data reveals that a high number of incidents since passage of the first standard in 1996 would not have been prevented by even the most recent (2012) version of the ANSI/WCMA standard. (Exhibit 1) Of the total 293 incidents between 1996 and 2012, 250 had sufficient information available to make such a determination. Of these 250 incidents, 102 of the injuries and deaths (approximately 40%) would not have been prevented by the current voluntary standard.*

There are several problems with the SBAI analysis that collectively make it an unreliable basis for petitioners' claims relating to the annual numbers of strangulation incidents, any trends over time in these numbers, and the extent to which these incidents involved products that were compliant with the applicable voluntary standard. In addition, the analysis provides misleading CPSC document reference numbers for at least 17 cases included in the analysis and fails to provide adequate references to support the inclusion of at least 12 other cases in the annual incident counts.

*Mixed Sample of Fatality, Injury, and No Injury Incidents*

The case counts include incidents that resulted in fatalities, others that resulted in injuries, and others in which no injury occurred. Of the 186 fatalities listed during the 17-year period 1996 through 2012, 74 (40 percent) occurred in the first six years of this time interval. For most of this time, only a small portion of the total population of corded window coverings in use were manufactured to comply with the initial version (1996) of the voluntary standard, and none was designed in accordance with the subsequent (2002, 2007, 2009, 2010, 2012, and 2014) versions of the standard.

The other 106 incidents included in the SBAI analysis consist of a non-statistical sample of a few injury incidents that were serious enough to warrant hospitalization; a larger number that resulted in less serious injuries; and some that did not result in any injury at all. However, SBAI does not provide this breakout for the full sample of 106 non-fatality incidents included in the analysis, so it is not possible to assess its completeness, accuracy, or representativeness.

*Incorrect or Unsupported Determination that a Standard-Compliant Product was Involved*

Of the 102 cases in SBAI Exhibit 1, 65 involved fatalities. Incident reports for 49 of these 65 fatalities were reviewed previously by a CPSC/WCMA Working Group. The SBAI determinations of compliance with the current voluntary standard were sharply at variance with the findings of the previous CPSC/WCMA review of the same incident reports:

- The Working Group determined that 17 of these 49 fatality incidents involved products that did **not** meet the 2002 voluntary standards. SBAI categorized them as being

compliant with the 2012 voluntary standard does not explain how it made these determinations.[3]

- Another 15 of the SBAI Exhibit 1 incidents involved IDIs that the Working Group determined did not contain sufficient information to identify the operating system for the window covering. Without this information it is not possible to determine whether the product was compliant with the applicable provisions in the 2002 or 2012 standard. SBAI does not explain how it determined that the products involved in these cases were compliant with the current voluntary standards.

- Finally, 17 of the SBAI Exhibit 1 incidents involving products that the Working Group determined were compliant with the applicable ANSI standard.

In other words, in half (17 of 34) of the cases when there was sufficient information available, SBAI determined that the product was compliant with the 2012 voluntary standard, while CPSC/WCMA identified it as a product that did not comply with the earlier, less comprehensive 2002 standard. In addition, SBAI determined that the products involved in 15 other fatality incidents were compliant with the 2012 voluntary standard, while the previous CPSC/WCMA review had found that there was insufficient information to determine whether or not the product was compliant with any applicable standard.

*Misleading and Missing Document Reference Numbers*

The sample of incident reports included in the SBAI analysis (provided on pp. 56 and 57 of the briefing package) includes 17 cases listed under IDI reference numbers that do not appear in the CPSC accident investigations database (see Table 1 below). With the exception of one case (100106CCC3329), it appears that these investigations were assigned but never completed. Consequently, the SBAI analysis should have provided the source of the information (including the relevant CPSC document number) and should have acknowledged that no investigation was completed.

Most of the incident narratives for these cases lack sufficient detail to support making a determination as to whether the product involved complied with the applicable voluntary standard. In addition, it is not possible to determine whether any of these reports relate to cases that were also included in the incident counts under different reference numbers.

---

[3] The 2012 standard is more comprehensive than the 2002 standard, so it is unlikely that a product could comply with the current standard but not be compliant with the earlier version.

**Table 1**
**Investigations Included on SBAI That Were Not Completed**

| IDI Number | Year of Incident | IDI Number | Year of Incident |
|---|---|---|---|
| 020719CEP9009 | 2002 | 100111CCC3235 | 2009 |
| 070213CCC3243 | 2006 | 100324CWE2012 | 2009 |
| 070221CCC3260 | 2007 | 100324CWE2013 | 2009 |
| 070914CCC1818 | 2004 | 100125CWE1054 | 2010 |
| 100106CCC3229 | 2008 | 100304CCC1300 | 2010 |
| 090227CCC3369 | 2009 | 100413CCC3564 | 2010 |
| 090416CCC2545 | 2009 | 101207CCC3281 | 2010 |
| 091106CCC3071 | 2009 | 101214CCC1191 | 2010 |
| 091210CCC3160 | 2009 | | |

The SBAI analysis also includes 12 cases for which no references are provided at all. These incidents are identified by date and place of occurrence [e.g., "2007 (month and day unknown) Houston, TX"] without any information that would permit these reports to be reviewed.

*Impact of a Mandatory Standard*

Finally, petitioners do not provide evidence to support the inference that a mandatory standard would eliminate all such incidents. Unsurprisingly, CPSC mandatory standards covering other types of children's products, including cribs, playpens, and strollers, have not resulted in a complete elimination of fatalities or injuries associated with these products.

## CPSC Staff Incident Analysis (Tab B)

The CPSC epidemiology staff's research encompassed a wider range of data sources than were used in the SBAI analysis. In addition to the three CPSC hazard databases typically used to identify product-related fatality incidents,[4] the report includes the results of staff searches for window covering cord incidents reported on the CPSC National Electronic Injury Surveillance System (NEISS), and the National Center for Health Statistics (NCHS).Multiple Cause of Deaths data file. In contrast to the SBAI analysis, the CPSC searches included incidents involving older children between the ages of five and eight.

However, the fatality and non-fatality incident counts presented in the CPSC staff analysis are essentially identical to those presented in the petition. The time frame for the incident analysis is from 1996 to 2012, chosen to match the time frame cited in the petition, and both the SBAI

---

[4] These are, in order of the amount of narrative detail typically available, the In-Depth Investigation file (INDP), Injury or Potential Injury Incident file (IPII), and the Death Certificates file (DTHS),

7

analysis and the CPSC study reviewed the hazard patterns from about 250 in-depth investigation (INDP) reports and a limited number of other incident reports (from the IPII database).

The major conclusions of the CPSC staff analysis are that: (1) there was no appreciable decline in fatality incidents over the period from 1996 through 2010; and (2) the data for the years from 2011 through 2013 are still too incomplete to be included in the assessment of incident trends. Our review and new analysis of these hazard data indicate the following:

- Several of the conclusions reached in the CPSC study are not valid.

  o The NCHS data do not support making a determination about trends in fatal incidents.
  o The NEISS data do provide a basis for concluding that the rate of ED-treated injuries has remained very low over the entire period, and if anything, has declined in recent years.
  o The other CPSC databases cannot be used to characterize the presence or absence of trends in non-fatal incidents.

- Most importantly, the CPSC study incorrectly treats the incident data for recent years beginning with 2011 as being too incomplete to include in an assessment of incident trends.

We review and critique various aspects of the CPSC staff analysis in this section. A new analysis of incident trends including data from 2011 through 2013 is provided in a separate section below.

*The NCHS Data Cannot Be Used to Asses Trends in Fatal Incidents*

NCHS fatality data were extracted by searching for incidents with a single ICD-10 cause of death code (W76, other accidental hanging and strangulation). However, these data do not provide information on the product involved in the incident. CPSC staff estimated the proportion of these incidents attributable to window covering cords by applying a fixed percentage from a study conducted on incidents in a time span that preceded most of the period included in this analysis:

> *A CPSC report by Marcy et al, which reviewed CPSC databases in 2002, found that 35 percent of all strangulation fatalities among children less than five years old were associated with window covering cords.* **Assuming that this 35 percent proportion applies to the entire 1999-2010 period**, *CPSC staff estimates that a minimum of 11 strangulation fatalities (35 percent of 31) occur on average annually on window covering cords among children under five years of age.*

Applying a fixed percentage to annual totals for all types of accidental strangulation incidents artificially suppresses any trend in annual incidents specifically involving window covering

cords. In any event, the NCHS data can be used to assess trends in overall accidental strangulation incidents, but they do not provide an adequate basis for making judgments about trends in fatalities associated with specific products.

The CPSC staff analysis asserts that this average annual number of incidents represents a minimum estimate because it does not include cord-related strangulations recorded under two other ICD-10 codes: W75 (accidental suffocation and strangulation in bed) and W83 (other specified threats to breathing). The impact of this omission is minimal, however:

- CPSC's own DTHS database includes no records of any fatality incidents occurring between 2000 and 2013 with an ICD-10 code of W75 during the entire period from 2000 to 2013.

- We were able to identify nine incidents in the DTHS database occurring in this 14-year period (i.e., fewer than one per year) that were coded as W83.

An additional problem is the NCHS data are only available through 2010 and therefore cannot be used to assess the numbers or trend in fatality incidents during recent years.

Given these limitations, the NCHS portion of the CPSC analysis represents a not particularly appropriate attempt to corroborate the average annual incident counts derived from more careful analysis of the more detailed incident reports available from the three CPSC hazard monitoring databases used by SBAI, CPSC, and our own analysis below.

*The NEISS Data Can Be Used to Assess Multi-year Trends in Non-Fatal Injury Incidents*

CPSC staff estimates that children age eight and under received treatment in hospital EDs for 1,590 injuries resulting from entanglements on window covering cords during the 17-year period from 1996 to 2012, an average of about 93 injuries annually. The CPSC report correctly notes that there are too few incident reports on the database to develop injury estimates for single years or to assess year-to-year fluctuations in fatalities. However, the remainder of this section of the report presents a profile of the reported incident by the age of the child and level of treatment required. Many of these estimates are based on very small counts of incidents.

In our view, the CPSC staff is selectively dismissive of the possibility of obtaining evidence on trends in non-fatal strangulation incidents from the NEISS reports, which are the only CPSC hazard data collected using a statistically structured sample. Based on our review and coding of the NEISS data for the years from 2002 through 2013, we estimate that there were an average of 65 non-fatal injury incidents annually during this period. It would be reasonable to assume that the higher CPSC staff estimate is influenced by including incident data from the earliest six years (1996-2001) in the analysis. This approach is suspect for several reasons:

- While the CPSC staff report indicates the 1996-2012 time frame was chosen to maintain comparability with the years included in the petitioners' analysis, the petition does not present any data based on NEISS incident reports.

- The NEISS sample underwent substantial revision during 1997. CPSC cautions that estimates from 1996 and earlier are not comparable to those for 1997 and more recent years.

- A previous Heiden Associates analysis demonstrated that estimates for the 1997 transition year have forward comparability issues—the CPSC NEISS highlights showed atypically large increases in injuries for many major product categories from 1997 to 1998.

- As noted above, relatively few corded window coverings in use for most of the 1996-2001 period were manufactured after the 1996 voluntary standard was adopted.

*The CPSC Staff Analysis and Petitioners' Analysis of Reported Incidents Are Based on Nearly Identical Compilations of Incidents*

The CPSC staff analysis reports finding a total of 285 reported fatal and nonfatal strangulation incidents on window covering cords that occurred among children up to eight years old from January 1996 through December 2012. The report duly notes that these 285 incidents do not constitute a statistical sample of known probability and do not necessarily include all window covering cord-related strangulation incidents that occurred during that period.

While there are some differences in the data sources used and the upper age limit for the children included in the analysis, the CPSC incident data are essentially identical to those used in the SBAI analysis, as Table 2 makes clear.

**Table 2**
**Fatality and Other Incidents in the SBAI and CPSC Analyses**

| | Fatality Incidents | | Other Incidents | |
|---|---|---|---|---|
| | SBAI | CPSC | SBAI | CPSC |
| 1996 | 17 | 17 | 5 | 6 |
| 1997 | 16 | 14 | 3 | 3 |
| 1998 | 12 | 12 | 2 | 1 |
| 1999 | 7 | 7 | 0 | 0 |
| 2000 | 11 | 11 | 5 | 5 |
| 2001 | 11 | 10 | 7 | 6 |
| 2002 | 11 | 11 | 9 | 7 |
| 2003 | 17 | 17 | 2 | 2 |
| 2004 | 6 | 6 | 4 | 4 |
| 2005 | 9 | 7 | 6 | 6 |
| 2006 | 7 | 7 | 4 | 5 |
| 2007 | 9 | 10 | 3 | 4 |
| 2008 | 17 | 18 | 9 | 8 |
| 2009 | 14 | 13 | 30 | 28 |
| 2010 | 11 | 11 | 14 | 13 |
| 2011 | 6 | 6 | 2 | 2 |
| 2012 | 5 | 7 | 1 | 1 |
| **1996 - 2012** | **186** | **184** | **106** | **101** |
| 2004 - 2013 | 84 | 85 | 73 | 71 |

CPSC includes two fewer fatality incidents and five fewer non-fatality incidents in its compilation over the 17-year analysis period than does the SBAI analysis. The incident counts are even more similar for the period from 2004 through 2013.[5]

The timeframe used in the CPSC staff analysis of incidents is problematic for two reasons:

- Coding of incident causes in the death certificates (DTHS) database was switched from ICD-9 to ICD-10 in 1999. There was a single code (E994.7) for all accidental asphyxiation and strangulation cases in the ICD-9 coding system, but three for accidental strangulation in the ICD-10 coding. In many instances the ICD-10 coding makes it easier to identify product-related fatality incidents.

- The SBAI analysis was prepared when 2013 data were not yet available. However, CPSC had received a substantial amount of data on 2013 incidents by the time the staff analysis

_____
[5] As discussed below, no data for 2013 incidents were included in either analysis.

was conducted. In the analysis presented below, we demonstrate that these data were sufficient to include in a trend analysis.

While the CPSC staff analysis includes reports with less complete information in the incident counts, the hazard analysis is confined to the 249 incidents for which an investigation could be completed. The reports provides a distribution of products for the 170 investigation that involved a fatality. Ninety-two (54 percent) of these fatal incidents involved a horizontal blind, 36 (21 percent) involved a vertical blind, 14 (8 percent) involved a curtain/drapery, eight (5 percent) a Roman shade, five (3 percent) a cellular shade, four (2 percent) a roll-up shade, and two (1 percent) a roller shade.

However, the subsequent analysis of hazard patterns makes no mention of continuous loop cords on horizontal blinds, which was the most frequent hazard pattern identified in the previous CPSC/WCMA review of investigated fatality incidents from 1996 through 2010.[6] We could not determine which hazard category or categories included these incidents from our review of the staff analysis.

**CPSC Engineering Analysis (Tab E)**

The engineering staff analysis concludes the 2014 ANSI/WCMA voluntary standard fails to address the hazard pattern in the majority (57 percent) of the cord-related incidents investigated by CPSC. According to the engineering staff analysis, virtually all of these incidents exhibited one of three hazard patterns:

- Entanglement in a loop created by knotted or tangled pull cord.
- Entanglement in one or more long cords, which the child wrapped around the neck
- Entanglement in a continuous loop cord.

Essentially, the standard is treated as failing to address any incidents involving looped cords on horizontal blinds and shades, despite ample evidence from the epidemiology data showing that the annual number of fatalities involving this hazard pattern declined after the adoption of the 1996 and 2002 versions of the voluntary standard that contained requirements relating to looped cords.[7]

As noted above, the CPSC hazard analysis appears to have included incidents involving continuous cord lifts on horizontal blinds and roman shades in hazard categories that are purportedly not addressed by the voluntary standard. However, it is not possible to replicate the categorization used by CPSC staff without a listing of incident document reference numbers.

---

[6] There were also several incidents involving continuous cord loops on roman shades that were addressed in the 2009 and 2010 versions of the voluntary standard.

[7] A 2011 Heiden Associates review of the 1996-2010 fatality incident investigations reviewed by the CPSC/WCMA Working Group found that the total number of incidents involving horizontal blind cord lift systems declined from 27 in 1996-200 to 23 in 2001-2005 and 14 in 2006-2010.

**Trends in Strangulation Incidents: A New Analysis**

The ANPR and briefing package analyses indicates that there has been no "observable trend" over time in the annual numbers of fatal and non-fatal cord strangulation incidents, based on the counts of incidents shown above in Table 2:

> *From 1999 through 2010, staff estimates that a minimum of 11 fatal strangulations related to window covering cords on average occurred per year in the United States among children under five years old. Staff finds no observable trend in the data.*

This assessment specifically excludes CPSC's own preliminary incident data for 2011 and 2012, the last two years of the period used for most of the staff analysis. The staff analysis indicates that data for these years are incomplete. The staff analysis also excludes all reports received relating to incidents in 2013.

While not explicitly stated, the most likely reason for these exclusions is that some of the incidents are identified from death certificates, many of which are received more than a year or two after the incident occurred. However, this lag in reporting has not prevented CPSC staff from developing and reporting estimated numbers of fatalities in previous reports dealing with other products and hazards. For example, the annual staff report on ATV fatalities and injuries has always included estimates of fatality incidents for years with incomplete data. It is therefore worth considering whether such estimates could be derived for cord-related strangulation fatalities.

It is even less clear why the CPSC staff analysis declined to present injury estimates for the 2011-2013 period or to investigate whether there was any trend in the annual numbers of non-fatal incidents using data from the one statistically representative source it maintains (the NEISS database).

To assess the impact of including data from recent years in the hazard analysis, Heiden Associates developed a fatal and non-fatal incident database based on a comprehensive review of the reports in the DTHS, INDP, IPII, and NEISS databases. The incident counts for each year from 2002 through 2012 are nearly identical to those in the CPSC staff analysis.

In the analysis presented below, we present estimates of cord-related strangulation fatalities and injuries for each two-year interval in the most recent decade (2004-2013) based on tabulations of this incident database. The implications of these estimates for long term trends in fatality and injury incidents are also discussed.

*Fatality Estimates for 2004-2013 and Implications for Incident Trends*

As of April 2014, there were six known fatality incidents in 2011, seven in 2012, and two thus far in 2013. Based on the following data and observations, we believe that CPSC has already received at least one report for nearly all of the fatality incidents that occurred during the three year period from 2011 through 2013:

- There are multiple reports in the CPSC hazard monitoring databases for almost all fatality incidents. The three CPSC hazard monitoring databases contain 201 reports for the 89 known fatality incidents from 2004 through 2013.[8]

- Reports of incidents (which are entered into the IPII database) are typically received much sooner after fatalities occur than are death certificates. This was the case for 78 of the 89 known fatalities that occurred from 2004 to 2013.

- While death certificates accounted for only 12 percent of the first reports of fatality incidents from 2002-2013, they have already accounted for 22 percent (two of nine) of those in the most recent two-year (2012-2013) period.

- About 60 percent of death certificates which represent first reports of fatality incidents are received within 18 months of the incident date. Thus, it would be reasonable to anticipate that CPSC will receive no more than one or two additional death certificates reporting a previously unknown fatality incident that occurred in 2012 or 2013.[9]

Annual fatality counts categorized by the source of the first report received by CPSC are presented in Table 3.

---

[8] For example, one or more incident reports can be received by CPSC, which then completes an investigation, and a copy of the death certificate is received after the investigation is complete.
[9] It is very unlikely that any more first reports will be received for incidents that occurred in 2011.

**Table 3**
**Cord Strangulation Fatalities by First Source of Notice to CPSC**

| Time Period | Total | Investigated | | No Investigation | |
|---|---|---|---|---|---|
| | | DTHS | IPII | DTHS | IPII |
| 2004 | 6 | 0 | 5 | 0 | 1 |
| 2005 | 9 | 1 | 6 | 0 | 2 |
| 2006 | 7 | 0 | 6 | 0 | 1 |
| 2007 | 9 | 1 | 6 | 1 | 1 |
| 2008 | 16 | 0 | 15 | 1 | 0 |
| 2009 | 17 | 1 | 9 | 3 | 4 |
| 2010 | 10 | 1 | 8 | 0 | 1 |
| 2011 | 6 | 0 | 6 | 0 | 0 |
| 2012 | 7 | 2 | 5 | 0 | 0 |
| 2013 | 2 | 0 | 2 | 0 | 0 |
| **2004 - 2013** | **89** | **6** | **68** | **5** | **10** |
| *Annual Average* | | | | | |
| 2004 - 2005 | 7.5 | 0.5 | 5.5 | 0.0 | 1.5 |
| 2006 - 2007 | 8.0 | 0.5 | 6.0 | 0.5 | 1.0 |
| 2008 - 2009 | 16.5 | 0.5 | 12.0 | 2.0 | 2.0 |
| 2010 - 2011 | 8.0 | 0.5 | 7.0 | 0.0 | 0.5 |
| 2012 - 2013 | 4.5 | 1.0 | 3.5 | 0.0 | 0.0 |

Based on this analysis, we are confident that there were between 9 and 11 fatality incidents that occurred during 2012 and 2013. Even if there are two additional fatality incidents reported, this would mean that the two-year average number of annual fatality incidents would be 5.5, or half (50 percent) of the estimate of 11 per year that the CPSC staff analysis estimates for the period from 1996 through 2010.

To be clear, the 2012-2013 fatality incident estimate does not demonstrate that the future incident rate will continue to decline monotonically in future years. Instead, this estimate does show that the average number of fatality incidents during the past 10 years (9 per year) is below the 11 per year estimate developed in the CPSC staff analysis using older data. It should also be noted that the 2004-2013 annual fatality would be lower still (averaging 7 per year) but for the temporary spike in incidents that occurred during 2008-2009.

To sum up, this new fatality analysis shows that:

- The fatality incident reports received thus far in 2011, 2012, and 2013 are adequate to estimate the total number of such incidents that occurred during these years.

- Incorporating these estimates shows that the annual number of fatalities was lower in the most recent decade (2004-2013) than the estimate of 11 fatalities per year in the 1996-2010 time period presented in the CSPC staff analysis.

- Including the fatality incident data for the period from 1996-2003 and excluding data for 2011-2013 makes the average higher than if only the more recent data were used.

It is not clear why data from more than a decade ago is more relevant than data for the past few years for evaluating trends in fatality incidents. A CPSC decision to proceed with proposing a mandatory standard should be based on the most recent and relevant data available.

*Injury Estimates for 2004-2013 and Implications for Non-fatal Incident Trends*

The CPSC staff analysis takes a similar approach to assessing the trend in incidents that did not result in fatalities. The study concludes that there was not an observable trend in these incidents during the period from 1996 through 2010, based on reports collected from sources that are not statistically structured. Data from a statistically valid source (the NEISS database) and incident reports for 2011-2013 are excluded from this assessment.

For this new analysis, we reviewed 2,400 incident reports involving blinds and shades (NEISS code 0638) and curtains and draperies (NEISS code 0617) received for hospital ED-treated injuries from 2004 through 2013.[10] Counts of the reports which involved strangulations injuries and annual estimates of ED-treated injuries associated with non-fatal cord strangulations are provided in Table 4.[11]

---

[10] The 2014 NEISS data had not yet been released at the time this analysis was conducted.
[11] These estimates include all non-fatal injuries involving children 8 and under, including one in which the window cord restrained a child from falling out a window and another that was noted as involving suicidal intent. They do not include injuries resulting from entrapment of fingers or hands, however.

**Table 4**
**Report Counts and Annual Estimates for ED-Treated Cord Strangulation Injuries**

| Year | Reports | Annual Estimate |
|------|---------|-----------------|
| 2004 | 2 | 141 |
| 2005 | 3 | 27 |
| 2006 | 3 | 27 |
| 2007 | 2 | 56 |
| 2008 | 4 | 26 |
| 2009 | 3 | 27 |
| 2010 | 4 | 81 |
| 2011 | 3 | 22 |
| 2012 | 1 | 40 |
| 2013 | 2 | 86 |
| *2004 – 2013* | **27** | **533** |
| *Annual Averages* | | |
| 2004 – 2005 | 2.5 | 84 |
| 2006 – 2007 | 2.5 | 42 |
| 2008 - 2009 | 3.5 | 27 |
| 2010 - 2011 | 3.5 | 51 |
| 2012 - 2013 | 1.5 | 63 |

As noted in the CPSC staff analysis, the single-year, and even two-year, estimates are not statistically significant, because of the low numbers of reports received. However, the data are adequate to develop a valid average annual estimate of ED-treated strangulation injuries for the entire 10-year period. Based on this analysis, there were an average of 53 such injuries treated annually between 2004 and 2013. This estimate is about 60 percent of the 90 per year that the CPSC staff analysis estimates for the period from 1996 through 2010. As with the fatality estimates, including the non-fatal injury data for the period from 1996-2003 and excluding data for 2013 makes the average higher than if only the more recent data were used.

**Conclusion**

It is not clear why data from more than a decade ago is more relevant than data for the past few years for evaluating trends in fatality or injury incidents. A CPSC decision to proceed with proposing a mandatory standard should be based on the most recent and relevant data available. Moreover, the engineering analysis appears to misclassify incidents involving hazard patterns that were addressed by successive versions of the voluntary standard.

17

# <u>Attachment 3:</u>

# Window Covering Safety Council Safety Efforts

March 23, 2022

**WCSC Safety Efforts/Public Education**

The Window Covering Safety Council (WCSC), founded in 1994, is a coalition of major U.S. manufacturers, importers, and retailers of window coverings dedicated to educating consumers about window covering cord safety. The Council assists and supports its members in the industry's ongoing efforts to encourage the use of cordless products in homes with young children, redesign corded products, and to support the national ANSI/WCMA standard for corded window coverings.

WCSC's overarching goal is to protect consumers. WCSC reaches out to millions of consumers through the distribution of news and informational materials and through partnerships with various public and private organizations to educate consumers about safe window coverings. WCSC also co-sponsors, with CPSC, National Window Covering Safety Month each October to specifically concentrate the public's attention on safety issues. Additionally, WCSC provides free retrofit kits and educational materials on how consumers can successfully retrofit their window coverings in order to make older window coverings safer.

WCSC's safety messaging does not simply begin or end each October. It is a year-round effort in which WCSC has engaged in a variety of innovative activities as part of its efforts to boost awareness. These programs range from window covering safety videos playing on NFL football stadium jumbotrons to social media campaigns. WCSC also publishes safety information in military newsletters and magazines to reach military families and has contacted educational publications to reach teachers and parents. Many of these activities are also implemented in Spanish through print publications, radio PSAs, and working with Spanish-language internet bloggers. The WCSC website includes frequently updated information on window cord safety; infographics on the current ANSI/WCMA-2018 standard, that is attached; as well as downloadable brochures; posters; videos; and even a window covering safety quiz. WCSC also regularly updates their blog which features articles such as "Top 6 Safety Tips this Holiday Season" and "Back to School Safety Tips to Make This School Year the Best One Yet." WCSC also provides additional resources on how to child proof a room and provides a downloadable child proofing checklist, also attached. WCSC also provides information and education on ANSI/WCMA-2018. This includes a Frequently Asked Question section as well as an easy-to-understand infographic. All these efforts make WCSC the one-stop shop for window covering education and safety.

Finally, The Best for Kids Certification Program is the window covering industry's first third-party certification program designed to help consumers and retailers identify window covering products that are best suited for use in homes with young children. The program requires product manufacturers want to be part of the program to meet stringent criteria and to submit those products to a third-party testing laboratory. Should these products meet these stringent requirements, they will be eligible to be listed as "certified" on labels and packaging materials. Having the Best for Kids certification makes it quick and easy for parents to find the safest window coverings for their young children. Products that are eligible for the Best for Kids Certification Program have either no cords, no operating cords and inner cords that are not accessible, or if accessible inner cords are present in products with no operating cords, the accessible inner cords cannot create a hazardous loop. Included on the Best for Kids Certification Program webpage are informational videos on the program as well as frequently asked questions.

WCSC's safety efforts have led to tremendous results. In March of 2022, WCSC conducted an online survey among 1,000 U.S. adults, ages 18 and older and found that 90% of adults with children in the home are aware of the strangulation hazard certain window cords may pose to infants and young

children. [1] WCSC will continue to educate the public so that as many consumers as possible are aware of the safety hazard of window covering cords. It is critical that adults take the safety concerns of window coverings into consideration when purchasing window products.

---

[1] Window Covering Safety Council, "National Survey Finds 90% of Adults with Children in the Home are Aware of Window Covering Cord Safety Hazards" (March 21, 2022).

# A SAFER MARKETPLACE:
## HISTORIC SAFETY STANDARD TO ELIMINATE MAJORITY OF CORDED WINDOW COVERINGS FROM U.S. MARKET

## "TOP 5 HIDDEN HAZARD IN THE HOME"

Corded window coverings can pose a strangulation hazard to infants and children and are one of the "top five hidden hazards in American homes."
-U.S. Consumer Product Safety Commission.



## HISTORIC NEW SAFETY STANDARD TAKES EFFECT



A vast majority of window covering products sold in the United States will be cordless or have inaccessible or short cords as a result of a new safety standard that goes into effect on December 15, 2018.

## NEW INNOVATIONS IN SAFETY

The new safety standard is a direct result of ongoing industry innovation, technological advances and new product development.

## BEST FOR KIDS™



Consumers today can continue look for the Best For Kids™ certification label to identify cordless window covering options. WCMA created the Best for Kids™ certification program in 2015 to make it easier for consumers shopping for window coverings to identify cordless products.

**KIDS AND CORDS DON'T MIX**
ONLY USE CORDLESS WINDOW COVERING PRODUCTS OR THOSE THAT HAVE INACCESSIBLE CORDS IN HOMES WITH YOUNG CHILDREN.

Read more at windowcoverings.org



# *Childproofing* Check List

✓ **Check for window covering cords** – families and caregivers should check if there are any window cords present in the home and if so, go cordless, as window cords can pose a strangulation hazard for infants and children. Families should replace any corded products with their safer counterparts, such as those marked with the **Best for Kids™** certification label.

✓ Ensure there is **no low standing furniture near any windows** as children can easily climb up and out.

✓ **Protect from sharp corners** – consider swapping out furniture or purchasing corner protectors.

✓ **Cover up any open electrical sockets** to protect curious hands and fingers.

✓ **Consider using a toy box without a lid or that has a spring box lid** – lidded toy boxes can accidentally slam on a child's hand or even trap them inside.

✓ **Keep cribs clear of bumper pads, blankets, stuffed animals, sleep positions or other soft objects** that may cause suffocation, entrapment or strangulation.

✓ **Remove any small refrigerator magnets** that pose a choking hazard.

✓ **Purchase child-safety locks for your cabinets** to keep dangerous cleaning products and sharp kitchen tools out of sight and access from exploring young children. Other household items like matches or prescriptions should also be stored in cabinets away from little hands.

✓ Remember to **keep your toilet lid down and install a toilet lock** so that curious young children don't risk losing their balance and falling in.

✓ **Ensure your changing table has safety straps** and that all baby care products are well out of reach of a baby's hands.

✓ **ALWAYS keep an all-purpose fire extinguisher on hand** and make sure you know how to use it before you need it.

✓ **Put a lid on it** – **your trash can that is**. Even better, keep it tucked away to avoid children coming in contact with sharp objects such as metal cans or glass bottles.



**WINDOW COVERING SAFETY COUNCIL**

For more safety tips, visit
www.windowcoverings.org.

# Attachment 4:

# Window Covering Manufacturers Association Letter to The Honourable Jean-Yves Duclus, PC, MP

March 3, 2022

 

March 3, 2022

The Honourable Jean-Yves Duclos, PC, MP
Minister of Health
House of Commons
Ottawa, Ontario
K1A 0A6
Via Email: hcminister.ministresc@canada.ca

**Health Canada's Failed Leadership on Corded Window Blinds Will Cost Thousands of Jobs**
*Final Appeal For A Practical, Science-Based Solution, In-line with The Highest Safety Standards*

Dear Minister Duclos:

On behalf of two hundred small and medium-sized manufacturers in Canada, and thousands of fabricators and dealers across the country we are writing you today to express our gravest concern with Health Canada's punitive and flawed approach to corded window coverings regulation, and strongly urge you to reconsider a practical, science-based solution, in-line with international safety standards.

With your leadership we can still avoid unnecessary economic harm and maintain the highest safety standards in the world.

Health Canada's just announced commitment to "planned compliance verification activities that will begin in May 2022," will lead to the loss of thousands of jobs, hundreds of millions of dollars in lost economic output, and loss of entire innovative, safe product lines manufactured and sold in Canada. No other jurisdiction, and none of Canada's trading partners, has adopted this punitive approach to regulation.

Home Depot, Bouclair Canada, Kent Building Supplies and other retailers have repeatedly informed Health Canada officials, and your office directly, that they cannot source compliant product from any Canadian or global supplier based on the current Corded Window Coverings Regulations (CWCR) that came into force on May 1, 2021. It is simply unworkable.

The Window Covering Manufacturers Association has submitted to Health Canada four simple and workable solutions to reform key sections of the department's corded window coverings regulation in order to ensure a fair and equitable pathway to compliance. These simple changes, based on the latest engineering innovations, would prevent an entire industry from being significantly crippled. We have never received a response from your department.

Since 2016, no Minister of Health has ever meet with Canada's window covering sector. Multiple letters, economic impact assessments by individual manufacturers, market disruption data, and requests for technical briefings have been ignored. In a recent meeting with your Director of Policy, those of us on the call were treated with a level of dismissiveness and disdain that we have never experienced in more than 30 years of working with elected officials, political staff and public servants in Canada, the U.S., or other countries.

Health Canada's February 28, 2022, statement suggesting that "Over the past several months, Health Canada has heard from, and provided information to, a number of stakeholders, including industry associations and representatives who have provided feedback and asked questions about the CWCR" is false. The "responses" from Health Canada have been comprised of a steadfast refusal to listen to product development facts and challenges, willfully ignoring actual safety and incident data, casual indifference to the requests of manufacturing and retail stakeholders for constructive dialogue and rational regulation and, for the past few months now, abject silence. It is unacceptable to our members and their employees across Canada that this is the type of regulatory relationship between government and industry that is apparently being practiced by your department.

With Health Canada's current approach, total losses (direct, indirect, and induced impacts) across the Canadian economy will amount to $800 million in lost economic output, a $357 million reduction in value-added, and a loss of over 3,900 jobs and $214 million in wages for Canadian workers.

Losses in the Canadian retail sector, which includes loss of imported stock product offerings on their shelves, will further reduce economic output by $755 million at a cost of 6,100 jobs while Canada is trying to recover from the pandemic.

We remain committed to a sincere and science-based approach to consumer safety in Canada, and hope that with your leadership we can avoid an unnecessary and harmful outcome for middle-class jobs in Canada.

Our offer to a practical and workable solution stands. We hope that you will provide direct and proactive leadership at this critical time.

Sincerely,

Ralph Vasami
Executive Director

CC.
Prime Minister of Canada
Deputy Prime Minister of Canada
Minister of Innovation, Science and Industry
President of the Treasury Board
Minister of International Trade, Export Promotion,
Small Business and Economic Development
Minister of Labour
Minister Responsible for the Federal Economic
Development Agency for Southern Ontario
Leader of the Opposition
Leader of the Bloc Quebecois
Leader of the NDP
Members of the House of Commons Health Committee
Members of the House of Commons Industry Committee
Member of the House of Commons International Trade

# Attachment 5:

# Window Covering Manufacturers Association Letter to the Honourable Patricia Hajdu, PC, MP

August 12, 2021

 

August 12, 2021

The Honourable Patricia Hajdu, PC, MP
Minister of Health

Dr. Stephen Lucas, Deputy Minister of Health
Health Canada
Brookes Claxton Building, Tunney's Pasture
Ottawa, Ontario
K1A 0K9

Via Email:      hcminister.ministresc@canada.ca
                stephen.lucas@canada.ca

Dear Minister Hajdu and Deputy Minister Lucas:

On March 18, 2021, the Window Covering Manufacturers Association and its Canadian Council (WCMA) submitted to Health Canada four simple and workable solutions to reform key sections of the department's corded window coverings regulation in order to ensure that a fair and equitable pathway to compliance could be achieved and to prevent an entire industry from being significantly crippled.  On June 3, 2021, market disruption data and other information was submitted to your political staff, at their request, so that they might better understand the confusion and negative impacts of the department's flawed and unworkable regulation.  These impacts, long foreshadowed by industry, are now being experienced in real time across Canada!

Further, on July 14, 2021, I wrote to you personally seeking an urgent meeting so you could hear directly from manufacturers and retailers the very real consequences and the harm being experienced by their businesses, their employees and their families that are occurring due to your department's failure to respond to industry's concerns. My July 14th communication is only the latest in a series of communications that began over four years ago when the first draft of the regulation was announced. Our comments have been combined with visits to the department, input from technical experts, and impact data from both manufacturers and retailers.

The "responses", however, from Health Canada have been comprised of a steadfast refusal to listen to product development facts and challenges, willfully ignoring actual safety and incident data, casual indifference to the requests of manufacturing and retail stakeholders for constructive dialogue and rational regulation and, for the past few months now, abject silence. It is unacceptable to our members and their employees across Canada that this is the type of regulatory relationship between government and industry that is apparently being practiced by your department.

355 Lexington Avenue, 17th Floor
New York, NY 10017-6603
Phone: (212) 297-2122
Fax: (212) 370-9047

After nearly 5 months since our March communication, it is candidly insulting to manufacturers, retailers, dealers, and fabricators in Canada that as Minister you and your departmental officials have refused to respond or engage with industry in any meaningful dialogue. Unfortunately, while we are incredibly disappointed with this situation, we, remarkably, are not surprised. Despite years of effort on industry's part to proactively bring veteran technical experts with decades of experience in the engineering, design, manufacture, and safety testing of window covering products to meetings with your officials, industry's concerns, and the resultant negative consequences and impacts to the sector as the result of the new regulation continue to be either dismissed or ignored. Furthermore, as manufacturers and retailers continue to inform and educate Members of Parliament, including some of your own caucus colleagues, on the consequences and impacts to businesses and employees in their ridings, we are informed these Parliamentarians' outreach and advocacy have been met with the same type of dismissive response. Rather than engage with any of these stakeholders and elected officials supportive of industry's reform, your departmental officials seemingly refuse to consider any changes to ensure compliance can be achieved.

To be clear - if the corded window coverings regulations are not amended, more than 88% of the window blinds manufactured and sold in Canada will not technically comply with Health Canada's regulation. Additional concerns and impacts are also being shared by companies who supply Canada's retail sector (shared with your officials in detail) with cordless stock window coverings because of the equally confusing and unsubstantiated pull force requirements in the regulation. Yet this devastating result has all come about without any apparent consideration of the actual facts respecting product safety and technological advances, incident rates (or, better said, the lack thereof), consumer choice and acceptance and the crippling impact to an industry and those that depend on it for their livelihoods. Specifically:

- Health Canada officials seem determined to ignore the fact that since 2018 ALL stock window covering products (representing approximately 80% of all units) sold in Canada no longer have any operating cords – they are all cordless operating systems that pose **no risk of strangulation**. In addition, the 2018 ANSI Standard requires custom products to be produced with automatic default requirements to minimize cord accessibility and improved tension device requirements, both of which have proven to be successful in minimizing potential hazards. Indeed, on a broader basis, aggressive industry innovation has dramatically expanded cordless or inaccessible corded operating system options offered on all varieties of custom-made products. Yet if the new regulation is not amended, entire product lines of proven safe product will be eliminated from the Canadian market leaving Canada's retail sector and Canadian consumers with no viable, affordable options. It is apparent that departmental officials continue to ignore product safety performance data and the lack of hazardous incidents driven by an industry committed to safety and innovation. How does eliminating entire product categories of proven safe products from the Canadian market and the resulting economic impacts of lost jobs and business closures advance the goal of child safety?
- Electrical cords on motorized window coverings have never caused a strangulation incident and pose no strangulation risk that is different from any other power cord used on any other consumer product. We fail to understand why Health Canada has chosen to single out these highly child-safe products for such disparate treatment as compared to all other consumer products. One effect of this aspect of your regulation is to characterize certain motorized products with exceedingly small antennae or battery cords that reside at the top of a product and out of the reach of any small children as "corded products", thus requiring strangulation hazard warnings to be adhered to these products.

When we tried to address this as a common-sense exception to the "corded" product requirements, we were simply told "a cord is a cord is a cord". No analysis, no discussion, no consideration.

- Health Canada officials also fail to acknowledge industry innovation on inner and rear cord hazards that were proactively addressed by regulators, manufacturers, test labs, engineers, and consumer advocates in 2009 that resulted in the development of both the current hazardous loop test and the 22 Newton pull force requirement. Since this issue was addressed and updated in subsequent ANSI and CSA standard development processes in the U.S. and Canada, there have been no inner or rear cord incidents on compliant window covering products. There is no justification for Health Canada's pull force change, and again, your department has simply dug in its heels and offered no reasonable, data driven explanation for the increased pull force requirement despite being informed by experienced product development engineers that this change was completely unnecessary. Why do proven safe products "need" to be further regulated such that the effect is regulate them out of existence?

- Departmental officials have never shared incident data, technical studies, or other information sources of value to justify the significant negative market impacts of the new regulation or putting Canada out of alignment with the U.S. and other major global trading partners. Officials continue to falsely repeat the "one incident per year" statistic to justify their flawed regulatory approach when they are fully aware industry innovation and safety standard improvements over the past three decades have dramatically reduced incidents in Canada.

- One of the reasons stated by the Department that they chose to pursue a regulatory solution rather than continue to participate in the standard development process was their belief that the standard development process would take too long to effect change. Ironically, the latest ANSI standard has been extremely effective and has been in effect since 2018 while the Canadian regulation is still not settled.

Despite assurances that Health Canada was not looking to regulate the window covering sector out of business, that is exactly what is happening if Health Canada does not act immediately on the workable reforms that manufacturers, retailers, dealers, and fabricators have proposed.

As shared, the department has been informed of the job losses and market impacts being experienced in real time – in some cases, manufacturers are simply abandoning the Canadian market, some are closing facilities while others have begun to lay off employees to reduce the size of their workforce as product lines are abandoned. Major Canadian retailers including Home Depot Canada, Bouclair Canada and many more small and medium-size retailers/dealers across Canada have informed government that they cannot source compliant products to meet supply chain requirements and therefore have no viable solutions to replace current, safe products on their retail shelves. Canadian consumers will be left with few, if any, affordable alternatives. Given this situation, all reputable consumer behavior studies have found that consumers will simply keep older, less innovative, and less safe window coverings in their homes.

After months of being ignored, the industry and its stakeholders demand immediate confirmation by Health Canada that the department is prepared to adopt the four workable solutions proposed by the WCMA. Although such a confirmation will not repair all the damage that has already resulted, it will nonetheless be helpful and welcomed by the industry. In the absence of adopting these reasonable reforms we are requesting that the department extend any enforcement of its regulation until May 1, 2023, in order to prevent further market disruption and the economic impacts being experienced now in real time.

We are aware such forbearance has been recently extended for the second time to Canada's pharmaceutical sector because of their inability to meet Health Canada regulation. Time is, and in fact for months has been, of the essence and we need the department to act.

We acknowledge that there is the strong possibility Canada will shortly be in a federal election. That cannot be used as a further excuse to ignore legitimate industry concerns even longer. Therefore, on an urgent basis, WCMA members and stakeholders are insisting on immediate action to address the industry's legitimate concerns in an effort to rectify these fundamental flaws, and their resultant negative impacts, to Health Canada's corded window coverings regulation.

Sincerely,

Ralph Vasami
Executive Director

# Attachment 6:

# Window Covering Manufacturers Association Letter to Consumer Product Safety Commission – Re: CPSC NPRM Operating Cords on Custom Window Coverings – Extension Request

February 28, 2022



**WINDOW COVERING
MANUFACTURERS
ASSOCIATION**

February 28, 2022

| Hon. Alexander Hoehn-Saric | Hon. Dana Baiocco | Hon. Peter A. Feldman | Hon. Richard Trumka Jr. |
|---|---|---|---|
| Chairman | Commissioner | Commissioner | Commissioner |
| U.S. Consumer Product Safety | U.S. Consumer Product Safety | U.S. Consumer Product Safety | U.S. Consumer Product Safety |
| Commission | Commission | Commission | Commission |
| 4330 East-West Highway | 4330 East-West Highway | 4330 East-West Highway | 4330 East-West Highway |
| Bethesda, MD 20814 | Bethesda, MD 20814 | Bethesda, MD 20814 | Bethesda, MD 20814 |

Re: CPSC NPRM Operating Cords on Custom Window Coverings – Extension Request

Dear Commissioners,

I am contacting you on behalf of the Window Covering Manufacturers Association (WCMA) regarding our letter to CPSC dated February 11, 2022 requesting an extension to the comment period for the Commission's Proposed Rule related to Operating Cords on Custom Window Coverings.

As you consider WCMA's request for an extension, we'd appreciate your consideration of the efforts that we have taken to date to obtain essential information from CPSC, as detailed below.

First, regarding the reports that are available on the CPSC website:

- Prior to our request to CPSC for the seven documents, WCMA took reasonable efforts to obtain these reports, including reviewing the docket and reviewing the CPSC website.
- Once the Proposed Rule was published and posted to the docket, we expected these materials to also be posted to the docket. When they were not posted to the docket, we contacted CPSC staff.

Second, regarding the two Euromonitor proprietary reports:

- On January 13, 2022 Ms. Balci-Sinha provided two of the seven requested reports via links to the CPSC website. She said that some of the reports are proprietary for CPSC and therefore might not be available to the public. However, Ms. Balci-Sinha indicated she would find out if WCMA could gain access.
- Almost six weeks later, on February 24, 2022, WCMA received written confirmation that CPSC would not release the two proprietary reports through the staff briefing memo for the extension request.
- On February 25, 2022, WCMA contacted Euromonitor to obtain the reports. It is our understanding from Euromonitor staff that these reports can only be purchased if one has a subscription to Euromonitor. Despite calls and emails to Euromonitor, we have yet to be put in contact with an account manager to provide additional information on how one can purchase a subscription. At

this point it is not clear how much the subscription and the reports will cost, nor how long it will take to gain access to reports.

- When relying on proprietary information, other federal agencies provide a means for access to stakeholders. For example, the Department of Transportation's rulemaking regulations require relevant copyrighted material to be placed in the docket for public review. See, e.g., 49 U.S.C. § 5.13(h)(3)(iii).

Third, regarding the third report that contains confidential trade data, WCMA requests that CPSC excerpt the information relied upon by CPSC staff, redact the confidential information, and place the excerpts in the docket.

WCMA must have access to the reports to assess the accuracy of cost estimates in CPSC's Preliminary Regulatory Analysis. Specifically, the proprietary Euromonitor reports are needed to fully assess the CPSC's estimates of annual window covering shipments, by window covering type, shown in Table 6, page 177 of the Staff Briefing Package, which are used by CPSC staff to estimate the number of affected corded products, by window covering type, in the calculation of aggregate costs of the proposed rule.

WCMA efforts to obtain this information has been more than reasonable, and yet we still do not have access to these reports. For these reasons, we respectfully request that CPSC extend the comment period.

Thank you for your consideration.

Sincerely,

Ralph Vasami
Executive Director

355 Lexington Avenue, 17th Floor
New York, NY 10017-6603
Phone: (212) 297-2122
Fax: (212) 370-9047

# EXHIBIT 13

CPSC Staff Statement: D+R International Market Research Final Report

The contractor's report titled, "Window Covering Market Characterization: Final Report," presents the results of a market research study of the U.S. window covering market. The primary purpose of the report is to create baseline unit sales estimates for "stock" and "custom" window covering products. This is required to inform a cost-benefit analysis for a proposed rule mandating cordless operation on all custom products. The contractor interviewed manufacturers of stock and custom window coverings to obtain new unit data, and to update previously provided datasets. Window covering retailers were also interviewed to ascertain whether WCMA A100-1.2018 has been implemented and followed as expected. The contractor also provided updated product pricing as well as updated window covering in use estimates with ECON staff requested methodology changes to address concerns.

Task completed per CPSC contract # CPS-2111-20-0003, Order # 61320620P0025.

# U.S. Consumer Product Safety Commission Window Covering Market Characterization: Final Report

### February 2021

Prepared for: Consumer Product Safety Commission per contract #61320620P0025

Prepared by: D+R International Ltd.

Authors: Rowan McCarthy, Shannon Christie

A828

# Contents

Executive Summary ........................................................................................................................... 4

Methodology ................................................................................................................................... 4

    Retail Channel Assessment ......................................................................................................... 4

    Literature Review ......................................................................................................................... 5

    Manufacturer/Industry Interviews.............................................................................................. 5

    Market Sales Data/Market Estimation ........................................................................................ 5

Retail Channel Assessment ............................................................................................................. 5

    Findings ........................................................................................................................................ 6

Literature Review ............................................................................................................................ 8

    Window Coverings Installed Base ................................................................................................ 8

    Window Coverings Imports......................................................................................................... 14

    Sales Channels............................................................................................................................. 15

Manufacturer and Industry Interviews.......................................................................................... 15

    Manufacturer Interview Findings............................................................................................... 15

    Stakeholder Interview Findings.................................................................................................. 16

Manufacturer Sales Data ............................................................................................................... 18

Window Covering Market Estimation ............................................................................................ 18

    Methodology............................................................................................................................... 18

    Assumptions and Risks............................................................................................................... 19

    Findings ....................................................................................................................................... 20

Conclusion...................................................................................................................................... 28

References ...................................................................................................................................... 29

A829

# Executive Summary

In December 2018, the Window Covering Manufacturer Association (WCMA) introduced a voluntary standard (WCMA A100-1.2018) to address safety concerns associated with the strangulation of young children and pets by corded window covering products. WCMA A100-1.2018 eliminates cords on "stock" products sold through retail channels, while "custom" window covering products are exempt from the requirement to remove cords.

The purpose of this research study is to characterize the window covering market in the United States, and provide granular detail on the share of various window covering product categories, stock versus custom products, and different distribution channels. This research will help support the Consumer Products Safety Commission's (CPSC) goal of understanding how the window covering market was affected by the introduction of the voluntary standard, WCMA A100-1.2018. D+R reviewed current census information on the number of households in the US and import data for window coverings to estimate the total window covering market size. In addition, D+R collected first-hand shipment data from window covering manufacturers to extrapolate the market share of different window covering product types, the custom vs stock share, as well as primary and secondary sales and distribution channels.

This report provides a comprehensive view of the U.S. window covering market, and includes details on the estimated installed base on window coverings, estimates of useful lifetime (EUL), historical and current window covering import data, product distribution and sales channels, and average pricing for the product categories, as specified by the CPSC. This information was synthesized to estimate the size and overall revenue of the residential window covering market in the U.S for 2015 through 2025.

D+R projects that the U.S window covering market ranges from 111.2 million units to 138.8 million units sold from 2015-2025, representing $6,878 million to $8,508 million in sales revenue. Metal/vinyl horizontal blinds are the largest share of shipments followed by vertical blinds, wood/faux wood horizontal blinds, cellular shades, and roller shades. Manufacturers have increased their offerings of window coverings with cordless operation, and this has increased the sales of these products even in the custom category. D+R estimates that custom sales range from 36-49 percent of all unit shipments indicating that the standard is not applicable to a large share of the market. D+R believes that the selection of corded or cordless operation for custom units is dependent on consumer choice and budget.

# Methodology

The following section describes D+R's market research methodology and approach to collect the key inputs for its market estimation model.

## Retail Channel Assessment

D+R conducted retail store-level audits to characterize the stocking of window covering products in downstream sales channels including big box retail stores, window covering retailers, and custom

window covering dealers. D+R developed a data collection template to record the information and aggregate it across all retailers. Originally D+R had proposed to visit store locations to collect this data in-person; however, due to the ongoing COVID-19 pandemic, D+R conducted store visits virtually through a combination of online store offering audits and phone calls.

## Literature Review

To establish and develop its initial understanding of the window covering market, D+R performed a comprehensive review of available literature and reports. D+R used existing research reports and studies from its current and ongoing work with the fenestration and fenestration attachment market, as well as its direct experience in working with the Window Covering Manufacturers Association (WCMA).

## Manufacturer/Industry Interviews

To supplement the data collected during the literature review, the D+R team scheduled, conducted, and documented interviews with a variety of window covering stakeholders. Interviews were used to collect information on the current state of window covering products, characterize the recent and current window covering sales and shipments (with an additional emphasis on the share of stock vs non-stock products), as well as solicit projections on future market state.

## Market Sales Data/Market Estimation

Historical sales data from Hunter Douglas, Springs Window Fashions, and Levolor was used as inputs into a model to create a time series projecting the size of the U.S. residential window coverings market. The market was further broken down into shares for each window covering category and the shares of stock versus custom shipments.

# Retail Channel Assessment

The majority of residential window coverings sold in the U.S. are sold at retail in big box stores, such as Lowe's and Home Depot, home furnishing stores, and specialty window fashion dealers.  To gain an initial understanding of the window covering retail sales channel and characterize the availability of corded and cordless product options, D+R conducted an online assessment of major retailer websites to collect key data points including:

- Product categories and brands sold by each retailer
- The number of SKUs sold for each product category and brand
- Availability of corded and cordless products
- Low, medium, and high price points for each window covering product category

For the online assessment, D+R reviewed the online catalogs of major window covering retailers including Walmart, Blinds.com, Bed Bath & Beyond, Home Depot, Kmart, Lowe's, and Wayfair. During each review, D+R documented the number of brands sold, corded or cordless options, stock or custom options, number of SKUs offered, and price ranges for each individual product category. This information was then aggregated to identify trends by product category.

This online research was supplemented with phone interviews with retailers that aimed to collect information on stocked window covering products and the custom ordering process. D+R originally proposed to conduct this assessment in person but was unable to do so as a result of COVID-19 travel restrictions and public health guidelines.

## Findings

**Big box retailers offer custom and cordless product options**
Of the stores interviewed, the Shade Store sells custom products exclusively, and two (Bed Bath & Beyond and Target) sell stock products exclusively in store. Lowe's offers both stock and custom products, but according to a sales associate, most customers that order custom do so for sizing reasons and still typically buy the cordless options at that location. Home Depot also offers both stock and custom; they offer custom corded products online if a safety warning is signed, but have gone completely cordless in store, including custom. Since this change, some customers report frustration that the cordless options are more expensive, especially if they are just looking to replace their existing window coverings without upgrading.

**The majority of online window covering product offerings are stocked and cordless products**
Examination of the online catalog data—41,789 SKUs across 748 brands—indicates that the majority of the SKUs available to purchase online are stock products (99 percent), and most are cordless (99 percent). Big box retailers and specialty stores do sell custom products that have corded offerings. Discount stores such as Walmart and Bed Bath & Beyond sell stock products exclusively in store and online.

**Average price varies by product category, with median prices ranging from $25 to $250**
Across all retailers, prices for window coverings varied widely depending on the product type, features such as lift operation, and size of the product. D+R recorded an average price point across various price ranges for the most common sizes on the online catalog of Home Depot and Lowe's. The most common size was between a 30 and 50 inch width. This data was collected for each window covering category. This average price point was then weighted by the number of products offered at that price point to determine a weighted average price point for each category. Blinds and most shade categories have a low price point around $5 and can range as high as $500 per unit depending on the size, material, and operation. Price ranges and weighted average price points for each window covering category are shown in Figure 1.



Figure 1. Pricing Ranges and Weighted Average for Common Sizes of each Product Category[1]

**Data on custom product SKUs and pricing is limited**

For most window covering categories, the data available through retail online catalog shows that custom and cordless products are more expensive on average which is expected. Unexpectedly, cordless stock products are shown to be cheaper on average than corded stock products; however, the number of corded stock products available online is minimal and may not be a representative sample.

Retail-level sales data would provide greater insight into the share of stock versus custom units sold year-over-year and could help assess changes in consumer behavior or purchasing patterns over time. If there is a shift to greater custom sales after the implementation of WCMA A100-1.2018, this could indicate that the preference for corded products could be one of the factors driving customers to buy custom products even with a higher price point to be able to have corded lift operation.

---

[1] (Lowe's Home Improvement, 2020); (Home Depot, 2020)

# Literature Review

D+R conducted a thorough literature review of publicly available data and reports on the window covering market to gather key inputs for its market estimation model which included the installed base of window coverings, window covering import sales volume, and primary sales and distribution channels.

D+R reviewed the following sources as part of its literature review:

- Consortium for Building and Energy Efficiency (CBEI)
- U.S. Department of Energy Residential Windows and Window Coverings: A Detailed View of the Installed Base and User Behavior (DOE)
- Northwest Energy Efficiency Alliance Residential Building Stock Assessment (NEEA RBSA)
- US Census Bureau American Housing Survey (USCB AHS)
- U.S. Energy Information Administration Residential Energy Consumption Survey (EIA RECS)

Table 1 summarizes the key information used from each source.

**Table 1. Sources Guide**

| Report/Source | Housing Characteristics | Product Technologies/ Specifications | Market Size and Composition | Sales Channels |
|---|---|---|---|---|
| CBEI | | X | | |
| DOE | X | X | X | X |
| NEEA RBSA | X | | X | |
| USCB AHS | X | | X | |
| EIA RECS | X | | X | |

## Window Coverings Installed Base

The U.S housing market provides a strong foundation for characterizing demand and sales of window coverings in the U.S, and calculating the installed base of window coverings on an annual basis.

D+R's estimation of the installed base of residential window coverings is informed by key housing growth indicators and characteristics including the number of homes in the U.S., housing construction data and growth rates, the type of homes, the number of windows in each type of home, and the average number of windows that have coverings installed in the home. The following section details D+R's approach to calculating the installed base of window coverings using data from the U.S Census Bureau and U.S. Department of Energy.

# Installed Base Inputs

## *U.S Housing Stock Characteristics*

### Units

The type of housing unit impacts the number of windows in the unit and therefore the number of window coverings that will be installed. Both the U.S. Census Bureau and U.S. Energy Information Administration (EIA) collect information on U.S housing stock by housing type, which is presented in Table 2. Both sources estimate that the most common housing unit type, the single-family detached home, accounts for the majority (63-64 percent) of all housing in the United States while the smallest, the mobile home, comprises the smallest share (5-6 percent).[2,3] The US Census Bureau and EIA datasets vary within a single percentage point on the estimates for single-family attached or townhomes (5 and 6 percent respectively) and apartment buildings with 2-4 units (7 and 8 percent respectively). Both studies estimate share of apartment buildings with 5 or more units at 18 percent.[4,5]

The US Census Bureau data estimates more total housing units than the EIA (124.1 million compared to 118.2 million), which may contribute to these variations in shares. D+R utilized the US Census Bureau estimates because the data was more recent compared to EIA.

**Table 2. U.S. Housing Units by Type[6,7]**

| Housing Unit Type | 2019 US Census Bureau Estimate (# million) | 2015 US EIA Estimate (# million) | 2019 US Census Bureau Estimate (%) | 2015 US EIA Estimate (%) |
|---|---|---|---|---|
| Single-Family Detached Home | 79.3 | 73.9 | 64 | 63 |
| Single-Family Attached Home (Townhomes) | 6.5 | 7 | 5 | 6 |
| Apartment Buildings 2-4 Units | 9.1 | 9.4 | 7 | 8 |
| Apartment Buildings 5+ Units | 22.4 | 21.1 | 18 | 18 |
| Manufactured or Mobile Home | 6.8 | 6.8 | 5 | 6 |
| Total | 124.1 | 118.2 | 100 | 100 |

### New Construction Activity

The window covering market and demand for window covering products can be directly tied to new construction activity in the housing market because window coverings are installed on the windows of the newly built homes. The US Census Bureau American Housing Survey, conducted nationally every two

---

[2] US Census Bureau, American Housing Survey 2019.
[3] US Energy Information Administration, 2015 Residential Energy Consumption Survey.
[4] US Census Bureau, American Housing Survey 2019.
[5] US Energy Information Administration, 2015 Residential Energy Consumption Survey.
[6] US Census Bureau, American Housing Survey 2019.
[7] US Energy Information Administration, 2015 Residential Energy Consumption Survey.

9

years since 1973, estimates the housing stock of the US. The growth rate year over year has averaged just over one percent at 1.05 percent between 2009 and 2019. There were an estimated 112 million housing units in 2009 and 124 million housing units in 2019.[8,9] This trend can be seen in Figure 2 where the estimated housing units for 2020-2025 are determined by a linear regression. Figure 3 shows the growth for each housing unit type.

Using this data, D+R estimated the total US housing units from 2015 – 2025.



**Figure 2. Growth in U.S. Housing Stock**

---

[8] US Census Bureau, American Housing Survey 1989.
[9] US Census Bureau, American Housing Survey 2019.



**Figure 3. Growth in U.S. Housing Stock by Unit Type**

## Housing Characteristics

### Windows

The number of windows varies by housing unit type. The number of windows per unit is greatest in single-family detached homes and typically decreases as occupancy density increases in units such as attached townhomes and apartment buildings.[10] The average number of windows across all housing units in the United States is approximately 12 windows. This average window count broken down by unit type can be seen in Table 3.

---

[10] Townhomes and apartments have shared walls with other units which decreases the number of windows in these unit types.

**Table 3. Average Number of Windows by Housing Unit Type[11]**

| Housing Unit Type | Average Number of Windows |
|---|---|
| Single-Family Detached | 14 |
| Single-Family Attached (Townhome) | 9 |
| Apartment Building 2-4 Units | 7 |
| Apartment Building 5+ Units | 4 |
| Manufactured/Mobile | 10 |

## Window Coverings

### Installation Rates

In 2013, the United States Department of Energy (US DOE) funded a windows and window attachments market characterization study which included a survey of 2,100 households in 13 cities across the United States to collect a representative sample of data on household characteristics including number of windows, location of windows, the types of window coverings installed, and how those coverings were operated to try and understand energy use implications.[12] According to this study, 78 percent of windows have one covering, 6 percent have multiple coverings, and 16 percent have no coverings.[13] D+R used the assumptions from this report into its estimate of the total installed base of window coverings. Figure 4 shows the estimated installed base from 2015 through 2025.

---

[11] US Energy Information Administration, 2015 Residential Energy Consumption Survey.
[12] US DOE, Residential Windows and Window Coverings, 2013.
[13] US DOE, Residential Windows and Window Coverings, 2013.

A838



Figure 4. Installed Base of Window Coverings in U.S.

## Window Covering Useful Life and Category Market Share

In addition to new construction activity, consumer preferences are a large driver of demand for window covering products. Consumers may elect to replace their window coverings for re-decorating purposes or because of product failures over time.

The lifetimes for different window covering categories vary greatly depending on the materials used to manufacture the product. The most common type of window covering is vinyl or metal horizontal blinds which are also the window covering category with the shortest useful lifetime of 4.25 years.[14] Window covering products last longer in categories such as curtains and drapery made of fabric and blinds or shutters made of wood which can last over 20 years.[15] The estimated lifetimes for the common window covering categories are shown in Table 4. The lifetimes are split into short, medium, and long lifetimes. These lifetime estimates will be used in determining the annual sales/shipments of window covering products from 2015 through 2025 and will have a significant effect on the estimated volume of unit shipments.

---

[14] US DOE, Residential Windows and Window Coverings, 2013.
[15] Ibid

**Table 4. Average Estimated Lifetime by Product Type[16]**

| Product Type | Average Estimated Lifetime (years) | | |
|---|---|---|---|
| | High Shipments | Medium Shipments | Low Shipments |
| Metal or vinyl horizontal blinds | 4.25 | 4.25 | 4.25 |
| Vertical blinds | 4 | 7 | 10 |
| Curtains/Drapery | 12 | 15 | 18 |
| Wood or faux wood horizontal blinds | 10 | 13 | 16 |
| Cellular shades | 4 | 7 | 10 |
| Pleated shades | 4 | 7 | 8.5 |
| Roller shades | 4 | 7 | 9 |
| Soft sheer blinds (non-transparent) | 5 | 7 | 8 |
| Soft sheer blinds (transparent) | 5 | 7 | 9.5 |
| Roman Shades | 10 | 13 | 16 |
| Sheer Drapery | 12 | 15 | 18 |
| Interior Shutters | 20 | 23 | 26 |

## Window Coverings Imports

According to the DOE study, the largest imported window covering category is vinyl and metal horizontal blinds which also happens to be the category that is also the largest portion (27 percent) of the installed base.[17] The number of imports of vinyl and metal horizontal blinds reported in 2019 by the US Census Bureau totaled 139.9 million.[18] In the 2013 DOE report, it was assumed that 65 percent of these shipments are for the residential window covering market.[19] This equates to about 90.9 million vinyl and metal horizontal blinds being shipped in the United States in 2019 for the residential market. This shows a moderate increase from the 2013 DOE report, which estimated that 86 million blinds were shipped annually in the US. These estimates assume all imports are sold in the same year which produced unreasonably high estimates a factor of 2-3 times higher than estimates from other sources for total market shipments and revenue. The estimates presented in this report use only a fraction of the reported imports as being sold in the same year. This is described in further detail in the assumptions of the Market Estimation section of this report.

The import numbers for metal and vinyl horizontal blinds do not have a consistent trend over the last decade. They have tended to rise and fall year over year which indicates that the market is fluctuating depending upon changes within the housing market and consumers general ability or willingness to spend on new or replacement window covering products. The fluctuation in the imports of this product type have dipped as low as -25 percent from 2015 to 2016 and grown as high as 11 percent from 2012 to 2013 and 2018 to 2019.[20]

---

[16] US DOE, Residential Windows and Window Coverings, 2013.
[17] Ibid
[18] US Census Bureau, Foreign Trade Division, 2020.
[19] US DOE, Residential Windows and Window Coverings, 2013.
[20] US Census Bureau, Foreign Trade Division, 2020.

## Sales Channels

Most window coverings products in 2013 were sold through retail channels (59 percent) closely followed by wholesalers and distributors (41 percent). Retail channels can be broken down in to big box retailers (35 percent of total distribution), window treatment stores (11 percent), mass merchant stores (7 percent), home furnishing stores (3 percent), high end channels (2 percent), and the internet (1 percent) which has grown in popularity over the last few years.[21] It is common for lower price point products such as blinds that are stock or cut-to-fit to be sold in big box retailers and the more expensive window covering categories such as drapes, shades, and shutters to be sold through higher end retailers.[22]

# Manufacturer and Industry Interviews

D+R interviewed window covering manufacturers, component manufacturers, and other window covering stakeholders to collect anecdotal information on the distribution of stock and custom product sales and how manufacturers responded and adjusted manufacturing practices to become compliant with the voluntary standard. Information from these interviews was also used to supplement the shipment data.

Representatives from the following organizations were contacted for interviews: 3 Day Blinds, Hunter Douglas, Levolor (acquired by Hunter Douglas in 2016), Nien Made, Rollease Acmeda, Somfy, Springs Window Fashions, Consumer Federation of America, and Parents for Window Blind Safety (PFWBS). The stakeholders that responded to our request include Hunter Douglas, Levolor, Nien Made, Rollease Acmeda, Springs Window Fashions, and Parents for Window Blind Safety.

## Manufacturer Interview Findings

**Window covering manufacturers built the necessary methods into their manufacturing and selling processes to ensure compliance with the voluntary standard**.
Various manufacturers indicated retail customers would not stock products that are not compliant, and conversely, manufacturers are aware of their customer's procedures and would not ship to them if there were concerns about the assembly and installation process. Hunter Douglas, which is the largest domestic manufacturer, provided an in depth description their robust quality control processes at all of its manufacturing facilities to ensure compliance through various stages of production. The other manufacturers ensured similar practices but did not provide a thorough description.

**The window covering market is shifting towards cordless products**
The awareness of the standard amongst manufacturers and the normalization of cordless window covering products with residential customers have begun to transition the window coverings market towards offering more window covering options using cordless operation features. In 2015, 10 percent of the products shipped by Hunter Douglas were cordless or had inaccessible cords. In 2019, cordless products and products with inaccessible cords accounted for 63 percent of total units shipped, and it's

---

[21] US DOE, Residential Windows and Window Coverings, 2013.
[22] Ibid

projected that they will account for 66 percent of 2020 units shipped.[23] Several manufacturers noted a trend towards greater motorization of larger window covering categories as consumers upgrade to smart homes that can integrate the use of these features. This adoption is more typical in commercial facilities and wealthier homes as the price points are much higher.

**Manufacturers believe that the standard has not pushed customers from purchasing stock products into the custom market**
The change to cordless increased the price point of stock products significantly, but custom products are still more expensive, so customers are buying stock cordless products rather than custom. Metal/vinyl blinds, vertical blinds, and wood/faux wood blinds were the most affected, since these categories have the highest share of stock sales. Shares for other product categories were mostly custom sales, and therefore haven't been affected.

## Stakeholder Interview Findings

**Corded product sales are down but may still represent significant sales volume**
While the manufacturers interviewed are confident that the standard is being followed consistently and that the cordless product market share has grown considerably, PFWBS expressed some doubts. Anecdotally, a representative gave an example of a large manufacturing warehouse in North Carolina that manufactures corded products and does not have to meet the standard because they are sold within the state and don't cross state borders.[24] There is no provision for this loophole in the standard. They also mentioned that newer homes built within the last two years are being filled with corded window coverings.

Additionally, PFWBS noted that custom corded products sales have started to decline. They provided aggregated market share data for two brands, shown in Figure 5 and Figure 6. This data is purported to be supplied from a "major US retailer". It should also be noted that the data supplier stated that the 2020 data may be inaccurate due to the market effects of COVID-19.

---

[23] (Jankoski, 2020)
[24] (Kaiser, 2020)

A842



**Figure 5. Custom Corded Product Market Share for Brand A, data supplied by PFWBS**



**Figure 6. Custom Corded Product Market Share for Brand B, data supplied by PFWBS**

17

# Manufacturer Sales Data

D+R contacted 3 Day Blinds[25], Hunter Douglas, Levolor[24], Nien Made, Rollease Acmeda, Somfy, and Springs Window Fashions for the purposes of collecting shipment data. These manufacturers have not supplied any data to date. Given the difficulty in acquiring data from the manufacturers, the data used for this analysis is from historical data dating back to 2007 through 2015 from Hunter Douglas and Springs Window Fashions. Shipment data from Levolor was also used from 2007 through 2011, prior to being acquired by Hunter Douglas.

These three manufacturers are the largest domestic window covering manufacturers and are estimated to have a market share of 65-75 percent of the total sales revenue in the United States (Hunter Douglas ~30-40 percent, Springs Window Fashions ~20 percent, Levolor ~15 percent).[26] While the shipment data is dated, the general trends of these three manufacturers should provide a good proxy for characterizing of the United States window covering market given the large share of the market these manufacturers comprise.

# Window Covering Market Estimation

## Methodology

The residential window coverings market size is estimated by using data collected from the U.S. Census on the number of homes in the United States. The number of homes is broken into the following unit types: single-family detached, single-family attached (townhomes), 2-4 unit apartment buildings, 5+ unit apartment buildings, and manufactured/mobile homes. Multiplying the housing stock by the average number of windows per unit type and the average number of windows that employ a covering is used to determine the installed base of window coverings. A Weibull distribution was used to determine the number of failures of the installed base for each window covering category each year based on their average useful life. The formula below defines the Weibull cumulative distribution function used to estimate product failures where x is the time in years that the window covering has been installed, α is the shape parameter, and β is the scale parameter which is the average useful life for each window covering category.

$$F(x, \alpha, \beta) = 1 - e^{-(\frac{x}{\beta})^{\alpha}}$$

A lower shape parameter (α) indicates a more constant failure rate with the failure probability more diffusely distributed around the average useful life. Conversely, a higher shape parameter (α) indicates

---

[25] Levolor and 3 Day Blinds are both subsidiary brands of Hunter Douglas
[26] Information from Manufacturers received prior to this study

an increasing failure rate over time with the failure probability more tightly distributed around the average useful life.

The α parameter used in the model is 7, and the β parameter used is the average useful life for each window category that are specified in Table 4 under "low shipments". The shorter average useful life estimates under the "high shipments" or "medium shipments" produced unit and revenue estimates in the model that are significantly higher by a factor of 2-3 times than reasonable estimates for the market. Any years for which there was not data for housing units, metal/vinyl blind imports, and shipment data a linear regression was used to estimate the value for a given year.

## Assumptions and Risks

The following assumptions could contribute to inaccurate estimates for market size and revenue: inaccurate average pricing data, inaccurate estimate for the number of metal/vinyl horizontal blinds that are imported and sold the same year, inaccurate estimates for the useful life of the various window covering categories, and inaccurate shares of sales by category and custom versus stock. Each of these assumptions is explained in further detail below.

The pricing data was determined from an online assessment of a small sample of the market which may not reflect the average price for each category. In addition, the average price was determined by finding a weighted average for the most common sizes for each window covering category. This could result in an average price that is not accurate across all sizes of window coverings. In the original revenue assessment, average price points were used across all sizes which led to an overall market revenue estimate that was much higher than anticipated. Therefore, the average price points were limited to the most common sizes lowering the average price point for each category.

For this study, it is assumed that 65 percent of metal/vinyl blinds imports are for residential consumers. This residential unit estimate is also assumed to account for 90-95 percent of the market for this category. However, the imports are higher by a factor of 9 in some cases compared to some of the historical empirical sales data for this window covering category. Because of this disparity, 25 percent of the residential imports were assumed to be sold in the same year they were imported for the projection model.

The average useful life estimates could also be lower than actual life times. This increases the number of failures and therefore sales for each category. This is especially true for the metal/vinyl blinds category which makes up the largest share of the installed base and of new product sales. The average useful life for this category is assumed to be 4.25 years in the DOE report. This causes a higher volume of failures for this category compared to all others.

The shares of sales for the various window covering categories is based upon the sales from some of the major manufacturers in the United States window covering market. However, these manufacturers focus on specific categories and in some cases do not have particular categories in their offerings. This introduces greater uncertainty specifically in the shares of sales in the curtains/drapery and sheer drapery categories that are not present in the data available from manufacturers. This also produces some uncertainty in the representative breakdown of stock versus custom shipments for categories that

19

are only sold as custom products by these manufacturers for instance. This bias can be seen in the representation of some categories being 100% custom shipments.

## Findings

The results of the projection model produced unit and revenue projections for 2015 through 2025 that are more closely in line with the "low" annual estimates in the DOE study published in 2013. The DOE study estimated annual shipments ranging from 150 million on the low end to 225 million on the high end.[27] The model in this report projects unit shipments ranging from 111.2 million units on the low end to 138.8 million units on the high end which can be seen in Figure 7.



**Figure 7. Time Series of U.S. Residential Window Covering Market Unit Shipments from 2015 through 2025**

The market revenue was calculated using the average price point for each category that are specified in Figure 1 and multiplying by the projected unit shipments. The results for the market revenue are displayed in Figure 8. The revenue estimates are higher than empirical data provided by some of the manufacturers.

---

[27] US DOE, Residential Windows and Window Coverings, 2013.

A846



**Figure 8. Time Series of U.S. Residential Window Covering Market Revenue from 2015 through 2025**

A time series breakdown of the total unit shipments into stock versus custom sales is shown in Figure 9. The share of custom versus stock sales over time is a critical insight into how the window covering market has changed in response to the WCMA A100-1.2018 standard which only affects stock products. Metal/vinyl blinds, roller shades, vertical blinds, and wood/faux wood blinds are the categories that should be most affected by the standard given the large share of stock sales in these categories. If these categories had an increase in custom sales after 2018, it would indicate that the cordless operation could be one of the factors driving consumers towards purchasing custom products with corded operation despite the higher price points. However, the projections indicate that there is not a consistent trend towards greater custom sales, and in the case of metal/vinyl blinds, there is an increasing share of stock sales over time. Figures 10-20 show the share of stock versus custom sales for each window covering category.

21



**Figure 9. Time Series of U.S. Residential Window Covering Market Stock vs Custom Unit Shipments from 2015 through 2025**



**Figure 10. Time Series of Metal/Vinyl Blinds Unit Shipments from 2015 through 2025**



Figure 11. Time Series of Vertical Blinds Unit Shipments from 2015 through 2025



Figure 12. Time Series of Curtains/Drapery Unit Shipments from 2015 through 2025

A849



**Figure 13. Time Series of Wood or Faux Wood Horizontal Blinds Unit Shipments from 2015 through 2025**



**Figure 14. Time Series of Cellular Shades Unit Shipments from 2015 through 2025**



Figure 15. Time Series of Pleated Shades Unit Shipments from 2015 through 2025



Figure 16. Time Series of Roller Shades Unit Shipments from 2015 through 2025



**Figure 17. Time Series of Soft Sheer Blinds Unit Shipments from 2015 through 2025**



**Figure 18. Time Series of Roman Shades Unit Shipments from 2015 through 2025**



Figure 19. Time Series of Sheer Drapery Unit Shipments from 2015 through 2025



Figure 20. Time Series of Interior Shutters Unit Shipments from 2015 through 2025

# Conclusion

The research and analysis in this report demonstrates that the voluntary standard WCMA A100-1.2018 has caused U.S. window covering manufacturers to design and offer cordless lift operations for most window covering categories. All manufacturers interviewed were aware of the standard and had implemented compliance in all stages of their development process from product design to fabrication. Compliance did raise costs for the manufacturers because of the need to re-design and adjust their processes, which may have translated to increased price points for window covering products with cordless lift operation. However, the increased cost for a cordless stock product is still a lower price point than a custom corded product in most cases. The large share of the installed base and the annual sales for the metal/vinyl horizontal blinds category indicate that most consumers are typically choosing the least cost option when replacing a window covering regardless of the lift operation.

At the same time, we project that custom sales account for 36-49 percent of all projected window covering unit sales. There is an increasing share of sales of window covering units with cordless lift operation even in custom sales, but given the higher cost, we expect that price sensitive consumers purchasing a custom product would choose a corded product at a lower price point. Some window covering categories are more likely to be custom ordered to fit customer preferences, including roman shades, pleated shades, and cellular shades. These categories that are ordered as custom products would increase the likelihood that those products are more often sold with corded lift operations.

CPSC's market research would benefit from direct shipment data from manufacturers. Shipment data would increase the accuracy of the projected unit estimates through 2025 and provide greater granularity on pricing and custom versus stock sales. These two important factors in estimating market size and revenue have likely shifted since 2015 in reaction to the standard introduced in 2018.

# References

Bed Bath & Beyond. (2020, September). *Curtains & Window Treatments - Bed Bath & Beyond*. Retrieved from https://www.bedbathandbeyond.com/store/category/curtains-window/15588/

Home Depot. (2020, September). *Window Treatments - Home Depot*. Retrieved from https://www.homedepot.com/b/Window-Treatments/N-5yc1vZar4w

Jankoski, J. (2020, December). VP Government Affairs Hunter Douglas. (R. McCarthy, Interviewer)

Kaiser, L. (2020, October). Parents for Window Blind Safety (PFWBS). (R. McCarthy, Interviewer)

Kmart. (2020, September). *Window Blinds & Shades - Kmart*. Retrieved from https://www.kmart.com/home-decor-window-treatments-hardware-blinds-shades/b-1348699256

Lowe's Home Improvement. (2020, September). *Window Treatments - Lowe's*. Retrieved from https://www.lowes.com/c/Window-treatments-Home-decor

Marsh, D. (2020, October). CEO Rollease Acmeda. (S. Christie, & R. McCarthy, Interviewers)

Singh, H. (2020, November). Nien Made. (R. McCarthy, & L. Albin, Interviewers)

Stout, J. (2020, December). Director of Marketing Levolor. (R. McCarthy, Interviewer)

Swopes, C. (2020, December). Egineering Regulatory Manager Springs Window Fashions. (R. McCarthy, Interviewer)

Wayfair. (2020, September). *Window Treatments - Wayfair*. Retrieved from https://www.wayfair.com/decor-pillows/cat/window-treatments-c416567.html


Bickel, S., Phan-Gruber, E., & Christie, S. (2013). *Residential Windows and Window Coverings: A Detailed View of the Installed Base and User Behavior.* Washington DC: Office of Energy Efficiency and Renewable Energy, United States Department of Energy.

Consortium for Building Energy Innovation. (2016). *Shading, Films, and Window Attachments (SFWA) Market Report.*

Northwest Energy Efficiency Alliance. (2017). *Residential Building Stock Assessment II Manufactured Homes Report 2016-2017.*

A855

Northwest Energy Efficiency Alliance. (2017). *Residential Building Stock Assessment II Multifamily Buildings Report 2016-2017.*

Northwest Energy Efficiency Alliance. (2017). *Residential Building Stock Assessment II Single-Family Homes Report 2016-2017.*

US Census Bureau. (2015). *American Housing Survey.*

US Census Bureau. (2019). *American Housing Survey.*

US Census Bureau. (2019). *American Manufactured Housing Survey.*

US Energy Information Administration, Office of Energy Consumption and Efficiency Statistics. (2015). *2015 Residential Energy Consumption Survey.*

# EXHIBIT 14



**UNITED STATES
CONSUMER PRODUCT SAFETY COMMISSION
4330 EAST WEST HIGHWAY
BETHESDA, MD 20814**

This document has been electronically
approved and signed.

**THIS MATTER IS NOT SCHEDULED FOR A BALLOT VOTE.**

**A DECISIONAL MEETING FOR THIS MATTER IS SCHEDULED ON:** _____TBD_____

**DATE:** October 6, 2021

| | |
|---|---|
| **TO:** | The Commission<br>Alberta E. Mills, Secretary |
| **THROUGH:** | Pamela J. Stone, Acting General Counsel<br>Mary T. Boyle, Executive Director |
| **FROM:** | Daniel R. Vice, Assistant General Counsel, Regulatory Affairs<br>Mary A. House, Attorney, Regulatory Affairs |
| **SUBJECT:** | Notices of Proposed Rulemaking to (1) Add Window Covering Cords to the Substantial Product Hazard List, and (2) Establish a Safety Standard for Operating Cords on Custom Window Coverings |

Staff is forwarding a briefing package to the Commission, recommending that the Commission publish in the *Federal Register* the attached two draft documents:

(1) Notice of proposed rulemaking (NPR), under section 15(j) of the Consumer Product Safety Act (CPSA), to deem that stock window coverings that do not comply with the operating and inner cord requirements in ANSI/WCMA A100.1 – 2018, American National Standard for Safety of Corded Window Covering Products (ANSI/WCMA-2018), and custom window coverings that do not comply with the requirements for inner cords in ANSI/WCMA-2018, present a substantial product hazard; and

(2) NPR under sections 7 and 9 of the CPSA to establish a Safety Standard for Operating Cords on Custom Window Coverings.

Taken together, the draft proposed rules would address the risk of strangulation deaths and injuries to children 8 years old and younger on stock and custom window covering cords, comprised of operating cords and inner cords, on each product type. If both rules are finalized, all window coverings would be required to meet the same requirements for operating cords and inner cords in sections 4.3.1 and 4.3.5, respectively, of ANSI/WCMA-2018.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Please indicate your vote on the following options:

I.     Approve publication of the attached notices in the *Federal Register*, as drafted.


_____            _____
(Signature)                                 (Date)

II.    Approve publication of the attached notices in the *Federal Register*, with the specified changes.


_____

_____

_____


_____            _____
(Signature)                                 (Date)

III.   Do not approve publication of the attached notices in the *Federal Register*.


_____            _____
(Signature)                                 (Date)

IV.    Take other action specified below.


_____

_____

_____


_____            _____
(Signature)                                 (Date)

Attachments: Draft *Federal Register* notices of proposed rulemaking: (1) Substantial Product Hazard List: Window Covering Cords; (2) Safety Standard for Operating Cords on Custom Window Coverings

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION                    CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Billing Code 6355-01-P

**CONSUMER PRODUCT SAFETY COMMISSION**

**16 CFR Part 1260**

**[CPSC Docket No. CPSC–2013–0028]**

**Safety Standard for Operating Cords on Custom Window Coverings**

**AGENCY**:  Consumer Product Safety Commission

**ACTION**:  Notice of proposed rulemaking

**SUMMARY**:  The U.S. Consumer Product Safety Commission (CPSC) has determined preliminarily that custom window coverings with accessible operating cords that are longer than 8 inches pose an unreasonable risk of strangulation to children 8 years old and younger.  To address this risk of strangulation, the Commission proposes a rule under the Consumer Product Safety Act (CPSA) to require that operating cords on custom window coverings meet the same requirements as operating cords on stock window coverings, as set forth in the applicable voluntary standard.  Thus, the rule proposes that operating cords on custom window coverings must be cordless, inaccessible, or 8 inches or shorter in length in any use position.  If finalized, operating cords on custom window coverings would require testing and certification to the rule under section 14 of the CPSA.  Moreover, operating cords on custom window coverings that meet the definition of a "children's product" would require third party testing by a CPSC-accredited third party conformity assessment body.  Accordingly, the rule also proposes to amend the Commission's regulation at 16 CFR part 1112 to add "Safety Standard for Operating Cords on Custom Window Coverings" to the list of rules that require third party testing.

**DATES**:  Written comments must be received by [INSERT DATE THAT IS 75 DAYS AFTER PUBLICATION IN THE FEDERAL REGISTER].

**ADDRESSES**:  Direct comments related to the Paperwork Reduction Act aspects of the

proposed rule to the Office of Information and Regulatory Affairs, the Office of Management

and Budget, Attn: CPSC Desk Officer, fax to: 202-395-6974, or e-mail

oira_submission@omb.eop.gov.  Submit all other comments on the proposed rule, identified by

Docket No. CPSC–2013–0028, by any of the following methods:

*Electronic Submissions:* Submit electronic comments to the Federal eRulemaking

Portal at: https://www.regulations.gov.  Follow the instructions for submitting comments.  CPSC

typically does not accept comments submitted by electronic mail (e-mail), except through

https://www.regulations.gov.  CPSC encourages you to submit electronic comments by using the

Federal eRulemaking Portal, as described above.

*Mail/hand delivery/courier Written Submissions:* Submit comments by mail/hand

delivery/courier to: Division of the Secretariat, Consumer Product Safety Commission, 4330

East West Highway, Bethesda, MD 20814; telephone: (301) 504-7479.  Alternatively, as a

temporary option during the COVID-19 pandemic, you can email such submissions to: cpsc-

os@cpsc.gov.

*Instructions:* All submissions must include the agency name and docket number for this

notice.  CPSC may post all comments without change, including any personal identifiers, contact

information, or other personal information provided, to: https://www.regulations.gov.  Do not

submit electronically: confidential business information, trade secret information, or other

sensitive or protected information that you do not want to be available to the public.  If you wish

to submit such information, please submit it according to the instructions for mail/hand

delivery/courier written submissions.

*Docket:* For access to the docket to read background documents or comments received, go to: https://www.regulations.gov, and insert the docket number, CPSC–2013–0028, into the "Search" box, and follow the prompts.

**FOR FURTHER INFORMATION CONTACT:** Rana Balci-Sinha, Director, Division of Human Factors, Directorate for Engineering Sciences, Office of Hazard Identification and Reduction, Consumer Product Safety Commission, National Product Testing and Evaluation Center, 5 Research Place, Rockville, MD 20850; telephone: 301-987-2584; rbalcisinha@cpsc.gov.

**SUPPLEMENTARY INFORMATION:**

**I.     Introduction**

*A.        Overview of the Proposed Rule*

The purpose of the proposed rule is to address the risk of strangulation to children 8 years old and younger associated with hazardous operating cords on custom window coverings. The Commission issues this notice of proposed rulemaking (NPR) using its authorities in sections 7 and 9 of the CPSA, 15 U.S.C. 2056 and 2058, to create a new mandatory standard for operating cords on custom window coverings.  Due to the ongoing fatal and nonfatal incidents associated with window covering cords, high severity of the outcomes (death and disability to children), proven technical feasibility of cordless products, the implementation of stronger operating cord requirements for stock window coverings already on the market, and the ineffectiveness of warnings and safety devices for this class of products, the Commission proposes to regulate operating cords on custom window coverings.  The proposed rule would require operating cords on custom window coverings to meet identical requirements for operating cords on stock window coverings, as set forth in section 4.3.1 of ANSI/WCMA

A100.1 – 2018, American National Standard for Safety of Corded Window Covering Products

(ANSI/WCMA-2018). The ANSI standard requires stock window coverings to have:

(1) no operating cords (cordless) (section 4.3.1.1);

(2) inaccessible operating cords (section 4.3.1.3); or

(3) operating cords shorter than 8 inches in any use position (section 4.3.1.2).

In a separate, concurrent rulemaking under section 15(j) of the CPSA, the Commission is

proposing to deem a "substantial product hazard" (SPH), as defined in section 15(a)(2) of the

CPSA: (1) the presence of hazardous operating cords on stock window coverings; (2) the

presence of hazardous inner cords on stock and custom window coverings; or (3) the absence of

a required manufacturer label. Both NPRs are based on information and analysis contained in

CPSC staff's September 29, 2021, Staff Briefing Package: Notice of Proposed Rulemaking for

Corded Window Coverings (Staff's NPR Briefing Package), available at: [Insert Link].

> B.    *Background and Statutory Authority*

Window coverings are "consumer products" within the jurisdiction of the CPSC, and

subject to regulation under the authority of the CPSA, because consumers use and enjoy window

coverings in or around a permanent or temporary household or residence, and in schools. *See* 15

U.S.C. 2052(a)(5). Section 7(a) of the CPSA authorizes the Commission to promulgate a

mandatory consumer product safety standard that sets forth performance or labeling

requirements for a consumer product if such requirements are reasonably necessary to prevent or

reduce an unreasonable risk of injury. 15 U.S.C. 2056(a). The proposed rule sets forth

performance requirements for operating cords on custom window coverings. The proposed

performance requirements would make operating cords on custom products meet the same

requirements for stock window coverings in section 4.3.1 of ANSI/WCMA-2018, to prevent an unreasonable risk of injury, strangulation and death, to children 8 years old and younger.

Section 7(b)(1) of the CPSA requires the Commission to rely on a voluntary standard, rather than promulgate a mandatory standard, when compliance with the voluntary standard would eliminate or adequately reduce the risk of injury associated with a product, and it is likely that products are in substantial compliance with the voluntary standard. 15 U.S.C. 2056(b)(1). As described in section II.E of this preamble, custom window coverings likely substantially comply with the voluntary standard, ANSI/WCMA-2018. However, section 4.3.2 of ANSI/WCMA-2018, which applies to custom window coverings, does not adequately address the risk of injury associated with operating cords on custom window coverings, because the ANSI standard allows operating cords on custom window coverings to be accessible to children, and to be longer than 8 inches, which presents an unreasonable risk of strangulation to children 8 years old and younger. CPSC staff advises that the operating cord requirements proposed in the NPR would address 100 percent of the operating cord incidents associated with custom window coverings.

Section 9 of the CPSA specifies the procedure that the Commission must follow to issue a consumer product safety standard under section 7 of the CPSA. In accordance with section 9, the Commission may commence rulemaking by issuing an advance notice of proposed rulemaking (ANPR) or a notice of proposed rulemaking (NPR). The Commission issued an ANPR for corded window coverings, including stock and custom products, in January 2015 (80 FR 2327 (January 16, 2015)). The Commission is moving forward with two NPRs because the voluntary standard now addresses the risk of injury for operating cords on stock window coverings, and inner cords on stock and custom window coverings. For the hazards addressed by

the voluntary standard, the Commission is issuing a separate rule under section 15(j) of the CPSA, leaving for this NPR to address, under sections 7 and 9 of the CPSA, operating cords on custom window coverings.

Section 9 authorizes the Commission to issue an NPR, including the proposed rule and a preliminary regulatory analysis, in accordance with section 9(c) of the CPSA. We request comments regarding the risk of injury identified by the Commission, the regulatory alternatives being considered, and other possible alternatives for addressing the risk of injury.  15 U.S.C. 2058(c).  The preliminary regulatory analysis must include:

- a preliminary description of the potential benefits and costs of the rule, including benefits and costs that cannot be quantified, and the analysis must identify who is likely to receive the benefits and bear the costs;

- a discussion of the reasons any standard or portion of a standard submitted to the Commission in response to the ANPR was not published by the Commission as the proposed rule or part of the proposed rule;

- a discussion of the reasons for the Commission's preliminary determination that efforts submitted to the Commission in response to the ANPR to develop or modify a voluntary standard would not be likely, within a reasonable period of time, to result in a voluntary standard that would eliminate or adequately reduce the risk of injury addressed by the proposed rule; and

- a description of alternatives to the proposed rule that the Commission considered and a brief explanation of the reason the alternatives were not chosen.

*Id.* Tab K of Staff's NPR Briefing Package, and section V of this preamble, provide the required preliminary regulatory analysis for a mandatory standard on operating cords for custom window coverings.

After issuing an NPR, the Commission will consider the comments received in response to the proposed rule and decide whether to issue a final rule, along with a final regulatory analysis. *Id.* 2058(c)–(f). The Commission also will provide an opportunity for interested persons to make oral presentations of the data, views, or arguments, in accordance with section 9(d)(2) of the CPSA. *Id.* 2058(d)(2).

According to section 9(f)(1) of the CPSA, before promulgating a consumer product safety rule, the Commission must consider, and make appropriate findings to be included in the rule, on the following issues:

- The degree and nature of the risk of injury that the rule is designed to eliminate or reduce;

- The approximate number of consumer products subject to the rule;

- The need of the public for the products subject to the rule and the probable effect the rule will have on utility, cost, or availability of such products; and

- The means to achieve the objective of the rule while minimizing adverse effects on competition, manufacturing, and commercial practices.

*Id.* 2058(f)(1). At the NPR stage, the Commission is making these findings preliminarily, to allow the public to comment on the findings. Section XIII of the preamble contains the Commission's preliminary findings.

Under section 9(f)(3) of the CPSA, to issue a final rule, the Commission must find that the rule is "reasonably necessary to eliminate or reduce an unreasonable risk of injury associated with such product" and that issuing the rule is in the public interest. *Id.* 2058(f)(3)(A)&(B).

Additionally, if a voluntary standard addressing the risk of injury has been adopted and implemented, the Commission must find that:

- The voluntary standard is not likely to eliminate or adequately reduce the risk of injury, *or*

- Substantial compliance with the voluntary standard is unlikely.

*Id.* 2058(f)(3)(D).  The Commission also must find that the expected benefits of the rule bear a reasonable relationship to its costs, and that the rule imposes the least burdensome requirements that would adequately reduce the risk of injury.  *Id.* 2058(f)(3)(E)&(F).  Section XIII of the preamble contains the Commission's preliminary findings on these additional requirements, so that the Commission can collect public comment.

    *C.*    *Product Description*

        1.  <u>Overview of Window Covering Products</u>

Window coverings comprise a wide range of products, including shades, blinds, curtains, and draperies.  Generally, the industry considers blinds to be "hard" window coverings, composed of slats or vanes, and considers shades to be "soft" window coverings, composed of a continuous roll of material.  Both blinds and shades may have inner cords that distribute forces to cause a motion, such as raising, lowering, or rotating the window covering to achieve a consumer's desired level of light control.  Manufacturers use inner cords on window coverings to open and close blinds and shades, using a variety of inputs, including traditional operating cords, motors, or direct-lift of the bottom rail of the product, to manipulate inner cords.  Curtains and

draperies do not contain inner cords, but consumers can operate curtains and drapes using a continuous loop operating cord or a wand.

A cord or loop used by consumers to manipulate a window covering is called an "operating cord" and may be in the form of a single cord, multiple cords, or continuous loops. "Cordless" window coverings are products designed to function without an operating cord, but they may contain inner cords. Figures 1 through 6 explain window covering terminology and show examples of different types of window coverings.



Figure 1. Horizontal blind





Figure 2. Roll-up shade with lifting       Figure 3. Cellular shade with looped operating

9



Figure 4. Vertical blind        Figure 5. Roman shade        Figure 6. Cordless horizontal blind

Figure 1 shows a horizontal blind containing inner cords, operating cords, and tilt cords. Figure 2 shows a roll-up shade containing lifting loops and operating cords. Figure 3 shows a cellular shade with inner cords between two layers of fabric and operating cords. Figure 4 shows a vertical blind with a looped operating cord to traverse the blind and a looped bead chain to tilt the vanes. Figure 5 shows a Roman shade with inner cords that run on the back side of the shade and operating cords. Figure 6 is a horizontal blind that is marketed as "cordless" because it has no operating cords, but it still contains inner cords.

Materials used to make shades and blinds include fabric, wood or faux wood, polymers, such as vinyl, and woven materials, such as bamboo. Window covering products are mounted either inside or outside the window frame and can be customized to fit non-standard-sized windows, or for operation when the window frame is inaccessible, using tools or mobility devices, such as ladders, stools, and lifts. Some window covering types, such as curtains/drapes,

shades, and horizontal blinds, can also be customized to fit unusual window shapes, like circles, ovals, trapezoids, and diamonds, but operation may be limited.

Window covering operating systems can vary slightly by window covering type, but all operating systems fit into one of two general categories: corded or cordless.

2.  Corded Window Coverings

"Traditional" or "corded" shades and blinds generally have cords located inside the product (inner cord), to the side of the product (operating cord or outer cord), or both. The inner cords between the head rail and bottom rail lift the horizontal slats to adjust light coming through, as in the case of horizontal blinds, or lift fabric and similar materials, as in the case of Roman or pleated shades. The inner cords may be exposed from the front, rear, or bottom of the window covering, or they can be rendered inaccessible, depending upon how the product is constructed. Horizontal blinds and pleated shades generally have two inner cords, one on each side of the blind; but products manufactured for wider windows may require more than two inner cords to be operational.

The outer cord or operating cord allows the user to raise, lower, open and close, rotate, or tilt the window covering. Operating cord systems generally fall into one of three categories: (1) standard; (2) single cord; and (3) continuous loop. The operating cord in a standard operating system consists of two or more cords and often includes a cord locking device to allow the user to set the height of the window covering. In a single cord operating system, the user can manipulate the window covering with a pull cord. The operating cord in a continuous loop operating system uses a single piece of cord or a beaded metal or plastic chain that is secured to a wall and operates like a pulley. For example, pulling the rear half of the loop will raise the shade, while pulling the front half of the loop will lower the shade.

11

Although operating systems can vary, some products are more commonly coupled with specific systems. Cellular and pleated shades can have any of the three operating cord systems; in contrast, roller and Roman shades mostly use a standard or continuous loop system. Horizontal blinds are generally coupled with a standard operating system, while vertical blinds operate by continuous loop. Some curtains and drapes operate by continuous loop along with a traverse rod, which are also within the scope of the rule. However, many curtains and drapes are stationary and do not have operating systems; these products are not within the scope of the rule.

3. Cordless Window Products

Virtually every window covering type is available with a "cordless" operating system, which means it has been designed to function without an operating cord.[1] Cordless window coverings may require inner cords, but these can be, and typically are, made inaccessible through a variety of approaches. In lieu of an operating cord, cordless operating systems can be manual or motorized. A manual operating system allows users to lift or lower the window covering with a plastic handle or directly by hand.

A motorized operating system uses a motor and control system to manipulate the window covering, such as a remote control or wall switch. Installation of cordless window coverings that are motorized is more complicated than manual systems because motorized systems require a power source. The power sources for motorized systems, in order of installation complexity are battery-powered, DC plug, solar-powered, and what is commonly called "hardwired."

The simplest power source for a motorized cordless product is a battery system, which is typically installed near the head rail in a circular tube called a battery wand. Replacement of the

---

[1]The availability of alternatives to corded window coverings may sometimes be constrained due to size and weight limitations. *See* Lee, 2014. Through market research, staff found several examples of cordless blinds that are made with a maximum height of 84" and a maximum width of 144" (Tab G of Staff's NPR Briefing Package).

12

batteries can require additional tools, like a screwdriver, step ladder, or stool.  Most manufacturers recommend lithium-ion batteries for use in their systems, due to the increased temperature level around window coverings.[2]  A DC plug adapter can also be used as a power source and is easy to install.  A window covering with a DC plug adapter can be plugged into any standard electrical outlet.  Electrical outlets aren't typically installed near the top of a window.  Accordingly, DC plugs may require consumers to use extension cords near the window covering to reach an available outlet, which some consumers may find unsightly.

Solar-powered, motorized window coverings use a rechargeable battery wand combined with a solar panel to charge the batteries.  Installation is about as complex as a typical battery system, but placement of the solar panel is critical to the operation of the window covering.  Newer, more advanced versions of solar-powered window coverings can power themselves, while also providing renewable energy.  These products are less mature than others and are generally much more expensive.

The most complex to install power source for motorized systems is to wire the window covering directly into the home, commonly called "hardwiring."  The industry does not regard hardwiring window coverings to be a task that consumers can complete.  Typically, electricians are required to install these products, which creates higher installation costs for consumers.

4.  <u>Other Types of Safety Devices</u>

Rather than eliminate the operating cord entirely, some manufacturers offer other devices to isolate the operating cord on custom window coverings.  These alternatives include, among others: retractable cord devices, cord cleats, cord shrouds, cord condensers, and wands.  Tab I in Staff's NPR Briefing Package contains a more detailed description of these devices and how to

---

[2] Window coverings receive direct sunlight for large portions of the day, resulting in higher surface temperatures that can cause the failure of non-lithium-type batteries.

13

operate each. As described in section I.C.3 of this preamble, and Tab I of Staff's NPR Briefing Package, these devices are inadequate to address the risk of injury associated with operating cords on custom window products.

All of these safety devices are currently available for purchase by consumers, or provided by manufacturers, on custom window coverings, but offerings vary by manufacturer. A retractable cord device uses a spring-loaded spool to adjust the length of the pull cord. After the consumer adjusts the pull cord to raise or lower the window covering, the retractable cord device automatically retracts the pull cord back to the bottom of the headrail in an attempt to keep the pull cord out of reach of small children.

Cord cleats are generally composed of transparent or white plastic material in a long, rectangular shape. To be effective, two cord cleats must be installed or anchored to the wall near the window covering at a height out of reach of children. Cord cleats are used in conjunction with operating cords that dangle below the bottom of the window covering. The consumer must wrap the operating cord(s) in an S-shape around the cord cleats each time the window covering is raised or lowered.

A cord shroud encloses the pull cord or continuous cord loops for various types of blinds and shades with a rigid material, usually plastic. Although the pull cord or continuous loop cords are rendered inaccessible, the consumer can use the cord shroud to raise and lower the window covering. Cord condensers are a small plastic device that the consumer feeds the multiple cords into to condense the pull cord to a single pull cord below where the device is installed. Wands are simple pieces of plastic that the consumer rotates or pulls to operate the window covering in place of a cord.

14

5. "Stock" and "Custom" Window Coverings Defined in the NPR

This NPR relies on the definitions of window coverings and their features as set forth in the ANSI/WCMA-2018 standard, which currently requires "stock" and "custom" window coverings to meet different sets of operating cord requirements. For the NPR, the definition of a "stock window covering" is based on the definition of "Stock Blinds, Shades, and Shadings" in section 3, definition 5.02 of ANSI/WCMA-2018. A "stock widow covering" is a completely or substantially fabricated product prior to being distributed in commerce and as a specific stock-keeping unit (SKU). Even when the seller, manufacturer, or distributor modifies a pre-assembled product, by adjusting to size, attaching the top rail or bottom rail, or tying cords to secure the bottom rail, the product is still considered "stock," as defined in ANSI/WCMA-2018. Moreover, under the ANSI standard, online sales of a window covering, or the size of the order, such as multifamily housing orders, do not make the product a non-stock product. ANSI/WCMA-2018 provides these examples to clarify that, as long as the product is "substantially fabricated," subsequent changes to the product do not change its categorization from "stock" to "custom."

The NPR defines a "custom window covering" using the same definition of "Custom Blinds, Shades, and Shadings" found in section 3, definition 5.01 of ANSI/WCMA-2018, which is "any window covering that is not classified as a stock window covering." We explain additional definitions in the NPR, including "operating cord," "cord shroud," and "rigid cord shroud," in section IV.A of this preamble.

6. The Window Covering Industry

Based on 2017 data, 1,898 firms were categorized as blinds and shades manufacturers and retailers (Census Bureau, 2020). Of these, about 1,840 firms (302 manufacturers and 1,538

retailers) are small.  In 2020, three manufacturers accounted for almost 38 percent of dollar sales in the U.S. window coverings market (Euromonitor 2021a).  Only one of these manufacturers is a publicly held firm.  In 2020, the largest global manufacturer and distributor of window coverings reported worldwide net sales of $3,543 million, with North American window covering sales reported as $1,703 million.  The second largest firm is privately held, and annual reports are not publicly available.  Estimates of this firm's revenue indicate annual U.S. window covering revenue in 2020 of approximately $728 million (Euromonitor 2021a).  The third firm is also privately held, and estimates indicate U.S. window covering revenues in 2020 of approximately $88 million (Euromonitor 2021a).  The remainder of the total market size of $6.6 billion is attributed to firms that each account for less than 3 percent market share (Euromonitor 2021b).

A recent study conducted for CPSC (D+R, 2021) estimated that in 2019, approximately 139 million residential window coverings were shipped in the United States.  Most of these shipments, 59.2 percent, were blinds, while 25.4 percent were shades.  When comparing unit sales data to revenue data, CPSC staff found that while custom products account for approximately 44 percent of unit sales, a disproportionate amount of revenue is attributable to custom window covering products.  For example, Roman shades, which are sold almost always as custom window covering products, account for 1.9 percent of annual sales in 2019, but generated revenues equal to 2.3 percent of the total.

6.  <u>Retail Prices</u>

Retail prices for window coverings vary, depending on the type of the product and retailer.  Stock products for common-size window coverings can be purchased at a variety of retailers, such as big box and home furnishing stores, and e-commerce retailers, such as Amazon

and Wayfair. The type of material and brand affect the price. According to a study conducted for CPSC by D+R International (2021),[3] weighted average prices for window coverings range from about $54 to $94 for shades and from about $25 to $250 for blinds.[4] Prices for vertical blinds are generally lower than the prices of horizontal blinds; prices for roller shades are slightly lower than the prices of Roman and cellular shades (D+R International, 2021).[5]

Consumers can purchase custom-sized and custom-designed window coverings from mass merchants, specialty retailers, e-commerce retailers, and in-home consultation firms. Custom coverings include uncommon window covering sizes, such as extremely small (*e.g.*, 9 inches wide x 13 inches high), extremely large (*e.g.*, 96 inches wide x 96 inches high), and other unusual sizes. Retail prices for custom-made window coverings range from $25 to $900, but prices can be as high as $5,000.[6] Typically, retail prices for custom products exceed the price of stock products of similar size and type. Retailers often suggest in-home measuring and evaluation to estimate the price for custom-designed products, because non-standard sizes or non-standard window shapes, or motorized lift systems can require professional installation. Prices for customized window coverings, on average, are higher than similar stock products sold by mass retailers.

7. <u>Window Coverings in Use</u>

CPSC staff created an estimate of custom window coverings in use using multiple data sources. Estimates for the year 2019, are developed from (1) estimates of U.S. residential

---

[3] CPSC contracted with D+R International, which interviewed window covering manufacturers and component manufacturers to collect anecdotal information on the distribution of stock and custom product sales and the impact of compliance with the voluntary standard (D+R International, 2021).

[4] The range for shades is based on average prices for cellular shades, roller shades, Roman shades, and pleated shades. The range for blinds is based on average prices for vinyl blinds, metal blinds, faux-wood blinds, wood blinds, and vertical blinds.

[5] The D+R review of prices and product availability found that stock product prices are generally lower than custom products and that cordless lift systems resulted in an increase in price, except in the case of vertical blinds.

[6] Based on firms' websites, retail prices for custom-made Roman shades can range from $300 to $5,000.

17

housing units; (2) estimates of the number of window coverings per housing unit; (3) estimates of the proportion of window coverings in use, by type; (4) estimates of the expected product life of window coverings; and (5) estimates of the proportion of corded custom window coverings sold by type. Based on U.S. Census estimates, approximately 124.1 million residential housing units existed in the United States during the year 2019 (Census Bureau, 2019). Additionally, the D+R (2020) study estimated an average of about 8.17 window coverings per housing unit.[7] The product of the number of housing units and the average number of window coverings per housing unit suggests that about 1,014 million window coverings may have been in use in the United States (124.1 million housing units × 8.17 window coverings per housing unit) during 2019.

The distribution of the estimated 1,014 million window coverings in use is created using the 2019 share of custom product sales to total for each aggregate category.[8] Application of the share of custom product sales to the window coverings in use estimate, amounts to approximately 111 million custom horizontal blinds, 213 million custom shades, 10 million custom vertical blinds, and 179 million custom curtains or drapery.[9] Applying an estimate of 65 percent of custom window covering products in use having operating and/or accessible cords equates to an approximate total of 332.6 million corded custom window coverings in use. As shown in Figure 7 below, staff estimates that approximately 72 million corded custom horizontal

---

[7] The D+R estimate uses a 2013 market characterization study completed for the U.S. Department of Energy. The study included a survey of 2,100 households in 13 cities across the United States to collect a representative sample of data on household characteristics, including number of windows, location of windows, the types of window coverings installed, and operation.

[8] Installed base data for window covering products does not differentiate between custom or stock products. A point estimate created from one year of sales data may distort product in use estimates if there are large fluctuations in sales due to consumer preferences from year to year or if the expected product life of custom products is substantially different than stock products.

[9] Interior shutters are included in the total 1,014 million window covering in use estimate, but because these products are out of scope for the rule, they are not included in the regulatory analysis later in this report.

blinds, 138.2 million corded custom shades, 6.4 million corded custom vertical blinds, and 116.1

million corded custom curtains or drapery are in use as of 2019.[10]

*Figure 7. Custom Window Coverings in Use (2019)*

| Product Category [1] | Total Product In Use [2] | Custom Product Share of Sales (2019) [3] | Custom Product In Use [4] [col. 2 x col. 3] | Corded Custom Product In Use [5] [col. 4 x 0.65] |
|---|---|---|---|---|
| Horizontal Blinds, All Types | 340.4 | 32.52% | 110.7 | 72.0 |
| Shades, All Types | 300.9 | 70.66% | 212.6 | 138.2 |
| Vertical Blinds | 168.2 | 5.82% | 9.8 | 6.4 |
| Curtains & Drapes | 178.6 | 100.00% | 178.6 | 116.1 |
| Total | 1014 | | 511.7 | 332.6 |

### D. Hazards Associated with Window Covering Cords

Window coverings, depending on the type of accessible cords, including operating cords

(meaning pull cords and continuous loop cords), inner cords, and lifting loops, can pose

strangulation hazards to children when they are accessible and long enough to wrap around a

child's neck. Figures 8, 9, and 10 below depict the strangulation hazard for different window

covering cord types.



Figure 8. (a) Operating pull cords ending in one tassel (left); (b) operating cords tangled, creating a loop (middle);
(c) operating cords wrapped around the neck (right)

---

[10] This estimate has an implicit assumption that the share of annual sales will equate to a similar share of product in use. Changes in consumer preferences over time, and differences in the expected product life between custom and stock products, could result in significant deviations in this estimate.



Figure 9. (a) Inner cords creating a loop (left), (b) Inner cords on the back side of Roman shade (right)



Figure 10. (a) Continuous loop cord (left), (b) Lifting loop on roll-up shade (right)

Children can strangle from mechanical compression of the neck when they place a window covering cord around their neck. Strangulation due to mechanical compression of the neck is a complex process resulting from multiple mechanisms and pathways that involve both obstruction of the airway passage and occlusion of blood vessels in the neck. Strangulation can lead to serious injuries with permanent debilitating outcomes or death. If sustained lateral pressure occurs at a level resulting in vascular occlusion, strangulation can occur when a child's head or neck becomes entangled in any position, even in situations where the body is fully or partially supported.

Strangulation is a form of asphyxia that can be partial (hypoxia), when there is an inadequate oxygen supply to the lungs, or total, when there is complete impairment of oxygen

transport to tissues.  A reduction in the delivery of oxygen to tissues can result in permanent, irreversible damage.  Experimental studies show that only 2 kg (4.4 lbs.) of pressure on the neck may occlude the jugular vein (Brouardel, 1897); and 3kg to 5 kg (7-11 lbs.) may occlude the common carotid arteries (Brouardel, 1897 and Polson, 1973).  Minimal compression of any of these vessels can lead to unconsciousness within 15 seconds and death in 2 to 3 minutes, (Digeronimo and Mayes, 1994; Hoff, 1978; lserson, 1984; Polson, 1973).

The vagus nerve is also located in the neck near the jugular vein and carotid artery.  The vagus nerve is responsible for maintaining a constant heart rate.  Compression of the vagus nerve can result in cardiac arrest due to mechanical stimulation of the carotid sinus-vagal reflex.  In addition, the functioning of the carotid sinuses may be affected by compression of the blood vessels.  Stimulation of the sinuses can result in a decrease in heart rate, myocardial contractility, cardiac output, and systemic arterial pressure in the absence of airway blockage.

Strangulation proceeding along one or more of these pathways can progress rapidly to anoxia, associated cardiac arrest, and death.  As seen in the CPSC data (Wanna-Nakamura, 2014), and in the published literature, neurological damage may range from amnesia to a long-term vegetative state.  Continued deterioration of the nervous system can lead to death (Howell and Gully, 1996; Medalia et al., 1991).

Based on CPSC staff's review of the incidents in section I.E of this preamble, and Tab A of Staff's NPR Briefing Package, 16 of the 194 victims required hospitalization; six survived a hypoxic-ischemic episode or were pulseless and in full cardiac arrest when found, suffered severe neurological sequalae, ranging from loss of memory to a long-term or permanent vegetative state, requiring tracheotomy and gastrointestinal tube feeding.  One victim, who remained hospitalized for 72 days, was released from the hospital with 75 percent permanent

brain damage and is now confined to a bed.

Because a preexisting loop acts as a noose when a child's neck is inserted, and death can occur within minutes of a child losing footing, CPSC staff concluded that head insertion into a preexisting loop poses a higher risk of injury than when a child wraps a cord around his or her neck. However, both scenarios have been demonstrated to be hazardous and have led to fatal outcomes, according to CPSC data.

E.     *Risk of Injury*

The Commission's 2015 ANPR on Window Coverings presented incident data covering the period 1996 through 2012. 80 FR 2327, 2332 (Jan. 16, 2015). Since then, WCMA published the revised voluntary standard for window coverings, ANSI/WCMA-2018. For products that comply, ANSI/WCMA-2018 has removed hazardous operating cords and inner cords from stock window coverings and removed hazardous inner cords for custom window coverings. The incident data demonstrate that regardless of whether a product is categorized as stock or custom, children are exposed to the same risk of injury from accessible window covering cords.

CPSC staff reviewed the data related to window coverings from 2009 through 2020.[11] Some of the data sources relied upon in this analysis do not have data for 2020 available yet; for those sources, staff included data for the latest available year, 2019. The following analysis distinguishes between stock and custom window coverings, whenever feasible. National estimates of deaths and injuries involving window covering strangulations among children under

---

[11] CPSC's incident search focused on fatal and near-miss strangulations suffered by young children due to window covering cords. Whenever feasible, staff selected the time frame to be 2009 through 2020. CPSC staff searched three databases for identification of window covering cord incidents: the Consumer Product Safety Risk Management System (CPSRMS), the National Electronic Injury Surveillance System (NEISS), and the Multiple Cause of Deaths data file. The first two sources are CPSC-maintained databases. The Multiple Cause of Deaths data file is available from the National Center for Health Statistics (NCHS). The appendix at the end of this memorandum details information about the CPSC data sources and the selection criteria used for this data search.

5 years of age are associated with *all* types of window coverings, because the available information does not allow the CPSC to distinguish product subtypes.

1. <u>Incident Data from CPSC Databases</u>

Based on newspaper clippings, consumer complaints, death certificates purchased from states, medical examiners' reports, hospital emergency department-treated injury reports, and in-depth investigation reports, CPSC found a total of 194 reported fatal and near-miss strangulations on window covering cords that occurred among children 8 years old and younger from January 2009 through December 2020. These 194 incidents do not constitute a statistical sample of known probability and do not necessarily include all window covering cord-related strangulation incidents that occurred during that period. However, these 194 incidents do provide at least a minimum number for such incidents during that time frame.

Table 1a provides the breakdown of the incidents by year. Because reporting is ongoing, the number of incidents presented here may change in the future. Given that these reports are anecdotal, and reporting is incomplete, CPSC strongly discourages drawing any inferences based on the year-to-year increase or decrease shown in the reported data.

**Table 1a**
**Reported Fatal and Near-Miss Strangulation Incidents Involving Window Covering Cords**
**Among Children Eight Years and Younger 2009 – 2020**

| Incident Year | Number of Reported Incidents | | |
|---|---|---|---|
| | *Total* | *Fatal Strangulations* | *Near-Miss Strangulations* |
| 2009 | 48 | 14 | 34 |
| 2010 | 31 | 11 | 20 |
| 2011 | 10 | 6 | 4 |
| 2012 | 17 | 8 | 9 |
| 2013 | 9 | 2 | 7 |
| 2014 | 17 | 12 | 5 |
| 2015 | 9 | 7 | 2 |
| 2016 | 17 | 13 | 4 |
| 2017 | 9 | 5 | 4 |
| 2018 | 8 | 4 | 4 |

23

| | | | |
|---|---|---|---|
| *2019\** | 11 | 4 | 7 |
| *2020\** | 8 | 3 | 5 |
| **Total** | **194** | **89** | **105** |

Source: CPSC epidemiological databases CPSRMS and NEISS.
Note:  * indicates data collection is ongoing.

Table 1b expands on Table 1a to display the distribution of the annual incidents by severity of incidents and type of window coverings involved.  CPSC staff identified 50 of 194 incident window coverings (26 percent) to be stock products, and 35 of the 194 (18 percent) were identified as custom products; CPSC staff could not identify the window covering type in the remaining 109 of the 194 (56 percent) incidents.

**Table 1b**
**Reported Fatal and Near-Miss Strangulation Incidents Involving Stock/Custom/Unknown Types of Window Covering Cords Among Children Eight Years and Younger 2009 -- 2020**

| Incident Year | Reported Incidents by Window Covering Type | | | |
|---|---|---|---|---|
| | *Stock (Fatal/Nonfatal)* | *Custom (Fatal/Nonfatal)* | *Unknown (Fatal/Nonfatal)* | *All* |
| 2009 | 20 (4/16) | 7 (2/5) | 21 (8/13) | 48 |
| 2010 | 10 (3/7) | 7 (2/5) | 14 (6/8) | 31 |
| 2011 | 2 (1/1) | 4 (3/1) | 4 (2/2) | 10 |
| 2012 | 1 (1/0) | 5 (1/4) | 11 (6/5) | 17 |
| 2013 | 2 (1/1) | 3 (1/2) | 4 (0/4) | 9 |
| 2014 | 3 (2/1) | 2 (1/1) | 12 (9/3) | 17 |
| 2015 | 4 (4/0) | 1 (1/0) | 4 (2/2) | 9 |
| 2016 | 5 (3/2) | 4 (3/1) | 8 (7/1) | 17 |
| 2017 | 2 (1/1) | 1 (0/1) | 6 (4/2) | 9 |
| 2018 | -- | 1 (0/1) | 7 (4/3) | 8 |
| *2019\** | 1(0/1) | -- | 10 (4/6) | 11 |
| *2020\** | -- | -- | 8 (3/5) | 8 |
| **Total** | **50 (20/30)** | **35 (14/21)** | **109 (55/54)** | **194** |

Source: CPSC epidemiological databases CPSRMS and NEISS.
Note:  * indicates data collection is ongoing

Eighty-nine of the 194 incidents (46 percent) reported a fatality.  Among the nonfatal incidents, 15 involved hospitalizations (8 percent).  The long-term outcomes of these 15 injuries varied from a scar around the neck, to quadriplegia, to permanent brain damage.  One additional child was treated and transferred to another hospital; the final outcome of this patient is

24

unknown.  In addition, 75 incidents (39 percent) involved less-severe injuries, some requiring medical treatment, but not hospitalization.  In the remaining 14 incidents (7 percent), a child became entangled in a window covering cord, but was able to disentangle from the cord and escape injury.  Overall, among the incidents with gender information available, 66 percent of the children involved were males, while 34 percent were females.  One incident did not report the gender of the child.

*(a) Distribution of Reported Incidents by Window Covering and
Associated Cord Types*

Based on CPSC staff's review of the incident data, listed below are the most common types of window coverings among the 194 reported incidents, along with the types of cords associated with each:

- Horizontal Blinds (includes Venetian and mini blinds)
  Associated cords: continuous loop cord/beaded chain (free-standing, *i.e.*, not mounted on a tension device), inner cord, pull cord (with loops or long cords), and tilt cord;

- Vertical Blinds
  Associated cords: continuous loop cord/beaded chain (free-standing);

- Roman Shades
  Associated cords: continuous loop cord/beaded chain (free-standing), inner cord, and pull cord (with loops or long cords);

- Roller Shades
  Associated cords: continuous loop cord/beaded chain (free-standing);

- Roll-Up Shades
  Associated cords: pull cord (with loops or long cords) and lifting loop;

- Other Shades (includes pleated, cellular-honeycomb)
  Associated cords: continuous loop cord/beaded chain (free-standing) and pull cord (with loops or long cords);

- Curtains/Draperies
  Associated cords: continuous loop cord/beaded chain (free-standing).

25

*(b) Incident Breakdown - Stock and Custom Window Coverings*

CPSC staff definitively identified 50 of the 194 incidents that involved stock window coverings in the period from 2009 through 2020. Of the 50 incidents, 64 percent involved horizontal blinds; 28 percent involved Roman shades; 4 percent involved roller shades; and 2 percent involved roll-up shades and vertical blinds.

CPSC staff definitively identified 35 of the 194 incidents that involved custom window coverings. Of the 35 incidents, 51 percent involved horizontal blinds; 17 percent involved Roman shades; and 9 percent involved roller shades. Other shades, such as cellular and pleated shades, together accounted for 11 percent of the incidents. Six percent involved vertical blinds. For the remaining 6 percent of the incidents involving custom products, staff did not have sufficient information to determine the type of window covering. Table 2 provides cross-tabulation of the incidents by window covering type and the associated cord type involved in these 35 incidents.

**Table 2: Distribution of Reported Incidents by Types of Window Coverings and Associated Cords Among Custom Products: 2009 – 2020**

|  | Pull cord | Continuous loop cord/ beaded chain | Inner cord | Lifting loop | Tilt cord | Unknown | Total (%) |
|---|---|---|---|---|---|---|---|
| **Horizontal** | 16 | 2 | -- | -- | -- | -- | **18 (51%)** |
| **Roman** | 1 | 2 | 3 | -- | -- | -- | **6 (17%)** |
| **Roller** | -- | 3 | -- | -- | -- | -- | **3 (9%)** |
| **Other Shades** | 1 | 3 | -- | -- | -- | -- | **4 (11%)** |
| **Vertical** | -- | 2 | -- | -- | -- | -- | **2 (6%)** |
| **Unknown** | -- | -- | -- | -- | -- | 2 | **2 (6%)** |
| **Total** | **18** | **12** | **3** | **--** | **--** | **2** | **35 (100%)** |

Source: CPSC databases CPSRMS and NEISS. Percentages may not add to 100 due to rounding.

For most of the reported incidents (109 out of 194), CPSC staff did not have enough information available to determine if the window covering was a stock or custom product.

Among these reported incidents, 32 percent involved horizontal blinds; 7 percent involved vertical blinds; 5 percent involved roll-up shades; roller shades and Roman shades were each involved in 4 percent of the incidents; and draperies and other shades (pleated/cellular) were each involved in 3 percent of the incidents. For a large proportion, 43 percent, CPSC staff could not determine the type of window covering based on the available data.

    (c) *Distribution of Fatal Incidents by Window Covering and Associated Cord Types*

Of the 194 reported incidents, 89 involved a fatality. Of the 89 deaths, 43 involved horizontal window coverings; 10 involved vertical window coverings; and 7 involved Roman shades. For 13 fatalities, staff does not know the window covering type. When separated by the known stock versus custom products, horizontal blinds were involved in the most fatalities. Figure 11 shows the breakouts by window covering types for all 89 reported fatalities, as well as among the known stock and custom products separately. Figure 11 also illustrates the distribution of these fatal incidents by types of window coverings.



Figure 11: Distribution of Fatalities by All Window Coverings



Source: CPSC epidemiological databases CPSRMS and NEISS

*(d) Most Common Cord Types and Associated Hazards Resulting in Fatalities*

Whether considering stock, custom, or unknown-if-stock-or-custom products, CPSC found that the pull/operating cord system is the single most hazardous scenario among the reported fatal incidents. Thirty-nine of the 89 (44 percent) fatalities involved a child getting entangled in such pull cords; continuous loops were next, with 23 of the 89 (26 percent) fatalities. Inner cords ranked next, accounting for 7 of the 89 (8 percent) fatalities.

**(i) Pull Cords**: In 37 of the 39 known pull cord fatalities, the pull cords were components of horizontal blinds. Of these 39 deaths, 38 occurred before implementation of the 2018 voluntary standard affecting stock products. Although reporting is ongoing, so far, one fatality has been reported in 2019, but none in 2020. Among the 39 fatalities, CPSC identified 7 incidents involving custom products, and 12 involving stock products; staff could not differentiate the remaining 20 incidents' window coverings in terms of being stock or custom products. Hence, the effects, if any, of the 2018 voluntary standard on these products have yet to be reflected in the data.

A closer look at pull cord-related incidents revealed several ways in which children have strangled. Figure 12 presents the distribution of the pull cord-related fatalities by the common modes of entanglement.

- *Loops created by knotted or tangled cord*:  CPSC's review revealed that before the incidents, the pull cords had been tied together, or had been coiled and tucked away (out of children's reach), but later became accessible.  When pull cords were tied together, a loop was created above the knot where the cords were tied, and that is where the child later became entangled.  When the cords were coiled, the cords also became tangled and created a loop, which later acted as a noose.  Among all 39 pull-cord-related fatal incidents, 18 out of 39 (46 percent) occurred on loops created by knotted or tangled cords.

- *One or more long cords that the child wrapped around their neck*:  In these scenarios, the child had wrapped the long pull cord(s) multiple times around the neck.  When the child fell, or tried to pull away from the window covering, the cord pulled back, causing the child to strangle or nearly strangle.  Among all pull cord-related fatal incidents, this category included 11 of the 39 (28 percent) pull cord fatalities.

- *Loop above a single tassel or a stop ball of the cord*:  Some pull cords consist of multiple cords that hang from the window covering's head rail and are joined at a point, by a plastic or wooden tassel, or by a stop ball.  In such configurations, a loop exists above the tassel. In the cases reviewed, CPSC determined that these loops, when accessible to a child, acted as a noose where the child was caught. Four of the 39 (10 percent) pull cord-related fatal incidents involved this scenario.

- *Pull cord tied to an object:* CPSC determined that in one of the 39 (3 percent) pull cord-related fatal incidents, pull cords were tied to a cord cleat, creating a u-shape on the cords where the child was strangled.

29

- *Unknown manner*: Five of the 39 (13 percent) pull cord-related fatal incidents did not report sufficient information to allow CPSC staff to determine the manner in which the child was entangled.



**Figure 12: Distribution of Pull Cord-Related Fatal Incidents by Mode of Entanglement 2009-2020**
**Source: CPSC databases CPSRMS and NEISS**

(ii) <u>**Continuous Loop Cords**</u>:  CPSC identified continuous loop cords or beaded chains that were not mounted with a tension device or that broke loose from a tension device at the time of the incident, to be the next major type of cord in which children become entangled.  Vertical blinds and curtains/drapes are the predominant types of window covering associated with strangulations on continuous loops.  Some of the incident reports mentioned the child's prior interest in wearing the beaded chain as a necklace.  Among the 89 fatalities, 23 reported this type of operating mechanism.

(iii) <u>**Inner Cords**</u>:  Inner cords on horizontal blinds and/or Roman shades are the third major type of cord in which children become entangled.  In these scenarios, the child pulled out the inner cord from between the slats of the horizontal blinds or from behind the Roman shades, which were in the lowered position.  Subsequently, the child got caught in the loop created by the pulled-out portion of the inner cord.  In some Roman shade incidents,

30

children inserted their heads into the opening between the inner cord and the shade material.

Seven of the 89 fatalities involved inner cords.

      **(iv) <u>Other Cords</u>**: Among the less-prevalent cord types, the lifting loop of a roll-up blind was involved in four fatalities. Children inserted their heads or arms into the lifting loop that came off the roll-up material, resulting in the strangulation incidents. Tilt cords that are used to swivel the slats on a horizontal blind were involved in an additional two fatal incidents.

    2. <u>Incident Data from National Estimates</u>

       *(a) Estimates of Window Covering Cord-Related Strangulation Deaths Using National Center for Health Statistics Data*

The National Center for Health Statistics (NCHS) compiles all death certificates filed in the United States into multiple-cause mortality data files. The mortality data files contain demographic information on the deceased, as well as codes to classify the underlying cause of death and up to 20 contributing conditions. The NCHS compiles the data in accordance with the World Health Organization's (WHO) instructions, which request member nations to classify causes of death by the current Manual of the International Statistical Classification of Diseases, Injuries, and Causes of Death. Death classifications use the tenth revision of the International Classification of Diseases (ICD), implemented in 1999. The latest year for which mortality data are available is 2019; as such, CPSC derived the strangulation fatality estimates for 2009 through 2019, which is a slightly different time frame than that used for the incident data from the CPSC databases.

Based on CPSC staff's review of the death certificates maintained in the CPSRMS database, staff identified three ICD10 codes that are likely to be used for classification of strangulation fatalities:

- W75 (*accidental suffocation and strangulation in bed*),

- W76 (*Other accidental hanging and strangulation*), and

- W83 (*Other specified threats to breathing*).

Among these three ICD10 codes, W76 appeared to be the most commonly used to classify strangulation deaths.

Using the ICD10 code value of W76, CPSC staff identified a total of 256 strangulation fatalities among children under age 5 in the multiple-cause mortality data from the NCHS from 2009 through 2019, which yields an annual average of 24 deaths (rounded up to the nearest integer). Two hundred and fifty-six strangulation fatalities are most likely an underestimate of all strangulation deaths, because CPSC staff did not use the other two ICD10 codes (W75 and W83) in the search of this data source. An unknown proportion of strangulation deaths are likely coded under ICD10=W75, as well as ICD10=W83, which cannot be distinguished from the non-strangulation deaths—because of the unavailability of any narrative description—in this data and added to the total. Hence, staff's annual average estimate of 24 strangulation deaths is a minimum.

A CPSC report by Marcy *et al.*,[12] which reviewed CPSC databases in 2002, found that 35 percent of all strangulation fatalities among children less than 5 years old were associated with window covering cords. Assuming that this 35 percent proportion applies to the entire period 2009 through 2019, CPSC staff estimates that, on average, a minimum of 9 strangulation fatalities (35 percent of the unrounded average annual death estimate of 23.27) occur annually on window covering cords among children under 5 years of age. Again, the estimate is rounded up to an integer. Figure 13 presents the yearly details. The Commission seeks comments on the estimated strangulations by window coverings.

---

[12] N. Marcy, G. Rutherford. "Strangulations Involving Children Under 5 Years Old." U.S. Consumer Product Safety Commission, December 2002.



**Figure 13: Estimated Annual Minimum for Fatal Strangulations Among Children Under Five Years of Age**

**Source:  Multiple Cause of Death data, NCHS, 2009 – 2019.**
**Note: The estimates for the window covering cord fatalities are based on the assumptions that 35 percent of all strangulation fatalities are due to window covering cords and that this percentage remained unchanged over 2009-2019.**

*(b) Estimates of Window Covering Cord-Related Strangulation Injuries Treated in Hospital Emergency Departments*

Based on the emergency department-treated injury data (NEISS), the aggregated estimated injuries to children 8 years of age and younger, who were entangled on window covering cords in the period 2009 through 2020, fell below the NEISS reportable threshold.[13] The injury estimates for individual years are even smaller, which makes any trend analysis unfeasible.  However, we combined the 34 injury reports from NEISS with the incident data for the analysis of anecdotal data in section I.E.1 of this preamble.  CPSC staff set the upper limit for the age selection criterion for NEISS data at 8 years old, whenever feasible, because of multiple incident reports received by CPSC staff that involved children up to that age.

---

[13] According to the NEISS publication criteria, an estimate must be 1,200 or greater, the sample size must be 20 or greater, <u>and</u> the coefficient of variation must be 33 percent or smaller.

*F.     ANSI/WCMA-2018 History and Description*

CPSC staff began working with the Window Covering Manufacturers Association (WCMA) in 1995 on an American National Standards Institute (ANSI) voluntary standard to address the strangulation hazard to young children from accessible cords on window coverings. WCMA published the first version of the ANSI standard in 1996.  The 1996 standard sought to prevent strangulation incidents created by looped cords by requiring either: (1) separate operating cords, or (2) a cord release device on multiple cords ending in one tassel.  The standard also required a tension device that would hold the cord or bead loop taut, when installed according to manufacturer's instructions.

In 2001 and in 2002, CPSC staff sent letters to the WCMA asking for revisions to the 1996 standard, including the addition of inner cord stops and the elimination of free-hanging cords or bead chains longer than the neck circumference of a fifth percentile 7- month to 9-month-old child.[14]  In August 2002, the published ANSI standard required inner cord stops.  In 2007, the published ANSI standard required that tension devices partially limit the consumer's ability to control the blind if the tension device is not properly installed.  In 2009 and 2010, WCMA published provisional voluntary standards to address hazards associated with Roman shades.

In November 2010, CPSC held a public meeting regarding window coverings, and WCMA announced that it would establish a steering committee to oversee the activities of six task groups, including one intended for operating pull cords and another for continuous loops. On December 20, 2011, WCMA balloted the proposed revisions to the voluntary standard, and on February 6, 2012, staff sent WCMA a letter providing comments on the proposed revision.[15]

---

[14] See https://www.cpsc.gov/Regulations-Laws--Standards/Voluntary-Standards/Window-Blind-Cords
[15] Letter can be found at: https://www.cpsc.gov/s3fs-public/pdfs/blk_media_wcma02_07_12.pdf.

In these comments, CPSC staff reiterated that the hazardous loop determination should be made

for all cords and that the length of an accessible operating cord should not be longer than the

neck circumference of the youngest child at risk.  In addition, staff raised concerns about the

inability of tension devices to eliminate effectively or reduce significantly the risk of

strangulation under certain foreseeable-use conditions.

In November 2012, the WCMA announced the approval of the 2012 version of the

ANSI/WCMA standard, which included: (1) requirements for durability and performance testing

of the tension/hold down devices, including new requirements for anchoring; (2) specific

installation instructions and warnings; (3) new requirements for products that rely on "wide lift

bands" to raise and lower window coverings; (4) requirements for a warning label and

pictograms on the outside of stock packaging and merchandising materials for corded products;

and (5) expanded testing requirements for cord accessibility, hazardous loop testing, roll-up style

shade performance, and durability testing of all safety devices.  A revised ANSI/WCMA A100.1

American National Standard for Safety of Corded Window Covering Products was approved on

July 21, 2014, which included an editorial change.

On July 22, 2014, CPSC staff sent a letter to the WCMA, requesting that the WCMA

reopen the ANSI standard to address the hazard related to pull cords and continuous loops, which

are the predominant hazard types in the incidents reported to CPSC.[16]  Staff suggested proposed

language for a revision to the voluntary standard and asked that WCMA consider including the

language in the standard.  On August 29, 2014, WCMA responded that the association would

begin the process of opening the ANSI/WCMA window covering standard.  On August 2, 2016,

CPSC staff hosted a WCMA technical meeting.  At the meeting, WCMA committed to revising

---

[16] Letter can be found at:
https://www.cpsc.gov/s3fs-public/pdfs/blk_media_WCMALtr22July2014.pdf.

the voluntary standard to require no operating cords, short cords that cannot form a hazardous loop, or inaccessible cords, recognizing that there will be exceptions to these requirements. WCMA said that they would be exploring segmentation approaches, such as product categories, operating systems, applications and uses, distribution channels (*e.g*., stock versus custom), location in home; and size, weight, and geometry of the product and ability of the products to be readily adaptable to new technologies. WCMA also committed to submitting a revised draft standard for ANSI to ballot by the end of 2016.

Throughout FY 2017, staff participated in WCMA steering committee meetings, and also participated in the stock/custom definitions and warning labeling task groups. ANSI published a revision to the window coverings standard, ANSI/WCMA A100.1 – 2018, on January 8, 2018. WCMA updated the 2018 version the standard in May 2018, to include missing balloted revisions. The standard went into effect on December 15, 2018.

This NPR is based on the most recent version of the voluntary standard, ANSI/WCMA-2018, which segments the window covering market between "stock" and "custom" window coverings, as defined in section 3 of the standard, definitions 5.02 and 5.01. Per section 4.3.1 of the standard, stock window coverings are required to have:

(1) no operating cords (4.3.1.1),

(2) inaccessible operating cords (4.3.1.3), or

(3) short operating cords (equal to or less than 8 inches) (4.3.1.2).

Although manufacturers of custom window coverings can opt to meet the operating cord requirements for stock window coverings (sections 4.3.2.1 through 4.3.2.3 for custom window coverings are identical to 4.3.1.1 through 4.3.1.3), consumers can still purchase corded window coverings if they custom order the product (sections 4.3.2.4 through 4.3.2.6). Table 3

demonstrates the operating cord systems allowed on custom window coverings that are not allowed on stock window coverings in ANSI/WCMA-2018.

**Table 3 – ANSI/WCMA-2018 Operating and Inner Cord Requirements for Stock and Custom Window Coverings**

| Performance Requirements | Stock Products | Custom Products |
|---|---|---|
| No operating cords OR | | Optional |
| Short operating cord with a length equal to or less than 8 inches in any state (free or under tension) OR | Required | Optional |
| Inaccessible operating cords | | Optional |
| Inner cords that meet Appendix C and D | Required | Required |
| Single Retractable Operating Cord Lift System | Prohibited | Allowed |
| Continuous-Loop Operating System | Prohibited | Allowed |
| Accessible Operating Cords longer than 8 inches | Prohibited | Allowed |

Section 4.3.2 of ANSI/WCMA-2018 contains additional revised default requirements for custom products, including:

(1) operating cords must have a default length of 40 percent of the blind height (previously unlimited) (4.4);

(2) a wand is the default option for tilting slats (instead of a cord) (4.4.1.1); and

(3) warning labels must depict more graphically the strangulation hazard associated with cords (5.1).

In 2018, staff participated in various task group meetings to develop requirements for rigid cord shrouds. Section 3, definition 2.09 of ANSI/WCMA-2018 defines a "cord shroud" as "a device or material added to limit the accessibility of a cord or formation of a Hazardous Loop." A "rigid cord shroud" is not defined in the voluntary standard, but it is a hard material that encases an operating cord to prevent a child from accessing the cord inside the device. The requirements developed by the ANSI task group would clarify "rigid" by confirming that a cord shroud is rigid enough to ensure that the shroud cannot be wrapped around a child's neck or

37

won't form a u-shape because of attaching the free end of the shroud to the wall (similar hazards to a single cord).  CPSC staff is not aware of incidents related to current products with rigid cord shrouds and advises that cord shrouds that meet the proposed modifications to the ANSI/WCMA standard will address the strangulation hazard posed by accessible cords.

The task group, including CPSC staff, worked from March through December 2018, to develop draft language to test rigid cord shrouds, but WCMA has not balloted the requirements.  The tests developed for rigid cord shrouds ensure the stiffness and integrity of the shroud.  CPSC staff advises that the allowed deflection (1 inch for every 19-inch length of rigid cord shroud) for a rigid cord shroud under the test is reasonable.  The axial torque test method simulates a child twisting the rigid cord shroud to determine if a cord becomes accessible.  The torque is based on the mean wrist twisting strength of 2- to 5-year-old males, using a vertically positioned 20 mm-diameter knob, which is 4.4 inch-pound (DTI, 2002).  If the cord is accessible, then the device is not considered a rigid cord shroud.  Accordingly, the Commission proposes a "rigid cord shroud" definition and test method in this NPR.  Tab H of Staff's NPR Briefing Package, and section IV.C of this preamble, contain the proposed language related to cord shrouds, which is based on the work of the ANSI task group.

On March 12, 2019, staff participated in a WCMA steering committee meeting.  The purpose of the meeting was to gather feedback on the new requirements that went into effect in December 2018, and to discuss potential proposals for the standard, which WCMA committed to open in mid-June 2019.  During the meeting, the attendees agreed on the need for more education for online sellers regarding distinguishing stock and custom products, such as a guidance document for online sellers.  Additionally, CPSC staff provided ideas for the next revision of the standard for the committee to consider, including: (1) segmenting custom

products by size and/or type to meet stock product requirements; (2) considering cord retractors for custom products as an option (which is not allowed for stock products); (3) investigating complete inoperability of the product if a tension device is not installed (current requirement is partial inoperability); and (4) considering cordless systems as default operating system for custom orders.

On May 16, 2019, staff sent a letter to WCMA, requesting segmentation of custom window coverings by size and/or type, and applying the requirements for stock products to these segments of custom products; presenting the cordless/short cords/inaccessible cords as the default operating system for custom products as an interim measure, as well as interrupting the ordering process with an alert on hazardous cords if a consumer wants to switch to a corded system; balloting the rigid cord shroud requirement that was finalized by the task group; reaching out to online sellers and developing a guidance document for online sellers; and clarifying whether the standard applies to curtain and drapery products.[17]

WCMA responded to CPSC staff on August 12, 2019 and stated that they have put on hold the planned revision of ANSI/WCMA standard because the Government of Canada published a new regulation on corded window coverings. WCMA explained that stock products that do not have operating cords but have inner cords that cannot form a hazardous loop, would not comply with the Canadian regulation because of the new regulated pull force applied to the inner cord. WCMA also stated that the force applied to the inner cord under the Canadian regulation is not applied to test for a hazardous loop; rather, it is applied to determine the force required to raise the product, which is completely contrary to the hazard scenario and is causing considerable confusion within the U.S. and Canadian manufacturing sectors. WCMA reassured

---

[17] See https://www.cpsc.gov/Regulations-Laws--Standards/Voluntary-Standards/Window-Blind-Cords

CPSC staff that they were still moving forward with balloting the rigid shroud language for the standard.

In November 2019, WCMA sent a letter to CPSC staff about the amendment in the fiscal year 2020 Operating Plan, asking staff to assess what further revisions are needed to the American National Standard for Safety of Corded Window Covering Products (ANSI/WCMA-2018), specifically for custom products. WCMA requested that CPSC staff use input from the technical experts at the WCMA's member companies during the upcoming study and in drafting the report to provide the Commission with a comprehensive and balanced review. The letter stated that WCMA will also proceed with balloting the rigid shroud language for the standard that was developed and agreed upon by the technical working group.

On February 3, 2020, staff sent a letter to WCMA, outlining staff's recommendations for future improvements to the standard, and included a request to reopen the standard and discuss staff's recommendations.[18] Staff reiterated their belief that substantial improvements have been made to the latest version of the standard, particularly on stock window coverings; however, staff asserted, expanding the requirements to custom corded window coverings would improve window covering safety. In September 2021, staff sent another letter to WCMA, urging WCMA to apply the stock product requirements in ANSI/WCMA-2018 to custom window coverings, as well as to ballot the rigid cord shroud language developed and agreed upon by the technical working group.

Section II of this preamble assesses the adequacy of requirements for operating cords on stock and custom window coverings in ANSI/WCMA-2018 to address the hazards associated with corded window coverings. Based on staff's assessment, the Commission finds that

---

[18] Letter can be found at the following link: https://www.cpsc.gov/s3fs-public/CPSC-Staff-Letter-to-WCMA-Feb-2020.pdf?TZtarOeedGSVnaPzS5dHOEKpKz7f3N24.

ANSI/WCMA-2018 adequately addresses the risk of strangulation on operating cords for stock window coverings, by removing operating cords, ensuring that they are inaccessible to children, or by making them too short for a child to wrap around his or her neck. However, as shown in Table 3, the Commission finds ANSI/WCMA-2018 does not adequately address the risk of injury associated with operating cords on custom window coverings, because custom products can still be sold to consumers with hazardous operating cords.

G.    *Commission Efforts to Address Hazardous Window Covering Cords*

    1.    Petition and Rulemaking

Since the mid-1990s, CPSC staff has been engaged with the voluntary standards body urging changes to the ANSI/WCMA standard to reduce the risk of injury associated with window covering cords. On October 8, 2014, the Commission granted a petition to initiate a rulemaking to develop a mandatory safety standard for window coverings.[19] The petition sought to prohibit window covering cords when a feasible cordless alternative exists. When a feasible cordless alternative does not exist, the petition requested that all window covering cords be made inaccessible by using passive guarding devices. The Commission granted the petition and directed staff to prepare an ANPR to seek information and comment on regulatory options for a mandatory rule to address the risk of strangulation to young children on window covering cords.

On January 9, 2015, the Commission voted to approve publication in the *Federal Register* of the ANPR for corded window coverings. The Commission published the ANPR for corded window covering products on January 16, 2015 (80 FR 2327). The ANPR initiated a

---

[19] The petition, CP 13-2, was submitted by Parents for Window Blind Safety, Consumer Federation of America, Consumers Union, Kids in Danger, Public Citizen, U.S. PIRG, Independent Safety Consulting, Safety Behavior Analysis, Inc., and Onder, Shelton, O'Leary & Peterson, LLC. Staff's October 1, 2014 Petition Briefing Package, and a copy of the petition at Tab A, is available on CPSC's website at: https://www.cpsc.gov/Global/ Newsroom/FOIA/CommissionBriefingPackages/2015/PetitionRequestingMandatoryStandardforCordedWindowCov erings.pdf on (cpsc.gov).

rulemaking proceeding under the CPSA. CPSC invited comments concerning the risk of injury associated with corded window coverings, the regulatory alternatives discussed in the notice, the costs to achieve each regulatory alternative, the effect of each alternative on the safety, cost, utility, and availability of window coverings, and other possible ways to address the risk of strangulation posed to young children by window covering cords. The Commission also invited interested persons to submit an existing standard or a statement of intent to modify or develop a voluntary standard to address the risk of injury. The ANPR was based on the 2014 version of the ANSI/WCMA standard.

As described in section II.A of this preamble, the revised version of the voluntary standard, ANSI/WCMA-2018, adequately addresses the risk of injury from operating and inner cords on stock window coverings, and the risk of inner cord strangulation on custom window coverings. Accordingly, the Commission is issuing two proposed rules: (1) this NPR under sections 7 and 9 of the CPSA, to require that custom window coverings sold in the United States not contain hazardous operating cords, by complying with the same operating cord requirements as stock products in section 4.3.1 of ANSI/WCMA-2018; and (2) in a separate, concurrent rulemaking under section 15(j) of the CPSA, the Commission is proposing to deem an SPH, as defined in section 15(a)(2) of the CPSA: (a) the presence of hazardous operating cords on stock window coverings, (b) the presence of hazardous inner cords on stock and custom window coverings, or (c) the absence of a required manufacturer label.

2. <u>Window Covering Recalls</u>

During the period from January 1, 2009 to December 31, 2020, CPSC conducted 42 consumer-level recalls, including two recall reannouncements. Tab C of Staff's NPR Briefing Package provides the details of these 42 recalls, where strangulation was the primary hazard.

Manufacturers recalled more than 28 million units,[20] including: Roman shades and blinds, roll-up blinds, roller shades, cellular shades, horizontal blinds, and vertical blinds.  The recalled products also included stock products, which can be purchased by consumers off the shelf, and custom products, which are made-to-order window coverings based on a consumer's specifications, such as material, size, and color.

## II.     Assessment of Operating Cord Requirements for Stock and Custom Window Coverings

Based on CPSC staff's engineering and human factors assessments of the voluntary standard, set forth in Tabs G and I of Staff's NPR Briefing Package, the NPR requires that operating cords on custom window coverings meet the same requirements for operating cords on stock window coverings, as provided in section 4.3.1 of ANSI/WCMA-2018.  In this section of the preamble, we provide an overview of the operating cord requirements for stock and custom window coverings in ANSI/WCMA-2018 and in other international standards; assess the adequacy of these requirements to address the risk of strangulation to young children; and explain why the Commission proposes to require that custom window coverings meet the same operating cord requirements as stock window coverings.

### A.  *Engineering Assessment of Operating Cord Requirements in ANSI/WCMA-2018*

#### 1.  Stock Window Coverings

Requirements for operating cords on stock window coverings in ANSI/WCMA-2018 are adequate to address the risk of injury associated with window coverings.  Staff analyzed the incident data, which indicated that the largest proportion of deaths, irrespective of window covering type, involved operating cords (most frequently tangled or knotted cords, followed by

---

[20] This estimate does not include the recalled units of Recall No. 10-073.  This was an industry-wide recall conducted by members of the Window Covering Safety Council (WCSC).  An exact number of recalled products was not stated in the recall announcements.

cord(s) wrapped around the child's neck). The voluntary standard recognizes that long and accessible cords can pose a strangulation hazard. ANSI/WCMA-2018 defines the "operating cord" as the portion of a cord that the user interacts with and manipulates to move the window covering in a certain direction (*e.g*., lifting or lowering, traversing, rotating). If a child wraps a long operating cord around their neck or inserts their neck into a cord loop created by the design of the window covering or by tangled cords, the child can strangle to death within minutes. ANSI/WCMA-2018 provides three ways that a stock window covering can comply with the standard to reduce or eliminate the risk of children strangulating on operating cords:

　　　*a. No Operating Cords (section 4.3.1.1).* Having no operating cords effectively eliminates the strangulation hazard associated with operating cords because there is no cord to cause strangulation. Consumers use a mechanism, other than an operating cord, to accomplish the desired movement action on the product (*i.e*., lifting, lowering, traversing). For example, a spring mechanism on a horizontal blind allows the user to lift and lower the blind via bottom rail of the window covering.

　　　*b. Short Cord with a Length Equal to or Less Than 8 Inches in Any State (section 4.3.1.2).* Based on the anthropometric dimensions of the youngest child involved in an incident, a static cord length of 8 inches or shorter is insufficient to strangle a child, because the neck circumference of a fifth percentile 6- to 9-month-old child is 8 inches (BSI, 1990, as cited in Norris and Wilson, 1995). Because a child would need some extra length of cord to hold the cord out and wrap it around their neck, staff calculated that a cord must be longer than 8 inches to cause strangulation.

　　　*c. Inaccessible Operating Cords Determined Per the Test Requirement in Appendix C of the ANSI/WCMA-2018 (section 4.3.1.3).* If a window covering has an operating

cord that is longer than 8 inches, ANSI/WCMA-2018 requires that the cord must be inaccessible to children. Having inaccessible cords effectively eliminates the strangulation hazard associated with operating cords, because the child is unable to access a cord to cause strangulation. Accordingly, this requirement is tested using a probe that is intended to simulate the finger size of a young child; the diameter of the probe is 0.25 inches, based on fifth percentile 2- to 3.5-year-old's index finger diameter (Snyder et al., 1977) at 0.33 inches and the off-the-shelf availability of a 0.25-inch diameter dowel pin. If the probe cannot touch the operating cord, the cord is then deemed inaccessible, pursuant to ANSI/WCMA-2018.

Staff is unaware of a stock window covering for sale in the United States that has an inaccessible operating cord, as described in section 4.3.1.3 of ANSI/WCMA-2018. For products sold in other countries that meet the inaccessibility requirement, the test in the voluntary standard is met by using a rigid cord shroud that encapsulates the operating cord. Figure 14 displays an example of a rigid cord shroud. In Figure 14, the accessibility probe cannot touch the operating cord because it is surrounded by the cord shroud. Therefore, the window covering in Figure 14 meets section 4.3.1.3 of ANSI/WCMA-2018, because the operating cord is inaccessible.



**Figure 14. Rigid cord shroud**

CPSC concludes that ANSI/WCMA–2018 adequately addresses the strangulation hazard posed by accessible operating cords on stock window covering products, because the standard either eliminates accessible operating cords, or limits the length of the cord so that it is too short for a child to strangle.

2. <u>Custom Window Coverings</u>

Requirements for operating cords on custom window products in section 4.3.2 of ANSI/WCMA-2018 do not adequately address the risk of strangulation to children 8 years old and younger, because ANSI/WCMA-2018 allows hazardous operating cords if window coverings are custom ordered. Of the 35 custom window covering incidents reviewed by staff, 30 of the 35 (86%) incidents were related to operating cords (including pull cords and continuous loops). CPSC staff advises that had the requirements in section 4.3.1 of the ANSI/WCMA standard for operating cords on stock products been in effect for custom window coverings, the requirements would have prevented 100 percent of the incidents involving operating cords on custom window coverings. However, the requirements in section 4.3.2 of ANSI/WCMA-2018 do not address the custom window covering incidents associated with accessible operating cords.

The 2018 version of the voluntary standard added two new requirements for custom window coverings to mitigate the hazard: (1) default maximum operating cord length of 40 percent of the blind height when the product is fully lowered, and (2) default tilt wand option for tilting slats instead of a cord. However, ANSI/WCMA-2018 still allows hazardous operating cords to be part of the window covering design for custom products, which can comply with ANSI/WCMA-2018 using one of the following methods, all of which pose strangulation risks:

(a) *Accessible Operating Cords longer than 8 inches (section 4.3.2.6).* By allowing operating cords on custom window coverings to exceed 8 inches in length,

ANSI/WCMA-2018 creates a continuing unreasonable risk of injury to children 8 years old and younger. Section 4.3.2.6 of ANSI/WCMA-2018 allows hazardous operating cords, meaning operating cords that are long enough to be wrapped around a child's neck, or multiple cords that can become tangled and create a loop large enough for a child to insert their head. Even though ANSI/WCMA-2018 attempts to reduce the strangulation risk by shortening the default length of the cord to 40 percent of the window covering's length (section 4.4) and specifying the tilt wand as the default option versus tilt cords (section 4.4.1.1), as explained in Tab I of Staff's NPR Briefing Package, and in section II.C of this preamble, the risk associated with operating cords remains.

(b) *Continuous Loop Operating System (section 4.3.2.5)*. This operating system requires that the operating loop be kept taut with a tension device. However, as observed in the incident data, a child can still insert his/her head into the continuous loop if it is not taut enough; in addition, as explained in Tab I of Staff's NPR Briefing Package, and in section II.C of this preamble, tension devices may not be attached to the wall, which results in a free loop on the product. CPSC staff identified 23 fatal strangulations involving a continuous corded loop on a product without a functional tension device. CPSC is aware of cord or bead-chain restraining devices intended to be integrated into the window covering, and that do not need to be attached on the wall to keep the loop taut. According to the standard, these devices are required to meet durability, UV stability, and impact testing, and the devices must pass the hazardous loop testing procedure to confirm that they do not create a hazardous loop from an accessible continuous operating cord. CPSC requests comments on the adequacy of these devices to reduce or eliminate the strangulation hazard associated with custom window coverings.

(c) *Single Retractable Cord Lift System (section 4.3.2.4).* This method of complying with ANSI/WCMA-2018 allows an operating cord on a custom window covering to be pulled at any length to operate the window covering, and then retracts to a shorter length when the user releases the cord. Staff advises that retractable cord lift systems with an extended cord greater than 8 inches, and a low-retraction force to sustain that length, could allow a child to manipulate the cord and wrap the cord around his/her neck. Accordingly, the retractable cord requirement, as written, in ANSI/WCMA-2018 for operating cords on custom window coverings is not adequate to address the risk of injury, because the maximum cord length and a minimum pull force required to operate the system is not specified in the standard. CPSC requests comments on whether additional requirements for retractable cords, such as a maximum exposed cord length and a minimum pull force for a single retractable cord lift system, can address the strangulation hazard.

Based on staff's analysis, the Commission concludes that ANSI/WCMA-2018 does not adequately address the strangulation hazard posed by accessible operating cords on custom window coverings, because the standard allows these products to have one or more operating cords that is longer than 8 inches, and the standard allows custom products to have continuous-loop operating systems.

3. <u>Window Covering Technologies</u>

Stock window coverings currently on the market, as well as a substantial portion of custom window coverings, implement safer technologies to address the hazards identified in the incident analysis review. These products include, but are not limited to, cordless window coverings, window coverings with rigid cord shrouds, and cordless motorized window coverings.

Operating cords can be made inaccessible with passive guarding devices. Passive

48

guarding devices allow the user to operate the window covering without the direct interaction of a hazardous cord. These types of window coverings use rigid cord shrouds, integrated cord/chain tensioners, or crank mechanisms.

Cordless blinds can be raised and lowered by pushing the bottom rail up or pulling the rail down. This same motion may also be used to adjust the position of the horizontal slats for light control. Through market research, CPSC staff found several examples of cordless blinds that are made with a maximum height of 84 inches and a maximum width of 144 inches.

Rigid cord shrouds can be retrofitted over various types of window coverings to enclose pull cords and continuous-cord loops. A rigid cord shroud allows the user to use the pull cords while eliminating access to the hazardous cords. CPSC staff worked with WCMA and other members from March through December 2018, to develop draft requirements to test the stiffness of "rigid cord shrouds," by measuring the deflection and deformation.[21] In December 2018, WCMA sent the agreed-upon language for rigid cord shrouds to the members; however, the language was never balloted. This NPR includes requirements for rigid cord shrouds, based on the previously developed test, so that custom window coverings can use a rigid cord shroud to comply with the proposed rule through inaccessibility of the operating cord.

The proposed rigid cord shroud requirements in the NPR include two tests: the "Center Load" test and the "Axial Torque" test, to ensure the stiffness and the integrity of the shroud so that the enclosed operating cord does not become accessible when the shroud is twisted. The Center Load test verifies the stiffness of the cord shroud, by measuring the amount of deflection in the shroud when both ends are mounted, and a 5-pound force is applied at the mid-point. This

---

[21] The 2018 standard tests rigid cord shrouds for UV stability and impact.

test ensures that the shroud is not flexible enough to wrap around a child's neck. The Axial

Torque test verifies that the cord shroud's opening does not enlarge to create an accessible cord

opening when the shroud is twisted. Tab H of Staff's NPR Briefing Package contains additional

detail on the requirement. The Commission solicits comments on the proposed test methods set

forth in the proposed regulatory text.

Crank mechanisms (Figure 15) can replace the continuous-loop mechanism with a

crank/wand. Because the operating cord is replaced with a wand, the strangulation hazard is

completely removed.



**Figure 15. Crank Mechanism**

Finally, cordless motorized blinds can be raised and lowered using an electric motor with

a supplied controller. These window coverings function similarly to the motorized projector

screens. Because these window coverings use a motor instead of a pull cord, they do not contain

exposed hazardous operating cords.

     B.     *Assessment of International Standards for Window Covering Operating Cords*

The 2015 ANPR identified three jurisdictions that specify requirements for the safety of

window coverings: (1) Australia, (2) Canada, and (3) Europe. Australia has a Trade Practices

(Consumer Product Safety Standard- Corded internal Window coverings) Regulation 2010

F2010C00801.  Europe has the EN: 13120 Internal Blinds-Performance requirements, including safety, EN 16433 Internal Blinds-Protection from strangulation hazards- test methods, and EN 16434 Internal Blinds- Protection from strangulation hazards- Requirements and Test methods for safety devices.  Canada previously had the Corded Window Covering Products Regulation SOR/2006-112.  Since the ANPR, the Canadian standard was revised to SOR/2019-97.

ANSI/WCMA-2018 is more stringent than Australia Regulation, 2010 F2010C00801, or EN 13120, EN 16433, or EN 16434.  However, ANSI/WCMA-2018 is not as stringent as the new Canadian regulation, SOR/2019-97.  Canada's window covering regulation states that any window covering cord that can be reached must be too short to wrap around a 1-year-old child's neck (*i.e.*, not more than 22cm (8.66 inches) in length) or form a loop that can be pulled over a 1-year-old child's head (*i.e.*, not more than 44cm (17.32 inches) in circumference).  Canada's regulation also requires that all window coverings meet one of the following conditions:

- Section 4: The cord shall be unreachable/inaccessible.

- Section 5 and 6: Reachable/accessible cords shall be 22 cm (8.66 inches) or less when pulled with 35N (7.87 lbf).

- Section 7: Reachable/accessible looped cords shall be 44 cm (17.32 inches) or less in perimeter when pulled with 35N (7.87 lbf).

Both the Canadian standard and the ANSI/WCMA stock window covering requirements do not permit a long accessible operating cord.  The Canadian standard is more stringent, however, because the Canadian standard applies to both stock and custom products, while the ANSI/WCMA standard contains separate requirements for stock and custom products, which allows long, accessible operating cords on custom products.

Although the Canadian standard is similar to the ANSI/WCMA's stock window covering

requirement, there are some differences. For example, ANSI/WCMA-2018 and the Canadian standard take a different approach to the definition of "Accessible Cord." Section 3, definition 2.01 of ANSI/WCMA-2018 defines an "accessible cord" as a cord that can touch a cord accessibility probe and a cord shroud accessibility probe. Section 1 of the Canadian regulation states that a "reachable/accessible cord" is:

> the part of the cord that any person can touch when the corded window
>
> covering has been installed whether the window covering is fully opened,
>
> fully closed or in any position in between.

This definition of "accessible cord" in the Canadian standard is subjective because the definition applies to a person with unspecified measurements who shall be able to reach a cord. The definition of "accessible cord" in ANSI/WCMA-2018 uses a performance requirement with accessibility probes based on the dimension of a child's fingers. The approach in ANSI/WCMA-2018 is more stringent than the Canadian standard because it requires a test that is not subjective and that provides consistent results when tested.

C.    *Human Factors Assessment of Operating Cord Requirements in ANSI/WCMA-2018*

Operating cord requirements for stock window coverings in section 4.3.1 of ANSI/WCMA-2018 effectively eliminate the strangulation hazard associated with operating cords. However, operating cord requirements for custom window coverings in section 4.3.2 of ANSI/WCMA-2018 allow operating cords to meet one of the three requirements for operating cords on stock window coverings in section 4.3.1 of the standard (cordless, inaccessible, or 8 inches or shorter) to comply, but the standard also allows operating cords that have accessible cords that are longer than 8 inches, such as single retractable cord lift systems, continuous loop operating systems, and standard operating systems. Thus, the ANSI standard allows free-

hanging and accessible cords on custom window coverings that do not eliminate the strangulation hazard associated with operating cords.

1. <u>Default Requirements for Custom Operating Cords Allow Accessible Cords</u>

In the earlier versions of the ANSI/WCMA standard, the standard contained no specified length for operating cords. However, ANSI/WCMA-2018 provides the following two new requirements for custom window coverings, which are intended to reduce the hazard associated with free-hanging and accessible operating cords:

- Section 4.4 of ANSI/WCMA-2018 requires that the default cord length should be no more than 40 percent of the product height when the window covering is fully lowered. The exception is when a custom length is required to ensure user accessibility. Figure 16 shows the length of operating cords that are longer than 40 percent of product height and shorter cords that comply with this new requirement.

- Section 4.4.1 requires that a wand tilt be the default operating system, and cord tilt be an allowable customer option (Figure 16). The length requirement in section 4.4 still applies to tilt cords.



Figure 16. Window blind with operating cords longer than 40 percent of the length of the product and tilt cords to tilt the slats (left). Window blind with operating cords equal to 40 percent of the product length and wand tilt replacing tilt cords (right)

CPSC has concerns with operating cords that comply with the requirements in sections 4.4 and 4.4.1 because:

- The length of operating cords can still be hazardous when the window covering is fully lowered. First, a child can wrap the cord around their neck; only about 8 inches of cord is enough to encircle the child's neck.[22] Additionally, multiple cords can tangle and create a loop in which a child can insert his/her head; a loop with a circumference of about 17 inches is sufficient for child's head to enter.[23] Figure 17 shows these two scenarios.

 

Figure 17. Demonstration of wrapped cords around (doll) child's neck (left),
(doll) child's head is through the loop created by entangled multiple cords (right)

- Operating cord(s) will get longer as the window covering is raised, making it easier for a child to access and manipulate the hazardous operating cord.

- If the cord tilt option is chosen, the cord tilt can also be long enough to be wrapped around a child's neck or be tangled and create a loop in which a child's head can enter.

- Consumers can easily change the default options during the custom order process, thus maintaining the ability to choose an accessible operating cord that exceeds 8 inches long, posing a strangulation hazard.

---

[22] Neck circumference of fifth percentile 6-9-month-old children is 8 inches (BSI, 1990 as cited in Norris and Wilson, 1995.)
[23] Head circumference of fifth percentile 6-9-month-old children is 16.5 inches (Snyder et al., 1977)

Incident data show that children have strangled on operating cords in various ways. As reported in the incident data in section I.E of this preamble, and Tab A of Staff's NPR Briefing Package, custom window coverings were involved in at least 35 incidents. Table 4 shows how children accessed window covering cords. In 14 incidents, the child climbed on an item including couch, chair, toy chest or dog kennel and accessed the cord. In four cases, a child was on a sleeping surface, including a bed (2), playpen, and a crib. In six incidents, a child was able to get to the cord from the floor.

Table 4. Child's interaction scenario in incidents associated with custom products

| Scenario | Number of Incidents |
|---|---|
| Climbed on an item to reach the cords | 14 |
| On floor | 6 |
| On bed, in playpen or crib | 4 |
| Unknown | 11 |
| *Total* | *35* |

The incident data demonstrate that accessible cords that are longer than 8 inches are hazardous. For example, the data show that even if operating cords are kept close to the window covering head rail with some means, children climb and access the cords. Additionally, a significant number of operating pull cord incidents occurred in fully or partially raised window coverings, which essentially reduces the benefit of having a default length of 40 percent of the window covering height in fully lowered position of the window covering, because the cords will get longer as the product is raised.[24] Based on these data, CPSC concludes that even though the requirements in sections 4.4 and 4.4.1 of the ANSI standard attempt to reduce the strangulation hazard associated with accessible and hazardous operating cords, these requirements are still

---

[24] A total of 36 out of 46 pull cord incidents when position of the window covering was known have occurred with partially or fully raised window covering (1996 to 2016 incidents.)

inadequate, because they continue to allow accessible and long cords to be part of the window covering.

2. <u>Warning Labels in ANSI/WCMA-2018, Alone, Are Inadequate to Address the Strangulation Hazard Associated with Operating Cords</u>

The ANSI/WCMA-2018 standard requires that corded custom window covering products have warning labels regarding the strangulation hazard to children, as summarized below:

- A generic warning label must be permanently attached to the bottom rail, including a pictogram depicting the hazard of a cord wrapped around a child's neck. The content explains the strangulation hazard and what consumers need to do to avoid the hazard (keeping cords out of children's reach, shortening cords to prevent reach, moving crib and furniture away.)

- A similar warning label must be placed on product merchandising materials which includes, but is not limited to, the sample book and the website (if the website is relied upon for promoting, merchandising, or selling on-line).

- A warning tag containing a pictogram and similar text as above must be placed on accessible cords, including operating cords, tension devices that are intended to keep continuous loops taut, and on inner cords of a roll up shade.

Formatting of warning labels in the ANSI standard is required to follow ANSI Z535 standards, which are the preeminent set of standards to develop safety labels.[25] This includes a signal word ("Warning") in all uppercase letters measuring not less than 5/16 in (8 mm) in height and preceded by an ANSI safety alert symbol (an equilateral triangle surrounding an exclamation point) of at least the same size, the rest of the warning message text be in both uppercase and

---

[25] The ANSI Z535 Series provides the specifications and requirements to establish uniformity of safety color coding, environmental / facility safety signs and communicating safety symbols. It also enables the design, application, use and placement of product safety signs, labels, safety tags and barricade tape.

lowercase letters, with capital letters measuring not less than 1/8 in (3 mm). A Spanish version of the label is also required.

Among the 35 incidents involving custom products, at least 19 included a permanent label. Table 5 shows the presence of the labels on the incident units.[26] The presence of the label was unknown in 10 incidents, and no label was reported in 6 incidents. In some cases, parents reported that they were aware of the cord hazard, but never thought their child would interact with them; in a few cases, parents were aware of the operating cord hazard but not the inner cord hazard. In some cases involving bead chains, parents thought that the connector clip on the bead chain loop was supposed to break away. None of the incident units had a hang tag. One unit had the hang tags tucked into the head rail, which was discovered when the unit was removed.

Table 5. Presence of permanent warning labels in incident units

| Permanent Label Present | Number of Incidents |
| --- | --- |
| Yes | 18 |
| Mostly peeled off | 1 |
| No | 6 |
| Unknown | 10 |
| *Total* | *35* |

Research demonstrates that consumers are less likely to look for and read safety information about the products that they use frequently and are familiar with (Godfrey et al., 1983). Given that many of the window covering incidents occurred on products with at least the permanent label attached on the bottom rail, and the high likelihood that consumers have window coverings in their homes and almost certainly use them daily, and thus have high familiarity, even well-designed warning labels will have limited effectiveness in communicating the hazard on this type of product.

---

[26] In two cases, staff examined exemplar units.

Based the forgoing research and the incident data, warning labels are unlikely to effectively reduce the strangulation risk due to hazardous cords on window coverings, because consumers are not likely to read and follow warning labels on window covering products, and strangulation deaths among children occur quickly and silently, such that parental supervision is insufficient to address the incidents.

3.   <u>Safety Devices Are Inadequate to Address the Risk of Strangulation</u>

ANSI/WCMA-2018 requires that custom products with accessible operating cords include cord cleats with instructions for use and mounting. The standard also requires that custom products with a continuous loop operating system contain a cord tension device. Figure 18 shows examples of cord cleats and tension devices.



Figure 18. Examples of cord cleat (left), cord tension device (right)

*(a) Tension Devices*

ANSI/WCMA-2018 requires that a tension device be attached to the cord or bead chain loop by the manufacturer and also requires a sequential process or tools to be removed, which essentially means that consumers would have to go through multiple steps or need to use a tool such as a screwdriver to remove the tension device. Unless installed or altered from the shipped condition, the voluntary standard also requires window coverings to be designed so that they are prevented from operating, at least partially, unless the tension device is properly installed. The

standard also requires that the tension device be supplied with fasteners and instructions and meet the durability test requirements.

CPSC has concerns with using safety devices to reduce the risk of strangulation for several reasons. Securing safety devices goes beyond the installation of the window covering itself, which increases the "cost of compliance" that is the time and effort to use the product. Also, safety devices, such as tension devices, usually require drilling holes on the wall or windowsill that may not be permissible for renters and may not be desirable by homeowners.

Among the 35 incidents involving custom products, 12 had continuous loop cords or bead chains. In one incident, the child was able to insert his head through the loop even though the tension device was attached to the wall, originally installed by a professional. In 2 incidents, a tension device was attached to the cord but not to the wall. In one incident, a tension device broke prior to the incident. In 4 incidents, staff confirmed that a tension device was not installed. The remaining 4 incidents contained no mention of tension device.

### *(b) Cord Cleats*

While the tension device is intended to prevent the window covering at least "partially" from operating, cord cleats have no impact on the operation of the window covering. Even when a cord cleat is installed, the consumer must wrap the cord around the cleat every time the product is raised or lowered to mitigate the strangulation hazard, which means that the user's active involvement is necessary every time. Further, cord cleats can be accessed by a child if he/she climbs up. In one incident, although caregivers normally wrapped the cord around the cleat, on the day of the incident, cords were not wrapped, and the child accessed the cords after climbing on a couch.

59

*(c) Consumer Perception of Safety Devices*

Some consumers may believe that because they either do not have young children living with them or visiting them, installation of the safety devices is unnecessary.  However, window coverings last a long time, and when homes are sold or new renters move in, the existing window coverings, if they are functional, usually remain installed and could be hazardous to new occupants with young children.

CPSC issued a contract to investigate the effectiveness of safety devices in reducing the risk of a child's access to hazardous cords and loops on window coverings.  Westat conducted research under Contract CPSC-Q-15-0064.[27]  The research objective was to provide CPSC with systematic and objective data on the factors that impact installation, use, and maintenance of window covering safety devices; assess how these factors impact the likelihood of correct installation, use, and maintenance; and identify how the factors relate to the goal of reducing children's access to hazardous cords and loops on window coverings.  Westat reviewed the window coverings and safety devices available in brick-and-mortar and online stores; performed task analysis to identify key issues and specific questions to be addressed in the focus groups; developed materials and procedures for the focus groups; and conducted the focus groups.  Major findings from the study point to:

(i)    A general awareness about cord entanglement among caregivers, which does not translate to precautionary action, due partly to the insufficient information provided at the point of sale;

---

[27] https://cpsc.gov/s3fs-public/Window%20Coverings%20Safety%20Devices%20Contractor%20Reports.pdf

(ii)   Lack of awareness of the speed and mechanism of the injury that may lead to caregivers' underestimating the importance of providing an adequate level of supervision;

(iii)   Difficulty using and installing safety devices as primary reasons for not using them; and

(iv)   Inability to recognize the purpose of the safety devices provided with window coverings.

In general, participants in the Westat study preferred a cordless window covering or a passive mechanism, which does not require intentional action by the user.  Westat concluded that there could be benefits from enhancing the public's awareness and understanding of the unique nature of incidents (*e.g.*, speed, mechanism) and explaining a child's vulnerability in all rooms in the home, and that providing specific information at the point of sale, could be partially helpful.  However, Westat stated that these improvements would be incremental, and that increasing the use of cordless window coverings would be needed to achieve significant benefits.

4.   <u>Relying on Parental Supervision is Inadequate to Address the Risk of Strangulation</u>

CPSC has recognized cords on window coverings as a hidden hazard for many years.  Strangulation with cords requires only a few minutes.  Because even young children are left unsupervised for a few minutes or more in a room that is considered safe, such as a bedroom or family room, parental supervision is unlikely to be effective to eliminate or reduce the hazard.  Children can wrap the cord around their necks, insert their heads into a cord loop and get injured, or die silently in a few minutes in any room, with or without supervision.

Even when supervision is present, the level of supervision varies and distractions and other limitations to supervision exist.  For example, CPSC has incident reports involving five

61

near-fatal strangulations, in which the parent was either nearby or in the same room and was able to rescue the child before the child lost consciousness.[28]  Among the 35 incidents involving custom products, incident location was known in 33 incidents.  In 18 incidents, a child was in a room shared by the family members such as a family room, living room, and sunroom.  Eleven of 18 incidents were not witnessed, whereas 5 were witnessed by an adult, 2 incidents occurred in the company of other children.  Almost all the incidents (14/15) that occurred in a bedroom were unwitnessed, including one victim's father sleeping in the same room; only one was witnessed by another child, a 5-year-old (Table 6.)  Out of the 14 fatalities, 13 were not witnessed, whereas, out of the 21 nonfatal incidents, 12 were not witnessed.

Research supports these observations.  People cannot be perfectly attentive, particularly over long periods of time, regardless of their desire to do so (Wickens & Hollands, 2000).  Caregivers are likely to be distracted, at least occasionally, because they must perform other tasks, are exposed to more salient stimuli, or are subject to other stressors, such as being responsible for supervising more than one child.  In fact, research by Morrongiello and colleagues (2006) indicates that older toddlers and preschool children (2 through 5 years old) are regularly out of view of a supervising caregiver for about 20 percent of their awake time at home, and are completely unsupervised (*i.e.*, the parent was not listening to or watching what the child was doing at all) for about 4 percent of awake time in the home.  The most common rooms in which children were left alone and unsupervised were the living or family room and the bedroom.

---

[28] Video capturing a child's entanglement in the cords at https://www.youtube.com/watch?v=2s6nBgy3MJA, accessed on 8/13/2021

Table 6. Location of incidents and whether the incidents were witnessed

| Location | Fatal | Nonfatal |
|---|---|---|
| Bedroom | | |
|    Witnessed by children | 1 | |
|    Not witnessed | 8 | 6 |
| Family/Living/Dining room | | |
|    Witnessed by Adult | | 5 |
|    Witnessed by children | | 2 |
|    Not witnessed | 5 | 6 |
| Unknown | | 2 |
| *Grand Total* | *14* | *21* |

5. <u>Assessment of Operating Cord Requirements for Window Coverings</u>

CPSC staff evaluated the requirements that apply to operating cords on stock window coverings in section 4.3.1 of ANSI/WCMA-2018 (no operating cords, short operating cords 8 inches or shorter, or inaccessible operating cords determined per the test requirement in Appendix C of ANSI/WCMA-2018). Having no operating cords effectively eliminates the strangulation hazard associated with operating cords because there is no cord to cause strangulation; therefore, this is an adequate requirement. Having a short cord that does not exceed 8 inches of length in any position of the window covering also effectively eliminates the strangulation hazard associated with operating cords; the neck circumference of fifth percentile 6-9-month-old children is 8 inches (BSI, 1990 as cited in Norris and Wilson, 1995), therefore this is an adequate requirement. Ensuring that the operating cords are inaccessible is another adequate requirement. This requirement is tested in ANSI/WCMA-2018 using a probe that is intended to simulate the finger size of a young child. The diameter of the probe is 0.25 inches, based on fifth percentile 2-3.5-year old's middle index finger diameter (Snyder et al., 1977.) at 0.33 inches and the off-the-shelf availability of a 0.25-inch diameter dowel pin. If the probe cannot touch the cords, the cord is then deemed inaccessible. Staff assessed that child

63

anthropometry and strength related inputs to develop these requirements are adequate to address the strangulation risk associated with hazardous cords.

Staff assessed the operating cord requirements on custom window coverings, which are different than those required on stock window coverings in section II.A of this preamble and Tab G of Staff's NPR Briefing Package. Based on the staff's assessment, the Commission proposes to require the same requirements for operating cords on stock and custom window coverings to effectively eliminate the unreasonable risk of strangulation associated with operating cords on custom window coverings.

### 6. Addressability of Incidents with the Proposed Rule

CPSC received reports of 194 incidents that reportedly occurred from January 2009 through December 2020. Staff identified 35 of these incidents as having occurred with a custom window covering; 50 with stock window covering, and in 109 cases, there was not enough information to identify whether the incident unit was stock or custom window covering. Out of the 35 custom window covering incidents, a continuous loop was involved in 12 incidents; operating cords, including tilt cords, were involved in 19 incidents; 3 incidents involved inner cords; and 2 incidents involved an unknown cord type.

The stock window covering requirements in ANSI/WCMA-2018 adequately address both the continuous loops and operating cords by removing cords entirely, making them inaccessible, or by requiring them to be no longer than 8 inches. All three of the inner cord incidents have reportedly occurred on custom Roman shades that did not comply with the requirements in the standard; if the products had complied with the voluntary standard, staff concludes that those incidents would have been prevented. Moreover, as reviewed in section II.E of this preamble

and Tab E of Staff's NPR Briefing Package, new window coverings substantially comply with the inner cord voluntary standards.

All 30 incidents associated with operating cords and continuous loops (out of 35 total incidents involving custom products, with the others including 3 that involved inner cords and 2 unknown) would have been prevented if the custom window covering complied with the requirements for stock window coverings in the ANSI/WCMA standard. The three inner cord related incidents would have been prevented if the incident units complied with the existing standard. Therefore, if the custom window covering complied with the recommended requirements, 86 percent (30/35) of the custom product incidents would have been addressed in addition to the 8.6 (3/35) percent of the inner cord incidents that would be addressed by complying with the voluntary standard. Given that all accessible and hazardous cords are effectively addressed with the recommended requirements, the remaining 5.4 percent of the incidents (which represented 2/35 incidents for which the involved cord type was unknown) would also be addressed.

Even though a large portion of the reported incidents did not have sufficient information to categorize the incident product as stock or custom, all of the hazard patterns involving unknown stock or custom product incidents (109) would also be addressed for future products if the Commission issues a final rule for operating cords on custom window coverings. If the unknown products are stock products, such products would be part of the market we now find to be substantially compliant with ANSI/WCMA-2018. If the unknown products are custom products, they would comply with the rule for operating cords on custom products. The hazard associated with inner cords is addressed by compliance with the ANSI standard; the Commission finds that all stock and custom products substantially comply with ANSI/WCMA-2018.

7. <u>Accessibility Concerns</u>

Some manufacturers, including WCMA, have expressed concern about users with a disability, who may not be able to reach cordless window coverings to successfully operate the product, and urge that these consumers still need a corded product. However, CPSC staff advises that various tools exist on the market designed to make the operation of the window coverings easier and accessible to consumers in a variety of use locations. For example, extension poles are already available for window coverings that are out of reach, such as poles for skylights and cordless products (Figure 19). Wands are also available to make it easier for users to operate it with a power grip instead of a pinch grip (Figure 20).



Figure 19. Examples of extension poles currently available on the market
(Source: Extension poles for out of reach shades | CellularWindowShades.com)[29]

---

[29] Mention of trade names or products does not constitute endorsement or recommendation for use, nor does it imply that alternative products are unavailable or unable to be substituted after appropriate evaluation. The products are identified here to describe the concept of accessibility tools. Such identification is not intended to imply recommendation or endorsement by the U.S. Consumer Product Safety Commission nor is it intended to imply that the products identified are necessarily the best available for this purpose.



Figure 20. Wand with a hand grip shown in the middle.
Photo provided by Parents for Window Blind Safety

8.  Information and Education

Since the first safety alert was issued in 1985, CPSC has been warning parents of the danger of child strangulation due to corded window coverings.  Every October, CPSC participates jointly with Window Covering Safety Council (WCSC) in National Window Covering Safety Month to urge parents and caregivers to check their window coverings for exposed and dangling cords and to take precautions.  Both CPSC and WCSC recommend cordless window coverings at homes where young children live or visit.

In addition to traditional communication methods, CPSC reaches out to consumers using social media, such as safety blogs and online chats, to create awareness of the hazards associated with corded window coverings.  Staff has not assessed the effectiveness of these public education campaigns, but given the long history on window covering safety campaigns, the campaigns have had limited impact.

D.  *Performance Requirements for Operating Cords on Custom Window Coverings*

ANSI/WCMA-2018 contains strong requirements for operating cords on stock window coverings.  Stock window coverings on the market demonstrate the feasibility of safer

67

technologies to meet these requirements. Due to the ongoing window covering cord incidents, high severity of the outcomes, proven technical feasibility, and the ineffectiveness of warnings and safety devices for this class of products, CPSC proposes in this NPR to require that operating cords on custom window coverings be identical to the requirements for operating cords on stock window coverings, as set forth in section 4.3.1 of ANSI/WCMA-2018. Section 4.3.1 of ANSI/WCMA-2018 requires that operating cords be cordless, inaccessible, or 8 inches or shorter.

Additionally, this NPR includes a rigid cord shroud requirement based on the WCMA Rigid Cord Shroud Task Group's work that was never balloted.[30] Implementing the rigid cord shroud requirements would allow custom window coverings to meet the mandatory rule by using a rigid cord shroud to make an operating cord inaccessible.

E.  *Window Coverings Substantially Comply with the Voluntary Standard*

The Commission has several bases to determine preliminarily that window coverings substantially comply with the requirements for operating cords in ANSI/WCMA-2018.[31] First, WCMA, the trade association for window coverings and the body that created the voluntary standard, stated in a comment on the ANPR (comment ID: CPSC_2013-0028-1555) that there has been substantial compliance with the voluntary standard since its first publication. WCMA also stated that the association's message to all manufacturers is that, to sell window coverings in the United States, compliance with the standard is mandatory.

---

[30] Although staff has never seen a stock product with a rigid cord shroud, staff encourages WCMA to revise the voluntary standard to include this requirement for stock and custom products.

[31] CPSC staff observes some decline in pediatric incident data that suggests compliance with the voluntary standard is effective at reducing the number of incidents (see Tab A of Staff's NPR Briefing Package for CPSRMS and NCHS data). We expect a similar trend to continue for stock products given the substantial improvements made to the standard in 2018. However, because window coverings are used for many years, and will be replaced over time with safer products that conform to the voluntary standard, several more years of incident data are required to more definitively demonstrate a reduction in incidents.

Additionally, the Commission instructed the staff to investigate the level of compliance of window coverings with the voluntary standard. CPSC contracted with D+R International, which interviewed window covering manufacturers and component manufacturers to collect anecdotal information on the distribution of stock and custom product sales and the impact of compliance with the voluntary standard (D+R International, 2021). Various manufacturers indicated retail customers would not stock noncompliant products. Manufacturers are also aware of their customers' procedures, and stated that they would not ship to them, if there were concerns about the assembly and installation process. The D+R report indicates that the voluntary standard has caused U.S. window covering manufacturers to design and offer cordless lift operations for most stock window covering categories. All manufacturers interviewed were aware of the standard and had implemented compliance in all stages of their development process, from product design to fabrication.

CPSC field staff also confirmed compliance of the categorization for "stock" and "custom" window coverings, as defined in the ANSI/WCMA standard. CPSC field staff conducted unannounced in-store visits to 18 firms, comprising wholesalers, manufacturers, and retailers. Window coverings in 13 locations demonstrated compliance with the voluntary standard for operating cords for stock and custom products. However, in four locations, staff observed noncompliance of custom window coverings with the ANSI/WCMA standard, including: length of operating cords 40 percent longer than the window covering length, with no accompanying specific customer request; lack of warning label; lack of manufacturer label; lack of hang tag; and use of a cord tilt, instead of wand tilt, without an accompanying specific customer request. Staff found one location with a noncomplying stock window covering. This stock window covering was being sold with long beaded-cord loops in various sizes. Tab E of

Staff's NPR Briefing Package contains a more detailed description of staff's assessment of substantial compliance with the voluntary standard.

Finally, CPSC technical staff tested custom product samples, using test parameters defined in ANSI/WCMA-2018, with a cord accessibility probe and force gauge. The samples tested by staff also indicated a high level of conformance in custom products regarding inner cord accessibility.

Based on incident data, WCMA's statements, contractor report findings, and staff's examination and testing of window covering products, the Commission preliminarily determines that a substantial majority of window coverings sold in the United States comply with the readily observable safety characteristics identified in ANSI/WCMA-2018.

## III.    Response to Comments on the ANPR

On January 16, 2015, the Commission published an ANPR to initiate rulemaking and seek information and comment on regulatory options for a mandatory rule to address the risk of strangulation to young children on window covering cords. The comment period on the ANPR was scheduled to end on March 17, 2015. However, in a letter dated February 2, 2015, WCMA requested a 75-day extension of the comment period to complete multiple studies that WCMA commissioned. The Commission granted WCMA's request to extend the comment period for the ANPR until June 1, 2015. CPSC received 1,010 comments during the comment period: 748 were in favor of a mandatory rule, 254 were against a mandatory rule, and eight had no clear opinion.

As reviewed in this preamble, since the public comment period on the ANPR closed in 2015, the ANSI/WCMA standard has substantially improved to effectively address the strangulation risk associated with stock window coverings. Accordingly, many of the comments

on the ANPR have been obviated by updates to the ANSI/WCMA standard, and specifically by the requirements for operating cords on stock window coverings and requirements for inner cords on stock and custom window coverings. Below we summarize the comments received on the ANPR and provide responses to the issues raised in the comments.

A.    *General Support or Opposition for a Mandatory Standard*

*Comment 1*: Seven hundred and forty-eight (748) commenters expressed general support for the rulemaking effort, some stating that given the hidden nature and severity of the risk, a mandatory standard is necessary. Two hundred and fifty-four (254) commenters submitted comments disagreeing with the proposed rulemaking, with most suggesting that a regulation will have a negative impact on the window covering industry.

*Response 1*: Although the Commission supports the changes to the ANSI/WCMA standard, as evidenced by the proposed rule under section 15(j) of the CPSA; an unreasonable risk of injury remains with operating cords on custom window coverings. Accordingly, we support a mandatory rulemaking to address this unreasonable risk of injury. Window coverings should be inherently safe and should not require consumer intervention due to the silent, quick, and hidden nature of the strangulation hazard. Since the ANPR was published in 2014, 37 children have died by strangulation on a window covering cord.

B.    *Voluntary Standard*

*Comment 2*: Several commenters expressed support for the voluntary standard and felt that working through the voluntary standards process to develop requirements for window coverings would create a more robust standard. Other commenters stated that a mandatory standard is necessary to address the strangulation hazard because decades have gone by and the number of deaths and permanent injuries associated with window covering cords remain

A930

consistent. These commenters noted that voluntary standards have failed to effectively address the strangulation hazard for nearly 20 years.

*Response 2:* CPSC staff worked closely with WCMA since 1995 to develop and revise the ANSI/WCMA A100.1 standard. Since the public comment period on the ANPR closed in 2015, the WCMA steering committee developed and published improvements to the voluntary standard, with substantial improvements in the 2018 revision to effectively address the strangulation risk associated with stock window coverings. For stock window coverings, the ANSI/WCMA standard requires: no operating cords, inaccessible cords, or short static cords that do not exceed eight inches in length. As detailed in this NPR briefing package, CPSC staff assesses that the requirements for operating cords on stock window coverings, and the requirements for inner cords on stock and custom window coverings, in ANSI/WCMA are adequate to address the risk of strangulation. However, ANSI/WCMA-2018 does not adequately address the hazard associated with operating cords on custom window coverings.

Given the availability of technologies applicable to both stock and custom window coverings, and the identical hazard patterns associated with cords on stock and custom window coverings, custom window coverings can be made as safe as stock window coverings to address the strangulation risk to children, by complying with the same operating cord requirements as stock window coverings. We agree with commenters regarding the timing concern, given that it took 22 years to get to an effective voluntary standard for cords on stock window coverings. Based on this experience, CPSC staff does not recommend delaying a rule to address operating cords on custom window coverings, to wait for the ANSI/WCMA standard to address these operating cords, and we concur.

*C.      Hazard Communication: Warnings, Public Awareness, and Education*

*Comment 3:* At least twelve commenters suggested that the Commission should rely on warning labels and educational campaigns to address the strangulation hazard. At least seven commenters stated that warning labels and educational efforts were tried, did not work, and are insufficient to address the strangulation risk.

*Response 3:* Section II.C of this preamble and Tab I of Staff's NPR Briefing Package discuss the reasons that warnings are unlikely to adequately address the strangulation hazard associated with window covering cords. Briefly, warning labels are not likely to be effective on products that consumers use frequently and are familiar with, because consumers are less likely to look for and read safety information. Most of the incident window coverings that CPSC reviewed had a permanent warning label on the product. Even well-designed warning labels will have limited effectiveness in communicating the hazard on this type of product.

However, public awareness is a crucial component in making safe purchasing decisions and safely using window coverings at home. Public information campaigns are on-going. For example, CPSC and the Window Covering Safety Council (WCSC) have joined forces to raise awareness regarding the strangulation risks presented by window covering cords. Since 2003, October has been designated "Window Covering Safety Month" by CPSC and the Window Covering Safety Council (WCSC). Currently, CPSC does not have information to evaluate the effectiveness of public information campaigns on reducing the risk of injury associated with corded window coverings. However, CPSC has conducted information and education campaigns for several decades on the hazards associated with corded window coverings; these efforts have had limited effectiveness in reducing injuries and deaths. Accordingly, the Commission will not

rely solely on education campaigns to address the risk of injury and will move forward with rulemaking.

### D.    *Off-the-Shelf Products*

*Comment 4:* At least two commenters suggested that off-the-shelf window coverings carry higher risks, because consumers install many window coverings incorrectly.  One of these commenters suggested that consumers typically do not read the installation instructions and are not familiar with safety devices, such as cord cleats.  Another commenter suggested that stock window coverings are more dangerous than custom window coverings because stock window coverings can have longer lengths of accessible pull cords than custom window coverings, stock window covering customers are less likely to get safety information, and stock window coverings are likely to be installed by consumers who may be unfamiliar with the hazard.

*Response 4:* Based on CPSC staff's assessment, the Commission has determined that the requirements for stock window coverings in the 2018 version of the ANSI/WCMA standard adequately and effectively address the operating and inner cord strangulation hazards associated with stock products.  The standard requires that stock window coverings have: no operating cords, cords shorter than 8 inches, or inaccessible cords.  The standard similarly requires that if inner cords are present, they either be inaccessible, or too short to create a loop large enough to insert a child's head.

The Commission agrees that consumer installation issues should not make window coverings less safe.  For example, ANSI/WCMA-2018 requirements for corded stock window coverings are not dependent on installation, and the requirements do not rely on safety devices.  However, ANSI/WCMA-2018 still relies on safety devices, such as cord cleats and tension devices, to address the strangulation hazard on custom window coverings.  Because consumers

can choose corded options that rely on the installation of external safety devices, and diligent monitoring and use of safety devices required of consumers, custom window coverings are now less safe than stock window coverings under the ANSI/WCMA standard.

Although the Commission agrees that consumers may not be as knowledgeable about safety devices as professional installers, most of the custom products involved in incidents were installed by professionals, and yet still lacked safety devices. Educating consumers is important to reduce the risk associated with the corded window coverings already installed in consumers' homes. However, manufacturing inherently safe custom window coverings that are on par with the stock window coverings that are compliant with ANSI/WCMA-2018 will have a more substantial impact on safety, as stock window coverings now do not have to rely on additional, consumer behavior-related measures to make the window covering safe.

E.    *Impact on Elderly and Disabled Consumers*

*Comment 5:* At least eight commenters suggested that cordless products will be difficult to use for those consumers who cannot reach window coverings to operate the product.

*Response 5:* Although some users have challenges reaching products at a height, CPSC staff advises that various tools are currently marketed for hard-to reach locations, such as skylights. Section II.C of this preamble and Tab I of Staff's NPR Briefing Package provide examples of these tools. Currently available tools and devices can be used to reach custom window coverings, and for stock window coverings such tools are already being used for this purpose. Some consumers are likely to choose window coverings operated via remote control.

F.    *Parental Responsibility*

*Comment 6:* At least 27 commenters suggested that parents are responsible for supervising their children around corded window coverings to prevent injuries.

*Response 6:* Strangulation by window covering cords requires only a few minutes to occur, and it happens silently. As explained in section II.C of this preamble and in Tab I of Staff's NPR Briefing Package, parental supervision is unlikely to be effective at eliminating or reducing the strangulation hazard, because even young children are left unsupervised for a few minutes or more in a room that is considered safe, such as bedroom or family room. A more effective solution to the window covering cord hazard is to ensure that window coverings do not have hazardous cords.

G.    *Rental Leases and Real Estate Documents*

*Comment 7:* At least 30 commenters suggested some means of informing or addressing the corded window covering hazard in rental units. Some commenters suggested disclosing the hazards associated with corded window coverings to inform renters. Other commenters suggested that rental units should replace existing corded window coverings with newer and safer window coverings. Some commenters were concerned that tenants may not have the option to replace corded window coverings. At least 34 commenters suggested requiring the disclosure of the presence of corded window coverings in real estate documents.

*Response 7:* The Commission shares the commenters' concerns regarding window coverings included in rental units where tenants with young children may not have the option of choosing safer window coverings. Moreover, the real estate sales process is an obvious opportunity to inform buyers about the dangers associated with corded window coverings, or to remove and replace the hazardous corded window coverings. However, CPSC does not have jurisdiction to regulate rental homes or real estate sales. Rather, the Commission regulates consumer products, wherever consumers may use such products (homes, schools, in recreation, or otherwise). State and local authorities likely have the authority to regulate what types of

defects must be disclosed in real estate documents and in rental home transactions, and some states already have regulations in place to address window covering cords in certain settings, such as daycare centers.

H.      *Cost of Safer Products*

*Comment 8:* At least 35 commenters stated that safer window coverings might be too expensive for some consumers, because regulations will increase the cost of window coverings, and motorized window coverings cost much more than corded products.  At least 108 commenters suggested that safe alternatives to corded window coverings currently exist but are unaffordable.  At least 71 commenters stated that the price of cordless window coverings will drop due to regulation and competition.

*Response 8:* Safer stock window coverings that comply with ANSI/WCMA-2018 are currently widely available for sale in the United States.  Based on a review of currently available window covering products completed by D+R International, nearly all available stock window coverings in 2021 are cordless.  Based on the D+R International (2020) study, sales of stock window coverings have remained consistent.

Corded products are now only available for custom window coverings.  Custom window coverings have typically been more expensive than stock window covering counterparts because consumers can special order sizes, colors, and shapes.  As described in the preliminary regulatory analysis, section V and in Staff's NPR Briefing Package, if this rule is finalized, retail prices for custom products are expected to increase by an average of at least 4 percent, price increase will vary based on product type.  Any custom window covering that cannot meet the requirement in the rule for an inaccessible or short operating cord must stop offering the product, incorporate a cordless lift system, or use a motorized lift system.

Based on a review of currently available custom products, motorized lift systems may be prohibitively expensive for many consumers and can exceed the cost of the window covering in some circumstances. If a motorized custom window covering is prohibitively expensive, consumers will likely substitute the window covering for another type (*i.e.,* using curtains instead of Roman shades), purchase a less expensive stock window covering (which already complies with ANSI/WCMA-2018), or purchase a cordless custom window covering with manual operation. If operating cords on custom window coverings must comply with the proposed rule, consumers will still have affordable window covering options.

I.        *Incentives for Manufacturers*

*Comment 9*: One commenter suggested that CPSC incentivize manufactures to design safer, durable, solutions for window coverings through grants and awards. Another commenter suggested that individuals and small companies need to be incentivized to create new products and systems without the need for high-cost research.

*Response 9:* CPSC does not currently have the resources to offer grants, subsidies, or awards to firms for development of safer window covering products.

J.        *Detailed Cost-Benefit Analysis*

*Comment 10:* At least three commenters suggested that CPSC must prepare a detailed cost and benefit analysis.

*Response 10:* CPSC staff developed a preliminary regulatory analysis, as required by the CPSA, with a preliminary description of the potential benefits and potential costs of the proposed rule, including any benefits or costs that cannot be quantified in monetary terms, and an identification of those likely to receive the benefits and bear the costs. Section V of this

preamble and Tab K of Staff's NPR Briefing Package contain this preliminary regulatory analysis.

K.      *Small versus Large Businesses*

*Comment 11:* One commenter stated that larger corporations that manufacturer "hard" window coverings would have an unfair advantage over smaller manufacturers of "soft" window coverings if the CPSC issues a mandatory regulation for window coverings, because hard window coverings could more easily comply with a mandatory rule.

*Response 11:* Stock window coverings that comply with ANSI/WCMA-2018 are available in both soft and hard types, and implementation of safer window covering technologies has been proven for both types of window coverings.  As stated in the Initial Regulatory Flexibility Analysis for custom window coverings, section VI of this preamble and Tab J of Staff's NPR Briefing Package, CPSC expects significant cost impacts on small manufacturers of custom products, but these costs are not limited to small manufacturers of certain window covering types.  The cost impacts of a rule on operating cords for custom window coverings vary by product type.  However, CPSC expects that small manufacturers of all custom window covering product types will have significant cost impacts (*i.e.*, those that exceed 1 percent of annual revenue) associated with the mandatory rule.

L.      *Product Options*

*Comment 12:* At least 40 commenters suggested that consumers may want to have different options to serve their different window covering needs, and that reducing options that are available to consumers is not preferable.

*Response 12:* Stock products currently on the market that comply with ANSI/WCMA-2018 are available in a variety of materials, sizes, and types to meet consumer needs.  Based on

the currently available window covering operating systems, the only product type that is unlikely to keep the traditional design and still meet the proposed rule would be roll-up style shades, as they are lifted and lowered using lifting loops that are accessible and hazardous. The window covering industry is innovative; roll-up shades could be replaced with a window covering option that meets the same purpose and is safe.

M.      *Product Reliability*

*Comment 13:* One commenter suggested that motors are not as reliable as cords on window coverings, because motors are more complex and require electricity. Two commenters suggested that cordless window coverings do not last long compared to corded versions.

*Response 13:* Cordless or motorized cordless window coverings are not the only option for a safer window covering that complies with the operating cord requirements in section 4.3.1 of ANSI/WCMA-2018. Corded window covering options are available and comply with section 4.3.1 of the ANSI standard if accessible cords are 8 inches or shorter or if the cords are made inaccessible using a rigid cord shroud. WCMA stated in their response to the ANPR that the expected product life for a window covering is 10 years for a custom-made window covering and 3-5 years for a stock window covering. CPSC does not have information on product life averages for each safer window covering technology.

N.      *Incidents/Risk*

*Comment 14:* Several commenters suggested that children die from interacting with household products other than window covering cords, and some commenters suggested that the risk of strangulation on window covering cords is low.

*Response 14:* The Commission is well-aware that children are injured and die from interacting with other household products. CPSC reviews injury and death reports daily, has a

database of these incidents, studies the incidents, and responds to the identified hazards, because our statutory mission is to protect consumers from the risk of injury associated with consumer products. The fact that other products also are associated with injuries and death does not diminish the seriousness of each hazard, and CPSC tries to use our authorities to address injuries on all hazards associated with consumer products. The strangulation hazard to young children on window covering cords is serious, with most incidents resulting in death. The strangulation hazard is a "hidden hazard," because many people do not understand or appreciate the hazard, and do not take appropriate steps to prevent death and injury. As reviewed in section II.C and Tab I of Staff's NPR Briefing Package, other means of addressing deaths and injuries, such as warning labels, parental supervision, and education campaigns, have not been effective at reducing deaths and injuries, and are unlikely to be effective in the future. However, performance requirements for window covering cords will effectively reduce the risk of death and injury to young children on window covering cords.

*O.*     *Stories of Loss*

*Comment 15:* Over 500 commenters either were personally affected by a window covering cord injury or death or knew someone who was affected by a death.

*Response 15:* The Commission appreciates the courage of these consumers in sharing their stories. To each of these parents, family members, and loved ones, we thank you for sharing these stories and we are deeply sorry for your loss. The Commission has taken the information about the interactions and conditions involved in the incidents into consideration in developing proposed rules for stock and custom window coverings.

## IV.    Description of the Proposed Rule

Section 4.3.1 of ANSI/WCMA-2018 sets forth the performance requirements for operating cords on stock window coverings (*see* Table 7).  The Commission has determined that these operating cord performance requirements are adequate and effective to reduce or eliminate the unreasonable risk of strangulation to children 8 years old or younger on window covering cords (see section II.A of this preamble).  The Commission has further determined that the requirements for operating cords on custom window coverings in section 4.3.2 of ANSI/WCMA-2018 are inadequate to address the risk of strangulation.  Accordingly, the Commission proposes to require that operating cords on custom window coverings comply with the same performance requirements for operating cords on stock window coverings in section 4.3.1, instead of the requirements in section 4.3.2, of ANSI/WCMA-2018.

**Table 7 – Requirements for Operating Cords on Stock Window Coverings in ANSI/WCMA-2018**

| *Stock Window Coverings*<br>*Section of the Standard* | *Explanation* |
|---|---|
| **A.   Operating cord** | |
| ***4.3.1.1 Cordless Operating System***<br>*"The product shall have no operating cords"* | (a) Operating cord not present *or* |
| ***4.3.1.2 Short Static or Access Cords***<br>*"The product shall have a Short Cord"* | (b) Operating cord is 8 inches or shorter in any use position *or* |
| ***4.3.1.3 Inaccessible Operating Cords***<br>*"The operating cords shall be inaccessible as determined per the test requirements in Appendix C: Test Procedure for Accessible Cords"* | (c) Operating cord is inaccessible when tested using cord shroud accessibility probe. |

### A.    Description of Proposed Section 1260.1 – Scope and Definitions

Proposed section 1260.1, scope and definitions, describes the scope of the proposed rule and provides relevant definitions.  The Commission's intent is to remain consistent with the ANSI standard for window coverings with regard to definitions, and the requirements for operating cords in section 4.3.1 of ANSI/WCMA-2018.  Section 1260.1(a) limits the scope of the

proposed rule to operating cords on custom window coverings. The risk of injury associated with inner cords on custom window coverings, and operating and inner cords on stock window coverings, are addressed in a separate proposed rule under section 15(j) of the CPSA. Section 1260.1(b) incorporates by reference several definitions in section 3 of ANSI/WCMA-2018. Below we set forth the terms and explain how these terms are defined in the ANSI standard.

- "custom window covering," definition 5.01 of ANSI/WCMA-2018, is a window covering that is not a stock window covering.

- "stock window covering" definition 5.02 of ANSI/WCMA-2018, is a product that is a completely or substantially fabricated product prior to being distributed in commerce and is a stock-keeping unit (SKU). For example, even when the seller, manufacturer, or distributor modifies a pre-assembled product by adjusting to size, attaching the top rail or bottom rail, or tying cords to secure the bottom rail, the product is still considered stock under the ANSI standard. Online sales of the product or the size of the order, such as multi-family housing, do not make the product a non-stock product. These examples are provided in ANSI/WCMA A100.1 – 2018 to clarify that as long as the product is "substantially fabricated," subsequent changes to the product do not change its categorization.

- "operating cord," definition 2.19 of ANSI/WCMA-2018, is a cord that the user manipulates to use the window covering, such as lifting, lowering, tilting, rotating, and traversing. An example operating cord is pictured in Figure 8 of this preamble.

- "cord shroud," definition 2.09 of ANSI/WCMA-2018, is material that is added around a cord to prevent a child from accessing the cord and to prevent the cord

from creating a loop. Defining a cord shroud in the proposed rule is necessary because the Commission is proposing to include a test for a "rigid cord shroud" in 1260.2(b), to meet the inaccessibility requirement in section 4.3.1.3.

The Commission is adding a definition for "rigid cord shroud" in proposed 1260.1(c) based on work by the voluntary standards task group in 2018. A "rigid cord shroud" is not currently defined in the standard but is a hard material that encases an operating cord to prevent a child from accessing an operating cord.

    B.     *Explanation of Proposed 1260.2 – Requirements for Operating Cords on Custom Window Coverings*

Proposed section 1260.2 sets forth the requirements for operating cords on custom window coverings. Section 1260.2(a) would require that each operating cord on a custom window covering comply with section 4.3.1 of ANSI/WCMA-2018 (operating cord not present (section 4.3.1.1)); operating cord is inaccessible (section 4.3.1.3); or operating cord is eight inches long or shorter in any position of the window covering (section 4.3.1.2), instead of the current requirements for operating cords on custom products in section 4.3.2 of ANSI/WCMA-2018.

Section 1260.2(b) contains the information required by the Office of the Federal Register (OFR) to incorporate by reference the requirements in section 4.3.1, and the relevant definitions in section 3, of ANSI/WCMA-2018. As set forth in section XII of this preamble, the Commission has met the OFR's procedural requirements to incorporate by reference the relevant parts of ANSI/WCMA-2018.

Section 1260.2(c) contains a proposed requirement for rigid cord shrouds, when they are used to comply with section 1260.2(a), to make an operating cord inaccessible. Proposed sections 1260.2(d) and (e) contain the test methods to confirm whether a cord shroud is "rigid."

84

The requirements for rigid cord shrouds are not currently in the ANSI/WCMA standard. An ANSI/WCMA task group worked on a test method in 2018 to clarify "rigid" by confirming that a cord shroud is rigid enough to ensure that the shroud cannot be wrapped around a child's neck or won't form a u-shape as a result of attaching the free end of the shroud to the wall (similar to hazards associated with a single cord). ANSI/WCMA has never balloted these provisions.

For this proposed rule, CPSC staff developed a similar test method based on the ANSI task group work. The proposed rigid cord shroud requirements include two tests, the "Center Load" test and the "Axial Torque" test. The Center Load test verifies the stiffness of the cord shroud, by measuring the amount of deflection in the shroud when both ends are mounted and a 5-pound force is applied at the mid-point. This test ensures the shroud is not flexible enough to wrap around a child's neck. The Axial Torque test verifies the cord shroud's opening does not enlarge to create an accessible cord opening when the shroud is twisted.

CPSC is not aware of incidents related to current products with rigid cord shrouds and concludes that shrouds that meet the proposed modifications to the ANSI/WCMA standard will address the strangulation hazard posed by accessible cords. Section II.A of this preamble and Tabs G and H of Staff's NPR Briefing Package contain further explanation and the proposed language related to cord shrouds.

C. *Explanation of Proposed 1260.3 – Prohibited Stockpiling*

The purpose of proposed 1260.3 is to prohibit manufacturers and importers from stockpiling products that will be subject to a mandatory rule, in an attempt to circumvent the final rule. The Commission's authority to issue an anti-stockpiling provision is in section 9(g)(2) of the CPSA. 15 U.S.C. 2058(g)(2). Proposed 1260.3(a) prohibits manufacturers and importers of custom window coverings from manufacturing or importing custom window coverings that do not comply with the requirements of the proposed rule in any 12-month period between the date

85

of the final rule publishing the in the *Federal Register* and the effective date of the rule, at a rate that is greater than 120 percent of the rate at which they manufactured or imported custom window coverings during the *base period* for the manufacturer.

The *base period* is set forth in proposed 1260.3(b) and is described as any period of 365 consecutive days, chosen by the manufacturer or importer, in the 5-year period immediately preceding promulgation of the final rule. "Promulgation" means the date the final rule is published in the *Federal Register*.

The proposed stockpiling limit is intended to allow manufacturers and importers sufficient flexibility to meet normal levels and fluctuations in demand for custom window coverings, while limiting the ability to stockpile large quantities that do not comply with the rule for sale after the effective date. Thus, the stockpiling limit would allow manufacturers and the industry to meet any foreseeable increase in the demand for custom window coverings, without allowing large quantities of custom window coverings to be stockpiled.

Custom products are typically made to order, so it is unlikely that a firm would manufacture large quantities in advance of demand. Therefore, this anti-stockpiling provision should not adversely impact manufacturers. However, firms will need to modify their window coverings to comply with the proposed requirements, and the modifications may be costly. Accordingly, CPSC believes it is appropriate to prevent stockpiling of noncompliant custom window coverings.

> D.    *Explanation of Proposed 1260.4 – Findings*

The findings required by section 9 of the CPSA are discussed in section XIII of this preamble.

V.     **Preliminary Regulatory Analysis**

A proposed consumer product safety rule published in the *Federal Register* in accordance with the requirements of section 9 of the CPSA must include a preliminary regulatory analysis that contains: a preliminary description of the potential benefits and potential costs of the proposed rule; a discussion of the reasons any standard or portion of a standard submitted to the Commission under subsection (a)(5) was not published by the Commission as the proposed rule or part of the proposed rule; a discussion of the reasons for the Commission's preliminary determination that efforts proposed under subsection (a)(6) and assisted by the Commission as required by section 5(a)(3) [15 U.S.C. § 2054 (a)(3)] would not, within a reasonable period of time, be likely to result in the development of a voluntary consumer product safety standard that would eliminate or adequately reduce the risk of injury addressed by the proposed rule; and a description of any reasonable alternatives to the proposed rule, together with a summary description of their potential costs and benefits, and a brief explanation of why such alternatives should not be published as a proposed rule.  The information and analysis in this section is based on Tab K of Staff's NPR Briefing Package.

A.     *Preliminary Discussion of Potential Benefits and Costs of the Rule*

Based on the estimated 9 fatal injuries involving corded window coverings per year, the societal costs of these fatal injuries are about $82.8 million annually.  Based on the estimate of about 185 nonfatal window covering injuries annually from CPSC's Injury Cost Model (ICM), staff estimates that the societal costs of nonfatal window covering injuries are approximately $9.3 million annually.  Overall, staff estimates the societal costs of fatal and nonfatal injuries to be about $92.1 million annually.  Because staff assesses that the voluntary standard adequately addresses the risk of injury associated with stock window coverings, and because operating and inner cord hazards on stock window coverings, and inner cord hazards on custom window

87

coverings, are the subject of a separate proposed rule under section 15(j) of the CPSA, this proposed rule under sections 7 and 9 of the CPSA would only address the injuries attributable to operating cords on custom window coverings. Staff estimates the proportion of injuries attributable to operating cords on custom products to be approximately $53.9 million annually, based on a CPSC review of reported incidents.

The present value of societal cost per window covering unit ranged from $0.92 for cellular, pleated, and roller shades, $1.57 for Roman shades, $3.61 for wood and faux wood horizontal blinds, $1.34 for metal/vinyl horizontal blinds, $7.56 for vertical blinds, and $0.14 for curtains/drapes. Combining these estimates with one year of corded custom window covering sales (2019) amounts to a gross annual benefit of $52.3 million. Adjusting this estimate for the expected effectiveness of the proposed rule, because not all incidents associated with custom window coverings involved operating cords, equates to a total annual benefit of approximately $49.5 million.

Based on component cost estimates, assembly/manufacturing costs, and proportions of domestic manufacturing, the increased cost per corded custom window covering produced would range from $2.15 to $34.57, an average of at least 4 percent of the retail price, and is highly dependent on product type. The proposed rule is not expected to result in any cost increases for cordless custom window coverings, and as such, aggregate costs are calculated on only corded custom products. Aggregate cost estimates range between $156.5 million to $309 million based on 2019 custom sales estimate of $61.58 million with a per unit cost increase, and the percentage of corded custom sales, which are estimated as 65 percent of custom window covering unit sales.

Many sources of uncertainty are inherent in a complex cost-benefit analysis because of using estimated parameters, inputs from several models, assumptions based on expert judgement,

and public/private data. This analysis includes uncertainty related to cost estimate calculations, the value of statistical life, the number of corded window coverings in use, and the expected product life for certain blind types. The cost studies from which staff derived all of the cost estimates could be outdated, given the first study was completed in 2016, about 2 years before WCMA revised the voluntary standard for stock products. Economies of scale could have reduced costs related to cordless components since the completion of the first cost study in 2016.[32] For example, prices for custom window coverings are, on average, higher than those for stock products, which are already required to comply with section 4.3.1 of ANSI/WCMA-2018. Although prices of stock window coverings have increased since the revised voluntary standard went into effect in 2018, sales of stock products remain consistent.[33] For custom products that already have higher prices, consumers may be willing to pay more for a safer window covering without affecting sales, similar to stock window coverings.

Another example of uncertainty in the analysis is related to the value of statistical life (VSL). Staff valued the benefit of reducing fatal incidents at $9.2 million each, which, as discussed in Tab K of Staff's NPR Briefing Package, is in-line with most reasonable estimates of the value of a statistical life. Staff noted though that there has been some discussion in the literature suggesting that people might be willing to spend more for a small reduction in the risk

---

[32] Staff notes, though, that the low-end cost could also be an underestimate for a rule involving custom products, because the cost study, from which the estimate is derived, mostly analyzed stock products with an assumed high-volume production in China, which is less applicable for custom than for stock.

[33] Staff does not have information on detailed sales data to determine the impact of the ANSI/WCMA-2018 on stock products. CPSC contractor (D+R) aimed to identify the share of custom versus stock sales over time to understand how the window covering market has changed in response to the ANSI/WCMA-2018 as the standard primarily impacts stock products. Researchers considered that metal/vinyl blinds, roller shades, vertical blinds, and wood/faux wood blinds are the categories that should be most affected by the standard, given their large share in stock product sales. They assumed that if these categories had an increase in custom sales after 2018, it would indicate that the cordless operation could be one of the factors driving consumers towards purchasing custom products with corded operation, despite the higher price points. However, researchers' projections indicate that there is not a consistent trend towards greater custom sales, and in the case of metal/vinyl blinds, there is an increasing share of stock sales over time.

89

to children than they are for the same reduction in their own risk. A review of the literature conducted for the CPSC suggested that the VSL for children could exceed that of adults by a factor of 1.2 to 3, with a midpoint of around 2 (IEc, 2018). If we increase the VSL by a factor of 3, the estimated VSL would equate to $27.6 million per life, increasing the total benefits of the rule to an estimated $136.9 million annually. *See* Table 11 in Tab K of Staff's NPR Briefing Package.

Additionally, the assumption used to create the estimate of corded products in the market is based on interviews with manufacturers and retailers, some of whom gave conflicting accounts. The estimate is not based on exposure surveys, and thus, the actual number of corded custom products could be higher or lower than the estimate used in the base analysis; and, we have no basis for stating whether we think we have over or underestimated the number.

Lastly, the estimated product life used in the analysis for vinyl and metal horizontal blinds was significantly shorter than for the other products. This estimate was based on work completed by D+R for the Department of Energy (2013). However, it is possible that this estimate is skewed because of the dominance of stock in this category. Custom window coverings have a longer product life. For example, WCMA stated in their response to the ANPR that the expected product life for a custom window covering is 10 years and is 3-5 years for a stock window covering. CPSC staff expects a higher per-unit benefit for custom products because of the longer expected product life.

B.      *Reasons for Not Relying on a Voluntary Standard*

Given improvements in the voluntary standard for operating and inner cords on stock window coverings, and inner cords on custom window coverings, the Commission considered whether the agency could rely on the current voluntary standard, ANSI/WCMA-2018, instead of

issuing a mandatory rule for operating cords on custom window coverings. However, as reviewed in section II of this preamble, staff assessed that operating cord requirements for custom products in ANSI/WCMA-2018 are inadequate to effectively address an unreasonable risk of strangulation to children 8 years old and younger associated with custom window coverings. Requirements in the voluntary standard still allow operating cords on custom window coverings to be accessible and to be longer than 8 inches.

Moreover, the Commission finds it unlikely that the ANSI/WCMA standard will be modified to address the risk of injury associated with operating cords on custom window coverings in the near term, or in the long term. CPSC's previous efforts to work with ANSI/WCMA for an effective standard for stock window coverings required more than two decades of development by WCMA. In addition, WCMA did not agree with recommendations from other stakeholders, including consumer advocates and CPSC staff, to require the stock product requirements for custom window coverings. WCMA resists safer custom window coverings, even though cord requirements to remove the strangulation hazard (cordless, inaccessible cords, or short cords) are well known by CPSC and the industry and the technologies to achieve this have been developed and are being used to manufacturer both stock and custom window coverings. Therefore, based on WCMA's position on operating cords on custom products, and on past experience, the Commission finds it unlikely that an effective voluntary standard addressing the operating cord hazards on custom window coverings will be developed within a reasonable period.

C.    *Alternatives to the Proposed Rule*

The Commission considered several alternatives to issuing a mandatory standard for operating cords on custom window coverings. These alternatives included: (1) not issuing a mandatory rule, but instead relying upon voluntary standards; (2) improving the voluntary

standard ANSI/WCMA-2018; (3) using a later effective date; (4) narrowing the scope of the rule to address only vertical blinds and curtains and drapes; and (5) continuing and improving information and education campaigns.

### 1. No Mandatory Standard; Rely on Voluntary Standard

If CPSC did not issue a mandatory standard, the Commission believes that most manufacturers would comply with ANSI/WCMA-2018, because manufacturers already substantially comply with the voluntary standard. However, ANSI/WCMA-2018 allows custom window coverings to be produced with hazardous operating cords, and CPSC concludes that the requirements for operating cords associated with custom window coverings in ANSI/WCMA-2018 are inadequate to protect children from the risk of strangulation. Not mandating a standard would not impose any additional costs on manufacturers; neither would it result in any additional benefits in terms of reduced deaths and injuries to children. CPSC staff does not recommend that the Commission pursue this option.

### 2. Improve Voluntary Standard for Window Coverings

The Commission also considered directing CPSC staff to continue participating in voluntary standards development and encouraging safety improvements to the voluntary standard for window coverings, ANSI/WCMA-2018. This option would be similar to the "no action alternative," with the key difference being that the Commission could direct staff to pursue safety improvements in the voluntary standard, including applying the requirements for operating cords on stock window coverings to custom window coverings, as a conditional alternative to a

mandatory standard. The Commission could then reconsider a mandatory standard if efforts to improve the voluntary standard for custom products remain unsatisfactory.

Although CPSC staff supports recent changes in the voluntary standard creating requirements for cordless/short cords/inaccessible cords on stock products, more descriptive warning labels, and materials describing the strangulation hazard, staff does not recommend that the Commission pursue this option. In the past, WCMA rejected initiatives for operating cords on custom products to be cordless, or to not have accessible cords longer than 8 inches in length. Based on staff's previous experience with WCMA, and the length of time it took for WCMA to update the voluntary standard to require cordless stock products (22 years), the Commission does not believe that WCMA is likely to improve the voluntary standard for custom products in a timely manner.

     3.   <u>Later Effective Date</u>

The proposed rule includes an effective date that is 2 years after the final rule is published in the *Federal Register*, which is twelve months longer than the statutory provision in section 9(c) of the CPSA. 15 U.S.C. § 2058(c). Because some manufacturers may need to redesign certain custom window coverings of unusual sizes to accommodate a cordless operation, a later effective date would allow manufacturers more time to redesign and spread the research and development costs or eliminate product variants that cannot be switched to cordless operation. Based on staff's analysis, the Commission believes it is unlikely that any manufacturer (large or small) would leave the window covering market as a result of the proposed rule. Nevertheless,

elimination of some product sizes is possible because conversion to cordless operation may not be feasible for some large or unusual sizes.

Providing a later effective date for the custom window covering rule would mitigate some of the costs related to redesign/research and development for manufacturers.  However, if cordless operation is not feasible, a reduction in sales would occur if a consumer could not find a suitable alternative.  Given the potential for large costs for some products to conform per unit to the proposed rule, delaying the effective date would be expected to reduce costs.

### 4.  Narrow Proposed Rule to Vertical Blinds, Curtains, and Drapes

The Commission could narrow the proposed rule to address only the hazards associated with operating cords on custom vertical blinds, curtains, and drapes, on the grounds that cords are not critical to the operation of these products.  These custom products typically offer cordless options at no additional cost because, for most applications, a plastic rod can be used for operation.  Narrowing the proposed rule to these three product types would lessen the cost impact and make it unlikely that any particular product type and/or size would be eliminated.  Under this alternative, the costs are expected to be near $0 because using plastic rods for operation is very similar to cords in cost.

However, only 2 of the 35 custom product incidents (both are fatalities) were associated with vertical blinds, and there were no curtain or drape incidents where the stock/custom classification could be determined.  Because of the limited presence of vertical blinds in custom product incidents (5.7 percent), this option is unlikely to be effective in reducing injuries and deaths.

### 5. Continue and Improve Information and Education Campaign

The Commission could work to improve the current information and education campaign concerning the strangulation hazard associated with custom corded window covering products. Information and education campaigns on corded window coverings that have been continuing for decades have had limited effectiveness in the reduction of injuries and deaths. Accordingly, the Commission will not rely solely on education campaigns to address the risk of injury.

## VI   Initial Regulatory Flexibility Act Analysis[34]

Whenever an agency publishes a proposed rule, the Regulatory Flexibility Act (5 USC 601 – 612) requires that the agency prepare an initial regulatory flexibility analysis (IRFA) that describes the impact that the rule would have on small businesses and other entities, unless the agency has a factual basis for certifying that the proposed rule "will not have a significant economic impact on a substantial number of small entities." [35]   The IRFA must contain –

(1) a description of why action by the agency is being considered;

(2) a succinct statement of the objectives of, and legal basis for, the proposed rule;

(3) a description of and, where feasible, an estimate of the number of small entities to which the proposed rule will apply;

(4) a description of the projected reporting, recordkeeping, and other compliance requirements of the proposed rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record; and

---

[34] The RFA analysis is based on Tab F of Staff's NPR Briefing Package.
[35] 5 USC § 605 (b) of The Regulatory Flexibility Act of 1980, as amended. Available at https://www.sba.gov/advocacy/regulatory-flexibility-act.

(5) an identification to the extent practicable, of all relevant Federal rules which may

duplicate, overlap or conflict with the proposed rule.

An IRFA must also contain a description of any significant alternatives that would

accomplish the stated objectives of the applicable statutes and which would minimize any

significant economic impact of the proposed rule on small entities.

A.      *Reason for Agency Action*

The proposed rule is intended to address the strangulation hazard to children 8 years and

younger associated with operating cords on custom window coverings.  Based on an analysis of

the relevant data, as set forth in section I.E of this preamble and Tab A of Staff's NPR Briefing

Package, staff reports an average of 9 fatal injuries annually to children less than 5 years old.

Staff estimates the societal costs of these fatal injuries to be about $82.8 million annually.  Based

on the estimate of about 185 nonfatal window covering injuries annually from CPSC's Injury

Cost Model (ICM), staff estimates the societal costs of nonfatal window covering injuries are

approximately $9.3 million.  Combining these estimates amounts to annual societal costs

associated with corded window coverings of approximately $92.1 million.  The proposed rule

only addresses injuries attributable to custom window coverings.  Based on a CPSC review of

194 reported incidents, the proportion of injuries attributable to custom window coverings is

approximately $53.9 million annually.

The NPR proposes that operating cords on custom window coverings be subject to the

same requirements in section 4.3.1 ANSI/WCMA-2018 that currently apply to operating cords

on stock window coverings.  Based on staff's expertise and analysis of window covering cord

incidents, the Commission has determined that these requirements are effective at preventing

strangulations for operating cords on stock window coverings and would be equally effective

when applied to operating cords on custom window coverings.

96

B.        *Objectives of and Legal Basis for the Rule*

The objective of the rule is to reduce or eliminate an unreasonable risk of injury or death to children 8 years old or younger associated with operating cords on custom window coverings. The Commission issues this proposed rule under the authority in sections 7 and 9 of the CPSA.

C.        *Small Entities to Which the Rule Will Apply*

Under SBA guidelines, a manufacturer of window coverings is categorized as small if the firm has fewer than 1,000 employees, retailers are considered small if they have sales revenue less than $8.0 million, and importers if the firm has fewer than 100 employees.  Based on 2017 data, 1,898 firms were categorized as blinds and shades manufacturers and retailers (Census Bureau, 2020).[36]  Of these, about 1,840 firms (302 manufacturers and 1,538 retailers) are small. As the NAICS code for importers is non-specific to window coverings, CPSC staff reviewed Customs and Border Patrol (CBP) data, firm financial reports, and Dun & Bradstreet reports to obtain a more precise estimate of importers.  Based on this research, CPSC staff estimates that there are approximately 83 importers that meet the SBA guidelines for a small business (Laciak 2020).

Nearly all of the 302 staff-identified small manufacturers are far below the 1,000 employee SBA threshold.  Two hundred thirty-eight (238) of the manufacturers have fewer than 20 employees, and 151 have fewer than 5 employees.  CPSC staff estimates that the annual revenue for the firms with fewer than 20 employees to be under $250,000.  Most of the firms with fewer than 5 employees manufacture custom window coverings on a per order basis.  The

---

[36] The North American Industry Classification System (NAICS) defines product codes for United States firms. Firms that manufacture window coverings may list their business under the NAICS product code for blinds and shades manufacturers (337920 Blind and Shade Manufacturing) or retailers (442291 Window Treatment Stores). The two product codes 337920 and 442291 encompass most products in the window coverings market.  However, some drapery and curtain manufacturers may be listed under 322230, stationary product manufacturing.  Importers of window coverings are generally listed in Home Furnishing Merchant Wholesalers (423220), which includes other home furnishing items and is non-specific to window coverings.

annual revenue for these manufacturers is most likely below $25,000, based on estimates from the Nonemployer Statistics from the U.S. Bureau of the Census. Staff estimates that the annual revenues for the remaining small manufacturers, those with more than 20 employees, are between $300,000 to $2,000,000.

D.      *Compliance Requirements of the Proposed Rule, Including Reporting and Recordkeeping Requirements*

The proposed rule would establish a performance standard for operating cords on custom window coverings, requiring that they meet the same requirements as operating cords on stock window coverings under section 4.3.1 of ANSI/WCMA-2018. To comply with the performance requirements, all accessible operating cords would need to be removed, made inaccessible, or shortened to 8 inches or less in any use position.

Under section 14 of the CPSA, as codified in 16 CFR part 1110, manufacturers and importers of custom window coverings will be required to certify (General Certificate of Conformity, or GCC), based on a test of each product or upon a reasonable testing program, that their window coverings comply with the requirements in the rule. If the custom window covering is a children's product, the window covering must be third party tested and certified (Children's Product Certificate, or CPC) for compliance with the rule. Each certificate of compliance must identify the manufacturer or importer issuing the certificate and any manufacturer, firm, or third party conformity assessment body on whose testing the certificate depends. The certificate must be legible and in English and include the date and place of manufacture, the date and place where the product was tested, including the full mailing address and telephone number for each party, and the contact information for the person responsible for maintaining records of the test results. The certificates may be in electronic format and must be

provided to each distributor or retailer of the product. Upon request, the certificates must also be provided to the CPSC and Customs and Border Protection (CBP).[37]

### E.  Costs of Proposed Rule That Would Be Incurred by Small Manufacturers

Custom window covering manufacturers would most likely adopt cordless lift operation systems to comply with the proposed rule. As discussed in section V of this preamble, and in Tab K of Staff's NPR Briefing Package, the preliminary regulatory analysis estimates the cost to modify window covering lift systems with the proposed rule ranges from $2.95 to $9.65 per horizontal blind, $2.15 to $34.57 per shade, and no expected cost increase for vertical blinds and curtains/drapes. CPSC staff does not have estimates of redesign costs but expects that these costs will be small given the already wide availability of product designs with inaccessible cords.[38] CPSC staff expects component costs to be significant, as inaccessible cord operation is expensive.

Estimates of the costs to modify three types of window coverings in Panchal (2016) indicate that, at a minimum, the costs to modify will range from 2 to 11 percent of retail prices. Panchal (2016) used a product archeology approach, supplemented by standard models for calculating only manufacturing and assembly costs, to estimate the incremental cost of implementing standard manual uncorded technology for entry-level stock window coverings – the type of window coverings that are available for purchase off-the-shelf from home improvement stores. Hence his estimates are most applicable to the more basic and inexpensive uncorded products at the low end of the window coverings market. Panchal's analysis does not

---

[37] The regulations governing the content, form, and availability of the certificates of compliance are codified at 16 CFR part 1110. Additional requirements for testing and certification of children's products are codified at 16 CFR part 1107.
[38] Based on interviews with window covering manufacturers there may be some size and placement limitations related in-accessible cord designs. These limitations can be addressed with motorization of the product but it is prohibitively expensive as many motorized systems can cost more than the window covering product itself.

account for any costs associated with product development and design innovations, testing, licensing of technology, manufacturing restrictions due to existing patents, and training of personnel, which would add further costs to implementing uncorded technologies. Panchal's analysis was also conducted two years before the ANSI standard was revised to require safer operating cords on stock window coverings in December 2018.

Manufacturers would likely incur some additional costs to certify that their window coverings meet the requirements of the proposed rule as required by Section 14 of the CPSA. The certification must be based on a test of each product or a reasonable testing program. WCMA developed a certification program for window covering products, titled "Best for Kids," which includes third party testing of products for accessible cords. CPSC staff believes this testing and certification program would meet the requirements in Section 14 of the CPSA, as long as the test laboratories are CPSC-accepted. Based on quotes from testing laboratory services for consumer products, the cost of the certification testing will range from $290 to $540 per window covering model.[39] Note that the requirement to certify compliance with all product safety rules, based on a reasonable testing program, is a requirement of the CPSA and not of the proposed rule.

Based on discussion in the Commission's proposed rule on stock window covering cords (Proposed rule to Amend 16 CFR part 1120, CPSC Docket No. [insert]), which evaluates the requirements in section 4.3.1 of ANSI/WCMA-2018 to be "readily observable," a reasonable testing program for nonchildren's custom window coverings could entail a simple visual inspection of products by the manufacturer, and simple measurements of the length of any accessible cord. Therefore, the cost of a reasonable testing program for compliance with the

---

[39] Based on quotes from firms to conduct certification tests to the current WCMA voluntary standard on window covering products currently available at retailers.

proposed rule is likely much lower than the cost of conducting a third party certification testing for children's products.

<center>*F. Impact on Small Manufacturers*</center>

To comply with the proposed rule, staff expects small manufacturers to incur redesign and incremental component costs, described above, for some product lines which currently are not available with inaccessible cords. Staff does not expect small manufacturers to suffer a disproportionate cost effect from the proposed rule, because the cost calculations and research were completed on a per unit basis; staff expects little if any redesign costs. Staff expects small manufacturers of window coverings to incur, at a bare minimum, a two percent impact to their custom window covering revenue from the proposed rule. This implies that if custom products account for all of a firm's revenue, then the minimum impact of the proposed rule is two percent of revenue.

Generally, staff considers an impact to be potentially significant if it exceeds 1 percent of a firm's revenue. Because even the smallest estimate of cost is 2 percent of retail price, staff believes that the proposed rule could have a significant impact on manufacturers that receive a significant portion of their revenue from the sale of custom window coverings. Staff expects small importers to bear similar costs as small manufacturers, but staff is unclear whether the impact will be significant. The cost effect as a percent of revenue is dependent on the firm's custom window covering imports as a percent of total revenue. Any small importer with revenues of at least 50 percent related to custom window coverings affected by the proposed rule could be significantly impacted. Due to these potential impacts, CPSC staff expects the proposed rule to have a significant effect on a substantial number of small firms.

*G.       Federal Rules which may Duplicate, Overlap, or Conflict with the Proposed Rule*

CPSC staff has not identified any other Federal rules that duplicate, overlap, or conflict with the proposed rule.

*H.       Alternatives for Reducing the Adverse Impact on Small Entities*

Under section 603(c) of the Regulatory Flexibility Act, an initial regulatory flexibility analysis should "contain a description of any significant alternatives to the proposed rule which accomplish the stated objectives of the applicable statutes and which minimize any significant impact of the proposed rule on small entities."  CPSC staff examined several alternatives to the proposed rule which could reduce the impact on small entities, as discussed in section V.C of this preamble.

## VII.    Environmental Considerations

Generally, the Commission's regulations are considered to have little or no potential for affecting the human environment, and environmental assessments and impact statements are not usually required.  *See* 16 CFR 1021.5(a).  The proposed rule to require operating cords on custom window coverings to comply with the same requirements for operating cords on stock window coverings, as set forth in section 4.3.1 of ANSI/WCMA-2018, is not expected to have an adverse impact on the environment and is considered to fall within the "categorical exclusion" for the purposes of the National Environmental Policy Act.  16 CFR 1021.5(c).

## VIII.   Paperwork Reduction Act

This proposed rule contains information collection requirements that are subject to public comment and review by the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (PRA; 44 U.S.C. 3501–3521).  Under the PRA, an agency must publish the following information:

- a title for the collection of information;

- a summary of the collection of information;

- a brief description of the need for the information and the proposed use of the information;

- a description of the likely respondents and proposed frequency of response to the collection of information;

- an estimate of the burden that will result from the collection of information; and

- notice that comments may be submitted to OMB.

44 U.S.C. 3507(a)(1)(D). In accordance with this requirement, the Commission provides the following information:

*Title*: Amendment to Third Party Testing of Children's Products, approved previously under OMB Control No. 3041-0159.

*Summary, Need, and Use of Information*: The proposed consumer product safety standard prescribes the safety requirements for operating cords on custom window coverings, and requires that these cords meet the same requirements for operating cords on stock window coverings, as set forth in the voluntary standard, section 4.3.1 of ANSI/WCMA-2018. These requirements are intended to reduce or eliminate an unreasonable risk of death or injury to children 8 years old and younger from strangulation.

Some custom window coverings are considered children's products. A "children's product" is a consumer product that is "designed or intended primarily for children 12 years of age or younger." 15 U.S.C. 2052(a)(2). The Commission's regulation at 16 C.F.R. part 1200 further interprets the term. Section 14 of the CPSA requires that children's products be tested by a third party conformity assessment body, and that the manufacturer of the product, including an importer, must issue a children's product certificate (CPC). Based on such third party testing, a

103

manufacturer or importer must attest to compliance with the applicable consumer product safety rule by issuing the CPC.  The requirement to test and certify children's products fall within the definition of "collection of information," as defined in 44 U.S.C. 3502(3).

The requirements for the CPCs are stated in Section 14 of the CPSA, and in the Commission's regulation at 16 C.F.R. parts 1107 and 1110.  Among other requirements, each certificate must identify the manufacturer or private labeler issuing the certificate and any third-party conformity assessment body, on whose testing the certificate depends, the date and place of manufacture, the date and place where the product was tested, each party's name, full mailing address, telephone number, and contact information for the individual responsible for maintaining records of test results.  The certificates must be in English.  The certificates must be furnished to each distributor or retailer of the product and to the CPSC, if requested.

The Commission already has an OMB control number, 3041-0159, for children's product testing and certification.  This rule would amend this collection of information to add window coverings that are children's products.

*Respondents and Frequency*: Respondents include manufacturers and importers of custom window coverings that are children's products.  Manufacturers and importers must comply with the information collection requirements when custom window coverings that are children's products are manufactured or imported.

*Estimated Burden*: CPSC has estimated the respondent burden in hours, and the estimated labor costs to the respondent.

*Estimate of Respondent Burden:* The hourly reporting burden imposed on firms that manufacture or import children's product custom window coverings includes the time and cost to maintain records related to third party testing, and to issue a CPC.

**Table 8: Estimated Annual Reporting Burden.**

| Burden Type | Total Annual Reponses | Length of Response | Annual Burden (hours) |
|---|---|---|---|
| Third-party recordkeeping, certification | 60,800 | 1.0 hours | 60,800 |

Three types of third-party testing of children's products are required: certification testing, material change testing, and periodic testing. Requirements state that manufacturers conduct sufficient testing to ensure that they have a high degree of assurance that their children's products comply with all applicable children's product safety rules before such products are introduced into commerce. If a manufacturer conducts periodic testing, they are required to keep records that describe how the samples of periodic testing are selected.

CPSC estimates that 0.1 percent of all custom window coverings sold annually, 60,800 window coverings, are children's products and would be subject to third-party testing, for which 1.0 hours of recordkeeping and record maintenance will be required. Thus, the total hourly burden of the recordkeeping associated with certification is 60,800 hours (1.0 × 60,800).

*Labor Cost of Respondent Burden.* According to the U.S. Bureau of Labor Statistics (BLS), Employer Costs for Employee Compensation, the total compensation cost per hour worked for all private industry workers was $36.64 (March 2021, https://www.bls.gov/ncs/ect/). Based on this analysis, CPSC staff estimates that labor cost of respondent burden would impose a cost to industry of approximately $2,227,712 annually (60,800 hours × $36.64 per hour).

*Cost to the Federal Government.* The estimated annual cost of the information collection requirements to the federal government is approximately $4,172, which includes 60 staff hours to examine and evaluate the information as needed for Compliance activities. This is based on a GS-12, step 5 level salaried employee. The average hourly wage rate for a mid-level salaried GS-12 employee in the Washington, DC metropolitan area (effective as of January 2021) is

$47.35 (GS-12, step 5).  This represents 68.1 percent of total compensation (U.S. Bureau of Labor Statistics, "Employer Costs for Employee Compensation," March 2021, percentage of wages and salaries for all civilian management, professional, and related employees: https://www.bls.gov/ncs/ect/. Adding an additional 31.9 percent for benefits brings average annual compensation for a mid-level salaried GS-12 employee to $69.53 per hour. Assuming that approximately 60 hours will be required annually, this results in an annual cost of $4,172 ($69.53 per hour × 60 hours = $ 4,171.80).

*Comments.* CPSC has submitted the information collection requirements of this rule to OMB for review in accordance with PRA requirements. 44 U.S.C. 3507(d). CPSC requests that interested parties submit comments regarding information collection to the Office of Information and Regulatory Affairs, OMB (see the ADDRESSES section at the beginning of this NPR).

Pursuant to 44 U.S.C. 3506(c)(2)(A), the Commission invites comments on:

- whether the proposed collection of information is necessary for the proper performance of CPSC's functions, including whether the information will have practical utility;

- the accuracy of CPSC's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

- ways to enhance the quality, utility, and clarity of the information the Commission proposes to collect;

- ways to reduce the burden of the collection of information on respondents, including the use of automated collection techniques, when appropriate, and other forms of information technology;

- the estimated burden hours associated with labels and hang tags, including any alternative estimates; and

- the estimated respondent cost other than burden hour cost.

## IX.  Preemption

Executive Order (EO) 12988, *Civil Justice Reform* (Feb. 5, 1996), directs agencies to specify the preemptive effect of a rule in the regulation. 61 FR 4729 (Feb. 7, 1996). The proposed regulation for operating cords on custom window coverings is issued under authority of the CPSA. 15 U.S.C. 2051-2089. Section 26 of the CPSA provides that "whenever a consumer product safety standard under this Act is in effect and applies to a risk of injury associated with a consumer product, no State or political subdivision of a State shall have any authority either to establish or to continue in effect any provision of a safety standard or regulation which prescribes any requirements as to the performance, composition, contents, design, finish, construction, packaging or labeling of such product which are designed to deal with the same risk of injury associated with such consumer product, unless such requirements are identical to the requirements of the Federal Standard." 15 U.S.C. 2075(a).

The federal government, or a state or local government, may establish or continue in effect a non-identical requirement for its own use that is designed to protect against the same risk of injury as the CPSC standard if the federal, state, or local requirement provides a higher degree of protection than the CPSA requirement. *Id.* 2075(b). In addition, states or political subdivisions of a state may apply for an exemption from preemption regarding a consumer product safety standard, and the Commission may issue a rule granting the exemption if it finds that the state or local standard: (1) provides a significantly higher degree of protection from the risk of injury or illness than the CPSA standard, and (2) does not unduly burden interstate commerce. *Id.* 2075(c).

Thus, the proposed rule for operating cords on custom window coverings would, if finalized, preempt non-identical state or local requirements for operating cords on custom window coverings designed to protect against the same risk of injury and prescribing requirements regarding the performance of operating cords on custom window coverings.

## X.     Testing, Certification, and Notice of Requirements

Section 14(a) of the CPSA includes requirements for certifying that children's products and non-children's products comply with applicable mandatory standards.  15 U.S.C. 2063(a). Section 14(a)(1) addresses required certifications for non-children's products, and sections 14(a)(2) and (a)(3) address certification requirements specific to children's products.

A "children's product" is a consumer product that is "designed or intended primarily for children 12 years of age or younger." *Id.* 2052(a)(2).  The following factors are relevant when determining whether a product is a children's product:

- manufacturer statements about the intended use of the product, including a label on the product if such statement is reasonable;
- whether the product is represented in its packaging, display, promotion, or advertising as appropriate for use by children 12 years of age or younger;
- whether the product is commonly recognized by consumers as being intended for use by a child 12 years of age or younger; and
- the Age Determination Guidelines issued by CPSC staff in September 2002, and any successor to such guidelines.

*Id.*  "For use" by children 12 years and younger generally means that children will interact physically with the product based on reasonably foreseeable use.  16 CFR § 1200.2(a)(2).

Children's products may be decorated or embellished with a childish theme, be sized for children, or be marketed to appeal primarily to children.  *Id*. § 1200.2(d)(1).

CPSC is aware that some window coverings are specifically designed for children, and based on the factors listed above, fall within the definition of a "children's product."  If the Commission issues a final rule for operating cords on custom window coverings, such a rule would require custom window coverings that are children's products to meet the third-party testing and certification requirements in section 14(a) of the CPSA.  The Commission's requirements for certificates of compliance are codified at 16 CFR part 1110.

*Non-Children's Products.* Section 14(a)(1) of the CPSA requires every manufacturer (which includes importers[40]) of a non-children's product that is subject to a consumer product safety rule under the CPSA or a similar rule, ban, standard, or regulation under any other law enforced by the Commission to certify that the product complies with all applicable CSPSC-enforced requirements. 15 U.S.C. 2063(a)(1).

*Children's Products.* Section 14(a)(2) of the CPSA requires the manufacturer or private labeler of a children's product that is subject to a children's product safety rule to certify that, based on a third-party conformity assessment body's testing, the product complies with the applicable children's product safety rule.  *Id.* 2063(a)(2).  Section 14(a) also requires the Commission to publish a notice of requirements (NOR) for a third-party conformity assessment body (*i.e.*, testing laboratory) to obtain accreditation to assess conformity with a children's product safety rule.  *Id.* 2063(a)(3)(A).  Because some custom window coverings are children's products, the proposed rule is a children's product safety rule, as applied to those products.  Accordingly, if the Commission issues a final rule, it must also issue an NOR.

---

[40] The CPSA defines a "manufacturer" as "any person who manufactures or imports a consumer product." 15 U.S.C. 2052(a)(11).

The Commission published a final rule, codified at 16 CFR part 1112, entitled *Requirements Pertaining to Third Party Conformity Assessment Bodies*, which established requirements and criteria concerning testing laboratories. 78 FR 15836 (Mar. 12, 2013). Part 1112 includes procedures for CPSC to accept a testing laboratory's accreditation and lists the children's product safety rules for which CPSC has published NORs. When CPSC issues a new NOR, it must amend part 1112 to include that NOR. Accordingly, as part of this NPR for operating cords on custom window coverings, the Commission proposes to amend part 1112 to add the "Safety Standard for Operating Cords on Custom Window Coverings" to the list of children's product safety rules for which CPSC has issued an NOR.

Testing laboratories that apply for CPSC acceptance to test custom window coverings that are children's products for compliance with the new rule would have to meet the requirements in part 1112. When a laboratory meets the requirements of a CPSC-accepted third party conformity assessment body, the laboratory can apply to CPSC to include 16 CFR part 1260, *Safety Standard for Operating Cords on Custom Window Coverings*, in the laboratory's scope of accreditation of CPSC safety rules listed on the CPSC website at:

www.cpsc.gov/labsearch.

## XI. Effective Date

The Administrative Procedure Act (APA) generally requires that the effective date of a rule be at least 30 days after publication of a final rule. 5 U.S.C. 553(d). Section 9(g)(1) of the CPSA states that a consumer product safety rule shall specify the date such rule is to take effect, and that the effective date must be at least 30 days after promulgation, but cannot exceed 180 days from the date a rule is promulgated, unless the Commission finds, for good cause shown, that a later effective date is in the public interest and publishes its reasons for such finding.

If finalized, the Commission proposes an effective date of two years after publication of the final rule in the *Federal Register*. Given that the window coverings sold in the United States already substantially comply with the requirements for operating cords in ANSI/WCMA-2018, and that a substantial portion of the custom market already offers safer products that would meet the proposed requirements, a 2-year period should be sufficient for the custom market to transition to new product offerings, where needed. Although the resulting net costs may be distributed among manufacturers, importers, retailers and consumers of window coverings, the initial impact of the regulations will be lessened by a 2-year effectiveness period. A 2-year effective date is also consistent with the effective date of Health Canada's window covering regulation, which modified the coming-into-force period to 24 months, based on net costs, and in response to industry's concerns expressed during the public consultation period. Based on the forgoing, the Commission could find good cause to extend the effective date of the rule beyond the statutory 180 days.

## XII.   Incorporation by Reference

The Commission proposes to incorporate by reference certain provisions of ANSI/WCMA A100.1 – 2018, American National Standard for Safety of Corded Window Covering Products. The Office of the Federal Register (OFR) has regulations concerning incorporation by reference. 1 CFR part 51. The OFR revised these regulations to require that, for a proposed rule, agencies must discuss in the preamble of the NPR ways that the materials the agency proposes to incorporate by reference are reasonably available to interested persons or how the agency worked to make the materials reasonably available. In addition, the preamble of the proposed rule must summarize the material. 1 CFR 51.5(a).

In accordance with the OFR's requirements, sections I.B.2.(d), II, IV and Table 3 of this preamble summarize the provisions of ANSI/WCMA A100.1 – 2018 that the Commission proposes to incorporate by reference. ANSI/WCMA A100.1 – 2018 is copyrighted. You may view a read-only copy of ANSI/WCMA A100.1 – 2018 free of charge at:

https://wcmanet.com/wp-content/uploads/2021/07/WCMA-A100-2018_v2_websitePDF.pdf.

Alternatively, interested parties may inspect a copy of the standard free of charge by contacting Alberta E. Mills, Division of the Secretariat, U.S. Consumer Product Safety Commission, 4330 East West Highway, Bethesda, MD 20814; telephone: 301-504-7479; e-mail: cpsc-os@cpsc.gov. To download or print the standard, interested persons may purchase a copy of ANSI/WCMA A100.1 – 2018 from WCMA, through its website (http://wcmanet.com), or contacting the Window Covering Manufacturers Association, Inc., 355 Lexington Avenue, New York, New York, 10017; telephone: 212.297.2122.

## XIII. Proposed Findings

The CPSA requires the Commission to make certain findings when issuing a consumer product safety standard. Specifically, the CPSA requires the Commission to consider and make findings about the following:

- the degree and nature of the risk of injury the rule is designed to eliminate or reduce;
- the approximate number of consumer products subject to the rule;
- the need of the public for the products subject to the rule and the probable effect the rule will have on the cost, availability, and utility of such products;
- any means to achieve the objective of the rule while minimizing adverse effects on competition, manufacturing, and commercial practices;

- that the rule, including the effective date, is reasonably necessary to eliminate or reduce an unreasonable risk of injury associated with the product;

- that issuing the rule is in the public interest;

- if a voluntary standard addressing the risk of injury has been adopted and implemented, that either compliance with the voluntary standard is not likely to result in the elimination or adequate reduction of the risk or injury, or it is unlikely to be substantial compliance with the voluntary standard;

- that the benefits expected from the rule bear a reasonable relationship to its costs; and

- that the rule imposes the least burdensome requirement that prevents or adequately reduces the risk of injury.

15 U.S.C. 2058(f)(1), (f)(3). At the NPR stage, the Commission is making these findings on a preliminary basis to allow the public to comment on the findings.

    A.    *Degree and Nature of the Risk of Injury*

Operating cords on custom window coverings present a strangulation hazard, including death and serious injury, to children 8 years old and younger. If children can access a window covering cord, children can wrap the cord around their neck, or insert their head into a loop formed by the cord and strangle. Strangulation can lead to serious injuries with permanent debilitating outcomes or death. If sustained lateral pressure occurs at a level resulting in vascular occlusion, strangulation can occur when a child's head or neck becomes entangled in any position, even in situations where the child's body is fully or partially supported.

Strangulation deaths and injuries on window covering cords are a "hidden hazard" because consumers do not understand or appreciate the hazard, or how quickly and silently strangulation occurs. Because even young children are left unsupervised for a few minutes or

more in a room that is considered safe, such as a bedroom or family room, adult supervision is unlikely to be effective to eliminate or reduce the hazard. Children can wrap the cord around their necks, insert their heads into a cord loop and get injured, or die silently in a few minutes in any room, with or without supervision.

Additionally, safety devices such as cord cleats and tension devices are unlikely to be effective because cord cleats need to be attached on the wall and caregivers must wrap the cord around the cleat each and every time the window covering is raised or lowered. As incident data show, children can still access and become entangled in cords by climbing on furniture. Tension devices also need to be attached on the wall or windowsill, which may not occur due to increased "cost" of compliance and unwillingness to create holes on the wall (which may not be permitted in rental homes); depending on how taut the cord loop is, it can still allow a child's head to enter the opening as observed in the incident data.

A user research study found a lack of awareness on cord entanglement among caregivers, lack of awareness of the speed and mechanism of the injury; difficulty using and installing safety devices as primary reasons for not using them; and inability to recognize the purpose of the safety devices provided with window coverings. Warning labels are not likely to be effective because research demonstrates that consumers are less likely to look for and read safety information about the products that they use frequently and are familiar with. Most of the incident units had the permanent warning label on the product. Even well-designed warning labels will have limited effectiveness in communicating the hazard on this type of product.

Custom window covering cords have a long product life, and it may take consumers several decades to replace these products. Accordingly, every custom product sold with accessible operating cord presents a "hidden hazard" to young children and can remain a hazard

in the household for 20 years. Some consumers may believe that because they either do not have young children living with them or visiting them, inaccessible operating cords on window coverings are not a safety hazard. However, window coverings last a long time, and when homes are sold or new renters move in, the existing window coverings, if they are functional, usually remain installed and could be hazardous to new occupants with young children.

On the other hand, window coverings that comply with the operating cord requirements for stock window covering requirements in section 4.3.1 of ANSI/WCMA-2018 adequately address the strangulation hazard, by not allowing hazardous cords on the product by design, and therefore do not rely on consumer action. One hundred percent of the operating cord incidents involving custom window coverings would have been prevented if the requirements in section 4.3.1 of ANSI/WCMA-2018 were in effect and covered the incident products.

Based on reviews of CPSC databases, we found that a total of 194 reported fatal and nonfatal strangulations on window coverings occurred among children eight years and younger, from January 2009 through December 2020. Nearly 46 percent were fatal incident reports (89 of 194), while the remaining were near-miss nonfatal incidents. Sixteen of the 194 victims required hospitalization, and six survived a hypoxic-ischemic episode or were pulseless and in full cardiac arrest when found, suffered severe neurological sequalae, ranging from loss of memory to a long-term or permanent vegetative state requiring tracheotomy and gastrointestinal tube feeding. One victim who remained hospitalized for 72 days was released from the hospital with 75 percent permanent brain damage and is confined to a bed.

Based on CPSC's Injury Cost Model, we estimated that approximately 185 medically treated nonfatal injuries have occurred annually from 2009 through 2020 involving children eight years and younger. We also estimated that based on a review of National Center for Health

115

Statistics (NCHS) and a separate study of child strangulations, a minimum of nine fatal strangulations related to window covering cords occurred per year in the United States among children under five years old from 2009 – 2019.

  B.  *Number of Consumer Products Subject to the Proposed Rule*

We estimate that approximately 512 million custom window coverings are in use in the United States. Only corded custom window coverings would be subject to the rule, which we estimate to be around 65 percent of custom window coverings. This brings the total number of window coverings that are subject to the rule to approximately 39 million units sold per year.

  C.  *The Public Need for Custom Window Coverings and the Effects of the Proposed Rule on Their Utility, Cost, and Availability*

Consumers commonly use window coverings in their homes to control light coming in through windows and for decoration. ANSI/WCMA-2018 segments the market between stock and custom window coverings. Stock and custom window coverings serve the same purpose, and window covering cords on stock and custom products present the same hazards to children. However, custom window coverings allow consumers to choose a wider variety of specific material, color, operating systems, or sizes, than stock products. Because ANSI/WCMA-2018 effectively addresses operating cords on stock window coverings, and the hazards on custom products are the same, the proposed rule requires custom window coverings to meet the same performance requirements for operating cords as the current operating cord requirements for stock window coverings in ANSI/WCMA-2018.

The Commission does not expect the proposed rule to have a substantial effect on the utility or availability of custom window coverings, and the impact on cost depends on the product type. Custom window coverings that already meet the voluntary standard would continue to serve the purpose of covering windows in consumers' homes. A possible negative

effect could occur with regard to the utility of custom window coverings for those consumers with accessibility issues, or window coverings in hard-to-reach locations, because consumers may need to use a tool to operate the window covering. However, this loss of utility would be mitigated by the availability of existing tools that are already available on the market, and by the ubiquity of remote-controlled operating systems.

Retail prices of custom window coverings vary substantially. The least expensive units for an average size window retail for less than $40, while some more expensive units may retail for several thousand dollars. The lowest cost to comply with the proposed rule determine by CPSC staff was about $2.15 per unit. This per unit cost was for potential modifications to comply with the proposed rule, in cases where CPSC staff was able to estimate the potential cost. Custom window covering prices may increase to reflect the added cost of modifying or redesigning products to comply with the proposed rule. If the costs associated with redesigning or modifying a custom window covering to comply with the standard results in the manufacturer discontinuing that model, there would be some loss in availability of that type.

Prices for custom window coverings are, on average, higher than those for stock products, which are already required to comply with section 4.3.1 of ANSI/WCMA-2018. Although prices of stock window coverings have increased since the revised voluntary standard went into effect in 2018, sales of stock products remain consistent.[41] For custom products that

---

[41] Staff does not have information on detailed sales data to determine the impact of the ANSI/WCMA-2018 on stock products. CPSC contractor (D+R) aimed to identify the share of custom versus stock sales over time to understand how the window covering market has changed in response to the ANSI/WCMA-2018 as the standard primarily impacts stock products. Researchers considered that metal/vinyl blinds, roller shades, vertical blinds, and wood/faux wood blinds are the categories that should be most affected by the standard, given their large share in stock product sales. They assumed that if these categories had an increase in custom sales after 2018, it would indicate that the cordless operation could be one of the factors driving consumers towards purchasing custom products with corded operation, despite the higher price points. However, researchers' projections indicate that there is not a consistent trend towards greater custom sales, and in the case of metal/vinyl blinds, there is an increasing share of stock sales over time.

already have higher prices, consumers may be willing to pay more for a safer window covering without affecting sales, similar to stock window coverings.

D.    *Other Means to Achieve the Objective of the Proposed Rule, While Minimizing Adverse Effects on Competition and Manufacturing*

The Commission considered alternatives to achieving the objective of the rule of reducing unreasonable risks of injury and death associated with operating cords on custom window coverings. For example, the Commission considered relying on compliance with the voluntary standard, and education campaigns, rather than issuing a mandatory rule for operating cords on custom window coverings. Because this is the approach CPSC has relied on, to date, this alternative would have minimal costs; however, it is unlikely to further reduce the risk of injury from operating cords on custom window coverings.

Similarly, the Commission also considered narrowing the scope of the rule to address only the hazards associated with operating cords on custom vertical blinds, curtains, and drapes, because cords are not critical to the operation of these products. Narrowing the proposed rule to these three product types would lessen the cost impact and make it unlikely that any particular product type and/or size would be eliminated, and costs would be near $0 because using plastic rods for operation is very similar to cords in cost. However, only 2 of the 35 custom product incidents (both are fatalities) were associated with vertical blinds, and there were no curtain or drape incidents where the stock/custom classification could be determined. This option would not result in an effective reduction in injuries and deaths.

Another alternative the Commission considered was providing a longer effective date. This may reduce the costs of the rule by spreading costs over a longer period, but it would also delay the benefits of the rule, in the form of reduced deaths and injuries.

*E.      Unreasonable Risk*

Based on CPSC's Injury Cost Model, about 185 medically treated nonfatal injuries have occurred annually from 2009 through 2020, involving children eight years and younger.  Based on a review of National Center for Health Statistics (NCHS) and a separate study of child strangulations, a minimum of nine fatal strangulations related to window covering cords occurred per year in the United States among children under five years old from 2009 – 2019.  Based on reviews of CPSC databases, we found that a total of 194 reported fatal and nonfatal strangulations on window coverings occurred among children eight years and younger, from January 2009 through December 2020.  Nearly 46 percent were fatal incident reports (89 of 194), while the remaining were near-miss nonfatal incidents.

The Commission estimates that the rule would result in aggregate benefits of about $49.5 million annually.  Of the potential modifications for which staff was able to estimate the potential cost, the lowest costs were about $2.15 per unit.  Effective performance requirements for operating cords on window coverings are well known and already utilized for lower-priced stock window coverings.  Technologies to address hazardous window covering cords are also known and utilized on stock products.  Moreover, the proposed rule is unlikely to have a large impact on the utility and availability of custom window coverings, but may have an impact on cost, depending on the design of the window covering.

The determination of whether a consumer product safety rule is reasonably necessary to reduce an unreasonable risk of injury involves balancing the degree and nature of the risk of injury addressed by the rule against the probable effect of the rule on the utility, cost, or availability of the product.  The Commission does not expect the proposed rule to have a substantial effect on the utility or availability of custom window coverings.  The rule may impact

119

the cost of custom window coverings, but consumers already pay more for custom window coverings, and are likely willing to pay more for safer products.

Weighing the possibility of increased costs for custom window coverings with the continuing deaths and injuries to young children, the Commission concludes preliminarily that custom window coverings with hazardous operating cords pose an unreasonable risk of injury and death and finds that the proposed rule is reasonably necessary to reduce that unreasonable risk of injury and death.

The proposed rule would apply the same requirements to custom window coverings that already apply to stock products. The requirements to address the hazard and the available technologies are widely known and already utilized on the least expensive products. Despite this fact, custom products remain corded, and deaths and injuries to young children on window covering cords continues. As reviewed in XIII.A, consumers do not appreciate the risk of strangulation, or how quickly deaths and injuries occur, even when children are supervised, and custom products can remain in consumer's homes for decades. Due to the ongoing fatal and nonfatal incidents associated with window covering cords, high severity of the outcomes (death and disability to children), proven technical feasibility of cordless products, the implementation of stronger operating cord requirements for stock window coverings already on the market, and the ineffectiveness of warnings and safety devices for this class of products, the Commission proposes to regulate operating cords on custom window coverings.

*F.  Public Interest*

This proposed rule is intended to address an unreasonable risk of injury and death posed by hazardous operating cords on custom window coverings. The Commission believes that adherence to the requirements of the proposed rule will significantly reduce or eliminate a hidden

hazard, strangulation deaths and injuries to children 8 years old and younger, in the future; thus, the rule is in the public interest.

G.       *Voluntary Standards*

The Commission is aware of one national voluntary standard, ANSI/WCMA-2018, and European, Australian, and Canadian standards.  Among these, the Commission considers the Canadian standard to be the most stringent because it applies to all window coverings.  ANSI/WCMA-2018 contains adequate performance requirements to address the risk of strangulation on for inner cords for both stock and custom window coverings and contains adequate requirements to address the risk of injury on operating cords for stock products.  The Commission also believes that custom window coverings substantially comply with the voluntary standard.  However, the Commission does not consider the operating cord requirements for custom window coverings in the standard adequate to address the risk of injury, because the voluntary standard still allows accessible and hazardous operating cords to be present on custom products.

H.       *Relationship of Benefits to Costs*

The aggregate benefits of the rule are estimated to be about $49.5 million annually; and the lowest cost of the rule is estimated to be about $156.5 million annually.  Some recent studies have suggested that the VSL for children could be higher than that for adults.  In other words, consumers might be willing to pay more to reduce the risk of premature death of children than to reduce the risk of premature death of adults.  A review of the literature conducted for the CPSC suggested that the VSL for children could exceed that of adults by a factor of 1.2 to 3, with a midpoint of around 2 (IEc, 2018).  This analysis included other uncertainties, such as cost estimate calculations, the number of corded window coverings in use, and the expected product life for certain blind types.  The cost studies from which staff derived all of the cost estimates

could be outdated, given the first study was completed in 2016, about 2 years before WCMA revised the voluntary standard for stock products. Economies of scale could have reduced costs related to cordless components since the completion of the first cost study in 2016. Additionally, the assumption used to create the estimate of corded products in the market is based on interviews with manufacturers and retailers, some of whom gave conflicting accounts.[42] Finally, the estimated product life used in the analysis for vinyl and metal horizontal blinds was significantly shorter than for the other products. This analysis was based on work completed by D+R for the Department of Energy (2013). However, this estimate may be skewed because of the dominance of stock window coverings in this category. Custom window coverings have a longer product life. For example, WCMA stated in their response to the ANPR that the expected product life for a custom window covering is 10 years and is 3-5 years for a stock window covering. CPSC staff expects a higher per-unit benefit for custom products because of the longer expected product life.

In this case, the cost of certain custom window coverings may increase if redesigned to meet the requirements in the proposed rule. However, effective performance requirements for operating cords on window coverings are well known and already utilized for lower-priced stock window coverings. Moreover, technologies to address hazardous window covering cords are also known and utilized on stock products. Finally, consumers are likely willing to pay more for a custom window covering that eliminates the strangulation risk to children.

Based on this analysis, the Commission preliminarily finds that the benefits expected from the rule bear a reasonable relationship to the anticipated costs of the rule.

---

[42] For example, one small retailer CPSC staff contacted provided an account that stated demand and sales of corded products have increased in the past two years, which is in conflict with multiple accounts from manufacturers and other larger retailers.

*I.        Least Burdensome Requirement That Would Adequately Reduce the Risk of Injury*

The Commission considered less-burdensome alternatives to the proposed rule, detailed in section V.C of this preamble, but preliminarily concludes that none of these alternatives would adequately reduce the risk of injury.

The Commission considered relying on voluntary recalls, compliance with the voluntary standard, and education campaigns, rather than issuing a mandatory standard.  These alternatives would have minimal costs but would be unlikely to reduce the risk of injury from custom window coverings that contain hazardous cords.

The Commission considered issuing a standard that applies only to a certain type of window covering such as vertical blinds.  This would impose lower costs on manufacturers but is unlikely to adequately reduce the risk of injury because it would only address incidents associated with those types.  Based on the custom product incident data, only 5.7 percent of the incidents involved vertical blinds and 22.7 percent involved faux wood/wood blinds.

The Commission considered providing a longer effective date for the final rule.  This option may reduce the costs of the rule by spreading costs over a longer period, but it would also delay the benefits of the rule, in the form of reducing the effectiveness of the final rule during the period of delay.

**XIV.    Request for Comments**

The Commission invites interested persons to submit their comments to the Commission on any aspect of the proposed rule.  Additionally, the Commission seeks comment on the following topics:

A.        The scope of the standard for custom window coverings, whether certain products should be included or excluded;

B.  Whether the ANSI/WCMA–2018 standard is adequate to address the strangulation risk associated with custom window coverings;

C.  Whether the rigid cord shroud requirements are adequate;

D.  Whether cord or bead chain restraining devices should be allowed for custom products that contains continuous loop operating system;

E.  Whether single retractable cord lift systems should be allowed for custom products and whether maximum exposed cord length and a minimum pull force for a single retractable cord lift system can address the strangulation hazard;

F.  The effect on component costs for custom products based on the requirement for stock products to comply with the voluntary standard since 2018;

G.  Whether button or coin cell battery enclosures in a remote control to operate a custom window covering should be included in the rulemaking, related to the hazards of swallowing small batteries;

H.  Whether to include a warning label that alerts consumers that if a hazardous cord becomes present due to broken window covering, they should remove the product from use.

Submit comments as provided in the instructions in the ADDRESSES section at the beginning of this notice.

## XV. Promulgation of a Final Rule

Section 9(d)(1) of the CPSA requires the Commission to promulgate a final consumer product safety rule within 60 days of publishing a proposed rule. 15 U.S.C. 2058(d)(1). Otherwise, the Commission must withdraw the proposed rule if it determines that the rule is not reasonably necessary to eliminate or reduce an unreasonable risk of injury associated with the

product or is not in the public interest. *Id.* However, the Commission can extend the 60-day period, for good cause shown, if it publishes the reasons for doing so in the *Federal Register. Id.*

The Commission finds that there is good cause to extend the 60-day period for this rulemaking. Under both the Administrative Procedure Act and the CPSA, the Commission must provide an opportunity for interested parties to submit written comments on a proposed rule. 5 U.S.C. 553; 15 U.S.C. 2058(d)(2). The Commission typically provides 75 days for interested parties to submit written comments. In this case, a shorter comment period may limit the quality and utility of information CPSC receives in comments, particularly for areas where it seeks data and other detailed information that may take time for commenters to compile. Additionally, the CPSA requires the Commission to provide interested parties with an opportunity to make oral presentations of data, views, or arguments. 15 U.S.C. 2058. This requires time for the Commission to arrange a public meeting for this purpose and provide notice to interested parties in advance of that meeting. After receiving written and oral comments, CPSC staff must have time to review and evaluate those comments.

These factors make it impractical for the Commission to issue a final rule within 60 days of this proposed rule. Moreover, issuing a final rule within 60 days of the NPR may limit commenters' ability to provide useful input on the rule, and CPSC's ability to evaluate and take that information into consideration in developing a final rule. Accordingly, the Commission finds that there is good cause to extend the 60-day period.

**List of Subjects**

**16 CFR Part 1112**

Administrative practice and procedure, Audit, Consumer protection, Reporting and recordkeeping requirements, Third-party conformity assessment body.

**16 CFR Part 1260**

Consumer protection, Imports, Incorporation by reference, Administrative practice and procedure, Window Coverings, Cords, Infants and children.

For the reasons discussed in the preamble, the Commission proposes to amend Title 16 of the Code of Federal Regulations as follows:

**PART 1112—REQUIREMENTS PERTAINING TO THIRD PARTY CONFORMITY ASSESSMENT BODIES**

1. The authority citation for part 1112 continues to read as follows:

**Authority:** Pub. L. 110-314, section 3, 122 Stat. 3016, 3017 (2008); 15 U.S.C. 2063.

2. Amend § 1112.15 by adding paragraph (b)(53) to read as follows:

**§ 1112.15  When can a third party conformity assessment body apply for CPSC acceptance for a particular CPSC rule or test method?**

\*     \*     \*     \*     \*

(b) \* \* \*

(53) 16 CFR part 1260, Safety Standard for Operating Cords on Custom Window Coverings.

\*     \*     \*     \*     \*

3. Add part 1260 to read as follows:

## PART 1260 – SAFETY STANDARD FOR OPERATING CORDS ON CUSTOM WINDOW COVERINGS

Sec.

1260.1  Scope and definitions.

1260.2  Requirements.

1260.3  Prohibited stockpiling.

1260.4  Findings.

Authority: 15 U.S.C. 2056, 15 U.S.C. 2058, and 5 U.S.C. 553.

### § 1260.1  Scope and definitions.

(a)  This part establishes a consumer product safety standard for operating cords on custom window coverings.

(b)  This consumer product safety standard relies on the following definitions in section 3 of ANSI/WCMA A100.1 – 2018, American National Standard for Safety of Corded Window Covering Products (approved on January 8, 2018) (ANSI/WCMA A100.1 – 2018):

*(1) Custom window covering* (Custom blinds, shades, and shadings) as defined in section 3, definition 5.01, of ANSI/WCMA A100.1 – 2018.

*(2) Stock window covering* (Stock blinds, shades, and shadings) as defined in section 3, definition 5.02, of ANSI/WCMA A100.1 – 2018.

*(3) Operating cord* as defined in section 3, definition 2.19, of ANSI/WCMA A100.1 – 2018.

*(4) Cord shroud* as defined in section 3, definition 2.09, of ANSI/WCMA A100.1 – 2018.

(c)  *Rigid Cord Shroud* is a cord shroud that is constructed of inflexible material to prevent a child from accessing a window covering cord.

## § 1260.2  Requirements.

(a) *Requirements for operating cords*.  Each operating cord on a custom window covering shall comply with section 4.3.1, instead of section 4.3.2, of ANSI/WCMA A100.1 – 2018.

(b) *Incorporation by reference*.  The Director of the Federal Register approves the incorporation by reference in sections 1260.1(b) and 1260.2(a), in accordance with 5 U.S.C. 552(a) and 1 CFR part 51.  A free, read-only copy of ANSI/WCMA A100.1 – 2018 is available for viewing on the Window Covering Manufacturers Association website at http://www.wcmanet.com/pdf/WCMA-A100.1-2018_view-only_v2.pdf.  You may inspect a copy at the Division of the Secretariat, U.S. Consumer Product Safety Commission, 4330 East West Highway, Bethesda, MD 20814, telephone (301) 504-7479, email: cpsc-os@cpsc.gov, or at the National Archives and Records Administration (NARA).  For information on the availability of this material at NARA, email fr.inspection@nara.gov, or go to: https://www.archives.gov/federal-register/cfr/ibr-locations.html. You may also obtain a copy from Window Covering Manufacturers Association, Inc., 355 Lexington Avenue, New York, New York, 10017, telephone: 212.297.2122, http://wcmanet.com or purchase the standard for download at: https://webstore.ansi.org/Standards/WCMA/ANSIWCMAA1002018.

(c) *Requirements for rigid cord shrouds*.  If a custom window covering complies with paragraph (a) by using a rigid cord shroud to make an operating cord inaccessible, the rigid cord shroud shall not have an accessible cord when tested for cord accessibility using the test methods defined in paragraphs (d) and (e).

(d) *Test methods for rigid cord shrouds*: *Center load test*.  (1) Support each end of the rigid cord shroud, but do not restrict the rotation along the axial direction.  Supports must be within 0.25 inches from the ends of the shroud as shown in Figure 1.



**Figure 1. Rigid Cord Shroud Test Set-up.**

(2) Apply a 5-pound force at the center of the rigid cord shroud for at least 5 seconds as shown in Figure 2.

(3) Measure the maximum deflection of the shroud, while the 5-pound force is applied.

(4) For rigid cord shrouds that are ≤ 19 inches, the deflection shall not exceed 1 inch. For every additional 19 inches in shroud length, the shroud can deflect an additional inch. See Figure 2.



**Figure 2. Rigid Cord Shroud Center Load Test and Deflection Measurement.**

(5) While continuing to apply the 5-pound force, determine if the cord(s) can be contacted by the cord shroud accessibility test probe shown in Figure 3. If the cord shroud accessibility test probe can touch any cord, the cord(s) are considered accessible.



**Figure 3. Cord Shroud Accessibility Test Probe**

(e) *Test methods for rigid cord shrouds: Axial torque test.* (1) Mount one end of the rigid cord shroud and restrict the rotation along the axial direction.

(2) Apply a 4.4 in-lb. (0.5Nm) torque along the other end of the rigid cord shroud for 5 seconds.

(3) While continuing to apply the torque, determine if the cord(s) can be contacted by the cord shroud accessibility test probe shown in figure 3. If the cord shroud accessibility test probe can touch any cord, the cord(s) are considered accessible.

**1260.3 Prohibited stockpiling.**

(a) *Prohibited acts.* Manufacturers and importers of custom window coverings shall not manufacture or import custom window coverings that do not comply with the requirements of this part in any 12-month period between [date of promulgation of the rule] and [effective date of the rule] at a rate that is greater than 120 percent of the rate at which they manufactured or imported custom window coverings during the *base period* for the manufacturer.

(b) *Base period.* The base period for custom window coverings is any period of 365 consecutive dates, chosen by the manufacturer or importer, in the 5-year period immediately preceding the promulgation of the final rule.

**1260.4 Findings.**

(a) *General*. Section 9(f) of the Consumer Product Safety Act (15 U.S.C. 2058(f)) requires the Commission to make findings concerning the following topics and to include the findings in the rule. Because the findings are required to be published in the rule, they reflect the information that was available to the Consumer Product Safety Commission (Commission, CPSC) when the standard was issued on [insert final rule publication date].

*(b) Degree and Nature of the Risk of Injury.* (1) Operating cords on custom window coverings present a strangulation hazard, including death and serious injury, to children 8 years old and younger. If children can access a window covering cord, children can wrap the cord around their neck, or insert their head into a loop formed by the cord and strangle. Strangulation can lead to serious injuries with permanent debilitating outcomes or death. If sustained lateral pressure occurs at a level resulting in vascular occlusion, strangulation can occur when a child's head or neck becomes entangled in any position, even in situations where the child's body is fully or partially supported.

(2) Strangulation deaths and injuries on window covering cords are a "hidden hazard" because consumers do not understand or appreciate the hazard, or how quickly and silently strangulation occurs. Because even young children are left unsupervised for a few minutes or more in a room that is considered safe, such as a bedroom or family room, parental supervision is unlikely to be effective to eliminate or reduce the hazard. Children can wrap the cord around their necks, insert their heads into a cord loop and get injured, or die silently in a few minutes in any room, with or without supervision.

(3) Additionally, safety devices, such as cord cleats and tension devices, are unlikely to be effective because cord cleats need to be attached on the wall and caregivers must wrap the cord

131

around the cleat each and every time the window covering is raised or lowered. As incident data show, children can still access and become entangled in cords by climbing on furniture. Tension devices also need to be attached on the wall or windowsill, which may not occur due to increased "cost" of compliance and unwillingness to create holes on the wall (or may not be permitted in rental homes); depending on how taut the cord loop is, it can still allow a child's head to enter the opening as observed in the incident data.

(4) A user research study found a lack of awareness on cord entanglement among caregivers, lack of awareness of the speed and mechanism of the injury; difficulty using and installing safety devices as primary reasons for not using them; and inability to recognize the purpose of the safety devices provided with window coverings. Warning labels are not likely to be effective because research demonstrates that consumers are less likely to look for and read safety information about the products that they use frequently and are familiar with. Most of the incident units had the permanent warning label on the product. Even well-designed warning labels will have limited effectiveness in communicating the hazard on this type of product.

(5) Custom window covering cords have a long product life, and it may take consumers several decades to replace these products. Accordingly, every custom product sold with accessible operating cord presents a "hidden hazard" to young children and can remain a hazard in the household for 20 years. Some consumers may believe that because they either do not have young children living with them or visiting them, inaccessible operating cords on window coverings is not a safety hazard. However, window coverings last a long time, and when homes are sold or new renters move in, the existing window coverings, if they are functional, usually remain installed and could be hazardous to new occupants with young children.

132

(6) On the other hand, window coverings that comply with the operating cord requirements for stock window covering requirements in section 4.3.1 of ANSI/WCMA-2018 adequately address the strangulation hazard, by not allowing hazardous cords on the product by design, and therefore do not rely on consumer action. One hundred percent of the operating cord incidents involving custom window coverings would have been prevented if the requirements in section 4.3.1 of ANSI/WCMA-2018 were in effect and covered the incident products.

(7) Based on reviews of CPSC databases, we found that a total of 194 reported fatal and nonfatal strangulations on window coverings occurred among children eight years and younger, from January 2009 through December 2020. Nearly 46 percent were fatal incident reports (89 of 194), while the remaining were near-miss nonfatal incidents. Sixteen of the 194 victims required hospitalization, and six survived a hypoxic-ischemic episode or were pulseless and in full cardiac arrest when found, suffered severe neurological sequalae, ranging from loss of memory to a long-term or permanent vegetative state requiring tracheotomy and gastrointestinal tube feeding. One victim who remained hospitalized for 72 days was released from the hospital with 75 percent permanent brain damage and is confined to a bed.

(8) Based on CPSC's Injury Cost Model, we estimated that approximately 185 medically treated nonfatal injuries have occurred annually from 2009 through 2020 involving children eight years and younger. We also estimated that based on a review of National Center for Health Statistics (NCHS) and a separate study of child strangulations, a minimum of nine fatal strangulations related to window covering cords occurred per year in the United States among children under five years old from 2009 – 2019.

(c) *Number of Consumer Products Subject to the Proposed Rule.* We estimate that approximately 512 million custom window coverings are in use in the United States. Only

133

corded custom window coverings would be subject to the rule, which we estimate to be around 65 percent of custom window coverings. This brings the total number of window coverings that are subject to the rule to approximately 39 million units per year.

(d) *The Public Need for Custom Window Coverings and the Effects of the Proposed Rule on Their Utility, Cost, and Availability*. (1) Consumers commonly use window coverings in their homes to control light coming in through windows and for decoration. ANSI/WCMA-2018 segments the market between stock and custom window coverings. Stock and custom window coverings serve the same purpose, and window covering cords on stock and custom products present the same hazards to children. However, custom window coverings allow consumers to choose a wider variety of specific material, color, operating systems, or sizes, than stock products. Because ANSI/WCMA-2018 effectively addresses operating cords on stock window coverings, and the hazards on custom products are the same, the proposed rule requires custom window coverings to meet the same performance requirements for operating cords as the current operating cord requirements for stock window coverings in ANSI/WCMA-2018.

(2) The Commission does not expect the proposed rule to have a substantial effect on the utility or availability of custom window coverings, and the impact on cost depends on the product type. Custom window coverings that already meet the voluntary standard would continue to serve the purpose of covering windows in consumers' homes. A possible negative effect could occur regarding the utility of custom window coverings for those consumers with accessibility issues, or window coverings in hard-to-reach locations, because consumers may need to use a tool to operate the window covering. However, this loss of utility would be mitigated by the availability of existing tools that are already available on the market, and by the ubiquity of remote-controlled operating systems.

(3) Retail prices of custom window coverings vary substantially. The least expensive units for an average size window retail for less than $40, while some more expensive units may retail for several thousand dollars. The lowest cost to comply with the proposed rule determine by CPSC staff was about $2.15 per unit. This per unit cost was for potential modifications to comply with the proposed rule, in cases where CPSC staff was able to estimate the potential cost. Custom window covering prices may increase to reflect the added cost of modifying or redesigning products to comply with the proposed rule. If the costs associated with redesigning or modifying a custom window covering to comply with the standard results in the manufacturer discontinuing that model, there would be some loss in availability of that type.

(4) Prices for custom window coverings are, on average, higher than those for stock products, which are already required to comply with section 4.3.1 of ANSI/WCMA-2018. Although prices of stock window coverings have increased since the revised voluntary standard went into effect in 2018, sales of stock products remain consistent.[43] For custom products that already have higher prices, consumers may be willing to pay more for a safer window covering without affecting sales, similar to stock window coverings.

(e) *Other Means to Achieve the Objective of the Proposed Rule, While Minimizing Adverse Effects on Competition and Manufacturing.* (1) The Commission considered alternatives to achieving the objective of the rule of reducing unreasonable risks of injury and death associated

---

[43] Staff does not have information on detailed sales data to determine the impact of the ANSI/WCMA-2018 on stock products. CPSC contractor (D+R) aimed to identify the share of custom versus stock sales over time to understand how the window covering market has changed in response to the ANSI/WCMA-2018 as the standard primarily impacts stock products. Researchers considered that metal/vinyl blinds, roller shades, vertical blinds, and wood/faux wood blinds are the categories that should be most affected by the standard, given their large share in stock product sales. They assumed that if these categories had an increase in custom sales after 2018, it would indicate that the cordless operation could be one of the factors driving consumers towards purchasing custom products with corded operation, despite the higher price points. However, researchers' projections indicate that there is not a consistent trend towards greater custom sales, and in the case of metal/vinyl blinds, there is an increasing share of stock sales over time.

with operating cords on custom window coverings. For example, the Commission considered relying on compliance with the voluntary standard, and education campaigns, rather than issuing a mandatory rule for operating cords on custom window coverings. Because this is the approach CPSC has relied on, to date, this alternative would have minimal costs; however, it is unlikely to further reduce the risk of injury from operating cords on custom window coverings.

(2) Similarly, the Commission also considered narrowing the scope of the rule to address only the hazards associated with operating cords on custom vertical blinds, curtains, and drapes, because cords are not critical to the operation of these products. Narrowing the proposed rule to these three product types would lessen the cost impact and make it unlikely that any particular product type and/or size would be eliminated, and costs would be near $0 because using plastic rods for operation is very similar to cords in cost. However, only 2 of the 35 custom product incidents (both are fatalities) were associated with vertical blinds, and there were no curtain or drape incidents where the stock/custom classification could be determined. This option would not result in an effective reduction in injuries and deaths.

(3) Another alternative the Commission considered was providing a longer effective date. This may reduce the costs of the rule by spreading costs over a longer period, but it would also delay the benefits of the rule, in the form of reduced deaths and injuries.

(f) *Unreasonable Risk.* (1) Based on CPSC's Injury Cost Model, about 185 medically treated nonfatal injuries have occurred annually from 2009 through 2020, involving children eight years and younger. Based on a review of National Center for Health Statistics (NCHS) and a separate study of child strangulations, a minimum of nine fatal strangulations related to window covering cords occurred per year in the United States among children under five years old from 2009 – 2019. Based on reviews of CPSC databases, we found that a total of 194

136

reported fatal and nonfatal strangulations on window coverings occurred among children eight years and younger, from January 2009 through December 2020. Nearly 46 percent were fatal incident reports (89 of 194), while the remaining were near-miss nonfatal incidents.

(2) The Commission estimates that the rule would result in aggregate benefits of about $49.5 million annually. Of the potential modifications for which staff was able to estimate the potential cost, the lowest costs were about $2.15 per unit. Effective performance requirements for operating cords on window coverings are well known and already utilized for lower-priced stock window coverings. Technologies to address hazardous window covering cords are also known and utilized on stock products. Moreover, the proposed rule is unlikely to have a large impact on the utility and availability of custom window coverings, but may have an impact on cost, depending on the design of the window covering.

(3) The determination of whether a consumer product safety rule is reasonably necessary to reduce an unreasonable risk of injury involves balancing the degree and nature of the risk of injury addressed by the rule against the probable effect of the rule on the utility, cost, or availability of the product. The Commission does not expect the proposed rule to have a substantial effect on the utility or availability of custom window coverings. The rule may impact the cost of custom window coverings, but consumers already pay more for custom window coverings, and are likely willing to pay more for safer products.

(4) Weighing the possibility of increased costs for custom window coverings with the continuing deaths and injuries to young children, the Commission concludes that custom window coverings with hazardous operating cords pose an unreasonable risk of injury and death and finds that the proposed rule is reasonably necessary to reduce that unreasonable risk of injury and death.

(5) The proposed rule would apply the same requirements to custom window coverings that already apply to stock products. The requirements to address the hazard and the available technologies are widely known and already utilized on the least expensive products. Despite this fact, custom products remain corded, and deaths and injuries to young children on window covering cords continues. As reviewed in XIII.A, consumers do not appreciate the risk of strangulation, or how quickly deaths and injuries occur, even when children are supervised, and custom products can remain in consumer's homes for decades. Due to the ongoing fatal and nonfatal incidents associated with window covering cords, high severity of the outcomes (death and disability to children), proven technical feasibility of cordless products, the implementation of stronger operating cord requirements for stock window coverings already on the market, and the ineffectiveness of warnings and safety devices for this class of products, the Commission proposes to regulate operating cords on custom window coverings.

(f) *Public Interest.* This proposed rule is intended to address an unreasonable risk of injury and death posed by hazardous operating cords on custom window coverings. The Commission believes that adherence to the requirements of the proposed rule will significantly reduce or eliminate a hidden hazard, strangulation deaths and injuries to children 8 years old and younger, in the future; thus, the rule is in the public interest.

(g) *Voluntary Standards.* The Commission is aware of one national voluntary standard, ANSI/WCMA-2018, and European, Australian, and Canadian standards. Among these, the Commission considers the Canadian standard to be the most stringent because it applies to all window coverings. ANSI/WCMA-2018 contains adequate performance requirements to address the risk of strangulation on for inner cords for both stock and custom window coverings and contains adequate requirements to address the risk of injury on operating cords for stock

138

products.  The Commission also believes that custom window coverings substantially comply with the voluntary standard.  However, the Commission does not consider the operating cord requirements for custom window coverings in the standard adequate to address the risk of injury, because the voluntary standard still allows accessible and hazardous operating cords to be present on custom products.

(h) *Relationship of Benefits to Costs.*  (1) The aggregate benefits of the rule are estimated to be about $49.5 million annually; and the lowest cost of the rule is estimated to be about $156.5 million annually.  Some recent studies have suggested that the VSL for children could be higher than that for adults.  In other words, consumers might be willing to pay more to reduce the risk of premature death of children than to reduce the risk of premature death of adults.  A review of the literature conducted for the CPSC suggested that the VSL for children could exceed that of adults by a factor of 1.2 to 3, with a midpoint of around 2 (IEc, 2018).  This analysis included other uncertainties, such as cost estimate calculations, the number of corded window coverings in use, and the expected product life for certain blind types.

(2) The cost studies from which staff derived all of the cost estimates could be outdated, given the first study was completed in 2016, about 2 years before WCMA revised the voluntary standard for stock products.  Economies of scale could have reduced costs related to cordless components since the completion of the first cost study in 2016.  Additionally, the assumption used to create the estimate of corded products in the market is based on interviews with manufacturers and retailers, some of whom gave conflicting accounts.[44]

---

[44] For example, one small retailer CPSC staff contacted provided an account that stated demand and sales of corded products have increased in the past two years, which is in conflict with multiple accounts from manufacturers and other larger retailers.

(3) Finally, the estimated product life used in the analysis for vinyl and metal horizontal blinds was significantly shorter than for the other products.  This analysis was based on work completed by D+R for the Department of Energy (2013).  However, this estimate may be skewed because of the dominance of stock window coverings in this category.  Custom window coverings have a longer product life.  For example, WCMA stated in their response to the ANPR that the expected product life for a custom window covering is 10 years and is 3-5 years for a stock window covering.  CPSC staff expects a higher per-unit benefit for custom products because of the longer expected product life.

(4) In this case, the cost of certain custom window coverings may increase if redesigned to meet the requirements in the proposed rule.  However, effective performance requirements for operating cords on window coverings are well known and already utilized for lower-priced stock window coverings.  Moreover, technologies to address hazardous window covering cords are also known and utilized on stock products.  Finally, consumers are likely willing to pay more for a custom window covering that eliminates the strangulation risk to children.

(5) Based on this analysis, the Commission finds that the benefits expected from the rule bear a reasonable relationship to the anticipated costs of the rule.

(i)  *Least Burdensome Requirement that Would Adequately Reduce the Risk of Injury.* (1) The Commission considered less-burdensome alternatives to the proposed rule but concludes that none of the considered alternatives would adequately reduce the risk of injury.

(2) The Commission considered relying on voluntary recalls, compliance with the voluntary standard, and education campaigns, rather than issuing a mandatory standard.  These alternatives would have minimal costs but would be unlikely to reduce the risk of injury from custom window coverings that contain hazardous cords.

140

(3) The Commission considered issuing a standard that applies only to a certain type of window covering such as vertical blinds.  This would impose lower costs on manufacturers but is unlikely to adequately reduce the risk of injury because it would only address incidents associated with those types.  Based on the custom product incident data, only 5.7 percent of the incidents involved vertical blinds and 22.7 percent involved faux wood/wood blinds.

(4) The Commission considered providing a longer effective date for the final rule.  This option may reduce the costs of the rule by spreading costs over a longer period, but it would also delay the benefits of the rule, in the form of reducing the effectiveness of the final rule during the period of delay.

Dated: _____

_____
Alberta E. Mills, Secretary
Consumer Product Safety Commission.



# Staff Briefing Package

Draft Notices of Proposed Rulemaking for

Corded Window Coverings

October 6, 2021

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... ii

BRIEFING MEMORANDUM ................................................................................................. iii

I.      INTRODUCTION ........................................................................................................ 4

II.     OPERATING CORDS AND INNER CORDS ON STOCK WINDOW COVERINGS
        AND INNER CORDS ON CUSTOM WINDOW COVERINGS UNDER SECTION
        15(J) OF THE CPSA ................................................................................................. 18

III.    CUSTOM WINDOW COVERINGS UNDER SECTIONS 7 AND 9 OF THE CPSA . 25

IV.     STAFF RECOMMENDATIONS ................................................................................ 35

TAB A: Fatal and Near-Miss Strangulations Associated with Window Covering Cords ............ 38

TAB B: Health Sciences Assessment of Fatal and Nonfatal Incidents Associated with Window
        Coverings NPR .................................................................................................. 56

TAB C: Summary of Recalls – January 2009 through December 2020 ...................................... 65

TAB D: Readily Observable Safety Characteristics of Stock And Custom Window Coverings . 73

TAB E: History of ANSI/WCMA Standard, CPSC Involvement, and Compliance with the
        Standard ............................................................................................................ 89

TAB F: Draft Proposed Rule Under Section 15(J) of The CPSA:  Operating and Inner Cords on
        Stock Window Coverings and Inner Cords on Custom Window Coverings Small
        Business Considerations ..................................................................................... 96

TAB G: Mechanical Engineering Assessment for Custom Window Coverings containing
        Operating Cords ............................................................................................... 101

TAB H: Draft Regulatory Language ......................................................................................... 119

TAB I: Human Factors Considerations for the Proposed Rule on Custom Window Coverings 127

TAB J: Mandatory Safety Standard for Custom Window Coverings: Initial Regulatory
        Flexibility Analysis .......................................................................................... 147

TAB K: Preliminary Regulatory Analysis of the Draft Proposed Rule for Custom Window
        Coverings .......................................................................................................... 156

TAB L: ANPR Comments and Staff Response ......................................................................... 193

THIS DOCUMENT HAS NOT BEEN REVIEWED                          CLEARED FOR PUBLIC RELEASE
OR ACCEPTED BY THE COMMISSION                                UNDER CPSA 6(b)(1)

**BRIEFING MEMORANDUM**

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



Date: October 6, 2021

TO:            The Commission
               Alberta E. Mills, Secretary

THROUGH:       Pamela Stone, Acting General Counsel
               Mary T. Boyle, Executive Director
               DeWane Ray, Deputy Executive Director for Safety Operations

FROM:          Duane E. Boniface, Assistant Executive Director
               Office of Hazard Identification and Reduction

               Rana Balci-Sinha, Ph.D., Project Manager
               Division of Human Factors, Directorate for Engineering Sciences

SUBJECT:       Draft Notice of Proposed Rulemaking for Stock Window Coverings Involving
               Operating and Inner Cords and Custom Window Coverings Involving Inner Cords
               under Section 15(j) of the Consumer Product Safety Act and Draft Notice of
               Proposed Rulemaking for Operating Cords on Custom Window Coverings under
               Sections 7 and 9 of the Consumer Product Safety Act

## I.    INTRODUCTION

In January 2015, the Commission published an advance notice of proposed rulemaking (ANPR)
for corded window covering products to address the associated strangulation hazard. 80 *Fed.
Reg.* 2,327 (Jan. 16, 2015). Subsequently, in 2018, the Window Covering Manufacturers
Association (WCMA) published a revised version of the voluntary standard for window covering
safety, the ANSI/WCMA A100.1 – 2018, American National Standard for Safety of Corded
Window Covering Products.  The 2018 update, originally published in 1996, went into effect on
December 15, 2018. The revised safety standard segments the market for window coverings
between "stock" and "custom" products, and includes requirements for each market segment.

U.S. Consumer Product Safety Commission (CPSC) staff recommends two draft proposed rules
to address strangulation hazards associated with corded window coverings:

- For operating cords and inner cords on "stock" window coverings, and for inner cords on
  "custom" window coverings, a draft notice of proposed rulemaking under Section 15(j)
  of the Consumer Product Safety Act (CPSA), and
- For operating cords on "custom" window coverings, a draft notice of proposed
  rulemaking, pursuant to sections 7 and 9 of the CPSA.

4

THIS DOCUMENT HAS NOT BEEN REVIEWED                    CLEARED FOR PUBLIC RELEASE
OR ACCEPTED BY THE COMMISSION                               UNDER CPSA 6(b)(1)

This briefing package includes:
- a review of the incident data, hazard patterns, injury type, and severity for window covering cords; and
- an examination of recalls associated with corded window coverings.

*For the Section 15(j) rule*:
- "readily observable" safety characteristics and how the voluntary standard addresses them;
- effectiveness of, and compliance with, the voluntary standard; and
- small business considerations.

*For the Sections 7 and 9 rule*:
- adequacy of the current voluntary standard;
- recommended requirements;
- an initial regulatory flexibility analysis that discusses the potential impact of the draft proposed rule on small businesses;
- a preliminary regulatory analysis that discusses the potential benefits and costs of the draft proposed rule requirements, an assessment of relevant voluntary standards and an analysis of alternatives considered;
- responses to public comments on the ANPR.

## A. Description of Window Coverings

Window coverings comprise a wide range of products, including shades, blinds, curtains, and draperies. In general terms, "hard" window coverings, composed of slats or vanes, are considered blinds; and "soft" window coverings that contain a continuous roll of material are considered shades.

Both blinds and shades may have inner cords that distribute forces to cause a motion, such as raising, lowering, or rotating the window covering to achieve the desired level of light control. These inner cords may be operated (opened and closed) by a variety of inputs, including traditional operating cords, motors, or direct-lift of the bottom rail of the product. Curtains and draperies do not contain inner cords, but they may be operated by a continuous loop cord. The cord or loop that is manipulated by the consumer to operate the window covering is called an "operating cord" and may be in the form of a single cord, multiple cords, or continuous loops.

"Cordless" window coverings are products designed to function without an operating cord, but they may contain inner cords.

Examples of window coverings are shown in Figures 1-6. Figure 1 shows a horizontal blind containing inner cords, operating cords, and tilt cords. Figure 2 shows a roll-up shade containing lifting loops and operating cords. Figure 3 shows a cellular shade with inner cords between two layers of fabric and operating cords. Figure 4 shows a vertical blind with a looped operating cord to traverse the blind and a looped bead chain to tilt the vanes. Figure 5 shows a Roman shade with inner cords that run on the back side of the shade and operating cords. Figure 6 is a horizontal blind that is marketed as "cordless" because it has no operating cords; it still has inner cords.

5



Head rail

Tilt cords

Pull cords
ending in
separate tassels

Inner cords

Bottom rail

Figure 1. Horizontal blind

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

A1006

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)





Figure 2. Roll-up shade with lifting loops

Figure 3. Cellular shade with looped operating cord







Figure 4. Vertical blind

Figure 5. Roman shade

Figure 6. Cordless horizontal blind

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

## B. Hazards Associated with Corded Window Coverings

Window coverings, depending on the type of accessible cords, including operating cords (meaning pull cords and continuous loop cords), inner cords, and lifting loops, can pose strangulation hazards to children. Figures 7, 8, and 9 depict the strangulation hazard for different window covering cord types.



Figure 7. (a) Operating pull cords ending in one tassel (left); (b) operating cords tangled, creating a loop (middle); (c) operating cords wrapped around the neck (right)



Figure 8. (a) Inner cords creating a loop (left), (b) Inner cords on the back side of Roman shade (right)



Figure 9. (a) Continuous loop cord (left), (b) Lifting loop on Roll-up Shade (right)

8

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

## C. Incident Data

*Estimated Fatalities and Injuries.* Based on a review of National Center for Health Statistics (NCHS) and a separate study of child strangulations, staff of CPSC's Directorate for Epidemiology, Division of Hazard Analysis (EPHA) estimates that a minimum of 9 fatal strangulations related to window covering cords occurred per year in the United States among children under 5 years old from 2009 through 2019 (Tab A).[1]

Staff also estimates, based on CPSC's Injury Cost Model, that approximately 185 medically treated nonfatal injuries have occurred annually from 2009 through 2020 involving children 8 years and younger (Tab K).[2]

*Reported Fatalities and Injuries.* Based on reviews of CPSC databases, staff found that a total of 194 reported fatal and nonfatal strangulations on window coverings have occurred among children 8 years and younger, from January 2009 through December 2020.[3] Nearly 46 percent were fatal incident reports (89 of 194), while the remaining were near-miss nonfatal incidents. Some of the reported nonfatal incidents involved severe injuries with long-term consequences, such as quadriplegia or permanent brain damage. Where known, stock window coverings accounted for 59 percent of all incidents and 58 percent of the fatal incidents. Similarly, where known, custom window coverings accounted for 41 percent of all incidents and 42 percent of the fatal incidents. However, for 56 percent of the 194 incidents, staff was unable to distinguish whether the incidents involved a stock or custom product. Although the ANSI/WCMA A100.1 – 2018 standard divides the window covering market into stock and custom products, incident scenarios are not based on WCMA's product distinction. Fatal and nonfatal injuries associated with window covering cords do not distinguish between stock and custom products because both types of products essentially have the same hazard patterns.

A review of the 194 incidents reveals that nearly 44 percent involved horizontal blinds; 25 percent of the incidents did not report the window covering type. Roman shades (12 percent), followed by vertical blinds (6 percent), ranked next. Among the fatal incidents, horizontal blinds accounted for 48 percent of deaths, and unknown type of window coverings accounted for 15 percent of the deaths. Vertical blinds (11 percent) and Roman shades (8 percent) ranked next.

Based on the reported scenarios, horizontal blind incidents predominantly involved pull cords. Vertical blind incidents predominantly involved continuous loop cord/beaded-chains, while Roman shade incidents mostly involved the inner cord.

Irrespective of product classification (stock or custom), and product type (*e.g.*, horizontal blind, cellular shade), among the 89 fatal incidents reported from 2009 through 2020, derived from CPSC databases, CPSC staff found that the largest proportion (39 of the 89) of the deaths involved pull cord(s), most frequently with tangled or knotted cord(s), followed by one or more

---

[1] Based on National Center for Health Statistics (NCHS) data and a CPSC study (Marcy et al., 2002)

[2] The ICM uses empirical relationships between the characteristics of injuries (diagnosis and body part) and victims (age and sex) initially treated in hospital EDs and the characteristics of those initially treated in other settings to project the number of medically treated injuries treated outside of hospital Emergency Departments.

[3] We note that the age range for the strangulation fatality estimate is different from the CPSC incident data analysis. This is because the age information available from the NCHS data were in pre-set groups (e.g., 0 – 4 years, 5 – 9 years, etc.), and staff's secondary analysis results3 focused on the 0 – 4 years age group. Accordingly, staff's computed estimates are also limited to ages zero to under five.

9

long cords wrapped around the child's neck. Children getting caught in continuous looped cords or beaded-chains without a functional tension device also figured as a major fatal hazard, accounting for 23 of the 89 fatal strangulations.

## D. Injury Severity and Type

Strangulation due to mechanical compression of the neck is a complex process resulting from multiple mechanisms and pathways that involve both obstruction of the airway passage and occlusion of blood vessels in the neck. Strangulation can lead to serious injuries with permanent debilitating outcomes or death. If sustained lateral pressure occurs at a level resulting in vascular occlusion, strangulation can occur when a child's head or neck becomes entangled in any position, even in situations where the body is fully or partially supported.

Strangulation is a form of asphyxia that can be partial (hypoxia) when there is an inadequate oxygen supply to the lungs, or total, when there is complete impairment of oxygen transport to tissues. A reduction in the delivery of oxygen to tissues can result in permanent, irreversible damage. Experimental studies show that only 2 kg (4.4 lbs.) of pressure on the neck may occlude the jugular vein (Brouardel, 1897); and 3-5 kg (7-11 lbs.) may occlude the common carotid arteries (Brouardel, 1897 and Polson, 1973). Minimal compression of any of these vessels can lead to unconsciousness within 15 seconds and death in 2 to 3 minutes, (Digeronimo and Mayes, 1994; Hoff, 1978; lserson, 1984; Polson, 1973). The vagus nerve is also located in the neck near the jugular vein and carotid artery. The vagus nerve is responsible for maintaining a constant heart rate. Compression of the vagus nerve can result in cardiac arrest due to mechanical stimulation of the carotid sinus-vagal reflex. In addition, the functioning of the carotid sinuses may be affected by compression of the blood vessels. Stimulation of the sinuses can result in a decrease in heart rate, myocardial contractility, cardiac output, and systemic arterial pressure in the absence of airway blockage.

Strangulation proceeding along one or more of these pathways can progress rapidly to anoxia, associated cardiac arrest, and death. As seen in the CPSC data (Wanna-Nakamura, 2014), and in the published literature, neurological damage may range from amnesia to a long-term vegetative state. Continued deterioration of the nervous system can lead to death (Howell and Gully, 1996; Medalia et al., 1991).

Based on the Division of Physiology and Pharmacology (HSPP) staff's review of the incidents (Tab B), 16 of the 194 victims required hospitalization, and six survived a hypoxic-ischemic episode, or were pulseless and in full cardiac arrest when found, suffered severe neurological sequalae, ranging from loss of memory to a long-term or permanent vegetative state requiring tracheotomy and gastrointestinal tube feeding. One victim who remained hospitalized for 72 days was released from the hospital with 75 percent permanent brain damage and is now confined to a bed. Because a preexisting loop acts as noose when a child's neck is inserted, and death can occur within minutes of a child losing footing, HSPP staff concluded that head insertion into a preexisting loop poses a higher risk of injury than when a cord is wrapped around a child's neck; although both scenarios have been demonstrated to be hazardous and have led to fatal outcomes, according to CPSC data.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

## E. ANSI/WCMA Standard and Rulemaking History

Since the mid-1990s, CPSC staff has been working with the Window Covering Manufacturers Association (WCMA), the standard developing organization accredited by the American National Standards Institute (ANSI). The ANSI standard for Safety of Corded Window Covering Products was first published in 1996 and sought to address strangulation incidents created by looped cords (Figure 7a). In August 2002, the published ANSI standard required inner cord stops to reduce the risk associated with inner cord (Figure 8a). The standard was revised in 2007, 2009, 2010, 2012, and 2014 to include requirements associated with tension devices to partially limit the consumer's ability to control the blind if the tension device is not properly installed; Roman shade inner cords (Figure 8b); durability and performance testing of tension devices; warning label and pictograms on the outside of stock packaging and merchandising materials; expanded testing for cord accessibility, hazardous loop testing, roll-up style shade performance, and durability of all safety devices.

The Commission granted a petition on October 8, 2014, and instructed staff to begin rulemaking to address the strangulation hazard associated with window covering cords.[4] The petitioners requested a rule to: (a) prohibit any window covering cords, where a feasible cordless alternative exists; and (b) for those instances where a feasible cordless alternative does not exist, require that all cords be made inaccessible through the use of passive guarding devices. On January 9, 2015, the Commission voted to approve publication in the *Federal Register* of the ANPR for corded window coverings, with changes. The Commission published the ANPR for corded window covering products on January 16, 2015 (80 *Fed. Reg.* 2,327). The ANPR initiated a rulemaking proceeding under the Consumer Product Safety Act (CPSA). CPSC invited comments concerning the risk of injury associated with corded window coverings, the regulatory alternatives discussed in the notice, the costs to achieve each regulatory alternative, the effect of each alternative on the safety, cost, utility, and availability of window coverings, and other possible ways to address the risk of strangulation posed to young children by window covering cords. We also invited interested persons to submit an existing standard or a statement of intent to modify or develop a voluntary standard to address the risk of injury.

ANSI published a revision to the window coverings standard, ANSI/WCMA A100.1-2018, on January 8, 2018. WCMA updated the 2018 version in May 2018 to include various definitions that were balloted and approved but were omitted by mistake in the January version. The standard went into effect on December 15, 2018. The revised safety standard segments the window covering market between stock and custom-made products. Per the standard, stock products are required to have:

     (1) no operating cords, or
     (2) inaccessible cords, or
     (3) short cords (equal to or less than 8 inches).

For custom-ordered window covering products, the products can follow the requirements for stock products, or consumers can purchase corded window coverings. The ANSI/WCMA

---

[4] The petition, CP 13-2, was submitted by Parents for Window Blind Safety, Consumer Federation of America, Consumers Union, Kids in Danger, Public Citizen, U.S. PIRG, Independent Safety Consulting, Safety Behavior Analysis, Inc., and Onder, Shelton, O'Leary & Peterson, LLC.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

A100.1 – 2018 standard also contains revised requirements for custom-ordered products, including:

(1) operating cords to have a default length of 40 percent of the blind height (previously unlimited);
(2) a wand to be the default option for tilting slats (instead of a cord); and
(3) warning labels to depict more graphically the strangulation hazard associated with cords.

The ANSI/WCMA A100.1 – 2018 standard allows consumers to deviate from the default options set forth in (1) and (2). WCMA established a task group to develop requirements for a "rigid cord shroud" that would make operating cords inaccessible for both stock and custom products. The requirement would confirm that a cord shroud makes the cord inaccessible while remaining rigid enough not to pose a strangulation hazard. The task group, including CPSC staff, worked from March through December 2018 to develop draft language for this requirement, but ANSI/WCMA has not balloted the draft requirement yet.

On February 3, 2020, staff sent a letter to WCMA, outlining staff's recommendations for future improvements to the standard, and included a request to reopen the standard and discuss staff's recommendations. Staff reiterated their belief that substantial improvements have been made to the latest version of the standard, particularly in "stock" products; however, expanding the requirements to custom corded window coverings would improve window covering safety. WCMA has not reopened the standard since the 2018 update.

In September 2021, staff sent another letter to WCMA, urging the WCMA to apply stock product requirements in the ANSI/WCMA A100.1 – 2018 standard to custom window coverings as well as balloting the rigid cord shroud language developed and agreed upon by the technical working group.


## F. Definition of "Stock Window Coverings" and "Custom Window Coverings"

The ANSI/WCMA A100.1 – 2018 standard requires "stock" and "custom" window coverings to meet different sets of requirements. Staff's draft proposed rules will use the phrases "stock window coverings" and "custom window coverings," as defined in the ANSI/WCMA A100.1 – 2018 Standard under the definition of "Stock Blinds, Shades, and Shadings," to distinguish the two product types.

A "stock window covering," as defined by ANSI/WCMA, is a completely or substantially fabricated product prior to being distributed in commerce and is a stock-keeping unit (SKU). Even when the seller, manufacturer, or distributor modifies a pre-assembled product, by adjusting to size, attaching the top rail or bottom rail, or tying cords to secure the bottom rail, the product is still considered stock. Online sales of the product, or the size of the order, such as multifamily housing orders, do not make the product a non-stock product. The standard provides these examples to clarify that, as long as the product is "substantially fabricated," subsequent changes to the product do not change its categorization.

Staff uses the term "custom window covering" in the draft proposed rule, as described in the ANSI/WCMA A100.1 – 2018 standard for "Custom Blinds, Shades, and Shadings," which are defined as any window covering that is not classified as a stock window covering.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

## G. Requirements in the ANSI/WCMA Standard

Per the ANSI/WCMA A100.1 – 2018 standard, stock and custom window coverings have the following general requirements for cords:

| Performance Requirements | Stock Products | Custom Products |
|---|---|---|
| No operating cords OR | | Optional |
| Short cord with a length equal to or less than 8 inches in any state (free or under tension) OR | Required | Optional |
| Inaccessible operating cords | | Optional |
| Inner cords that meet Appendix C and D | Required | Required |
| Single Retractable Cord Lift System | Prohibited | Allowed |
| Continuous Loop Operating System | Prohibited | Allowed |
| Accessible Operating Cords longer than 8 inches | Prohibited | Allowed |

## H. International Standards

In Tab G, staff of CPSC's Directorate for Engineering Sciences, Division of Mechanical and Combustion Engineering (ESMC) compared the ANSI/WCMA A100.1 – 2018 standard with international standards consisting of Australia Trade Practices (Consumer Product Safety Standard- Corded internal Window coverings) Regulations 2010 F2010C00801, EN: 13120 Internal blinds- Performance requirements including safety, EN 16433 Internal blinds- Protection from strangulation hazards- test methods, EN 16434 Internal blinds- Protection from strangulation hazards- Requirements and Test methods for safety devices, and Canada Corded Window Coverings Regulations: SOR/2019-97.

Staff concludes that the Canadian regulations are similar to the ANSI/WCMA A100.1 – 2018 standard's stock product requirements; however, the Canadian regulations apply to stock and custom products. Because the requirements apply to all window coverings in the Canadian regulations, CPSC staff concludes that the Canadian standard is more stringent than the ANSI/WCMA A100.1 – 2018 standard.

## I. Adequacy of ANSI/WCMA Standard

Staff of CPSC's Directorate for Engineering Sciences determined that the *stock* product requirements in the ANSI/WCMA A100.1 – 2018 standard are adequate to address the risk of strangulation associated with stock products, as explained below (Tabs G and I):

a) *Operating cords*: The voluntary standard recognizes that long and accessible cords on stock products can pose a strangulation hazard. The standard defines the "operating cord" as the portion of a cord that the user interacts and manipulates to move the window covering in a certain direction (*e.g.*, lifting or lowering, traversing, rotating). If a child wraps a long operating cord around his/her neck, or inserts his/her neck into a loop that can be present by design or occur due to tangled up cords, a child can strangle to death within minutes.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Stock window coverings may comply with the voluntary standard in three ways to address operating cord hazards:

- *No operating cords*: Having no operating cords effectively eliminates the strangulation hazard associated with operating cords because there is no cord to cause strangulation. Consumers use a mechanism other than an operating cord to accomplish the desired movement action on the product (*i.e.*, lifting, lowering, traversing). For example, a spring mechanism on a horizontal blind allows the user to lift and lower the blind via the bottom rail of the window covering.

- *Short cord with a length equal to or less than 8 inches in any state (free or under tension)*: Based on the anthropometric dimensions of youngest children involved in incidents, a static cord length of 8 inches or shorter is not sufficient to strangle a child as the neck circumference of fifth percentile 6-9 month-old children is 8 inches (BSI, 1990 as cited in Norris and Wilson, 1995); a child would need some extra length of cord to hold the cord; thus, the cord would have to be longer than 8 inches to cause strangulation.

- *Inaccessible operating cords determined per the test requirement in Appendix C of the ANSI/WCMA A100.1*: This requirement is tested using a probe that is intended to simulate the finger size of a young child, the diameter of the probe is 0.25 inches, based on fifth percentile 2-3.5-year old's index finger diameter (Snyder et al., 1977) at 0.33 inches and the off-the-shelf availability of a 0.25-inch diameter dowel pin. If the probe cannot touch the cords, the cord is then deemed inaccessible. Having "inaccessible operating cords," by definition, addresses the strangulation hazard by adequately preventing accessibility to the cord, and thus, eliminating the ability for a cord to cause strangulation.

b) *Inner cords*: Inner cords run through the window covering, as shown in Figure 1. The inner cord pulls the bottom rail up when the window covering is raised. Inner cords can pose a strangulation hazard if the child pulls on the inner cord and then places their head in the loop, as shown in Figure 8. The ANSI/WCMA A100.1 – 2018 standard has two testing requirements to confirm the safety of inner cords these apply to both stock and custom window coverings. First, the inner cords are tested for accessibility using a cord accessibility probe. If cords are accessible, then the cord is pulled with a maximum force of 5 pounds, followed by an attempt to insert a head probe into the opening with a force of 10 pounds. If inner cords are inaccessible, or do not allow the head probe to go through the opening, then the inner cord is compliant with the standard. Inner cords that are inaccessible, or inner cord loops that are not large enough to accommodate a child's head, address the strangulation hazard associated with inner cords.

Staff determined that the ANSI/WCMA A100.1 – 2018 standard is inadequate to address the risk of strangulation associated with operating cords on custom window coverings because the standard allows hazardous cords. Custom products can comply with the standard using one of the following methods, all posing strangulation risks:

- *Continuous Loop Operating System*: This operating system requires the operating loop to be kept taut with a tension device. However, as observed in the incident data, a child can

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

still insert his/her head into the continuous loop if the loop is not taut enough; in addition, as explained in Tab I, tension devices may not be attached to the wall, leaving a dangling loop on the product. Staff is aware of Cord or Bead Chain Restraining Devices intended to be integrated into the window covering and do not need to be attached on the wall to keep the loop taut. According to the standard, these devices are required to meet durability, UV stability, and impact testing and must pass the hazardous loop testing procedure to confirm that device prevents the creation of a hazardous loop from an accessible continuous operating cord. Staff is requesting comments on the adequacy of these devices for custom products.

- *Accessible Operating Cords longer than 8 inches*: This requirement allows the cord to be long enough to be wrapped around the neck or multiple cords to be tangled, creating a loop. Even though the latest version of the standard attempts to reduce the risk by shortening the default length of the cord to 40 percent of the window covering length, and by making the tilt wand as the default instead of tilt cords, the risk associated with operating cords remains.

- *Single Retractable Cord Lift System*: This allows a cord to be pulled at any length to operate the window covering and then retracts to a shorter length when the user releases the cord. It is foreseeable that a child can wrap the cord around his/her neck because retractable cord lift systems with the extended cord would be long enough (greater than 8 inches), and a retraction force to sustain that length could be low enough for a child to manipulate and wrap the cord around his/her neck. Staff considers this requirement not adequate as written, because the maximum cord length and a minimum pull force required to operate the system is not specified in the standard. Staff is requesting comments to determine if additional requirements, such as a maximum exposed cord length, and a minimum pull force for a single retractable cord lift system, can address the strangulation hazard.

The ANSI/WCMA A100.1 – 2018 standard contains the same inner cord requirements for stock and custom window covering products; staff determined that the inner cord requirements are adequate to mitigate the strangulation hazard.

## J. Human Factors Concerns

Staff of CPSC's Directorate for Engineering Sciences, Division of Human Factors (ESHF) assessed that, based on incident data review, user study, and human factors literature, the requirements for custom product operating cords in the ANSI/WCMA A100.1 – 2018 standard are inadequate to address the strangulation hazard associated with these cords (Tab I). Operating cord requirements for custom window coverings in the ANSI/WCMA A100.1 – 2018 still allow hazardous operating cords to be part of the window covering. Operating cords can be long enough to fit around the child's neck, or loops can be large enough to allow child's head to enter.

Safety devices, such as cord cleats and tension devices, are unlikely to be effective to address the risk of injury, because cord cleats need to be attached to the wall, and caregivers must wrap the cord around the cleat every time the window covering is raised or lowered. As incident data show, children can still access and entangle in the cords. Tension devices also need to be

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

attached to the wall or window sill, which may not occur due to increased "cost" of compliance (*e.g.*, time and effort) and unwillingness to create holes in the wall (and may not be permissible in rental homes); depending on how taut the cord loop is, the cord loop can still allow a child's head to enter the opening, as observed in the incident data.

A user research study found that caregivers lacked awareness regarding the potential for cord entanglement, lacked awareness of the speed and mechanism of the strangulation injury; stated difficulty using and installing safety devices, among the primary reasons for not using them; and they were unable to recognize the purpose of the safety devices provided with window coverings (Levi et al., 2016).[5]

According to Godfrey et al. (1983), consumers are less likely to look for and read safety information about the products that they frequently use and are familiar with. Consumers are very likely to have high familiarity with window coverings because they almost certainly have window coverings in their homes and probably use them daily. Therefore, even well-designed warning labels will have limited effectiveness in communicating the hazard on this type of product.

CPSC staff concludes that warning labels are unlikely to effectively reduce the strangulation risk from hazardous cords on window coverings, because consumers are not likely to read and follow warning labels on window covering products, and strangulation deaths among children occur quickly and silently, such that parental supervision is insufficient to address the incidents. Indeed, staff observed that most of the incident window covering units had the permanent warning label required by the ANSI/WCMA standard, applicable at the time of manufacture, affixed to the product. Even well-designed warning labels will have limited effectiveness in communicating the hazard on this type of product, because consumers are less likely to heed warnings for familiar products that they commonly interact with without incident. In contrast, stock window covering requirements in the ANSI/WCMA A100.1 – 2018 standard adequately address the strangulation hazard, by not allowing hazardous cords on the product, by design, and do not rely on consumer action to address the risk.

## K. Canadian Regulation and Current Issues

On May 1, 2019, Health Canada published a new Corded Window Coverings Regulations (CWCR) SOR/2019-97 to restrict the length of cords and the size of loops allowed on window coverings sold in Canada.[6] The regulations, made under the Canada Consumer Product Safety Act (CCPSA), limit the length of reachable cords (*i.e.*, the part of the cord that any person can touch when the corded window covering has been installed, whether the window covering is fully opened, fully closed or in any position in between), and the size of loops that can be created by a cord, to help eliminate the risk of strangulation.[7] The regulations require that any cord that can be reached must be too short to wrap around the neck (22 cm or 8.66 inches or shorter) or

---

[5] https://cpsc.gov/s3fs-public/Window%20Coverings%20Safety%20Devices%20Contractor%20Reports.pdf

[6] https://canadagazette.gc.ca/rp-pr/p2/2019/2019-05-01/html/sor-dors97-eng.html

[7] Both the CWCR and ANSIWCMA restrict small parts and lead content.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

too short to form a hazardous loop that can accommodate a child's head (44 cm or 17.32 inches or smaller in perimeter) when subjected to a 35 Newton (7.87 pounds) pull force.

Canadian regulations require that a cord that cannot be reached would have to remain unreachable throughout the useful life of the product, and require a warning on the product, packaging, instructions, and on associated advertisements with instructions to remove the product immediately if those hazards appear. Canadian regulations also require on-product information containing model name or model number, date of manufacture, name and location of manufacturer (and importer where applicable).

On May 1, 2021, the Canadian regulations came into force. Due to the unprecedented circumstances associated with the COVID-19 pandemic, Health Canada issued a notice describing several timelines to comply with the regulation.[8] From May 1, 2021 to April 30, 2022, Health Canada intends to promote awareness of, and compliance with, the CWCR. Health Canada will also be monitoring progress towards compliance. As of May 1, 2022, Health Canada intends to increase its compliance monitoring activities and enforcement action, where necessary, to address identified instances of noncompliance with the CWCR. Health Canada adds that it will enforce the CWCR anytime on or after May 1, 2021, if warranted, for example, based on incidents, complaints, or the level of risk.

Staff is aware that window covering industry members, including U.S.-based firms, have raised concerns about the regulations. In particular, industry has raised concerns about the amount of pull force that is applied to inner cords in the CWCR.[9] Staff notes that the ANSI/WCMA A100.1 – 2018 standard requires a 5-pound pull force to be applied to inner cords; whereas, CWCR requires a 7.87-pound pull force. Industry members are requesting that the CWCR replace the 7.87-pound requirement with the 5-pound requirement to be consistent with the ANSI/WCMA A100.1 – 2018 standard. As explained in Tab I, due to the lack of inner cord incidents that demonstrate the inadequacy of the 5-pound requirement, and the complex action to pull inner cords on cordless window coverings, staff concludes that the pull force of 5-pound appears to be adequate to address the risk of injury. CPSC staff's recommendation for custom products aligns with the current stock product requirements in the ANSI/WCMA A100.1 – 2018 standard.


## L. Recalls

Staff of CPSC's Office of Compliance (EXC) reviewed recalls involving window coverings (Tab C). From January 1, 2009 to December 31, 2020, CPSC conducted 42 consumer-level window covering product recalls, including two re-announcements (Tab C). More than 28 million units[10] were recalled and include: Roman shades, roll-up blinds, roller shades, cellular shades, horizontal blinds, and vertical blinds. The recalled products include stock products, as well as custom products. Recalled products were associated with 14 deaths and 31 near-strangulations.

---

[8] https://www.canada.ca/en/health-canada/services/consumer-product-safety/legislation-guidelines/guidelines-policies/notice-stakeholders-corded-window-coverings.html

[9] https://nationalpost.com/news/canada/health-canadas-confusing-and-unworkable-regulations-spur-bitter-fight-with-window-blind-industry

[10] This estimate does not include the recalled units of Recall No. 10-073. This was an industry-wide recall conducted by members of the Window Covering Safety Council (WCSC). An exact number of recalled products was not stated in the recall announcement.

## II. OPERATING CORDS AND INNER CORDS ON STOCK WINDOW COVERINGS AND INNER CORDS ON CUSTOM WINDOW COVERINGS UNDER SECTION 15(J) OF THE CPSA

Staff recommends that the Commission publish staff's draft proposed rule. The rule would deem the presence of one or more of the readily observable characteristics demonstrating hazardous operating cords on stock window coverings, and hazardous inner cords on stock and custom window coverings, both of which are adequately addressed in the ANSI/WCMA A100.1 – 2018 standard, to be a "substantial product hazard" (SPH), as authorized under section 15(j) of the CPSA.

The readily observable operating cord and inner cord characteristics of stock window coverings and inner cord characteristics of custom window coverings are embodied in the existing voluntary standard, ANSI/WCMA A100.1 – 2018, Standard for Safety of Window Covering Products, approved on January 8, 2018.

The Consumer Product Safety Improvement Act (CPSIA) expanded section 15 of the CPSA, by creating a new subsection (j) that allows the Commission to specify by rule for a consumer product, or class of consumer products, characteristics whose existence or absence the Commission deems present a substantial product hazard, as defined in section 15(a)(2) of the CPSA. To deem the presence or absence of characteristics an SPH:

- the characteristics must be "readily observable";
- the characteristics must be addressed by a voluntary standard;
- the voluntary standard must be effective at reducing the risk of injury; and
- there must be substantial compliance with the voluntary standard.

The latest version of the ANSI/WCMA standard significantly improved the safety of stock window coverings by practically eliminating hazardous operating cords. The standard also improved the safety of stock and custom products by adequately reducing the inner cord hazard. Staff's market study demonstrated a high level of product compliance with the voluntary standard. Accordingly, CPSC staff concludes that all of the criteria required for including stock window coverings that contain the readily observable hazardous operating and inner cords, which have been adequately addressed by ANSI/WCMA, have been met and therefore, should be included on the SPH list under section 15(j) of the CPSA. In addition, CPSC staff concludes that the criteria required to include hazardous inner cords on custom window coverings on the 15(j) list of SPHs, because hazardous inner cords are readily observable and have been adequately addressed in the ANSI/WCMA standard.

### A. Proposed Definition of Stock and Custom Window Covering Products

Staff proposes that the definition of "stock window covering products," for purposes of the draft proposed 15(j) rule, be consistent with the description of "Stock Blinds, Shades, and Shadings" defined in section 3 of the ANSI/WCMA A100.1 – 2018 standard. As explained above in section I.F., the standard defines "Custom Blinds, Shades, and Shadings" as any window covering that is not classified as a stock window covering as stated in Section 3, Definition 5.01 of the ANSI/WCMA A100.1 – 2018 standard. For the draft proposed rule for custom window covering

18

products, staff will reference the same definition used in the ANSI/WCMA A100.1 – 2018 standard.

**B. Substantial Product Hazards Associated with Window Covering Products**

Section 15(a)(2) of the CPSA defines an SPH, in relevant part, as a product defect, which (because of the pattern of defect, the number of defective products distributed in commerce, the severity of the risk, or otherwise) creates a substantial risk of injury to the public. To address effectively the risk of injury from strangulation, CPSC staff has identified the following safety characteristics embodied in the ANSI/WCMA A100.1 – 2018 standard.

(a) The presence of any one of these characteristics presents an SPH for stock window coverings:

1. Operating cords that are:
   o Present, and
   o Longer than 8 inches in any state (free or under tension), or
   o Accessible determined per the test requirement in Appendix C of the ANSI/WCMA A100.1.

2. Inner cords that do not meet Appendix C and D of the ANSI/WCMA A100.1 – 2018.

(b) In addition, CPSC staff has identified one readily observable safety characteristic of custom window coverings embodied in the ANSI/WCMA standard. The presence of this characteristic presents an SPH:

1. Inner cords that do not meet Appendix C and D of the ANSI/WCMA A100.1 – 2018.

(c) Staff has identified one readily observable characteristic, the absence of which constitutes an SPH for both stock and custom products. The ANSI/WCMA A100.1 – 2018 standard requires that window coverings include an on-product manufacturer label identifying the manufacturer or importer of record or fabricator, date of manufacture, and the designation of the product as "Custom" or "Stock." The absence of this manufacturer label constitutes an SPH because the lack of the label makes it difficult for staff, manufacturers, and consumers to identify the product and class of products subject to a recall, and to distinguish stock from custom products. Differentiating stock from custom products is important as long as the operating cord requirements for these products are not identical. For example, staff anticipates that the Commission can issue a final rule under section 15(j) before completing a rule under sections 7 and 9. Once a rule for operating cords on custom products is complete, substantive cord requirements for all window coverings will be the same. Before that time, only inner cords on custom products will be subject to a rule. Therefore, CPSC staff will need to be able to differentiate stock products from custom products until the operating cord requirements are the same, and product information that aids a recall will always be necessary to effect and expedite a recall.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

## C. Hazardous Cords Are Readily Observable Safety Characteristics

The ANSI/WCMA A100.1 – 2018 standard requires the operating cords of stock window coverings to be either not present, inaccessible, or eight inches long or shorter in any position of the stock window covering. The standard also requires that for both stock and custom products, inner cords either be not accessible, or if accessible, the inner cords do not allow an opening larger than a child's head size. CPSC staff assesses that all of these characteristics are readily observable by observing whether the window covering has cords and, if it does, assessing cord accessibility and then measuring the length of the cord or loop. The readily observable characteristics associated with stock window coverings are:

a. Presence, length, and accessibility of operating cords in stock window coverings, and
b. Presence and accessibility of inner cords and size of inner cord loops in both stock and custom window coverings.
c. Presence of manufacturer label on both stock and custom window coverings.

Staff lists below the readily observable safety characteristics and applicable criteria.

| Stock Window Coverings Section of the Standard | Readily Observable Characteristics | Criterion |
|---|---|---|
| **A. Operating cord** | | |
| ***4.3.1.1 Cordless Operating System*** <br><br> **"The product shall have no operating cords"** | Presence of the operating cord | (a) Not present *or* |
| ***4.3.1.2 Short Static or Access Cords*** <br><br> **"The product shall have a Short Cord"** | If present, measure the length in any position of the window covering | (b) 8 inches or shorter *or* |
| ***4.3.1.3 Inaccessible Operating Cords*** <br><br> **"The operating cords shall be inaccessible as determined per the test requirements in Appendix C: Test Procedure for Accessible Cords"** | If present, observe whether accessible | (c) Inaccessible using cord accessibility probe |
| *Stock and Custom Window Coverings, Section of the Standard* | *Readily Observable Characteristics* | *Criterion* |
| **B. Inner cord** | | |

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

| | | |
|---|---|---|
| **4.5 Inner Cords**<br><br>**"All products with inner cords must meet the requirements in Appendix C and Appendix D."**<br><br>**Appendix C. Test Procedure for Accessible Cords** | If present, determine whether accessible | (a) Inaccessible using cord accessibility probe *or* |
| **Appendix D. Hazardous Loop Test Procedure** | If present, determine whether a child's head can penetrate the opening | (b) Pull inner cord and measure to determine whether the opening is less than 17 inches. For 15(j) purposes, this is comparable to inserting a head probe with a force of 10 pounds. |
| **C.   Manufacturer label** | | |
| **5.3 Manufacturer Label: There shall be a permanent label(s) or marking on all finished window covering products** | Presence of a permanent label or marking within or on the headrail or on the roller tube | Observe whether the label is present and contains the following:<br>(a) The name, city, and state of the manufacturer / importer / fabricator<br>(b) Month and year of manufacture<br>(c) Designation of window covering as "Custom" or "Stock" |

**D.  Hazardous Operating Cords for Stock Window Coverings and Hazardous Inner Cords for Both Stock and Custom Window Coverings Are Addressed by the Voluntary Standard**

As discussed above and in this briefing package, staff concludes that the requirements in the ANSI/WCMA A100.1 – 2018 adequately address the strangulation risk involving operating cords for stock products and involving inner cords for both stock and custom products.

**E.  ANSI/WCMA A100.1 Standard Is Effective in Reducing the Risk of Injury or Death Associated with Operating Cords on Stock Window Coverings and Inner Cords on Stock Window Coverings and Custom Window Coverings**

The revised 2018 version of the ANSI/WCMA standard effectively eliminates or significantly reduces the risk of strangulation from operating cords associated with stock window coverings. Staff is assured that for products sold after the effective date and going forward, compliance with the requirements in the ANSI/WCMA A100.1 – 2018 standard for stock window coverings are

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

adequate to address the strangulation risk for those products.[11] In addition, staff concludes that compliance with the inner cord requirements in the ANSI/WCMA A100.1 – 2018 standard for custom window coverings are adequate to address the strangulation risk from these inner cords as those requirements are identical to stock window coverings.

## F.  Substantial Compliance with ANSI/WCMA A100.1

WCMA stated in its comment to the ANPR (comment ID: CPSC_2013-0028-1555) that there has been substantial compliance with the standard since its first publication.  WCMA also stated that the association's message to all manufacturers is that compliance with the standard is mandatory to sell window coverings in the United States.

To investigate the level of compliance, CPSC contracted with D+R International, who interviewed window covering manufacturers and component manufacturers to collect anecdotal information on the distribution of stock and custom product sales and the impact of compliance with the voluntary standard (D+R International, 2021).  Various manufacturers indicated retail customers would not stock noncompliant products. Manufacturers are also aware of their customers' procedures and would not ship to them if there were concerns about the assembly and installation process. The D+R report indicates that the voluntary standard has caused U.S. window covering manufacturers to design and offer cordless lift operations for most stock window covering categories. All manufacturers interviewed were aware of the standard and had implemented compliance in all stages of their development process, from product design to fabrication. In addition, CPSC Field staff confirmed compliance of the product categorization for stock and custom as defined in the ANSI/WCMA A100.1 – 2018 standard.  CPSC field staff conducted unannounced in-store visits to 18 firms comprising wholesalers, manufacturers, and retailers. Thirteen locations demonstrated compliance with the voluntary standard in terms of operating cords for both stock and custom products.  However, in four locations, staff observed non-compliance of custom products with the ANSI/WCMA A100.1 – 2018 standard. The primary violations were: the length of operating cords was longer than 40 percent of the window covering length when window covering was fully lowered, with no accompanying specific customer request; lack of warning label; lack of manufacturer label; lack of hang tag; and use of a cord tilt instead of wand tilt, without an accompanying specific customer request. Staff found one location with a non-complying stock product.  This product was being sold with long beaded cord loops in various sizes. Based on CPSC staff's review of market information and contractor report findings, and WCMA's statements, staff concludes that a substantial majority of stock window coverings sold in the United States conform to ANSI/WCMA A100.1 – 2018 standard. Samples tested by CPSC staff also indicate a high level of conformance in custom products related to inner cord accessibility.[12]

---

[11] Even though the requirements in the 2018 standard, when followed, should lead to safe stock window coverings, staff concludes that it will take a long time for the existing window coverings in consumers' homes to be replaced. This standard does not apply to existing products. Staff notes that the Window Covering Safety Council (WCSC) distributes safety devices through their website, CPSC and WCSC promote safe window coverings and what to do to reduce the hazard during October safety month.

[12] Staff tested custom product samples using test parameters defined in WCMA A100-1.2018 which involved the use of a cord accessibility probe and force gauge.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

## G. Small Business Considerations

Staff from Directorate for Economic Analysis (EC) investigated the potential effects of a proposed rule on small entities, see Tab F, Draft Proposed Rule under Section 15(j) of the CPSA, Operating and Inner Cords on Stock Window Coverings and Inner Cords on Custom Window Coverings Small Business Considerations. Based on staff's review, a proposed rule designating stock window covering products that do not conform to the ANSI/WCMA A100.1 – 2018 standard and custom window covering products not conforming to the inner cord provisions in the ANSI/WCMA A100.1 – 2018 standard as SPHs will not likely have a significant impact on a substantial number of small businesses or other small entities. Data collected in person at manufacturers, retailers, and importers by CPSC staff indicates that the level of conformance with the sections of the WCMA standard concerning stock products is high and most likely greater than 90 percent.[13] Samples tested by CPSC staff also indicate a high level of conformance in custom products related to inner cord accessibility.[14] Firms already conforming to the standard would experience no impact by the proposed rule. At least one small manufacturer that does not currently conform to the accessible cord provision will experience a significant cost impact by the rule (Tab K). Staff does not believe that a substantial number of small manufacturers will experience this cost impact. The rule is not likely to significantly impact retailers and importers of window covering products because manufacturers will bear the potential costs. Should a window covering retailer and/or importer bear a cost related to conformance, staff expects this cost to only account for a small portion of total revenues, as these firms typically sell/import other home furnishing products in addition to window coverings.

Based on the available information, the Commission could certify that the draft proposed rule to deem nonconforming operating cords and inner cords on stock products and inner cords on custom products to be SPHs would likely not have a significant impact on a substantial number of small businesses or other small entities.

## H. Effect of Finalizing a 15(j) Rule for Operating Cords and Inner Cords on Stock Window Coverings and on Inner Cords on Custom Window Coverings

Section 15(j) of the CPSA allows the Commission to issue a rule specifying that a consumer product or class of consumer products has characteristics whose presence or absence creates a substantial product hazard. If a final rule is issued under section 15(j) of the CPSA, such a rule would not be a consumer product safety rule, and thus, would not create a mandatory standard that triggers testing or certification requirements under section 14(a) of the CPSA.

Although a rule issued under section 15(j) of the CPSA is not a consumer product safety rule, placing a consumer product on the substantial product hazard list in 16 CFR part 1120 would have certain ramifications. A product that is or has a substantial product hazard is subject to the reporting requirements of section 15(b) of the CPSA, 15 U.S.C. 2064(b). A manufacturer, importer, distributor, or retailer that fails to report a substantial product hazard to the

---

[13] Based on CPSC staff's in person unannounced visits to window covering retailers, manufacturers, and importers in major metropolitan areas, one violation was identified in which a stock product was available with accessible cords.

[14] Staff tested custom product samples using test parameters defined in WCMA A100-1.2018 which involved the use of a cord accessibility probe and force gauge.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Commission may be subject to civil penalties under section 20 of the CPSA, 15 U.S.C. 2069, and possibly to criminal penalties under section 21 of the CPSA, 15 U.S.C. 2070.

A product that is or contains a substantial product hazard may be subject to a voluntary corrective action or a corrective action under sections 15(c) and (d) of the CPSA, 15 U.S.C. 2064(c) and (d). Thus, if a final rule is issued under section 15(j) for operating and inner cords on stock window coverings and inner cords on custom window coverings, the Commission could order the manufacturer, importer, distributor, or retailer of stock and custom window coverings that do not contain any applicable readily observable characteristics to offer to repair or replace the product, or to refund the purchase price to the consumer.

A product that is offered for import into the United States and is or contains a substantial product hazard shall be refused admission into the United States under section 17(a) of the CPSA, 15 U.S.C. 2066(a). Additionally, U.S. CBP has the authority to seize certain products offered for import under the Tariff Act of 1930 (19 U.S.C. 1595a) (Tariff Act), and to assess civil penalties that CBP, by law, is authorized to impose. Section 1595a(c)(2)(A) of the Tariff Act states that CBP may seize merchandise, and such merchandize may be forfeited if: "its importation or entry is subject to any restriction or prohibition which is imposed by law relating to health, safety, or conservation and the merchandise is not in compliance with the applicable rule, regulation, or statute."

## I. Effective Date

Staff recommends that a final rule listing stock window coverings that contain one or more readily observable characteristic (hazardous operating cords and hazardous inner cords) and custom window coverings that contain an observable characteristic (hazardous inner cords) as SPHs become effective 30 days after publication of a final rule in the *Federal Register*. A substantial majority of window coverings already meet the requirements of ANSI/WCMA A100.1 – 2018, and the observable characteristics from ANSI/WCMA A100.1 – 2018 in the draft proposed rule have long been in effect and are well known. Staff concludes that a 30-day effective date would not likely result in significant impacts on small firms or disrupt the supply of products that would meet the rule's requirements.

## J. Commission Options for Section 15(j) Rule for Operating Cords and Inner Cords on Stock Window Coverings and for Inner Cords on Custom Window Coverings

The following options are available for Commission consideration:

1. Publish a notice of proposed rulemaking (NPR), as drafted by the OGC.
2. Publish an NPR, with changes, as directed by the Commission.
3. Other options, as directed by the Commission.

## K. Request for Comments on Section 15(j) Rule for Operating Cords and Inner Cords on Stock Window Coverings and for Inner Cords on Custom Window Coverings

CPSC staff invites interested persons to submit their comments to the Commission on any aspect of the proposed rule.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

## III.    CUSTOM WINDOW COVERINGS UNDER SECTIONS 7 AND 9 OF THE CPSA

Although the ANSI/WCMA A100.1 – 2018 standard adequately addresses the strangulation risk associated with operating cords and inner cords on stock window coverings, and the inner cords on custom window coverings, the requirements for custom window coverings still allow hazardous operating cords to be present on the product. Due to the ongoing fatal and nonfatal incidents, high severity of the outcomes, proven technical feasibility of cordless products, the existing implementation of stronger requirements for stock window coverings already on the market, and the ineffectiveness of warnings and safety devices for this class of products, staff recommends that the requirements for operating cords on custom window coverings be identical to the requirements for operating cords on stock window coverings outlined in the ANSI/WCMA A100.1 – 2018 standard.

Staff recommends that the Commission publish an NPR to address strangulation hazard associated with operating cords on custom window covering products.

### A.  Staff Recommendations for Proposed Rule

Although the ANSI/WCMA standard divides the window covering market into stock and custom products, incident scenarios are not divided based on WCMA's product distinction.  Fatal and nonfatal injuries associated with window covering cords do not differ between stock and custom products because both types of products essentially have the same hazard patterns. Therefore, staff recommends that operating cords for custom window coverings meet the same requirements as operating cords for stock window coverings as outlined in the ANSI/WCMA A100.1 – 2018 standard.

In addition, staff recommends that the rigid cord shroud requirements based on the language developed by WCMA Rigid Cord Shroud Task Group, but not yet balloted, be part of the rule. Therefore, if the custom window covering uses a rigid cord shroud device to comply with the rule, to clarify the meaning of rigid, the device will be tested to confirm that it is not hazardous.[15]

### B.  Certification and Notice of Requirements

As explained below, if finalized, a rule for custom window coverings under sections 7 and 9 of the CPSA would be a consumer product safety rule that requires testing and certification under section 14(a) of the CPSA.  Additionally, as applied to children's custom window coverings, the rule would be a children's product safety rule that requires third party testing by a CPSC-accepted laboratory, and certification of compliance to the standard.  *See* 16 CFR parts 1110 and 1107.

The CPSA defines "children's products" as products designed or intended primarily for children 12 years or younger. Section 14(a) of the CPSA includes requirements for certifying that children's products and non-children's products comply with applicable mandatory standards.

---

[15] WCMA states that they intend to ballot this requirement. If the requirement is balloted and approved, Section 15(j) can include this requirement as part of an observable safety characteristic for both stock and custom products.

25

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Section 14(a)(1) addresses required certifications for non-children's products, and sections 14(a)(2) and (a)(3) address certification requirements specific to "children's products."

The CPSA defines a "children's product" as "a consumer product designed or intended primarily for children 12 years of age or younger" and states that, when determining whether a product is primarily intended for children 12 years and younger, to consider the following factors: (1) manufacturer statements about the intended use of the product, including a label on the product if such statement is reasonable; (2) whether the product is represented in its packaging, display, promotion, or advertising as appropriate for use by children 12 years of age or younger; (3) whether the product is commonly recognized by consumers as being intended for use by a child 12 years of age or younger; and (4) the Age Determination Guidelines issued by CPSC staff in September 2002, and any successor to such guidelines.

The Commission interpreted this statute for children's products in its regulation at 16 CFR part 1200, and set forth specific examples involving home furnishings in § 1200.2(d)(1). General home furnishings and fixtures (including, but not limited to: rocking chairs, shelving units, televisions, digital music players, ceiling fans, humidifiers, air purifiers, window curtains, tissue boxes, rugs, carpets, lamps, clothing hooks and racks) that often are found in children's rooms or schools would not be considered children's products, unless they are decorated or embellished with a childish theme and invite use by a child 12 years of age or younger, are sized for a child, or are marketed to appeal primarily to children. Staff is aware of some window coverings that are marketed, packaged, displayed, promoted, and/or advertised as intended for children 12 years old and younger; incident data and some recalls include these children's products. However, cord strangulation incidents mainly involve window coverings that are not primarily intended for children; staff is aware that children interact with window coverings, regardless of whether they are children's products.

If the Commission issues a final rule for custom window coverings, manufacturers or importers of non-children's custom window coverings must test products to the rule and issue a General Certificate of Conformity (GCC) demonstrating compliance; and manufacturers of custom window coverings that are children's products must have products third party tested by a CPSC-accepted laboratory and issue a Children's Product Certificate (CPC) demonstrating compliance with the rule.

The Commission's regulation on requirements for certificates of compliance is codified at 16 CFR part 1110. Section 14(a)(1) of the CPSA requires every manufacturer of a non-children's product, which includes the importer, that is subject to a consumer product safety rule under the CPSA or a similar rule, ban, standard, or regulation under any other law enforced by the Commission and which is imported for consumption or warehousing or distributed in commerce, to issue a certificate. The manufacturer must certify, based on a test of each product or upon a reasonable testing program, that the product complies with all rules, bans, standards, or regulations applicable to the product under the CPSA or any other law enforced by the Commission. The certificate must specify each such rule, ban, standard, or regulation that applies to the product.

For children's products, section 14(a)(2) of the CPSA states that, before importing for consumption or warehousing or distributing in commerce any children's product that is subject to a children's product safety rule, the manufacturer (including the importer) must submit sufficient samples of the children's product, or samples that are identical in all material respects

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

to the product, to a CPSC-recognized third party conformity assessment body accredited under section 14(a)(3) of the CPSA ("recognized third party test laboratory"). The recognized third party test laboratory must test the children's product for compliance with such children's product safety rule. Based on the testing, the manufacturer or importer must issue a certificate that certifies that the children's product complies with the children's product safety rule based on the assessment of a recognized third party laboratory accredited to conduct such tests. The Commission's requirements for testing and labeling children's products is codified at 16 CFR part 1107. Additionally, part 1109 sets forth requirements for using the testing of component parts to meet the testing and certification requirements for both children's and non-children's products.

Section 14(a)(3)(A) of the CPSA states that the third party testing requirement applies to any children's product manufactured more than 90 days after the Commission has established and published an NOR for the accreditation of third party conformity assessment bodies to assess conformity with a children's product safety rule. The Commission published a final rule regarding Requirements Pertaining to Third Party Conformity Assessment Bodies, codified in 16 CFR part 1112. 78 *Fed. Reg.* 15,836 (Mar. 12, 2013). Part 1112 establishes the requirements for accreditation of third party testing laboratories to test for compliance with a children's product safety rule. The final rule also codifies all of the NORs that CPSC has published, to date, for children's product safety rules. All new children's product safety rules require an amendment to part 1112 to create an NOR. For custom window coverings that are children's products, staff recommends that the Commission propose to amend part 1112 to include custom window coverings that are children's products in the list of children's product safety rules for which CPSC has issued NORs. Commission approval of accreditation requirements for the testing of CSUs that are children's products will make effective the third party testing and certification requirement for custom window coverings that are children's products manufactured more than 90 days after the Commission has established and published an NOR for the accreditation of third party conformity assessment bodies to assess conformity with the children's product safety rule.

## C. Preliminary Regulatory Analysis

A proposed consumer product safety rule published in the *Federal Register* in accordance with the requirements of section 9 of the CPSA must include a preliminary regulatory analysis that contains: a preliminary description of the potential benefits and potential costs of the proposed rule; a discussion of the reasons any standard or portion of a standard submitted to the Commission under subsection (a)(5) was not published by the Commission as the proposed rule or part of the proposed rule; a discussion of the reasons for the Commission's preliminary determination that efforts proposed under subsection (a)(6) and assisted by the Commission as required by section 5(a)(3) [15 U.S.C. § 2054 (a)(3)] would not, within a reasonable period of time, be likely to result in the development of a voluntary consumer product safety standard that would eliminate or adequately reduce the risk of injury addressed by the proposed rule; and a description of any reasonable alternatives to the proposed rule, together with a summary description of their potential costs and benefits, and a brief explanation of why such alternatives should not be published as a proposed rule.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Staff from Directorate for Economic Analysis (EC) developed a preliminary regulatory analysis (Tab K).

### a) Preliminary Discussion of Potential Benefits and Costs of the Rule

Based on the estimated 9 fatal injuries involving corded window coverings per year, the societal costs of these fatal injuries are about $82.8 million annually. Based on the estimate of about 185 nonfatal window covering injuries annually from CPSC's Injury Cost Model (ICM), staff estimates that the societal costs of nonfatal window covering injuries are approximately $9.3 million annually. Overall, staff estimates the societal costs of fatal and nonfatal injuries to be about $92.1 million annually. Because staff assesses that the voluntary standard adequately addresses the risk of injury associated with stock window coverings, and because stock window coverings are the subject of a separate draft proposed rule under section 15(j) of the CPSA, the draft proposed rule under sections 7 and 9 of the CPSA would only address the proportion of these injuries attributable to custom window covering products. Staff estimates the proportion of injuries attributable to custom products to be approximately $53.9 million annually, based on a CPSC review of reported incidents.

Staff calculated the present value of the societal cost of injuries for each detailed window covering type based on the expected product life. The present value of societal cost ranged from $0.92 for cellular, pleated, and roller shades, $1.57 for roman shades, $3.61 for wood and faux wood horizontal blinds, $1.34 for metal/vinyl horizontal blinds, $7.56 for vertical blinds, and $0.14 for curtains/drapes. Combining these estimates with one year of corded custom window covering sales (2019) amounts to a gross annual benefit of $52.3 million. Adjusting this estimate for the expected effectiveness of the proposed rule equates to a total annual benefit of approximately $49.5 million.

Based on component cost estimates, assembly/manufacturing costs, and proportions of domestic manufacturing, the increased cost per corded custom window covering produced would range from $2.15 to $34.57 and is highly dependent on product type. Staff expects that manufacturers would pass much of this cost on to consumers in the form of higher prices. Interviews conducted with retailers and manufacturers indicate that about 65 percent of custom window covering unit sales are currently corded products. The proposed rule is not expected to result in any cost increases for cordless custom window coverings, and as such, aggregate costs are calculated on only corded custom products. Combining the 2019 custom sales estimate of $61.58 million with a per unit cost increase, and the percentage of corded custom sales, results in an aggregate cost range of $156.5 million and $309 million.

Staff notes that there are many sources of uncertainty inherent in a complex cost-benefit analysis because of using estimated parameters, inputs from several models, assumptions based on expert judgement, and public/private data. This analysis includes uncertainty related to cost estimate calculations, the value of statistical life, the number of corded window coverings in use, and the expected product life for certain blind types. For example, the cost studies from which staff derived all of the cost estimates could be outdated, given the first study was completed in 2016, about 2 years before WCMA revised the voluntary standard for stock products. Economies of scale could have reduced costs related to cordless components since the completion of the first cost study in 2016. Staff notes, though, that the low-end cost could also be an underestimate for a rule involving custom products, because the cost study, from which the estimate is derived,

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

mostly analyzed stock products with an assumed high-volume production in China, which is less applicable for custom than for stock.

Another example of uncertainty in the analysis is related to the value of statistical life. Staff valued the benefit of reducing fatal incidents at $9.2 million each, which, as discussed in Tab K is in-line with most reasonable estimates of the value of a statistical life. Staff notes though that there has been some discussion in the literature suggesting that people might be willing to spend more for a small reduction in the risk to children than they are for the same reduction in their own risk. A review of the literature conducted for the CPSC suggested that the VSL for children could exceed that of adults by a factor of 1.2 to 3, with a midpoint of around 2 (IEc, 2018).

Additionally, the assumption used to create the estimate of corded products in the market is based on interviews with manufacturers and retailers, some of whom gave conflicting accounts. The estimate is not based on exposure surveys, and thus, the actual number of corded custom products could be higher or lower than the estimate used in the base analysis; and, we have no basis for stating whether we think we have over or underestimated the number.

Lastly, the estimated product life used in the analysis for vinyl and metal horizontal blinds was significantly shorter than for the other products. It was based on work completed by D+R for the Department of Energy (2013). However, it is possible that this estimate is skewed because of the dominance of stock in this category. A longer expected product life for this category would result in a higher per-unit benefit.

*b) Voluntary Standard*

In developing the draft proposed rule, CPSC staff considered whether the Commission could rely on the current voluntary standard, ANSI/WCMA A100.1– 2018, in lieu of a rule. Staff assessed that operating cord requirements for custom products in the ANSI/WCMA A100.1 – 2018 standard are inadequate to effectively address the strangulation hazard associated with custom window coverings. Requirements in the voluntary standard still allow hazardous operating cords to be part of the custom products. Staff notes that previous efforts for an effective stock product voluntary standard required more than two decades of development by WCMA. In addition, staff notes that WCMA did not agree with recommendations from other stakeholders, including consumer advocates and CPSC, to require the stock product requirements for custom window coverings. Therefore, it is unlikely that an effective voluntary standard addressing the operating cord hazards on custom window coverings will be developed within a reasonable period.

*c) Alternatives Considered*

CPSC staff considered several alternatives to the requirements in the draft proposed rule for custom window coverings. These alternatives included: (1) not issuing a mandatory rule, but instead relying upon voluntary standards; (2) improving the voluntary standard ANSI/WCMA A100.1 – 2018; (3) using a later effective date; (4) narrowing the scope of the rule to  address only vertical blinds and curtains and drapes; and (5) continuing and improving information and education campaigns. Staff discusses each of these alternatives below. The discussion includes the reasons why staff did not include the alternative in the draft proposed rule, as well as qualitative discussion of costs and benefits, where possible.

*No Mandatory Standard/Rely on Voluntary Standard*

If CPSC did not issue a mandatory standard, most manufacturers would comply with ANSI/WCMA A100.1 – 2018, which allows custom window coverings to be produced with hazardous operating cords. CPSC staff concludes that the requirements for operating cords associated with custom window coverings in ANSI/WCMA A100.1 – 2018 are inadequate to protect children from the risk of strangulation. Not mandating a standard would not impose any additional costs on manufacturers; neither would it result in any additional benefits in terms of reduced deaths and injuries to children. Therefore, staff does not recommend this option.

*Improve Voluntary Standard for Window Coverings*

Another alternative might be for Commission staff to continue participating and encouraging safety improvements to the voluntary standard for window coverings, ANSI/WCMA A100.1 – 2018. This option would be similar to the "no action alternative," with the key difference being that the Commission could direct staff to pursue safety improvements in the voluntary standard, including applying the requirements for operating cords on stock window coverings to custom window coverings, as a conditional alternative to a mandatory standard. The Commission could then reconsider a mandatory standard if efforts to improve the voluntary standard for custom products remain unsatisfactory.

Staff supports recent changes in the voluntary standard creating requirements for cordless/short cords/inaccessible cords on stock products, more descriptive warning labels, and materials describing the strangulation hazard. However, WCMA, in the past, has rejected initiatives to require no operating cords or no accessible cords exceeding 8 inches in length on custom products. Based on staff's previous experience with WCMA, and the length of time it took for WCMA to update the voluntary standard to require cordless stock products (22 years), staff does not believe that WCMA is likely to improve the voluntary standard for custom products in a timely manner. Consequently, staff does not recommend waiting for improvements to the voluntary standard, because the voluntary standards process is unlikely to lead to adequate requirements for custom window coverings. In addition, it is unknown if, or when, these would include adequate requirements that apply for all custom window coverings.

*Later Effective Date*

The draft proposed rule includes an effective date that is 2 years after the final rule is published in the *Federal Register*, which is twelve months longer than the statutory provision in section 9(c) of the CPSA.[16] 15 U.S.C. § 2058(c). Given that there are some issues in redesigning certain window coverings of unusual sizes to accommodate a cordless operation, a later effective date would allow manufacturers more time to redesign and spread the research and development costs, or eliminate product variants that cannot be switched to cordless operation. Staff believes it is unlikely that any manufacturer (large or small) would leave the window covering market as a result of the draft proposed rule. Nevertheless, elimination of some product sizes is possible because conversion to cordless operation may not be feasible for some large or unusual sizes.

---

[16] Section 9(c) of the CPSA provides that rules must be issued within twelve months after the date of publication of a proposed rule unless the Commission extends this period for good cause.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Later effective dates, beyond the proposed two-year effective date, would mitigate some of the costs related to redesign/research and development for manufacturers. However, if cordless operation is not feasible a reduction in sales would occur if a consumer could not find a suitable alternative. Delaying the effective date would be expected to decrease costs, but not by a consequential amount as further cost reductions would be mostly attributable to inventory reductions of products in which cordless operation isn't feasible.

### *Narrow Proposed Rule to Vertical Blinds, Curtains, and Drapes*

The Commission could narrow the draft proposed rule to address only the hazards associated with operating cords on vertical blinds, curtains, and drapes on the grounds that cords are not critical to the operation of these products. These products typically offer cordless options at no additional cost because, for most applications, a plastic rod can be used for operation. Narrowing the proposed rule to these three product types would lessen the cost impact and make it unlikely that any particular product type and/or size would be eliminated. Under this alternative, the costs are expected to be near $0 because using plastic rods for operation is very similar to cords in cost. However, only 2 of the 35 custom product incidents (both are fatalities) were associated with vertical blinds, and there were no curtain or drape incidents where the stock/custom classification could be determined. Given the limited presence of vertical blinds in custom product incidents (5.7 percent), staff cannot recommend this option, because an effective reduction in injuries and deaths is unlikely with this approach.

### *Continue and Improve Information and Education Campaign*

The Commission could work to improve the current information and education campaign concerning the strangulation hazard associated with custom corded window covering products. However, staff notes that information and education campaigns on corded window coverings that have been continuing for decades have had limited effectiveness in the reduction of injuries and deaths. Accordingly, staff does not recommend relying solely on education campaigns to address the risk of injury.

## D. Initial Regulatory Flexibility Analysis

Whenever an agency publishes a proposed rule, the Regulatory Flexibility Act (5 USC 601 – 612) requires that the agency prepare an initial regulatory flexibility analysis that describes the impact that the rule would have on small businesses and other entities, unless the agency has a factual basis for certifying that the proposed rule "will not have a significant economic impact on a substantial number of small entities." Staff of CPSC's Directorate for Economic Analysis (EC) prepared this analysis as summarized below in Tab J.

Based on 2017 data, 1,898 firms were categorized as blinds and shades manufacturers and retailers (Census Bureau, 2020). Of these, about 1,840 firms (302 manufacturers and 1,538 retailers) are considered small. Because the NAICS code for importers is non-specific to window coverings, CPSC staff reviewed CBP data, firm financial reports, and Dun & Bradstreet reports to obtain an estimate. CPSC staff estimates that there are approximately 83 importers that meet the SBA guidelines for a small business (Laciak 2020).

Nearly all of the 302 small manufacturers identified are far below the 1,000-employee SBA threshold. Two hundred thirty-eight (238) of the manufacturers have fewer than 20 employees,

and 151 have fewer than 5 employees. CPSC staff estimates that the annual revenue for the firms with fewer than 20 employees to be under $250,000. Most of the firms with fewer than 5 employees manufacture custom window coverings on a per-order basis. The annual revenue for these manufacturers is most likely below $25,000, based on estimates from the Non-employer Statistics from the U.S. Bureau of the Census. Staff estimates that the annual revenues for the remaining small manufacturers, those with more than 20 employees, are between $300,000 to $2,000,000.

The draft proposed rule would establish a performance standard for operating cords on custom window coverings by adopting the requirements in ANSI/WCMA A100-1.2018, the voluntary standard for operating cords on stock products and extending the requirements to custom products. To comply with the performance requirements, all accessible operating cords would need to be removed, made inaccessible, or shortened to 8 inches or less. Under section 14 of the CPSA, as codified in 16 CFR part 1110, manufacturers or importers of custom window coverings will be required to certify, based on a test of each product or upon a reasonable testing program, that their window coverings comply with the requirements of the draft proposed rule. Each certificate of compliance must identify the manufacturer or importer issuing the certificate and any manufacturer, firm, or third party conformity assessment body on whose testing the certificate depends. The certificate must be legible and in English and also include the date and place of manufacture, the date and place where the product was tested, including the full mailing address and telephone number for each party, and the contact information for the person responsible for maintaining records of the test results. The certificates may be in electronic format and must be provided to each distributor or retailer of the product. Upon request, the certificates must also be provided to the CPSC and/or CBP.

Custom window covering manufacturers would most likely adopt cordless lift operation systems to comply with the draft proposed rule. As discussed in the preliminary regulatory analysis of the proposed rule (Tab K, Bailey, 2021), the cost to modify window covering lift systems with the draft proposed rule ranges from $2.95 to $9.65 per horizontal blind, $2.15 to $34.57 per shade, and no expected cost increase for vertical blinds and curtains/drapes. CPSC staff does not have estimates of redesign costs but expects that these costs will be small, given the already wide availability of product designs with inaccessible cords. However, CPSC staff expects component costs to be significant, because inaccessible cord operation is expensive, as shown in the preliminary regulatory analysis (Tab K, Bailey, 2021.) Staff does not know the effect on component costs for custom products based on the requirement for stock products to comply with the voluntary standard since 2018, but economies of scale could decrease component costs for custom products, as well. Staff seeks comment on this issue.

Estimates of the costs to modify three types of window coverings in Panchal (2016) indicate that, at a minimum, the costs to modify will range from 2 to 11 percent of retail prices. However, there are uncertainties related to these cost estimates, as explained in Tab K, because this analysis preceded revisions to the voluntary standard for stock products in 2018.

Manufacturers would likely incur some additional costs to certify that their window coverings meet the requirements of the draft proposed rule, as required by Section 14 of the CPSA. The certification must be based on a test of each product or a reasonable testing program. Manufacturers may use any testing method that they believe is reasonable, and they are not required to use the same test method that would be used by CPSC to test for compliance. The

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Window Covering Manufacturers Association (WCMA) developed a certification program for window covering products titled, "Best for Kids," which includes third party testing of products for accessible cords. CPSC staff believes that this certification would meet the requirements, as outlined in Section 14 of the CPSA, for children's and non-children's products. Moreover, because the tests are simple, meaning they require observation and simple measurements, and they meet the definition of "readily observable characteristics" in Section 15 of the CPSA, costs to test per model are expected to be low. Staff also notes that the Commission has a policy that required product labels do not need to be third party tested (but must be certified as compliant). Based on quotes from testing laboratory services for consumer products, the cost of the certification testing will range from $290 to $540 per window covering model. Note that the requirement to certify compliance with all product safety rules is a requirement of the CPSA, but not of the draft proposed rule.

CPSC staff notes that a reasonable testing program could entail a simple visual inspection of products by the manufacturer and would still likely meet the requirements. Therefore, the cost of a reasonable testing program for compliance with the draft proposed rule could be much lower than the cost of conducting a third party certification test of each product.

To comply with the draft proposed rule, small manufacturers are expected to incur redesign and incremental component costs, described above, for some product lines that currently are not available in inaccessible cord variants. Staff does not expect small manufacturers to suffer a disproportionate cost effect from the draft proposed rule, because the cost calculations and research were completed on a per-unit basis, and little, if any, redesign costs are expected. Small manufacturers of window coverings are expected to incur, at a bare minimum, a 2 percent impact to their corded custom window covering revenue from the draft proposed rule. This implies that if corded custom products account for all of a firm's revenue, then the minimum impact of the draft proposed rule is 2 percent of revenue.

Generally, staff considers an impact to be potentially significant if it exceeds 1 percent of a firm's revenue. Because even the smallest estimate of cost is 2 percent of retail price, staff believes that the draft proposed rule could have a significant impact on manufacturers that receive a significant portion of their revenue from the sale of corded custom window coverings. Staff notes that small importers are expected to bear similar costs as small manufacturers, but staff is unclear whether the impact will be significant. The cost effect as a percent of revenue depends on the firm's corded custom window covering imports as a percent of total revenue. Any small importer with revenues of at least 50 percent related to corded custom window covering products affected by the draft proposed rule could be significantly impacted. Due to these potential impacts, CPSC staff expects the draft proposed rule to have a significant effect on a substantial number of small firms.

As discussed in preliminary regulatory analysis, CPSC staff examined several alternatives to the draft proposed rule that could reduce the impact on small entities. However, with the exception of a later effective date, staff does not recommend these options, because they do not effectively address hazardous operating cords on custom window coverings.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

## E. Comments to ANPR

Following the publication of the ANPR, the Commission received comments from a total of 1,013 people or entities. Tab L consolidates staff responses to comments. In general, comments fell into one or more different topic areas, including: general support or opposition to a rule, economic impact to the industry, consumers having window covering choices, communicating about the hazard through real estate disclosure documents, rental lease issues, personal stories associated with window covering cords, personal stories about someone who will be negatively impacted by the proposed rule, suggestions on warnings and launching educational campaigns, impacts on elderly/disabled populations, unfair advantage to corporations, cost (increase cost for cordless or drop in cordless prices due to regulations), parental responsibility, incentives for good designs, subsidizing companies so they can comply with new standards, and problems associated with installation performed by non-professionals. Staff reminds the Commission that since the public comment period on the ANPR closed in 2015, the voluntary standard has made substantial improvements to effectively address the strangulation risk associated with stock window coverings. Many of the comments are obviated by the new voluntary standard and changes to stock products.

## F. Anti-Stockpiling

The draft proposed rule would also prohibit (under Section 9 of CPSA) any person from manufacturing or importing noncomplying custom window coverings in any period of 12 consecutive months between the date of promulgation of the final rule and the effective date, at a rate that is greater than 120 percent of the rate at which they manufactured or imported custom window coverings during the base period for the manufacturer. The base period is any period of 365 consecutive days, chosen by the manufacturer or importer, in the 5-year period immediately preceding promulgation of the rule. Thus, the stockpiling limit would allow manufacturers and the industry to meet any foreseeable increase in the demand for custom window coverings, without allowing large quantities of custom window coverings to be stockpiled.

Custom products are typically made to order, so it is unlikely that a firm would manufacture large quantities in advance of demand. Therefore, this anti-stockpiling provision should not adversely impact manufacturers. CPSC staff welcomes comment from any manufacturer or importer who believes that they could be adversely impacted by this provision.

## G. Effective Date

CPSC staff recommends that the Commission propose an effective date of 720 days after publication of the final rule for manufacturers to comply with the requirements. Given that the current market for window coverings already complies with the same requirements, and that a substantial portion of the custom market already offers safer products that would meet the proposed requirements, a 2-year (720 days) period should be sufficient for the custom market to transition to new product offerings, where needed. Although the resulting net costs may be distributed among manufacturers, importers, retailers and consumers of window coverings, the initial impact of the regulations will be lessened by a 2-year effectiveness period. Staff notes that this period is the same as Health Canada's regulations, after they modified their coming-

34

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

into-force period to 24 months, based on net costs, and in response to industry's concerns expressed during the public consultation period.

## H. Commission Options for Sections 7 and 9 Rule for Custom Window Coverings

The following options are available for Commission consideration:

1. Publish an NPR for custom window coverings, as drafted by the OGC. The draft NPR proposes to extend the requirements for stock window coverings in the ANSI/WCMA standard to custom window coverings, and to include a provision mandating a test procedure for rigid cord shrouds;
2. Publish an NPR, with changes, as directed by the Commission.
3. Other options, as directed by the Commission.

## I. Request for Comments on NPR for Custom Window Coverings

Staff recommends requesting comments on the following items:

a. The scope of the standard for custom window coverings, whether certain products should be included or excluded;
b. Whether the ANSI/WCMA A100.1 – 2018 standard is adequate to address the strangulation risk associated with custom window coverings;
c. Whether the rigid cord shroud requirements are adequate;
d. Whether cord or bead chain restraining devices should be allowed for custom products that contains continuous loop operating system;
e. Whether single retractable cord lift systems should be allowed for custom products and whether maximum exposed cord length and a minimum pull force for a single retractable cord lift system can address the strangulation hazard;
f. The effect on component costs for custom products based on the requirement for stock products to comply with the voluntary standard since 2018;
g. Whether button or coin cell battery enclosures in a remote control to operate a custom window covering should be included in the rulemaking, related to the hazards of swallowing small batteries;
h. Whether to include a warning label that alerts consumers that if a hazardous cord becomes present due to broken window covering, they should remove the product from use.

## IV. STAFF RECOMMENDATIONS

(1) CPSC staff recommends that the Commission publish an NPR, as prepared by the OGC, under Section 15(j) of the CPSA, to deem that stock window coverings that do not comply with the requirements in the ANSI/WCMA A100.1 – 2018 standard for operating cords and inner cords, and custom window coverings that do not comply with the requirements for inner cords, present a substantial product hazard.
(2) CPSC staff also recommends that the Commission publish a notice of proposed rulemaking, as prepared by the OGC, under Sections 7 and 9 of the CPSA to address the risk of injury associated with operating cords on custom window coverings.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

*Section 15(j) of the CPSA on Stock Products involving Operating Cords and Inner Cords and on Custom Products involving Inner Cords*

CPSC staff identified readily observable safety characteristics on stock and custom window coverings (presence of hazardous operating cords and inner cords for stock window coverings, presence of hazardous inner cords for custom window coverings). The presence of hazardous cords on these products, as well as the absence of an on-product manufacturer label, constitute a substantial product hazard. Hazardous operating cords and inner cords on stock window coverings and hazardous inner cords on custom window coverings are adequately addressed in the voluntary standard, ANSI/WCMA A100. 1 – 2018. Based on a study and staff's additional assessment of the market, CPSC staff advises that stock and custom window coverings likely substantially comply with the voluntary standard.

Staff recommends that the Commission publish a proposed rule to list as substantial product hazards, stock window covering products that contain one or more readily observable characteristics (hazardous operating cords and hazardous inner cords), and custom window covering products that contain one readily observable characteristic (hazardous inner cords) and absence of manufacturer label on both stock and custom window coverings. Staff further recommends that the Commission propose that a final rule become effective 30 days after publication in the *Federal Register.*

*Sections 7 and 9 of the CPSA for Operating Cords on Custom Products*

CPSC staff is aware of 194 strangulation incidents associated with window covering cords from 2009 through 2020. Staff identified 35 incidents resulting from custom window coverings, 80 incidents from stock window coverings, while 109 incidents did not have sufficient information for categorization. Out of the 35 custom window covering incidents, the ANSI/WCMA standard adequately addressed the 3 inner cord incidents; however, the standard did not adequately address 30 incidents associated with operating cords, because the standard allows hazardous operating cords in custom products but not stock products. This means that at least 86 percent of the custom product incidents may still occur with the current requirements. Therefore, CPSC staff recommends that stock product requirements in the voluntary standard be applied to custom products to effectively reduce deaths and injuries associated with custom corded window coverings. Recommended requirements are technologically feasible and have been implemented in all stock window coverings that are compliant with the ANSI/WCMA A100.1 – 2018 standard.

In the United States, based on staff's preliminary regulatory analysis, requiring custom window coverings to have the same requirements as the stock products, in the best-case scenario, results in costs and benefits that may be justified by the qualitative benefit of preventing the deaths of young children.

**References**

Australia Trade Practices (Consumer Product Safety Standard- Corded internal Window coverings) Regulations (2010) F2010C00801.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Brouardel, P. (1897) *La pendaison, La strangulation, La suffocation, La submersion.* JB Bailliere et fil, Paris, France, pp. 38-40.

BS EN 13120:2009+A1:2014. Internal blinds- Performance requirements including safety.

BS EN 16433:2014. Internal blinds. Protection from strangulation hazards. Test methods.

BS EN 16434:2014. Internal blinds. Protection from strangulation hazards. Requirements and test methods for safety devices.

Corded Window Coverings Regulations: SOR/2019-97. Canada Gazette, Part II, Volume 153, Number 9.

D+R International Ltd (2021). Window Covering Market Characterization: Final Report. Silver Spring, MD. D+R International.

Digeronimo, R.J., Mayes T.C. (1994) Near-hanging injury in childhood: a literature review and report of three cases. Pediatr Emerg Care, 10(3):150-6.

Feldman. K.W., Simms, R.J. (1980) Strangulation in childhood: Epidemiology and clinical course. Pediatrics, 65:1079-1085.

Hoff, B.H. (1978) Multiple organ failure after near-hanging. *Crit Care Med*; 6:366-9. Howell MA.

Iserson, K.V. (1984) Strangulation: A review of ligature, manual and postural neck compression injuries. Ann. Emerg. Med. 13:179-185.

Levi, S., Benedick, A., Lerner, N., De Leonardis, D., Huey, R. (2016) Effectiveness of Safety Devices in Reducing the Risk of Child's Access to Hazardous Cords and Loops - Final Report (Contract CPSC-F-15-0089) Rockville, MD: Westat.

Marcy, N., Rutherford, G. (2002) Strangulations Involving Children Under 5 Years Old. U.S. Consumer Product Safety Commission, December 2002.

Medalia, A.A., Merriam, A.E., Ehrenreich, J.H. (1991) The neuropsychological sequelae of attempted hanging. J Neurol Neurosurg Psychiatry; 54:546–8.

Polson, C.J. (1973) Hanging In: Polson CJ and Gee DJ (eds.) Essentials of forensic medicine Oxford England, 371-404.

Wanna-Nakamura *Health Sciences Memorandum, Briefing Package Window Covering Petition. 2014.* https://www.cpsc.gov/s3fs-public/pdfs/blk_pdf_PetitionRequestingMandatoryStandardforCordedWindowCoverings.pdf Last accessed July 2021.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**TAB A: FATAL AND NEAR-MISS STRANGULATIONS ASSOCIATED WITH WINDOW COVERING CORDS**

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



**MEMORANDUM**

Date: October 6, 2021

| TO | : | Rana Balci-Sinha |
| | | Project Manager, Window Coverings Rulemaking |
| | | Director, Division of Human Factors, Directorate for Engineering Sciences |

| THROUGH | : | Stephen Hanway |
| | | Associate Executive Director |
| | | Directorate for Epidemiology |

| FROM | : | Risana Chowdhury |
| | | Director, Division of Hazard Analysis |
| | | Directorate for Epidemiology |

| SUBJECT | : | Fatal and Near-Miss Strangulations Associated with Window Covering Cords |

## Introduction

In 2015, CPSC published an advance notice of proposed rulemaking (ANPR) on Window Coverings (WC); the data presented for that package covered the period from 1996 through 2012. Since then, in 2018, the Window Covering Manufacturers Association (WCMA) published a revised voluntary standard (ANSI/WCMA A100.1 – 2018, American National Standard for Safety of Corded Window Covering Products) for window coverings. For products that comply, staff believes that the standard has essentially removed the hazardous operating/pull cords for stock window coverings. To study the effectiveness and any lack of compliance with the voluntary standard associated with window covering cords, CPSC staff reviewed the data related to these products from 2009 through 2020 to capture the before- and after-standard time frame. Some of the data sources staff used in this analysis do not have data for 2020 available yet; for those sources, staff included data for the latest available year, 2019.

This memorandum summarizes CPSC staff's incident analysis for window covering cords. In the first section, staff presents results from analysis of incidents reported to CPSC. For these incidents, staff distinguishes between stock versus custom window coverings, whenever feasible. In the next section, staff presents national estimates of deaths and injuries involving WC strangulations among children under 5 years of age. Due to lack of information in the data about the specificity of the product type, staff could not differentiate between the various types (such as stock versus custom) of window coverings involved. As such, the estimates are associated with *all* types of window coverings.

39

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

## Methodology

CPSC staff's search focused on fatal and near-miss strangulations suffered by young children due to window covering cords. Whenever feasible, staff selected the time frame to be 2009 through 2020. CPSC staff searched three databases for identification of window covering cord incidents: the Consumer Product Safety Risk Management System (CPSRMS),[17] the National Electronic Injury Surveillance System (NEISS), and the Multiple Cause of Deaths data file. The first two sources are CPSC-maintained databases. The Multiple Cause of Deaths data file is available from the National Center for Health Statistics (NCHS). The appendix at the end of this memorandum details information about the CPSC data sources and the selection criteria used for this data search.

Below, staff first presents analysis of the incident data from the CPSC data sources, which is followed by national estimates based on the NCHS data.

## I. Incidents from CPSC Databases

Based on newspaper clippings, consumer complaints, death certificates purchased from states, medical examiners' reports, hospital emergency department-treated injury reports, and in-depth investigation reports, CPSC staff found a total of 194 reported fatal and near-miss strangulations on window covering cords that occurred among children 8 years old and younger from January 2009 through December 2020. These 194 incidents do not constitute a statistical sample of known probability and do not necessarily include all window covering cord-related strangulation incidents that occurred during that period. However, these 194 incidents do provide at least a minimum number for such incidents during that time frame.

Table 1a provides the breakdown of the incidents by year. Because reporting is ongoing, the number of incidents presented here may change in the future. Given that these reports are anecdotal and reporting is incomplete, CPSC staff strongly discourages drawing any inferences based on the year-to-year increase or decrease shown in the reported data.

Table 1b expands on Table 1a to display the distribution of the annual incidents by severity of incidents and type of window coverings involved. Staff identified 50 of 194 incident window coverings (26 percent) to be stock products, and 35 of the 194 (18 percent) were identified as custom products; Staff could not identify the window covering type in the remaining 109 of the 194 (56 percent) incidents.

---

[17] Prior to 2011, the reports contained in CPSRMS resided in three separate databases: Injury or Potential Injury Incident file (IPII), the Death Certificates file (DTHS), the In-Depth Investigation file (INDP) and any data extraction required a search for each of the three databases, separately.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**Table 1a**
**Reported Fatal and Near-Miss Strangulation Incidents Involving Window Covering Cords**
**Among Children Eight Years and Younger**
**2009 – 2020**

| Incident Year | Number of Reported Incidents | | |
|---|---|---|---|
| | *Total* | *Fatal Strangulations* | *Near-Miss Strangulations* |
| 2009 | 48 | 14 | 34 |
| 2010 | 31 | 11 | 20 |
| 2011 | 10 | 6 | 4 |
| 2012 | 17 | 8 | 9 |
| 2013 | 9 | 2 | 7 |
| 2014 | 17 | 12 | 5 |
| 2015 | 9 | 7 | 2 |
| 2016 | 17 | 13 | 4 |
| 2017 | 9 | 5 | 4 |
| 2018 | 8 | 4 | 4 |
| *2019\** | 11 | 4 | 7 |
| *2020\** | 8 | 3 | 5 |
| **Total** | **194** | **89** | **105** |

Source: CPSC epidemiological databases CPSRMS and NEISS.
Note: * indicates data collection is ongoing

**Table 1b**
**Reported Fatal and Near-Miss Strangulation Incidents Involving Stock/Custom/Unknown**
**Types of Window Covering Cords Among Children Eight Years and Younger**
**2009 -- 2020**

| Incident Year | Reported Incidents by Window Covering Type | | | |
|---|---|---|---|---|
| | *Stock (Fatal/Nonfatal)* | *Custom (Fatal/Nonfatal)* | *Unknown (Fatal/Nonfatal)* | *All* |
| 2009 | 20 (4/16) | 7 (2/5) | 21 (8/13) | 48 |
| 2010 | 10 (3/7) | 7 (2/5) | 14 (6/8) | 31 |
| 2011 | 2 (1/1) | 4 (3/1) | 4 (2/2) | 10 |
| 2012 | 1 (1/0) | 5 (1/4) | 11 (6/5) | 17 |
| 2013 | 2 (1/1) | 3 (1/2) | 4 (0/4) | 9 |
| 2014 | 3 (2/1) | 2 (1/1) | 12 (9/3) | 17 |
| 2015 | 4 (4/0) | 1 (1/0) | 4 (2/2) | 9 |
| 2016 | 5 (3/2) | 4 (3/1) | 8 (7/1) | 17 |
| 2017 | 2 (1/1) | 1 (0/1) | 6 (4/2) | 9 |
| 2018 | -- | 1 (0/1) | 7 (4/3) | 8 |
| *2019\** | 1(0/1) | -- | 10 (4/6) | 11 |
| *2020\** | -- | -- | 8 (3/5) | 8 |
| **Total** | **50 (20/30)** | **35 (14/21)** | **109 (55/54)** | **194** |

Source: CPSC epidemiological databases CPSRMS and NEISS.
Note: * indicates data collection is ongoing

41

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

A1041

Overall, among the incidents with gender information available, 66 percent of the children involved were males, while 34 percent were females. One incident did not report the gender of the child.

Eighty-nine of the 194 incidents (46 percent) reported a fatality. Among the nonfatal incidents, 15 involved hospitalizations (8 percent). The long-term outcomes of these 15 injuries varied from a scar around the neck, to quadriplegia, to permanent brain damage. One additional child was treated and transferred to another hospital; the final outcome of this patient is unknown. In addition, 75 incidents (39 percent) involved less-severe injuries, some requiring medical treatment but not hospitalization. In the remaining 14 incidents (7 percent), a child became entangled in a window covering cord, but was able to disentangle from the cord and escape injury. The top chart in Figure 1 shows the number and disposition of the incidents by the child's age for all types of window coverings. The bottom two charts show the same distributions, separated by stock versus custom types of window coverings. Staff notes that the fewer reported incidents for custom products represents the lack of specificity in this data set and does not necessarily mean that there are actually fewer incidents involving custom products.

**Figure 1: Reported Fatal and Near-Miss Strangulation Incidents Among Children Age Eight Years and Younger; 2009 --2020**



THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



*Stock Window Coverings*



*Custom Window Coverings*

**Source: CPSC epidemiological databases CPSRMS and NEISS**

*Distribution of Reported Incidents by Window Covering and Associated Cord Types*

Based on staff's review, the most common types of window coverings among the 194 reported incidents, along with the types of cords associated with each, are listed below.

- Horizontal Blinds (includes Venetian and mini-blinds)
  Associated cords: continuous loop cord/beaded-chain (free-standing, *i.e*., not mounted on a tension device), inner cord, pull cord (with loops or long cords), and tilt cord;
- Vertical Blinds
  Associated cords: continuous loop cord/beaded-chain (free-standing);
- Roman Shades
  Associated cords: continuous loop cord/beaded-chain (free-standing), inner cord, and pull cord (with loops or long cords);
- Roller Shades
  Associated cords: continuous loop cord/beaded-chain (free-standing);
- Roll-up Shades
  Associated cords: pull cord (with loops or long cords) and lifting loop;
- Other Shades (includes pleated, cellular-honeycomb)
  Associated cords: continuous loop cord/beaded-chain (free-standing) and pull cord (with loops or long cords);
- Curtains/Draperies
  Associated cords: continuous loop cord/beaded-chain (free-standing).

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

1. Stock Window Coverings

CPSC staff was able to identify definitively 50 incidents that involved stock products in the period 2009 through 2020. Of the 50 incidents, 64 percent involved horizontal blinds, 28 percent involved Roman shades, 4 percent roller shades, and 2 percent involved roll-up shades and vertical blinds. Table 2 below provides the cross-tabulation of the incidents by the window covering type and the associated cord type involved in these incidents.

**Table 2: Distribution of Reported Incidents By Types of Window Coverings and Associated Cords Among Stock Products: 2009 – 2020**

|  | Pull cord | Continuous loop cord/beaded-chain | Inner cord | Lifting loop | Tilt cord | Unknown | Total (Percentage) |
|---|---|---|---|---|---|---|---|
| **Horizontal** | 24 | -- | 1 | -- | 2 | 5 | **32 (64%)** |
| **Roman** | -- | -- | 13 | -- | -- | 1 | **14 (28%)** |
| **Roller** | -- | 2 | -- | -- | -- | -- | **2 (4%)** |
| **Roll-up** | -- | -- | -- | 1 | -- | -- | **1 (2%)** |
| **Vertical** | -- | 1 | -- | -- | -- | -- | **1 (2%)** |
| **Total** | **24** | **3** | **14** | **1** | **2** | **6** | **50 (100%)** |

Source: CPSC databases CPSRMS and NEISS. Percentages may not add to 100 due to rounding.

2. Custom Window Coverings

CPSC staff identified definitively 35 incidents that involved custom window covering products. Of the 35 incidents, 51 percent involved horizontal blinds, 17 percent involved Roman shades, and 9 percent roller shades. Other shades, such as cellular and pleated shades, together accounted for 11 percent of the incidents. Six percent involved vertical blinds. For the remaining 6 percent of the incidents involving custom products, staff did not have sufficient information to determine the type of covering. Table 3 below provides the cross-tabulation of the incidents by the window covering type and the associated cord type involved in these 35 incidents.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**Table 3: Distribution of Reported Incidents By Types of Window Coverings and Associated Cords Among Custom Products: 2009 – 2020**

|  | Pull cord | Continuous loop cord/beaded-chain | Inner cord | Lifting loop | Tilt cord | Unknown | Total (Percentage) |
|---|---|---|---|---|---|---|---|
| **Horizontal** | 16 | 2 | -- | -- | -- | -- | **18 (51%)** |
| **Roman** | 1 | 2 | 3 | -- | -- | -- | **6 (17%)** |
| **Roller** | -- | 3 | -- | -- | -- | -- | **3 (9%)** |
| **Other Shades** | 1 | 3 | -- | -- | -- | -- | **4 (11%)** |
| **Vertical** | -- | 2 | -- | -- | -- | -- | **2 (6%)** |
| **Unknown** | -- | -- | -- | -- | -- | 2 | **2 (6%)** |
| **Total** | **18** | **12** | **3** | **--** | **--** | **2** | **35 (100%)** |

**Source: CPSC databases CPSRMS and NEISS. Percentages may not add to 100 due to rounding.**

3.   Undetermined/Unknown Window Coverings

For the majority of the reported incidents (109 out of 194), staff did not have enough information available to determine if the window covering product was stock or custom.  Among these reported incidents, 32 percent were horizontal blinds; 7 percent were vertical blinds; 5 percent were roll-up shades; roller shades and Roman shades were 4 percent each; and draperies and other shades (pleated/cellular) were 3 percent each. For a large proportion, 43 percent, staff could not determine the type of window covering based on the available data.  Table 4 below provides the cross-tabulation of the incidents by the window covering type and the associated cord type involved in 109 these incidents.

45

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**Table 4: Distribution of Reported Incidents**
**By Types of Window Coverings and Associated Cords: 2009 – 2020**
**Unknown (if Stock or Custom) Products**

| | Pull cord | Continuous loop cord/beaded-chain | Inner cord | Lifting loop | Tilt cord | Unknown | Total (Percentage) |
|---|---|---|---|---|---|---|---|
| **Horizontal** | 25 | -- | 2 | -- | 3 | 5 | **35 (32%)** |
| **Vertical** | -- | 8 | -- | -- | -- | -- | **8 (7%)** |
| **Roll-Up Shades** | 1 | -- | -- | 3 | -- | 1 | **5 (5%)** |
| **Roman** | 1 | -- | 3 | -- | -- | -- | **4 (4%)** |
| **Roller** | -- | 4 | -- | -- | -- | -- | **4 (4%)** |
| **Other Shades** | 1 | 2 | -- | -- | -- | -- | **3 (3%)** |
| **Draperies** | -- | 3 | -- | -- | -- | -- | **3 (3%)** |
| **Unknown** | 1 | 1 | -- | -- | -- | 45 | **47 (43%)** |
| **Total** | **29** | **18** | **5** | **3** | **3** | **51** | **109 (100%)** |

Source: CPSC databases CPSRMS and NEISS. Percentages may not add to 100 due to rounding.

Figure 2 presents a visual presentation of all 194 reported incidents, regardless of the stock/custom status of the product, by window covering and associated cord types.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



**Figure 2: Distribution of Reported Incidents by Types of Window Coverings and Associated Cords 2009 – 2020**

Source: CPSC databases CPSRMS and NEISS

The 194 incident reports rarely contained information on safety device usage. The information was unknown or unreported 92 percent of the time for the 50 stock product incidents; 66 percent of the time for the 35 custom product incidents; and 91 percent of the time for the remaining 109 incidents with stock/custom product status unknown.

*Distribution of Fatal Incidents by Window Covering and Associated Cord Types*

Of the 194 reported incidents, 89 involved a fatality. Of the 89 deaths, 43 involved horizontal window coverings, 10 involved vertical window coverings, and 7 involved Roman shades. For 13 fatalities, staff does not know the window covering type. When separated by the known stock versus custom products, horizontal blinds were involved in the most fatalities. Figure 3 shows the breakouts by window covering types for all 89 reported fatalities, as well as among the known stock and custom products separately.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Figure 3 illustrates the distribution of these fatal incidents by types of window coverings.



**Figure 3: Distribution of Fatalities by All Window Coverings**



**Source: CPSC epidemiological databases CPSRMS and NEISS**

*Most Common Cord Types and Associated Hazards Resulting in Fatalities*

Whether considering stock, custom, or unknown-if-stock-or-custom products, staff found that the pull/operating cord system is the single most hazardous scenario among the reported fatal incidents. Thirty-nine of the 89 (44 percent) fatalities involved a child getting entangled in such pull cords; continuous loops were next, with 23 of the 89 (26 percent) fatalities. Inner cords ranked next, accounting for seven of the 89 (8 percent) fatalities.

48

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**Pull Cords:** In 37 of the 39 known pull cord fatalities, the pull cords were components of horizontal blinds. Of these 39 deaths, 38 occurred prior to the implementation of the 2018 voluntary standard affecting stock products. Although reporting is ongoing, so far, one fatality has been reported in 2019, but none in 2020. Among the 39 fatalities, staff identified 7 incidents as involving custom products, and 12 as stock products; staff could not differentiate the remaining 20 incidents' window coverings vis-à-vis their stock versus custom status. Hence, any effects of the 2018 voluntary standard on these products are not yet reflected in the data. A closer look at pull cord-related incidents revealed several ways in which children have strangled.

A.  *Loops created by knotted or tangled cord*: Staff's review revealed that prior to the incidents, the pull cords had been tied together or had been coiled and tucked away (out of children's reach), but had later become accessible. When pull cords were tied together, a loop was created above the knot where the cords were tied and that is where the child later became entangled. When the cords were coiled, the cords also became tangled and created a loop, which later acted as a noose. Among all 39 pull cord-related fatal incidents, 18 out of 39 (46 percent) occurred on loops created by knotted or tangled cords.

B.  *One or more long cords that the child wrapped around their neck*: In these scenarios, the child had wrapped the long pull cord(s) multiple times around the neck. When the child fell, or tried to pull away from the window covering, the cord pulled back, causing the child to strangle or nearly strangle. Among all pull cord-related fatal incidents, this category included 11 of the 39 (28 percent) pull cord fatalities.

C.  *Loop above a single tassel or a stop ball of the cord*: Some pull cords consist of multiple cords that hang from the window covering's head rail and are joined at a point, by a plastic or wooden tassel, or by a stop ball. In such configurations, a loop exists above the tassel. In the cases reviewed, staff determined that these loops, when accessible to a child, acted as a noose where the child was caught. Four of the 39 (10 percent) pull cord-related fatal incidents involved this scenario.

D.  *Pull cord tied to an object:* Staff determined that in one of the 39 (3 percent) pull cord-related fatal incidents, pull cords were tied to a cord cleat, creating a u-shape on the cords where the child was strangled.

E.  *Unknown manner*: Five of the 39 (13 percent) pull cord-related fatal incidents did not report sufficient information to allow CPSC staff to determine the manner in which the child was entangled.

Figure 4 presents the distribution of the pull cord-related fatalities by the common modes of entanglement.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**Figure 4: Distribution of Pull Cord-Related Fatal Incidents
by Mode of Entanglement
2009-2020**



3% pull cord tied to an object

13% unknown manner of entanglements

10% cord with loop above single tassel

28% cord wrapped around neck

46% cord tangled or knotted

**Source: CPSC databases CPSRMS and NEISS**

**Continuous Loop Cords**:  Staff identified continuous loop cords or beaded-chains that were not mounted with a tension device or that broke loose from a tension device at the time of the incident, to be the next major type of cord in which children become entangled.  Vertical blinds and curtains/drapes are the predominant types of window covering associated with strangulations on continuous loops.  Some of the incident reports mentioned the child's prior interest in wearing the beaded-chain as a necklace.  Among the 89 fatalities, 23 reported this type of operating mechanism.

**Inner Cords**:  Inner cords on horizontal blinds and/or Roman shades are the third major type of cord in which children become entangled.  In these scenarios, the child pulled out the inner cord from between the slats of the horizontal blinds or from behind the Roman shades, which were in the lowered position.  Subsequently, the child got caught in the loop created by the pulled-out portion of the inner cord.  In some Roman shade incidents, children inserted their heads into the opening between the inner cord and the shade material.  Seven of the 89 fatalities involved inner cords.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**Other Cords**: Among the less prevalent cord types, the lifting loop of a roll-up blind was involved in four fatalities. Children inserted their heads or arms into the lifting loop that came off the roll-up material resulting in the strangulation incidents. Tilt cords that are used to swivel the slats on a horizontal blind were involved in an additional two fatal incidents.

## II. National Estimates

*Estimates of Window Covering Cord-Related Strangulation Deaths Using NCHS Data*

NCHS compiles all death certificates filed in the United States into multiple cause mortality data files. The mortality data files contain demographic information on the deceased, as well as codes to classify the underlying cause of death and up to 20 contributing conditions. NCHS compiles the data in accordance with the World Health Organization's instructions, which request member nations to classify causes of death by the current Manual of the International Statistical Classification of Diseases, Injuries, and Causes of Death. Death classifications use the tenth revision of the International Classification of Diseases (ICD), implemented in 1999. The latest year for which mortality data is available is 2019; as such, CPSC staff derived the strangulation fatality estimates for 2009-2019, which is a slightly different time frame than that used for the other databases.

Based on CPSC staff's review of the death certificates maintained in the CPSRMS database, staff identified three ICD10 codes that are likely to be used for classification of strangulation fatalities:

- W75 (*accidental suffocation and strangulation in bed*),
- W76 (*Other accidental hanging and strangulation*), and
- W83 (*Other specified threats to breathing*).

Among these three ICD10 codes, W76 appeared to be the most commonly used to classify strangulation deaths.

Using the ICD10 code value of W76, staff identified a total of 256 strangulation fatalities among children under age 5 in the multiple cause mortality data from NCHS from 2009 through 2019, which yields an annual average of 24 deaths (rounded up to the nearest integer). Two hundred and fifty-six strangulation fatalities are most likely an underestimate of all strangulation deaths, because CPSC staff did not use the other two ICD10 codes (W75 and W83) in the search of this data source. An unknown proportion of strangulation deaths are likely coded under ICD10=W75, as well as ICD10=W83, which cannot be distinguished from the non-strangulation deaths— because of the unavailability of any narrative description—in this data and added to the total. Hence, staff's annual average estimate of 24 strangulation deaths is a minimum.

A CPSC report by Marcy *et al.*,[18] which reviewed CPSC databases in 2002, found that 35 percent of all strangulation fatalities among children less than 5 years old were associated with window covering cords. Assuming that this 35 percent proportion applies to the entire 2009

---

[18] N. Marcy, G. Rutherford. "Strangulations Involving Children Under 5 Years Old." U.S. Consumer Product Safety Commission, December 2002.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

through 2019 period, CPSC staff estimates that, on average, a minimum of 9 strangulation fatalities (35 percent of the unrounded average annual death estimate of 23.27) occur annually on window covering cords among children under 5 years of age.  Again, the estimate is rounded up to an integer.  Figure 5 presents the yearly details. Staff seeks comments on the estimated strangulations by window coverings.

**Figure 5: Estimated Annual Minimum for Fatal Strangulations Among Children Under Five Years of Age**

**Source:  Multiple Cause of Death data, NCHS, 2009 – 2019.**
**Note: The estimates for the window covering cord fatalities are based on the assumptions that 35 percent of all strangulation fatalities are due to window covering cords and that this percentage remained unchanged over 2009-2019.**

*Estimates of Window Covering Cord-Related Strangulation Injuries Treated in Hospital Emergency Departments*

Based on the emergency department-treated injury data (NEISS), the aggregated estimated injuries from 2009 through 2020, to children 8 years of age and younger, who were entangled on window covering cords, fall below the NEISS reportable threshold.[19]  The injury estimates for individual years are even smaller, which makes any trend analysis unfeasible.  However, the 34 injury reports from NEISS are combined with the incident data for the analysis that follows.  It is worth noting here that the upper limit for the age selection criterion was set at 8 years, whenever feasible, because of multiple incident reports received by CPSC staff that involved children up to that age.

---

[19] According to the NEISS publication criteria, an estimate must be 1,200 or greater, the sample size must be 20 or greater, and the coefficient of variation must be 33% or smaller.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

## III. Summary

CPSC staff was unable to derive reportable estimates for strangulation or near-strangulation injuries involving window covering cords during the 2009 through 2020 time frame for the 8 years and younger age group. The estimates do not meet the NEISS reporting threshold. These injury reports were, instead, combined with the anecdotal reports received by CPSC in the incident analysis.

Based on CPSC's CPSRMS data (prior to 2011 the databases were DTHS, IPII, and INDP), staff found that a total of 194 strangulation and near-strangulation incidents, involving children 8 years old and younger, were reported from 2009 through 2020. Nearly 46 percent were fatal incident reports, while the remaining were near-miss nonfatal incidents. Some of the reported nonfatal incidents involved severe injuries with long-term consequences, such as quadriplegia or permanent brain damage.

Stock window coverings accounted for 26 percent of all incidents and 22 percent of the fatal incidents. Custom window coverings accounted for 18 percent of all incidents and 16 percent of the fatal incidents. However, for the majority of the 194 incidents, staff was unable to distinguish whether the incidents involved a stock or custom product.

A review of the 194 incidents reveals that nearly 44 percent involved horizontal blinds; 25 percent of the incidents did not report the window covering type. Roman shades (12 percent), followed by vertical blinds (6 percent), ranked next. Among the fatal incidents, horizontal blinds accounted for 48 percent of deaths; and unknown types of window coverings accounted for 15 percent of the deaths. Vertical blinds (11 percent) and Roman shades (8 percent) ranked next.

Based on the reported scenarios, horizontal blinds predominantly involved pull cords. Vertical blinds predominantly involved continuous loop cord/beaded-chains, while Roman shades mostly involved the inner cord.

Among the 89 fatal incidents, irrespective of the window covering type, CPSC staff found that the largest proportion (at least 39 of the 89) of the deaths involved pull cord(s) as the operating mechanism, most frequently with tangled or knotted cord(s), followed by one or more long cords wrapped around the child's neck. Children getting caught in continuous looped cords or beaded-chains without a functional tension device also figured as a major fatal hazard, accounting for 23 of the 89 fatal strangulations.

Based on NCHS data and a CPSC study, staff estimates that a *minimum* average of nine fatal strangulations related to window covering cords occurred per year in the United States among children under 5 years old spanning the period from 2009 through 2019.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**Appendix**

**CPSC Data Sources**

**NEISS:**  The National Electronic Injury Surveillance System.  The injury data are collected from a stratified probability sample of about 100 hospitals nationwide, which are equipped with 24-hour emergency departments with more than six beds.  The sample is stratified by the hospital size.  Each record in the database includes the date of treatment of the injury, age of the injured, diagnosis for the injury, disposition of the injury, codes to identify the product involved, the sample incident weight, and a narrative describing the incident, among other information.  NEISS data is used for calculating national estimates of injuries treated in emergency departments and can be used for trend determination, when feasible.

**CPSRMS**: Since 2011, the Consumer Product Safety Risk Management System serves as a database, which also integrates several workflow processes required for the collection, maintenance, exploration, and review of CPSC's epidemiological data.  Its public-facing component is known as the SaferProducts.gov, through which consumers and business entities can submit or search consumer product-related complaints. It houses the data from the legacy databases DTHS, IPII, and INDP, as well as all fatality reports from NEISS.

**DTHS:** The Death Certificates file.  This database contains death certificates that are bought by CPSC from all 50 states, as well as Washington D.C., New York City, and some territories.  Following the system of International Classification of Diseases (ICD), the external cause of death is coded on each death certificate; the CPSC criteria for selecting the external codes to purchase depend on projects of interest.  Moreover, there is usually a lag in time—a couple of years, on average—between the death occurrence and the receipt of the death certificate by CPSC.  This database is neither a statistical sample, nor a complete census of all product-related deaths.  Each record in the database includes the date of death, state/city of death, age of the decedent, ICD code for the death, codes to identify the product, a narrative describing the incident, as well as other information.

**IPII:**   The Injury or Potential Injury Incident file.  This database contains information from newspaper clippings, consumer complaints, medical examiners and coroners' reports, letters from law firms, manufacturer and retailer reports, and similar sources.  Beside information such as the date of incident, age of person involved, state/city and disposition of incident, records in this database often include scenario-specific details, product-related details, such as manufacturer/model name, and date of purchase.

**INDP:** The In-Depth Investigation file.  The reports in this database are follow-up in-depth investigations of incidents contained in the other three CPSC databases.  In other words, IPII, DTHS, and NEISS reports are the source documents for INDP reports.  These are mostly on-site or occasionally telephone investigations completed by CPSC Field investigators.  These investigators often visit next-of-kin to obtain first-hand information, collect the product involved in the incident, and collect all official documents (from state, county, and/or local authorities) as supporting documents.  This database contains, by far, the most complete information about incidents reported to CPSC.  Each record in this database contains basic information on the incident, person, product, as well as a detailed report usually containing photographs of the incident scene and the product(s), and other official supporting documents.

54

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**Data Selection Criteria**

- Date of occurrence: January 1, 2009 – December 31, 2020.
- Product codes involved: 0638 (*Window shades, venetian blinds or window shutters*), and 0617 (*Draperies, curtains or shower curtains (fabric or plastic)*).
- Age of child: 0-8 years.  The upper limit for the age selection criterion was set at 8 years for the CPSC databases because of multiple incident reports received by staff that indicate involvement of children up to that age.
- Hazard: Strangulation or near-strangulation incidents.
- Excluded: Unless incidents occurred in a U.S. military base, all incidents that occurred outside the United States. Also, any reports of safety issues but no occurrence of strangulation or near-strangulation.
- In the analysis involving data from CPSC databases, multiple reports were often identified that pertained to the same incident.  All of these reports were associated to prevent any double-counting.
- Any report of window covering cord involvement in a source document that was contradicted by follow-up investigation findings was excluded.  Conversely, any investigation that reported involvement of a window covering cord, even though the source document did not, was included.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**TAB B: HEALTH SCIENCES ASSESSMENT OF FATAL AND NONFATAL INCIDENTS ASSOCIATED WITH WINDOW COVERINGS NPR**

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



**MEMORANDUM**

Date: October 6, 2021

TO        :    Rana Balci-Sinha, Ph.D., CPE
Project Manager, Window Coverings Rulemaking
Director, Division of Human Factors
Directorate for Engineering Sciences

THROUGH:    Mary Kelleher, Associate Executive Director
Directorate for Health Sciences

Stefanie Marques, Ph.D., Director
Division of Pharmacology and Physiology Assessment

FROM   :    Suad Wanna-Nakamura, Ph.D., Physiologist
Division of Pharmacology and Physiology Assessment

SUBJECT :    Health Sciences Assessment of Fatal and Nonfatal Incidents Associated
with Window Coverings NPR

## 1. Introduction

On January 16, 2015, the U.S. Consumer Product Safety Commission published an advance
notice of proposed rulemaking (ANPR), *80 Fed. Reg*. 2,327.[20]  In support of two NPRs to
address stock and custom window covering products and associated hazards, this memorandum
provides information on deaths and injuries associated with window covering cords from 2009
through 2020 (EPHA Tab), and the risk and injury potential associated with a child becoming
suspended or entangled in window covering cords.

## 2. Background

Unintentional, self-strangulation of young children can result from entanglement with loose
cords, ropes, wires, and other ligatures commonly found around the house, often in close
proximity to sleep and play areas (Busuttil and Keeling, 2008, Wanna-Nakamura, 2014). A
strangulation hazard exists whenever a window covering cord has a loop configuration. This can
be either by design with a preexisting continuous loop, as in cords or chains of a vertical blind
(Figure 1 D), lift cords (Figure 1 C), loops formed by a single tassel (Figure 2 A), or by
deliberately tying loose ends of a cord (Figure 2 B, 2 C).  Loops can also be created by
entanglement of multiple cords with tassels fastened to the end of each single cord (Figure 2 D),

---

[20] https://www.cpsc.gov/s3fs-
public/pdfs/blk_pdf_PetitionRequestingMandatoryStandardforCordedWindowCoverings.pdf

57

THIS DOCUMENT HAS NOT BEEN REVIEWED      CLEARED FOR PUBLIC RELEASE
OR ACCEPTED BY THE COMMISSION      UNDER CPSA 6(b)(1)
A1057

or with a breakaway device that fails to release when downward pressure force is applied. Strangulation can also happen when an individual, free-hanging operating cord, shown in (Figure 1 A, B, and C), becomes wrapped around the victim's neck.

Children have strangled by inserting their heads into preexisting loops, or by wrapping a cord around their neck. Strangulation can occur when children are able to access window cords for example, by climbing on furniture or other items placed below or near a window, or by standing on the floor or standing, kneeling, or sitting in a crib next to a long, dangling operating cord. Fourteen reported incidents involved a child climbing onto furniture, such as a couch, chair, or other product placed close to the window, and four incidents involving access from an elevated surface, such as a crib or bed situated in close proximity to a window. The risk of strangulation is greatly increased when the child becomes entangled, trips, or loses their footing, or while swinging or jumping. It is not necessary for the ligature to encircle the neck completely for hanging to occur (Polson, 1973).



(A)     (B)

(C)     (D)

**Figure 1.** Examples of window covering types showing free standing-operating pull-cord types (A, B, and C). Loop formation, made by pulling on the inner pull cord of a horizontal blind window covering type (A), or a Roman shade type (B), and by design in vertical blinds with continuous-loop, operating system-type window covering (D).

THIS DOCUMENT HAS NOT BEEN REVIEWED                CLEARED FOR PUBLIC RELEASE
OR ACCEPTED BY THE COMMISSION                       UNDER CPSA 6(b)(1)

   

**Figure 2.** Images from actual CPSC incident data showing loops formed by a single tassel in an operating pull cord (A), intentional knotting (B and C), and cord entanglement (D)

### 3. Pathophysiology of Strangulation

Strangulation can occur when a child's head or neck becomes entangled in any position, even in situations where the body is fully or partially supported. Strangulation due to mechanical compression of the neck is a complex process resulting from multiple mechanisms and pathways that can involve obstruction of the airway passage and occlusion of blood vessels in the neck. Strangulation can lead to serious injuries with permanent debilitating outcomes or death. Strangulation is a form of asphyxia that can be partial (hypoxia), when there is an inadequate oxygen supply to the lungs, or total (anoxia), when there is total impairment of oxygen transport to tissues. The latter can be accompanied by carbon dioxide retention. A reduction in the delivery of oxygen to tissues can result in permanent irreversible damage. Brain tissue is particularly sensitive, and often, it is the most affected organ in strangulation incidents. (Feldman and Simms, 1980; DiMaio and DiMaio, 2001; Spitz, 2006; Oehmichen et al., 2005; Saukko and Knight, 2004; Gordon and, Shapiro, 1982; McNie, 1980; and Adams et al., 2006). Two blood vessels transport blood to and from the brain. The carotid artery carries oxygenated blood to the brain, and the jugular vein returns the deoxygenated blood back to the lungs via the heart. Both blood vessels pass through the soft tissue on each side of the neck and are vulnerable to compression. Experimental studies have shown that blood flow can be occluded in the jugular vein with only 2 kg (4.4 lbs.) of pressure on the neck (Brouardel, 1897) and with 3-5 kg (7-11 lbs.) in the carotid artery (Brouardel, 1897 and Polson, 1973). Minimal compression of either vessel can lead to unconsciousness within 15 seconds, and death it can lead to death in 2 to 3 minutes, (Digeronimo and Mayes, 1994; Hoff, 1978; lserson, 1984; Polson, 1973). A pressure of 15kg (33 lbs.) is required to occlude the trachea, leading to airway obstruction. (Brouardel, 1897).

Sustained pressure on the neck can proceed along one or more of these pathways leading to strangulation, which can rapidly progress to anoxia, associated cardiac and respiratory arrest, and death. The prognosis for hypoxic victims due to strangulation is dependent primarily on the extent of oxygen deprivation, the duration of unconsciousness, and the speed of resuscitation. Rapid reversal of the hypoxic state is essential to prevent or limit the development of pulmonary and cerebral edema that can lead to death. Thus, victims who are oxygen deprived for a short duration or quickly receive cardiopulmonary resuscitation to reestablish cerebral blood flow have

59

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

the most favorable prognosis and recovery.

In addition to the above pathways, the vagus nerve is located in the neck in close proximity to the jugular vein and carotid artery and is responsible for maintaining a constant heart rate. Compression of the vagus nerve can result in cardiac arrest due to mechanical stimulation of the carotid sinus-vagal reflex. Furthermore, the functioning of the carotid sinuses can be affected by compression of the blood vessels. The carotid sinuses are involved in the control and maintenance of various physiological homeostatic mechanisms in the body. They are baroreceptors that monitor heart activity and can adjust blood pressure and heart rate. While they respond primarily to intravascular pressure acting on vessel walls due to normal physiological conditions, they can also be activated by longitudinal forces, such as compression that may stretch and deform the blood vessel walls (Feldman and Simms, 1980; Hoff, 1978; Gresham, 1993; Iserson 1984; Shepherd, 1990). Thus, stimulation of the sinuses can result in a decrease in heart rate, myocardial contractility, cardiac output, and systemic arterial pressure, even in the absence of airway blockage.

In cases of near-hanging, children found alive and resuscitated immediately before the full onset of anoxia have a good chance of full recovery (Digeronimo and Mayes, 1994; Feldman and Simms, 1980; Iserson 1984). The sooner the compression forces are removed and resuscitation initiated, the greater the likelihood that the child will regain consciousness and recover from their injuries. However, even victims who are revived after oxygen deprivation for periods of less than 4 minutes can still suffer a wide range of serious consequences. Brain hypoxia can cause unconsciousness in less than 3 minutes and result in permanent brain damage or death. Victims who are not resuscitated within a few minutes, or who respond poorly to such efforts rarely have a favorable outcome (Digeronimo and Mayes. 1994; Feldman and Simms, 1980; Hoff, 1978). The length of oxygen deprivation ultimately governs the victim's chance for survival or the severity of neurological damage. As seen in the CPSC data (Wanna-Nakamura, 2014) and in the published literature, neurological damage may range from amnesia to long-term vegetative state. Continued deterioration of the nervous system can lead to death (Howell and Gully, 1996; Medalia et al., 1991). Preexisting health conditions at the time of the incident can also be a factor (Robert, et al., 1996).

## 4. Health Sciences (HS) Review of Fatalities and Injuries and Discussion of Hazard Patterns

HS staff reviewed the incident reports for the 194 cases identified by EPHA staff (Tab A) as fatal strangulations and near-hanging[21] in children aged eight years and under. The search covered an 11-year period from January 1, 2009 through December 31, 2020 of cases reported to CPSC from newspaper clippings, consumer complaints, death certificates purchased from states, medical examiners' reports, hospital emergency department-treated injury reports, and in-depth investigation reports. The victims ranged in age from 11 months to 7 years old.

Of the 194 reported incidents, 89 had fatal outcome (46 percent). In 35 of the 89 fatal incidents

---

[21] Refers to patients who survive a hanging injury long enough to reach a hospital.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

the victims were transferred to a hospital where lifesaving efforts to save the child continued. Twenty-four were pronounced dead on arrival or within a day after admission. Continued effort to save the life of the remaining 11 failed, even after hospitalization that spanned a period of up to 17 days.

Among the nonfatal incidents, 75 victims required medical treatment but no hospitalization. Red or purple ligature marks were often visible around the neck (Figure 2 A and B), and at times extending behind the ears. In some instances, the ligature marks were consistent with the type and size of cord or a tassel at point of contact (Figure 3 C). Fourteen victims survived without injury because an adult heard a sound and intervened, or another sibling, who was present in the same room with the victim at the time of the incident, alerted the caretaker, or the victim was able to free themselves and walk away from the entanglement. All these nonfatal incidents could have had a more serious, and even fatal outcome, if the child had not been released from the cord.

  

**Figure 3.** Illustrated in these images are ligature marks on victim's neck (A, B, and C). Orange arrow pointing to a deep furrow at point of contact with tassel (C).

Sixteen incidents involved hospitalizations, and six of the hospitalized victims who survived a severe hypoxic-ischemic episode or were pulseless and in full cardiac arrest when found, suffered severe neurological sequalae, ranging from loss of memory to a long-term or permanent vegetative state requiring tracheotomy and gastrointestinal tube feeding. Other outcomes include: coma; paralysis or problems controlling movement; sensory disturbances including pain; problems using or understanding language; seizures; cognitive and memory deficits; neuropsychological problems; and emotional disturbances. One child required 10-day treatment in the pediatric intensive care unit.

One victim who remained hospitalized for 72 days was released from the hospital with permanent 75 percent brain damage and is confined to a bed. She has limited frontal lobe and brain stem function. She has a tracheotomy and a gastrointestinal tube, which are both permanent. She requires tube feeding and cannot voluntarily move or speak. Her physical movements are mainly involuntary muscle reflexes. She is under constant medical care with an on-site nurse for 16 hours a day. Staff does not have data on the current health condition of this child, or other injured children.

*4.2 Hazard*

61

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Two types of head/neck entanglement are associated with window coverings operational systems that may lead to strangulation:

1) head insertion into preexisting loop, whether by design, or via a loop formed by a tangled or knotted cord, Figure 2; and
2) a free-standing cord, which can be wrapped around the neck.

Regardless of product type, where reported, the operating pull cord contributed to 39 of the 89 fatal incidents, (44 percent), including the pull cord wrapped around the neck in 11 fatalities. The second most common type of hazard was head insertion into continuous loops (commonly found by design in vertical blinds and shade), resulting in 23 fatalities or loops formed by knotted or entangled operating pull cords resulting in another 23 of the 89 (26 percent) fatalities (Figure 1 D); followed by inner cords, accounting for 7 of the 89 fatalities (8 percent) typically found in Roman shades (Figure 2 A).

Because a preexisting loop acts as a noose when a child's neck is inserted, and because death can occur within minutes of a child losing footing, while a child who wraps the window cord around their neck may be able to disentangle from the cord and escape injury or may be exposed to forces/pressure insufficient to lead to asphyxiation, Health Sciences staff concludes head insertion into a preexisting loop poses a higher risk of injury than when a cord is wrapped around a child's neck. Nevertheless, both have been demonstrated to be extremely hazardous. Staff's conclusion is consistent with CPSC injury and death data, which show that almost half of the deaths that have occurred on window cords were associated with horizontal blinds (43 of 89) that have these loops (Wanna-Nakamura, 2014)

## 5. Conclusion

Based on HS staff review and analysis of available records of the incident data, HS staff concludes that window coverings products with free-hanging operating cords or loops present a potential strangulation hazard to infants and toddlers if they insert their head and become caught in the loop opening or become ensnared around the neck by the cord. As seen in the incident data reported to CPSC and from the medical literature, external compression of the neck by ligature can lead to severe anoxia/ischemic brain injuries that can result in severe neurological disorders, as well as death.

Victims who survive prolonged anoxic episodes generally require a multidisciplinary rehabilitation that may include one or all of the following: speech therapy, physical therapy, and adaptive equipment training, and victims may also require help with their daily activities. Caregivers, who are often family members, require special training programs designed to help the patient return a certain level of function. Parents work with nurses and physical therapists to develop learning skills essential for the day-to-day management of their child. Some children may need prolonged specialized care outside the home, in assisted living settings with the level of care dependent on the severity of injury. In addition to the physical demands, families of victims are also affected financially and emotionally.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**References:**

Adams VI, Flomenbaum MA, Hirsch CS. Trauma and disease. In: Spitz WU, Spitz DJ, editors.

Brouardel P. *La pendaison, La strangulation, La suffocation, La submersion.* JB Bailliere et fil, Paris, France, 1897; pp. 38-40.

Busuttil A, Keeling, JW. Paediatric Forensic Medicine & Pathology. USA: CRC Press; 2008. p.329-35.

Camps FE and Hunt AC. Pressure on the neck. J Forensic Med 6:116, 1959.

Clark MA, Feczko JD, Hawley DA, Pless JE, Tate LR Fardal PM. Asphyxial deaths due to hanging in children. *J Forensic Sci* 1993; 38: 344-52.

DiMaio VJ, DiMaio D. Asphyxia. In: Geberth VJ, series editor. Forensic pathology, 2nd edn. Boca Raton, FL: CRC Press, 2001:229–77.

Digeronimo RJ1, Mayes TC. Near-hanging injury in childhood: a literature review and report of three cases. Pediatr Emerg Care. 1994 Jun; 10(3):150-6.

Gordon I, Shapiro HA. Deaths usually initiated by hypoxic hypoxia or anoxic anoxia. In: Gordon I, Shapiro HA, editors. Forensic medicine: a to principles, 2nd ed. Edinburgh, UK: Churchill Livingstone, 1982;95–129.

Gresham GA. Violent forms of asphyxial death. In: Mason JK (ed) *The pathology of trauma.*

Edward Arnold, Boston. 1993; pp. 204-13.

Feldman KW and Simms RJ. Strangulation in childhood: Epidemiology and clinical course. Pediatrics 1980, 65:1079-1085.

Hoff BH. Multiple organ failure after near-hanging. *Crit Care Med* 1978; 6:366-9. Howell MA,

Iserson, K.V. Strangulation: A review of ligature, manual, and postural neck compression injuries. Ann. Emerg. Med. 13:179-185, 1984.

Kemper M , Gibson S. Accidental hanging with recovery. J Pediatr. 1945; 26:401-405.

Medalia AA, Merriam AE, Ehrenreich JH. The neuropsychological sequelae of attempted hanging. J Neurol Neurosurg Psychiatry. 1991; 54:546–8.

McNie AB. Asphyxial deaths. In: Fisher RS, Petty CS, editors. Forensic pathology. United Kingdom: Castle House Publications, 1980:123–8.

Oehmichen M, Auer RN, Kçnig HG. Forensic types of ischemia and asphyxia. In: Oehmichen M, editor. Forensic neuropathology and associated neurology. Berlin: Springer-

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Verlag, 2005:293–313.

Polson CJ. Hanging In: Polson CJ and Gee DJ (eds.) Essentials of forensic medicine Oxford England, 1973 371-404.

Prasad SP, Singh RB. Window blinds: hanging risk, a case report highlights the danger posed by some window blind cords (Clinical Update). Com Pract. Feb 1 2010.

Robert AS, William CH, Kelly F, Jean R, Mary A. Strangulation injuries in children. Part 1. Clinical Analysis. J Trauma. 1996; 40:68–72.

Saukko P, Knight B. Suffocation and 'asphyxia' In: Ueberberg A, project editor. Knight's forensic pathology, 3rd edn. London, UK: Arnold Publishers, 2004; 352–67.

Saukko P, Knight B. Fatal pressure on the neck. In: Ueberberg A, project editor. Knight's forensic pathology, 3rd ed. London, UK: Arnold Publishers, 2004:368–94.

Shepherd RT, Accidental self-strangulation in a young child Med. Sci. Law, 1990; 30:119-123

Spitz WU. Asphyxia. In: Spitz WU, Spitz DJ, editors. Spitz and Fisher's medico-legal investigation of death: guidelines for the application of pathology to crime investigation, 4th edn.

Verma SK. Pediatric & adolescent strangulation deaths. J Clin Forensic Med 2007; 14:61-4.

Wanna-Nakamura *Health Sciences Memorandum, Briefing Package Window Covering Petition. 2014.* https://www.cpsc.gov/s3fs-public/pdfs/blk_pdf_PetitionRequestingMandatoryStandardforCordedWindowCoverings.pdf Last accessed July 2021.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**TAB C: SUMMARY OF RECALLS – JANUARY 2009 THROUGH DECEMBER 2020**

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



UNITED STATES
CONSUMER PRODUCT SAFETY COMMISSION
BETHESDA, MARYLAND 20814

MEMORANDUM

**DATE:** October 6, 2021

TO : Rana Balci-Sinha
Project Manager, Window Coverings Rulemaking
Director, Division of Human Factors, Directorate for Engineering Sciences

THROUGH: Robert Kaye, Director, Office of Compliance and Field Operations
Mary B. Murphy, Director, Division of Enforcement and Litigation
Howard Tarnoff, Deputy Director, Division of Enforcement and Litigation

FROM : Christopher Nguyen, Compliance Officer, Division of Enforcement and Litigation

SUBJECT : Window Covering Cords: Summary of Recalls – January 2009 through December 2020

This memorandum provides a summary of recalls involving window covering cords and cord devices from a review conducted by the Office of Compliance and Field Operations.

## Summary of Recalls Involving Window Covering Cords and Cord Devices

Compliance staff reviewed recalls associated with window covering cords and cord devices from January 1, 2009 to December 31, 2020. During that period, CPSC conducted 42 consumer-level recalls, including two reannouncements. Manufacturers recalled more than 28 million units,[22] including: Roman shades and blinds, roll-up blinds, roller shades, cellular shades, horizontal blinds, and vertical blinds. The recalled products also included stock products, which can be purchased by consumers off-the-shelf, and custom products, which are made-to-order window coverings based on a consumer's specifications, such as material, size, and color.

Strangulation is the primary hazard in each of these recalls. The way in which the strangulation risk can manifest depends on the types of cords used on the recalled window coverings. Strangulations can occur when a child places his or her neck between an exposed inner cord and the fabric on the backside of the window covering, or when a child pulls the cord out and wraps it around their neck. Lifting loops can slide off the side of a window covering and a child's neck can become entangled on the free-standing loop that is created. For products with continuous looped cords and bead chains, a child can become entangled in the free-standing loop if it is not attached to the wall or floor with a tension device.

Table 1 presents the 42 recalls conducted between January 1, 2009 and December 31, 2020, and notes: the recall date, the firm involved, the product types, the types of cords/cord

---

[22] This estimate does not include the recalled units of Recall No. 10-073. This was an industry-wide recall conducted by members of the Window Covering Safety Council (WCSC). An exact number of recalled products was not stated in the recall announcement.

66

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

devices that create the strangulation hazard, the approximate number of recalled units, the number of reported incidents and deaths, and the recall number.

**TABLE 1 – Recalls Involving Window Covering Cords and Cord Devices**

**From January 1, 2009 to December 31, 2020**

| Recall Date | Firm | Product | Types of Cords/ Cord Devices | Number of Recalled Units | Number of Reported Incidents | Number of Reported Deaths | Recall Number |
|---|---|---|---|---|---|---|---|
| 1/13/2009 | Cost Plus, Inc. | Roll-up Blinds and Roman Shades | Inner cords Lifting cord loops Looped pull cords | 692,400 | 0 | 0 | 09-090 |
| 8/26/2009 | IKEA Home Furnishings | Roman Blinds | Continuous looped bead chains Inner cords | 120,000 | 1 - near-strangulation | 0 | 09-325 |
| 8/26/2009 | Lewis Hyman Inc. | Roll-up Blinds and Roman Shades | Inner cords Lifting cord loops | 4.2 mill (Roll-up Blinds) 600,000 (Roman Shades) | 0 | 2 | 09-324 |
| 8/26/2009 | Lutron Electronics Co. Inc. | Roller Shades | Continuous looped bead chain | 245,000 | 0 | 0 | 09-328 |
| 8/26/2009 | Vertical Land Inc. | Horizontal and Vertical Blinds Cellular Shades | Continuous looped bead chain Inner cords Looped pull cords | 15,400 (Horizontal) 16,400 (Vertical) 800 (Cellular) | 0 | 1 | 09-329 |

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

| Recall Date | Firm | Product | Types of Cords/ Cord Devices | Number of Recalled Units | Number of Reported Incidents | Number of Reported Deaths | Recall Number |
|---|---|---|---|---|---|---|---|
| 8/26/2009 | Victoria Classics | Roman Shades | Inner cords Operating pull cords | 163,000 | 0 | 0 | 09-327 |
| 10/27/2009 | Hanover Direct Inc. | Roman Shades | Inner cords | 90,000 | 1 - near strangulation | 0 | 10-023 |
| 10/27/2009 | IKEA Home Furnishings | Roller Blinds | Continuous looped bead chain | 533,000 | 0 | 0 | 10-022 |
| 10/27/2009 | Louis Hornick & Co., Inc. | Roman Shades | Inner cords | 364,000 | 2 - near strangulations | 0 | 10-025 |
| 12/15/2009 | Airtex Design Group Inc. | Roman Shades | Inner cords | 2,000 | 0 | 0 | 10-710 |
| 12/15/2009 | All Strong Industry (USA) Inc. | Roman Shades | Inner cords | 290,000 | 0 | 1 | 10-068 |
| 12/15/2009 | Draper Inc. | Roman Shades | Continuous looped bead chain Inner cords Operating pull cords | 1,800 | 0 | 0 | 10-074 |
| 12/15/2009 | International Merchandise | Roll-up Shades | Lifting cord loops Looped pull cords | 355,000 | 0 | 0 | 10-070 |
| 12/15/2009 | J.C. Penney Purchasing Corp. | Roll-up Blinds and Roman Shades | Inner cords Lifting cord loops | 2.2 million | 2 - near-strangulations | 0 | 10-066 |

THIS DOCUMENT HAS NOT BEEN REVIEWED OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE UNDER CPSA 6(b)(1)

| Recall Date | Firm | Product | Types of Cords/ Cord Devices | Number of Recalled Units | Number of Reported Incidents | Number of Reported Deaths | Recall Number |
|---|---|---|---|---|---|---|---|
| 12/15/2009 | Lotus & Windoware Inc. | Roll-up Blinds | Lifting cord loops | 250,000 | 0 | 0 | 10-069 |
| 12/15/2009 | Louis Hornick & Co. Inc. | Roman Shades | Inner cords | 6,300 | 2 – near-strangulations | 0 | 10-075[23] |
| 12/15/2009 | Pottery Barn, Pottery Barn Kids, and PBteen | Roman Shades and Roller Shades | Inner cords Looped pull cords | 305,000 (Roman Shades) 45,000 (Roller Shades) | 1 - near-strangulation | 0 | 10-071 |
| 12/15/2009 | West Elm | Roman Shades | Inner cords | 42,000 | 0 | 0 | 10-072 |
| 12/15/2009 | Window Covering Safety Council (WCSC) | Roll-up Blinds and Roman Shades | Inner cords Lifting cord loops | All Roman Shades and Roll-up Blinds[24] | 16 - near-strangulations with Roman Shades | 5 - Roman Shades 3 - Roll-up Blinds | 10-073 |
| 12/15/2009 | Walmart Stores Inc. | Roll-up Blinds and Roman Shades | Inner cords Lifting cord loops | 1.1 million | 0 | 0 | 10-067 |
| 12/17/2009 | American Vintage Group LLC | Horizontal Blinds | Operating pull cords | 1,100 | 0 | 0 | 10-711 |
| 12/17/2009 | Airtex Design Group Inc. | Roman Shades | Inner cords | 4,600 | 0 | 0 | 10-712 |
| 3/2/2010 | Lutron Electronics Co. Inc. | Roman Shades | Continuous looped bead chain Inner cords | 5,000 | 0 | 0 | 10-149 |

[23] This recall was a reannouncement of Recall No. 10-025, which was originally announced on October 27, 2009.

[24] This recall was an industry-wide recall conducted by members of the Window Covering Safety Council (WCSC). An exact number of recalled products was not stated in the recall announcement.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

| Recall Date | Firm | Product | Types of Cords/ Cord Devices | Number of Recalled Units | Number of Reported Incidents | Number of Reported Deaths | Recall Number |
|---|---|---|---|---|---|---|---|
| 3/2/2010 | Meijer | Roll-up Blinds and Roman Shades | Inner cords Lifting cord loops | 240,000 | 0 | 0 | 10-150 |
| 3/4/2010 | Ethan Allen Global Inc. | Roman Shades | Inner cords | 163,000 | 0 | 0 | 10-156 |
| 5/4/2010 | Blair LLC | Roman Shades | Inner cords | 5,600 | 0 | 0 | 10-217 |
| 6/10/2010 | IKEA Home Furnishings | Roll-up Blinds, Roller Blinds, and Roman Blinds | Continuous looped bead chain Inner cords Lifting cord loops | 3,360,000 | 2 - near-strangulations | 1 | 10-261 |
| 6/15/2010 | Chicology | Roll-up Blinds | Lifting cord loops | 6,200 | 0 | 0 | 10-263 |
| 7/22/2010 | Smith+Noble | Roller Shades and Roman Shades | Continuous looped bead chain/cords Inner cords | 1.3 million | 1 - near-strangulation | 0 | 10-307 |
| 9/9/2010 | Jo-Ann Fabric and Craft Stores | Roll-up Blinds | Lifting cord loops | 1,800 | 0 | 0 | 10-340 |
| 10/7/2010 | Green Mountain Vista, Inc. | Roman Shades | Inner cords | 200,000 | 0 | 0 | 11-007 |

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

| Recall Date | Firm | Product | Types of Cords/ Cord Devices | Number of Recalled Units | Number of Reported Incidents | Number of Reported Deaths | Recall Number |
|---|---|---|---|---|---|---|---|
| 11/10/2010 | Hanover Direct Inc. | Roll-up Blinds, Roller Blinds, and Roman Shades | Continuous looped bead chain/cords Inner cords Lifting cord loops | 28,500 (Roll-up and Roller Blinds) 495,000 (Roman Shades) | 1 - near-strangulation | 1 | 11-036 |
| 12/1/2010 | Lowe's Home Centers, Inc. | Roll-up Blinds and Roman Shades | Inner cords Lifting cord loops | 5 million (Roll-up Blinds) 6 million (Roman Shades) | 2 - near-strangulations | 0 | 11-054 |
| 6/30/2011 | The Shade Store | Roman Shades | Inner cords | 45,000 | 0 | 0 | 11-747 |
| 6/30/2011 | Wm. Wright Co. | Roman Shade Kits | Inner cords | 48,000 | 0 | 0 | 11-264 |
| 10/19/2011 | Meijer | Roll-up Blinds and Roman Shades | Inner cords Lifting cord loops | 3,200 | 0 | 0 | 12-012[25] |
| 11/21/2012 | Hunter Douglas | Top-Down Bottom-Up Honeycomb Shades and Pleated Shades | Breakaway cords | 4,400 | 0 | 0 | 13-707 |

---

[25] This recall was a reannouncement of Recall No. 10-150, which was originally announced on March 2, 2010.

THIS DOCUMENT HAS NOT BEEN REVIEWED OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE UNDER CPSA 6(b)(1)

| Recall Date | Firm | Product | Types of Cords/ Cord Devices | Number of Recalled Units | Number of Reported Incidents | Number of Reported Deaths | Recall Number |
|---|---|---|---|---|---|---|---|
| 3/31/2015 | Blinds To Go | Cellular Shades, Pleated Shades, and Roller Shades | Continuous looped bead chain/cords | 200,000 | 0 | 0 | 15-106 |
| 11/3/2015 | Carra Imports LLC | Cellular Shades, Soft Horizontal Shades, Roller Shades, and Roman Shades | Continuous looped bead chain/cords Inner cords | 55,000 | 0 | 0 | 16-705 |
| 11/24/2015 | Lutron Electronics Co. Inc. | Roman Shades | Hobble tape | 240 | 0 | 0 | 16-042 |
| 2/1/2018 | Hunter Douglas | Sheer Blinds | Cord restraints | 550 | 11 - reports of broken or cracked cord restraints | 0 | 18-720 |
| 7/11/2019 | Levolor Inc. | Cellular Shades | Operating pull cords with non-breakaway cord connector | 30,000 | 0 | 0 | 19-761 |

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**TAB D: READILY OBSERVABLE SAFETY CHARACTERISTICS OF STOCK AND CUSTOM WINDOW COVERINGS**

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



UNITED STATES
CONSUMER PRODUCT SAFETY COMMISSION
BETHESDA, MARYLAND 20814

Memorandum

Date: October 6, 2021

To:        Rana Balci-Sinha, Project Manager
           Division of Human Factors, Directorate for Engineering Sciences

THROUGH:   Mark Kumagai, P.E., Associate Executive Director,
           Directorate for Engineering Sciences

           Caroleene Paul, Director,
           Division of Mechanical Engineering

FROM:      Kevin Lee, Mechanical Engineer
           Division of Mechanical Engineering, Directorate for Engineering Sciences

SUBJECT:   Readily Observable Safety Characteristics of Stock and Custom Window Coverings

## I. Introduction

The current voluntary standard for window coverings, which is intended to prevent children from strangulation on window covering cords, is ANSI/WCMA A100.1 – 2018, Standard for Safety of Window Covering Products (ANSI/WCMA). As discussed in Tabs G and I, the operating cord requirements that apply to stock products in the ANSI/WCMA standard are adequate to address the risk of death and injury associated with strangulation. Also, the inner cord requirements that apply to both stock and custom products in the ANSI/WCMA standard are adequate to address the risk of death and injury associated with strangulation. Accordingly, the ANSI/WCMA voluntary standard currently provides guidance when CPSC staff evaluates operating cords on stock window coverings and inner cords on stock and custom window coverings for safety defects that might present risks of strangulation. In this memorandum, staff describes the two readily observable safety characteristics of stock window coverings and one readily observable safety characteristic of custom window coverings, identifies the pertinent sections of the ANSI/WCMA standard that define these requirements, and recommends that the Commission find that stock and custom window coverings that do not meet the identified readily observable characteristics in the voluntary standard present a substantial product hazard (SPH).

Staff's draft notice of proposed rulemaking under section 15(j) of the Consumer Product Safety Act (CPSA) (15(j) NPR) uses the phrases "stock window coverings" and "custom window coverings" to specify the window covering products that are within the scope of the draft 15(j) NPR. Staff recommends defining "stock window coverings" and "custom window coverings," for the purposes of the draft 15(j) NPR, consistent with the definitions of these products falling within the scope of ANSI/WCMA standard under the definition of "Stock Blinds, Shades, and Shadings."

74

THIS DOCUMENT HAS NOT BEEN REVIEWED                    CLEARED FOR PUBLIC RELEASE
OR ACCEPTED BY THE COMMISSION                                  UNDER CPSA 6(b)(1)

A "stock window covering," as defined by ANSI/WCMA, is a completely or substantially fabricated product prior to being distributed in commerce and is a stock-keeping unit (SKU). Even when the seller, manufacturer, or distributor modifies a pre-assembled product by adjusting to size, attaching the top rail or bottom rail, or tying cords to secure the bottom rail, the product is still considered stock. Online sales of the product, or the size of the order, such as multifamily housing, does not make the product a non-stock product. These examples are provided in the standard to clarify that as long as the product is "substantially fabricated," subsequent changes to the product do not change its categorization. The standard defines "custom window coverings" as any window covering that is not identified as a stock window covering.

Operating cords on custom window coverings that are not within the scope of the rule (custom blinds, shades, and shadings) are the subject of a different, concurrent, draft notice of proposed rulemaking under sections 7 and 9 of the CPSA (7/9 NPR).

## II. Readily Observable Safety Characteristics of Stock and Custom Window Coverings

Cords on both stock and custom window covering products present a strangulation risk to young children, as discussed in Tabs G and I. To prevent child strangulation, the ANSI/WCMA A100.1 standard requires one of the following for operating and tilt cords on stock window coverings: (1) not present, (2) inaccessible, or (3) a length of eight inches or shorter in any position. The standard also requires that accessible inner cords and non-rigid inner cord shrouds not allow an opening larger than a child's head size for both stock and custom products. As described in more detail below, staff should be able to quickly and easily observe whether a window covering product is stock or custom based on a required product label. Staff can also quickly and easily observe whether a stock product complies with the operating cord requirements, by visually inspecting whether product has an operating cord. If a stock product does not have an operating cord, the product complies with the standard. If the stock product has an accessible operating cord, it must be eight inches or shorter in any position to comply, which staff can easily observe with a tape measure. Finally, staff can easily visually observe whether a stock or custom product has inner cords. If a product has inner cords, staff will assess compliance with the voluntary standard. CPSC staff states that observing inner cord characteristics on stock and custom window coverings are readily observable by taking simple measurements using the following tools:

a. *Cord Accessibility Probe* (Figure 1) – Used to determining whether an operating cord, inner cord, or inner cord shroud is accessible to a child. The probe is an inexpensive measuring device designed to simulate a child's hands and fingers, by considering children's anthropometric dimensions, for details and references, see ESHF memo (Tab I). Staff estimates that the cost to manufacture the probe ranges from $50 to 3D print the part from plastic to $200 to machine the part from aluminum rod. Manufacturers of window coverings should already have this device.

b. *Shroud Accessibility Probe* (Figure 2) – Used to determine whether inner cords in a cord shroud with openings smaller than ¼" are accessible to a child. This probe is designed to simulate the finger size of a young child, see ESHF memo (Tab I) for references. Like the

cord accessibility probe, the shroud accessibility probe is inexpensive measuring device that can be purchased for less than $5.



Figure 1. Cord Accessibility Probe



Figure 2. Cord Shroud Accessibility Probe

c. *Head Probe* (Figure 3a) – Used to determine whether a child's head could pass through the loop created by inner cords and non-rigid cord shrouds. The head probe simulates the head size of a fifth percentile 7-9-month-old child, see ESHF memo (Tab I) for more details. However, as described in this memo, a tape measure can also be used to measure the perimeter of the opening (Figure 3b.) The head probe is another inexpensive measuring device that can be made using readily available materials or 3D printed for approximately $50). Manufacturers should already have the probe, or they can use a tape measure to assess an inner cord.




Figure 3. (a) Head Probe, (b) Tape measure

d. *Force gauge* (Figure 4) – Used to pull on the subject cord to determine whether a hazardous loop can be created. A force gauge measures the force at which a cord is pulled to simulate the force a child could exert on the cord. This measuring device is widely available at various online retailers around $50-100, depending on product features.

76

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



Figure 4. Force gauge

Staff lists below the readily observable safety characteristics of window covering cords. Port inspectors and field investigators can observe the presence, length, or accessibility of operating cords and the accessibility of inner cords within a couple of minutes. When required, staff can observe whether an inner cord opening is large enough to accommodate a child's head size within a few minutes. Finally, staff can observe whether the manufacturer label is on the product in less than a minute.

| Stock Window Coverings | Readily Observable Characteristics | Criterion |
|---|---|---|
| A. Operating cord | | |
| 4.3.1.1 Cordless Operating System  "The product shall have no operating cords" | Presence of the operating cord | (d) Not present or |
| 4.3.1.2 Short Static or Access Cords  "The product shall have a Short Cord" | If present, measure the length in any position of the window covering | (e) 8 inches or shorter or |
| 4.3.1.3 Inaccessible Operating Cords | If present, observe whether accessible | (f) Inaccessible using cord accessibility probe |

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

| | | |
|---|---|---|
| *"The operating cords shall be inaccessible as determined per the test*<br><br>*requirements in Appendix C: Test Procedure for Accessible Cords"* | | |
| ***Stock and Custom Window Coverings*** | ***Readily Observable Characteristics*** | ***Criterion*** |
| B. Inner cord | | |
| *4.5 Inner Cords*<br><br>*"All products with inner cords must meet the requirements in Appendix C and Appendix D."*<br><br>*Appendix C. Test Procedure for Accessible Cords* | If present, determine whether accessible | (c) Inaccessible using cord accessibility probe *or* |
| *Appendix D. Hazardous Loop Test Procedure* | If present, determine whether a child's head can penetrate the opening | (d) Pull inner cord and measure to determine whether the opening is less than 17 inches. For 15(j) purposes, this is comparable to inserting a head probe with a force of 10 pounds. |
| C. Manufacturer label | | |
| *5.3 Manufacturer Label: There shall be a permanent label(s) or marking on all finished window covering products* | Presence of a permanent label or marking within or on the headrail or on the roller tube | Observe whether the label is present and contains the following:<br>(d) The name, city, and state of the manufacturer / importer / fabricator<br>(e) Month and year of manufacture<br>(f) Designation of window covering as "Custom" or "Stock" |

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

*A. Readily Observable Characteristics of an Operating Cord*

**1) Is there an operating cord?**

The presence of an operating cord (i.e., the portion of a cord that the user interacts with during operation) is observable with a visual check. See Figures 5 and 6 comparing two window coverings, one containing cords, the other without operating cords. Figure 5 demonstrates the operating cords that are accessible using a cord accessibility probe, although the presence of cords is easily observable with visual confirmation. For a window covering with accessible operating cords as shown in Figure 5, a CPSC investigator would proceed to the next step to determine whether the length of the operating cord is hazardous. The blind without operating cords (Figure 6) is compliant with the operating cord requirement, and staff would now proceed to assess compliance of the inner cord accessibility.



Figure 5. Corded Horizontal Blinds

Figure 6. Cordless Horizontal Blind

**2) Is the cord longer than 8 inches in any position of the window covering?**

An operating cord with a length exceeding eight inches is observable by measuring the length of the operating cord in any position of the window covering. To observe the operating cord length, the investigator must first keep the product stationary by having another person to hold it, hanging it up on a fixed surface, or placing the window covering on the floor. The investigator can then measure the length of the operating cord with a tape measure or ruler. Figure 7 demonstrates fully lowered, mid-length, or fully raised positions of the window covering where the investigator can take a measurement. If the operating cord is longer than 8 inches in any position, the blind does not meet the cord length requirement in ANSI/WCMA A100.1. Pursuant to the draft 15(j) NPR, the product would be deemed to have a substantial product hazard (SPH). No further inspection is necessary.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



Figure 7. One product showing the length of the operating cord in three positions: fully lowered, middle height, fully raised

### 3) Is the enclosed cord accessible?

Whether a child has access to an operating cord that is enclosed within a rigid shroud is observable by checking whether the cord accessibility probe can touch the operating cord. The investigator would attempt to contact the operating cord using the cord accessibility probe (Figure 8). In the example, the cord shroud accessibility probe cannot touch the cord. The investigator would proceed to the next step to observe accessibility of the inner cord to a child. Staff is not aware of a stock product containing a rigid cord shroud, so this step is unlikely for stock window coverings. The example shown in Figure 8 is a custom product sold overseas.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



Figure 8. Product with a rigid cord shroud that encapsulates the cord. The cord shroud accessibility probe cannot touch the shrouded cord.

### B. *Readily Observable Characteristics of an Inner Cord*

If the window covering passes the operating cord requirements in ANSI/WCMA A100.1 by complying with one of the paths identified above, the investigator would then observe accessibility of the inner cords, if present on the product.

#### 1) **Is there an inner cord?**

The presence of an inner cord (i.e., the portion of a cord connect head rail and bottom rail) is observable with a visual check. A window covering without inner cords such as a roller shade is compliant with the inner cord requirement, and no further inspection is necessary on the cords.

#### 2) **Is the inner cord accessible?**

Accessibility to an inner cord of an open construction window covering type, such as horizontal, Roman, and pleated shades, is observable by checking whether the cord accessibility probe can touch the cords located 12" below the headrail before reaching a 2" diameter section or by inserting a 2" diameter section to any opening. Figure 9 shows how to observe whether an inner cord is accessible on a horizontal blind. Because the inner cord on this sample is accessible, the investigator would next to proceed determine whether a hazardous opening can be created by the inner cord, by pulling on the inner cords.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



Figure 9. Accessibility to inner cord in an open construction (horizontal)

Figure 10 depicts an example of a Roman shade. Although this shade has no operating cords, the backside of the shade contains two inner cords that run through the rear side of the shade. The inner cords are routed through inner cord shrouds.



Inner cords

Figure 10. Front and backside of a Roman Shade

The cord accessibility probe can touch the inner cords on this sample, which means that the cord

82

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

is accessible under the ANSI/WCMA A100.1 standard (Figure 11). The investigator would proceed to the next step to determine whether the inner cord opening is hazardous.



Figure 11. The cord accessibility probe can touch the inner cord in an open construction shade (Roman shade)

Accessibility to an inner cord of a closed construction window covering type, such as a cellular shade, is observable by checking whether the: (1) cord accessibility probe can touch the cords located 12" below the head rail before reaching the 4-inch diameter section of the probe, or (2) 4-inch diameter section of the probe can be inserted into any opening. Figure 12 demonstrates a cellular shade with no operating cord. The two inner cords are run between the two layers of the shade. The cord accessibility probe cannot be inserted through the opening and touch the cords. Because the inner cord is not accessible, the hazardous loop test cannot be performed. In this example, the shade complies with both operating cord and inner cord requirements. Therefore, this shade is compliant with this portion of the ANSI/WCMA A100.1 standard, and would not create an SPH related to the inner-cord accessibility under the 15(j) NPR.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)





Figure 12. Accessibility to the inner cord in a closed construction (cellular)

**3) Is the inner cord opening large enough for child's head to go through?**

   a. If the investigator observes that the inner cord is accessible with the cord accessibility probe, then the investigator would assess the size of the accessible inner cord opening, to determine whether a child could put their head through the loop created by the inner cord. Observing whether the inner cord opening is hazardous requires first fully lowering the window covering.

   b. Pull the inner cord:

      i. For horizontal blinds:

84

While using one hand to hold the window covering surface in place, pull the inner cord with a force gauge until it reads 5 pounds of force in a direction most likely to create the maximum length or the inner cord has been pulled 25 inches, whichever comes first (Figure 13.)



Figure 13. Inner cord opening on a horizontal blind

ii. For Roman shades' non-rigid shroud:

1. Restraining the cord shroud while pulling the inner cord with a force gauge until it reads 5 pounds of force in a direction most likely to create the maximum length or the inner cord has been pulled 25 inches, whichever comes first. See Figure 14.



Figure 14. Inner cord opening on a Roman shade

2. Restraining the covering fabric with one hand and pulling the Roman shade non-rigid shroud with a force gauge until it reads 5 pounds force in a direction most likely to create the maximum length or the inner cord shroud has been pulled 25 inches, whichever comes first. See Figure 15.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



Figure 15. Non-rigid shroud opening on a Roman Shade

c. Attach the head probe to another force gauge.

d. While continuing to hold the inner cord or non-rigid shroud to form the opening in step 'b', insert the head probe into the inner cord opening or non-rigid shroud opening with an insertion force up to 10 pounds. See Figure 16.



Figure 16. Inserting of the head probe into the inner cord loop and non-rigid cord shroud

e. If the head probe can be inserted into the inner cord opening or non-rigid shroud opening, then pursuant to the draft 15(j) NPR, the product would be deemed to have a substantial product hazard (SPH). No further inspection is necessary.

f. Staff found that measuring the perimeter of the inner cord opening with a measuring tape provides an equivalent result to inserting a head probe with a force gauge. Figure 17 shows the perimeter openings on a horizontal blind, Roman shade inner cord and Roman shade inner cord shroud.

86

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



Figure 17. Perimeter measurement on a horizontal blind (top), Roman shade inner cord (middle), and Roman shade inner cord shroud (bottom)

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

*C. Readily Observable Characteristics of a Manufacturer Label*

If the investigator observes a permanent label on the headrail (or roller tube) with the following information, the product complies with the requirements identified in Section 5.3 of the standard. The investigator can perform this visual check in less than a minute.

- The readily distinguishable name, city, and state of the manufacturer / importer / fabricator
- The month and year of manufacture.
- The designation of the window coverings as "Custom" or "Stock".

## III. Conclusion

As described in this memorandum, the presence of hazardous operating cords or hazardous inner cords creates the potential for strangulation. CPSC staff can readily observe whether stock window coverings contain such hazardous operating and inner cords and whether custom window coverings contain hazardous inner cords quickly by observing the products and, when necessary, using simple tools to measure cord length. Accordingly, CPSC staff recommends that the Commission publish the draft proposed rule under section 15(j) to deem the presence of one or more of the described readily observable safety characteristics to be a "substantial product hazard," as defined in section 15(a)(2) of the CPSA.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**TAB E: HISTORY OF ANSI/WCMA STANDARD, CPSC INVOLVEMENT, AND COMPLIANCE WITH THE STANDARD**

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



October 6, 2021

TO:             Window Coverings Rulemaking File

THROUGH:   Mark Kumagai, Associate Executive Director,
                Directorate for Engineering Sciences

FROM:          Rana Balci-Sinha, Project Manager, Window Coverings Rulemaking
                Division of Human Factors, Directorate for Engineering Sciences

SUBJECT:     History of ANSI/WCMA Standard, CPC Involvement, and Compliance with the
                Standard

**ANSI/WCMA Standard**

In 1995, CPSC staff began working with the Window Covering Manufacturers Association
(WCMA) on an American National Standards Institute (ANSI) voluntary standard to address the
strangulation hazard to young children from accessible cords on window coverings.
Consequently, WCMA published the first version of the ANSI standard in 1996. The 1996
standard sought to prevent strangulation incidents created by looped cords by requiring either:
(a) separate operating cords, or (b) a cord release device on multiple cords ending in one tassel.
The standard also required a tension device that would hold the cord or bead loop taut, when
installed according to manufacturer's instructions. In 2001 and in 2002, CPSC staff sent letters
to the WCMA asking for revisions to the 1996 standard, including the addition of inner cord
stops and the elimination of free-hanging cords or bead chains longer than the neck
circumference of a fifth percentile 7−9-month-old child. In August 2002, the published ANSI
standard required inner cord stops. In 2007, the published ANSI standard required that tension
devices partially limit the consumer's ability to control the blind if the tension device is not
properly installed.

In 2009, WCMA published a provisional voluntary standard specifying descriptive requirements
for Roman shades. In September 2010, WCMA published a stronger performance-based
standard addressing Roman shade inner cords as another provisional standard.

In November 2010, CPSC held a public meeting and WCMA announced that it would establish a
steering committee to oversee the activities of six task groups, including one intended for pull
cords and another for continuous loops. On December 20, 2011, the WCMA balloted the
proposed revisions to the voluntary standard. On February 6, 2012, staff sent WCMA a letter
providing comments on the proposed revision.

[26] In these comments, CPSC staff reiterated that the hazardous loop determination should be
made for all cords and that the length of an accessible operating cord should not be longer than
the neck circumference of the youngest child at risk. In addition, staff raised concerns about the

---

[26] Letters can be found in the Voluntary Standards section of the cpsc.gov at: https://www.cpsc.gov/Regulations-
Laws--Standards/Voluntary-Standards/Window-Blind-Cords

THIS DOCUMENT HAS NOT BEEN REVIEWED          CLEARED FOR PUBLIC RELEASE
OR ACCEPTED BY THE COMMISSION                        UNDER CPSA 6(b)(1)

inability of tension devices to eliminate effectively or reduce significantly the risk of strangulation under certain foreseeable-use conditions.

In November 2012, the WCMA announced the approval of the 2012 version of the ANSI/WCMA standard which includes: (1) requirements for durability and performance testing of the tension/hold down devices, including new requirements for anchoring; (2) specific installation instructions and warnings; (3) new requirements for products that rely on "wide lift bands" to raise and lower window coverings; (4) requirements for a warning label and pictograms on the outside of stock packaging and merchandising materials for corded products; and (5) expanded testing requirements for cord accessibility, hazardous loop testing, roll-up style shade performance, and durability testing of all safety devices. A revised ANSI/WCMA A100.1 American National Standard for Safety of Corded Window Covering Products was approved on July 21, 2014, which included an editorial change.

On July 22, 2014, CPSC staff sent a letter to the WCMA requesting that the WCMA reopen the ANSI standard to address the hazard related to pull cords and continuous loops, which are the predominant hazard types in the incidents reported to CPSC. Staff suggested proposed language for a revision to the voluntary standard and asked that WCMA consider including the language in the standard. On August 29, 2014, WCMA responded that the association would begin the process of opening the ANSI/WCMA window covering standard.

In 2014, staff prepared a briefing package in response to a petition that CPSC received. The petition sought to prohibit window covering cords, where a feasible cordless alternative exists. In addition, for those instances in which a feasible cordless alternative did not exist, the petition requested that all window covering cords be made inaccessible through the use of passive guarding devices. On October 8, 2014, the Commission voted to grant the petition and directed staff to prepare an Advance Notice of Proposed Rulemaking (ANPR) to address the strangulation hazard associated with window coverings. On January 9, 2015, the Commission voted to approve publication in the *Federal Register* of the ANPR for corded window coverings, with changes. The ANPR began a rulemaking proceeding under the Consumer Product Safety Act (CPSA) to address the risk of strangulation to young children that is associated with corded window covering products. Staff hosted a WCMA technical meeting on August 2, 2016. WCMA committed to revising the standard to require either having no operating cords or short cords that cannot form a hazardous loop or having inaccessible cords, stating that there will be exceptions as WCMA would be exploring segmentation approaches such as product categories, operating systems, applications and uses, distribution channels (e.g., stock versus custom), location in home; and size, weight, and geometry of the product and ability of the products to be readily adaptable to new technologies, and eventually submitting draft standard for ANSI ballot by the end of 2016.

In 2016, CPSC staff managed two contracts and a task order associated with the open rulemaking: (1) a technical feasibility and cost improvement analysis of currently available safer technologies for window coverings, (2) a focus group study regarding installation, use, and maintenance of safety devices, primarily cord cleats and tension devices, and (3) cost analysis of cordless window covering options.

Throughout FY2017, staff participated in WCMA steering committee meetings, and also participated on stock/custom definition and warning labeling task groups. ANSI published a revision to the window coverings standard, ANSI/WCMA A100.1 – 2018, on January 8, 2018.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

WCMA updated the 2018 version in May 2018, to include the missing balloted revisions. The standard went into effect on December 15, 2018. The revised safety standard segments the window covering market between stock and custom-made products. Per the standard, stock products are required to have:

(1) no operating cords, or

(2) inaccessible cords, or

(3) short cords (equal to or less than 8 inches).

Although custom window coverings can meet the requirements for stock window coverings, consumers can still purchase corded window coverings if they custom order the product. The 2018 standard contains revised requirements for custom products, requiring:

(1) the operating cords to have a default length of 40 percent of the blind height (previously unlimited);

(2) the wand to be the default option for tilting slats (instead of a cord); and

(3) the warning labels to depict more graphically the strangulation hazard associated with cords.

In 2018, staff participated in various task group meetings to develop requirements for rigid cord shrouds. The rigid cord shroud activity was considered to be the beginning of the work for a future revision of the standard. On March 12, 2019 staff participated in a WCMA steering committee meeting. The purpose of the meeting was to gather feedback on the new requirements that went into effect and to discuss potential proposals for the standard, which WCMA committed to open in mid-June 2019. During the meeting, the attendees agreed on the need for more education for online sellers on the difference between stock and custom products, such as a guidance document for online sellers. Additionally, staff provided ideas for the next revision and for the committee to consider, including: (1) segmenting custom products by size and/or type to meet stock product requirements, (2) considering cord retractors for custom products as an option (which is not allowed for stock products); (3) investigating complete inoperability of the product if a tension device is not installed (current requirement is partial inoperability), and (4) considering cordless as default operating system for custom orders.

On May 16, 2019 staff sent a letter to WCMA requesting: segmentation of custom window coverings by size and/or type and applying the requirement for stock products to these segments of custom products; presenting the cordless/short cords/inaccessible cords as the default operating system for custom products as an interim measure as well as interrupting the ordering process with an alert on hazardous cords if a consumer wants to switch to a corded system; balloting the rigid cord shroud requirement that was finalized by the task group; reaching out to online sellers and developing a guidance document for online sellers; and providing clarification on whether the standard applies to curtain and drapery products. WCMA responded on August 12, 2019 and stated that they have put on hold the planned revision of ANSI/WCMA standard because the Government of Canada published a new regulation on corded window coverings. WCMA explained that stock products that do not have operating cords, but have inner cords that cannot form a hazardous loop, would not comply with the Canadian regulation because of the new regulated pull force applied to the inner cord. WCMA also stated that the force applied to

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

the inner cord under the Canadian regulation is not applied to test for a hazardous loop; it is applied to determine the force required to raise the product, which is completely contrary to the hazard scenario and is causing considerable confusion within the U.S. and Canadian manufacturing sectors. WCMA reassured the staff at that time that they were still moving forward with balloting the rigid shroud language for the standard.

In November 2019, WCMA sent a letter to CPSC staff about the amendment in the Fiscal Year 2020 Operating Plan asking staff to assess what further revisions are needed to the American National Standard for Safety of Corded Window Covering Products (ANSI/WCMA A100-2018), specifically for custom products. WCMA requested that CPSC staff utilize input from the technical experts at the WCMA's member companies during the upcoming study and in the drafting of the report in order to provide the Commission with a comprehensive and balanced review. The letter stated that WCMA will also move forward with balloting the rigid shroud language for the standard that was developed and agreed upon by the technical working group.

On February 3, 2020, staff sent a letter to WCMA, outlining staff's recommendations for future improvements to the standard, and included a request to reopen the standard and discuss staff's recommendations. Staff reiterated their belief that substantial improvements have been made to the latest version of the standard, particularly in "stock" products; however, expanding the requirements to custom corded window coverings would improve window covering safety.

In September 2021, staff sent another letter to WCMA, urging the WCMA to apply stock product requirements in ANSI/WCMA A100.1-2018 to custom window coverings as well as balloting the rigid cord shroud language developed and agreed upon by the technical working group.

**Custom Order Process and Safety Messaging**

Per the 2018 standard, "a warning label is to be placed on product merchandising materials which includes, but is not limited to, the sample book and the website." For online sales, the website must display a label that includes pictograms that represent the hazard of a cord wrapping around a child's neck, placed conspicuously, with a signal word ("Warning" in English, and "Advertencia" in Spanish) in all uppercase letters measuring not less than 5/16 in (8 mm) and preceded by an ANSI safety alert symbol (an equilateral triangle surrounding an exclamation point) of at least the same. The rest of the warning message text must be in both uppercase and lowercase letters (sentence capitalization), with capital letters measuring not less than 1/8 in (3 mm). The generic warning label(s) must include the text "Window blind cord can STRANGLE your child. To prevent strangulation, purchase cordless products or products with inaccessible cords."

Staff reviewed five websites to identify what types of warnings are present for consumers while they are ordering corded custom window coverings.

 a) Big Box Retailer #1:

Staff selected a customized width and height, inside/outside mount, a specific color, corded lift and cord tilt, light blocking options, and valance type. More than 900 width and more than 800 height options were available for consumers to select from, along with 20 color choices.

93

No warnings about the cord hazard were presented during the purchasing process.

Therefore, staff concludes that this retailer failed to meet the 2018 version of the voluntary standard for custom window coverings.

b) Big Box Retailer #2:

Staff selected a customized width and height, inside/outside mount, a specific color, corded lift and cord tilt, specified the cord length, ladder style, and valance type. More than 900 width and more than 800 height options were available for consumers to select from, along with 21 color choices.

For the corded lift option, if the consumer chose to click on the symbol "i," a pop-up message appears that recommends using cord cleats to keep cords away from children and pets.

Also, the cart summary showed a warning label, not in the ANSI recommended color, but with a safety alert symbol, stating: "Cords present a strangulation hazard to children. For child safety, consider purchasing cordless products or items with inaccessible cords." The label contains no pictograms. Therefore, staff concludes that this retailer failed to meet the 2018 version of the voluntary standard for custom window coverings.

c) Window Coverings Online Retailer #1:

Staff selected a customized width and height, inside/outside mount, a specific color, corded lift and cord tilt, head rail style, and light block options. More than 800 width and more than 700 height options were available for consumers to select from, along with 6 color choices.

Consumers see a statement while they are selecting the corded option, which states that multiple free-hanging pull cords are not recommended in homes with children and pets. The site did not contain the required pictogram. Staff concludes that this retailer failed to meet the 2018 version of the voluntary standard for custom window coverings.

d) Window Coverings Online Retailer #2:

Staff selected a customized width and height, inside/outside mount, a specific color, corded lift and cord tilt, and valance. More than 800 width and more than 800 height options were available for consumers to select from, along with 16 color choices.

Corded option (Standard Lift) had an orange safety alert symbol, and when pressed, a warning appears stating that corded lift products with accessible cords pose a strangulation hazard to young children and pets, that cordless products are the safest choice, and that cordless products are recommended for homes where kids and pets are present. The site did not contain the required pictogram. Staff concludes that this retailer failed to meet the 2018 version of the voluntary standard for custom window coverings.

e) Window Coverings Online Retailer #3:

Staff selected a customized width and height, inside/outside mount, a specific color, corded lift and cord tilt. More than 800 width and more than 800 height options were available for consumers to select from, along with 9 color choices.

No warnings were present during the ordering process. Staff concludes that this retailer failed to meet the 2018 version of the voluntary standard for custom window coverings.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Conclusion: Staff concludes that none of the reviewed websites that sell custom window coverings displayed the pictogram required for custom window coverings on warning labels per ANSI/WCMA A100.1 – 2018 standard. Some websites mention the strangulation hazard. Websites did not appear to have consistent messaging, and some fail to mention the strangulation hazard associated with cords. All of the reviewed websites fail to meet the required labeling and safety messaging per the standard for custom window coverings.

**In-Store Assessments**

During fiscal years 2020 and 2021, staff from Field Operations visited 18 stores consisting of wholesalers and retailers. In four locations, staff observed non-compliance of custom products with the ANSI/WCMA standard. Primary violations included: the length of operating cord longer than 40 percent of the window covering length with no accompanying specific customer request; lack of warning label; lack of manufacturer label; lack of hang tag; and cord tilt instead of wand tilt without accompanying specific customer request. In a fifth location, a window covering product was being sold with long beaded cord loops in various sizes, which appeared to be stock products. Based on this review, staff concludes that most of the wholesalers and retailers appear to have a clear distinction between stock and custom window coverings. In some cases, firms failed to meet primarily custom window coverings labeling requirements and documentations with regards to customer orders specifying deviations from default options.

**Compliance with the Standard**

WCMA stated in their comment to the ANPR (comment ID: CPSC_2013-0028-1555) that there has been substantial compliance with the standard since its first publication. WCMA also stated that the association's message to all manufacturers is that compliance with the standard is mandatory to sell window coverings in the U.S.

D+R interviewed window covering manufacturers and component manufacturers to collect anecdotal information on the distribution of stock and custom product sales and the impact of the compliance with the voluntary standard (D+R International, 2021). Various manufacturers indicated retail customers would not stock noncompliant products. Manufacturers are also aware of their customers' procedures and would not ship to them if there were concerns about the assembly and installation process. D+R report indicates that the voluntary standard has caused U.S. window covering manufacturers to design and offer cordless lift operations for most window covering categories. All manufacturers interviewed were aware of the standard and had implemented compliance in all stages of their development process, from product design to fabrication.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**TAB F: DRAFT PROPOSED RULE UNDER SECTION 15(J) OF THE CPSA: OPERATING AND INNER CORDS ON STOCK WINDOW COVERINGS AND INNER CORDS ON CUSTOM WINDOW COVERINGS SMALL BUSINESS CONSIDERATIONS**

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



**UNITED STATES**
**CONSUMER PRODUCT SAFETY COMMISSION**
**BETHESDA, MARYLAND 20814**

Memorandum

Date: October 6, 2021

TO :            Rana Balci-Sinha, Window Coverings Rulemaking Project Manager
                Division of Human Factors, Directorate for Engineering Sciences

THROUGH:        Robert Franklin, Acting Associate Executive Director,
                Directorate for Economic Analysis

FROM:           Mark Bailey, Directorate for Economic Analysis

SUBJECT:        Draft Proposed Rule Under Section 15(j) of the CPSA:
                Operating and Inner Cords on Stock Window Coverings and Inner Cords
                on Custom Window Coverings Small Business Considerations

**Background**

        Section 223 of the Consumer Product Safety Improvement Act of 2008 (CPSIA)
amended section 15 of the CPSA with the addition of section 15(j), 15 U.S.C. § 2064(j). The
amendment states that the Commission may specify, by rule, characteristics of products that
present an SPH if: (a) the characteristics are readily observable; (b) the characteristics have been
addressed by a voluntary standard; (c) such voluntary standard has effectively reduced the risk of
injury; and (d) there is substantial compliance with such voluntary standard. The Commission is
considering a draft proposed rule designating that "stock" window covering products not
conforming to one or more readily observable characteristics in WCMA A100-1.2018 and
"custom" window covering products not conforming to the inner cord provisions in WCMA
A100-1.2018 section 6 as SPHs. WCMA A100-1.2018 incorporates an updated definition of
"stock" products, labeling/warning specifications, and removal of accessible cords/loops in
"stock" products and updated specifications for the inner cords of custom products.

        CPSC staff considers the standard to be effective in reducing the risk of injury associated
with "stock" products and with inner cords on "custom" window coverings. The standard that
explicitly removes accessible or hazardous cords in stock products and updates inner cord
specifications has been in effect since December 2018. Staff notes that many manufacturers
began offering cordless stock products before the standard went into full effect. More recent
National Electronic Injury Surveillance System (NEISS) information suggests that the number of
pediatric strangulations have declined as more cordless stock products become available.[27] (Tab
A, Chowdhury 2021)

_____

[27] A CPSC staff review of reported incidents from 2009 to 2020 show a slightly declining trend for both fatal and
non-fatal pediatric injuries but given that many of the reported injuries are anecdotal and reporting is incomplete,

THIS DOCUMENT HAS NOT BEEN REVIEWED                    CLEARED FOR PUBLIC RELEASE
   OR ACCEPTED BY THE COMMISSION                              UNDER CPSA 6(b)(1)

The draft proposed rule would make the presence of one or more of the following readily observable characteristics required in WCMA A100-1.2018 a reason for deeming stock window coverings an SPH.

- An accessible and hazardous operating cord is present
- An accessible and hazardous inner cord is present
- Manufacturers label is missing or no stock designation on label

The draft proposed rule would make the presence of the following readily observable characteristic required in WCMA A100-1.2018 a reason for deeming custom window coverings an SPH.

- An accessible and hazardous inner cord is present
- Manufacturers label is missing or no custom designation on label

Window coverings that fall within the scope of ANSI/WCMA A100.1 – 2018 and the draft proposed rule that do not conform to the provisions above would present an SPH and be subject to appropriate enforcement action, such as a product recall, fines, or seizure and forfeiture upon importation.

## Market Information

The proposed rule would apply to all window covering products as defined in the draft proposed rule, consistent with the definition in ANSI/WCMA A100.1 – 2018. Window coverings include the following product categories: blinds, shades, and curtains and draperies. The shades category includes: cellular shades, pleated shades, roller shades, and Roman shades. The blinds category includes horizontal blinds and vertical blinds of varying material types. The total window covering market size in 2020 was approximately $6.6 billion.[28] (Euromonitor 2021a). CPSC staff estimates that firms classified as small by Small Business Administration (SBA) guidelines account for $4.08 billion annually, and that none of these firms account for more than three percent of total market share by revenue. (Euromonitor 2021b)

## Industry Information

The North American Industry Classification System (NAICS) defines product codes for U.S. firms. Firms that manufacture window coverings may list their business under the NAICS product code for blinds and shades manufacturers (337920 Blind and Shade Manufacturing) or retailers (442291 Window Treatment Stores).[29] Importers of window coverings are generally

CPSC staff strongly discourages drawing any inferences based on the year-to-year increase or decrease shown in the reported data. Also note, that the cases involving stock products account for a small majority of the injuries in which the product classification (stock/custom) could be determined.

[28] Stock window coverings most likely account for a minority of the total market size in terms of revenue due to significant average price differences between stock and custom products. (D+R International 2021)

[29] The two product codes 337920 and 442291 encompass most products in the window coverings market. However, some drapery and curtain manufacturers may be listed under 322230, stationary product manufacturing.

98

listed in Home Furnishing Merchant Wholesalers (423220) which includes other home furnishing items and is non-specific to window coverings.

Under SBA guidelines, a manufacturer of window coverings is categorized as small if the firm has less than 1,000 employees, retailers are considered small if they have sales revenue less than $8.0 million, and importers if the firm has less than 100 employees. Based on 2017 data, 1,898 firms were categorized as blinds and shades manufacturers and retailers (Census Bureau, 2020). Of these, about 1,840 firms (302 manufacturers and 1,538 retailers) are small. As the NAICS code for importers is non-specific to window coverings, CPSC staff reviewed Customs and Border Patrol data, firm financial reports, and Dun & Bradstreet reports to obtain an estimate. CPSC staff estimates that there are approximately 83 importers that meet the SBA guidelines for a small business (Laciak 2020). Nearly all of the 302 small manufacturers identified are far below the 1,000 employee SBA threshold as a majority are firms with under 5 employees. CPSC staff believes that the window coverings produced by these firms would meet the voluntary standard definition of a custom product, because many are hand crafters and produce products to a specific customer order.

## Small Business Impacts

A proposed rule designating window covering products that do not conform to ANSI/WCMA A100.1 – 2018 provisions concerning stock products and custom product inner cord accessibility or hazardousness as an SPH will not likely have a significant impact on a substantial number of small businesses or other small entities. Data collected in person at manufacturers, retailers, and importers by CPSC staff indicate that the level of conformance with the sections of the WCMA standard concerning stock products is high and most likely greater than 90 percent (Tab E).[30] Samples tested by CPSC staff also indicate a high level of conformance in custom products related to inner cord accessibility.[31]

Firms already conforming to the standard would experience no impact by the proposed rule. CPSC staff does note though that at least one small manufacturer that does not currently conform to the accessible cord provision will experience a significant cost impact by the rule (Tab K). Staff does not believe a substantial number of small manufacturers will experience this cost impact. Retailers and importers are not expected to be significantly impacted by the rule as potential costs to conform (no accessible cords, and labeling) will be borne by manufacturers. Should a window covering retailer and/or importer bear a cost related to conformance staff expects the cost to only account for a small portion of total revenues as these firms typically sell/import other home furnishing products in addition to window coverings.

Based on the available information, the Commission could certify that the draft proposed rule to deem nonconforming operating cords and inner cords on stock products and inner cords

---

[30] CPSC staff conducted in person unannounced visits to window covering retailers, manufacturers, and importers in major metropolitan areas and only found one violation in which a stock product was available with accessible cords. Four violations were found concerning warning/manufacturer labels not related to inner cords on custom products.

[31] Staff tested custom product samples using test parameters defined in ANSI/WCMA A100.1 – 2018 which involved the use of a cord accessibility probe and force gauge.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

on custom products to be SPHs would likely not have a significant impact on a substantial number of small businesses or other small entities.

## References Cited

Bailey, Mark, 2021. *Preliminary Regulatory Analysis of the Draft Proposed Rule for Custom Window Coverings* U.S. Consumer Product Safety Commission, 2021.

Chowdhury, Risana, 2021. "Memorandum to Window Covering Cords Petition Project Manager: Fatal and Near-Miss Strangulations Associated with Window Covering Cords". Bethesda, MD: U.S. Consumer Product Safety Commission.

Census Bureau, 2020. Statistics of US Businesses (SUSB) 2017. Suitland, MD. Census Bureau.

D+R International Ltd, 2021. Window Covering Market Characterization: Final Report. Silver Spring, MD. D+R International.

Euromonitor International, 2021a. Window Covering Market Share by Company 2014-2020. Chicago, IL. Euromonitor International.

Euromonitor International, 2021b. Window Covering Market Size USD 2014-2020. Chicago, IL. Euromonitor International.

Laciak, Arthur, 2020. Importation Patterns for USA: For Blinds. Bethesda, MD: U.S. Consumer Product Safety Commission.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**TAB G: MECHANICAL ENGINEERING ASSESSMENT FOR CUSTOM WINDOW COVERINGS CONTAINING OPERATING CORDS**

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



**UNITED STATES
CONSUMER PRODUCT SAFETY COMMISSION
BETHESDA, MARYLAND 20814**

Memorandum

Date: October 6, 2021

To:     Rana Balci-Sinha, Ph.D., CPE, Project Manager, Window Coverings
        Rulemaking, Division of Human Factors, Directorate for Engineering
        Sciences

Through: Mark Kumagai P.E.
        Associate Executive Director, Directorate for Engineering Sciences

        Caroleene Paul, Director,
        Division of Mechanical Engineering, Directorate for Engineering Sciences

From:   Kevin Lee, Mechanical Engineer,
        Division of Mechanical Engineering, Directorate for Engineering Sciences

Subject: Mechanical Engineering Assessment for Custom Window Coverings containing
        Operating Cords

## I.    Introduction

In this memorandum, CPSC staff discusses:

- Product Description
- Hazard
- ANSI/WCMA A100.1 – 2018, *American National Standard for Safety of Corded Window
  Covering Products* (ANSI/WCMA standard or voluntary standard),
- Adequacy of the ANSI/WCMA standard to addresses the risk of injury associated with
  custom window covering cords,
- Existing international standards for window coverings, and
- Staff's proposed performance requirements for custom window coverings.

## II.   Product

Window coverings comprise a wide range of products, including shades, blinds, curtains, and
draperies. In general terms, the industry considers "hard" window coverings, such as those
composed of slats or vanes, as blinds; and "soft" window coverings that contain a continuous roll
of material as shades. Both blinds and shades may have inner cords that cause a motion, such as
raising, lowering, traversing, or rotating the window covering to achieve the desired level of light
control. Curtains and draperies do not contain inner cords but may be operated by a continuous
loop. The cord or loop that is manipulated by the consumer to operate the window covering is
called an "operating cord" and maybe in the form of a single cord, multiple cords, or continuous
loops. Cordless window coverings are products designed to function without an operating cord

102

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

but may contain inner cords. Examples of window coverings are shown in Figures 1-6. Figure 1 shows a horizontal blind containing inner cords, operating cords, and tilt cords. Figure 2 shows a roll up shade containing lifting loops and operating cords. Figure 3 shows a cellular shade with inner cords between two layers of fabric and operating cords. Figure 4 shows a vertical blind with a looped operating cord to traverse the blind and a looped bead chain to tilt the vanes. Figure 5 shows a Roman shade with inner cords that run on the back side of the shade and operating cords. Figure 6 is a horizontal blind that is marketed as "cordless" because it has no operating cords, it still has inner cords.



**Figure 1. Horizontal blind**

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

A1103



**Figure 2. Roll-up shade with lifting loops.**



**Figure 3. Cellular shade with looped operating cord.**



**Figure 4. Vertical Blind.**



**Figure 5. Roman Shade.**



**Figure 6. Cordless horizontal blind.**

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

## III.    Hazards

Depending on the window covering type, hazard scenarios identified in the ANPR involved strangulation to children in: 1) Accessible operating cords, or 2) Accessible inner cords. Figures 7, 8, and 9 depict the strangulation hazard for different cord types.



**Figure 7. (a) Operating pull cords ending in one tassel (left), (b) operating cords tangled creating a loop (middle), (c) operating cords wrapped around the neck (right)**



**Figure 8. (a) Inner cords creating a loop (left), (b) Inner cords on the back side of Roman shade (right)**



**Figure 9. (a) Continuous loop cord (left), (b) Lifting loop (right)**

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

## IV. Incident Data

Staff of CPSC's Directorate for Epidemiology, Division of Hazard Analysis (EPHA) estimates that a minimum of nine fatal strangulations related to window covering cords occurred per year in the United States among children under five years old from 2009 – 2019.[32]

CPSC staff found a total of 194 reported fatal and near-miss strangulations on window covering cords that occurred among children 8 years old and younger from January 2009 through December 2020 (see Tab A).[33] Nearly 46 percent (89 of 194) of incidents were fatal incident reports, while the remaining were near-miss nonfatal incidents.  Some of the reported non-fatal incidents involved severe injuries with long-term consequences, such as quadriplegia or permanent brain damage. Stock window coverings accounted for at least 26 percent of all incidents and at least 22 percent of fatal incidents, and custom window coverings accounted for at least 18 percent of all incidents and at least 16 percent of fatal incidents. However, staff was unable to distinguish whether the incidents involved a stock or custom product for the majority of the 194 incidents.

Among the 89 fatal incidents, irrespective of the window covering type, CPSC staff found that the largest proportion (39 of the 89) of the deaths involved pull cord(s) as the operating mechanism, most frequently with tangled or knotted cord(s), followed by one or more long cords wrapped around the child's neck. Children getting caught in continuous looped cords or beaded chains without a functional tension device also figured as a major fatal hazard accounting for 23 of the 89 fatal strangulations.

CPSC staff definitively identified 35 incidents that involved custom window covering products (See Tab A). Of the 35 custom window covering incidents reviewed by staff, three incidents were related to inner cords, and 30 of the 35 (86%) incidents were related to operating cords (including pull cords and continuous loops).

## V. Voluntary Standards

### ANSI/WCMA A100.1 American National Standard for Safety of Corded Window Covering Products

In 1994, the Window Covering Manufacturers Association (WCMA) agreed to work with CPSC staff to develop a voluntary standard for window covering safety under the American National Standard Institute (ANSI) standards process. This standard was published in 1996 and was designated as ANSI/WCMA A100.1 – 1996 *American National Standard for Safety of Corded Window Covering Products*. The 1996 ANSI/WCMA standard included:

- requirements to minimize cord loops by requiring horizontal blinds to have separate tassels or a cord release device,
- requirements to provide a tension device for continuous loops and chains,
- requirements for Labeling and Operational Tags.

---

[32] Based on National Center for Health Statistics (NCHS) data and a CPSC study (Marcy et al., 2002)

[33] Based on CPSC's CPSRMS data (prior to 2011 the databases were DTHS, IPII, and INDP)

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

The standard has been revised eight times since 1996. In August 2002, the published ANSI standard required inner cord stops to reduce the risk associated with inner cords (Figure 3a). The standard was revised in 2007, 2009, 2010, 2012, and 2014 to include requirements associated with tension devices to partially limit the consumer's ability to control the blind if the tension device is not properly installed; Roman shade inner cords (Figure 3b); durability and performance testing of tension devices; warning label and pictograms on the outside of stock packaging and merchandising materials; expanded testing for cord accessibility, hazardous loop testing, roll-up style shade performance; and durability of all safety devices. The 2014 version of the standard included some editorial changes.

### a. Current ANSI/WCMA A100.1 – 2018 standard requirements

Since the publication of the ANPR in 2015, ANSI published a revision to the window coverings standard, ANSI/WCMA A100.1 – 2018, on January 8, 2018. WCMA subsequently updated the 2018 version in May 2018, to include some missing balloted revisions. The standard went into effect on December 15, 2018. The revised voluntary safety standard segments the window covering market between stock and custom-made products and specifies different cord requirements for stock and custom-made products.

Section 3, Definition 5.02 of the ANSI/WCMA A100.1 – 2018 standard, defines "Stock Blinds, Shades, and Shadings" as products completely or substantially fabricated before being sold to the consumer. Stock window coverings include products that require preassembly or can be modified by the seller to adjust the window covering's length/width, attachment of the top or bottom rail, or attachment of cords. The method of distribution or size of the purchase order does not classify a window covering as stock or custom.

Section 3, Definition 5.01 of the ANSI/WCMA A100.1 – 2018 standard, defines "Custom Blinds, Shades, and Shadings" as any window covering that is not classified as a stock window covering. For the draft proposed rule for custom window covering products, staff will reference the same definition that is in the ANSI/WCMA standard. See Appendix for the exact definition of stock and custom products.

Per the standard, stock products are required to have:

> (1) no operating cords, or
> (2) inaccessible cords, or
> (3) short cords (equal to or less than 8 inches).

For custom-ordered window covering products, the products can follow the requirements for stock products to be "cordless" or the products can have accessible cords. The ANSI/WCMA standard also contains revised requirements for custom products with accessible operating cords to require:

> (1) the operating cords to have a default length of 40 percent of the blind height (previously unlimited);
> (2) the wand to be the default option for tilting slats (instead of a cord); and
> (3) the warning labels to depict more graphically the strangulation hazard associated with cords.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Table 1 lists the performance requirements that are applicable to stock and custom window coverings.

Table 1. Performance Requirements in the ANSI/WCMA A100.1 – 2018

| *Performance Requirements* | **Stock Products** | **Custom Products** |
|---|---|---|
| *No operating cords OR* | | Optional |
| *Short cord with a length equal to or less than 8 inches in any state (free or under tension) OR* | Required | Optional |
| *Inaccessible operating cords* | | Optional |
| *Inner cords that meet Appendix C and D* | Required | Required |
| *Single Retractable Cord Lift System* | Prohibited | Allowed |
| *Continuous Loop Operating System* | Prohibited | Allowed |
| *Accessible Operating Cords longer than 8 inches* | Prohibited | Allowed |

In 2018, WCMA established a task group to develop performance requirements for a "rigid cord shroud" that is designed to make operating cords inaccessible on window coverings. The requirement would clarify "rigid" by confirming that a cord shroud is rigid enough to ensure that the shroud cannot be wrapped around a child's neck or won't form a u-shape as a result of attaching the free end of the shroud to the wall (similar hazards to a single cord). CPSC staff is not aware of incidents related to current products with rigid cord shrouds and concludes that shrouds that meet the proposed ANSI/WCMA standard will address the strangulation hazard posed by accessible cords. The task group, including CPSC staff, worked from March through December 2018 to develop draft language, but WCMA has not balloted the requirements. See Tab H for the proposed language.

On February 3, 2020, staff sent a letter to WCMA, outlining staff's recommendations for future improvements to the voluntary standard, and included a request to reopen the standard and discuss staff's recommendations. Staff reiterated their belief that substantial improvements have been made to the latest version of the standard, particularly in "stock" products; however, expanding the requirements to custom corded window coverings would improve window covering safety.

In September 2021, staff sent another letter to WCMA, urging the WCMA to apply stock product requirements in ANSI/WCMA A100.1-2018 to custom window coverings as well as balloting the rigid cord shroud language developed and agreed upon by the technical working group.

## A. Adequacy of ANSI/WCMA's Stock and Custom Window Covering Requirements

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

As discussed earlier, hazard scenarios identified in the ANPR involved strangulation to children in: 1) Accessible operating cords, or 2) Accessible inner cords.

## 1. Stock Products

CPSC staff determined that the stock product requirements in the ANSI/WCMA standard are adequate to address the risk of injury associated with window coverings, as explained below:

a) **Operating cords**: Staff analysis of incident data indicates the largest proportion of deaths, irrespective of window covering type, involved operating cords (most frequently tangled or knotted cords, followed by cord(s) wrapped around the child's neck). The voluntary standard recognizes that long and accessible cords can pose a strangulation hazard. The standard defines the operating cord as the portion of a cord that the user interacts with and manipulates to move the window covering in a certain direction (e.g., lifting or lowering, traversing, rotating). If a child wraps a long operating cord around their neck or inserts their neck into a loop that can be present by design or occur due to tangled up cords, the child can strangle to death within minutes. The ANSI/WCMA standard provides three ways that a stock window covering can comply with the standard to address operating cord hazards:

- **No operating cords**: Having no operating cords effectively eliminates the strangulation hazard associated with operating cords because there is no cord to cause strangulation. Consumers use a mechanism other than an operating cord to accomplish the desired movement action on the product (*i.e.*, lifting, lowering, traversing). For example, a spring mechanism on a horizontal blind allows the user to lift and lower the blind via bottom rail of the window covering.

- **Short cord with a length equal to or less than 8 inches in any state (free or under tension)**: Based on the anthropometric dimensions of youngest children involved in incidents, a static cord length of 8 inches or shorter is not sufficient to strangle a child as the neck circumference of fifth percentile 6-9 month-old children is 8 inches (BSI, 1990 as cited in Norris and Wilson, 1995); a child would need some extra length of cord to hold the cord, thus the cord must be longer than 8 inches to cause strangulation.

- **Inaccessible operating cords determined per the test requirement in Appendix C of the ANSI/WCMA A100.1**: If a window covering has an operating cord that is longer than 8 inches, the ANSI/WCMA standard requires that the cord must be inaccessible to children. Having inaccessible cords effectively eliminates the strangulation hazard associated with operating cords because the child is unable to access a cord to cause strangulation. Accordingly, this requirement is tested using a probe that is intended to simulate the finger size of a young child; the diameter of the probe is 0.25 inches, based on the fifth percentile 2-3.5-year old's index finger diameter (Snyder et al., 1977) at 0.33 inches and off-the-shelf availability of a 0.25-inch diameter dowel pin. If the probe cannot touch the operating cord, the cord is then deemed inaccessible. Staff is unaware of a stock window covering for sale in the U.S. that uses this method to meet the voluntary standard. For products sold in other countries that use this method, the test is obviated by the use of a rigid cord shroud that encapsulates the operating cord. See Figure 10 for an example.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



**Figure 10. Rigid cord shroud**

CPSC staff concludes that ANSI/WCMA A100.1 – 2018 adequately addresses the strangulation hazard posed by accessible operating cords in stock window covering products because the standard either eliminates accessible operating cords or limits the length of the cord to a length that is too short in which to strangle.

b) **Inner cords**: Inner cords run through the window covering as shown in Figure 1. The inner cord pulls the bottom rail up when the window covering is raised. Inner cords can pose a strangulation hazard if a child pulls on the inner cord and inserts their head in loop as shown in Figure 8. Section 4.5 *Inner Cords* of ANSI/WCMA A100.1 requires all products to meet two testing requirements to: 1) determine accessibility of the inner cord, and 2) If accessible, determine if a hazardous loop can form.

Inner cords are tested for accessibility to children using a cord accessibility probe (Figure 11) that is modeled after a fifth percentile 2-3.5-year old's finger dimensions.  If the inner cord is exposed from the front, rear, bottom, or sides of the window covering (typically found in Roman or horizontal window coverings), then the cord is deemed accessible if any part of the cord can touch the accessibility probe before reaching the 2-inch diameter section of the probe. If the inner cord is enclosed within a segmented layer of a product (typically found in cellular window coverings), then the cord is deemed accessible if any part of the cord can touch the accessibility probe before reaching the 4-inch diameter section of the probe.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



**Figure 11. Accessibility Probe (dimensions - inches)**

If the inner cords are deemed accessible, another test determines if a hazardous loop can form. The test consists of pulling the accessible inner cord over a time period of 5 seconds until either 5 pounds of force is achieved or the cord has pulled out 25 inches, whichever comes first. If a head probe, with insertion force of 10 pounds, can pass through the loop formed, the loop is considered a hazardous loop. The 10-pound insertion force was referenced from the ASTM F963 *Standard Consumer Safety Specification for Toy Safety*, with rationale stating "The 10 lbf is a reasonable force to simulate a child's pulling a loop over the head."

CPSC staff concludes that ANSI/WCMA A100.1 – 2018 adequately addresses the strangulation hazard posed by accessible inner cords in stock window covering products because the standard either eliminates accessible inner cords or limits the size of the loop that can be formed if an accessible inner cord is pulled to prevent a child from inserting their head in a hazardous inner cord loop.

## 2. Custom Window Coverings

Staff determined that the ANSI/WCMA standard does not adequately address the risk of strangulation associated with operating cords in custom window covering products because the standards allow hazardous cords. Although the 2018 version of the standard added two new requirements for custom window coverings to mitigate the hazard (default maximum operating cord length of 40 percent of the blind height when the product is fully lowered and default tilt wand option for tilting slats instead of a cord), the standard still allows hazardous operating cords to be part of the window covering design. Custom products can comply with the standard using one of the following methods, all of which pose strangulation risks:

- **Accessible Operating Cords longer than 8 inches**: This requirement allows an operating cord to be long enough to be wrapped around the neck or multiple cords to be tangled creating a loop. Even though the latest version of the standard attempts to reduce the risk by shortening the default length of the cord to 40 percent of the

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

window covering's length, and specifying the tilt wand as the default option versus tilt cords, as explained in Tab I, the risk associated with operating cords remains.

- **Continuous Loop Operating System**: This operating system requires that the operating loop be kept taut with a tension device. However, as observed in the incident data, a child can still insert his/her head into the continuous loop if it is not taut enough; in addition, as explained in Tab I, tension devices may not be attached to the wall which results in a free loop on the product. Staff identified 23 fatal strangulations involving a continuous corded loop on a product without a functional tension device. Staff is aware of Cord or Bead Chain Restraining Devices intended to be integrated into the window covering and do not need to be attached on the wall to keep the loop taut. According to the standard, these devices are required to meet durability, UV stability, and impact testing and must pass the hazardous loop testing procedure to confirm that device prevents the creation of a hazardous loop from an accessible continuous operating cord. Staff is requesting comments on the adequacy of these devices for custom products.

- **Single Retractable Cord Lift System**: This allows a cord to be pulled at any length to operate the window covering and then retracts to a shorter length when the user releases the cord. Retractable cord lift systems with the extended cord greater than 8 inches and a low retraction force to sustain that length could allow a child to manipulate and wrap the cord around his/her neck. Staff considers this requirement not adequate as written because the maximum cord length and a minimum pull force required to operate the system is not specified in the standard. Staff is requesting comments to determine if additional requirements such as a maximum exposed cord length and a minimum pull force for a single retractable cord lift system can address the strangulation hazard.

The ANSI/WCMA standard has the same requirements for inner cords that apply to stock and custom products.

CPSC staff concludes that ANSI/WCMA A100.1 – 2018 does not adequately address the strangulation hazard posed by accessible operating cords in custom window covering products because the standard allows these products to have one or more operating cords that is longer than 8 inches and the standard allows custom products to have continuous loop operating systems. The standard requires both stock and custom products to meet the same inner cords requirements (which limit accessibility of inner cords or limit the size of loop that can be formed when accessible inner cords are pulled to prevent a child from inserting their head in a hazardous inner cord loop); therefore, staff concludes ANSI/WCMA A100.1 adequately addresses the strangulation hazard posed by accessible inner cords in custom window covering products.

Of the 35 custom window covering incidents reviewed by staff, three incidents were related to inner cords, and 30 of the 35 (86%) incidents were related to operating cords (including pull cords and continuous loops). The requirements in ANSI/WCMA A100.1 address the custom window covering incidents associated with inner cords but do not address the incidents associated with accessible operating cords.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

### 3. Assessment of International Standards

The ANPR identified three jurisdictions which specify requirements for the safety of window coverings: (1) Australia, (2) Canada, and (3) Europe.

Australia has a Trade Practices (Consumer Product Safety Standard- Corded internal Window coverings) Regulation 2010 F2010C00801.

Europe has the EN: 13120 Internal blinds- Performance requirements including safety, EN 16433 Internal blinds- Protection from strangulation hazards- test methods, and EN 16434 Internal blinds- Protection from strangulation hazards- Requirements and Test methods for safety devices.

Staff compared the current ANSI/WCMA standard with the international standards and determined that the ANSI/WCMA standard was more stringent than the Australia Regulation 2010 F2010C00801 or EN 13120, EN 16433, and EN 16434.

Canada previously had the Corded Window Covering Products Regulation SOR/2006-112. Since the ANPR, the Canadian standard was revised to SOR/2019-97. The Canadian regulation states that any cord that can be reached must be too short to wrap around a one-year-old child's neck (i.e. not more than 22cm (8.66 inches) in length) or form a loop that can be pulled over a one-year-old child's head (i.e. not more than 44cm (17.32 inches) in circumference). Canada's regulation requires all window coverings, which effectively cover both stock and custom products, to meet one of the following conditions:

- Section 4: The cord shall be unreachable/inaccessible
- Section 5 and 6: Reachable/accessible cords shall be 22 cm (8.66 inches) or less when pulled with 35N (7.87 lbf).
- Section 7: Reachable/accessible looped cords shall be 44 cm (17.32 inches) or less in perimeter when pulled with 35N (7.87 lbf).

Both the Canadian standard and the ANSI/WCMA stock window covering requirements do not permit a long accessible operating cord. The Canadian standard is more stringent because while the Canadian standard applies to both stock and custom products, the ANSI/WCMA standard contains separate requirements to permit long accessible operating cords in custom products. Although the Canadian standard is similar to the ANSI/WCMA's stock window covering requirement, there are some differences discussed below.

*Definition of accessible cord*

Section 3, Definition 2.01 of the ANSI/WCMA standard defines an accessible cord as a cord that can touch a cord accessibility probe and a cord shroud accessibility probe, while section 1 of the Canadian regulation states a reachable/accessible cord is:

> the part of the cord that any person can touch when the corded window covering has been installed whether the window covering is fully opened, fully closed or in any position in between.

Staff concludes that the Canadian standard's definition of an accessible cord is subjective

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

because it defines an accessible cord by stating a person with unspecified measurements shall be able to reach it, while the ANSI/WCMA standard defines an accessible cord through a performance requirement.

*Inner cord requirements*

The Canadian regulation addresses the inner cord hazard by requiring that all accessible looped cords be too short to form a loop that can be pulled over a one-year-old child's head (not more than 44 cm (17.32 inches) in circumference) when pulled with 35 N (7.87 pounds) of force. This pull force is based on the 97th percentile pinch-pull strength of 2 to 5-year-old males.

The ANSI/WCMA standard addresses the inner cord hazard by requiring all accessible inner cords to pass the Hazardous loop test. In the Hazardous loop test, the accessible inner cord is pulled with a force gage until it measures 5 pounds (22.2 N) or 25 inches of slack is pulled, whichever comes first. The 22.2 Newton force is based on Section 4.14.1 *Cords, Straps, and Elastics* in ASTM F963 *Standard Consumer Safety Specification for Toy Safety*. The head probe has dimensions of Width 148 mm by Length 110 mm by Height 150 mm, and shall not be able to be inserted in the loop with a force of 44.5 Newton (10 pounds). The head probe is representative of a 5th percentile 7-9-month-old and the 10 pounds was based on section 8.22 *Test for Loops and Cords* in ASTM F963 whose rationale states "The 10 lbf is a reasonable force to simulate a child's pulling a loop over the head."

Although the ANSI/WCMA standard's 5-pound pull force is somewhat less than the pull force in the Canadian regulation (7.87 pounds), due to the complexity and variances involved in pulling an inner cord, staff concludes the ANSI/WCMA requirement adequately assesses the ability of a child to access the inner cord based on the lack of incidents involving inner cords in the time that requirements have been established in the ANSI/WCMA standard in 2002.

As set forth above, the ANSI/WCMA standard is substantially equivalent to the Canadian standard with respect to stock window coverings because they both require window coverings to practically contain either: (1) no operating cords, (2) short operating cords, or (3) inaccessible operating cords. Both standards follow similar test procedures to test the accessibility of inner cords and if accessible, to determine if the loop formed is hazardous. Overall, because the Canadian standard's requirements apply to stock and custom products and the ANSI/WCMA standard allows less stringent requirements for operating cords on custom products, CPSC staff concludes the Canadian standard is more stringent than the ANSI/WCMA standard for custom products.

## VI.    Available Technologies:

Currently, consumers can purchase products on the market that address all of the hazards identified in the incident hazard review. The products that address the hazards include, but are not limited to window coverings that: are cordless, use rigid cord shrouds, or are cordless and motorized.

Operating cords can be made inaccessible with passive guarding devices. Passive guarding devices allow the user to operate the window covering without the direct interaction of a hazardous cord. These types of window coverings use rigid cord shrouds, integrated

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

cord/chain tensioners, or crank mechanisms.

Cordless blinds can be raised and lowered by pushing the bottom rail up or pulling the rail down. This same motion may also be used to adjust the position of the horizontal slats for light control. Through market research, staff found several examples of cordless blinds that are made with a maximum height of 84" and a maximum width of 144".

Rigid cord shrouds as shown in Figure 10 can be retrofitted over various types of window coverings to enclose pull cords and continuous cord loops. The cord shroud allows the user to utilize the pull cords while eliminating access to the hazardous cords.

Crank mechanisms (Figure 12) replace the continuous loop mechanism with a crank/wand mechanism. Because the operating cord is replaced with a wand, the strangulation hazard is completely removed.



**Figure 12. Crank Mechanism**

Cordless motorized blinds can be raised and lowered using an electric motor with a supplied controller. These products function similarly to the motorized projector screens. Because these products use a motor instead of a pull cord, they do not contain exposed hazardous operating cords.

## VII. Recommended Performance Requirements

Due to the ongoing window covering cord incidents, high severity of the outcomes, proven technical feasibility, an existing implementation in the voluntary standard of stronger requirements for stock window coverings already on the market, and ineffectiveness of warnings and safety devices for this class of products, CPSC staff recommends that the requirements for custom products be identical to stock window coverings outlined in the ANSI/WCMA A100.1 – 2018 standard.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION
CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

In addition, staff recommends that the rigid cord shroud requirements based on the language developed by the WCMA Rigid Cord Shroud Task Group, but have not yet been balloted, be part of the mandatory standard for custom window coverings.[34]

**Rigid cord shroud:**

CPSC staff worked with WCMA and other members from March - December 2018 to develop draft requirements to test the stiffness of "rigid cord shrouds" by measuring the deflection and deformation.[35] In December 2018, WCMA sent the agreed-upon language for rigid cord shrouds to the members, however, the language was never balloted. Staff recommends that the custom window coverings meet this requirement if they contain a rigid cord shroud to comply with the rule through inaccessibility of the operating cords. The language is shown in Tab H (regulatory language) and explained below:

The proposed rigid cord shroud requirements include two tests, the "Center Load Test" and the "Axial Torque" test to ensure the stiffness and the integrity of the shroud so that the enclosed operating cord does not become accessible when shroud is twisted. The Center load test verifies the stiffness of the cord shroud, by measuring the amount of deflection in the shroud when both ends are mounted and a 5-pound force is applied at the mid-point. This test ensures the shroud is not flexible enough to wrap around a child's neck. The axial torque test verifies the cord shroud's opening does not enlarge to create an accessible cord opening when the shroud is twisted. Staff solicits comments on the proposed test methods set forth in Tab H for rigid cord shrouds.

## VIII.    Conclusion

Based on staff's review of 35 incidents identified as involving custom window covering products (of which 86 percent involved operating cords) and on staff analysis of the ANSI/WCMA A100.1 – 2018 standard, staff concludes the standard does not adequately address the hazard with operating cords for custom window coverings.

Staff also concludes that stock window covering requirements in the voluntary standard are adequate and would address the custom window covering incidents involving operating cords; therefore, staff recommends the requirements for custom products be identical to stock window coverings outlined in the ANSI/WCMA A100.1 – 2018 standard.

Staff also recommends a draft language for rigid cord shrouds based on the language developed by the WCMA Rigid Cord Shroud Task Group in 2018 to be part of the proposed requirements. The purpose of this addition is to clarify the meaning of rigid to ensure that rigid cord shrouds

---

[34] Although staff has never seen a stock product with a rigid cord shroud, staff encourages WCMA to revise the voluntary standard to include this requirement for stock and custom products.

[35] The 2018 standard tests rigid cord shrouds for UV stability and impact.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

are not flexible to completely or partially wrap around the child's neck or do not allow hazardous cords to become accessible to children.

Staff notes that stock window coverings currently on the market, as well as a substantial portion of custom window coverings, already implement safer technologies to address the hazards identified in the incident analysis review. These products include, but are not limited to cordless window coverings, window coverings with rigid cord shrouds, and cordless motorized window coverings.

117

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

A1117

**Appendix**

Section 3, Definition 5.02 of ANSI/WCMA A100.1 – 2018 defines Stock Blinds, Shades, and Shadings as:

> "A specific stock keeping unit or SKU, which is completely or substantially fabricated (as defined below) in advance of being distributed in commerce (as that term is defined in 15 U.S.C. Sect. 2052(a)(7) and in advance of any specific consumer request for that product. The SKU can either be sold "as is" or modified or adjusted by the seller, manufacturer, or distributor before or after being distributed in commerce and it would still be considered a Stock Blind, Shade and Shading.
> "Substantially fabricated" would include products pre-assembled in advance of a consumer order or purchase. Pre-assembled products that are modified or adjusted by the seller, manufacturer or distributor before or after being distributed in commerce will still be considered as "substantially fabricated" if they require, but is not limited to, any of the following: adjustments to size, attachment of the top rail and/or bottom rail, and/or tying of Cords to secure the Bottom Rail to finish the assembly of the product.
> Stock Blinds, Shades, and Shadings shall not be considered Custom Blinds, Shades, and Shadings solely because of the method of distribution (e.g., Internet sales) or the size of the purchasing order (e.g., for multi-family housing developments)."

Section 3, Definition 5.01 of ANSI/WCMA A100.1 – 2018 defines Custom Blinds, Shades, and Shadings as:

> "Any window covering that is not classified as a stock window covering."

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**TAB H: DRAFT REGULATORY LANGUAGE**

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

# AMENDMENT TO PART 1120—SUBSTANTIAL PRODUCT HAZARD LIST

To address the risk of injury associated with operating cords on stock window coverings, and inner cords on stock and custom window coverings staff recommends adding three paragraphs to 16 C.F.R. part 1120 to: define "stock window covering" and "custom window covering," describe the readily observable characteristics of stock and custom window coverings in ANSI/WCMA A100.1 – 2018, and incorporate by reference relevant portions of ANSI/WCMA A100.1 – 2018, as follows:

## 1120.2 Definitions.

(f) *Stock window covering* (also known as a *stock blind, shade, or shading*) is defined in section 3, definition 5.02, of ANSI/WCMA A100.1 – 2018, as a product that is a completely or substantially fabricated product prior to being distributed in commerce and is a stock-keeping unit (SKU). Even when the seller, manufacturer, or distributor modify a pre-assembled product by adjusting to size, attaching the top rail or bottom rail, or tying cords to secure the bottom rail, the product is still considered stock. Online sales of the product, or the size of the order, such as multi-family housing, does not make the product a non-stock product. These examples are provided in the standard to clarify that as long as the product is "substantially fabricated," subsequent changes to the product do not change its categorization.

(g) *Custom window covering* (also known as a *custom blind, shade, or shading*) is defined in section 3, definition 5.01, of ANSI/WCMA A100.1 – 2018, as any window covering that is not classified as a stock window covering.

## 1120.3 Products deemed to be substantial product hazards.

(e) *Stock window coverings* that fail to comply with one or more of the following requirements of ANSI/WCMA A100.1 – 2018:

(1) Operating cord requirements in sections 4.3.1.1 (cordless operating system), 4.3.1.2 (short static or access cord), or 4.3.1.3 (inaccessible operating cord); and

(2) Inner cord requirements in section 4.5.

(f) *Custom window coverings* that fail to comply with inner cord requirements in section 4.5 of ANSI/WCMA A100.1 – 2018.

(g) *Stock* and *custom window coverings* that fail to comply with the requirement for an on-product manufacturer label in section 5.3 of ANSI/WCMA A100.1 – 2018.

## 1120.4 Standards incorporated by reference.

(d) Window Covering Manufacturers Association, Inc. 355 Lexington Avenue, New York, New York, 10017. telephone: 212.297.2122. http://wcmanet.com

(1) ANSI/WCMA A100.1 – 2018. *American National Standard For Safety Of Corded Window Covering Products,* IBR approved for §1120.3 (e), (f), and (g).

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

To address the risk of injury associated with operating cords on custom window coverings, staff recommends that the requirements for operating cords on stock products in the ANSI/WCMA standard be extended to custom window coverings. Accordingly, staff recommends adding a new part to title 16, chapter II of the Code of Federal Regulations, as follows:

**PART XXX-SAFETY STANDARD FOR CUSTOM WINDOW COVERING PRODUCTS**

Sec.

XXXX.1  Scope and definitions.

XXXX.2  Requirements for custom window covering products.

XXXX.3  Prohibited stockpiling

XXXX.4  Findings.

**Authority**:  **15 U.S.C. 2051(b), 2056, 2058, 2063(c), 2076(e)**

**§ XXXX.1  Scope and definitions.**

(a)  This part establishes a consumer product safety standard for operating cords on custom window coverings.

(b)  *Custom window coverings* (blinds, shades, and shadings) are defined in section 3, definition 5.01 of ANSI/WCMA A100.1 – 2018, American National Standard For Safety of Corded Window Covering Products, as window coverings that are not stock.  .

(c)  *Stock window coverings* (blinds, shades, and shadings) are defined in section 3, definition 5.02 of ANSI/WCMA A100.1 – 2018 as: "A specific stock keeping unit or SKU, which is completely or substantially fabricated (as defined below) in advance of being distributed in commerce (as that term is defined in 15 U.S.C. § 2052(a)(7) and in advance of any specific consumer request for that product. The SKU can either be sold "as is" or modified or adjusted by the seller, manufacturer, or distributor before or after being distributed in commerce and it would still be considered a Stock Blind, Shade and Shading. "Substantially fabricated" would include

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

products pre-assembled in advance of a consumer order or purchase. Pre-assembled products that are modified or adjusted by the seller, manufacturer or distributor before or after being distributed in commerce will still be considered as "substantially fabricated" if they require, but is not limited to, any of the following: adjustments to size, attachment of the top rail and/or bottom rail, and/or tying of Cords to secure the Bottom Rail to finish the assembly of the product. Stock Blinds, Shades, and Shadings shall not be considered Custom Blinds, Shades, and Shadings solely because of the method of distribution (e.g., Internet sales) or the size of the purchasing order (e.g., for multi-family housing developments)."

(d) *Operating cord* is defined in section 3, definition 2.19, of ANSI/WCMA A100.1 – 2018, as "the portion of the cord that the user manipulates directly during operation. Operation includes, but is not limited to, lifting, lowering, tilting, rotating, and traversing."

(e) *Cord shroud* is defined in section 3, definition 2.09, of ANSI/WCMA A100.1 – 2018 as "a device or material added to limit the accessibility of a cord or formation of a Hazardous Loop."

(f) *Rigid Cord Shroud* is a cord shroud that is constructed of inflexible material to prevent children from accessing a window covering cord.

**§ XXXX.2 Requirements for operating cords on custom window coverings.**

(a) *Requirements for operating cords.* Each operating cord on a custom window covering shall comply with section 4.3.1, instead of section 4.3.2, of ANSI/WCMA A100.1 – 2018, American National Standard For Safety of Corded Window Covering Products (approved on January 8, 2018).

(b) *Incorporation by reference.* The Director of the Federal Register approves the incorporation by reference in sections 1260.1 and 1260.2, in accordance with 5 U.S.C. 552(a)

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

and 1 CFR part 51.  You may obtain a copy from Window Covering Manufacturers Association, Inc., 355 Lexington Avenue, New York, New York, 10017, telephone: 212.297.2122, http://wcmanet.com or https://webstore.ansi.org/Standards/WCMA/ANSIWCMAA1002018.  A read-only copy of the standard is available for viewing on the WCMA website at http://www.wcmanet.com/pdf/WCMA-A100.1-2018_view-only_v2.pdf.  You may inspect a copy at the Division of the Secretariat, U.S. Consumer Product Safety Commission, 4330 East West Highway, Bethesda, MD 20814, telephone (301) 504-7479, email: cpsc-os@cpsc.gov, or at the National Archives and Records Administration (NARA).  For information on the availability of this material at NARA, email fedreg.legal@nara.gov, or go to: www.archives.gov/federal-register/cfr/ibr-locations.html.

(c) *Requirements for rigid cord shrouds*.  If a custom window covering complies with paragraph (a) using a rigid cord shroud, the rigid cord shroud shall not have an accessible cord when tested for cord accessibility using the test methods defined in paragraphs (d) and (e).

(d) *Test methods for rigid cord shrouds*: *Center load test*.

1.  Support each end of the rigid cord shroud, but do not restrict the rotation along the axial direction.  Supports must be within 0.25 inches from the ends of the shroud as shown in figure 1.



THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Figure 1. Rigid Cord Shroud Test Set-up.

2. Apply a 5-pound force at the center of the rigid cord shroud for at least 5 seconds as shown in figure 2.

3. Measure the maximum deflection of the shroud, while the 5-pound force is applied.

4. For rigid cord shrouds that are ≤ 19 inches, the deflection shall not exceed 1 inch. For every additional 19 inches in shroud length, the shroud can deflect an additional inch. See Figure 2.



Figure 2. Rigid Cord Shroud Center Load Test and Deflection Measurement.

5. While continuing to apply the 5-pound force, determine if the cord(s) can be contacted by the cord shroud accessibility test probe shown in figure 3. If the cord shroud accessibility test probe can touch any cord, the cord(s) are considered accessible.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



Figure 3. Cord Shroud Accessibility Test Probe

(e) *Test methods for rigid cord shrouds: Axial torque test.*

1. Mount one end of the rigid cord shroud and restrict the rotation along the axial direction.

2. Apply a 4.4 in-lb. (0.5Nm) torque along the other end of the rigid cord shroud for 5 seconds.

3. While continuing to apply the torque, determine if the cord(s) can be contacted by the cord shroud accessibility test probe shown in figure 3. If the cord shroud accessibility test probe can touch any cord, the cord(s) are considered accessible.

**XXXX.3 Prohibited stockpiling.**

(a) *Prohibited acts.* Manufacturers and importers of custom window coverings shall not manufacture or import custom window coverings that do not comply with the requirements of this part in any 12-month period between [date of promulgation of the rule] and [effective date of the rule] at a rate that is greater than 120 percent of the rate at which they manufactured or imported custom window coverings during the *base period* for the manufacturer.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

125
CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

(b) *Base period.* The base period for custom window coverings is any period of 365 consecutive dates, chosen by the manufacturer or importer, in the 5-year period immediately preceding the promulgation of the final rule.

**XXXX.4 Findings.**

[Will be blank for Staff Package 6b Review.  Findings will be reviewed as part of the draft rule.]

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**TAB I: HUMAN FACTORS CONSIDERATIONS FOR THE PROPOSED RULE ON CUSTOM WINDOW COVERINGS**

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



UNITED STATES
CONSUMER PRODUCT SAFETY COMMISSION
BETHESDA, MARYLAND 20814

**Memorandum**

October 6, 2021

TO:              Window Coverings Rulemaking File

THROUGH:  Mark Kumagai, Associate Executive Director,
                      Directorate for Engineering Sciences

FROM:          Rana Balci-Sinha, Director, Division of Human Factors,
                      Directorate for Engineering Sciences

SUBJECT:    Human Factors Considerations for the Proposed Rule on Custom Window
                      Coverings

## 1. Introduction

In January 2015, the U.S. Consumer Product Safety Commission (CPSC) published an advance notice of proposed rulemaking (ANPR) to address the strangulation hazard associated with corded window covering products. 80 *Fed. Reg.* 2,327 (Jan. 16, 2015). In this memorandum, staff of CPSC's Directorate for Engineering Sciences, Division of Human Factors (ESHF), discusses the human factors related concerns associated with custom window covering requirements in the ANSI/WCMA A100.1 – 2018 standard (ANSI/WCMA), and describes human factors considerations for the draft proposed rule (NPR).

## 2. Assessment of Custom Product Requirements in the Voluntary Standard

*a)  Operating Cord Requirements that apply to Stock and Custom Products*

Operating cords on stock products are required to meet one of the following to comply with the ANSI/WCMA standard:

      (1) No operating cords;

      (2) Short cord with a length equal to or less than 8 inches in any state (free or under tension),

      (3) Inaccessible operating cords determined per the test requirement in Appendix C of the ANSI/WCMA A100.1.

These requirements effectively eliminate the strangulation hazard associated with operating cords as explained in this memorandum.

According to the standard, custom products are allowed to meet one of the three requirements listed above but also are allowed to have operating systems that do not eliminate the strangulation hazard because they result in free-hanging and accessible cords; these systems include single retractable cord lift system, continuous loop operating system, and standard operating system.

128

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

*b)  New Operating Cord Length Requirements that apply to Custom Products*

In the earlier versions of the standard, there was no specified length for the operating cords. Per the 2018 standard, custom window coverings have two new requirements intended to reduce the hazard associated with free-hanging and accessible operating cords as described below:

(1)  The default cord length should be no more than 40 percent of the product height when the window covering is fully lowered. The exception is when a custom length is required to ensure user accessibility. Figure 1 shows the length of operating cords that are longer than 40 percent of product height and shorter cords that comply with this new requirement.

(2)  Wand tilt becomes the default operating system and cord tilt becomes an allowable customer option (Figure 1). The length requirement about the 40 percent explained above still applies to tilt cords.



Figure 1. Window blind with operating cords longer than 40 percent of the length of the product and tilt cords to tilt the slats (left). Window blind with operating cords equal to 40 percent of the product length and wand tilt replacing tilt cords (right)

Staff has several concerns with these requirements:

• The length of the operating cord(s) can still be hazardous when the product is fully lowered because (1) a child can still wrap the cord around their neck; only about 8 inches of cord is enough to encircle the child's neck,[36] and/or (2) multiple cords can tangle and create a loop in which a child can insert his/her head; a loop with a

---

[36] Neck circumference of fifth percentile 6-9-month-old children is 8 inches (BSI, 1990 as cited in Norris and Wilson, 1995.)

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

circumference of about 17 inches is sufficient for child's head to enter.[37] Figure 2 shows these two scenarios.



Figure 2. Demonstration of wrapped cords around (doll) child's neck (left), (doll) child's head is through the loop created by entangled multiple cords (right)

- The operating cord(s) will get longer as the window covering is raised, making it easier for a child to access and manipulate,
- If the cord tilt option is chosen, the cord tilt can also be long enough to be wrapped around a child's neck or be tangled and create a loop in which a child's head can enter.
- The default options can easily be changed during the custom order process, thus maintaining the consumer's ability to choose and utility, but also allowing long, accessible cords which pose a strangulation hazard.

*Child's Access to Cords*

Incident data show that children can access the cord in various ways. As reported in the Division of Hazard Analysis, Directorate for Epidemiology (EPHA) memorandum (Chowdhury, 2021), staff determined that custom products were involved in 35 incidents. Table 1 shows how children accessed the cords. In 14 incidents, the child climbed on an item including couch, chair, toy chest or dog kennel and accessed the cord. In four cases, a child was on a sleeping surface including bed (2), playpen, and a crib. In six incidents, a child was able to get to the cord from the floor.

Table 1. Child's interaction scenario in incidents associated with custom products

| Scenario | Number of Incidents |
|---|---|
| Climbed on an item to reach the cords | 14 |
| On floor | 6 |
| On bed, in playpen or crib | 4 |
| Unknown | 11 |
| *Total* | *35* |

---

[37] Head circumference of fifth percentile 6-9-month-old children is 16.5 inches (Snyder et al., 1977)

130

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

The incident data demonstrate that accessible cords that are longer than 8 inches are hazardous. For example, the data show that even if operating cords are kept close to the head rail with some means, children climb and access the cords. In addition, there are a significant number of operating pull cord incidents that occurred in fully or partially raised window coverings, which essentially reduce the benefit of having a default length of 40 percent of the window covering height in fully lowered position of the window covering because the cords will get longer as the product is raised.[38] Based on these data, staff concludes that even though both requirements attempt to reduce the strangulation hazard associated with accessible and hazardous operating cords, requirements still fall short as they allow accessible and long cords to be part of the window covering.

*c)  Warning Labels in the Voluntary Standard*

The ANSI/WCMA A100.1 – 2018 standard requires that corded custom window covering products have warning labels regarding the strangulation hazard to children, as summarized below:

- A generic warning label that is permanently attached to the bottom rail, including a pictogram depicting the hazard of a cord wrapped around a child's neck. The content explains the strangulation hazard and what consumers need to do to avoid the hazard (keeping cords out of children's reach, shortening cords to prevent reach, moving crib and furniture away.)
- A similar warning label must be placed on product merchandising materials which includes, but is not limited to, the sample book and the website (if the website is relied upon for promoting, merchandising, or selling on-line.)
- A warning tag containing a pictogram and similar text as above on accessible cords including operating cords, tension devices that are intended to keep continuous loops taut, and on inner cords of a roll up shade.

Staff notes that the formatting of warning labels is required to follow ANSI Z535 standards, which are the preeminent set of standards to develop safety labels.[39] This includes a signal word ("Warning") in all uppercase letters measuring not less than 5/16 in (8 mm) in height and preceded by an ANSI safety alert symbol (an equilateral triangle surrounding an exclamation point) of at least the same size, the rest of the warning message text be in both uppercase and lowercase letters, with capital letters measuring not less than 1/8 in (3 mm). A Spanish version of the label is also required.

Among the 35 incidents involving custom products, at least 19 included a permanent label. Table 2 shows the presence of the labels on the incident units.[40] The presence of the label was unknown in 10 incidents, and no label was reported in 6 incidents. In some cases, parents reported that they were aware of the cord hazard, but never thought their child would interact

---

[38] A total of 36 out of 46 pull cord incidents when position of the window covering was known have occurred with partially or fully raised window covering (1996 to 2016 incidents.)

[39] The ANSI Z535 Series provides the specifications and requirements to establish uniformity of safety color coding, environmental / facility safety signs and communicating safety symbols. It also enables the design, application, use and placement of product safety signs, labels, safety tags and barricade tape.

[40] In two cases, staff examined exemplar units.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

with them; in a few cases, parents were aware of the operating cord hazard but not the inner cord hazard. In some cases that involved bead chains, parents thought that the connector clip on the bead chain loop was supposed to break away. Staff notes that none of the incident units had a hang tag. One unit had the hang tags tucked into the head rail, which was discovered when the unit was removed.

Table 2. Presence of permanent warning labels in incident units

| Permanent Label Present | Number of Incidents |
|---|---|
| Yes | 18 |
| Mostly peeled off | 1 |
| No | 6 |
| Unknown | 10 |
| *Total* | *35* |

Research demonstrates that consumers are less likely to look for and read safety information about the products that they use frequently and are familiar with (Godfrey et al., 1983). Given that many of the window covering incidents occurred on products with at least the permanent label attached on the bottom rail, and the high likelihood that consumers have window coverings in their homes and almost certainly use them daily, and thus have high familiarity, even well-designed warning labels will have limited effectiveness in communicating the hazard on this type of product.

CPSC staff concludes that warning labels are unlikely to effectively reduce the strangulation risk due to hazardous cords on window coverings because consumers are not likely to read and follow warning labels on window covering products, and strangulation deaths among children occur quickly and silently, such that parental supervision is insufficient to address the incidents.

*d) Safety Devices*

The voluntary standard requires that custom products with accessible operating cords include cord cleats with instructions for use and mounting. The standard also requires that custom products with a continuous loop operating system contain a cord tension device. Figure 3 shows examples of cord cleats and tension devices.

 

Figure 3. Examples of cord cleat (left), cord tension device (right)

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

*Tension Devices*

ANSI/WCMA requires that a tension device be attached to the cord or bead chain loop by the manufacturer and also requires a sequential process or tools to be removed, which essentially means that consumers would have to go through multiple steps or need to use a tool such as a screw driver to remove the tension device. Unless installed or altered from the shipped condition, the voluntary standard also requires window coverings to be designed so that they are prevented from operating, at least partially, unless the tension device is properly installed. The standard also requires that the tension device be supplied with fasteners and instructions and meet the durability test requirements.

Staff has been concerned with safety devices over the years for several reasons: securing safety devices goes beyond the installation of the window covering itself, which increases the "cost of compliance" that is the time and effort to use the product. Furthermore, tension devices, for example, usually require drilling holes on the wall or window sill that may not be permissible for renters and may not be desirable by home owners.

Among the 35 incidents involving custom products, 12 had continuous loop cords or bead chains. In one incident, the child was able to insert his head through the loop even though the tension device was attached to the wall, originally installed by a professional. In 2 incidents, a tension device was attached to the cord but not to the wall. In one incident, a tension device broke prior to the incident. In 4 incidents, staff confirmed that a tension device was not installed. The remaining 4 incidents contained no mention of tension device.

*Cord Cleats*

While the tension device is intended to at least "partially" prevent the window covering from operating, cord cleats have no impact on the operation of the window covering. Even when a cord cleat is installed, the consumer must wrap the cord around the cleat every time the product is raised or lowered to mitigate the strangulation hazard, which means that the user's active involvement is necessary every time. Further, cord cleats can be accessed by a child if he/she climbs up. In one incident, although caregivers normally wrapped the cord around the cleat, on the day of the incident, cords were not wrapped, and the child accessed the cords after climbing on a couch.

*Consumer Perception of Safety Devices*

Some consumers may believe that because they either do not have young children living with them or visiting them, installation of the safety devices is unnecessary. However, window coverings last a long time, and when homes are sold or new renters move in, the existing window coverings, if they are functional, usually remain installed and could be hazardous to new occupants with young children.

CPSC issued a contract to investigate the effectiveness of safety devices in reducing the risk of a child's access to hazardous cords and loops on window coverings. The research was conducted

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

by Westat, under Contract CPSC-Q-15-0064.[41] The objective of the research was to provide CPSC with systematic and objective data on the factors that impact installation, use, and maintenance of safety devices; assess how these factors impact the likelihood of correct installation, use, and maintenance; and identify how the factors relate to the goal of reducing children's access to hazardous cords and loops. Westat reviewed the window coverings and safety devices available in brick-and-mortar and online stores; performed task analysis to identify key issues and specific questions to be addressed in the focus groups; developed materials and procedures for the focus groups; and conducted the focus groups. Major findings from the study point to:

(1) A general awareness about cord entanglement among caregivers, which does not translate to precautionary action, due partly to the insufficient information provided at the point of sale;

(2) Lack of awareness of the speed and mechanism of the injury that may lead to caregivers' underestimating the importance of providing an adequate level of supervision;

(3) Difficulty using and installing safety devices as primary reasons for not using them; and

(4) Inability to recognize the purpose of the safety devices provided with window coverings.

In general, participants in the Westat study preferred a cordless window covering or a passive mechanism, which does not require intentional action by the user. Westat concluded that there could be benefits from enhancing the public's awareness and understanding of the unique nature of incidents (e.g., speed, mechanism) and explaining a child's vulnerability in all rooms in the home, and that providing specific information at the point of sale, could be partially helpful. However, Westat stated that these improvements would be incremental, and that increasing the use of cordless window coverings would be needed to achieve significant benefits.


### 3.  Parental Supervision

CPSC has recognized cords on window coverings as a hidden hazard for many years. Strangulation with cords requires only a few minutes. Because even young children are left unsupervised for a few minutes or more in a room that is considered safe, such as a bedroom or family room, staff conclude that parental supervision is unlikely to be effective to eliminate or reduce the hazard. Children can wrap the cord around their necks or insert their heads into a cord loop and get injured or die silently in a few minutes in any room, with or without supervision, because even when supervision is present, the level of supervision varies and distractions and other limitations to supervision exist. For example, staff received reports of five near-fatal strangulations in which the parent was either nearby or in the same room and was able to rescue the child before the child lost consciousness.[42] Among the 35 incidents involving custom

---

[41] https://cpsc.gov/s3fs-public/Window%20Coverings%20Safety%20Devices%20Contractor%20Reports.pdf

[42] Video capturing a child's entanglement in the cords at https://www.youtube.com/watch?v=2s6nBgy3MJA, accessed on 8/13/2021

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

products, incident location was known in 33 incidents. In 18 incidents, a child was in a room shared by the family members such as a family room, living room, and sun room. Eleven of 18 incidents were not witnessed, whereas 5 were witnessed by an adult, 2 incidents occurred in the company of other children. Almost all the incidents (14/15) that occurred in a bedroom were unwitnessed, including one victim's father sleeping in the same room; only one was witnessed by another child, a 5-year-old (Table 3.) Out of the 14 fatalities, 13 were not witnessed whereas out of the 21 nonfatal incidents, 12 were not witnessed. Research supports these observations. People cannot be perfectly attentive, particularly over long periods of time, regardless of their desire to do so (Wickens & Hollands, 2000). Caregivers are likely to be distracted at least occasionally because they must perform other tasks, are exposed to more salient stimuli, or are subject to other stressors, such as being responsible for supervising more than one child. In fact, research by Morrongiello and colleagues (2006) indicates that older toddlers and preschool children (2 through 5 years old) are regularly out of view of a supervising parent for about 20 percent of their awake time at home, and are completely unsupervised (i.e., the parent was not listening to or watching what the child was doing at all) for about 4 percent of awake time in the home. The most common rooms in which children were left alone and unsupervised were the living or family room and the bedroom.

Table 3. Location of incidents and whether the incidents were witnessed

| Location | Fatal | Nonfatal |
|---|---|---|
| Bedroom | | |
|    Witnessed by children | 1 | |
|    Not witnessed | 8 | 6 |
| Family/Living/Dining room | | |
|    Witnessed by Adult | | 5 |
|    Witnessed by children | | 2 |
|    Not witnessed | 5 | 6 |
| Unknown | | 2 |
| *Grand Total* | *14* | *21* |

## 4. Assessment of Recommended Requirements for Custom Window Coverings

Staff evaluated the requirements that apply to stock window coverings in the ANSI/WCMA standard. Requirements that apply to stock products are as follows:

- Operating cords shall meet one of the following:
  - No operating cords,
  - Short cord with a length equal to or less than 8 inches in any state (free or under tension), or
  - Inaccessible operating cords determined per the test requirement in Appendix C of the ANSI/WCMA A100.1
- Inner cords shall meet Appendix C and D of the ANSI/WCMA A100.1.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Staff assesses that child anthropometry and strength related inputs to develop these requirements are adequate to address the strangulation risk associated with hazardous cords as discussed below:

a)  *Operating Cord Requirements*

- Having no operating cords effectively eliminates the strangulation hazard associated with operating cords because there is no cord to cause strangulation; therefore, this is an adequate requirement.
- Having a short cord that does not exceed 8 inches of length in any position of the window covering also effectively eliminates the strangulation hazard associated with operating cords; the neck circumference of fifth percentile 6-9-month-old children is 8 inches (BSI, 1990 as cited in Norris and Wilson, 1995), therefore this is an adequate requirement.
- Ensuring that the operating cords are inaccessible is another adequate requirement. This requirement is tested in the ANSI/WCMA standard using a probe that is intended to simulate the finger size of a young child, the diameter of the probe is 0.25 inches based on fifth percentile 2-3.5-year old's index finger diameter (Snyder et al., 1977) at 0.33 inches and the off-the-shelf availability of a 0.25-inch dowel pin. If the probe cannot touch the cords, the cord is then deemed inaccessible.

Figure 4 shows examples that comply with the operating cord requirements.



Figure 4. Example window covering with no operating cords (left), with short cord not to exceed 8 inches (middle), inaccessible cord (right, source: Rollease Acmeda at https://www.rolleaseacmeda.com/au/news/article/childsafety)

Staff concludes that applying the same requirements for stock window covering products listed above to custom products will effectively eliminate the strangulation hazard associated with an operating cord on a window covering that is functional and operational as intended (i.e., not broken).

b)  *Inner Cord Requirements*

ANSI/WCMA requires the inner cords for both stock and custom products to meet the same set of requirements.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

1.  *Access to inner cord*: Accessibility of the inner cords is tested using the cord accessibility probe (Figure 5.) The probe was developed using the anthropometric dimensions of children's hands and fingers.



Figure 5. Accessibility probe (dimensions – inches)

The accessibility probe has different requirements for "Open" and "Closed" construction window covering products.

-   Open construction means that inner cords are exposed from the front, rear, bottom or sides of the window covering, which are typical of Roman, horizontal, and pleated window coverings. Typically, inner cords for these products are enclosed between layers of the window covering without segmented sections, allowing access to inner cords in the product's interior from any opening.
-   Closed construction means that inner cords are enclosed within segmented layers of the product, which is typical of a cellular shade.  Access to inner cords is limited to only that section of the cord in an individual segment.

For "open" construction products, if the inner cord accessibility probe can touch any cords before reaching the 2 in (51 mm) diameter section on the accessibility probe, the cords are considered accessible and must be tested to Appendix D: hazardous loop test procedure. If the 2 in (51 mm) diameter section of the inner cord accessibility probe can be inserted into any opening, then the cords are considered accessible and must be tested to Appendix D: Hazardous Loop Test Procedure.

For "closed" construction products, if the inner cord accessibility probe can touch any cords before reaching the 4 in (102 mm) diameter section, the cords are considered accessible and must be tested to the Appendix D: Hazardous Loop Test Procedure. If the 4 in (102 mm) diameter section of the inner cord accessibility probe can be inserted into any opening, then the cords are considered accessible and must be tested to Appendix D: Hazardous Loop Test Procedure. Table 4 shows scenarios and the calculated dimensions of the probe.

137

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Table 4. Accessibility probe dimensions

| Scenario | Dimension | Rationale for Dimension | Anthropometric Reference |
|---|---|---|---|
| **Child inserts and curls the finger to grasp the cord** | 0.625-inch diameter | Opening needed to grasp the cord if a child inserts his/her index finger into the opening and curls it to grasp the cord. | Snyder et al (1977) |
| | 1.0-inch length | Rounded number for the tip of index finger to the middle joint | Owings, et al (1977) |
| **Child inserts the hand to an opening up to the thumb crotch** | 1.813-inch diameter | Opening needed to grasp the cord if a child inserts his/her hand in a straight position up to the thumb crotch. | Snyder, et al (1977) BSI (1990) as cited in Norris, B., & Wilson, J. R. (1995). |
| | 2.5-inch length | the thumb crotch – middle finger length | Snyder et al (1977) |
| **Child inserts the hand to the opening to reach a cord** | 2.0-inch diameter | Opening needed to grasp the cord if a child inserts his/her hand to the opening | Owings, et al (1977) |

2.  *Hazardous Loop Test*: If the inner cord is found accessible, the product must be tested to determine whether a hazardous loop can be created between an inner cord and the window covering material.

Even though ANSI/WCMA test procedures are slightly different between open and closed constructions, a hazardous loop creation first requires pulling the accessible inner cord in the direction that is perpendicular to the window covering surface, and in the direction that would result in the largest loop opening. The test method requires a pull force be exerted over 5 seconds at a maximum of 5 pounds, or a pulled distance of 25 inches, that simulates the arm length of a 95th percentile 8-year-old (PeopleSize 2008), whichever comes first. The pulled cord is then attached to two hooks 2.8 inches apart that simulates the hand breadth of the child.

Once the inner cord is pulled, the opening created by the pulled cord is then tested to determine whether a head probe simulating the head size of a fifth percentile 7-9-month-old child can be inserted with a maximum of 10 pounds insertion force.

Staff agrees with the size of the head probe because it takes into consideration the head breadth (4.33 inches), head length (5.83 inches), and head circumference (16.9 inches) of the youngest child at risk (fifth percentile 7-9-month-old, Snyder 1975 and 1977.) Head height is based on a CT scan of a 6-month-old and measures at 5.9 inches.

The tension force of 5 pounds is based on Section 4.14.1 Cords, Straps, and Elastics in ASTM F963. The insertion force of 10 pounds is based on Section 8.22 Test for Loops and Cords in ASTM F963. Staff could not locate the reference that ASTM F963 used to determine the 5 pounds of pull force for cords or straps. Staff notes that in Canada's Corded Window Covering Regulations, a pull force of 7.87 pounds (35 Newton) is applied to accessible cords, including

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

inner cords.[43] This force is estimated to represent a 97th percentile pinch-pull strength of 2-5-year-old males (DTI 2000) whereas a 5-pound (22 Newton) force represents the 32nd percentile for 2-5-year-old boys.

Based on staff's review of the literature on children's pull strength, we could not locate a pull strength measurement that exactly replicates a child's pulling action of an inner cord on a window covering. Staff notes that the action of pulling an inner cord would not be a straightforward task for a child, it requires both hands and arms working simultaneously because child would need to keep the window covering stationary while pulling a cord at the same time (Figure 6.)



Figure 6. Action of pulling inner cord out

Staff reviewed the inner cord incidents that were reported on custom window coverings. Staff found that all three inner cord incidents were associated with Roman shades with a very accessible and easy to pull inner cord on the backside of the product, with no shroud or slat (Figure 7.)



Figure 7. Accessible and hazardous inner cords from IDIs 090728CCC2792 (left), 110607CCC3794 (middle), 140305CBB1435 (right)

Staff is also aware of three inner cord incidents involving stock horizontal blinds during the reporting period. One product did not have cord stops; another product had cord stops positioned too low, in addition to the blind being too long for the window, creating extra slack; and the third product had broken slats (Figure 8.) Not having a cord stop on a traditional blind can allow inner

---

[43] Government of Canada, Corded Window Coverings Regulations: SOR/2019-97 available at:
https://gazette.gc.ca/rp-pr/p2/2019/2019-05-01/html/sor-dors97-eng.html

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

cords to be pulled at excessive lengths. If cord stops are positioned too low, the cords can be pulled until the cord stops reach the head rail, possibly creating a large loop.



Figure 8. Inner cord incidents associated with horizontal blinds in IDIs 091009CCC2026 (top left), 111018CCC2027 (top right), 190829CCC1712 (bottom two)

Staff also evaluated a cordless stock horizontal blind and a cordless stock Roman shade. Both products included a spring mechanism to raise and lower the product. Staff attempted to simulate how a child would interact with the inner cord. Staff had the most difficulty keeping the window covering material in place while attempting to pull the inner cord on both products, as the more

140

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

staff attempted to pull the inner cord the more the window covering itself came with it. This is in contrast with window coverings that have traditional operating cords, which make it easier to pull the inner cord without much resistance from the window covering itself, if there is no inner cord stop or the inner cord stop is positioned too low.

Staff concludes that even though the 5-pound pull force is less than the pull force that Health Canada references, due to the complexity of pulling an inner cord while attempting to stabilize the window covering surface as well as lack of incidents that demonstrate an inadequacy of the pull force, staff continues to recommend 5 pounds as a sufficient pull force. Staff reiterates that in contrast with the Canadian legislation, pull force is applied to only inner cords in the ANSI/WCMA standard, whereas operating cords are required to meet stringent requirements without an applied pull force.

Staff could not locate the reference that ASTM F963 used to determine the 10 pounds of insertion force the ANSI/WCMA standard adopted for the head probe. Given the lack of incidents that staff could directly relate to insertion force of a child's head, staff concludes that this requirement is adequate.

*c) Rigid Cord Shroud Requirements*

Between March and December of 2018, the WCMA Rigid Cord Shroud Task Group, which includes CPSC staff, has worked to develop draft requirements to test "rigid cord shrouds" for deflection and deformation. Although the 2018 standard has requirements associated with rigid cord shrouds, it does not have a test method to clarify the meaning of "rigid" to ensure that rigid cord shroud is not flexible enough to cause a hazard like a cord and it does not allow the cord inside the shroud to be accessible. In December 2018, WCMA sent the agreed-upon language to the members, however, the language was never balloted. Staff recommends that the custom window coverings meet this requirement if they contain a rigid cord shroud that makes the operating cords inaccessible. The language is shown in Tab H (regulatory language.) The tests ensure the stiffness and integrity of the shroud. Staff finds the allowed deflection (1 inch for every 19-inch length of rigid cord shroud) reasonable. The axial torque test method simulates a child twisting the rigid cord shroud to determine if a cord becomes accessible. The torque is based on the mean wrist twisting strength of 2-5-year-old males using a vertically positioned 20 mm-diameter knob which is 4.4 inch-pound (DTI, 2002.) If the cord is accessible, then the device is not considered a rigid cord shroud.

## 5. Addressability of Incidents with the proposed rule:

According to the Division of Hazard Analysis, Directorate for Epidemiology memorandum, CPSC received reports of 194 incidents that reportedly occurred from January 2009 through December 2020. Staff identified 35 of these incidents as having occurred with a custom window covering; 50 with stock window covering, and in 109 cases, there was not enough information to identify whether the incident unit was stock or custom window covering.

Out of the 35 custom window covering incidents, a continuous loop was involved in 12 incidents; operating cords, including tilt cords, were involved in 19 incidents; 3 incidents involved inner cords; and 2 incidents involved an unknown cord type (Table 5.)

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Table 5. Stock/Custom/Unknown Window Coverings involved in Incidents and Cord Types

| Stock/Custom | Continuous loop | Inner cord | Lifting loop | Operating cord | Tilt cord | Unknown | Grand Total |
|---|---|---|---|---|---|---|---|
| **Custom** | 12 | 3 | | 18 | | 2 | 35 |
| **Stock** | 3 | 14 | 1 | 24 | 2 | 6 | 50 |
| **Unknown** | 18 | 5 | 3 | 29 | 3 | 51 | 109 |
| *Grand Total* | *33* | *22* | *4* | *71* | *5* | *59* | *194* |

The stock product requirements in the voluntary standard adequately address both the continuous loops and operating cords by removing cords entirely, making them inaccessible, or by requiring them to be no longer than 8 inches; therefore, staff concludes that custom window coverings that comply with the same requirements would address the strangulation hazard resulting from continuous loops and operating cords.

All three of the inner cord incidents have reportedly occurred on custom Roman shades that did not comply with the requirements in the standard; if the products had complied with the voluntary standard, staff concludes that those incidents would have been prevented. Staff has concluded that window coverings now sold have substantial compliance to the inner cord voluntary standards (Tab E).

Overall, staff concludes that all 30 incidents associated with operating cords and continuous loops (out of 35 total incidents involving custom products, with the others including 3 that involved inner cords and 2 unknown) would have been prevented if the custom window covering complied with the requirements for stock window coverings in the ANSI/WCMA standard. The three inner cord related incidents would have been prevented if the incident units complied with the existing standard. Therefore, staff concludes that if the custom window coverings complied with the recommended requirements, 86 percent (30/35) of the custom product incidents would have been addressed in addition to the 8.6 (3/35) percent of the inner cord incidents that would be addressed by complying with the voluntary standard. Given that all accessible and hazardous cords are effectively addressed with the recommended requirements, staff assumes that the remaining 5.4 percent of the incidents (which represented 2/35 incidents for which the involved cord type was unknown) would also be addressed.

Staff notes that even though a large portion of the reported incidents did not have sufficient information to categorize the incident product as stock or custom, all of the hazard patterns involving unknown stock or custom product incidents (109) would also be addressed for future products if the draft proposed rule is enacted because if they are stock products, they would be part of the market we now find to be substantially compliant with the ANSI/WCMA A100.1 – 2018, and if they are custom products, they would comply with the draft proposed rule which aim to address operating cords (including tilt cords) and lifting loop incidents same as stock products, in addition to inner cords that would be already compliant with the ANSI/WCMA A100.1 – 2018.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

## 6. Accessibility Concerns

Some manufacturers including WCMA have expressed concern about users with a disability, who may not be able to reach cordless window coverings to successfully operate the product, and urge that these consumers still need a corded product. However, staff found various tools that are designed to make the operation of the window covering easier and accessible to consumers in a variety of use locations. For example, extension poles are already available for window coverings that are out of reach, such as poles for skylights and cordless products (Figure 9.) Wands are also available to make it easier for users to operate it with a power grip instead of a pinch grip (Figure 10.)



Figure 9. Examples of extension poles currently available on the market (Source: Extension poles for out of reach shades | CellularWindowShades.com)[44]

---

[44] Mention of trade names or products does not constitute endorsement or recommendation for use, nor does it imply that alternative products are unavailable or unable to be substituted after appropriate evaluation. The products are identified here to describe the concept of accessibility tools. Such identification is not intended to imply recommendation or endorsement by the U.S. Consumer Product Safety Commission nor is it intended to imply that the products identified are necessarily the best available for this purpose.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



Figure 10. Wand with a hand grip shown in the middle. Photo provided by Parents for Window Blind Safety

## 7. Information and Education

Since the first safety alert was issued in 1985, CPSC has been warning parents of the danger of child strangulation due to corded window coverings. Every October, CPSC participates jointly with Window Covering Safety Council (WCSC) in National Window Covering Safety Month to urge parents and caregivers to check their window coverings for exposed and dangling cords and to take precautions. Both CPSC and WCSC recommend cordless window coverings at homes where young children live or visit.

In addition to traditional communication methods, CPSC reaches out to consumers using social media, such as safety blogs and online chats, to create awareness of the hazards associated with corded window coverings. Staff does not have information to assess the effectiveness of public education campaigns but given the long history on window covering safety campaigns, the achieved effectiveness has been limited.

## 8. Other Considerations

Staff specifically solicits comments on the following two topics in the draft NPR:

- Based on increasing number of incidents involving children associated with button battery ingestions, should a window covering product that comes with a remote control containing button batteries have requirements to restrict access to the battery compartment?[45] Staff is not

---

[45] https://www.cpsc.gov/s3fs-public/ConsumerProductInjuriesCOVID19pandemic.pdf?StV8YoN146UhwbIv6rclS53mTYuH1b21

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

aware of stock products with remote controls but custom products with remote controls are available.

• Should a window covering product with inaccessible cords have a warning label that alerts consumers that if a hazardous cord appears on the product, such as due to damage to the product, they should remove the product from use? Staff notes that there have been reports of inner cord incidents, as discussed above, that involved broken slats. This requirement would ideally be included in the ANSI/WCMA standard to alert consumers about the hazard involving stock products as well.

## 9. Conclusion

Based on incident data review, user study, and human factors literature, staff assesses that operating cords requirements for custom products in the ANSI/WCMA A100.1 – 2018 standard are inadequate to effectively address the strangulation hazard associated with custom window covering cords. Requirements in the voluntary standard still allow hazardous operating cords to be part of the custom window covering. Operating cords for custom window coverings can be long enough to fit around the child's neck or can create loops large enough to allow a child to insert their head. At least 86 percent of custom product incidents (30 of 35) can still occur if the product complied with the voluntary standard. Safety devices such as cord cleats and tension devices are unlikely to be effective, because cord cleats need to be attached on the wall and caregivers must wrap the cord around the cleat each and every time the window covering is raised or lowered. As incident data show, children can still access and become entangled in cords by climbing on furniture. Tension devices also need to be attached on the wall or window sill, which may not occur due to increased "cost" of compliance and unwillingness to create holes on the wall (or may not be permitted in rental homes); depending on how taut the cord loop is, it can still allow a child's head to enter the opening as observed in the incident data. User research study found a lack of awareness on cord entanglement among caregivers, lack of awareness of the speed and mechanism of the injury; difficulty using and installing safety devices as primary reasons for not using them; and inability to recognize the purpose of the safety devices provided with window coverings. Warning labels are not likely to be effective because research demonstrates that consumers are less likely to look for and read safety information about the products that they use frequently and are familiar with. Most of the incident units had the permanent warning label on the product. Even well-designed warning labels will have limited effectiveness in communicating the hazard on this type of product.

On the other hand, stock window covering requirements in the ANSI/WCMA standard adequately address the strangulation hazard by not allowing hazardous cords on the product by design, and therefore do not rely on consumer action.

## References

BSI (1990) as cited in Norris, B., & Wilson, J. R. (1995). *CHILDATA: The handbook of child measurements and capabilities –Data for design safety.* London: Department of Trade and Industry.

DTI (2000). *Strength Data for Design Safety – Phase 1* (DTI/URN 00/1070). London: Department of Trade and Industry.

145

DTI (2002). *Strength Data for Design Safety – Phase 2* (DTI/URN 01/1433). London: Department of Trade and Industry.

Godfrey, S. S., Allender, L., Laughery, K. R., Smith, V. L. (1983). Warning Messages: Will the consumer bother to look? *Proceedings of the Human Factors Society Annual Meeting,* Volume: 27 issue: 11, page(s): 950-954. Issue published: October 1, 1983

Morrongiello, B. A., Corbett, M., McCourt, M., & Johnston, N. (2006). Understanding unintentional injury-risk in young children I. The nature and scope of caregiver supervision of children at home. *Journal of Pediatric Psychology*, 31(6), 529–539.

Norris, B., Wilson, J. R. (1995). Childata: The Handbook of Child Measurements and Capabilities. Data for Design Safety. UK: Department of Trade and Industry (URN 95/681)

Owings, C.L., Norcutt, R.H., Snyder, R.G., Golomb, D.H. & Lloyd, K.Y. (1977). *Gripping Strength Measurements of Children for Product Safety Design*. Prepared for the U.S. Consumer Product Safety Commission, Washington, D.C.

Snyder, R.G., Spencer, M. L., Owings, C.L., Schneider, L.W. (1975). *Physical Characteristics of Children as related to Death & Injury for Consumer Product Safety Design* (Report No. UM-HSRI-75-5). Prepared for the U.S. Consumer Product Safety Commission, Washington, D.C.

Snyder, R.G., Schneider, L.W., Owings, C.L., Reynolds, H.M., Golomb, D.H., & Schork, M.A. (1977). *Anthropometry of Infants, Children and Youths to Age 18 for Product Safety Design* (Report No. UM-HSRI-77-17). Prepared for the U.S. Consumer Product Safety Commission, Washington, D.C.

Wickens, C. D., & Hollands, J. G. (2000). *Engineering Psychology and Human Performance* (3rd Ed.). Upper Saddle River, NJ: Prentice Hall.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**TAB J: MANDATORY SAFETY STANDARD FOR CUSTOM WINDOW COVERINGS: INITIAL REGULATORY FLEXIBILITY ANALYSIS**

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

# Mandatory Safety Standard for Custom Window Coverings: Draft Initial Regulatory Flexibility Analysis



**Mark Bailey**

**Directorate for Economic Analysis**

**October 6, 2021**

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

# Mandatory Safety Standard for Custom Window Coverings: Initial Regulatory Flexibility Analysis

The Commission is considering a draft proposed rule that would establish a mandatory safety standard for custom window coverings. The draft proposed rule would require that custom window coverings have no accessible cords or short, static cords no longer than eight inches in length and adhere to requirements established in voluntary standard ANSI/WCMA A100-1.2018. Whenever an agency publishes a proposed rule, the Regulatory Flexibility Act (5 USC 601 – 612) requires that the agency prepare an initial regulatory flexibility analysis that describes the impact that the rule would have on small businesses and other entities, unless the agency has a factual basis for certifying that the proposed rule "will not have a significant economic impact on a substantial number of small entities."[46] The initial regulatory flexibility analysis (IRFA) must contain –

(1) a description of why action by the agency is being considered;

(2) a succinct statement of the objectives of, and legal basis for, the proposed rule;

(3) a description of and, where feasible, an estimate of the number of small entities to which the proposed rule will apply;

(4) a description of the projected reporting, recordkeeping and other compliance requirements of the proposed rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record; and

(5) an identification to the extent practicable, of all relevant Federal rules which may duplicate, overlap or conflict with the proposed rule.

An IRFA must also contain a description of any significant alternatives that would accomplish the stated objectives of the applicable statutes and which would minimize any significant economic impact of the proposed rule on small entities. Alternatives could include (1) establishing differing compliance or reporting requirements that consider the resources available to small businesses; (2) clarifying, consolidating, or simplifying compliance and reporting requirements for small entities; (3) using performance rather than design standards; and (4) exempting from coverage of the rule, or any part of the rule thereof, for small entities. This report provides an IRFA examining the potential impact of the draft rule on small businesses and other small entities.

## Reason for Agency Action

The draft proposed rule is intended to address the strangulation hazard involving corded custom window covering products. The Directorate for Epidemiology, Division of Hazard Analysis (EPHA), reports that there is an average of 9 fatal injuries annually to children less than

---

[46] 5 USC § 605 (b) of The Regulatory Flexibility Act of 1980, as amended. Available at
https://www.sba.gov/advocacy/regulatory-flexibility-act.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

5 years old (Tab A, Chowdhury, 2021). The societal costs of these fatal injuries amounted to about $82.8 million annually (Tab K, Bailey, 2021). Based on the estimate of about 185 nonfatal window covering injuries annually from CPSC's Injury Cost Model (ICM) the Directorate for Economic Analysis estimates the societal costs of nonfatal window covering injuries are approximately $9.3 million (Bailey, 2021). Combining these estimates amounts to annual societal costs associated with corded window coverings of approximately $92.1 million. The draft proposed rule would only address the proportion of these injuries attributable to custom products which based on a CPSC review of 194 reported incidents would be approximately $53.9 million annually.

The draft proposed rule would adopt for custom products the same requirements in ANSI/WCMA A100-1.2018 that currently apply to stock products. Staff assesses that these requirements are effective at preventing strangulations for stock products and would be equally effective when applied to custom window coverings Tab I (Balci-Sinha 2021).

## Objectives of and Legal Basis for the Rule

The objective of the rule is to reduce the risk of serious injury or death related to corded custom window coverings to children under age 8. The draft proposed rule would be issued under the authority of Sections 7 and 9 of the Consumer Product Safety Act.

## Small Entities to Which the Rule Will Apply

The North American Industry Classification System (NAICS) defines product codes for U.S. firms. Firms that manufacture window coverings may list their business under the NAICS product code for blinds and shades manufacturers (337920 Blind and Shade Manufacturing) or retailers (442291 Window Treatment Stores).[47] Importers of window coverings are generally listed in Home Furnishing Merchant Wholesalers (423220) which includes other home furnishing items and is non-specific to window coverings.

Under SBA guidelines, a manufacturer of window coverings is categorized as small if the firm has less than 1,000 employees, retailers are considered small if they have sales revenue less than $8.0 million, and importers if the firm has less than 100 employees. Based on 2017 data, there were 1,898 firms categorized as blinds and shades manufacturers and retailers (Census Bureau, 2020). Of these, about 1,840 firms (302 manufacturers and 1,538 retailers) are small. As the NAICS code for importers in non-specific to window coverings CPSC staff reviewed Customs and Border Patrol data, firm financial reports, and Dun & Bradstreet reports to obtain a more precise estimate of importers. Based on this research, CPSC staff estimates that there are approximately 83 importers that meet the SBA guidelines for a small business (Laciak 2020).

Nearly all of the 302 small manufacturers identified are far below the 1,000 employee SBA threshold. 238 of the manufacturers have fewer than 20 employees and 151 have fewer than 5 employees. CPSC staff estimates that the annual revenue for the firms with fewer than 20 employees to be under $250,000. Most of the firms with fewer than 5 employees manufacture

---

[47] The two product codes 337920 and 442291 encompass most products in the window coverings market. However, some drapery and curtain manufacturers may be listed under 322230, stationary product manufacturing.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

custom window coverings on a per order basis. The annual revenue for these manufacturers is most likely below $25,000, based on estimates from the Nonemployer Statistics from the U.S. Bureau of the Census. Staff estimates that the annual revenues for the remaining small manufacturers, those with more than 20 employees, are between $300,000 to $2,000,000.

## Compliance Requirements of the Draft Proposed Rule, Including Reporting and Recordkeeping Requirements

The draft proposed rule would establish a performance standard for custom window coverings that would adopt the voluntary standard for stock products in ANSI/WCMA A100-1.2018.[48] To comply with the performance requirements, all accessible operating cords would need to be removed, made inaccessible, or shortened to less than 8 inches.

Under section 14 of the CPSA, as codified in 16 CFR part 1110, manufacturers and importers of custom window coverings will be required to certify, based on a test of each product or upon a reasonable testing program, that their window coverings comply with the requirements of the draft proposed rule. Each certificate of compliance must identify the manufacturer or importer issuing the certificate and any manufacturer, firm, or third party conformity assessment body on whose testing the certificate depends. The certificate must be legible and in English and also include the date and place of manufacture, the date and place where the product was tested, including the full mailing address and telephone number for each party, and the contact information for the person responsible for maintaining records of the test results. The certificates may be in electronic format and must be provided to each distributor or retailer of the product. Upon request, the certificates must also be provided to the CPSC and Customs and Border Protection (CBP).[49]

## Costs of Draft Rule That Would Be Incurred By Small Manufacturers

Custom window covering manufacturers would most likely adopt cordless lift operation systems to comply with the draft proposed rule. As discussed in the preliminary regulatory analysis of the proposed rule (Tab K Bailey, 2021), the cost to modify window covering lift systems with the draft proposed rule ranges from $2.95 to $9.65 per horizontal blind, $2.15 to $34.57 per shade, and no expected cost increase for vertical blinds and curtains/drapes. CPSC staff does not have estimates of redesign costs but expects that these costs will be small given the already wide availability of product designs with inaccessible cords.[50] CPSC staff expects component costs to be significant as inaccessible cord operation is expensive as shown in Tab K the preliminary regulatory analysis (Bailey, 2021).

---

[48] See section 4.3.1 of the voluntary standard for a description of the operating systems that would be allowed as the draft proposed rule would adapt the stock product requirements for custom products.

[49] The regulations governing the content, form, and availability of the certificates of compliance are codified at 16 CFR 1110.

[50] Based on interviews with window covering manufacturers there may be some size and placement limitations related in-accessible cord designs. These limitations can be addressed with motorization of the product but it is prohibitively expensive as many motorized systems can cost more than the window covering product itself.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION
CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Estimates of the costs to modify three types of window coverings in Panchal (2016) indicate that at a minimum the costs to modify will range from 2 to 11 percent of retail prices. Panchal (2016) used a product archeology approach, supplemented by standard models for calculating only manufacturing and assembly costs, to estimate the incremental cost of implementing standard manual uncorded technology for entry-level stock window coverings – the type of window coverings that are available for purchase off-the-shelf from home improvement stores. Hence his estimates are most applicable to the more basic and inexpensive uncorded products at the low end of the window coverings market. Panchal's analysis does not account for any costs associated with product development and design innovations, testing, licensing of technology, manufacturing restrictions due to existing patents, and training of personnel, which would add further costs to implementing uncorded technologies (Panchal, 2016).

Manufacturers would likely incur some additional costs to certify that their window coverings meet the requirements of the draft proposed rule as required by Section 14 of the CPSA. The certification must be based on a test of each product or a reasonable testing program. The Window Covering Manufacturers Association (WCMA) developed a certification program for window covering products titled "Best for Kids" which includes third party testing of products for accessible cords. CPSC staff believes this certification would meet the requirements as outlined in Section 14 of the CPSA. Based on quotes from testing laboratory services for consumer products, the cost of the certification testing will range from $290 to $540 per window covering model.[51] Note that the requirement to certify compliance with all product safety rules, based on a reasonable testing program, is a requirement of the CPSA and not of the draft proposed rule.

CPSC staff note that a reasonable testing program could entail a simple visual inspection of products by the manufacturer and would still likely meet the requirements. Therefore, the cost of a reasonable testing program for compliance with the draft proposed rule is likely much lower than the cost of conducting a third party certification test of each product.

## Impact on Small Manufacturers

In order to comply with the draft proposed rule, small manufacturers are expected to incur redesign and incremental component costs described above for some product lines which currently are not available in in-accessible cord variants. Staff does not expect small manufacturers to suffer a disproportionate cost effect from the draft proposed rule as the cost calculations and research were completed on a per unit basis and little if any redesign costs are expected. Small manufacturers of window coverings are expected to incur at a bare minimum a two percent impact to their custom window covering revenue from the draft proposed rule. This implies that if custom products account for all of a firm's revenue then the minimum impact of the draft proposed rule is two percent of revenue.

Generally, staff considers an impact to be potentially significant if it exceeds 1 percent of a firm's revenue. Because even the smallest estimate of cost is 2 percent of retail price staff

---

[51] Based on quotes from firms to conduct certification tests to the current WCMA voluntary standard on window covering products currently available at retailers.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

believes that the draft proposed rule could have a significant impact on manufacturers that receive a significant portion of their revenue from the sale of custom window coverings. Staff notes that small importers are expected to bear similar costs as small manufacturers, but staff is unclear whether the impact will be significant. The cost effect as a percent of revenue is dependent on the firm's custom window covering imports as a percent of total revenue. Any small importer with revenues of at least 50 percent related to custom window covering products affected by the draft proposed rule could be significantly impacted. Due to these potential impacts, CPSC staff expects the draft proposed rule to have a significant effect on a substantial number of small firms.

## Federal Rules which may Duplicate, Overlap, or Conflict with the Proposed Rule

CPSC staff has not identified any other Federal rules that duplicate, overlap, or conflict with the draft proposed rule.

## Alternatives for Reducing the Adverse Impact on Small Entities

Under section 603(c) of the Regulatory Flexibility Act, an initial regulatory flexibility analysis should "contain a description of any significant alternatives to the proposed rule which accomplish the stated objectives of the applicable statutes and which minimize any significant impact of the proposed rule on small entities." CPSC staff examined several alternatives to the draft proposed rule which could reduce the impact on small entities. These are discussed below.

### No Action Alternative

Under this alternative the status quo would be maintained. This option might be selected on the grounds that the risk associated with custom corded products is small and materials describing the risk associated with corded window covering products are distributed to consumers upon purchase. Additionally, cordless products are widely available for nearly all window covering types for consumers that can afford them. There are no costs associated with this alternative. However, this alternative is unlikely to address the fatal and non-fatal injuries involving corded custom window coverings. Corded custom products would still be available to consumers.

### Improve Voluntary Standard for Window Coverings

Another alternative might be for Commission staff to continue participating and encouraging safety improvements to the voluntary standard for window coverings, WCMA A100-1. This option would be similar to the "no action alternative," with the key difference being that the Commission could direct staff to pursue safety improvements in the voluntary standard, including applying relevant conditions on stock products to custom, as a conditional alternative to a mandatory standard. The Commission could then reconsider a mandatory standard if efforts to improve the voluntary standard on custom products remain unsatisfactory.

153

Staff has supported recent changes in the voluntary standard with requirements for cordless stock products, more descriptive warning labels, and materials describing the strangulation hazard. Additionally, WCMA has in the past rejected initiatives to require no accessible cords on custom products. Consequently, it does not appear that the voluntary standards process is likely to lead to a custom cordless requirement for any product type in the short or long run. Staff note that previous efforts for an effective stock product voluntary standard required over two decades of development by WCMA.

*Later Effective Date*

The draft proposed rule includes an effective date that is two years after the final rule is published in the *Federal Register*, which is twelve months longer than the statutory provision in section 9(c) of the CPSA.[52] 15 U.S.C. § 2058(c). Given that there are some issues in redesigning certain window coverings of unusual sizes to accommodate cordless operation, a later effective date would allow manufacturers more time to redesign and spread the research and development costs, or eliminate product variants that cannot be switched to cordless operation. It is unlikely that any manufacturer (large or small) would leave the window covering market as a result of the draft proposed rule but elimination of some product sizes is possible as conversion to cordless operation may not be feasible for large or unusual sizes.[53]

Later effective dates, beyond the proposed two-year effective date, would mitigate some of the costs related to redesign/research and development for manufacturers. However, if cordless operation is not feasible a reduction in sales would occur if a consumer could not find a suitable alternative. Given the large costs to conform per unit of the draft proposed rule, delaying the effective date would be expected to reduce costs but not by a consequential amount as further cost reductions would be mostly attributable to inventory reductions of products in which cordless operation isn't feasible.

*Limit Proposed Rule to Vertical Blinds, Curtains, and Drapes*

The Commission could narrow the draft proposed rule to only address hazards associated with operating cords on vertical blinds, curtains, and drapes on the grounds that cords are not critical to the operation of these products. These products typically offer cordless options at no additional cost because, for most applications, a plastic rod can be used for operation. Narrowing the proposed rule to these three product types would lessen the cost impact and make it unlikely that any particular product type and/or size would be eliminated. Under this alternative, the costs are expected to be near $0 because using plastic rods for operation is very similar to cords in cost. However, only 2 of the 35 custom product incidents (both are fatalities) were associated with vertical blinds and there were no curtain or drape incidents where the stock/custom classification could be determined. Given the small presence of vertical blinds in custom product

---

[52] Section 9(c) of the CPSA provides that rules must be issued within twelve months after the date of publication of a proposed rule unless the Commission extends this period for good cause.

[53] Motorization is a possibility in these cases but motorization of window coverings is expensive and may exceed the cost of the window covering product.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

incidents, staff cannot recommend this option because an effective reduction in injuries and deaths are unlikely with this approach.

*Continue and Improve Information and Education Campaign*

The Commission could work to improve the current information and education campaign concerning the strangulation hazard associated with corded window covering products. This alternative could be implemented on its own without regard for regulatory action. CPSC staff find the current campaign to be ineffective at communicating the hazard to consumers and by extension ineffective at reducing or preventing injuries associated with window coverings.

## References

Bailey, Mark, 2021. Preliminary Regulatory Analysis of the Draft Proposed Rule for Custom Window Coverings. Bethesda, MD: U.S. Consumer Product Safety Commission.

Chowdhury, Risana, 2021. "Memorandum to Window Covering Cords Petition Project Manager: Fatal and Near-Miss Strangulations Associated with Window Covering Cords". Bethesda, MD: U.S. Consumer Product Safety Commission.

Census Bureau, 2020. Statistics of US Businesses (SUSB) 2017. Suitland, MD. Census Bureau.

Euromonitor International, 2021a. Window Covering Market Share by Company 2014-2020. Chicago, IL. Euromonitor International.

Euromonitor International, 2021b. Window Covering Market Size USD 2014-2020. Chicago, IL. Euromonitor International.

Industrial Economics Inc. (IEc), 2016. "Memorandum to CPSC: Final Cordless Window Coverings Comprehensive Cost Analysis. Cambridge, MA. Industrial Economics Inc.

Laciak, Arthur, 2020. Importation Patterns for USA: For Blinds. Bethesda, MD: U.S. Consumer Product Safety Commission.

Panchal Jitesh H., 2016. Manufacturing Cost Analysis: Cordless vs. Corded Window Covering Products. West Lafayette, IN. Purdue University.

Window Covering Manufacturers Association. 2015a. "Memorandum to Window Covering Manufacturers Association, Re: Review and Critique of CPSC Economic Analysis in ANPR and Briefing Package." Submitted with public comment on 80 *FR* 2327, submitted June 1, 2015, Docket No. CPSC-2013-0028.

Window Covering Manufacturers Association. 2015b. Public comment on 80 *FR* 2327 submitted June 1, 2015. Docket No.CPSC-2013-0028.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**TAB K: PRELIMINARY REGULATORY ANALYSIS OF THE DRAFT PROPOSED RULE FOR CUSTOM WINDOW COVERINGS**

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



**Preliminary Regulatory Analysis of the Draft Proposed Rule**

**for Custom Window Coverings**

**Mark Bailey, M.S.**

**Directorate for Economic Analysis**

**U.S. Consumer Product Safety Commission**

**October 6, 2021**

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

# WINDOW COVERINGS, PRELIMINARY REGULATORY ANALYSIS

## Executive Summary

Window coverings are separated into the following product categories: blinds, shades, and curtains/draperies. The shades category includes cellular shades, pleated shades, roller shades, and Roman shades, while the blinds category includes horizontal blinds and vertical blinds of varying material types. Curtains/draperies are simply a piece of material (normally a fabric) hung at the top of a window to form a covering or screen. These products are further classified by a "stock" and "custom" designation as defined in the voluntary standard for window coverings, ANSI/WCMA A100.1 – 2018. Generally, stock products are less expensive than custom for similar materials and construction. Operating systems for window coverings are classified into two categories: corded and cordless. Corded window covering operating systems generally have cords to raise and lower the product, or move the product from side to side, as well as to open and close slats to allow for light control. Cords are typically located inside the product (inner cord), to the side of the product (operating cord or outer cord), or both. Cordless window coverings are designed to function without an operating cord, generally either through manual operation or motorization, and may have inner cords. Cordless operating systems are typically more expensive than corded products, with motorized operating systems commanding the highest price premium.

The draft proposed rule would address the risk of strangulation in children age 8 and under by eliminating accessible cords for custom window covering products. Since late 2018, the ANSI/WCMA voluntary standard has been in full effect. CPSC staff assesses that compliance with this voluntary standard eliminates accessible cords from stock window covering products. However, staff assesses that the ANSI/WCMA standard does not eliminate the risk of strangulation associated with custom window covering products, because the voluntary standard still allows hazardous accessible cords on custom products. The draft proposed rule would require custom products to meet the same requirements with respect to hazardous cords for stock products in the ANSI/WCMA standard, requiring the removal of hazardous accessible cords in all window covering products without regard for product classification.

CPSC staff estimates that approximately 9 fatal injuries involving corded window coverings occur annually (Tab A, Chowdhury 2021). The Directorate for Epidemiology also explored the nonfatal injuries reported through NEISS. However, the estimate derived from the number of nonfatal strangulation injuries involving corded window coverings does not meet the publication criteria established in NEISS; as such, these injury cases could not be used to generate an annual estimate of nonfatal injuries treated in hospital emergency departments. Staff estimate the societal costs of the fatal injuries to be about $82.8 million annually and the Directorate for Economic Analysis estimates that the societal costs for the annual amount of nonfatal injuries to be approximately $9.3 million.[54] The aggregate societal costs using these estimates amounts to $92.1 million. Because staff assesses that the voluntary standard adequately addresses the risk of injury associated with stock window coverings, and because stock window coverings are the subject of a separate draft proposed rule under section 15(j) of the Consumer Product Safety Act (CPSC), the draft proposed rule under sections 7 and 9 of the CPSA would only address the proportion of these injuries costs attributable to custom stock products. Staff

---

[54] The estimate is based on application of CPSC's Injury Cost Model to the small sample of NEISS nonfatal injuries involving corded window coverings to obtain an estimate of the number of nonfatal injuries not treated in hospital emergency departments.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

estimates the proportion of injury cost attributable to custom products to be approximately $53.9 million annually, based on a CPSC review of reported incidents. Combined with an estimate of 511.72 million custom window coverings in use and an estimate of custom corded products in use of 65 percent for the year of 2019 results in a societal cost estimate of deaths and injuries associated with corded custom window coverings of approximately $0.16 per custom window covering in use. ($53.9 million / [511.72 x 0.65])

Staff calculated the present value of the societal cost of injuries for each detailed blind type based on the expected product life. The present value of societal cost per unit for Metal and Vinyl horizontal blinds, Wood and Faux Wood horizontal blinds amounts to $1.34 and $3.61 respectively. For cellular, pleated, roller, and soft sheer shades the present value equates to $0.92 per unit. Roman shades equate to a per unit present value of $1.57. Combining these estimates with one year of corded custom window covering sales (2019) amounts to a gross annual benefit of $52.3 million. Adjusting this estimate for the expected effectiveness of the proposed rule equates to a total benefit of approximately $49.5 million.

The draft proposed rule would impose significant costs on manufacturers of custom window covering products. Based on component cost estimates, assembly/manufacturing costs, and proportions of domestic manufacturing, the cost per corded custom window covering produced would range from $2.15 to $34.57 and is highly dependent on product type. Manufacturers would be expected to pass much of this cost to consumers in the form of higher prices. Interviews conducted with retailers and manufacturers indicate that about 65 percent of custom window covering unit sales are currently corded products. The proposed rule would not be expected to result in any cost increases for cordless custom window coverings, and as such, aggregate costs should be calculated on only corded custom products. Combining the 2019 custom sales estimate of 61.58 million with per unit cost increase, and the percentage of corded custom sales results in an aggregate cost range of $156.5 million and $309 million.

Our analysis discussed several alternatives to the draft proposed rule, including:

- 7.1 No Action Alternative
- 7.2 Improve the Voluntary Standard for Window Coverings
- 7.3 Later Effective Date
- 7.4 Limit the Scope of the Proposed Rule to Vertical Blinds, Curtains, and Drapes
- 7.5 Continue and Improve Information and Education Campaign

The expected benefits of the alternatives would be lower than the expected benefits of the draft proposed rule, but the costs would also be lower. In particular, the alternatives could, individually or in combination, reduce the costs of the draft proposed rule on manufacturers (including small manufacturers), and/or allow for greater choice in the types of window coverings that consumers could purchase.

# 1.0 INTRODUCTION

Parents for Window Blind Safety, Consumer Federation of America, Consumers Union, Kids in Danger, Public Citizen, U.S. PIRG, Independent Safety Consulting, Safety Behavior Analysis, Inc., and

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Onder, Shelton, O'Leary & Peterson, LLC petitioned the U.S. Consumer Product Safety Commission (CPSC) to promulgate a mandatory standard that prohibits the use of cords in window coverings where a feasible cordless alternative exists, and, for those instances where a feasible cordless alternative does not exist, require that the cords be less than 8 inches long, or require that cords be made inaccessible through the use of passive guarding devices. On July 15, 2013, the Commission published a *Federal Register* notice (78 *Fed. Reg*. 42,026) requesting public comments on the petition.

The CPSC initiated a regulatory proceeding by published an Advance Notice of Proposed Rulemaking (ANPR) on January 16, 2015 (80 *Fed. Reg*. 566). In 2017, the Window Covering Manufacturers Association (WCMA) updated its voluntary standard that was officially adopted in 2018 (WCMA A100-1.2018). The 2018 version of the ANSI/WCMA voluntary standard segments window covering products into two main categories: stock and custom. The voluntary standard requires that stock window covering products be products without cords or without accessible cords or only with short, static cords (*i.e*., maximum eight inches in length). The standard requires custom products to meet one of the three requirements: (1) No operating cords; (2) Short cord with a length equal to or less than 8 inches in any state (free or under tension), (3) Inaccessible operating cords determined per the test requirement in Appendix C of the standard **or** have operating systems that result in free-hanging and accessible cords; these systems include single retractable cord lift system, continuous loop operating system, and standard operating system.

## 1.1 Draft Proposed Rule

The draft proposed rule is intended to address the strangulation hazard involving operating cords on custom window covering products by applying the same requirements for operating cords in ANSI/WCMA A100-1.2018 that currently apply to stock products to custom window coverings. Staff concludes that the requirements for operating cords on stock window covering products are effective at preventing strangulations and would be 94.6 percent effective when applied to custom window coverings (Tab I, Balci-Sinha 2021).

## 2.0 NEED FOR THE RULE

## 2.1 Risk of Death or Injury Posed by Window Coverings

The purpose of the regulatory proceeding on window coverings, initiated by the 2015 ANPR, was to address an unreasonable risk of death and injury resulting from pediatric strangulation posed by corded window coverings. As shown below, in recent years there have been about 9 deaths and about 185 medically treated injuries annually that involve the strangulation of young children on corded window coverings (Chowdhury, 2021; Lawrence et al., 2018).[55] The Commission is now considering whether a mandatory safety standard for window coverings is needed to address an unreasonable risk of

---

[55] The estimates of medically treated non-fatal injuries do not meet NEISS reporting requirements but are used in this analysis to assign societal costs even though the values are small.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

death or injury that is posed by operating cords on custom window covering products that still contain the traditional cords and pose a strangulation risk.

Window coverings are currently sold as stock or custom products. As noted, in 2018 the industry addressed the hazard by adopting a voluntary product safety standard that required all window coverings sold as stock products to: (1) have no operating cord, (2) have a short cord of less than 8 inches, or (3) have inaccessible operating cords.[56] Based on recent estimates, about 56 percent of the window coverings sold in 2019 were stock products and 44 percent were custom products (D+R, 2021). The ANSI/WCMA voluntary standard does not require that operating cords on custom window coverings be cordless; custom window coverings can still be purchased with operating cords if a consumer desires. Because the majority of products sold are stock window coverings, a large proportion of window coverings sold in the US today are cordless, thereby eliminating the hazard associated with cord-related strangulation for these products.

## 3.0 MARKET INFORMATION

### 3.1 The Product

Window coverings include the following product categories: blinds, shades, and curtains and draperies. The shades category includes cellular shades, pleated shades, roller shades, and Roman shades, while the blinds category includes horizontal blinds and vertical blinds of varying material types. These products are further classified by a "stock" or "custom" designation, as defined in ANSI/WCMA A100.1 – 2018. The standard defines a "stock" window covering product as a specific SKU, which is completely or substantially fabricated in advance of being distributed in commerce (as that term is defined in 15 U.S.C. Sect.2052(a)(7)) and in advance of any specific consumer request for that product. The SKU can either be sold "as is" or modified or adjusted by the seller, manufacturer, or distributor before or after being distributed in commerce, and it would still be considered a stock blind or shade.

Materials used to make shades and blinds include fabric, wood or faux wood, polymers, such as vinyl, and woven materials, such as bamboo. Window covering operating systems can vary slightly by window covering type, but all operating systems fit into one of two general categories: corded or cordless. Window covering products are mounted either inside or outside the window frame, and can be customized to fit non-standard sized windows, or for operation when the window frame is inaccessible, using tools or mobility devices (ladders, stools, lifts etc. etc.). Some window covering types, curtains/drapes, shades, and horizontal blinds, can also be customized to fit unusual window shapes like circles, ovals, trapezoids, diamonds etc. etc. but operation may be limited.

### 3.1.1 Corded Window Covering Products

"Traditional" or "corded" shades and blinds generally have cords located inside the product (inner cord), to the side of the product (operating cord or outer cord), or both. The inner cords between

---

[56] For purposes of this analysis, window coverings that (1) have no operating cord, (2) have a short cord of less than 8 inches, or (3) have inaccessible operating cords, will be described as *uncorded or cordless*.

the head rail and bottom rail lift the horizontal slats to adjust light coming through, as in the case of horizontal blinds, or fabric and similar materials, as is the case for Roman or pleated shades. The inner cords may be exposed from the front, rear, or bottom of the window covering, or can be rendered inaccessible depending upon how the product is constructed. Horizontal blinds and pleated shades generally have two inner cords, one on each side of the blind, but products manufactured for wider windows may require more than two inner cords to be operational.

The outer cord or operating cord allows the user to raise, lower, open and close, rotate, or tilt the window covering. Operating cord systems generally fall into one of three categories: (1) standard; (2) single cord; and (3) continuous loop. The operating cord in a standard operating system consists of two or more cords and often includes a cord locking device to allow the user to set the height of the window covering. In a single cord operating system, the user is able to manipulate the window covering with a pull cord. The operating cord in a continuous loop operating system uses a single piece of cord or a beaded metal or plastic chain which is secured to a wall and operates like a pulley. For example, pulling the rear loop will raise the shade while pulling the front half of the loop will lower the shade.

While operating systems can vary, some products are more commonly coupled with specific systems. Cellular and pleated shades can have any of the three systems while roller and Roman shades mostly use a standard or continuous loop. Horizontal blinds are generally coupled with a standard operating system while vertical blinds operate by continuous loop. Some curtains and drapes operate by continuous loop in conjunction with a traverse rod, and are also within the scope of the rule. However, many curtains and drapes are stationary and do not have operating systems; these products are not within the scope of the rule.

### 3.1.2 Cordless Window Products

Virtually every window covering type is available with a "cordless" operating system, which means it has been designed to function without an operating cord.[57] Cordless window coverings may require inner cords, but these can be, and typically are, made inaccessible through a variety of approaches. In lieu of an operating cord, cordless operating systems can be manual or motorized. A manual operating system allows users to lift or lower the window covering with a plastic handle or directly by hand.

A motorized operating system uses a motor and control system to manipulate the window covering, such as a remote control or wall switch. Installation of cordless window coverings that are motorized is more complicated than manual systems as these require a power source. The power sources for motorized systems in order of installation complexity are: battery powered, DC plug, solar powered, and what is commonly called "hardwired."

The simplest power source to install is a battery system typically installed near the head rail in a circular tube called a battery wand. Replacement of the batteries can require additional tools like a

---

[57]The availability of alternatives to corded window coverings may sometimes be constrained due to size and weight limitations. *See* Lee, 2014. Through market research, staff found several examples of cordless blinds that are made with a maximum height of 84" and a maximum width of 144" (Tab G).

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

screwdriver, step ladder, or stool. Most manufacturers recommend lithium ion batteries for use in their systems due to the increased temperature level around window coverings.[58] A DC plug adapter can also be used as a power source and is easy to install. A window covering with a DC plug adapter can be plugged into any standard electrical outlet. Electrical outlets aren't typically installed near the top of a window. Accordingly, DC plugs may require consumers to use extension cords near the window covering to reach an available outlet, which some consumers may find unsightly.

Solar powered motorized window coverings operate thru the use of a rechargeable battery wand combined with a solar panel which charges the batteries. Installation is about as complex as a typical battery system, but placement of the solar panel is critical to the operation of the window covering. Newer more advanced versions of solar powered window coverings can power themselves while also providing renewable energy. These products are less mature than others and generally much more expensive.

The most complex to install power source for motorized systems is to wire the window covering directly into the home; this is commonly called "hardwiring." The industry does not regard hardwiring window coverings as a task consumers can complete. Typically, electricians are required to install these products, which creates higher installation costs for consumers.

### 3.1.3 Other Types of Safety Devices

Rather than eliminating the operating cord entirely some manufacturers offer other devices to isolate the operating cord. These alternatives include, among others: retractable cord devices, cord cleats, cord shrouds, cord condensers, and wands. All of these devices are available for purchase by consumers but offerings vary by manufacturer. A retractable cord device uses a spring loaded spool to adjust the length of the pull cord. After the consumer adjusts the pull cord to raise or lower the window covering, the retractable cord device automatically retracts the pull cord back to the bottom of the headrail and ensures the pull cord is out of reach of small children.

Cord cleats are generally composed of transparent or white plastic material in a long, rectangular shape. Two cord cleats must be installed or anchored to the wall near the window covering at a height out of reach of children. Cord cleats are used in conjunction with operating cords that dangle below the bottom of the window covering. The consumer wraps operating cord(s) in an S-shape around the cord cleats. See Tab I for more detailed descriptions of these devices and how each is operated.

A cord shroud encloses the pull cord or continuous cord loops for various types of blinds and shades with a rigid material, usually plastic. Although the pull cord or continuous loop cords are rendered inaccessible, the consumer can use the cord shroud to raise and lower the window covering. Cord condensers are a small plastic device that the consumer feeds the multiple cords into to condense the pull cord to a single pull cord below where the device is installed. Wands are simple pieces of plastic that the consumer rotates or pulls to operate the window covering in place of a cord.

---

[58] Window coverings receive direct sunlight for large portions of the day resulting in higher surface temperatures which can cause the failure of non-lithium type batteries.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

## 3.2 The Industry

The North American Industry Classification System (NAICS) defines product codes for U.S. firms. Firms that manufacture window coverings may list their business under the NAICS product code for blinds and shades manufacturers (337920 Blind and Shade Manufacturing) or retailers (442291 Window Treatment Stores).[59] Under U.S. Small Business Administration (SBA) guidelines, a manufacturer of window coverings is categorized as small if the firm has less than 1000 employees and retailers are considered small if they have sales revenue less than $8.0 million. Based on 2017 data, 1,898 firms were categorized as blinds and shades manufacturers and retailers (Census Bureau, 2020). Of these, about 1,840 firms (302 manufacturers and 1,538 retailers) are small.

In 2020, three manufacturers accounted for almost 38 percent of dollar sales in the U.S. window coverings market (Euromonitor 2021a). Only one of these manufacturers is a publicly-held firm. In 2020, the largest global manufacturer and distributor of window coverings reported worldwide net sales of $3,543 million, with North American window covering sales reported as 1,703 million. The second largest firm is privately held and annual reports are not publicly available. Estimates of this firm's revenue indicate annual U.S. window covering revenue in 2020 of approximately $728 million (Euromonitor 2021a). The third firm is also privately held and estimates indicate U.S. window covering revenues in 2020 of approximately $88 million (Euromonitor 2021a). The remainder of the total market size of $6.6 billion is attributed to firms that each account for less than three percent market share (Euromonitor 2021b).

A recent study conducted for CPSC (D+R, 2021) estimated that in 2019, approximately 139 million residential window coverings were shipped in the United States. The majority of these shipments, 59.2 percent, were blinds while 25.4 percent were shades. When comparing unit sales data to revenue data, staff found that while custom products account for approximately 44 percent of unit sales, a disproportionate amount of revenue is attributable to custom window covering products For example, roman shades which nearly all sold are custom window covering products account for 1.9 percent of annual sales in 2019 but generated revenues equal to 2.3 percent of the total.

## 3.3 Retail Prices

Retail prices for window coverings vary, depending on the type of the product and retailer. Stock products for common size window coverings can be purchased at a variety of retailers, such as big box and home furnishing stores, and e-commerce retailers, such as Amazon and Wayfair. The type of material and brand affect the price. According to the D+R International (2021) study, weighted average prices for window coverings range from about $54 to $94 for shades and from about $25 to $250 for blinds.[60] Prices for vertical blinds are generally lower than the prices of horizontal blinds; prices for

---

[59] The two product codes 337920 and 442291 encompass most products in the window coverings market. However, some drapery and curtain manufacturers may be listed under 322230, stationary product manufacturing.

[60] The range for shades is based on average prices for cellular shades, roller shades, Roman shades, and pleated shades. The range for blinds is based on average prices for vinyl blinds, metal blinds, faux-wood blinds, wood blinds, and vertical blinds.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

roller shades are slightly lower than the prices of Roman and cellular shades (D+R International, 2021).[61]

Consumers can purchase custom sized and custom designed window coverings from mass merchants, specialty retailers, e-commerce retailers and in-home consultation firms. Custom coverings include uncommon window covering sizes, such as extremely small (e.g., 9 inches wide x 13 inches high), extremely large (e.g., 96 inches wide x 96 inches high), and other unusual sizes. Retail prices for custom made window coverings range from $25 to $900 but can be as high as $5,000.[62] Typically retail prices for custom products exceed the price of stock products of similar size and type. Retailers often suggest in-home measuring and evaluation to estimate the price for custom designed products, as non-standard sizes or window shapes or motorized lift systems can require professional installation. Prices for customized window coverings are on average higher than similar stock products sold by mass retailers.

### 3.4 Window Coverings In Use

CPSC staff created an estimate of custom window coverings in use using multiple data sources. Estimates for the year 2019 are developed from (1) estimates of U.S. residential housing units, (2) estimates of the number of window coverings per housing unit, (3) estimates of the proportion of window coverings in use, by type, (4) estimates of the expected product life of window coverings, and (5) estimates of the proportion of corded custom window coverings sold by type. Based on U.S. Census estimates, approximately 124.1 million residential housing units existed in the United States during the year 2019 (Census Bureau, 2019). Additionally, the D+R (2020) study estimated an average of about 8.17 window coverings per housing unit.[63] The product of the number of housing units and the average number of window coverings per housing unit suggests about 1,014 million window coverings may have been in use in the U.S. (124.1 million housing units × 8.17 window coverings per housing unit) during the year 2019.

The distribution of the estimated 1,014 million window coverings in use is created using the 2019 share of custom product sales to total for each aggregate category.[64] Application of the share of custom product sales to the window covering in use estimate amounts to approximately 111 million custom horizontal blinds, 213 million custom shades, 10 million custom vertical blinds, and 179 million

---

[61] The D+R review of prices and product availability found that stock product prices are generally lower than custom products and that cordless lift systems resulted in an increase in price except in the case of vertical blinds.

[62] Based on firms' websites, retail prices for custom-made Roman shades can range from $300-$5,000.

[63] The D+R estimate utilizes a 2013 market characterization study completed for the United States Department of Energy. The study included a survey of 2,100 households in 13 cities across the United States to collect a representative sample of data on household characteristics including number of windows, location of windows, the types of window coverings installed, and operation.

[64] Installed base data for window covering products does not differentiate between custom or stock products. A point estimate created from one year of sales data may distort product in use estimates if there are large fluctuations in sales due to consumer preferences from year to year or if the expected product life of custom products is substantially different than stock products.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

custom curtains or drapery.[65] Applying an estimate of 65 percent of custom window covering products in use have operating and/or accessible cords equates to an approximate total of 332.6 million corded custom window coverings in use. As shown in figure 1 below, staff estimates that approximately 72 million corded custom horizontal blinds, 138.2 million corded custom shades, 6.4 million corded custom vertical blinds, and 116.1 million corded custom curtains or drapery are in use as of the year 2019.[66]

*Figure 1. Custom Window Coverings in Use (2019)*

| Product Category [1] | Total Product In Use [2] | Custom Product Share of Sales (2019) [3] | Custom Product In Use [4] [col. 2 x col. 3] | Corded Custom Product In Use [5] [col. 4 x 0.65] |
|---|---|---|---|---|
| Horizontal Blinds, All Types | 340.4 | 32.52% | 110.7 | 72.0 |
| Shades, All Types | 300.9 | 70.66% | 212.6 | 138.2 |
| Vertical Blinds | 168.2 | 5.82% | 9.8 | 6.4 |
| Curtains & Drapes | 178.6 | 100.00% | 178.6 | 116.1 |
| Total | 1014 | | 511.7 | 332.6 |

## 4.0 PRELIMINARY REGULATORY ANALYSIS

Pursuant to section 9(c) of the Consumer Product Safety Act, publication of a proposed rule must include a preliminary regulatory analysis containing the following:

(1) a preliminary description of the potential benefits and costs of the proposed rule, including any benefits or costs that cannot be quantified in monetary terms, and an identification of those likely to receive the benefits and bear the costs (Discussed in sections 4.1-4.9);

(2) a discussion of the reasons why a standard submitted to the Commission was not published as the proposed rule (Discussed in section 6);

(3) a discussion of why a relevant voluntary safety standard would not eliminate or adequately reduce the risk of injury addressed by the proposed rule (Discussed in section 6); and

(4) a description of any reasonable alternatives to the proposed rule, together with a summary description of their potential costs and benefits and why such alternatives should not be published as a proposed rule (Discussed in section 7).

15 U.S.C. § 2058(c).



[65] Interior shutters are included in the total 1,014 million window covering in use estimate but as these products are out of scope for the rule they are not included in the regulatory analysis later in this report.

[66] This estimate has an implicit assumption that the share of annual sales will equate to a similar share of product in use. Changes in consumer preferences over time and differences in the expected product life between custom and stock products could result in significant deviations in this estimate.

166

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

This analysis discusses the potential benefits and costs of the proposed rule from a societal perspective, considering all of the significant costs and health outcomes (Gold et al., 1996; Haddix, Teutsch, and Corso, 2003; Neumann et al., 2016). Benefits and costs, as well as product-related risks, are calculated on a per-product in use basis, an approach that has been found useful at the CPSC (Zamula, Rogers, Bailey, 2016). The benefits of the draft proposed rule are measured as the estimated reduction in the societal costs of the deaths and injuries involving corded window coverings. Some unquantifiable benefits also exist related to the rule and are discussed later in section 4.9. The costs of the rule are defined as the added costs associated with bringing custom corded window coverings into compliance with the draft proposed rule. The analysis calculates the benefits and costs of the rule on a per product in use basis (Jenkins and Rodgers, 2020), and applies these estimates to annual sales data to determine the expected benefits and costs that would be associated with one year's production and sale of window covering.

## 4.1 Annual Injury Costs

We begin by developing annual estimates of the injury costs of the deaths and injuries involving corded window coverings. These injury costs represent the pool from which the benefits of the rule will be drawn. Second, we distribute the injury costs over the major window covering categories (e.g., horizontal blinds, shades, vertical blinds, and curtains/draperies) and classification (stock/custom) then calculate annual injury costs, per window covering, during the 2009 through 2020 time period. These estimates are then adjusted to account for safety improvements associated with recent revisions to the voluntary standard and CPSC enforcement actions that have taken place in recent years.

## 4.2 Fatal and Nonfatal Injuries involving Window Covering Cords

According to the Directorate for Epidemiology, a minimum of about 9 deaths involving window coverings occurred annually during 2009-2020 (Tab A, Chowdhury, 2021). The Directorate for Epidemiology also explored the injuries reported through the National Electronic Injury Surveillance System (NEISS), a national probability sample of U.S. hospital emergency departments (ED). However, the estimate derived from the number of nonfatal strangulation injuries involving corded window coverings does not meet the publication criteria established in NEISS; as such, these injury cases could not be used to generate an annual estimate of nonfatal injuries treated in hospital emergency departments.

In addition to injuries initially treated in hospital EDs, many product-related injuries are treated in other medical settings, such as, among others, physicians' offices, clinics, and ambulatory surgery centers. Some injuries also result in direct hospital admission, bypassing the hospital ED entirely. Staff estimated the number of nonfatal corded window covering injuries treated outside of hospital EDs using the CPSC's Injury Cost Model (ICM) ((Lawrence et al., 2018). The ICM uses empirical relationships between the characteristics of injuries (diagnosis and body part) and victims (age and sex) initially treated in hospital EDs and the characteristics of those initially treated in other settings to project the number of medically treated injuries treated *outside* of hospital EDs (Lawrence et al., 2018). Estimates of injuries treated in doctors' offices, clinics, and the like, are based on data from the Medical

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Expenditure Panel Survey (MEPS). The ICM uses the MEPS data, in combination with a classification tree analysis technique, to project the number and characteristics of injuries treated outside of hospitals. To project the number of direct hospital admissions which bypass hospital EDs, the ICM uses data from the Nationwide Inpatient Sample of the Healthcare Cost and Utilization Project (HCUP-NIS), also analyzed using a classification tree analysis technique.

Applying the empirical relationships described above to the small sample of nonfatal injuries reported through NEISS amounts to approximately 185 medically treated nonfatal injuries annually involving corded window coverings. Staff then quantified the injury costs of the annual estimate of 185 nonfatal but medically treated injuries using the CPSC's Injury Cost Model (ICM). The ICM is fully integrated with NEISS, and, in addition to providing estimates of the costs of injuries reported through NEISS, also estimates the costs of medically treated injuries that are initially treated outside of hospital emergency departments. The major aggregated injury cost components provided by the ICM include medical costs, work losses, and the intangible costs associated with lost quality of life or pain and suffering.

Medical costs include three categories of expenditures: (1) medical and hospital costs associated with treating the injury victim during the initial recovery period and in the long run, including the costs associated with corrective surgery, the treatment of chronic injuries, and rehabilitation services; (2) ancillary costs, such as costs for prescriptions, medical equipment, and ambulance transport; and (3) costs of health insurance claims processing. Cost estimates for these expenditure categories were derived from a number of national and state databases, including the Medical Expenditure Panel Survey, the Nationwide Inpatient Sample of the Healthcare Cost and Utilization Project (HCUP-NIS), the Nationwide Emergency Department Sample (NEDS), the National Nursing Home Survey (NNHS), MarketScan® claims data, and a variety of other federal, state, and private databases.

Work loss estimates are intended to include: (1) the forgone earnings of the victim, including lost wage work and household work, (2) the forgone earnings of parents and visitors, including lost wage work and household work, (3) imputed long term work losses of the victim that would be associated with permanent impairment, and (4) employer productivity losses, such as the costs incurred when employers spend time juggling schedules or training replacement workers. Estimates are based on information from the, the Nationwide Inpatient Sample of the Healthcare Cost and Utilization Project (HCUP-NIS), the Nationwide Emergency Department Sample (NEDS), Detailed Claims Information (a workers' compensation database), the National Health Interview Survey, U.S. Bureau of Labor Statistics, and other sources.

The intangible, or non-economic, costs of injury reflect the physical and emotional trauma of injury as well as the mental anguish of victims and caregivers. Intangible costs are difficult to quantify because they do not represent products or resources traded in the marketplace. Nevertheless, they typically represent the largest component of injury cost and need to be accounted for in any benefit-cost analysis involving health outcomes (Rice et al., 1989). The ICM develops a monetary estimate of these intangible costs from jury awards for pain and suffering. While these awards can vary widely on a case-by-case basis, studies have shown them to be systematically related to a number of factors, including economic losses, the type and severity of injury, and the age of the victim (Viscusi, 1988; Rodgers, 1993). Estimates for the ICM were derived from regression analysis of jury awards in nonfatal product liability cases involving consumer products compiled by Jury Verdicts Research, Inc.

168

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

## 4.3 Annual Injury Costs, per Window Covering in Use

Based on estimates from the ICM, the injury costs of the approximately 185 nonfatal medically treated injuries involving corded window coverings amounted to about $9.3 million annually, or an average of about $50,300 per injury. These injury costs ranged from about $9,300 per injury treated outside of a hospital ED, to about $10,300 per injury treated and released from the ED, to about $357,000 per hospitalized injury.

Additionally, as noted above, the Directorate for Epidemiology estimated a minimum of about 9 deaths involving window coverings occurred annually during 2009-2020 (Tab A, Chowdhury, 2021). If we assign a cost of $9.2 million for each death, based on current estimates of the value of a statistical life, then the injury costs associated with these deaths would amount to about $82.8 million annually (9 deaths × $9.2 million). When combined with the injury costs of nonfatal injuries, the aggregate injury costs involving corded window coverings amounted to about $92.1 million annually ($82.8 from deaths + $9.3 from nonfatal injuries).

The columns of Table 1 distribute the annual deaths and injuries of the investigated cases by major window covering type and excluding cases involving inner cords as these injuries are not addressed by the requirements analyzed in this report. Window covering types include horizontal and vertical blinds, shades, and curtains/drapery. Staff developed this distribution from a review of 194 investigated cases described in Tab A. (Chowdhury 2021) Removal of the 22 cases involving inner cords results in 172 cases involving corded window coverings. After excluding unknowns (i.e., 49 cases in which the window covering type was unknown), horizontal blinds accounted for at least 82 incidents (66.7 percent), shades accounted for at least about 27 incidents (22.0 percent), vertical blinds accounted for at least 11 incidents (8.9 percent), and curtains and drapery accounted for at least 3 incidents (2.4 percent).

Table 1. Annual Window Covering Injuries
by Window Covering Type, excludes
injuries involving inner cords

|  | (1)<br>Deaths<br>(Investigated<br>Cases) | (2)<br>Injuries<br>(Investigated<br>Cases) |
|---|---|---|
| Horizontal Blinds | 3.42 | 3.42 |
| Shades | 1.25 | 1.00 |
| Vertical Blinds | 0.83 | 0.08 |
| Curtains/Drapes | 0.25 | 0.00 |
| Unknown | 1.08 | 3.00 |
| Total | 6.83 | 7.50 |

To calculate the annual risks and injury costs, per corded custom window covering in use, staff calculated an estimate of the number and distribution of corded custom window coverings in use. As

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

stated in section 3.4 and shown in figure 1, staff estimates that approximately 72 million corded custom horizontal blinds, 138.2 million corded custom shades, 6.4 million corded custom vertical blinds, and 116.1 million corded custom curtains or drapery are in use as of the year 2019.[67]

To calculate the annual injury cost per custom window covering in use, staff divided the injury cost for each category by the estimated number in use for each category. Estimates of annual injury costs, per custom window covering in use, range from about $0.01 per curtain or drape to about $0.50 per vertical blind. Note that this estimate excludes injury costs in which the blind type and/or the stock/custom classification is unknown. Distributing the injury costs of these unknowns proportionally to the known blind type and classification results in an estimate of $0.34 for horizontal blinds, $0.15 for shades, $1.21 for vertical blinds, and $0.01 for curtains/drapes. These results are summarized in table 2 below.

Below staff estimates the present value of these annual per unit injury cost estimates, over the expected product life of the window coverings, which forms the basis for estimating the expected benefits of the draft proposed rule, assuming the draft proposed rule would eliminate all of the societal costs involving strangulation by window cords on custom products.[68] Staff's present value estimate for each blind type is created using the per unit injury cost estimate that accounts for the previously discussed unknown blind type and classification along with the expected product lives in the D+R 2021 study and assuming a 3 percent discount rate. The present value of societal costs per unit for Metal and Vinyl horizontal blinds, Wood and Faux Wood horizontal blinds amounts to $1.34 and $3.61 respectively. For cellular, pleated, roller, and soft sheer shades the present value equates to $0.92 per unit as the expected life product for all these shade types is 7 years and the per unit societal cost is $0.15. Roman shades with an expected product life of 13 years results in a per unit present value of $1.57. For vertical blinds and drapes the per unit present value is approximately $7.56 and $0.14 respectively. Table 2 below displays these results by product type along with the expected product life.

---

[67] This estimate has an implicit assumption that the share of annual sales will equate to a similar share of product in use. Changes in consumer preferences over time and differences in the expected product life between custom and stock products could result in significant deviations in this estimate.

[68] Staff used the expected life for each product type in D+R 2021 to calculate the present value of societal costs. These future costs are discounted using a discount rate of 3 or 7 percent per OMB Circular A-4. Staff used a discount rate of 3 percent in the estimates described in this report. CPSC staff recognizes that these rates may be considered high as real interest rates have persisted below these values for a decade.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Table 2. Estimates of Societal Costs per Product by Window Covering Type

| | [1]<br><br>Annual Injury Cost (Millions) | [2]<br><br>Number of Corded Custom Products in use (Millions) | [3]<br><br>Annual Injury Cost per unit | [4]<br><br>Expected Product Life | [5]<br><br>PV of Injury Costs per unit* |
|---|---|---|---|---|---|
| Horizontal Blinds | $24.4 | 72.0 | $0.34 | | |
| Vinyl/Metal | | | $0.34 | 4.25 | $1.34 |
| Wood/Faux Wood | | | $0.34 | 13 | $3.61 |
| Shades | $20.4 | 138.2 | $0.15 | | |
| Cellular | | | $0.15 | 7 | $0.92 |
| Pleated | | | $0.15 | 7 | $0.92 |
| Roman | | | $0.15 | 13 | $1.57 |
| Roller | | | $0.15 | 7 | $0.92 |
| Soft Sheer | | | $0.15 | 7 | $0.92 |
| | | | | | |
| Vertical Blinds | $7.7 | 6.4 | $1.21 | 7 | $7.56 |
| | | | | | |
| Curtains/Drapery | $1.4 | 116.1 | $0.01 | 15 | $0.14 |

*A discount rate of 3% is applied.

## 4.4 The Expected Costs of the Rule

Staff's cost analysis relies primarily on two window covering reports prepared for the CPSC under the economic support contract CPSC-D-15-0004. The first was a report prepared by Jitesh H. Panchal, Ph.D., an academic engineering expert. Dr. Panchal's study was designed to estimate the incremental manufacturing costs of implementing uncorded designs for window covering products (Panchal, 2016). The second was a comprehensive cost analysis evaluating the possible costs of a rule that would eliminate window covering designs with accessible cords (IEc, 2016b).

Because of the many window covering types and designs, and including stock and custom products, the comprehensive cost analysis conducted by IEc (2016b) developed both lower and upper bound estimates of the costs associated with a possible rule eliminating accessible cords from window coverings. The lower bound was largely based on the Panchal (2016) cost analysis. The upper bound was based on estimates suggested by the WCMA (2016a) in its May 2015 presentation at the CPSC testing laboratories, and reported in IEc (2016b).

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

### 4.4.1 Low-End Cost Estimates

Panchal (2016) used a product archeology approach, supplemented by standard models for calculating only manufacturing and assembly costs, to estimate the incremental cost of implementing standard manual uncorded technology for entry-level stock window coverings – the type of window coverings that are available for purchase off-the-shelf from home improvement stores.  Hence, his estimates are most applicable to the more basic and inexpensive uncorded products at the low end of the window coverings market.  Panchal (2016) estimates do not account for any costs associated with product development and design innovations, testing, licensing of technology, manufacturing restrictions due to existing patents, and training of personnel, which would add further costs to implementing uncorded technologies (Panchal, 2016).  Additionally, he notes that higher incremental costs could result from the use of higher-quality uncorded systems than those analyzed in his report and the need to create customized solutions for window coverings of greater size and weight.  Thus, the incremental cost increases estimated in the Panchal (2016) report represent a low-end estimate of the impact of a requirement for cord inaccessible window coverings based solely on the costs of components and the assembly of the product.

As shown in Table 3, Dr. Panchal specifically analyzes three low-price stock products: horizontal blinds, cellular shades, and Roman shades. For each product, he provides incremental costs for two window covering sizes.  He also provided separate cost estimates for those window coverings produced in (1) a low-cost manufacturing environment, and (2) a high-cost manufacturing environment. According to Dr. Panchal, the low cost environment is reflective of costs when window coverings produced abroad and imported into the U.S., and the high cost environment is reflective of the costs associated with window coverings produced domestically in the U.S.  Finally, to make his per unit cost estimates applicable to the large array of window coverings in the marketplace, he estimated increased manufacturing costs as a percent of retail price for each product.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Table 3. Low-End Estimates of Increased Manufacturing Costs for Selected Window Covering Types, as a Percentage of Retail Prices

| Window Covering Type | Increased Manufacturing Costs, as a Percent of Retail Price | |
| --- | --- | --- |
| | Low Cost Environment | High Cost Environment |
| | | |
| Horizontal Blinds | | |
| 27" x 64" | 6 – 11% | 11 – 20% |
| 72" x 64" | 5 – 9% | 9 – 16% |
| Cellular Shades | | |
| 23" x 72" | 3 – 5% | 5 – 9% |
| 72" x 72" | 2 – 4% | 4 – 7% |
| Roman Shades | | |
| 27" x 64" | 4 – 8% | 8 – 15% |
| 72" x 64" | 3 – 6% | 7 – 13% |
| Source: Panchal (2016). Notes:  a.) The low cost environment assumes manufacturing occurs outside of the United States.  b.) The high cost environment assumes manufacturing occurs in the United States. | | |

Note that the percentage range for each window covering type and size accounts for the impact of production volume on the cost estimates. The lower percentage estimate in each range reflects costs when there is a relatively high production volume (about one million units annually); the upper percentage reflects costs when there is a smaller production volume (about 100 thousand unit annually).

Table 4 presents available information on foreign and domestic production (IEc, 2016b), which allows us to consider the proportions of window coverings produced in a high cost environment (U.S. domestic production) or a low-cost environment (foreign production imported into the U.S.).

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Table 4: Manufacturing Location

| Window Covering Type | Percent Produced Outside the U.S. (Low Cost Environment) | Percent Produced Domestically (High Cost Environment) |
|---|---|---|
| Vinyl Blinds | 97% | 3% |
| Metal blinds | 79% | 21% |
| Faux wood blinds | 85% | 15% |
| Wood blinds | 75% | 25% |
| Pleated shades[a] | 75% | 25% |
| Cellular shades | 18% | 82% |
| Roman shades | 48% | 52% |

Source: IEc (2016b)

a.) Although Panchal (2016) does not analyze pleated shades, we apply the incremental cost estimate for cellular shades to this product.

Per unit cost estimates are provided in Table 5. In order to apply Dr. Panchal's low-end cost estimates (as a percentage of retail price), we need estimates of retail prices for the various window covering a) price is representative of the potentially affected corded products (column b).[69] The low-end percentage change in cost, based on Dr. Panchal's work, and the implied cost increase are presented in columns (2) and (3) in Table 5 below. Note that because the mean unit costs were presented in 2012 dollars, they have been adjusted with the Consumer Price Index for all urban consumers (CPI-U) to reflect 2019 dollars (column 1).

---

[69] The price information presented in D&R (2013) could include both corded and uncorded products. Thus, because uncorded products are more expensive, applying these prices in our analysis may overstate the economic impact of the potential requirement.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Table 5. Average Incremental Costs Associated with the Draft Proposed Rule (2019 dollars)

| Window Covering Type | [1]<br>Mean Unit Price | Low-End Estimates<br>(Based on Panchal, 2016) | | High-End Estimates<br>(Based on WCMA, 2015a) | |
| --- | --- | --- | --- | --- | --- |
| | | [2]<br>Average Cost Increase as a % of Retail Price | [3]<br>Average Unit Cost Increase | [4]<br>Average Cost Increase as a % of Retail Price | [5]<br>Average Unit Cost Increase |
| Vinyl/Metal Blinds | $36.90 | 8% | $2.95 | 23% | $8.49 |
| Wood/Faux Wood Blinds | $68.94 | 9% | $6.20 | 14% | $9.65 |
| Pleated Shades | $53.87 | 4% | $2.15 | 14% | $7.54 |
| Cellular Shades | $93.36 | 6% | $5.60 | 14% | $13.07 |
| Roman Shades | $68.51 | 8% | $5.48 | 14% | $9.59 |
| Roller Shades | $63.26 | 8% | $5.06 | 14% | $8.86 |

1. Although Panchal (2016) does not evaluate pleated shades explicitly, we apply the estimate for the incremental increase in price for cellular shades to this product category.

2. Panchal (2016) only evaluated motorized cordless roller shades, we apply the estimate for incremental increase in price for roman shades to this category as it is the most appropriate.

An alternative cost estimate was also developed by Health Canada for various "safer" window covering operating systems in 2019. The Health Canada estimate is an incremental cost estimate for both cordless systems and "safer" corded systems which is strictly focused on component costs. The cost estimates by window covering operating system created by Motiv in 2016 for CPSC were used by Health Canada to create the estimates. Among other things, the Motiv analysis attempted to estimate the lowest cost possible. For example, it assumed, where possible, the use of plastic materials and injection molding even though it states that the use of metal components could "improve the feel and overall operating life" of the product. Although metal components might have resulted in a higher quality and longer-lived product, the Motiv report states that the costs would have been substantially higher. The assumptions used in the Motiv analysis are valid when estimating the incremental cost of cordless low end stock products which are produced at high volumes. They are less valid when estimating the cost of custom and higher quality products.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Nevertheless, Health Canada used these estimates in their analysis and found that compared the costs of a baseline corded operating system the incremental cost of cordless systems ranged from $0.16 for a pulley activated system to $9.95 for a motorized system.[70] The average incremental cost from these calculations equates to $2.10 per window covering.

### 4.4.2. High-End Cost Estimates

In an attempt to capture costs potentially omitted from the estimates presented in Panchal (2016), IEc (2016b) also presented a set of alternative high-end estimates. In its May 2015 presentation to CPSC staff, representatives of the WCMA noted that the cost of implementing uncorded technology is within the range of 20 to 40 percent of the overall product cost for custom products and 40 to 60 percent of the overall product cost for stock products.[71] We assume that these estimates include the costs associated with product development, testing, licensing of technology, training of personnel, and customized solutions for larger or heavier products that were excluded from the Panchal (2016) estimates.

To determine the high-end per unit incremental cost of cord inaccessible technology as a proportion of the retail price, staff required information that described the mark-ups associated with window coverings. Supplier Relations US, LLC (2010), reports that the producer price represents 46.4 percent of the total retail price for window coverings.[72] Consequently, the high-end cost estimates would be equal to the proportion of costs associated with the uncorded technology, multiplied by the proportion of the retail price attributable to the cost of producing the product (46.4 percent). Thus, for stock products, the uncorded technology would increase costs by 18.6 percent to 27.8 percent (*i.e.,* $0.464 \times 0.40$ to $0.464 \times 0.60$), or an average of 23.2 percent. And, for the custom products, the uncorded technology will increase prices by 9.3 percent to 18.6 percent ($0.464 \times 0.20$ to $0.464 \times .40$), or an average of 13.9 percent. The IEc (2016b) work was done prior to the voluntary standard that required all stock products to be uncorded. Consequently, we use the 13.9 percent projection for custom products as the average estimate of the high end cost increase (column 4). The high-end cost estimates are presented in column (5) of Table 5.

---

[70] Cost estimates calculated by Health Canada are reported in $CAD. The annual USD to CAD exchange rate in 2019 published by Bank of Canada ($1.3352) was used to convert these values to $USD.

[71] Presumably, the higher percentage of costs as a proportion of the overall product costs for the stock products is because the base cost of stock products is substantially lower than for the custom products.

[72] The remainder of the retail price is comprised of margins for wholesalers (9.6 percent), freight (7.1 percent), and retailers (36.9%).

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**4.5 Preliminary Description of the Potential Costs and Benefits of the Draft Proposed Rule**

This section provides a preliminary description of the potential costs and benefits of the draft proposed rule over the expected product life of one year's sales of uncorded (or cord inaccessible) custom window coverings.  First, we estimate annual sales of custom corded window coverings, by window covering type.  These are the window covering products that will be affected by the draft proposed rule.  Second, we estimate the costs and benefits that would be associated with these sales.

The WCMA (2015b) provided a rough estimate of about 100 million window covering units sold in the United States annually.  D+R International (2021) estimated annual sales of about 131 million or more units from 2015 to 2019.  For purposes of this analysis, we will use annual sales of about 138.8 million units of window coverings in 2019, which is consistent with estimates of the current population of window coverings in use and their expected product life.

Table 6 provides estimates of annual window covering shipments, by window covering type, based on estimates from IEc (2016b) and D+R International (2021).  Basic vinyl and metal horizontal blinds account for about 28 percent of window covering shipments, wood and faux wood horizontal blinds account for 15 percent, the various types of shades account for about 16 percent, vertical blinds account for about 16 percent, and curtains and drapes accounted for about 11 percent, and interior shutters account for about 1 percent.

Table 6.  Estimated Window Covering Shipments, Total and Uncorded Annually, by Window Covering Type

| Window Covering Type | Estimated Annual Sales (Units Shipped) | Percent Share of Shipments Custom | Custom Shipments | Estimated Corded Custom Shipments 65% of Shipments |
|---|---|---|---|---|
|  |  |  |  |  |
| Metal/Vinyl Horizontal Blinds | 39,241,726 | 11% | 4,328,995 | 2,813,846 |
| Wood or Faux Wood Horizontal Blinds | 21,282,046 | 50% | 10,643,902 | 6,918,536 |
| Cellular Shades | 13,065,992 | 75% | 9,749,855 | 6,337,405 |
| Pleated Shades | 5,478,820 | 100% | 5,478,820 | 3,561,233 |
| Roman Shades | 2,640,170 | 100% | 2,640,170 | 1,716,111 |
| Roller Shades | 10,887,173 | 27% | 2,955,619 | 1,921,153 |
| Soft Sheer | 3,234,787 | 100% | 3,234,787 | 2,102,612 |
| Vertical Blinds | 21,729,928 | 6% | 1,264,170 | 821,710 |
| Sheer Drapery | 4,695,304 | 100% | 4,695,304 | 3,051,947 |
| Curtains/Drapery | 15,807,053 | 100% | 15,807,053 | 10,274,585 |
| Interior Shutters | 778,750 | 100% | 778,750 | NA |
| Total | 138,841,749 |  | 61,577,425 | 39,519,138 |
| Source: D&R (2021) |  |  |  |  |

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Based on statements from WCMA members (WCMA, 2015a), IEc (2016a, 2016b) estimated in 2015 that about 99 percent of horizontal blinds and about 50 percent of cellular, roller, pleated, and Roman shades shipped were corded products. A review of currently available products conducted by D+R shows that corded products are estimated to account for less than one percent of stock products and a majority of custom products due to the price differential.[73] This indicates a large market shift away from corded to cordless products occurred within the stock classification. This also indicates no such shift occurred for products classified as custom because corded product availability was unchanged and corded variants are still priced significantly lower than cordless. Based on D+R's review and interviews with retailers, we assume that 65 percent of custom window coverings are sold with corded lift operation. Again, we note that because of the uncertainty surrounding the proportions, we conduct an analysis in section 4.7 to determine the sensitivity of our results to changes in these proportions.

### 4.5.1 Preliminary Description of the Potential Per Unit Costs and Benefits for Custom Window Coverings, by Type, and Aggregate Costs and Benefits Associated with One Year of Product Sales

Table 7 presents preliminary description of the potential cost and benefits of the draft proposed rule. Column 1 contains the estimates of affected corded products, by window covering type, and column 2 contains the low-end expected incremental costs associated with producing uncorded, or cord inaccessible, window coverings. Column 3 shows the low-end aggregated costs of the rule, by window covering type; they equal the product of the affected products (column 1) and the estimated incremental increases in manufacturing costs needed to make them uncorded or cord inaccessible (column 2). Aggregate estimated costs amount to about $156.5 million. However, this may be an underestimate. We were unable to quantify the costs associated with the roller and soft sheer shades and have therefore applied the cost increase from roman shades to obtain an estimate. Additionally, the uncorded blinds may also result in an unquantified reduction in utility for some consumers due to greater inconvenience during operation. For example, for small uncorded blinds over ovens or kitchen sinks may be especially difficult for some consumers reach.

---

[73] D+R conducted a review of available SKU's at retailers along with the customization options to determine the availability of corded products. While nearly all stock SKU's were cordless a few were found still available for purchase with external cords but equipped with safety devices. D+R also conducted interviews with manufacturers and retailers to determine the prevalence of corded custom products and concluded corded custom still account for a majority of sales due to the significantly lower price when compared to cordless operation. D+R did note that they believe the share of corded custom products to shrink over time.

THIS DOCUMENT HAS NOT BEEN REVIEWED                 CLEARED FOR PUBLIC RELEASE
OR ACCEPTED BY THE COMMISSION                              UNDER CPSA 6(b)(1)

Table 7.  Preliminary Description of the Potential Benefits and Costs of the Draft Proposed Rule,
by Detailed Distribution of Window Covering Types

|  | | Low-End Costs | | High-End Costs | | Benefit Estimate | |
|---|---|---|---|---|---|---|---|
|  | [1] | [2] | [3] | [4] | [5] | [6] | [7] |
|  | Affected Window Coverings (millions) | Cost per Window Covering | Aggregate Costs (millions $) | Cost per Window Covering | Aggregate Costs (millions $) | PV of Injury Costs per unit* | Aggregate Benefits (millions $) |
| Horizontal Blinds | | | | | | | |
| Vinyl/Metal | 2.81 | $2.95 | $8.31 | $8.49 | $23.88 | $1.34 | $3.56 |
| Wood/Faux Wood | 6.92 | $6.20 | $42.93 | $9.65 | $66.77 | $3.61 | $23.64 |
| Shades | | | | | | | |
| Cellular | 6.34 | $5.60 | $35.50 | $13.07 | $82.83 | $0.92 | $5.51 |
| Pleated | 3.56 | $2.15 | $7.67 | $7.54 | $26.86 | $0.92 | $3.09 |
| Roman | 1.72 | $5.48 | $9.41 | $9.59 | $16.46 | $1.57 | $2.55 |
| Roller** | 1.92 | $5.06 | $9.72 | $8.86 | $17.01 | $0.92 | $1.67 |
| Soft Sheer** | 2.10 | $19.76 | $41.54 | $34.57 | $72.69 | $0.92 | $1.83 |
|  | | | | | | | |
| Vertical Blinds | 0.82 | $0.00 | $0.00 | $0.00 | $0.00 | $7.56 | $5.87 |
|  | | | | | | | |
| Curtains/Drapery | 13.33 | $0.00 | $0.00 | $0.00 | $0.00 | $0.14 | $1.81 |
| - | - | - | - | - | - | - | - |

\* The per unit present value of injury costs associated with corded window coverings equals the implied benefits associated with removal of cords.

\*\* The cost increase as a percent of retail price for roman shades is applied to these product types.

\*\*\* The aggregate benefit is adjusted for an estimate of the voluntary standards effectiveness (94.6%) in Tab I.

Additionally, the aggregated low-end cost estimates do not include any costs associated with uncorded vertical blinds or curtains/drapery, based on the assumption that wands can generally be substituted for cords, and that the costs of the wands are generally offset by eliminating the cords (Panchal, 2016).  This assumption is probably true for most vertical blinds and curtains, but there may be some size limitations to the use of wands: some very large window coverings may require cords or motors to operate effectively.  Additionally, substituting the wands for cords may result in some unquantifiable reduction in utility for consumers in the form of inconvenience and or difficulty in adjusting the uncorded products.  There will also be costs associated with compliance for roller shades and soft sheer blinds, because both are currently available as corded options.  However, these costs are unknown and therefore are estimated using the cost increase of roman shades.

Columns 4 and 5 describe the *high-end* incremental cost increases, per window covering, along with the estimated costs associated with one year's sale of window coverings.  The estimated high-end costs would amount to about $309 million annually.  However, as with the low-end estimates, this may

179

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

be an underestimate due to the cost increase estimate used for roller and soft sheer products. Additionally, while the costs of many uncorded vertical blinds and curtain/drapery products may not increase (assuming wands can generally replace cords without an increase in net costs), some of these coverings may be so large that some consumers will choose the more convenient motorized system which, according to Panchal (2016), may add about $100 to the cost of a window covering. Motorized systems can add significantly more than $100 in some cases as the price is heavily dependent on the choice of power source which as stated earlier in this report may require expert installation.[74] If, for example, all custom vertical blind customers (almost six percent of all vertical blind purchases) preferred the more convenient motorized systems for vertical blinds, the costs could amount to about $126 million annually.[75]

### 4.5.2 Preliminary Discussion of the Potential Aggregate Benefits by Custom Window Covering Type and Aggregate Costs Associated with One Year of Product Sales

Finally, columns 6 and 7 of Table 7 above provide information on the expected benefits. Column 6 provides the expected present value of the societal costs for each window covering type. This present value figure represents the per unit benefits associated with the different types of window coverings, under the assumptions that (1) uncorded window coverings will prevent all cord-related strangulations involving window coverings, and (2) there are no offsetting risks that would be presented by uncorded window coverings. Finally, column 7 provides the estimated aggregate gross benefits that would be associated with one year's production and sale of window coverings adjusted by the 94.6 percent effectiveness estimate in Tab I (Balci-Sinha 2021), and is estimated as the product of the present value figure in column 6, the effectiveness estimate, and the number of window coverings affected in column 1. In aggregate, gross benefits would amount to about $49.5 million.

Table 8 summarizes the cost and benefit estimates from Table 7, by general window covering type (e.g., horizontal blinds, shades, vertical blinds, and curtains/drapery). Shades account for majority of costs and a small minority of benefits because of their low sales volume combined with higher costs to accommodate cordless operation. In aggregate, the estimated costs ranged from $156.5 million to $309 million, while the estimated benefits amounted to about $49.5 million. The estimated costs of horizontal blinds ranged from an estimated $51.2 million to $90.7 million, while benefits amounted to an estimated $27.2 million.

---

[74] Installations of some motorized systems can cost upwards of $1,000 or more due to placement and wiring the power source directly into a home's wiring. Estimate is based on quotes solicited for varying shaped/sized windows with a motorized window covering hardwired into the home's electrical system. Quotes for a standard sized window range from $250 to $325 per motor.

[75] Based on an estimate of 21.73 million total vertical blind sales in 2019.

Table 8. Estimates of Aggregate Costs, and Benefits of the Draft Proposed Rule, by Type of Window Covering

|  | [1] | [2] | [3] | [4] |
|---|---|---|---|---|
|  | Affected Window Covering (millions) | Aggregate Costs low end (millions $) | Aggregate Costs high end (millions $) | Aggregate Benefits (millions $) |
| Horizontal Blinds | 9.73 | $51.23 | $90.66 | $27.19 |
| Shades | 15.64 | $103.84 | $215.86 | $14.64 |
| Vertical Blinds | 0.82 | $0.00 | $0.00 | $5.87 |
| Curtains/Drapery | 13.33 | $0.00 | $0.00 | $1.81 |
| Total | 39.52 | $155.07 | $306.52 | $49.52 |

The estimated annual aggregate benefits associated with corded vertical blinds and curtains/drapes amount to about $5.9 million and $1.8 million, respectively. The aggregate costs associated with the vertical blinds and curtains are unknown and is most likely near zero. However, a rule making these products uncorded could result in some reduction in utility in terms of inconvenience and reductions in ease of use.

Overall, our analysis suggests on the order of about $156.5 million to $309 million in estimated quantifiable costs and about $49.5 million in benefits. The robustness of these estimates if some of the underlying estimates and assumptions are changed is examined in the next two sections.

### 4.6 Characterization of Uncertainty in Benefit and Cost Estimates

In a complex cost benefit analysis using estimated parameters, inputs from several models, assumptions based on expert judgement, and public/private data there are likely to be many sources of uncertainty. This section exams several sources of uncertainty in the analysis that could impact the findings. These include, the incremental cost of cordless products, the VSL applicable to analyzing risks to children, the number of corded custom window coverings in use, and perhaps a longer average product life than used for horizontal vinyl/metal custom blinds.

The estimates of the societal cost of injuries are highly dependent on CPSC staff's review of cases from 2009 to 2020 involving window coverings as this review is used to determine how much of the injury costs are attributable to custom window coverings. If the review did not accurately assign incidents to the correct product or classification type it could result in higher or lower benefit estimates by product type.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

*Incremental Cost of Cordless Technology*

As already indicated in the text, there is some uncertainty regarding the incremental cost of the cordless technologies. Therefore, in the analysis a range of costs was used including cost estimates from Panchal (2016) and IEc (2016b). We note that that especially the low estimate from Panchal (2016) were probably more applicable to stock products than to custom products, which are the window coverings to which the rule would apply. The reason that these may be underestimates for a rule involving custom products include the fact that he mostly analyzed stock products and that for the low estimates he assumed a high volume production in China, which is less applicable for custom than for stock. Therefore, the low value from Panchal (2016) is probably the lowest potential cost.

Importantly, cordless custom window coverings are already widely available and the incremental retail price differences between custom window coverings that are alike in every respect except that one is cordless are observable. The observed increment in retail prices between the two typically ranges from $10 to $80 and is highly dependent on product type and size. The retail increment likely includes some markup over costs, which strongly suggests the cost estimates used in this analysis are not over estimates.

From this the staff concludes that the actual costs are probably within the ranges of costs used in this analysis, but there is some chance that the cost estimates underestimate the actual cost.

*Value of Reducing Fatal Risks*

The analysis valued the benefit of reducing fatal incidents at $9.2 million each, which, as discussed earlier is in-line with most reasonable estimates of the value of a statistical life. The VSL is not a value of a life, but is in fact an estimate of the amount people are willing to pay for a small reduction in a risk of death summed over many people. For example, if 10,000 people were willing to pay $900 each to reduce their risk of death by 0.0001, then those people would combined be willing to spend $9 million to reduce the risk of one additional death.

There has been some discussion in the literature suggesting that people might be willing to spend more for a small reduction in the risk to children than they are for the same reduction in their own risk. This could perhaps be because young children might be incapable of understanding the risks and due to that people might be willing to pay more to reduce their risk of premature death. A review of the literature conducted for the CPSC suggested that the VSL for children could exceed that of adults by a factor of 1.2 to 3, with a midpoint of around 2 (IEc, 2018). If we substituted the high end of this range, which suggests that the VSL for children could be 3 times the VSL for adults, the estimated per unit benefit of the draft proposed rule would be higher. The table below compares the base per unit benefit estimate used in the analysis to the per unit benefit estimate assuming a VSL of $27.6 million.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Table 9. Per Unit Benefits and Costs By Product Category

| Category | Base Analysis Benefits after 94.6% effectiveness adjustment | VSL of $27.6 million | Low End Cost | High End Cost |
|---|---|---|---|---|
| Horizontal Blinds, All Types | $2.79 | $7.55 | $3.42 | $6.05 |
| Shades, All Types | $0.94 | $2.60 | $6.64 | $13.80 |
| Vertical Blinds | $7.15 | $20.84 | $0.00 | $0.00 |
| Curtains & Drapes | $0.14 | $0.41 | $0.00 | $0.00 |

*Estimate of Corded Custom Window Coverings in Use*

The estimate of corded custom window coverings in use that was used in the base analysis is given in Figure 1. As noted this estimate was based on estimates of the total number of window coverings and interviews with manufacturers and retailers in which some gave conflicting accounts. They were not based on exposure surveys and thus the actual number of corded custom products could be either higher or lower than the estimate used in the base analysis and we have no basis for stating if we think we have over or underestimated the number. If the share of custom cordless products has grown by a greater amount than assumed, then there could be fewer corded products in use meaning that we have underestimated the risk associated with corded products. On the other hand, if we have overestimated the number of corded products in use, then there could be more corded products in use which means we have overestimated the risk and therefore overestimated the per unit benefits of the draft proposed rule. Table 10 below shows how assuming the number of corded custom window coverings in use increased/decreased by 20 percent than estimated would affect the per unit benefit before discounting compared to the baseline estimate.

Table 10. Per Unit Benefit, before discounting, by Category

| Category | Cost of Injuries (millions $) | Base Number in Use (millions) | Base Per Unit Benefit | Per Unit Benefit if Corded Custom Window Covering in Use increased by 20% | Per Unit Benefit if Corded Custom Window Covering in Use decreased by 20% |
|---|---|---|---|---|---|
| Horizontal Blinds, All Types | $24.4 | 72.0 | $0.34 | $0.28 | $0.42 |
| Shades, All Types | $20.4 | 138.2 | $0.15 | $0.12 | $0.18 |
| Vertical Blinds | $7.7 | 6.4 | $1.21 | $1.01 | $1.52 |
| Curtains & Drapes | $1.4 | 116.1 | $0.01 | $0.01 | $0.02 |

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

*Longer Product Life for Vinyl/Metal Horizontal Blinds*

The estimated product life used in the analysis for vinyl and metal horizontal blinds was significantly shorter than for the other products. It was based on work completed by D+R for the Department of Energy (2013). However, it is possible that this estimate is skewed because of the dominance of stock in this category. If we assumed that the product life of custom vinyl and metal blinds was longer, perhaps approaching the 10 years claimed by WCMA that they strive for with custom products, then the per unit benefit associated with horizontal vinyl and metal blinds would be $2.74 after adjusting for the effectiveness of the standard.

## 4.7 Sensitivity Analysis

The previous sections of this report preliminarily described the potential benefits and costs of the draft proposed rule based on our methodology, the results from our reference case analysis, and characterized the uncertainty related to these estimates. This section presents an analysis that will describe the sensitivity of the results to variations in key parameters of the reference case analysis. This analysis considers the impact of a higher VSL for children (i.e., a willingness to pay more for a small reduction in the risk of death for children), difference in the number of window coverings in use, the percentage of custom corded product shipments, and the expected product life.

Relative to the reference case analysis, Table 9 presents the results for an alternative VSL that is multiplied by a factor of 3, window coverings in use varying by 20 percent, the percentage of custom corded product shipments by 25 percent, and the expected product life by 40 percent.[76] The aggregate benefit and the range of costs for each input variable is presented for a low cost environment and a high cost environment as described earlier in this report.

Table 11 below describes the results of the sensitivity analysis. Only benefits and costs associated with custom window coverings are shown. The methodology to estimate benefits and costs is the same as used in the reference case with only the input variables adjusted.

---

[76] A report on valuing reductions in fatal risk to children completed by IEC for CPSC in 2018 found that VSL for children may exceed the VSL for adults by a range of 1.2 to a factor of 3. The report can be found at :

https://www.cpsc.gov/s3fs-public/VSL_Children_Report_FINAL_20180103.pdf?crqdQGttjTalnQbCPf3.7freqXkMrEbu

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Table 11. Sensitivity Analysis

| Sensitivity Analysis | | | |
|---|---|---|---|
| *Input Values* | | | |
| *Row* | *Input Values for Sensitivity Analysis* | *Expected Benefits (millions of 2019 dollars)* | *Range of Expected Costs (millions of 2019 dollars)* |
| a. | Reference Case Analysis | $49.5 | $156.5 to $309.0 |
| Value of Statistical Life (VSL) | | | |
| b. | VSL= $27.6 million | $136.9 | $156.5 to $309.0 |
| Percentage of Corded Custom Window Coverings Sales | | | |
| c. | 40% | $30.5 | $95.4 to $188.6 |
| d. | 90% | $68.7 | $214.7 to $424.4 |
| Estimate of Window Coverings In Use | | | |
| e. | Window Coverings In Use 20% lower | $62.0 | $156.5 to $309.0 |
| f. | Window Coverings In Use 20% Higher | $41.3 | $156.5 to $309.0 |
| Expected Product life | | | |
| g. | 40% Shorter | $31.5 | $156.5 to $309.0 |
| h. | 40% Longer | $65.6 | $156.5 to $309.0 |

Row b displays the result of increasing the VSL by a factor of 3 to represent a higher value of risk reductions to children. The analysis shows a significant increase in benefits in this case. Variations in the percentage of corded custom window covering sales had the most significant impacts on benefits and costs as shown in rows c and d.

A variation of 20 percent in the estimates of window coverings in use had a smaller impact on benefits. For example, an estimate of 20 percent lower window covering in use the benefits are approximately $62 million as shown in row e. Increasing the window covering in use estimate by 20 percent results in approximate benefits of $41.3 million as shown in row f. The final input variable evaluated is expected product life for window coverings which was adjusted by an increase/decrease of 40 percent. The results are shown in rows g and h.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

## 4.8 Additional discussion

Staff in the Directorate for Economic Analysis note that uncorded window covering options exist for nearly every window covering types. In fact, as noted previously, the existing voluntary safety standard published in 2018 requires that all stock products, which currently account for about 56 percent of the window coverings sold and are generally less expensive than custom window coverings are uncorded. Additionally, uncorded options exist for most types of custom window coverings and some consumers do opt for uncorded custom window coverings (D+R International 2021).

However, there could be some inadequacies in the market that result in less than the optimal amount of safety being provided by the market. The first type of inadequacy or market failure is the potential existence of externalities. Externalities exist when one party's actions impose uncompensated benefits or costs on another party. In the case of rental housing, for example, the choice of window covering may be made by a landlord. In this case, an externality may be created when the purchase decision reflects the risk preferences of the landlord, but the costs of that decision (in terms of risk) would be borne by tenants, some with children. One would generally expect a landlord to choose the lowest cost options, which today would probably be the cordless stock options. However, it is also possible that a landlord could work with a window covering supplier to measure, order, and install the window coverings for their rental units. In these cases, the supplier might in fact be ordering custom products and the corded options would be the lowest cost options. The landlord might not be taking the interests of his or her tenants into account. Similarly, as discussed in Tab I, when residency of a house or apartment changes, the window coverings from the prior occupant commonly transfer to the new occupant, who may thus not have complete choice in window coverings.

Some consumers might have inadequate information concerning the hazard either underestimate, or be generally unaware of the risks posed by corded window blinds. Although corded window blinds include warnings of the strangulation risk. The proposed rule may also provide benefits to consumers who might underestimate the extent to which the risk posed by corded window coverings could apply to their own household. For example, they might not believe that their children would play with window covering cords and disregard the warnings. These consumers in effect could undervalue the risk reduction offered by uncorded window coverings.[77] Finally, we note that the draft proposed rule is intended to protect young children who probably do not understand the risks of their actions.

## 4.9 Unquantified Benefits

The monetized benefits in this analysis only reflect the subset of benefits attributable to a reduction in fatal and non-fatal injuries associated with custom window coverings. There may be unquantifiable benefits related to operation or aesthetics of cordless products. Some consumers may derive additional utility from the more streamlined look of cordless products. Staff also note that cordless products may more reliably operate during lift or tilt operation which can be a source of

---

[77] The Directorate for Economic Analysis note that it may be perfectly rational for some consumers to choose corded window coverings. Households that do not have young children and seldom receive visits from young children do not face the risk of having a child strangled by a window cord. These households would not benefit from choosing uncorded window coverings solely for reducing the risk of strangulation.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

frustration with corded products. However, because uncorded alternatives exist for virtually all types of custom window coverings, the value of these unquantified benefits is less than the price differential between the corded and uncorded options.

# 5.0 SUMMARY AND CONCLUSION

This analysis suggests that for most shade and horizontal blinds, the monetized benefits of the draft proposed rule would be less than the monetized costs. For curtains/ draperies and for vertical blinds, however, the monetized benefits could be greater than the monetized costs. In the aggregate, that is summed across all products types, the monetized benefits are less than the monetized costs. The estimate of monetized aggregate benefits for one year's worth of sales amounted to approximately $49.5 million or approximately $1.26 per unit sold. The estimate of monetized aggregate costs using the low-end/high-end cost environment amounts to $156.5 million and $309.0 million respectively. These values equate to a per unit sold cost of $3.96 for the low-end environment and $7.82 for the high end environment.

There is some uncertainty regarding the precise level of costs and benefits associated with the rule, in large part because there is uncertainty concerning the distribution of deaths and injuries by the stock and custom categories. The voluntary standard only became effective in 2018. However, because information on deaths lag for about 1 to 3 years, and because the information on the characteristics of window covering types is limited, it is difficult to determine precisely how many of the deaths actually involve custom products. It could be, for example, that custom products tend to be purchased by higher income households with fewer children and therefore present a lower risk than stock products. We have more up-to-date information quantifying the nonfatal injuries involving window coverings, but the characteristics of the window coverings involved in nonfatal injures are also limited. In an attempt to address some of this uncertainty, a sensitivity analysis was conducted that still suggested that for most types of window coverings, the monetized benefits would probably be less than the monetized costs.

Additionally, the draft proposed rule could potentially result in the elimination of some sizes, and/or types of window coverings from the market, or require more expensive (e.g. motorized) methods for the efficient functioning of window coverings than were contemplated in this analysis. Manufacturers might need to develop alternatives to corded lift systems for unusual size products. Motorized cordless lift may still be used in most cases but would increase the complexity to install as well as dramatically increase the cost as professionally installed window coverings in some cases could potentially exceed $1,000 for just one unusual size and/or shaped window. The large increase in cost could result in a loss of utility as consumers may have a preference for blinds or shades but would have to substitute for curtains or drapes as the required sized blind or shade is no longer available.

Finally, we note that cordless window coverings are already available: they include all stock products (roughly 56% based on most recent estimates) and some proportion of custom products. Additionally, consumers are provided information about the safety of window coverings and are warned about the hazards of corded products at the point-of-sale, but CPSC staff note that these warnings are inconsistently provided and an ineffective method to communicate the hazard.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

# 6.0 VOLUNTARY STANDARD

As discussed earlier in this report and in the other tabs of the briefing memo the relevant voluntary standard is ANSI/WCMA A100-1.2018. The voluntary standard requires that stock window covering products be products without cords or without accessible cords or only with short, static cords (*i.e.*, maximum eight inches in length). The standard requires custom products to meet one of the three requirements: (1) No operating cords; (2) Short cord with a length equal to or less than 8 inches in any state (free or under tension), (3) Inaccessible operating cords determined per the test requirement in Appendix C of the standard **or** have operating systems that result in free-hanging and accessible cords; these systems include single retractable cord lift system, continuous loop operating system, and standard operating system. Based on incident data review, user study, and human factors literature, staff assesses that operating cords requirements for custom products in the ANSI/WCMA A100.1 – 2018 standard are inadequate to effectively address the strangulation hazard associated with custom window covering cords. See Tab I for more details. Staff also note that voluntary standards committees have in the past rejected initiatives to require no accessible cords on custom products which would address the strangulation hazard. Simply stated, the voluntary standards process is very unlikely to lead to a custom cordless requirement for any product type in the short or long run as the current effective standard for stock products took over two decades to complete.

# 7.0 REGULATORY ALTERNATIVES

## 7.1. No Action Alternative

Under this alternative the status quo would be maintained. This option might be selected on the grounds that the risk associated with custom corded products is small and materials describing the risk associated with corded window covering products are distributed to consumers upon purchase. Additionally, cordless products are widely available for nearly all window covering types for consumers that can afford them.

Over the long run changes in consumer preferences could increase the number of custom corded products in use. Note that practically all stock versions of products are less expensive than custom and price sensitive consumers will substitute cordless stock products for the frequently more expensive corded custom variants.

We cannot estimate the benefits and costs due to this alternative due to several factors such as, the uncertainty related to consumer preferences for corded products, and the uncertainty related to size limitations for cordless products. However, we note that costs compared to a mandatory rule would be lower under this alternative.

## 7.2 Improve Voluntary Standard for Window Coverings

Another alternative might be for Commission staff to continue participating and encouraging safety improvements to the voluntary standard for window coverings, WCMA A100-1. This option

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

would be similar to the "no action alternative," with the key difference being that the Commission could direct staff to pursue safety improvements in the voluntary standard, including applying relevant conditions on stock products to custom, as a conditional alternative to a mandatory standard. The Commission could then reconsider a mandatory standard if efforts to improve the voluntary standard on custom products remain unsatisfactory.

Staff has supported recent changes in the voluntary standard with requirements for cordless stock products, more descriptive warning labels, and materials describing the strangulation hazard. Additionally, voluntary standards committees have in the past rejected initiatives to require no accessible cords on custom products. Consequently, it does not appear that the voluntary standards process is likely to lead to a custom cordless requirement for any product type in the short or long run as the current effective standard for stock products took over two decades to complete.

### 7.3 Later Effective Date

The draft proposed rule includes an effective date that is two years after the final rule is published in the *Federal Register*. Given that there are some issues in redesigning certain window coverings of unusual sizes to accommodate cordless operation, a later effective date would allow manufacturers more time to redesign and spread the research and development costs, or eliminate product variants that cannot be switched to cordless operation. It is unlikely that any manufacturer (large or small) would leave the window covering market as a result of the draft proposed rule but elimination of some product sizes is possible as conversion to cordless operation may not be feasible for large or unusual sizes.[78]

Later effective dates, beyond the proposed two-year effective date, would mitigate some of the costs related to redesign/research and development for manufacturers. However, if cordless operation is not feasible a reduction in sales would occur if a consumer could not find a suitable alternative. Delaying the effective date would be expected to decrease costs, but not by a consequential amount as further cost reductions would be mostly attributable to inventory reductions of products in which cordless operation isn't feasible.

### 7.4 Narrow Proposed Rule to Vertical Blinds, Curtains, and Drapes

The Commission could narrow the draft proposed rule to vertical blinds, curtains, and drapes on the grounds that cords are not critical to the operation of these products. These products typically offer cordless options at no additional cost as for most applications because a plastic rod can be used for operation. Narrowing the proposed rule to these three product types would lessen the cost impact and make it unlikely that any particular product type and/or size would be eliminated. Note though that some consumers may require motorization which would dramatically increase the cost but few consumers are expected to require motorization for these products. Consumers may also prefer decorative cords that

---

[78] Motorization is a possibility in these cases but as described earlier in this report motorization of window coverings is expensive and may exceed the cost of the window covering product.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

exceed the length described in the proposed rule which would result in lower utility for these consumers should those decorative cords be removed.

Under this alternative, the benefits and costs would be limited to vertical blinds, curtains, and drapes which accounted for approximately 35 percent of 2019 window covering product sales. However, the number of injuries and deaths associated with these products represents a small fraction (5.7 percent) of the total. The costs for this would be close to $0, but the benefits would be substantially smaller than the draft proposed rule because only a few incidents are associated with these products.

## 7.5 Continue and Improve Information and Education Campaign

The Commission could work to improve the current information and education campaign concerning the strangulation hazard associated with corded window covering products. This alternative could be implemented on its own without regard for regulatory action. Staff finds that the warnings are unlikely to effectively reduce the strangulation risk due to hazardous cords on window coverings because despite the warnings, some consumers are not likely to follow warning labels on window covering products, perhaps because they underestimate the degree of the risk or extent to which it applies to them. Moreover, strangulation deaths among children occur quickly and silently, such that parental supervision is insufficient to address the incidents (Tab I).

**Acknowledgements**

The preparation, writing, and review of this report was supported by a team of staff. We acknowledge and thank team members for their significant contributions.

Gregory Rodgers, PhD., Previous AED Directorate for Economics

Robert Franklin, Acting AED Directorate for Economics

## References

Asch, Peter, 1988. *Consumer safety regulation*. Oxford University Press: New York.

Balci-Sinha, Rana, 2021. "Human Factors Considerations for the Proposed Rule on Custom Window Coverings". Bethesda, MD: U.S. Consumer Product Safety Commission.

Chowdhury, Risana, 2021. "Memorandum to Window Covering Cords Petition Project Manager: Fatal and Near-Miss Strangulations Associated with Window Covering Cords". Bethesda, MD: U.S. Consumer Product Safety Commission.

Census Bureau, 2020. Statistics of US Businesses (SUSB) 2017. Suitland, MD. Census Bureau.

Corded Window Coverings Regulations (2019), SOR/2019-97, available at: https://canadagazette.gc.ca/rp-pr/p2/2019/2019-05-01/pdf/g2-15309.pdf

D&R International Ltd, 2013. Residential Windows and Window Coverings: A Detailed View of the Installed Base and Consumer Behavior. Silver Spring, MD. D&R International.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

D+R International Ltd, 2021. Window Covering Market Characterization: Final Report. Silver Spring, MD. D+R International.

Euromonitor International, 2021a. Window Covering Market Share by Company 2014-2020. Chicago, IL. Euromonitor International.

Euromonitor International, 2021b. Window Covering Market Size USD 2014-2020. Chicago, IL. Euromonitor International.

Gold, Marthe R., Siegel, Joanna E., Russell, Louise B., Weinstein, Milton C., 1996. *Cost-effectiveness in health and medicine*. New York: Oxford University Press.

Haddix, Anne C., Teutsch, Steven M., Corso, Phaedra S., 2003. *Prevention effectiveness: A guide to decision and economic evaluation* (2nd ed.). New York: Oxford University Press.

Industrial Economics Inc. (IEc), 2016a. "Memorandum to CPSC: Window Coverings Market Research Report". Cambridge, MA. Industrial Economics Inc.

Industrial Economics Inc. (IEc), 2016b. "Memorandum to CPSC: Final Cordless Window Coverings Comprehensive Cost Analysis". Cambridge, MA. Industrial Economics Inc.

Industrial Economics Inc. (IEc), 2018. Final Report to CPSC: Valuing Reductions in Fatal Risks to Children. Cambridge, MA. Industrial Economics Inc.

Jenkins, Jill L., Rodgers, Gregory B., 2020. Combining measures of risk exposure with injury incidence estimates to estimate nursery product injury rates, *Journal of Safety Research,* 72, 43-46.

Motiv, 2016. Technical Feasibility and Cost Improvement Analysis of Safer Window Covering Technologies: Phase 5 Final Report. Boston, MA. Motiv.

Laciak, Arthur, 2020. Importation Patterns for USA: For Blinds. Bethesda, MD: U.S. Consumer Product Safety Commission.

Lawrence, BA, Miller, TR, Waejrer, GM, Spicer, RS, Cohen, MA, Zamula, WW, 2018. The Consumer Product Safety Commission's Revised Injury Cost Model. Maryland: Pacific Institute for Research and Evaluation (PIRE). (February, 2018). Available at: https://www.cpsc.gov/s3fs-public/ICM-2018-Documentation.pdf?YWuW4Jn0eb2hExeA0z68B64cv6LlUYoE

Neumann, Peter J., Sanders, Gillian D,, Russell, Louise B., Siegel, Joanna E., Ganiats, Theodore G., 2016. *Cost-effectiveness in health and medicine*: *Second Edition*. New York: Oxford University Press.

OMB, 1993. Executive Order 12866 of September 10, 1993: regulatory planning and review, *Federal Register* 58(90), 51735-51744. Available at: http://www.archives.gov/federal-register/executive-orders/pdf/12866.pdf

Panchal, Jitesh H., 2016. Manufacturing Cost Analysis: Cordless vs. Corded Window Covering Products. West Lafayette, IN. Purdue University.

Rice, Dorothy P., MacKenzie, Ellen J., and Associates, 1989. *Cost of injury in the United States: A report to Congress.* San Francisco, CA: Institute for Health & Aging, University of California and Injury Prevention Center, The Johns Hopkins University.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

Rodgers, Gregory B., 1993. Estimating jury compensation for pain and suffering in product liability cases involving nonfatal personal injury. *Journal of Forensic Economics 6*(3), 251-262.

Supplier Relations U.S. LLC. 2010. Blind and Shade Manufacturing Industry in the U.S. and its International Trade. Supplier Relations U.S., LLC: Irvine, CA.

Viscusi, W. Kip, 1988. The determinants of the disposition of product liability cases: Systematic compensation or capricious awards? *International Review of Law and Economics,* 8, 203-220.

Viscusi, W. Kip, Harrington, Joseph E., Vernon, John M., 2005. *Economics of regulation and antitrust, 4th Edition.* Cambridge, MA: MIT press.

Window Covering Manufacturers Association. 2015a. "Memorandum to Window Covering Manufacturers Association, Re: Review and Critique of CPSC Economic Analysis in ANPR and Briefing Package." Submitted with public comment on 80 *FR* 2327, submitted June 1, 2015, Docket No. CPSC-2013-0028.

Window Covering Manufacturers Association. 2015b. Public comment on 80 *FR* 2327 submitted June 1, 2015. Docket No.CPSC-2013-0028.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

**TAB L: ANPR COMMENTS AND STAFF RESPONSE**

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)



UNITED STATES
CONSUMER PRODUCT SAFETY COMMISSION
BETHESDA, MARYLAND 20814

Memorandum

Date: October 6, 2021

To:         Window Coverings Rulemaking File

Through:    Duane Boniface, Assistant Executive Director,
            Office of Hazard Analysis and Reduction (EXHR)

From:       Window Coverings EXHR team

Subject:    ANPR Comments and Staff Response

## Background

On January 16, 2015, the Commission published an advance notice of proposed rulemaking (ANPR) initiating rulemaking and seeking information and comment on regulatory options for a mandatory rule to address the risk of strangulation to young children on window covering cords. The comment period on the ANPR was scheduled to end on March 17, 2015. In a letter dated February 2, 2015, the Window Covering Manufacturers Association (WCMA) requested a 75-day extension of the comment period to complete multiple studies that WCMA commissioned. The Commission granted WCMA's request to extend the comment period for the ANPR until June 1, 2015. CPSC received 1,010 comments during the comment period: 748 were in favor of a mandatory rule, 254 were against the rule, and eight had no clear opinion. This memorandum summarizes the comments and provides technical staff's responses to the issues raised.

Staff notes that since the public comment period on the ANPR closed in 2015, the voluntary standard has made substantial improvements to effectively address the strangulation risk associated with stock window coverings. For stock window coverings, the ANSI/WCMA standard requires either no operating cords or short static cords that are eight inches or shorter or inaccessible operating cords. As detailed in this NPR briefing package, staff assesses that these requirements are adequate to address the risk of strangulation on window covering cords. Many of the comments are obviated by the new voluntary standard and changes to stock products involving operating cords and to both stock and custom products involving inner cords.

## Comments and Responses

Comments fell into one or more different topic areas, as grouped below.

## General Support or Opposition

*Comments*

194

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

*A total of 748 commenters expressed general support for the rulemaking effort, some stating that given the hidden nature and severity of the risk, a mandatory standard is necessary. A total of 254 commenters submitted comments disagreeing with the proposed rulemaking, with most suggesting that a regulation will have a negative impact on the window covering industry.*

*Staff Response*

Staff is generally in agreement with those supporting the rulemaking. CPSC staff agrees that window coverings should be inherently safe and should not require consumer intervention due to the silent, quick, and hidden nature of the hazard. Since the ANPR was published in 2014, 37 children have died by strangulation on a window covering cord.

**Voluntary Standard**

*Comments*

*Several commenters expressed support for the voluntary standard and felt the voluntary standard process would create a more robust standard. However, other commenters stated that a mandatory standard is necessary to address the hazard because decades have passed with the number of deaths and permanent injuries remaining consistent. They noted that voluntary standards have failed to effectively address this issue for nearly 20 years.*

*Staff Response*

Staff has worked closely with WCMA since 1995 to develop and revise the ANSI/WCMA A100.1 standard. Staff acknowledges that since the public comment period on the ANPR closed in 2015, WCMA steering committee has developed and published improvements to the voluntary standard with substantial improvements to effectively address the strangulation risk associated with stock window coverings. For stock window coverings, the ANSI/WCMA standard requires either no operating cords or inaccessible cords or short static cords that do not exceed eight inches in length. As detailed in this NPR briefing package, staff assesses that these requirements are adequate to address the risk of strangulation on window covering cords.

However, the ANSI/WCMA standard does not adequately address the hazard associated with operating cords on custom window coverings. Given the availability of the technologies applicable to both stock and custom window coverings, and the identical hazard patterns regardless of whether the product is made for stock or custom, staff explains in this briefing package that custom products can be made as safe as stock window coverings to address the risk to children by complying with the same requirements as stock products. Given the 22 years to get to an effective stock product voluntary standard and lack of WCMA progress on the custom product standard over multiple years, staff does not recommend waiting for custom products to be included.

**Hazard Communication: Warnings, Public Awareness, and Education**

*Comments*

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

*At least twelve commenters suggested that warning labels and educational campaigns should be relied on to address the strangulation hazard while at least seven others stated that warning labels and educational efforts were tried, did not work, and are insufficient to address the strangulation risk.*

*Staff Response*

In the ESHF memo, staff discusses the reasons that warnings are unlikely to adequately address the strangulation hazard associated with window covering cords. See Tab I.  Briefly, warning labels are not likely to be effective on products that consumers use frequently and are familiar with because consumers are less likely to look for and read safety information. Most of the incident units had the permanent warning label on the product.  Even well-designed warning labels will have limited effectiveness in communicating the hazard on this type of product.

However, CPSC staff agrees that public awareness is a crucial component in making safe purchasing decisions and safely using window covering products at home. Public information campaigns are on-going. CPSC and the Window Covering Safety Council (WCSC) have joined forces to raise awareness of strangulation risks presented by window covering cords. October has been designated "Window Covering Safety Month" by CPSC and the Window Covering Safety Council (WCSC) since 2003. Currently, staff does not have information to evaluate the effectiveness of public information campaigns on reducing the risk of injury associated with corded window coverings.  However, staff notes that information and education campaigns on corded window coverings that have been continuing for decades have had limited effectiveness in the reduction of injuries and deaths.  Accordingly, staff does not recommend relying solely on education campaigns to address the risk of injury.

**Off-the-Shelf Products**

*Comments*

*At least two commenters suggested that off-the-shelf products carry higher risks, many off-the-shelf products are installed incorrectly, one of these commenters suggested that consumers typically do not read the installation instructions and are not familiar with the safety devices such as cord cleats.*

*One commenter suggested that stock products are more dangerous than custom products because stock products can have longer lengths of accessible pull cords than custom window coverings, stock product customers are less likely to get safety information, and stock products are likely to be installed by consumers who may be unfamiliar with the hazard.*

*Staff Response*

The 2018 version of the ANSI/WCMA standard has effective requirements to address the strangulation hazard on stock window coverings. The standard requires that stock products to have either no operating cords, short cords, or inaccessible cords at all times. The way the product is installed should not make the product less safe as these requirements are not

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

dependent on installation and the requirements do not rely on safety devices. However, custom products still rely on safety devices such as cord cleats and tension devices to make the corded product safe because the standard still allows the hazardous cords to be present on the product.

Although staff agrees that consumers may not be as knowledgeable as professional installers, staff notes that the majority of the custom products involved in the incidents were installed by professionals and still lacked safety devices. Educating consumers is important to reduce the risk associated with the corded window coverings already installed in consumers' homes. However, manufacturing inherently safe custom window coverings that are on par with the stock products that are compliant with the ANSI/WCMA standard will have a more substantial impact on safety as they do not have to rely on additional measures to make the window covering safe.

**Impact on elderly and disabled consumers**

*Comments*

*At least eight commenters suggested that cordless products will be difficult to use for those consumers who cannot reach window coverings to operate the product.*

*Staff Response*

Although staff agrees that certain users have challenges with reaching high up, staff found various tools that are currently marketed for hard-to reach locations such as skylights. Tab I provides a few examples. Staff concludes that currently available tools and devices can be, and for stock products are being, utilized for this purpose. Some consumers are likely to choose window coverings operated via remote control as well.

**Parental Responsibility**

*Comments*

*At least 27 commenters suggested that parents are responsible to supervise their children around window coverings.*

*Staff Response*

Strangulation with cords requires only a few minutes to occur and happens silently. As explained in Tab I, parental supervision is unlikely to be effective to eliminate or reduce the hazard, because even young children are left unsupervised for a few minutes or more in a room that is considered safe, such as bedroom or family room. A more effective solution to the window covering cord hazard is to ensure that window coverings do not have hazardous cords.

**Rental Leases and Real Estate Documents**

*Comments*

197

*At least 30 commenters suggested some means of informing or addressing the hazard in rental units. Some suggested disclosing the hazards associated with corded window coverings to inform renters. Others suggested that the rental units should have new and safe window coverings. Some commenters stated that tenants may not have the option to replace window coverings. At least 34 commenters suggested disclosing the presence of corded window coverings in the real estate documents.*

*Staff Response*

CPSC regulates consumer products, wherever consumers may use such products (homes, schools, in recreation, or otherwise). Certain state and local authorities may have regulations in place with regard to rental homes. CPSC staff agrees with the commenters' concerns regarding window coverings included in rental units where tenants with young children may not have the option of choosing safer window coverings. Staff also agrees that the sale process of a residence is an obvious opportunity to inform the buyers about the dangers associated with corded window coverings or to remove and replace the hazardous window coverings. However, CPSC does not have the authority to require landlords to disclose the hazards of window covering cords to prospective renters.

**Cost of Safer Products**

*Comment:*

*At least 35 commenters stated that safer window coverings might to be too expensive for some consumers, regulations will increase the cost of window coverings, and motorized window coverings cost much more. At least 108 commenters suggested that safe alternatives currently exist but are unaffordable. At least 71 commenters stated that cordless prices will drop due to regulation and competition.*

*Staff Response:*

Safer window covering products are currently produced by manufacturers and are widely available in the U.S. Staff note that based on a review of currently available window covering products completed by D+R International nearly all available stock window covering products in 2021 are cordless products. Corded products are only available for custom window coverings and are typically more expensive than stock product counterparts.

As described in the preliminary regulatory analysis, retail prices for custom products are expected to increase as a result of the draft proposed rule. The increase will vary based on product type but staff expects the prices of custom products to increase by at least 4 percent. Any custom window covering product that cannot meet the inaccessible/length provisions related to cords will either have to stop offering the product, incorporate a cordless lift system, or use a motorized lift system. Based on a review of currently available custom products, CSPC staff believes it is likely that motorized lift systems can be prohibitively expensive for many consumers as these systems can exceed the cost of the window covering itself. Staff notes that it is more likely that a consumer will either substitute for another type of window covering (*i.e.*

198

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

using curtains instead of roman shades) or purchase a less expensive stock product (which already complies with the draft proposed rule) or purchase a cordless product with manual operation.

**Incentives for Manufacturers**

Comment:

*One commenter suggested that CPSC incentivize manufactures to design safer, durable, solutions for window coverings through grants and awards. Another commenter suggested that individuals and small companies need to be incentivized to create new products and systems without the need for high-cost research.*

*Staff Response:*

CPSC does not currently have the resources to offer grants, subsidies, or awards to firms for development of safer window covering products.

**Detailed Cost-Benefit Analysis**

*Comment:*

*At least three commenters suggested that a detailed cost and benefit analysis is needed.*

*Staff Response:*

CPSC staff developed a preliminary regulatory analysis, as required by the CPSA, with a preliminary description of the potential benefits and potential costs of the proposed rule, including any benefits or costs that cannot be quantified in monetary terms, and an identification of those likely to receive the benefits and bear the costs. This preliminary regulatory analysis is contained in Tab K.

**Small versus Large Businesses**

*Comment:*

*One commenter suggested that a regulation will give larger corporations an unfair advantage as the hard window coverings can comply with it but small manufacturers who make soft window coverings cannot.*

*Staff Response:*

Staff notes that stock window coverings on the market that are free from hazardous cords are available in both soft and hard types and implementation of safer technologies has been proven for both types. As stated in the Initial Regulatory Flexibility Analysis for custom window coverings, staff expects significant cost impacts on small manufacturers of custom products but

199

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

these costs are not limited to small manufacturers of certain window covering types. The impacts vary by product type but significant cost impacts (i.e. those that exceed 1 percent of annual revenue) on small manufacturers of all custom window covering product types are expected as a result of the draft proposed rule.

## Product Options

*Comments*

*At least 40 commenters suggested that consumers may want to have different options to serve their different needs and reducing the options that are available to consumers is not preferable.*

*Staff Response*

Staff observes that stock products currently on the market that are free from hazardous cords are available in a variety of materials, sizes, and types to meet consumer needs. Based on the operating systems of window coverings, the only product type that is unlikely to keep the traditional design and still meet the proposed rule would be roll-up style shades as they are lifted and lowered using lifting loops that are accessible and hazardous. Based on the innovative ability of the window covering industry, staff concludes that these shades could be replaced with ones that can still meet the same purpose and made safe.

## Product Reliability

*Comments*

*One commenter suggested that motors are not as reliable as cords because they are more complex and require electricity.*

*Two commenters suggested that cordless window coverings do not last long compared to corded versions.*

*Staff Response*

Staff notes that cordless window coverings are not the only option and that motorized cordless window coverings are not the only cordless options. Corded window covering options are available if the cords are 8 inches or shorter if accessible or if the cords are inaccessible with a rigid cord shroud. WCMA stated in their response to ANPR that the expected product life is 10 years for custom-made window covering products and 3-5 years for stock window covering products. We do not have information on product life for each technology.

## Incidents/Risk

*Comments*

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

*Several commenters suggested that children die from interacting with other household products and some suggested that the risk is low.*

*Staff Response*

Children die from interacting with other household products; however, that does not diminish the seriousness of strangulation hazard from cords, nor the necessity of setting a performance standard to reduce the risk.

**Stories of Loss**

*Comments*

*Over 500 commenters either were personally affected by window covering cord injury or death or knew someone who were affected by it.*

*Staff Response*

Staff appreciates the courage of these consumers in sharing their stories. To each of these parents, family members and loved ones, we thank you for sharing these stories and we are deeply sorry for your loss.   CPSC staff have taken the information about the interactions and conditions involved in the incidents into consideration in developing a draft NPR for stock and custom window coverings.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

# EXHIBIT 15

**STANDARD**

**FOR SAFETY OF**

**WINDOW COVERING PRODUCTS**

**SPONSOR**



**WINDOW COVERING MANUFACTURERS ASSOCIATION, INC.**



**American National Standards Institute**
**Approved January 8, 2018**

Published by
Window Covering Manufacturers Association, Inc.
355 Lexington Avenue, New York, New York, 10017

Copyright © 2018 by the Window Covering Manufacturers Association, Inc.
Not to be reproduced without
specific authorization from WCMA

Printed in the USA

This Standard was developed by the Window Covering Manufacturers Association, Inc

**FOREWORD**

WCMA standards, of which the document contained herein is one, are developed through a consensus standards development process approved by the American National Standards Institute. This process brings together volunteers representing varied viewpoints and interests to achieve consensus around window covering products and safety issues. While the WCMA administers the process and establishes rules to promote fairness in the development of consensus, it does not independently test, evaluate, or verify the accuracy of any information or the soundness of any judgments contained in any such standards.

The WCMA disclaims liability for any personal injury, property, or other damages of any nature whatsoever, whether special, indirect, consequential or compensatory, directly or indirectly resulting from the publication, use of, or reliance on this document. The WCMA also makes no guaranty or warranty as to the accuracy or completeness of any information published herein.

In issuing and making this document available, the WCMA is not undertaking to render professional or other services for or on behalf of any person or entity. Nor is the WCMA undertaking to perform any duty owed by any person or entity to someone else. Anyone using this document should rely on his or her own independent judgment or, as appropriate, seek the advice of a competent professional in determining the exercise of reasonable care in any given circumstances.

The WCMA has no power, nor does it undertake, to police or enforce compliance with the contents of this document. Nor does the WCMA list, certify, test or inspect products, designs, or installations for compliance with this document. Any certification or other statement of compliance with the requirements of this document shall not be attributable to the WCMA and is solely the responsibility of the certifier or maker of such statement.

*This page intentionally left blank.*

# TABLE OF CONTENTS

1 SCOPE........................................................................................................................6

2 GENERAL ..................................................................................................................6

3 DEFINITIONS .............................................................................................................6

4 PRODUCT REQUIREMENTS ...................................................................................9

5 LABELING AND OPERATIONAL TAG REQUIREMENTS ..................................11

6 TESTS AND PARAMETERS .....................................................................................14

APPENDIX A:  REFERENCE DOCUMENTS ...........................................................20

APPENDIX B:  TEST PROCEDURE FOR CORD RELEASE DEVICE ...................21

APPENDIX C:  TEST PROCEDURE FOR ACCESSIBLE CORDS .........................31

APPENDIX D:  HAZARDOUS LOOP TEST PROCEDURE......................................33

APPENDIX E:  TEST FOR ROLL UP STYLE BLIND INNER CORD RELEASE DEVICE ..42

APPENDIX G:  RATIONALE AND BACKGROUND INFORMATION ..................53

APPENDIX H:  TESTING SUMMARY, PRODUCT ILLUSTRATIONS ..................55

# 1 SCOPE

1.1 **Background:** The members of the Window Covering Manufacturers Association, Inc. (WCMA), recognizing that unfortunate accidents, including strangulation, have occurred among young children using certain products made or imported by members of the industry, have prepared this Standard in cooperation with the U.S. Consumer Product Safety Commission (CPSC).

This Standard is not intended to inhibit, but rather to encourage, the development of devices and methods that shall further improve the safety of products manufactured by industry members. Manufacturers and other users of this Standard are requested to submit suggestions for improvements to WCMA.

Members of WCMA, in recognition of continuing improvements to be made, shall sponsor appropriate revisions to this Standard on a regular basis.

1.2 This Standard applies to all interior window covering products. The items covered include the products listed in 1.3.

1.3 Types of window covering products documented in this standard include, but are not limited to, cellular shades, horizontal blinds, pleated shades, roll up style blinds, roller shades, sheer shades, Roman style shades, traverse rods (including products that are used with traverse rods, e.g., curtains and drapes), panel tracks, and vertical blinds. These products can be manufactured and distributed as either stock or custom products. (See Section 3 for definitions of these terms.)

# 2 GENERAL

2.1 **Objective:** The objective of this Standard is to provide requirements for products documented in this standard in 1.2 and 1.3 that reduce the possibility of injury, including strangulation, to young children from the bead chain, cord, or any type of flexible Loop.

2.2 **Values:** Required values given in this Standard are given in U.S. units. The SI (metric) equivalents are approximate.

2.3 **Tolerances:** Where only plus or minus values are given, they are permitted to be exceeded or reduced as appropriate at the option of the manufacturers. Linear dimensions expressed without specific tolerances or not marked maximum or minimum shall be plus or minus 1/32 in (1 mm).

2.4 **Reference Documents:** All documents referenced are included in Appendix A: Reference Documents.

2.5 **Products:** Product types are described and / or illustrated in Appendix H: Product Illustrations.

# 3 DEFINITIONS

| Genus | ID | Term | Definition |
|-------|-----|------|------------|
| 1. Window Covering products | 1.01 | Cellular Shades | Multiple layers of material formed into tubes or cells, whose operation consists of raising and lowering. |
| | 1.02 | Horizontal Blinds | Rigid horizontal slats, suspended from a headrail by Ladders, and whose operation may include tilting, raising and lowering. |
| | 1.03 | Pleated Shades | Single or multiple layers of material with permanent pleats in a horizontal orientation, whose operation consists of raising and lowering. |

| | 1.04 | Roll Up Style Shade | A flexible sheet with an external cord, whose operation consists of pulling up or releasing the cord to roll up or lower the sheet from the bottom or top, as the case may be. |
|---|---|---|---|
| | 1.05 | Roller Shade | Flexible sheets of material attached to a roller and a means of supporting the roller, whose operation consists of furling or unfurling the material from the roller. |
| | 1.06 | Roman Style Shades | Flexible fabric with rings, clips, or attachment devices, aligned in columns and spaced, through which cords or Wide Bands run from the headrail to the lowest ring or bottom rail, so that the fabric folds or gathers during operation as the cord or Wide Band is pulled towards the headrail. |
| | 1.07 | Traverse Rod | A rod or track upon which drapes or panels are attached that slide open and closed |
| | 1.08 | Vertical Blinds | Rigid or flexible sheet vertical slats suspended from a headrail, and whose operation may include traversing and rotating. |
| 2. Cord-related components | 2.01 | Accessible Cords | Cord that can be contacted by the test probe following the test procedures in Appendix C: Test Procedure for Accessible Cords. |
| | 2.02 | Band | A thin strip of material which is wider than it is thick and is utilized in the function or operation of a window covering product. If a band is not classified as a Wide Band, then for testing purposes, the band is considered equivalent to a cord. |
| | 2.03 | Bead Chain | A cord with series of small spheres made of plastic or metal |
| | 2.04 | Cord | A long slender flexible material. |
| | 2.05 | Cord Connector | A device or technique used to join several individual cords. |
| | 2.06 | Cord Lock | A device that temporarily holds the window covering product at a desired height during operation. |
| | 2.07 | Cord Release Device | A passive device which releases a Loop when subjected to a specified load. |
| | 2.08 | Cord Retraction Device | A passive device which winds and gathers cords when tension is no longer applied by the user. |
| | 2.09 | Cord Shroud | A device or material added to limit the accessibility of a cord or formation of a Hazardous Loop. |
| | 2.10 | Free Standing Cord Loop | A Loop formed by an Inner Cord that does not diminish in size when the force used to create the Loop is removed. |
| | 2.11 | Guide Cord | A fixed or static Cord intended to restrict and/or guide window covering product components. |
| | 2.12 | Hazardous Loop | A Loop that allows the head probe to pass through it when tested per Appendix D: Hazardous Loop Test Procedure. |
| | 2.13 | Inaccessible Operating Cord | Operating Cords that are inaccessible as determined per the test requirements in Appendix C: Test Procedure for Accessible Cords. |
| | 2.14 | Inner Cord | The portion of a Cord which transfers force from the user interface to components during operation. |
| | 2.15 | Inner Cord Stop Device | A device that prevents the Accessible Inner Cords from being pulled to create a free-standing Loop. |
| | 2.16 | Ladder | A system that is typically constructed of Cord but can also be made of fabric with decorative facings that are used in horizontal blinds that support and determine spacing between slats. |
| | 2.17 | Loop | A bounded opening formed by any configuration of Cords and/or window covering material. |

| | 2.18 | Cord and Bead Chain Restraining Device | A device that prevents the creation of a Hazardous Loop from an Accessible Continuous Operating Cord. |
|---|---|---|---|
| | 2.19 | Operating Cord | The portion of a Cord which the user manipulates directly during operation. Operation includes, but is not limited to, lifting, lowering, tilting, rotating, and traversing. |
| | 2.20 | Short Static or Access Cord | An Operating Cord or Band that is fixed in length in any state (free or under tension), to be a length equal to or less than 8 inches, typically attached to a bottom rail to enable access to operate the shade. |
| | 2.21 | Retractable Cord | An Operating Cord that extends when pulled by a user, and retracts to a shorter length when the user releases the Cord. |
| | 2.22 | Tassel | A device used to terminate and cover the end of an Operating Cord. |
| | 2.23 | Tension Device | A device that is used to maintain tension on the Cord or Bead Chain Loop. |
| | 2.24 | Wide Band | A Band that meets the specifications outlined in 6.8. |
| 3. Non-Cord product component | 3.01 | Active Device | A device that is activated and operated by the direct interaction of the user. |
| | 3.02 | Bottom Rail | Component at the bottom of a window covering that acts as an attachment point for the ends of Inner Cords or provides weight to insure proper operation. |
| | 3.03 | Headrail | Component at the top of a window covering that supports the product while mounted and allows Operating and Inner Cords to be routed through it. |
| | 3.04 | Passive Device | Component that operates without the direct interaction of the user. |
| | 3.06 | Wand | A rigid material, used for manual operation. |
| 4. Method of operating a window covering product | 4.01 | Cycle | A single complete instance of operation, which may include raise, lower, traverse, and rotate. |
| | 4.02 | Operating systems, Continuous Loop | A single Cord or Bead Chain formed in a continuous Loop to perform operation. |
| | 4.03 | Operating systems, Cord Loop Lift for Roll Up Shades | A Standard Operating system whose Accessible Cords go through the headrail, extend down to the bottom of the product, wrap around the bottom, extend back up to the top and terminate by attaching to the headrail. |
| | 4.04 | Operating systems, Cordless | An operating system that does not require an Operating Cord, or whose Operating Cord is inaccessible, as defined in 2.13. A cordless product may still have Accessible Inner Cords. |
| | 4.05 | Operating systems, Motorized | A Cordless Operating system that includes a motor and control system. |
| | 4.06 | Operating systems, Single cord | A single Operating Cord to perform operation. |
| | 4.07 | Operating systems, Standard | Two or more Operating Cords performing the function of both the Operating Cord and Inner Cord. |
| | 4.08 | Permanent (marking) | A marking or label that cannot be removed, or which tears, or that damages the surface to which it is attached during an attempt to manually remove it without the aid of tools or solvents. |
| | 4.09 | Sequential Process | An operation that requires two or more independent steps to be performed in a specific order. |

| 5. Method of distributing window covering product | 5.01 | Custom Blinds, Shades, and Shadings | Any window covering that is not classified as a stock window covering. |
|---|---|---|---|
| | 5.02 | Stock Blinds, Shades, and Shadings: | A specific stock keeping unit or SKU, which is completely or substantially fabricated (as defined below) in advance of being distributed in commerce (as that term is defined in 15 U.S.C. Sect. 2052(a)(7) and in advance of any specific consumer request for that product. The SKU can either be sold "as is" or modified or adjusted by the seller, manufacturer, or distributor before or after being distributed in commerce and it would still be considered a Stock Blind, Shade and Shading.<br><br>"Substantially fabricated" would include products pre-assembled in advance of a consumer order or purchase. Pre-assembled products that are modified or adjusted by the seller, manufacturer or distributor before or after being distributed in commerce will still be considered as "substantially fabricated" if they require, but is not limited to, any of the following: adjustments to size, attachment of the top rail and/or bottom rail, and/or tying of Cords to secure the Bottom Rail to finish the assembly of the product.<br><br>Stock Blinds, Shades, and Shadings shall not be considered Custom Blinds, Shades, and Shadings solely because of the method of distribution (e.g., Internet sales) or the size of the purchasing order (e.g., for multi-family housing developments). |

# 4 PRODUCT REQUIREMENTS

**4.1 Allowable Lead Content:** Exterior components of the window covering which are 12 in (31 cm) or more below the bottom of the headrail shall be produced with no more than 0.01% lead by weight (100 ppm) and follow the methodology and exemptions described in the Consumer Product Safety Improvement Act of 2008, Public Law 110-314, 122 Stat. 3016, and regulations promulgated thereunder.

**4.2 Small Parts:** Any safety component or device that is intended to separate from the product shall meet the requirements of Federal Standard: 16 CFR Part 1501 (see Appendix A: Reference Documents).

**4.3 Operating Systems**

**4.3.1 Stock Blinds, Shades, and Shadings:** Where more than one method is utilized, at least one shall meet the applicable requirement in Section 6.

**4.3.1.1 Cordless Operating System:** (includes Motorized Operating Systems)

4.3.1.1.1 The product shall have no Operating Cords.

**4.3.1.2 Short Static or Access Cords**

4.3.1.2.1 The product shall have a Short Cord.

**4.3.1.3 Inaccessible Operating Cords**

4.3.1.3.1 The Operating Cords shall be inaccessible as determined per the test requirements in Appendix C: Test Procedure for Accessible Cords.

**4.3.2 Custom Blinds, Shades, and Shadings:** Where more than one method is utilized, at least one shall meet the applicable requirement in Section 6.

4.3.2.1 **Cordless Operating System:** (includes Motorized Operating Systems)

4.3.2.1.1 The product shall have no Operating Cords.

4.3.2.2 **Short Static or Access Cords**

4.3.2.2.1 The product shall have a Short Cord.

4.3.2.3 **Inaccessible Operating Cords**

4.3.2.3.1 The Operating Cords shall be inaccessible as determined per the test requirements in Appendix C: Test Procedure for Accessible Cords.

4.3.2.4 **Single Retractable Cord Lift System**

4.3.2.4.1 The product shall contain a permanently attached Cord Retraction Device that meets the requirements in 6.2. All window covering products with Accessible Operating Cords require warning labels and warning tags as described in 5.1 and 5.2.

4.3.2.5 **Continuous Loop Operating System:** Where more than one method is utilized, at least one shall meet the applicable requirement in 6. All window covering products with Accessible Operating Cords require warning labels and warning tags as described in 5.1 and 5.2.

4.3.2.5.1 The product shall contain a Cord Tension Device that meets the requirements in 6.4.

4.3.2.5.2 The product shall contain a Cord or Bead Chain Restraining Device that meets the requirements of 6.5.

4.3.2.5.3 The product shall contain a Rigid Cord Shroud that meets the requirements of 6.3.2

4.3.2.6 **Standard Operating System:** All window covering products with Accessible Operating Cords require warning labels and warning tags as described in 5.1 and 5.2.

4.3.2.6.1 **Multi-Cord Lift System:** Where more than one method is utilized, at least one shall meet the applicable requirement in 6.

4.3.2.6.1.1 The product shall have one or more separate Operating Cords.

4.3.2.6.1.2 If the product joins 2 Cords, the Cord Connector must separate and meet the requirements in Appendix B and the requirements in 6.1.

4.3.2.6.1.3 If the product joins 3 or more Operating Cords

4.3.2.6.1.3.1 If the Cord Connector does not meet the requirements of Appendix B and 6.1 as a cord release device, it must limit the exposed Loop above the Cord Connector to less than 3 in (76 mm) below the bottom of the Cord Lock when the bottom rail is in the fully lowered position.

4.3.2.6.1.4 The product shall contain a Rigid Cord Shroud Device that meets the requirements in 6.3.2

4.3.2.7 **Cord Loop Lift Operating System:** All window covering products with Accessible Operating Cords require warning labels and warning tags as described in 5.

4.3.2.7.1 If the product is a Roll Up Style Shade, Accessible Inner Cords shall meet the requirements in 6.1 and Appendix E: Test for Roll Up Style Blind Inner Cord Release Device.

4.4 **Operating Cord Length:** For all products with Accessible Operating Cords which are free hanging (not restrained), the default Cord length should be no more than 40% of the product height when the window covering is fully deployed for maximum privacy. The exception is when a custom length is required to ensure user accessibility.

4.4.1 Tilt or Rotational Cords for horizontal and vertical blinds

    4.4.1.1 Wand tilt is the default operating system and Cord tilt is an allowable customer option.

    4.4.1.2 Cord length for Cord tilt must meet the requirements as indicated in 4.4 above when the louvers are oriented such that the two Operating Cords are equal in length. The exception is when a custom length is needed to ensure user accessibility.

4.5 **Inner Cords:** All products with Inner Cords must meet the requirements in Appendix C and Appendix D

    4.5.1 If the product has Shrouded Inner Cords they must meet requirements in section 6.3.

    4.5.2 If the product has Inner Cord Stop Devices or Cord Connectors, it must meet requirements in 6.7

4.6 **Cord Cleats:** For all products with Accessible Operating Cords which are free hanging (not restrained) and not Short Cords, Cord Cleats must be provided with instructions for use and mounting.

## 5 LABELING AND OPERATIONAL TAG REQUIREMENTS

5.1 **Labeling:** Manufacturers shall provide warning labels on all window coverings described in 4.3.2.4, 4.3.2.5, 4.3.2.6, and 4.3.2.7. All warning labels and warning tags shall comply with the requirements below and shall adhere to ANSI Z535 standards (see Appendix A: Reference Documents), and shall be provided in both English and Spanish. If a single long label containing both languages is used instead of two separate labels, only one set of pictograms is required.

    5.1.1 **Generic Warning Bottom Rail Label(s):** The signal word ("Warning" in English and "Advertencia" in Spanish) shall be in all uppercase letters measuring not less than 5/16 in (8 mm) in height and preceded by an ANSI safety alert symbol (an equilateral triangle surrounding an exclamation point) of at least the same size. The rest of the warning message text shall be in both uppercase and lowercase letters (sentence capitalization), with capital letters measuring not less than 1/8 in (3 mm) (English) or 3/32 in (2 mm) (Spanish). **The warning label shall include a pictogram that represents the hazard of a Cord wrapping around a young child's neck as depicted in the example below.** The label shall be a permanent marking affixed to all products with Accessible Operating Cords. The label shall be placed on the bottom rail of the window covering, and printed in a color that contrasts the bottom rail color. For products without bottom rails, the label shall be placed in an alternative location on the product, to be determined by the manufacturer or importer, that is visible to the user.   The generic warning label(s) shall read as follows:



    5.1.2 **Generic Warning Bottom Rail Label for Narrow Product:** A warning label of reduced size may be used only on product less than 18 in (457 mm) wide or where space limitations prevent the use of label(s) described in 5.1.1 The signal word ("Warning" in English and "Advertencia" in Spanish) shall be in all uppercase letters measuring not less than 5/32 in (4 mm) and preceded by an ANSI safety alert symbol (an equilateral triangle surrounding an exclamation point) of at least the same size. The rest of the warning message text shall be in both uppercase and lowercase letters (sentence capitalization), with capital letters measuring not less than 1/16 in (2 mm). The warning label shall include a pictogram that represents the hazard of a

Cord wrapping around a young child's neck as depicted in the example above. The label shall be a permanent marking affixed to all products with Accessible Operating Cords. The label shall be placed on the bottom rail of the window covering, and printed in a color that contrasts the bottom rail color. For products without bottom rails, the label shall be placed in an alternative location on the product, to be determined by the manufacturer or importer, that is visible to the user. The generic warning label(s) shall read as shown in 5.1.1.

**5.1.3 Labels for Merchandising for Custom Corded Products:** A warning label is to be placed on product merchandising materials which includes, but is not limited to, the sample book and the website (if the website is relied upon for promoting, merchandising, or selling on-line). The warning label shall include pictograms that represent the hazard of a Cord wrapping around a young child's neck as depicted in the example below. The warning label shall be placed conspicuously on the merchandising materials. For the United States, the languages shall be English and Spanish.



⚠ **WARNING/ADVERTENCIA**

Window blind cord can STRANGLE your child.
To prevent strangulation, purchase cordless products or products with inaccessible cords.

La cuerda de la persiana puede ESTRANGULAR a su niño.
Para evitar el estrangulamiento, compre alternativas cuerda o productos con cuerdas inaccesibles.

5.1.3.1 The signal word ("Warning" in English, and "Advertencia" in Spanish) shall be in all uppercase letters measuring not less than 5/16 in (8 mm) and preceded by an ANSI safety alert symbol (an equilateral triangle surrounding an exclamation point) of at least the same size. The rest of the warning message text shall be in both uppercase and lowercase letters (sentence capitalization), with capital letters measuring not less than 1/8 in (3 mm). The generic warning label(s) shall read as shown in 5.1.3.

**5.2 Operational Warning Tags:** The manufacturer shall provide an operational warning tag on the product. This tag shall include, at a minimum, all information presented in the following operational warning tags based on the characteristics of the product or the safety devices included on the product. The "Warning" word shall be typeset no less than 5/16 in (8 mm) in capital letters and preceded by the ANSI safety alert symbol (an equilateral triangle surrounding an exclamation point). The rest of the message is in upper and lower case with the capital letters not less than 1/8 in (3 mm). The warning tag shall include a pictogram that represents the hazard of a Cord wrapping around a young child's neck as depicted in the example below. The warning tag(s) shall be used on all window covering products that have Accessible Operating Cords.

### 5.2.1 All Accessible Operating Cords




**Window Blind Cord Can STRANGLE Your Child**

- Children can strangle in the loop above the cord bead.
- Children can climb furniture to reach cords.
- Move crib and furniture away.
- Shorten cords to prevent reach.
- Keep cords separate. Twisted or knotted cords can create a loop.
- Keep all cords out of children's reach.




**La cuerda de la persiana puede ESTRANGULAR su niño**

- Los niños se pueden estrangular en el lazo por encima del cordón.
- Los niños pueden subir los muebles para alcanzar las cuerdas.
- Mueva la cuna y los muebles.
- Acorte las cuerdas para evitar el alcance.
- Mantenga las cuerdas separadas. Los cordones retorcidos o anudados pueden crear un lazo.
- Mantenga todas las cuerdas fuera del alcance de los niños.

### 5.2.2 Tension Device Warning Tag (attach to Cord or Tension Device)




**Window Blind Cord Can STRANGLE Your Child**

- Children can climb furniture to reach cords.
- Move crib and furniture away.
- Keep all cords out of children's reach.
- Attach tension device to wall or floor.
- Fasteners provided with the tension device may not be appropriate for all mounting surfaces.
- Use appropriate anchors for the mounting surface conditions.




**La cuerda de la persiana puede ESTRANGULAR su niño**

- Los niños pueden subir los muebles para alcanzar las cuerdas.
- Mueva la cuna y los muebles.
- Mantenga todas las cuerdas fuera del alcance de los niños.
- Conecte el dispositivo de tensión a la pared o al suelo.
- Los sujetadores provistos con el dispositivo de tensión pueden no ser apropiados para todas las superficies de montaje.
- Utilice anclajes apropiados para las condiciones de la superficie de montaje.

## A1215

### 5.2.3 **Roll Up Style Shade**

This warning tag must be attached to the lower most section of the Inner Cord of a Roll Up Style Shade that has Accessible Cord(s) and be visible from the front of the shade upon installation.




5.3 **Manufacturer Label:** There shall be a permanent label(s) or marking on all finished window covering products identifying:

   5.3.1 The readily distinguishable name, city, and state of the manufacturer or importer of record or fabricator

   5.3.2 The month and year of manufacture.

   5.3.3 The designation of the window coverings as "Custom" or "Stock", per the definitions in 3, using a "C" or the word "Custom" or an "S" or the word "Stock", respectively.

   5.3.4 Custom products must also include customer order information (e.g., customer name or customer order number) to match the product with a specific order.

   5.3.5  This label is to be located within or on the headrail or on the roller tube so it can be easily referenced by the user or inspecting agency.


## 6 TESTS AND PARAMETERS

6.1 **Cord Release Devices:** Cord Release Devices are tested differently according to whether they are applied to single Loop Operating Cords, multiple Loop Operating Cords, or for Roll Up Style Shades. Cord release devices shall be tested in accordance with Appendix B: Test Procedure for Cord Release Device or Appendix E: Test for Roll Up Style Shade Inner Cord Release Device. If a window covering contains more than one type of Operating Cord or Inner Cord assembly, the relevant test of Appendix B: Test Procedure for Cord Release Device or Appendix E: Test for Roll Up Style Shade Inner Cord Release Device must be applied separately to each type of Cord.

   6.1.1 **Operating Cords:** If a release device is applied to a single Loop Operating Cord or multiple Loop Operating Cords, perform the test as directed in Appendix B: Test Procedures for Cord Release Device.

6.1.2 **Inner Cords of Roll Up Style Shades**: For a release device applied to an Inner Cord of a Roll Up Style Shade, perform the test as directed in Appendix E: Test for Roll Up Style Shade Inner Cord Release Device

6.2 **Cord Retraction Devices:** Permanent or internally design Cord Retraction Devices shall adhere to the following:

6.2.1 The Cord Retraction Device shall passively retract the Cord when there is no tension on the Operating Cord.

6.2.2 The Cord Retraction Device shall have a service life of 5,000 cycles after exposed portion or components have been subjected to 500 hours of UV exposure per AATCC Test Method 16-2004, Option 3.

6.3 **Cord Shroud:** Cord Shrouds are designed to limit accessibility of Inner Cords or Operating Cords and shall adhere to the following:

6.3.1 Evaluated as an assembly or individual cords as determined by Appendix C: Test Procedure for Accessible Cords and tested in accordance with Appendix D: Hazardous Loop Test Procedure.

6.3.2 The components of the Cord Shroud assembly shall be exposed to 500 hours of UV per AATCC Test Method 16-2004, Option 3 and then tested for durability.

6.3.2.1 Rigid Design- Evaluate for durability, impact, and operation per 6.6.

6.3.2.2 Non-Rigid Design – for Inner Cords only- evaluate all connection points which must not separate and expose Inner Cords at less than 5 lbs pull force.

6.4 **Tension Devices:** Tension Devices for Cord or Bead Chain Loops shall adhere to the following:

6.4.1 The Tension Device shall be attached to the Cord or Bead Chain Loop by the manufacturer and require a sequential process or tools to be removed. It shall be designed, placed and shipped such that, unless properly installed or altered from the shipped condition with sequential process or tools, it prevents the window covering from operating.

6.4.2 The Tension Device in conjunction with the product shall be designed so when not properly installed will, at least partially, prevent the window covering from functioning for light control or privacy.

6.4.3 The Tension Device shall be supplied with fasteners and instructions to attach to wood substrates. The Tension Device shall also be supplied with information about attaching to drywall and metal substrates. The fasteners shall have a minimum fastener manufacturer-rated or tested release force of 20 lb (89 N).

6.4.4 The Tension Device, in conjunction with the product, shall be designed for durability to meet the following test requirements:

6.4.4.1 **Operational Cycle Test:** Cycle test Tension Device in conjunction with the product as supplied by the manufacturer and mounted with the supplied anchors/fasteners to an appropriate vertical or horizontal surface as recommended by the manufacturer for 3,000 cycles with a delay interval of a standard 2 min. between each cycle. Standard speed of 1.0 - 1.5 ft/sec (31- 46 cm/sec), unless otherwise specified by the manufacturer.

6.4.4.2 **UV Stability:** Subject five separate Tension Devices (assemblies) and five separate sets of mounting components to 500 hours UV per AATCC Test Method 16-2004, , Option 3 and the table below:

| Sample Number | Testing Required |
|---|---|
| 1 | 6.4.4.2; 6.4.4.3 |
| 2 | 6.4.4.2; 6.4.4.4 (perpendicular direction) |

| 3 | 6.4.4.2; 6.4.4.4 (substrate 1) |
| 4 | 6.4.4.2; 6.4.4.4. (substrate 2) |
| 5 | 6.4.4.2; 6.4.4.4. (substrate 3) |

6.4.4.3 **Impact Test:** Impact test according to ASTMD5420, with Gardner tester IG-1120 using striker # IG-1243 using 15 in-lb (1.7 joule) on the Tension Device and separately on attachment components (if any). A drawing should be provided with the part(s) indicating the location and direction for impact but at a minimum of horizontal and perpendicular to the mounting surface.

6.4.4.3.1 Place one of the UV-exposed Tension Device (assemblies) into test fixture and provide impact as stated above, both parallel and perpendicular to the mounting direction. Deformation of the parts is acceptable, but any cracking or dislodged parts are considered a failure.

6.4.4.3.2 Place one of the UV-exposed mounting components into test fixture and provide impact as stated above on the portion of the product that mounts to the wall (or other mounting surface). Deformation of the parts is acceptable, but any cracking or dislodged parts are considered a failure.

6.4.4.4 **Loop Cord and Bead Chain Durability Testing**: The Cord or Bead Chain Loop shall be tested to ensure installation is maintained on the Loop Cord for the life of the product.

According to the manufacturer's provided instructions and hardware, mount one each of the UV-exposed Tension Devices & mounting components / Loop assemblies to the following vertical surfaces: drywall, wood, and metal.

6.4.4.4.1 Subject the Cord or Bead Chain Loop to a force of 5 lb (22.2 N) for 5 seconds both parallel and perpendicular to the mounting surface by pulling on the Loop Cord.

6.4.4.4.2 The Loop Cord or Bead Chain, in conjunction with the Tension Device and mounting hardware, should maintain integrity for ten tests in each direction and on each vertical surface type: drywall, wood, and metal.

6.5 **Loop Cord and Bead Chain Restraining Device:** Loop Cord and Bead Chain Restraining Devices shall adhere to the following:

6.5.1 The Loop Cord and Bead Chain Restraining Device shall be designed and installed on the window covering product by the manufacturer to limit the operating Cord Loop length from creating a Hazardous Loop

6.5.2 The components of the Loop Cord and Bead Chain Restraining Device shall be tested for durability and safety using the following:

6.5.2.1 **Operational Cycle Test:** Test the Loop Cord and Bead Chain Restraining Device in conjunction with the product as supplied by the manufacturer and mounted as recommended by the manufacturer to an appropriate surface for 3,000 cycles with a delay interval of a standard 2 min. between each cycle. Standard speed of 1.0 - 1.5 ft/sec (31-46 cm/sec), unless otherwise specified by the manufacturer.

6.5.2.2 **UV Stability:** Subject three of the Loop Cord and Bead Chain Restraining Devices (and mounting components (if any) to 500 hours UV per AATCC Test Method 16-2004, Option 3 and the table below:

| Sample Number | Testing Required |
| --- | --- |

| 1 | 6.5.2.2; 6.5.2.3; 6.5.2.4 |
|---|---|
| 2 | 6.5.2.2; 6.5.2.4 |
| 3 | 6.5.2.2; 6.5.2.5 |

6.5.2.3 **Impact Test:** Impact test according to ASTM D5420, with Gardner tester IG-1120 using striker # IG-1243 using 15 in-lb (1.7 joule) on the Loop Cord and Bead Chain Restraining Device and attachment components (if any). A drawing should be provided with the part(s) indicating the location for impact but at a minimum of horizontal and perpendicular to the window covering product.

6.5.2.3.1 Place another of the UV-exposed Loop Cord and Bead Chain Restraining Device (assemblies) into test fixture and provide impact as stated above on the portion of the product which contains the Loop Cord or Bead Chain. Deformation of the parts is acceptable, but any cracking or dislodged parts are considered a failure.

6.5.2.3.2 Place mounting parts (if any) into test fixture and provide impact as stated in 6.6.2.4 on the portion of the device that mounts to the body of the window covering product or to the wall (or other mounting surface). Deformation of the parts is acceptable, but any cracking or dislodged parts are considered a failure.

6.5.2.4 **Loop Cord and Bead Chain Restraining Device Durability Testing**: The Cord or Bead Chain Loop shall be tested to ensure proper functionality is maintained on the Loop Cord or Bead Chain for the life of the product.

6.5.2.4.1 Mount the window covering with the attached UV-exposed Loop Cord and Bead Chain Restraining Device to a rigid surface according to manufacturer's testing instructions.

6.5.2.4.2 Locate the approximate midpoint of the accessible combined Loop. Using the test fixture as shown in Appendix D: Hazardous Loop Test Procedure, subject the Cord or Bead Chain Loop to a force of 5 lb (22.2 N) for 5 seconds both parallel and perpendicular to the window covering.

6.5.2.4.3 Determine if the Loop Cord and Bead Chain Restraining Device assembly can maintain integrity of the assembly according to design intent.

6.5.2.5 **Hazardous Loop Testing Procedure for Loop Cord and Bead Chain Restraining Devices**

6.5.2.5.1 Place the Hazardous Loop Test Stand Assembly (Figure D2) at the location of the Cord or Bead Chain restraining device and Operating Cord of the window covering and adjust the vertical height so that the Restraining Arm Assembly (Figure D2 #17,15,16) aligns with the approximate midpoint of the accessible combined Loop to be tested. Place the Restraining Arm (Figure D2 Item #16) against the Cord or Bead Chain restraining device.

6.5.2.5.2 Ensure the scale measuring distance traveled on the Force Gauge Arm Subassembly is set to zero (Figure D2 Item 1). Zero the Force Gauge and then loop the Accessible Cord or Bead Chain onto both hooks of the Force Gauge Arm Subassembly (Figure D5 Item #1.1).

6.5.2.5.3 Set the Force Gauge to "Continuous Readout" and over a time period of 5 seconds +/- 1 second, gently pull the Horizontal Arm (Figure D5 Item #1.8) of the Force Gauge Arm Subassembly away from the window covering to create an open Loop until the Force Gauge indicates a tension force of 5 lb (+/- 0.25 lb) (22.2 N +/- 1.1 N) or the Scale (Figure D5 Item #1.4) indicates a pulled distance of 25 in (+/- 0.25 in) (63.5 cm +/- 0.6 cm), whichever comes first. Lock the Horizontal Arm in place using the Brake Assembly (Figure D-5 Item #1.10).

6.5.2.5.4 Using the head probe in Figure D1 determine whether the head probe can pass through the opening created between the Hooks and the Restraining Arm with an insertion force of 10lb (44.5 N) or less, perpendicular to the plane of the opening.

6.5.2.5.4.1 If the head probe cannot pass through the Loop under the conditions above, the opening is not a Hazardous Loop.

6.5.2.5.4.2 If the head probe can pass through the Loop under the conditions above, the Loop is considered a Hazardous Loop.

6.6 **Rigid Cord Shroud:** A Rigid Cord Shroud device shall adhere to the following:

6.6.1 The Rigid Cord Shroud Device shall be designed and installed on the window covering product by the manufacturer to limit Operating Cord accessibility

6.6.2 The components of the Rigid Cord Shroud Device shall be tested for durability and safety using the following:

6.6.2.1 **UV Stability:** Subject three of the Rigid Cord Shroud Devices (and mounting components, if any) to 500 hours UV per AATCC Test Method 16-2004, Option 3 and the table below:

| Sample Number | Testing Required |
|---|---|
| 1 | 6.6.2.1; 6.6.2.2; |
| 2 | 6.6.2.1; 6.6.2.3 |

6.6.2.2 **Operational Cycle Test:** Test the Rigid Cord Shroud Device in conjunction with the product as supplied by the manufacturer and mounted as recommended by the manufacturer to an appropriate surface for 3,000 cycles with a delay interval of a standard 2 min. between each cycle. Standard speed of 1.0 - 1.5 ft/sec (31- 46 cm/sec), unless otherwise specified by the manufacturer.

6.6.2.3 **Impact Test:** Impact test according to ASTM D5420, with Gardner tester IG-1120 using striker # IG-1243 using 15 in-lb (1.7 joule) on the Rigid Cord Shroud device and attachment components (if any). A drawing should be provided with the part(s) indicating the location for impact but at a minimum one horizontal and one perpendicular to the window covering product.

6.6.2.3.1 Place the UV-exposed Rigid Cord Shroud Device (assemblies) into test fixture and provide impact as stated above on the portion of the product which contains the Operating Cord at a point that provides or translates function of the Operating Cord. Deformation of the parts is acceptable, but any cracking or dislodged parts are considered a failure.

6.6.2.3.2 Place mounting parts (if any) into test fixture and provide impact as stated in 6.6.2.3 on the portion of the device that mounts to the body of the window covering product. Deformation of the parts is acceptable, but any cracking or dislodged parts are considered a failure.

6.7 **Inner Cord Stop Device or Cord Connector:** The Inner Cord Stop Devices or Cord Connector, in conjunction with the product, shall be tested in the following order and meet the following requirements:

6.7.1 **Operational Test:** With the Inner Cord Stop Device securely attached to the Cord, the window covering shall be raised and lowered smoothly 1,000 times (non-Horizontal Blind window covering 3,000 times), with an interval of at least 15 seconds between each cycle. The Inner Cord Stop Device shall move less than 1 in (25 mm) from its original position on the Cord.  (If the Cord fails, replace.)

6.7.2 **Impact Test:** Window covering products that do not incorporate a device preventing "free fall" of the window covering shall be capable of withstanding 1,000 "free fall" impacts from the fully raised to the fully lowered position, on a maximum sized window covering.

6.7.3 **UV Stability and Compression Test:** Subject a separate Inner Cord Stop Device to 500 hours UV per AATCC Test Method 16-2004, Option 3. The Inner Cord Stop Device shall not break from being subjected to a 25 lb (111 N) compression test, specified in ASTM F963. A drawing should be provided with the part(s) indicating the location and direction for impact testing.

6.8 **Wide Lift Bands:** Wide Lift Bands shall be treated as Cords unless they meet the requirements for a Wide Lift Band, and when used, shall adhere to the following requirements:

6.8.1 Bands shall be a minimum width of 3.5 in.

6.8.2 Bands should be constructed of a material that has a wide lift band safety factor of 16.0 (in-kg) or greater

6.8.2.1 Wide Lift Band safety factor shall be calculated by the following parameters.

6.8.2.1.1 Width (inches) of material measured when flat (measured in inches).

6.8.2.1.2 Stiffness of band tested in accordance with ASTM D4032, with pneumatic actuator, digital gage with 25 kgf capacity (measured in kg).

6.8.2.1.3 Wide Lift Band safety factor is the simple product of the numerical values achieved in 6.8.2.1.1 and 6.8.2.1.2.

**APPENDIX A: REFERENCE DOCUMENTS**

**Reference Documents**

**American Association of Textile Chemists and Colorists (AATCC)**

AATCC TEST Method 16-2004 Option 3- Colorfastness to Light

Available from American Association of Textile Chemists and Colorists, AATCC, P. O. Box 12215, One Davis Drive, Research Triangle Park, North Carolina, 27709-2215, fax +1 919 549 8933, www.aatcc.org

**American National Standards Institute (ANSI)**

ANSI Z535.1-2006 (r2011) - Safety Color Code
ANSI Z535.2-2006 (r2011) - Environmental and Facility Safety Signs
ANSI Z535.3-2006 (r2011) - Criteria for Safety Symbols
ANSI Z535.4-2006 (r2011) - Product Safety Signs and Labels
ANSI Z535.5-2006 (r2011) - Accident Prevention Tags (for temporary hazards)

Available from American National Standards Institute, 25 West 43rd Street 4th Floor, New York, NY 10036, +1 212 642 4900, www.ansi.org

**ASTM International**

ASTM D4032-08 Standard Test Method for Stiffness of Fabric by the Circular Bend Procedure
ASTM D5420-10 Standard Test Method for Impact Resistance of Flat, Rigid Plastic Specimen by Means of a Striker Impacted by a Falling Weight (Gardner Impact)
ASTM F963-11 - Standard Consumer Safety Specification for Toy Safety
Available from ASTM International, 100 Barr Harbor Drive, PO Box c700, West Conshohocken, PA 19428-2959, +1 610 832 9500, www.astm.org

**Code of Federal Regulations (CFR)**

16 CFR Part 1501 - Method for Identifying Toys and Other Articles Intended for Use by Children Under 3 Years which Present Choking, Aspiration, or Ingestion Hazards Because of Small Parts

Available from U.S. Consumer Product Safety Commission, Washington, DC 20207, +1 800 638 2772, www.cpsc.gov

**European Standards**

EN 71-3:1994/ A1:2000/AC:2002 of the European Committee for Standardization entitled Safety of Toys – Part 3

**APPENDIX B: TEST PROCEDURE FOR CORD RELEASE DEVICE**

**Single Loop and Multiple Loop Cord Release Device – Operating Cords**

## B1 Equipment

B1.1 Standard test fixture per instructions and drawing in Figures B-1, B-2. Force gauge rated to at least 10 lb (44.5 N), with a maximum hold feature.

## B2 Set-up of Test Fixture

B2.1 Mount the standard test fixture so that the force gauge is positioned over the fixture centerline when viewed from the front and approximately at the mid-point when viewed from the side. Position the fixture or mount the force gauge so that the hook of the gauge is 5.75 to 6.25 in (146 mm to 159 mm) above the fixture upper surface.

## B3 Loop Definition & Preparation

B3.1 **Single Loop Cord Release Device** Attach device to Cord ends to define a Loop 3.5 feet (107 cm) in circumference plus or minus 1 in (2.5cm). Trim excess Cord. If appropriate, assemble segments of device. On the opposite end of the Loop from the device, tie a small Loop and hook onto force gauge.

B3.2 **Multiple Loop Cord Release Device** Number (tag and label) each individual Cord. Form all Cord Loop combinations according to procedure for multiple Cord Release devices.

## B4 Loop Test & Acceptance

B4.1 Slide the Loop over the test fixture. Twist the device 360 degrees (one full revolution). Draw force gauge vertically up at a speed between 0.1 and 1.0 in per second (2.5 mm to 25 mm per second). The device being tested shall release within 10 seconds from its initial contact with the lower portion of the test fixture. Record force at separation. Repeat for 50 devices.

B4.2 The average shall not exceed 5.0 lb (1.63 kg, 13.3 N.) release force to separate the 50 devices tested, and all samples shall have a release force below 7.0 lb (2.27 kg, 22.2 N) for the device to be accepted. In the event that not more than 2% of the combinations tested produce an initial release force measurement in excess of 7.0 lb (22.2 N), such combinations may be retested and if, upon retesting, their release force measurements fall below 7.0lb (22.2 N), they shall be deemed acceptable.

## B5 Loop Forming Procedure for Multiple Cord (Multiple Loop) Devices

B5.1 Configurations for EACH device ('tassel') vary according to:

B5.1.1 Multiple CORDS (from 2 to N).

B5.1.2 Multiple SEGMENTS in the device, from 1 to a number equal to the cord count, N.

B5.1.3 Multiple ATTACHMENTS between individual Cords and device parts, from 1 (a single fixture point for the entire Cord bundle) to N, one individual fixture for each of N Cords. Note that 'Attachments' refers to distinguishable connection points of Cords to the assembled device, not just to non-separating connections of individual Cords to any separated device segments.

Schematic illustrations of examples from this set are provided below:



CASE 2111:
2 CORDS
1 SEGMENTS (hinged)
1 ATTACHMENT (hole)
1 DEVICE

CASE 2221:
2 CORDS
2 SEGMENTS (not hinged)
2 ATTACHMENTS (holes)
1 DEVICE

CASE 4442:
4 CORDS
4 SEGMENTS (not hinged)
4 ATTACHMENTS (holes)
2 DEVICES

CASE 8111:
8 CORDS
1 SEGMENTS (hinged)
1 ATTACHMENT (hole)
1 DEVICE

CASE 5555:
5 CORDS
5 SEGMENTS
5 ATTACHMENTS (hole)
5 DEVICES

**B6 Cord Arrangements for Testing Multiple Loop Cord Devices**

B6.1 A CROSSING is defined as a displacement of one or more Cords relative to others, between load and device that cannot be undone by twisting the device as a whole. Any simple twisting of any number of Cords all together within a single Attachment does not produce a crossing.

B6.2 Limits of Load Crossings: This procedure addresses only single crossings, as any system of three or more Cords can be braided, or subjected to multiple, successive crossings between load and device to overcome any separating load, preventing device release function.

**B7 Test Loop Formation for Multiple Loop Cord Devices**

B7.1 For each device with N Cords (1, 2, 3, …, n) and A attachments (i, ii, iii, …, a), regardless of segment count; each of the following **Crossed & Uncrossed Cord** arrangements must be loaded according to Sections B2, B3, and B4 and must produce separation of the loaded Cord Loop within allowable force limits listed there.

**B7 Uncrossed Cords**   Separate each Cord individually to form one side of a loading Loop with all other Cords together forming the other side of the Loop. Each pair of Cords must be separated from the others to form a loading Loop. Each triplet of Cords must be separated from the others to form a loading Loop. Continue separation sequence (group of 4 Cords, 5 Cords, etc.) until the count of separated Cords has exceeded half the total Cord count.

**B8 Crossed Cords** Cross one Cord in turn, from each attachment, between every other pair of Cords not sharing that same attachment, forming a loading Loop with the crossing Cord and crossed Cords as opposite sides of the loading Loop. Cross each pair of Cords NOT sharing an attachment between every other pair in the system, forming a loading Loop with the crossing Cord and crossed Cords as opposite sides of the loading Loop. Cross any triplets of Cords NOT sharing an attachment through every other pair of Cords in the system, forming a loading Loop with the crossing Cord and crossed Cords as opposite sides of the loading Loop. For each case, apply. Continue this sequence (groups of 4 Cords, 5 Cords, etc.) until all sets of crossing Cords have been tested.

**B9 Schematic Illustrations of Multiple Cord Loading Configurations (Crossings)**

B9.1 Schematics are presented below for all crossings for loading arrangements through 4 Cords.

B9.1.1 NOTES ON SCHEMATICS:

B9.1.1.1 Each Cord is numbered. Unless noted on figure, numbers are arbitrary, but consistent.

B9.1.1.2 Numbers shown in circles represent Cord, entering device from above.

B9.1.1.3 Large circle represents device

B9.1.1.4 Un-numbered circles represent attachments to device

B9.1.1.5 Heavy lines represent Cords between load and device

B9.1.1.6 Cord numbers shown outside device circle represent Cords crossed OVER other Cords shown, and below load

B9.1.1.7 Dashed line represents load line (axis of test fixture)

**Two Cords One Attachment   Two Cords Two Attachments**



B3.4.3 - 2A

B3.4.3 - 2B

**Three Cords One Attachment**

B3.4.4 - 1A

B3.4.4 - 1B

B3.4.4 - 1C

**Three Cords Two Attachments**

B3.4.4 - 2A

B3.4.4 - 2B

B3.4.4 - 2C

**Three Cords Three Attachments**

B3.4.4 - 3A

B3.4.4 - 3B

B3.4.4 - 3C

B3.4.4 - 3D

B3.4.4 - 3E

B3.4.4 - 3F

**Four Cords One Attachment**



B3.4.5 - 1A    B3.4.5 - 1B    B3.4.5 - 1C    B3.4.5 - 1D

B3.4.5 - 1E    B3.4.5 - 1F    B3.4.5 - 1G

**Four Cords Two Attachments**



B3.4.5 - 2A  B3.4.5 - 2B  B3.4.5 - 2C  B3.4.5 - 2D

B3.4.5 - 2E  B3.4.5 - 2F  B3.4.5 - 2G

B3.4.5 - 2H  B3.4.5 - 2I  B3.4.5 - 2J  B3.4.5 - 2K

B3.4.5 - 2L  B3.4.5 -

B3.4.5 - 2N

(TEST THIS ARRANGEMENT ALSO, IF ATTACHMENTS
DIVIDE 4 CORDS INTO GROUPS OF 3 & 1, NOT 2 & 2 -
#2 ASSIGNED TO SINGLE-CORD ATTACHMENT;
#1, #3, #4 ARE IDENTICAL FOR ANY CROSSING BY #2)

# Four Cords Three Attachments



B3.4.5 - 3A

B3.4.5 - 3B

B3.4.5 - 3C

B3.4.5 - 3D

B3.4.5 - 3E

B3.4.5 - 3F

B3.4.5 - 3G

B3.4.5 - 3H

B3.4.5 - 3I

B3.4.5 - 3J

B3.4.5 - 3K

B3.4.5 - 3L

B3.4.5 - 3M

B3.4.5 - 3N

B3.4.5 - 3O

B3.4.5 - 3P

**Four Cords Four Attachments**



B3.4.5 - B3.4.5 - 4B

B3.4.5 - 4C

B3.4.5 - 4D

B3.4.5 - 4E

B3.4.5 - 4F

B3.4.5 - 4G

B3.4.5 - 4H

B3.4.5 - 4I

B3.4.5 - 4J

B3.4.5 - 4K

B3.4.5 - 4L

B3.4.5 - 4M

B3.4.5 - 4N

B3.4.5 - 4O

B3.4.5 - 4P

B3.4.5 - 4Q

B3.4.5 - 4R

B3.4.5 - 4S

B3.4.5 - 4T



Figure B1 – TEST FIXTURE CONSTRUCTION



UPWARD VELOCITY BETWEEN
.1 AND 1.0
(2.54mm and 25.4 mm)
INCHES PER SECOND

6" +/- 1/4"
(152 mm)

6" +/- 1/4"
(152 mm)

**SIDE VIEW**

**FRONT VIEW**

**CORD RELEASE DEVICE AND
CORD SHEAR DEVICE STANDARD
TEST FIXTURE DETAILS**

Figure B2 – TEST FIXTURE LOADING

**APPENDIX C: TEST PROCEDURE FOR ACCESSIBLE CORDS**

Appendix C describes test requirements for determining the accessibility of Cords on the front, rear, bottom, or sides of properly installed window covering product.

The Inner Cords on a window covering product that are within 12 in (31 cm) of the bottom of the headrail are considered not accessible.

Test method is determined by the window covering construction type as described in C2.1

**C1 Shade Mounting and Preparation**

C1.1 Hang the window covering on a mounting rail using brackets according to manufacturer's installation instructions. The shade is to be tested in the fully lowered position

C1.1.1 Allow enough room around the mounted window covering to perform the Accessible Cord test.

**C2 Inner Cord Test with Cord Accessibility Probe**

C2.1 Determine if the window covering is to be tested to the "Open" or "Closed" construction test procedure.

Open Construction window covering products have one of the following:

- Inner Cords that are exposed from the front, rear, bottom or sides of the window covering which are typical of Roman, horizontal, and pleated window coverings.
- Cords that are enclosed between layers of the window covering without segmented sections allowing access to any portion of the interior from any opening.

Closed Construction has Inner Cords that are enclosed within segmented layers of the product which is typical of Cellular Shade. Access is limited to only that section of the Cord in an individual segment.

**C2.1.1 "Open" construction:** Determine if any opening in the window covering, more than 12 in (31 cm) below the bottom of the headrail, allows touching of the Inner Cords with the Inner Cord accessibility probe (Figure C1).

C2.1.1.1 If the Inner Cord accessibility probe can touch any Cords before reaching the 2 in (51 mm) diameter section the Cords are considered accessible and must be tested to Appendix D: Hazardous Loop Test Procedure.

C2.1.1.2 If the 2 in (51 mm) diameter section of the Inner Cord accessibility probe can be inserted into any opening then the Cords are considered accessible and must be tested to Appendix D: Hazardous Loop Test Procedure.

**C2.1.2 "Closed" construction:** Determine if any opening in the window covering, more than 12 in (31 cm) below the bottom of the headrail, allows touching of the Inner Cords with the Inner Cord accessibility probe (Figure C1).

C2.1.2.1 If the Inner Cord accessibility probe can touch any Cords before reaching the 4 in (102 mm) diameter section the Cords are considered accessible and must be tested to the Appendix D: Hazardous Loop Test Procedure.

C2.1.2.2 If the 4 in (102 mm) diameter section of the Inner Cord accessibility probe can be inserted into any opening then the Cords are considered accessible and must be tested to Appendix D: Hazardous Loop Test Procedure.



**Figure C1 – CORD ACCESSIBILITY PROBE**

Note: See Appendix G: Rationale and Background Information,

## C3 Operating Cords

C3.1 Any Operating Cord that can be contacted by the Cord accessibility probe (Figure C1) is considered an Accessible Cord.

## C4 Cord Shroud Accessibility Test with Cord Shroud Accessibility Probe

C4.1 Cord Shrouds with openings smaller than 1/4" diameter, are to be tested with the Cord, per Appendix D. Cord Shrouds with openings larger than 1/4" diameter, are to be tested independently of the Cord, per Appendix D.



**Figure C2 – CORD SHROUD ACCESSIBILITY PROBE**

Note: See Appendix G: Rationale and Background Information,

## APPENDIX D: HAZARDOUS LOOP TEST PROCEDURE

Appendix D describes test requirements for the Accessible Inner Cords of all window covering types and the potentially Hazardous Loop or opening that may be created between an Inner Cord and the window covering material by manipulation of the Inner Cord and / or window covering material. If a Hazardous Loop is formed following the Appendix D: Hazardous Loop Test Procedure, the product is non-compliant.

### D1 Window Covering Mounting and Preparation

D1.1 Hang the window covering on a mounting rail using brackets according to manufacturer's installation instructions.

D1.1.1 It is recommended that enough room is allowed all around the mounted window covering for the test fixture and Cord-pull allowance.

D1.1.2 It is recommended that allowances are made for various heights of either window covering or test fixture and tests at multiple vertical positions on the window covering, either by raising or lowering the entire window covering, or by adjusting the level of the test fixture.

D1.1.3 All Inner Cords which are accessible from the front, sides, bottom, or rear of the window covering and are 12 in (31 cm) or more below the bottom of the headrail, are subject to these tests.

D1.1.3.1 If the openings between the Accessible Inner Cord and the window covering material are similar in design, the tests shall be conducted on a minimum of one Inner Cord near the side edge of the window covering and one Inner Cord towards the horizontal center of the window covering for each configuration tested.

D1.1.3.2 If the openings between the Accessible Inner Cord and the window covering material are similar in design, the tests shall be conducted on a minimum of the bottom most row of openings and the middle row of openings.

D1.1.4 At each position on the window covering product where Cords are tested, all combinations of Cords and combined Loops shall be tested separately.

D1.1.5 Test procedure D2 shall be performed with the window covering in the fully lowered position.

D1.1.5.1 If the sample contains a top-down, bottom-up operation feature, Procedure D2 shall be performed with the bottom rail fully lowered and the middle rail up against the headrail (window covering fully covering the window).

D1.1.6 Loops that are formed by excessive or intricate manipulations, including damaging the product or using tools, of the Accessible Cord shall be exempt from testing.

### D2 Creation of a Hazardous Loop

D2.1 Orient the Hazardous Loop test stand assembly, shown in Figure D2 through Figure D6, such that the hooks (Figure D5 Item #9.5) on the force gauge arm subassembly (Figure D5) will be able to pull the Accessible Inner Cord to form or enlarge a Loop (see Figure D7). The direction of pull will be perpendicular to surface of the window covering product, and away from the surface.

D2.1.1 If the Inner Cord is only accessible from the side of the window covering, then the fixture shall be oriented such that it will apply the pull force perpendicular to that side surface of the window covering (or parallel to the front of the window covering). If the Inner Cord is accessible from the back or front of the window covering, then the fixture shall be oriented such that the pull force is applied perpendicular to that surface of the window covering. Likewise, if the Inner Cord is only accessible from the bottom of the

window covering, the pull force should be applied in a vertical direction, perpendicular to the bottom surface. The restraining arm (Figure D2 Item #16) shall be placed against the window covering.

D2.1.2 If the same Inner Cord section is accessible from two or more directions, testing shall be conducted by pulling the Inner Cord in the direction that would result in the largest Loop opening. It may be necessary to conduct the evaluation more than once to determine the direction that would result in the largest Loop opening on certain window covering designs.

D2.2 Place the Hazardous Loop test stand assembly at the surface of the window covering and adjust the vertical height so that the restraining arm aligns with the opening to be tested.

D2.2.1 If testing a Roman or Roll Up Style Blind, the restraining arm shall be placed in between the Inner Cord and the window covering material at the opening to be tested.

D2.2.2 When testing all other styles of window coverings, the restraining arm shall be placed against both the window covering material and the Inner Cord, just slightly above the opening to be tested.

D2.3 Ensure the scale measuring distance traveled on the force gauge arm subassembly is set to zero (Figure D2 Item 1). Zero the force gauge and place the force gauge in continuous read-out mode. Loop the Accessible Cord onto both hooks of the force gauge arm subassembly (Figure D5 Item #1.1).

D2.3.1 While looping the Cord onto both hooks, the force exerted on the Cord or the force registered on the force gauge may exceed 5 lb (22.2 N) to obtain the required set-up configuration.

D2.3.2 The coating on the hooks (Figure D5 Item #1.6) is Tygon tubing with a durometer 69A that is intended to simulate human skin. In the event that the tubing becomes worn or damaged, replace it with new tubing.

D2.4 Over a time period of 5 seconds +/- 1 second, gently pull the horizontal arm (Figure D5 Item #1.8) of the force gauge arm subassembly away from the window covering to create an open Loop until the force gauge indicates a tension force of 5 lb +/- 0.25 lb (22.2 N +/- 1.1 N) or the scale (Figure D5 Item #1.4) indicates a pulled distance of 25 in+/- 0.25in (63.5 cm +/- 0.6 cm), whichever comes first. Lock the horizontal arm in place using the brake assembly (Figure D-5 Item #1.10).

D2.5 Using the head probe (Figure D1) determine whether the head probe can pass through the opening created between the hooks and the restraining arm with an insertion force of 10 lb (44.5 N) or less, perpendicular to the plane of the opening

D2.5.1 If the head probe cannot pass through the Loop under the conditions above, the opening is not a Hazardous Loop.

D2.5.2 If the head probe can pass through the Loop under the conditions above, the Loop is considered a Hazardous Loop.



| ITEM NO. | ITEM NAME | DESCRIPTION (MCMASTER CARR PART NUMBERS PROVIDED FOR REFERENCE. EQUIVALENTS ARE ACCEPTABLE.) | QTY. |
|---|---|---|---|
| 1 | HEAD PROBE | 7-9 MONTH OLD 5% : 4.33in (110mm) HEAD BREADTH, 5.83in (148mm) HEAD LENGTH, 16.6in (422mm) +/- 0.3in (8mm) HEAD CIRCUMFERENCE, 5.9in (150mm) OVERALL HEIGHT | 1 |
| 2 | THREADED INSERT | MCMASTER CARR #99362A600 10-32 THREADED INSERT DRILL 0.264in (6.7mm) 3/8in (9.5mm) LONG | 1 |
| 3 | FORCE GAUGE | MCMASTER CARR #17435T33 10LB SCALE WITH MAXIMUM HOLD | 1 |

**Figure D1 – HAZARDOUS LOOP HEAD PROBE**

A1237



**Figure D2 – HAZARDOUS LOOP TEST STAND ASSEMBLY**

# HAZARDOUS LOOP TEST STAND ASSEMBLY
## BILL OF MATERIALS

**80/20 COMPONENTS CAN BE ORDERED AS KIT# WCMA060410**
**BERTELKAMP AUTOMATION, INC**
**6321 BAUM DRIVE**
**KNOXVILLE TN 37919**
**800-251-9134**
**INFO@BERTELKAMP.COM**



| ITEM NO. | ITEM NAME | DESCRIPTION (MCMASTER CARR, 80/20 PART NUMBERS PROVIDED FOR REFERENCE. EQUIVALENTS ARE ACCEPTABLE.) | QTY. |
|---|---|---|---|
| 1 | FORCE GAUGE ARM SUBASSEMBLY | 80/20, MCMASTER CARR, MARK-10 COMPONENTS - SEE SEPARATE ASSEMBLY DRAWING FOR COMPONENTS | 1 |
| 2 | STAND BASE | 80/20 1530 36in (914mm) LONG - TAP BOTH ENDS 5/16in-18 | 1 |
| 3 | UPRIGHT | 80/20 1515 96in (2438mm) LONG | 1 |
| 4 | SLIDE MOUNT | 80/20 1530 10in (254mm) LONG | 1 |
| 5 | HORIZONTAL ARM | 80/20 1515 30in (762mm) LONG - TAP ONE END 5/16in-18 | 1 |
| 6 | JOINING PLATE 4312 | 80/20 4312 7 HOLE JOINING PLATE | 1 |
| 7 | VERTICAL ADJUSTMENT SLIDE | 80/20 6526 LINEAR SLIDE WITH BRAKE | 1 |
| 8 | CORNER BRACE | 80/20 4301 4 HOLE CORNER BRACE | 1 |
| 9 | BRAKE ASSEMBLY | 80/20 6800 LINEAR SLIDE BRAKE ASSEMBLY | 1 |
| 10 | MACHINE SCREW | 80/20 3122 SOCKET HEAD CAP SCREW 5/16in-18 1in LONG | 4 |
| 11 | 3320 T NUT ASSEMBLY | 80/20 3320 TNUT ASSEMBLY 5/16in-18 X 11/16in FLANGED BUTTON HEAD WITH 3/16in HEX DRIVER AND ECONOMY T NUT | 21 |
| 12 | 3439 T NUT ASSEMBLY | 80/20 3439 TNUT ASSEMBLY 5/16in-18 X 3/4in BUTTON HEAD WITH 3/16in HEX DRIVER AND ECONOMY T NUT | 2 |
| 13 | 1515 ENDCAP | 80/20 2030YEL 1515 YELLOW ENDCAP WITH CENTER PUSHIN | 1 |
| 14 | 3340 BUTTON HEAD SCREW | 80/20 3340 5/16in-18 X 1/2in FLANGED BUTTON HEAD WITH 3/16in HEX DRIVER | 3 |
| 15 | STAND BASE LEGS | 80/20 # CM04-042910 OR MCMASTER CARR # 8982K174 1-1/2in (38mm) X 1-1/2in (38mm) X 3/16in (4.8mm) X CUT TO 18in (457mm) LONG 6061 ALUMINUM WITH 11/32in (8.7mm) DIA HOLES | 2 |
| 16 | FABRIC SUPPORT ARM | 80/20 # CM45-060410 OR MCMASTER-CARR #8975K533 ALUMINUM 6061 3/16in (4.8mm) X 2in (51mm) CUT TO 18in (457mm) LONG WITH 1 HOLE 11/32in (8.7mm) DIA, 2 HOLES TAPPED 5/16in-18 | 1 |
| 17 | CUSTOM EXTENSION PLATE | 80/20 # CM03-042910 OR MCMASTER CARR #8975K425 4in (102mm) X 1/4in (6mm) X 12in (305mm) LONG ALUMINUM 6061 PLATE WITH 6 X 11/32in (8.7mm) DIA HOLES | 2 |

**Figure D3 – HAZARDOUS LOOP TEST STAND BILL OF MATERIALS**



**HAZARDOUS LOOP TEST STAND CUSTOM COMPONENTS**

| ITEM NO. | ITEM NAME | DESCRIPTION (MCMASTER-CARR PART NUMBERS PROVIDED FOR REFERENCE. EQUIVALENTS ARE ACCEPTABLE.) | QTY. |
|---|---|---|---|
| 15 | STAND BASE LEGS | 80/20 # CM04-042910 OR MCMASTER CARR # 8982K174 1-1/2in (38mm) X 1-1/2in (38mm) X 3/16in (4.8mm) X CUT TO 18in (457mm) LONG 6061 ALUMINUM WITH 11/32in (8.7mm) DIA HOLES | 2 |

| ITEM NO. | ITEM NAME | DESCRIPTION | QTY. |
|---|---|---|---|
| 16 | FABRIC SUPPORT ARM | 80/20 # CM45-060410 OR MCMASTER-CARR #8975K533 ALUMINUM 6061 3/16in (4.8mm) X 2in (51mm) CUT TO 18in (457mm) LONG WITH 1 HOLE 11/32in (8.7mm) DIA, 2 HOLES TAPPED 5/16in-18 | 1 |

| ITEM NO. | ITEM NAME | DESCRIPTION | QTY. |
|---|---|---|---|
| 17 | CUSTOM EXTENSION PLATE | 80/20 # CM03-042910 OR MCMASTER CARR #8975K425 4in (102mm) X 1/4in (6mm) X 12in (305mm) LONG ALUMINUM 6061 PLATE WITH 6 X 11/32in (8.7mm) DIA HOLES | 2 |

**Figure D4 - HAZARDOUS LOOP TEST STAND CUSTOM COMPONENTS**

A1240



**FORCE GAUGE ARM SUBASSEMBLY**

| ITEM NO. | FORCE GAUGE ARM SUBASSEMBLY ITEM NAME | DESCRIPTION (MCMASTER CARR, 80/20, MARK-10 PART NUMBERS PROVIDED FOR REFERENCE. EQUIVALENTS ARE ACCEPTABLE.) | QTY. |
|---|---|---|---|
| 1.1 | FORCE GAUGE MG10 | MARK-10 # MG10 0-10LB FORCE GAUGE WITH #6-32 MOUNTING HOLES | 1 |
| 1.2 | GAUGE MOUNTING SCREW | MCMASTER CARR #90272A148 #6-32 X 1/2in LONG ZINC PLATED PAN PHILLIPS HEAD | 4 |
| 1.3 | THREADED INSERT | MCMASTER CARR #99362A600 10-32 THREADED INSERT DRILL 0.264in (6.7mm) 3/8in (9.5mm) LONG | 1 |
| 1.4 | SCALE | MCMASTER CARR #19325A43 ADHESIVE BACKED SCALE LEFT TO RIGHT | 1 |
| 1.5 | HOOK | MCMASTER CARR # 29905T46 HOOK 304SS, 0.157in (4.0mm) WIRE | 2 |
| 1.6 | TUBING | MCMASTER CARR # 9449K43 TYGON TUBING, 5/16in (7.9mm) OD X 3/16in (4.8mm) ID, 69A DUROMETER, CUT TO 2in (51mm) LONG | 2 |
| 1.7 | 3320 T NUT ASSEMBLY | 80/20 3320 TNUT ASSEMBLY 5/16in-18 X 11/16in FLANGED BUTTON HEAD WITH 3/16in HEX DRIVER AND ECONOMY T NUT | 2 |
| 1.8 | HORIZONTAL ARM | 80/20 1515 30in (762mm) LONG - TAP ONE END 5/16in-18 | 1 |
| 1.9 | FORCE GAUGE SLIDE ASSEMBLY | 80/20 6873 LINEAR SLIDE ASSEMBLY WITH BRAKE | 1 |
| 1.10 | BRAKE ASSEMBLY | 80/20 6800 LINEAR SLIDE BRAKE ASSEMBLY | 1 |
| 1.11 | 1515 ENDCAP | 80/20 2030YEL 1515 YELLOW ENDCAP WITH CENTER PUSHIN | 1 |
| 1.12 | MOUNTING BLOCK | 80/20 # CM44-060410 OR MCMASTER CARR #8733K81 NYLON BAR WITH ADDED HOLES FOR HOOKS AND THREADED INSERT | 1 |
| 1.13 | FORCE GAUGE MOUNTING PLATE | 80/20 # CM43-060410 OR MCMASTER CARR #8975K686 2-1/2in (64mm) X 1/4in (6.4mm) X 6in (152mm) LONG ALUMINUM 6061 PLATE WITH 4 HOLES 3/16in (4.8mm) DIA AND 2 HOLES 11/32in (8.7mm) DIA | 1 |

**Figure D5 – HAZARDOUS LOOP TEST STAND FORCE GAUGE ARM SUBASSEMBLY BILL OF MATERIALS**

A1241



# FORCE GAUGE ARM SUBASSEMBLY CUSTOM COMPONENTS

| ITEM NO. | ITEM NAME | DESCRIPTION (MCMASTER CARR NUMBERS ARE PROVIDED FOR REFERENCE. EQUIVALENTS ARE ACCEPTABLE.) | QTY. |
|---|---|---|---|
| 1.12 | MOUNTING BLOCK | 80/20 # CM44-060410 OR MCMASTER CARR #8733K81 NYLON BAR WITH ADDED HOLES FOR HOOKS AND THREADED INSERT | 1 |

| ITEM NO. | ITEM NAME | DESCRIPTION | QTY. |
|---|---|---|---|
| 1.13 | FORCE GAUGE MOUNTING PLATE | 80/20 # CM43-060410 OR MCMASTER CARR #8975K686 2-1/2in (64mm) X 1/4in (6.4mm) X 6in (152mm) LONG ALUMINUM 6061 PLATE WITH 4 HOLES 3/16in (4.8mm) DIA AND 2 HOLES 11/32in (8.7mm) DIA | 1 |

**Figure D6 – HAZARDOUS LOOP TEST STAND FORCE GAUGE ARM SUBASSEMBLY CUSTOM COMPONENTS**



**Figure D7 – HAZARDOUS LOOP TEST STAND AND A ROMAN STYLE SHADE**

A1243

**APPENDIX E: TEST FOR ROLL UP STYLE SHADE INNER CORD RELEASE DEVICE**

**E1 Equipment**

E1.1 Standard Test Fixture per instructions and drawing in Figures E1 and E2.

E1.2 Length of representative Inner Cord 10 ft (3 m) long. The Cord should be representative of the Cord to be used with the release device under component test E2.

E1.3 Force gauge rated to at least 10 lb (44.5 N), with at least 0.05-lbf (0.2 N) resolution, with a maximum hold feature.

**E2 Release Device Test** This test assesses the average and maximum release force of the release device itself.

**E2.1 Set-Up of Test Fixture**

E2.1.1 Attach the Standard Test Fixture to the force gauge such that the cylindrical member is free to articulate.

**E2.2 Test Set-up**

E2.2.1 Attach the release device to a rigid mounting surface in a manner representative of the way the release device is attached to a window covering assembly, as shown in Figure E3.

E2.2.2 Anchor one end of the Cord to the rigid mounting surface in a manner representative of the window covering assembly.

E2.2.3 Attach the other end of the Cord to the release device. If necessary, assemble the release device according to manufacturer's instructions.

**E2.3 Device Test & Acceptance**

E2.3.1 Engage the test fixture cylinder with the hanging Loop in the manner depicted in Figure E3.

E2.3.2 Zero the force gauge and draw force gauge vertically downward at a speed between 0.1 and 1.0 in per second (2.5 mm to 25 mm per second). The device being tested shall release less than 10 seconds from the time tension develops in the Cord.

E2.3.3 Record force at separation.

E2.3.4 Repeat E2.3.1 through E2.3.3 for a total of 12 each release devices.

E2.3.5 Repeat E2.3.1 through E2.3.4 for a total of 12 each release devices, but pull at an angle of 30° outward from the vertical mounting plane of the fixture, as shown in Figure E4.

E2.3.6 Repeat E2.3.1 through E2.3.4 for a total of 12 each release devices, but pull at an angle of 30° laterally to the left of vertical, in the vertical plane of the fixture, as shown in Figure E5.

E2.3.7 Repeat E2.3.1 through E2.3.4 for a total of 12 each release devices, but pull at an angle of 30° laterally to the right of vertical, in the plane of the fixture, as shown in Figure E6.

E2.3.8 The average shall not exceed 3.0 lbf (13.3 N) release force to separate the devices on the 48 devices tested, and all samples shall have a release force below 5.0 lbf (22.2 N) for the device to be accepted. In the event that not more than *one* of the devices tested produces an initial release force measurement in excess of 5.0 lbf (22.2 N), such devices may be retested and if, upon retesting, their release force measurements fall below 5.0 lbf (22.2 N), the device shall be deemed acceptable.

**E3 Test of Assembled Window Covering** This test assesses the performance of the release device as part of a window covering assembly.

E3.1 **Set-up of Test Fixture**

E3.1.1 Attach the Standard Test Fixture to the force gauge as illustrated in Figure E1.

E3.2 **Test Set-up**

E3.2.1 Hang the window covering on a mounting rail using hardware according to the manufacturer's instructions. Mount the rail high enough to allow the window covering to be fully lowered while allowing sufficient room below the lower-most portion of the assembly for the force gauge with attached test fixture.

E3.3 **Loop Definition & Preparation**

E3.3.1 Test window covering with release device assembled according to the manufacturer's instructions.

E3.4 **Loop Test & Acceptance**

E3.4.1 Position the window covering in the fully lowered position. Lower the Cord to be tested an additional amount to allow engagement of the test fixture with the Loop below the bottom rail, as shown in Figure E7.

E3.4.2 If necessary, tie off or otherwise restrain the Loop end not connected to the release device, for example by engaging the Cord Lock, in order to secure the Loop end from pulling out of the headrail.

E3.4.3 If necessary, assemble the release device according to manufacturer's instructions.

E3.4.4 Loop the bottom of the Loop over the Test Fixture on the force gauge, as shown in Figure E7.

E3.4.5 Zero the force gauge and draw the force gauge vertically downward at a speed between 0.1 and 1.0 in per second (2.5 mm to 25 mm per second). The device being tested shall release less than 10 seconds from the time tension develops in the Cord.

E3.4.6 Record force at separation.

E3.4.7 Repeat E3.4.3 through E3.4.6 two (2) times for a total of three releases.

E3.4.8 Repeat steps E3.4.3 through E3.4.7, according to the arrangement shown in Figure E8 by pulling along a line 30° outward from the mounting plane of the window covering.

E3.4.9 Repeat steps E3.4.3 through E3.4.7, but pull along a line with 30° angle from the vertical to the left or right (as appropriate for whether the release device is on the left or right of the window covering assembly) in the arrangement depicted in Figure E9.

E3.4.10 The average shall not exceed 3.0 lb(13.3 N) release force to separate the device, and all samples shall have a release force below 5.0 lb ( 22.2 N) for the release device to be accepted. In the event that not more than *one* test produces an initial release force measurement in excess of 5.0 lb (22.2 N), such test may be repeated and if, upon retesting, the release force measurement falls below 5.0 lb (22.2 N), the device shall be deemed acceptable.



**Figure E1**

| Component | McMaster-Carr Part No. (equivalents are acceptable) |
|---|---|
| 3/8" (9.5 mm) neoprene foam, Durometer 35-42 on Shore D0 scale | 4463K151 |
| 1/16" (1.5 mm) vinyl sheet, Durometer 70-75A | 8513K43 |
| 1" (25 mm) neoprene foam firmness (25% deflection):    9-13 psi (60-90 kPa) (firm) | 8647K89 |
| Force gauge, 10-lb scale, 0.05-lbf (20-gf) resolution, with peak-hold feature | 17435T33 |



Foam-Covered
2" (50 mm) PVC Pipe
on Foam Core

Force
Gauge

**Figure E2**



Force Gauge

Force Gauge

**Figure E3**

A1248



**Figure E4**



Force
Gauge

30°

**Figure E5**

A1250



30°

Force
Gauge

**Figure E6**

A1251



**Figure E7**



**Figure E8**



Force Gauge

30°

**Figure E9**

# APPENDIX F: RATIONALE AND BACKGROUND INFORMATION

Appendix F describes the rationale and / or background information for select provisions of the standard.

**F1** Section 4.4 Default options for Operating Cord Length and Wand Tilt

F1.1 Cord Length- In prior versions of the standard, Operating Cord length has not been standardized. Previous Cord lengths often ranged from 50% to 100% of window covering height. The default Operating Cord length of 40% was established based on anthropometric data that considers accessibility and ability to grasp and pull a Cord by most users on a window covering mounted at standard height of 80" above the floor. To ensure accessibility for all consumers, an exception is allowed for custom lengths.

F1.2 Wand Tilt- Wands require fine hand manipulations to operate (twisting motion). To ensure accessibility and ease of operation for users, the option for Cord tilt is allowed for circumstances where Cord operation is preferred over wand tilt by the user.

**F2** Sections 6.7.1 and 6.7.2 Maximum Free-Standing Cord Loop

F2.1 The 4 in (102 mm) diameter is based on a 6 in (152 mm) Loop equivalent.

**F3** Section 6.8 Wide Lift Bands

F3.1 The WCMA engaged an independent laboratory to verify that "wide" lift bands reduce risk of strangulation when used in place of an Inner Cord. Test results showed a relationship between width and stiffness of the material and influence on pressures to occlude an airway during simulation. Based on data and discussion of the testing, a safety factor of 16.0 was determined to be acceptable. The wide lift band safety factor (in-kg) is calculated by multiplying the width of the wide lift band (measured in inches) by the stiffness of the wide lift band (measured in kgf). Stiffness values of the wide lift band were measured using test method ASTM 4032-2008, pneumatic actuator, digital gage with a 25kgf (115 N) capacity.

**F4** Figure C1, Cord Accessibility Probe

F4.1 The 6 in (152 mm) end depth is based on anthropometric data and historical information.

F4.2 The 5/8 in (16 mm) diameter is based on a child inserting his/her index finger into the opening and curl his/her finger to grasp the Cord. The distance from the tip of index finger to the middle joint is approximately same as the inside grip diameter (5th percentile 2.5-3.5 year olds[1]), which is added to the index finger diameter (5th percentile 2-3.5 year olds[2]).

F4.3 The 1in (25 mm) depth is the rounded number for the tip of index finger to the middle joint explained above.

F4.4 The 1 13/16 in (46 mm) diameter is based on the opening needed to grasp the Cord if a child inserts his/her hand in a straight position up to the thumb crotch. Hand circumference at the palm (mean 2-2.5 year old child[3]) is added to the opening needed to grasp the Cord with index finger (inside grip diameter of a 5th percentile 2.5-3.5 year old).

F4.5 The 2.5 in (64 mm) depth is the thumb crotch – middle finger length for 5th percentile 2-3.5 year old[2].

[1] Owings, C.L., Norcutt, R.H., Snyder, R.G., Golomb, D.H. & Lloyd, K.Y. (1977). Gripping Strength Measurements of Children for Product Safety Design. Prepared for the U.S. Consumer Product Safety Commission, Washington, D.C.

[2] Snyder, R.G., Schneider, L.W., Owings, C.L., Reynolds, H.M., Golomb, D.H., & Schork, M.A. (1977). *Anthropometry of Infants, Children and Youths to Age 18 for Product Safety Design* (Report No. UM-HSRI-77-17). Prepared for the U.S. Consumer Product Safety Commission, Washington, D.C.

[3] BSI (1990) as cited in Norris, B., & Wilson, J. R. (1995). CHILDATA: The handbook of child measurements and capabilities –Data for design safety. London: Department of Trade and Industry.

**F5** Figure C2, Cord Shroud Accessibility Probe

F5.1 The ¼ in (6 mm) diameter is based on: 0.33 in (8 mm) is the 5th percentile 2-year-old's index finger diameter in Snyder's study[2].

**F6** Section D2.4, Head Probe

F6.1 Tension force of 5 lb (22.2 N) is based on Section 4.14.1 Cords, Straps, and Elastics in ASTM F963.

F6.2 Insertion force of 10 lb (44.5) is based on Section 8.22 Test for Loops and Cords in ASTM F963.

F6.3 16.6 in (42.2 cm) is representative of the 5th percentile 7-9 month old, measurements provided by http://ovrt.nist.gov/projects/anthrokids and shape provided by Intertek CT scan images

**APPENDIX G: TESTING SUMMARY, PRODUCT ILLUSTRATIONS**

**Not Part of ANSI/WCMA A100.1**

**Component Testing and Window Covering Product Testing Summary**

| Section | Component Testing | Window Covering Product Testing |
|---------|-------------------|--------------------------------|
| 4.1 | Lead testing<br>• Components such as finish on bottom rail, textiles, louvers, slats | |
| 4.2 | Small component testing for choking hazard<br>• Safety component or device that is intended to separate | |
| 5 | | All window covering products Appropriate warning labels, tags, and instructions |
| 6.1 | Cord release device<br>• Cord separation test / Appendix B | |
| 6.2 | | Any fully assembled window covering products that rely on cord Retraction Devices<br>• Retraction test, 6.2.1<br>• Cycle test, 6.2.2 |
| 6.3 | | Any fully assembled window covering products that rely on Cord Shroud devices<br>• Accessibility test- Appendix C<br>• Creation of Hazardous Loop- Appendix D, if required<br>Non-rigid Cord Shroud<br>• Force for attachment points, 6.3.2.2 |
| 6.4 | Cord Tensioner<br>• UV stability test, 6.4.4.2<br>• Impact test, 6.4.4.3<br>• Durability, 6.4.4.4 | Any fully assembled window covering products that rely on Tension Devices<br>• Evaluate for shipped condition, 6.4.1<br>• Test for partial inoperability, 6.4.2<br>• Operational test, 6.4.4.1 |
| 6.5 | Looped Cord and Bead Chain Restraining Device<br>• UV Stability, 6.5.2.2<br>• Impact, 6.5.2.3<br>• Durability, 6.5.2.4 | Any fully assembled window covering products that rely on Loop Cord or Bead Chain restraining devices<br>• Operational test, 6.5.2.1<br>• Hazardous Loop testing, 6.5.2.5 |
| 6.6 | Rigid Cord Shroud Device<br>• UV Stability, 6.6.2.1<br>• Impact, 6.6.2.3 | Any fully assembled window covering products that rely on Rigid Cord Shroud devices<br>• Operational test, 6.6.2.2 |

| | | |
|---|---|---|
| 6.7 | Inner cord stop devices<br>• UV Stability & Compression test, 6.7.3 | Any fully assembled window covering products with Inner Cord stop devices<br>• Operational test, 6.7.1<br>• Impact test, 6.7.2 |
| 6.8 | Wide lift band materials<br>• Band width, 6.8.1<br>• Materials stiffness, 6.8.2 | |
| Appendix B | Test procedure for Cord Release Device<br>• Single Loop B.3.1<br>• Multiple Loop B.3.2 | |
| Appendix C | | Test Procedure for Accessible Cords<br>• Operating Cords<br>• Inner Cords |
| Appendix D | | Hazardous Loop Test Procedure<br>Inner cord test D3 |
| Appendix E | Roll Up Style Shade Cord Release Test<br>• Cord Release Device as component | Roll Up Style Shade Cord Release Test<br>• Cord Release Device on assembled product |

APPENDIX H: **Illustrations of common Window Coverings, operating systems, and options** (Images may not represent all styles of window coverings and these are for illustration purposes only).



FIGURE H1 Horizontal Blinds

FIGURE H2 Cellular Shade

FIGURE H3 Pleated Shade

FIGURE H4 Roll Up Style Blind

FIGURE H5 Roller Shade

FIGURE H6 Traverse Rod



| | |
|---|---|
| FIGURE H7 Roman Style Shade | FIGURE H8 Panel Track |
| Figure H9 Sheer Shade | Figure H10 Vertical Blind |
| Figure H11- BUTD Shade | Figure H12 bead chain restraining device |



H13- Motorized shade

*This page intentionally left blank.*