**[NOT YET SCHEDULED FOR ORAL ARGUMENT]**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

WINDOW COVERING
  MANUFACTURERS ASSOCIATION,

  Petitioner,

  v.                                                   No. 22-1300

CONSUMER PRODUCT SAFETY
COMMISSION,

  Respondent.

**RESPONSE OF CONSUMER PRODUCT SAFETY COMMISSION
TO MOTION FOR STAY PENDING REVIEW, REMAND AND
VACATUR, OR EXPEDITED CONSIDERATION**

When children's heads become ensnared in the cords that control
window coverings like blinds and shades, "death can occur within
minutes." Safety Standard for Operating Cords on Custom Window
Coverings, 87 Fed. Reg. 73,144, 73,151 (Nov. 28, 2022) (Final Rule).
Indeed, "[i]f young children are left unsupervised for even a few minutes
in a room that is considered safe, such as a bedroom or family room, they
can wrap a cord around their neck, insert their head into a cord loop, and
be injured or die silently." *Id.* at 73,162.

Numerous methods of controlling window coverings that do not present this risk have been developed and are being sold around the world. Since 2018, "stock" window coverings sold in the United States—generally speaking, prefabricated products available in standard sizes—have been subject to a voluntary standard prohibiting lengthy operating cords. And since May 2022, all window coverings sold in Canada—stock and custom—have been prohibited from including such cords.

The safety standard challenged here, which was issued by the Consumer Product Safety Commission on a unanimous, bipartisan basis, does little more than require that custom products abide by standards similar to those that apply to stock products in the United States, and that apply to all products in Canada. It extensively addresses all the findings required by the Consumer Product Safety Act, and it adopts the latest effective date Congress permitted absent a finding of good cause. Because petitioner Window Covering Manufacturers Association is neither likely to succeed on the merits nor at risk of irreparable harm, and because the equities weigh against a stay, the Court should deny petitioner's motion to stay the rule pending judicial review or to remand the rule under 15 U.S.C. § 2060(b). We do not oppose petitioner's request

to expedite briefing, which would allow the case to be briefed and argued before the rule takes effect on May 30, 2023.

## STATEMENT

1. Congress enacted the Consumer Product Safety Act, 15 U.S.C. § 2051 *et seq.*, to "protect the public against unreasonable risks of injury associated with consumer products," *id.* § 2051(b)(1). The Act established the Commission, which may "promulgate consumer product safety standards" when "reasonably necessary to prevent or reduce an unreasonable risk of injury associated with such product." *Id.* § 2056(a). The Commission can create mandatory standards through rulemaking in which it must consider "relevant available product data," the "risk of injury," "the approximate number" of affected products, "the need of the public for the consumer products," the "probable effect" on "utility, cost, or availability" of those products, alternative means of "achieving the objective of the order while minimizing adverse effects," and "the public interest." *Id.* § 2058(e), (f)(1), (3). The Commission "shall specify the date such rule is to take effect not exceeding 180 days from the date promulgated, unless the Commission finds, for good cause shown, that a later effective date is in the public interest and publishes its reasons for

such finding." *Id.* § 2058(g).  Congress instructed the Commission to "rely upon voluntary consumer product safety standards" instead of regulations "whenever compliance with such voluntary standards would eliminate or adequately reduce the risk of injury addressed and it is likely that there will be substantial compliance with such voluntary standards." *Id.* § 2056(b)(1); *see id.* § 2058(b)(2).

2.     In 2018, the industry adopted a voluntary standard requiring that stock window coverings be cordless, or have operating cords that are either inaccessible or not longer than 8 inches in any use position.  *See* Final Rule 73,145.  Following adoption of that standard, which "eliminated the strangulation hazard on stock window coverings," "sales increased and cordless technologies became well-developed."  16 C.F.R. § 1260.4(f)(4).

The 2018 standard imposes less stringent limitations on custom products, which account for approximately 44% of unit sales, *see* Final Rule 73,149.  Under that standard, custom products may include a free-hanging cord subject to a default limit of 40% of the product height when the product is fully lowered.  *Id.* at 73,157.  Yet customers may override that default and order a cord of any length.  They may also override the

default option of a wand for tilting blind slats and select a second cord. *See id.*

3.    The Commission published a notice of proposed rulemaking on January 7, 2022, proposing to extend the requirements on stock products to custom products. *See* Safety Standard for Operating Cords on Custom Window Coverings, 87 Fed. Reg. 1014 (Jan. 7, 2022).   On November 28, 2022, the Commission approved the Final Rule.   Like the proposed rule, the Final Rule requires that custom coverings either be cordless or have operating cords that are inaccessible or not longer than 8 inches in any use position.   *See* 16 C.F.R. § 1260.2.   Among other options, manufacturers may make a cord inaccessible using a rigid shroud that encases the cord. *See id.* § 1260.1(b)(6).   They may also use a retractable cord "that extends when pulled by a user, and fully retracts when the user releases the cord," *id.* § 1260.1(b)(7), provided that no more than 12 inches of cord are exposed, *id.* § 1260.2(c)(2).   The Final Rule also permits manufacturers to restrain continuous loops of cord or chain using a device that is "integrated to and installed on the window covering" and "prevents the creation of hazardous loop."   *Id.* § 1260.1(b)(8).   The effective date is May 30, 2023.   Final Rule 73,144.

4.    In promulgating the rule, the Commission explained that "[o]perating cords on custom window coverings present an unreasonable risk of strangulation, including death and serious injury, to children 8 years old and younger."  16 C.F.R. § 1260.4(b)(1).  The Commission had obtained specific reports "of 209 fatal and near-miss strangulations on window covering cords that occurred among children 8 years old and younger from January 2009 through December 2021."  Final Rule 73,144.  Of these incidents, 48% were fatal; others resulted in hospitalization, quadriplegia, and brain damage.  *Id.*  Of the 86 incidents where staff could make a determination of product type, 42% involved custom products.  *Id.*  Modeling showed that the total number of incidents was far greater than the number of specific reports, numbering close to 200 incidents annually.  16 C.F.R. § 1260.4(f)(1).

The Commission explained why the 2018 voluntary standard was inadequate for custom products.  A cord that is 40% of product height is long enough that "a child can wrap the cord around their neck."  Final Rule 73,159.  And cords "get longer as the product is raised"; a 60-inch blind could have a 24-inch cord when the blind is closed that extends to 84 inches when the blind is raised.  *Id.* at 73,160.  Finally, "[f]irms

typically allow consumers to easily change the default options during the custom order process." *See id.*

The Commission also assessed a voluntary standard that was proposed after the notice of proposed rulemaking and has been approved since publication of the Final Rule. The Commission acknowledged that the then-proposed 2022 standard contained some improvements. Final Rule 73,165. Numerous hazards remained unaddressed, however, including (1) retractable cords that can expose 36 inches of cord, and (2) continuous loop systems with external tension devices that might not be installed at all, can be easily removed, and are insufficient to prevent strangulation even when in place. *See id.* 73,165-68 & figs. 20-24.

The Commission found that "the benefits expected from the rule bear a reasonable relationship to its costs." 15 U.S.C. § 2058(f)(3)(E). Depending on the underlying assumptions, the quantifiable benefits either somewhat outweighed or were somewhat outweighed by the estimate of costs. Final Rule 73,182-83. Either way, the Commission cautioned that its estimate of costs "does not account for efficiencies resulting from prior safety innovation in stock window coverings or custom window coverings for Canada" and that its estimate of benefits

does not account for "the unquantified benefits of the final rule, including the emotional distress level of caregivers that will be reduced by the final rule." *Id.* 73,183.

The Commission noted that staff had recommended a later effective date, *see* Final Rule 73,177, but did not find good cause to extend the default statutory maximum of 180 days. At the outset, it noted that staff had not "conclude[d] that a longer effective date creates a material reduction in the estimated costs of the rule." *Id.* Assessing the record as a whole, it explained that "methods of eliminating the window covering cord hazard have been developed for stock window coverings under" the 2018 voluntary standard and that "solutions developed for Canada should be usable in the United States as well." *Id.* Moreover, most comments requesting a later effective date were "not specific or substantiated," *id.*, "failed to provide specific justifications," *id.* 73,189, and engendered "doubt whether the drafters were familiar with the company's operations," *id.* In contrast, one industry commenter "stated that 180-day lead time is more than sufficient for industry implementation." *Id.*

5. On November 30, 2022, petitioner commenced this action, and the following day, it sought a stay of the effective date from the Commission, requesting a response by December 15. A159-164. On December 16, while the request was pending, with a Commission vote scheduled for no later than December 21, petitioner sought a stay from this Court. On December 21, the Commission denied petitioner's request, observing that it "largely repeats claims the Commission extensively addressed and rejected" in the Final Rule. SA1.

## ARGUMENT

## I. The Court Should Deny A Stay.

The Court should deny a stay because petitioner satisfies none of the factors governing such relief. *See Nken v. Holder*, 556 U.S. 418, 426 (2009).

### A. Petitioner Is Unlikely To Succeed On The Merits.

Petitioner is unlikely to succeed on the merits. The Commission satisfied all rulemaking requirements, and the effective date is the latest permitted absent a finding of good cause.

1. **The Commission Found That The Rule Is Reasonably Necessary To Prevent Or Reduce An Unreasonable Risk Of Injury.**

Consumer Product Safety Act standards such as this one are reviewed for "substantial evidence," 15 U.S.C. § 2060(c), which is functionally identical to arbitrary and capricious review, *S.C. Pub. Serv. Auth. v. Fed. Energy Reg. Comm'n*, 762 F.3d 41, 54 (D.C. Cir. 2014) (per curiam). The "court is not to substitute its judgment for that of the agency" but instead must decide whether it "may reasonably be discerned" that the agency "examine[d] the relevant" information and identified "a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

1. Safety standards must be "reasonably necessary to prevent or reduce an unreasonable risk of injury." 15 U.S.C. § 2056(a). Under this framing, "[t]he regulation may issue if the severity of the injury that may result from the product, factored by the likelihood of the injury, offsets the harm the regulation itself imposes upon manufacturers and consumers," though "a precise 'body count' of actual injuries that will be reduced by each regulatory provision" is not required. *Forester v. CPSC,*

559 F.2d 774, 788, 789 (D.C. Cir. 1977) (interpreting similar provision of Federal Hazardous Substances Act).

Petitioner does not dispute the basic premises of the regulation. The Commission documented numerous cases of fatal or near-fatal strangulation from operating cords, Final Rule 73,144, and it is undisputed that the safety standard is 100% effective in eliminating the risk associated with such cords. *Id.* 73,158. Indeed, the standard for custom window coverings mirrors the standard that the Commission found—and petitioner does not dispute—"eliminated the strangulation hazard on stock window coverings." 16 C.F.R. § 1260.4(f)(4).

On the other side of the ledger, the Commission found that "compliance with the final rule will result in a net [cost] increase of as little as $24 per household every approximately 10 years." Final Rule 73,144. That estimate was based on analysis showing that a household replacing all 12 window coverings in a typical home would incur an estimated net cost increase ranging from "$23.67 using less expensive products to $218.82 using more expensive custom window coverings." *Id.* 73,171. The Commission found that this was "a reasonable cost to ensure that children avoid death or serious injury." *Id.* Indeed, the parallel

standard for stock coverings "did not negatively impact sales of stock products" in the United States, while similar requirements in Canada have been implemented with little additional expense for consumers. 16 C.F.R. § 1260.4(f)(4); *see* Final Rule 73,172. The Commission accordingly made the requisite findings that "[w]eighing the possibility of increased costs for custom window coverings with the continuing deaths and injuries to young children, . . . custom window coverings with hazardous operating cords pose an unreasonable risk of injury and death and . . . the final rule is reasonably necessary to reduce that unreasonable risk of injury and death." 16 C.F.R. § 1260.4(f)(5).

Unable to contest the basic premises, petitioner quibbles with details. Petitioner complains that some points in the Commission's range of estimates of quantifiable costs and benefits showed costs exceeding benefits. But as the Commission explained, these estimates are highly sensitive to assumptions and do not account for unquantified benefits. These unquantified benefits are especially large because the injured parties are almost invariably children, leading to "shock or perceived guilt related to a caregiver's inattentiveness" or, more straightforwardly, to a higher estimate of the lost value of life for those who were in others'

care and would have had many years ahead of them. Final Rule 73,183. The Commission was not required to perform a mechanical comparison, but merely to conclude that the costs bear a reasonable relationship to benefits. *See* 15 U.S.C. § 2058(f)(3)(E). The Commission's conclusion was reasonable because "the severity of the injury is usually death to a child, the cost per household is reasonable particularly in light of the long life of the products, and similar operating cord requirements have been successfully implemented, without substantial market disruption, for stock window coverings in the U.S. as well as for stock and custom window coverings in Canada." Final Rule 73,183.

Petitioner fixates on the Commission's identification of only 36 reviewed incidents that were confirmed to involve custom products. *See* Mot. 7-8. But in most incidents, the product type was unknown, and other incidents were never reported. *See* Final Rule 73,152-53. Nothing in the record suggests that there were only 36 incidents involving custom products.

Petitioner fares no better in complaining that the estimated cost per operating system was "calculated as a percentage of average-sized stock products," as opposed to "custom products, which generally are

larger and use more expensive components and materials." Mot. 11. The Commission accounted for that possibility: "to make the per-unit cost estimates applicable to the large array of window coverings in the marketplace," it "estimated increased manufacturing costs as a percent of retail price for each product." A599. Moreover, petitioner's own representatives reported that, as a percentage matter, adjustments were less expensive for custom products than for stock products (presumably because the base cost of custom products was higher). A601 & n.21. Petitioner is therefore incorrect that the "estimated cost per operating system is obviously too low." Mot. 11; *see also* Final Rule 73,186 (calculating range of costs from $2.99 to $9.77 for horizontal blinds); A612 (industry comment suggesting "incremental cost estimate of $7.78 per custom product").

Nor can petitioner obtain relief by suggesting that the Commission "based its cost assessment only on the residential market." Mot. 11. The Commission calculated an estimated increased cost per window covering and applied it to an estimate of "the number of units that will be affected by the draft final rule." A603. Using various sources, the Commission estimated total annual 2020 sales of 124.9 million, of which almost 16

million were custom corded products.  A603 tbl. 11.  Petitioner cannot reasonably complain that the estimate for the total market was too low on the ground that it inadequately accounts for commercial coverings (or on any other ground) given that the Commission's figure was significantly higher than a figure (100 million window coverings of all types per year) that petitioner previously provided, A603, and that it did not update in its comments on the notice of proposed rulemaking.

Petitioner says that the Commission "never explained how it arrived" at its $14.7 million estimate for the cost of developing compliant products.  Mot. 11-12.  But the Commission explained that it had estimated such costs per firm to "equate to approximately $772,500," Final Rule 73,186; *see also* A565; A602, and estimated that "[o]nly manufacturers with at least 75 employees are anticipated to perform this investment," Final Rule 73,186.  Petitioner is correct only insofar as the Final Rule did not expressly state the number of such manufacturers (19), which was derived (unsurprisingly) from the same Census Bureau data repeatedly cited in the Final Rule for the number of small entities affected.  *See id.* 73,185.

Petitioner also contends that the cost estimate was too low because declarations submitted for the first time in this Court suggest that industry will incur various costs for which the Commission inadequately accounted. *See* Mot. 11-12. The Commission cannot be faulted for failing to account for materials that were not before it. "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court," *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) (alteration in original and internal quotation marks omitted), and this Court should not countenance petitioner's attempt to "'sandbag'" the Commission, *USAir, Inc. v. Dep't of Transp.*, 969 F.2d 1256, 1260 (D.C. Cir. 1992).

2.    Petitioner does not advance its argument by contending that recent changes to the voluntary standard for custom coverings "would have eliminated *half* of the 36 incidents." Mot. 8. As the Commission noted, because the proposed 2022 standard was not "'in existence'" at the time of the Final Rule, it had no obligation rely on it pursuant to 15 U.S.C. § 2058(b)(2). *See* Final Rule 73,165. The Commission further concluded that the then-proposed standard would not eliminate risks that have caused a significant number of injuries; the Final Rule

recounts, in detail, specific actual incidents in that category. Final Rule 73,166-67. Indeed, the Commission identified significant problems with the 2022 standard, including (1) permitting retractable cords up to 36 inches long, *id.* 73,165, and (2) permitting continuous loop tension devices that might not be installed at all, could be easily removed, and are insufficient to prevent strangulation even when in place. *See id.* at 73,165-68 & figs. 20-24.[1] There is no basis for petitioner's argument that the Commission "did not evaluate" the proposed 2022 standard. Mot. 8.

"In view of the Commission's extensive consideration of this matter and its conscientious attempt to balance competing considerations of safety, expense and convenience," this Court should not "conclude that its ultimate determination was unreasonable." *Forrester*, 559 F.2d at 797.

---

[1] Petitioner faults the Commission for stating that the 2022 standard would not "*eliminate*" the risk of injury. Mot. 9. While the preamble uses various formulations across its 50 pages, the actual finding is that the 2022 standard was "inadequate to address the risk of injury." 16 C.F.R. § 1260.4(j)(3).

### 2. The Commission Reasonably Selected The Latest Effective Date Permitted By Statute Absent A Finding Of Good Cause.

Petitioner also challenges the effective date. Yet the Commission selected the latest date permitted absent a finding of good cause, and there is no basis to disturb its decision not to make such a finding.

Although the Administrative Procedure Act permits agencies to select any effective date 30 or more days after publication, *see* 5 U.S.C. § 553(d), in the Consumer Product Safety Act Congress decided that safety standards will presumptively take effect within 30 to 180 days. While Congress provided the Commission with flexibility to select a date within this range, the Commission may exceed the 180-day maximum only when it "finds, for good cause shown, that a later effective date is in the public interest," 15 U.S.C. § 2058(g)(1). The Commission made no such finding here, and instead found that the effective date of 180 days after publication was reasonably necessary, 16 C.F.R. § 1260.4(f)(6).

The Commission's decision not to override Congress's presumption that safety standards should take effect within 180 days should not be lightly set aside, for several overlapping reasons. By honoring the presumption, the Commission and this Court show appropriate "respect

for Congress's prerogatives as policymaker." *Murphy v. Smith*, 138 S. Ct. 784, 788 (2018). And the Commission's discretionary determination concerning the public interest should be reviewed—if at all—highly deferentially. *See Drake v. Fed. Aviation Admin.*, 291 F.3d 59, 72 (D.C. Cir. 2002) (noting difference between whether standard is objectively met and whether agency believes standard is met, and stating that latter formulation "exudes deference" to the agency (quoting *Webster v. Doe*, 486 U.S. 592, 600 (1988))).

In this case, the Commission's explanation satisfies any plausibly applicable standard of review. Among other things, the Commission (1) highlighted the absence of any suggestion "that a longer effective date creates a material reduction in the estimated costs of the rule," Final Rule 73,177; (2) pointed to existing technologies that satisfy the 2018 stock standard, *id.*; (3) observed that companies had redesigned products to comply with the Canadian standard, *id.*; and (4) found that comments advocating a later effective date were "not specific or substantiated," *id.*, and "had clear credibility problems," SA2; *see* Final Rule 73,189.[2]

---

[2] Petitioner attributes to the Commission various statements made by its staff. *See, e.g.*, Mot. 13 (claiming that "CPSC has acknowledged"
*Continued on next page.*

Petitioner asks this Court to re-weigh the evidence and conclude that industry could not accommodate the statutory default. It is telling that in doing so, petitioner relies principally upon new declarations submitted in this litigation regarding differences between products used in Canada and those that would comply with the Rule. The Commission stated in the rulemaking that "a number of commenters arguing for a delayed effective date are known to sell in Canada, and yet they did not address how the Canadian rule impacts compliance with [the Commission's] final rule," Final Rule 73,177. Petitioner is not entitled to address that deficiency now. *See Fla. Power & Light Co.*, 470 U.S. at 743.

In any event, "[o]nce assured the Commission has engaged in reasoned decisionmaking, it is not for [the Court] to reweigh the conflicting evidence or otherwise to substitute [its] judgment for that of the Commission." *Ind. Mun. Power Agency v. Fed. Energy Reg. Comm'n*, 56 F.3d 247, 254 (D.C. Cir. 1995). That is particularly true where "the task facing the [Commission] was to make a prediction about future facts," as "agencies should be given a wide berth when

_____

that "the industry will not have compliant corded products available in six months"). The Commission was not bound by staff recommendations, and where the Commission disagreed with staff, it explained why.

making predictive judgments." *Bd. of Cnty. Comm'rs v. Dep't of Transp.*, 955 F.3d 96, 99 (D.C. Cir. 2020). Section 2058(g) "confers broad discretion on the Commission," *ASG Indus. v. CPSC*, 593 F.2d 1323, 1335 (D.C. Cir. 1979), and it did not abuse that discretion here.

### 3. The Commission Complied With Notice-And-Comment Requirements.

The Commission satisfied notice-and-comment requirements, *contra* Mot. 16-18. A final rule need not be identical to a proposed rule, and violates the logical outgrowth doctrine only if it differs from the proposed rule in a manner that deprives parties of meaningful notice and opportunity to comment. *See, e.g.*, *AFL-CIO v. Donovan*, 757 F.2d 330, 338 (D.C. Cir. 1985). The Final Rule—which is functionally identical to the proposed rule, other than providing some additional flexibilities for industry—readily satisfies this standard.

1. Petitioner does not suggest that the Final Rule itself deviated in any significant way from the proposed rule. It instead points to certain points of analysis in the preamble to the Final Rule that were not included in the proposed rule. None of these points deprived petitioner of a meaningful opportunity to comment.

Petitioner first complains that "the final Rule included estimates of the cost to develop compliant products, while the proposed Rule contained no such analysis." Mot. 16 (citations omitted). Petitioner does not and could not argue that it was deprived of an opportunity to comment on this topic; the notice of proposed rulemaking recognized that "product development and design innovations" would "add further costs to implementing uncorded technologies," 87 Fed. Reg. at 1047, and petitioner told the Commission that "industry will need to develop new technologies to meet consumer demand," A753.

There was nothing untoward about waiting to estimate costs until the Commission could do so "[b]ased on comments," including "comments from manufacturers." A564. Petitioner identifies no authority requiring the Commission to invite a round of comment to obtain enough information to develop a methodology regarding a single element of the estimate of the rule's cost to manufacturers and then invite a second round of comment to allow critiques of that methodology; certainly *Owner-Operator Independent Drivers' Ass'n v. Federal Motor Carrier Safety Admin.*, 494 F.3d 188 (D.C. Cir. 2007), which involved the withholding of "the most critical factual material that was used to

support the agency's position," *id.* at 201 (internal quotation marks and alterations omitted), stands for no such proposition.

2.    Petitioner observes that the Commission changed its method for calculating the total number of corded custom window coverings in the United States. *See* Mot. 17. The Commission initially estimated this number by multiplying the number of housing units by the average number of window coverings per unit. *See* A1165. Petitioner's comments criticized these calculations, *see* A749-752, and in the Final Rule, the Commission used a model that "projects the number of products in use given estimates of annual product shipments/unit sales and information on product failure rates over time," Final Rule 73,149. The Commission is entitled to revise its methodology in response to comments; that is the point of notice and comment. All of the figures upon which the Commission relied are publicly available. *See* A591-92. The study that petitioner complains was "not made public," Mot. 17, is a decades-old study generically describing such modeling, and a copy is appended to this opposition. *See* SA5-103.

3.    Petitioner complains that the Commission "analyzed 15 new incident reports never discussed in the proposed Rule." Mot. 17. As the

Commission explained, it "received reports of 15 additional incidents" after extracting data for the proposed rule. *See* Final Rule 73,151. An agency does not violate the APA if its "methodology remain[s] constant" and additional data is "used to check or confirm prior assessments." *Solite Corp. v. U.S. Envt'l Prot. Agency*, 952 F.2d 473, 485 (D.C. Cir. 1991) (per curiam).

4.     Petitioner says that the Commission wrongfully waited until the Final Rule to analyze the 2022 voluntary standard. Mot. 17. That standard was not voted upon until July 15, 2022, more than six months after the notice of proposed rulemaking. *See* Final Rule 73,165. Petitioner cannot force the Commission to continually reopen the comment period by releasing new voluntary standards. *Cf. Solite Corp.*, 952 F.2d at 484. In any case, it "could have petitioned" the Commission to "reopen the notice-and-comment period" so that it could submit comments concerning the 2022 proposal. *See CTS Corp. v. Envt'l Prot. Agency*, 759 F.3d 52, 65 (D.C. Cir. 2014).[3]

---

[3] Petitioner also suggests that the Final Rule is invalid because the Commissioners may only be removed for cause. *See* Mot. 18 n.1. That contention is foreclosed by *Humphrey's Executor v. United States*, 295 U.S. 602 (1935). *See, e.g.*, *Morrison v. Olson*, 487 U.S. 654, 691-92 & n.31

*Continued on next page.*

## B. Petitioner Will Not Be Irreparably Injured Without A Stay.

Petitioner will not be irreparably injured absent interim relief. Irreparable harm is a high standard; the alleged injury must be "certain and great," and "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough." *Wis. Gas Co. v. Fed. Energy Reg. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (internal quotation marks omitted).

Petitioner's irreparable harm contentions overlap with the merits: it contends that "[c]ompliant products will not be available for at least two years," leading to "enormous" financial harm. Mot. 18. As with petitioner's challenge to the effective date, this Court should not lightly reject the Commission's contrary findings. Petitioner "had an incentive to aim high when estimating the . . . cost" of compliance, *Sw. Airlines Co. v. Transp. Sec. Admin.*, 650 F.3d 752, 757 (D.C. Cir. 2011), and "it is not

---

(1988) (highlighting removal provision for commissioners); *id.* at 724-25 (Scalia, J., dissenting) ("Since [the Court's] 1935 decision in *Humphrey's Executor . . .*, removal restrictions have been generally regarded as lawful for so-called 'independent regulatory agencies,' such as . . . the Consumer Product Safety Commission . . . ."); *In re Aiken Cnty.*, 645 F.3d 428, 446 (D.C. Cir. 2011) (Kavanaugh, J., concurring) ("*Humphrey's Executor* is an entrenched Supreme Court precedent, protected by stare decisis.").

for [the Court] to reweigh the conflicting evidence or otherwise to substitute [its] judgment for that of the Commission," *Ind. Mun. Power Agency*, 56 F.3d at 254.

In any case, the Final Rule's effective date is more than five months away, so any potential harm relating to its actually becoming effective is not "of such imminence that there is a clear and present need" for interim relief. *Wis. Gas Co.*, 758 F.2d at 674 (emphasis and internal quotation marks omitted). Nor would a stay provide petitioner meaningful certainty in the interim, since a stay would not preclude the Final Rule's subsequent affirmance. Given that the parties have agreed on an expedited briefing schedule, there is no need to grant a stay now.

## C. The Equities Favor Allowing The Rule To Take Effect.

Finally, the equities and public interest favor the Commission. As it found, "promulgation of the rule is in the public interest" because it "will significantly reduce or eliminate a hidden hazard, strangulation deaths and injuries to children 8 years old and younger, without major disruption to industry or consumers." 16 C.F.R. § 1260.4(g). And "the risk of severe harm and death to young children over the lengthy service life of noncompliant window coverings" outweighs the costs associated

with the rule.  SA3.  In contrast, "the net increase in cost for consumers is as little as approximately $24 every time a household replaces *all* of its custom window coverings approximately every 10 years."  Final Rule 73,171.

## II. The Court Should Not Remand The Final Rule, But The Commission Does Not Oppose Expedition On The Agreed Schedule.

Petitioner's alternative request for a remand under 15 U.S.C. § 2060(b) largely rehashes its erroneous notice-and-comment argument, but seeks the extraordinary relief of summary vacatur—relief not even mentioned in the relevant statute, which is geared toward allowing the Commission to receive additional comments and reassess its own decision.  Mot. 22.  That request lacks merit.

As discussed above, the Commission does not object to expedition on the schedule that petitioner has proposed, and the parties' agreement on an expedited briefing schedule weighs heavily against the entry of interim relief at this time.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant*
*Attorney General*

DANIEL TENNY

*/s/ Steven A. Myers*

STEVEN A. MYERS
*Attorneys, Appellate Staff*
*Civil Division, Room 7232*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*

*(202) 305-8648*

Dated: December 27, 2022

## CERTIFICATE OF COMPLIANCE

This response complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5180 words, excluding those portions exempted by Rule 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 27(d)(1)(E) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Steven A. Myers*
Steven A. Myers

# SUPPLEMENTAL ADDENDUM

# SUPPLEMENTAL ADDENDUM TABLE OF CONTENTS

Consumer Product Safety
Commission Order Dated December 21, 2022 ..................................SA1

Lahr, M.L., Gordon, B.B., 1980. Product Life
Model Feasibility And Development Study.....................................SA5

_____

                                )

In the Matter of                      )

                                )

                                )

The Window Covering Manufacturers Association  )

Request to Postpone Effective Date of Safety     )

Standard                              )

_____)

### ORDER DENYING REQUEST TO POSTPONE THE EFFECTIVE DATE OF SAFETY STANDARD FOR OPERATING CORDS ON CUSTOM WINDOW COVERINGS PENDING JUDICIAL REVIEW

On November 28, 2022, the Commission published the Safety Standard for Operating Cords on Custom Window Coverings in the *Federal Register* at 87 Fed. Reg. 73144 (to be codified at 16 C.F.R part 1260) ("Custom Cord Rule" or "Rule"). On November 30, 2022, the Window Covering Manufacturers Association (WCMA) filed a Petition for Review of the Rule in the United States Court of Appeals for the District of Columbia Circuit. On December 1, 2022, WCMA sought from the Commission a stay of the Rule's May 30, 2023 effective date, pending judicial review. WCMA asserts that its members will suffer irreparable financial and reputational harm if the Rule takes effect before late 2024.

For the reasons given below, WCMA's request for a stay of the May 30, 2023 effective date is denied. WCMA largely repeats claims the Commission extensively addressed and rejected in the Custom Cord Rule. Accordingly, WCMA has not carried its burden of making a strong showing that a stay is warranted.

Under the Administrative Procedure Act (APA), an agency may postpone the effective date of its own action pending judicial review when the "agency finds that justice so requires." 5 U.S.C. § 705. In considering WCMA's request for postponement of the effective date pending judicial review of the Rule, we are guided by the Supreme Court's explanation that a party seeking a stay bears the burden of making a "strong showing" that it is likely to succeed on the merits, that it will be irreparably injured absent a stay, that the balance of equities favors it, and that a stay is consistent with the public interest. *Whole Woman's Health v. Jackson* 141 S. Ct. 2494, 2495 (2021) (per curiam). A stay is not a matter of right even if irreparable injury to the movant might otherwise result. *Nken v. Holder*, 556 U.S. 418, 427 (2009).

Under section 9(g)(1) of the Consumer Product Safety Act (CPSA), the Commission is required to specify the date a new consumer product safety rule is to take effect, which may not exceed 180 days from the date of promulgation unless the Commission finds, for good cause shown, that a later effective date is in the public interest and publishes its reasons for such a finding. 15 U.S.C. § 2058(g)(1). Further, under section 9(f)(3)(A) and (B) of the CPSA, the Commission may not promulgate a consumer product safety rule subject to section 9 unless it makes specific findings, among them that the rule (including its effective date) is reasonably necessary to eliminate or reduce the unreasonable risk of injury associated with such product

and that promulgation of the rule is in the public interest. 15 U.S.C. § 2058(f)(3)(A) and (B).  In assessing WCMA's request, we are mindful of the Commission's prior determinations concerning those requirements, as reflected in the Custom Cord Rule.

Irreparable Injury.  Regarding injury to WCMA's members, the Commission considered essentially the same arguments WCMA now makes in its stay request when it adopted the Custom Cord Rule. The Commission did not "find good cause in the public interest to delay the effective date" beyond the 180-day statutory period.  87 Fed. Reg. 73177.  The Commission further found that the 180-day effective date after *Federal Register* publication that Congress established is reasonably necessary to address the strangulation risk from operating cords on custom window coverings.  *Id.* at 73194.

The Commission assessed whether the development and logistics phases for most custom window coverings to come into compliance require more than a 180-day effective date. Specifically, the Commission determined that:

- A later effective date would not materially reduce the estimated costs of the Rule (87 Fed. Reg. 73177);

- "[C]ordless options are available for nearly all window covering types and many stock product substitutes are available to consumers" (*id.*);

- Methods of eliminating the hazard that are currently used for stock window coverings, based on the ANSI/WCMA-2018 voluntary standard, can be used for or adapted to all but the largest custom window coverings (*id.* at 73170, 73177); and

- Canadian requirements, which cover all stock and custom window coverings without exception, have been successful and provide usable solutions, even for larger custom-sized window coverings. Several major manufacturers source both the Canadian and U.S. markets and have been able to comply with the more stringent Canadian requirements without significant disruption, reflecting that the U.S. industry similarly will be able to meet any design, development, testing and logistics concerns with technologies already in use.  (*Id.* at 73144, 73171-79, 73183, 73194.)

As the Commission further observed, "most of the comments suggesting a longer effective date," which WCMA now references, "were not specific or substantiated," and the handful that provided specific information had clear credibility problems.  *Id.* at 73177, 73189.  At least one manufacturer had commented in the record that 180 days is sufficient lead time "for a painless industry implementation" of the Rule.  *Id.* at 73177.

The Commission also considered the economic analysis prepared by CPSC staff and could not conclude, based on the record compiled, that a longer effective date would materially reduce the estimated costs of the Rule.  *Id.*  The Commission identified the projected compliance costs the Rule imposes on manufacturers of custom window coverings, in the range of an incremental cost of $0 to $35 per window covering and 1-2% of annual revenues.  *Id.* at 73182, 73186.  Ordinary costs of regulatory compliance, however, do not constitute "irreparable" harm.  *See, e.g.*, Wis. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir.1985) (per curiam) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough."); *A.O. Smith Corp. v. FTC*, 530 F.2d 515, 527 (3d Cir. 1976)

("Any time a corporation complies with a government regulation that requires corporation action, it spends money and loses profits; yet it could hardly be contended that proof of such an injury, alone, would satisfy the requisite for a preliminary injunction.").

Harm of stay to third parties.  The Custom Cord Rule was adopted as part of the Commission's effort to address the risk of death or injury from strangulation to children 8 years of age or younger, which has led to an estimated 185 medically treated nonfatal injuries annually from 2009 through 2020, and at least 8 fatal strangulations per year related to window covering cords among children younger than 5 years old.  87 Fed. Reg. at 73193.  Yet the cost to consumers of preventing deaths and injuries from cords on custom window coverings would be just $24 for refreshing the blinds in an entire household approximately once per decade.  *Id.* at 73194.

The Commission's considered view was that any additional delay in implementation of the Rule would lead to the installation of additional unsafe corded window coverings that would threaten families—including unsuspecting guests and future owners of the home—for years to come, and unreasonably "risk the lives of more children to strangulation on hazardous custom products."  *Id.* at 73184.  When balancing the risk of severe harm and death to young children over the lengthy service life of noncompliant window coverings that are installed before implementation of the Rule, against the possibility that stock products or compliant custom products might need to be substituted for noncompliant custom products for a period of time, the Commission unanimously opted for protecting the safety of children and families. *Id.* at 73194.

The Commission weighed arguments against applying the Rule to commercial and educational establishments where custom window coverings are accessible to consumers.  It found no material difference from the rule's beneficial effect in residential settings, while also confirming that commercial installations accessible to consumers are properly within the scope of the Rule.  *Id.* at 73173.

Whether stay serves the public interest.  Delaying the May 30, 2023 effective date beyond the time reasonably necessary for industry to comply would undercut the very purpose of adopting a consumer product safety rule, by exposing children to the unreasonable risk presented by custom operating cord systems that allow for strangulation. *See id.* at 73194.  We again emphasize that our assessment is consistent with Congress's direction in section 9(g)(1) of the CPSA that, except in special circumstances, the effective date for consumer product safety rules such as this one should not exceed 180 days—the period adopted here.

Likelihood of success on the merits.  WCMA contends it is likely to prevail in its challenge to the Rule largely because the Commission did not adequately assess the beneficial impact of WCMA's voluntary standard for custom window coverings, as required under CPSA section 9(f)(3).  On the contrary, the Commission addressed the WCMA/ANSI-2018 standard in detail when it adopted the Rule, and connected the Rule's mandatory requirements to specific, potentially deadly gaps in that voluntary standard. *See* 87 Fed. Reg. 73156-61.

Regarding the unpublished 2022 revision that has not yet taken effect, the Commission explained in the *Federal Register* that under CPSA section 9 a voluntary standard must be finally approved before it can be considered "in existence" as an alternative to a mandatory rule. The Commission nevertheless examined the draft 2022 revision and determined that even if adopted, it would not adequately address unreasonable risks of strangulation to children from

3

hazardous continuous loop operating systems and cords longer than 8 inches on custom coverings. *Id.* at 73165-68.

Neither are WCMA's disputes about cost-benefit analysis sufficient to show likelihood of success on the merits. The CPSC staff's economic analysis extensively considered manufacturing costs and processes, including for commercial establishments covered by the Rule. *Id.* at 73172-74, 73182-83, 73193-95. It showed that the expected costs of the rule, generously estimated, are in the same range as the expected economic benefits, with the exact relationship depending on the assumptions used. *Id.* at 73194-95. This satisfies the CPSA's requirement of a "reasonable relationship" between costs and benefits. 15 U.S.C. § 2058(f)(3)(E).

Having considered the arguments for a stay raised by WCMA, along with the requirements found in the CPSA section 9, including the effective date requirements of section 9(g)(1) of the CPSA, 15 U.S.C. § 2058(g)(1),

IT IS HEREBY ORDERED BY THE COMMISSION that

1. WCMA's request to stay the May 30, 2023 effective date on the Safety Standard for Operating Cords on Custom Window Coverings pending judicial review is denied; and

2. The Secretary of the Commission shall transmit to WCMA this Order denying WCMA's request to stay the May 30, 2023 effective date.

SO ORDERED this  21st day of December, 2022.

BY THE COMMISSION,

ALBERTA
MILLS

Digitally signed by ALBERTA MILLS
Date: 2022.12.21 17:01:25 -05'00'

Alberta E. Mills
Secretary
Consumer Product Safety Commission





Columbus Laboratories

FINAL REPORT

on

PRODUCT LIFE MODEL FEASIBILITY
AND DEVELOPMENT STUDY

to

DEPUTY ASSOCIATE EXECUTIVE DIRECTORATE
FOR ECONOMIC ANALYSIS
U.S. CONSUMER PRODUCT SAFETY COMMISSION

July 14, 1980

by

M. L. Lahr and B. B. Gordon

CPSC-C-78-0091, Task 6, Subtasks 6.01-6.06
Requested by Arlen Slobodow

BATTELLE
Columbus Division
505 King Avenue
Columbus, Ohio 43201


**Battelle**
Columbus Laboratories

**Date**    July 14, 1980

**To**    David Pomeroy, HICS, CPSC

**From**    Michael L. Lahr, BCL   *M.L.L.*

**Subject**    CPSC-C-78-0091  Task 6 Subtasks 6.0106.06
Product Life Model Feasibility and Development Study

Enclosed is one copy of the final report on our Product Life Model Feasibility
and Development Study. A set of pages describing the use of the gamma function
addition to CPSFORE and the computer code deck will be sent under separate cover.

I will be available for limited consultation regarding the model and its use
as well as any additional questions you may have regarding the report. My
number is 976-4073.

It has been an interesting and developmental study for myself and others that
worked on this project. I hope that we may work together again in the future.

cc.  Mr. Walter R. Hobby, DAED/HIC, CPSC (1 bound copy and 1 camera-ready copy)
     Ms. Joyce Lawn, Contracts Specialist (cover memo and title page only)

## EXECUTIVE SUMMARY

This report presents the results of Task 6, a study of
product life models.  Such models will provide The Consumer Product
Safety Commission (CPSC) with estimates of the ages of products in
use for the analyses of the impacts of proposed regulations.

A theory of product life estimation that deals with the
concepts of resistance and stress is presented.  Resistance is a
measure of the ability of a product to perform its function.  Stress
is a measure of the threat to continued use of a product.  These
concepts combined in a simulation model would constitute the basis for
a new product life model.  However, preliminary interviews and a
literature review showed that (a) little product life data were
available and (b) available data were not applicable to the new model
concept.  Based on these findings, CPSC decided to change the focus
of Task 6 to improving CPSFORE, the product life model now in use by
CPSC.

CPSC provided Battelle with a list of suggested improvements
to CPSFORE.  The suggested improvements that required programming
changes were made.  One improvement required analysis of the process
to select product age distributions and parameters based on product
characteristics.  To obtain data for this analysis, a pilot survey of 20
products was conducted by Market Facts, Inc.  Sufficient numbers of
responses were obtained for 10 products to permit comparison of actual
and standard distributions.  The gamma distribution was selected to
model the product age distributions based on similarity between shapes
of frequency distributions and ease of calculation of parameters.

The estimated parameters calculated for the gamma distributions
were compared to product characteristics.  The shape parameter, $k$, appears
to be related to the average purchase cost per year of expected life and
to typical repairability.  The scale factor $\lambda$, is almost inversely
proportional to the expected life of the product.  This analysis led to
the hypothesis that $k$ should be estimated based on cost, repairability,
and average expected life of a product.  Then $\lambda$ can be found by dividing

k by the average expected life.  However, this hypothesis is based on
small amounts of data from a pilot survey.

A larger survey and additional analysis are still required
to verify the hypothesis with a reasonable degree of confidence.
In addition, CPSFORE must be modified to accept gamma distributions for
product life distribution.

# TABLE OF CONTENTS

INTRODUCTION 1

Background 1

Objectives and Scope 2

Research Approach 2

A Theory of Product Life Estimation 3

Feasibility of Model Development 3

Suggested Improvements in the CPSFORE Model 3

The Pilot Consumer Survey 3

Distribution Selection and Parameter Development 4

Report Contents 4

A THEORY OF PRODUCT LIFE ESTIMATION 4

Terminology 4

Resistance 5

Stress 5

Failure Occurrence 5

Failure Mode Functions 6

Failure Modes 9

Random Failures 9

Wear Failures 10

Fashion Failures 11

Application of the Theory 12

FEASIBILITY OF MODEL DEVELOPMENT 13

Data Requirements 13

Data Availability 13

Implications of Data Availability 14

SUGGESTED IMPROVEMENTS IN THE CPSFORE MODEL                          15

THE PILOT CONSUMER SURVEY                                            15

  Survey Objective and Scope                                15

    Products Surveyed                            16

    Questionnaire Development                     16

  Survey Coverage                                           17

    Product Response Level                        17

    Previous Product Unit Service Life Response   18

DISTRIBUTION SELECTION AND PARAMETER DEVELOPMENT                     19

  Brief Service-Life Probability Distribution Descriptions  19

    The Hazard Function                          20

    The Exponential Distribution                 21

    The Weibull Distribution                     23

    The Gamma Distribution                       24

    The Log-Normal Distribution                  26

    The Gumbel (Extreme-Valve) Distribution      27

  Distributions Applicable to CPSFORE                       30

    Estimation of Gamma Parameter                30

    Estimation of Log-Normal Parameters          31

    Estimation of Weibull Parameters             32

  Preliminary Product to Distribution Pairings              34

    Selection Rationale                          34

    Product to distribution Pairings             34

  Post Pairing Analysis                                     35

    Gamma Distribution Parameter Evaluation      35

    Future Research Possibilities                47

IMPROVED ACCURACY OF THE CPSFORE MODEL                    49

  Improvements Made to Date                               49

  Proposed Improvements                                   49

REFERENCES OF PRODUCT LIFE                                50

FINAL REPORT

· on

PRODUCT LIFE MODEL FEASIBILITY
AND DEVELOPMENT STUDY

to

DEPUTY ASSOCIATE EXECUTIVE DIRECTORATE FOR ECONOMIC ANALYSIS
U.S. CONSUMER PRODUCT SAFETY COMMISSION

from

BATTELLE
Columbus Division

July 14, 1980


## INTRODUCTION

### Background

This report presents the results of a study of product life
models. The Consumer Product Safety Commission (CPSC) needs data concerning
the distribution of ages of products in use for the analysis of the impact
of proposed regulations. A product life model is a tool for estimating the
distribution of product ages based on characteristics of the particular
product.

CPSC currently uses a computer model, named CPSFORE, to estimate
the number of units of a particular product in use as a function of age.
CPSFORE lacks a basis for assigning a product survival distribution. In
addition, there were several areas of improvement needed in the operation
of CPSFORE.

## Objectives and Scope

Battelle was originally requested to (1) investigate the
feasibility of developing a product life model and (2) develop and test
a product life model, if such a model were deemed feasible. The pre-
liminary activities on this study made it clear that the data required
to develop a more refined model than CPSFORE were not available. Therefore
the objectives of the task were modified to

(1)  Make some required improvements in CPSFORE
(2)  Develop a procedure for selection of appropriate
     statistical distribution and parameters for categories
     of products to be analyzed using CPSFORE.

The first objective was to be achieved by minor programming changes.
The second objective was to be achieved using the results of a survey
designed to acquire data to assist in validation of CPSFORE and in
providing a basis for a refined product life model.

The survey was to cover a list of consumer products of current
or future interest to CPSC. A group of 20 products was chosen by CPSC
for inclusion in the survey. The list of products is shown later in
this report.

## Research Approach

The work plan for Task 6 was comprised of the following
subtasks:

Subtask 6.01 - Literature Search and Synthesis
Subtask 6.02 - Development of Theory of Product Life Estimation
Subtask 6.03 - Formation of Methodological Framework for the
               Product Life Model
Subtask 6.04 - Model Development
Subtask 6.05 - Data Gathering
Subtask 6.06 - Model Testing and Analysis.

Early in Subtask 6.03, it was evident that the data required for an improved
product life model were not available and could not be collected within the
resources of this task. Therefore, Battelle recommended that the focus of

Task 6 be directed toward improvement of the existing product life model, CPSFORE. CPSC decided that this change in direction should be made.

The approach used for achieving the study objectives involved the following set of interrelated subtasks.

## A Theory of Product Life Estimation

This activity involved formulation of a theory of product life estimation. This theory is essentially a way of viewing product life that could be the basis of a refined product life model. The theory also provided guidance in selecting data to be sought by the survey to be conducted.

## Feasibility of Model Development

This activity involved examining the feasibility of developing a refined product life model. It was apparent that the lack of available data would not permit development of a refined product life model at this time.

## Suggested Improvements in the CPSFORE Model

This activity involved making some improvements in CPSFORE suggested by CPSC to improve the utility of that model.

## The Pilot Consumer Survey

This activity involved arranging for, designing, and conducting a consumer survey to collect data related to product life and the factors affecting product life. The results of the survey do provide some of the required data, but also indicate the need for additional analysis of the survey data and additional data collection.

## Distribution Selection and Parameter Development

This activity involves analysis of the service life distributions
obtained from the survey results and comparisons of those distributions
with various standard distributions. This analysis led to a procedure for
selecting a standard distribution and the associated parameters to be
used by CPSC in the application of CPSFORE.

## Report Contents

The remainder of the report describes the results of each of
the activities mentioned in this section.

## A THEORY OF PRODUCT LIFE ESTIMATION

### Terminology

We will refer to the end of a product's service life as a failure,
although the product may be retired from use without failing, in the
usual meaning of that word. This failure can occur because of (1) breakage
as in the case of architectural glass, (2) inoperability such as a lawnmower
that won't run or a battery that won't hold a charge, (3) wear-out as in
the case of an upholstered chair that is threadbare, (4) obsolescence
such as a gas space heater replaced by a safer, more economical furnace
or (5) style such as a clothing garment that is out-of-style. These
various kinds of failure are not independent. For example, inoperability
can be the result of wear-out or obsolescence can impact a decision not
to repair a fault caused by breakage. However, with these concepts in
mind, we can look at the following approach to describing failure modes.

This approach involves consideration of two elements:
(1) Resistance: A measure of the ability of a product
to perform its function adequately, and
(2) Stress: A measure of the threat to a product's
ability to perform its function adequately.

## Resistance

The factors affecting resistance are:

(1) Strength - If the product is designed well with
large margins for safety it will resist breakage.

(2) Maintainability - If it is economical and simple
to service and repair, the product can be kept
in a failure-resistant state and can be returned to
an operable state after minor failures.

(3) Wear - As a product ages and is used, wear of the
product reduces the safety margin in many components.

(4) Cost - As the cost of a replacement product increases,
the product is more likely to be continued in use.

## Stress

The factors affecting stress are:

(1) Random Occurrences - A product can fail because of
breakage, loss, fire, and other similar accidents.

(2) Desirability - A product can cease to be used if it
becomes undesirable. As fashion changes or improved
products become available, there is less resistance
to replacement of the product with a more desirable one.

## Failure Occurrence

Failure will occur whenever the stress on a product exceeds
its resistance. This is shown diagramatically in Figure 1. In this
diagram, the resistance of the hypothetical product is reduced over
time until a peak in the stress curve exceeds the resistance of the
product. The shape of the resistance and stress curves will vary greatly
depending on the characteristics of the product.



INDEX OF
RESISTANCE
AND STRESS

FIGURE 1.   FAILURE OCCURRENCE

Using the concept of resistance and stress, we can hypothesize
various shapes for the curves for specific products.  The shapes of the
resistance and stress curves result in different patterns of failure and
different product life distributions.

## Failure Mode Functions

There are three types of curves that will be used in the
following discussion.  These will be  clarified in this section.

The first curve is a <u>hazard</u> <u>function</u>.  This curve describes the
proportion of the units of a product in use that will fail as a function
of the age of the product.  An example is shown in Figure 2.  The curve
is interpreted to mean that about 8 percent of the products will fail
during their first year of use; that about 50 percent of the products
in use that are 4 years old will fail during the year; and that almost
100 percent of products 7 years old will fail during the year.  In
general, the percentage of the units of a product in use that fail will
be low for new units and increase to almost 100 percent for very old units.



PERCENTAGE OF
UNITS IN USE
THAT FAIL
DURING A YEAR

FIGURE 2.   EXAMPLE HAZARD FUNCTION

The second curve is a cummulative failure curve.  In statistical terms this is called the distribution function.  This curve describes the percentage of units of a product in use that has failed by any age.  An example is shown in Figure 3.



PERCENTAGE OF
UNITS THAT WILL
HAVE FAILED

FIGURE 3.   EXAMPLE CUMMULATIVE FAILURE CURVE

This curve is interpreted to mean that 8 percent of the units of a product
will have failed during the first year of its use; by the end of the third
year 50 percent of the units will have failed; and by the end of the sixth
year more than 99 percent of the units will have failed.

Cummulative failure curves, by definition, must start at 0 and
approach 100 percent as a limit. Note that 100 minus the cummulative
failures is the percent of units of a product still in use as a function
of age.

The third curve is the <u>failure distribution curve</u>. In statistical
terms this is called the <u>probability density function</u>. This curve describes
the proportion of the units of a product that will fail during each year of
its potential lifetime. An example of this curve is shown in Figure 4.



PERCENTAGE
OF UNITS
THAT FAIL

FIGURE 4. EXAMPLE FAILURE DISTRIBUTION CURVE

The curve is interpreted to mean that 8 percent of the units of a product
put into use will fail during the first year; 17 percent during the second
year; 25 percent during the third year, etc. The sum of all of the ordinates
will be 100 percent, since all of the products will fail eventually.

There are mathematical relationships between the three curves,
that make it possible to derive the other two curves from any one. These
relationships are

9

$$h(t_1) = \frac{f(t_1)}{1 - F(t_1)} \quad , \text{ and}$$

$$F(t_1) = \sum_{t=0}^{t=t_1} f(t)$$

Where $h(t_1)$ is the hazard function of a product's service life evaluated at time 1.

$f(t_1)$ is the probability density function of a product's service life

and  $F(t_1)$ is the distribution function at $t_1$ of a product's service life

### Failure Modes

Some of the possible product failure modes will be discussed in this section using the terminology defined above.

### Random Failures

If a failure is purely random, there is no change in resistance over time and there is a large random component to stress. The resistance and stress (R/S) curves are shown in Figure 5.



FIGURE 5.   RANDOM FAILURE - R/S CURVES

Architectural glass approaches this type of failure. The resistance curve is essentially constant throughout the life of the glass. The stress resulting from accidental breakage, remodelling, or building demolition occurs frequently with glass that is still very serviceable.

SA21

10

This type of failure is equivalent to a constant hazard rate. See Figure 6(a). This results in an exponentially decreasing failure distribution as shown in Figure 6(b), and a cummulative failure curve, exponentially approaching 1 as shown in Figure 6(c).



FIGURE 6.  RANDOM FAILURE

Wear Failures

If a failure is a result of wear, the resistance will decrease with time until a relatively small random stress results in failure. The resistance and stress curves are shown in Figure 7.



FIGURE 7.  WEAR FAILURE - R/S CURVES

Automobile batteries approach this type of failure. There is some possibility of early failure from accident or misuse, but usually failure occurs when the lead is depleted or sediment builds up, both wear type phenomena.

This type of failure results in a steep rise in the hazard rate (Figure 8(a)), a narrow function in the cummulative failure distribution (Figure 8(b)), and a steep rise in the cummulative failure curve as shown in Figure 8(c).



FIGURE 8.  WEAR FAILURE

## Fashion Failures

If the failure of a product results largely from going out of fashion, the stress curve increases greatly.  This going out of fashion could result from changes in style or improvements in product performance or safety.  Resistance and stress curves are shown in Figure 9.



FIGURE 9.  FASHION FAILURE - R/S CURVES

These curves are typical of any product that is subject to major periodic
model changes. The definition of failure that is used for this report
is important in understanding fashion failures. A unit has failed if it
is not used because it is out of style, although the unit is still
capable of performing its intended function. The fashion failure results
in a rapidly increasing hazard rate as shown in Figure 10(a). The failure
distribution curve (Figure 10(b)) and the cummulative failure curve
(Figure 10(c)) are very similar to the curves for a wear failure, except
they are steeper than for a wear failure.



FIGURE 10. FASHION FAILURE

Most products will fail in a combination of modes and will not
produce actual distributions that are like the idealized functions shown
above.

## Application of the Theory

There are two major ways to use this theory of product life
estimation. First, the theory might be used as the basis for a product
life simulation model. This simulation would require the availability
(collection) of data regarding product resistance and stress. The simulation
would use Monte Carlo techniques to generate a product life distribution for
use in economic analysis. The second use of the theory would be to assist
in understanding failure modes so that the selection of standard distribu-
tions and parameters for use in CPSFORE could be done more systematically.

## FEASIBILITY OF MODEL DEVELOPMENT

### Data Requirements

There are several data problems related to the use of a simulation model to develop product life distributions (the first potential use for the theory). Very little data are available regarding the factors of resistance and stress as defined above. In past research on product life the emphasis has been on increasing product life without examining distributions of product life or the product characteristics that lead to the distributions. To produce the required data, a long term program involving (1) more specific definition of data requirements, (2) extensive data collection for a variety of products, and (3) establishment of a data processing system to analyze the data should be developed. It was not possible to accomplish this during the current task, but CPSC should consider an ongoing activity to improve its ability to estimate product life distributions.

The data needs to determine the proper distribution and parameters as an input to CPSFORE are much less demanding. For this application, all that is needed are historical product life distributions. An analysis of the historical data and product characteristics would then produce a procedure for estimating life distribution and parameters for new product analyses. Battelle discussed these problems with CPSC and presented the viewpoint contained above. CPSC then decided the focus of the task should be on improving its existing product life model, CPSFORE, rather than developing a new model.

### Data Availability

Data availability has direct impact on the character and scope of any practicable model. If little data are available either a less demanding model must be developed, or additional activity to produce a desired set of data must be undertaken. For this reason, a series of interviews with Battelle staff and industry contacts was held to determine the level of data availability as well as to specify what would be involved in data collection activities.

During the interviews it was determined that little useful data were available. For example, products such as architectural glass and home insulation generally last the lifetime of the home in which they are installed. Manufacturers and trade associations, therefore, tend to claim a life of at least forty years for these products. Higher estimates would be expected in a more intense investigation.

For the remainder of the products, service life data were found to be very scarce. Some contacts knew an approximate value and range for the service life of the product in question. However, none of the contacts admitted to having printed data on the distribution of failure modes or mean service life for a product.

An early discussion with Market Facts, Inc. in Washington, D.C. and information obtained during the literature search indicated that data in the form desired would be difficult to obtain from secondary sources. Data available from industry sources would have been developed for other uses, possibly promotion, and might not be usable for calibrating a model. Market Facts suggested a customized consumer survey would be the best method to realize such data.

## Implications of Data Availability

Although the theory of product life estimation previously described is a logical approach, the availability of data proves it to be impractical in the short term. Data on resistance and stress levels are, at least, difficult to estimate. The various failure modes of a product are usually known, but the proportion of failures due to each failure mode is virtually unknown.

Based on the CPSC decision to improve the existing product life model, a list of suggested improvements in the CPSFORE model was obtained from CPSC on November 28, 1978. It was decided that the needed improvements would be incorporated and an improved version of the model would result. It was also decided that the parameters needed for the CPSFORE model improvement could be estimated from data obtainable from a consumer survey. Therefore, CPSC authorized a pilot consumer survey and let Battelle make the suggested improvements in the CPSFORE model.

## SUGGESTED IMPROVEMENTS
## IN THE CPSFORE MODEL

As a result of the feasibility study of the developed theory
Battelle recommended revamping the existing CPSFORE model following the
guidelines set forth in the November 28, 1978, memo from CPSC. The guide-
lines listed six areas where improvements in the model could be made. The
following is a summary of the needs identified by CPSC.

(1) Criteria, based on product characteristics, which will
determine distribution choice for each product.

(2) Ability to arrive at accurate stock figures without
forecasting far into the future nor without developing
data for the distant past

(3) More efficient error response

(4) Ability to read entire cohort matrix for forecasts of any
future

(5) Output format changes
a. printout of product name
b. printout of distribution chosen and parameters used
c. printout of historical data used as inputs

(6) Inclusion of the number of products in service one year
after production in the cohort matrix.

## THE PILOT CONSUMER SURVEY

### Survey Objectives and Scope

In Battelle's previous correspondence with CPSC dealing with a
product life model, a working paper dated February 23, 1979, Battelle
recommended the design of a pilot survey for the "acquisition of the data
required to validate the CPSFORE model". This survey was designed to help
in the assignment of statistical distributions to specified consumer products,
one of the "needed improvements".

## Products Surveyed

As Subtask 6.06 of this study, Battelle was to test the model using up to twenty products identified by CPSC provided data could be obtained for each of the products. The survey was undertaken to satisfy these data needs. The products for which the survey questionnaire was developed were:

(1) Portable hair dryers with a hood
(2) Blow hair dryers
(3) Electric automatic drip coffee makers
(4) Water heaters
(5) Electric lawn mowers
(6) Gasoline lawn mowers (walk-behind type)
(7) Unvented gas space heaters
(8) Wood or coal heating stove
(9) Wall-to-wall carpeting
(10) Bath mats or rugs
(11) Sleepwear for children age 12 and under
(12) Extension cords
(13) Aluminum extension ladders
(14) Backyard playground equipment sets
(15) Upholstered furniture with original fabric
(16) Aerosol spray paints in cans
(17) Bicycles with balloon tires
(18) Bicycles with high pressure tires
(19) Cellulose home insulation
(20) Window glass including storm windows

## Questionnaire Development

The survey was designed to cover the following topics:
(1) Product service life
(2) The level of product maintenance
(3) Product failure modes
(4) Product quality

(5)  Reasons for product purchase

(6)  Age of product at time of purchase

(7)  Product disposal modes

The questions vary for certain products due to the characteristics of the products involved.  A copy of the final survey questionnaire is included in Appendix A.

## Survey Coverage

The survey was conducted by Market Facts, Inc., using a controlled mail panel facility.  The final copy of the questionnaire was mailed to 205 households of which 178 responded.

## Product Response Level

The following is the product-by-product response level:

| Product | Response |
|---|---|
| Portable hair dryers with a hood | 49 |
| Blow hair dryers | 129 |
| Electric automatic drip coffee makers | 80 |
| Water heaters | 151 |
| Electric lawn mowers | 50 |
| Gasoline lawn mowers (walk-behind types) | 119 |
| Unvented gas space heaters | 36 |
| Wood or coal heating stoves | 58 |
| Wall-to-wall carpeting | 110 |
| Bath mats or rugs | 145 |
| Sleepwear for children age 12 and under | 109 |
| Extension cords | 169 |
| Aluminum extension ladders | 71 |
| Backyard playground equipment sets | 62 |
| Upholstered furniture with original fabric | 150 |
| Aerosol spray paints in cans | 151 |
| Bicycles with balloon tires | 61 |
| Bicycles with high pressure tires | 89 |

| Product | Response |
|---|---|
| Cellulose home insulation | 30 |
| Window glass including storm windows | 153 |

The results of the survey probably do not describe the characteristics of
the covered products for the United States population due to the survey
technique used. The technique was that of maximizing the number of products
covered by each respondent. Cost factors demanded the use of such a survey.
However, it was assumed that the resulting analysis would not be greatly
biased by the use of the survey data.

Previous Product Unit
Service Life Response

To facilitate the development of service life distributions,
questionnaires for 16 of the products involved in the survey included a
question regarding the age of the previous unit of the subject product at the end
of its service life. The previous unit means the unit of the subject product
owned prior to the one currently possessed. The following indicates the
response level for that question.

| Product | Response |
|---|---|
| Portable hair dryers with a hood | 16 |
| Blow hair dryers | 59 |
| Electric automatic drip coffee makers | 12 |
| Water heaters | 70 |
| Electric lawn mowers | 12 |
| Gasoline lawn mowers (walk-behind type) | 70 |
| Unvented gas space heaters | 24 |
| Wood or coal heating stoves | 11 |
| Bath mats or rugs | 104 |
| Sleepwear for children age 12 and under | 87 |
| Extension cords | 63 |
| Aluminum extension ladders | 7 |
| Backyard playground equipment sets | 12 |
| Upholstered furniture with original fabric | 103 |
| Bicycles with balloon tires | 22 |

| Product | Response |
|---|---|
| Bicycles with high pressure tires | 28 |

To describe in more detail what a response to this questions means, the product "portable hair dryers with a hood" will be used.

(1) The responding household owned a portable hair dryer with a hood at the time of the questionnaire mailing

(2) The responding household owned a portable hair dryer with a hood prior to that which they owned at the time of the questionnaire mailing

(3) The responding household could estimate the age of the portable hair dryer with a hood when it was no longer used, and

(4) The responding household decided to answer the question.

The surveyed distributions for age of each of these products when it was no longer used is shown in Figures B-1 to B-16 in Appendix B.

## DISTRIBUTION SELECTION AND
## PARAMETER DEVELOPMENT

### Brief Service-Life Probability
### Distribution Descriptions

This section is concerned with distributions applied as service life models for components or systems. Two of these--the exponential (or Poisson) and Weibull distributions were included in The User's Guide for the Product Forecasting Model (CPSFORE). Three others--the gamma, log-normal and Gumbell (Type I extreme-value) distributions--are introduced for the first time.

## The Hazard Function

As mentioned earlier in the theory of product life estimation, the hazard function describes the proportion of products in use that fail or are retired from service with respect to the age of a product. It is also known as the conditional failure function, the intensity function, or the force of mortality and is expressed mathematically as

$$h(t) = \frac{f(t)}{1-F(t)} \tag{1}$$

where $f(t)$ and $F(t)$ are the probability density and distribution functions for service life.

A hazard function appropriate for many phenomena, including even human life, is the so-called "bathtub curve" shown in Figure 11. For an initial time up to $t_0$, $h(t)$ is relatively large but decreasing in value because of "infant mortality". Translated into product terms, a high frequency of early failures may be attributed to manufacturing defects. Subsequently, $h(t)$ remains nearly constant until time $t_1$, after which it increases due to wear-out failure. In consumer products, the new product failure rate is generally low due to manufacturing quality control and warranties. A warranty allows repairs or replacement of the product to occur without cost to the consumer other than inconvenience. But doesn't mitigate against failures occuring.



FIGURE 11. THE "BATHTUB CURVE" HAZARD FUNCTION

## Hazard Functions of Common
## Distributions

The following hazard functions are shown in Figure 12. (1) Normal distribution with μ=5 and σ=1;* (b) uniform distribution between 0 and 10; and (c) an exponential distribution with λ=0.2**. The normal distribution is not truly applicable as a service-life model because a normally distributed variate can take on negative values, whereas service life cannot be negative. The uniform distribution, which is different than that described in the CPSFORE user's guide, is limited as a service life model because there is a specified upper limit before which the failure of the product must occur. Therefore, its hazard rate approaches infinity as t approaches the upper limit since all the units that have not yet failed must fail within a smaller and smaller interval.



FIGURE 12.   HAZARD FUNCTIONS FOR NORMAL, UNIFORM
AND EXPONENTIAL DISTRIBUTIONS

---

\* For a normal distribution μ is the mean value and σ is the standard
deviation.

The hazard function for an exponentially distributed variate is a constant. This result and its implications are discussed below.

## The Exponential Distribution

The exponential probability density function (or more precisely, the negative exponential distribution)

$$f(t;\lambda) = \lambda e^{-\lambda t}, \quad t \geq o, \ \lambda > o \tag{2}$$

is the most familiar service life distribution. It plays a central role in reliability, comparable to that of the normal distribution in other applications.

From equations (1) and (2), the hazard function for an exponentially distributed variate is

$$h(t) = \frac{\lambda e^{-\lambda t}}{1 - \int_0^t \lambda e^{-\lambda y} dy} = \frac{\lambda e^{-\lambda t}}{e^{-\lambda t}} = \lambda \tag{3}$$

Thus the probability of failure during a specified time interval is a constant. Hence, is often referred to as the failure rate.

## The Weibull Distribution

Due to the inadequacy of the exponential distribution as a model for service life, the Weibull distribution, which in reality is a family of distributions, has recently emerged as the most popular measure for service life. Whereas the applicability of the exponential distribution is limited because of a constant hazard rate, the family of Weibull distributions can be written to include increasing and decreasing hazard rates as well.

The Weibull distribution results from the hazard function

$$h(t) = \frac{\beta}{\delta} \left(\frac{t}{\delta}\right)^{\beta-1} , \quad \beta, \delta > 0; \quad \underline{t \geq 0} \tag{4}$$

Its probability density function is

$$f(t; \beta, \delta) = \frac{\beta}{\delta} \left(\frac{t}{\delta}\right)^{\beta-1} \exp\left[-\left(\frac{t}{\delta}\right)^{\beta}\right] \tag{5}$$

Where $\delta$ is the scale parameter and $\beta$ is the shape parameter.

The hazard function and the probability density function for the Weibull distribution have a wide variety of shapes (see Figures 13 and 14). In particular, when $\beta > 1$, the Weibull probability density function is single-peaked, and the hazard function increases with t; for $\beta > 1$, the probability density function is reverse J-shaped, and the hazard function decreases with t. When $\beta = 1$, the hazard function is a constant, and the Weibull function is equivalent to the exponential distribution; in this case, the Weibull scale parameter $\delta$ is the reciprocal of the exponential distribution parameter $\lambda$.



FIGURE 13.   HAZARD-RATE CURVES FOR THE
WEIBULL DISTRIBUTION $\delta=1$.



FIGURE 14.  WEIBULL DENSITY FUNCTIONS

## The Gamma Distribution

Like other life-test models, the gamma distribution has been advanced
as a service life distribution on both theoretical and empirical grounds.  The
gamma distribution can be considered a generalization of the exponential
distribution where failure takes place as soon as exactly k events have
occurred, assuming events occur independently at a constant rate.  As k
increases, the gamma distribution approaches the shape of a normal distribution.
Figure 15 shows examples of gamma distributions.



FIGURE 15.  SOME GAMMA DISTRIBUTIONS, λ=1.

The gamma probability density function is

$$f(t; k,\lambda) = \frac{\lambda^k t^{k-1} e^{-\lambda t}}{\Gamma(k)} \quad , \quad t \geq 0; \; \lambda, k > 0 \tag{6}$$

Where $\Gamma(k)$ is the gamma function

$$\Gamma(k) = \int_0^\infty t^{k-1} e^{-t} dt \tag{7}$$

k is the shape parameter

and $\lambda$ is the scale parameter

and t is the time period to be evaluated.

Figure 16 shows some examples of gamma hazard functions.



FIGURE 16.  HAZARD RATE CURVES FOR THE
GAMMA DISTRIBUTION, $\lambda=1$

### The Log-Normal Distribution

The log-normal and the gamma distributions are sometimes used inter-
changeably in certain cases due to the similarity of some of their hazard
functions (see Figures 16 and 17).  The justification of the log-normal
distribution to represent service life is based on the multiplicative-effect
properties of that distribution.  That is, the log-normal distribution can
be derived as the model for a system which fails from the multiplication of
many small flaws.



FIGURE 17. HAZARD FUNCTIONS FOR LOG-NORMAL
DISTRIBUTIONS WITH DIFFERENT
PARAMETER VALUES

The popularity of the log-normal distribution is in part due to
the ease in obtaining its percentiles, since cumulative values for y = ln t
can be obtained from the tabulation of the standardized normal distribution
and the corresponding values of t are found by taking antilogs.

The log-normal distribution is the model for a random variable
whose natural logarithm follows the normal distribution with parameters
μ and σ. Hence the probability density function t is

$$f(t;\mu,\sigma) = \frac{1}{2\pi\sigma t} \exp\left[-\frac{1}{2\sigma^2}(\ln(t)-m)^2\right], t>0, \quad -\infty<\mu<\infty, \quad \mu>0 \quad (8)$$

This distribution has a variety of shapes for non-negative variates (those usable in service life applications) as can be seen from Figures 18 and 19.  Note that μ and σ are scale and shape parameters respectively and not location and scale parameters as in the normal distribution.

## The Gumbel (Extreme-Value)
## Distribution

The Type I asymptotic distribution of smallest or largest extreme is also known as the Gumbel distribution and is often used as a service life model for series or parallel electrical systems, as well as in cases where failure is due to corrosive processes.

The hazard functions and probability density functions for the Type I asymptotic distributions for the largest and smallest extremes respectively are

$$h(t) = \frac{\exp[\,-(1/\eta)\,(t-\partial)]}{\eta,\{\exp[e^{-(1/\eta)\,(t-\partial)}]-1\}},$$ (9a)

$$h(t) = \frac{1}{\eta}\exp\left(\frac{t-\partial}{\eta}\right),$$ (9b)

$$f(t;\mu,\sigma) = \frac{1}{\eta}\exp\left[-\frac{1}{\eta}(t-\partial)-e^{-(1/\eta)\,(+-\partial)}\right]$$ (10a)

$$f(t:\partial,\eta) = \frac{1}{\eta}\exp\left[\frac{1}{\eta}(t-\partial-e^{(1/\eta)\,(t-\partial)}\right]$$ (10b)

$$t>0,\ -\infty <\partial <\infty,\ \eta>0$$

Where $\partial$ is the mode and $\eta$ is a scale parameter.

Plots for $\partial = 5$ and $\eta = 1$ are shown in Figures 20 and 21.



FIGURES 18 and 19.  VARIOUS LOG-NORMAL DISTRIBUTIONS



FIGURE 20. HAZARD FUNCTIONS FOR TYPE I
EXTREME-VALUE DISTRIBUTIONS



FIGURE 21. TYPE I EXTREME-VALUE DISTRIBUTIONS

## Distributions Applicable to CPSFORE

Of the aforementioned service life distributions, only the gamma, exponential, and log-normal have parameters which can easily be calculated. Weibull and Type I extreme value parameters must be derived through extensive calculations and/or plotting of survey data. This section will deal with the estimation of parameters for the gamma, log-normal, and Weibull distributions.

The exponential distribution will not be discussed, since it is a member of both the gamma and Weibull distributions, as well as being listed as the Poisson distribution in the CPSFORE user's guide. The Type I extreme value distribution will not be dealt with due to its limited application in consumer products and because of the difficulty incurred in calculating its parameters.

### Estimation of Gamma Parameters

The gamma distribution is the most valuable of the distribution to the CPSC. Not only does it include one of the better varieties of hazard functions, but its parameters can be estimated easily from survey data. The simplest method based on matched moments is

$$\hat{\lambda} = \frac{\bar{t}(n-1)}{\sum\limits_{i=1}^{n} (t_i - \bar{t})^2} = \frac{\bar{t}}{s^2} \ ) \qquad (11)$$

where     $\bar{t}$ is the expected life of the product,

$s^2$ is the variance in the expected life of the product,

and the $t_i$; i=1,2,.....n are the observed life lengths.

Equivalently

$$\hat{\lambda} = (n-1) \left[ \frac{\sum\limits_{i=1}^{n} t_i}{n \sum\limits_{i=1}^{n} t_i^2 - (\sum\limits_{i=1}^{n} t_i)^2} \right]$$ (12)

the estimate of k is

$$\hat{k} = \frac{\bar{t}^2 (n-1)}{\sum\limits_{i=1}^{n} (t_i - \bar{t})^2}$$ (13)

or

$$\hat{k} = \hat{\lambda} \bar{t}$$ (14)

In some applications of the gamma distribution, k is known, and only $\lambda$ needs to be estimated from data. For example, in representing the time for k independent events to take place, only the rate of occurence $\lambda$ might be unknown. When the gamma distribution is used as a service life distribution, k is likely to be the same for similar products and can be determined from past experience. In such situations, $\lambda$ can be estimated by equation (14).

Estimation of Log-Normal Parameters

The parameters for the log-normal distribution can be calculated from survey data in the same manner in which those of the normal distribution are. Since, for the normal distribution, the parameter $\mu$ is the average life length, the following equation can be used to estimate $\mu$:

$$\hat{u} = \bar{t} = \frac{\sum\limits_{i=1}^{n} t_i}{n} \tag{15}$$

Where $\bar{t}$ is the sample expected life length

n is the number of observed life lengths

and $t_i$, i=1,2,3...n are the observed life lengths

Also, since the parameter $\sigma$ is the standard deviation of the normal distribution, we obtain from the estimate

$$\hat{\sigma} = s = \left[\sum_{i=1}^{n} \frac{(t_i-\bar{t})^2}{n-1}\right]^{1/2} = \left[\frac{n\sum\limits_{i=1}^{n} t_i^2 - (\sum\limits_{i=1}^{n} t_i)^2}{n(n-1)}\right]^{1/2} \tag{16}$$

## Estimation of Weibull Parameters

The estimation of Weibull distribution parameters from survey data generally involves the solution of nonlinear equations. In this section, however, a simpler linear regression procedure, adequate for practical problems, will be briefly discussed.

In general, distributions with shape parameters cannot be analyzed using regression analysis. However, the shape and scale parameters of the Weibull distribution may be transformed into scale and location parameters using the following equation:

$$\ln \ln\left[\frac{1}{1-F(t)}\right] = \beta \ln t - \beta \ln \delta \tag{17}$$

since

$$F(t) = 1 - \exp\left[-\left(\frac{t}{\delta}\right)^\beta\right] \tag{18}$$

Thus, for any Weibull variate ln ln{1/[1-F(t)]} will plot as a straight
line against the natural logarithms of the observations.  To avoid the
need for computing ln ln {1/[1-F(t)]} and ln t, probability paper can be
used.  The axes of the probability paper should be scaled so that (i-1/2)100/n
can be plotted on the ordinate, corresponding to ln ln {1/[1-F(t)]}, and
the observed values can be plotted on the abscissa; corresponding to ln t.

Equation (17) can be written as

$$w = a + bz \qquad , \qquad (19)$$

where

$$w = \ln \ln \left[\frac{1}{1-F(t)}\right] , \qquad (20)$$

$$z = \ln t \qquad , \qquad (21)$$

$$b = \beta \qquad , \qquad (22)$$

and $\qquad a = -\beta \ln \delta \qquad . \qquad (23)$

Therefore, using Equations (22) and (23) to estimate Weibull parameters

$$\hat{\beta} = b \qquad (24)$$

$$\hat{\delta} = e^{-a/b} \qquad , \qquad (25)$$

where the values of a and b are obtained as the y intercept and the slope
of the plotted line.  The slope is

$$b = \frac{w_2 - w_1}{z_2 - z_1} \qquad , \qquad (26)$$

where $w_2$ and $w_1$ are two values of ln ln {1-[1-F(t)]} and where $z_2$ and $z_1$
are the corresponding values of ln t on the plotted line.

## Preliminary Product to Distribution Pairings

### Selection Rationale

To ascertain the primary study objective of developing criteria, based on product characteristics, upon which a selection of distributions could be made when using CPSFORE, an initial set of product to distribution pairings was developed based upon empirical data obtained from the consumer survey. Of the products surveyed only those products with 50 or more responses on the question regarding previous product unit service life were considered for this pairing procedure. Fifty was estimated by Market Facts as the lower limit for responses necessary for valid analysis.

The distributions considered during this procedure were the exponential, gamma, and Weibull distributions. The log-normal distribution was not considered due to its similarity to the gamma distribution.

The preliminary pairings were to be based solely upon the shape of the frequency distributions, observed data from the questions regarding previous product unit service life and the shapes of the distributions mentioned above.

### Product to Distribution Pairings.

The gamma distribution was favored over the Weibull distribution although either could have been used, due for the most part to the greater difficulty incurred in determining the Weibull parameters. However, as will be discussed in a later section (Gamma Distribution Parameter Evaluation) the product characteristics determine the parameters of the gamma distribution. One gamma parameter approximates the inverse of product life, which is easily estimated. The other parameter is a combination of the remaining product characteristics. Neither the exponential nor the uniform distributions were used, since both are distributions of a "perfect" product. One has a constant failure rate. The other maintains that a constant number of a product lot will fail or be retired each year.

Figures 22 through 28 illustrate the fit of the gamma distribution to the survey data. The bar graphs illustrate the surveyed average number of annual failures for the given time intervals. The line graphs illustrate the expected average number of annual failures for the same time intervals assuming the given product had a gamma shaped life distribution with parameters shown in Table 1 and Table 2 on page 43, which were estimated using equation 12 and equation 14. As can be noted, the gamma distribution tends to closely fit the survey data.

## Post Pairing Analysis

### Gamma Distribution Parameter Evaluation

After the product to distribution pairings had been made, it was hoped that basic assumptions could be made about the distributions assigned and their corresponding parameters that would reflect basic product characteristics. Hence, the parameters of the gamma distribution were examined. Included in this examination were products with a response level greater than 24.

Table 1 shows the products listed in increasing value of $\lambda$, the scale parameter. This value is directly related to the product's average failure rate. The average failure rate in turn is the inverse of the expected service life ($\bar{t}$). Therefore, if a product has a short expected service life it would have a $\lambda$ of relatively high value.

Table 2 lists the products evaluated with increasing values of k, the shape parameter. When k=1, the gamma distribution is an exponential distribution. Assuming $\lambda$ is the product's average failure rate, k must reflect all factors that would cause the product to be in service a different length of time than that expected by the reciprocal of $\lambda$. That is, k reflects the level of obsolescence, the level of breakage, product cost and other factors.

FIGURE 22    ACTUAL DISTRIBUTION VERSUS GAMMA DISTRIBUTION
             OF AVERAGE ANNUAL BLOW HAIR DRYER FAILURES AT
             2-YEAR INTERVALS



FIGURE 23 .   ACTUAL DISTRIBUTION VERSUS GAMMA
              DISTRIBUTION OF AVERAGE ANNUAL
              EXTENSION CORD FAILURES AT 5-YEAR INTERVALS



FIGURE 24 .  ACTUAL DISTRIBUTION VERSUS GAMMA DISTRIBUTION
OF AVERAGE ANNUAL BATH MAT FAILURES AT 5-YEAR
INTERVALS



FIGURE 25 . ACTUAL DISTRIBUTION VERSUS GAMMA DISTRIBUTION
OF GAS LAWN MOWER FAILURES AT 2-YEAR INTERVALS



Years of Intervals

FIGURE 26 . ACTUAL DISTRIBUTION VERSUS GAMMA DISTRIBUTION
OF AVERAGE ANNUAL CHILDREN'S SLEEPWEAR AT 1-YEAR
INTERVALS



FIGURE 27 . ACTUAL DISTRIBUTION VERSUS GAMMA DISTRIBUTION
OF WATER HEATER FAILURES AT 5-YEAR INTERVALS



42



FIGURE 28 . ACTUAL DISTRIBUTION VERSUS GAMMA DISTRIBUTION
OF UPHOLSTERED FURNITURE AT 5-YEAR INTERVALS

Years of Interval

Average Failures Per Year

SA54

TABLE 1.  A PRODUCT COMPARISON OF THE GAMMA SCALE
PARAMETER AND AVERAGE SERVICE LIFE

| Product | $\bar{t}$ | $\lambda$ |
|---|---|---|
| Bath mats | 15.6 | .084 |
| Extension cords | 12.8 | .110 |
| Gas space heaters | 7.8 | .230 |
| Water heaters | 13.9 | .272 |
| Upholstered furniture | 11.3 | .306 |
| Gasoline push lawn mowers | 8.0 | .323 |
| Blow hand-held hair dryers | 4.5 | .380 |
| Narrow-tired bicycles | 5.6 | .396 |
| Drip grind coffee makers | 3.8 | .631 |
| Children's sleepwear | 1.8 | 1.591 |

TABLE 2.  A PRODUCT COMPARISON OF THE GAMMA SHAPE PARAMETER

| Product | k |
|---|---|
| Pure Random Failure | 1.000 |
| Extension cords | 1.284 |
| Bath mats | 1.315 |
| Blow hand-held hair dryers | 1.692 |
| Gas space heaters | 1.794 |
| Narrow-tired bicycles | 2.210 |
| Drip grind coffee makers | 2.410 |
| Gasoline push lawn mowers | 2.590 |
| Children's sleepwear | 2.916 |
| Upholstered furniture | 3.444 |
| Water heaters | 3.780 |

Figure 29 was developed to analyze the k parameter. Figure 29 is a plot of average product life against λ with hyperboles representing four integer values of k (1 through 4). In addition vertical lines have been drawn dividing the products into three groups; those that last 10 years or greater, those that last between 4 and 10 years, and those that last four years or less. The following is the list of products representing the numbered points on the graph:

(1) Bath mats
(2) Extension cords
(3) Gas space heaters
(4) Water heaters
(5) Upholstered furniture
(6) Gasoline push lawn mowers
(7) Hand-held blow dryers
(8) Narrow tired bicycles
(9) Drip grind coffee makers
(10) Children's sleepwear.

Since the greatest difference in k values existed for the products that tended to last longer than 10 years, the analysis started with those products. The only major product characteristic common between water heaters and upholstered furniture was a high original product cost (see Table 3) likewise it was true that both bath mats and extension cords were relatively inexpensive. Hence, it was assumed that for those products that lasted greater than 10 years that cost was a major determinant of the k value.

Unfortunately a similar analysis did not hold true for those products which tend to last between 4 to 10 years. Instead it was discovered the fact that a product was typically repaired or not became a major factor. In this group both gasoline push lawn mowers and narrow tired bicycles had k values greater than 2, while gas space heaters and hand-held blow hair dryers had values less than 2.



FIGURE 29. A GRAPHICAL REPRESENTATION OF THE VARYING
VALUES OF THE GAMMA DISTRIBUTION PARAMETER k

TABLE 3.  AVERAGE ANNUAL PRODUCT COST FOR
A NEW REPLACEMENT

| Product | Average Cost (In Dollars) |
|---|---|
| Bath mats | .60 |
| Extension cords | .80 |
| Gas space heaters | 16.70 |
| Water heaters | 7.90 |
| Upholstered furniture | 44.40 |
| Gasoline push lawn mowers | 11.30 |
| Hand-held blow hair dryers | 4.50 |
| Narrow tired bicycles | 17.00 |
| Drip grind coffee makers | 7.80 |
| Children's sleepwear | 5.60 |

For those products that tend to last less than 4 years a problem occurred, the k value differential between the two products surveyed was minimal. However, several other products with a product life of less than 4 years were considered. Through this hypothetical analysis it was determined that average annual product cost was again the major determinant of k. The products other than drip grind coffee makers and children's sleepwear that were considered are toothbrushes, plastic eating ware, adult clothing, billfolds, toys, and games.

Figure 30 summarizes the last few paragraphs and gives value ranges of k for the five different product segments. However, the value assignments may be incorrect since only ten products could be used for this analysis.

After determining the approximate value of k through the use of Figure 30, $\lambda$ can easily be estimated using a transformed version of Equation 14,

$$\hat{\lambda} = \frac{\hat{k}}{\hat{t}} \qquad (27)$$

## Future Research Possibilities

As a result of the analysis performed, the factors involved in determining the type of distribution to use have become more clear. Unfortunately, the pilot survey developed was insufficient and hence the subsequent analysis was dependent upon assumptions and too little data. Any further in-depth research in the area of consumer product service life will require a consumer survey. Such a survey could be used to validate the findings of this study, as well as analyze the effect of product characteristics on parameters of other service life distributions, such as the Weibull and log-normal. Such a survey should include questions on product age at failure or retirement, product cost, reasons for product failure or retirement, and product repairability at economic cost. Also a better



FIGURE 30. A METHODOLOGY TO DETERMINE THE GAMMA DISTRIBUTION PARAMETER K FOR CONSUMER PRODUCTS

means for analyzing the service life of such products as windows, spray paints, and home insulation should be developed.

## IMPROVED ACCURACY OF THE CPSFORE MODEL

### Improvements Made to Date

With the addition of the gamma distribution and the other various completed improvements (see the section on Suggested Improvements for the CPSFORE Model), the CPSFORE program should be much more usable and accurate for the CPSC. This is especially true in light of the fact that the CPSC primarily relies upon the normal and uniform distributions, which are inaccurate for estimating product life. Using some form of the gamma distribution, even though the parameters may be inaccurate, would prove to be a more acceptable estimate of the service life distribution for most consumer products.

### Proposed Improvements

One of the best service life distributions is the Weibull distribution, due to the variety in its hazard functions that can be attained. This distribution already exists on the CPSFORE model, and hence is ready and available for use. Unfortunately, the difficulty in estimating its parameters is limiting its usefulness. To improve the CPSFORE model, a more extensive study with a higher response and wider selection of product types should be undertaken. With the results of this survey a more complete evaluation of the Gamma and Weibull parameters should be made for more effective use of the two distributions.

REFERENCES ON PRODUCT LIFE
FOR CPSC TASK 6

"A Product Life Model"

(1)   Conn, W. David, Factors Affecting Product Lifetime,
      National Science Foundation, Washington, August 1978.

(2)   Davis, D. J., "An Analysis of Some Failure Data", Journal of
      the American Statistical Association, Vol. 47 (258),
      June 1952, pp 113-150.

(3)   Epstein, Benjamin, and, Sobel, Milton, "Life Testing", American
      Statistical Association Journal, Volume 48, September 1953,
      pp 486-502.

(4)   Gupta, Shanti S., and Groll, Phyllis A., "Gamma Distribution in
      Acceptance Sampling Based on Life Tests", American Statistical
      Association Journal, Volume 56, December 1967, pp 942-970.

(5)   Gryna, Frank M., Jr., User Costs of Poor Product Quality (Mimeograph),
      Doctoral Thesis from the University of Iowa, Iowa City, Iowa,
      August 1970, pp 1-13.

(6)   Hahn, Gerald J., and Shapiro, Samuel S., Statistical Models
      in Engineering, John Wiley & Sons, New York, 1967.

(7)   Harris, Carl M., and Singpurwalla, Nozer D., "Life Distributions
      Derived from Stochastic Hazard Functions", IEEE Transactions on
      Reliability, Vol. R-17 (2), June 1968, pp 70-79.

(8)   Kao, John H. K., "A Graphical Estimation of Mixed Weibull Parameters
      in Life-Testing of Electron Tubes", Technometrics, Vol. 1 (4)
      November 1959, pp 389-407.

(9)   Lund, Robert T., and Denney, W. Michael, "Extending Product Life:
      Time to Remanufacture?", Management Review, March 1978, pp 21-26.

(10)  Lund, Robert T., "Making Products Live Longer", Technology Review,
      Vol. 79 (3), January 1977, pp 1-7.

(11)  Lund, Robert T., Incentives for Longer Product Life: A Case Study,
      Center for Policy Alternatives, Cambridge, Massachusette,
      October 1975.

(12)  Mann, Nancy R., Schafer, Ray E., and; Singpurwalla, Nozer D.,
      Methods for Statistical Analysis of Reliability and Life Data,
      John Wiley & Sons, New York, 1974.

(13)  Ruffin, Marylin Doss, and Tippett, Katherine S., "Service-Life
      Expectancy of Household Appliances: New Estimates from the USDA",
      Home Economics Research Journal, Vol. 3 (3), March 1975, pp 159-170.

(14)  Schafer, R. E., and Feduccia, Anthony J., "Prior Distributions
      Fitted to Observed Reliability Data", IEEE Transactions on
      Reliability, Vol. R-21 (3), August 1972, pp 148-154.

(15)  Shives, T. Robert, and Willard, William A. eds., Product Durability
      and Life, Proceedings of the 27th Meeting of the Mechanical
      Failures Prevention Group, National Bureau of Standards,
      Washington, May 1978.

(16)  "Statistical and Marketing Report", Merchandising, 1976-1979,
      (4 issues).

(17)  "Statistical and Marketing Report", Merchandising Week, 1968-1975,
      (8 issues).

(18)  "Statistical-Marketing Section", Electrical Merchandising Week,
      January 20, 1964.

(19)  "Statistical Report", Merchandising Week, 1965-1967 (3 issues).

(20)  "Statistical Review: A Ten Year Review 1969-1978", Appliance 26th
      Annual Report, April 1979.

(21)  Tippett, Katherine S., "Service Life of Appliances by Selected House-
      hold Characteristics", Family Economics Review, Summer 1978.

(22)  Tippett, Katherine S.; Magrabi, Frances M.; and, Gray Bruce C.,
      "Service-Life of Appliances: Variations by Selected Characteristics
      of Owner Households", Home Economics Research Journal, Vol. 6 (3),
      March 1978, pp 182-191.

(23)  "Indicence of Specific Household Items and Fixtures in U.S. Households",
      Robert R. Nathan and Associates (November, 1969).

(24)  Lund, Robert t., et al., The Productivity of Servicing Consumer Durable
      Products, The Center for Policy Alternatives, Massachusetts Institute
      of Technology (June, 1974).

(25)  Modig, Carl, Information on the Concept of "Useful Life" of a Product,
      Informatics, Inc., Rockville, Maryland (February 14, 1975).

(26)  1978 Motorcycle Statistical Annual, Motorcycle Industry Council, Inc.
      (1978).

(27) Morrison, Bruce J., "Aerosol Spray Paint Can Survey", The Sherwin-Williams Company, Martin J. Devine, Ed., (July, 1974).

(28) Proceedings of a Workshop on Wear Control to Achieve Product Durability, Naval Air Development Center, Warminister, Pennsylvania (February, 1976).

(29) Symposium on Product Durability and Life (Short Abstracts), Mechanical Failures Prevention Group (November, 1977).

(30) Symposium on Product Durability and Life (Attendance List), Mechanical Failures Prevention Group (November, 1977).

(31) "Air Conditioners Recalled", CPSC News Release (October 19, 1978).

(32) Pearson, K., Tables of the Incomplete $\Gamma$-function. Biometrica Office. University College, London, 1957.

APPENDIX A

<u>THE CONSUMER MAIL SURVEY</u>
<u>ON PRODUCT LIFE</u>

 **CONSUMER MAIL PANELS**
123 SOUTH FRANKLIN STREET · CHICAGO, ILLINOIS 60606

(L081)

Dear Panel Member:

Today my questionnaire is about 20 different types of products in the home. I will be asking you for information on such items as lawn mowers, extension cords, hair dryers, bicycles, etc. Feel free to look at sales slips or talk with other members of your household in order to answer the questions. Each product only has a few questions. Please answer these questions for each of the 20 products which you own. If you do not own a particular product, please indicate this, and move on to the questions for the next product.

A few of the questions can be answered by writing in a number. Others can be answered by placing an "X" in one or more of the boxes that best indicates your response to that question.

After you have completed your questionnaire, please return it to me in the postage paid envelope I have enclosed. For your help, I will be sending a little something as a token of my appreciation. Please allow me at least eight weeks to process and send you this gift. Thank you so very much for helping me with this survey.

Cordially,

Marie

A-2

1. Do you or a member of your household own a portable hair dryer with a hood (not a cap or hand held)?

   Yes. . . . ☐          No. . . . ☐ ⟶ (SKIP TO NEXT PRODUCT)     (13)

   IF THERE IS MORE THAN ONE PORTABLE HAIR DRYER WITH A HOOD IN YOUR HOUSEHOLD PLEASE ANSWER THE FOLLOWING QUESTIONS FOR THE NEWEST ONE ONLY.

2. Was this portable hair dryer with a hood new when you or a member of your household bought or received it?

   Yes. . . . ☐          No. . . . ☐          (14)

3. What was the main reason(s) for buying or receiving this portable hair dryer?     (15-16)
   ("X" AS MANY AS APPLY)

   Old hair dryer cost too much to fix . ☐ 1     New hair dryer had more features ☐ 7
   Old hair dryer wore out . . . . . . ☐ 2     Didn't buy, received as gift. . . ☐ 8
   Old hair dryer broke. . . . . . . . ☐ 3     Did not have hair dryer needed a
   Old hair dryer too small. . . . . . ☐ 4       product of this type. . . . . . ☐ 9
   Needed more than one. . . . . . . . ☐ 5     Other (Write In): _____
   New hair dryer more stylish . . . . ☐ 6     _____

4. How long have you or a member of your household had this portable hair dryer?

   (WRITE IN): _____ Years _____ Months
               (17-18)              (19-20)

5. How much did you or a member of your household pay for this portable hair dryer?

   (WRITE IN): $ _____
                 (21-23)

6. Now, please think about other portable hair dryers of about the same size and with similar features. Do you think this portable hair dryer is a higher quality product than other portable hair dryers of about the same size and with similar features, is about the same quality, or is a lower quality product?     (24 Open)

   Higher quality. . . . . . . ☐ 1     Lower quality. . . . ☐ 3     (25)
   About the same quality. . . ☐ 2     Not sure/Don't know. ☐ 4

7. Has this portable hair dryer been repaired since you or a member of your household have had it (Do Not Include Maintenance)?

   Yes. . . . ☐          No. . . . ☐ ⟶ (GO TO QU. 10)     (26)

8. How many times has this portable hair dryer been repaired (Do Not Include Maintenance)?

   (WRITE IN): _____ times
                 (27)

9. On the average, when this portable hair dryer is repaired how much does it     (28 Open)
   cost? Please include the cost for all parts and labor you had to pay for (Do Not Include Maintenance).

   (WRITE IN): $ _____
                 (29-31)

10. How much would you or a member of your household be willing to spend on repairs before you think it would be better to get rid of this portable hair dryer and buy another hair dryer?     (32 Open)

    (WRITE IN): $ _____
                  (33-35)

11. How long do you or a member of your household expect to use this portable hair dryer?     (36 Open)

    (WRITE IN): _____ Years _____ Months
                (37-38)              (39-40)

12. Did you or a member of your household own a portable hair dryer with hood before owning this one?

    Yes. . . . ☐          No. . . . ☐ ⟶ (GO TO NEXT PRODUCT)     (41)

13. How old was the previous portable hair dryer when it was no longer used?

    (WRITE IN): _____ Years _____ Months
                (42-43)              (44-45)

14. What happened to the old portable hair dryer when you or a member of your household bought this portable hair dryer?

    Sold it. . . . . . . ☐ 1     Have it but do not use it. . . ☐ 4
    Threw it away. . . . ☐ 2     Still use it . . . . . . . . . ☐ 5     (46)
    Gave it away . . . . ☐ 3     Traded it in . . . . . . . . . ☐ 6

    (47 Open)

    - - - - - - - - - - GO TO NEXT PRODUCT - - - - - - - - - -

SA67

Job No. L081
Page 3

1. Do you or a member of your household own an electric lawn mower (walk-behind type)?

Yes. . . . ☐          No. . . . ☐ ➔ (SKIP TO NEXT PRODUCT)          (48)

IF THERE IS MORE THAN ONE ELECTRIC LAWN MOWER (WALK BEHIND TYPE) IN YOUR HOUSEHOLD PLEASE ANSWER THE FOLLOWING QUESTIONS FOR THE NEWEST ONE ONLY.

2. Was this electric lawn mower new when you or a member of your household bought or received it?

Yes. . . . ☐          No. . . . ☐          (49)

3. What was the main reason(s) for buying or receiving this electric lawn mower? ("X" AS MANY AS APPLY)          (50-51)

Old mower cost too much to fix . . . ☐ 1     New mower had more features . ☐ 7

Old mower wore out . . . . . . . . . ☐ 2     Didn't buy, received as gift. ☐ 8

Old mower broke. . . . . . . . . . . ☐ 3     Did not have mower, needed a

Old mower too small. . . . . . . . . ☐ 4        product of this type. . . . ☐ 9

Needed more than one . . . . . . . . ☐ 5     Other (Write In): _____

Wanted a safer mower . . . . . . . . ☐ 6

4. How long have you or a member of your household had this electric lawn mower?

(WRITE IN): _____ Years _____ Months
              (52-53)                (54-55)

5. How much did you or a member of your household pay for this electric lawn mower?

(WRITE IN): $ _____
                (56-58)

6. Now, please think about other electric lawn mowers of about the same size and with similar features. Do you think this electric lawn mower is a _higher quality product_ than other electric lawn mowers of about the same size and with similar features, is _about the same quality_, or is a _lower quality product_?          (59 Open)

Higher quality. . . . . . . ☐ 1     Lower quality. . . . . ☐ 3

About the same quality. . . ☐ 2     Not sure/Don't know. . ☐ 4          (60)

7. Has this electric lawn mower been repaired since you or a member of your household have had it (Do Not Include Maintenance)?

Yes. . . . ☐          No. . . . ☐ ➔ (GO TO QU. 10)          (61)

8. How many times has this electric lawn mower been repaired (Do Not Include Maintenance)?

(WRITE IN): _____ times
                (62)

9. On the average, when this electric lawn mower is repaired how much does it cost? Please include the cost for all parts and labor you had to pay for (Do Not Include Maintenance).          (63 Open)

(WRITE IN): $ _____
                (64-66)

10. How much would you or a member of your household be willing to spend on repairs before you think it would be better to get rid of this electric Lawn mower and buy another mower?          (67 Open)

(WRITE IN): $ _____
                (68-70)

11. How long do you or a member of your household expect to use this electric lawn mower?          (71 Open)

(WRITE IN): _____ Years _____ Months
              (72-73)                (74-75)

12. Did you or a member of your household own an electric lawn mower (walk-behind type) before owning this one?

Yes. . . . ☐          No. . . . ☐ ➔ (GO TO NEXT PRODUCT)          (76)

13. How old was the previous electric lawn mower when it was no longer used?     (77-78 Open)

(WRITE IN): _____ Years _____ Months   79 ☐0☐1☐ 80
              (13-14)                (15-16)                Card 2
                                                            Dup 1-12

14. What happened to the old electric lawn mower when you or a member of your household bought this electric lawn mower?

Sold it. . . . . . . . ☐ 1     Have it but do not use it. . . ☐ 4

Threw it away. . . . . ☐ 2     Still use it . . . . . . . . . ☐ 5          (17)

Gave it away . . . . . ☐ 3     Traded it in . . . . . . . . . ☐ 6

(18 Open)

- - - - - - - - - - GO TO NEXT PRODUCT - - - - - - - - - -

A-4

1.  Do you or a member of your household own a gasoline lawn mower (walk-behind type)?

    Yes. . . . ☐          No. . . . ☐ ⟶ (SKIP TO NEXT PRODUCT)          (19)

    IF THERE IS MORE THAN ONE GASOLINE LAWN MOWER (WALK-BEHIND TYPE) IN YOUR HOUSEHOLD PLEASE ANSWER THE FOLLOWING QUESTIONS FOR THE NEWEST ONE ONLY.

2.  Was this gasoline lawn mower new when you or a member of your household bought or received it?

    Yes. . . . ☐          No. . . . ☐          (20)

3.  What was the main reason(s) for buying or receiving this gasoline lawn mower? ("X" AS MANY AS APPLY)          (21-22)

    Old mower cost too much to fix . . . ☐ 1      New mower had more features . ☐ 7
    Old mower wore out . . . . . . . . . ☐ 2      Didn't buy, received as gift. ☐ 8
    Old mower broke. . . . . . . . . . . ☐ 3      Did not have mower, needed a
    Old mower too small. . . . . . . . . ☐ 4          product of this type. . . . ☐ 9
    Needed more than one . . . . . . . . ☐ 5      Other (Write In): _____
    Wanted a safer mower . . . . . . . . ☐ 6      _____

4.  How long have you or a member of your household had this gasoline lawn mower?

    (WRITE IN): _____ Years _____ Months
                   (23-24)              (25-26)

5.  How much did you or a member of your household pay for this gasoline lawn mower?

    (WRITE IN): $ _____
                    (27-29)

6.  Now, please think about other gasoline lawn mowers of about the same size and with similar features. Do you think this gasoline lawn mower is a higher quality product than other gasoline lawn mowers of the same size and with similar features, is about the same quality, or is a lower quality product?          (30 Open)

    Higher quality. . . . . . . ☐ 1      Lower quality. . . . . ☐ 3          (31)
    About the same quality. . . ☐ 2      Not sure/Don't know. . ☐ 4

7.  Has this gasoline lawn mower been repaired since you or a member of your household have had it (Do Not Include Maintenance)?

    Yes. . . . ☐          No. . . . ☐ ⟶ (GO TO QU. 10)          (32)

8.  How many times has this gasoline lawn mower been repaired (Do Not Include Maintenance)?

    (WRITE IN): _____ times
                    (33)

9.  On the average, when this gasoline lawn mower is repaired how much does it          (34 Open)
    cost? Please include the cost for all parts and labor you had to pay for (Do Not Include Maintenance).

    (WRITE IN): $ _____
                    (35-37)

10. How much would you or a member of your household be willing to spend on repairs before you think it would be better to get rid of this gasoline lawn mower and buy another mower?          (38 Open)

    (WRITE IN): $ _____
                    (39-41)

11. How long do you or a member of your household expect to use this gasoline lawn mower?          (42 Open)

    (WRITE IN): _____ Years _____ Months
                   (43-44)              (45-46)

12. Did you or a member of your household own a gasoline lawn mower (walk-behind type) before owning this one?

    Yes. . . . ☐          No. . . . ☐ ⟶ (GO TO NEXT PRODUCT)          (47)

13. How old was the previous gasoline lawn mower when it was no longer used?

    (WRITE IN): _____ Years _____ Months
                   (48-49)              (50-51)

14. What happened to the old gasoline lawn mower when you or a member of your household bought this gasoline lawn mower?

    Sold it. . . . . . . . ☐ 1      Have it but do not use it. . . ☐ 4
    Threw it away. . . . . ☐ 2      Still use it . . . . . . . . . ☐ 5          (52)
    Gave it away . . . . . ☐ 3      Traded it in . . . . . . . . . ☐ 6

                                                                          (53 Open)

    - - - - - - - - - GO TO NEXT PRODUCT - - - - - - - - - -

Job No. L081
Page 5

1. Do you or a member of your household own an unvented gas space heater (natural gas or LPG)?

    Yes. . . . ☐        No. . . . ☐ ⟶ (SKIP TO NEXT PRODUCT)    (54)

IF THERE IS MORE THAN ONE UNVENTED GAS SPACE HEATER IN YOUR HOUSEHOLD PLEASE ANSWER THE FOLLOWING QUESTIONS FOR THE NEWEST ONE ONLY.

2. Was this unvented gas space heater new when you or a member of your household bought or received it?

    Yes. . . . ☐        No. . . . ☐    (55)

3. What was the main reason(s) for buying or receiving this space heater? ("X" AS MANY AS APPLY)    (56-57)

| | |
|---|---|
| Old heater cost too much to fix. . . ☐ 1 | New heater had more features. ☐ 7 |
| Old heater wore out. . . . . . . . . ☐ 2 | Didn't buy, received as gift. ☐ 8 |
| Old heater broke . . . . . . . . . . ☐ 3 | Did not have heater needed a |
| Old heater too small . . . . . . . . ☐ 4 | product of this type. . . . ☐ 9 |
| Needed more than one . . . . . . . . ☐ 5 | Other (Write In): _____ |
| New heater more stylish. . . . . . . ☐ 6 | _____ |

4. How long have you or a member of your household had this unvented gas space heater?

    (WRITE IN): _____ Years _____ Months
               (58-59)         (60-61)

5. How much did you or a member of your household pay for this unvented gas space heater?

    (WRITE IN): $_____
               (62-64)

6. Now, please think about other unvented gas space heaters of about the same size and with similar features. Do you think this heater is a <u>higher quality product</u> than other unvented gas space heaters of about the same size and with similar features, is <u>about the same quality</u>, or is a <u>lower quality product</u>?    (65 Open)

    Higher quality. . . . . . . . ☐ 1    Lower quality. . . . . ☐ 3
    About the same quality. . . . ☐ 2    Not sure/Don't know. . ☐ 4    (66)

7. Has this unvented gas space heater been repaired since you or a member of your household have had it (Do Not Include Maintenance)?

    Yes. . . . ☐        No. . . . ☐ ⟶ (GO TO QU. 10)    (67)

8. How many times has this unvented gas space heater been repaired (Do Not Include Maintenance)?

    (WRITE IN): _____ times
               (68)

9. On the average, when this unvented gas space heater is repaired how much does it cost? Please include the cost for all parts and labor you had to pay for (Do Not Include Maintenance).    (69 Open)

    (WRITE IN): $_____
               (70-72)

10. How much would you or a member of your household be willing to spend on repairs before you think it would be better to get rid of this unvented gas space heater and buy another heater or heating system?    (73 Open)

    (WRITE IN): $_____
               (74-76)           (77-78 Open)

11. How long do you or a member of your household expect to use this unvented gas space heater?    79 ☐0☐1☐2 80

    (WRITE IN): _____ Years _____ Months    Card 3
               (13-14)         (15-16)    Dup 1-12

12. Did you or a member of your household own an unvented gas space heater before owning this one?

    Yes. . . . ☐        No. . . . ☐ ⟶ (GO TO NEXT PRODUCT)    (17)

13. How old was the previous unvented gas space heater when it was no longer used?

    (WRITE IN): _____ Years _____ Months
               (18-19)         (20-21)

14. What happened to the old unvented gas space heater when you or a member of your household bought this heater?

| | |
|---|---|
| Sold it. . . . . . . . ☐ 1 | Have it but do not use it . . . ☐ 4 |
| Threw it away. . . . . ☐ 2 | Still use it . . . . . . . . . . ☐ 5 |
| Gave it away . . . . . ☐ 3 | Traded it in . . . . . . . . . . ☐ 6    (22) |

- - - - - - - - - GO TO NEXT PRODUCT - - - - - - - - - -

1. Does the home you live in now have cellulose home insulation (NOT fiberglass or foam)?

Yes. . . . ☐          No. . . . ☐ ⟶ (SKIP TO NEXT PRODUCT)     (23)

IF YOU OR A MEMBER OF YOUR HOUSEHOLD HAVE BOUGHT OR RECEIVED CELLULOSE HOME INSULA-
MORE THAN ONCE PLEASE ANSWER THE FOLLOWING QUESTIONS FOR THE MOST RECENT INSULATION ONLY.

(QUESTION 2 NOT USED)

3. What was the main reason(s) for buying or receiving this cellulose home insulation? ("X" AS MANY AS APPLY)

Old insulation did not keep home warm
or cool enough . . . . . . . . . . ☐ 1

Came with home . . . . . . . . . . ☐ 2

Had to insulate an addition to
the house. . . . . . . . . . . . ☐ 3

Didn't buy, received as gift. ☐ 4     (24)

Did not have any, needed a
product of this type. . . . ☐ 5

Other (Write In):_____
_____

4. How long have you or a member of your household had this cellulose home insulation?

(WRITE IN): _____ Years _____ Months
            (25-26)        (27-28)

5. How much did you or a member of your household pay for this cellulose home insula-
tion (Not Including Installation Costs)?

(WRITE IN): $_____ per role/bag/cubic feet
             (29-31)

6. How long do you or a member of your household expect this cellulose home insulation
to last before adding to it?                                    (32 Open)

(WRITE IN): _____ Years _____ Months
            (33-34)        (35-36)

7. Prior to February 1978 cellulose home insulation was sold in two categories,
Category 1 (average quality) and Category 2 (high quality), indicate which type was
installed in your home.

Category 1 (average quality). . . . . ☐ 1   Category 2 (high quality). . . .☐ 2  (37)
        Installed since February 1978.☐ 3   Unsure/Don't know . . . . . .☐ 4

THE FOLLOWING QUESTIONS DEAL WITH YOUR HOUSEHOLD'S TOTAL EXPERIENCE WITH CELLULOSE
INSULATION.

8. Have you or a member of your household ever added to the insulation in your home with
cellulose home insulation?

Yes . . . . . . . .☐       No . . . . . . .☐ ⟶ (GO TO NEXT PRODUCT)     (38)

9. How many times?

(WRITE IN):_____times
            (39)                                    (40 Open)

10. How long have you lived in this home?

(WRITE IN):_____years
            (41-42)

11. Why did you add cellulose home insulation to the old insulation?

Old insulation did not keep
home warm or cool enough . . . . ☐ 1

Insulated an addition to the home.☐ 2

Old insulation became wet. . . . ☐ 3

Other reason (WRITE IN):_____   (43)
_____

- - - - - - - - - GO TO NEXT PRODUCT- - - - - - - - -

Job No. L081
Page 7

1. Do you or a member of your household own a wood or coal heating stove (like a Franklin stove or air tight stove)?

Yes. . . . ☐      No. . . . ☐ ——→ (SKIP TO NEXT PRODUCT)     (44)

IF THERE IS MORE THAN ONE WOOD OR COAL HEATING STOVE IN YOUR HOUSEHOLD PLEASE ANSWER THE FOLLOWING QUESTIONS FOR THE NEWEST ONLY.

2. Was this wood or coal heating stove new when you or a member of your household bought or received it?

Yes. . . . ☐      No. . . . ☐        (45)

3. What was the main reason(s) for buying or receiving this wood or coal heating stove? ("X" AS MANY AS APPLY)    (46-47)

| | |
|---|---|
| Old heating stove cost too much to fix ☐ 1 | New heating stove had more features ☐ 8 |
| Old heating stove wore out . . . . . . ☐ 2 | Didn't buy, received as gift. . . . ☐ 9 |
| Old heating stove broke. . . . . . . . ☐ 3 | Did not have heating stove, needed a product of this type. . . . . . ☐ 0 |
| Old heating stove too small. . . . . ☐ 4 | |
| Needed more than one . . . . . . . ☐ 5 | Other (Write In): _____ |
| New heating stove more stylish . . . ☐ 6 | _____ |
| To save on heating costs . . . . . . ☐ 7 | |

4. How long have you or a member of your household had this wood or coal heating stove?

(WRITE IN): _____ Years _____ Months
             (48-49)           (50-51)

5. How much did you or a member of your household pay for this wood or coal heating stove?

(WRITE IN): $ _____ . . . . __
           (52-54)

6. Now, please think about other wood or coal heating stoves of about the same size and with similar features. Do you think this wood or coal heating stove is a higher quality product than other wood or coal heating stoves of about the same size and with similar features, is about the same quality, or is a lower quality product?  (55 Open)

Higher quality. . . . . . . . ☐ 1     Lower quality. . . . . ☐ 3    (56)
About the same quality. . . . ☐ 2     Not sure/Don't know. . ☐ 4

7. Has this wood or coal heating stove been repaired since you or a member of your household have had it (Do Not Include Maintenance)?

Yes. . . . ☐      No. . . . ☐ ——→ (GO TO QU. 10)    (57)

8. How many times has this wood or coal heating stove been repaired (Do Not Include Maintenance)?

(WRITE IN): _____ times
           (58)

9. On the average, when this wood or coal heating stove is repaired how much does it cost? Please include the cost for all parts and labor you had to pay for (Do not Include Maintenance).  (59 Open)

(WRITE IN): $ _____
           (60-62)

10. How much would you or a member of your household be willing to spend on repairs before you think it would be better to get rid of this wood or coal heating stove and buy another heating stove or other heating system?  (63 Open)

(WRITE IN): $ _____ . . . . __
           (64-66)

11. How long do you or a member of your household expect to use this wood or coal heating stove?  (67 Open)

(WRITE IN): _____ Years _____ Months
           (68-69)        (70-71)

12. Did you or a member of your household own a wood or coal heating stove before owning this one?

Yes. . . . ☐      No. . . . ☐ ——→ (GO TO NEXT PRODUCT)    (72)

13. How old was the previous wood or coal heating stove when it was no longer used?

(WRITE IN): _____ Years _____ Months
           (73-74)       (75-76)

14. What happened to the old wood or coal heating stove when you or a member of your household bought this wood or coal heating stove?

Sold it. . . . . . . . ☐ 1     Have it but do not use it. . ☐ 4
Threw it away. . . . . ☐ 2     Still use it . . . . . . . . ☐ 5   (77)
Gave it away . . . . . ☐ 3     Traded it in. . . . . . . . ☐ 6

                                       (78 Open)

79 ☐0☐ ☐3☐

GO TO NEXT PRODUCT - - - - - - - -

# A-8

Job No. L081
Page 8

Card /
Dup 1·=

1. Have you or a member of your household bought or received any sleepwear for child·en age 12 and under in the past five years?

   Yes . . . . □          No . . . . □ ──▶ (SKIP TO NEXT PRODUCT)    (13)

   IF YOU OR A MEMBER OF YOUR HOUSEHOLD HAVE BOUGHT OR RECEIVED CHILDREN'S SLEEPWEAR MORE THAN ONCE IN THE PAST FIVE YEARS PLEASE ANSWER THE FOLLOWING QUESTIONS FOR THE MOST RECENT SLEEPWEAR ONLY.

2. Was this sleepwear new when you or a member of your household bought or received it?

   Yes. . . . □          No. . . □                                   (14)

3. What was the main reason(s) for buying or receiving this sleepwear? ("X" AS MANY AS APPLY)

   Old sleepwear wore out . . . . . . . □ 1      New sleepwear more stylish. . □ 5
   Old sleepwear tore . . . . . . . . . □ 2      Didn't buy, received as gift. □ 6   (15)
   Old sleepwear too small. . . . . . . □ 3      Did not have sleepwear, needed
   Needed more than one . . . . . . . . □ 4        a product of this type. . . □ 7

                                                 Other (WRITE IN):_____
                                                 _____
                                                                        (16 Open)
4. How old is this sleepwear?                                           (17-18)
   (WRITE IN):_____Years_____Months                   (19-20)

5. How much did you or a member of your household pay for this sleepwear?
                          (WRITE IN): $ _____
                                          (21-23)

6. Now, please think about other similar types of sleepwear. Do you think this sleep-wear is a higher quality product than other similar types of sleepwear, is about the same quality, or is a lower quality product?                        (24 Open)

   Higher quality. . . . . . . □ 1    Lower quality. . . . . □ 3
   About the same quality . . □ 2    Not sure/Don't know. . □ 4           (25)

                        (QUESTIONS 7-10 NOT USED)

11. How long do you or a member of your household expect to use this sleepwear?
    (WRITE IN): _____ Years _____ Months
                   (26-27)                (28-29)

12. Did you or a member of your household own any sleepwear for children age 12 and under before owning this sleepwear?

    Yes. . . □          No. . . . □ ──▶ (GO TO NEXT PRODUCT)   (30)

13. How old was the previous sleepwear when it was no longer used?
    (WRITE IN): _____ Years _____ Months
                   (31-32)                (33-34)

14. What did you do with the old sleepwear when you or a member of your household bought the new sleepwear?

    Sold it. . . . . . . □ 1    Have it but do not use it. . . □ 4
    Threw it away. . . . . □ 2    Still use it . . . . . . . . □ 5      (35)
    Gave it away . . . . . □ 3    Use for other purposes . . . . □ 6

                                                                        (36 Open)

    - - - - - - - - - GO TO NEXT PRODUCT - - - - - - - - - -

SA73

Job No. L081
Page 9

1. Do you or a member of your household own an aluminum extension ladder?

    Yes. . . . ☐    No. . . . ☐ ─────▶(SKIP TO NEXT PRODUCT)    (37)

    IF THERE IS MORE THAN ONE ALUMINUM EXTENSION LADDER IN YOUR HOUSEHOLD PLEASE
    ANSWER THE FOLLOWING QUESTIONS FOR THE NEWEST ONE ONLY.

2. Was this aluminum extension ladder new when you or a member of your household
   bought or received it?

    Yes. . . . ☐    No. . . . ☐    (38)

3. What was the main reason(s) for buying or receiving this aluminum extension ladder   (39-40)
   ("X" AS MANY AS APPLY)

    Old ladder was not working properly. ☐ 1    New ladder had more features. ☐ 6
    Old ladder wore out. . . . . . . . . ☐ 2    Didn't buy, received as gift.. ☐ 7
    Old ladder broke . . . . . . . . . . ☐ 3    Did not have ladder, needed a
    Old ladder too short . . . . . . . . ☐ 4        product of this type. . . . ☐ 8
    Needed more than one . . . . . . . . ☐ 5    Other (Write In):_____

4. How long have you or a member of your household had this aluminum extension
   ladder?

    (WRITE IN): _____ Years _____ Months
                   (41-42)              (43-44)

5. How much did you or a member of your household pay for this aluminum extension
   ladder?

    (WRITE IN): $ _____
                   (45-47)

6. Now, please think about other aluminum extension ladders of about the same size
   and with similar features. Do you think this aluminum extension ladder is a higher
   quality product than other aluminum extension ladders of about the same size and
   with similar features, is about the same quality, or is a lower quality product?   (48 Open)

    Higher quality. . . . . . . ☐ 1    Lower quality. . . . . ☐ 3
    About the same quality. . . ☐ 2    Not sure/Don't know. . ☐ 4    (49)

7. Has this aluminum extension ladder been repaired since you or a member of your
   household have had it (Do Not Include Maintenance)?

    Yes. . . . ☐    No. . . . ☐ ─────▶(GO TO QU. 10)    (50)

8. How many times has this aluminum extension ladder been repaired (Do Not Include
   Maintenance)?

    (WRITE IN): _____ times
                   (51)

9. On the average, when this aluminum extension ladder is repaired how much does it
   cost? Please include the cost for all parts and labor you had to pay for (Do Not
   Include Maintenance).

    (WRITE IN): $ _____    (52 Open)
                   (53-55)

10. How much would you or a member of your household be willing to spend on repairs
    before you think it would be better to get rid of this aluminum extension ladder and
    buy another ladder?

    (WRITE IN): $ _____    (56 Open)
                   (57-59)

11. How long do you or a member of your household expect to use this aluminum exten-
    sion ladder?

    (WRITE IN): _____ Years _____ Months    (60 Open)
                   (61-62)              (63-64)

12. Did you or a member of your household own an aluminum extension ladder before owning
    this one?

    Yes. . . . ☐    No. . . . ☐ ─────▶(GO TO NEXT PRODUCT)    (65)

13. How old was the previous aluminum extension ladder when it was no longer used?

    (WRITE IN): _____ Years _____ Months
                   (66-67)              (68-69)

14. What happened to the old aluminum extension ladder when you or a member of your
    household bought this aluminum extension ladder?

    Sold it. . . . . . . . ☐ 1    Have it but do not use it. . . ☐ 4
    Threw it away. . . . . ☐ 2    Still use it . . . . . . . . . ☐ 5    (70)
    Gave it away . . . . . ☐ 3    Traded it in . . . . . . . . . ☐ 6

    (71 Open)

    - - - - - - - - - - GO TO NEXT PRODUCT - - - - - - - - - -

1. Do you or a member of your household own a backyard playground equipment set
(purchased set not built)?

    Yes. . . . ☐      No. . . . ☐ ⟶ (SKIP TO NEXT PRODUCT)   (72)

IF THERE IS MORE THAN ONE PURCHASED BACKYARD PLAYGROUND EQUIPMENT SET IN YOUR
HOUSEHOLD PLEASE ANSWER THE FOLLOWING QUESTIONS FOR THE NEWEST SET ONLY.

2. Was this backyard playground equipment new when you or a member of your household
bought or received it?

    Yes. . . . ☐      No. . . . ☐     (73)

3. What was the main reason(s) for buying or receiving this backyard playground  (74-75)
equipment?  ("X" AS MANY AS APPLY)

    Old playground set was not safe . . . ☐1   New playground set had more features .☐6

    Old playground set wore out . . . . . ☐2   Didn't buy, received as gift . . . . .☐7

    Old playground set broke . . . . . ☐3   Did not have playground set, needed

    Outgrew old set . . . . . . . . . . . ☐4     a product of this type . . . . . . ☐8

    Needed more than one . . . . . . . .☐5   Other (Write In):_____

_____

                   (76-78 Open)

4. How long have you or a member of your household had this backyard playground  79 ⬚0⬚4⬚ 80
equipment?                                     Card 4

    (WRITE IN): _____ Years _____ Months  Dup 1-12
             (13-14)        (15-16)

5. How much did you or a member of your household pay for this backyard playground
equipment?

    (WRITE IN): $_____
               (17-19)

6. Now, please think about other backyard playground equipment sets of about the same
size and with similar features. Do you think this backyard playground equipment set
is a higher quality product than other backyard playground equipment sets of about
the same size and with similar features, is about the same quality, or is a lower
quality product?                                  (20 Open)

    Higher quality. . . . . . . ☐1    Lower quality. . . . . ☐3   (21)

    About the same quality. . . ☐2    Not sure/Don't know. . ☐4

7. Has this backyard playground equipment been repaired since you or a member of your
household have had it (Do Not Include Maintenance)?

    Yes. . . . ☐      No. . . . ☐ ⟶ (GO TO QU. 10)  (22)

8. How many times has this backyard playground equipment been repaired (Do Not
Include Maintenance)?

                  (WRITE IN): _____ times
                             (23)

9. On the average, when this backyard playground equipment is repaired how much does
it cost? Please include the cost for all parts and labor you had to pay for (Do Not  (24 Open)
Include Maintenance).

               (WRITE IN): $_____
                         (25-27)

10. How much would you or a member of your household be willing to spend on repairs
before you think it would be better to get rid of this backyard playground equipment
and buy another set?                               (28 Open)

               (WRITE IN): $_____
                         (29-31)

11. How long do you or a member of your household expect to use this backyard play-  (32 Open)
ground equipment?

    (WRITE IN): _____ Years _____ Months
            (33-34)        (35-36)

12. Did you or a member of your household own a backyard playground equipment set before
owning this one?

    Yes. . . . ☐      No. . . . ☐ ⟶ (GO TO NEXT PRODUCT)  (37)

13. How old was the previous backyard playground equipment when it was no longer used?

    (WRITE IN): _____ Years _____ Months
            (38-39)        (40-41)

14. What happened to the old backyard playground equipment when you or a member of
your household bought this new set?

    Sold it. . . . . . . . ☐1    Have it but do not use it. . . ☐4

    Threw it away. . . . . ☐2    Still use it . . . . . . . . . ☐5   (42)

    Gave it away . . . . . ☐3    Traded it in . . . . . . . . . ☐6

                                          (43 Open)

- - - - - - - - - - GO TO NEXT PRODUCT - - - - - - - - - -

Job No. L081
Page 11

1. Do you or a member of your household own a bicycle with balloon tires (wide, low pressure tires)?

Yes. . . . ☐   No. . . . ☐ ⟶ (SKIP TO NEXT PRODUCT)   (44)

IF THERE IS MORE THAN ONE BICYCLE WITH BALLOON TIRES IN YOUR HOUSEHOLD PLEASE ANSWER THE FOLLOWING QUESTIONS FOR THE NEWEST ONE ONLY.

2. Was this bicycle with balloon tires new when you or a member of your household bought or received it?

Yes. . . . ☐   No. . . . ☐   (45)

3. What was the main reason(s) for buying or receiving this bicycle with balloon tires? ("X" AS MANY AS APPLY)   (46-47)

Old bicycle cost too much to fix . . ☐1   New bicycle had more features ☐8
Old bicycle wore out . . . . . . . ☐2   Didn't buy, received as gift. ☐9
Old bicycle broke. . . . . . . . ☐3   Did not have bicycle, needed a
Old bicycle too small. . . . . . . ☐4   product of this type. . . . ☐0
Needed more than one . . . . . . ☐5   Other (Write In) :_____
New bicycle was stylish. . . . . . ☐6   _____
Old bicycle was stolen . . . . . . ☐7

4. How long have you or a member of your household had this bicycle with balloon tires?

(WRITE IN) :_____ Years _____ Months
             (48-49)              (50-51)

5. How much did you or a member of your household pay for this bicycle with balloon tires?

(WRITE IN) : $_____
             (52-54)

6. Now, please think about other bicycles with balloon tires of about the same size and with similar features. Do you think this bicycle with balloon tires is a higher quality product than other bicycles with balloon tires of about the same size and with similar features, is about the same quality, or is a lower quality product? (55 Open)

Higher quality . . . . . . . ☐1   Lower quality. . . . . ☐3
About the same quality . . . ☐2   Not sure/Don't know. . ☐4   (56)

7. Has this bicycle with balloon tires been repaired since you or a member of your household have had it (Do Not Include Maintenance)?

Yes. . . . ☐   No. . . . ☐ ⟶ (GO TO QU. 10)   (57)

8. How many times has this bicycle with balloon tires been repaired (Do Not Include Maintenance)?

(WRITE IN) : _____ times
               (58)

9. On the average, when this bicycle with balloon tires is repaired how much does it cost? Please include the cost for all parts and labor you had to pay for (Do Not Include Maintenance)?   (59 Open)

(WRITE IN) : $_____
              (60-62)

10. How much would you or a member of your household be willing to spend on repairs before you think it would be better to get rid of this bicycle with balloon tires and buy another bicycle?   (63 Open)

(WRITE IN) : $_____
              (64-66)

11. How long do you or a member of your household expect to use this bicycle with balloon tires?   (67 Open)

(WRITE IN) : _____ Years _____ Months
              (68-69)            (70-71)

12. Did you or a member of your household own a bicycle with balloon tires before owning this one?

Yes. . . . ☐   No. . . . ☐ ⟶ (GO TO NEXT PRODUCT)   (72)

13. How old was the previous bicycle with balloon tires when it was replaced?

(WRITE IN) : _____ Years _____ Months
              (73-74)            (75-76)

14. What happened to the old bicycle with balloon tires when you or a member of your household bought the new one?

Sold it. . . . . . . . ☐1   Have it but do not use it. . . ☐5
Threw it away. . . . . ☐2   Still use it . . . . . . . . ☐6   (77)
Gave it away . . . . . ☐3   Traded it in . . . . . . . . ☐7
It was stolen. . . . . ☐4

                                                    (78 Open)

- - - - - - - - - GO TO NEXT PRODUCT - - - - - - - - -

A-12

1. Do you or a member of your household own a bicycle with high pressure (narrow) tires? Card 6 Dup 1-12

Yes. . . . ☐          No. . . . ☐ ——→ (SKIP TO NEXT PRODUCT)          (13)

IF THERE IS MORE THAN ONE BICYCLE WITH HIGH PRESSURE TIRES IN YOUR HOUSEHOLD PLEASE ANSWER THE FOLLOWING QUESTIONS FOR THE NEWEST ONE ONLY.

2. Was this bicycle with high pressure tires new when you or a member of your household bought it?

Yes. . . . ☐          No. . . . ☐          (14)

3. What was the main reason(s) for buying this bicycle with high pressure tires? ("X" AS MANY AS APPLY)

Old bicycle cost too much to fix . . ☐ 1          (15-16)
Old bicycle wore out . . . . . . . . ☐ 2          New bicycle had more features ☐ 8
Old bicycle broke. . . . . . . . . . ☐ 3          Didn't buy, received as gift. ☐ 9
Old bicycle too small. . . . . . . . ☐ 4          Did not have bicycle, needed a product of this type. . . . ☐ 0
Needed more than one . . . . . . . . ☐ 5
New bicycle more stylish . . . . . . ☐ 6          Other (Write In): _____
Old bicycle was stolen . . . . . . . ☐ 7          _____

4. How long have you or a member of your household had this bicycle with high pressure tires?

(WRITE IN): _____ Years _____ Months
            (17-18)           (19-20)

5. How much did you or a member of your household pay for this bicycle with high pressure tires?

(WRITE IN): $ _____
            (21-23)

6. Now, please think about other bicycles with high pressure tires of about the same size and with similar features. Do you think this bicycle with high pressure tires is a higher quality product than other bicycles with high pressure tires of about the same size and with similar features, is about the same quality, or is a lower quality product?
                                                                              (24 Open)
Higher quality. . . . . . . . ☐ 1          Lower quality. . . . . ☐ 3
About the same quality. . . . ☐ 2          Not sure/Don't know. . ☐ 4          (25)

7. Has this bicycle with high pressure tires been repaired since you or a member of your household have had it (Do Not Include Maintenance)?

Yes. . . . ☐          No. . . . ☐ ——→ (GO TO QU. 10)          (26)

8. How many times has this bicycle with high pressure tires been repaired (Do Not Include Maintenance)?

(WRITE IN): _____ times
            (27)

9. On the average, when this bicycle with high pressure tires is repaired how much does it cost? Please include the cost for all parts and labor you had to pay for (Do Not Include Maintenance).
                                                                              (28 Open)
(WRITE IN): $ _____
            (29-31)

10. How much would you or a member of your household be willing to spend on repairs before you think it would be better to get rid of this bicycle with high pressure tires and buy another bicycle?
(WRITE IN): $ _____          (32 Open)
            (33-35)

11. How long do you or a member of your household expect to use this bicycle with high pressure tires?
(WRITE IN): _____ Years _____ Months          (36 Open)
            (37-38)        (39-40)

12. Did you or a member of your household own a bicycle with high pressure tires before buying this one?

Yes. . . . ☐          No. . . . ☐ ——→ (GO TO NEXT PRODUCT)          (41)

13. How old was the previous bicycle with high pressure tires when it was replaced?
(WRITE IN): _____ Years _____ Months
            (42-43)        (44-45)

14. What happened to the old bicycle with high pressure tires when you or a member of your household bought the new one?

Sold it. . . . . . . . ☐ 1          Have it but do not use it. . . ☐ 5
Threw it away. . . . . ☐ 2          Still use it . . . . . . . . . ☐ 6          (46)
Gave it away . . . . . ☐ 3          Traded it in . . . . . . . . . ☐ 7
It was stolen. . . . . ☐ 4

- - - - - - - - - GO TO NEXT PRODUCT - - - - - - - - -          (47 Open)

1. Do you or a member of your household own an electric automatic drip coffee maker (Like a Mr. Coffee)?

   Yes. . . . ☐          No. . . . ☐ ——▶(SKIP TO NEXT PRODUCT)      (48)

   IF THERE IS MORE THAN ONE ELECTRIC AUTOMATIC DRIP COFFEE MAKER (LIKE MR. COFFEE) IN YOUR HOUSEHOLD PLEASE ANSWER THE FOLLOWING QUESTIONS FOR THE NEWEST ONE ONLY.

2. Was this electric automatic drip coffee maker new when you or a member of your household bought or received it?

   Yes. . . . ☐          No. . . . ☐      (49)

3. What was the main reason(s) for buying or receiving this electric automatic drip    (50-51) coffee maker?  ("X" AS MANY AS APPLY)

   Old coffee maker cost too much to fix ☐1   New coffee maker had more features ☐7
   Old coffee maker wore out. . . . . . ☐2   Didn't buy, received as gift. . . ☐8
   Old coffee maker broke . . . . . . . ☐3   Did not have coffee maker, needed a
   Old coffee maker too small . . . . . ☐4       product of this type. . . . . . ☐9
   Needed more than one . . . . . . . . ☐5   Other (Write In):_____
   New coffee maker was more stylish. . ☐6   _____

4. How long have you or a member of your household had this electric automatic drip coffee maker?

   (WRITE IN): _____ Years _____Months
               (52-53)        (54-55)

5. How much did you or a member of your household pay for this electric automatic drip coffee maker?

   (WRITE IN): $ _____
               (56-58)

6. Now, please think about other electric automatic drip coffee makers of about the same size with similar features.  Do you think this electric automatic drip coffee maker is a higher quality product than other electric automatic drip coffee makers of about the same size and with similar features, is about the same quality, or is lower quality product?                                                            (59 Open)

   Higher quality. . . . . . . ☐1   Lower quality. . . . . ☐3      (60)
   About the same quality. . . ☐2   Not sure/Don't know. . ☐4

7. Has this electric automatic drip coffee maker been repaired since you or a member of your household have had it (Do Not Include Maintenance)?

   Yes. . . . ☐          No. . . ☐ ——▶(GO TO QU. 10)      (61)

8. How many times has this electric automatic drip coffee maker been repaired (Do Not Include Maintenance)?

   (WRITE IN): _____ times
               (62)

9. On the average, when this electric automatic drip coffee maker is repaired how much does it cost? Please include the cost for all parts and labor you had to pay for       (63 Open) (Do Not Include Maintenance).

   (WRITE IN): $ _____
               (64-66)

                                                                      (67-78 Open)
10. How much would you or a member of your household be willing to spend on repairs before you think it would be better to get rid of this electric automatic drip coffee maker and buy another coffee maker?                                 79 ⓪ 6  80

    (WRITE IN): $ _____                                            Card 7
                (13-15)                                              Dup 1-12

11. How long do you or a member of your household expect to use this electric automatic drip coffee maker?                                                            (16 Open)

    (WRITE IN): _____ Years _____Months
                (17-18)        (19-20)

12. Did you or a member of your household own an electric automatic drip coffee maker (like Mr. Coffee) before owning this one?

    Yes. . . . . ☐          No. . . . .☐ ——▶(GO TO NEXT PRODUCT)      (21)

13. How old was the previous electric automatic drip coffee maker when it was no longer  (22-23) used?                                                                  (24-25)

    (WRITE IN): _____Years_____Months

14. What happened to the old electric automatic drip coffee maker when you or a member of your household bought this electric automatic drip coffee maker?

    Sold it. . . . . . . .☐1   Have it but do not use it. . ☐4
    Threw it away. . . . . .☐2   Still use it . . . . . . . . ☐5      (26)
    Gave it away . . . . . .☐3   Traded it in . . . . . . . . ☐6

- - - - - - - - GO TO NEXT PRODUCT- - - - - - - -

A-14

1. Have you, yourself, or any other member of your household ever purchased aerosol spray paint in a can?

   Yes. . . . . . .☐     No . . . . . .☐ ⟶ (GO TO NEXT PRODUCT)   (27)

2. Please estimate the number of aerosol spray paint cans used by you, or other members of your household <u>during the past year</u>?

   _____Cans   (28-29)

3. How long a duration was there between the <u>last time</u> you bought a can of spray paint and the time you used it? ("X" ONE BOX)   (30)

   Used it the same day . . . . . .☐1     Used it a couple weeks later . .☐4
   Used it a few days later . . . .☐2     Used it a month later. . . . . .☐5
   Used it a week later . . . . . .☐3     Used it more than a month later.☐6

4. The <u>last time</u> you bought aerosol spray paint, how many cans did you buy ("X" ONE BOX)

   One . . . . . . .☐1     Four . . . . . . ☐4
   Two . . . . . . .☐2     Five . . . . . ☐5     (31)
   Three . . . . .☐3     Six or more. . . ☐6

5. Were all the aerosol spray paint cans you bought for your last aerosol spray paint job "used up"?

   Yes . . . . . . .☐     No . . . . . . ☐   (32)

6. In the last year, for all jobs for which you used aerosol spray paint, estimate the percentage of those jobs where you used the full can of paint. (CIRCLE <u>ONE</u> NUMBER)

   0%   10%   20%   30%   40%   50%   60%   70%   80%   90% (33-34)
   100%

7. What was done with those aerosol spray paint cans which you did <u>not</u> use completely? ("X" ONE BOX)   (35)

   I ultimately threw them away. .☐1     I eventually used them in another job .☐3
   I still have them . . . . . . .☐2     Other (WRITE IN):_____

8. How long a period of time passed before you finally did "use up" the paint? ("X" ONE BOX)   (36)

   A few days . . .☐1     1-2 months . . . .☐4     7-11 months . . . .☐7
   A week . . . . .☐2     3-5 months . . . .☐5     About 1 year. . . .☐8
   2-3 weeks. . . .☐3     About 6 months . .☐6     More than 1 year. .☐9

9. What percentage, approximately, of those aerosol spray paint cans which you did not completely use for a job did you have to discard because of clogged nozzles on the next use? (CIRCLE <u>ONE</u> NUMBER)   (37-38)

   0%   10%   20%   30%   40%   50%   60%   70%   80%   90%   100%

10. Do you presently have any cans of aerosol spray paint in your home?

    Yes . . . . .☐     No . . . . . .☐ ⟶ (GO TO NEXT PRODUCT)   (39)

11. How long have you had these cans?

    A week or less . . . . .☐1     About six months . . . .☐4
    A week to a month. . . .☐2     A year . . . . . . . . .☐5     (40)
    A few months . . . . . .☐3     Over a year. . . . . . .☐6

12. For those cans of aerosol spray paint you have had over six months, what is the probability that they will be used in the next six months? (CIRCLE <u>ONE</u> NUMBER)   (41-42)

    0%   10%   20%   30%   40%   50%   60%   70%   80%   90%   100%

    (43 Open)

- - - - - - - - GO TO NEXT PRODUCT- - - - - - - - -

A-15

1. Does the home you live in now have wall-to-wall carpeting?

   Yes. . . . ☐      No. . . . ☐ ──► (SKIP TO NEXT PRODUCT)   (44

   IF YOU OR A MEMBER OF YOUR HOUSEHOLD HAVE BOUGHT OR RECEIVED WALL-TO-WALL CARPETING MORE THAN ONCE PLEASE ANSWER FOLLOWING QUESTIONS FOR MOST RECENT WALL-TO-WALL CARPETING ONLY.

2. Was this wall-to-wall carpeting new when you or a member of your household bought or received it?

   Yes. . . . ☐         No. . . . ☐   (45

3. What was the main reason(s) for buying or receiving this wall-to-wall carpeting? ("X" AS MANY AS APPLY)   (46-47)

   Old carpet stained . . . . . . . . ☐ 1     Came with home. . . . . . . ☐ 7
   Old carpet cost too much to repair . . . . ☐ 2    Didn't buy, received as gift. ☐ 8
   Old carpet worn out . . . . . . . . ☐ 3    Did not have any, needed a product of this type. . . . ☐ 9
   Additions to home. . . . . . . . . ☐ 4
   Remodeled, not additions . . . . . ☐ 5     Other (Write in):_____
   New carpet more stylish . . . . . . ☐ 6    _____

4. How long have you or a member of your household had this wall-to-wall carpeting?
   (WRITE IN): _____ Years (48-49)  _____ Months (50-51)

5. How much did you or a member of your household pay for this wall-to-wall carpeting? Please include any installation cost.
   (WRITE IN): $_____ per square yard (52-54)

6. Now, please think about other similar types of wall-to-wall carpeting. Do you think this wall-to-wall carpeting is a _higher quality product_ than other similar types of wall-to-wall carpeting, is _about the same quality_, or is a _lower quality product_?   (55 Ope

   Higher quality. . . . . . . ☐ 1    Lower quality. . . . . ☐ 3
   About the same quality. . . ☐ 2    Not sure/Don't know. . ☐ 4   (56

7. How long do you or a member of your household expect to use this wall-to-wall carpeting?
   (WRITE IN): _____ Years (57-58)  _____ Months (59-60)

   THE FOLLOWING QUESTIONS DEAL WITH YOUR HOUSEHOLD'S EXPERIENCE WITH WALL-TO-WALL CARPETING:

8. Have you ever replaced wall-to-wall carpeting with other wall-to-wall carpeting in the home you live in now?

   Yes. . . . . . ☐     No . . . . . . ☐ ──► (GO TO NEXT PRODUCT)   (

9. How many times?
   (WRITE IN):_____ times (62)

10. How long have you lived in this home?
    (WRITE IN):_____ years (63 Ope (64-65)

11. How many rooms does your home have?
    (WRITE IN):_____ ....rooms (66-67)

12. What has been your main reason(s) for getting replacement wall-to-wall carpeting?
    Old carpet stained . . . . ☐ 1    Remodeled home . . . . . . ☐ 4
    Old carpet worn out. . . . ☐ 2    New carpet more stylish. . . ☐ 5   (
    Old carpet torn. . . . . . ☐ 3    Other reason (WRITE IN):_____
    _____

13. What usually happened to the old wall-to-wall carpeting when you or a member of your household bought new wall-to-wall carpeting?
    Sold it . . . . . . . . . . ☐ 1    Have it but do not use it . .☐ 4
    Threw it away . . . . . . . ☐ 2    Use it for other purposes . .☐ 5
    Gave it away. . . . . . . . ☐ 3    Traded it in. . . . . . . . .☐ 6   (
    Still use it. . . . . . . . .☐ 7

                                                                    (70-78 Ope
    - - - - - - - - -GO TO NEXT PRODUCT- - - - - - - - -   79 ☐ 0 7

Job No. L081
Page 16

Card 8
Dup 1-12

1.  Does the home you live in now, have any window glass including storm windows (NOT glass doors)?

    Yes. . . . ☐         No. . . . ☐ ──► (SKIP TO NEXT PRODUCT)        (13)

    IF YOU OR A MEMBER OF YOUR HOUSEHOLD BOUGHT OR RECEIVED WINDOW GLASS MORE THAN ONCE FOR YOUR PRESENT HOME PLEASE ANSWER THE FOLLOWING QUESTIONS FOR THE MOST RECENT WINDOW GLASS ONLY.

2.  Was this window glass new when you or a member of your household bought or received it?

    Yes. . . . ☐         No. . . . ☐                                    (14)

3.  What was the main reason(s) for buying or receiving this window glass? ("X" AS MANY AS APPLY)                                                              (15)

    Adding window glass where no               Didn't buy, received as gift. ☐ 5
      window was before. . . . . . . . . ☐ 1    Other (Write In): _____
    Replacing broken window. . . . . . ☐ 2
    Replacing old window . . . . . . . . ☐ 3    _____
    Needed storm window. . . . . . . . ☐ 4

4.  How long have you or a member of your household had this window glass?

              (WRITE IN): _____ Years _____ Months
                              (16-17)                  (18-19)

5.  How much did you or a member of your household pay for this window glass (Do Not Include Installation costs)?

              (WRITE IN): $_____ per square foot
                             (20-22)

    THE FOLLOWING QUESTIONS DEAL WITH YOUR HOUSEHOLD'S TOTAL EXPERIENCE WITH WINDOW GLASS.
                                                                         (23 Open)

6.  Have you ever bought or replaced any window glass in the home you live in now?

              Yes. . . . . . ☐         No. . . . . . ☐ ──► (GO TO NEXT PRODUCT) (24)

7.  How many times?

              (WRITE IN): _____ times
                             (25)

8.  How long have you lived in this home?                                (26 Open)

              (WRITE IN): _____ years
                             (27-28)

9.  How many window panes (for windows only) does your home have?

              (WRITE IN): _____ panes
                             (29-30)

10. What has been your main reason for getting replacement window glass?

              Old window broke . . . . . . . . . . ☐ 1
              Remodelled window. . . . . . . . . ☐ 2                      (31)
              Old glass unsafe . . . . . . . . . . ☐ 3
              Other reason (WRITE IN): _____

              _____
                                                                         (32 Open)

              - - - - - - - - - GO TO NEXT PRODUCT - - - - - - - - - -

Job No. L091
Page 17

1. Do you or a member of your household own a blow hair dryer (hand held, electric)?

    Yes. . . . ☐        No. . . . ☐ ──▶ (SKIP TO NEXT PRODUCT)   (33)

    IF THERE IS MORE THAN ONE BLOW HAIR DRYER IN YOUR HOUSEHOLD PLEASE ANSWER THE
    FOLLOWING QUESTIONS FOR THE NEWEST ONE ONLY.

2. Was this blow hair dryer new when you or a member of your household bought or received
    it?

    Yes. . . . . . .☐        No. . . . . . .☐        (34)

3. What was the main reason(s) for buying or receiving this blow hair dryer? ("X" AS
    MANY AS APPLY)                                                                       (35-36)

    Old hair dryer cost too much to fix . . ☐1        New hair dryer had more features ☐8
    Old hair dryer wore out . . . . . . . .☐2        Didn't buy, received as gift. . .☐9
    Old hair dryer broke. . . . . . . . .☐3          Did not have hair dryer needed a
    Old hair dryer too small. . . . . . .☐4          product of this type . . . . . .☐0
    Needed more than one. . . . . . . . .☐5          Other (Write In):_____
    New hair dryer more stylish . . . . .☐6          _____
    Old hair dryer contained asbestos . . ☐7

4. How long have you or a member of your household had this blow hair dryer?

    (WRITE IN): _____ Years _____Months
                    (37-38)                  (39-40)

5. How much did you or a member of your household pay for this blow hair dryer?

    (WRITE IN): $_____
                    (41-43)

6. Now, please think about other blow hair dryers of about the same size and with similar
    features. Do you think this blow hair dryer is a higher quality product than other blow
    hair dryers of about the same size and with similar features, is about the same quality,
    or is a lower quality product?                                                      (44 Open)

    Higher quality. . . . . . . ☐1        Lower quality. . . . . ☐3
    About the same quality. . . ☐2        Not sure/Don't know. . ☐4        (45)

7. Has this blow hair dryer been repaired since you or a member of your household have
    had it (Do Not include Maintenance)?

    Yes. . . . ☐        No. . . . ☐ ──▶ (GO TO QU. 10)        (46)

8. How many times has this blow hair dryer been repaired (Do Not Include Maintenance)?

    (WRITE IN): _____ times
                        (47)

9. On the average, when this blow hair dryer is repaired how much does it cost? Please
    include the cost for all parts and labor you had to pay for (Do Not Include    (48 Open)
    Maintenance).

    (WRITE IN): $_____
                    (49-51)

10. How much would you or a member of your household be willing to spend on repairs
    before you think it would be better to get rid of this blow hair dryer and buy another
    hair dryer?                                                                         (52 Open)

    (WRITE IN): $_____
                        (53-55)

11. How long do you or a member of your household expect to use this blow hair dryer?

    (WRITE IN): _____ Years _____ Months    (56 Open)
                    (57-58)                  (59-60)

12. Did you or a member of your household own a blow hair dryer before owning this one?

    Yes. . . . ☐        No. . . . ☐ ──▶ (GO TO NEXT PRODUCT)    (61)

13. How old was the previous blow hair dryer when it was no longer used?

    (WRITE IN): _____ Years _____ Months
                    (62-63)                  (64-65)

14. What happened to the old blow hair dryer when you or a member of your household bought
    this blow dryer?

    Sold it. . . . . . . . . . .☐1        Have it but do not use . . . . ☐5
    Threw it away. . . . . . .☐2          Still use it . . . . . . . . .☐6        (66)
    Gave it away . . . . . . .☐3          Traded it in . . . . . . . . .☐7
    Use it for other purposes.☐4

                                                                    (67-68 Open)

- - - - - - - - - - GO TO NEXT PRODUCT - - - - - - - - - -

Job No. L081
Page 18

1. Do you or a member of your household own an extension cord?

    Yes. . . . ☐        No. . . . ☐ ⟶ (SKIP TO NEXT PRODUCT)    (69)

    IF THERE IS MORE THAN ONE EXTENSION CORD IN YOUR HOUSEHOLD PLEASE ANSWER THE
    FOLLOWING QUESTIONS FOR THE NEWEST ONE ONLY.

2. Was this extension cord new when you or a member of your household bought or
   received it?

    Yes. . . . ☐        No. . . . ☐    (70)

3. What was the main reason(s) for buying or receiving this extension cord? ("X" AS    (71-72)
   MANY AS APPLY)

    Old cord was not working properly  . . ☐ 1      Didn't buy, received as gift. ☐ 6
    Old cord wore out . . . . . . . . . . ☐ 2        Did not have cord, needed a
    Old cord could not be fixed  . . . . . ☐ 3         product of this type. . . . ☐ 7
    Needed more than one . . . . . . . . ☐ 4         Other (Write In):_____
    Need special type of extension cord. ☐ 5

4. How long have you or a member of your household had this extension cord?

    (WRITE IN): _____ Years  _____Months
                    (73-74)                (75-76)              (77-78 Open)

5. How much did you or a member of your household pay for this extenson cord?    79 ☐0☐8☐ 80
                                                                                  Card 9
    (WRITE IN): $ _____                                                Dup 1-12
                    (13-15)

6. Now, please think about other similar types of extension cords.  Do you think this
   extension cord is a higher quality product than other similar extension cords, is
   about the same quality, or is a lower quality product.    (16 Open)

    Higher quality. . . . . . . ☐ 1      Lower quality. . . . . ☐ 3
    About the same quality. . . ☐ 2      Not sure/Don't know. . ☐ 4    (17)

7. How long do you or a member of your household expect to use this extension cord
   before replacing it?

    (WRITE IN):_____ Years_____Months
                  (18-19)              (20-21)

8. Have you ever replaced an extension cord with another extension cord?

    Yes. . . . . . ☐    No. . . . ☐ ⟶ (GO TO NEXT PRODUCT)    (22)

    How many times? (WRITE IN):_____Times    (23)

    Over what period of time? (WRITE IN):_____Years    (24 Open)
                                              (25-26)

9. What have been the main reason(s) for getting a replacement extension cord?

    Old cord not working properly. . . .☐ 1
    Old cord worn out. . . . . . . . . .☐ 2
    Old cord could not be fixed. . . . .☐ 3    (27)
    Old cord lacked enough outlets . . .☐ 4

    Other (WRITE IN):_____

    _____

10. What usually happened to the old extension cord(s) when you or a member of your house-
    hold bought the new extension cord(s)?

    Threw it away. . . . . . . .☐ 1
    Gave it away . . . . . . . .☐ 2    (28)
    Have it but do not use it. .☐ 3

    - - - - - - - -GO TO NEXT PRODUCT- - - - - - - - -

                                                                        (29 Open)

# A-19

Page 19

Job No. L081
Page 19

1. Do you or a member of your household own any bath mats or rugs?

    Yes. . . . ☐        No. . . . ☐ ⟶ (SKIP TO NEXT PRODUC    (30)

IF THERE IS MORE THAN ONE BATH MAT OR RUG IN YOUR HOUSEHOLD PLEASE ANSWER THE FOLLOWING QUESTIONS FOR THE NEWEST ONE ONLY.

2. Was this bath mat or rug new when you or a member of your household bought or received it?

    Yes. . . . ☐        No. . . . ☐    (31)

3. What was the main reason(s) for buying or receiving this bath mat or rug? ("X" AS MANY AS APPLY)    (32-33)

Old mat or rug wore out . . . . . . . ☐ 1    New one more stylish. . . . . ☐ 5
Old mat or rug damaged . . . . . . ☐ 2    Didn't buy, received as gift. ☐ 6
Old mat or rug too small . . . . . . ☐ 3    Did not have one, needed a
Needed more than one . . . . . . . . ☐ 4       product of this type. . . ☐ 7

    Other (Write In) : _____

4. How long have you or a member of your household had this bath mat or rug?

(WRITE IN) : _____ Years _____ Months
    (34-35)    (36-37)

5. How much did you or a member of your household pay for this bath mat or rug?

(WRITE IN) : $ _____ per bath mat or rug
    (38-40)

6. Now, please think about other similar types of bath mats or rugs. Do you think this bath mat or rug is a higher quality product than other similar types of bath mats or rugs, is about the same quality, or is a lower quality product? (41 Open)

Higher quality. . . . . . . ☐ 1    Lower quality. . . . . ☐ 3    (42)
About the same quality . . . ☐ 2    Not sure/Don't know. . ☐ 4

7. How long do you or a member of your household expect to use this bath mat or rug?

(WRITE IN) : _____ Years _____ Months
    (43-44)    (45-46)

THE FOLLOWING QUESTIONS DEAL WITH YOUR HOUSEHOLD'S TOTAL EXPERIENCE WITH BATH MATS AND RUGS

8. Have you ever bought or replaced any bath mats or rugs with another bath mat or rug?

    Yes. . . . . . ☐    No. . . . . ☐ ⟶ (GO TO NEXT PRODUCT)    (47)

9. How many times?

(WRITE IN) : _____ times
    (48)    (49 Open)

10. Over what period of time?

(WRITE IN) : _____ Years
    (50-51)

11. What are your primary reason(s) for getting a replacement bath mat or rug?    (52)

Old mat or rug wore out. . . . ☐ 1    New mat or rug more stylish. . . . ☐ 4
Remodelled bathroom. . . . . . ☐ 2    Need old rug or mat for
Old mat or rug damaged . . . . ☐ 3      other purposes . . . . . . . . ☐ 5

    Other reason (WRITE IN) : _____

12. What usually happened to the old bath mat(s) or rug(s) when you or a member of your household bought new bath mat(s) or rug(s)?

Sold them . . . . . . . . . . . ☐1    Have them but do not use them. ☐ 4
Gave them away. . . . . . . . . ☐2    Traded them in . . . . . . . ☐ 5  (53)
Use them for other purposes . . ☐3    Still use them . . . . . . . ☐ 6

    (54 Open)

- - - - - - - - - GO TO NEXT PRODUCT - - - - - - - - - -

SA84

1. Does the home you live in now have a water heater (electric or gas)?

    Yes. . . . ☐     No. . . . ☐ ⟶ (SKIP TO NEXT PRODUCT)     (55)

    IF YOUR HOUSE HAS MORE THAN ONE WATER HEATER PLEASE ANSWER THE FOLLOWING QUESTIONS FOR THE MOST RECENT WATER HEATER ONLY.

2. Was this water heater new when you or a member of your household bought or received it?

    Yes. . . . . . ☐     No . . . . . . ☐     (56)

3. What was the main reason(s) for buying or receiving this water heater? (X° AS MANY AS APPLY)     (57-58)

    Old water heater cost too much to fix ☐ 1     New water heater had more features. . .☐ 7

    Old water heater wore out . . . . . . ☐ 2     Didn't buy, received as gift. . . . .☐ 8

    Old water heater broke. . . . . . . ☐ 3     Did not have water heater needed

    Old water heater too small. . . . . ☐ 4       a product of this type. . . . . . .☐ 9

    Needed more than one . . . . . . . . ☐ 5     Other (Write In): _____

    Came with home . . . . . . . . . . . ☐ 6     _____

4. How long have you or a member of your household had this water heater?

    (WRITE IN): _____ Years _____ Months
                  (59-60)              (61-62)

5. How much did you or a member of your household pay for ths water heater (Do Not Include Installation cost)?

    (WRITE IN): $ _____
                    (63-65)

6. Now, please think about other water heaters of about the same size and with similar features. Do you think this water heater is a <u>higher quality product</u> than other water heaters of about the same size and with smilar features, is <u>about the same quality</u>, or is a <u>lower quality product</u>?

    Higher quality. . . . . . ☐ 1     Lower quality . . . . ☐ 3     (66 Open)

    About the same quality. . . .☐ 2     Not sure/Don't know . ☐ 4     (67)

7. Has this water heater been repaired since you or a member of your household have had it(Do Not Include Maintenance)?

    Yes. . . . ☐     No. . . ☐ ⟶ (GO TO QU. 10)     (68)

8. How many times has this water heater been repaired (Do Not Include Maintenance)?

    (WRITE IN): _____ times
                    (69)

9. On the average, when this water heater is repaired how much does it cost? Please include the cost for all parts and labor you had to pay for (Do Not Include maintenance).

    (WRITE IN): $ _____     (70 Open)
                    (71-73)

10. How much would you or a member of your household be willing to spend on repairs before you think it would be better to get rid of this water heater and buy (74-78 Open) another water heater?

    (WRITE IN): $ _____     79 ☐0☐9☐ 80
                    (13-15)                    Card 10
                                               Dup 1-12

11. How long do you or a member of your household expect to ue this water heater?

    (WRITE IN): _____ Years _____ Months     (16 Open)
                  (17-18)              (19-20)

12. Did your home have a water heater before this one?

    Yes. . . . ☐     No . . . ☐ ⟶ (GO TO NEXT PRODUCT)     (21)

13. How old was the previous water heater when it was no longer used?

    (WRITE IN): _____ Years _____ Months     (22-23)
                                                        (24-25)

14. What happened to the old water heater when you or a member of your household bought this water heater?

    Sold it. . . . . . . . ☐ 1     Have it but do not use it. . . ☐ 4

    Threw it away. . . . . ☐ 2     Still use it . . . . . . . . ☐ 5     (26)

    Gave it away . . . . . ☐ 3     Traded it in . . . . . . . . ☐ 6

- - - - - - - - - - GO TO NEXT PRODUCT - - - - - - - - - -

A-21

1. Do you or a member of your household own any upholstered furniture with o· :ina'
fabric?

Yes. . . . ☐          No. . . . ☐                         (2

IF THERE IS MORE THAN ONE PIECE OF UPHOLSTERED FURNITURE WITH ORIGINAL FABRIC
IN YOUR HOUSEHOLD, PLEASE ANSWER THE FOLLOWING QUESTIONS FOR THE MOST RECENT UPHOL-
STERED FURNITURE ONLY.

2. Was this upholstered furniture new when you or a member of your household
bought or received it?

Yes. . . . ☐          No. . . . ☐                         '2·

3. What was the main reason(s) for buying or receiving this upholstered furniture?
("X" AS MANY AS APPLY)                                     (30-31

Old furniture damaged. . . . . . . ☐1      Remodeled room(s)/house . . . ☐6

Old furniture wore out . . . . . . ☐2      Didn't buy, received as gift. ☐7

Old furniture broke. . . . . . . . ☐3      Did not have furniture, needed

Needed more furniture. . . . . . . ☐4          a product of this type. . . ☐8

New furniture is more stylish. . . ☐5      Other (Write In): _____

4. How long have you or a member of your household had this upholstered furniture with
original fabric?

(WRITE IN): _____ Years _____ Months
            (32-33)            (34-35)
            (QUESTIONS 5 AND 6 NOT USED)

7. Has this upholstered furniture been repaired since you or a member of your
household have had it (not reupholstered)?

Yes. . . . ☐          No. . . . ☐ ——→ (GO TO QU. 10)    :6)

8. How many times has this upholstered furniture been repaired (not reupholstered)?

(Write In): _____ : times
                (37)

9. On the average, when this upholstered furniture is repaired how much does it cost?
Please include the cost for all parts and labor you had to pay for.    (38 Open)

(WRITE IN): $ _____
               (39-41)

10. How much would you or a member of your household be wiling to spend on repairs
(not re-upholstering) before you think it would be better to get rid of this
upholstered furniture or re-upholster it?                  (42 Open)

(WRITE IN): $ _____ ...
               (43-45)

11. How long do you or a member of your household expect to use this upholstered fur-
niture before replacing or re-upholstering it?           (45 Open)

(WRITE IN): _____ Years _____ Months
            (47-48)            (49-50)

12. Did you or a member of your household own upholstered furniture with original fabric
before owning this furniture?

Yes. . . . ☐          No. . . . ☐                         (51)

13. How old was the previous upholstered furniture when it was replaced or re-upholstered?

(WRITE IN): _____ Years _____ Months
            (52-53)            (54-55)

14. What happened to the old upholstered furniture when you or a member of your
household bought or received this upholstered furniture?

Sold it. . . . . . . . ☐1      Have it but do not use it. . . ☐4

Threw it away. . . . . ☐2      Still use it . . . . . . . . . ☐5    (56)

Gave it away . . . . . ☐3      Had it re-upholstered. . . . . ☐6

(57-78 Open)

79 ☐1|0: 80

SA86

# APPENDIX B

## FREQUENCY DISTRIBUTIONS
## FOR SURVEYED PRODUCTS

FIGURE B-1.  SURVEYED FREQUENCY DISTRIBUTION FOR
BLOW HAIR DRYERS AT 2-YEAR INTERVALS



| Years | Number of Failures | Average Number of Failures/Year |
|---|---|---|
| 1-2 | 12 | 6.0 |
| 3-4 | 21 | 10.5 |
| 5-6 | 18 | 9.0 |
| 7-8 | 3 | 1.5 |
| 9-10 | 3 | 1.5 |

FIGURE B-2.   SURVEYED FREQUENCY DISTRIBUTION FOR
EXTENSION CORDS AT 5-YEAR INTERVALS



| Year | Number of Failures | Average Number of Failures/Year |
|------|--------------------|--------------------------------|
| 1-5 | 26 | 5.2 |
| 6-10 | 15 | 3.0 |
| 11-15 | 7 | 1.4 |
| 16-20 | 5 | 1.0 |
| 21-25 | 3 | 0.6 |
| 26-30 | 5 | 1.0 |

FIGURE B-3. SURVEYED FREQUENCY DISTRIBUTION FOR
BATH MATS AT 5-YEAR INTERVAL



| Years | Number of Failures | Average Number of Failures/Year |
|---|---|---|
| 1-5 | 32 | 6.4 |
| 6-10 | 22 | 4.4 |
| 11-15 | 10 | 2.0 |
| 16-20 | 11 | 2.2 |
| 21-25 | 10 | 2.0 |
| 26-30 | 9 | 1.8 |
| 31-35 | 2 | 0.4 |
| 36-40 | 3 | 0.6 |
| 41-45 | . | |

FIGURE B-4.  SURVEYED FREQUENCY DISTRIBUTION FOR
GAS LAWN MOWERS AT 2-YEAR INTERVALS



| Years | Number of Failures | Average Number of Failures/Year |
|-------|--------------------|--------------------------------|
| 1-2   | 3                  | 1.5                            |
| 3-4   | 11                 | 5.5                            |
| 5-6   | 23                 | 11.5                           |
| 7-8   | 11                 | 5.5                            |
| 9-10  | 9                  | 4.5                            |
| 11-12 | 2                  | 1.0                            |
| 13-14 | 1                  | 0.5                            |
| 15-16 | 5                  | 2.5                            |
| 17-18 | 3                  | 1.5                            |



FIGURE B-5. SURVEYED FREQUENCY DISTRIBUTION FOR
CHILDREN'S SLEEPWEAR AT 1-YEAR INTERVALS

| Year | Number of Failures |
|---|---|
| 1 | 40 |
| 2 | 28 |
| 3 | 11 |
| 4 | 1 |
| 5 | 3 |
| 6 | 1 |

FIGURE B-6.  SURVEYED FREQUENCY DISTRIBUTION FOR
WATER HEATERS AT 5-YEAR INTERVALS



| Years | Number of Failures | Average Number of Failures/Year |
|-------|--------------------|---------------------------------|
| 1-5   | 8                  | 1.6                             |
| 6-10  | 23                 | 4.6                             |
| 11-15 | 20                 | 4.0                             |
| 16-20 | 9                  | 1.8                             |
| 21-25 | 1                  | 0.2                             |
| 26-30 | 6                  | 1.2                             |



FIGURE B-7.  SURVEYED FREQUENCY DISTRIBUTION FOR
UPHOLSTERED FURNITURE AT 5-YEAR INTERVALS

| Years | Number of Failures | Average Number of Failures/Year |
|---|---|---|
| 1-5 | 18 | 3.6 |
| 6-10 | 38 | 7.6 |
| 11-15 | 25 | 5.0 |
| 16-20 | 16 | 3.2 |
| 21-25 | 2 | 0.4 |
| 26-30 | 2 | 0.4 |

FIGURE B-8 .  SURVEYED FREQUENCY DISTRIBUTION FOR UNVENTED
GAS SPACE HEATERS AT 5-YEAR INTERVALS



| Years | Number of Failures |
|-------|--------------------|
| 1-5   | 13                 |
| 6-10  | 9                  |
| 11-15 | 2                  |
| 16-20 | 0                  |
| 21-25 | 0                  |
| 26-30 | 1                  |

FIGURE B-9 . SURVEYED FREQUENCY DISTRIBUTION FOR
NARROW TIRED BIKES AT 2-YEAR INTERVALS



| Years | Number of Failures |
|-------|--------------------|
| 1-2   | 6 |
| 3-4   | 6 |
| 5-6   | 6 |
| 7-8   | 3 |
| 9-10  | 2 |
| 11-12 | 1 |
| 13-14 | 1 |
| 15-16 | 1 |

FIGURE B-10. SURVEYED FREQUENCY DISTRIBUTION FOR ELECTRIC
AUTOMATIC DRIP COFFEE MAKERS AT 2-YEAR INTERVALS



| Years | Number of Failures |
|-------|--------------------|
| 1-2   | 5                  |
| 3-4   | 5                  |
| 5-6   | 0                  |
| 7-8   | 2                  |

FIGURE B-11.   SURVEYED FREQUENCY DISTRIBUTION FOR
HAIR DRYERS AT 5-YEAR INTERVALS



| Year | Number of Failures |
|------|:---:|
| 1-5 | 8 |
| 6-10 | 4 |
| 11-15 | 1 |
| 16-20 | 2 |

FIGURE B-12.  SURVEYED FREQUENCY DISTRIBUTION OFR
BALLOON-TIRED BIKES AT 5-YEAR INTERVALS



| Year | Number of Failures |
|------|--------------------|
| 1-5 | 11 |
| 6-10 | 3 |
| 11-15 | 3 |
| 16-20 | 1 |
| 21-25 | 2 |

FIGURE B-13.  SURVEYED FREQUENCY DISTRIBUTION FOR
PLAYGROUND EQUIPMENT AT 5-YEAR INTERVALS



| Year | Number of Failures |
|------|--------------------|
| 1-5   | 5 |
| 6-10  | 3 |
| 11-15 | 2 |
| 16-20 | 1 |
| 21-25 | 1 |
| 26-30 | 1 |

FIGURE B-14. SURVEYED FREQUENCY DISTRIBUTION FOR
ELECTRIC LAWN MOWERS AT 2-YEAR INTERVALS



| Year | Number of Failures |
|------|--------------------|
| 1-2 | 1 |
| 3-4 | 1 |
| 5-6 | 4 |
| 7-8 | 1 |
| 9-10 | 3 |
| 11-12 | 1 |
| 13-14 | 0 |
| 15-16 | 1 |

FIGURE B-15.  SURVEYED FREQUENCY DISTRIBUTION FOR WOOD
OR COAL HEATING STOVES AT 5-YEAR INTERVALS



| Years | Number of Failures |
|-------|--------------------|
| 1-5   | 5 |
| 6-10  | 1 |
| 11-15 | 1 |
| 16-20 | 2 |
| 21-25 | 1 |
| 26-30 | 0 |
| 31-35 | 1 |

FIGURE B-16.  SURVEYED FREQUENCY DISTRIBUTION FOR
EXTENSION LADDERS AT 5-YEAR INTERVALS



| Year | Number of Failures |
|-------|-------|
| 1-5 | 2 |
| 6-10 | 1 |
| 11-15 | 4 |