IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

WINDOW COVERING MANUFACTURERS ASSOCIATION,

Petitioner,

v.

UNITED STATES CONSUMER PRODUCT SAFETY COMMISSION,

Respondent.

On Petition For Review of a Final Rule of the
United States Consumer Product Safety Commission

**REPLY IN SUPPORT OF MOTION FOR A STAY PENDING REVIEW,
REMAND AND VACATUR, OR EXPEDITED CONSIDERATION**

Avi M. Kupfer
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600

Wajdi C. Mallat
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500
*Licensed only in Utah;
New York admission pending.*

Nicole A. Saharsky
Erika Z. Jones
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3000
nsaharsky@mayerbrown.com

*Counsel for Petitioner Window Covering Manufacturers Association*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................1

ARGUMENT .........................................................................................2

    A.    WCMA Has Established Irreparable Injury .......................................2

    B.    WCMA Has Established A Likelihood Of Success ............................4

CONCLUSION ....................................................................................11

REPLY ADDENDUM ........................................................................RA1

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Consumers' Research v. CPSC*,
   592 F. Supp. 3d 568 (E.D. Tex. 2022)...................................................5

*Finnbin, LLC v. CPSC*,
   45 F.4th 127 (D.C. Cir. 2022).........................................................5, 9

*Forester v. CPSC*,
   559 F.2d 774 (D.C. Cir. 1977).........................................................5

*Humphrey's Executor v. United States*,
   295 U.S. 602 (1935)........................................................................5

*In re NTE Conn., LLC*,
   26 F.4th 980 (D.C. Cir. 2022).........................................................3, 4

*Owner-Operator Indep. Drivers Ass'n v. FMCSA*,
   494 F.3d 188 (D.C. Cir. 2007).......................................................11

*Seila Law LLC v. CFPB*,
   140 S. Ct. 2183 (2020)...................................................................5

*Whitman-Walker Clinic, Inc. v. HHS*,
   485 F. Supp. 3d 1 (D.D.C. 2020).................................................4

*Wis. Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985).......................................................3, 4

*Zen Magnets, LLC v. CPSC*,
   841 F.3d 1141 (10th Cir. 2016) .....................................................4

**Statutes, Regulations, and Rules**

Administrative Procedure Act,
   5 U.S.C. § 551 *et seq.* ...............................................................4, 5

Consumer Product Safety Act,
   15 U.S.C. § 2051 *et seq.*

   § 2058(f)(1) .................................................................................4, 11

**Statutes, Regulations, and Rules (continued)**                    **Page(s)**

Consumer Product Safety Act,
    15 U.S.C. § 2051 *et seq.*

    § 2058(f)(1)(A) ....................................................................8

    § 2058(f)(3) ....................................................................4, 11

    § 2058(f)(3)(A) ............................................................5, 6, 7, 8

    § 2058(f)(3)(D)(i) ..............................................................8, 9

    § 2058(f)(3)(E) ..................................................................5, 8

    § 2058(f)(3)(F) ....................................................................10

    § 2058(g)(1) ..........................................................................6

    § 2060(b) ..............................................................................10

    § 2060(c) ................................................................................6

16 C.F.R. § 1031.4(a)(3) ....................................................................6

16 C.F.R. § 1260.1(a) ........................................................................2

16 C.F.R. § 1260.4 ..........................................................................11

16 C.F.R. § 1260.4(e)(4) ....................................................................6

**Other Authorities**

87 Fed. Reg. 73,144 (Nov. 28, 2022)....................................2, 8, 9, 10, 11

# INTRODUCTION

Since 1996, WCMA has led the way in making window coverings more and more safe. It adopted a voluntary industry standard in 1996 and revised that standard seven times, including again in 2022. As a result, the injury risk from cords has fallen dramatically, and the 2022 revision will decrease that risk even further. That is exactly what Congress envisioned when it adopted the Consumer Product Safety Act (CPSA)—for the industry to lead the way.

Rather than continuing to work with WCMA to adopt workable standards, the CPSC bulldozed forward with a mandatory rule. Manufacturers cannot possibly comply with the Rule in six months; they told the CPSC that during rulemaking and documented that in declarations. The industry will lose hundreds of millions of dollars (with no way to get it back from the government), people will lose their jobs, and small businesses will close. The Rule already is causing irreparable injury, as manufacturers scramble to transform their operations and modify existing contracts.

The CPSC's justifications for the Rule are flimsy. Of course there is a strong interest in protecting children, but the voluntary standard has effectively addressed those risks, and the CPSC's own staff said that the Rule will not have meaningful benefits in six months. The CPSC claims compliance is easy, pointing to rules for stock products and Canadian products. But the solutions for stock products do not work for custom products, and products developed for Canada do not comply with

the Rule. The CPSC overrode many judgments made by its staff, including their rejection of a six-month effective date. Worse yet, the Rule was a moving target up until the last minute, which deprived the industry of any meaningful opportunity to comment. The CPSC said *nothing* about the 2022 revision to the voluntary standard until the final Rule, giving the industry no chance to respond.

At its core, the government's argument comes down to a claim of deference— "trust us." But that is the exact opposite of what Congress prescribed in the CPSA. It said to allow the industry to regulate through voluntary standards first. It put the burden on the agency to justify further regulation, and it directed courts to apply a stricter-than-usual standard of review. The CPSC may disagree with Congress's preference for voluntary standards, but it must comply with the CPSA. It has not come close to doing so here. The Court should stay or vacate and remand the Rule.

## ARGUMENT

### A. WCMA Has Established Irreparable Injury

1. Without a stay, the Rule will devastate the multi-billion-dollar custom window coverings industry. About 60% of custom products use operating cords. 87 Fed. Reg. 73,144, 73,149 (Nov. 28, 2022). Under the Rule, those products no longer can be sold in five months. 16 C.F.R. § 1260.1(a). But substitute Rule-compliant products will not be available for two years. A14, A76, A131, A143.

In the meantime, the Rule already is harming WCMA's members. They are racing to transform their operations to produce additional non-corded products and to modify existing contracts. A21-23, A83-84, A137-39. As the Rule's effective date approaches, manufacturers expect to lose hundreds of millions of dollars and to be forced to lay off employees, and small businesses that rely on those products will suffer acute financial stress. A22-23, A83-85, A137-39, A144-5, A153-54. None of this will help consumers: With no corded custom products available, many customers will decide to keep older, less safe products, A163, because non-corded alternatives are infeasible, A6-9, A67-70, A126-28.

In comments on the proposed Rule, manufacturers warned that a six-month effective date would be catastrophic. A728-730, RA13-14, RA24-25, RA35-36, RA50-54, RA60, RA63-64. The CPSC staff found those concerns "credible": It concluded that a six-month effective date would "be very disruptive for producers" and could "significant[ly] impact" small businesses in particular. A524, A619, A633.

The CPSC contends (Opp. 25-26) that financial harm cannot justify a stay. That is incorrect: *Wisconsin Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985) (per curiam) (cited in Opp. 25), said only that "[r]ecoverable monetary loss" cannot justify a stay. 758 F.2d at 674. Where, as here, "no adequate compensatory or other corrective relief" is available, "financial injury can be irreparable." *In re NTE Conn.,*

*LLC*, 26 F.4th 980, 990 (D.C. Cir. 2022); *see Wis. Gas*, 758 F.2d at 674 ("threaten[ing] the very existence of" a business is irreparable injury). Courts often find financial harm to be irreparable in agency rulemaking cases. *See, e.g.*, *Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 57-59 (D.D.C. 2020) (citing cases). And the CPSC's argument is cold comfort to people who will lose their jobs and businesses that will close.

2. The balance of equities strongly favors a stay, because the Rule will not meaningfully improve public safety in six months. Child-safety incidents already are rare, and the 2022 revision will reduce them even further. Stay Mot. 20-21.

The CPSC argues (Opp. 26-27) that the Rule will improve safety by preventing sales of existing corded products, but new products will not be available for two years, leaving customers to continue using older, less safe products. A163. As the CPSC staff determined, any benefit from a six-month effective date will be "very small." A524.

**B.      WCMA Has Established A Likelihood Of Success**

The CPSC contends (Opp. 9-24) that the Rule is subject to "highly deferential[]" Administrative Procedure Act (APA) review. Opp. 19. That ignores the CPSA's unique provisions. Congress required the CPSC to rely on a voluntary standard unless it specifically establishes that the standard will not sufficiently reduce risk. 15 U.S.C. § 2058(f)(1), (3); *Zen Magnets, LLC v. CPSC*, 841 F.3d 1141,

1147 (10th Cir. 2016); *see* Stay Mot. 2-3. The CPSC cannot simply assert that a mandatory rule is necessary; it must justify the rule using a "rigorous cost-benefit analysis," *Finnbin, LLC v. CPSC*, 45 F.4th 127, 135 (D.C. Cir. 2022); *see* 15 U.S.C. § 2058(f)(3)(E), and justify its chosen effective date, *id.* § 2058(f)(3)(A).

Further, as this Court has recognized, the CPSA's judicial-review provision is "more strict" than the "requirements . . . found in the [APA]." *Forester v. CPSC*, 559 F.2d 774, 789 n.22 (D.C. Cir. 1977); *see* Stay Mot. 3. The government relies (Opp. 10-11) on the standard of review applicable to the Federal Hazardous Substances Act in *Forester*, but this Court found "significant procedural differences" between that statute and the CPSA, including that the CPSA requires "express findings concerning the need for and effect of the proposed regulations." 559 F.2d at 783 n.11, 789 n.22; *see* Opp. 10 (citing *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 54 (D.C. Cir. 2014) (per curiam), which also concerned a statute besides the CPSA).

The CPSC's findings do not come close to justifying the mandatory Rule. Three particular problems stand out.[1]

---

[1] WCMA also explained that the CPSC's structure has a constitutional defect. Stay Mot. 18 n.1 The CPSC says that argument is foreclosed by *Humphrey's Executor v. United States*, 295 U.S. 602 (1935). Opp. 24-25 n.3. But the *Humphrey's Executor* exception applies only to a bipartisan, multimember expert body that does not "exercise any executive power." *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2199 (2020). Here, the CPSC "exercises substantial executive power" by promulgating rules and imposing monetary penalties. *Consumers' Research v. CPSC*, 592 F.

1. The CSPC did not justify its six-month effective date. The CPSA includes two provisions about effective dates: It creates a presumptive 180-day effective date, 15 U.S.C. § 2058(g)(1), but then separately requires the CPSC to find that a chosen effective date is "reasonably necessary," *id.* § 2058(f)(3)(A). The CPSC focuses on the former and ignores the latter. Opp. 18-21. The CPSC cannot rely only on the former (and claim deference) when the latter requires a specific finding subject to a heightened standard of review, 15 U.S.C. § 2060(c).

Significantly, the CPSC staff—on whose analysis the Rule rests—agreed that compliance in six months is infeasible. Finding manufacturers' concerns "credible," it found that a six-month effective date would "be very disruptive for producers" and could "significant[ly] impact" small businesses. A524, A619, A633. The staff repeatedly stated that any benefit from shortening the effective date to six months would be "very small." *Id.* The Commissioners overrode those recommendations with no independent feasibility or risk analysis. Stay Mot. 14; *cf.* 16 C.F.R. § 1031.4(a)(3) (making CPSC staff responsible for analyzing voluntary standards).

The CPSC did not make "contrary findings" (Opp. 25) to justify the six-month effective date. Instead, it made a blanket assertion that industry can comply with the effective date, 16 C.F.R. § 1260.4(e)(4), which it now tries to justify (Opp. 8)

Supp. 3d 568, 584 (E.D. Tex. 2022), *appeal docketed*, No. 22-40328 (5th Cir. May 18, 2022).

through a single cherry-picked comment with no supporting evidence, RA38-42. That ignores the many contrary comments provided to the agency, A728-730, RA13-14, RA24-25, RA35-36, RA50-54, RA60, RA63-64, and this Court, A14, A76, A131, A143, detailing manufacturers' inability to comply. Further, the government is wrong to criticize (Opp. 19) industry comments on this point; they were lengthy and detailed, *see, e.g.*, A728-730, RA13-14, RA35-36, RA50-54, RA60, RA63-64, and the CPSC staff found them "credible." A524. The Commissioners made no contrary credibility finding.

The CPSC asserts that compliance will be easy based on comparisons to stock products and the Canadian rule. Opp. 8, 13, 19-20; *see* Public Citizen Amicus Br. 9. But cordless systems for stock products cannot simply be transferred to larger, more complex custom products. A18-21, A79-82, A133-36. Besides, manufacturers had one year to develop (less complicated) cordless systems for stock products. RA66. And the Canadian regulation is materially different from the Rule; products that comply with that regulation do not comply with the Rule. Stay Mot. 14-15. Besides, the CPSC did not rely on the Canadian regulation in the proposed Rule, instead raising it at the last minute, A266, A275, when the industry had no chance to respond.

2. The CPSC failed to make the findings required under the CPSA to adopt a mandatory rule. The CPSC had to establish that compliance with the voluntary standard will not "eliminat[e] or adequate[ly] reduc[e]" an "unreasonable risk of

injury" from the products. 15 U.S.C. § 2058(f)(3)(A), (D)(i). The CPSC also had to make findings about the "degree . . . of the risk of injury" under the voluntary standard and show that a mandatory rule is the "least burdensome" way to reduce that risk. *Id.* § 2058(f)(1)(A), (3)(E). The CPSC did not do that here. It relied on risks of cords in general, without addressing how revisions to the voluntary standard have decreased—and will continue to decrease—those risks. Stay Mot. 7-10.

A fundamental flaw in the CPSC's analysis is that it treats the voluntary standard as an afterthought. It barely addressed the 2022 revision (at the last minute), and it does not account for ways that earlier revisions materially reduced risks. Stay Mot. 8-9. The voluntary standard has worked: The child injury rate has decreased over 400% since 2009, and two recent revisions would eliminate half of the remaining known incidents involving custom products, 87 Fed. Reg. at 73,152; A672. The CPSC misleadingly states (Opp. 6) that there are an estimated 200 annual incidents from 2009-2020 across stock *and* custom products, but it has acknowledged that over 90% involved products that are not allowed after the 2018 revision, A585-86. Indeed, the CPSC separately estimates only 14.4 annual incidents for stock and custom products "associated with cord types that are within [the] scope of" the Rule, 87 Fed. Reg. at 73,182, which does not even account for the risk-reducing effects of recent voluntary standard revisions.

The CPSC responds that the Rule is needed because the voluntary standard does not eliminate *all* risk. Opp. 11; *see* Public Citizen Amicus Br. 5-8. But the whole point of CPSA provisions requiring detailed findings is that the agency has to do a more nuanced analysis. Besides, the CPSC did not actually make findings connecting the asserted risks to the Rule. For example, for one of the three types of corded products (retractable cords), the agency found no recorded incidents, 87 Fed. Reg. at 73,178, and the 2022 revision eliminates another type (cord lock), A684-85.

The CPSA requires a "rigorous cost-benefit analysis," *Finnbin*, 45 F.4th at 135, given the enormous impact of mandatory rules on industry and the preference for voluntary standards. But the CPSC's analysis completely failed to account for the commercial market. Stay Mot. 11. The "sources" on which the CPSC relied, Opp. 14, considered only residential products, A846; *see* 87 Fed. Reg. at 73,149; A603-10, and WCMA's comments pointed that out, A755. Further, the CPSC's estimated cost of new operating systems (supposedly $24 per product, Opp. 14) is obviously off because it is based on average-sized stock products, not more expensive, complex custom products. Stay Mot. 11. The CPSC's estimated $14.7 million compliance cost, 87 Fed. Reg. at 73,182, accounts for only one type of operating system (a rigid cord shroud), Opp. 15 (citing A565), and ignores many other significant costs, Stay Mot. 11-12, as the CPSC itself has acknowledged, *see*

A565.  The bottom line is that the CPSC did a shoddy job, and cannot satisfy its burden under the CPSA by claiming deference.

3.     The CPSC's findings violated the APA's notice-and-comment requirements.  Most notably, even though CPSC staff had been working with WCMA to revise the voluntary standard since May 2021, A723, the CPSC did not even address the 2022 revision until the Final Rule, 87 Fed. Reg. at 73,165-68.  The agency's sandbagging deprived WCMA of any opportunity to respond.  And its criticisms of the revision lack merit; the 2022 revision significantly reduces injury risks by phasing out free-hanging cords, eliminating cord loops from many products, and requiring tension devices installed with cord loops.  A684-85.

The CPSC attempts to justify (Opp. 16) disregarding the 2022 revision by saying it was not yet in effect.  But the CPSA specifically requires the CPSC to consider any "le[ss] burdensome" alternatives to a mandatory rule, 15 U.S.C. § 2058(f)(3)(F), which include a near-final voluntary standard revision.  The CPSC's other response (Opp. 24)—that WCMA should have petitioned to reopen the comment period after the Rule became final—is absurd, especially since the CPSC opposes WCMA's request for a remand to provide comments here.[2]

_____

[2]  The CPSC contends (Opp. 27) that 15 U.S.C. § 2060(b) does not allow vacatur and remand.  But that is the whole point of this unique provision, which authorizes courts to require the CPSC to "provide additional opportunity for" comments in order to "modify its findings." *Id.*

The CPSC made other significant, last-minute changes to the Rule. It raised 15 previously undisclosed incidents, 87 Fed. Reg. at 73,151-53, and still refuses to provide WCMA with any information about them, *see* A166-70. And it kept changing the cost-benefit analysis, Stay Mot. 16-17, giving the industry no chance to comment on key aspects of the model and the "critical factual material used to support" the Rule, *Owner-Operator Indep. Drivers' Ass'n v. FMCSA*, 494 F.3d 188, 201 (D.C. Cir. 2007).

The CPSC does not dispute those last-minute changes, instead suggesting (Opp. 21-23) that does not matter because it modified only the findings, not "the Final Rule itself." But the findings indisputably are part of the Rule. 15 U.S.C. § 2058(f)(1), (3); *see* 16 C.F.R. § 1260.4. The agency has no excuse for its eleventh-hour hijinks, especially in a case where it has a heightened burden to justify its regulation.

## CONCLUSION

The Court should stay the Rule pending review, or vacate and remand the Rule. Alternatively, the Court should expedite review on the agreed-upon schedule.

Respectfully submitted,

/s/ *Nicole A. Saharsky*

Avi M. Kupfer
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600

Nicole A. Saharsky
Erika Z. Jones
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3000
nsaharsky@mayerbrown.com

Wajdi C. Mallat*
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500
*Licensed only in Utah;*
*New York admission pending.*

*Counsel for Petitioner Window Covering Manufacturers Association*

Dated: January 3, 2023

**CERTIFICATE OF COMPLIANCE**

This filing complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 2599 words excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 27(a)(2)(B).

This filing complies with the typeface requirements of Rule 32(a)(5) and the type-style requirement of Rule 32(a)(6) because it was prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman 14-point type for text and footnotes.

*/s/ Nicole A. Saharsky*
Nicole A. Saharsky

**CERTIFICATE OF SERVICE**

I hereby certify that on January 3, 2023, I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system which will serve all counsel of record.

*/s/ Nicole A. Saharsky*
Nicole A. Saharsky

**REPLY ADDENDUM**

# REPLY ADDENDUM TABLE OF CONTENTS

| Document | Page Number |
|---|---|
| Exhibit 1 – Springs Window Fashions, LLC Comment on Proposed Rule (Mar. 23, 2022) | RA1 |
| Exhibit 2 – Office of Advocacy, U.S. Small Business Admin., Comment on Proposed Rule (Mar. 23, 2022) | RA21 |
| Exhibit 3 – Rowley Company, LLC Comment on Proposed Rule (Mar. 23, 2022) | RA27 |
| Exhibit 4 – Safe T Shade, LLC Comment on Proposed Rule (Mar. 23, 2022) | RA37 |
| Exhibit 5 – Hunter Douglas, Inc. Comment on Proposed Rule (Mar. 22, 2022) | RA43 |
| Exhibit 6 – Custom Brands Group Comment on Proposed Rule (Mar. 22, 2022) | RA55 |
| Exhibit 7 – 3 Day Blinds Comment on Proposed Rule (Mar. 21, 2022) | RA61 |
| Exhibit 8 – Press Release, WCMA, Window Covering Manufacturers Association Announces Historic New Window Covering Safety Standard (Jan. 25, 2018) | RA65 |

# EXHIBIT 1

An official website of the United States Government.  🇺🇸

Docket (/docket/CPSC-2013-0028)  /  Document (CPSC-2013-0028-1567) (/document/CPSC-2013-0028-1567)
  / Comment

 **PUBLIC SUBMISSION**

# Comment from Springs Window Fashions, LLC

Posted by the **Consumer Product Safety Commission** on Mar 23, 2022

View More Comments   2.06K   (/document/CPSC-2013-0028-1567/comment)

View Related Comments   3.62K   (/docket/CPSC-2013-0028/comments?filter=springs)         Share ▾

---

Comment

March 23, 2022

Ms. Alberta Mills
Secretary
Division of the Secretariat
Office of the General Counsel
U.S. Consumer Product Safety Commission
4330 East West Highway
Bethesda, MD 20814

Re: Comments on CPSC-2013-0028 – Safety Standard: Operating Cords on Custom Window Coverings,
Notice of Proposed Rulemaking

Dear Ms. Mills,

Springs Window Fashions, LLC appreciates the opportunity to comment on CPSC-2013-0028 – Safety
Standard: Operating Cords on Custom Window Coverings, Notice of Proposed Rulemaking.

Attached are Spring Window Fashions, LLC's comments.

Should you have any questions or need for additional information, please do not hesitate to contact me.

Regards,

Dan Aiman
SVP & General Counsel

RA2

Attachments  1

📄  Springs Window Fashions LLC Comments CPSC 2013 0028 v20220323

⬇ Download ▾

**Comment ID**

CPSC-2013-0028-3587

◎ **Tracking Number**

l14-4uc3-1diz

| Comment Details | Submitter Info |
|---|---|

**Document Subtype**

Public Comment

**Received Date**

Mar 23, 2022



About        Bulk Data Download        Agencies        Learn

(/about)        (/bulkdownload)        (/agencies)        (/learn)

Reports        FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)        (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

RA4

## I.      Introduction:

Springs Window Furnishings, LLC is a leading manufacturer of custom window coverings, serving the residential and commercial markets. Our product categories include shades, blinds, shutters, soft coverings and awnings, which are sold through dealers (national chains and independents), retail and internet accounts (big box retailers and internet retailers) and commercial channels (architects and dealers).

Our Company is headquartered in Middleton, Wisconsin, and employs over 9,000 employees. We manufacture tens of thousands of custom products on a daily basis.

Our sales closely mirror the diversification of the custom windows coverings market, with a split between residential and commercial markets of approximately 80%/20%.

SWF is a member of Window Coverings Manufacturer's Association ("WCMA") and our products comply with the current 2018 American National Standards Institute (ANSI)/WCMA Standard for Safety of Window Covering Products (ANSI/WCMA-2018).  SWF has been an active participant on the committee that developed the voluntary standards for window coverings, which have continuously improved the safety of windows coverings, greatly reducing the risks of the hazards associated with window coverings.

**Our products:**

Window coverings are offered as either stock or custom.  The stock segment is comprised of pre-packaged products based on the average desired specifications of end-consumers and are generally maintained in the retailers' channel inventory. Conversely, the custom segment is comprised of made-to-order products based on each end-consumer's desired specifications, including dimensions, fabrics, colors, control mechanisms and mounting techniques.

Consumers are assisted in their decision making at the point of purchase with customer trained sales associates, product samples and point of purchase sample materials. Custom products require more flexibility than stock products to allow for a product that can service windows that are standard and non-standard sizes and shapes, including in places with location constraints (e.g. transom, out of reach or difficult to reach).  The custom category is made up of over 20 totally different product categories that will require multiple and new engineering solutions to achieve possible compliance with the Proposed Standard.[1] Custom products are a complex category to create and require significant coordination between procurement, manufacturing, logistics and customer service functions in order to

---

[1]   The following is a non-exhaustive live of the various types of custom window coverings, each of which will require its own engineering solution to comply with the Proposed Standard: (1) horizontal blinds made of aluminum; (2) horizontal blinds made of wood; (3) horizontal blinds made of composite material; (4) horizontal blinds made of plastic; (5) vertical blinds; (6) cellular shades; (7) pleated shades; (8) roller shades; (9) woven wood shades; (10) banded shades; (11) vertical panels; (12) horizontal shadings; (13) vertical shadings; (14) multi-functional shadings; (15) cellular roller shades (16) roman style shadings; (17) roman style shadings; (18) insulating shadings; (19) balloon shades; (20) traditional roman shades; and (21) specialty shapes in multiple applications and product styles.

1

configure and manufacture products to meet established lead time and delivery requirements, thus making them more complicate to design, engineer, and bring to market.

According to industry data, custom window coverings sold in the United States are approximately 60% of the window coverings market in dollars (which represents approximately 20% of the window coverings units sold). Over 95 percent of our unit sales and revenue were custom products in fiscal year 2021. We offer a comprehensive portfolio of custom blinds, shades, shutters, awnings and related accessories for residential and commercial end-markets.

**Overview of our brands**

*Residential End-Market:*

We offer a set of premium and value brands for the residential window covering end-market, including Graber, Horizons, Bali, and Vitale.

*Commercial: End-Market:*

It appears that based on the NPR the Proposed Standard intends to address potential hazards of window coverings in residences[2]. However, the Proposed Standard applies to all custom products and all SWF's commercial products are custom. Given the broad interpretation of the definition of "consumer products" under the Consumer Product Safety Act, this means that many of our strictly commercial products could be subject to this regulation, unless the Commission makes clarifying changes to its definition of "custom window covering" as outlined later in this comment. As such, our we are including our custom commercial product in our comments including Mecho (a technology focused, for shades with highly specified product features, advanced designs and energy efficiency capabilities) and SWFContract ("mass market" brand, offering more economical product options).

**Our sales channels:**

SWF covers both the residential and commercial custom window coverings market. Approximately 76% of our custom sales in fiscal year 2021 of window coverings, were generated in the residential market across the dealer and retail channels, which is primarily geared towards sales for renovation, repair and remodel. The remaining 24% or our customer sales were generated in the commercial market and sold through architects, designers, general contractors and dealers.

*Dealer channel:*

The entire dealer channel for the custom market is estimated to be $2.3 billion in 2021 based on industry data, or approximately 56% of the overall custom window coverings market. The dealer channel has a diverse set of customers that include nationally franchised dealers and independent dealers such as local store front chains, specialty boutiques and thousands of other small and independent market participants that cater to consumers who require a personalized decorator or designer assistance. There are a significant number of independent dealers in the United States, over 7,500 of which are serviced by our Company. In addition, we are the exclusive provider of custom

---

[2] The cost-benefit analysis is based solely on the number of window coverings in residences and all the incidents on which the risk determination is made occurred in residences.

window coverings for a major national retailer, which maintains in-store kiosks served by our local dealers, who then complete in-home consultations to measure, quote and install our products.

*Retail channel and internet market:*

The retail channel is comprised of big box home improvement centers. Retail accounts are estimated to represent an approximately $500 million of the custom market in 2021, or approximately 12% of the overall custom coverings market.

Merchandising and customer sales associate training programs are important drivers of success in the retail channel. Ensuring updated training and merchandising materials is critical when introducing new or redesigned products. Launching a new or redesigned product without appropriate training and materials greatly impacts the revenues of those launches. This training is often done in person. We maintain up-to-date and stylish point of purchase materials that are used to aid the consumer's decision-making process in addition to offering products that are in line with current trends in home design.

Most of our online sales are completed through our national retail customers' online portals, as well as independent online operators. As such, any changes to products and offerings need to flow through to their systems. We estimate the internet custom market to be approximately $400 million in 2021, or approximately 10% of the overall custom coverings market.

*Commercial channel:*

The commercial channel represented approximately 24% of our custom net sales in fiscal year 2021. We estimate the commercial channel to be 21% of the overall custom market. SWF sells into a number of end-markets within the commercial segment, including office, light commercial, healthcare, education, multi-family and hospitality.

The commercial channel projects involve many stakeholders, including architects and designers, who specify the brand and product type that should be used, commercial dealers, who bid on the business and install the products once specifications have been written building owners, and general contractors, who select a brand and product set based on the dealer proposals and architect specifications received.

**II.    Comments**

SWF shares the goal of the Consumer Product Safety Commission ("Commission) – to address unreasonable risks associated with hazards caused by consumer products. SWF disagrees with the Commission that CPSC-2013-0028 – Safety Standard: Operating Cords on Custom Window Coverings, Notice of Proposed rulemaking ("Proposed Standard") is necessary to adequately address the hazards associated with window coverings. Specifically, the Proposed Standard is premature as the data is incomplete regarding the efficacy of ANSI/WCMA-2018. In addition, ANSI/WCMA 2018 is currently being revised to further reduce or eliminate potential hazards associated with custom window coverings.[3] The revised version of the ANSI/WCMA standard will not only adequately address the

---

[3] On May 23, 2021 – five months before CPSC staff released its package – WCMA re-opened the voluntary standard on custom products.

identified hazards but also mitigate the overreaching cost impacts and impossibility of the compliance timeline of the Proposed Standard.

In addition, the Proposed Standard is overbroad, eliminating products from the market for which no current viable replacement exists or are used in non-residential applications where the hazard that the Commission seeks to address does not exist.  In fact, among many issues with the Commission's cost-benefit analysis, it does not appear that commercial products were included in Commission's analysis despite the fact the Proposed Standard arguably applies to them. Lastly, even if the analysis justifying the Proposed Standard is correct, and it is necessary, the last-second amendment to change the effective date from 2 years to 180 days renders it impossible for SWF (and the industry) to make the wholesale changes to its products, business, and supply chains to comply.

SWF encourages the Commission adopt the revised ANSI/WCMA standard under 15(j) once the revision is finalized, similar to the Commission's approach to stock products and inner cord requirements for custom products.  Alternatively, we urge the CPSC to reconsider the scope of the Proposed Rule particularly with respect to non-residential products and to re-evaluate the effective date timeline.  The Commission should also remedy the flaws in its analysis of relevant incidents and the costs and benefits of compliance, including an accurate assessment of the significant costs to the economy and businesses associated with widespread elimination of products, including non-residential products, within 180 days of the final rule, with insufficient evidence of benefit to child safety, and, if included within the scope of the final rule, the financial impact of this rule to the market for non-residential products.

### A.  ANSI/WCMA 2018 Standard

SWF believes the most effective way to reduce the potential risks from window coverings is the ANSI/WCMA standard.

CPSC's own data, as explained in the WCMA's comments and expert report, indicates incidents are trending down.  CPSC states that "the effects, if any, of the 2018 voluntary standard on these products have yet to be reflected in the data."[4]  However, in the related rulemaking for stock products and inner cords for custom products, the CPSC notes that according to NEISS data, "the number of pediatric strangulations has declined as more cordless stock products become available."[5]  CPSC attributes this to changes in ANSI/WCMA-2018.[6]  How, on the one hand, can the CPSC state it cannot measure the impact of ANSI/MCMA 2018 when, on the other hand, it says they can? It appears the Commission does so based on which rulemaking it supports.  Furthermore, the NEISS data does not distinguish between stock and custom so how is possible to say whether the decline is due to changes in stock versus custom products?  The decline must be attributed to both stock and custom (or, at a minimum, the CPSC must at least admit that it is not known whether the dip is due to stock vs. custom).

The Proposed Standard seeks to eliminate continuous cord loops, even when proper installation of a tension device is required for consumers to be able to raise or lower the window covering.  This,

---

[4] FR 1025

[5] Staff Briefing p. 97.

[6] Staff Briefing p. 97: "Staff notes that many manufacturers began offering cordless stock products before the standard went into full effect."

despite the fact the Commission supported, or at least did not object to, ANSI/WCMA 2018 which requires any continuous cord loops to be under tension and the fact that there does not appear to be any data in the records that continuous cord loops properly installed and under tension were involved in any incidents.

Importantly, the CPSC has determined that the window covering industry has a history of substantial compliance with the voluntary standard[7] and notes that "[i]f CPSC did not issue a mandatory standard, the Commission believes that most manufacturers would comply with ANSI/WCMA-2018, because manufacturers already substantially comply with the voluntary standard."[8] All of our products comply with ANSI/WCMA 2018.

Since the adoption of ANSI/WCMA 2018, based on our internal sales data, from 2018 to 2021 SWF saw in increase of 8% in residential custom products as percentage of overall sales of (stock and custom) and an increase of 22% in the percentage of residential cordless custom products versus residential corded custom products. It appears that when given a choice between cordless and corded for a given use, consumers are choosing cordless options which reduces the overall hazards associated with corded window coverings. However, as we note later in these comments, customers still require corded window coverings that meet ANSI/WCMA 2018 for certain applications or budgets.

The clear downward trends in incidents, coupled with the CPSC's own belief that the ANSI/WCMA standard is responsible for the reduction incidents, suggests that the proposed rulemaking is not required.

Notwithstanding this fact, ANSI/WCMA 2018 is being revised and SWF is involved. The Steering Committee members universally agreed with the goal of eliminating free hanging cords (all standard cord lock systems, cord joiners, and cord tilting systems) from custom window covering products. The revisions currently under discussion reduce the potential for misuse and failure of tension devices for continuous loops on custom products. A Technical Committee, of which SWF is a member, also has been convened to finalize the details to include in the updated standard. With these revisions, it is the intention of the committee to address the major hazard scenarios identified by the In-Depth Investigations (IDIs) prepared by CPSC and shared with WCMA. SWF believes that given the industry's substantial compliance with ANSI/WCMA 2018 that ANSI/WCMA, once revised, will provide yet a further reduction in risk and more than adequately reduce the risks of injury associated with the window coverings. It is important to note that the standard for rulemaking is not the elimination of risk, which appears to be the Commission's position; rather it is whether the standard adequately reduces the risk.[9]

### B.  Timeline and Cost of Compliance

The Commission does not properly consider the all the costs of compliance, and, instead, narrowly focuses on the incremental component costs and costs to manufacture and assemble.[10] The Commission leaves out the costs of product development, replacing required marketing assets, and

---

[7]"[T]he Commission preliminarily determines that a substantial majority of window coverings sold in the United States comply with the readily observable safety characteristics identified in ANSI/WCMA-2018." 87 Fed. Reg. 1,039.

[8] 87 Fed. Reg. 1,045.

[9] See 15 USC § 2056(b)(1) which requires and evaluation of whether a standard adequately reduces the risk.

[10] 87 Fed. Reg. 1,047

updating information technology systems.  The Commission also leaves out the costs associated with the 180 day timeline and does not explain why it did not follow the recommendation of its staff for a 2 year effective date.  Rather, its entire analysis is an assumption not based in fact: "CPSC staff does not have estimates of redesign costs but expects that these costs will be small given the already wide availability of product designs with inaccessible cords."[11] For the avoidance of doubt, the timelines and costs discussed are the typical timelines and costs for **one** new product or re-designed product line.  The Proposed Standard impacts 11 residential products lines and 5 commercial product lines, and we provide a summary of the aggregate timeline and costs, below.

*Product Development Activities and Timeline*

At SWF, the typical product development timeline for a single related residential product from conception to first delivery to our customers is 19-34 months (normally taking about 24 months).  For that single product, the schedule includes:

- Product Design: Design includes concept development, design refinement, tolerance analysis, and stress analysis, generally takes 6-12 months depending on the complexity.
- Commercialization:  Commercialization of the product (i.e. getting it made and to market) normally takes 9-18 months **after** completion of the design phase, and includes identifying and assessing suppliers for parts, supplier tooling and tooling validation, obtaining equipment for production and installing, initial production runs, and ocean shipping.
- Inventory Build:  Following the Commercialization phase, there is a 2-4 month period for inventory build to support production and safety stock.  Note:  although a product may be custom, the design will share constituent parts, so commercialization also includes inventory build for parts and materials to support the custom order process.

Since SWF does not normally redesign its entire product offering at the same time, it is difficult to estimate the impact of the Proposed Standard, but the normal 24-month timeline per product line is likely to be extended 1.5x-2x to comply with the Proposed Standard across all residential products, including time to increase staffing (with a longer time depending on difficulty of hiring qualified staff). We have found that much of the process cannot be outsourced as external resources are not effective for final design, fabrication manual, and engineering launch support.

*Product Development Costs*

The cost of product development varies.   Based on a review of the historic costs of developing new products and re-engineering products, we estimate that for each product type that can be re-engineered or designed to comply with the Proposed Standard, there will be between $1-3 million of expenses and additional $1-2 million in capital expenses, including tooling, machinery, and real estate (additional floor space as cordless options require more labor and therefore more square footage for the same production volume). The variation is dependent on the scope of the redesign and the complexity of the products, and we cannot perform a detailed analysis until the scope of the changes needed is finalized.  In the case of development of under the Proposed Standard, the scope would be massive (it is across all products) and the complexity high (in some cases developing technology that does not exist versus minor re-engineering).

---

[11] Id.

Custom products include over 20 totally different product type designs.  Corporately, SWF's product development teams have the capacity to do one or two product launches/major redesigns at a time.  As mentioned, the Proposed Standard impacts 11 residential products lines and 5 commercial product lines.  And, even though there may be similarities in the redesigns, there are no short cuts.  While some synergies of design may be realized, the vast majority of the process applies to each product and any assertions by the Commission that by leveraging prior designs the timeline can shortened and cost reduced is simply without any support.  This is particularly true with cordless as each solution needs to be calibrated with each window covering and the variations within the type.[12]

The complexity of the redesigns necessary, involving the entire lift system (e.g. brackets, clutch, tune, springs, cradles, and gearing), will likely increase resource spend by 50% for each product line.

In order to reduce the overall compliance timeline to closer to 24 months, we estimate additional incremental spend (additional staff, outsourcing where feasible, etc.) at $1-2 million PER PRODUCT LINE beyond our typical spend to accelerate development and testing. In addition, we estimate an additional $750k per product line due to increased costs related to managing such a massive change across our large global supply base (900+ suppliers) on a compressed timeline, including expediting tooling, testing, re-work, and shipping.

*Additional Costs of Compliance*

However, designing and commercializing a product is only one component of bringing a new or redesigned product to market.  Depending on the channel, in-store displays need to be revised and samples books need to be created, including re-shooting photography and updating print and electronic media.  Samples books and hand samples play a large role in the sale and marketing of custom window coverings.  Customers buying customer window coverings want to see and feel the fabrics and understand how a lift system will feel and work.  The in-store displays permit consumer to compare different window covering options (horizontal vs. vertical, shades vs. blinds, etc.).  When comparing options customer window coverings across manufacturers, in-store displays and sample books differentiate one manufacturer from another in the market. It is a not a substitute to convey these attributes through websites or printed media.

Each of these activities have their own work stream and supply chain, and SWF has 1,000s of customers selling our products.  Most of this work cannot start until the product design is completed.  It can take 12+ months to change out in-store displays for one product line.  Much of the sample book process is outsourced to third party vendors, and it takes 18+ months of coordination to design, print, assemble, and ship the sample books.  This timeline may seem long, but for each product line's sample book, we must obtain 100s of fabrics from suppliers and validate they meet the specification before offering them to our customers.  Once validated, those fabrics need to be sent to the vendor fabricating the books for inclusion. The books need to be printed, assembled, and then ultimately delivered to our retailers and dealers.  In addition, we estimate that photography of the new and redesign products to be used for all forms of marketing, point of sale, and other product information materials would take approximately 7 months and updating all print and digital media would take 12-18 months. Based on data from prior product launches and a review of current costs and capacity, and depending on the

---

[12] For example, the operation of a cordless lift system is dependent on a number of factors including the spring tension and operation parameters.  Depending on the size of the window covering and material, the weight profile is different and that may necessitate different spring calibrations or, in some instances, modifications or redesigns or the lift system, to achieve commercially acceptable operation.

requirements, we estimate the cost of updating and rolling out new in-stores displays; creating, sourcing, and distributing sample books; and updating advertising and digital assets for all impacted product lines to be between $3.9 million and $18.75M.[13]

Not only do the products need to be redesigned and commercialized and the displays, sample books, and marking materials created and distributed, but our internal IT systems will need to be updated to support ordering the new products. Although motorization or cordless lift may be available for some products currently, updating the systems to supporting ordering those options with new product lines or redesigned products is far from trivial. Enterprise resource planning software needs to be updated with the new information products. Product ordering, including pricing and options, needs to be revised. Once updated, the system needs to be rolled out to our customers who will need training. A critical component of our systems are the models for the custom configurator which feeds into every operational system. These models need to be built for each impacted product and building them requires deep internal knowledge of our system and products and is not suitable for outsourcing. In addition, given the steep and long learning curve, it would be difficult to hire additional staff and train such that they would make an appreciable difference in reducing the timeline. None of this work can begin until the product designs are finalized. We estimate it will take 320 hours, costing approximately $14,080 per product line.

In addition, there are unprecedented constraints on the global supply chain, from inflation to employee shortages to COVID shutdowns. Material and chip shortages could likely increase development time by 25-100%. Based on our current experience, parts originating overseas are taking an additional two+ months to be delivered. Couple this with the fact that the entire industry will be doing this at the same time and shares many of the same suppliers. For example, there are few capable vendors to create sample books. The supply base will be further strained and time and expense to comply with the Proposed Standard.

*Summary of Timeline and Cost of Compliance*

| Item | Standard Time 1-2 Products | Estimated Time All Products | Costs Per Product Line for Major Redesign | Total Product Lines Equivalents[14] | Total Estimated Costs All Product Lines |
|------|------|------|------|------|------|
| Product Development – Residential | 18-24 months | 27-48 months | Expenses: $1M-3M Capital: $1M | 11 | Expenses: $11M-$33M Capital: $11M |
| Product Development – Non-Residential | 18-24 months | 27-48 months | Expenses: $2M Capital: $1M | 5 | Expenses: $10M Capital: $5M |

---

[13] Low end estimate includes work to update marketing pieces, printing color one page pieces, double sided and postage with lowest estimated quantities, photography, supplemental free-lance work, and updating obsolete sample books with stickers with required information. High-end estimate includes work to update marketing pieces, printing a higher number of color, multi-page pieces and postage with highest estimated quantities, photography, supplemental free-lance work, and updating obsolete sample books with stickers with required information. These costs assume using stickers in lieu of replacing obsolete sample books as quickly as possible.

[14]

| | | | | | |
|---|---|---|---|---|---|
| Complexity of Redesigns (lift systems) | | | $500k-$1M | 16 | $8M-$16M |
| Additional Impact of Short Timeline including additional tooling (testing, re-work, and shipping) | N/A | N/A | Expenses $1M-2M Capital: $750k | 16 | Expense: $16M-32M Capital: $12M |
| Marketing Assets (photography, print)* | N/A | 9-18 months | $3.9M-18.75M** | N/A | $3.9M-18.75M |
| IT Systems* | ~2 months | 24-36 months | $14,080k | 16 | $225k |
| Supply Chain Issues | | 25%-100% increase | | | |
| **TOTAL** | | | | | $77.06M-125.89M |

*Majority of this work for these items requires product development to be completed.
**Low end estimate includes work to update marketing pieces, printing color one page pieces, double sided and postage with lowest estimated quantities, photography, supplemental free-lance work, and updating obsolete sample books with stickers with required information.  High-end estimate includes work to update marketing pieces, printing color, multi-page pieces and postage with highest estimated quantities, photography, supplemental free-lance work, and updating obsolete sample books with stickers with required information.

### C.   The 180 Day Effective Date is not Feasible

The unsupported decision to change the effective date from 2 years to 180 days ignores business realities and the significant financial impact on the entire industry, not to mention the impact on consumers.  The Commission should provide for an effective date of at least 24 months, consistent with the staff's recommendation, and further, should consider a longer time period based on these comments and the staff's statement that a longer time would further reduce the cost of compliance.

The Commission rejected its own staff's recommendation of a two-year effective date for its Proposed Standard and instead voted arbitrarily to include a 180-day effective date with no rationale. The 180 days is not supported by the economic analysis prepared for the Proposed Standard that was based on the 2 year effective date recommended by staff.  The 180 days is also not feasible to allow for industry to respond to the elimination of product categories resulting from the new regulation.  Last, it would delay consumer transition from older (pre-2018) products to newer available safer products as there would either be no compliant substitute products in some cases or consumers will not be able to afford (or be willing to pay) the increased cost of available alternatives under the Proposed Standard where substitute products may exist.

Even if it were possible to just substitute all lost corded product volume with a cordless version of the same product (which is not possible), we still would not be able to meet the 180-day timeline. In order to replace corded with cordless, operations would need to reorganize the manufacturing floor and will need more space as it takes more labor to make cordless, requiring more space for the same volume, much less for increased volume.  We would need to train the work force and obtain additional equipment as we have insufficient cordless manufacturing capacity.  Normally, it takes 4-12 months to obtain equipment (depending whether the equipment is standard, special order, or unique for SWF) not including and sale and contracting process), including 3-4 months of time ocean transit time if the supplier is overseas.  Currently, with supply chains and workforces stretched and behind due to Covid-

19, we'd expect delays, potentially 3-6 additional months. This is the timeline just to obtain the equipment. It does not include the time to install and prepare the equipment for production or train employees. Even in the best case, if sourcing from overseas suppliers following finalization the Proposed Standard, it is unlikely we would have the equipment before the effective date of the Proposed Standard. Even if we paid air freight to expedite obtaining the equipment (at a cost that is likely equal to or more than the value of the equipment in many circumstances) given the current lead times, it would still be insufficient. Moreover, there is no guarantee that our suppliers for cordless parts and materials would be able to develop the needed additional capacity in order to supply us, as they would be faced with the same delays and supply chain issues.

Based on the discussion in Section B of these comments regarding the timeline for us to comply, we cannot conceive of how we could accomplish the requirements of the Proposed Standard across our product lines in less than 24 months (at any cost) much less in 180 days. And the Commission agrees: its own economic analysis in support of the Proposed Standard does not contemplate a 180-day effective date but instead considers the impact of a two-year effective date and still concludes the costs outweigh the benefits even with a two-year effective date. In support of a two-year effective date, CPSC staff recognized "that there are some issues in redesigning certain window coverings of unusual sizes to accommodate a cordless option." Because "elimination of some product sizes is possible because conversion to cordless operation may not be feasible for some large or unusual sizes," CPSC should consider an effective date "longer than two years to mitigate the impact."[15] The reality is that it is simply not feasible to expect that manufacturers can design and manufacture new products that do not even exist today and be ready to sell to the market later within two year, much less 180 days. Even for those products where a cordless or motorized option is available, it is not a plug and play replacement and additional engineering and commercialization is required – something the CPSC has not taken into consideration. Without adequate time (at least 24 months, with 36 months more feasible) to make the switch to cordless options (where available), there will be substantially fewer options in the market, and in some cases, no options at all. It will have a huge impact on the industry across manufacturers, retailers, designers, and installers (see Section E., below). At a minimum, the Commission should follow the recommendation of its staff and set an effective date of at least 24 months.

### D.  Products not Available

The industry and Springs has yet to develop the technology to support custom window coverings that could both comply with the Proposed Standard and replace the entire existing array of custom products. Size, weight, and location requirements for custom products prevent the use of many of the cordless lift systems offered for stock products. In fact, CPSC recognizes, the Proposed Standard would eliminate product categories for custom window coverings with no viable replacements at this time.[16] Furthermore, motorization is also limited by size and weight restrictions. And, once that technology is developed, it needs to be incorporated into supply chains, affecting planning and decision making of manufacturers, distributors, and retailers (see discussion in Section B, above).

While the CPSC's statement that cordless operating systems are available for every type of window covering, the statement is misleading, ignoring that within these product types, there are specific product varieties that—due to size, weight, product location, or other limitations—are not

---

[15] See Staff Briefing p. 189.
[16] "[E]limination of some product sizes is possible because conversion to cordless operation may not be feasible for some large or unusual sizes." 87 Fed. Reg. 1,045.

presently available with, or suitable to, cordless or motorized operating systems. For example, for non-wood/faux blinds, the current limits are between 96-144 inches in width and 86-144 inches tall, depending on the window covering type (and related weight) and lift system (plug-in motorized, battery powered motorized, or cordless).  Due to size/weight limits on cordless systems, our cordless faux blinds can cover approximately only 50% of the window area as our corded faux blinds, while cordless wood blinds can cover only 80% of the window area of corded wood blinds.  The CPSC acknowledges as much – in a footnote. [17]

Generally, for windows taller than 84 inches (7 feet), a cordless, non-motorized system is not a practical alternative as the majority of the population cannot reach this height.  For applications of our main commercial brand, approximately 48% of the blinds and shades sold are for lengths longer than 7 feet.  The Proposed Standard, therefore, would impact approximately 28% of all our total custom commercial volume by units and 14% of our non-residential custom commercial volume by units.

Furthermore, WCMA's comments to the Proposed Standard accurately detail the limits of current cordless technology. The net result is that many products would not be available with cordless systems and would be eliminated if the Proposed Standard is finalized.  Health Canada's Corded Window Coverings Regulations (CWCR) provides a look into the future in the US, where manufacturers, including SWF, have no viable solutions to address the impact across all product lines caused by the CWCR's prohibition against all cords (included continuous cord loops under tension).

In addition, cordless lift systems are not an alternative for some customers that have disabilities or other physical limitations due to age, and the additional expense of motorized systems for supported applications may not be affordable for many of these consumers. This will result in consumers holding on to products that do not meet the most current ANSI/WCMA standard which will not contribute to risk reduction.

### E.  Financial Impact

The Commission underestimates the cost of the Proposed Standard.  First, the Proposed Standard states:  "CPSC staff doesn't not have estimates of redesign costs but expects that these cost will be small given the already wide availability of product designs with inaccessible cords."[18] former assumption is like saying the cost to redesign the engines of large work trucks to make them electric/hybrid is small given the wide availability of economy-sized small passenger vehicles with electric or hybrid engines available.  The lift system is the engine of window coverings, and, just like with vehicles, the application of that engine makes all the difference.  Based on SWF's estimate, the costs of redesigning and the required activities that follow are not small.  As described in Section B of these comments, these costs are between $77.31M and $126.16M.

In addition to the costs of compliance with the Proposed Standard described in Section B, above, there are additional costs which the Commission's rulemaking seems to ignore.

With respect to residential custom products, based on the Proposed Standard with adequate time to re-design products, we forecast a first-year decline of 16% in total units sold, representing over $90M in revenue.  We anticipate that due to design constraints and consumer price sensitivity, we expect lost sales to continue in the future as there will be products without any compliant substitutes or

---

[17] 87 Fed. Reg. 1,018 n.2.  ("[t]he availability of alternatives to corded window coverings may sometimes be constrained due to size and weight limitations").
[18] See 87 Fed. Reg. 1,047 (Jan. 7, 2022)

for which the substitute is not affordable for current customers.  If the effective is 180 days, the reduction in revenue would be SWF would be much greater as we would no have substitute products available.  The decline could be as much as 28%, representing more than $170M in revenue.  Moreover, we expect any lost sales and revenue related to the 180-day effective day to continue at near this level until we can develop alternative solutions that comply with the Proposed Standard (as discussed in Section B – at least 2, and possibly 3 years after the effective date) and which are price competitive with the lost products.  Even then, we except there to be an overall reduction in sales as there will be products that simply have no substitute.

With respect to commercial custom products,[19] we estimate the Proposed Standard would impact approximately 58% of our current volume for those products which represents approximately 48% of our current sale revenue for those products.  The Proposed Standard would devastate this business in a market where in many cases there are no alternatives to continuous corded loops (due to size, weight, and cost factors).  Moreover, non-residential custom products present zero risk with respect to the hazards associated with window coverings as none of the incidents on which this rulemaking is based involve products in these settings.[20]

In addition, the CPSC misstates the costs associated with the Proposed Standard.  The Proposed Standard states a range a cost of compliance of $2.15-$34.57 per window covering[21].  The Commission used the lowest number of $2.15 even after acknowledging that number was based on a study to implement cordless technology in mass-produced, high volume, low end window coverings.  Nor did it include any costs associated with product development and design innovations, testing, training, patents.[22]

Under the Proposed Standard, the range of our increased cost per window covering to move from corded to cordless is $4.61 - $26.61 with a weighted average of $7.78 per unit, over 350% more than the estimate used by CPSC (and for some products it is understated by more than 12x). The range of our costs per window covering to move from corded to motorized is $50.17 - $89.16 with a weighted average of $74.83 per unit, thirty-four time greater than the CPSC estimate.

The impact of these costs to the consumer is also profound:

| Product Type | Average Price at Retail Corded[23] | Incremental Price at Retail to Substitute (per Unit)[24] | |
|---|---|---|---|
| | | Cordless for Corded | Motorized for Corded |
| Horizontals | $88.57 | $38.09 | N/A |
| Pleated Shades | $200.52 | $49.01 | $290.74 |
| Cellular Shades | $208.63 | $35.16 | $300.52 |
| Roman Shades | $318.45 | $35.47 | $255.01 |

[19] Includes lodging, healthcare, education, multi-family, other, and public lobby space in office buildings.
[20] Based on a review of incidents records included with the rulemaking.
[21] See 87 Fed. Reg. 1,047 (Jan. 7, 2022)
[22] Id.
[23] We calculated the average retail price ("ARP") for corded window coverings for each product type using the average amount paid by dealers/retailers for the corded window coverings within the product type multiplied by a typical retail margin of 50% (where price paid by the retailer/dealer is 50% of the price for which the product sells).
[24] Incremental cost is calculated by calculating the ARP of cordless and motorized window coverings for each product type and then calculating the difference of the ARPs for corded and cordless and corded and motorized.

RA16

| Wood Blinds | $184.63 | $52.37 | $272.15 |
|---|---|---|---|
| Natural Shades | $312.03 | $37.47 | $368.84 |
| Solar/Roller Shades* | $266.85 | $5.94 | $375.91 |
| Faux Wood Blinds | $123.44 | $51.54 | $317.12 |

*Corded Solar/Roller Shades use continuous cord loop lift system so the incremental cost is to substitute CCL for Cordless.

If the Proposed Standard is enacted and a consumer wants to replace older window coverings (or purchase a new window coverings), that consumer would pay $311.53 more for cordless window coverings on average (based on the D&R data relied on by the Commission that households have an average of 8.17 window coverings per housing unit[25]), which is more than 24% higher than corded window coverings.  If that customer wanted to replace corded window coverings with motorized, the consumer would pay, on average, $2,544.71 more, which is over 155% more than corded.  Given the substantial price increases from corded to cordless or motorized, many consumers may not purchase new or replacement window coverings, further reducing sales and increasing the impact of the regulation on our company.  This should come as no surprise as the CPSC recognized that there could be lost sales if consumers could not find a suitable alternative,[26] which includes an alternative within their budget.

### F.   Should Certain Products be Included/Excluded from Proposed Standard

As currently drafted, the Proposed Standard is too broad.  The Proposed Standard does not make clear in its definition of custom window coverings that it only includes window coverings intended for residential use. Instead, the Proposed Standard is predicated on the distinction between stock and custom product, [27]pointing to and relying on the broader definition in ANSI/WCMA A100.1-2018 that would also include custom window coverings intended for commercial use.  However, this distinction fails to recognize that the vast majority of commercial applications of window coverings are "custom" products, a majority of which are corded due to the applications (wide, tall windows) where no technically feasible or cost-effective alternative exists.  This is problematic as the broad definition of a "consumer product" under the Consumer Product Safety Act means many applications of commercial product may be considered "consumer products", including uses in hospitality, healthcare, lodging, education, and aspects of office uses. [28]  This inclusion of non-residential custom products in the Proposed Standard is not warranted.

All of the data used by the Commission to support its rulemaking is based on residential uses.  A footnote in the staff briefing makes this clear:  "The [D&R] study included a survey of 2100 households in 13 cities to collect a representative sample of data on household characteristics…."[29]  It appears that every incident reviewed, and which form the basis of the Commission's risk analysis, occurred in a

---

[25] Staff briefing, page 165.

[26] Fed. Reg. 1,046 (Jan. 7, 2022)

[27] See CPSC, Safety Standard for Operating Cords on Custom Window Coverings, Notice of Proposed Rulemaking, 87 Fed. Reg. 1,015 (Jan. 7, 2022)

[28] A "consumer product" is any product that is produced or distributed "for the personal use, consumption or enjoyment of a consumer in or around a permanent or temporary household or residence, a school, in recreation, or otherwise."  15 U.S.C. § 2052(a)(5).

[29] 87 Fed. Reg. 1,019-20 (Jan. 7, 2022); Staff briefing, page 165, footnote 63.

residence. We could find no incident in the record of any incidents in commercial settings such as hotels, retail, healthcare, schools, or universities. Yet, as drafted, the Proposed Standard could apply to custom product in all these commercial settings, and the rulemaking record is devoid of any data or discussing concerning these products despite the impact the Proposed Standard could have on them and the businesses that manufacture, distribute, and sell them.

Although the Commission did not include any discussion of the non-residential custom product, we would like to specifically address the impact of the Proposed Standard. A large percentage of non-residential products use continuous cord loops due to the size and weight of those window coverings. While the remaining products are cordless (cordless lift and motorized), those alternatives are not viable for every application. Just as with residential custom window coverings, a combination of factors determines whether cordless or motorized is an option. The interplay of height, width, and weight are determinative. In addition, the material used for the window covering plays a role in the weight. If a window is too tall, cordless is not an option. If a window is wide or the material heavy, a cordless system will not be an option, as the current cordless mechanisms have weight limits. The same factors play a role in whether motorization is possible. Furthermore, residential cordless mechanisms and motorization systems are not generally interchangeable for commercial applications. The cycle count, load ratings, and overall durability require extensive product development, engineering, and different materials (e.g. metal vs plastic parts) to meet the rigors of commercial use. As a result, commercial products typically take longer to develop and bring to market, further complicating overall compliance and making the 180-day effective date a nullity.

These design requirements lead to the other major factor – price. Typically, all else being equal (everything but lift system), our custom commercial cordless window coverings are 2x-3x more expensive to the dealer than a corded version. And, all else being equal, our custom commercial motorized window coverings are anywhere from 4x-5x more expensive than a corded version. When factoring in the price to the ultimate purchaser, the prices difference is more evident. Given the scope of commercial projects, these cost differences add up quickly. Even when cordless or motorized is an option, this price differential may not be an option for the project (as mentioned in Section D, approximately 48% of orders for our main commercial brand involve window coverings greater than 7 ft in length).

In addition, as described in our comments in Section D, above, there will be many applications where cordless or motorized options are not possible. For example, where the tops of the windows are over 84 inches from the floor, cordless window coverings are not a practical alternative as end-users cannot easily lift the cordless units to the top of the window. There are weight limitations associated with both cordless and motorized options. Where the weight of the window covering (determined by the height, width, and material) is too great, neither is an alternative.

We believe that if finalized, in order to address this over inclusion of non-residential commercial products, the Proposed Standard should be revised to clearly include only those custom products that are intended for residential use by adding language to the end of proposed § 1260.1(b)(1) such that it reads as follows: "Custom window covering (Custom blinds, shades, and shadings) as defined in section 3, definition 5.01, of ANSI/ WCMA A100.1—2018 and intended for residential use." The agency should further interpret the phrase "intended for residential use" to mean homes and rental properties, since

14

the basis of the rulemaking is addressing the risk to children in their residences. The term "intended for residential use" should not include any location that is not a residence. If this rulemaking moves forward, the agency must tailor the application of the Proposed Standard in this manner because the entirety of CPSC's justification for the Proposed Standard is limited to the use of corded window coverings in residential applications. This includes the incident data that CPSC relies upon, as well as the estimates of corded custom window coverings in use. If finalized, any application of this standard outside of residential applications the definition of consumer product and the justification provided would not be supported.

Alternatively, the Commission should reopen the rulemaking and obtain the necessary data to fully and properly evaluate the risks associated with window coverings in non-residential settings and perform the required cost-benefit analysis.

## III.    Conclusion

This Proposed Standard is the not the most effective way to address the risk associated with window coverings.  We believe that ANSI/WCMA 2018 is adequately addressing those risks and the data will ultimately bear this out, particularly given the trends[30].  However, we support the ongoing revisions to that standard which include additional requirements for custom window coverings and further reduce and adequately address the risk of those products.

Alternatively, we believe that Proposed Standard is not supported by the data.  The Commission's cost benefit analysis woefully underestimates the cost of compliance by not including any costs of the massive product development necessitated by the Proposed Standard through its failure to fully understand the products.  The fact that a solution exists for similar product, does not mean there is a solution for a different product or that the existing solution can be easily adapted to a different product. As we illustrated, the associated costs to redesign and launch the products is close to, if not greater than nine-figures.  The cost of manufacturing compliance is understated by a minimum of 350% and likely is understated by much more.  The data used by the CPSC is not current, and therefore, does not reflect the current reality.  The conclusion that ANSI/WCMA 2018 is not effective to adequately address the hazards is conjecture, because, as admitted by the Commission, there is not yet enough data to evaluate the results.

Even more problematic is that the Proposed Standard impacts custom commercial window coverings, including non-residential ones, and the rulemaking record is devoid of any data or consideration of that impact.  It particularly troublesome because the record also contains no evidence of any hazard in these locations – not one cited incident occurred in commercial location.  There is no cost-benefit justification for inclusion custom window coverings intended for commercial use.

If the Commission moves forward with the Proposed Standard despite the flaws in its rulemaking the Commission should amend the rule as described in Section II.F of our comments to clarify the Proposed Standard applies only to residential custom window covers.

---

[30] See Comments submitted by WCMA regarding incident trends.

In addition, the Commission should provide for an effective date of at least 24 months, consistent with the staff's recommendation, and further, should consider a longer time period based on these comments and the staff's statement that a longer time would further reduce the cost of compliance.

# EXHIBIT 2



March 23, 2022

VIA ELECTRONIC SUBMISSION

The Honorable Alexander Hoehn-Saric
Commission Chair
U.S. Consumer Product Safety Commission
4330 East-West Highway
Bethesda, MD 20814

**Re: Safety Standard for Operating Cords on Custom Window Coverings (87 Fed. Reg. 1014; January 7, 2022).**

Dear Commission Chair Hoehn-Saric:

On January 7, 2022, the U.S. Consumer Product Safety Commission (CPSC) published a proposed rule establishing safety standards for operating cords on custom window coverings. The proposed rule requires that the operating cords on custom window coverings be eliminated, thereby making them cordless or inaccessible to children. The Office of Advocacy of the U.S. Small Business Administration (Advocacy) respectfully submits the following comments on the proposed rule. While child safety is paramount, CPSC should do more to consider reasonable modifications to the proposed rule that would ease the burden on small businesses while still meeting the Commission's stated objectives.

## I. Background

### A. The Office of Advocacy

Congress established the Office of Advocacy under Pub. L. 94-305 to represent the views of small entities before Federal agencies and Congress. Advocacy is an independent office within the U.S. Small Business Administration (SBA). As such, the views expressed by Advocacy do not necessarily reflect the views of the SBA or the Administration. The Regulatory Flexibility



Act (RFA),[1] as amended by the Small Business Regulatory Enforcement Fairness Act (SBREFA),[2] gives small entities a voice in the rulemaking process. For all rules that are expected to have a significant economic impact on a substantial number of small entities, the RFA requires federal agencies to assess the impact of the proposed rule on small entities and to consider less burdensome alternatives.

The Small Business Jobs Act of 2010 requires agencies to give every appropriate consideration to comments provided by Advocacy.[3] The agency must include a response to these written comments in any explanation or discussion accompanying the final rule's publication in the *Federal Register*, unless the agency certifies that the public interest is not served by doing so.[4]

Advocacy's comments are consistent with Congressional intent underlying the RFA, that "[w]hen adopting regulations to protect the health, safety, and economic welfare of the nation, federal agencies should seek to achieve statutory goals as effectively and efficiently as possible without imposing unnecessary burdens on the public."[5]

### B. Background on the Proposed Rule

On January 7, 2022, CPSC published a proposed rule to establish safety standards for operating cords on custom window coverings. The proposed rule requires that operating cords be cordless, inaccessible, or eight inches or shorter in length in any use position.[6] The Consumer Product Safety Act authorizes CPSC to promulgate mandatory consumer safety standards if such requirements are necessary to prevent or reduce an unreasonable risk of injury.[7] CPSC is required to rely on a voluntary standard when compliance would adequately eliminate or reduce the risk of injury and it is likely that products are in substantial compliance with the voluntary standard.[8]

Window coverings include a range of products including blinds, shades, curtains, and draperies. Operating cords are those that are used to manipulate a window covering in some way and may include single cords, multiple cords, or a continuous loop.[9] This rulemaking regulates the operating cords on these various window covering products, specifically for custom-made coverings. Stock window coverings are already regulated under a voluntary ANSI safety standard.[10]

---

[1] 5 U.S.C. §601 et seq.
[2] Pub. L. 104-121, Title II, 110 Stat. 857 (1996) (codified in various sections of 5 U.S.C. §601 et seq.).
[3] Small Business Jobs Act of 2010 (PL. 111-240) §1601.
[4] *Id.*
[5] *Id.*
[6] Safety Standard for Operating Cords on Custom Window Coverings, 87 Fed. Reg. 1014, (January 7, 2022).
[7] *Id.* at 1015 citing 15 U.S.C. §2056 (a).
[8] *Id.* citing 15 U.S.C. §2056 (b)(1).
[9] *Id.* at 1016.
[10] American National Standard for Safety of Corded Window Covering Products § 4.3.1, ANSI/WCMA A100.1—2018, (ANSI/WCMA-2018).

According to CPSC's data, from 2009-2020 there were approximately 194 incidents involving injury and/or fatality by strangulation from window operating cords.[11] CPSC states that it is promulgating this rule to further reduce the number of incidences of strangulation from window covering cords.

## II. Advocacy's Comments

### A. CPSC should seek comment on and revise its Regulatory Flexibility Act analysis.

#### 1. CPSC's initial Regulatory Flexibility Act analysis relies on incomplete information. The Commission should publish an updated analysis for comment.

In the proposed rulemaking, CPSC conducts an initial Regulatory Flexibility Act analysis as required by statute.[12] The analysis identifies 302 manufacturers, 1,538 retailers, and 83 importers that may be affected by this rule. However, it does not offer enough detail about firm size or cite all its sources in the analysis. CPSC should provide more detail about these affected small businesses and cite each source where appropriate. CPSC should present a table showing the breakdown of each affected industry by firm size, along with average revenue for each size group. CPSC's revenue estimates of small businesses in affected industries in its analysis do not match revenue estimates of these types of businesses in publicly available economic data sources. CPSC may have used employer data to count the number of firms but used non-employer data to estimate the average revenues. CPSC should ensure that it cites all data sources used, and Advocacy recommends using the same data sources to estimate average annual revenue as for estimating counts of affected small firms when possible.

For example, Census Bureau data on small employer firms with fewer than five employees from the Statistics of U.S. Businesses data series include firm count and revenue statistics for firms with at least one employee up to four employees, and revenues for these businesses will differ from small firms without employees (non-employers) included in the Census Bureau's Nonemployer Statistics data series. CPSC should consult with Advocacy to ensure that the Commission's analysis understands the impacts on small entities and that it meets statutory requirements under the Regulatory Flexibility Act.

#### 2. Advocacy encourages CPSC to consider alternatives that reduce the burden to small businesses while still meeting the stated objectives of increased child safety.

Producing products that minimize the risk of serious harm or death to children are of paramount concern. To the extent that CPSC can identify and consider alternatives that minimize the economic impacts to small businesses while still meeting the stated objectives of the rule, Advocacy would encourage the Commission to do so.

---

[11] *Id.* at 1023.
[12] *Id.* at 1046.

Small businesses are deeply concerned about child safety when using their products, but they will need additional time to respond to the requirements of the rulemaking. Advocacy conducted outreach to small manufacturers and retailers of custom window coverings. One manufacturer said that production of compliant products requires at least 50 percent more labor and more square footage of manufacturing plant space, which means large upfront and per-unit costs. These additional costs to produce the compliant products will result in higher prices. Some small manufacturers indicated that not all consumers will be willing to pay increased prices. They may instead respond by foregoing new window coverings, opting to keep existing ones, or purchasing used or old products that are even less safe.

Several small manufacturers indicated that the proposed rule would render approximately 45 to 90 percent of their current products non-compliant. They stated that the proposed rule would eliminate certain categories of window coverings. Some orders will still be in the construction and design phase when CPSC's rulemaking goes final, causing them to halt production on products that have already been ordered and paid for. This would result in a lack of confidence in these businesses by consumers, and the potential that they may not purchase the compliant products.

According to small manufacturers, CPSC's adoption of voluntary standards for operating cords on stock window coverings took large manufacturers approximately two years to comply. Given the unique and custom nature of the products being regulated under the current rulemaking, CPSC should consider offering additional time for compliance, and in the interim require manufacturers to continue to educate consumers about product safety for corded window coverings as well as offering safety devices for corded products.

Another potential alternative to the rulemaking would be the adoption of voluntary standards for custom window coverings. Small businesses have indicated that CPSC has not considered the recent updates to the voluntary standard in this rulemaking. CPSC could assess whether these latest voluntary standards provide the necessary level of child safety sought through this rulemaking, and adopt such standards provided they meet the objectives of the rule.

**B. CPSC should consider exceptions in situations where corded window coverings are a necessity, such as under the Americans with Disabilities Act.**

CPSC should consider and allow for exceptions in situations where the consumer may need a corded window covering. Examples may include inaccessible window coverings, such as ones located behind furniture, or over a kitchen sink. Furthermore, the rule does not consider situations in which an operating cord is necessary due to the consumer having a disability. For example, operating cords might be necessary if someone were not able to stand to pull down a shade or use a retractable cord. Cordless window shades can also be very heavy which creates additional accessibility issues. In such instances a corded window covering would be necessary. However, under the proposed rule, these products would be prohibited.

Small manufacturers have indicated that motorized coverings may cost as much as 20 times more than mechanical cord systems. Instead of buying updated, more expensive products, consumers may opt to keep existing old coverings, or attempt to purchase second-hand coverings that may also be several years old. This would create even more hazards as old products are even less compliant with existing safety standards.

CPSC should therefore consider exceptions in situations where a corded product is necessary due to consumer limitations. Small businesses are already counseling customers on operating safety with corded products. They will continue to do so for those customers who request a corded product. Small businesses can also offer safety devices to be used with corded coverings in situations where the customer cannot use a cordless option.

## III. Conclusion

Both Advocacy and small businesses are concerned for the safety of children with respect to operating cords on custom window coverings. While child safety is paramount, CPSC should do more to consider reasonable modifications to the proposed rule that would ease the burden on small businesses while still meeting the Commission's stated objectives. If you have any questions or require additional information, please contact me or Assistant Chief Counsel Prianka Sharma at (202) 205-6938 or by email at prianka.sharma@sba.gov.

Sincerely,

/s/
Major L. Clark, III
Deputy Chief Counsel
Office of Advocacy
U.S. Small Business Administration

/s/
Prianka P. Sharma
Assistant Chief Counsel
Office of Advocacy
U.S. Small Business Administration

Copy to:    Dominic Mancini, Deputy Administrator
            Office of Information and Regulatory Affairs
            Office of Management and Budget

# EXHIBIT 3



Mr. Dan Adams
Rowley Company, LLC
230 Meek Road
Gastonia, NC 28056

March 23, 2022

Ms. Alberta E. Mills
Secretary
Division of the Secretariat
U.S. Consumer Product Safety Commission
4330 East West Highway
Bethesda, MD 20814

*Comment Letter Electronically Submitted via Regulations.gov*

RE:     **Consumer Product Safety Commission's Notice of Proposed Rulemaking (NPRM) on
        "Safety Standard for Operating Cords on Custom Window Coverings";
        Docket No. CPSC-2013-0028**

Dear Ms. Mills:

On behalf of Rowley Company, LLC, please accept this comment letter in response to the
Consumer Product Safety Commission's (CPSC or Commission) Notice of Proposed Rulemaking
on "Safety Standard for Operating Cords on Custom Window Coverings" (Rule or NPRM).

For the reasons discussed below, as well as others, we strongly oppose this proposed rule, as it
is unnecessary, overreaching, arbitrary, and incredibly harmful to industry businesses and to our
customers.

Rowley Company is a leading manufacturer and international distributor of home décor products
that incorporate value-added services and solutions designed for our professional trade and

1



retail partners. Since 1962, Rowley has been helping support drapery and upholstery workrooms, installers, and designers by providing the tools and supplies that they need to successfully grow their businesses. Headquartered in Gastonia, NC, our company's portfolio offers over 15,000 products available, and are used worldwide in window covering design, fabrication and installation, quilting, and upholstery. As both a manufacturer and distributor, we proudly serve workrooms, designers, upholsterers, and installers.[1]

Please know that we at Rowley Company certainly share the overall concern of product safety in the marketplace. We also support efforts to further eliminate hazardous products related to custom window coverings. Rowley has long been committed to safety education programs. However, this mandatory rule proposal ignores years of coordination and cooperation between the industry, the CPSC, and other interest groups, collectively working together to develop effective voluntary standards.

Now, the CPSC has decided to ignore the voluntary standard process, not wait to fully evaluate the effectiveness of the most recent version of the American National Standards Institute (ANSI)/Window Covering Manufacturers Association (WCMA) standard, and instead move forward with restrictive requirements in a mandatory rule. The rule proposal was an unexpected and insufficiently-explained change in Commission policy. While perhaps with noble intentions, the Commission making such a drastic reversal in policy is not fully outlined in the NPRM, nor is the rationale justified. Rather, the NPRM is unnecessary, and arbitrary and capricious.

---

[1] The products Rowley offers is quite varied for its different users. For example, Rowley offers all the tools needed to transform a workroom into the ultimate workspace, vital to anyone who fabricates custom treatments or furnishings. One can build and prep their designs with the necessary tools and equipment, including steamers, shears and cutters, tapes, adhesives, linings, cornice board, drapery pins and more. With regard to designer products, Rowley offers everything from beautiful drapery hardware lines under the AriA® Metal Hardware and Finestra® brands, to unique custom button embellishments, button borders and painted tassels. One can take creations to the next level with our innovative, leading edge products like the FirmaFlex™ bendable fiber board and Swing Door Top Treatment Kit solutions. We provide the perfect finishing touches to customize design projects. Rowley also provides a complete selection of installation products including fasteners, brackets, mounting hardware, tracks, components, and measuring tools to cover virtually any installation job. Rowley offers a complete selection of tools, supplies and instructional products for upholstery and re-upholstery needs. One can find most everything needed to make work less labor intensive - from electric rotary cutters and long-nose air staplers to flexible tack strip and foam saws.

2



To require that operating cords on custom window coverings meet the same requirements as operating cords on stock window coverings is not appropriate and is unworkable. As discussed below, there are distinct differences between stock coverings and custom coverings, and a one-size-fits-all approach as attempted here by the CPSC simply does not work.

If made final, the CPSC rule would adversely impact the window coverings industry, small businesses like ours in particular, as well as end-user consumers. As such, we oppose this rulemaking.

We respectfully request that the CPSC reevaluate its position and not allow the NPRM to become final and effective. Rather, the Commission should work productively and cooperatively with the industry to develop updates to the ANSI/WCMA voluntary standards.

             \*               \*           \*

**Providing Safe Products in the Marketplace**

The window covering industry has long been committed to safety. Industry and the CPSC have together worked to develop and update common rules through the ANSI/WCMA standard for many years. Here at Rowley, our products adhere to these voluntary standards for the industry developed in coordination with the CPSC. We also conduct employee training, release how-to guides, issue product videos, hold educational webinars, publish tips and techniques – all designed to help our customers with our products.

For many years, Rowley has also participated in industry tradeshows and National Window Coverings Safety Month. Industry businesses have every incentive to manufacture and sell safe products.

Industry businesses like Rowley also offer products that meet the "Best for Kids" certification and awareness programs. Products with this designation are those that are officially certified by a third party testing group, after being designed to help retailers and customers (namely parents) identify those window covering products that are best suited for homes with younger children.

**Custom vs. Stock Products**



The CPSC has decided that what is appropriate for one type of window covering (i.e. stock) is automatically appropriate for custom coverings. However, these are very different product types and cannot be treated the same. Stock covering products are inherently different from custom products. Stock covering products typically cover standard size windows, and usually involve horizontal blinds that can much more easily transition to a cordless option.

In contrast, because they come in so many different shapes and sizes, custom window coverings involve numerous different product designs. Custom products must allow for a variety of sizes, weights, and location constraints. As a result, custom products require unique and complex engineering solutions, and much more flexibility, compared to their stock counterparts. In many cases, technical and engineering solutions for cordless custom coverings have not yet been identified as they have for stock options. Cordless coverings are simply not yet available for all custom products.

The CPSC rule also does not appropriately recognize accessibility concerns if custom window coverings were removed from the marketplace. With no definitive alternatives, the rule would create a serious void of product options for an important segment of Americans.

**Rule Would Result in Substantial Economic Harm, Have a Devastating Impact on Industry**

If allowed to become final and effective, this rule proposal would cause severe economic harm to the industry and to our company, as it would serve to eliminate entire product categories and lines. Small businesses in particular would incur substantial revenue losses when they find themselves unable to sell significant amounts of existing product because of the new rule requirements. For small businesses who do not have the immediate resources to make changes, the adverse effects will be especially profound. And for larger companies with greater product volume, the losses in revenue from wasted product would be severe.

This dire situation will only be worsened by the incredibly short 180-day time frame in which the rule would take effect. It seems that initially the CPSC thought an appropriate effective period was two years' time, but has now arbitrarily decided to drastically shorten the period to only 180 days.

This rule would have an adverse impact on the window coverings industry, our company, its associates, and our customers. For instance, in the short term, especially with the 180-day compliance of the rulemaking, the rule would severely impact a significant portion of our business for custom solutions for window coverings of components, value-added solutions,

4



shades and shade components, and traversing solutions. All of these products provide a broad range of viable options and solutions required due to size, weight, affordability, location of windows, and unique window design. The adverse impact will be significant to our company, as well as to other small and large businesses. Customers will also be affected as well. The rule will result in no viable technical solutions to cover all of the various window sizes and designs.

To make matters worse, the economic impact on the industry from this rule would also occur in the midst of a very difficult time. We continue to deal with the problems of a global pandemic, including supply chain delays and difficulties. Additionally, rising inflation only serves to ramp up the economic pressure.

The CPSC seems to overlook and underestimate the high cost of compliance with the proposed rule. The cost to comply is stunning considering the need update marketing materials, product samples, IT systems and processes, training, and other necessary areas. Plus, there is always a significant marketing component for product changes to ensure familiarity and safety. Additionally, on-hand inventory for these impacted products and components per sales cycle is beyond this current compliance period, which would result in significant financial impacts.

The CPSC also underestimates the time necessary to attempt to meet all requirements of the NPRM. For instance, options for custom window coverings are simply not viable at the present time. And, the minimum design, product development, and testing cycle is at least two full years (likely more). That estimate is before one takes into account the scale-up of any production and distribution.

Again, in this current pandemic market, the production timeline is upwards of 180 days alone, not even including another 180 days+ for channel distribution to the end consumer. And, this is assuming that technological improvements and innovation can even occur so that companies could work to comply with these requirements. It is simply unreasonable from a practical matter to think that all of these undertakings could be done so quickly.

The Commission also fails to fully consider all of the necessary marketing and company samples that would ultimately be required with new product options. Some of the necessary includes updating both internal and external training, and process set-up for significant amount of product. The sheer size and effort of these new requirements on a grand scale for any size company is extraordinary, and in most cases not financially viable within a reliable time frame. Plus, meeting these requirements would certainly be an economic challenge for small businesses.

5



The increased costs of compliance with this rule will also be passed down to consumers through higher prices and reduced product availability. Ultimately, these new mandatory requirements would force a substantial number of companies, and small businesses in particular, to have to let employees go and to even close down. It does not seem that the CPSC has fully considered the drastic loss of business – in many different ways – if this rule were to take effect.

It is likely that this rule could cause a 25-40% reduction in available custom covering product. Additionally, the revenue loss to Rowley and other similarly situated small businesses could be so drastic, we would be forced to let employees go and to shutter certain operations.

**ANSI/WCMA Voluntary Standards**

Our industry has a long history of working with the CPSC, interest groups, safety advocates, and others to establish voluntary standards, including the 2018 ANSI/WCMA safety standards. Over the years, the industry has relied on Commission staff to work in good faith to develop this voluntary standard. The 2018 ANSI/WCMA safety standard was reopened last year in order to conduct important updates for custom window products, and it is our understanding that committee meetings and discussions among the parties have already taken place.

However, it does not appear that there has yet been a full evaluation of the effectiveness of the 2018 standard. It would seem that the CPSC must conduct a full review first before determining and concluding whether the standard has been effective in the area of safety. Especially without the benefit of a full and complete review of the latest voluntary standard, the rulemaking at hand is duplicative and would only serve to complicate the ongoing revision process by wasting time and resources. It is much more appropriate to let the voluntary safety standard process continue without the CPSC intervening with a redundant mandatory rule. And, a voluntary standard with the consensus of all interested parties would result in a more effective, efficient environment.

Federal regulation like this rule proposal cannot easily accommodate further technological advancements, and cannot readily respond to changes in the marketplace. By design, federal rules are not easy to revise or change in an expeditious manner. Voluntary standards, however, can be much more nimble, and provide flexibility when adapting to new product innovations. Given the desire of the Commission to develop new and innovative custom products, such flexibility found in voluntary standards is necessary.

Though voting in favor of the rule proposal, even one of the CPSC Commissioners, Peter Feldman, has stated his optimism for a voluntary industry standard:

6



*I am cautiously optimistic that a voluntary standard for custom window coverings may be established before a final rule is completed, as was the case for stock coverings. It is a positive sign that CPSC and other stakeholders have reengaged in establishing such a standard for custom products.*

(Statement of CPSC Commissioner Peter A. Feldman on "Notices of Proposed Rulemaking Related to Window Covering Cords," Dec. 14, 2021.) We too are hopeful that the CPSC will provide the necessary time and attention to the voluntary standard process, without forcing a premature mandatory rule on the industry.

**Lack of Policy Justification for Rule**

In some cases, it may make sense for the CPSC to apply a "one-size-fits-all" approach to its consumer product evaluations. However, this rule, which applies rules for stock coverings to custom coverings, is not one of those instances. As discussed above, there are major, inherent differences between the two product types. Unlike stock, custom products have dozens of different product designs that require unique and complex engineering solutions, and cord solutions simply do not exist for all custom products.

Industry businesses like ours share the concern about safety, and have strong incentives to protect consumer goodwill and maintain positive relationships with their customers. Additionally, the industry has economic and legal incentives for providing safe products that comply with voluntary standards in the marketplace. The CPSC does not seem to have taken any of these facts into account.

Also, it would seem that the data presented would need to be definitive if being used by the CPSC to support the elimination of entire lines of consumer product. However, that is not the case with what is presented in the NPRM. It is unclear from the data whether the rule would actually address incidents involving out-of-date product. The data presented would seem to pre-date the current 2018 voluntary standard, in which there has not yet been a meaningful, thorough review of the latest standard' effectiveness. The CPSC data seems to suggest that newer, more modern products remain the problem when that is not necessarily the case. Thus, it would seem that the projected benefits of the rule are not as clear and distinct as they should be, and may be overstated in the cost-benefit analysis.


Further, before eliminating entire product lines, the CPSC must consider whether the problems it identifies can be addressed through less restrictive means. The analysis in the NPRM is lacking, and does not provide sufficient explanation supported by data as to why a portion of the window coverings market should be eliminated.

In its Regulatory Flexibility Act discussion, the CPSC concludes that it expects the proposed rule to have a significant effect on a substantial number of small firms. This is a major concern, and the Commission seems to minimize the impact that the proposed rule would have on small manufacturers and other entities. The Commission does not recognize the difficulties in complying with such a restrictive new standard, if it is even possible. Additionally, the NPRM does not adequately present alternatives that would minimize significant economic impacts on small entities while accomplishing the agency's objectives.

Finally, in issuing a mandatory rule, the CPSC must properly balance the costs vs. the benefits of such rulemaking. As earlier noted, given that the costs to comply are much greater than stated in the NPRM, the CPSC does not seem to have fully evaluated the issue or examined the costs. As a result, the Commission has failed to appropriately satisfy this requirement. If finalized, the proposed rule would be invalid because the Commission has ignored several procedural requirements governing the rulemaking process.

**Incredibly Short Effective Date**

Without sufficient justification, the CPSC has proposed an effective date of 180 days after publication of a final rule in the Federal Register. This is an incredibly short, and arbitrary, time frame that is unrealistic, unworkable, and logistically impossible. The CPSC incorrectly dismisses this concern in discussing possible alternatives to the rule proposal in its analysis.

One cannot merely flip a switch and automatically have fully compliant custom products. There are countless changes by numerous parties throughout the supply chain that would be required to be made in a short amount of time. Any new technology must be incorporated into appropriate supply chain process, which takes much planning and time. Manufacturers, distributors, retailers, and others must all pivot to these new replacement parts and products. The CPSC is incorrect in stating that it is unlikely that any manufacturer – large or small – would leave the window covering market due to the rule proposal. From our perspective, business closures is a valid concern if this rule becomes final and takes effect.

8



Again, it should be noted that there are currently no viable replacement products to the existing product that would be banned under this rule proposal. To attempt to accomplish this goal will require time – time for developing concepts, utilizing technology, manufacturing, marketing, and other necessary steps. Taken together, 180 days is simply not a reasonable time period.

If the CPSC continues with this rule proposal, it will cause economic harm to thousands of businesses across the country, and provide consumers with fewer safe options by preventing access to already-manufactured safe products. Rather than moving forward toward a final rulemaking, the CPSC should withdraw the proposed rule and work with industry stakeholders to develop voluntary standards that address safety concerns related to custom window coverings.

<u>We oppose this Consumer Product Safety Commission rule proposal.</u>

Thank you for your consideration of these comments.

Sincerely,

Dan Adams
Rowley Company, LLC

# EXHIBIT 4

An official website of the United States Government. 🇺🇸

Docket (/docket/CPSC-2013-0028)  /  Document (CPSC-2013-0028-1567) (/document/CPSC-2013-0028-1567)
 / Comment

 **PUBLIC SUBMISSION**

# Comment from SAFE T SHADE, LLC

Posted by the **Consumer Product Safety Commission** on Mar 23, 2022

View More Comments   2.06K   (/document/CPSC-2013-0028-1567/comment)

View Related Comments   3.62K   (/docket/CPSC-2013-0028/comments)          Share ▾

| Comment |
| --- |

SAFE T SHADE, LLC (STS) has been working constantly and quite vigilantly, to get dangerous cords out of windows for over ten years. Please know, our Mission since my coming out of retirement in 2010, has been to eliminate dangerous cords in windows. I have, with friends, invested over $12 million behind 19 patented products that are available to all Manufacturers in the Industry, to quite affordably improve the looks of, and to make their window coverings totally cordless safe. Those who care, 1,700+ STS Customers who have repeatedly used our products, have contributed to our phenomenal growth (+118% per year) over the past eight years. However, the Industry core manufacturers do not care as much about window covering safety as our Customers and the Commission. Those Manufacturers have only tried to insulate their products from appropriate but inconvenient Regulation and have not proceeded to make all their products safe. Therefore I offer you the accompanying Note (see below) that I sent to Tyler Goodier at Health Canada, September 18, 2018. This Note, which I believe totally applies today, primarily squashes any theoretical cost increase debate, debunks arguments for peripheral window covering Consumers (cordless safe ADA compliant systems and tall window operating systems are all affordably available), and illustrates that a 180 day lead time is more than sufficient for a painless Industry implementation.

On a related note, in the latest WCMA Steering Committee session (this month), I did emphasize to "the Industry" the CPSC experience in 2010 with Drop Side Cribs. I stated that if they do not address eliminating dangerous tension devices, the CPSC will probably mandate new Safety Standards. The individual directing the conversation said there are no known alternatives to making many products cordless safe (I know firsthand the Company he is employed by knows about the very many safe solutions available). I responded by sending them, despite their extremely dismissive request, affordable, alternative solution videos for their evaluation. I have received no comment back. Please MANDATE NOW!

I am available to discuss this at your convenience and will make myself available to come testify before the Commission, privately (I'll share with you additional new products) or with the Industry present, at any time.

Will

RA38

William Lynch
President
SAFE T SHADE, LLC
Phone: 336-228-6000


From: William Lynch
Sent: Tuesday, September 18, 2018 12:17 PM
To: Tyler Goodier <tyler.goodier@canada.ca>
Subject: Comments On Canadian CBA

Tyler,

Please accept the accompanying comments on the CBA as I realize this is being forwarded to you after
your designated deadline. I apologize for this late submission. I have an explanation for missing the
deadline BUT we realize our submission is still late. I do hope that some of these comments are helpful to
you in our united cause.

If you have any questions or would like to discuss any of this, please call me anytime at: 336-228-6000
(Office). I will be traveling to California tomorrow through Friday. My mobile number is: 704-526-9911.

Will

William Lynch
President
SAFE T SHADE, LLC



Attachments  1

CANADIAN Cost-Benefit Analysis Comments 9.10.18

⬇ Download ▾

**Comment ID**
CPSC-2013-0028-3356

**Tracking Number**
l12-pgdo-ug38

| **Comment Details** | **Submitter Info** |
| --- | --- |

**Document Subtype**

Public Comment

**Received Date**

Mar 22, 2022



Your Voice in Federal Decision Making

About
(/about)

Bulk Data Download
(/bulkdownload)

Agencies
(/agencies)

Learn
(/learn)

Reports
(https://resources.regulations.gov/public/component/main?main=Reports)

FAQ
(/faq)

Privacy & Security Notice (/privacy-notice)  |  User Notice (/user-notice)  |

Accessibility Statement (/accessibility)  |  Developers (https://open.gsa.gov/api/regulationsgov/)  |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

**COMMENTS ON THE**

**HEALTH CANADA**

**DRAFT COST-BENEFIT ANALYSIS FOR**

**CORDED WINDOW COVERING REGULATIONS**


<u>**OVERVIEW**</u>

We at SAFE T SHADE applaud you for your detailed approach and analysis addressing the elimination of infant strangulation due to dangerous cords on window coverings.  We agree with you that ALL operating cords, regardless of "short cord" length, should be prohibited as well as the elimination or enclosure of cord loops (straight cord loops and beaded cord loops).


<u>**COMMENTS**</u>

General Comments:

- We believe the "87% produced overseas" assumption is probably closer to 50% given verbal reports stated by the Manufacturers we know.
- The "10 year life expectancy" assumption is probably accurate during a weak economy. During a robust economy Consumers trade-out/changeover their window coverings about every 7 years based on Manufacturer discussions.
- There are ADA compliant, cord inaccessible products available now that accommodate "disabled persons and people of short stature".
- With "800 small businesses involved in…CWCs", of which 197 were identified as Manufacturers, the market size suggests each Manufacturer is quite small.  Additionally, if each is similar in scope as in the US, then they are predominantly 1-3 person workrooms that do not make components but rather buy components, like safe lift systems, from a select few large Manufacturers.

Cost-Benefit Comments:

- Component Cost estimate of $9.06 million is possibly high but not un-reasonable.
- Research & Development cost of $3.98 million is unnecessary and should default to $0. Every Manufacturer either already has a cordless alternative or has been working on one and has already incurred this cost regardless of a new Regulation.
- Tooling cost estimate of $11.1 million is unnecessary and should default to $0.  Every Manufacturer must build new tools about every 5 to 7 years as a normal course of their business regardless of current or new design.

**CONCLUSIONS**

- Based on the above Costs (without the assumed unnecessary R&D and Tooling cost burdens), a recalculation of the Cost-Benefit Ratio could result in 1.697 versus the original 1.89 which even better makes the case for the move to going cordless or cord inaccessible.
- Based on the nature of and the ease of the small businesses sourcing safe lift system components from the select few larger Manufacturer sources, the six month coming-to-force of the Regulation should be reconsidered for the sake of preventing infant strangulation due to cords sooner.
- A scope of the Regulation might want to be expanded to explicitly state this Regulation does not just address residential window coverings and not just interior window coverings.

# EXHIBIT 5

**Corporate Office**
1 Blue Hill Plaza
Pearl River, NY 10965

T 845.664.7000
F 845.664.7001
www.hunterdouglas.com



March 22, 2022

<u>VIA Regulations.gov</u>

Ms. Alberta Mills
Secretary
Division of the Secretariat
Office of the General Counsel
U.S. Consumer Product Safety Commission
4330 East West Highway
Bethesda, MD 20814

Re: Comments on CPSC-2013-0028 – Safety Standard: Operating Cords on Custom Window
Coverings, Notice of Proposed Rulemaking

Dear Ms. Mills:

Hunter Douglas Inc. respectfully submits the comments that immediately follow with respect to
CPSC-2013-0028 – Safety Standard: Operating Cords on Custom Window Coverings, Notice of
Proposed Rulemaking.

Should you have any questions or need for additional information, please do not hesitate to
contact me.

Very truly yours,
Hunter Douglas Inc.

Richard Gottuso
Snr. Vice President & General Counsel

**Summary Overview**: As more fully addressed herein, Hunter Douglas Inc. ("HDI") views the Consumer Product Safety Commission's ("CPSC") proposed mandatory safety standard respecting operating cords on custom window covering products (CPSC-2013-0028) as both over-reaching and unnecessary. In combination with the revised (and shortened) 180 day effective date, the proposed mandatory safety standard will cause significant and undue economic and implementation hardships not only for manufacturers like HDI, but also for retailers (both large and small) and consumers of window covering products.

The proposed mandatory safety standard over-reaches to "solve" a child safety issue that has been constantly and successfully addressed by industry via the American National Standards Institute ("ANSI")/WCMA Standard for Safety of Window Covering Products (hereinafter the "Voluntary Standard"). . This is evidenced by (1) a pronounced and continual reduction of the child safety hazard and related incidents, (2) industry's introduction of advanced operating systems on many of its product varieties (namely, cordless, retractable cord and motorized operating systems ) and (3) industry's practice of consistently revising the ANSI/WCMA Voluntary Standard to drive innovation based on data and advancing technology to reduce or eliminate child safety risks—as exemplified by the significant changes contained in the last revised Voluntary Standard in 2018.

As a result of these various actions, the "corded" operating systems that HDI believes should be allowed to remain for custom products (most notably, retractable cord and continuous cord loop operating systems) have, to our knowledge, not been involved in even a single incident when manufactured in accordance with and compliant with, the 2018 ANSI/WCMA Voluntary Standard. Combined with this is the fact—as is well known to CPSC—that the industry is currently in the process of further enhancing the Voluntary Standard to eliminate free hanging cords (i.e. all cord locks, tilt cords and cord joiners). These operating systems have historically been involved in the majority of known incidents. Industry's current revision efforts also propose to enhance the requirements for continuous loop cord systems, so as to lower the already minimal risk associated with these systems. These latest changes to the Voluntary Standard will further mitigate any hazards involving new window covering products. Importantly, these results can be achieved while still fulfilling important consumer needs, without eliminating legitimate consumer choice on certain custom products and otherwise causing the type of severe negative economic impact on manufacturers, retailers and consumers that will result if the CPSC proposed mandatory standard is adopted.

**Background—HDI**: Hunter Douglas Inc. is the leading manufacturer of custom window covering products in North America. For years, HDI has been recognized as a leader in product development and innovation, with a dedicated focus on child safety. With our product engineering and development expertise in custom window coverings, including all varieties of blinds, shades, shutters, curtains, drapes, and other custom window treatments, HDI has been at the forefront of industry innovation. We are also a leading participant in the efforts of our industry organization, Window Coverings Manufacturers Association ("WCMA"), to work with CPSC and other interested stakeholders to eliminate hazards through continual critical analysis of, and improvement to, the Voluntary Standard,

In this regard, HDI played a major role in the 2018 Voluntary Standard revision which imposed the comprehensive and effective requirement that all stock window covering products must be cordless, resulting in the elimination of corded operating systems in approximately 80% of the industry's units sold. The 2018 Voluntary Standard also established new and enhanced requirements for custom products (which are the subject of the present rulemaking) by effectively creating a "default" cordless product, allowing free hanging lift cords (with length limitations) and/or tilt cords only where the customer explicitly requested same for their custom products. This approach, while voluntarily limiting available corded custom products, also recognized that "custom" products (by definition) are each uniquely manufactured to meet a consumer's specifications and needs and that, therefore, some specific product configurations and consumer choice/preferences must still be met.

At HDI, product development and innovations are not solely driven by safety standard revisions and the need for compliance. Rather, our product development and innovation activities are part of a constant, unrelenting R&D process that takes numerous factors, with child safety a priority, into consideration. This product innovation and development process is "baked in" to the fabric of what HDI stands for as a company. This fact should not be overlooked or downplayed. The product innovation and developments efforts of HDI (and other manufacturers) have resulted in both the availability of more cordless and motorized products becoming available to/ordered by consumers and less incidents involving young children. This market and safety evolution is driven by manufacturer-led efforts in response to consumer needs, and not simply by regulatory mandates.

In addition to our approximately 6,150 employees throughout the United States (representing the industry's largest domestic workforce), HDI's products are distributed by large ("big box") and smaller retailers alike. Included in HDI's distribution network are approximately 8,000 smaller, independently owned dealers, who rely on the breadth of HDI's custom product offerings to support themselves and their families and who form the backbone of the type of small businesses that are vital to America's economy. To effectively deprive these dealers of the opportunity to sell the broadest range of child safe custom products—as CPSC's proposed mandatory standard would do—will inevitably result in a severe negative impact on these small businesses, many of whom may not be able to survive.

Both HDI and our retail distribution partners only manufacture and sell products that comply with the 2018 Voluntary Standard. HDI incorporates compliance with the Voluntary Standard's requirements into all stages of its product development efforts, beginning in the product design stage and ending with quality and manufacturing process controls at the manufacturing/fabrication stage. Indeed, as CPSC recognizes, the broader window covering industry substantially complies with the 2018 Voluntary Standard and, therefore, supports the safety advances that have resulted from that standard revision.

Critically, HDI and our retail partners play an enormous role in educating consumers about child safety concerns and assisting them to choose the best products to fit their specific lifestyle, needs and budgets. HDI partners with its dealer network to provide them with a wide array of child safety messaging, point-of-sale advertising and training on child safety awareness and custom product choice. Given that in custom product sales there is a great deal of direct interaction with the

consumer, this child safety education further acts to reduce the child safety hazard risk for custom products. Similarly, the overwhelming majority of HDI's custom products are installed by an independent installer network, the majority of whom have been trained and certified by HDI. To further enhance the services associated with custom window covering purchases, HDI created HDIS ("Hunter Douglas Installation Services"). This group of professional installers are educated on all aspects of child safety (sometimes recommending different product selections to consumers when doing pre-sale activities like measurements) and trained on the proper installation of all custom products. HDIS' measuring and installation services are offered to our thousands of independent dealers, with their services being guaranteed by HDI.[1] By contrast, in "stock" product purchases, consumers more typically select their own products with little or no sales staff interaction and install the products themselves. These realities attendant to customs and stock products are important differences and act to reduce child safety risks associated with custom products, further highlighting the unnecessary nature of CPSC's proposed mandatory standard.[2]

**Specific Concerns & Comments**:

1.    Ignoring Incident Data Causes the Elimination of Safe Products from the Custom Segment:

A critical aspect of safety as associated with consumer products is to reduce any proven or significant safety hazards by applying product technological advances to address the product varieties that pose demonstrated safety risks. A key driver in assessing which products pose cognizable safety risks is available verifiable incident data. Throughout the years, CPSC, industry and consumer advocates have consistently aligned on the need to be "data driven" in connection with product development efforts and the Voluntary Standard revision process. As to the proposed mandatory standard, however, CPSC takes two unsupportable steps respecting the available data.

First, CPSC ignores that the available incident data shows, especially in the context of the estimated more than one billion window coverings products in residences throughout the United States, that fatalities related to custom products are extremely rare. Instead CPSC drives its regulatory efforts by relying on what may hypothetically occur, instead of what actually has (or has not) occurred in the real world.

Second, CPSC assesses "all incidents equally", failing to account for when a particular incident occurred and where the state of product safety and the provisions of the then-applicable Voluntary Standard stood at that time. As a result, CPSC treats incidents involving older technologies manufactured under superseded Voluntary Standard revisions as being equivalent to incidents that have occurred (and, more notably, have not occurred) with respect to products that comply with

---

[1] Other custom product manufacturers also assist their customers with professionally-trained measuring and installation services.

[2] CPSC's assessment report neither discusses nor gives any weight to point of sale consumer safety education or the benefits of professional installation. Nor does CPSC assess the impact of the various public education campaigns undertaken over the years by HDI (and other manufacturers) or by the WCMA through the Window Covering Safety Council ("WCSC"). The lack of consideration for these efforts further diminishes the quality of CPSC's conclusions as to incidents rates. (This is important because data shows that the majority of incidents occur on older, legacy products that significantly predate the current Voluntary Standard)

the 2018 Voluntary Standard.[3] This is not merely mixing "apples and oranges, this is mixing apples and shovels!

The net result of this unsupportable methodology is that the proposed mandatory standard will force the complete elimination of products as to which there have either been no incidents (such as retractable cord products) or as to which the possibility of incidents, when products are manufactured and installed in compliance with the 2018 Voluntary Standard, is at most, exceedingly minimal (such as continuous loop cord with tension device operating systems). This result is even more concerning in light of industry's current efforts (which are well-known to CPSC) to further increase the safety aspects of continuous loop products by requiring all tension devices have a spring loaded design to ensure constant cord tension. Additionally the updated Voluntary Standard will increase the difficulty to install these products without cord tension devices or to remove them after installation. Under the updated Voluntary Standard, if the tension device is removed, it will likely result in product damage and, if not installed or subsequently removed, will make the product far more difficult to operate in the intended fashion. Finally, the updated Voluntary Standard will add performance metrics to further ensure that tension devices will not break or fail with extended use.

CPSC's proposal to ban continuous loop products ignores two critical points: (1) To HDI's (and industry's) knowledge, there have been zero incidents on continuous loop products that were manufactured in compliance with the currently-effective 2018 Voluntary Standard—a fact that CPSC incident analysis does not (and can not) controvert[4] and (2) CPSC staff has long taken the position that cords under tension do not pose a significant risk hazard (See July 22, 2014 letter to Ralph Vasami of WCMA from George Borlase, CPSC hazard identification and reduction expert: "Staff recognizes that tension devices when they are properly installed and intact, keep the looped cord taut and do not allow a child's head to enter the loop.") (See also CPSC Staff Briefing, p.10, incidents involving continuous loop cords involved situations where tension devices were not installed or were broken.) In the almost eight years since the referenced Borlase letter, HDI (and other manufacturers) have continued to improve the safety of continuous loop operating systems and now propose to further advance safety considerations related to these products in the current Voluntary Standard revision.

By ignoring both its prior position on the issue and the very incident data upon by which the agency has long urged industry to be driven, CPSC takes an unsustainable regulatory approach to retractable cord and continuous cord loop products. CPSC's authority to promulgate consumer product safety standards is limited to when there is an "unreasonable risk of injury" associated with a product. (See 15 USC Sect. 2056(a)). Yet, CPSC has failed to undertake ANY sort of

---

[3] HDI understands that WCMA will be submitting an in-depth critique of the flawed fashion by which CPSC assessed window covering product incidents in attempting to develop a justification for its proposed mandatory standard. HDI adopts includes the conclusions set out in the WCMA critique comments as if they were more fully set forth in this comment letter.

[4] WCMA's efforts to obtain incident data from CPSC have been marked by a history of unacceptable delays and/or refusal to provide information known to the agency. Moreover, when data has been provided, it has often been redacted in questionable fashion. This has hindered WCMA's good faith efforts to be guided—as CPSC argues should be the case—by data.

supportable risk analysis. Instead, CPSC leans on the mere existence of an incident (regardless of when it occurred and what, if any, Voluntary Standard revision, applied to the product involved) to justify the elimination of all custom continuous loop cord and retractable cord products. Putting aside any discussion of what factors and data a competently performed risk analysis should consider, the fact that CPSC failed to provide any cognizable risk analysis cannot be said to adequately support a determination that corded custom window coverings pose an "unreasonable" risk.

CPSC and industry have examined the data and the current state of product technology advances with respect to free hanging corded custom products (i.e. those with cord locks, tilt cords and/or cord joiners) and _mutually_ determined that those operating systems can and should now be removed. (As noted, industry has already notified CPSC of its intention to take this step as part of the current standard revision process.) CPSC's position with respect to free hanging corded custom products provides, however, a marked contrast with its approach on retractable cord and continuous cord loop products. Without any similar evaluation of the incident data and whether such incidents would have occurred on retractable cord and continuous cord loop products compliant with the 2018 Voluntary Standard, CPSC mandatory standard would ban these operating systems simply because there have been past incidents on older product versions. This "blanket ban" approach also ignores the most recent product safety advances. The industry's latest proposals to revise the Voluntary Standard's provisions as to continuous loop products further underscores the nonsensical nature of the CPSC's proposal.

CPSC's approach also fails to recognize that custom product varieties, which do not pose any demonstrated hazard risk, and which are a small segment of all window coverings[5], require more flexibility than stock products to allow for a variety of product size and weight and location (e.g. over sinks, behind furniture or high on walls) constraints. CPSC ignores the fact that there is a necessity for some safe corded products to remain available to consumers so as to address unique ("custom") needs and to allow for consumer preference in settings where child safety is not a key factor. CPSC's "no operating cords ever" approach also ignores the fact that custom products with compliant cords are needed for segments of the population (such as those with disabilities) that are either unable to effectively operate a cordless product or cannot afford expensive motorized products. This type of regulatory excess is not warranted, appropriate nor legally defensible.

The ramifications of CPSC's proposal to eliminate proven safe corded custom products go even further. By eliminating product categories for which there are no viable replacements, CPSC creates an incentive for consumers to keep their older non-compliant custom corded window coverings, instead of replacing them with safer custom products that meet the current 2018 Voluntary Standard (as further enhanced by the current proposed changes to the Voluntary Standard). This unintended consequence moves the issue of child safety backward, not forward.

---

[5] CPSC opines, without any identified or supportable basis, that custom products account for as much as 50% of all product units sold. This is a significant error as manufacturer information provided to WCMA demonstrates that custom products account for roughly 20% of all units sold, whereas stock products account of roughly 80% of all units sold.

Like consumers, HDI will also be significantly harmed by the proposed mandatory standard. Beyond the already-accepted elimination of free hanging cord operating system products, the CPSC proposed mandatory standard would result in the elimination of an additional approximate 32% of our custom product offerings, with no available alternatives to replace that loss—and all without resulting in any cognizable benefit to child safety.[6] These products are an important component of the custom segment and their loss would have an immediate negative financial impact on HDI and the network of small dealers that sell our custom products. Neither manufacturers nor retailers should be arbitrarily forced to sustain such a large economic hit, especially when there is no discernible child safety risk associated with the products at issue. In addition to failing to provide an incident risk analysis, CPSC also has not provided a supportable cost-benefit analysis that addresses child safety concerns in light of products that comply with the current 2018 Voluntary Standard. There is a simple reason for that: providing such a cost-benefit analysis would demonstrate that CPSC can not meet applicable legal requirements to impose a mandatory standard.

2.    The Proposed Mandatory Standard Contains an Unrealistic and Inappropriately Burdensome 180-Day Effective Date.

Notwithstanding HDI's position that the proposed mandatory standard is, in and of itself, completely unnecessary and will result in severe economic and product availability hardships for consumers, retailer and manufacturers, CPSC's proposed 180-day effective date will only significantly add to those hardships. The proposed 180-day effective date is indefensible, particularly when examining CPSC's original effective date recommendation (as contained in the Staff Briefing) and how CPSC then arbitrarily reduced the effective period by 75%!

In the CPSC Staff Briefing, a two-year effective date was proposed, doubling the 12-month effective period for the 2018 Voluntary Standard, which, as noted, implemented unprecedented changes. In recommending a two-year effective date, CPSC Staff recognized that the proposed mandatory standard would eliminate certain custom product categories for which no viable replacements exist.

Part of the rationale for the two-year effective date was CPSC Staff's acknowledgment that in order to replace retractable and continuous loop operating system products (which constitute a significant percentage of custom product offerings), industry would need ample time to develop the technology to support replacement solutions for these operating systems that can both comply with the proposed mandatory standard and be viable for various consumer needs.[7] This reality

---

[6] When combined with products containing either cord lock or tilt cord systems (which are already to be eliminated per the current Voluntary Standard proposal), the total impact on HDI's custom product offering would be the elimination of approximately 50% of our current offerings! Any business would suffer significant economic damage from such a reduction.

[7] Although CPSC has apparently not undertaken any analysis on the issue, there are serious limitations as to the types of operating systems that would remain allowed if the mandatory standard is imposed. Thus, and despite any assertions to the contrary, there is no simple ability for HDI to immediately replace any eliminated operating systems with those systems which remain. For example, (i) cordless operating systems do not work for larger and/or heavier products and in locations where accessibility to the product is limited; (ii) larger motorized systems require component developments to account for weight considerations—both with respect to product size and as to motor weight.

presents HDI (and other manufacturers) with daunting engineering and commercial introduction challenges given that size, weight, and location requirements for custom products that presently utilize retractable and continuous loop operating system prevent (as has been suggested) a simple transition to the type of cordless lift systems offered for stock products.[8] For example, on HDI's best-selling product, Duette cellular shades, the elimination of the continuous loop operating system option and replacement with a cordless (LiteRise) operating system would reduce the maximum available product size from 174 sq. ft. to only 70 sq. ft. and add a $105 surcharge to the cost of each unit. Due to the limitations of cordless operating systems, similar results will occur in other custom product categories. Below are examples for four of the most popular custom product categories HDI sells:

| Maximum Unit Size Comparison of Cord Loops Under Tension vs Cordless Operating Systems | | | |
|---|---|---|---|
| Product Type | Cord Loops Under Tension, Max Size per Unit, (Sq. Ft.) | Cordless Operating System, Max Size per Unit, (Sq. Ft.) | Added Cordless Cost per Unit |
| Cellular Shade | 174 | 70 | $105 |
| Woven Woods | 88.5 | 49 | $125 |
| Roller Shade | 109.1 | 52.5 | $205 |
| Wood Blind* | 80 | 45.5 | $165 |

*\* Cord Lock Operating System*

Moreover, due to the need for more (and more expensive) parts, more assembly labor, and other quality-related costs associated with the production of more complex products, the elimination of continuous loop operating systems will result in materially greater product costs to consumers.

Based on HDI's extensive experience in custom product development, it typically takes in the range of 32-40 months to develop a new product, ensure that it can meet weather conditions and the daily use needs to which window covering products are exposed, arrange for supply and production needs and to commercially introduce the new product (as supported by sales, sampling and marketing materials). The foregoing applies to the concurrent development of just 1 or 2 new products. The need to re-engineer and/or develop new operating systems for the entire gamut of HDI's 20 custom product categories (with the same limited engineering resources) would take

---

Motorized products also have power supply concerns that do not fit all applications and locations. Motorized products also present cost considerations for many consumers. Again, it is critical to bear in mind that all of these changes would be occurring in the custom product segment, i.e., the product segment where product diversity is the greatest.
[8] Indeed, CPSC Staff suggested that, because of these significant product engineering challenges, consideration could be given to an effective date that was longer than 2 years in order to mitigate the impact on industry.

significantly longer. Even if HDI had commenced such new product development efforts on the very day the CPSC Commissioners voted to approve the proposed mandatory standard, there would not be enough time to introduce new products into the market by the time 180-day effective period expires. Putting aside the fact that retractable and continuous loop operating system products do not pose a significant child safety risk and, therefore, do not need to be eliminated in the first instance, the proposed 180-day effective day period unreasonably prevents any realistic ability for HDI to develop compliant products to replace those products that would be eliminated.[9]

Despite its own Staff's considered recommendation, the CPSC's Commissioners—without any discussion, prior warning or assessment of its impact--arbitrarily reduced the effective date to 180-days based on a proposal by a new Commissioner, Richard Trumka. Commissioner Trumka (1) did not meet to discuss the issue with HDI (or, to our knowledge, any other prominent custom window covering manufacturer) or with any retailers, (2) has not, to our knowledge, worked in any aspect of the window covering product industry or designed any window covering product technology and (3) did not present any analysis or evaluation as to why a reduction to 180-days would not cause an immense hardship on industry and added costs to consumers. It is therefore impossible to discern a justifiable basis for the effective date reduction.

For a manufacturer like HDI, the shorter proposed effective date raises an entire litany of challenges that will materially increase costs of compliance and, in turn, translate to higher prices for consumers—during a time when Americans are already challenged by high inflation. That these economic impacts are real and will occur was recognized by CPSC Staff in its Briefing, but that evaluation was in the context of a 2-year effective date, not the dramatically reduced 180-day effective date period. Moreover, in assessing the costs associated with the proposed mandatory standard, CPSC's analysis was limited to per-product component costs. That approach only tells a portion of the story and ignores other significant costs that are incurred at the manufacturing (and other) levels. Irrespective of the cost elements measured, when they are examined through a 180-day effective period lens, both the magnitude of those costs and the implementation challenges to commercially introduce a compliant product materially increase.

Even if it were somehow possible to take out the 32-40 month new product development cycle, HDI cannot meet a 180-day effective period because, without limitation, of the following:

    (a) extensive R&D product development and re-engineering costs, especially in the context of new products, all of which require rigorous parts qualification and product life-cycle testing in order to assure that these products meet the usage and weather/environmental conditions to which window covering products are exposed;

    (b) parts availability and supply-chain issues associated with new product demands and an unknown product mix, an issue that is even more pronounced given the current global supply-chain crisis—both in terms of component sourcing and costs;

    (c) re-doing inventory planning and the potential obsolescence of (already ordered) components due to long lead times;

---

[9] The inability to develop, test and commercially introduce replacement products within the extremely limited proposed 180-day window only further magnifies the concern that consumers will tend to hold onto older, non-compliant window covering products longer. This works against, not for, child safety.

(d) reliance on third party suppliers to provide molds, extrusions and components in a timeframe that they have never been able to meet in the past;

(e) costs associated with creating new product sample books, have them constructed (a task performed by 3rd parties) and available for distribution to retailers (a process that ordinarily takes HDI 14-20 months and costs millions of dollars);

(f) increased labor costs as cordless products require greater assembly labor than corded products—and this is without factoring in the presently unknown increased labor component that will be required to assemble even more complex cordless products (IF they can be developed at all);

(g) the multi-million dollar costs associated with producing and installing new product displays, creating consumer marketing materials and updating the numerous web sites and social media platforms that HDI hosts on behalf of our dealer partners, along with the costs and time necessary to educate both HDI's own employees and those of our retail partners on new products and the related marketing and display items;

(h) the need to create and introduce new manufacturing equipment and processes, ranging from product molds to manufacturing line changes associated with new and more complex products; and

(i) the costs associated with changing order entry systems, pricing guides and product SKUs to address new products and parts to ensure accurate order and replacement part fulfillment.

With an understanding of the above, and to anyone practiced in the development and commercial introduction of window covering products, CPSC's use of only per-product component costs increases smacks of amateurishness and should be either ignored or heavily discounted as it greatly underestimates the costs that will be borne.[10]

Further, the costs identified above are those that will be incurred at the "manufacturing" level. A truly complete cost assessment must also factor in the costs to retailers, and especially the small-businesses that comprise the principal distribution network for HDI's custom products. In that sense, the HDI dealer's business viability directly impacts HDI economically and vice versa. The heightened costs to be incurred by these businesses include the cost to purchase sample books and new product displays, which can be daunting for small businesses, particularly if they are forced to incur these costs in a compressed time period.

For example, whereas HDI dealers typically replace their sample books on a rolling, approximately three-year basis, condensed product line changes associated with the proposed 180-day effective period, will result in recently-purchased sample books being rendered obsolete and concurrently require the purchase of 12-15 new sample books at once. This is not a trivial cost for a small

---

[10] For example, in considering alternatives to the Proposed Standard, CPSC posits that the cost of transitioning from operating cords to an operating wand is $0 "because using plastic rods for operation is very similar to cords in cost." 87 Fed. Reg. 1,046. Regardless whether the costs of the products are the same, CPSC completely ignores the costs associated with the re-engineering of product lines, additional labor costs, additional component costs that result from changes in operating systems due to a change from a cord to a wand, increased packaging and shipping costs (as a wand is longer that the width of the product thereby requiring larger and more complicated packaging) the sourcing and vetting of new materials, and updating of retailer displays, among others. And that is for just one component change!

business as new HDI sample books typically cost a dealer $300 each.[11] This must be accounted for in any cost analysis. There are also costs for dealer employees to be trained on new products and displays (and indirect costs resulting from lost sales and service time). These examples are separate from the threshold issue of whether—due to eliminated products for which there are no viable replacements-- retailers will even be able to meet the custom product requirements of consumers.

**Conclusion**: Based upon all of the issues discussed herein, and because the CPSC did not provide either a supportable risk or cost-benefit analysis, nor consider the heightened cost impacts of a 180-day effective date, the CPSC can not make a supportable finding that the proposed mandatory standard (including its effective date) is reasonably necessary to eliminate or reduce an unreasonable risk of injury associated with the impacted custom window covering products. Therefore, HDI submits that the proposed mandatory rule be abandoned in favor of the latest Voluntary Standard revisions.[12]

---

[11] Across HDI's approximately 5000 aligned dealers alone, this would mean a small business cost impact of at least $18,000,000. (12 (books) (x) $300 (x) 5000)

[12] Alternatively, as to the shortened effective date, CPSC should go back to the 2-year effective period originally recommended by CPSC staff.

# EXHIBIT 6



March 22, 2022

<u>VIA Courier</u>

Ms. Alberta Mills
Secretary
Division of the Secretariat
Office of the General Counsel
U.S. Consumer Product Safety Commission
4330 East West Highway
Bethesda, MD 20814

**Re: Comments on CPSC-2013-0028 – Safety Standard: Operating Cords on Custom Window Coverings, Notice of Proposed Rulemaking**

Dear Ms. Mills:

Custom Brands Group respectfully submits the comments that immediately follow with respect to CPSC-2013-0028 – Safety Standard: Operating Cords on Custom Window Coverings, Notice of Proposed Rulemaking.

Should you have any questions or need additional information, please do not hesitate to contact me.

Very truly yours,
Custom Brands Group

Wayne Gourlay

**Wayne Gourlay**
**President**
wayne.gourlay@custombrandsgroup.com
213.745.3203

12800 Center Court Dr. South
Suite 100
Cerritos, CA 90703
custombrandsgroup.com

RA56

**Summary Overview:** As more fully addressed herein, Custom Brands Group (CBG) views CPSC's proposed mandatory safety standard respecting operating cords on custom window covering products as both overreaching and unnecessary. In combination with the revised (and shortened) 180-day effective date, the proposed mandatory safety standards will cause significant and unnecessary economic and implementation hardships only for manufacturers like CBG, but also for retailers and consumers of window covering products.

The proposed mandatory safety standard overreaches to "solve" a problem that has been constantly and actively addressed by the industry via its ANSI/WCMA Voluntary Standard. This is evidenced by:
1. A pronounced and continual reduction of the child safety hazard;
2. Industry's introduction of advanced operating systems on many of its product varieties, namely cordless, retractable cord, and motorized operating systems;
3. Industry's practice of consistently revising the ANSI/WCMA Voluntary Standard, to drive innovation based on data and advancing technology to reduce or eliminate child safety risks - as exemplified by the significant changes contained in the last revised Voluntary Standard in 2018.

As a result of these actions, the "corded" operating systems that CBG believes should be allowed to remain for custom products, notably retractable cord and continuous cord loop operating systems, have, *to our knowledge, not been involved in even a single incident when manufactured in accordance to and compliant with the 2018 ANSI/WCMA Voluntary Standard.* Combined with this is the fact that the industry is presently in the process of further enhancing the Voluntary Standard to eliminate free-hanging corded operating systems, which have historically been involved in the majority of known incidents. The industry's current revision efforts also propose to enhance the requirements for continuous loop cord systems to lower any risk associated with them from an already minimal state.

These latest changes will result in the possibility of incidents involving new window covering products being radically minimized. These results can be achieved while still fulfilling important consumer needs, without eliminating necessary consumer choice on certain custom products and otherwise causing a severe negative economic impact on manufacturers, retailers, and consumers that will result if the proposed CPSC mandatory standard is adopted.

**CBG Background:** Custom Brands Group (CBG), based in Cerritos, CA, is a leading manufacturer of custom window covering products. We have been in business for 45+ years. With over 700 employees in the US and more than 3,500 in North America, we fabricate more custom window coverings than any other U.S.-based company. *100% of these custom products meet the current WCMA standards.*

It is critical to know that CBG product development activities are not solely driven by standards revisions and the need for compliance. Our development activities are part of a continuous improvement process to develop and launch more cordless and motorized products into the

2

RA57

consumer marketplace. In the last 3 years, our organization has introduced 35 new cordless/automated operating systems across six product categories; as a result, our sales mix has positively shifted to more cordless/automated products being sold. However, not every window can be covered with one of these solutions, nor can every consumer afford it.

CBG proudly sells to over 7,000 smaller, independent locally owned and operated businesses, the lifeblood of the American economy. These dealers and their employees support their families, are active economic partners in their local communities, and are passionate about the safety of every child. To deprive these dealers the opportunity to sell the broadest range of child-safe custom products - as the CPSC proposed mandatory standard would do - will result in a severe negative impact on these small businesses and their communities.

Additionally, we actively support and participate in the efforts of our industry organization, Window Coverings Manufacturers Association (WCMA), to work with the CPSC and other interested stakeholders to eliminate hazards through continual critical analysis of, and improvement to, the applicable voluntary safety standard, namely: the American National Standards Institute (ANSI)/WCMA standard for Safety of Window Covering Products.

The custom window coverings selling process is renowned for its high degree of engagement with the retailer and the consumer, as opposed to the "stock" product purchase where there is little to no sales staff interaction. We and our retail partners play a critical role in educating consumers about child safety concerns and assisting them to choose the best products for their particular needs and budgets, including facilitating the child-safety conversation. Via our branded websites (altawindowfashions.com; enlightenedstyle.com) we actively advocate for child-safe choices as well as provide resources to help concerned parties make informed, smart decisions. Our primary sales merchandising tool - our sample books - educates consumers on the need for child-safe options in the home and clearly identifies those solutions. Child safety education is at the forefront of our merchandising and our retailers' engagement with prospective customers. This level of awareness and education further acts to reduce the child safety risks for custom products.

**The Impact of Eliminating Safe Products:**

The WCMA is currently in the process of updating the 2018 WCMA/ANSI voluntary safety standard that will include the elimination of all free-hanging cords (standard cord locks and cord tilts). Those two systems have been the primary cause of the strangulation hazards and incidents on window coverings products. The updated WCMA/ANSI Window Covering Safety Standard will also add performance requirements for continuous cord loop systems using a spring tension device. This action is designed to further reduce the already limited hazard associated with these operating systems when they are properly designed and installed. Cords under tension have been proven safe. CBG supports this effort.

The CPSC's proposed mandatory standard, however, takes the position that cords under tension represent an unreasonable risk. The mandatory standard would prohibit products with

cords under tension from being sold. These drastic changes would eliminate whole segments of our product line with no immediate alternative to replace them, including cord loops with tension devices, top-down/bottom-up designs (a very popular consumer choice), and retractable cords. Upwards of one-third of our units would be eliminated overnight causing severe financial hardship both to us and our customers.

**Specific Concerns/Comments:**

The CPSC assesses "all incidents equally," failing to account for when a particular incident occurred and where the state of product safety and the provisions of the then-applicable Voluntary Standard stood at the time. Therefore, the CPSC treats incidents involving older technologies manufactured under superseded Voluntary Standard revisions as being equal to incidents that have occurred or more notably NOT OCCURRED, with respect to products that comply with the 2018 Voluntary Standard.

The net result of the unsupportable methodology is that the proposed mandatory standard will force the complete elimination of products as to which there has either been no incidents - such as retractable cord products - or as to which the possibility of incidents when the product are manufactured and installed in compliance with the 2018 Voluntary Standard.

The CPSC proposal to ban continuous loop products ignores two critical points: 1) to our knowledge, there have been zero incidents on continuous loop products that were manufactured in compliance with the 2018 Voluntary Standard, and 2) the CPSC staff has long taken the position that cords under tension do not pose a significant risk hazard. *The CPSC appears to be ignoring both its prior position on this issue as well as the incident data.*

**With respect to free-hanging cords, we are in mutual agreement as to the need to remove those operating systems from the market; the industry has previously notified the CPSC of its intention to take this step as part of the current standard revision process.**

The CPSC overly broad ban proposal blatantly ignores the needs of many American consumers in trying to purchase new custom window coverings:

- The tops of many windows cannot be reached by disabled consumers as well as those short of stature when using a cordless solution.
- Wider and/or taller windows frequently cannot be covered with a cordless option due to material weight issues; these windows can frequently be covered with a cord loop with a tensioner device.
- From a financial perspective, many consumers can not afford the additional costs that are associated with a motorized solution which is what would be needed in the above scenarios. Additionally, those with limited sight are frequently challenged to use motorized devices.

4

An unintended, but likely very real consequence of the proposed CPSC action, is that current window coverings with older free-hanging cords will not be replaced due to the lack of availability of affordable solutions.

Manufacturers throughout the US are still reeling from and attempting to manage through the worldwide supply chain and logistics issues. Components that used to take us two months from order to delivery are now upwards of six-to-eight months. If given just 180 days to comply, we would likely have a duration of time where some product categories as a whole would not be sold due to a lack of control systems. Additionally, the short time frame would not allow us to pursue any product development of compliant solutions that would minimize the consumer cost increase.

Further implications of this unrealistic short time frame include:
- All selling materials would need to be overhauled; the printing industry is dealing with widespread labor and supply shortages.
- Display shades/blinds would need to be replaced adding additional financial burdens to the retailer and would be hampered by supply chain issues.
- Complex ordering systems would need to be completely revamped. Major system changes take upwards of 18 months to plan and execute.

To ramp up to meet an October 2022 implementation date is simply unrealistic and clearly defined by individuals with no real-world knowledge of running a business in today's environment. Rampant out-of-stock situations would be incurred slowing down an economic recovery that is already on shaky ground with rising inflation and interest rates.

The products we are intended to launch/sell in Fall 2022, were in development 18+ months ago. It is simply not feasible to expect that we can manufacture new products that don't even exist today. Without adequate time to design and switch to new operating systems, entire product categories may cease to exist.

Many of our small business retailers were closed for months in 2020. They are still recovering. This proposal, with its many limitations and short implementation timeframe, could not have come at a worse time. It will create a significant financial burden across the spectrum.

We are in mutual agreement that one child's death is one too many. We believe that the industry's latest Voluntary Standard revisions will achieve the goal of a home with child-safe window coverings, while also providing the American consumer the choices needed to cover the windows in their home.

On behalf of the US small custom window coverings businesses as well as ourselves, we respectfully request that the CPSC abandon the proposed mandatory rule in favor of the industry's latest Voluntary Standard revisions that specifically address the elimination of all free-hanging cords from custom products. The cost to business and the reduction of consumer choice is simply unnecessary given the industry's new Voluntary Standards.

5

# EXHIBIT 7



March 21, 2022

<u>VIA Email and Regulations.gov</u>

Ms. Alberta Mills
Secretary
Division of the Secretariat
Office of the General Counsel
U.S. Consumer Product Safety Commission
4330 East West Highway
Bethesda, MD 20814

Re: Comments on CPSC-2013-0028 – Safety Standard: Operating Cords on Custom Window
Coverings, Notice of Proposed Rulemaking

Dear Ms. Mills:

3 Day Blinds respectfully submits the following comments regarding CPSC-2013-0028 – Safety
Standard: Operating Cords on Custom Window Coverings, Notice of Proposed Rulemaking.

**Introduction:**

3 Day Blinds is a leading manufacturer and retailer of custom window coverings. For over 40
years, we have offered outstanding service, superior value, unprecedented delivery time, and a
broad range of fashionable products. We sell our products directly through company employed
Design Consultants. We have approximately 1,200 U.S. based employees and install partners and
we service hundreds of thousands of customers every year.

3 Day Blinds disagrees with the proposed Mandatory Standard for Operating Cords on Custom
Window Coverings. The Mandatory Standard coupled with the proposed effective date are both
unnecessary and not feasible.

**Mandatory Standards should be replaced with updated Voluntary Standards:**

The Mandatory Standards are unnecessary due to the proactive and successful steps the industry
has taken and continues to take.  The voluntary standards enacted by the industry in 2018 made
significant changes in product offerings and provided additional safety enhancements. The
industry supplemented this with extensive and ongoing employee training and awareness
campaigns. Furthermore, both 3 Day Blinds and the industry as a whole continue to work to
make products even safer.

167  Technology Drive        Irvine        California        92618



The industry is currently working on further enhancements to the voluntary standards to eliminate free hanging corded operating systems, which in the past have been the majority of all incidents.

As members of the Window Coverings Manufacturing Association (WCMA) for over 20 years, 3 Day Blinds has been an active member on the WCMA steering committee to make revisions to the 2018 ANSI/WCMA Window Coverings Safety Standards. The proposed revisions to the 2018 WCMA/ANSI Voluntary Window Covering Safety Standards will eliminate all free hanging cords. Additionally, new language in the updated 2018 WCMA/ANSI Safety Standard will add further performance requirements for continuous cord loop systems using a spring tension device. Finally, there is improved language around guidelines for manufacturing and retractable cord devices. All of these performance revisions and requirements will mitigate the ability to create a hazardous condition. Since enacting, the 2018 ANSI/WCMA Window Coverings Safety Standards there have been zero reported incidents with product manufactured under these guidelines. We believe these revisions will provide even further strides to provide products consumers demand with safe operating conditions.

Both the proposed Mandatory Standard and the proposed Voluntary Standard eliminate free handing cords. However, the proposed mandatory standard goes further and will prevent the sale of Continuous Cord Loop (CCL) products that are very highly favored by our consumers. Many of our consumers select these CCL products due to the size, weight and location of a window. The larger the shade, the heavier these products can get. Due to required componentry, narrow windows rely on CCL to raise and lower window coverings. At this time, we are unable to produce these products with cordless or motorized controls. Some windows are very difficult to access, for example; high up windows, windows over a sink and windows behind a couch—we worry that prohibiting the sales of CCL in these difficult to reach areas will result in consumers climbing ladders, chairs or other household items to reach or manipulate the product for their specific needs. This has the potential for significant consumer injuries. Most window coverings have a 7-10 year life; reducing options may result in consumers keeping older non-compliant products in windows longer.

**Timing is unreasonable:**

The timing proposed to enact the Mandatory Standard is not feasible. The proposed 180 day period would provide significant financial strains. The proposed Mandatory Standards would eliminate entire categories of products where there are currently no viable alternatives. This will create an undue hardship on consumers and the companies that sell and manufacture the product.



The proposed mandatory standard timeline is unprecedented. Product enhancements, changes and introductions take 6-12 months to implement (longer if new components need to be designed, tested and inventory levels achieved). Due to supply chain challenges in the last two years, most of our updates are taking upwards of 18 months due to raw material shortages. We order many of our components six months in advance to ensure proper stock to meet demand. The short implementation timeline will not provide our team enough time to procure components, test and implement replacement products resulting in loss of revenue but also an inability to meet consumer demand. The 2018 standards had a 12-month implementation timeline and the CPSC staff briefing on the proposed Mandatory Standard recommended a 2-year effective date. While we strongly recommend that the Mandatory Standards be withdrawn and replaced with a new voluntary standard. If the Mandatory Standard goes forward we highly encourage a 2 year implementation period.

**Conclusion**

3 Day Blinds is committed to providing a safe product with a product selection that meets consumer's needs. We do not believe there is enough evidence to support a need for a mandatory rulemaking as the revisions to the voluntary standards provide ample regulations.

Sincerely

David Hall
3 Day Blinds
Dave.Hall@3day.com
President and CEO

# EXHIBIT 8



**Media Contact:**
**Paul Nathanson**
**202-828-1714**
**Paul.Nathanson@policyres.com**



## Window Covering Manufacturers Association Announces Historic
## New Window Covering Safety Standard

**New York, NY (UPDATED January 25, 2018)–The** Window Covering Manufacturers Association (WCMA) announced today the approval of a new window covering safety standard by the American National Standards Institute (ANSI) that will require a vast majority of window covering products sold in the United States and Canada to be cordless or have inaccessible or short cords. The new safety standard, ANSI/WCMA A100.1-2018, strengthens window-covering safety by requiring that all stock products sold in stores and online—which account for more than 80 percent of all window covering products sold in the U.S. and Canada—to be cordless or have inaccessible cords or short cords.

WCMA previously announced that the compliance date for the new standard would be one year after ANSI approval, which would be January 9, 2019. However, at the request of CPSC Chairman, Ann Marie Buerkle, who asked WCMA to move up the compliance date, WCMA is advising all companies manufacturing, distributing or selling window covering products in the U.S. and Canada that the compliance date of the new standard is December 15, 2018. This means that all products manufactured after this date must comply with the new standard, although many manufacturers will likely begin introducing new products based on the new standard earlier in the year.

"The revised safety standard segments the market between stock and custom-made products because U.S. Consumer Product Safety Commission (CPSC) incident data show that requiring stock products to be cordless or have inaccessible or short cords would have the most significant and immediate impact on reducing the strangulation risk to young children from certain window covering cords," said WCMA Executive Director, Ralph Vasami.

Corded window coverings will only be available on custom-order products, as corded products are still needed by a wide range of consumers, including the elderly and those with disabilities, those short in stature, and those with windows in hard-to-reach locations. The revised standard imposes new restrictions on these custom-order products such as requiring operating cords to have a default length of 40% of the window covering height [currently it is unlimited] and a default to a tilt wand instead of a tilt cord. The new safety standard also includes a change in warning tags to more graphically depict the strangulation hazard.

Many custom-order window coverings are also now available with cordless operating systems or have inaccessible cords. It is therefore likely that more than 90 percent of products sold in the U.S. and Canada will be cordless or have inaccessible cords once compliance with the new safety standard is in place.

"All companies who manufacture, distribute, or sell window coverings in the U.S. must comply with the voluntary safety standard or face enforcement action by the CPSC and/or be open to legal action if non-compliant products are sold," said Vasami. "'Voluntary' simply signifies that industry worked cooperatively with the CPSC, safety experts, and others under the auspices of ANSI to develop the standard."

*(more)*

355 Lexington Avenue, 17th Floor
New York, NY 10017-6603
Phone: (212) 297-2122
Fax: (212) 370-9047

The revised standard was updated in strict accordance with the internationally-respected American National Standards Institute (ANSI) process. ANSI requirements mandate an open and balanced process with public review opportunities. The 18 month process required assembling a consensus body (the canvass group), submitting the draft standard to the canvass group for ballot and comment, addressing the comments received, re-balloting, a public review period and then finally achieving approval of the standard.

"I congratulate WCMA member companies, CPSC officials, safety advocates, retailers and all stakeholders who devoted an incredible amount of time and effort over the past 18 months to develop the most significant revision to the window covering safety standard since 1996," continued Vasami. "The new safety standard is a direct result of ongoing industry innovation, technological advances and new product development. However, our work is not done. WCMA is creating a task force this month to study what else can be done to further enhance safety on corded custom products."

Vasami concluded, "I am hopeful that the Government of Canada will align Canadian window covering regulations with the new U.S. standard. A harmonized standard will result in further reductions in strangulation risks and decrease the possibility of confusion in the Canadian market."

Consumers today can look for the "Best for Kids" certification label to identify cordless window covering options. WCMA created the "Best for Kids" certification program in 2015 to make it easier for consumers shopping for window coverings to identify cordless products.

***NOTE: This press release was updated on January 25, 2018 to further clarify that December 15, 2018 is the date that all manufacturers must comply with the standard. All products manufactured after this date must comply with the new standard, although many manufacturers will likely begin introducing new products based on the new standard earlier in the year. In addition, the press release further explains that the new safety standard, ANSI/WCMA A100.1-2018, requires all stock products sold in stores and online to be cordless or have inaccessible cords or short cords.***

###

*About WCMA*

*Organized in the 1950s as the Venetian Blind Council, the Window Covering Manufacturers Association (WCMA) represents the interests of the window covering industry manufacturers, fabricators and assemblers. Industry products include blinds, shades, shutters, curtains, curtain rods, drapes, drapery hardware and other window treatments. Visit us on the web at www.wcmanet.org*