IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

WINDOW COVERING MANUFACTURERS ASSOCIATION,

Petitioner,

v.

UNITED STATES CONSUMER PRODUCT SAFETY COMMISSION,

Respondent.

On Petition For Review of a Final Rule of the
United States Consumer Product Safety Commission

**PAGE PROOF BRIEF OF PETITIONER
WINDOW COVERING MANUFACTURERS ASSOCIATION**

Avi M. Kupfer
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600

Wajdi C. Mallat
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500
*Licensed only in Utah;
New York admission pending.*

Nicole A. Saharsky
Erika Z. Jones
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3000
nsaharsky@mayerbrown.com

*Counsel for Petitioner Window Covering Manufacturers Association*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**1.**     *Parties and Amici*

**(i)  Parties, Intervenors, and Amici who Appeared in the District Court**

There were no district court proceedings in this case, which is a petition for review of final agency action.

**(ii)  Parties to this Case**

Petitioner:  Window Covering Manufacturers Association

Respondent:  United States Consumer Product Safety Commission.

**(iii)  Amici in this Case**

Consumer Reports, Kids In Danger, Parents for Window Blind Safety, and Public Citizen have appeared as amici supporting Respondent.

**(iv)  Circuit Rule 26.1 Disclosures**

See disclosure form included below.

**2.**     *Rulings Under Review*

Petitioner seeks review of the Consumer Product Safety Commission's final rule entitled *Safety Standard for Operating Cords on Custom Window Coverings*, 87 Fed. Reg. 73,144 (Nov. 28, 2022).

**3.**     *Related Cases*

This case has not previously been before this Court or any other court.

# RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and D.C. Circuit Rule 26.1, the Window Covering Manufacturers Association states that it is a nonprofit corporation that represents the interests of window covering industry manufacturers, fabricators, and assemblers.  It has no parent company, and no publicly-held company has a 10% or greater ownership interest in it.

*/s/ Nicole A. Saharsky*
Nicole A. Saharsky

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............i

RULE 26.1 CORPORATE DISCLOSURE STATEMENT.................................. ii

TABLE OF AUTHORITIES ..................................................................vi

GLOSSARY...................................................................................... xiii

INTRODUCTION .................................................................................1

STATEMENT OF JURISDICTION.........................................................3

STATEMENT OF THE ISSUES..............................................................3

STATUTES AND REGULATIONS.........................................................4

STATEMENT OF THE CASE.................................................................4

      A.     The CPSA's Requirements For Promulgating Mandatory
           Safety Rules.........................................................................4

      B.     Voluntary Standards In The Window Covering Industry ..................7

      C.     The New Rule....................................................................11

      D.     The Court's Stay Of The New Rule ..................................16

SUMMARY OF THE ARGUMENT ......................................................16

STANDING .......................................................................................20

STANDARD OF REVIEW ..................................................................21

ARGUMENT .....................................................................................22

I.     THE RULE IS ARBITRARY, CAPRICIOUS, AND NOT IN
      ACCORDANCE WITH LAW ......................................................22

      A.     The CPSC Did Not Meet The CPSA's Demanding
           Requirements For Promulgating A Mandatory Rule .........................22

           1.     The CPSC did not consider the effectiveness of the
                voluntary standard in reducing injury risk..............................23

  2. The CPSC did not justify the Rule using a rigorous cost-benefit analysis ...................................................................29

    a. The CPSC vastly underestimated the Rule's costs .....................................................................30

    b. The CPSC vastly overestimated the Rule's benefits ..................................................................34

 B. The CPSC Adopted A Six-Month Effective Date Without Justification And In Contravention Of Its Own Staff's Findings ......35

  1. A six-month effective date does not reduce injury risk ...........36

  2. The industry cannot create compliant products by the effective date ........................................................37

  3. Awareness of the proposed Rule cannot support the effective date ..........................................................41

 C. The CPSC Failed To Follow Basic Notice-And-Comment Procedures .......................................................................42

  1. The CPSC did not address the 2022 revision to the voluntary standard until the final Rule ...................43

  2. There were fundamental differences between the cost-benefit analysis in the proposed Rule and the one in the final Rule .............................................................45

  3. The final Rule analyzed new incident reports never discussed in the proposed Rule ..................................47

II. THE RULE IS INVALID BECAUSE THE CPSC'S STRUCTURE IS UNCONSTITUTIONAL .................................................................49

 A. The Statutory For-Cause Restriction On Removing CPSC Commissioners Violates The Separation Of Powers .........................49

 B. The Appropriate Remedy For The Constitutional Defect Is To Vacate The Rule...........................................................54

CONCLUSION ...................................................................................58

CERTIFICATE OF COMPLIANCE .......................................................59

CERTIFICATE OF SERVICE ...............................................................59

ADDENDUM

5 U.S.C. § 553.................................................................1a

5 U.S.C. § 604.................................................................1a

15 U.S.C. § 2053..............................................................2a

15 U.S.C. § 2054..............................................................3a

15 U.S.C. § 2056..............................................................3a

15 U.S.C. § 2058..............................................................4a

15 U.S.C. § 2060..............................................................6a

15 U.S.C. § 2064..............................................................7a

15 U.S.C. § 2069..............................................................8a

15 U.S.C. § 2071..............................................................8a

15 U.S.C. § 2076..............................................................9a

16 C.F.R. § 1025.11..........................................................10a

16 C.F.R. § 1025.55..........................................................10a

16 C.F.R. § 1031.4...........................................................11a

16 C.F.R. § 1260.1...........................................................12a

16 C.F.R. § 1260.2...........................................................12a

16 C.F.R. § 1260.4...........................................................16a

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Am. Radio Relay League, Inc. v. FCC*,
  524 F.3d 227 (D.C. Cir. 2008)........................................................46

*Aqua Slide 'N' Dive Corp. v. CPSC*,
  569 F.2d 831 (5th Cir. 1978) .............................................21, 22, 45

*Ass'n of Data Processing Serv. Orgs. v. Bd. of Governors of Fed.
  Reserve Sys.*,
  745 F.2d 677 (D.C. Cir. 1984)........................................................21

*Bennett v. Spear*,
  520 U.S. 154 (1997)........................................................................42

*Brecht v. Abrahamson*,
  507 U.S. 619 (1993)........................................................................55

*BMW of N. Am., Inc. v. Gore*,
  517 U.S. 559 (1996)........................................................................30

*Calcutt v. FDIC*,
  37 F.4th 293 (6th Cir. 2022) ....................................................56, 57

*Chamber of Com. of U.S. v. SEC*,
  443 F.3d 890 (D.C. Cir. 2006)........................................................47

*City of Arlington v. FCC*,
  569 U.S. 290 (2003)........................................................................52

*City of Pittsburgh v. Fed. Power Comm'n*,
  237 F.2d 741 (D.C. Cir. 1956)........................................................48

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*,
  51 F.4th 616 (5th Cir. 2022) ....................................................56, 57

*Collins v. Lew*,
  No. 4:16-cv-3113, 2022 WL 17170955 (S.D. Tex. Nov. 21, 2022) .................56

*Collins v. Yellen*,
  141 S. Ct. 1761 (2021)......................................................52, 55, 56, 57

**Cases (continued)** **Page(s)**

*Consumer Fed'n of Am. v. CPSC,*
   990 F.2d 1298 (D.C. Cir. 1993)........................................................23

*Consumers' Rsch. v. CPSC,*
   592 F. Supp. 3d 568 (E.D. Tex. 2022)................................................51

*Daimler Trucks N. Am. LLC v. EPA,*
   737 F.3d 95 (D.C. Cir. 2013)...........................................................43

*Finnbin, LLC v. CPSC,*
   45 F.4th 127 (D.C. Cir. 2022)................................................5, 23, 29

*Forester v. CPSC,*
   559 F.2d 774 (D.C. Cir. 1977)........................................................6, 21

*Free Enter. Fund v. PCAOB,*
   561 U.S. 477 (2010)...................................................................50, 54

*Humphrey's Executor v. United States,*
   295 U.S. 602 (1935)..........................................................50, 51, 53, 54

*Hunt v. Wash. State Apple Advert. Comm'n,*
   432 U.S. 333 (1977)...................................................................20, 21

*Morrison v .Olson,*
   487 U.S. 654 (1988).....................................................................53, 54

*N. Am.'s Bldg. Trades Unions v. OSHA,*
   878 F.3d 271 (D.C. Cir. 2017).........................................................44

*Orange Belt Dist. Council of Painters v. NLRB,*
   328 F.2d 534 (D.C. Cir. 1964).........................................................48

*Owner-Operator Indep. Drivers Ass'n v. FMCSA,*
   494 F.3d 188 (D.C. Cir. 2007).........................................................45

*Ryder v. United States,*
   515 U.S. 177 (1995)........................................................................55

*Seila Law LLC v. CFPB,*
   140 S. Ct. 2183 (2020)........................................ 20, 49, 50, 51, 53, 57

**Cases (continued)**                                         **Page(s)**

*Swaim v. Califano*,
　599 F.2d 1309 (4th Cir. 1979) ........................................48

*United Steel v. MSHA*,
　925 F.3d 1279 (D.C. Cir. 2019) ......................................48

*Warth v. Seldin*,
　422 U.S. 490 (1975) .........................................................20

*Zen Magnets, LLC v. CPSC*,
　841 F.3d 1141 (10th Cir. 2016) ................5, 24, 27, 29, 35

**Constitution, Statutes, and Regulations**        **Page(s)**

U.S. Constitution

　Art. II § 1, cl. 1 ..............................................................52

　Art. II § 1, cl. 1, § 3 ......................................................49

Administrative Procedure Act,
　5 U.S.C. § 551 *et seq.*

　§ 553 .............................................................................4, 6

　§ 553(b) ...........................................................................42

　§ 553(c) ...........................................................................42

　§ 604(a) ...........................................................................39

　§ 706 ...................................................................................6

　§ 706(2) ...........................................................................48

　§ 706(2)(A) ........................................................................3

Consumer Product Safety Act,
　15 U.S.C. § 2051 *et seq.*

　§ 2053(a) ................................................................4, 7, 50

Consumer Product Safety Act,
    15 U.S.C. § 2051 *et seq.*

§ 2054(a)(4) ................................................................................4, 47

§ 2056(a) ..........................................................................................52

§ 2056(b)(1) ...............................................................................5, 23

§ 2058(d)(2) ...............................................................................4, 42

§ 2058(f)(1) ...................................................................3, 6, 21, 44

§ 2058(f)(1)(A)......................................................................24, 25, 26

§ 2058(f)(1)(B)...............................................................................29, 32

§ 2058(f)(1)(C)...............................................................................29, 32

§ 2058(f)(1)(D).....................................................................................23

§ 2058(f)(3)(A)........................................ 3, 5, 6, 17, 23, 24, 29, 35

§ 2058(f)(3)(D)(i) ........................................................................5, 23

§ 2058(f)(3)(E) ................................................................5, 17, 29, 32

§ 2058(f)(3)(F) ...............................................................5, 23, 25, 26, 29

§ 2058(g)(1) ...............................................................................6, 35

§ 2058(h)...........................................................................................55

§ 2060 .................................................................................................3

§ 2060(b)...........................................................................................48

§ 2060(c)...........................................................................3, 6, 21, 36

§ 2064(g)...........................................................................................53

**Constitution, Statutes, and Regulations (continued)**          **Page(s)**

Consumer Product Safety Act,
   15 U.S.C. § 2051 *et seq.*

   § 2069(a)(1) ........................................................................52

   § 2071(a) .............................................................................53

   § 2076(a) .............................................................................52

   § 2076(b) .............................................................................52

   § 2076(b)(7) ........................................................................53

16 C.F.R. § 1025.11(a).................................................................52

16 C.F.R. § 1025.55 .....................................................................52

16 C.F.R. § 1031.4(a)(3) ..........................................................7, 37

16 C.F.R. § 1260.1(a)..................................................................14

16 C.F.R. § 1260.2 .......................................................................42

16 C.F.R. § 1260.2(a)...............................................................14, 15

16 C.F.R. § 1260.2(b) ...............................................................14, 39

16 C.F.R. § 1260.2(b)(1)..............................................................40

16 C.F.R. § 1260.2(b)(1)(v).........................................................40

16 C.F.R. § 1260.2(b)(2)..............................................................40

16 C.F.R. § 1260.2(c)...................................................................28

16 C.F.R. § 1260.2(c)(2)...........................................................14, 40

16 C.F.R. § 1260.2(d) ..............................................................14, 39

16 C.F.R. § 1260.2(d)(1)..............................................................40

16 C.F.R. § 1260.2(d)(2)..............................................................40

**Constitution, Statutes, and Regulations (continued)**          **Page(s)**

16 C.F.R. § 1260.2(d)(3)................................................................40

16 C.F.R. § 1260.4 .......................................................................44

16 C.F.R. § 1260.4(b)(3)..............................................................24

16 C.F.R. § 1260.4(b)(7)...................................................8, 26, 53

16 C.F.R. § 1260.4(b)(8)..........................................................34, 35

16 C.F.R. § 1260.4(d)(4)..............................................................31

16 C.F.R. § 1260.4(e)(4).................................................38, 39, 42

16 C.F.R. § 1260.4(f)(1)...............................................................47

16 C.F.R. § 1260.4(f)(4)...............................................................46

16 C.F.R. § 1260.4(f)(6)..........................................................35, 36

16 C.F.R. § 1260.4(h) ...................................................................7

16 C.F.R. § 1260.4(i) ..................................................................45

16 C.F.R. § 1260.4(i)(1)..........................................................29, 34

16 C.F.R. § 1260.4(i)(3)................................................................31

**Other Authorities**                                           **Page(s)**

86 Fed. Reg. 68,244 (Dec. 1, 2021) ..........................................52

87 Fed. Reg. 1,014 (Jan. 7, 2022) .......................................25, 42

87 Fed. Reg. 73,144 (Nov. 28, 2022). 7, 8, 11, 13, 15, 22, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 37, 38, 39, 40, 41, 42, 44, 45, 46, 47

Corded Window Coverings Regulations, SOR/2019-97 (Can.).............................40

Gov't Accountability Office, *Consumer Product Safety Commission: Actions Needed to Improve Processes for Addressing Product Defect Cases* (Nov. 2020) ....................................................51

**Other Authorities (continued)** **Page(s)**

H.R. Rep. No. 92-1153 (1972)..............................................................6, 21

H.R. Rep. No. 97-208 (1981).....................................................................24

Office of Compliance and Field Operations, U.S. Consumer Prod.
    Safety Comm'n, *The Regulated Products Handbook* (May 6, 2013) ...............51

S. Rep. No. 92-749 (1972) ......................................................................6, 21

Window Covering Mfrs. Ass'n, *Window Covering Manufacturers
    Association Announces Update to Window Covering Safety
    Standard* (Jan. 27, 2023)......................................................................10

# GLOSSARY

ANSI American National Standards Institute

APA Administrative Procedure Act

CPSA Consumer Product Safety Act

CPSC Consumer Product Safety Commission

FHFA Federal Housing Finance Agency

FOIA Freedom of Information Act

FTC Federal Trade Commission

SBA Small Business Administration

WCMA Window Covering Manufacturers Association

# INTRODUCTION

The Consumer Product Safety Commission (CPSC) promulgated an unprecedented Rule that will outlaw most custom window coverings in six months. Every year, Americans buy more than 25 million custom blinds, shades, and other window coverings. Those sales sustain a multi-billion-dollar industry of manufacturers, retailers, dealers, and contractors, 97% of which are small businesses. As a result of the Rule, those businesses stand to lose hundreds of millions of dollars; some will be forced to lay off employees and some will have to close.

One would expect such a sweeping regulation to be a response to an unprecedented safety risk, but the opposite is true. The industry takes child safety very seriously. For decades it has worked with consumer groups, the CPSC's staff, and other stakeholders to develop a voluntary standard that has made window coverings increasingly safe. Injuries are exceptionally rare. Injury rates have declined steadily for years as a result of new safety measures embodied in the voluntary standard.

That is exactly how Congress intended consumer product regulation to work. Congress made that clear in the Consumer Product Safety Act (CPSA), when it expressed its strong preference for industry self-regulation and put the burden on the CPSC to justify overruling a voluntary industry standard. In particular, the CPSA

requires the CPSC to make particular findings, supported by record evidence, to demonstrate the need for a mandatory rule; establish that the rule is the least burdensome way to address that need; and justify the chosen effective date. The CPSA makes all of those findings subject to a heightened standard of judicial review. It imposes additional notice-and-comment procedures as well.

As the Court recognized in granting a stay, the Rule has many legal problems. Under the CPSA, the agency was supposed to determine whether an unreasonable risk of injury remained under the voluntary standard, but it did not assess injury risks under the voluntary standard at all; it just claimed an ability to regulate based on hypothetical risks. The CPSC's evaluation of the Rule's costs and benefits was riddled with obvious errors, including the failure to account for impacts on the entire commercial segment of the market. And the Commissioners did no independent analysis to justify the selected six-month effective date for the Rule after the CPSC's staff twice recommended longer dates because of the industry's "credible" concerns about its inability to comply in six months.

In fact, the CPSC's staff repeatedly found that the Rule will be "very disruptive" for manufacturers and will cause "significant" financial harm to the industry, and that any benefit of a six-month effective date will be "very small." Rather than heed those warnings, the Commissioners ginned up new justifications for the Rule at the eleventh hour, depriving the industry of any meaningful

opportunity to comment. And the Commissioners wielded this immense power to devastate an entire industry without sufficient Presidential oversight.

Any one of these is a sufficient reason to invalidate the Rule. Combined, they show an agency that has veered far off course from what Congress intended. The Court should vacate the Rule and remand to the CPSC.

## STATEMENT OF JURISDICTION

On November 28, 2022, the CPSC promulgated the challenged rule. On November 30, 2022, the Window Covering Manufacturers Association (WCMA) filed this petition for review. This Court has jurisdiction under 15 U.S.C. § 2060.

## STATEMENT OF THE ISSUES

1.     Whether the CPSC's mandatory rule for custom window coverings is arbitrary, capricious, or not in accordance with law in violation of the CPSA, 15 U.S.C. § 2060(c), and the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), because:

   a.     The CPSC has not complied with the CPSA's requirements for promulgating a mandatory rule to override a voluntary standard, in particular the requirements in 15 U.S.C. § 2058(f)(1) and (3);

   b.     The CPSC has not justified its six-month effective date as is required by 15 U.S.C. § 2058(f)(3)(A); and

c.	The CPSC failed to provide the notice and an opportunity for public comment required by 15 U.S.C. § 2058(d)(2) and 5 U.S.C. § 553.

2.	Whether 15 U.S.C. § 2053(a), which provides that CPSC Commissioners are removable "by the President for neglect of duty or malfeasance in office but for no other cause," violates the Constitution's separation of powers.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.	The CPSA's Requirements For Promulgating Mandatory Safety Rules

The CPSA is unique among statutes governing administrative agencies because it requires the CPSC to justify regulating, rather than presuming that the agency may regulate. In the CPSA, Congress expressed a clear preference for voluntary industry regulation. It wanted industry to lead the way in adopting standards to regulate consumer products, because industry can account for real-world experience and technological changes and develop workable requirements. Congress therefore directed the CPSC to "assist public and private organizations or groups of manufacturers, administratively and technically, in the development of" voluntary safety standards. 15 U.S.C. § 2054(a)(4).

Under the CPSA, the CPSC "shall rely upon voluntary consumer product safety standards," rather than promulgate top-down rules, "whenever compliance

with such voluntary standards would eliminate or adequately reduce the risk of injury addressed" and "substantial compliance" with the voluntary standard is likely. 15 U.S.C. § 2056(b)(1). As this Court has recognized, that means the CPSC has to "stay its hand if a voluntary standard adopted by a private group adequately reduces the relevant product risks and will likely achieve substantial compliance." *Finnbin, LLC v. CPSC*, 45 F.4th 127, 131 (D.C. Cir. 2022).

To override a voluntary standard, the CPSC must satisfy a heavy burden. Among other things, it must make findings that a mandatory rule is "reasonably necessary" to address an "unreasonable risk of injury associated with [the] product"; that compliance with the voluntary standard will not "eliminat[e] or adequate[ly] reduc[e]" that risk; and that the rule imposes the "least burdensome requirement" to adequately reduce that risk. 15 U.S.C. § 2058(f)(3)(A), (D)(i), (F). It also must conduct a "rigorous cost-benefit analysis" to justify the rule. *Finnbin*, 45 F.4th at 135 (discussing 15 U.S.C. § 2058(f)(3)(E)). In essence, the CPSC must find that "the severity of the injury that may result from the product, factored by the likelihood of the injury, offsets the harm the regulation imposes upon manufacturers and consumers." *Zen Magnets, LLC v. CPSC*, 841 F.3d 1141, 1147 (10th Cir. 2016).

The CPSC also must make supporting findings, based on record evidence, about the "degree and nature of the risk of injury" the rule is designed to address; the "approximate number of consumer products, or types or classes thereof" that are

subject to the rule; the rule's "probable effect . . . upon the utility, cost, or availability of" products subject to the rule; and "any means of achieving the objective . . . while minimizing adverse effects on competition or disruption or dislocation of manufacturing and other commercial practices consistent with the public health and safety." 15 U.S.C. § 2058(f)(1).

Separately, the CPSC must justify the effective date it chooses for a mandatory rule. Although the CPSA creates a presumptive 180-day effective date that the CPSC may extend for "good cause," 15 U.S.C. § 2058(g)(1), it separately requires the CPSC to justify the effective date as "reasonably necessary to eliminate or reduce an unreasonable risk of injury associated with [the] product," *id.* § 2058(f)(3)(A).

All of those required findings are subject to a heightened standard of review. The CPSA's judicial-review provision provides that a mandatory rule "shall not be affirmed unless the Commission's findings" under 15 U.S.C. § 2058(f)(1) and (3) are "supported by substantial evidence on the record taken as a whole." 15 U.S.C. § 2060(c). This Court has recognized that this standard is "more strict" than the "requirements . . . found in 5 U.S.C. §§ 553 and 706 [the APA]." *Forester v. CPSC*, 559 F.2d 774, 789 n.22 (D.C. Cir. 1977); *see* H.R. Rep. No. 92-1153, at 26, 38 (1972); S. Rep. No. 92-749, at 35 (1972).

The CPSC operates through five Commissioners who are appointed by the President and confirmed by the Senate.  15 U.S.C. § 2053(a).  The Commissioners vote on whether to promulgate mandatory safety rules based on analysis provided by the CPSC staff.  *See* 16 C.F.R. § 1031.4(a)(3); 87 Fed. Reg. 73,144, 73,144 (Nov. 28, 2022).  Commissioners "may be removed by the President for neglect of duty or malfeasance in office but for no other cause."  15 U.S.C. § 2053(a).

## B.     Voluntary Standards In The Window Covering Industry

WCMA's members are committed to providing safe products for consumers.  *See, e.g.*, 12/13/21 Letter.[1]  WCMA has spent decades working with industry, safety advocates, and the CPSC to develop and revise a voluntary standard to reduce the safety risks from window coverings, especially to children.  WCMA first adopted its voluntary standard in 1996, and it has revised the standard seven times since then.  A725-27; A156-57.  The CPSC acknowledges that manufacturers "substantially comply with the voluntary standard."  16 C.F.R. § 1260.4(h).

The voluntary standard has improved window covering safety dramatically.  In 1996, the standard established the first requirements for operating cord design and safety warnings and banned certain types of cords that posed a strangulation risk to young children.  A726.  Further revisions to the voluntary standard expanded the testing requirements for cords, enhanced safety warnings, and banned products that

---

[1]   "JA" refers to the joint appendix.  "A" refer to the addendum to the stay motion.

posed an injury risk, such as free-hanging cord loops and certain styles of Roman shades. A726-27. Then in 2018, the industry took the major step of banning operating cords in stock products, A727, which represent 80% of window coverings, *see* 87 Fed. Reg. at 73,149. For each of these revisions, the industry worked with relevant stakeholders to account for new data about potential safety risks and new technologies than can help address those risks. A726-27. This process has been a model for the collaborative development of consumer product safety standards envisioned by the CPSA.

The voluntary standard has reduced the risk of injury from window covering operating cords significantly. Since 2009, the CPSC recorded 209 total injury incidents involving children related to window coverings across 1.1 billion products in United States residences. 16 C.F.R. § 1260.4(b)(7); 87 Fed. Reg. at 73,152. Almost all of those incidents were from operating cords, 87 Fed. Reg. at 73,153, but as of 2018, operating cords are no longer allowed in most products, and the remaining corded products (for custom applications) are subject to rigorous testing, design, and warning label requirements, 87 Fed. Reg. at 73,154; A726-27. As a result, the annual injury rate has decreased over 400% since 2009. 87 Fed. Reg. at 73,152; A733-35.

In 2019, the industry turned its attention to custom window coverings, as opposed to stock window coverings. Consumers choose custom window coverings

when their windows are too large for stock products or are in difficult-to-reach locations, or when the desired color, fabric, or feature is not available in stock products. *See* A728, A744, RA5, RA31, RA49. Custom products are made to order based on consumer specifications, and they generally are made from more expensive components and materials than stock products, which are mass-produced in a limited range of sizes and styles. A65-66; RA5.

As with prior revisions, the process for the 2022 revision began with WCMA soliciting recommendations from a steering committee of manufacturers, retailers, consumer groups, and CPSC staff. *See* 5/16/19 Letter; A522. The CPSC staff submitted multiple rounds of written recommendations and provided feedback at steering committee meetings. *See* 2/3/20 Letter; 5/16/19 Letter. In December 2021, WCMA officially reopened the process for revising the voluntary standard under the procedures set out by the American National Standards Institute (ANSI). A549. WCMA worked with the CPSC staff to establish task groups focused on specific areas for improving the voluntary standard. *See* 10/28/21 Meeting Log. At regular meetings in 2021 and 2022, WCMA updated the CPSC staff on the progress of the revision, solicited input from the steering committee, and made significant changes based on its recommendations. *See, e.g.*, A549-50; 5/3/22 Meeting Log; 3/2/22 Meeting Log; 12/2/21 Meeting Log; 1/21/22 Meeting Log. In January 2022, WCMA presented a draft revision to the steering committee for comment. A549. WCMA

received many comments on the draft, including two rounds of written comments from the CPSC staff. *See* 8/15/22 Letter; 3/1/22 Letter.

In August 2022, industry representatives, consumer groups, the CPSC staff, and other stakeholders voted on whether to adopt the revised voluntary standard. A549. Those voting against adopting the revision had an opportunity to explain their reasoning, and WCMA then addressed those concerns. Window Covering Mfrs. Ass'n, *Window Covering Manufacturers Association Announces Update to Window Covering Safety Standard* 1-2 (Jan. 27, 2023), https://wcmanet.com/wp-content/uploads/2023/01/WCMA-Standard-Approved.pdf. For the first time ever, the CPSC staff voted against the voluntary standard revision – despite acknowledging that the revision will improve consumer safety. 8/15/22 Letter. In December 2022, ANSI approved the revision. A156-57.

The 2022 revision includes many safety improvements for custom products. Among other measures, it bans all free-hanging operating cords, A684-85 § 4; limits the length of retractable cords, A690 § 6.1.2; requires a retractable cord system to use a wand, rather than a cord, as the operating mechanism, A690 § 6.1.3; and requires manufacturers to preinstall safety devices, A690 § 6.3.2-6.3.3. The 2022 revision gives industry 18 months to comply; it will take effect in June 2024. *Window Covering Manufacturers Association Announces Update to Window Covering Safety Standard* 1.

## C.    The New Rule

Despite the success of the voluntary standard, the CPSC decided to push forward with a mandatory rule for custom products.  As the voluntary standard revision was nearing its completion, the Commissioners rushed to promulgate the Rule before WCMA finalized the 2022 revision.  *See* 87 Fed. Reg. at 73,165.

The Rule regulates custom window coverings, as opposed to stock products. In the United States, there are 229 million custom window coverings in homes, 87 Fed. Reg. at 73,149, and at least 80 million more in commercial buildings, A67. Most custom window coverings use operating cords in some capacity.  *See* 87 Fed. Reg. at 73,149.  Custom corded operating systems are popular with consumers because they are easy to use and less expensive than non-corded custom alternatives. A6-9, A67-70, A126-28.  Some large and difficult-to-reach window coverings require corded operating systems.  A728-29, A743-46.

Corded operating systems come in three configurations.  In a "cord lock" system, the operating cords hang freely from the headrail.  87 Fed. Reg. at 73,148. A cord locking device allows the user to set the window covering height by releasing the cords at an angle perpendicular to the headrail.  *Id.*

**Figure 1    Cord Lock System**



A70.

In a "single retractable cord lift" system, a user pulls a cord or wand that is connected to a retractable cord housed in the headrail, and the retractable cord becomes exposed.  A7-8, A68-69.  When the user releases the cord or wand, the retractable cord goes back into the headrail.  *Id.*

**Figure 2       Single Retractable Cord Lift System**



A8.

In a "continuous loop" system, the user pulls a continuous cord or beaded chain that is anchored to a wall and under constant tension.  87 Fed. Reg. at 73,148. The loop works like a pulley, allowing the user to raise or lower the window covering by pulling opposite sides of the loop.  *Id.*

**Figure 3    Continuous Loop System**



A68.

The Rule eliminates or requires massive changes to all of these. The Rule completely eliminates cord lock systems as an option. 16 C.F.R. § 1260.2(a); A1211-12. For single retractable systems, the Rule requires manufacturers to redesign existing products so that no more than 12 inches of cord is exposed when the products are in use. 16 C.F.R. § 1260.2(c)(2). For continuous loop systems, the Rule requires manufacturers to redesign existing products to add either a rigid shroud (to enclose the cord) or a restraining device (to prevent the creation of a large loop). *Id.* § 1260.2(a)-(b), (d); A1211-12. The Rule has a six-month effective date. 16 C.F.R. § 1260.1(a).

No major manufacturer currently makes a corded custom window covering that complies with the Rule. *See* RA14-15; RA50-54; *see also* A728-30. It will take

manufacturers two years or more to develop custom corded products that comply with the Rule.  A564-65, A602.  Because they will not have compliant products to sell when the Rule takes effect, manufacturers – the vast majority of which are small businesses, 87 Fed. Reg. at 73,149 – will suffer substantial financial harm, *see, e.g.*, A22-23, A83-84, A137-39, A144-45, A153-54.  Some of them will have to lay off employees and others will go out of business.  *See* A144-45, A153-54.

The CPSC staff told the Commissioners that industry could not comply in six months and recommended longer effective dates based on their analysis of manufacturer capabilities and injury risk.  A456-58, A475-76, A523-24 (two-year and one-year effective dates, depending on the product); A952-53 (two-year effective date).  The Commissioners overrode the staff's recommendation with no independent feasibility or risk analysis.  *See* A172-73, A309-10, A325-31.

The Rule differs from the 2022 voluntary standard revision in several respects.  Both the Rule and the 2022 revision ban cord lock systems, 16 C.F.R. § 1260.2(a); A1211-12; A684-85 § 4, but the 2022 revision gives manufacturers sufficient time (18 months) to transition to other types of products.  Only the Rule (and not the voluntary standard) requires manufacturers to design new retractable cord lift and continuous loop operating systems.

**D.   The Court's Stay Of The New Rule**

WCMA petitioned this Court for review of the Rule and sought a stay from the CPSC, A159-64, which was denied, SA1-4.  WCMA then sought a stay from the Court, which was granted, with the Court finding that WCMA "satisfied the stringent requirements for a stay pending court review."  Stay Order 1.

## SUMMARY OF THE ARGUMENT

WCMA has spent decades developing a voluntary standard in partnership with retailers, consumer advocates, and the CPSC.  It is undisputed that manufacturers substantially comply with the standard.  It also is undisputed that, as a result of the voluntary standard, the injury risk from operating cords has fallen dramatically, and the 2022 revision will decrease that risk even further.  Yet rather than work with WCMA to continue to improve the voluntary standard, the CPSC rushed to promulgate a mandatory rule.  That Rule is deeply flawed.

I.  The Rule does not come close to satisfying the demanding requirements in the CPSA.  Under the CPSA, the CPSC must evaluate whether the voluntary standard adequately reduces risk, and it must justify its decision to override the voluntary standard.  Here, the CPSC treated the voluntary standard as an afterthought.  Although WCMA had been working on that revision since 2019, and the CPSC staff participated throughout that process, the CPSC did not even address the 2022 revision until the final Rule itself, when it criticized the revision and gave

the industry no chance to respond. That turns the regulatory scheme Congress envisioned on its head.

Rather than provide evidence to show that its mandatory rule is "reasonably necessary to eliminate or reduce an unreasonable risk of injury" that is not already addressed by the voluntary standard, 15 U.S.C. § 2058(f)(3)(A), the CPSC relied on hypotheticals to conclude that there is a theoretical possibility of injury. But the voluntary standard has made the injury risk from window covering cords exceedingly low, and the 2022 revision will reduce it further. The CPSC's task was to assess whether any remaining risk justified overriding the voluntary standard with a mandatory rule. It simply did not do that analysis. Its failure to do so is especially glaring, because for some products that the Rule regulates, there is no documented safety risk at all. And because it did not make an evidence-based risk finding, the CPSC cannot satisfy the requirement that it use the "least burdensome" means to address that risk.

In addition to demonstrating the need for a mandatory rule, the CPSC was required to conduct a rigorous cost-benefit analysis under 15 U.S.C. § 2058(f)(3)(E) to justify the particular rule chosen. The CPSC's cost-benefit analysis was incomplete and inadequate. First, the CPSC's own analysis shows that costs significantly outweigh benefits, which means that even if presumed accurate, that analysis cannot justify the Rule. Second, the analysis is not close to accurate; it

vastly underestimated costs and overestimated benefits.  On the costs side, although the Rule regulates custom products, the CPSC calculated the cost increase from the Rule based on less expensive, less complicated stock products.  It also did no cost assessment for commercial products, which are approximately 25% of the custom market.  And it failed to account for tens of millions of dollars that manufacturers must spend to develop and market Rule-compliant products.  On the benefits side, the CPSC assumed that custom products have been responsible for three times as many incidents as stock products (without record evidence to back that up) and that injury rates will stay constant in the future (although they have decreased dramatically in recent years).

The CPSC failed to justify the six-month effective date.  The CPSC staff, who actually analyzed manufacturer capability and injury risk, recommended longer effective dates of one year for shorter products and two years for taller products. The Commissioners overrode those recommendations in the final Rule without any independent analysis.  The CPSC now claims compliance will be easy, pointing to rules for stock products and Canadian products.  But the solutions for stock products do not work for custom products, and products developed to comply with the Canadian regulation do not comply with the Rule.  In a last-ditch attempt to defend the effective date, the CPSC asserts that manufacturers should have started complying when the rulemaking process began in October 2021.  But only final

agency actions create legal obligations, and here, the Rule was a moving target up until the very end.

The CPSC did not provide fair notice or a fair opportunity for the regulated community to comment. Most significantly, the CPSC did not even address the 2022 voluntary standard revision until the final Rule itself. As a result, the regulated community had no opportunity to respond to the CPSC's (last-minute) assertion that the voluntary standard will not adequately reduce risk. The CPSC produced many other supposed justifications for the Rule at the last minute – including its reliance on the Canadian regulation and on new incident reports – giving the industry no chance to respond. The CPSC also made significant changes to its cost-benefit model in the final Rule without making public the underlying studies or data. All of this deprived the industry of any meaningful opportunity to comment on the Rule before it was promulgated and resulted in a Rule that is arbitrary and unjustified.

II. Separately, the Rule is invalid because the Commissioners who promulgated it were unconstitutionally insulated from Presidential oversight. The CPSC Commissioners are principal officers who exercise substantial executive power by promulgating rules, conducting administrative adjudications, and commencing civil suits. They wield immense power. This case proves the point: With the stroke of a pen, the Commissioners overrode many of their own staff's recommendations and threw a billion-dollar industry into disarray.

Under the CPSA, the President may remove the Commissioners only for cause. In *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020), the Supreme Court made clear that a similar for-cause removal restriction violated the separation of powers. Here, as in *Seila Law*, the officials shielded from removal are principal officers who wield substantial executive power. And here, as in *Seila Law*, no exceptions to the President's removal power apply. The Commissioners are not inferior officers with narrowly defined duties and they are not members of an expert agency that does not wield substantial executive power. Thus, the Commissioners "must be removable by the President at will." *Id.* at 2192. The Court should vacate the Rule so that WCMA members are not subject to requirements promulgated by an unconstitutionally structured agency.

The Court should vacate the Rule and remand to the CPSC.

## STANDING

WCMA represents the interests of window covering industry manufacturers, fabricators, and assemblers that make products that are subject to the Rule. It has associational standing to bring this suit "as the representative of its members." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). Those members "would otherwise have standing to sue in their own right," *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977), because they will lose revenue, be forced to lay off employees, and suffer reputational harm if the Rule takes effect, *see, e.g.*, A22-23, A83-85,

A137-39, A145, A153. Those interests "are germane to [WCMA's] purpose" to represent the interests of the window covering industry, and WCMA's claims and request for relief do not require "the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343.

## STANDARD OF REVIEW

The Rule "shall not be affirmed unless" the CPSC supports the required findings under the CPSA, 15 U.S.C. § 2058(f)(1), (3), with "substantial evidence on the record taken as a whole," *id.* § 2060(c). Congress intended this to be a heightened standard of review. *See* H. Rep. No. 92-1153, at 26, 38 (CPSA's "substantial evidence" standard is a "stricter standard of review" than "usual"); S. Rep. No. 92-749, at 35 (similar). This Court has recognized that this CPSA-specific standard of review is "more strict" than the "requirements . . . found in [the APA]." *Forester*, 559 F.2d at 789 n.22.

Courts therefore "scrutinize" the CPSC's findings to justify a mandatory rule "more closely than an 'arbitrary and capricious' standard would allow." *Ass'n of Data Processing Serv. Orgs. v. Bd. of Governors of Fed. Rsrv. Sys.*, 745 F.2d 677, 685 (D.C. Cir. 1984) (quoting *Aqua Slide 'N' Dive Corp. v. CPSC*, 569 F.2d 831, 837 (5th Cir. 1978)). They critically assess "whether the established facts reasonably satisfy the criteria necessary to support the ultimate statutory finding[s]" and give greater weight to "[t]echnical studies which have survived scrutiny of the scientific

community" than to "facts which first see the light of day in a court proceeding." *Aqua Slide*, 569 F.2d at 838. The "extent to which data and views in the record have been exposed to public comment will affect their reliability." *Id.*

## ARGUMENT

## I. THE RULE IS ARBITRARY, CAPRICIOUS, AND NOT IN ACCORDANCE WITH LAW

At issue is the CPSC's rule establishing requirements for operating cords on custom window coverings, 87 Fed. Reg. 73,144 (the Rule). The Rule overrides a voluntary standard that the industry first developed in 1996 and has revised many times.

The Rule is invalid under the CPSA and APA for three reasons. First, the CPSC failed to make the findings necessary to justify adopting a mandatory rule to override the voluntary standard. Second, the CPSC chose an effective date with which the industry cannot possibly comply, even though its own staff concluded that a six-month effective date would not meaningfully improve safety. Third, the CPSC violated basic notice-and-comment requirements in the CSPA and APA, making changes to the Rule and its supporting justifications at the final moment. Especially under the CPSA's heightened standard of review, the Rule cannot stand.

### A. The CPSC Did Not Meet The CPSA's Demanding Requirements For Promulgating A Mandatory Rule

Under the CPSA, the CPSC must make two types of findings to justify overriding a voluntary standard with a mandatory rule. It first must find that the rule

is necessary because the voluntary standard will not adequately reduce the risk of harm, and it must justify the particular rule it chose using a rigorous cost-benefit analysis. The CPSC did neither here.

### 1. The CPSC did not consider the effectiveness of the voluntary standard in reducing injury risk

Congress required the CPSC to "rely upon voluntary consumer product safety standards," rather than promulgate top-down rules, "whenever compliance with such voluntary standards would eliminate or adequately reduce the risk of injury addressed" and "substantial compliance" with the voluntary standard is likely. 15 U.S.C. § 2056(b)(1). In those circumstances, the CPSC "must stay its hand." *Finnbin*, 45 F.4th at 131; *see Consumer Fed'n of Am. v. CPSC*, 990 F.2d 1298, 1305 n.14 (D.C. Cir. 1993) (The CPSC must "show that voluntary standards would be insufficient before it may promulgate a mandatory consumer product safety rule").

The CPSC must satisfy several demanding statutory requirements if it wants to promulgate a mandatory rule in the face of a voluntary standard. It must show that the rule is "reasonably necessary" to address an "unreasonable risk of injury associated with [the] product"; that compliance with the voluntary standard will not "eliminat[e] or adequate[ly] reduc[e]" that risk; and that the rule imposes the "least burdensome requirement" to adequately reduce that risk and "minimiz[es] . . . disruption or dislocation of manufacturing." 15 U.S.C. § 2058(f)(1)(D), (f)(3)(A), (D)(i), (F). To fulfill those requirements, the CPSC must evaluate the "likelihood"

of injury absent the mandatory rule; the "mere possibility" of risk is insufficient. *Zen Magnets*, 841 F.3d at 1147, 1151-52.

The CPSC's job was to analyze the "degree" of risk that remained in light of the safety measures in the voluntary standard and determine whether that risk was "unreasonable." 15 U.S.C. § 2058(f)(1)(A), (3)(A); *see* H.R. Rep. No. 97-208, at 871 (1981) (Conf. Rep.) (CPSC must consider whether the voluntary standard has "reduced" the risk of injury "to a sufficient extent" such that there is "no longer . . . an unreasonable risk of injury"). Here, the CPSC did not find an unreasonable risk of injury under the voluntary standard. Instead, it relied on hypothetical instances to try to support a theoretical possibility of injury.

For example, the CPSC suggested that a continuous loop system is unsafe because the user "may not" properly secure the tension device to the wall and "can . . . remove[]" it, and because a child's head "can still" fit in a loop under tension. 16 C.F.R. § 1260.4(b)(3); 87 Fed. Reg. at 73,169; *see* 87 Fed. Reg. at 73,157, 73,161 (describing hypothetical "scenarios" where incidents might arise). But the 2018 voluntary standard requires manufacturers to secure the tension device to the product, A1217 § 6.4.1-.2; to design products not to work without a tension device, A1217 § 6.4.2; to test for durability, A1216-21 § 6; and to include graphic warning labels, A1213-16 § 5 – all of which reduce the likelihood of a tension device coming loose or breaking and causing injury. The 2022 revision introduces

additional requirements for testing and securing tension devices.  A690 § 6.3.2-6.3.3.  The CPSC did not account for how those safety measures have reduced the risk.[2]  And because the CPSC did not evaluate the actual "degree . . . of the risk of injury" under the voluntary standard, 15 U.S.C. § 2058(f)(1)(A), it could not show that it utilized the "least burdensome requirement" necessary to address that risk, *id.* § 2058(f)(3)(F).

The CPSC has essentially two responses.  First, it contends (Stay Opp. 16) that it could disregard the 2022 revision because it was not yet in effect.  But the CPSA specifically requires the CPSC to consider any "le[ss] burdensome" alternatives to a mandatory rule, 15 U.S.C. § 2058(f)(3)(F), and the 2022 revision plainly qualifies as one.  It was almost final when the CPSC promulgated the Rule.  The CPSC staff were actively involved in its development and were well aware of the new safety features in it.  *See* 87 Fed. Reg. 1014, 1029 (Jan. 7, 2022); A549-50.  Besides, the CPSC failed to account for the other recent revisions when it assessed risk – such as the 2018 revision, which included several safety-enhancing measures, *see* A1213-21.

---

[2]    The CPSC repeated that same mistake when it evaluated the other measures in the voluntary standard.  *See, e.g.*, 87 Fed. Reg. at 73,159-60 (asserting that default requirements for non-corded systems and shorter cords in the 2018 revision, A1212-13 § 4.4, "continue to allow accessible and long cords"); A672 (asserting that the ban on free-hanging operating cords in the 2022 revision, A684-85 § 4, does not eliminate risk because consumers might purchase other corded products).

Second, the CPSC stated that the voluntary standard cannot completely eliminate all risk from operating cords. *E.g.*, 87 Fed. Reg. at 73,157, 73,161, 73,165; A672. But the CPSA requires the agency to determine the "degree . . . of the risk" under a voluntary standard; determine that the rule is "reasonably necessary" to address that risk; and demonstrate that it "imposes the least burdensome requirement" necessary. 15 U.S.C. § 2058(f)(1)(A), (3)(A), (F). The CPSC cannot simply assume that there is some risk and then adopt a sweeping regulation based on that assumption. That would make the CPSA's specific requirements of a risk analysis under the voluntary standard and use of the least burdensome alternative meaningless.

The CPSC did cite some incident data from 2009-2021, *see* 16 C.F.R. § 1260.4(b)(7), (f)(1), but that data did not account for the voluntary standard. For example, it cited "incident data showing a total of 209 reported fatal and nonfatal child strangulations involving window coverings from 2009-2021. *Id.* § 1260.4(b)(7). But those incidents have been largely addressed by the voluntary standard. The 2018 revision eliminated operating cords in stock products, A727, which are 80% of the market and most often used in residential settings, *see* 87 Fed. Reg. at 73,149. The 2022 revision addressed the risk from cords in custom products by banning free-hanging operating cords, A684-85 § 4, and banning continuous cord loops in certain products, A685 § 4.4.2.5, which even the CPSC admits further

improve safety, *see* A672.  The only remaining accessible cords either are less than eight inches, retract into the headrail when not in use, or are secured to the wall and kept under tension.  A685 § 4.4.2.  From 2009-2021, the overall rate of safety incidents decreased over 400%, 87 Fed. Reg. at 73,152; A733-35, and the rate is expected to decrease further, *id.* at 73,152; A672.

The CPSC took a similar approach in *Zen Magnets, LLC v. CPSC*, *supra*, and the Tenth Circuit invalidated the agency's mandatory rule restricting the size and strength of magnets sold to consumers.  841 F.3d at 1146.  There, the CPSC relied on injury data that did not capture subsequent regulatory actions that had "reduced [the] injury rate . . . and therefore reduced [the] need for a" mandatory rule.  *Id.* at 1149.  In vacating the rule, the Tenth Circuit explained that "where there is a known and significant change or trend in the data underlying" a CPSC rule, "the agency must either take that change or trend into account, or explain why it relied solely on data pre-dating that change or trend."  *Id.*

The CPSC's data here are even worse, because they show *no* documented risk associated with some of the regulated products.  For one of the three types of corded systems – retractable lift systems – the CPSC admitted that it is "not aware" of any incidents "associated with retractable cords" in the nearly 25 years since they have been on the market.  87 Fed. Reg. at 73,178; *see* A740.  That makes sense, because retractable cords are not accessible unless the user is operating the window covering,

and then, the accessible portion of the cord is under tension and at the very top of the window. The 2022 revision to the voluntary standard reduces even further any risk from those cords by limiting the length of the exposed cord, A690 § 6.1.2, and requiring manufacturers to use a wand, rather than a cord, as the operating mechanism, A690 § 6.1.3. Instead of analyzing the degree of risk that retractable systems pose in light of those limitations, the CPSC hypothesized admittedly "unlikely scenario[s]," 10/28/15 Letter, in which injuries theoretically "could" occur, 87 Fed. Reg. at 73,165; A539-43, and imposed expensive new redesign requirements on these products, 16 C.F.R. § 1260.2(c).

The CPSC likewise had no evidence of any risk associated with products used in commercial settings, such as storefronts and offices. Commenters flagged this issue for the CPSC. One of the largest U.S. manufacturers noted that "none of the incidents on which th[e] rulemaking is based" involved commercial products and that the CPSC did no analysis of risks from commercial products. RA16; *see* RA17-19. Yet the CPSC swept them up in the Rule anyway. The Rule treats commercial and residential products the same, even though commercial products generally are taller and subject to additional testing requirements, RA17-18. The CPSC's only response was that commercial products are "within CPSC's jurisdiction" and present a risk of "potential harm" because "consumers have access to" them. 87 Fed. Reg. at 73,173. That is not an evidence-based risk assessment. Thus, for these products

(as for retractable lift systems), the CPSC did not show an "unreasonable risk," 15 U.S.C. § 2058(f)(3)(A), and therefore cannot justify the Rule as the "least burdensome" way to address that risk, *id.* § 2058(f)(3)(F).

> ## 2. The CPSC did not justify the Rule using a rigorous cost-benefit analysis

In addition to showing the need for a mandatory rule, the CPSC must justify its mandatory rule using a "rigorous cost-benefit analysis." *Finnbin*, 45 F.4th at 135. In that analysis, it is required to establish, using record evidence, the "approximate number" of products subject to the Rule and the "probable effect" of the Rule on the cost of those products. 15 U.S.C. § 2058(f)(1)(B)-(C). Then, it has to establish, again using record evidence, that "the benefits expected from the rule bear a reasonable relationship to its costs." *Id.* § 2058(f)(3)(E).

The CPSC's cost-benefit analysis flunks this requirement on its own terms. The CPSC determined that the Rule's costs are 135-460% greater than its benefits. A609; *see* 16 C.F.R. § 1260.4(i)(1); 87 Fed. Reg. at 73,183. (The actual percentage is even higher because the CPSC estimated benefits in 2021 dollars but estimated costs in 2020 dollars. *Compare* A597 *with* A601-02.) The CPSC ran thirty alternative cost-benefit scenarios, and found that benefits outweigh costs in only one, A614-15, and that scenario was skewed because it considered costs only for "entry-level stock" products, A599-601. That is not a "reasonable relationship" between costs and benefits. *See Zen Magnets*, 841 F.3d at 1147 (CPSC must show that

29

benefits "offset[]" costs); *cf. BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 580 & n.32 (1996) (no "reasonable relationship" where one item is "out of all proportion" with another). So even assuming that the CPSC's analysis is accurate, it does not show that the costs of the Rule justify its benefits. And the analysis is not accurate; it vastly underestimated the Rule's costs and vastly overestimated its benefits.

### a.    The CPSC vastly underestimated the Rule's costs

To determine costs, the CPSC multiplied the number of custom corded window coverings sold for residential use in 2020 by an estimated increased cost per operating system. A601-09. Then it added an estimated cost of reduced sales, A606, plus $14.7 million for "research, development, and retooling," A610; *see* 87 Fed. Reg. at 73,182-83. That analysis has at least three fundamental problems.

First, the estimated increased cost per custom product is obviously too low because it is calculated based on less complex, lower-cost stock products. To calculate the increased cost of products due to the Rule, the CPSC multiplied the prices of common types of window coverings by the percentage "average cost increase" of those prices. 87 Fed. at 73,182-83; A601-03. The prices come from a third-party report listing prices of the most common-sized products available in two online retail catalogs, A831-33, and 99% of the products in online retail catalogs are stock products, A832. Stock window covering prices are a poor indicator of custom product prices because, as the CPSC acknowledges, custom products "have higher

prices on average" compared to stock products.  16 C.F.R. § 1260.4(d)(4).  That is because custom products generally come in larger or unusual sizes and have more expensive components and materials.  A723, RA14, RA51; *see* A18-21, A79-82, A133-36.

Commenters, including manufacturers that are most familiar with product costs, raised this issue with the CPSC.  They explained that the average cost per window covering is many times greater than the agency's estimate. *See, e.g.*, RA16-17.  But the CPSC made no change.  As a result, it calculated an artificially low $24 total amount for a "household to replace all custom . . . products."  16 C.F.R. § 1260.4(d)(4), (i)(3).  That comes out to only $2 per window covering, because the CPSC assumed an average of 12 window coverings per household.  *Id.*

Second, the CPSC's analysis completely ignores the commercial side of the custom market.  Approximately 25% of custom window coverings are used in commercial settings.  *See* 87 Fed. Reg. at 73,149; A67.  But the CPSC's cost calculations did not consider commercial settings at all; it was limited to residential settings.  Specifically, to determine the number of affected window coverings, the CPSC multiplied the number of window coverings sold for residential use in 2020 by the estimated percentage that are custom products with operating cords.  A603; *see* A604-10.  It is undisputed that the CPSC's figure for the number of window coverings sold comes from a third-party report that considered only residential sales.

A846; *see* A748. Indeed, the CPSC expressly acknowledged that the report calculated only the number of "residential window coverings [that] were shipped in the United States." 87 Fed. Reg. at 73,149.

Commenters pointed out that ignoring commercial products would vastly underestimate costs, especially because custom commercial products generally are more complex and expensive than custom residential products. *E.g.*, A755, A748, RA8, RA18. The CPSC's only response was that window coverings in "commercial . . . buildings" fall "within [its] jurisdiction" and that there is some risk because consumers "visit such businesses." 87 Fed. Reg. at 73,173. That is not a cost estimate. The CPSC did not even attempt to quantify the costs the Rule will impose for commercial products, even though the CPSA specifically directs it to determine the "approximate number of consumer products," the "probable effect" of the Rule on the cost of those products, and the "relationship" between benefits and costs. 15 U.S.C. § 2058(f)(1)(B), (C), (f)(3)(E).

Third, the CPSC's estimated $14.7 million in additional industrywide costs is way too low. The only cost the CPSC considered is the cost to make compliant products. 87 Fed. Reg. at 73,182; A610. That will cost much more than $14.7 million; the cost for the largest three manufacturers alone is about $32 million. A14, A75-76, A131. The CPSC arrived at $14.7 million by multiplying the number of manufacturers with at least 75 employees by the cost to develop and produce one

rigid shroud (which the CPSC estimated at $772,500). 87 Fed. Reg. at 73,186, A564-66, A602; *see* Stay Opp. 15. But manufacturers must add shrouds to their continuous loop systems across different product lines. RA10-13, RA53; *see, e.g.*, A723, A728, RA10-13, RA32, RA51-52. A single shroud will not work with all product lines. A567. And the CPSC's estimate completely ignores the other changes manufacturers must make (shortening retractable cords and adding restraining devices to continuous loop systems) for their products to comply with the Rule. *See* 87 Fed. Reg. at 73,186.

The CPSC's estimate does not consider many other significant categories of costs. In addition to the costs to design and produce compliant products, manufacturers also must spend millions of dollars to create thousands of new in-store displays and sample books for the retailers and dealers that sell window coverings to consumers, and develop promotional, sales, and training materials for their own employees. *See, e.g.*, A753, RA11-13, RA52-54. Although the CPSC acknowledged that the "total development cost" for manufacturers includes those costs, A566; *see* 87 Fed. Reg. at 73,173, it did not attempt to quantify them.

In addition, the industry will lose hundreds of millions of dollars in revenue when the Rule takes effect. Manufacturers will no longer be able to make more than 60% of custom window coverings, *e.g.*, A753, A755, RA15-16, RA25; *cf.* 87 Fed. Reg. at 73,186 (noting manufactures will need to "redesign" products that "are not

available in [cordless] variants"), and retailers, dealers, interior designers, and contractors will not be able to sell or install those products, *see* A755, RA53. The CPSC did not account for those costs, either.

### b. The CPSC vastly overestimated the Rule's benefits

Not only did the CPSC vastly underestimate the Rule's costs, but it vastly overestimated the benefits. The CPSC's benefits estimate is based on annual injury costs, which it calculated by multiplying the estimated number of annual incidents from 2009-2021 associated with custom corded products by a cost per incident. 16 C.F.R. § 1260.4(b)(8), (i)(1); 87 Fed. Reg. at 73,182; *see* A593-98. The CPSC's estimated $32 million in annual injury costs from custom products is too high for two reasons.

First, the CPSC overestimated the percentage of incidents involving custom products. To estimate annual injury costs from custom products, the CPSC multiplied the total annual injury costs from custom and stock products by the percentage of incidents involving custom products. A596-98. But that percentage is too high. Although custom products are only 20% of window coverings, 87 Fed. Reg. at 73,149, the CPSC assumed they are involved in 44-54% of incidents, A594-97. The CPSC did not justify that mismatch with any evidence.

Second, the CPSC ignored the strong downward trend in incidents as a result of the voluntary standard. The CPSC's estimated 6.8 annual fatal incidents, 16

C.F.R. § 1260.4(b)(8), is based on a 2002 study (not made public during the rulemaking) of the percentage of reported strangulations associated with window coverings, A531-32, A597. The CPSC "[a]ssum[ed]" that that percentage has not changed since 2002. 87 Fed. Reg. at 73,153-54. That is simply untrue; there has been a sharp downward trend since 2009 due to the voluntary standard (and in particular, its elimination of cords in stock products). *Id.* at 73,152; A733-35. The CPSC has specifically acknowledged that the 2018 and 2022 revisions to the voluntary standard have eliminated many of the risks from operating cords. *See* 87 Fed. Reg. at 73,154; A672. And when particular issues arise – such as when there was an incident spike related to Roman shades in 2009-2010 – WCMA acts to address them. For example, it promptly amended the voluntary standard to address that Roman shades issue, and incidents declined. A727, A733-35. It was unreasonable for the CPSC to ignore these "known and significant . . . trend[s] in the data" that have resulted in a "reduced injury rate." *Zen Magnets*, 841 F.3d at 1149.

### B. The CPSC Adopted A Six-Month Effective Date Without Justification And In Contravention Of Its Own Staff's Findings

The CPSA creates a presumptive 180-day effective date that the CPSC may extend for "good cause," 15 U.S.C. § 2058(g)(1), but then separately requires the CPSC to find that a chosen effective date is "reasonably necessary," *id.* § 2058(f)(3)(A). Here, the CPSC sought to justify the Rule's effective date using the default provision, *see* 16 C.F.R. § 1260.4(f)(6), without making findings

sufficient to satisfy the separate requirement that it justify the effective date as reasonably necessary. That is especially problematic because the CPSA not only includes that separate requirement, but it expressly subjects it to a heightened standard of judicial review. *See* 15 U.S.C. § 2060(c).

Notably, the CPSC staff did not recommend a six-month effective date. Instead, they twice recommended longer effective dates based on their investigation and analysis of manufacturer capabilities and injury risk. *See* A456-58, A475-76, A523-24 (two-year and one-year effective dates, depending on the product); A952-53 (two-year effective date). They found "good cause to extend the effective date beyond 180 days" based on the totality of "credible" comments from manufacturers and retailers and their own assessment of when products can be available. A529, A619, A633. In an eleventh-hour move, the Commissioners overrode the staff's recommendation and chose a six-month effective date. A309-10, A325-31. The CPSC provided three justifications, none of which is supported by substantial evidence.

### 1. A six-month effective date does not reduce injury risk

The CPSC claims that a six-month effective date is necessary to reduce safety risks. 16 C.F.R. § 1260.4(f)(6). But the CPSC provided no analysis about why a six-month effective date would materially reduce the risk, as opposed to a one- or two-year effective date. The Rule is supposed to be "based on" the staff's analysis,

36

87 Fed. Reg. at 73,144; 16 C.F.R. § 1031.4(a)(3), but that analysis only provided evidence to justify a one- or two-year effective date. The CPSC staff repeatedly stated that any benefit from shortening the effective date to six months from one or two years would be "very small" because "most noncompliant window coverings will take years to cycle out of use." A524, A619, A633.

In fact, a six-month effective date actually could increase injury risk. As the CPSC has acknowledged, A564-65, A602, it will take at least two years for manufacturers to develop corded products that comply with the Rule, *see* A728, RA10-13, RA32, RA35-36, RA51-52. In the meantime, consumers who otherwise would have purchased newer products that comply with the voluntary standard instead will hold onto older, less safe corded products because non-corded alternatives are unworkable and too expensive. A728-29, A743-46, A789-90, RA13, RA52 n.9. The CPSC did not analyze the net safety impact of an effective date that makes new custom corded products unavailable for two years.

### 2. The industry cannot create compliant products by the effective date

In comments submitted to the CPSC and declarations submitted to this Court, manufacturers detailed why they cannot create Rule-compliant products in six months. Significantly, the CPSC staff – on whose analysis the Rule rests – agreed that compliance in six months is infeasible. Finding manufacturers' concerns "credible," the staff found that a six-month effective date "has the potential to be

very disruptive for producers and consumers" and could "significant[ly] impact" small businesses.  A524, A619, A633.  At the same time, the staff recommended "later effective date[s]" that "would allow manufacturers more time to redesign, distribute costs of compliance along the entire year, or discontinue product variants that cannot meet compliance."  87 Fed. Reg. at 73,177.  The Commissioners overrode the staff's recommendations with no independent feasibility or risk analysis.

Instead, the Rule simply made a blanket assertion that industry can comply in six months.  16 C.F.R. § 1260.4(e)(4).  The CPSC also cherry picked, 87 Fed. Reg. at 73,177, a single comment from a small components manufacturer stating (with no evidence) that six months "is more than sufficient for a painless industry implementation" of the Rule.  RA38.  But more than 400 contrary comments from manufacturers and other stakeholders explained that it will take much longer to design, develop, test, and market Rule-compliant products.  87 Fed. Reg. at 73,177; *see, e.g.*, A728-730, RA13-14, RA24-25, RA35-36, RA50-54, RA60, RA63-64. The CPSC staff "found these concerns to be credible because of the specific examples provided by commenters and because these comments comport to what staff has determined about the industry's supply chain."  A524.

The CPSC largely ignored comments provided by the Small Business Administration (SBA) about how the six-month effective date will hurt small

businesses. The SBA explained that small businesses make up the vast majority of window covering manufacturers, 87 Fed. Reg. at 73,149, and that a six-month effective date will cause many of them acute financial distress, RA25. The CPSC was supposed to carefully account for those views; indeed, the Regulatory Flexibility Act specifically requires it to do so, *see* 5 U.S.C. § 604(a). Yet all the CPSC did in response to the SBA's serious, documented concerns was to repeat its conclusion that six months "should be sufficient" for manufacturers to make compliant products. 87 Fed. Reg. at 73,179. That disrespect for the considered views of the federal agency charged with supporting small businesses provides yet another reason to invalidate the Rule.

The CPSC now asserts that compliance will be easy because the industry already complies with rules for Canadian products and stock products. 16 C.F.R. § 1260.4(e)(4); 87 Fed. Reg. at 73,173, 73,179. Those are new justifications that the CPSC never raised in the proposed Rule, so the regulated community had no chance to respond. Anyway, the CPSC is wrong on both counts. The Canadian regulation and the U.S. Rule impose different rules for operating cords. The Canadian regulation limits cord accessibility when the product is *not* in use, whereas the U.S. Rule limits cord accessibility when the product *is* in use. *Compare* A32 *with* 16 C.F.R. § 1260.2(b), (d), A1217 § 6.3.1, A218 § 6.5.2.5, *and* A1234 C3. The two rules use different tests for assessing operating cord accessibility, *compare* A52 *and*

A108 *with* 16 C.F.R. § 1260.2(b)(1)(v), (2), and the U.S. Rule requires rigid shrouds and restraining devices to pass tests not used in Canada, *compare* Corded Window Coverings Regulations, SOR/2019-97 (Can.) *with* 16 C.F.R. § 1260.2(b)(1)-(2), (d)(1)-(3). Only the U.S. Rule (and not the Canadian regulation) limits the length of retractable cords to twelve inches. *See* 16 C.F.R. § 1260.2(c)(2).

Thus, the Canadian and U.S. regulations are not "substantively similar," 87 Fed. Reg. at 73,183, and a product that complies with the Canadian rule will not automatically comply with the U.S. Rule. The two largest U.S. manufacturers designed only two corded operating systems to comply with the Canadian regulation, and those operating systems do not comply with the Rule. *See, e.g.*, A11-14, A72-75. Instead, manufacturers must design entirely new operating systems for their products in order to serve the larger U.S. market, which the CPSC staff has acknowledged will take two to two and one-half years per system. *See* A564-65; *see also* A9-11, A70-72, A130-31. The CPSC cites no record evidence to support its contrary assertion.

The CPSC faulted the industry for not addressing in its comments "how the Canadian rule impacts compliance with CPSC's final rule." 87 Fed. Reg. at 73,177. But the CPSC never asked for comments about the Canadian rule and never cited the Canadian regulation to justify the effective date in the proposed Rule. Instead,

the CPSC raised this justification for the first time in the *final* Rule, A266, A275, when the industry had no chance to respond.

In addition, the industry's compliance with the voluntary standard for *stock* products, A1211 § 4.3.1, does not mean that manufacturers can develop Rule-compliant *custom* products in six months. Under the voluntary standard, manufacturers had nearly all of 2018 to develop (much less complicated) cordless systems for stock products. *See* RA64. Cordless systems for small, less complex, and relatively inexpensive stock products cannot be transferred to larger, more complex custom products, which utilize components made from different (and more durable) materials. RA14, RA51; *see* A18-21, A79-82, A133-36. Manufacturers explained in comments that developing cordless custom products will take longer than six months. RA13-14, RA35-36, RA53-54. Further, as the CPSC acknowledges, 87 Fed. Reg. at 73,170, 73,171, some custom products are so large that they cannot use cordless technologies, A745; *see* A728, A743-33, A746, RA50-51. No record evidence supports the CPSC's assertion that cordless operating systems in stock products are "transferable" to custom products. 87 Fed. Reg. at 73,170.

### 3. Awareness of the proposed Rule cannot support the effective date

Finally, the CPSC asserted that a six-month effective date is reasonable because manufacturers have been "aware of the likelihood of a rule" since October

2021, when the staff issued briefing on the proposed Rule. 87 Fed. Reg. at 73,177; *see* 16 C.F.R. § 1260.4(e)(4). The idea that manufacturers should have started complying with the final Rule based on a pre-proposed-Rule staff briefing is absurd. Only final agency action creates legal obligations. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997). Manufacturers are not required to begin compliance efforts based on a proposed Rule that may never be adopted.

The CPSC's suggestion is especially misplaced here, where the Rule's requirements kept changing right up until the Commissioners' vote. *Compare* 16 C.F.R. § 1260.2, *with* 87 Fed. Reg. 1,014, 1,054-55 (Jan. 7, 2022). For example, during the rulemaking process, the CPSC contemplated at least three effective-date schemes, ranging from six months to two years. 87 Fed. Reg. at 1050; A456-58, A475-76, A523-24, A952-53. Further, as explained below, the Commissioners made several changes to the Rule and offered several new justifications just before voting on it. It would have been impossible for the industry to start designing and manufacturing new products to comply with this moving target.

## C. The CPSC Failed To Follow Basic Notice-And-Comment Procedures

The APA requires notice-and-comment rulemaking for agency rules, 5 U.S.C. § 553(b)-(c), and the CPSA mandates enhanced procedures to provide opportunities for oral presentation of data, views, or arguments when the CPSC proposes mandatory consumer product safety rules, 15 U.S.C. § 2058(d)(2). This notice-and-

comment process is a "crucial" rulemaking requirement for ensuring "fairness to affected parties." *Daimler Trucks N. Am. LLC v. EPA*, 737 F.3d 95, 100 (D.C. Cir. 2013). Through notice and comment, "regulations are tested via exposure to diverse public comment" and "affected parties [have] an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." *Id.*

Here, the agency ran roughshod over these foundational administrative-law requirements. The CPSC made changes to the Rule up until the very end. When the Commissioners finally voted on the Rule, there were significant unanticipated differences between the proposed and final Rule. Three of the most significant changes involve the 2022 voluntary standard, the cost-benefit analysis, and the incident reports.

### 1. The CPSC did not address the 2022 revision to the voluntary standard until the final Rule

Although the CPSC was supposed to build its analysis on an assessment of the voluntary standard, the CPSC did not even address the adequacy of the 2022 revision to the voluntary standard until the final Rule itself. It completely sandbagged the industry and the public on this critical point.

WCMA started working on the 2022 revision in 2019, when it invited the CPSC staff to provide input on the scope of the revision. 5/16/19 Letter. The entire time the CPSC was considering the Rule, its staff was participating in proceedings

to amend the voluntary standard.  87 Fed. Reg. at 73,155; *see, e.g.*, 12/13/21 Letter; 2/03/20 Letter; 5/16/19 Letter.  Yet the CPSC waited until the absolute last minute to provide an analysis about the supposed inadequacy of the 2022 revision.  87 Fed. Reg. at 73,165-68.  At that point, the industry had no chance to respond; the Rule was a done deal.  In opposing a stay, the CPSC asserted (Stay Opp. 24) that WCMA should have petitioned to reopen the comment period after the Rule became final, but it was the agency's job to provide opportunity for comment.  Further, the CPSC's argument rings hollow in light of the fact that it is has opposed remand for additional comment here.

The CPSC also suggested (Stay Opp. 21-23) that its under-the-wire changes to the Rule do not matter because it modified only the findings, not "the Final Rule itself."  But the findings indisputably are part of the Rule.  The CPSA requires that the CPSC "include[] [its] finding[s] in the rule," 15 U.S.C. § 2058(f)(1), (3), and it did so here, *see* 16 C.F.R. § 1260.4.  Besides, the Court has explained that an agency must "allow for meaningful commentary" not only on the requirements that a rule places on the regulated community, but also on the "technical basis for a proposed rule."  *N. Am.'s Bldg. Trades Unions v. OSHA*, 878 F.3d 271, 301 (D.C. Cir. 2017).

The CPSC's last-minute consideration of the 2022 revision is an egregious process failure.  It shows an utter disregard for the scheme Congress set out in the CPSA.

### 2. There were fundamental differences between the cost-benefit analysis in the proposed Rule and the one in the final Rule

The CPSC made substantial changes to its cost-benefit analysis without permitting any comment from the companies that would bear the brunt of the Rule's enormous costs. Those changes are especially problematic in light of the CPSA's heightened review standard, under which "data and views in the record" that were not "exposed to public comment" are considered less "reliab[le]." *Aqua Slide*, 569 F.2d at 838. For example, the final Rule estimates that it will cost the industry $14.7 million to comply based on the cost of developing a rigid cord shroud, 87 Fed. Reg. at 73,182; A564-65, A602, A610, while the proposed Rule contained no similar analysis of compliance costs.

Manufacturers thus had "no way of knowing" how the CPSC would estimate compliance costs up until the very end, and no way of commenting on key aspects of "the model and [the agency's] methodology," which were among "the most critical factual material . . . used to support" the Rule. *Owner-Operator Indep. Drivers Ass'n v. FMCSA*, 494 F.3d 188, 201 (D.C. Cir. 2007); *see* 16 C.F.R. § 1260.4(i). That error prejudiced WCMA members. Several manufacturer members submitted detailed declarations documenting how the CPSC's estimate ignored significant costs for developing Rule-compliant products. *See* A14-17, A75-79, A131-33.

The CPSC tried to bolster its cost analysis by finding that the "Canadian market [did not experience] a significant reduction in consumer choice" due to the Canadian regulation. 16 C.F.R. § 1260.4(f)(4); *see* 87 Fed. Reg. at 73,171; A654. But there is no record evidence to support that conclusion. Even before the Canadian regulation went into effect, the industry warned the CPSC that the Canadian market likely would shrink due to the regulation. *See, e.g.*, A816-17, RA15; 8/12/19 Letter. The CPSC never gave the industry any opportunity to provide comments on the real-world impacts of the Canadian regulation, instead concluding (without data) that there was no change to the Canadian market.

At the same time, the CPSC's estimate of benefits was constantly shifting. The CPSC's benefits estimate was based on injury cost per product, which the agency calculated by dividing annual injury costs by the number of window coverings in use. A598, A698-09. In the proposed Rule and final Rule, the CPSC used two completely different methods and data sources for calculating the number of window coverings in use. *Compare* 87 Fed. Reg. at 73,149 *and* A591-92 *with* A1165-66. Worse still, the method in the final Rule relied on a study that the CPSC did not make "available during the rulemaking." *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008).

### 3. The final Rule analyzed new incident reports never discussed in the proposed Rule

While WCMA was revising the voluntary standard in 2021 and 2022, the CPSC was supposed to be "assist[ing] . . . administratively and technically." 15 U.S.C. § 2054(a)(4). Instead, it hid 15 new incident reports from WCMA. And then in its own rulemaking proceeding, it pulled the reports out at the last minute and asserted that they support the Rule. 87 Fed. Reg. at 73,151-53; *see* A528-32.

This was not a case of an agency merely "expand[ing] . . . or amend[ing] other data that ha[d] been offered for comment." *Chamber of Com. of U.S. v. SEC*, 443 F.3d 890, 903 (D.C. Cir. 2006). During the rulemaking process, the CPSC did not provide *any* of the 209 "incident reports" that it says support the Rule. 16 C.F.R. § 1260.4(f)(1). Instead, it shared a handful of redacted incident reports with WCMA in response to multiple FOIA requests, but those incomplete reports lacked key details and attachments, making it impossible to provide data-driven comments. A725 n.8.

Even now, the agency still has not provided most of the incident reports. When the CPSC filed the certified index of the administrative record, the reports were not listed. WCMA followed up, and the CPSC responded that the reports are incorporated by reference into the record. WCMA requested those reports again from the CPSC. Five days before the deadline for this brief, the CPSC produced an undated chart not listed in the certified index or discussed in the Rule, which

provides short summaries of most of the reports, but lacks critical detail. *See* Chart. The CPSC *still* has not produced the reports themselves.

* * * * *

The CPSC's failures render the Rule arbitrary, capricious, and not in accordance with law. Thus, the Court should follow the ordinary practice to vacate and remand the rule. *See* 5 U.S.C. § 706(2); *United Steel v. MSHA*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (noting that the Court "vacate[s] unlawful agency action" except in "rare cases").

At a minimum, the Court should vacate and remand the Rule to the CPSC to "provide additional opportunity for" comments in order to "modify its findings, or make new findings." 15 U.S.C. § 2060(b). That alternative relief is amply justified here, because the CPSC made significant changes to the Rule on which the regulated community had no chance to comment. Courts have vacated and remanded agency actions pursuant to statutes that have similar remedy provisions. *See, e.g.*, *Swaim v. Califano*, 599 F.2d 1309, 1312 (4th Cir. 1979) (Social Security Act); *Orange Belt Dist. Council of Painters v. NLRB*, 328 F.2d 534, 539-40 (D.C. Cir. 1964) (National Labor Relations Act); *City of Pittsburgh v. Fed. Power Comm'n*, 237 F.2d 741, 751, 755-56 (D.C. Cir. 1956) (Natural Gas Act). The many process failures in promulgating the Rule confirm that it should not be allowed to take effect.

## II. THE RULE IS INVALID BECAUSE THE CPSC'S STRUCTURE IS UNCONSTITUTIONAL

The Rule also is invalid because the Commissioners who promulgated it were unconstitutionally insulated from Presidential oversight. The Commissioners are principal officers who wield substantial executive power, yet the President may remove them only for cause. That protection violates the separation of powers, and the appropriate remedy is for the Court to vacate the Rule.

### A. The Statutory For-Cause Restriction On Removing CPSC Commissioners Violates The Separation Of Powers

Under Article II, "the 'executive Power' – all of it – is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila L. LLC v. CFPB*, 140 S. Ct. 2183, 2191 (2020) (quoting U.S. Const. Art. II § 1, cl. 1, § 3). Although "the Framers expected that the President would rely on subordinate officers for assistance" in wielding the executive power, they vested the President with "the power of appointing, overseeing, and controlling" those officers. *Id.* at 2191, 2197. To ensure that the President can control and oversee subordinate officers, "the Constitution gives the President the authority to remove those who assist him in carrying out his duties." *Id.* at 2191 (quotation marks omitted).

The removal power is "essential to the execution of the laws by" the President. *Seila*, 140 S. Ct. at 2198. It preserves the President's ability to oversee the use of executive power. And in turn, it ensures that the President can be "held fully

accountable" to the people "for discharging his own responsibilities." *Free Enter.*
*Fund v. PCAOB*, 561 U.S. 477, 514 (2010).

The Supreme Court has recognized two narrow exceptions to the President's
"unrestricted removal power." *Seila*, 140 S. Ct. at 2192. First, Congress may
"provide tenure protections to certain *inferior* officers with narrowly defined duties"
that do not include "policymaking or administrative authority." *Id.* at 2192, 2200.
Inferior officers are "directed and supervised" by principal officers. *Id.* at 2199 n.3.
Second, Congress may provide tenure protections "for multimember expert agencies
that do not wield substantial executive power." *Id.* at 2199-2200. The Supreme
Court initially recognized that exception in *Humphrey's Executor v. United States*,
295 U.S. 602 (1935). These exceptions mark "the outermost constitutional limits of
permissible congressional restrictions on the President's removal power." *Seila*, 140
S. Ct. at 2200.

Applying those principles, the for-cause removal restriction on CPSC
Commissioners is unconstitutional. The Commissioners cannot be removed by the
President except "for neglect of duty or malfeasance in office but for no other cause."
15 U.S.C. § 2053(a). That for-cause restriction on the power to remove
Commissioners violates the separation of powers because it robs the President of the
ability to "supervise . . . those who wield executive power on his behalf." *Seila*, 140
S. Ct. at 2191.

No exception to the general rule applies here. The first exception does not apply because CPSC Commissioners are principal officers, not inferior officers. They are not removable by any superior and their work is not "directed and supervised" by anyone, let alone the President. *Seila*, 140 S. Ct. at 2199 n.3. The Commissioners exercise broad "policymaking or administrative authority." *Id.* at 2200. They set national policy by promulgating regulations concerning consumer products and enforce that policy "through administrative adjudications and civil actions," bringing "the coercive power of the state to bear on millions of private citizens and businesses." *Id.* at 2200-01.

Second, the *Humphrey's Executor* exception does not apply because CPSC Commissioners exercise "substantial executive power" without meaningful supervision. *Seila*, 140 S. Ct. at 2200; *see Consumers' Rsch. v. CPSC*, 592 F. Supp. 3d 568, 580 (E.D. Tex. 2022) (holding that the CPSC's structure is unconstitutional because the Commissioners wield "substantial executive power"), *appeal pending*, No. 22-40328 (5th Cir.) (calendared for argument on March 6, 2023). The CPSC exercises "jurisdiction over thousands of types of consumer products used in the home, in schools, in recreation, or otherwise." Office of Compliance and Field Operations, U.S. Consumer Prod. Safety Comm'n, *The Regulated Products Handbook* 5 (May 6, 2013). Those products represent $1.6 trillion in annual consumption. Gov't Accountability Office, GAO-21-56, *Consumer Product Safety*

*Commission: Actions Needed to Improve Processes for Addressing Product Defect Cases* 1 (Nov. 2020).

The Commissioners exercise that vast authority in several different ways. First, they have the authority to promulgate "performance requirements" for consumer products, 15 U.S.C. § 2056(a), and the power to ban hazardous substances outright, *id.* § 2057. "Interpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law." *Bowsher*, 478 U.S. at 733; *see Collins v. Yellen*, 141 S. Ct. 1761, 1785-86 (2021) ("executive power" includes "issu[ing] . . . regulation[s]"). They also exercise considerable adjudicative powers, including the power to investigate product safety incidents and to issue product recalls. In the course of those investigations, they may issue subpoenas and take testimony. 15 U.S.C. § 2076(a)-(b). In response to violations of consumer product laws, they may commence, and ultimately render final decisions in, administrative adjudicative proceedings that could result in substantial civil penalties. *Id.* § 2069(a)(1); 16 C.F.R. §§ 1025.11(a), 1025.55; 86 Fed. Reg. 68,244 (Dec. 1, 2021). Though the CPSC's adjudicative proceedings may take "'judicial' forms," they undoubtedly are "the exercise of . . . the 'executive Power.'" *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) (quoting U.S. Const. Art. II, § 1, cl. 1).

The Commissioners may exercise their "potent enforcement powers" by commencing civil actions in federal court. *Seila*, 140 S. Ct. at 2193. In civil suits, the CPSC may seek injunctive relief and monetary penalties. 15 U.S.C. §§ 2064(g), 2071(a), 2076(b)(7). Those powers fall squarely within the domain of executive authority. *See Seila*, 140 S. Ct. at 2193.

In its opposition to WCMA's stay motion, the CPSC argued (Stay Opp. 24-25 n.3) that the *Humphrey's Executor* exception should be extended to the Commissioners. It should not. *Humphrey's Executor* concerned a for-cause removal protection for commissioners of the Federal Trade Commission (FTC). Because the decision upholding that protection was limited to "officers of the kind [t]here under consideration," *Humphrey's Executor*, 295 U.S. at 632, "the contours of the *Humphrey's Executor* exception depend upon the characteristics of the agency" at issue. *Seila*, 140 S. Ct. at 2198. The *Humphrey's Executor* Court "viewed the FTC (as it existed in 1935) as exercising 'no part of the executive power.'" *Id.* at 2198 (quoting *Humphrey's Executor*, 295 U.S. at 628). Rather, it was said to "perform[] legislative and judicial functions." *Id.* at 2199. In contrast, the CPSC wields numerous and substantial executive powers.

The CPSC also cited (Stay Opp. 24-25 n.3) opinions in *Morrison v. Olson*, 487 U.S. 654 (1988), in which various Justices indicated that removal restrictions on multi-member commissioners "have been generally regarded as lawful." *Id.* at 724

(Scalia, J., dissenting); *see id.* at 691-92 & n.31 (opinion of the Court). But *Morrison* did not involve principal officers exercising executive authority unchecked. It involved the appointment and removal of an inferior officer. *Id.* at 685-93. In addition, *Morrison* predated the Court's decision in *Seila Law*, which specifically addressed the issue and limited *Humphrey's Executor*. *See* 140 S. Ct. at 2198-2200. Similarly misplaced is the CPSC's reliance on then-Judge Kavanaugh's concurrence related to the Nuclear Regulatory Commission. Stay Opp. 25 n.3 (citing *In re Aiken County*, 645 F.3d 428, 442 (D.C. Cir. 2011)). That opinion likewise predated *Seila Law* and therefore could not take account of the Supreme Court's authoritative interpretation of its own prior ruling in *Humphrey's Executor*.

## B. The Appropriate Remedy For The Constitutional Defect Is To Vacate The Rule

Vacatur is the appropriate remedy here. WCMA members are suffering ongoing harm by being forced to conform their business operations to a Rule promulgated by an unconstitutionally structured agency. The Supreme Court has made clear that constitutional challengers who are suffering a "'here-and-now' injury" are entitled to relief. *Free Enter. Fund*, 561 U.S. at 513 (explaining that the relief must be "sufficient to ensure" that agency rules are "enforced only by a constitutional agency accountable to the Executive"). That harm will continue unless the unaccountable CPSC Commissioners decide to unwind the Rule through a future notice-and-comment rulemaking in which they determine that the Rule is

not "reasonably necessary," 15 U.S.C. § 2058(h) – a very unlikely scenario in light of the CPSC's single-minded approach to this Rule. Thus, any remedy other than vacatur would allow WCMA members' harm to continue unabated. It also would discourage meritorious challenges on separation-of-powers grounds, *Ryder v. United States*, 515 U.S. 177, 186 (1995), and would contravene the ordinary rule that the government "bears the burden of proving that [a constitutional] error is harmless," *Brecht v. Abrahamson*, 507 U.S. 619, 630 (1993).

Vacatur is not foreclosed by the Supreme Court's decision in *Collins v. Yellen*, *supra*. In *Collins*, Fannie Mae and Freddie Mac shareholders challenged an agreement between the Department of Treasury and the Federal Housing Finance Agency (FHFA) that gave Treasury preferred shares in Fannie Mae and Freddie Mac and variable dividends. 141 S. Ct. at 1770. The shareholders argued that the FHFA's structure was unconstitutional because it was led by a single director who could be removed by the President only for cause. *Id.* The Supreme Court agreed. *Id.* at 1783-87.

With respect to the remedy, the Supreme Court held that the shareholders could seek retrospective relief but not prospective relief. The challenged agreement was adopted by an acting FHFA director who was removable at will, but was implemented by FHFA directors who were not removable at will. 141 S. Ct. at 1787. The Court declined to address whether the agreement should be "set[] aside . . . in

its entirety," because it was initially adopted by a director who was removable at will. *Id.* In addition, a subsequent agreement between FHFA and Treasury had removed the complained-of dividend formula. *Id.* at 1779-80. As to retrospective relief, the Court remanded for the lower courts to decide, in the first instance, whether the unconstitutional removal scheme had harmed the shareholders and if it did, what remedy was appropriate. *Id.* at 1789. On remand, the district court held that the shareholders failed to demonstrate compensable retrospective harm. *Collins v. Lew*, No. 4:16-cv-3113, 2022 WL 17170955, at *4-6 (S.D. Tex. Nov. 21, 2022), *appeal pending*, No. 22-20632 (5th Cir.).

Two courts of appeals have extended *Collins* to situations where plaintiffs were seeking prospective relief, holding that a challenger must establish that the unconstitutional removal protection affected the complained-of agency decision. *Calcutt v. FDIC*, 37 F.4th 293, 314-17 (6th Cir. 2022), *mandate recalled and stay granted*, 2022 WL 4546340 (Kavanaugh, J., in chambers), *petition for cert. pending* (filed Jan. 30, 2023); *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 631-32, 642-43 (5th Cir. 2022), *petitions for cert. pending*, Nos. 22-448 & 22-663 (filed Nov. 14, 2022 and Jan. 13, 2023).

The remedy set out in *Collins* does not apply here by its terms, and it should not be extended to cover this situation. First, unlike the agreement at issue in *Collins*, the Rule was adopted by CPSC Commissioners who lacked Presidential oversight.

They enacted the Rule without oversight from the "only . . . authority that . . . they must fear and, in the performance of their functions, obey." *Seila*, 140 S. Ct. at 2197 (quotation marks and alterations omitted). *Collins* made clear that it was not considering that scenario. 141 S. Ct. at 1787. Second, the remedy discussion in *Collins* was expressly limited to retrospective relief because the FHFA director who adopted the agreement was removable at will and the complained-of dividend formula was no longer part of the agreement. *Id.* at 1787-89. WCMA is seeking to block the CPSC Commissioners' future exercise of unlawful authority through a Rule that will continue to harm businesses unless the CPSC repeals it. Third, *Collins* involved a collateral attack on an intergovernmental agreement. *Id.* at 1770, 1787. In contrast, the Rule directly regulates WCMA members' businesses.

Neither of the court of appeals' decisions addressed CPSC Commissioners, and they do not support extending *Collins* to the situation here. Those cases failed to give appropriate weight to the distinctions in *Collins* discussed above and erroneously placed the burden to prove harm on the challengers. *See Calcutt*, 37 F.4th at 316; *Cmty. Fin. Servs.*, 51 F.4th at 631-32. Further, one of the cases did not involve a challenge to a rulemaking. *See Calcutt*, 37 F.4th at 316.

The constitutional violation here is obvious, and the implications for the regulated community are severe. One way or another, the Rule should be vacated.

**CONCLUSION**

The Court should vacate the Rule and remand to the CPSC. Alternatively, the Court should vacate and remand the Rule to the CPSC to provide additional opportunity for comments in order to modify its findings or make new findings.

Respectfully submitted,

*/s/ Nicole A. Saharsky*

| | |
|---|---|
| | Nicole A. Saharsky |
| Avi M. Kupfer | Erika Z. Jones |
| MAYER BROWN LLP | MAYER BROWN LLP |
| 71 S. Wacker Drive | 1999 K Street, N.W. |
| Chicago, IL 60606 | Washington, DC 20006 |
| (312) 782-0600 | (202) 263-3000 |
| | nsaharsky@mayerbrown.com |
| Wajdi C. Mallat | |
| MAYER BROWN LLP | |
| 1221 Avenue of the Americas | |
| New York, NY 10020 | |
| (212) 506-2500 | |
| *Licensed only in Utah;* | |
| *New York admission pending.* | |

*Counsel for Petitioner Window Covering Manufacturers Association*

Dated: January 31, 2023

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 12,984 words excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirement of Rule 32(a)(6) because it was prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman 14-point type for text and footnotes.

*/s/ Nicole A. Saharsky*
Nicole A. Saharsky

## CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2023, I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system which will serve all counsel of record.

*/s/ Nicole A. Saharsky*
Nicole A. Saharsky

# ADDENDUM

# STATUTORY AND REGULATORY AUTHORITIES

1.    5 U.S.C. § 553 provides, in relevant part:

**Rule making**

\* \* \* \* \*

(b)  General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law.  The notice shall include –

(1) a statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

Except when notice or hearing is required by statute, this subsection does not apply –

(A)   to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

\* \* \* \* \*

(c)  After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation.  After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.  When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

\* \* \* \* \*

2.    5 U.S.C. § 604 provides, in relevant part:

**Final regulatory flexibility analysis**

(a)  When an agency promulgates a final rule under section 553 of this title, after being required by that section or any other law to publish a general notice of proposed rulemaking, or promulgates a final interpretative rule involving the internal revenue laws of the United States as described in section 603(a), the agency shall prepare a final regulatory flexibility analysis. Each final regulatory flexibility analysis shall contain –

(1)  a statement of the need for, and objectives of, the rule;

(2)  a statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments;

(3)  the response of the agency to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule as a result of the comments;

(4)  a description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available;

(5)  a description of the projected reporting, recordkeeping and other compliance requirements of the rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record;

(6) a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected; and

*  *  *  *  *


3.      15 U.S.C. § 2053 provides, in relevant part:

**Consumer product safety standards**

(a) **Establishment; Chairman**

An independent regulatory commission is hereby established, to be known as the Consumer Product Safety Commission, consisting of five Commissioners who shall be appointed by the President, by and with the advice and consent of the Senate. In making such appointments, the President shall consider individuals who, by reason of their background and expertise in areas related to consumer products and protection of the public from risks to safety, are qualified to serve as members of the Commission. The Chairman shall be appointed by the President, by and with the advice and consent of the Senate, from among the members of the Commission. An individual may be appointed as a member of the Commission and as Chairman at the same time. Any member of the Commission may be removed by the President for neglect of duty or malfeasance in office but for no other cause.

\* \* \* \* \*

4. 15 U.S.C. § 2054 provides, in relevant part:

**Product safety information and research**

(a) **Injury Information Clearinghouse; duties**

The Commission shall –

\* \* \* \* \*

(4) to the extent practicable and appropriate (taking into account the resources and priorities of the Commission), assist public and private organizations or groups of manufacturers, administratively and technically, in the development of product safety standards and test methods.

\* \* \* \* \*

5. 15 U.S.C. § 2056 provides, in relevant part:

**Consumer product safety standards**

(a) **Types of requirements**

The Commission may promulgate consumer product safety standards in accordance with the provisions of section 2058 of this title. A consumer product safety standard shall consist of one or more of any of the following types of requirements:

(1) Requirements expressed in terms of performance requirements.

(2) Requirements that a consumer product be marked with or accompanied by clear and adequate warnings or instructions, or requirements respecting the form of warnings or instructions.

Any requirement of such a standard shall be reasonably necessary to prevent or reduce an unreasonable risk of injury associated with such product.

(b) **Reliance of Commission upon voluntary standards**

(1) The Commission shall rely upon voluntary consumer product safety standards rather than promulgate a consumer product safety standard prescribing requirements described in subsection (a) whenever compliance with such voluntary standards would eliminate or adequately reduce the risk of injury addressed and it is likely that there will be substantial compliance with such voluntary standards.

\* \* \* \* \*


6. 15 U.S.C. § 2058 provides, in relevant part:

**Procedure for consumer product safety rules**

\* \* \* \* \*

(d) **Promulgation of rule; time**

\* \* \* \* \*

(2) Consumer product safety rules shall be promulgated in accordance with section 553 of title 5, except that the Commission shall give interested persons an opportunity for the oral presentation of data, views, or arguments, in addition to an opportunity to make written submissions. A transcript shall be kept of any oral presentation.

\* \* \* \* \*

(f) **Findings; final regulatory analysis; judicial review of rule**

(1)  Prior to promulgating a consumer product safety rule, the Commission shall consider, and shall make appropriate findings for inclusion in such rule with respect to –

(A)  the degree and nature of the risk of injury the rule is designed to eliminate or reduce;

(B)  the approximate number of consumer products, or types or classes thereof, subject to such rule;

(C)  the need of the public for the consumer products subject to such rule, and the probable effect of such rule upon the utility, cost, or availability of such products to meet such need; and

(D)  any means of achieving the objective of the order while minimizing adverse effects on competition or disruption or dislocation of manufacturing and other commercial practices consistent with the public health and safety.

*  *  *  *  *

(3)  The Commission shall not promulgate a consumer product safety rule unless it finds (and includes such finding in the rule) –

(A)  that the rule (including its effective date) is reasonably necessary to eliminate or reduce an unreasonable risk of injury associated with such product;

(B)  that the promulgation of the rule is in the public interest;

*  *  *  *  *

(D)  in the case of a rule which relates to a risk of injury with respect to which persons who would be subject to such rule have adopted and implemented a voluntary consumer product safety standard, that –

(i)  compliance with such voluntary consumer product safety standard is not likely to result in the elimination or adequate reduction of such risk of injury; or

(ii)  it is unlikely that there will be substantial compliance with such voluntary consumer product safety standard;

(E)  that the benefits expected from the rule bear a reasonable relationship to its costs; and

(F)  that the rule imposes the least burdensome requirement which prevents or adequately reduces the risk of injury for which the rule is being promulgated.

\* \* \* \* \*

(g)  **Effective date of rule or standard; stockpiling of product**

(1)  Each consumer product safety rule shall specify the date such rule is to take effect not exceeding 180 days from the date promulgated, unless the Commission finds, for good cause shown, that a later effective date is in the public interest and publishes its reasons for such finding.  The effective date of a consumer product safety standard under this chapter shall be set at a date at least 30 days after the date of promulgation unless the Commission for good cause shown determines that an earlier effective date is in the public interest.  In no case may the effective date be set at a date which is earlier than the date of promulgation.  A consumer product safety standard shall be applicable only to consumer products manufactured after the effective date.

\* \* \* \* \*

7.      15 U.S.C. § 2060 provides, in relevant part:

**Judicial review of consumer product safety rules**

\* \* \* \* \*

(b)  **Additional data, views, or arguments**

If the petitioner applies to the court for leave to adduce additional data, views, or arguments and shows to the satisfaction of the court that such additional data, views, or arguments are material and that there were reasonable grounds for the petitioner's failure to adduce such data, views, or arguments in the proceeding before the Commission, the court may order the Commission to provide additional opportunity for the oral presentation of data, views, or arguments and for written submissions. The Commission may modify its findings, or make new findings by reason of the additional data, views, or arguments so taken and shall file such modified or new findings, and its recommendation, if any, for the modification or setting aside of its original rule, with the return of such additional data, views, or arguments.

(c) **Jurisdiction; costs and attorneys' fees; substantial evidence to support administrative findings**

Upon the filing of the petition under subsection (a) of this section the court shall have jurisdiction to review the consumer product safety rule in accordance with chapter 7 of title 5, and to grant appropriate relief, including interim relief, as provided in such chapter. A court may in the interest of justice include in such relief an award of the costs of suit, including reasonable attorneys' fees (determined in accordance with subsection (f)[*] and reasonable expert witnesses' fees. Attorneys' fees may be awarded against the United States (or any agency or official of the United States) without regard to section 2412 of title 28 or any other provision of law.   The consumer product safety rule shall not be affirmed unless the Commission's findings under sections 2058(f)(1) and 2058(f)(3) of this title are supported by substantial evidence on the record taken as a whole.

\* \* \* \* \*

8.     15 U.S.C. § 2064 provides, in relevant part:

**Substantial product hazards**

\* \* \* \* \*

(g) **Preliminary injunction**

(1)  If the Commission has initiated a proceeding under this section for the issuance of an order under subsection (d) with respect to a product which the Commission has reason to believe presents a substantial product hazard, the Commission (without regard to section 2076(b)(7) of this title) or the Attorney General may, in accordance with 2061(d)(1)[†] of this title, apply to a district court of the United States for the issuance of a preliminary injunction to restrain the distribution in commerce of such product pending the completion of such proceeding.  If such a preliminary injunction has been issued, the Commission (or the Attorney General if the preliminary injunction was issued upon an application of the Attorney General) may apply to the issuing court for extensions of such preliminary injunction.

---

[*]  So in original.  Probably should be followed by closing parenthesis.
[†]  So in original.  Probably should be preceded by "section."

(2) Any preliminary injunction, and any extension of a preliminary injunction, issued under this subsection with respect to a product shall be in effect for such period as the issuing court prescribes not to exceed a period which extends beyond the thirtieth day from the date of the issuance of the preliminary injunction (or, in the case of a preliminary injunction which has been extended, the date of its extension) or the date of the completion or termination of the proceeding under this section respecting such product, whichever date occurs first.

(3) The amount in controversy requirement of section 1331 of title 28 does not apply with respect to the jurisdiction of a district court of the United States to issue or exend[‡] a preliminary injunction under this subsection.

\* \* \* \* \*

9.      15 U.S.C. § 2069 provides, in relevant part:

**Civil penalties**

(a) **Amount of penalty**

(1) Any person who knowingly violates section 2068 of this title shall be subject to a civil penalty not to exceed $100,000 for each such violation. Subject to paragraph (2), a violation of section 2068(a)(1), (2), (4), (5), (6), (7), (8), (9), (10), or (11) of this title shall constitute a separate offense with respect to each consumer product involved, except that the maximum civil penalty shall not exceed $15,000,000 for any related series of violations.  A violation of section 2068(a)(3) of this title shall constitute a separate violation with respect to each failure or refusal to allow or perform an act required thereby; and, if such violation is a continuing one, each day of such violation shall constitute a separate offense, except that the maximum civil penalty shall not exceed $15,000,000 for any related series of violations.

\* \* \* \* \*

10.      15 U.S.C. § 2071 provides, in relevant part:

---

[‡] So in original.  Probably should be "extend."

**Injunctive enforcement and seizure**

(a) **Jurisdiction**

The United States district courts shall have jurisdiction to take the following action:

(1)  Restrain any violation of section 2068 of this title.

(2)  Restrain any person from manufacturing for sale, offering for sale, distributing in commerce, or importing into the United States a product in violation of an order in effect under section 2064(d) of this title.

(3)  Restrain any person from distributing in commerce a product which does not comply with a consumer product safety rule.

Such actions may be brought by the Commission (without regard to section 2076(b)(7)(A) of this title) or by the Attorney General in any United States district court for a district wherein any act, omission, or transaction constituting the violation occurred, or in such court for the district wherein the defendant is found or transacts business.  In any action under this section process may be served on a defendant in any other district in which the defendant resides or may be found.

\*  \*  \*  \*  \*


11.    15 U.S.C. § 2076 provides, in relevant part:

**Additional functions of Consumer Product Safety Commission**

(a) **Authority to conduct hearings or other inquiries**

The Commission may, by one or more of its members or by such agents or agency as it may designate, conduct any hearing or other inquiry necessary or appropriate to its functions anywhere in the United States.  A Commissioner who participates in such a hearing or other inquiry shall not be disqualified solely by reason of such participation from subsequently participating in a decision of the Commission in the same manner.  The Commission shall publish notice of any proposed hearing in the Federal Register and shall afford a reasonable opportunity for interested persons to present relevant testimony and data.

(b) **Commission powers; orders**

The Commission shall also have the power –

* * * * *

(7) to –

(A) initiate, prosecute, defend, or appeal (other than to the Supreme Court of the United States), through its own legal representative and in the name of the Commission, any civil action if the Commission makes a written request to the Attorney General for representation in such civil action and the Attorney General does not within the 45-day period beginning on the date such request was made notify the Commission in writing that the Attorney General will represent the Commission in such civil action, and

(B) initiate, prosecute, or appeal, through its own legal representative, with the concurrence of the Attorney General or through the Attorney General, any criminal action,

for the purpose of enforcing the laws subject to its jurisdiction;

* * * * *

12.    16 C.F.R. § 1025.11 provides, in relevant part:

**Commencement of proceedings.**

(a) Notice of institution of enforcement proceedings. The Commission may, by one or more of its members or by such agents or agency as it may designate, conduct any hearing or other inquiry necessary or appropriate to its functions anywhere in the United States. A Commissioner who participates in such a hearing or other inquiry shall not be disqualified solely by reason of such participation from subsequently participating in a decision of the Commission in the same manner. The Commission shall publish notice of any proposed hearing in the Federal Register and shall afford a reasonable opportunity for interested persons to present relevant testimony and data.

* * * * *

13.    16 C.F.R. § 1025.55 provides:

**Final decision on appeal or review.**

(a) Consideration of record.  Upon appeal from or review of an Initial Decision, the Commission shall consider the record as a whole or such parts of the record as are cited or as may be necessary to resolve the issues presented and, in addition, shall, to the extent necessary or desirable, exercise all the powers which it could have exercised if it had made the Initial Decision.

(b)  Rendering of final decision.  In rendering its decision, the Commission shall adopt, modify, or set aside the findings, conclusions, and order contained in the Initial Decision, and shall include in its Final Decision a statement of the reasons for its action and any concurring or dissenting opinions.  The Commission shall issue an order reflecting its Final Decision.

(c)  Except as otherwise ordered by the Commission, the Commission shall endeavor to file its Decision within ninety (90) days after the filing of all briefs or after receipt of transcript of the oral argument, whichever is later.


14.     16 C.F.R. § 1031.4 provides, in relevant part:

**Effect of voluntary standards activities on Commission activities.**

(a)(1)  The Commission, in determining whether to begin proceedings to develop mandatory standards under the acts it administers, considers whether mandatory regulation is necessary or whether there is an existing voluntary standard that adequately addresses the problem and the extent to which that voluntary standard is complied with by the affected industry.

(2)  The Commission acknowledges that there are situations in which adequate voluntary standards, in combination with appropriate certification programs, may be appropriate to support a conclusion that a mandatory standard is not necessary.  The Commission may find that a mandatory standard is not necessary where compliance with an existing voluntary standard would eliminate or adequately reduce the risk of injury associated with the product, contains requirements and test methods that have been evaluated and found acceptable by the Commission, and it is likely that there will be substantial and timely compliance with the voluntary standard.  Under such circumstances, the Commission may agree to encourage industry compliance with the voluntary standard and subsequently evaluate the effectiveness of the standard in terms of accident and injury reduction for products produced in compliance with the standard.

(3)  In evaluating voluntary standards, the Commission will relate the requirements of the standard to the identified risks of injury and evaluate the requirements in terms of their effectiveness in eliminating or reducing the risks of injury.  The evaluation of voluntary standards will be conducted by Commission staff members, including representatives of legal, economics, engineering, epidemiological, health sciences, human factors, other appropriate interests, and the Voluntary Standards Coordinator. The staff evaluation will be conducted in a manner similar to evaluations of standards being considered for promulgation as mandatory standards.

*  *  *  *  *

15.    16 C.F.R. § 1260.1 provides, in relevant part:

**Scope and definitions.**

(a)  This part establishes a consumer product safety standard for operating cords on custom window coverings.  The effective date of this part is May 30, 2023.

*  *  *  *  *

16.    16 C.F.R. § 1260.2 provides:

**Requirements.**

(a)  Requirements for operating cords.  Each custom window covering shall comply with section 4.3.1 or 4.3.2.5.2, instead of section 4.3.2, of ANSI/WCMA A100.1 – 2018 (incorporated by reference, see § 1260.5).

(b)  Requirements for operating cords.  Each custom window covering shall comply with section 4.3.1 or 4.3.2.5.2, instead of section 4.3.2, of ANSI/WCMA A100.1 – 2018 (incorporated by reference, see § 1260.5).

(1)  Test methods for rigid cord shrouds: Center load test.

(i)  Support each end of the rigid cord shroud, but do not restrict the rotation along the axial direction.  Supports must be within 0.25 inches from the ends of the shroud as shown in figure 1 to this paragraph (b)(1)(i).

Figure 1 to Paragraph (b)(1)(i) – Rigid Cord Shroud Test Set–Up



(ii) Apply a 5–pound force at the center of the rigid cord shroud for at least 5 seconds as shown in figure 2 to this paragraph (b)(1)(ii).

Figure 2 to Paragraph (b)(1)(ii) – Rigid Cord Shroud Center Load Test and Deflection Measurement



(iii)  Measure the maximum deflection of the shroud, while the 5–pound force is applied.

(iv)  For rigid cord shrouds that are ≤19 inches, the deflection shall not exceed 1 inch.  For every additional 19 inches in shroud length, the shroud can deflect an additional inch.  See figure 2 to paragraph (b)(1)(ii) of this section.

(v)  While continuing to apply the 5–pound force, determine if the cord(s) can be contacted by the cord shroud accessibility test probe shown in figure 3 to this paragraph (b)(1)(v).  If the cord shroud accessibility test probe can touch any cord, the cord(s) are considered accessible.

Figure 3 to Paragraph (b)(1)(v) – Cord Shroud Accessibility Test Probe



(2)  Test methods for rigid cord shrouds: Axial torque test.

(i)  Mount one end of the rigid cord shroud and restrict the rotation along the axial direction.

(ii)  Apply a 4.4 in-lb. (0.5Nm) torque along the other end of the rigid cord shroud for 5 seconds.

(iii)  While continuing to apply the torque, determine if the cord(s) can be contacted by the cord shroud accessibility test probe shown in figure 3 to paragraph (b)(1)(v) of this section.  If the cord shroud accessibility test probe can touch any cord, the cord(s) are considered accessible.

(c)  Requirements for cord retraction devices.  If a custom window covering complies with paragraph (a) of this section using a cord retraction device, the cord retraction device shall meet the requirements in paragraphs (c)(1) through (4) of this section.

(1)  When a 30 grams mass is applied to the operating interface, the cord retraction device shall maintain full retraction of the retractable cord such that the retractable cord is not accessible per Appendix C of ANSI/WCMA A100.1 – 2018.

(2)  The maximum stroke length for a cord retraction device is 12 inches measured from the bottom of the headrail.

(3)  The operating interface for cord retraction devices may not be a cord of any length including a short static or access cord.  It may be a ring and pole, a wand or any other design that cannot bend on itself, eliminating the potential of creating a hazardous loop.

(4)  The cord retraction device shall have a service life of at least 5,000 cycles after exposed portions or components have been subjected to 500 hours of ultraviolet (UV) exposure per American Association of Textile Chemists and Colorists (AATCC) Test Method 16–2004, Option 3 of ANSI/WCMA A100.1 – 2018.

(d)  Requirements for loop cord and bead chain restraining devices.  If a custom window covering complies with paragraph (a) of this section using a loop cord and bead chain restraining device, the loop cord and bead chain restraining device shall meet the requirements in section 6.5, of ANSI/WCMA A100.1 – 2018 with an additional test as defined in paragraph (d)(l) of this section, and shall not form a hazardous loop when tested for a hazardous loop using the test methods defined in paragraphs (d)(2) and (3) of this section.

(1)  Test methods for loop cord and bead chain restraining device: UV stability and operational cycle test.  One sample loop cord and bead chain restraining device shall be tested to section 6.5.2.2, UV Stability, of ANSI/WCMA A100.1 – 2018, followed by section 6.5.2.1, Operational Cycle Test, of ANSI/WCMA A100.1 – 2018.

(2)  Test methods for loop cord and bead chain restraining device: Center load test.

(i)  Support each end of the loop cord and bead chain restraining device, but do not restrict the rotation along the axial direction.  Supports must be within 0.25 inches from the ends of the shroud as shown in figure 4 to this paragraph (d)(2)(i).

Figure 4 to Paragraph (d)(2)(i) – Cord and Bead Chain Restraining Device Test Set–Up



(ii)  Apply a 5–pound force at the center of the cord and bead chain restraining device for at least 5 seconds as shown in figure 5 to this paragraph (d)(2)(ii).

Figure 5 to Paragraph (d)(2)(ii) – Loop Cord and Bead Chain Restraining Device Center Load Test and Deflection Measurement



(iii)  Measure the maximum deflection of the cord and bead chain restraining device, while the 5–pound force is applied.

(iv)  For cord and bead chain restraining device that are ≤19 inches, the deflection shall not exceed 1 inch.  For every additional 19 inches in shroud length, the shroud can deflect an additional inch.  See figure 5 to paragraph (d)(2)(ii) of this section.

(v)  While continuing to apply the 5-pound force, determine if the cord(s) create an opening between the cord and the restraining device.  If the hazardous loop head

probe (Figure D1 of ANSI/WCMA A1001–2018) can pass through the opening, the opening is considered a hazardous loop.

(3)  Test methods for cord and bead chain restraining devices: Axial torque test.

(i)  Mount one end of the cord and bead chain restraining device and restrict the rotation along the axial direction.

(ii)  Apply a 4.4 in-lb. (0.5 Nm) torque along the other end of the cord and bead chain restraining device for 5 seconds.  While continuing to apply the torque, determine if the cord(s) if the cord(s) create an opening between the cord and the restraining device.  If the hazardous loop head probe (Figure D1 of ANSI/WCMA A1001 – 2018) can pass through the opening, the opening is considered a hazardous loop.

17.    16 C.F.R. § 1260.4 provides:

**Findings.**

(a)  General.  Section 9(f) of the Consumer Product Safety Act (15 U.S.C. 2058(f)) requires the Commission to make findings concerning the following topics and to include the findings in the rule.

Note 1 to paragraph (a): Because the findings are required to be published in the rule, they reflect the information that was available to the Consumer Product Safety Commission (Commission, CPSC) when the standard was issued on November 28, 2022.

(b)  Degree and nature of the risk of injury.

(1)  Operating cords on custom window coverings present an unreasonable risk of strangulation, including death and serious injury, to children 8 years old and younger.  If children can access a window covering cord that is longer than 8 inches, children can wrap the cord around their neck, or insert their head into a loop formed by the cord and strangle.  Strangulation can lead to serious injuries with permanent debilitating outcomes or death.

(2)  Strangulation deaths and injuries on window covering cords are a "hidden hazard" because consumers do not understand or appreciate the hazard, or how quickly and silently strangulation occurs.  Because young children may be left unsupervised for a few minutes or more in a room that is considered safe, such as a

bedroom or family room, adult supervision is unlikely to eliminate or reduce the hazard. Children can wrap the cord around their neck, insert their head into a cord loop and get injured or die silently in a few minutes in any room, with or without supervision.

(3) Safety devices such as cord cleats and tension devices are unlikely to be effective to eliminate or substantially reduce the hazard. Cord cleats, for example, need to be attached on the wall and caregivers must wrap the cord around the cleat each and every time the window covering is raised or lowered. As incident data show, children can still access and become entangled in cords by climbing on furniture. Tension devices also need to be attached on the wall or windowsill, which may not occur (and may not be permitted in rental homes); even if properly installed, depending on how taut the cord loop is, it can still allow a child's head to enter the opening as observed in the incident data.

(4) A user research study found a lack of awareness on cord entanglement among caregivers; lack of awareness of the speed and mechanism of the injury; difficulty using and installing safety devices as primary reasons for not using them; and inability to recognize the purpose of the safety devices provided with window coverings. Warning labels are not likely to be effective because consumers are less likely to look for and read safety information about the products that they use frequently and are familiar with. Many of the children at risk of strangulation, those 8 years old and younger, cannot read or appreciate warning labels. Most of the window covering units involved in strangulation incidents had the permanent warning label on the product. Even well-designed warning labels will have limited effectiveness in communicating the hazard on this type of product.

(5) Every custom product sold with an accessible operating cord presents a hidden hazard to young children and can remain a hazard in the household for one to two decades or longer. Some consumers may believe that because they do not currently have young children living with them or visiting them, accessible operating cords on window coverings are not a safety hazard. However, window coverings last a long time, family circumstances change, and when homes are sold or new renters move in, the existing window coverings, if they are functional, usually remain installed and could be hazardous to new occupants with young children.

(6) Window coverings that comply with the operating cord requirements for stock window covering requirements in section 4.3.1 of ANSI/WCMA A100.1 – 2018 (incorporated by reference, see § 1260.5) adequately address the strangulation hazard, by not allowing hazardous cords on the product by design, and therefore do not rely on consumer action. CPSC finds that all of the operating cord incidents it

identified as involving custom window coverings likely would have been prevented if the requirements in section 4.3.1 of ANSI/WCMA A100.1 – 2018 were in effect and covered the incident products.

(7) CPSC databases contain incident data showing a total of 209 reported fatal and nonfatal strangulations on window coverings among children eight years and younger, from January 2009 through December 2021. Nearly 48 percent of the reported incidents were fatal (100 of 209). Sixteen of the surviving victims required hospitalization, and six survived a hypoxic-ischemic episode or were pulseless and in full cardiac arrest when found, suffered severe neurological sequalae ranging from loss of memory to a long-term or permanent vegetative state requiring tracheotomy and gastrointestinal tube feeding. One victim remained hospitalized for 72 days, was released with 75 percent permanent brain damage, and is confined to a bed.

(8) Based on CPSC's Injury Cost Model, approximately 7.6 medically treated nonfatal injuries to children 8 years and younger occurred annually in the United States from 2009 through 2021. Based on National Center for Health Statistics (NCHS) data and a separate study of child strangulations, a minimum of approximately 6.8 fatal strangulations related to window covering operating cords (excluding inner cords and lifting loops) occurred per year in the United States among children under eight years old from 2009-2020.

(c) Number of consumer products subject to the rule. Approximately 145 million corded custom window coverings were in use in the United States in 2020. About 25 million custom window coverings were shipped in the U.S. in 2020, and about 15.9 million of these were corded custom window coverings.

(d) The public need for custom window coverings and the effects of the rule on their utility, cost, and availability.

(1) Consumers commonly use window coverings in their homes to control light coming in through windows, for privacy, and for decoration. The window covering market is divided into stock and custom products. The final rule addresses hazards associated with custom window coverings, which present the same risk of strangulation as stock window coverings, but custom window coverings allow consumers to choose from a wider variety of materials, colors, operating systems, or sizes, than stock products.

(2) The Commission does not expect the final rule to have a substantial effect on the utility or availability of custom window coverings, and the impact on cost depends on the product type. The Commission considered whether some consumers,

such as the elderly and disabled, or those with windows in hard-to-reach locations, would experience a loss of utility from the removal of accessible operating cords from custom window coverings. The final rule mitigates any potential loss in utility by including several methods to make operating cords safer while still providing ease of use, including rigid cord shrouds, retractable cords, and loop cord and bead restraining devices, to assist consumers to raise and lower custom window coverings. Additionally, consumers can choose to use a remote-controlled operating system, or other tools, such as a pole, to operate the window covering.

(3) Retail prices of custom window coverings vary substantially. The least expensive units for an average size window retail for less than $40, while some more expensive units may retail for several thousand dollars. Custom window covering prices may increase to reflect the added cost of modifying or redesigning products to comply with the final rule. If the costs associated with redesigning or modifying a custom window covering to comply with the standard results in the manufacturer discontinuing that model, there would be some loss in availability of that type.

(4) Although prices of stock window coverings have increased since ANSI/WCMA A100.1 – 2018 went into effect in 2018, sales of stock products remain consistent. For custom products, which have higher prices on average, consumers very well may be willing to pay more for a safer window covering without affecting sales, similar to stock window coverings. The regulatory analysis in the final rule states that the estimated net cost increase per household to replace all custom window products in a home to be as low as $24 for less expensive products, representing only a 5% increase in cost. Such cost increase is nominal to prevent the hidden strangulation hazard to children on window coverings for the 10 years custom window coverings are likely to be used.

(e) Other means to achieve the objective of the rule, while minimizing adverse effects on competition and manufacturing.

(1) The Commission considered alternatives to achieving the rule's objective of reducing the unreasonable risks to children of injury and death associated with operating cords on custom window coverings. For example, the Commission considered relying on compliance with the voluntary standard and education campaigns rather than issuing a mandatory rule for operating cords on custom window coverings. This is the approach CPSC has relied on to date, and it would have minimal costs; however, it is unlikely to further reduce the risk of injury from operating cords on custom window coverings.

(2)  Similarly, the Commission considered narrowing the scope of the rule to address only the hazards associated with operating cords on custom vertical blinds, curtains, and drapes, because cords are not critical to the operation of these products. Narrowing the rule to these three product types would lessen the cost impact and make it unlikely that any particular product type and/or size would be eliminated, and costs would be near $0 because using plastic rods for operation is very similar to cords in cost.  However, only 3 of the 36 custom product incidents (all are fatalities) were associated with vertical blinds, and there were no curtain or drape incidents where the stock/custom classification could be determined.  This option would not result in an effective reduction in injuries and deaths.

(3)  Other alternatives the Commission considered include: adopting the Canadian standard for window covering cords, which would increase the costs to comply with the rule with no additional benefits, and adopting a draft revised version of the voluntary standard, which the Commission staff has determined is inadequate to address the risk of injury because the revised standard would still allow accessible cords to remain available for sale to consumers.

(4)  The Commission also considered setting a later effective date.  Based on the record before the Commission, including the severity of the strangulation hazard to children, the advanced state of compliance with similar requirements for stock window coverings in the United States and for stock and custom window coverings in Canada, and the long pendency of this proceeding, the final rule provides an effective date that is 180 days after publication of the final rule, as proposed.

(f)  Unreasonable risk.

(1)  Based on CPSC's Injury Cost Model, about 185 medically treated nonfatal injuries are predicted to have occurred annually from 2009 through 2020, involving children eight years and younger.  Based on a review of National Center for Health Statistics (NCHS data) and a separate study of child strangulations, a minimum of 8.1 fatal strangulations related to window covering cords occurred per year in the United States among children under five years old from 2009-2020.  Based on reviews of CPSC databases, we found reports of a total of 209 reported fatal and nonfatal strangulations on window coverings among children eight years and younger, from January 2009 through December 2021.  Nearly 48 percent were fatal incident reports (100 of 209), while the remaining were near-miss nonfatal incidents.

(2)  The Commission estimates that the rule would result in aggregate benefits of about $31.6 million annually due to a reduction in deaths and injuries caused by custom window coverings.  Of the potential modifications for which staff was able

to estimate the potential cost, the lowest costs were about $2.18 per unit, although costs for some units are likely $0. Effective performance requirements for operating cords on window coverings are well known and already utilized for lower-priced stock window coverings. Technologies to address hazardous window covering cords are also known and utilized on stock products.

(3) The determination of whether a consumer product safety rule is reasonably necessary to reduce an unreasonable risk of injury involves balancing the degree and nature of the risk of injury addressed by the rule against the probable effect of the rule on the utility, cost, or availability of the product. The Commission does not expect the final rule to have a substantial effect on the utility or availability of custom window coverings. The rule may impact the cost of custom window coverings, but consumers already pay more for custom window coverings, and are likely willing to pay more for safer products.

(4) ANSI/WCMA-2018 eliminated the strangulation hazard on stock window coverings, which did not negatively impact sales of stock products; sales increased and cordless technologies became well-developed. The final rule will extend the requirements for stock products to custom window coverings. The Commission expects that the custom window covering market will absorb this cost, just as seen in the stock window covering market. This fact is also observed in the Canadian window covering market after Canada implemented a rule that eliminates hazardous cords on all window covering products. Staff identified no evidence from the Canadian market of a significant reduction in consumer choice as a result of their rule. Rather, the Canadian market has reacted with cost-effective substitutes and redesigned products.

(5) Weighing the possibility of increased costs for custom window coverings with the continuing deaths and injuries to young children, the Commission concludes that custom window coverings with hazardous operating cords pose an unreasonable risk of injury and death and finds that the final rule is reasonably necessary to reduce that unreasonable risk of injury and death.

(6) The Commission also finds that an effective date of 180 days after publication is reasonably necessary to address the unreasonable risk of strangulation from operating cords on custom window coverings. Section 9(g)(1) of the CPSA (15 U.S.C. 2058(g)(1)) sets a presumptive maximum effective date of 180 days after publication of the rule. To extend this period, the Commission must find good cause that doing so is within the public interest. When balancing the risk of severe harm and death to young children over the entire service life of noncompliant window coverings, against the possibility that some styles of custom window coverings may

be less available during a transition period and stock products or other custom styles might need to be used instead, the Commission finds that the public interest is better served by protecting the safety of children and families.

(g) Public interest. The final rule is intended to address an unreasonable risk of injury and death posed by hazardous operating cords on custom window coverings. Adherence to the requirements of the final rule will significantly reduce or eliminate a hidden hazard, strangulation deaths and injuries to children 8 years old and younger, without major disruption to industry or consumers; thus, the Commission finds that promulgation of the rule is in the public interest.

(h) Voluntary standards. The Commission is aware of one national voluntary standard, ANSI/WCMA A100.1 – 2018, as well as European, Australian, and Canadian standards. Among these, the Commission considers the Canadian standard to be the most stringent because it applies to all window coverings. ANSI/WCMA A100.1 – 2018 contains adequate performance requirements to address the risk of strangulation on inner cords for both stock and custom window coverings and contains adequate requirements to address the risk of injury on operating cords for stock products. The Commission also finds that custom window coverings substantially comply with the voluntary standard. However, the Commission finds that operating cord requirements for custom window coverings in ANSI/WCMA A100.1 – 2018 are inadequate to address the risk of injury, because the voluntary standard allows accessible and hazardous operating cords to be present on custom products. Thus, the Commission finds that compliance with an existing voluntary standard is not likely to result in the elimination or adequate reduction of the risk of injury presented by custom window coverings.

(i) Relationship of benefits to costs.

(1) The aggregate benefits of the rule are conservatively estimated to be about $23 million annually with the base value of statistical life (VSL); and the lowest cost of the rule is estimated to be about $54.4 million annually. Recent studies suggest that the VSL for children could be higher than that for adults. In other words, consumers might be willing to pay more to reduce the risk of premature death of children than to reduce the risk of premature death of adults. A review of the literature conducted for the CPSC suggested that the VSL for children could exceed that of adults by a factor of 1.2 to 3, with a midpoint of around 2 (Industrial Economics, Incorporated (IEc), 2018). "Memorandum to CPSC: Valuing Reductions in Fatal Risks to Children." Cambridge, MA (available at: https://www.cpsc.gov/s3fs-public/VSL_Children_Report_FINAL_20180103.pdf). The Commission received positive comment on increasing the VSL for children by a factor of 3. Staff provided

a sensitivity analysis for the final rule demonstrating how the ratio of costs and benefits change based on several variables, including a higher VSL for children. When staff increased the VSL by a factor of 3 for children (value of $31.5 million), the benefits of the rule exceed costs by approximately $14.3 million.

(2)  Staff's benefits and costs analysis also highlights unquantified benefits regarding the emotional distress of caregivers that could also be reduced by the final rule. This benefit is not directly accounted for in the primary VSL estimate of $10.5 million. The value of the shock or perceived guilt related to a caregiver's inattentiveness could be significant, as it could result in large reductions to physical wellbeing or income loss.

(3)  To determine how the final rule impacts consumers, staff converted costs and benefits of the rule into a calculated net cost per household, based on the data point that the average detached, single-family household has 12 window coverings. This analysis translates into a net cost of the final rule of $1.97 for metal or vinyl horizontal blinds. Using the assumption of 12 window coverings per household, this equates to a net cost of the rule (above the benefits provided) of $23.67 per household every time a household updates their custom window coverings, about once every 10 years. For metal or vinyl horizontal blinds, $23.67 is slightly more than 5 percent of the total cost of $448.32 that a household would spend to update their window coverings.

(4)  We note that economies of scale associated with the voluntary standard for stock product operating cords, and the Canadian standard, may have reduced costs associated with cordless components since Commission staff developed the bases for their cost estimates as early as 2016. Additionally, custom window coverings have a longer product life, which increases the benefit of improving safety beyond the levels Commission staff determined for both stock and customer window coverings.

(5)  Based on this analysis, the Commission finds that the benefits expected from the rule bear a reasonable relationship to the anticipated costs of the rule.

(j)  Least burdensome requirement that would adequately reduce the risk of injury.

(1)  The Commission considered less-burdensome alternatives to the final rule, detailed in paragraph (e) of this section, but finds that none of these alternatives would adequately reduce the risk of injury.

(2)  The Commission considered relying on voluntary recalls, compliance with the voluntary standard, and education campaigns, rather than issuing a mandatory

standard. These alternatives would have minimal costs but would be unlikely to reduce the risk of injury from custom window coverings that contain hazardous cords.

(3) The Commission considered issuing a standard that applies only to certain types of window coverings such as vertical blinds. This would impose lower costs on manufacturers but is unlikely to adequately reduce the risk of injury because it would only address incidents associated with those types. Based on the custom product incident data, only 8.3 percent of the incidents involved vertical blinds and 22.2 percent involved faux wood/wood blinds. The Commission considered adopting the Canadian standard for window covering cords, which would increase the costs to comply with the rule with no additional benefits and/or providing a longer effective date. And the Commission considered adopting a 2022 draft revision of the voluntary standard but finds the requirements in the standard inadequate to address the risk of injury.