IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

WINDOW COVERING MANUFACTURERS ASSOCIATION,

Petitioner,

v.

UNITED STATES CONSUMER PRODUCT SAFETY COMMISSION,

Respondent.

On Petition For Review of a Final Rule of the
United States Consumer Product Safety Commission

**FINAL REPLY BRIEF OF PETITIONER
WINDOW COVERING MANUFACTURERS ASSOCIATION**

Avi M. Kupfer
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600

Wajdi C. Mallat
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500
*Licensed only in Utah;
New York admission pending*.

Nicole A. Saharsky
Erika Z. Jones
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
(202) 263-3000
nsaharsky@mayerbrown.com

*Counsel for Petitioner Window Covering Manufacturers Association*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

GLOSSARY ..................................................................................... vi

INTRODUCTION AND SUMMARY OF ARGUMENT ..................................... 1

ARGUMENT .................................................................................... 3

I.  THE CPSC DID NOT COMPLY WITH THE CPSA OR THE APA .......... 3

    A.  The CPSC Did Not Meet The CPSA's Requirements For
        Promulgating A Mandatory Rule ...................................... 5

        1.  The CPSC did not assess the degree of risk or establish
            an unreasonable risk under the voluntary standard ................... 5

        2.  The CPSC did not conduct a rigorous analysis showing a
            reasonable relationship between the Rule's costs and
            benefits ........................................................................ 8

            a.  The CPSC vastly underestimated the Rule's costs .......... 9

            b.  The CPSC vastly overestimated the Rule's benefits ..... 13

    B.  The CPSC's Finding That The Effective Date Is Reasonably
        Necessary Lacks Any Record Support And Contravenes Its
        Staff's Analysis .......................................................... 15

    C.  The CPSC Evaded Basic Notice-And-Comment Procedures ........... 19

II.  THE CPSC'S STRUCTURE IS UNCONSTITUTIONAL ......................... 22

    A.  Serving On A Multi-Member Commission Does Not Cure The
        Separation-Of-Powers Problem Here ................................ 22

    B.  The Appropriate Remedy Is Vacatur ............................... 26

CONCLUSION ................................................................................. 28

CERTIFICATE OF COMPLIANCE ....................................................... 29

CERTIFICATE OF SERVICE .............................................................. 29

# TABLE OF AUTHORITIES

**Cases**                                                                                  **Page(s)**

*Am. Radio Relay League, Inc. v. FCC,*
   524 F.3d 227 (D.C. Cir. 2008) .......................................................................21

*Am. Wildlands v. Kempthorne,*
   530 F.3d 991 (D.C. Cir. 2008) .......................................................................22

*Aqua Slide 'N' Dive Corp. v. CPSC,*
   569 F.2d 831 (5th Cir. 1978) ..........................................................................4

*ASG Indus., Inc. v. CPSC,*
   593 F.2d 1323 (D.C. Cir. 1979) ...................................................................4, 5

*Ass'n of Data Processing Serv. Orgs. v. Bd. of Governors of Fed.*
   *Reserve Sys.,*
   745 F.2d 677 (D.C. Cir. 1984) ........................................................................4

*Calcutt v. FDIC,*
   37 F.4th 293 (6th Cir. 2022) .....................................................................27, 28

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB,*
   51 F.4th 616 (5th Cir. 2022) .....................................................................27, 28

*Collins v. Yellen,*
   141 S. Ct. 1761 (2021) .........................................................................25, 26, 27

*CSX Transp., Inc. v. STB,*
   584 F.3d 1076 (D.C. Cir. 2009) .................................................................19, 21

*Daimler Trucks N. Am. LLC v. EPA,*
   737 F.3d 95 (D.C. Cir. 2013) ....................................................................20, 21

*Finnbin, LLC v. CPSC,*
   45 F.4th 127 (D.C. Cir. 2022) .........................................................................8

*Forester v. CPSC,*
   559 F.2d 774 (D.C. Cir. 1977) ..................................................................3, 4, 9

*Free Enter. Fund v. PCAOB,*
   561 U.S. 477 (2010) .........................................................................24, 25, 26, 27

**Cases (continued)**                                              **Page(s)**

*Humphrey's Executor v. United States*,
   295 U.S. 602 (1935)........................................................23, 24, 25

*Kidd v. TSA*,
   723 F. App'x 5 (D.C. Cir. 2018)........................................22

*Melcher v. FCC*,
   134 F.3d 1143 (D.C. Cir. 1998)........................................12

*NYC C.L.A.S.H., Inc. v. Fudge*,
   47 F.4th 757 (D.C. Cir. 2022)..........................................18

*Owner-Operator Indep. Drivers Ass'n v. FMCSA*,
   494 F.3d 188 (D.C. Cir. 2007)..........................................20

*Seila Law LLC v. CFPB*,
   140 S. Ct. 2183 (2020)...........................................23, 24, 25, 26, 27

*Toy Mfrs. of Am., Inc. v. CPSC*,
   630 F.2d 70 (2d Cir. 1980) ..............................................4

*Zen Magnets, LLC v. CPSC*,
   841 F.3d 1141 (10th Cir. 2016) ....................................8, 15

**Statutes and Regulations**

Administrative Procedure Act,
   5 U.S.C. § 551 *et seq.*

      § 553 ...........................................................................4

      § 553(b)......................................................................19

      § 553(c).......................................................................19

      § 706 ...........................................................................4

Consumer Product Safety Act,
   15 U.S.C. § 2051 *et seq.*

      § 2058 .........................................................................4

**Statutes and Regulations (continued)**                              **Page(s)**

Consumer Product Safety Act,
   15 U.S.C. § 2051 *et seq.*

   § 2058(a)(2) ................................................................6

   § 2058(c)(4) ................................................................6

   § 2058(d)(2) ..............................................................19

   § 2058(f)(1) ...........................................................3, 20

   § 2058(f)(1)(A) ...........................................................5

   § 2058(f)(1)(B) ...............................................8, 11, 21

   § 2058(f)(1)(C) ...............................................8, 11, 21

   § 2058(f)(1)(D) ....................................................8, 13

   § 2058(f)(2)(B) ...........................................................6

   § 2058(f)(3) .......................................................3, 16, 20

   § 2058(f)(3)(A) .......................................5, 15, 16, 17

   § 2058(f)(3)(E) .......................................................8, 9

   § 2058(f)(3)(F) .......................................................5, 6

   § 2058(g)(1) ..............................................................15

   § 2060 .......................................................................4

   § 2060(b) ..................................................................22

   § 2060(c) ...........................................................3, 9, 16

16 C.F.R. § 1260.2(b) ...........................................12, 18

16 C.F.R. § 1260.2(c) .................................................18

16 C.F.R. § 1260.2(d) ................................................18

**Statutes and Regulations (continued)**                                    **Page(s)**

16 C.F.R. § 1260.4(c)................................................................10

16 C.F.R. § 1260.4(d)(4)..........................................................10

16 C.F.R. § 1260.4(e)...............................................................19

16 C.F.R. § 1260.4(e)(3).......................................................6, 20

16 C.F.R. § 1260.4(h) .................................................................5

16 C.F.R. § 1260.4(i)(2)............................................................15

16 C.F.R. § 1260.4(j)(3).............................................................6

**Other Authorities**

87 Fed. Reg. 73,144 (Nov. 28, 2022)......................................7, 14, 19, 20

Fed. Reserve Bank of St. Louis, *Inflation, consumer prices for the United States* (May 3, 2022)..............................................13

H.R. Rep. No. 92-1153 (1972)....................................................3

S. Rep. No. 92-749 (1972) ..........................................................3

**GLOSSARY**

APA                    Administrative Procedure Act

CFPB                   Consumer Financial Protection Bureau

CPSA                   Consumer Product Safety Act

CPSC                   Consumer Product Safety Commission

FHFA                   Federal Housing Finance Agency

FOIA                   Freedom of Information Act

SBA                    Small Business Administration

WCMA                   Window Covering Manufacturers Association

## INTRODUCTION AND SUMMARY OF ARGUMENT

The voluntary standard is working. The window coverings industry eliminated free-hanging operating cords from stock products in 2018 and from custom products in 2022. Since the industry first adopted the voluntary standard in 1996, it has consistently reduced the risk of harm from window covering cords, to the point where incidents very rarely occur.

Yet the CPSC tries to paint a picture of a recalcitrant industry that does not care about child safety. Nothing could be further from the truth. The industry has been leading the way in improving safety for decades, working collaboratively with consumer groups and the CPSC.

Recently, the CPSC's Commissioners have decided that they would rather make mandatory rules than partner with industry. They pushed forward with the Rule, effective in six months, against their own staff's recommendations. Not only is that approach ill-advised, but it is directly contrary to the CPSA.

The CPSA reflects Congress's strong preference for voluntary standards crafted jointly by businesses and regulators. Rather than giving the CPSC carte blanche to regulate, it permits the CPSC to adopt a mandatory rule only when the CPSC makes several specific, evidence-based findings. The CPSC must establish that the voluntary standard (and any other less burdensome alternative) does not adequately reduce risk; it must support its rule through a rigorous cost-benefit analysis;

and it must separately justify the rule's effective date. All of those findings are subject to a heightened standard of review.

Here, the CPSC did not come close to satisfying its burdens under the CPSA and did not even follow the basic notice-and-comment procedures required by the APA. The CPSC attempts to justify the Rule using far-fetched hypotheticals and old data that does not account for the recent voluntary standard revisions. The reality is that the risk of injury is very low and continues to decrease, because the 2018 and 2022 revisions eliminated free-hanging operating cords and placed significant restrictions on any remaining cords (such as requiring cords to be retractable or attached to a wall and kept under tension). The CPSC did not assess the degree of risk under the voluntary standard at all, and thus could not show that the Rule was the least burdensome way to reduce that risk.

The CPSC's own cost-benefit analysis shows that the Rule's costs greatly exceed its benefits, even with the agency greatly underestimating costs and overestimating benefits. The six-month effective date is completely unjustified (the CPSC did not even attempt to show it is necessary to reduce risks) and unworkable (the staff agreed that the industry cannot comply in that timeframe). The CPSC also brushed aside the concerns raised by the SBA about the effects of the rule on small businesses. And the CPSC sandbagged the industry while promulgating the Rule, making significant substantive changes in the final Rule, when the industry had no

opportunity to respond. Worst of all, the CPSC wielded this immense power to devastate the industry without sufficient Presidential oversight.

The CPSC's position boils down to an assertion that it has broad discretion to adopt a mandatory rule despite successful industry self-regulation. But Congress made a contrary judgment in the CPSA, and the agency is bound to follow the rules Congress set out. It stubbornly refuses to do so. The Court should vacate the Rule.

## ARGUMENT

## I. THE CPSC DID NOT COMPLY WITH THE CPSA OR THE APA

This is not just another case of routine agency rulemaking subject to deferential arbitrary-and-capricious review. The CPSA sets a high bar for overriding an industry standard, requiring the agency to make particular findings and support them with record evidence. 15 U.S.C. § 2058(f)(1), (3); *see* Chamber of Commerce Br. 6-15; NAM Br. 4-9. All of those findings are subject to a heightened standard of review. 15 U.S.C. § 2060(c); *see* WCMA Br. 21-22. Congress wanted a "stricter standard of review" than "usual." H.R. Rep. No. 92-1153, at 26, 38 (1972); *see* S. Rep. No. 92-749, at 35 (1972) (similar).

The CPSC is flat wrong to say (Br. 20) that "no case" supports a heightened review standard. This Court and other courts of appeals have recognized that the CPSA's "review provision[]" is "more strict" than the arbitrary-and-capricious standard. *Forester v. CPSC*, 559 F.2d 774, 789 n.22 (D.C. Cir. 1977) ("[R]ulemaking

authority under the CPSA is governed by 15 U.S.C. §§ 2058 and 2060, which establish requirements in addition to," and "more strict" than, "those found in 5 U.S.C. §§ 553 and 706."); *see Toy Mfrs. of Am., Inc. v. CPSC*, 630 F.2d 70, 75 n.8 (2d Cir. 1980) ("When the CPSC utilizes its rulemaking authority pursuant to the CPSA . . . 15 U.S.C. § 2058 and § 2060 control, and these sections establish procedural requirements and review standards that are stricter than" arbitrary-and-capricious review.); *Aqua Slide 'N' Dive Corp. v. CPSC*, 569 F.2d 831, 837 (5th Cir. 1978) ("Congress put the substantial evidence test in the [CPSA] because it wanted the courts to scrutinize the Commission's actions more closely than an 'arbitrary and capricious' standard would allow."); *see also ASG Indus., Inc. v. CPSC*, 593 F.2d 1323, 1336 n.58 (D.C. Cir. 1979) (favorably citing *Aqua Slide*'s discussion of the standard).

The CPSC's suggestion that *Forester* did not address heightened CPSA review is incorrect. The "interesting question" the Court declined to answer (CPSC Br. 20) was whether the CPSC could "evade the more strict procedural and review provisions of the CPSA" by promulgating a rule under a separate statute – not whether the CPSA's review standard is more strict than arbitrary-and-capricious review. *See* 559 F.2d at 789 n.22. *Association of Data Processing Service Organizations, Inc. v. Board of Governors of the Federal Reserve System*, 745 F.2d 677, 685 (D.C. Cir. 1984) (cited in CPSC Br. 20), is no help to the CPSC either, because it cited the

CPSA as an example of a statute where Congress intended substantial-evidence review that is "different" from, and more demanding than, "the arbitrary or capricious test."

The demanding standard of review dooms the Rule. But even under ordinary arbitrary-and-capricious review, the Rule easily would fail.

### A.     The CPSC Did Not Meet The CPSA's Requirements For Promulgating A Mandatory Rule

#### 1.     The CPSC did not assess the degree of risk or establish an unreasonable risk under the voluntary standard

The CPSC may not promulgate a mandatory rule unless it analyzes the "degree . . . of the risk of injury" under the voluntary standard and establishes that the mandatory rule is the "least burdensome requirement" to address an "unreasonable risk of injury associated with [the] product." 15 U.S.C. § 2058(f)(1)(A), (f)(3)(A), (F). Here, the voluntary standard has been in place since 1996, and all agree that the industry substantially complies. 16 C.F.R. § 1260.4(h).

The CPSC's approach is to cite the risk of injury in the abstract in an attempt to justify the Rule, without accounting for the effects of the 2018 and 2022 voluntary standard revisions. The CPSC halfheartedly suggests (Br. 24) that it was only required to consider the 2018 revision, because the 2022 revision was not in effect when it promulgated the Rule. But as the CPSC acknowledges (Br. 25), it had to consider any "le[ss] burdensome requirement" that would "prevent[] or adequately

reduce[] the risk of injury," 15 U.S.C. § 2058(f)(3)(F), and the 2022 revision is such an alternative. Indeed, the CPSA repeatedly refers to the CPSC's obligation to consider alternatives. *Id.* § 2058(a)(2), (c)(4), (f)(2)(B). The CPSC actually *did* consider the 2022 revision (albeit in cursory, last-minute analysis, 16 C.F.R. § 1260.4(e)(3), (j)(3)), and thus cannot credibly claim it is irrelevant.

In addition to five prior revisions, the 2018 and 2022 revisions imposed requirements that substantially improved product safety. They eliminated the traditional "cord lock" system, which carries the most significant safety risk: The 2018 revision eliminated free-hanging cords in the most common (stock) products, and the 2022 revision eliminated them for the less common, more complex custom products. WCMA Br. 8-10. Under the 2022 revision, exposed cords are allowed only if they are eight inches or shorter, retractable (in a retractable lift system), or attached to a wall in a loop and under tension (in a continuous loop system). JA655. In both 2018 and 2022, the industry also imposed new requirements on product design, testing, and warning labels for custom products. JA655, JA1328-38.

The CPSC simply did not assess the risks in light of those alternatives. It repeatedly asserts (Br. 1, 8, 12-13, 16-17, 27; *see* Public Citizen Br. 6-18) that the most serious risk from custom window coverings is free-hanging cords – but glosses over the fact that the industry already voluntarily banned them. JA655. The CPSC

then deems (Br. 22) the 2018 and 2022 revisions too "permissive" and "[in]effective," without ever determining the degree of risk remaining under the revisions or the least burdensome way to address that risk.

The CPSC's supposed risk analysis is a mish mash of old data, hypotheticals, and speculation. The CPSC relies (Br. 11-12) on incident reports that by and large predated the 2018 and 2022 revisions to the voluntary standard. But annual reported incidents have declined 400% since 2009, and the CPSC admits (JA643) that the 2018 and 2022 revisions will reduce them even further. *See* WCMA Br. 26-27. Also, the CPSC has refused to provide the complete incident reports to WCMA. Instead, it waited until this litigation, then provided a chart summarizing them which does not provide the information needed to determine whether any incident involved a window covering that complied with the new requirements. *Id.* at 47-48; JA1488-504; *see* JA749-50.

Moreover, there is no documented risk at all from some products. Although the CPSC asserts (Br. 17, 25-26) that retractable lift systems have "dangerous features" that "could" harm children, the CPSC has acknowledged that a retractable system has *never* been implicated in a safety incident despite over 25 years of use, 87 Fed. Reg. 73,144, 73,178 (Nov. 28, 2022), and that any such incident is "unlikely," JA1381. Further, the industry has adopted design requirements to make these systems even safer. WCMA Br. 27-28. The CPSC likewise has not identified

*any* incidents associated with custom products in commercial settings, yet it regulated them anyway.  *Id.* at 28-29.

The CPSC's meager effort here does not come close to satisfying its burden to assess risk and choose the least burdensome alternative.  *See Zen Magnets, LLC v. CPSC*, 841 F.3d 1141, 1146 (10th Cir. 2016) (invalidating regulation when CPSC failed to account for new measures that reduced risk).  If accepted, the CPSC's approach would turn the CPSA on its head by allowing the agency to regulate first and ask questions later, rather than the other way around.

### 2. The CPSC did not conduct a rigorous analysis showing a reasonable relationship between the Rule's costs and benefits

The CPSC was required to conduct a "rigorous . . . analysis," *Finnbin, LLC v. CPSC*, 45 F.4th 127, 135 (D.C. Cir. 2022), demonstrating a "reasonable relationship" between the Rule's costs and benefits, 15 U.S.C. § 2058(f)(3)(E).  In addition, the agency had to make specific findings on the "approximate number of consumer products" affected; the "probable effect" of the Rule on the "utility, cost, or availability" of those products; and "any means of achieving [its] objective . . . while minimizing . . . disruption or dislocation of manufacturing and other commercial practices."  *Id.* § 2058(f)(1)(B)-(D).

Contrary to the agency's assertion (Br. 32-33), the cost-benefit analysis and related findings are not subject to "highly deferential" review.  Congress specifically

required the agency to find "that the benefits expected from the rule bear a reasonable relationship to its costs," 15 U.S.C. § 2058(f)(3)(E), and made that finding subject to heightened substantial-evidence review, *id.* § 2060(c). None of the decisions the CPSC cites about deferential review (Br. 32-33) involved the CPSA.

The CPSC's own analysis shows that the Rule's costs greatly exceed its benefits. *See* WCMA Br. 29-30. The CPSC points (Br. 33) to a single scenario where benefits outweighed costs. But that ignores the 29 other scenarios where costs exceeded benefits, often by massive amounts. *Forester*, 559 F.2d at 789 (benefits must "offset[] the harm the regulation . . . imposes"). Further, the only way the CPSC could get the one scenario to support its desired result was by basing costs on lower-cost stock products, rather than the higher-cost custom products regulated by the Rule. *See* WCMA Br. 29. And even a cursory analysis of the agency's cost and benefit calculations reveals many obvious flaws.

### a. The CPSC vastly underestimated the Rule's costs

WCMA identified three fundamental flaws in how the agency estimated costs. Br. 30-35. The CPSC does not meaningfully respond to any of them.

First, the CPSC estimated the cost increase per custom product based on relatively inexpensive stock products. WCMA Br. 30-32. The CPSC's response (Br. 37-38) is that it created two cost models: a low-end estimate based on stock products and a high-end estimate based on "other data." But both models started with the

9

same stock product prices, JA572-73 (identical figures in Tables 9 and 10), then used different methods to estimate the percentage increase in those prices, *compare* JA570-72 *with* JA572-73. The CPSC should have started with custom product prices, because the Rule regulates only custom products, 16 C.F.R. § 1260.4(c), and it is undisputed that custom products usually are much "higher price[d]" because they are generally larger and more complex than stock products, *id.* § 1260.4(d)(4); *see* WCMA Br. 31. Many commenters made that point to the CPSC. *See, e.g.*, JA718, JA735, JA850.

Because the CPSC relied only on stock products, it estimated a net cost of $24 to replace 12 custom products in a household, which is obviously too low. JA720-21. The CPSC's only response (Br. 36-37) is that WCMA confused net and total prices. It did not – WCMA recognizes that the $24 is a net amount, Br. 30-31 – but anyway, the CPSC's response is just a distraction. The important point is that the CPSC's approach is fundamentally flawed because it focused on stock rather than custom products. The CPSC simply has no justification for that.

Second, the CPSC did not account for cost impacts on commercial products, even though they are 25% of the market. WCMA Br. 31-32. The CPSC does not dispute that. Instead, it tries to shift the blame, suggesting (Br. 38) that it was

WCMA's job to determine the number of commercial products.[1]  That is wrong.

When the CPSC proposed the Rule, many commenters, including WCMA, told the agency that it was overlooking impacts to commercial products, which represent a significant percentage of revenue for many manufacturers, dealers, installers, and contractors.  *E.g.*, JA712, JA720-23, JA760, JA767.  It was the agency's job to account for costs associated with custom products.  Instead, the CPSC ignored the comments.  It therefore failed to determine the "approximate number of consumer products" affected in the commercial sector or the "probable effect" of the Rule on them.  15 U.S.C. § 2058(f)(1)(B)-(C).

The CPSC suggests (Br. 38-39) that it made up for the failure to include commercial products because in one of its 30 scenarios, it bumped up the number of residential products by 20%.  *See* JA585.  But that still underestimated the market size by 10% (commercial is approximately 25% of the custom market), and it underestimated the cost to create compliant products, because commercial products are more complex and more expensive than residential products.  *See* WCMA Br. 31-32.

---

[1] The CPSC notes (Br. 38) that WCMA provided a 2015 estimate of the number of window coverings that was lower than the CPSC's 2020 estimate.  Br. 38 (citing JA1382-94).  Of course it was – the U.S. population has grown significantly since then – but it does not matter, because neither estimate considered commercial products.

Third, the CPSC's estimated $14.7 million in industrywide compliance costs is far too low for two reasons. It assumes that manufacturers will develop a single operating system to comply with the Rule across all product lines, and it ignores many significant expenses associated with developing and selling Rule-compliant products. WCMA Br. 32-34.

The CPSC's estimate is based on the creation of one rigid shroud which it assumes will work across all product lines. JA535. That is wrong from the start, because a rigid shroud is used only for continuous cord loop systems. 16 C.F.R. § 1260.2(b). The CPSC completely failed to estimate the costs of compliance for retractable lift systems. Further, as many commenters explained, a single shroud will not work across all continuous loop systems. *See* WCMA Br. 33. The CPSC's response (Br. 41-43) is that manufacturers theoretically could comply by using only one shroud. JA538. But as the CPSC elsewhere admits (Br. 42), its job was to estimate costs based on how manufacturers actually will comply with the Rule in the real world – *i.e.*, their "future market behavior." *Melcher v. FCC*, 134 F.3d 1143, 1152 (D.C. Cir. 1998).

WCMA identified significant categories of costs that the CPSC omitted from its estimate. Br. 33-34. It also explained that the Rule will cause the industry massive financial losses, forcing some companies to lay off employees and others to go out of business. *Id.* at 15, 33-34. The CPSC tries to dismiss those concerns (Br. 41)

by suggesting that they only appeared in stay declarations filed in this Court. That is wrong: Manufacturers made the same points in their comments on the proposed Rule, and the CPSC staff found those concerns "credible." WCMA Br. 33; JA495. The SBA also expressed great concern about the effect of the Rule on small businesses, and the CPSC just brushed aside those considered views of another government agency. WCMA Br. 38-39.

Besides, the CPSC cannot blame the industry for not providing specific enough comments on compliance costs, because the agency did not even provide that estimate until the final Rule, when the industry had no chance to weigh in. *See* WCMA Br. 45-46. The CPSC was supposed to be "minimizing . . . disruption or dislocation of manufacturing and other commercial practices," 15 U.S.C. § 2058(f)(1)(D), but instead it gave the industry the back of the hand.

### b. The CPSC vastly overestimated the Rule's benefits

The CPSC likewise provides no good explanation for the errors that inflated its benefits estimate.

First, the CPSC admits that it estimated *benefits* in 2021 dollars and *costs* in 2020 dollars, Br. 43 n.2, thereby inflating benefits by almost 5%, Fed. Reserve Bank of St. Louis, *Inflation, consumer prices for the United States* (May 3, 2022), https://fred.stlouisfed.org/data/FPCPITOTLZGUSA.txt. The CPSC asserts (Br. 43

n.2) that its error "did not meaningfully affect" its analysis, but it provides no record support for that.

Second, the CPSC did not reliably estimate the number of incidents the Rule would prevent. Custom products comprise only 20% of the window coverings market, yet the CPSC asserted that they are responsible for 44-54% of incidents.[2] The CPSC says it had a methodology for reaching that number, but that methodology still does not explain the mismatch. WCMA Br. 34. There is no justification for assuming that custom products would cause injuries at four times the rate of stock products.

Third, the CPSC assumed that injuries will occur in the future at the same rate they occurred in 2002. WCMA Br. 34-35. That is a bad assumption: Since 2002, the voluntary standard has been updated six times, JA645, JA739, and incidents have sharply declined (more than 400%) due to safety improvements, 87 Fed. Reg. at 73,152 tbl.2a.[3] Although the CPSC acknowledges that the 2018 and 2022 revisions have eliminated many safety risks, *id.* at 73,154; JA643, it continues to rely on old

---

[2] The Rule's preamble states that "CPSC staff found that . . . custom products account for approximately 44 percent of unit sales." 87 Fed. Reg. at 73,149 (quoted in CPSC Br. 8). That 44% is a typo; the preamble elsewhere explains that "the share of custom products sold/in use" is 20 percent, *id.* & tbl.1, and the staff used that figure in its analysis, JA574.

[3] The CPSC claims (Br. 35) "reporting delays," but the downward trend is apparent on the face of the CPSC's own data, even when omitting years for which its "data collection is ongoing." 87 Fed. Reg. at 73,152 tbl.2a; *see* JA745-47.

data that does not account for those revisions. That is the same problem that led the Tenth Circuit to invalidate the rule in *Zen Magnets*. *See* 841 F.3d at 1149.

Finally, the CPSC argues (Br. 30-32) that the Rule's "unquantified benefits" "could be significant." 16 C.F.R. § 1260.4(i)(2). But the CPSC never claims that those benefits *are* significant or that they close the yawning cost-benefit gap here. The CPSC also disregarded "unquantified costs," such as employee layoffs, WCMA Br. 15, that cut against its finding. If the CPSC could justify a mandatory rule by asserting a mere possibility of unquantifiable benefits, then the statutory requirement that the agency show a reasonable relationship between costs and benefits would be meaningless.

### B. The CPSC's Finding That The Effective Date Is Reasonably Necessary Lacks Any Record Support And Contravenes Its Staff's Analysis

Although the CPSA includes a default six-month effective date, 15 U.S.C. § 2058(g)(1), it separately requires the agency to show the selected effective date is "reasonably necessary to" address an "unreasonable" injury risk, *id.* § 2058(f)(3)(A).

The CPSC primarily relies (Br. 50-53) on the default provision, claiming that a six-month effective date is presumptively "lawful." But that ignores the separate requirement that the CPSC find that "the rule (*including its effective date*) is reasonably necessary to eliminate or reduce an unreasonable risk of injury associated with

[a] product." 15 U.S.C. § 2058(f)(3)(A) (emphasis added). That is a threshold requirement: The agency "shall not promulgate a . . . rule," *id.* § 2058(f)(3), and a reviewing court "shall not" uphold the rule, unless the agency satisfies that specific requirement with "substantial evidence on the record taken as a whole," *id.* § 2060(c). The CPSC says (Br. 53) requiring compliance with that provision would "nulli[fy]" the default rule, but the two are easily reconcilable; the CPSC must find that its effective date is reasonably necessary to reduce risk as a threshold matter, then must provide a reasoned explanation if the date is later than six months.

The CPSC also argues (Br. 51) that the Court must be "highly deferential[]" to its chosen effective date. Again, that is wrong: Congress specifically provided that heightened substantial-evidence review, 15 U.S.C. § 2060(c), applies to the requirement of justifying the effective date as reasonably necessary, *id.* § 2058(f)(3)(A).

The CPSC barely defends its effective date on the merits. Its staff found that a six-month effective date would *not* meaningfully reduce injury risk because "non-compliant window coverings will take years to cycle out of use." JA495, JA590, JA604. In fact, the effective date could actually *increase* the injury risk because Rule-compliant products will be unavailable and consumers will continue to use older, less safe products. WCMA Br. 37. The CPSC has no response. For that

reason alone, the CPSC has not shown that the selected effective date is necessary to address an "unreasonable risk of injury." 15 U.S.C. § 2058(f)(3)(A).

The industry also explained that a six-month effective date would impose enormous costs. JA695, JA699-700, JA717-18, JA849-53. Indeed, the two largest manufacturers provided detailed comments explaining why they cannot develop Rule-compliant products on a six-month timeline. JA717-18, JA849-53. The CPSC staff found those concerns "credible" because commenters provided "specific examples" that "comport to what staff has determined about the industry's supply chain." JA495. The staff also found that a six-month effective date would be "very disruptive" and that a later effective date "would mitigate costs related to redesign/research and development." JA495, JA590, JA604. That is why the staff recommended later effective dates. WCMA Br. 36. So the CPSC is wrong to say (Br. 52) that a later effective date would not materially reduce costs to the industry.

The CPSC suggests (Br. 9, 31, 52, 54-55) that the industry can create compliant products quickly because manufacturers already comply with rules for stock products and Canadian products. As WCMA has explained (Br. 41), *cordless* solutions for stock products will not automatically transfer to larger, more complex custom products (many of which are too large to use cordless technologies). That is especially true for custom commercial products, which have additional design requirements. JA722. Further, manufacturers cannot rely on stock products to comply

with the Rule's requirements for *corded* custom operating systems, because those requirements do not apply to stock products (indeed, no corded stock products are allowed under the voluntary standard). *Compare* 16 C.F.R. § 1260.2(b)-(d), *with* JA654-55.

WCMA likewise has explained (Br. 39-40) that there are significant material differences between the Canadian and U.S. rules and that the record contains no evidence that any redesigned Canadian product complies with the U.S. Rule. The CPSC does not engage with those arguments, let alone identify substantial evidence in the record to refute them.

Instead, the CPSC tries to blame the commenters. It asserts that the comments were insufficiently "specific" and "credib[le]," Br. 52, and that commenters did not sufficiently explain "how the Canadian rule impacts compliance with [the CPSC's] rule," Br. 54. But the staff found the comments both "specific" and "credible," JA495, and the CPSC cites no record evidence to question those findings. The CPSC quotes its post-decisional letter denying WCMA's stay request, where it asserted that some comments "had clear credibility problems." Br. 52 (quoting JA100). That letter "was not before the agency when making its decision," *NYC C.L.A.S.H., Inc. v. Fudge*, 47 F.4th 757, 765 (D.C. Cir. 2022), and it never identifies any record evidence that supports its assertions (or even says which comments supposedly are not credible). Besides, the industry had no opportunity to address the appropriateness

of the CPSC's reliance on the Canadian rule, because the CPSC did not attempt to justify the effective date based on the Canadian rule until the final Rule, JA199, JA208, when the industry had no chance to respond, *see CSX Transp., Inc. v. STB*, 584 F.3d 1076, 1079 (D.C. Cir. 2009) (Court will not fault a party that "had no way to raise [an] argument until the [agency] issued its final rule.").

Finally, the CPSC has abandoned its unfounded argument that a six-month effective date is permitted because manufacturers were "aware of the likelihood of a rule" as of the date of the proposed Rule. 87 Fed. Reg. at 73,170, 73,177; *see* 16 C.F.R. § 1260.4(e); WCMA Br. 41-42.

### C. The CPSC Evaded Basic Notice-And-Comment Procedures

The CPSC blatantly disregarded the important procedural requirements that ensure fairness to the regulated industry. It withheld much of its analysis until the final Rule, publishing it only at the last minute when the industry could no longer comment. WCMA Br. 42-48. It did not address the 2022 revision until the final Rule, even though CPSC staff had been participating in that revision since May 2019. *Id.* at 9-10. And it changed its methodology and provided new justifications (such as reliance on the Canadian rule) in the final Rule. *Id.* at 40-41, 46. That violated both the APA's notice-and-comment requirements, 5 U.S.C. § 553(b)-(c), and the CPSA's heightened procedural requirements, 15 U.S.C. § 2058(d)(2); *see* NAM Br. 16-19.

The CPSC has no excuse for that sandbagging. It argues (Br. 43-44) that the final Rule was a "logical outgrowth" of the proposed Rule, and in fact is "functionally identical" to it. That is incorrect. For example, the proposed Rule did not preview that the CPSC would make findings about the 2022 standard or the cost of industry compliance, and those findings are part of the Rule. 15 U.S.C. § 2058(f)(1), (3). Further, the notice-and-comment requirement applies not only to the text of a rule but also to the "technical basis for a proposed rule" and the "critical factual material that is used to support the agency's position." *Owner-Operator Indep. Drivers Ass'n v. FMCSA*, 494 F.3d 188, 199 (D.C. Cir. 2007).

The CPSC suggests (Br. 44) that it was not required to address the 2022 revision, but it was. *See* WCMA Br. 8-9. The CPSC recognized that, because it addressed that revision, albeit with nothing more than a drive-by, unsubstantiated assertion that it is "inadequate to address the risk of injury." 16 C.F.R. § 1260.4(e)(3). The CPSC was supposed to focus its analysis on the voluntary standard. Instead, it treated the most recent revision as an afterthought, waiting to address it until the absolute last minute, when the industry could not respond.

The CPSC incorrectly asserts (Br. 44-46) that the changes to the cost-benefit analysis in the final Rule were not "major." The proposed Rule's cost-benefit analysis did not include compliance costs at all; the $14.7 million appeared only in the final Rule, 87 Fed. Reg. at 73,182, when the industry had no opportunity "to

offer . . . criticisms" of that estimate, *Daimler Trucks N. Am. LLC v. EPA*, 737 F.3d 95, 100 (D.C. Cir. 2013). The final Rule also used an entirely new methodology to calculate the number of window coverings in use, based on a study never made public during the rulemaking process. WCMA Br. 46. Both of those findings are important; the CPSC cannot adopt a mandatory rule without them. *See* 15 U.S.C. § 2058(f)(1)(B) (CPSC must find "the approximate number of consumer products . . . subject to such rule"), (C) (CPSC must determine "the probable effect of such rule upon the utility, cost, or availability of such products"). Yet the public (including the regulated community) learned of the "uncommented upon data and calculations," *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008), only when the "final rule revealed" them, *CSX Transp.*, 584 F.3d at 1081.

Finally, the CPSC has no excuse for refusing to provide the complete incident reports that it says support the Rule. WCMA Br. 47-48. Because the CPSC relied on them, those reports are part of the administrative record. *See* CPSC Br. 48. Yet the CPSC did not provide them during rulemaking, and it still refuses to provide them now. (It provided only about one-third of the reports, heavily redacted, in response to FOIA requests, and it never provided any of them to the public.) The CPSC responds (Br. 49-50) that it prepared a chart summarizing the reports. But the CPSC did not release the chart during *rulemaking*; instead, it provided the chart just days before the deadline for WCMA's brief. Besides, the chart's short "narrative . . .

descriptions" of the incident reports, CPSC Br. 50, contain no detail to determine whether the implicated products complied with the voluntary standard, *see* JA749-50.[4] The CPSC's refusal to provide the record material on which the Rule relies has fundamentally skewed the administrative process, preventing any comments during rulemaking, obstructing WCMA's litigation of this case, and impeding this Court's review of the Rule "based on the full administrative record." *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008).

These egregious process failures at a minimum warrant vacating the Rule to permit additional opportunity for comment under 15 U.S.C. § 2060(b). WCMA Br. 48. (The CPSC makes no argument against that relief.) But the Rule is so flawed from start to finish that the Court should vacate the Rule in its entirety.

## II. THE CPSC'S STRUCTURE IS UNCONSTITUTIONAL

### A. Serving On A Multi-Member Commission Does Not Cure The Separation-Of-Powers Problem Here

The Commissioners who promulgated the Rule wield immense executive power but are insulated from Presidential oversight by for-cause removal protection,

---

[4] The CPSC now claims a concern with disclosing personal information, Br. 50, but it easily could have redacted that limited information or provided the incident reports under seal, *see, e.g.*, *Kidd v. TSA*, 723 F. App'x 5 (D.C. Cir. 2018).

which violates the separation of powers. WCMA Br. 49-54. The CPSC's only response (Br. 55-63) is that being a member of a multi-member commission alleviates those separation-of-powers concerns. That is mistaken.

In *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2198 (2020), the Supreme Court set out the "general rule" that the President must have unrestricted power to remove executive officers. The Court recognized only "two exceptions" to that general rule, *id.*, and the CPSC relies on one of them. Contrary to the CPSC's contention (Br. 59; *see* CAC Br. 7-9), that exception does not apply broadly to all "multi-member regulatory agencies." Rather, it applies only to "multimember expert agencies *that do not wield substantial executive power*." *Seila Law*, 140 S. Ct. at 2199-2200 (emphasis added).

Here, CPSC Commissioners *do* wield "substantial executive power": They can regulate a broad swath of the economy and impose ruinous financial penalties on manufacturers. WCMA Br. 51-53. This Court should not "extend" the exception in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), to that "new situation," *Seila Law*, 140 S. Ct. at 2201, because it would swallow up the general rule by allowing executive officers to wield considerable power outside of the politically accountable chain of command that the Constitution requires.

The CPSC does not dispute WCMA's characterization of its authority. Instead, it states (Br. 61) that the 1935 Federal Trade Commission (the agency at issue

in *Humphrey's Executor*) "also had . . . substantial executive power." But the Supreme Court found it irrelevant that the 1935 Federal Trade Commission may have had "broader rulemaking, enforcement, and adjudicatory powers than the *Humphrey's* Court appreciated." *Seila Law*, 140 S. Ct. at 2200 n.4; *see id.* at 2198 n.2. "[W]hat matters is the set of powers the Court considered as the basis for its decision," *id.* at 2200 n.4, and the Court said those powers included "no part of the executive power," *id.* at 2198 (quoting *Humphrey's Executor*, 295 U.S. at 628).

The CPSC also focuses (Br. 60-61) on dicta from *Seila Law* that there "may be . . . alternative [statutory] responses" Congress can pursue to fix the defect in the Consumer Financial Protection Bureau's (CFPB) structure, including "converting the CFPB into a multimember agency." 140 S. Ct. at 2211. But the Court did not hold that a multi-member CFPB wielding substantial executive power would pass muster. It merely noted that Congress, unlike federal courts, potentially can revise statutes to correct constitutional defects.

The CPSC cites (Br. 61) two other Supreme Court decisions, but they are inapposite. *Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 483, 493 (2010), noted that the *Humphrey's Executor* exception applies to "independent agencies run by principal officers" in "certain circumstances." But the Court had no occasion to address what those "circumstances" might be. The only question before the Court was whether Congress could protect inferior officers with two layers of good-cause

removal.  *Id.* at 501.  Then ten years later, in *Seila Law*, the Court more fully explained that the *Humphrey's Executor* exception insulates from removal "expert agencies that do not wield substantial executive power."  140 S. Ct. at 2199-2200.  The Court held that the for-cause removal protection for the CFPB Director, who exercises considerable "executive power," does not fit within the *Humphrey's Executor* exception.  *Id.* at 2200.

The CPSC suggests (Br. 61) that *Collins v. Yellen*, 141 S. Ct. 1761 (2021), disavowed the holding in *Seila Law* about the limited scope of the *Humphrey's Executor* exception.  It did not.  *Collins* applied the rule of *Seila Law* to a similar factual situation – the Federal Housing Finance Agency (FHFA) Director, who wields substantial executive power and can only be removed for cause.  *Id.* at 1783-84.  The CPSC relies on *Collins*'s statement that "[c]ourts are not well-suited to weigh the relative importance of the regulatory and enforcement authority of disparate agencies."  *Id.* at 1785; *see also* CAC Br. 22-23.  But the Court was simply explaining that the case did not turn on fine-grained distinctions between the responsibilities of the CFPB and FHFA; rather, what mattered was that the agency head wielded substantial executive power.  The Court did not consider, much less repudiate, *Seila Law*'s holding on the *Humphrey's Executor* exception.

The CPSC also relies (Br. 60-61) on a footnote in *Collins*, 141 S. Ct. at 1785 n.19, which it mischaracterizes as allowing removal restrictions for all multi-member agencies. The footnote addressed the Sinking Fund Commission; it noted that the Commission had multiple members, then explained that it did not "operate[] beyond the President's control" because most members were "removable at will." *Id.* For that agency, the President could exercise "meaningful supervision." *Seila Law*, 140 S. Ct. at 2203. The President cannot do that for the CPSC.

At bottom, the CPSC has no explanation for how a multi-member commission cures the separation-of-powers concerns recognized in *Seila Law*. Neither single agency heads nor multi-member agency commissioners with removal protection are "elected by the people []or meaningfully controlled (through the threat of removal) by someone who is." *Seila Law*, 140 S. Ct. at 2203.

## B. The Appropriate Remedy Is Vacatur

WCMA is seeking prospective relief from the harms its members are suffering because of the Rule. Vacatur is the appropriate way to remedy that "here-and-now" injury. *Free Enter. Fund*, 561 U.S. at 513; *see* WCMA Br. 54-57. There is no other viable way to provide relief, because the CPSC will not reconsider the Rule. WCMA Br. 54-55.

The CPSC's only response (Br. 63-66) is to analogize to *Collins v. Yellen*, *supra*. In that case, the Supreme Court invalidated an unconstitutional removal restriction but held that the availability of *retrospective* relief turned on whether the restriction had "inflicted harm" on the challengers by altering the government's actions. 141 S. Ct. at 1789.

*Collins* is inapposite here, because WCMA seeks *prospective* relief. When a party seeks prospective relief based on a separation-of-powers violation, the Court repeatedly has rejected the view that the party has the burden to "show that the challenged act would not have been taken if the responsible official had been subject to the President's control." *Seila Law*, 140 S. Ct. at 2196; *see Free Enter. Fund*, 561 U.S. at 491 n.2, 513 (challenger "entitled to declaratory relief sufficient to ensure that" regulatory requirements would "be enforced only by a constitutional agency accountable to the Executive"). Instead, it is "sufficient" to show "that the challenger sustains injury" from the action. *Seila Law*, 140 S. Ct. at 2196 (quotation marks and alteration omitted). Nothing in *Collins* disturbed the Supreme Court holdings about the availability of prospective relief; *Collins* involved only retrospective relief.

The CPSC cites (Br. 65-66) court of appeals decisions that apply *Collins*, but most did not involve requests for prospective relief. The two decisions that did involve prospective relief represent an unwarranted expansion of *Collins*. WCMA Br.

56-57 (discussing *Calcutt v. FDIC*, 37 F.4th 293, 314-17 (6th Cir. 2022), and *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 631-32, 642-43 (5th Cir. 2022)). The Supreme Court has granted review in one of those cases, and a certiorari petition is pending in the other. CPSC Br. 65-66.

## CONCLUSION

The Court should vacate the Rule and remand to the CPSC. Alternatively, the Court should vacate and remand the Rule for additional comments.

Respectfully submitted,

*/s/ Nicole A. Saharsky*

| | |
|---|---|
| Avi M. Kupfer | Nicole A. Saharsky |
| MAYER BROWN LLP | Erika Z. Jones |
| 71 S. Wacker Drive | MAYER BROWN LLP |
| Chicago, IL 60606 | 1999 K Street, NW |
| (312) 782-0600 | Washington, DC 20006 |
| | (202) 263-3000 |
| Wajdi C. Mallat | nsaharsky@mayerbrown.com |
| MAYER BROWN LLP | |
| 1221 Avenue of the Americas | |
| New York, NY 10020 | |
| (212) 506-2500 | |
| *Licensed only in Utah;* | |
| *New York admission pending.* | |

*Counsel for Petitioner Window Covering Manufacturers Association*

Dated: March 23, 2023

## CERTIFICATE OF COMPLIANCE

This filing complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) because it contains 6491 words excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirement of Rule 32(a)(6) because it was prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman 14-point type for text and footnotes.

/s/ *Nicole A. Saharsky*
Nicole A. Saharsky

## CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2023, I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system which will serve all counsel of record.

/s/ *Nicole A. Saharsky*
Nicole A. Saharsky